THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF TITLE 11 OF THE UNITED STATES CODE, 11 U.S.C. §§ 101–1532 (THE "BANKRUPTCY CODE"). ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND PROVISIONS OF THE BANKRUPTCY CODE. ACCEPTANCES OR REJECTIONS OF THE DEBTORS' JOINT PLAN PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE AS IT MAY BE AMENDED AND SUPPLEMENTED FROM TIME TO TIME, (THE "PLAN") MAY NOT BE SOLICITED UNTIL THE DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF ILLINOIS (THE "BANKRUPTCY COURT") HAVING JURISDICTION OVER THE BELOW–CAPTIONED CHAPTER 11 CASES.

THE DISCLOSURE STATEMENT IS PROVIDED IN THE NATURE OF A SETTLEMENT PROPOSAL IN FURTHERANCE OF SETTLEMENT DISCUSSIONS. ACCORDINGLY, THE DISCLOSURE STATEMENT IS ENTITLED TO THE PROTECTIONS OF RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL INFORMATION AND INFORMATION EXCHANGED IN THE CONTEXT OF SETTLEMENT DISCUSSIONS. NOTHING IN THE DISCLOSURE STATEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR DEEMED BINDING ON THE DEBTORS.

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| | ) Chapter 11 |
| In re: | ) |
| | ) Case No. 08-10095 |
| KIMBALL HILL, INC., *et al.*,[1] | ) (Jointly Administered) |
| | ) |
| Debtors. | ) Hon. Susan Pierson Sonderby |

## DISCLOSURE STATEMENT FOR THE DEBTORS' JOINT PLAN PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE

KIRKLAND & ELLIS LLP
Paul M. Basta, Esq. (NY 2568046)
Catherine Peshkin, Esq. (NY MP 5400)
Citigroup Center
153 East 53rd Street
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

*Counsel to the Debtors*

Ray C. Schrock, Esq. (IL 6257005)
Lauren Hawkins, Esq. (IL 6288225)
Aon Center
200 East Randolph Drive
Chicago, Illinois 60601
Telephone: (312) 861-2000
Facsimile: (312) 861-2200

Dated: December 2, 2008

---

[1] The Debtors in these cases include: Kimball Hill, Inc.; 18th and Peoria, LLC; KH Financial Holding Company; KH Ingham Park South, LLC; KHH Texas Trading Company L.P.; Kimball Hill Far East Detroit, LLC; Kimball Hill Homes Austin, L.P.; Kimball Hill Homes California, Inc.; Kimball Hill Homes Dallas, L.P.; Kimball Hill Homes Florida, Inc.; Kimball Hill Homes Houston, L.P.; Kimball Hill Homes Illinois, LLC; Kimball Hill Homes Nevada, Inc.; Kimball Hill Homes Ohio, Inc.; Kimball Hill Homes Oregon, Inc.; Kimball Hill Homes Realty Florida, Inc.; Kimball Hill Homes San Antonio, L.P.; Kimball Hill Homes Texas Investments, L.L.C.; Kimball Hill Homes Texas Operations, L.L.C.; Kimball Hill Homes Texas, Inc.; Kimball Hill Homes Washington, Inc.; Kimball Hill Homes Wisconsin, Inc.; Kimball Hill Stateway, Inc.; Kimball Hill Texas Investment Company, L.L.C.; Kimball Hill Urban Centers Chicago One, L.L.C.; Kimball Hill Urban Centers Chicago Two, L.L.C.; Kimball Hill Urban Centers Special Purposes, LLC; Kimball Hill Urban Centers, L.L.C.; National Credit and Guaranty Corporation; and The Hamilton Place Partnership.

## TABLE OF CONTENTS

ARTICLE I. SUMMARY ......................................................................................................1
    A.    Rules of Interpretation...........................................................................................1
    B.    The Purpose of the Plan. ......................................................................................2
    C.    The Debtors' Principal Assets and Indebtedness. .................................................2
    D.    Treatment of Claims and Interests. ......................................................................3
    E.    Claims Estimates. .................................................................................................6
    F.    Preservation of Causes of Action. .........................................................................8
    G.    Compromise and Settlement of Claims and Controversies....................................10
    H.    Releases by the Debtors. ......................................................................................10
    I.    Releases by Holders of Claims and Interests. .......................................................11
    J.    Exculpation. ..........................................................................................................11
    K.    Injunction. .............................................................................................................12
    L.    Certain Factors to Be Considered Prior to Voting. ...............................................12
    M.    Voting and Confirmation. ......................................................................................13
    N.    Consummation of the Plan. ...................................................................................14

ARTICLE II. BACKGROUND.............................................................................................14
    A.    Description of the Debtors' Business.....................................................................14
    B.    The Debtors' Prepetition Capital Structure. ..........................................................17
    C.    Management of the Debtors. ..................................................................................19

ARTICLE III. THE CHAPTER 11 CASES ...........................................................................19
    A.    Events Leading to the Chapter 11 Cases. ..............................................................19
    B.    Initiation of the Chapter 11 Cases. ........................................................................21
    C.    Appointment of the Creditors' Committee.............................................................22
    D.    Stabilization of Operations....................................................................................22
    E.    Certain Administrative Matters in the Chapter 11 Cases. ......................................26
    F.    Claims. ..................................................................................................................29
    G.    The Debtors' Attempts to Reorganize...................................................................31
    H.    Global Settlement of Claims Between Creditors' Committee and
            Prepetition Lenders. .............................................................................................33

ARTICLE IV. SALE AND WIND-DOWN PROCESS ...........................................................38
    A.    Orderly Wind-Down. ............................................................................................38
    B.    Wind-Down Employee Incentive Program. ...........................................................38

ARTICLE V. SUMMARY OF THE PLAN ...........................................................................39
    A.    Overview of Chapter 11. .......................................................................................40
    B.    Administrative and Priority Claims. ......................................................................41
    C.    Classification and Treatment of Claims and Equity Interests. ................................42
    D.    Cramdown. ............................................................................................................45
    E.    Means for Implementation of the Plan....................................................................46
    F.    Treatment of Executory Contracts and Unexpired Leases......................................52
    G.    Procedures for Resolving Disputed Claims and Interests. ......................................56
    H.    Provisions Governing Distributions. ......................................................................58

K&E 13063060.29

I.    Effective of Confirmation of the Plan. ...........................................................64

J.    Allowance and Payment of Certain Administrative Claims. .........................67

K.    The Post-Consummation Trust; the Plan Administrator. ..............................69

L.    The Liquidation Trust; the Liquidation Trust Administrator. .......................69

M.   Conditions Precedent to Confirmation and Consummation of the Plan. .......70

N.    Modification, Revocation, or Withdrawal of the Plan. .................................71

O.    Retention of Jurisdiction. ..............................................................................72

ARTICLE VI. STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE
PLAN ................................................................................................................72

A.    The Confirmation Hearing. ...........................................................................73

B.    Confirmation Standards. ................................................................................73

C.    Financial Feasibility. .....................................................................................74

D.    Best Interests of Creditors Test. ....................................................................75

E.    Acceptance by Impaired Classes....................................................................77

F.    Confirmation Without Acceptance by All Impaired Classes. ........................77

ARTICLE VII. CERTAIN FACTORS TO BE CONSIDERED PRIOR TO VOTING ...............79

A.    Certain Bankruptcy Considerations. ..............................................................79

ARTICLE VIII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES ............................82

A.    Certain United States Federal Income Tax Consequences to the Debtors. ....................83

B.    Certain United States Federal Income Tax Consequences to the Holders of
Class A-1 Claims..........................................................................................83

C.    Certain United States Federal Income Tax Consequences to the Holders of
Class C-1 Claims, Class C-2 Claims, Class C-3 Claims, and Class D Claims. ............84

D.    Receipt of Interests in Post-Consummation Trust and in the Liquidation Trust...........85

ARTICLE IX. SOLICITATION PROCESS .............................................................................87

A.    Voting and Solicitation Agent and Securities Voting Agent. .......................87

B.    Solicitation Package. .....................................................................................88

C.    Distribution of the Solicitation Package.........................................................88

D.    Form of Notice to Unclassified Claims and Unimpaired Classes. ................89

E.    Retained Causes of Action and Counterparties to Executory Contracts and
Unexpired Leases Notices. ............................................................................89

F.    Distribution of Materials to the Master Service List and the 2002 List........89

G.    Publication of the Confirmation Hearing Notice. ..........................................89

ARTICLE X. VOTING INSTRUCTIONS................................................................................90

A.    The Record Date............................................................................................90

B.    Solicitation Deadline. ....................................................................................90

C.    Voting Deadline. ...........................................................................................90

D.    Holders of Claims Entitled To Vote..............................................................91

E.    Conclusively Presumed Acceptance of the Plan. ..........................................91

F.    Conclusively Presumed Rejection of the Plan ..............................................91

G.    Voting Procedures. ........................................................................................92

H.    Tabulation Procedures...................................................................................92

I.    Votes Required for Acceptance by a Class. ....................................................................98

ARTICLE XI. RECOMMENDATION ........................................................................................99

K&E 13063060.29

THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE DEBTORS' JOINT PLAN PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE (THE "PLAN"), CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS RELATED TO THE PLAN, CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES AND CERTAIN FINANCIAL INFORMATION. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS. THE INFORMATION INCLUDED HEREIN IS FOR PURPOSES OF SOLICITING ACCEPTANCE OF THE PLAN AND SHOULD NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER AND HOW TO VOTE ON THE PLAN. THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS THAT ARE ATTACHED HERETO OR INCORPORATED BY REFERENCE HEREIN ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO SUCH INFORMATION AND DOCUMENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THE DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION INCORPORATED HEREIN BY REFERENCE, THE PLAN OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION, AS THE CASE MAY BE, SHALL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE STATEMENTS AND FINANCIAL INFORMATION CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THE DISCLOSURE STATEMENT SHOULD NOT INFER THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN BETWEEN THE DATE HEREOF AND THE TIME OF SUCH REVIEW. EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY REVIEW THE PLAN, THE DISCLOSURE STATEMENT, AND EXHIBITS TO THE PLAN IN THEIR ENTIRETY BEFORE CASTING A BALLOT. THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. ANY PERSONS DESIRING ANY SUCH ADVICE OR OTHER ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS.

NO PARTY IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THE DISCLOSURE STATEMENT. NO REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THE DISCLOSURE STATEMENT. ANY INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THE PLAN THAT ARE OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN AND IN THE PLAN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR INTEREST.

WITH RESPECT TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING, THREATENED, OR POTENTIAL LITIGATION OR ACTIONS, THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE AND MAY NOT BE CONSTRUED AS AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS AND PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE.

THE DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

ALTHOUGH THE DEBTORS HAVE USED THEIR BEST EFFORTS TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THE DISCLOSURE STATEMENT, THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THE DISCLOSURE STATEMENT HAS NOT BEEN AUDITED.

THE PROJECTIONS PROVIDED IN THE DISCLOSURE STATEMENT HAVE BEEN PREPARED BY THE MANAGEMENT OF THE DEBTORS WITH THE ASSISTANCE OF THEIR ADVISORS. THESE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT, THOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THESE PROJECTIONS OR TO THE ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

SEE ARTICLE VII OF THE DISCLOSURE STATEMENT, ENTITLED "CERTAIN FACTORS TO BE CONSIDERED PRIOR TO VOTING," FOR A DISCUSSION OF CERTAIN CONSIDERATIONS IN CONNECTION WITH A DECISION BY A HOLDER OF AN IMPAIRED CLAIM TO ACCEPT OR REJECT THE PLAN.

THE DISCLOSURE STATEMENT HAS BEEN DETERMINED BY THE BANKRUPTCY COURT TO CONTAIN ADEQUATE INFORMATION AS REQUIRED BY SECTION 1125 OF TITLE 11 OF THE UNITED STATES CODE, 11 U.S.C. §§ 101-1532

(THE "BANKRUPTCY CODE"), WHICH DETERMINATION DOES NOT CONSTITUTE A RECOMMENDATION OR APPROVAL OF THE PLAN.

UNLESS OTHERWISE STATED, ANY CAPITALIZED TERM USED HEREIN SHALL HAVE THE MEANING ASSIGNED TO SUCH TERM HEREIN OR, IF NO MEANING IS SO ASSIGNED, THE MEANING ASSIGNED TO SUCH TERM IN THE PLAN.

**THE BANKRUPTCY COURT HAS SCHEDULED THE CONFIRMATION HEARING TO COMMENCE ON [_____], 2009 AT [___] PREVAILING CENTRAL TIME BEFORE THE HONORABLE SUSAN PIERSON SONDERBY, UNITED STATES BANKRUPTCY JUDGE, IN THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, IN COURTROOM 642 IN THE UNITED STATES COURTHOUSE LOCATED AT 219 SOUTH DEARBORN STREET, CHICAGO, ILLINOIS 60604. THE CONFIRMATION HEARING MAY BE ADJOURNED FROM TIME TO TIME BY THE BANKRUPTCY COURT WITHOUT FURTHER NOTICE OTHER THAN AN ANNOUNCEMENT OF THE ADJOURNED DATE MADE AT THE CONFIRMATION HEARING OR ANY ADJOURNMENT THEREOF.**

**OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE FILED AND SERVED ON OR BEFORE [_____], 2009, IN ACCORDANCE WITH THE SOLICITATION PROCEDURES ORDER THAT THE DEBTORS FILED AND SERVED ON HOLDERS OF CLAIMS, HOLDERS OF INTERESTS, AND OTHER PARTIES IN INTEREST. IF OBJECTIONS TO CONFIRMATION ARE NOT TIMELY SERVED AND FILED IN COMPLIANCE WITH THE SOLICITATION PROCEDURES ORDER, THEY MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

# ARTICLE I.
# SUMMARY

The following summary is qualified in its entirety by the more detailed information contained in the Plan and elsewhere in the Disclosure Statement.

On April 23, 2008 (the "Petition Date"), Kimball Hill and certain of its direct and indirect subsidiaries (each a "Debtor," and collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. Prior to and after the Petition Date, the Debtors and certain of their non-Debtor subsidiaries operated one of the largest privately owned homebuilding businesses and one of the thirty largest homebuilding businesses in the United States.

The Disclosure Statement is being furnished by the Debtors pursuant to section 1125 of the Bankruptcy Code in connection with: (a) the solicitation of votes for the acceptance or rejection of the Debtors' Plan and (b) the confirmation hearing (the "Confirmation Hearing"), which is scheduled for [_____], 2009 at [___] Central Time (the "Confirmation Hearing Date"). A copy of the Plan is annexed hereto as <u>Exhibit A</u> and incorporated by reference herein.

The Disclosure Statement describes certain aspects of the Plan, including the treatment of Claims and Interests, and describes certain aspects of the Debtors' operations, projections, and other related matters.

A.     <u>Rules of Interpretation</u>.

The following rules for interpretation and construction shall apply to the Disclosure Statement: (1) capitalized terms used in the Disclosure Statement and not otherwise defined shall have the meanings ascribed to such terms in Section I.A. of the Plan; (2) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (3) unless otherwise specified, any reference in the Disclosure Statement to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (4) unless otherwise specified, any reference in the Disclosure Statement to an existing document, schedule, or exhibit, whether or not filed, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified or supplemented; (5) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (6) unless otherwise specified, all references in the Disclosure Statement to Articles are references to Articles of the Disclosure Statement or to the Disclosure Statement; (7) unless otherwise specified, all references in the Disclosure Statement to exhibits are references to exhibits in the Plan Supplement; (8) the words "herein," "hereof," and "hereto" refer to the Disclosure Statement in its entirety rather than to a particular portion of the Disclosure Statement; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Disclosure Statement; (10) unless otherwise set forth in the Disclosure Statement, the rules of

construction set forth in Bankruptcy Code § 102 shall apply; (11) any term used in capitalized form in the Disclosure Statement that is not otherwise defined in the Disclosure Statement or the Plan but that is used in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (12) all references to docket numbers of documents filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's Case Management/Electronic Case Filing ("CM/ECF") system; (13) all references to statutes, regulations orders, rules of courts, and the like shall mean as amended from time to time, unless otherwise stated; (14) in computing any period of time prescribed or allowed, the provisions of Bankruptcy Rule 9006(a) shall apply, and if the date on which a transaction may occur pursuant to this Disclosure Statement shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day; and (15) unless otherwise specified, all references in the Disclosure Statement to monetary figures shall refer to currency of the United States of America.

B.    The Purpose of the Plan.

The Plan generally contemplates the creation of the Post-Consummation Trust and the Liquidation Trust, and the Pro Rata distribution of the net proceeds of the Post-Consummation Trust Assets to Holders of Senior Credit Agreement Claims and the Pro Rata distribution of the net proceeds of the Liquidation Trust Assets to the Holders of the Senior Credit Agreement Claims and certain Unsecured Claims.

During the Chapter 11 Cases, the Creditors' Committee sought standing to assert various claims and causes of action under chapter 5 of the Bankruptcy Code against the Prepetition Lenders (defined below).  In addition, the Prepetition Lenders asserted claims under section 507(b) of the Bankruptcy Code against the unencumbered assets of the Debtors' Estates. After extensive negotiations to resolve these claims and causes of action, on November 14, 2008, the Creditors' Committee and the Prepetition Agent reached a global settlement that is incorporated into, and designed to be implemented through, the Plan.  As more fully described in Article III.H herein, the settlement governs the treatment and distributions to be received by certain Holders of Claims and resolves several other matters regarding the administration of the Debtors' Estates, including the manner in which Administrative Claims will be paid and the establishment of the Post-Consummation Trust and Liquidation Trust.

The Debtors believe that the Plan maximizes recoveries for Holders of Allowed Claims and strongly recommend that you vote to accept the Plan (if you are entitled to vote).  The Debtors believe that any alternative to Confirmation of the Plan, such as conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or attempts by another party in interest to file a plan, would result in significant delays, litigation, and additional costs and, ultimately, would lower the recoveries for Holders of Allowed Claims.

C.    The Debtors' Principal Assets and Indebtedness.

The principal assets of the Debtors include their homebuilding business, which includes cash, receivables, inventory of undeveloped land and developed lots, constructed and partially constructed homes (sold and unsold), and two office properties located in

Rolling Meadows, Illinois.      The    Debtors'    principal    indebtedness    includes:
(1) Senior Credit Agreement Claims;      (2) Other Secured Claims;      (3) Secured Bank Claims;
(4) Senior Unsecured Claims;              (5) General Unsecured Claims;              and
(6) Unsecured Senior Subordinated Note Claims.

D.      Treatment of Claims and Interests.

Except for unclassified DIP Facility Claims, Administrative Claims, Priority Tax Claims, Intercompany Claims, and Intercompany Interests, the Plan divides all Claims against the Debtors into various Classes. The table set forth below summarizes the Classes of Claims and Interests under the Plan, the treatment of Claims and Interests, and projected recovery for Holders of Allowed Claims and Interests in such Classes and the entitlement of Holders of Claims and Interests in such Classes to vote to accept or reject the Plan.

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Plan Administrator and the Liquidation Trust Administrator reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

1.      Summary and Treatment of Allowed Unclassified Claims.

| Claim | Plan Treatment | Projected Recovery Under the Plan |
|---|---|---|
| DIP Facility Claims | Payment in full in Cash. | 100% |
| Administrative Claims | Payment in full in Cash. | 100% |
| Priority Tax Claims | (a) Payment in full in Cash; (b) Payment in Cash in an amount agreed to by the Holder and the Debtors, with the consent of the Prepetition Agent and the Creditors' Committee, or the Plan Administrator, with the consent of the Liquidation Trust Administrator; or (c) at the option of the Plan Administrator, payment in Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of not more than five years after the Commencement Date. | 100% |
| Intercompany Interests | Cancelled and no distribution under the Plan. | 0% |
| Intercompany Claims | Cancelled and no distribution under the Plan. | 0% |

2.       Summary of Classification and Treatment of Allowed Claims and Interests.

| Class | Claim | Plan Treatment of Class | Projected Recovery Range | Status | Voting Rights |
|-------|-------|-------------------------|--------------------------|--------|---------------|
| A-1 | Senior Credit Agreement Claims | (a) Pro Rata share of the beneficial interests of the Post-Consummation Trust; (b) Pro Rata share of the payment on account of the Diminution Claim, which is allowed in the amount of $10 million; (c) Pro Rata share of 64% of the proceeds of the Pre-Effective Date Sale Transactions allocable to the Debtors' unencumbered assets; and (d) Pro Rata share of 100% of the Liquidation Trust Series A Interests.<br><br>Except as otherwise set forth in the Plan, the distributions to Class A-1 give effect to the subordination provisions of the Senior Subordinated Notes Indenture.<br><br>The reasonable fees and expenses of Agent's attorneys and financial advisors in connection with the consummation, administration, and enforcement of the Plan shall be paid from the Post-Consummation Trust Assets.<br><br>Each Holder of an Allowed Senior Credit Agreement Claim shall be deemed to consent to the distribution of $2.1 million in Cash from the Committee Settlement Payment to Holders of Allowed Unsecured Senior Subordinated Note Claims on the Effective Date as part of the Settlement. | 48%-37% | Impaired | Yes |
| A-2 | Other Secured Claims | (a) Payment in full in Cash from the net proceeds of the collateral securing such Class A-2 Claim; (b) delivery of the collateral securing such Class A-2 Claim and any interest required to be paid under section 506(b) of the Bankruptcy Code; or (c) otherwise rendered Unimpaired. | 100% | Unimpaired | No (presumed to accept) |

4

| Class | Claim | Plan Treatment of Class | Projected Recovery Range | Status | Voting Rights |
|-------|-------|------------------------|--------------------------|--------|---------------|
| A-3 | Secured Bank Claims | (a) Payment in full in Cash from the net proceeds of the collateral securing such Class A-3 Claim; (b) delivery of the collateral securing such Class A-3 Claim and any interest required to be paid under section 506(b) of the Bankruptcy Code; or (c) otherwise rendered Unimpaired. | 100% | Unimpaired | No (presumed to accept) |
| B | Priority Non-Tax Claims | Payment in full in Cash from the collateral securing the Senior Credit Agreement Claims. | 100% | Unimpaired | No (presumed to accept) |
| C-1 | Senior Unsecured Claims | (a) Pro Rata share of 36% of the Pre-Effective Date Sale Transactions allocable to the Debtors' unencumbered assets; (b) Pro Rata share of 100% of the Liquidation Trust Series B Interests; and (c) Pro Rata share of $3.9 million from the Committee Settlement Payment.  Except as otherwise set forth in the Plan, the distributions to Class C-1 give effect to the subordination provisions of the Senior Subordinated Notes Indenture. | 36%-29% | Impaired | Yes |
| C-2 | General Unsecured Claims | (a) Pro Rata share of 36% of the Pre-Effective Date Sale Transactions allocable to the Debtors' unencumbered assets; (b) Pro Rata share of 100% of the Liquidation Trust Series B Interests; and (c) Pro Rata share of $3.9 million from the Committee Settlement Payment. | 20%-17% | Impaired | Yes |

| Class | Claim | Plan Treatment of Class | Projected Recovery Range | Status | Voting Rights |
|---|---|---|---|---|---|
| C-3 | Unsecured Senior Subordinated Note Claims | Pro Rata share of $2.1 million in Cash from the Committee Settlement Payment; provided that (a) if Class C-3 votes to reject the Plan, or (b) if any Holder of an Allowed Unsecured Senior Subordinated Note Claim or the Indenture Trustee objects to Confirmation of the Plan or files a notice of appeal of the Confirmation Order, then the Cash payment contemplated hereby shall not be made and Holders of Allowed Unsecured Senior Subordinated Note Claims shall not receive and retain a distribution under the Plan and, in such event, the $2.1 million in Cash described above shall revert to Holders of Liquidation Trust Series B Interests for distribution in accordance with the provisions of the Plan and the Liquidation Trust Agreement. | 1% | Impaired | Yes |
| | | The treatment and distributions to be paid to the Holders of Allowed Senior Credit Agreement Claims and Senior Unsecured Claims give effect to the subordination provisions of the Senior Subordinated Notes Indenture and section 510(a) of the Bankruptcy Code, and the distribution to be retained by the Holders of Allowed Unsecured Senior Subordinated Note Claims has been provided solely out of the recovery to the Holders of Allowed Senior Credit Agreement Claims. | | | |
| D | Subordinated Debt Securities Claims | Not entitled to receive any distribution under the Plan. | 0% | Impaired | No (presumed to reject) |
| E | Interests | Not entitled to receive any distribution under the Plan. | 0% | Impaired | No (presumed to reject) |

E.    Claims Estimates.

As of November 28, 2008, approximately $16 million was outstanding under the DIP Facility. In addition, as of November 28, 2008, Kurtzman Carson Consultants LLC, the Debtors' claims, voting, and solicitation agent (the "Voting and Solicitation Agent"), had received approximately 2,990 Claims and the approximate numbers and total amounts of Claims

filed against one or more of the Debtors were as follows: (1) 30 Administrative Claims in the total amount of $1,060,220.43; (2) 19 Priority Tax Claims in the total amount of $1,182,171.15; (3) 1 Senior Credit Agreement Claim in an unliquidated amount; (4) 737 Other Secured Claims in the total amount of $23,153,387.63 (plus unliquidated amounts); (5) 2 Secured Bank Claims in the total amount of $6,516,558.98; (6) 575 Priority Non-Tax Claims in the total amount of $3,436,016.66 (plus unliquidated amounts); (7) 1,613 Senior Unsecured Claims and General Unsecured Claims in the total amount of $2,337,334,670.77 (plus unliquidated amounts); (8) 1 Unsecured Senior Subordinated Note Claim in an unliquidated amount; and (9) no claims that are believed to be Subordinated Debt Securities Claims. The Debtors believe that many of the filed Proofs of Claim are invalid, untimely, duplicative, and/or overstated and plan to object to such Claims.

The Debtors estimate that, at the conclusion of the Claims objection, reconciliation, and resolution process, the aggregate amount of Allowed Claims will be as follows: (1) an Allowed DIP Facility Claim in the approximate total amount of $16,000,000; (2) Allowed Administrative Claims in the approximate total amount of $1,000,000; (3) Allowed Priority Tax Claims in the approximate total amount of $1,000,000; (4) an Allowed Senior Credit Agreement Claim in the approximate total amount of $315,100,000; (5) Allowed Other Secured Claims in the approximate total amount of $4,000,000; (6) Allowed Secured Bank Claims in the approximate total amount of $6,520,000; (7) Allowed Priority Non-Tax Claims in the approximate total amount of $1,000,000; (8) Allowed Senior Unsecured Claims in the approximate total amount of $43,571,000; (9) Allowed General Unsecured Claims in the total approximate amount of $130,900,000; (10) Allowed Unsecured Senior Subordinated Note Claims in the approximate total amount of $210,600,000; and (11) no Allowed Subordinated Debt Securities Claims. The estimate of Allowed Administrative Claims includes, among others, Claims arising from the cure of assumed Executory Contracts and Unexpired Leases, Claims arising from a right of reclamation, and certain Administrative Claim requests reflected on the Claims Register and docket for which the Debtors reasonably expect there to be a recovery. The estimate of Allowed Administrative Claims does not include ordinary course obligations incurred postpetition such as trade payables and certain Professional fees. Based upon the Debtors' valuation, the Debtors believe that the Secured portion of the Senior Credit Agreement Claims is allowable (a) in the amount of $72 million in the aggregate in the event the Debtors do not consummate, on or before the Effective Date, a sale of substantially all of the assets that are collateral securing the Senior Credit Agreement Claims or (b) in the event such sale is consummated on or before the Effective Date, in the amount of consideration allocable to the assets securing the Senior Credit Agreement Claims.

These estimates are approximate and based upon numerous assumptions and represent significant reductions in the aggregate face amount of Claims filed. There is no guarantee that the ultimate amount of each category of Claims will conform to the estimates stated herein, and the majority of Claims underlying such estimates are subject to challenge. Approximately 1,700 Claims have been asserted in unliquidated amounts. The Debtors believe that certain Claims are without merit and intend to object to all such Claims, however, there can be no assurance that the Debtors will be able to achieve the significant reductions in Claims set forth above. Moreover, additional Claims may be filed or identified during the Claims objection, reconciliation, and resolution process that may materially affect the foregoing estimates.

F.      <u>Preservation of Causes of Action</u>.

1.      Maintenance of Causes of Action.

Except as otherwise provided in the Plan, on the Effective Date, all of the Debtors' rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, in any court or other tribunal in an adversary proceeding or contested matter filed in one or more of the Chapter 11 Cases, including the following actions and any Causes of Actions specified on Exhibit A to the Plan, will be transferred for the Liquidation Trust: (a) objections to Claims under the Plan; and (b) any other litigation or Causes of Action, whether legal, equitable, or statutory in nature, arising out of, or in connection with the Debtors' businesses, assets, or operations or otherwise affecting the Debtors, including possible claims against the following types of parties, both domestic and foreign, for the following types of claims:  (i) Causes of Action against vendors, suppliers of goods or services, or other parties for overpayments, back charges, duplicate payments, improper holdbacks, deposits, warranties, guarantees, indemnities, or setoff; (ii) Causes of Action against utilities, vendors, suppliers of services or goods, or other parties for wrongful or improper termination, suspension of services or supply of goods, or failure to meet other contractual or regulatory obligations; (iii) Causes of Action against vendors, suppliers of goods or services, or other parties for failure to fully perform or to condition performance on additional requirements under contracts with any one or more of the Debtors before the assumption or rejection of the subject contracts; (iv) Causes of Action for any liens, including mechanic's, artisan's, materialmen's, possessory, or statutory liens held by any one or more of the Debtors; (v) Causes of Action for payments, deposits, holdbacks, reserves, or other amounts owed by any creditor, lessor, utility, supplier, vendor, insurer, surety, lender, bondholder, lessor, or other party; (vi) Causes of Action against any current or former director, officer, employee, or agent of the Debtors arising out of employment related matters; (vii) Causes of Action against any professional services provider or any other party arising out of financial reporting; (viii) Causes of Action arising out of environmental or contaminant exposure matters against landlords, lessors, environmental consultants, environmental agencies, or suppliers of environmental services or goods; (ix) Causes of Action against insurance carriers, reinsurance carriers, underwriters, or surety bond issuers relating to coverage, indemnity, contribution, reimbursement, or other matters; (x) counterclaims and defenses relating to notes, bonds, or other contract obligations; (xi) Causes of Action against local, state, federal, and foreign taxing authorities for refunds of overpayments or other payments; (xii) Causes of Action against attorneys, accountants, consultants, or other professional service providers relating to services rendered; (xiii) contract, tort, or equitable Causes of Action that may exist or subsequently arise; (xiv) any intracompany or intercompany Causes of Action; (xv) Causes of Action of the Debtors arising under section 362 of the Bankruptcy Code; (xvi) equitable subordination Causes of Action arising under section 510 of the Bankruptcy Code or other applicable law; (xvii) turnover Causes of Action arising under sections 542 or 543 of the Bankruptcy Code; (xviii) Causes of Action arising under chapter 5 of the Bankruptcy Code, including preferences under section 547 of the Bankruptcy Code; and (xix) Causes of Action for unfair competition, interference with contract or potential business advantage, conversion, infringement of intellectual property, or other business tort claims; <u>provided</u> that such actions shall not include Causes of Action which, if prosecuted, would have a direct adverse effect on the Post-Consummation Trust Assets.

The foregoing Causes of Action will be transferred to the Liquidation Trust notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code and except as otherwise provided in the Plan, any claims, rights, and Causes of Action that the respective Debtors may hold against any Entity will vest in the Liquidation Trust. The Liquidation Trust, through its authorized agents or representatives, will have and may exclusively enforce any and all such claims, rights, or Causes of Action transferred to it, and all other similar claims arising pursuant to applicable state laws, including fraudulent transfer claims, if any, and all other Causes of Action of a trustee and debtor in possession pursuant to the Bankruptcy Code in accordance with the provisions of the Liquidation Trust Agreement. The Liquidation Trust will have the exclusive right, authority, and discretion to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any and all such claims, rights, and Causes of Action transferred to it, and to decline to do any of the foregoing in accordance with the terms of the Liquidation Trust Agreement.

For clarity, subject to the other provisions of the Plan, all of the Liquidation Trust Claims and other Causes of Action will be transferred to the Liquidation Trust as of the Effective Date. Notwithstanding anything to the contrary herein, the Post-Consummation Trust will own and control any Causes of Action or claims arising from or in connection with the collateral securing the Senior Credit Agreement or arising after the Effective Date in respect of any Post-Consummation Trust Asset. The Post-Consummation Trust will have the right to object to all Administrative Claims and Claims which, if Allowed, would entitle the Holder thereof to payments or other distributions from the Post-Consummation Trust and the Liquidation Trust will have the right to object to all Claims which, if Allowed, would entitle the Holder thereof to payments or other distributions from the Liquidation Trust.

2.      Preservation of All Causes of Action Not Expressly Settled or Released.

Unless a claim or Cause of Action against a creditor or other Entity is expressly waived, relinquished, released, compromised, or settled in the Plan or any Final Order, the Debtors expressly reserve such claim or Cause of Action for later adjudication by the Liquidation Trust or Post-Consummation Trust, as applicable, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches will apply to such claims or Causes of Action upon or after the Confirmation or Consummation of the Plan based on the Disclosure Statement, the Plan, or the Confirmation Order, except where such claims or Causes of Action have been expressly waived, relinquished, released, compromised, or settled in the Plan or a Final Order. In addition, the Liquidation Trust or Post-Consummation Trust, as applicable, expressly reserves the right to pursue or adopt any claims or Causes of Action not so waived, relinquished, released, compromised, or settled that are alleged in any lawsuit in which the Debtors are a defendant or an interested party, against any Entity, including the plaintiffs or co-defendants in such lawsuits. Any Entity to whom the Debtors incurred an obligation (whether on account of services, purchase, sale of goods, or otherwise), or who received services from the Debtors or a transfer of money or property of the Debtors, or who has transacted business with the Debtors, in each case prior to the Petition Date, should assume that such obligation, transfer, or transaction may be reviewed by the Liquidation Trust or Post-Consummation Trust, as applicable, subsequent to the

9

Effective Date and may, to the extent not theretofore expressly waived, relinquished, released, compromised, or settled, be the subject of an action after the Effective Date, whether or not: (a) such Entity has filed a Proof of Claim against the Debtors in the Chapter 11 Cases; (b) an objection has been filed to such Entity's Proof of Claim; (c) such Entity's Claim was included in the Debtors' Schedules; or (d) the Debtors have objected to such Entity's scheduled Claim or identified such Claim as contingent, unliquidated, or disputed.

G.    Compromise and Settlement of Claims and Controversies.

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, Causes of Action, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or Interest (including the full and final resolution of any and all claims and causes of action asserted by the Creditors' Committee against the Prepetition Agent and the Prepetition Lenders and the Diminution Claim asserted by the Prepetition Lenders), or any distribution to be made on account of such an Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Liquidation Trust Administrator and Plan Administrator, as applicable, may compromise and settle Claims against them and Causes of Action against other Entities.

H.    Releases by the Debtors.

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious emergence of the Debtors and the implementation of the Plan, on and after the Effective Date, the Released Parties are deemed released and discharged by the Debtors, their Estates, the Post-Consummation Trust, the Liquidation Trust, and their Affiliates, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims or Causes of Action asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, their Estates, the Post-Consummation Trust, the Liquidation Trust, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the**

Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan and Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes a failure to perform the duty to act in good faith and where such failure to perform constitutes willful misconduct, gross negligence, or fraud.

I.    Releases by Holders of Claims and Interests.

Except as otherwise specifically provided in the Plan, on and after the Effective Date, Holders of Claims and Interests (1) voting to accept the Plan or (2) abstaining from voting on the Plan and, in either case, electing not to opt-out of the release contained in this paragraph (which by definition, does not include Holders of Claims and Interests who are not entitled to vote in favor of or against the Plan), shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Debtors, the Post-Consummation Trust, the Liquidation Trust, and the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Debtors' Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan and Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than Claims or liabilities arising out of or relating to any act or omission of a Debtor or a Released Party that constitutes a failure to perform the duty to act in good faith, with the care of an ordinarily prudent person and in a manner the Debtor or the Released Party reasonably believed to be in the best interests of the Debtors (to the extent such duty is imposed by applicable non-bankruptcy law) where such failure to perform constitutes willful misconduct, gross negligence, or fraud; **provided** that this release and discharge shall not apply to any distributions on account of Claims or Interests specifically contemplated in Article VII of the Plan.

J.    Exculpation.

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Claim, obligation, Cause of Action, or liability to one another or to any Exculpating Party for any Exculpated Claim, except for gross negligence, willful misconduct, or fraud, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Debtors (and each of

their respective Affiliates, agents, directors, officers, employees, advisors, and attorneys) have, and upon the Effective Date shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the distributions of the securities pursuant to the Plan, and therefore are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

K.      Injunction.

**IF YOU ACCEPT ANY DISTRIBUTION PURSUANT TO THE PLAN, YOU WILL BE DEEMED TO HAVE SPECIFICALLY CONSENTED TO THE FOLLOWING INJUNCTIONS SET FORTH IN ARTICLE VIII.F OF THE PLAN.**

Except as otherwise expressly provided in the Plan or for obligations issued pursuant to the Plan, all Entities who have held, hold, or may hold Claims or Interests that have been released pursuant to Article VIII.C of the Plan or Article VIII.E of the Plan, discharged pursuant to Article VIII.B of the Plan, or are subject to exculpation pursuant to Article VIII.D of the Plan are permanently enjoined, from and after the Effective Date, from:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication in a Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan. Nothing in the Plan or Confirmation Order shall preclude any Entity from pursuing an action against one or more of the Debtors in a nominal capacity to recover insurance proceeds so long as the Plan Administrator or the Liquidation Trust Administrator, as applicable, and any such Entity agree in writing that such Entity will:  (a) waive all Claims against the Post-Consummation Trust, the Liquidation Trust, and the Estates related to such action and (b) enforce any judgment on account of such Claim solely against applicable insurance proceeds, if any.

L.      Certain Factors to Be Considered Prior to Voting.

Holders of Claims entitled to vote on the Plan should carefully consider the risks set forth in Article VII herein prior to accepting or rejecting the Plan.

M.     Voting and Confirmation.

The Classes entitled to vote will have accepted the Plan if (1) the Holders of at least two thirds in dollar amount of the Allowed Claims actually voting in each such Class, as applicable, have voted to accept the Plan and (2) the Holders of more than one half in number of the Allowed Claims actually voting in each such Class, as applicable, have voted to accept the Plan. Assuming the requisite acceptances are obtained, the Debtors intend to seek Confirmation of the Plan at the Confirmation Hearing scheduled to commence on [_____], 2009 at [___] prevailing Central Time, before the Bankruptcy Court.     Section 1129(a)(10) of the Bankruptcy Code will be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Class of Claims that is Impaired under the Plan.

THE DEBTORS WILL SEEK CONFIRMATION OF THE PLAN UNDER SECTION 1129(B) OF THE BANKRUPTCY CODE WITH RESPECT TO ANY IMPAIRED CLASSES PRESUMED TO REJECT THE PLAN, AND THE DEBTORS RESERVE THE RIGHT TO DO SO WITH RESPECT TO ANY OTHER REJECTING CLASS OR TO MODIFY THE PLAN.

The Bankruptcy Court has established [_____], 2009 (the "Record Date"), as the date for determining which Holders of Claims are eligible to vote on the Plan. Ballots and Master Ballots, along with this Disclosure Statement, the Plan, and the Solicitation Procedures Order, will be mailed to all registered Holders of Claims as of the Record Date that are entitled to vote. A return envelope will be included with Ballots, as appropriate. Beneficial Holders of Claims or Interests who receive a return envelope addressed to their bank, brokerage firm or other nominee or its agent (each, a "Nominee") should allow sufficient time for their votes to be received by the Nominee and processed on a Master Ballot before the Voting Deadline, as defined below.

The Voting and Solicitation Agent and the Securities Voting Agent (with respect to Unsecured Senior Subordinated Note Claims) will answer questions regarding the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan, provide additional copies of all materials and oversee the voting tabulation. The Voting and Solicitation Agent and the Securities Voting Agent (with respect to Unsecured Senior Subordinated Note Claims) will also process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan. The address for the Voting and Solicitation Agent is:

Kimball Hill, Inc.
c/o Kurtzman Carson Consultants LLC
2335 Alaska Avenue
El Segundo, California  90245

If you have any questions on voting procedures, please call the Voting and Solicitation Agent at the following toll free number:  (877) 631-3923.

The address for the Securities Voting Agent is:

Kimball Hill, Inc.
c/o Financial Balloting Group LLC
757 Third Avenue - Third Floor
New York, New York  10017
Attn:  Ballot Processing Center

If you are a Noteholder and have any questions on voting procedures, please call the Securities Voting Agent at the following toll free number:  (646) 282-1800.

TO BE COUNTED, BALLOTS (OR MASTER BALLOTS OF THE RESPECTIVE NOMINEE HOLDER, IF APPLICABLE) INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY THE VOTING AND SOLICITATION AGENT AND THE SECURITIES VOTING AGENT, AS APPLICABLE, NO LATER THAN 5:00 P.M. PREVAILING PACIFIC TIME ON [_____], 2009 (THE "VOTING DEADLINE").  ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE SHALL NOT BE COUNTED.

THE DEBTORS BELIEVE THAT THE PLAN IS IN THE BEST INTEREST OF ALL OF THEIR CREDITORS.  THE DEBTORS RECOMMEND THAT ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO ACCEPT THE PLAN.

N.    Consummation of the Plan.

It will be a condition to Confirmation of the Plan that all provisions, terms, and conditions of the Plan are approved in the Confirmation Order unless otherwise satisfied or waived pursuant to the provisions of Article XII of the Plan.  Following Confirmation, the Plan will be consummated on the Effective Date, which will be a Business Day selected by the Debtors, in consultation with the Prepetition Agent and the Creditors' Committee, after the Confirmation Date on which all conditions to Consummation of the Plan have been satisfied or waived.  Unless otherwise specified in the Plan, anything required to be done by the Debtors on the Effective Date may be done on the Effective Date or as soon as reasonably practicable thereafter.

## ARTICLE II.
## BACKGROUND

A.    Description of the Debtors' Business.

1.    Corporate Structure.

The Debtors consist of Kimball Hill and twenty-nine of its direct and indirect subsidiaries, all of which are incorporated or organized in the United States.  In addition, the Debtors have direct non-wholly-owned and indirect wholly-owned subsidiaries incorporated or organized in the United States that were not included in the Debtors' chapter 11 cases.

Attached hereto as Exhibit B are two organizational charts of the Debtors. The first chart shows the Debtors' corporate structure as of the Petition Date. The second chart shows the Debtors' corporate structure as of the date that this Disclosure Statement is filed.

2.      Corporate History.

The Debtors were founded in 1969 in Rolling Meadows, Illinois and focused their homebuilding operations exclusively in Illinois until 1989. After 1989, the Debtors expanded their operations to California, Florida, Nevada, Ohio, Oregon, Washington, and Wisconsin. As of the Petition Date, the Debtors have continued to design, build, and sell new homes (single-family attached and detached homes as well as multi-family homes) to a broad range of customers, including first-time buyers and first and second-time move-up buyers, in numerous metropolitan markets within Illinois, Texas, Nevada, and California. In February 2008, the Debtors commenced an orderly wind-down of their operations in the Florida market, which process is expected to last through early 2009.

The Debtors' headquarters and core management team have been located in Rolling Meadows, Illinois. As of December 1, 2008, the Debtors employed approximately 385 employees. None of the Debtors' employees have been represented by a labor union.

The Debtors distinguished themselves from their competitors in a number of respects, including through award-winning home design, quality construction, and delivery of a remarkable customer experience up to and after move-in. In addition to providing customers with a quality, integrated home-buying experience, certain of the Debtors and their non-Debtor subsidiaries embarked on joint ventures with third parties to offer financial services such as mortgage financing and closing services to the Debtors' customers.

3.      Kimball Hill's Business Operations.

a.      Homebuilding.

Prior to and during the Chapter 11 Cases, the Debtors and certain of their non-Debtor subsidiaries were one of the thirty largest homebuilders in the country with operations focused in four geographic regions. In each of these regions, the Debtors competed with both local and national competitors. Like most large homebuilders, the Debtors essentially operate a management company that coordinates the activities of numerous contractors.

For the fiscal year ending September 30, 2007, the Debtors delivered 3,246 homes to homebuyers and generated approximately $895 million in homebuilding revenues. In 2006, the Debtors delivered 4,079 homes to homebuyers and generated approximately $1.16 billion in homebuilding revenues. In 2005, the Debtors delivered 3,881 homes to homebuyers and generated approximately $1.15 billion in homebuilding revenues. As of December 31, 2007, the Debtors had approximately $795 million in assets and $632 million in liabilities on a consolidated basis. As of December 31, 2007, the Debtors controlled approximately 17,183 homesites for development.

(i)     Land Management.

Prior to the Petition Date, the Debtors developed raw land and built homes on developed lots in existing communities.  To that end, the Debtors entered into certain contracts and option contracts to purchase raw land and developed lots.   After the commencement of the Chapter 11 Cases, however, the Debtors focused on purchasing and building homes on developed lots rather than developing raw land.  Some of the Debtors' land purchase contracts afford the Debtors the right to buy certain land at prearranged prices and predetermined times with limited obligations in the event it determines not to proceed with the purchases.  However, other contracts involve substantial purchase obligations.

Contracts for developed lots generally afford the Debtors the right to buy homesites at predetermined prices on a schedule anticipated to correspond roughly with the start of vertical construction.  In general, the Debtors' obligations with respect to most of these contracts are limited to (A) already-posted deposits and (B) paying certain expenses related to the homesites until such time as the Debtors either purchase them or decide not to do so.

(ii)     Joint Ventures.

In addition to their wholly-owned business operations, as of the Petition Date, the Debtors were involved in approximately seventeen strategic joint ventures with unrelated third parties to acquire, develop, and sell land and/or homesites, to construct and sell homes, or to provide home closing or mortgages in connection with the Debtors' home sales.  Only one of the joint ventures is a Debtor in the Chapter 11 Cases and none of the non-Debtor joint ventures is an obligor with respect to any of the Debtors' bank facilities or indenture obligations.

The joint ventures vary significantly from one to another, both with respect to the Debtors' rights and obligations, and in terms of each joint venture's significance to the Debtors' operations.  The Debtors' current interests in joint ventures range from 6.29% to 90%.  The Debtors manage some of the joint ventures, and some of the joint ventures also involve other troubled homebuilders or real estate entities.  A number of the joint ventures have separate indebtedness, and the Debtors generally guaranteed such obligations to some extent (e.g., to the extent of the Debtors' interest in the joint venture) or entirely.

The real estate development and construction joint venture projects are in varying stages of completion, with some of them having finished developing and selling substantially all of the homes that they were formed to complete, and others still in the stage of developing land, lots and/or homes.   Certain joint ventures, particularly those that have their own financing arrangements and are currently in the construction or acquisition stage of development, face financial difficulties in their own right.  Some of those difficulties relate to the overall downturn in the housing industry described above; in addition, certain joint ventures face breaches of their own financing agreements, in part as a result of the Debtors' financial difficulties and the filing of the Chapter 11 Cases, among other reasons.

b.     Financial Services.

To provide a full range of home buying services to their customers, the Debtors have offered certain financial services to their customers, namely mortgage financing and closing and

escrow services.  The Debtors offered these services only to their customers and did not provide them to other consumers.  To provide these services, certain non–Debtor affiliates (collectively, the "Financial Services Entities") and/or Debtors entered into joint ventures with unaffiliated third parties.  For example, the Debtors' indirect subsidiary, KH Financial, L.P., entered into a joint venture with Wells Fargo Ventures LLC to form KH Mortgage, LLC, which provides mortgage financing services to the Debtors' customers.  In addition, other Debtors and Financial Services Entities entered into joint ventures with multiple title companies.

B.        The Debtors' Prepetition Capital Structure.

        1.        Secured Bank Loans.

        On August 10, 2007, the Debtors amended and restated an existing $500 million previously unsecured revolving credit facility (as further amended, the "Senior Secured Credit Facility" or, as applicable, the "Senior Credit Agreement"), led by Harris Bank, N.A., as the Prepetition Agent, and other syndicate lenders (collectively, the "Prepetition Lenders"), to obtain relief from certain financial covenant calculations and other covenants.  The Senior Secured Credit Facility included a swing line subfacility in the amount of $10 million and a subfacility for the issuance of letters of credit up to $100 million.

        The indebtedness under the Senior Secured Credit Facility is secured by liens on certain of the Debtors' real property and related assets and certain of the Debtors' accounts (collectively, the "Existing Collateral").  Additionally, amounts generated by the collection of the Debtors' accounts receivable, sales of inventory or other dispositions of the Existing Collateral, all of which constitute proceeds of the Existing Collateral, are cash collateral of the Prepetition Lenders (the "Cash Collateral").  The Senior Secured Credit Facility also is guaranteed, on a joint and several basis, by all of the Debtors other than Kimball Hill.

        As of September 30, 2007, and December 31, 2007, the Debtors were in default under the Senior Secured Credit Facility in respect of certain financial covenants, including the minimum tangible net worth covenant, and because the Debtors had failed to deliver certain forecasts, certificates, and other deliveries required under the Senior Secured Credit Facility.  In addition, the Prepetition Lenders were entitled to exercise remedies in connection with certain cross-defaults to other credit and guarantee agreements to which certain Debtors were party.

        Between January and April 2008, the Debtors and the Prepetition Lenders entered into limited duration waiver agreements and numerous amendments to the Senior Secured Credit Facility and the associated security agreement pursuant to which, among other things, the Prepetition Lenders permitted the Debtors to continue to borrow under the Senior Secured Credit Facility subject to a permanent reduction of the commitment under the Senior Secured Credit Facility from $500.0 million to $360.0 million, the grant of additional liens on the Debtors' cash accounts that were not previously subject to the Prepetition Lenders' liens and certain other terms and conditions.  As of the Petition Date, the aggregate outstanding amount of principal under the Senior Secured Credit Facility was approximately $317.0 million, along with interest, fees, and charges accrued and accruing thereon and chargeable with respect thereto.  Approximately $12.7 million of that amount was comprised of letters of credit.

2.      Other Secured Debt.

The Debtors also have two outstanding term loans with AmeriMark Bank related to their headquarters locations in Rolling Meadows, Illinois.  Each term loan is secured by the corresponding office complex (collectively, the "Rolling Meadows Collateral").  As of December 31, 2007, the Debtors had $3.5 million outstanding on the term loan for their current headquarters ("Stonehill Square"), which is due in October 2010, and $4.8 million outstanding on the term loan for a property they at one time had intended to use as a new headquarters facility ("2900 Golf Road"), which is due in March 2009.  In April 2008, the Debtors sold a portion of Stonehill Square to an unrelated third-party buyer in an arms' length transaction and used the proceeds to repay a portion of the Stonehill Square term loan.  As of the Petition Date, approximately $1.7 million was outstanding under the Stonehill Square term loan and approximately $4.8 million was outstanding under the 2900 Golf Road term loan.  During the Chapter 11 Cases, the Debtors have marketed 2900 Golf Road for sale.

3.      Unsecured Senior Subordinated Notes.

The Debtors have $203 million in principal amount of unsecured senior subordinated notes outstanding.    On  December 19, 2005,  Kimball  Hill  issued $203 million  of $10^1/_2$% Senior Subordinated Notes due 2012 in a private placement.  Shortly thereafter, in May and June of 2006, the Debtors completed a public exchange offer for all of the outstanding $10^1/_2$%  Senior Subordinated Notes.    Each  of  the  Debtors  has  guaranteed  the $10^1/_2$% Senior Subordinated Notes on a joint and several basis.  Generally speaking, the $10^1/_2$% Senior Subordinated Notes and the guarantees are subordinated to all of the indebtedness of the issuer and guarantors, respectively, including guarantees of Joint Venture-related indebtedness,  but  excluding  debt  explicitly  subordinated  to  the $10^1/_2$% Senior Subordinated Notes, intercompany obligations, additional indebtedness not permitted under the Senior Subordinated Notes Indenture, unsecured obligations to trade creditors, and certain other obligations.  Interest on the $10^1/_2$% Senior Subordinated Notes is payable semi-annually in June and December.  Prior to the Petition Date, the Debtors had not missed  an  interest  payment  under  the  $10^1/_2$%  Senior Subordinated Notes.    Since the Petition Date, the Debtors have not made any interest or other payments under the $10^1/_2$% Senior Subordinated Notes.

4.      Common Stock.

As  of  April 23, 2008,  Kimball  Hill  had  4,386,645.227 shares  of  common  stock outstanding.

C.    Management of the Debtors.

The management team of the Debtors is comprised of the following persons:

| Name | Position |
|---|---|
| C. Kenneth Love | President and Chief Executive Officer |
| Edward J. Madell | Senior Vice President, Chief Financial Officer, and Treasurer |
| Robert J. Ryan | Senior Vice President – People |
| Ann M. Hamilton | Senior Vice President and General Counsel |
| Bradley R. Grining | Vice President and Controller |
| Michael T. Richardson | Regional President |
| Thomas Jacobs | Regional President |

**ARTICLE III.**
**THE CHAPTER 11 CASES**

The following is a general summary of the Chapter 11 Cases, including the events leading up to the chapter 11 filings, the stabilization of the Debtors' operations following the chapter 11 filings, certain administrative matters addressed during the Chapter 11 Cases and the Debtors' restructuring initiatives since the chapter 11 filings.

A.    Events Leading to the Chapter 11 Cases.

The homebuilding industry is highly competitive and fragmented.  The Debtors compete with large national homebuilding companies and smaller regional and local homebuilders.  The Debtors also face competition from existing home resales (including the growing number of foreclosed homes offered at substantially reduced prices) and, to a lesser extent, condominiums and rental housing.

Competition among both small and large residential homebuilders is based on a number of interrelated factors, including location, reputation, amenities, design, quality, and price. Builders of new homes compete not only for homebuyers, but also for desirable properties, financing, raw materials, and skilled independent contractors.  Since the market began to deteriorate in 2006, residential homebuilders have increased the competitive use of sales price reductions to generate new home orders, thereby placing additional pressure on sales volume and gross profit.

The market deterioration was particularly sudden and steep in Florida, Nevada, and California — three of the five regions in which the Debtors had operated prior to announcing their exit from the Florida market in February 2008.  While these markets previously were strong, decreasing consumer sentiment and excess supply led to downward pricing pressure for residential homes, as well as improved and unimproved land.  In those regions and overall, industry trends reduced home prices and slowed the pace of home sales.

On January 15, 2008, the Debtors disclosed a net loss for fiscal year 2007 of approximately $220 million, a substantial decline from their $42 million profit in fiscal year 2006.  And on February 14, 2008, the company disclosed a net loss for the quarter ending

December 31, 2007 of approximately $46 million, more than twice the net loss of approximately $21 million for the corresponding quarter in 2006. In February 2008, the Debtors announced their plan to exit the Florida market. The wind down of operations in Florida is expected to last through early 2009.

The Debtors believe the following significant issues, among others, substantially contributed to the deterioration of the Debtors' financial performance:

1.    Significant Decrease in Demand Leading to Oversupply.

The homebuilding industry in the United States experienced a significant and sustained decrease in demand for new homes resulting in an oversupply of new and existing homes available for sale. The significant increase in foreclosures, particularly, in some of the regions in which the Debtors operate, contributed to the oversupply of homes available for sale. In addition, the rapid increase in new and existing home prices over the past several years reduced housing affordability and tempered buyer demand. In particular, investors and speculators reduced their purchasing activity and, instead, stepped up their efforts to sell earlier-acquired property. Ultimately, these trends resulted in fewer new home sales and higher cancellations which in turn led to higher inventories of unsold homes. In fiscal year 2007, the Debtors' net new home orders decreased by 8.5%.

2.    The Availability and Affordability of Residential Mortgage Financing.

The adverse impact of the demand and supply trends noted above was compounded by the widespread difficulties surrounding the mortgage and credit markets. Triggered initially by a significant increase in foreclosures beginning in 2006, the subprime mortgage crisis had a substantial effect on credit standards in the mortgage industry. Notably, the volatile mortgage market reduced investor demand for mortgage loans and mortgage-backed securities and led to tighter credit requirements. In turn, many potential Kimball Hill homebuyers experienced difficulty in obtaining mortgage loans or faced increased borrowing expenses in the form of higher interest rates and/or larger down payment requirements. Increases in interest rates or decreases in the availability of mortgage funds caused a decline in the market for new homes as potential homebuyers experienced more difficulty obtaining affordable financing. Overall, uncertainties caused by the mortgage crisis led financial institutions to reduce lending activity in an effort to reduce further risk.

In particular, concerns regarding the availability of mortgage financing substantially reduced the Debtors' home sales in certain markets and the lending volume related to the Debtors' mortgage operations. Increased interest rates also limited the Debtors' ability to realize their backlog of home orders because their sales contracts typically provide customers with a financing contingency which allows customers to cancel their contracts in the event they cannot arrange adequate financing. Ultimately, the decreased availability of mortgage financing harmed the Debtors by further increasing their supply of housing inventory, reducing their home sale prices, decreasing demand for their homes, and dampening customer confidence on a wide-scale basis.

In fiscal year 2007, the Debtors' homebuilding revenues decreased 23% to $894.7 million from approximately $1.2 billion in fiscal year 2006. This decrease was primarily due to a 20% decrease in the number of homes delivered and a 7% decrease in the average sale price of homes delivered. New home deliveries in fiscal year 2007 decreased to 3,246 from 4,079 in fiscal year 2006. Further, the average sale price of the Debtors' homes delivered decreased to $257,000 from $277,000 in fiscal year 2006.

3.      Pressure from the Debtors' Leveraged Structure.

Due to the market forces described above, it became increasingly difficult for the Debtors to meet their debt service obligations. In particular, the Debtors were unable to maintain certain specified consolidated ratios and unable to satisfy certain consolidated financial tests under the Debtors' Senior Secured Credit Facility. As of September 30, 2007, and December 31, 2007, the Debtors were in default under the Senior Secured Credit Facility. Due to those defaults, the Debtors were unable to borrow additional amounts under the terms of the Senior Secured Credit Facility. Although the Debtors and the Prepetition Agent negotiated a series of temporary waivers and amendments to the Senior Secured Credit Facility that, among other things, permitted the Debtors to continue borrowing under the Senior Secured Credit Facility, this series of developments ultimately resulted in a substantial reduction of the Debtors' liquidity position, which ultimately precipitated the filing of the Chapter 11 Cases.

Compounding the issues under the Senior Secured Credit Facility, the Debtors also faced an approximately $10.7 million interest payment coming due under the $10^1/_2$% Senior Subordinated Notes on June 15, 2008.

4.      Joint Venture Obligations.

The Debtors also had near-term obligations associated with certain of their joint ventures. Specifically, the Debtors were alleged to be in default under a number of their joint venture agreements, including without limitation the Sunridge Park and Regency Oaks joint ventures (as discussed in Article III.E.5 herein). In addition, the Debtors had a substantial land purchase obligation coming due in connection with their South Edge and Kyle Canyon joint venture. As of the Petition Date, the Debtors were unable to meet their obligations associated with a number of their joint ventures.

B.      <u>Initiation of the Chapter 11 Cases</u>.

On April 23, 2008, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On April 25, 2008, the Bankruptcy Court entered an order jointly administering the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b). No trustee or examiner has been appointed in the Chapter 11 Cases.

C.     <u>Appointment of the Creditors' Committee</u>.

On April 30, 2008, the United States Trustee for the Northern District of Illinois (the "U.S. Trustee") appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee"). The members of the Creditors' Committee currently include: US Bank, N.A., as indenture trustee for the $10^1/_2\%$ Senior Subordinated Notes; SMH Capital Advisors, Inc.; California National Bank; Tower Crossing Homeowner's Association; Masco Corporation; and Builders Gypsum Supply. The Creditors' Committee retained Akin Gump Strauss Hauer & Feld LLP and Shaw Gussis Fishman Glantz Wolfson & Towbin LLC as their counsel and FTI Consulting, Inc. as their financial advisor. The Creditors' Committee also retained The Garden City Group as its notice and information agent.

Since the formation of the Creditors' Committee, the Debtors have consulted with the Creditors' Committee concerning all aspects of the Chapter 11 Cases. The Debtors have kept the Creditors' Committee informed about their operations and, together with the Debtors' management team and advisors, the Creditors' Committee has participated actively in, among other things, a review of the Debtors' operations and business plan. Additionally, the Debtors and their advisors have met with the Creditors' Committee and their advisors regularly, including in connection with the formulation and negotiation of the Plan.

D.     <u>Stabilization of Operations</u>.

A smooth transition into chapter 11 was essential for the Debtors because the purchase of a home is a significant investment, based upon trust and confidence. It was critically important for the Debtors to maintain the loyalty and goodwill of their customers and associates, as well as their strong reputation for quality and exceptional customer service. To do so, the Debtors needed to be able to continue home sales and closings in the ordinary course of business. It was also crucial for the Debtors to remain on favorable terms with their trade partners and contractors to ensure that current operations continued uninterrupted.

Upon commencing the Chapter 11 Cases, the Debtors devoted substantial efforts to stabilizing their operations and preserving and restoring their relationships with vendors, contractors, title companies, customers, employees, utility providers, and other parties that had been affected by the commencement of the Chapter 11 Cases. To this end, in addition to the voluntary petitions for relief filed by the Debtors, the Debtors also filed a number of motions and applications with the Bankruptcy Court. Within a few days, the Bankruptcy Court entered several orders to, among other things: (a) prevent interruptions to the Debtors' businesses; (b) ease the strain on the Debtors' relationships with certain essential constituents; (c) provide access to much-needed working capital; and (d) allow the Debtors to retain certain advisors necessary to assist the Debtors with the administration of the Chapter 11 Cases. Several of these orders are summarized below.

1.     Debtor in Possession Financing ("DIP Financing").

As of the Petition Date, the Debtors faced an inability to access financing to fund operations and thereby generate revenue to support their business. The homebuilding industry

crisis and the significant impairment charges as a result of the depressed housing market took a significant toll on the Debtors' balance sheet and working capital was scarce. The deterioration of the homebuilding industry and the stagnant credit market significantly hampered the Debtors' ability to obtain traditional DIP Financing alternatives. Moreover, the ability to obtain DIP Financing was further limited by the need to preserve the value of certain unencumbered assets for the Debtors' unsecured creditors.

On April 15, 2008, the Debtors received a $51,851,594 federal tax refund from the Internal Revenue Service as a result of a net operating loss carryback. The Debtors determined that Kimball Hill would use the unencumbered tax refund to provide DIP Financing to the other Debtors. To protect the unsecured creditors' interests in the Debtors' unencumbered assets – including the tax refund – the DIP Financing contemplated a consensual priming of the Prepetition Lenders' security interests. The Prepetition Lenders also consented to the use of their cash collateral.

On April 25, 2008, the Bankruptcy Court entered an interim order (the "First Interim DIP Order") authorizing the Debtors to obtain, and Kimball Hill to provide, postpetition financing in the aggregate amount of up to $35 million on an interim basis to (a) pay administrative expenses incurred in the Chapter 11 Cases, (b) provide for working capital and other general corporate purposes, and (c) make any other payments permitted by the Bankruptcy Code, the interim order, or any other order of the Bankruptcy Court to the extent provided for in the DIP Facility.

In addition to approving the interim financing, the Bankruptcy Court authorized the Debtors to use cash collateral pursuant to the terms and conditions set forth in the interim order and granted the Prepetition Lenders adequate protection in the following forms: (i) reimbursement of fees and expenses incurred by professionals for the Prepetition Agent; (ii) payment in cash of an amount equal to the interest due under the Senior Secured Credit Agreement at non-default rates; (iii) additional liens and security interests in the Debtors' collateral that are, respectively, junior to the liens and security interests granted to the DIP Lender; (iv) a superpriority claim pursuant to section 507(b) of the Bankruptcy Code, but not to the extent of the liens granted to the DIP Lender, which claim is secured by unencumbered assets of the Debtors; (v) delivery by the Debtors of periodic reporting packages; and (vi) compliance with a budget.

On May 1, 2008, the Bankruptcy Court entered a second interim order authorizing the DIP Financing and the terms of the use of the Prepetition Lenders' cash collateral on an interim basis, and amending certain terms of the First Interim DIP Order.

On May 13, 2008, the Bankruptcy Court entered a final order approving the DIP Facility and the terms of the use of the Prepetition Lenders' cash collateral on a final basis.

2.      Home Sales and Customer Programs.

The Debtors' ability to operate under chapter 11 hinged on their ability to satisfy existing contractual obligations to customers and to continue to contract for and complete the construction and sale of homes, including by acquiring land and lots, constructing homes, and transferring title to homebuyers "free and clear" of liens, all without the necessity of seeking and

obtaining a Court order for each individual sale.  Accordingly, the Bankruptcy Court entered interim and final orders authorizing the Debtors to continue to sell homes free and clear of all liens and establishing procedures for the resolution and payment of prepetition claims of certain third parties that may be entitled under state law to assert or perfect liens against the Debtors' real property.

The Debtors also obtained authority, but not direction, to honor their prepetition customer programs, including warranty programs, in order to maintain the loyalty and goodwill of their customers.

3.    Prepetition Lien Claims.

As part of their homebuilding operations, the Debtors routinely contract with a number of third parties, including subcontractors and suppliers, for services, supplies, and building materials necessary to ensure that home construction continues in a timely manner.  Notably, the Debtors believed most of these parties would be entitled under applicable non-bankruptcy law to assert liens against the Debtors and their property (the "Lien Claimants").

To induce the Lien Claimants to continue to do business with and/or extend favorable trade terms to the Debtors, the Debtors obtained authority to pay those parties that had or could have asserted liens against the Debtors' property or homes the Debtors recently had sold.  The Debtors also obtained authority to immediately pay the Administrative Claims under section 503(b)(9) of the Bankruptcy Code of parties that had delivered goods to the Debtors within the 20 days before the Petition Date (the "503(b)(9) Claimants").

In aggregate, the Debtors have paid approximately $24.69 million to Lien Claimants and approximately $1.19 million to the 503(b)(9) Claimants during the Chapter 11 Cases.

4.    Utilities.

Recognizing the severe impact even a brief disruption of utility services would have on the Debtors' business operations, the Bankruptcy Court established procedures for determining adequate assurance of payment for future utility service and prohibited utility providers from altering, refusing, or discontinuing services without further order during the Chapter 11 Cases. The procedures approved by the Bankruptcy Court provided for the establishment of a utility deposit account in the aggregate amount of 50% of the Debtors' average monthly utility spending of approximately $380,000 (the "Utility Deposit Account") and permitted utilities to request additional adequate assurance of payment from the Debtors, and provided for an expedited dispute resolution process before the Bankruptcy Court in the event that the Debtors and the utility provider were unable to agree on an appropriate form of adequate assurance of future payment.

5.    Taxes.

The Debtors believed that certain taxing authorities had the ability to exercise remedies that would be detrimental to the Debtors' restructuring if the Debtors failed to remit certain taxes and fees.  Accordingly, the Debtors sought and obtained interim and final orders from the Bankruptcy Court authorizing the Debtors to pay certain fees and taxes, including sales, use,

franchise, real and personal property taxes, business licenses and fees, annual report taxes, and other charges and assessments as necessary or appropriate to avoid harm to the Debtors' business operations.

6.    Severance and Incentive Programs.

a.    Implementation of Severance Program.

At the inception of the Chapter 11 Cases, the Debtors did not seek immediate approval of their prepetition severance program. This temporary freeze on severance benefits, coupled with the Debtor's financial situation and the prepetition termination of over 300 employees in the prior 8 month period, created significant uncertainty within the ranks of the Debtors' employees. The Debtors' management began to sense, and experience first hand, a decline in employee morale as a result of a perceived lack of job security. Consequently, the Debtors sought authorization from the Bankruptcy Court to implement a postpetition severance program in a concerted effort to combat this uncertainty, specifically with respect to the perceived risk that working for a company in chapter 11 results in an increased likelihood of job elimination. On June 18, 2008, the Bankruptcy Court entered an order approving the Debtors' severance plan for all full-time employees and allowing the Debtors to make prepetition severance payments to certain employees terminated prepetition.

The Debtors' severance program provides that all full-time employees without employment contracts are qualified to receive severance benefits in the event that the employee has been terminated involuntarily and without cause. Severance benefits are also contingent on the employee's execution of a release of all claims against the Debtors. The primary cash component of the severance program consists of payments to eligible employees in the form of salary continuation. The salary continuation benefit is measured in terms of the number of weeks of salary provided to the terminated employee and varies based on the employee's level and years of service. Under the Debtors' severance program, payments to "insiders" are capped in accordance with the limitations set forth in section 503(c)(2)(B) of the Bankruptcy Code regardless of the insiders' tenure. Additionally, under the severance program each employee involuntarily terminated is eligible to receive health and dental care coverage through COBRA from date of termination through the duration of the employee's salary continuation. Lastly, for senior and executive level employees, severance payments and other benefits terminate after the later of twenty-six weeks or the day a senior or executive level employee commences alternate employment.

b.    Implementation of Incentive Program.

Prior to their chapter 11 filing, the Debtors also offered an annual employee bonus program based on operational achievements and evaluation of individual performance and contribution levels. Given the financial condition of the Debtors and the pendency of the Chapter 11 Cases, the Debtors' employees manifested similar concerns regarding the overall reduction in competitive compensation opportunities. As such, to foster and enhance employee focus and productivity, the Debtors designed and sought Bankruptcy Court approval of an incentive program designed to provide appropriate incentives to employees but subject to the

financial constraints under which the Debtors were operating.   On June 18, 2008, the Bankruptcy Court approved the Debtors' incentive program.

The Debtors' incentive program consisted of two components: an operations component and a discretionary component.   The Debtors designed the operations component for approximately 100 employees who occupied positions critical to the operation of the Debtors' ongoing business (other than the Debtors' top seven employees).   These eligible employees were entitled to compensation only upon achieving certain revenue and productivity targets that were determined quarterly with the consent of the Creditors' Committee and the Prepetition Lenders.

The discretionary component of the Debtors' incentive plan provided for the creation of a bonus pool in the amount of $250,000, from which the Debtors' chief executive officer could award individual bonus payments in order to motivate and reward any employee (other than the Debtors' top seven employees).   Discretionary incentive payments were subject to a cap of $10,000 per employee, provided that the Debtors could award individual incentive bonus payments in excess of $10,000 (but in no event greater than $50,000 per employee) with the consent of the Creditors' Committee and the Prepetition Agent.

c.      Implementation of Florida Wind-Down Employee Incentive Program.

As part of their prepetition restructuring initiatives, the Debtors announced the wind-down of their Florida operations in February 2008.   As part of their Florida wind-down process, the Debtors established a comprehensive plan to complete the remaining projects on which they already had commenced construction.   The Debtors' ability to execute their plan was dependent upon the continued employment and dedication of key employees with the knowledge, experience, and skill necessary to support the Debtors' remaining Florida projects and to wind-down the Florida operations.   Recognizing the need to motivate these 35 key employees to conduct the Florida wind-down in a way that would maximize value for the Debtors' stakeholders, the Debtors developed and sought Bankruptcy Court approval of a comprehensive incentive plan for key employees in their Florida division.   On June 18, 2008, the Bankruptcy Court entered an order approving the Debtors' incentive plan in connection with the wind-down of their operations in Florida.

The Florida wind-down incentive plan involved two major components:  (1) transitioning responsibilities from key employees as projects are completed and sold and (2) motivating key employees by providing payments to those employees who meet certain targeted goals throughout the wind-down process and maintain satisfactory performance ratings throughout the remainder of their employment.   Ultimately, the wind-down incentive plan contemplated the departure of key employees at predetermined times according to the progression of the Debtors' wind-down goals.   The Florida wind-down is scheduled to be completed by early 2009.

E.     Certain Administrative Matters in the Chapter 11 Cases.

1.      Employment and Retention of Advisors.

Throughout the Chapter 11 Cases, the Debtors retained certain Professionals to assist them in carrying out their duties as debtors in possession and to otherwise represent their interests in the Chapter 11 Cases.   These Professionals included:  (a) Kirkland & Ellis LLP, as

counsel for the Debtors; (b) Houlihan Lokey Howard & Zukin Capital, Inc., as investment banker and financial advisor to the Debtors; (c) Deloitte Tax LLP, as tax consultant and advisor to the Debtors; and (d) Kurtzman Carson Consultants LLC, as voting, claims, and balloting agent to the Debtors.  In addition, prior to the commencement of the Chapter 11 Cases, the Debtors engaged Alvarez & Marsal North America, LLC ("A&M") as their restructuring consultant, and Andrew D. J. Hede, a Managing Director of A&M, as Chief Restructuring Officer.  The Debtors also retained Neal, Gerber & Eisenberg LLP and Gardere Wynne Sewell LLP, each as special counsel in connection with the sales of certain specialized types of assets.  The Bankruptcy Court entered an order approving certain procedures for the interim compensation and reimbursement of retained Professionals in the Chapter 11 Cases.

2.    Asset Sales.

a.    De Minimis Asset Sales.

Throughout the Chapter 11 Cases, the Debtors reviewed the strategic benefits of their assets to their operations.  As a result of this review, the Debtors identified certain de minimis assets that would provide the greatest return to the Debtors' estates through sale.  De minimis assets included non-land assets valued below $250,000 and land assets valued below $5 million.  On May 29, 2008, the Bankruptcy Court entered an order authorizing the Debtors to sell certain de minimis assets and establishing expedited procedures for selling such de minimis assets (the "De Minimis Asset Sales Order").  Pursuant to the De Minimis Asset Sales Order, the Debtors have sold several such assets for an aggregate sale price of approximately $7,732,883 during the Chapter 11 Cases.

b.    Non-Core Asset Sales.

The Debtors also identified certain non-core assets that would provide the greatest return to the Debtors' estates through sale.  These non-core assets included assets valued outside the parameters established by the De Minimis Asset Sales Order.  Therefore, the Debtors obtained a separate order establishing streamlined procedures for selling such assets.

c.    Other Asset Sales.

During the Chapter 11 Cases, the Debtors determined that selling certain real property located in Tarrant County, Texas, that contains various mineral deposits, including oil and natural gas (the "Mineral Estate") would return more value to the Debtors' estates than the regular royalty payments that the Debtors received from the Mineral Estate prior to the sale.  Accordingly, the Debtors marketed the Mineral Estate for sale and, on October 31, 2008, sold the Mineral Estate to the highest bidder, Smith Oil Company, Inc., for approximately $4.5 million.

3.    De Minimis Settlement Procedures.

On June 18, 2008, the Bankruptcy Court approved the Debtors' motion seeking approval of certain procedures for settling de minimis Claims. Under the de minimis settlement procedures, the Debtors may settle Claims for $250,000 or less without further notice or order of the Bankruptcy Court, provided that the Debtors provide notice and an opportunity to object to the settlements to the Prepetition Agent, the Creditors' Committee, and the U.S. Trustee.  The

Debtors have sought separate Bankruptcy Court authority for settlements that fell outside the authority granted in the de minimis settlement procedures.

      4.      Procedures for Rejection of Executory Contracts and Unexpired Leases.

As of the Petition Date, the Debtors were parties to thousands of Executory Contracts and Unexpired Leases. The Debtors have reviewed the Executory Contracts and Unexpired Leases of personal property to which they are counterparties. To date, the Debtors have sought to reject approximately 42 Executory Contracts and Unexpired Leases, many of which were rejected as part of the Debtors' decision to discontinue or consolidate certain business operations.

By an order dated August 12, 2008, the Bankruptcy Court extended the time within which the Debtors must assume or reject Unexpired Leases of non-residential real property pursuant to section 365(d)(4) of the Bankruptcy Code through and including November 19, 2008. By agreed orders dated November 18, 2008, the Bankruptcy Court further extended the time within which the Debtors must assume or reject certain real property leases to March 31, 2009. The remainder of the real property leases have been rejected by operation of law.

In connection with the Sale and Wind-Down Process (defined below), the Debtors expect that favorable Executory Contracts and Unexpired Leases may be assumed and assigned to purchasers to maximize the recovery to the estate. To the extent that Executory Contracts and Unexpired Leases are unfavorable or relate to businesses or assets that are liquidated or wound-down, the Debtors expect that such contracts and leases will be rejected.

      5.      WRI Settlement.

Before the Petition Date, the partners in the Debtors' Sunridge Park and Regency Oaks joint ventures asserted numerous defaults against certain of the Debtors, the general partners of such joint ventures. These disputes affected the ongoing administration of the joint ventures in the Chapter 11 Cases. Accordingly, the Debtors believed it would be advantageous to resolve these disputes as quickly as possible.

After extensive negotiations, on October 28, 2008, Debtors Kimball Hill Homes California, Inc. ("KHH California") and Kimball Hill Homes Illinois, LLC ("KHH Illinois") entered into settlement agreements with WRI Communities Fund I, LLC and WRI Sunridge Park 83, LLC and WRI Investments III LLC (collectively, "WRI"), respectively, providing for the settlement of all Claims between the parties. The Sunridge Park Limited Partnership settlement essentially provided that the WRI party would exit the joint venture, leaving KHH California as the sole member of a successor limited liability company ("KH Sunridge Park LLC"). As consideration for exiting the joint venture, the WRI party received 83 of the 140 lots owned by the joint venture. In addition, pursuant to the settlement, KH Sunridge Park LLC and WRI entered into a development agreement pursuant to which KH Sunridge Park LLC agreed to continue the horizontal development of the 83 lots distributed to WRI. As consideration for developing the property, WRI will pay KH Sunridge Park LLC a fee equal to 5% of the development costs and expenses.

The Regency Oaks Limited Partnership settlement also provided that the WRI party would exit the joint venture, leaving KHH Illinois as the sole member of a successor limited liability company ("Regency Oaks LLC").  As consideration for exiting the joint venture, the WRI party received a cash payment of approximately $850,000 (representing amounts due to WRI under the limited partnership agreement) from the Regency Oaks joint venture.

      6.      Exclusivity.

Section 1121(b) of the Bankruptcy Code establishes an initial period of 120 days after the Bankruptcy Court enters an order for relief under chapter 11 of the Bankruptcy Code during which only the debtor may file a plan.  If the debtor files a plan within such 120-day period, section 1121(c)(3) of the Bankruptcy Code extends the exclusivity period by an additional 60 days to permit the debtor to seek acceptances of such plan.  Section 1121(d) of the Bankruptcy Code also permits a bankruptcy court to extend these exclusivity periods "for cause." Without further order of the Bankruptcy Court, the Debtors' initial exclusivity period to file a plan would have expired on August 21, 2008.  However, by orders dated August 12, 2008 and October 14, 2008, the Bankruptcy Court extended the periods of the Debtors' exclusive authority.  The current deadline for the Debtors to file a plan is January 16, 2009, and the current deadline to seek acceptance of a plan is March 16, 2009.  The Debtors have reserved their rights to further extend these deadlines.

F.     <u>Claims</u>.

On June 9, 2008, the Debtors filed their schedules of assets and liabilities and statement of financial affairs (collectively, the "Schedules") with the Bankruptcy Court.  On June 10, 2008, the Debtors amended their Schedules.  Interested parties may review the Schedules at the office of the Clerk of the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, 219 S. Dearborn Street, Chicago, Illinois 60604 or by visiting http://www.kccllc.net/kimballhill.

      1.      Bar Dates.

On June 11, 2008, the Bankruptcy Court entered an order pursuant to Bankruptcy Rule 3003(c)(3) setting: (a) August 1, 2008, as the date by which all Entities (except Governmental Units) are required to file Proofs of Claim for prepetition Claims and Administrative Claims asserted pursuant to section 503(b)(9) of the Bankruptcy Code; (b) the later of (i) August 1, 2008 and (ii) 30 days after a claimant is served with notice that the Debtors have amended their Schedules in a manner that reduces, deletes, or changes the status of a Claim in the Schedules, as the date by which such claimant is required to file Proofs of Claim for prepetition Claims relating to the amended Schedules; (c) the latest of (i) August 1, 2008, (ii) 30 days after the date of the entry of any order authorizing the rejection of an Executory Contract or Unexpired Lease, and (iii) 30 days after the effective date of the rejection of such Executory Contract or Unexpired Lease, as the date by which all entities are required to file Proofs of Claim for rejection damages; and (d) December 8, 2008, as the date by which all governmental units are required to file Proofs of Claim for prepetition Claims.  In accordance with the Bar Date Order, written notice of the various Bar Dates was mailed to, among others, all Holders of Claims listed

on the Schedules. In addition, the Debtors published notice of the Claims Bar Date in the *USA Today*, *The Wall Street Journal* (National Edition), and *The Chicago Tribune*.

The Debtors also plan to file a motion to be heard on January 13, 2009 asking the Bankruptcy Court to set bar dates for filing Administrative Claims. The motion will request establishment of an interim bar date for Administrative Claims arising between the Petition Date and the date of the motion, and a bar date 45 days after the Effective Date for Administrative Claims arising after the date of the motion.

   2.    Claims.

As of November 28, 2008, approximately $16 million was outstanding under the DIP Facility. In addition, as of November 28, 2008, the Voting and Solicitation Agent had received approximately 2,990 Claims and the approximate numbers and total amounts of Claims filed against one or more of the Debtors were as follows: (1) 30 Administrative Claims in the total amount of $1,060,220.43; (2) 19 Priority Tax Claims in the total amount of $1,182,171.15; (3) 1 Senior Credit Agreement Claim in an unliquidated amount; (4) 737 Other Secured Claims in the total amount of $23,153,387.63 (plus unliquidated amounts); (5) 2 Secured Bank Claims in the total amount of $6,516,558.98; (6) 575 Priority Non-Tax Claims in the total amount of $3,436,016.66 (plus unliquidated amounts); (7) 1,613 Senior Unsecured Claims and General Unsecured Claims in the total amount of $2,337,334,670.77 (plus unliquidated amounts); (8) 1 Unsecured Senior Subordinated Note Claim in an unliquidated amount; and (9) no claims that are believed to be Subordinated Debt Securities Claims. The Debtors believe that many of the filed Proofs of Claim are invalid, untimely, duplicative, and/or overstated and plan to object to such Claims.

The Debtors estimate that, at the conclusion of the Claims objection, reconciliation, and resolution process, the aggregate amount of Allowed Claims will be as follows: (1) an Allowed DIP Facility Claim in the approximate total amount of $16,000,000; (2) Allowed Administrative Claims in the approximate total amount of $1,000,000; (3) Allowed Priority Tax Claims in the approximate total amount of $1,000,000; (4) an Allowed Senior Credit Agreement Claim in the approximate total amount of $315,100,000; (5) Allowed Other Secured Claims in the approximate total amount of $4,000,000; (6) Allowed Secured Bank Claims in the approximate total amount of $6,520,000; (7) Allowed Priority Non-Tax Claims in the approximate total amount of $1,000,000; (8) Allowed Senior Unsecured Claims in the approximate total amount of $43,571,000; (9) Allowed General Unsecured Claims in the total approximate amount of $130,900,000; (10) Allowed Unsecured Senior Subordinated Note Claims in the approximate total amount of $210,600,000; and (11) no Allowed Subordinated Debt Securities Claims. The estimate of Allowed Administrative Claims includes, among others, Claims arising from the cure of assumed Executory Contracts and Unexpired Leases, Claims arising from a right of reclamation, and certain Administrative Claim requests reflected on the Claims Register and docket for which the Debtors reasonably expect there to be a recovery. The estimate of Allowed Administrative Claims does not include ordinary course obligations incurred postpetition such as trade payables and certain Professional fees. Based upon the Debtors' valuation, the Debtors believe that the Secured portion of the Senior Credit Agreement Claims is allowable (a) in the amount of $72 million in the aggregate in the event the Debtors do not

consummate, on or before the Effective Date, a sale of substantially all of the assets that are collateral securing the Senior Credit Agreement Claims or (b) in the event such sale is consummated on or before the Effective Date, in the amount of consideration allocable to the assets securing the Senior Credit Agreement Claims.

These estimates are approximate and based upon numerous assumptions and represent significant reductions in the aggregate face amount of Claims filed. There is no guarantee that the ultimate amount of each category of Claims will conform to the estimates stated herein, and the majority of Claims underlying such estimates are subject to challenge. Numerous Claims have been asserted in unliquidated amounts. The Debtors believe that certain Claims are without merit and intend to object to all such Claims, however, there can be no assurance that the Debtors will be able to achieve the significant reductions in Claims set forth above. Moreover, additional Claims may be filed or identified during the Claims objection, reconciliation, and resolution process that may materially affect the foregoing estimates.

G.    The Debtors' Attempts to Reorganize.

Before commencing the Chapter 11 Cases, the Debtors pursued a number of financial and operational restructuring initiatives. The Debtors commenced the Chapter 11 Cases to continue implementing these restructuring initiatives and to continue the search for a plan sponsor for either a going concern investment in the Debtors or a sale of some or all of the Debtors' assets. During the Chapter 11 Cases, the Debtors conducted an exhaustive search for a plan sponsor or potential purchaser, as well as an analysis of a stand-alone reorganization alternative, all as discussed in further detail below.

1.    Operational and Cost-Cutting Initiatives.

The Debtors' first step was to streamline operations and reduce costs. To that end, commencing at the end of 2007, the Debtors' management identified several opportunities to improve the performance of their operations, increase efficiency, and cut costs. Among other things, the Debtors' management and financial advisors identified withdrawal from the Florida market as a way to improve financial performance. Accordingly, in February 2008, the Debtors announced an orderly wind-down of their operations in Florida. The Debtors also streamlined their operations to focus generally on constructing homes on finished lots – developed land that does not require any work prior to building homes on the land. In addition, the Debtors reduced their headcount as part of the restructuring.

2.    Development of a Revised Business Plan.

Integral to the Debtors' restructuring effort and securing a plan sponsor (and, after the Petition Date, required by the Bankruptcy Court's orders approving the DIP Facility and the Debtors' use of the Prepetition Lenders' cash collateral) was the development of a revised business plan. This process, which entailed a full-scale evaluation of the Debtors' entire business to identify cost-cutting and efficiency-generating opportunities, had been commenced in early 2008. After the Petition Date, the Debtors continued to dedicate significant resources to reviewing each community to determine its profitability and strategic benefit to the Debtors' operations overall. The Debtors distributed and discussed the revised business plan with the

Prepetition Lenders and the Creditors' Committee in June 2008. The revised business plan was a critical element of the ongoing plan sponsor and plan alternatives processes and thus to the Debtors' strategy for exiting chapter 11 and formed the basis for discussions with their major constituencies in evaluating plan alternatives.

       3.      Plan Sponsor Process.

On a parallel track, in early 2008, the Debtors' advisors also began to solicit proposals from potential plan sponsors for going concern investments in the Debtors, as well as for sales of some or all of the Debtors' assets. However, due to the state of the credit markets and the deterioration of the housing industry, the Debtors determined that obtaining a plan sponsor was unlikely outside of chapter 11.

Accordingly, the Debtors commenced these Chapter 11 Cases with the goal of formulating and negotiating a consensual chapter 11 plan that would maximize recoveries for all parties in interest. At the inception of these Chapter 11 Cases, the Debtors envisioned a 90-120 day plan sponsor process designed to generate a range of chapter 11 exit alternatives. As part of this plan sponsor process, the Debtors and their advisors contacted approximately 100 potential investors, signed confidentiality agreements with more than 55 of those investors, and conducted in-depth documentary and in-person due diligence with approximately 7 investors. This in-depth due diligence included numerous meetings and conference calls between the Debtors' management and advisors and these investors. The process has been time-consuming and has dominated the time of the Debtors' financial advisors in addition to requiring a substantial amount of management involvement (the Debtors received proposals from six parties at various stages of the process).

The Debtors continued to work hard throughout the Chapter 11 Cases to attract a plan sponsor. The plan sponsor process continued to appear promising as the Debtors continued to make progress with plan negotiations and their search for a plan sponsor. The Debtors considered and entertained proposals for a wide range of options, including an equity sponsor, a sale of the business as a going concern, and bulk asset sales in addition to a stand-alone reorganization. Evaluating plan sponsor alternatives and their impact on various plan formulations comprised a significant part of the plan formulation and negotiation process.

In the meantime, the Debtors also continued to work constructively with the Prepetition Lenders, the Creditors' Committee, and their respective advisors to negotiate and formulate a plan designed to address the needs of each of their varying constituencies. In early September, the Debtors circulated a draft plan to these key constituent groups and sought market feedback regarding the basic structure of that plan. Although the Debtors continued to make progress with the plan sponsor process, financial markets suffered a significant collapse in mid-September and the high profile failures of several large financial institutions made securing financing for plan sponsors, either with a third party or consensually with the Debtors' prepetition creditors, highly unlikely. At the outset, the economic turmoil slowed but did not derail the plan sponsor process. Notably, however, the recent disruption within numerous major financial institutions and the crisis in the financial markets has rippled through the financial community and created an even more significant distraction for a number of parties in interest and the homebuilding industry generally.

In the end, the market turmoil proved too much for the Debtors to overcome.  Indeed, between the Petition Date and September 2008, new home prices for the industry dropped 12.3% from an average price of $314,300 to $275,500.  New home sales also have dropped 16.3% between the first and third quarters of 2008, from 141,000 units sold to 118,000.  These are just two of the indicators that reflect the negative impacts of the turmoil on the Debtors' businesses and the obstacles to their efforts to reorganize.  Moreover, the recent financial crises have dramatically limited the forms of consideration acceptable to the Debtors' creditors, particularly the Prepetition Lenders.  Given these circumstances, the Debtors have decided, in consultation with the Prepetition Lenders and the Creditors' Committee, that commencing an orderly wind-down of their business in conjunction with their continuing sale efforts is necessary to maximize returns for all parties in interest.  In connection with the wind-down, the Debtors have worked hard to negotiate and formulate the Plan, which incorporates a global settlement between, and enjoys the full support of, both representatives of the Debtors' primary constituent groups, the Prepetition Agent, and the Creditors' Committee.

H.      Global Settlement of Claims Between Creditors' Committee and Prepetition Lenders.

On August 28, 2008, the Creditors' Committee moved for standing to assert various claims and causes of action against the Prepetition Lenders on behalf of the Estates (the "Standing Motion"), including claims to avoid certain alleged constructively fraudulent transfers and preferential transfers under chapter 5 of the Bankruptcy Code.  The Standing Motion was adjourned from time to time pending settlement negotiations between the Creditors' Committee and the Prepetition Lenders regarding the Claims the Creditors' Committee sought to assert in the Standing Motion and certain other Claims alleged by the Prepetition Lenders against the Debtors' Estates, including Claims under section 507(b) of the Bankruptcy Code.

On November 14, 2008, the Creditors' Committee and the Prepetition Agent reached a global settlement (the "Settlement") that is incorporated into, and designed to be implemented through, the Plan.  In addition to governing the treatment and distributions to be received by certain Holders of Claims, the settlement resolves several other matters regarding the administration of the Debtors' Estates, including the manner in which Administrative Claims will be paid and the establishment of the Post-Consummation Trust and the Liquidation Trust.  Set forth below are more detailed discussions regarding the Claims resolved by the Settlement and the terms of the Settlement itself.

1.      The Creditors' Committee's Claims.

Generally speaking, the Creditors' Committee sought authority in the Standing Motion to bring Claims to avoid the following transfers as constructively fraudulent under sections 544 and 548 of the Bankruptcy Code:  (a) security interests granted to the Prepetition Lenders under the Senior Secured Credit Facility from and after August 10, 2007; and (b) the incurrence of guarantee obligations by the Debtor subsidiaries of Kimball Hill. in favor of the Prepetition Lenders.  The Creditors' Committee also sought authority to bring Claims to avoid the following transfers as preferences under section 547 of the Bankruptcy Code:  (i) the liens granted by the Debtors to secure obligations under the Senior Secured Credit Facility in the 90 days prior to the Petition Date; and (ii) approximately $20 million in cash allegedly paid by the Debtors on the Senior Secured Credit Facility during the 90 days prior to the Petition Date.

According to the Creditors' Committee, the Debtors granted security interests in connection with the August 2007 amendment and restatement of the Senior Secured Credit Facility (which previously had been unsecured) at a time when the Debtors were insolvent and for less than a reasonably equivalent value.  The Creditors' Committee also alleged that guarantees of Kimball Hill's obligations to the Prepetition Lenders that were made by Kimball Hill's Debtor-subsidiaries in 2005 under the then unsecured credit facility, that was amended to become the Senior Secured Credit Facility, were made at a time when the Debtors were insolvent and for less than a reasonably equivalent value.  Thus, the Creditors' Committee asserted that such security interests and subsidiary guarantees were avoidable under section 548 of the Bankruptcy Code and Illinois law, by means of section 544 of the Bankruptcy Code.

The Creditors' Committee also alleged that certain liens granted and payments made to the Prepetition Lenders within ninety days of the commencement of the Chapter 11 Cases on account of the Senior Secured Credit Facility were transfers on account of an antecedent debt made while the Debtors were insolvent and entitled the Prepetition Lenders to receive more than they would have in a hypothetical liquidation under chapter 7 of the Bankruptcy Code.  Thus, the Creditors' Committee asserted that such liens and payments were avoidable under section 547 of the Bankruptcy Code.

The Bankruptcy Court has not decided the Standing Motion or conferred standing on the Creditors' Committee to bring the above-described Claims.  Instead, the Debtors, the Creditors' Committee, and the Prepetition Agent agreed to adjourn the Standing Motion from time to time while the parties negotiated the terms of a consensual plan.  Nothing herein shall be deemed to be an admission or waiver of the Prepetition Lenders' right to contest the Creditors' Committee's request for standing.  The Prepetition Agent reserves all rights to object to the Standing Motion and to any grant of standing to the Creditors' Committee in the event the Settlement is not approved or the Plan or a substantially similar plan incorporating the Settlement is not consummated.

2.      The Prepetition Lenders' Claims.

As discussed in section III.D.1 above, the Prepetition Lenders consented to the priming of their liens and the use of their cash collateral in connection with the Debtors' DIP Financing.  As adequate protection for their priming and cash collateral use, the Prepetition Lenders consensual priming of their liens, and the consensual use of their cash collateral, the Prepetition Lenders received, among other things, a superpriority claim for the diminution in the value of their collateral pursuant to section 507(b) of the Bankruptcy Code, but not to the extent of the liens granted to the DIP Lender, which claim is secured by unencumbered assets of the Debtors (a "Diminution Claim").  In light of the continued decline of the housing market during the Chapter 11 Cases, the Prepetition Agent informed the Debtors and the Creditors' Committee that it intended to assert a substantial Diminution Claim — well in excess of the Diminution Claim payment under the Settlement — against the Debtors' unencumbered assets.  The Prepetition Agent also informed the Debtors that the Prepetition Lenders expected that under any restructuring or wind-down of operations, a portion of the Administrative Claims would be paid from the unencumbered assets available to satisfy Unsecured Claims.

3.      The Terms of the Settlement.

After extensive negotiations, the Prepetition Agent and the Creditors' Committee reached a global settlement to resolve all of the Claims asserted or potentially asserted against each other in the Chapter 11 Cases.  In short, the key terms of the Settlement are:

- $6 million cash payment from the Post-Consummation Trust (i.e., encumbered assets) to the Liquidation Trust, $2.1 million of which will be directed to the Holders of Allowed Unsecured Senior Subordinated Note Claims.  The remaining $3.9 million will be allocated Pro Rata among the Holders of Liquidation Trust Series B Interests or as otherwise determined by the Creditors' Committee;

- $10 million cash payment from the Liquidation Trust (i.e., unencumbered assets) to the Post-Consummation Trust for the benefit of Holders of Allowed Senior Credit Agreement Claims;

- Holders of Allowed Senior Credit Agreement Claims will receive 100% of the interests in the Post-Consummation Trust and 64% of the interests in the Liquidation Trust;

- Holders of Allowed Unsecured Claims will receive the remaining 36% of the interests in the Liquidation Trust, after giving effect to applicable subordination provisions; and

- (a) 100% of Administrative Claims incurred on or before November 30, 2008 will be paid from the collateral securing the Senior Credit Agreement Claims or the Post-Consummation Trust, as applicable, except that expenses incurred by the Creditors' Committee's professionals in connection with the investigation and prosecution of claims asserted by the Creditors' Committee in its Standing Motion shall be paid from the Debtors' unencumbered assets or the Liquidation Trust, as applicable, (b) 95% of the Administrative Claims incurred on and after December 1, 2008 will be paid from the Debtors' encumbered assets or the Post-Consummation Trust, as applicable, and the remaining 5% will be paid from the Debtors' unencumbered assets or the Liquidation Trust, as applicable; except that expenses incurred by the Creditors' Committee's professionals will be paid from the Debtors' unencumbered assets or the Liquidation Trust, as applicable; and (c) upon the Effective Date each of the Post-Consummation Trust and the Liquidation Trust shall pay 100% of its expenses, except that certain expenses that benefit both trusts will be allocated in the same manner as post-December 1, 2008 Administrative Claims.

Nothing herein or in the Plan shall constitute an admission or waiver by the Prepetition Agent, the Prepetition Lenders, or the Creditors' Committee regarding any of the Claims resolved by the Settlement.

The detailed terms of the Settlement are as follows:

      a.      Creditors' Committee Cause of Action Payment.

The Post-Consummation Trust will pay $6 million in Cash to the Liquidation Trust on the Effective Date out of the Post-Consummation Trust Assets in full and final settlement of any and all claims and causes of action asserted by the Creditors' Committee against the Prepetition Agent and the Prepetition Lenders as set forth in the Standing Motion, $2.1 million of which will be directed to the Holders of Allowed Unsecured Senior Subordinated Note Claims. The remaining $3.9 million will be allocated Pro Rata among the Holders of Liquidation Trust Series B Interests or as otherwise determined by the Creditors' Committee.

      b.      Diminution Claim Payment.

The Liquidation Trust will pay $10 million in Cash to the Post-Consummation Trust on the Effective Date out of the Liquidation Trust Assets in full and final settlement of any claims of the Prepetition Lenders on account of the diminution in the value of their collateral during the pendency of the Chapter 11 Cases. The payment will be allocated Pro Rata among the Holders of Allowed Senior Credit Agreement Claims.

      c.      The Liquidation Trust.

The Liquidation Trust will be established for the benefit of the Liquidation Trust Beneficiaries to liquidate the Debtors' unencumbered assets, resolve Disputed Claims, and make distributions to holders of Liquidation Trust Interests. The Holders of Allowed Senior Credit Agreement Claims will receive the Liquidation Trust Series A Interests on account of the Allowed Senior Credit Agreement Claims, which will represent 64% of the Liquidation Trust Interests on a fully diluted basis. Certain Holders of Allowed Unsecured Claims, other than the Prepetition Lenders and Holders of Unsecured Senior Subordinated Note Claims, will receive the Liquidation Trust Series B Interests on account of their Allowed Claims, which will represent 36% of the Liquidation Trust Interests on a fully diluted basis. Except as provided in the Plan, the Liquidation Trust will be responsible for all fees and expenses incurred by the Liquidation Trust, including fees and expenses of professionals retained thereby.

      d.      The Post-Consummation Trust.

The Post-Consummation Trust will be established for the benefit of the Post-Consummation Trust Beneficiaries to liquidate the collateral securing the Senior Credit Agreement Claims and make payments as contemplated by the Plan. The Holders of Allowed Senior Credit Agreement Claims will receive their Pro Rata share of 100% of the Post-Consummation Trust Interests. Except as otherwise provided in the Plan, the Post-Consummation Trust will be responsible for all fees and expenses incurred by the Post-Consummation Trust, including fees and expenses of professionals retained thereby.

      e.      Allocation of Shared Expenses.

To the extent both the Post-Consumption Trust and Liquidation Trust require the services of the same individuals or incur expenses on account of goods or services beneficial to both, the fees and expenses associated therewith will be allocated 95% to the Post-Consumption Trust and 5% to the Liquidation Trust.

      f.     Classification and Treatment of Claims and Interests Under the Plan.

Claims and Interests will be classified and treated in accordance with the provisions set forth in Article III of the Plan.

      g.     Payment to Holders of Allowed Unsecured Senior Subordinated Note Claims.

Under the conditions set forth in Article III of the Plan, each Holder of an Allowed Unsecured Senior Subordinated Note Claim shall receive and retain its Pro Rata share of $2.1 million in Cash from the Committee Settlement Payment in addition to recoveries that shall be allocable to the Holders of Allowed Senior Credit Agreement Claims and Allowed Senior Unsecured Claims pursuant to the subordination provisions of the Senior Subordinated Notes Indenture and section 510(a) of the Bankruptcy Code.

      h.     Indenture Trustee Fees.

On the Effective Date or as soon as reasonably practicable thereafter, all reasonable fees of the Indenture Trustee (and its counsel), as determined by the Creditors' Committee, will be paid in full, in Cash by the Liquidation Trust Administrator out of the Liquidation Trust Assets.

      i.     Adequate Protection.

The Creditors' Committee will not object to the continued payment of adequate protection payments to the Prepetition Lenders through the Effective Date.

      j.     Allocation of Administrative Claims.

One hundred percent of Administrative Claims incurred on or before November 30, 2008 will be paid from the collateral securing the Senior Credit Agreement Claims or the Post-Consumption Trust, as applicable, except that expenses incurred by the Creditors' Committee's professionals in connection with the investigation and prosecution of claims asserted by the Creditors' Committee in its Standing Motion shall be paid from the Debtors' unencumbered assets or the Liquidation Trust, as applicable. Ninety-five percent of the Administrative Claims incurred on and after December 1, 2008 will be paid from the Debtors' encumbered assets or the Post-Consumption Trust, as applicable, and the remaining 5% will be paid from the Debtors' unencumbered assets or the Liquidation Trust, as applicable; except that expenses incurred by the Creditors' Committee's professionals will be paid from the Debtors' unencumbered assets or the Liquidation Trust, as applicable. Upon the Effective Date each of the Post-Consumption Trust and the Liquidation Trust shall pay 100% of its expenses, except that certain expenses that benefit both trusts will be allocated in the same manner as post-December 1, 2008 Administrative Claims.

# ARTICLE IV.
## SALE AND WIND-DOWN PROCESS

To maximize the value that can be realized from the Debtors' businesses and assets, the Debtors have embarked on a sale process (the "Sale and Wind-Down Process") that contemplates, among other things: (i) an orderly wind-down of the Debtors' non-salable business operations; (ii) sales of all remaining assets; and (iii) preservation of the Debtors' working capital assets and mitigation of Administrative Claims and other wind-down costs to the extent possible.   After the Effective Date, the Post-Consummation Trust and Liquidation Trust will conduct the Sale and Wind-Down Process.  The Debtors believe that the Sale and Wind-Down Process will be substantially complete within 15 months.  Due to the significant number of variables affecting the Sale and Wind-Down Process, the Debtors cannot predict the amount, if any, of net recoveries from the disposition of those assets.

A.    Orderly Wind-Down.

The Debtors contemplate an immediate and substantial reduction in force affecting approximately 160 employees, bringing the total number of the Debtors' remaining employees to approximately 225 after the reduction in force.  The Debtors' ability to complete their remaining projects and exit the markets in which they operate in a manner that allows them to maximize value for creditors is dependent upon the continued dedication of the remaining employees and the top seven senior executives.  These employees possess the knowledge, experience, and skill necessary to support the Debtors' remaining projects and wind-down their operations in a manner that will maximize the value of the Debtors' Estates for the benefit of their creditors.

In connection with the Sale and Wind-Down Process, the Debtors established a comprehensive plan to complete the remaining projects on which they have already commenced construction in an effort to maximize the sale value of such projects for the benefit of creditors. A major component of the Sale and Wind-Down Process includes transitioning responsibilities from employees as projects are completed and sold and the employees' specific job responsibilities are completed.   The Sale and Wind-Down Process involves the departure of employees at pre-determined times according to the progression of the wind-down goals.

The Debtors have, with assistance from their Professionals, analyzed expected recoveries under both the Sale and Wind-Down Process and a "fire sale" liquidation.  The Debtors have determined that under the Sale and Wind-Down Process, the Debtors and their Estates would realize substantially more than under a "fire sale" liquidation and conversion to chapter 7.  The increase in value of the Debtors' Estates pursuant to the wind-down will directly benefit the Debtors' creditors and employees.

The Debtors also have analyzed the cost of engaging outside contractors to conduct the Sale and Wind-Down Process.  This would cost the Debtors substantially more than the cost of the proposed Wind-Down Incentive Program.

B.    Wind-Down Employee Incentive Program.

To complete the wind-down of their operations, the Debtors have devised a plan to motivate their employees to maximize the value of the Debtors' Estates for the benefit of

creditors.  Concurrently herewith, the Debtors filed a motion seeking approval of a new incentive program tailored to their wind-down process (the "Wind-Down Incentive Program").  This motion, fully supported by the Prepetition Lenders and the Creditors' Committee, provides incentives for the Debtors' employees to wind-down the Debtors' business in a cost-effective and efficient manner that maximizes returns for the Debtors' creditors.

The proposed Wind-Down Incentive Program consists of two components, incentive programs for each of their (1) key employees and (2) senior management.  The proposed program for key employees provides incentives for all remaining employees of the Debtors other than the top seven executives.  These key employees would be entitled to receive incentive payments only upon receiving satisfactory reviews and the Debtors' meeting certain financial and construction targets.  Incentive payments under the proposed program would increase with employment length and would be capped at 25% of each employee's base salary.  The discretionary bonus pool of $250,000 included in the first incentive program is proposed to be renewed in the Wind-Down Incentive Program at an additional cost of only $50,000, as $200,000 will be carried over from the old program.

The proposed senior management incentive program has two sub-components, a completion bonus and a transaction bonus.  This program would provide incentives for the Debtors' top seven executives.  The completion bonus provides for incentive payments of up to an aggregate of $1.52 million, to be allocated among the executives by the compensation committee of the Debtors' board of directors if the Debtors meet particular financial and construction targets.  The transaction bonus is conditioned upon the sale of a majority of the Debtors' assets measured as of the commencement of the Sale and Wind-Down Process and the timing of the sale.  The maximum payment provided by the transaction bonus is 1% of the sale proceeds.

### ARTICLE V.
### SUMMARY OF THE PLAN

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN (AS WELL AS THE EXHIBITS THERETO AND DEFINITIONS THEREIN).

THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN THE DOCUMENTS REFERRED TO IN THE PLAN.  THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO IN THE PLAN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENT OF SUCH TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO IN THE PLAN.

THE PLAN ITSELF AND THE DOCUMENTS IN THE PLAN CONTROL THE ACTUAL TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN AND WILL, UPON THE OCCURRENCE OF THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AND INTERESTS, THE ESTATES, ALL PARTIES RECEIVING PROPERTY UNDER THE PLAN, AND OTHER PARTIES IN INTEREST.  IN THE EVENT OF ANY CONFLICT BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT SHALL CONTROL.

The purpose of the Plan is to fairly and expeditiously liquidate and distribute the proceeds realized from the Sale and Wind-Down Process consistent with the Bankruptcy Code.  The Debtors believe that the Plan is in the best interests of Holders of Claims and parties in interest. If the Plan is not confirmed, the Debtors believe that they will be forced either to file an alternate plan of reorganization or liquidate under chapter 7 of the Bankruptcy Code.  Under these alternative scenarios, the Debtors believe that the Holders of Claims would realize a less favorable distribution of value, or, in certain cases, none at all.

A.      Overview of Chapter 11.

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor can reorganize or wind-down its business for the benefit of itself and holders of claims against and interests in the debtor.  Chapter 11 also is designed to promote equality of treatment for similarly situated holders of claims against the debtor and similarly situated holders of interests in the debtor with respect to the distribution of the debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a chapter 11 plan is the principal objective of a chapter 11 case.  A chapter 11 plan sets forth the means for satisfying claims against, and interests in, a debtor. Confirmation of a chapter 11 plan by a bankruptcy court makes the plan binding upon the debtor, any person or entity acquiring property under the plan and any holder of claims against or interests in the debtor, whether or not such holder of claims or interests (1) is impaired under or has accepted the plan or (2) receives or retains any property under the plan.  Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, a confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therewith the obligations specified under the confirmed plan.

A chapter 11 plan may specify that the legal, contractual, and equitable rights of the holders of claims or interests in certain classes are to remain unaltered by provisions of the plan. Such classes are referred to as "unimpaired" and, because of such favorable treatment, are deemed to accept the plan.  Accordingly, the Debtors need not solicit votes from the Holders of Claims or Interests in such classes.  A chapter 11 plan also may specify that certain classes will not receive any distribution of property or retain any claim against a debtor.  Such classes are

deemed not to accept the plan and, therefore, need not be solicited to vote to accept or reject the plan.  Any classes that are receiving a distribution of property under the plan but are not "unimpaired" will be solicited to vote to accept or reject the plan.

Section 1123 of the Bankruptcy Code provides that a chapter 11 plan shall classify claims against and interests in the debtor.  In compliance therewith, the Plan divides Claims and Interests into various Classes and sets forth the treatment for each Class.  The Debtors also are required, as discussed above, under section 1122 of the Bankruptcy Code, to classify Claims and Interests into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Classes.  The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code, but it is possible that a Holder of a Claim or Interest may challenge the classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.   In such event, the Debtors intend, to the extent permitted by the Bankruptcy Court and the Plan, to make such reasonable modifications of the classifications under the Plan to permit Confirmation and to use the Plan acceptances received in this solicitation for the purpose of obtaining the approval of the reconstituted Class or Classes of which the accepting Holder is ultimately deemed to be a member.  Any such reclassification could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

B.     Administrative and Priority Claims.

In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Facility Claims, Administrative Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in Article III of the Plan.

1.     DIP Facility Claims.

In full satisfaction, settlement, release, and discharge of and in exchange for each Allowed DIP Facility Claim, on or as soon as reasonably practicable after the Effective Date, the Post-Consummation Trust shall pay the DIP Facility Claims in full in Cash to the Liquidation Trust.

2.     Administrative Claims.

In full satisfaction, settlement, release, and discharge of and in exchange for each Allowed Administrative Claim, each Holder thereof shall be paid in full in Cash (a) on the Effective Date or as soon as reasonably practicable thereafter, (b) if such Claim is Allowed after the Effective Date, on or as soon as reasonably practicable after such Claim is Allowed, or (c) upon such other terms as may be agreed upon by such Holder and (i) the Debtors, with the consent of the Prepetition Agent and the Creditors' Committee or (ii) the Plan Administrator or the Liquidation Trust Administrator, as applicable, or otherwise pursuant to an order of the Bankruptcy Court.

3.       Priority Tax Claims.

In full satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date shall receive on, or as soon as reasonably practicable after the Effective Date, and in each case to be paid out of the collateral securing the Senior Credit Agreement Claims: (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; (b) Cash in an amount agreed to by such Holder and the Debtors with the consent of the Prepetition Agent and the Creditors' Committee, or the Plan Administrator, with the consent of the Liquidation Trust Administrator, as applicable; or (c) at the option of the Plan Administrator, with the consent of the Liquidation Trust Administrator, Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of not more than five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.

C.       Classification and Treatment of Claims and Equity Interests.

Except for unclassified DIP Facility Claims, Administrative Claims, Priority Tax Claims, Intercompany Claims, and Intercompany Interests, the Plan divides all Claims against and Interests in the Debtors into various Classes. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

All payments and other distributions stated in this Article to be made by the Debtors will, (a) if made on or before the Effective Date, be made by the Debtors and (b) if made after the Effective Date, be made by the Post-Consummation Trust or the Liquidation Trust, as applicable.

1.       Class A-1 - Senior Credit Agreement Claims.

Senior Credit Agreement Claims include both the (a) the Secured Claims arising under the Senior Credit Agreement, and (b) the unsecured deficiency Claims arising under the Senior Credit Agreement in an amount equal to the difference between the amount of the Senior Credit Agreement Claims and the aggregate value of the collateral pledged to secure such Claims.

Class A-1 is Impaired and entitled to vote to accept or reject the Plan. Each Class A-1 Claim asserted in the master Proof of Claim filed by the Prepetition Agent on behalf of all Prepetition Lenders (Proof of Claim No. 1657) shall be Allowed as of the Effective Date (without prejudice to the allowance of other Senior Credit Agreement Claims filed by individual Holders of Class A-1 Claims) and each Holder of an Allowed Class A-1 Claim shall receive, in full and final satisfaction of such Allowed Class A-1 Claim: (i) its Pro Rata share of the beneficial interests of the Post-Consummation Trust; (ii) its Pro Rata share of the payment on account of the Diminution Claim, which is Allowed in the amount of $10 million and shall be

paid in full in Cash on the Effective Date; (iii) its Pro Rata share of 64% of the proceeds of the Pre-Effective Date Sale Transactions allocable to the Debtors' unencumbered assets; and (iv) its Pro Rata share of 100% of the Liquidation Trust Series A Interests.   In addition, the reasonable fees and expenses of the Prepetition Agent's attorneys and financial advisor incurred in connection with the consummation, administration, and enforcement of the Plan shall be paid from the Post-Consummation Trust Assets.   Except as otherwise set forth in the Plan, distributions to Allowed Senior Credit Agreement Claims give effect to the subordination provisions of the Senior Subordinated Notes Indenture.   Further, each Holder of an Allowed Senior Credit Agreement Claim shall be deemed to consent to the distribution of $2.1 million in Cash from the Committee Settlement Payment to Holders of Allowed Unsecured Senior Subordinated Note Claims on the Effective Date as part of the Settlement (defined below) between the Debtors, the Creditors' Committee, and the Prepetition Agent.

2.      Class A-2 - Other Secured Claims.

Other Secured Claims include any Secured Claim that is not a DIP Facility Claim, a Senior Credit Agreement Claim, or a Secured Bank Claim.

Class A-2 is Unimpaired and deemed to accept the Plan.   On or as soon as practicable after the Effective Date, each Holder of an Allowed Class A-2 Claim will receive, in full and final satisfaction of such Allowed Class A-2 Claim:   (a) payment in full in Cash of such Allowed Other Secured Claim from the net proceeds of the collateral securing such Claim; (b) delivery of the collateral securing any such Allowed Other Secured Claim and any interest required to be paid under section 506(b) of the Bankruptcy Code; or (c) such Allowed Other Secured Claim will otherwise be rendered Unimpaired.

3.      Class A-3 - Secured Bank Claims.

Secured Bank Claims include any Claim arising in connection with either the AmeriMark Bank $4,800,000 Promissory Note or the AmeriMark Bank $3,500,000 Promissory Note to the extent such Claim is a Secured Claim.

Class A-3 is Unimpaired and deemed to accept the Plan.   On or as soon as practicable after the Effective Date, each Holder of an Allowed Class A-3 Claim will receive, in full and final satisfaction of such Allowed Class A-3 Claim:   (i) payment in full in Cash of such Allowed Secured Bank Claim from the net proceeds of the collateral securing such Claim; (ii) delivery of the collateral securing any such Allowed Secured Bank Claim and any interest required to be paid under section 506(b) of the Bankruptcy Code; or (iii) such Allowed Secured Bank Claim will otherwise be rendered Unimpaired.

4.      Class B - Priority Non-Tax Claims.

Priority Non-Tax Claims include any Claim accorded priority in right of payment pursuant to section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

Class B is Unimpaired and deemed to accept the Plan.  On or as soon as practicable after the Effective Date, each Holder of an Allowed Class B Claim will receive, in full and final satisfaction of such Allowed Class B Claim, payment in full in Cash from the collateral securing the Senior Credit Agreement Claims.

5.        Class C-1 - Senior Unsecured Claims.

Senior Unsecured Claims include any Unsecured Claim that is entitled to the benefits of the subordination provisions in the Senior Subordinated Notes Indenture, other than the Senior Credit Agreement Claims.

Class C-1 is Impaired and entitled to vote to accept or reject the Plan.  On or as soon as practicable after the Effective Date, each Holder of a Class C-1 Claim will receive, in full and final satisfaction of such Allowed Class C-1 Claim:  (a) its Pro Rata share of 36% of the proceeds of the Pre-Effective Date Sale Transactions allocable to the Debtors' unencumbered assets, (b) its Pro Rata share of 100% of the Liquidation Trust Series B Interests, and (c) its Pro Rata share of $3.9 million from the Committee Settlement Payment.  Except as otherwise set forth in the Plan, distributions to Allowed Senior Unsecured Claims shall give effect to the subordination provisions of the Senior Subordinated Notes Indenture.

6.        Class C-2 - General Unsecured Claims.

General Unsecured Claims include any Claim against any of the Debtors that is not a/an: (a) DIP Facility Claim; (b) Administrative Claim; (c) Priority Tax Claim; (d) Priority Non-Tax Claim; (e) Senior Credit Agreement Claim; (f) Other  Secured Claim;  (g) Secured Bank Claim; (h) Other        Senior Unsecured Claim;      (i) Unsecured Senior Subordinated Note Claim; (j) Intercompany Claim; or (k) Subordinated Debt Securities Claim.

Class C-2 is Impaired and entitled to vote to accept or reject the Plan.  On or as soon as practicable after the Effective Date, each Holder of a Class C-2 Claim will receive, in full and final satisfaction of such Allowed Class C-2 Claim:  (i) its Pro Rata share of 36% of the proceeds of the Pre-Effective Date Sale Transactions allocable to the Debtors' unencumbered assets, (ii) its Pro Rata share of 100% of the Liquidation Trust Series B Interests, and (iii) its Pro Rata share of $3.9 million from the Committee Settlement Payment.

7.        Class C-3 - Unsecured Senior Subordinated Note Claims.

Unsecured Senior Subordinated Note Claims include any Claim arising under or in connection with the Senior Subordinated Notes Indenture or the $10^1/_2$% Senior Subordinated Notes, except that any Subordinated Debt Securities Claim relating to securities issued under the Senior Subordinated Notes Indenture is not an Unsecured Senior Subordinated Note Claim.

Class C-3 is Impaired and entitled to vote to accept or reject the Plan.  In full satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Unsecured Senior Subordinated Note Claim,        each        Holder        of        an Allowed Unsecured Senior Subordinated Note Claim shall receive and retain its Pro Rata share of $2.1 million in Cash from the Committee Settlement Payment; provided that (a) if Class C-3 votes        to        reject        the        Plan,        or        (b) if        any        Holder        of        an

Allowed Unsecured Senior Subordinated Note Claim or the Indenture Trustee objects to Confirmation of the Plan or files a notice of appeal of the Confirmation Order, then the Cash payment contemplated by this paragraph shall not be made and Holders of Allowed Unsecured Senior Subordinated Note Claims shall not receive and retain a distribution under the Plan and, in such event, the $2.1 million in Cash described above shall revert to Holders of Liquidation Trust Series B Interests for distribution in accordance with the provisions of the Plan and the Liquidation Trust Agreement.

For the avoidance of doubt, the treatment and distributions to be paid to the Holders of Allowed Senior Credit Agreement Claims and Senior Unsecured Claims give effect to the subordination provisions of the Senior Subordinated Notes Indenture and section 510(a) of the Bankruptcy Code, and the distribution to be retained by the Holders of Allowed Unsecured Senior Subordinated Note Claims has been provided solely out of the recovery to the Holders of Allowed Senior Credit Agreement Claims.

8.      Class D - Subordinated Debt Securities Claims.

Subordinated Debt Securities Claims include any Claim of the type described in and subject to subordination pursuant to section 510(b) of the Bankruptcy Code relating to the $10^{1}/_{2}$% Senior Subordinated Notes.

Class D is Impaired and deemed to reject the Plan. Holders of Class D Claims will not receive a distribution from the Estates under the Plan.

9.      Class E - Interests.

Interests include all (a) equity security in any of the Debtors, including all issued, unissued, authorized, or outstanding shares of stock, together with any warrants, options, or contractual rights to purchase or acquire such equity securities at any time and all rights arising with respect thereto and (b) partnership, limited liability company, or similar interests in any of the Debtors.

Class E is Impaired and deemed to reject the Plan. On the Effective Date, all Interests will be deemed cancelled and Holders thereof will not receive a distribution under the Plan in respect of such Interests.

D.      Cramdown.

The Debtors request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code. The Debtors, (1) with the consent of the Prepetition Agent and the Creditors' Committee, if the modification materially adversely affects the distributions contemplated under the Plan to the Prepetition Lenders or the Holders of Unsecured Claims, as applicable, or (2) in consultation with the Prepetition Agent and the Creditors' Committee, if the modifications do not materially adversely affect the distributions to be made to the Prepetition Lenders or the Holders of Unsecured Claims, reserve any right to modify the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

E.    Means for Implementation of the Plan.

    1.    Sale of Assets.

Prior to the Effective Date, the Debtors, in consultation with the Creditors' Committee and the Prepetition Agent, may consummate the Pre-Effective Date Sale Transactions.

    2.    The Post-Consummation Trust.

        a.    Establishment of the Post-Consummation Trust.

On the Effective Date, the Debtors, on their own behalf and on behalf of the Post-Consummation Trust Beneficiaries, will execute the Post-Consummation Trust Agreement and will take all other steps necessary to establish the Post-Consummation Trust pursuant to the Post-Consummation Trust Agreement as further described in Article X of the Plan.  On the Effective Date, and in accordance with and pursuant to the terms of the Plan, sections 1123(a)(5)(B) and 1123(b)(3)(B) of the Bankruptcy Code, and Bankruptcy Rule 9019, (a) the Liquidation Trust will transfer to the Post-Consummation Trust the Diminution Claim payment and (b) the Debtors will transfer to the Post-Consummation Trust all of their rights, title, and interests in all of the Post-Confirmation Trust Assets.  On the Effective Date, or as soon thereafter as is reasonably practicable, the funds in the Utility Deposit Account will be transferred to the Post-Consummation Trust.   In connection with the transfer of the Post-Confirmation Trust Assets, any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Post-Consummation Trust will vest in the Post-Consummation Trust and its representatives, and the Debtors and the Post-Consummation Trust are authorized to take all necessary actions to effectuate the transfer of such privileges.

        b.    Funding Expenses of the Post-Consummation Trust.

As more fully described in the Post-Consummation Trust Agreement, the Post-Consummation Trust Assets will be reduced to Cash.   Expenses of the Post-Consummation Trust shall be paid in accordance with the terms of the Post-Consummation Trust Budget.

        c.    Allocation of Expenses Shared with the Liquidation Trust.

To the extent both the Post-Consummation Trust and Liquidation Trust require the services of the same individuals or incur expenses on account of goods or services beneficial to both, the fees and expenses associated therewith shall be allocated 95% to the Post-Consummation Trust and 5% to the Liquidation Trust.

        d.    Appointment of the Plan Administrator.

On the Effective Date and in compliance with the provisions of the Plan, the Plan Administrator will be appointed in accordance with the Post-Consummation Trust Agreement and after the Effective Date, the Plan Administrator will administer the Post-Consummation Trust in accordance with the

Post-Consummation Trust Agreement.  The Plan Administrator will prepare and make available to the Post-Consummation Trust Beneficiaries, on a semi-annual basis, a written report detailing, among other things, the litigation status of Claims or Causes of Action transferred to the Post-Consummation Trust, any settlements entered into by the Post-Consummation Trust, the proceeds recovered to date from the Post-Consummation Trust Assets, and the distributions made by the Post-Consummation Trust.

      3.      The Liquidation Trust.

      a.      Establishment of the Liquidation Trust.

On the Effective Date, the Debtors, on their own behalf and on behalf of Holders of Allowed Claims entitled to receive Liquidation Trust Interests pursuant to the Plan will execute the Liquidation Trust Agreement and will take all other steps necessary to establish the Liquidation Trust pursuant to the Liquidation Trust Agreement as further described in Article XI of the Plan.  On the Effective Date, and in accordance with and pursuant to the terms of the Plan, (i) the Post-Consummation Trust, as applicable, will transfer to the Liquidation Trust the Committee Settlement Payment, and (ii) all of the Estates' rights, title, and interests in all of the Liquidation Trust Assets will be transferred to the Liquidation Trust.  In connection with the transfer of such assets, any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Liquidation Trust will vest in the Liquidation Trust and its representatives, and the Debtors and the Liquidation Trust are authorized to take all necessary actions to effectuate the transfer of such privileges.

      b.      Prosecution of Liquidation Trust Claims.

Liquidation Trust Claims may only be prosecuted or settled by the Liquidation Trust. The Liquidation Trust Claims will be transferred to the Liquidation Trust as of the Effective Date.

      c.      Distributions from the Liquidation Trust.

Distributions from the Liquidation Trust will occur as set forth in Article XI of the Plan and in accordance with the terms of the Liquidation Trust Agreement.

      d.      Funding Expenses of the Liquidation Trust.

As more fully described in the Liquidation Trust Agreement, the Liquidation Trust Assets will be reduced to Cash.  Expenses of the Liquidation Trust shall be paid in accordance with the terms of the Liquidation Trust Budget.

      e.      Allocation of Expenses Shared with the Post-Consummation Trust.

To the extent both the Post-Consummation Trust and Liquidation Trust require the services of the same individuals or incur expenses on account of goods or services beneficial to both, the fees and expenses associated therewith shall be allocated 95% to the Post-Consummation Trust and 5% to the Liquidation Trust.

f.      Appointment of the Liquidation Trust Administrator.

On the Effective Date and in compliance with the provisions of the Plan, the Liquidation Trust Administrator will be appointed in accordance with the Liquidation Trust Agreement and after the Effective Date, the Liquidation Trust Administrator will administer the Liquidation Trust in accordance with the Liquidation Trust Agreement. The Liquidation Trust Administrator will prepare and make available to Holders of Liquidation Trust Interests, on a semi-annual basis, a written report detailing, among other things, the litigation status of claims or Causes of Action transferred to the Liquidation Trust, any settlements entered into by the Liquidation Trust, the proceeds recovered to date from the Liquidation Trust Assets, and the distributions made by the Liquidation Trust.

4.      Cancellation of Debt and Equity Securities and Related Obligations.

On the Effective Date, except as otherwise specifically provided for in the Plan:  (a) the Kimball Hill Common Stock and any other Certificate, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest shall be cancelled solely as to the Debtors, and neither the Liquidation Trust Administrator nor the Plan Administrator shall have any continuing obligations thereunder; and (b) the Holders of or parties to such cancelled instruments, securities, and other documentation will have no rights arising from or relating to such instruments, securities, and other documentation or the cancellation thereof, except the rights provided pursuant to the Plan; <u>provided</u> that notwithstanding Confirmation, any such indenture or agreement that governs the rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of:  (i) allowing Holders to receive distributions under the Plan; (ii) allowing a Servicer to make distributions on account of such Claims or Interests as provided in Article VII; (iii) permitting such Servicer to maintain any rights and liens it may have against property other than property of the Debtors, the Post-Consummation Trust, or the Liquidation Trust for fees, costs, and expenses pursuant to such indenture or other agreement; and (iv) governing the rights and obligations of non-Debtor parties to such agreements vis à vis each other; <u>provided</u> <u>further</u> that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Debtors, the Post-Consummation Trust, or the Liquidation Trust.  The Debtors, the Post-Consummation Trust, and the Liquidation Trust shall not have any obligations to any Servicer for any fees, costs, or expenses, except as expressly otherwise provided in the Plan.

5.      Corporate Action.

Upon the entry of the Confirmation Order by the Bankruptcy Court, all matters provided for under the Plan involving the corporate structure of the Debtors will be deemed authorized and approved without any requirement of further action by the Debtors, the Debtors' shareholders, or the Debtors' boards of directors.  The Debtors may, for the purpose of effectuating the transfer of the Post-Consummation Trust Assets to the Post-Consummation Trust in a manner deemed to be in the best interests of the Post-Consummation Trust Beneficiaries and the transfer of the Liquidation Trust Assets to the

Liquidation Trust in a manner deemed to be in the best interests of the Liquidation Trust Beneficiaries, (a) preserve the corporate existence of some or all of the Debtors so as to permit the transfer of the Post-Consummation Trust Assets and the Liquidation Trust Assets owned by such Debtors by means of direct or indirect transfers of the stock or other equity interests of such Debtors to the Post-Consummation Trust and the Liquidation Trust, as applicable, and if deemed desirable in connection therewith to cancel the existing stock or other equity interests of such Debtors, issue new stock or equity interests of such Debtors, amend the organizational documents of such Debtors, and replace the officers and directors of such Debtors, (b) create new corporations or other entities and transfer certain of the Post-Consummation Trust Assets and/or Liquidation Trust Assets thereto so as to permit the transfer of such assets by means of direct or indirect transfers of the stock or other equity interests of such new corporations or other entities to the Post-Consummation Trust or Liquidation Trust, as applicable, and (c) effect other transactions determined by the Debtors (in consultation with the Creditors' Committee and Prepetition Agent) to be appropriate to achieve such purpose. To the extent not used in the transfer of Post-Consummation Trust Assets or Liquidation Trust Assets and not completed prior to the Effective Date, the Debtors (and their boards of directors) will dissolve or otherwise terminate their existence following the Effective Date and are authorized to dissolve or terminate the existence of wholly owned non-Debtor subsidiaries following the Effective Date as well as any remaining health, welfare, or benefit plans.

   6.  Effectuating Documents; Further Assurances.

   On and after the Effective Date, the Plan Administrator and the Liquidation Trust Administrator, as applicable, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements and documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan.

   7.  Exemption from Certain Transfer Taxes and Recording Fees.

   Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to the Post-Consummation Trust, the Liquidation Trust, or to any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors; (b) the creation, modification, consolidation, or recording of any mortgage, deed of trust, or other security interest; (c) the making, assignment, or recording of any lease or sublease; or (d) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and

recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

        8.        Employee and Retiree Benefits.

On the Effective Date, except as otherwise set forth herein or in the Plan Supplement, the Debtors' existing employee benefit policies, plans, and agreements that have not been terminated prior to the Effective Date will terminate.

        9.        Creation of Professional Fee Escrow Account.

On the Effective Date, the Debtors or the Plan Administrator, as applicable, shall establish the Professional Fee Escrow Account and reserve an amount necessary to pay all of the Accrued Professional Compensation.

        10.      Preservation of Causes of Action.

        a.        Maintenance of Causes of Action.

Except as otherwise provided in the Plan, on the Effective Date, all of the Debtors' rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, in any court or other tribunal in an adversary proceeding or contested matter filed in one or more of the Chapter 11 Cases, including the following actions and any Causes of Actions specified on Exhibit A to the Plan, will be transferred to the Liquidation Trust: (i) objections to Claims under the Plan; and (ii) any other litigation or Causes of Action, whether legal, equitable, or statutory in nature, arising out of, or in connection with the Debtors' businesses, assets, or operations or otherwise affecting the Debtors, including possible claims against the following types of parties, both domestic and foreign, for the following types of claims: (A) Causes of Action against vendors, suppliers of goods or services, or other parties for overpayments, back charges, duplicate payments, improper holdbacks, deposits, warranties, guarantees, indemnities, or setoff; (B) Causes of Action against utilities, vendors, suppliers of services or goods, or other parties for wrongful or improper termination, suspension of services or supply of goods, or failure to meet other contractual or regulatory obligations; (C) Causes of Action against vendors, suppliers of goods or services, or other parties for failure to fully perform or to condition performance on additional requirements under contracts with any one or more of the Debtors before the assumption or rejection of the subject contracts; (D) Causes of Action for any liens, including mechanic's, artisan's, materialmen's, possessory, or statutory liens held by any one or more of the Debtors; (E) Causes of Action for payments, deposits, holdbacks, reserves, or other amounts owed by any creditor, lessor, utility, supplier, vendor, insurer, surety, lender, bondholder, lessor, or other party; (F) Causes of Action against any current or former director, officer, employee, or agent of the Debtors arising out of employment related matters; (G) Causes of Action against any professional services provider or any other party arising out of financial reporting; (H) Causes of Action arising out of environmental or contaminant exposure matters against landlords, lessors, environmental consultants, environmental agencies, or suppliers of environmental services or goods; (I) Causes of Action against insurance carriers, reinsurance carriers, underwriters, or surety bond issuers relating to coverage, indemnity, contribution, reimbursement, or other matters;

(J) counterclaims and defenses relating to notes, bonds, or other contract obligations; (K) Causes of Action against local, state, federal, and foreign taxing authorities for refunds of overpayments or other payments; (L) Causes of Action against attorneys, accountants, consultants, or other professional service providers relating to services rendered; (M) contract, tort, or equitable Causes of Action that may exist or subsequently arise; (N) any intracompany or intercompany Causes of Action; (O) Causes of Action of the Debtors arising under section 362 of the Bankruptcy Code; (P) equitable subordination Causes of Action arising under section 510 of the Bankruptcy Code or other applicable law; (Q) turnover Causes of Action arising under sections 542 or 543 of the Bankruptcy Code; (R) Causes of Action arising under chapter 5 of the Bankruptcy Code, including preferences under section 547 of the Bankruptcy Code; and (S) Causes of Action for unfair competition, interference with contract or potential business advantage, conversion, infringement of intellectual property, or other business tort claims; provided that such actions shall not include Causes of Action which, if prosecuted, would have a direct adverse effect on the Post-Consummation Trust Assets.

The foregoing Causes of Action will be transferred to the Liquidation Trust notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code and except as otherwise provided in the Plan, any claims, rights, and Causes of Action that the respective Debtors may hold against any Entity will vest in the Liquidation Trust.  The Liquidation Trust, through its authorized agents or representatives, will have and may exclusively enforce any and all such claims, rights, or Causes of Action transferred to it, and all other similar claims arising pursuant to applicable state laws, including fraudulent transfer claims, if any, and all other Causes of Action of a trustee and debtor in possession pursuant to the Bankruptcy Code in accordance with the provisions of the Liquidation Trust Agreement.  The Liquidation Trust will have the exclusive right, authority, and discretion to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any and all such claims, rights, and Causes of Action transferred to it, and to decline to do any of the foregoing in accordance with the terms of the Liquidation Trust Agreement.

For clarity, subject to the other provisions of the Plan, all of the Liquidation Trust Claims and other Causes of Action will be transferred to the Liquidation Trust as of the Effective Date. Notwithstanding anything to the contrary herein, the Post-Consummation Trust will own and control any Causes of Action or claims arising from or in connection with the collateral securing the Senior Credit Agreement or arising after the Effective Date in respect of any Post-Consummation Trust Asset.  The Post-Consummation Trust will have the right to object to all Administrative Claims and Claims which, if Allowed, would entitle the Holder thereof to payments or other distributions from the Post-Consummation Trust and the Liquidation Trust will have the right to object to all Claims which, if Allowed, would entitle the Holder thereof to payments or other distributions from the Liquidation Trust.

      b.      Preservation of All Causes of Action Not Expressly Settled or Released.

Unless a claim or Cause of Action against a creditor or other Entity is expressly waived, relinquished, released, compromised, or settled in the Plan or any Final Order, the Debtors expressly reserve such claim or Cause of Action for later adjudication by the Liquidation Trust

or Post-Consummation Trust, as applicable, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches will apply to such claims or Causes of Action upon or after the Confirmation or Consummation of the Plan based on the Disclosure Statement, the Plan, or the Confirmation Order, except where such claims or Causes of Action have been expressly waived, relinquished, released, compromised, or settled in the Plan or a Final Order. In addition, the Liquidation Trust or Post-Consummation Trust, as applicable, expressly reserves the right to pursue or adopt any claims or Causes of Action not so waived, relinquished, released, compromised, or settled that are alleged in any lawsuit in which the Debtors are a defendant or an interested party, against any Entity, including the plaintiffs or co-defendants in such lawsuits. Any Entity to whom the Debtors incurred an obligation (whether on account of services, purchase, sale of goods, or otherwise), or who received services from the Debtors or a transfer of money or property of the Debtors, or who has transacted business with the Debtors, in each case prior to the Petition Date, should assume that such obligation, transfer, or transaction may be reviewed by the Liquidation Trust or Post-Consummation Trust, as applicable, subsequent to the Effective Date and may, to the extent not theretofore expressly waived, relinquished, released, compromised, or settled, be the subject of an action after the Effective Date, whether or not: (i) such Entity has filed a Proof of Claim against the Debtors in the Chapter 11 Cases; (ii) an objection has been filed to such Entity's Proof of Claim; (iii) such Entity's Claim was included in the Debtors' Schedules; or (iv) the Debtors have objected to such Entity's scheduled Claim or identified such Claim as contingent, unliquidated, or disputed.

11.     Release of Liens.

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Interests, mortgages, deeds of trust, liens, or other security interests against the property of any Estate will be fully released and discharged.     Pursuant to section 1141(c) of the Bankruptcy Code, all claims and interests that are not expressly provided for and preserved herein shall be extinguished upon Confirmation.     Upon Confirmation, the Debtors and all property dealt with herein shall be free and clear of all such Claims and Interests, including, but not limited to, liens, security interests, and any and all other encumbrances.

F.     Treatment of Executory Contracts and Unexpired Leases.

1.     Executory Contracts and Unexpired Leases to Be Assumed or Assumed and Assigned.

a.     Assumption and Assignment Generally.

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the applicable Debtor or Debtors will assume and assign to the Post-Consummation Trust, the Liquidation Trust, or the applicable purchaser of the Debtors' assets, each of the Executory Contracts and Unexpired Leases listed on Exhibit B to the Plan. Each contract and lease listed on Exhibit B to the Plan will be assumed only to the extent

that any such contract or lease constitutes an Executory Contract or Unexpired Lease. Listing a contract or lease on Exhibit B to the Plan does not constitute an admission by the Debtors, the Post-Consummation Trust, or the Liquidation Trust, as applicable, that such contract or lease is an Executory Contract or Unexpired Lease or that the Debtors, the Post-Consummation Trust, or the Liquidation Trust has any liability thereunder.

        b.      Assumptions and Assignments of Executory Contracts and Unexpired Leases.

Each Executory Contract and Unexpired Lease listed on Exhibit B to the Plan includes any modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such contract or lease, irrespective of whether such agreement, instrument, or other document is listed on Exhibit B to the Plan, unless any such modification, amendment, supplement, restatement, or other agreement is rejected pursuant to Article V.C of the Plan.

        c.      Approval of Assumptions and Assignments.

Entry of the Confirmation Order by the Bankruptcy Court will constitute approval of the assumption or conditional assumption of the Executory Contracts and Unexpired Leases to be assumed under the Plan as of the Effective Date pursuant to Sections 365 and 1123 of the Bankruptcy Code. Each Executory Contract and Unexpired Lease that is assumed will vest in and be fully enforceable by the Post-Consummation Trust or Liquidation Trust, as applicable, any applicable assignee in accordance with its terms, except as may be modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing or providing for its assumption, or applicable law.

        2.      Payments Related to the Assumption of Executory Contracts and Unexpired Leases.

To the extent that such Claims constitute monetary defaults, the Cure Amount Claims associated with each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the option of the Debtor assuming such contract or lease or the assignee of such Debtor, if any: (a) by payment of the Cure Amount Claim in Cash on or as soon as reasonably practicable after the Effective Date; or (b) on such other terms as are agreed to by the parties to such Executory Contract or Unexpired Lease. If there is a dispute regarding: (i) the amount of any Cure Amount Claim; (ii) the ability of the Post-Consummation Trust, the Liquidation Trust, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed; or (iii) any other matter pertaining to assumption or assumption and assignment of such contract or lease, the payment of any Cure Amount Claim required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order resolving the dispute and approving the assumption by the Debtors or the Plan Administrator. Any amounts required to be paid to cure any Executory Contract or Unexpired Lease to be assumed by the Post-Consummation Trust or Liquidation Trust shall be borne by the Post-Consummation Trust or Liquidation Trust, as applicable. Any Cure Amount Claims paid by the Debtors from and after December 1, 2008

(A) attributable to assets that would constitute Post-Consummation Trust Assets shall be ascribed to the collateral securing the Senior Credit Agreement Claims and (B) attributable to assets that would constitute Liquidation Trust Assets shall be ascribed to the unencumbered assets of the Debtors.  Cure Amount Claims paid and/or incurred prior to December 1, 2008 shall be allocated in the same manner as Administrative Claims.

       3.      Executory Contracts and Unexpired Leases to Be Rejected.

Except for an Executory Contract or Unexpired Lease that was previously assumed, assumed and assigned, or rejected by an order of the Bankruptcy Court with the effective date of such assumption or rejection on or before the Effective Date, or that is assumed pursuant to Article V.A of the Plan, each Executory Contract and Unexpired Lease entered into by a Debtor prior to the Petition Date will be rejected pursuant to section 365 of the Bankruptcy Code on the Effective Date or as of the date set forth on Exhibit C to the Plan.  The Executory Contracts and Unexpired Leases to be rejected will include but not be limited to the Executory Contracts and Unexpired Leases listed on Exhibit C to the Plan.  Each contract and lease listed on Exhibit C to the Plan will be rejected only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease.  Listing a contract or lease on Exhibit C to the Plan does not constitute an admission by a Debtor, the Post-Consummation Trust, or the Liquidation Trust that such contract or lease is an Executory Contract or Unexpired Lease or that a Debtor, the Post-Consummation Trust, or the Liquidation Trust has any liability thereunder.  Any Executory Contract and Unexpired Lease not listed on Exhibit B to the Plan and not previously assumed, assumed and assigned, or rejected by an order of the Bankruptcy Court (other than those Executory Contracts and Unexpired Leases identified on Exhibit C to the Plan) will be rejected on the Effective Date irrespective of whether such contract is listed on Exhibit C to the Plan and the Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections pursuant to section 365 of the Bankruptcy Code as of the Effective Date.

       4.      Bar Date for Rejection Damages.

Notwithstanding anything in any order establishing a Bar Date to the contrary, if the rejection of an Executory Contract or Unexpired Lease, including pursuant to Article V.C of the Plan, gives rise to a Claim (including any Claims arising from those Indemnification Obligations described in Article V.E of the Plan) by the other party or parties to such contract or lease, such Claim will be forever barred and will not be enforceable against the Debtors, the Liquidation Trust, the Post-Consummation Trust, their respective successors, or their respective properties unless a Proof of Claim is filed and served on the Post-Consummation Trust and the Liquidation Trust pursuant to the procedures specified in the notice of the Effective Date or an order of the Bankruptcy Court, in each case no later than 30 days after the Effective Date.

       5.      Obligations to Indemnify Directors, Officers, and Employees.

The obligations of each Debtor to indemnify any person serving as one of its directors, officers, or employees as of or following the Effective Date will, to the extent constituting an Executory Contract, be deemed rejected as of the Effective Date.  The Debtors, the Post-Consummation Trust, and the Liquidation Trust will have no obligation on or after the Effective Date to pay or perform such Indemnification Obligations.  Notwithstanding the

foregoing, such directors, officers, and employees will have the benefit of any and all directors' and officers' liability insurance policies that may be in effect, but none of the Debtors, the Post-Consummation Trust, or the Liquidation Trust will have any obligation on or after the Effective Date to pay premiums thereunder.

6.      Contracts and Leases Entered into After the Petition Date.

Any contracts or leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be (a) performed by the Post-Consummation Trust in the ordinary course of its business; and/or (b) terminated, with the relevant counterparty required to file a Claim asserting any alleged damages within the applicable Rejection Claims Bar Date.

7.      Reservation of Rights.

Neither the exclusion nor inclusion of any contract or lease by the Debtors on any Exhibit to the Plan, nor anything contained in the Plan, will constitute an admission by the Debtors that any such contract or lease is or is not in fact an Executory Contract or Unexpired Lease or that any Debtor, the Liquidation Trust, or the Post-Consummation Trust, or their respective Affiliates, has any liability thereunder.

Nothing in the Plan will waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of the Debtors, the Liquidation Trust, or the Post-Consummation Trust under any Executory Contract or non-Executory Contract or any Unexpired Lease or expired lease.

Nothing in the Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors, the Post-Consummation Trust, or the Liquidation Trust under any Executory Contract or non-Executory Contract or any Unexpired Lease or expired lease.

At any time through and including 90 days after the Effective Date, the Debtors and, solely to the extent it affects each, the Liquidation Trust, and the Post-Consummation Trust reserve the right to alter, amend, modify, or supplement Exhibit B to the Plan and Exhibit C to the Plan.

If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, then (a) the Debtors, in consultation with the Prepetition Agent and the Creditors' Committee, (b) the Post-Consummation Trust, with the consent of the Liquidation Trust, or (c) the Liquidation Trust with the consent of the Post-Consummation Trust, as applicable, will have 30 days following entry of a Final Order resolving such dispute to amend their decision to assume or reject such contract or lease.

G.    <u>Procedures for Resolving Disputed Claims and Interests</u>.

      1.      Allowance of Claims and Interests.

After the Effective Date, except as released herein or by Bankruptcy Court Order, the Liquidation Trust shall have and retain any and all rights and defenses the Debtors had with respect to any Claims and Interests immediately prior to the Effective Date, including the Causes of Action referenced in Article IV of the Plan.

      2.      Claims and Interests Administration Responsibilities.

Except as otherwise specifically provided in the Plan, after the Effective Date, the Liquidation Trust Administrator shall have the authority:  (a) to file, withdraw, or litigate to judgment any objections to Claims or Interests; (b) to settle or compromise any Disputed Claim or Interest without any further notice to or action, order, or approval by the Bankruptcy Court; and (c) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court; <u>provided</u> that (i) the Plan Administrator, in consultation with the Liquidation Trust Administrator, shall have such authority with respect to Administrative Claims and (ii) the Plan Administrator shall have such authority with respect to Priority Tax Claims and Class B Claims.

      3.      Estimation of Claims and Interests.

Before the Effective Date, the Debtors, and after the Effective Date, the Liquidation Trust Administrator or Plan Administrator, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim or Interest that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.   In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the Liquidation Trust Administrator or Plan Administrator, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim or Interest that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has filed a motion requesting the right to seek such reconsideration on or before twenty days after the date on which such Claim is estimated.

4.    Adjustment to Claims Without Objection.

Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the Claims Register at the request of the Plan Administrator or Liquidation Trust Administrator without any further notice to or action, order, or approval of the Bankruptcy Court.

5.    Disallowance of Claims or Interests.

Any Claims or Interests held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims and Interests may not receive any distributions on account of such Claims and Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Liquidation Trust Administrator.  All Claims filed on account of an employee benefit referenced in Article IV.H shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent the Plan Administrator elects to honor such employee benefit out of the proceeds of the Post-Consummation Trust Assets, without any further notice to or action, order, or approval of the Bankruptcy Court.

**EXCEPT AS OTHERWISE AGREED BY THE DEBTORS, IN CONSULTATION WITH THE CREDITORS' COMMITTEE, OR THE LIQUIDATION TRUST ADMINISTRATOR, AS APPLICABLE, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS SHALL NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS ON OR BEFORE THE CONFIRMATION HEARING SUCH LATE CLAIM HAS BEEN DEEMED TIMELY FILED BY A BANKRUPTCY COURT ORDER.**

**ANY CLAIM OR INTEREST THAT HAS BEEN OR IS HEREAFTER LISTED IN THE SCHEDULES AS CONTINGENT, UNLIQUIDATED OR DISPUTED, AND FOR WHICH NO PROOF OF CLAIM OR INTEREST HAS BEEN TIMELY FILED IS NOT CONSIDERED ALLOWED AND SHALL BE EXPUNGED WITHOUT FURTHER ACTION BY THE DEBTORS AND WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT.**

6.    Offer of Judgment.

The Liquidation Trust Administrator or Plan Administrator, as applicable, is authorized to serve upon a Holder of a Claim an offer to allow judgment to be taken on account of such Holder's Claim, and, pursuant to Bankruptcy Rules 7068 and 9014, Federal Rule of Civil Procedure 68 shall apply to such offer of judgment.  To the extent the Holder of a Claim must

pay the costs incurred by the Liquidation Trust Administrator or Plan Administrator, as applicable, after the making of such offer, the Liquidation Trust Administrator or Plan Administrator, as applicable, is entitled to set off such amounts against the amount of any distribution to be paid to such Holder without any further notice to or action, order, or approval of the Bankruptcy Court.

7.      Amendments to Claims.

On or after the Effective Date, except as provided in Article VI of the Plan, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court and the Liquidation Trust Administrator or Plan Administrator, as applicable, and any such new or amended Claim filed shall be deemed disallowed in full and expunged without any further action.

H.      Provisions Governing Distributions.

1.      Distributions on Account of Claims Allowed as of the Effective Date.

Except as otherwise provided in the Plan or a Final Order, or as otherwise agreed to by the relevant parties (which prior to its dissolution, shall include the Creditors' Committee), initial distributions under the Plan on account of Claims Allowed on or before the Effective Date shall be made on the Distribution Date; provided that (a) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (b) Allowed Priority Tax Claims, unless otherwise agreed, shall be paid in full in Cash on the Effective Date or as soon as reasonably practicable thereafter, or over a five-year period as provided in section 1129(a)(9)(C) of the Bankruptcy Code with annual interest provided by applicable non-bankruptcy law.

2.      Method of Distributions to Holders of Claims.

The Post-Consummation Trust, the Liquidation Trust, or such Third Party Disbursing Agents as the Post-Consummation Trust or Liquidation Trust may employ, will make all distributions required under the Plan. Each Disbursing Agent will serve without bond, and any Disbursing Agent may employ or contract with other Persons to assist in or make the distributions required by the Plan.

3.      Distributions on Account of Claims Allowed After the Effective Date.

a.      Payments and Distributions on Disputed Claims.

Except as otherwise provided in the Plan or a Final Order, or as otherwise agreed to by the relevant parties, distributions under the Plan on account of Disputed Claims that become Allowed after the Effective Date shall be made on the Periodic Distribution Date that is at least thirty days after the Disputed Claim becomes an Allowed Claim; provided that Disputed Priority Tax Claims that become Allowed Priority Tax Claims after the Effective Date,

58

unless otherwise agreed, shall be paid in full in Cash on the Periodic Distribution Date that is at least thirty days after the Disputed Claim becomes an Allowed Claim or over a five-year period as provided in section 1129(a)(9)(C) of the Bankruptcy Code with annual interest provided by applicable non-bankruptcy law.

        b.        Special Rules for Distributions to Holders of Disputed Claims.

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the relevant parties:  (i) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order; and (ii) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order and the Disputed Claim has been Allowed or disallowed.  All distributions made pursuant to the Plan on account of an Allowed Claim shall be made together with any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the distributed property as if such Allowed Claim had been an Allowed Claim on the dates distributions were previously made to Holders of Allowed Claims included in the applicable Class.

        4.        Delivery of Distributions.

        a.        Record Date for Distributions.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions pursuant to Article VII of the Plan shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.  Notwithstanding the foregoing, if a Claim, other than one based on a publicly traded Certificate, is transferred twenty or fewer days before the Distribution Record Date, the Disbursing Agent shall make distributions to the transferee only to the extent practical and in any event only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

        b.        Distributions.

The Disbursing Agents shall make all distributions required under the Plan, except that distributions to Holders of Allowed Claims governed by a separate agreement and administered by a Servicer shall be deposited with the appropriate Servicer, at which time such distributions shall be deemed complete, and the Servicer shall deliver such distributions in accordance with the Plan and the terms of the governing agreement.

        c.        Delivery of Distributions in General.

Except as otherwise provided in the Plan, and notwithstanding any authority to the contrary, distributions to Holders of Allowed Claims shall be made to Holders of record as of the Distribution Record Date by the Disbursing Agents or a Servicer, as appropriate:  (i) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (ii) to the signatory set forth on any of the Proofs of Claim filed by such

Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is filed or if the applicable Disbursing Agent has been notified in writing of a change of address); (iii) at the addresses reflected in the Schedules if no Proof of Claim has been filed and the Disbursing Agents have not received a written notice of a change of address; or (iv) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf. Except as provided herein, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan. No Disbursing Agent shall incur any liability whatsoever on account of any distributions under the Plan. Distributions to Holders of publicly traded Certificates will be made in accordance with Article VII.D.10 of the Plan.

        d.      Accrual of Interest.

Except as specifically otherwise provided in the Plan, in no event shall interest accrue after the Interest Accrual Limitation Date on account of any Allowed Claim.

        e.      Allocation Between Principal and Accrued Interest.

Except as otherwise provided in the Plan, distributions on account of Allowed Claims shall be treated as allocated first to principal and thereafter to interest, if any, accrued through the Interest Accrual Limitation Date.

        f.      Compliance Matters.

In connection with the Plan, to the extent applicable, the Disbursing Agents shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Plan Administrator and the Liquidation Trust Administrator shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Plan Administrator and the Liquidation Trust Administrator reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

        g.      Foreign Currency Exchange Rate.

Except as otherwise provided in the Plan or a Bankruptcy Court order, as of the Effective Date, any Claim asserted in any currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate as of the Petition Date, as quoted at 4:00 p.m. (ET) midrange spot rate of exchange for the applicable currency as published in *The Wall Street Journal, National Edition*, on the Petition Date.

h.    Fractional, De Minimis, Undeliverable, and Unclaimed Distributions.

(i)    Fractional Distributions.

Notwithstanding any other provision of the Plan to the contrary, the Disbursing Agent shall not be required to make distributions or payments of fractions of dollars, fractions of Post-Consummation Trust Interests, or fractions of Liquidation Trust Interests.  Whenever any payment of Cash of a fraction of a dollar, payment of a Post-Consummation Trust Interest in a fraction thereof, or payment of a Liquidation Trust Interest in a fraction thereof pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar, nearest whole Post-Consummation Trust Interest, or nearest whole Liquidation Trust Interest (up or down), with half dollars, half Post-Consummation Interests, and half Liquidation Trust Interests or less being rounded down.

(ii)    De Minimis Distributions.

Neither the Disbursing Agent nor any Servicer shall have any obligation to make a distribution on account of an Allowed Claim if the amount to be distributed to the specific Holder of an Allowed Claim on the particular Periodic Distribution Date does not constitute a final distribution to such Holder and is or has an economic value less than $500.

(iii)    Undeliverable Distributions.

If any distribution to a Holder of an Allowed Claim is returned to a Disbursing Agent as undeliverable, no further distributions shall be made to such Holder unless and until the Plan Administrator,   Liquidation Trust Administrator,   or   Third Party Disbursing Agent,   as applicable, is notified in writing of such Holder's then-current address, at which time all currently due missed distributions shall be made to such Holder on the next Periodic Distribution Date.  Undeliverable distributions shall remain in the possession of the applicable Disbursing Agent until such time as a distribution becomes deliverable, or such distribution reverts to the Post-Consummation Trust or Liquidation Trust, as applicable, pursuant to Article VII.D.8.d of the Plan, and shall not be supplemented with any interest, dividends, or other accruals of any kind.

(iv)    Reversion.

Any distribution under the Plan that is an Unclaimed Distribution for a period of six months after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revest in the Post-Consummation Trust or Liquidation Trust, as applicable.  Upon such revesting, the Claim of any Holder or its successors with respect to such property shall be cancelled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary.

i.    Manner of Payment Pursuant to the Plan.

Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Disbursing Agent by check or by wire transfer.  Checks issued by the Disbursing Agents or

applicable Servicer on account of Allowed Claims shall be null and void if not negotiated within ninety days after issuance, but may be requested to be reissued until the distribution revests in the Post-Consummation Trust or Liquidation Trust, as applicable, pursuant to Article VII.D.8.d of the Plan.

        j.      Surrender of Cancelled Instruments or Securities.

On the Effective Date or as soon as reasonably practicable thereafter, each Holder of a Certificate shall surrender such Certificate to the Plan Administrator, the Liquidation Trust Administrator, or a Servicer (to the extent the relevant Claim is governed by an agreement and administered by a Servicer).  Such Certificate shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis à vis one another with respect to such Certificate.  No distribution of property pursuant to the Plan shall be made to or on behalf of any such Holder unless and until such Certificate is received by the Plan Administrator, the Liquidation Trust Administrator, or the Servicer or the unavailability of such Certificate is reasonably established to the satisfaction of the Plan Administrator, the Liquidation Trust Administrator, or the Servicer pursuant to the provisions of Article VII.D.11 of the Plan.  Any Holder who fails to surrender or cause to be surrendered such Certificate or fails to execute and deliver an affidavit of loss and indemnity acceptable to the Plan Administrator, the Liquidation Trust Administrator, or the Servicer prior to the first anniversary of the Effective Date, shall have its Claim discharged with no further action, be forever barred from asserting any such Claim, be deemed to have forfeited all rights and Claims with respect to such Certificate, and not participate in any distribution under the Plan; furthermore, all property with respect to such forfeited distributions, including any dividends or interest attributable thereto, shall revert to the Post-Consummation Trust or Liquidation Trust, as applicable, notwithstanding any federal or state escheat, abandoned, or unclaimed property law to the contrary.

        k.      Lost, Stolen, Mutilated, or Destroyed Debt Securities.

Any Holder of Allowed Claims evidenced by a Certificate that has been lost, stolen, mutilated, or destroyed shall, in lieu of surrendering such Certificate, deliver to the Plan Administrator, the Liquidation Trust Administrator, or Servicer, if applicable, an affidavit of loss acceptable to the Plan Administrator, the Liquidation Trust Administrator, or Servicer setting forth the unavailability of the Certificate, and such additional indemnity as may be required reasonably by the Plan Administrator, the Liquidation Trust Administrator, or Servicer to hold the Plan Administrator, the Liquidation Trust Administrator, or Servicer harmless from any damages, liabilities, or costs incurred in treating such Holder as a Holder of an Allowed Claim.  Upon compliance with this procedure by a Holder of an Allowed Claim evidenced by such a lost, stolen, mutilated, or destroyed Certificate, such Holder shall, for all purposes pursuant to the Plan, be deemed to have surrendered such Certificate.

5.      Claims Paid or Payable by Third Parties.

        a.      Claims Paid by Third Parties.

The Claims and Solicitation Agent shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Disbursing Agent.  Further, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or Disbursing Agent on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the Plan Administrator, or the Liquidation Trust Administrator, as applicable, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the Post-Consummation Trust or Liquidation Trust, as applicable, annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid; underlined provided that the Plan Administrator or Liquidation Trust Administrator, as applicable, may waive this requirement without further notice.

        b.      Claims Payable by Third Parties.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies or by a third party insurer that has agreed to tender defense until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' or third party insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims Register by the Claims and Solicitation Agent without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

        c.      Applicability of Insurance Policies.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors, the Post-Consummation Trust, the Liquidation Trust, or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

I.      Effective of Confirmation of the Plan.

     1.      Subordinated Claims.

Except as otherwise dictated by the terms of the Plan, the allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.   Pursuant to section 510 of the Bankruptcy Code, the Plan Administrator and the Liquidation Trust Administrator reserve the right to reclassify any Allowed Claim in accordance with any contractual, legal, or equitable subordination relating thereto.

     2.      Compromise and Settlement of Claims and Controversies.

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, Causes of Action and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or Interest (including the full and final resolution of any and all claims and causes of action asserted by the Creditors' Committee against the Prepetition Agent and the Prepetition Lenders and the Diminution Claim asserted by the Prepetition Lenders), or any distribution to be made on account of such an Allowed Claim or Interest.   The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.   In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Liquidation Trust Administrator and Plan Administrator, as applicable, may compromise and settle Claims against them and Causes of Action against other Entities.

     3.      **Releases by the Debtors.**

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious emergence of the Debtors and the implementation of the Plan, on and after the Effective Date, the Released Parties are deemed released and discharged by the Debtors, their Estates, the Post-Consummation Trust, the Liquidation Trust, and their Affiliates, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims or Causes of Action asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, their Estates, the Post-Consummation Trust, the Liquidation Trust, or their Affiliates would have been**

legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan and Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes a failure to perform the duty to act in good faith and where such failure to perform constitutes willful misconduct, gross negligence, or fraud.

4.      **Exculpation.**

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Claim, obligation, Cause of Action, or liability to one another or to any Exculpating Party for any Exculpated Claim, except for gross negligence, willful misconduct, or fraud, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Debtors (and each of their respective Affiliates, agents, directors, officers, employees, advisors, and attorneys) have, and upon the Effective Date shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the distributions of the securities pursuant to the Plan, and therefore are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

5.      **Releases by Holders of Claims and Interests.**

Except as otherwise specifically provided in the Plan, on and after the Effective Date, Holders of Claims and Interests (1) voting to accept the Plan or (2) abstaining from voting on the Plan and, in either case, electing not to opt-out of the release contained in this paragraph (which by definition, does not include Holders of Claims and Interests who are not entitled to vote in favor of or against the Plan), shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Debtors, the Post-Consummation Trust, the Liquidation Trust, and the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Debtors' Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any

security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan and Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than Claims or liabilities arising out of or relating to any act or omission of a Debtor or a Released Party that constitutes a failure to perform the duty to act in good faith, with the care of an ordinarily prudent person and in a manner the Debtor or the Released Party reasonably believed to be in the best interests of the Debtors (to the extent such duty is imposed by applicable non-bankruptcy law) where such failure to perform constitutes willful misconduct, gross negligence, or fraud; **provided** that this release and discharge shall not apply to any distributions on account of Claims or Interests specifically contemplated in Article VII of the Plan.

6.      **Injunction.**

Except as otherwise expressly provided in the Plan or for obligations issued pursuant to the Plan, all Entities who have held, hold, or may hold Claims or Interests that have been released pursuant to Article VIII.C of the Plan or Article VIII.E of the Plan, discharged pursuant to Article VIII.B of the Plan, or are subject to exculpation pursuant to Article VIII.D of the Plan are permanently enjoined, from and after the Effective Date, from:  (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication in a Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan. Nothing in the Plan or Confirmation Order shall preclude any Entity from pursuing an action against one or more of the Debtors in a nominal capacity to recover insurance proceeds so long as the Plan Administrator or the Liquidation Trust Administrator, as applicable, and any such Entity agree in writing that such Entity will:  (i) waive all Claims against the Post-Consummation Trust, the Liquidation Trust, and the Estates related to such action and (ii) enforce any judgment on account of such Claim solely against applicable insurance proceeds, if any.

7.      **Setoffs.**

**Except as otherwise expressly provided for in the Plan, the Plan Administrator or Liquidation Trust Administrator, as applicable, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may setoff against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any Claims, rights, and Causes of Action of any nature that the Post-Consummation Trust or Liquidation Trust, as applicable, may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release of any such Claims, rights, and Causes of Action that the Post-Consummation Trust or Liquidation Trust, as applicable, may possess against such Holder.  In no event shall any Holder of Claims or Interests be entitled to setoff any Claim or Interest against any Claim, right, or Cause of Action of the Post-Consummation Trust or Liquidation Trust, as applicable, unless such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Voting Deadline, and notwithstanding any indication in any Proof of Claim or Proof of Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise and obtain such authority from the Bankruptcy Court on or prior to the Effective Date.**

8.      **Recoupment.**

**In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtor, the Post-Consummation Trust or the Liquidation Trust, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.**

J.      Allowance and Payment of Certain Administrative Claims.

1.      Professional Claims.

a.      Final Fee Applications.

All final requests for payment of Claims of a Professional shall be filed no later than forty-five days after the Effective Date.  Any objections to final requests for payment of Claims of a Professional shall be filed no later than sixty days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Claims shall be determined by the Bankruptcy Court.

b.      Payment of Interim Amounts.

Except as otherwise provided in the Plan and subject to Article IX.A.1 of the Plan, Professionals shall be paid pursuant to the Interim Compensation Order for amounts earned through the Effective Date.

c.     Professional Fee Reserve Amount.

To receive payment for unbilled fees and expenses incurred through the Effective Date, on or before the Effective Date, the Professionals shall estimate their Accrued Professional Compensation prior to and as of the Effective Date and shall deliver such estimate to the Debtors. If a Professional does not provide an estimate, the Debtors may estimate the unbilled fees and expenses of such Professional; provided that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional nor a cap on the fees and expenses of such Professional.   The total amount so estimated as of the Effective Date shall comprise the Professional Fee Reserve Amount.

d.     Professional Fee Escrow Account.

In accordance with Article IX.A.3 of the Plan, on the Effective Date, the Debtors shall fund the Professional Fee Escrow Account with Cash equal to the aggregate Professional Fee Reserve Amount for all Professionals.   The Professional Fee Escrow Account shall be maintained in trust for the Professionals with respect to whom fees or expenses have been held back pursuant to the Interim Compensation Order.   Such funds shall not be considered property of the Post-Consummation Trust.   The remaining amount of Professional Claims owing to the Professionals shall be paid in Cash to such Professionals by the Plan Administrator from the Professional Fee Escrow Account when such Claims are Allowed by a Bankruptcy Court order.   When all Professional Claims have been paid in full, amounts remaining in the Professional Fee Escrow Account, if any, shall be paid to the Post-Consummation Trust and Liquidation Trust in accordance with the Administrative Expense Allocation Procedures.

e.     Post-Effective Date Fees and Expenses.

From and after the Effective Date, the Plan Administrator and the Liquidation Trust Administrator, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation and Consummation incurred by the Post-Consummation Trust, the Liquidation Trust, the Debtors' Professionals, and the Creditors' Committee in accordance with (i) the Administrative Expense Allocation Procedures and (ii) the Post-Consummation Trust Budget and the Liquidation Trust Budget, as applicable.   Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Post-Consummation Trust and the Liquidation Trust may employ any Professional in the ordinary course of business.

f.     Substantial Contribution Compensation and Expenses.

Except as otherwise specifically provided in the Plan, any Entity who requests compensation or expense reimbursement for making a substantial contribution in the

68

Chapter 11 Cases pursuant to sections 503(b)(3), (4), or (5) of the Bankruptcy Code must file an application and serve such application on counsel for the Debtors and the Creditors' Committee or the Plan Administrator and the Liquidation Trust Administrator, as applicable, and as otherwise required by the Bankruptcy Court and the Bankruptcy Code on or before the Administrative Claim Bar Date or be forever barred from seeking such compensation or expense reimbursement.

g.      Indenture Trustee Fees.

On the Effective Date, or as soon as reasonably practicable thereafter, all reasonable fees and expenses of the Indenture Trustee (and its counsel, agents, and advisors), as determined by the Creditors' Committee, that are payable pursuant to the Senior Subordinated Notes Indenture (including, without limitation, in connection with service on the Creditors' Committee and in connection with distributions under the Plan, but excluding fees and expenses related to the litigation of Disputed Claims and disputes related to Confirmation) shall be paid by the Liquidation Trust from the Liquidation Trust Assets.

2.      Other Administrative Claims.

Requests for payment of Administrative Claims must be filed and served on the Plan Administrator and the Liquidation Trust Administrator pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order, no later than, as applicable, (a) the pre-Effective Date date set forth in the Administrative Claims Bar Date Order, or (b) [__] days after the Effective Date, as set forth in detail in the Administrative Claims Bar Date Order. Holders of Administrative Claims that are required to file and serve a request for payment of such Administrative Claims and that do not file and serve such a request by the applicable Bar Date will be forever barred from asserting such Administrative Claims against the Debtors, the Post-Consummation Trust or the Liquidation Trust, or their respective property, and such Administrative Claims will be deemed discharged as of the Effective Date. In the event that any party with standing objects to an Administrative Claim, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim previously Allowed by Final Order.

K.      The Post-Consummation Trust; the Plan Administrator.

The powers, authority, responsibilities, and duties of the Post-Consummation Trust and the Plan Administrator are set forth in and will be governed by the Post-Consummation Trust Agreement. The Prepetition Agent will designate the initial Plan Administrator. The Post-Consummation Trust Assets shall be set forth in the Post-Consummation Trust Agreement included in the Plan Supplement.

L.      The Liquidation Trust; the Liquidation Trust Administrator.

The powers, authority, responsibilities, and duties of the Liquidation Trust and the Liquidation Trust Administrator are set forth in and will be governed by the

Liquidation Trust Agreement.   The Creditors' Committee will designate the initial Liquidation Trust Administrator, who shall be acceptable to the Prepetition Agent.

M.     <u>Conditions Precedent to Confirmation and Consummation of the Plan</u>.

    1.     Conditions to Confirmation.

The following are conditions precedent to Confirmation that must be satisfied or waived in accordance with Article XII.C of the Plan:

        (a)     The Bankruptcy Court shall have approved the Disclosure Statement, in a manner acceptable to the Debtors, the Prepetition Agent, and the Creditors' Committee, as containing adequate information with respect to the Plan within the meaning of section 1125 of the Bankruptcy Code.

        (b)     The proposed Confirmation Order shall be in form and substance acceptable to the Debtors, the Prepetition Agent, and the Creditors' Committee.

        (c)     The Liquidation Trust Agreement, Post-Consummation Trust Agreement, the Plan Supplement, and all of the schedules, documents, and exhibits contained therein shall be filed with the Bankruptcy Court in form and substance acceptable to the Debtors, the Prepetition Agent, and the Creditors' Committee.

    2.     Conditions Precedent to Consummation.

The following are conditions precedent to Consummation that must be satisfied or waived in accordance with Article XII.C of the Plan:

        (a)     The Bankruptcy Court shall have authorized the assumption and rejection of Executory Contracts and Unexpired Leases by the Debtors as contemplated by Article V of the Plan.

        (b)     The Confirmation Order shall have become a Final Order in form and substance acceptable to the Debtors, the Prepetition Agent, and the Creditors' Committee.

        (c)     The most current version of the Liquidation Trust Agreement, the Post-Consummation Trust Agreement, the Plan Supplement, and all of the schedules, documents, and exhibits contained therein shall be filed with the Bankruptcy Court in form and substance acceptable to the Debtors, the Prepetition Agent, and the Creditors' Committee.

        (d)     The Confirmation Date shall have occurred.

3.       Waiver of Conditions Precedent.

The Debtors, with consent of the Prepetition Agent and the Creditors' Committee, may waive any of the conditions to Confirmation or Consummation set forth in Article XII of the Plan at any time, without any notice to other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm or consummate the Plan. A failure to satisfy or waive any condition to Confirmation or Consummation may be asserted as a failure of Confirmation or Consummation regardless of the circumstances giving rise to such failure (including any action or inaction by the party asserting such failure). The failure of the Debtors to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

4.       Effect of Non-Occurrence of Conditions to Confirmation.

Each of the conditions to Consummation must be satisfied or duly waived pursuant to Article XII.C of the Plan and Consummation must occur within 180 days of Confirmation, or by such later date established by Bankruptcy Court order. If Consummation has not occurred within 180 days of Confirmation, then upon motion by a party in interest made before Consummation and a hearing, the Confirmation Order may be vacated by the Bankruptcy Court; provided that, notwithstanding the filing of such motion to vacate, the Confirmation Order may not be vacated if Consummation occurs before the Bankruptcy Court enters an order granting such motion. If the Confirmation Order is vacated for any reason, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, including the discharge of Claims and termination of Interests pursuant to the Plan and section 1141 of the Bankruptcy Code and the assumptions, assignments, or rejections of Executory Contracts or Unexpired Leases pursuant to Article V of the Plan, and nothing contained in the Plan or Disclosure Statement shall (a) constitute a waiver or release of any Claim, Interests, or Causes of Action; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

5.       Satisfaction of Conditions Precedent to Confirmation.

Upon entry of a Confirmation Order in form and substance acceptable to the Debtors, the Prepetition Agent, and the Creditors' Committee, each of the conditions precedent to Confirmation, as set forth in Article XII.A of the Plan, shall be deemed to have been satisfied or waived in accordance with the Plan.

N.       <u>Modification, Revocation, or Withdrawal of the Plan</u>.

1.       Modification and Amendments.

Except as otherwise specifically provided in the Plan, the Debtors, with the consent of the Prepetition Agent and the Creditors' Committee, reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors, with the consent of the

Prepetition Agent and the Creditors' Committee, expressly reserve their rights to revoke or withdraw, or to alter, amend, or modify materially the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article XIII of the Plan.  Upon its Filing, the Plan Supplement may be inspected in the office of the clerk of the Bankruptcy Court or its designee during normal business hours, at the Bankruptcy Court's website at http://www.ilnb.uscourts.gov, and at the Claims and Solicitation Agent's website at http://www.kccllc.net/kimballhill.  The documents contained in the Plan Supplement are an integral part of the Plan and shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.

2.      Effect of Confirmation on Modifications.

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

3.      Revocation or Withdrawal of Plan.

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent plans.  If a Debtor revokes or withdraws the Plan, or if Confirmation or Consummation does not occur, then**:**  (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (c) nothing contained in the Plan shall**:**  (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of such Debtor or any other Entity; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

O.      Retention of Jurisdiction.

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code.

**ARTICLE VI.**
**STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN**

The following is a brief summary of the Plan Confirmation process.  Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult their own attorneys.

A.    <u>The Confirmation Hearing</u>.

     Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on Confirmation (the "Confirmation Hearing").   Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation.

     **THE     BANKRUPTCY COURT     HAS     SCHEDULED     THE CONFIRMATION HEARING TO COMMENCE ON [_____], 2009 AT [___] PREVAILING CENTRAL TIME BEFORE THE HONORABLE SUSAN PIERSON SONDERBY, UNITED STATES BANKRUPTCY JUDGE, IN THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, LOCATED AT 219 SOUTH DEARBORN STREET, COURTROOM 1825, CHICAGO, ILLINOIS 60604.  THE CONFIRMATION HEARING MAY BE ADJOURNED FROM TIME TO TIME BY THE BANKRUPTCY COURT WITHOUT FURTHER NOTICE EXCEPT FOR AN ANNOUNCEMENT OF THE ADJOURNED DATE MADE AT THE CONFIRMATION HEARING OR ANY ADJOURNMENT THEREOF.**

     **OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE FILED AND SERVED ON OR BEFORE [_____], 2009, IN ACCORDANCE WITH THE SOLICITATION PROCEDURES ORDER FILED AND SERVED ON HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES IN INTEREST.   UNLESS OBJECTIONS TO CONFIRMATION ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE SOLICITATION PROCEDURES ORDER, THEY MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

B.    <u>Confirmation Standards</u>.

     To confirm the Plan, the Bankruptcy Court must find, among other things, that the requirements of section 1129 of the Bankruptcy Code have been satisfied.  The requirements of section 1129 of the Bankruptcy Code are listed below:

1.    the Plan complies with the applicable provisions of the Bankruptcy Code;

2.    the Debtors, as Plan proponents, will have complied with the applicable provisions of the Bankruptcy Code;

3.    the Plan has been proposed in good faith and not by any means forbidden by law;

4.    any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the cases, has been disclosed to the Bankruptcy Court, and any such payment made before the Confirmation is reasonable, or if such payment is to be fixed after the Confirmation, such payment is subject to the approval of the Bankruptcy Court as reasonable;

5.    with respect to each Class of Impaired Claims or Interests, either each Holder of a Claim or Interest of such Class has accepted the Plan or will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the

Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on such date under chapter 7 of the Bankruptcy Code;

6.      each Class of Claims or Interests that is entitled to vote on the Plan either has accepted the Plan or is not impaired under the Plan, or the Plan can be confirmed without the approval of each voting Class pursuant to section 1129(b) of the Bankruptcy Code;

7.      except to the extent that the Holder of a particular Claim will agree to a different treatment of such Claim, the Plan provides that Allowed Administrative and Allowed Priority Non-Tax Claims will be paid in full on the Effective Date, or as soon as reasonably practicable thereafter;

8.      at least one Class of Impaired Claims or Interests will accept the Plan, determined without including any acceptance of the Plan by any insider holding a Claim or Interest of such Class;

9.      Confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan;

10.     all fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid as of the Effective Date; and

11.     the Plan addresses payment of retiree benefits, if any, in accordance with section 1114 of the Bankruptcy Code.

The Debtors believe that the Plan satisfies the requirements of section 1129 of the Bankruptcy Code, including that (a) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code, (b) the Debtors have complied or will have complied with all of the requirements of chapter 11, and (c) the Plan has been proposed in good faith.

C.      <u>Financial Feasibility</u>.

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find, as a condition to Confirmation, that Confirmation is not likely to be followed by the liquidation of the Debtors, unless such liquidation is proposed in the Plan, or the need for further financial reorganization. The Plan contemplates that all assets of the Debtors ultimately will be disposed of and all proceeds of the assets will be distributed to the Creditors pursuant to the terms of the Plan. Since no further reorganization of the Debtors will be possible, the Debtors believe that the Plan meets the feasibility requirement. The Debtors believe that sufficient funds will exist to make all payments required by the Plan.

D.     <u>Best Interests of Creditors Test</u>.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that the Bankruptcy Court find, as a condition to Confirmation, that each Holder of a Claim or Interest in each Impaired Class:  (1) has accepted the Plan or (2) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such Person would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  To make these findings, the Bankruptcy Court must:   (a) estimate the Cash proceeds (the "Liquidation Proceeds") that a chapter 7 trustee would generate if each Chapter 11 Case were converted to a chapter 7 case and the assets of such Estate were liquidated; (b) determine the distribution ("Liquidation Distribution") that each non-accepting Holder of a Claim or Interest would receive from the Liquidation Proceeds under the priority scheme dictated in chapter 7; and (c) compare each Holder's Liquidation Distribution to the distribution under the Plan ("Plan Distribution") that such Holder would receive if the Plan were Confirmed and consummated.

To assist the Bankruptcy Court in making the findings required under section 1129(a)(7), the Debtors' management, together with A&M, prepared the analysis of estimated distributions to creditors under the Plan set forth below (the "Plan Distribution Analysis") and the Liquidation Analysis attached as <u>Exhibit C</u> hereto (to assist in parts (a) and (b), above).

1.     Plan Distribution Analysis.

The Plan Distribution Analysis presents "High" and "Low" estimates of the proceeds that would be available for distribution to creditors if the Plan were confirmed and effectuated according to its terms.   These estimates represent a range of management's assumptions regarding the costs that would be incurred to implement the Plan and the funds that would be available for distribution to creditors.  The Plan Distribution Analysis has the same projected Effective Date as the Liquidation Analysis (the "Assumed Effective Date").   In addition, management's assumptions in the Plan Distribution Analysis regarding anticipated events and proceeds expected to be realized prior to the Assumed Effective Date are the same as those used to prepare the Liquidation Analysis.

If the Plan is confirmed, on the Effective Date the Debtors will transfer certain of their assets to the Post-Consummation Trust and certain of their assets to the Liquidation Trust and such trusts will continue the Sale and Wind-Down Process.  Consistent with the goals of the Sale and Wind-Down Process discussed in Article IV, the Plan Distribution Analysis assumes, among other things:  (a) an orderly wind-down of the Debtors' non-salable business operations; (b) sales of all remaining assets; and (c) preservation of the Debtors' working capital assets and mitigation of Administrative Claims and other wind-down costs to the extent possible.

**Plan Distribution Analysis**

(in $000s)

|  | | High | | Low | |
|---|---|---|---|---|---|
| Aggregate Estimated Proceeds | | $ 357,583 | | $ 316,257 | |
| Total Wind Down Costs | | (132,618) | | (132,618) | |
| **Net Proceeds Available for Distribution** | | **$ 224,965** | | **$ 183,639** | |

| | | Estimated Chapter 11 Recovery | | | |
| | | High | | Low | |
| Class | Total Claims | Recovery $ | Recovery % | Recovery $ | Recovery % |
|---|---|---|---|---|---|
| DIP Facility Claims | 16,000 | 16,000 | 100% | 16,000 | 100% |
| Administrative and Priority Claims[1] | 3,000 | 3,000 | 100% | 3,000 | 100% |
| A-1 - Senior Credit Agreement Claims | 315,102 | 151,188 | 48% | 117,325 | 37% |
| A-2 - Other Secured Claims | 4,000 | 4,000 | 100% | 4,000 | 100% |
| A-3 - Secured Bank Claims | 6,517 | 6,517 | 100% | 6,517 | 100% |
| C-1 Senior Unsecured Claims | 43,571 | 15,574 | 36% | 12,725 | 29% |
| C-2 General Unsecured Claims | 130,918 | 26,586 | 20% | 21,970 | 17% |
| C-3 Unsecured Senior Subordinated Note Claim | 210,585 | 2,100 | 1% | 2,100 | 1% |
| | $ 729,693 | $ 224,965 | 31% | $ 183,639 | 25% |

[1] - Includes Class B Priority Non-Tax Claims

The Settlement on which the Plan is premised provides for distributions to creditors on a consolidated basis. Consistent with the Settlement, any Claim against a Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors are deemed one right to a distribution under the Plan.

THE DEBTORS BELIEVE THAT ANY ANALYSIS OF HYPOTHETICAL PLAN DISTRIBUTIONS IS NECESSARILY SPECULATIVE. THERE ARE A NUMBER OF ESTIMATES AND ASSUMPTIONS UNDERLYING THESE ESTIMATES THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT LEGAL, ECONOMIC, COMPETITIVE, AND OPERATIONAL UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS. NEITHER THE ESTIMATED PLAN DISTRIBUTIONS, NOR THE FINANCIAL INFORMATION ON WHICH IT IS BASED, HAS BEEN EXAMINED OR REVIEWED BY INDEPENDENT ACCOUNTANTS OR PREPARED IN ACCORDANCE WITH STANDARDS PROMULGATED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. THERE CAN BE NO ASSURANCE THAT ACTUAL RESULTS WILL NOT VARY MATERIALLY FROM THE HYPOTHETICAL RESULTS PRESENTED IN THE PLAN DISTRIBUTION ANALYSIS.

2.    Conclusion.

Holders of Allowed Claims in every Class are projected to recover as much or more under the Plan than they would in a chapter 7 liquidation. Moreover, as set forth in more detail below, in a liquidation under chapter 7, a substantial Allowed Diminution Claim could result in no recovery for unsecured creditors classified in Classes C-1, C-2, and C-3 under the Plan. Therefore, the best interests test is satisfied.

As made clear by the Liquidation Analysis, although the Debtors have certain unencumbered assets whose proceeds could be available for distribution to Holders of Unsecured Claims, the Prepetition Lenders have asserted a substantial superpriority Claim pursuant to section 507(b) of the Bankruptcy Code for the diminution in value of their collateral during the Chapter 11 Cases. Under the Plan and the Settlement upon which it is premised, the Prepetition Lenders have agreed to accept a Diminution Claim substantially less than the Diminution Claim they are asserting. This compromise preserves recoveries for Holders of Unsecured Claims. In a chapter 7 proceeding, however, the Settlement would not be applicable, and the amount of an Allowed Diminution Claim could exceed the value of the proceeds of unencumbered assets available for distribution to unsecured creditors. The recovery under the Plan provided to Class C-3 is provided only because the acceptance of the Plan by Class A-1 permits such recovery pursuant to certain provisions of chapter 11 of the Bankruptcy Code, which provisions would not be applicable in a chapter 7 proceeding.

E.   Acceptance by Impaired Classes.

The Bankruptcy Code also requires, as a condition to confirmation, that each class of claims or interests that is impaired under a plan accept the plan, with the exception described in the following section. A class that is not "impaired" under a plan of reorganization is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan (1) leaves unaltered the legal, equitable, and contractual rights to which the claim or interest entitles the holder of such claim or interest or (2) cures any default and reinstates the original terms of the obligation.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance. Under section 1126(d) of the Bankruptcy Code, a class of interests has accepted the plan if holders of such interests holding at least two-thirds in amount actually voting have voted to accept the plan.

F.   Confirmation Without Acceptance by All Impaired Classes.

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan, even if such plan has not been accepted by all impaired classes entitled to vote on such plan; provided that such plan has been accepted by at least one impaired class.

Section 1129(b) of the Bankruptcy Code states that notwithstanding the failure of an impaired class to accept a plan of reorganization, the plan will be confirmed, on request of the proponent of the plan, in a procedure commonly known as "cram-down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

In general, a plan does not discriminate unfairly if it provides a treatment to the class that is substantially equivalent to the treatment that is provided to other classes that have equal rank.

In determining whether a plan discriminates unfairly, courts will take into account a number of factors. Accordingly, two classes of unsecured claims could be treated differently without unfairly discriminating against either class.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of secured claims includes the requirements that: (1) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the secured claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan and (2) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the debtor's plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of unsecured claims includes the requirement that either: (1) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the Effective Date, equal to the allowed amount of such claim; or (2) the holder of any claim or interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or interest.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of interests includes the requirements that either: (1) the plan provide that each holder of an interest in such class receive or retain under the plan, on account of such interest, property of a value, as of the Effective Date, equal to the greater of (a) the allowed amount of any fixed liquidation preference to which such holder is entitled, (b) any fixed redemption price to which such holder is entitled, or (c) the value of such interest; or (2) if the class does not receive such an amount as required under (1), no class of interests junior to the non-accepting class may receive a distribution under the plan.

The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any Impaired Class, as applicable, presumed to reject the Plan, and the Debtors reserve the right to do so with respect to any other rejecting Class of Claims or Interests, as applicable, or to modify the Plan. Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Class that is Impaired under the Plan.

The Debtors submit that if the Debtors "cram-down" the Plan pursuant to Section 1129(b) of the Bankruptcy Code, the Plan will be structured such that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. If the Debtors seek to "cram-down" the Plan on Holders of Secured Claims, all such Holders shall receive a distribution that satisfies the fair and equitable requirement. The Plan also satisfies the fair and equitable requirement with respect to Holders of Unsecured Claims because even though such Holders will not receive payment in full on account of the Allowed amount of their Claims (other than to the Holders of Allowed Unsecured Senior Subordinated Note Claims as set forth herein), no junior Claim or Interest receives any distribution under the Plan. Holders of Interests

will receive no distribution under the Plan, but there is no junior Claim or Interest that will receive any distribution under the Plan either.  Therefore, the requirements of section 1129(b) of the Bankruptcy Code would be satisfied in the event that the Debtors are required to "cram down."

## ARTICLE VII.
## CERTAIN FACTORS TO BE CONSIDERED PRIOR TO VOTING

HOLDERS OF CLAIMS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE DISCLOSURE STATEMENT AND RELATED DOCUMENTS, REFERRED TO OR INCORPORATED BY REFERENCE IN THE DISCLOSURE STATEMENT, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.  THIS ARTICLE PROVIDES INFORMATION REGARDING POTENTIAL RISKS IN CONNECTION WITH THE PLAN AND THE FINANCIAL PROJECTIONS IN THE PLAN SUPPLEMENT.  THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

A.    Certain Bankruptcy Considerations.

1.    The Debtors May Not Be Able to Obtain Confirmation of the Plan.

The Debtors cannot ensure that they will receive the requisite acceptances to confirm the Plan.  Even if the Debtors receive the requisite acceptances, the Debtors cannot ensure that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of Claims and Interests might challenge the adequacy of the Disclosure Statement or the balloting procedures and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met, including that the terms of the Plan are fair and equitable to non-accepting Classes.

As discussed in further detail in Article VI herein, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things:  (a) a finding by the Bankruptcy Court that the plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of the plan is not likely to be followed by a liquidation or a need for further financial reorganization; and (c) the value of distributions to non-accepting holders of claims and interests within a particular class under the plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.  While there can be no assurance that these requirements will be met, the Debtors believe that the Plan complies with section 1129 of the Bankruptcy Code.

Confirmation and Consummation also are subject to certain conditions described in Article V herein.  If the Plan is not confirmed, it is unclear what distributions Holders of Claims ultimately would receive and it is possible that an alternative plan not premised upon the

Settlement would result in substantially less favorable treatment for Holders of Claims than such Holders would receive under the Plan.

2.      The Bankruptcy Court May Not Approve the Compromise and Settlement Contemplated By the Plan.

As described in more detail in Article V herein, the Plan constitutes a settlement, compromise, and release of rights arising from or relating to the allowance, classification, and treatment of all Allowed Claims and Allowed Interests and their respect distributions and treatments under the Plan and takes into account, and conforms to, the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510(b) and (c) of the Bankruptcy Code.  This settlement, compromise, and release requires approval by the Bankruptcy Court in the Confirmation Order.  The Debtors cannot ensure that the Bankruptcy Court will approve the settlement described in Article VIII.B of the Plan.

3.      Parties in Interest May Object to the Debtors' Classification of Claims.

Section 1122 of the Bankruptcy Code provides that a chapter 11 plan may classify a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code.  However, there is no assurance that the Bankruptcy Court will hold that the Plan's classification of Claims and Interests complies with the Bankruptcy Code.

4.      Failure to Satisfy Vote Requirement.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek Confirmation, as promptly as practicable thereafter. In the event that sufficient votes are not received, the Debtors may propose an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar to or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

5.      The Debtors May Object to the Amount or Secured or Priority Status of a Claim.

The Debtors reserve the right to object to the amount or the secured or priority status of any Claim or Interest.  The estimates set forth in the Disclosure Statement cannot be relied on by any Holder of a Claims or Interest whose Claim or Interest is subject to an objection.  Any such Holder of a Claim or Interest may not receive its specified share of the estimated distributions described in the Disclosure Statement.

6.      Procedures for Contingent and Unliquidated Claims.

Notwithstanding any language in any Proof of Claim or otherwise, the Holder of a contingent or unliquidated Claim shall not be entitled to receive or recover any amount in excess of the amount:     (a) stated in the Holder's Proof of Claim, if any, as of the

Distribution Record Date; or (b) if the Proof of Claim does not ascribe a monetary value to such Holders' Claim on the Distribution Record Date, the amount the Debtors elect to withhold on account of such Claim.

       7.       Nonconsensual Confirmation.

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Debtors believe that the Plan satisfies these requirements and the Debtors may request such nonconsensual Confirmation in accordance with section 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.

THESE CONSIDERATIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD–LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. WORDS SUCH AS "EXPECT," "PLANS," "ANTICIPATES," "INDICATES," "BELIEVES," "FORECAST," "GUIDANCE," "OUTLOOK," AND SIMILAR EXPRESSIONS ARE INTENDED TO IDENTIFY FORWARD-LOOKING STATEMENTS. ADDITIONALLY, FORWARD-LOOKING STATEMENTS INCLUDE STATEMENTS WHICH DO NOT RELATE SOLELY TO HISTORICAL FACTS, SUCH AS STATEMENTS WHICH IDENTIFY UNCERTAINTIES OR TRENDS, DISCUSS THE POSSIBLE FUTURE EFFECTS OF CURRENT KNOWN TRENDS OR UNCERTAINTIES OR WHICH INDICATE THAT THE FUTURE EFFECTS OF KNOWN TRENDS OR UNCERTAINTIES CANNOT BE PREDICTED, GUARANTEED, OR ASSURED. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING, WITHOUT LIMITATION, THOSE DESCRIBED ELSEWHERE IN THIS DISCLOSURE STATEMENT, THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, NATURAL DISASTERS AND UNUSUAL WEATHER CONDITIONS, TERRORIST ACTIONS OR ACTS OF WAR, ACTIONS OF GOVERNMENTAL BODIES, AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS. ADDITIONAL RISKS AND UNCERTAINTIES NOT PRESENTLY KNOWN TO THE DEBTORS OR THAT THE DEBTORS CURRENTLY BELIEVE TO BE IMMATERIAL MAY ALSO IMPAIR THE DEBTORS' BUSINESS, FINANCIAL CONDITION, RESULTS OF OPERATIONS, AND THE VALUE OF THE DEBTORS' ESTATES. IF ANY OF THE RISKS OCCUR, THE DEBTORS' BUSINESS, FINANCIAL CONDITION, OPERATING RESULTS, AND THE

VALUE OF THE DEBTORS' ESTATES, AS WELL AS THE DEBTORS' ABILITY TO CONSUMMATE THE PLAN, COULD BE MATERIALLY ADVERSELY AFFECTED.

## ARTICLE VIII.
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain federal income tax consequences of the implementation of the Plan to the Debtors and certain Holders of Claims. The following summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder (the "Regulations"), judicial decisions and published administrative rules and pronouncements of the Internal Revenue Service as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors have not requested and will not request a ruling from the Internal Revenue Service or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the Internal Revenue Service will adopt. In addition, this summary does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as Persons who are related to the Debtors within the meaning of the Tax Code, foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, investors in pass-through entities, and Holders of Claims who are themselves in bankruptcy). Furthermore, this discussion assumes that Holders of Claims hold only Claims in a single Class. Holders of Claims should consult their own tax advisors as to the effect such ownership may have on the federal income tax consequences described below.

This discussion assumes that, except as recharacterized by a Final Order of the Bankruptcy Court, the various debt and other arrangements to which the Debtors are a party will be respected for federal income tax purposes in accordance with their form.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE UNITED STATES INTERNAL REVENUE SERVICE, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE TAX CODE. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY

ATTACHMENTS) IS NOT WRITTEN TO SUPPORT THE PROMOTION, MARKETING OR RECOMMENDATION TO ANOTHER PARTY OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THIS DISCLOSURE STATEMENT.  EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

A.      Certain United States Federal Income Tax Consequences to the Debtors.

Under the Plan, the Debtors are transferring substantially all of their remaining assets to the Post-Consummation Trust and the Liquidation Trust.  These transfers of assets may result in the recognition of taxable gain or loss to the Debtors, based on the difference between the fair market value of these assets and the Debtor's tax basis in these assets.  To the extent that the Debtors realize gain from the transfer of these assets the Debtors believe that they will have sufficient current losses and net operating loss carryovers to shelter these gains, although there could be some liability to the Debtors in certain states and under the federal alternative minimum tax.

B.      Certain United States Federal Income Tax Consequences to the Holders of Class A-1 Claims.

Pursuant to the Plan, Holders of Class A-1 Claims will receive, in full satisfaction and discharge of their Claims, their share of the beneficial interests of the Post-Confirmation Trust.

A Holder should recognize gain or loss equal to the difference between the fair market value as of the Effective Date of the beneficial interests in the Post-Consummation Trust (to the extent such beneficial interests are not allocable to accrued interest) and the Holder's tax basis in the Claims surrendered by the Holder.  Such gain or loss should be capital in nature (subject to the "market discount" rules described below) and should be long term capital gain or loss if the Claims were held for more than one year by the Holder.  To the extent that any portion of the beneficial interests received in the exchange is allocable to accrued interest, the Holder may recognize ordinary income, which is addressed in the discussion below regarding accrued interest.  A Holder's tax basis in the beneficial interests received should equal the fair market value as of the Effective Date.  A Holder's holding period for the beneficial interests should begin on the day following the Effective Date.

To the extent that any amount received by a Holder of a Claim is attributable to accrued interest, such amount should be taxable to the Holder as interest income.  Conversely, a Holder of a Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest on the Claims was previously included in the Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by a Holder of a Claim will be attributable to accrued interest is unclear.  Nevertheless, the Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal.

Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of the gain realized by a Holder of a Claim who exchanges the Claim for Liquidation Trust Interests or Cash on the Effective Date may be treated as ordinary income (instead of capital gain) to the extent of the amount of "market discount" on the Claim.   In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest," or, (ii) in the case of a debt instrument issued with original issue discount, its adjusted issue price by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the Claim, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the taxable disposition of Claims that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claims were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).

C.      Certain United States Federal Income Tax Consequences to the Holders of Class C-1 Claims, Class C-2 Claims, Class C-3 Claims, and Class D Claims.

Pursuant to the Plan, Holders of Class C-1 Claims, Class C-2 Claims, Class C-3 Claims, and Class D Claims will receive, in full satisfaction and discharge of their Claims, their pro rata share of interests in the Liquidation Trust.   The amount received, if any, from such Liquidation Trust is contingent on the value obtained for the Debtors' unencumbered assets and the outcome of the Causes of Action held by the Liquidation Trust.   The Holder should recognize gain or loss equal to the difference between (1) the fair market value as of the Effective Date of the Liquidation Trust Interests received (to the extent it is not allocable to accrued interest) and (2) the Holder's tax basis in the Claims surrendered by the Holder.   Such gain or loss should be capital in nature (subject to the "market discount" rules described below) and should be long term capital gain or loss if the Claims were held for more than one year by the Holder.   To the extent that any portion of the Liquidation Trust beneficial interests received in the exchange is allocable to accrued interest, the Holder may recognize ordinary income, which is addressed in the discussion below regarding accrued interest.   A Holder's tax basis in the beneficial interests received should equal their fair market value as of the Effective Date.   A Holder's holding period for the Liquidation Trust beneficial interests should begin on the day following the Effective Date.

It is plausible that a Holder could treat the transaction as an 'open' transaction for tax purposes, in which case the recognition of any gain or loss on the transaction might be deferred pending the determination of the amount of the Liquidation Trust beneficial interests received. The federal income tax consequences of an open transaction are uncertain and highly complex, and a Holder should consult with its own tax advisor if it believes that open transaction treatment might be appropriate.

To the extent that any amount received by a Holder of a Claim is attributable to accrued interest, such amount should be taxable to the Holder as interest income.  Conversely, a Holder of a Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve

84

for worthless debts) to the extent that any accrued interest on the Claims was previously included in the Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by a Holder of a Claim will be attributable to accrued interest is unclear. Nevertheless, the Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal.

Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of the gain realized by a Holder of a Claim who exchanges the Claim for Liquidation Trust beneficial interests or Cash on the Effective Date may be treated as ordinary income (instead of capital gain) to the extent of the amount of "market discount" on the Claim. In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest," or (ii) in the case of a debt instrument issued with original issue discount, its adjusted issue price by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the Claim, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the taxable disposition of Claims that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claims were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).

D.      Receipt of Interests in Post-Consummation Trust and in the Liquidation Trust.

On the Effective Date, the Post-Consummation Trust and the Liquidation Trust will be settled and are currently anticipated to exist as either grantor trusts or partnerships, in each case, for the benefit of certain creditors. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by the Plan Administrator or the Liquidation Trust Administrator), pursuant to Treasury Regulation Section 1.671-1(a) and/or Treasury Regulation Section 301.7701-4(d) and related regulations, the Plan Administrator and the Liquidation Trust Administrator may designate and file returns for each of the Post-Consummation Trust and the Liquidation Trust as a "grantor trust" and/or "liquidating trust" and therefore, for federal income tax purposes, the Post-Consummation Trust's and Liquidation Trust's taxable income (or loss) should be allocated pro rata to its beneficiaries.

The Plan Administrator and the Liquidation Trust Administrator intend to take a position on Post-Consummation Trust's and Liquidation Trust's tax return that the Post-Consummation Trust and the Liquidation Trust, respectively, should each be treated as a grantor trust set up for the benefit of creditors.

Holders of Claims that receive a beneficial interest in the Post-Consummation Trust and in the Liquidation Trust will be required to report on their U.S. federal income tax returns their

share of the Post-Consummation Trust's and the Liquidation Trust's items of income, gain, loss, deduction and credit in the year recognized by the Post-Consummation Trust and the Liquidation Trust, respectively, whether or not each of the Post-Consummation Trust and the Liquidation Trust is taxed as a partnership or a grantor trust.  This requirement may result in Holders being subject to tax on their allocable share of the Post-Consummation Trust's and the Liquidation Trust's taxable income prior to receiving any cash distributions from the Post-Consummation Trust and the Liquidation Trust.  In general, holders of interest in the Post-Consummation Trust and in the Liquidation Trust will not be subject to tax on their receipt of distributions from the trust.

Any Liquidation Trust Assets held by the Liquidation Trust on account of Disputed Claims shall be treated as held in trust by the Liquidation Trust as fiduciary for the benefit of the holders of Disputed Claims (each a "Disputed Claims Reserve").

Under section 468B(g) of the Tax Code, amounts earned by an escrow account, settlement fund, or similar fund must be subject to current tax.  Although certain Treasury Regulations have been issued under this section, no Treasury Regulations have as yet been promulgated to address the tax treatment of such accounts in a bankruptcy setting.  Thus, depending on the facts of a particular situation, such an account could be treated as a separately taxable trust, as a grantor trust treated as owned by the holders of disputed claims or by the Debtor (or, if applicable, any of its successors), or otherwise.  On February 1, 1999, the IRS issued proposed Treasury Regulations that, if finalized in their current form, would specify the tax treatment of reserves of the type here involved that are established after the date such Treasury Regulations become final.  In general, such Treasury Regulations would tax such a reserve as a "qualified settlement fund" under Treasury Regulation sections 1.468B-1 et seq. and thus subject to a separate entity level tax.  As to previously established escrows and the like, such Treasury Regulations would provide that the IRS would not challenge any reasonably, consistently applied method of taxation for income earned by the escrow or account, and any reasonably, consistently applied method for reporting such income.

Absent definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Liquidation Trust will (i) treat each Disputed Claims Reserve as a discrete trust for federal income tax purposes, consisting of separate and independent shares to be established in respect of each disputed claim in the class of claims to which such reserve relates, in accordance with the trust provisions of Code, and (ii) to the extent permitted by applicable law, report consistently for state and local income tax purposes.  In addition, pursuant to the Plan, all parties shall report consistently with such treatment.

Accordingly, subject to issuance of definitive guidance, the Liquidation Trust, in each case as fiduciary for Holders of Disputed Claims, will report as subject to a separate entity level tax any amounts earned by its respective Disputed Claims Reserves, except to the extent such earnings are distributed by such fiduciary during the same taxable year.  In such event, any amount earned by a Disputed Claims Reserve that is distributed to a holder during the same taxable year will be includible in such holder's gross income.

Holders of Claims are urged to consult their tax advisors regarding the tax consequences of the right to receive and of the receipt (if any) of property from the Liquidation Trust and each

Holder of a Disputed Claim is urged to consult its tax advisor regarding the potential tax treatment of the Disputed Claim Reserve, distributions therefrom, and any tax consequences to such Holder relating thereto.

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS OR INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

**ARTICLE IX.**
**SOLICITATION PROCESS**

A.       Voting and Solicitation Agent and Securities Voting Agent.

On [_____,] 2009, the Bankruptcy Court entered the Solicitation Procedures Order approving the adequacy of the Disclosure Statement and approving procedures for the solicitation of votes to accept or reject the Plan (the "Solicitation Procedures"). A copy of the Solicitation Procedures is attached as an exhibit to the Solicitation Procedures Order and is included in the Plan Supplement. In addition to approving the Solicitation Procedures, the Solicitation Procedures Order established certain dates and deadlines, including the date for the Confirmation Hearing, the deadline for parties to object to Confirmation, the Record Date, and the Voting Deadline. The Solicitation Procedures Order also approved the forms of Ballots, Master Ballots, and certain Confirmation-related notices. The Solicitation Procedures Order and the Solicitation Procedures should be read in conjunction with this Article IX of the Disclosure Statement. Capitalized terms used in this Article IX of the Disclosure Statement that are not otherwise defined in the Disclosure Statement or Plan shall have the meanings ascribed to them in the Solicitation Procedures.

The Debtors have retained Kurtzman Carson Consultants LLC to, among other things, act as their voting and solicitation agent in connection with the solicitation of votes to accept or reject the Plan (the "Voting and Solicitation Agent"). The Voting and Solicitation Agent is authorized to assist the Debtors in the following: (1) distributing the Solicitation Packages and soliciting votes on the Plan; (2) receiving, tabulating, and reporting on Ballots and Master Ballots cast to accept or reject the Plan by Holders of Claims; (3) responding to inquiries from Holders of Claims and Interests and other parties in interest relating to the Disclosure Statement, the Plan, the Ballots and the Master Ballots, the Solicitation Procedures, the Solicitation Package, and all other matters related thereto, including, without limitation, the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan, (4) if necessary, contacting creditors and Holders of Claims and Interests regarding the Plan; and (5) filing a Voting Report prior to the Confirmation Hearing.

In addition to the solicitation conducted by the Voting and Solicitation Agent, the Debtors, through the Voting and Solicitation Agent, will utilize the services of the Financial Balloting Group, LLC ("FBG" or the "Securities Voting Agent"), to solicit votes of Holders of Claims based on publicly traded securities, i.e., Class C-3 Claims.

B.    Solicitation Package.

The following documents and materials will constitute the solicitation package (the "Solicitation Package"):

    1.    Paper copies of the following:

- the Solicitation Procedures Order, together with the Solicitation Procedures;

- a cover letter describing the contents of the Solicitation Package;

- a letter from the Debtors' significant constituents urging Holders in each Voting Class to accept the Plan;

- the Confirmation Hearing Notice; and

- the appropriate Ballot(s) and ballot instructions with respect thereto, together with a pre-addressed, postage pre-paid return envelope; and

    2.    a CD-ROM containing electronic copies of the following:

- the Disclosure Statement, as approved by the Bankruptcy Court (with all appendices thereto, including the Plan), the exhibits to the Plan, and any other supplements or amendments to these documents that may be filed with the Bankruptcy Court; and

- any supplemental Solicitation Documents the Debtors may file with the Bankruptcy Court or that the Bankruptcy Court orders to be made available.

C.    Distribution of the Solicitation Package.

The Solicitation Package will be distributed in accordance with the Solicitation Procedures to Holders of Claims in voting Classes as of the Record Date. The Solicitation Package (except the Ballots and Master Ballots) may also be obtained (1) from the Debtors' Voting and Solicitation Agent (a) at its website at http://www.kccllc.net/kimballhill (the "Case Website"), (b) by writing to Kimball Hill, Inc., c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California  90245, or (c) by calling (877) 631-3923, or (2) for a fee via PACER at https://ecf.ilnb.uscourts.gov/.

D.    <u>Form of Notice to Unclassified Claims and Unimpaired Classes</u>.

Certain Holders of Claims that are not classified in accordance with section 1123(a)(1) of the Bankruptcy Code, that are not entitled to vote because they are Unimpaired or are otherwise deemed to accept the Plan under section 1126(f) of the Bankruptcy Code, will receive only the Confirmation Hearing Notice and the Non-Voting Status Notice–Deemed to Accept.  The Non-Voting Status Notices will instruct these Holders how they may obtain copies of the documents contained in the Solicitation Package (excluding Ballots).

E.    <u>Retained Causes of Action and Counterparties to Executory Contracts and Unexpired Leases Notices</u>.

The parties to retained Causes of Action listed on Exhibit A to the Plan and the counterparties to the Debtors' Executory Contracts and Unexpired Leases listed on Exhibit B to the Plan and Exhibit C to the Plan will receive only the Confirmation Hearing Notice and one or both of the following additional notices:  (1) the Retained Causes of Action Notice; and/or (2) the Notice to Counterparties to Executory Contracts and Unexpired Leases, as applicable.  If any such party holds a claim against the Debtors as of the Record Date, such party may also receive a Solicitation Package pursuant to the procedures outlined in Article IX.C herein.  The Retained Causes of Action Notice and the Notice to Counterparties to Executory Contracts and Unexpired Leases will instruct parties how they may obtain copies of the Solicitation Package.

F.    <u>Distribution of Materials to the Master Service List and the 2002 List</u>.

Through the Voting and Solicitation Agent, the Debtors also intend to serve the Master Service List and the 2002 List (as defined in the Bankruptcy Court's *Amended Order Establishing Certain Notice, Case Management, and Administrative Procedures*, dated May 13, 2008 Docket No. 174) as of the Record Date, either paper copies of, or a CD-ROM containing, the Disclosure Statement Order, the Disclosure Statement, and all exhibits to the Disclosure Statement, including the Plan.  Any party who receives a CD-ROM but desires a paper copy of these documents and any party that desires a CD-ROM or a paper copy of the Solicitation Package (excluding Ballots) may request the copies from the Voting and Solicitation Agent.

G.    <u>Publication of the Confirmation Hearing Notice</u>.

Following entry of the Solicitation Procedures Order, the Debtors will publish the Confirmation Hearing Notice, which will contain, among other things, the Plan Objection Deadline, the Voting Deadline and the date that the Confirmation Hearing is first scheduled, in the national editions of the following publications to provide notification to those Entities that may not receive notice by mail:  the *USA Today*, the *The Wall Street Journal*, and *The Chicago Tribune*.  The Confirmation Hearing Notice also will be published on the Voting and Solicitation Agent's website at http://www.kccllc.net/kimballhill.

# ARTICLE X.
# VOTING INSTRUCTIONS

The following is a brief summary regarding voting on the Plan. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult their own attorneys. Additional information regarding voting procedures is set forth in the Notice accompanying the Disclosure Statement. Capitalized terms used in this Article X that are not otherwise defined herein shall have the meanings ascribed to them in the *Motion of the Debtors for an Order Approving Disclosure Statement and Relief Related Thereto* (the "Solicitation Procedures Motion") and documents filed therewith.

THE DEBTORS BELIEVE THAT THE PLAN IS IN THE BEST INTEREST OF ALL CREDITORS AND INTEREST HOLDERS. THE DEBTORS RECOMMEND THAT ALL CREDITORS ENTITLED TO VOTE SUBMIT BALLOTS OR MASTER BALLOTS VOTING TO ACCEPT THE PLAN.

A.    The Record Date.

The Bankruptcy Court has approved [_____], 2009, as the record date for purposes of determining which creditors and interest holders are entitled to vote on the Plan (the "Record Date").

B.    Solicitation Deadline.

The Debtors will distribute the Solicitation Package to Holders of Claims entitled to vote on the Plan no later than [_____], 2009 (the "Solicitation Deadline").

C.    Voting Deadline

The Bankruptcy Court has approved [_____], at 5:00 p.m. prevailing Pacific Time, as the voting deadline (the "Voting Deadline") for submitting Ballots and Master Ballots with respect to the Plan. The Debtors may extend the Voting Deadline without further order of the Bankruptcy Court, but will document any such extension in the Voting Report (each as defined below). To be counted as votes to accept or reject the Plan, all Ballots and Master Ballots must be properly executed, completed, and delivered by: (1) first class mail; (2) overnight courier; or (3) personal delivery, so that they are actually received no later than the Voting Deadline by the Voting and Solicitation Agent, Kurtzman Carson Consultants LLC ("KCC"), or with respect to Claims based on publicly-traded securities (the "Securities"), by the Securities Voting Agent, Financial Balloting Group, LLC ("FBG").

The Ballots and Master Ballots will clearly indicate the appropriate return address (or, in the case of Securities, instructions for the proper return of Ballots). Ballots returnable to KCC should be sent to:

Kimball Hill, Inc.
c/o Kurtzman Carson Consultants LLC
2335 Alaska Avenue
El Segundo, California  90245

Master Ballots returnable to FBG should be sent to:

Kimball Hill, Inc.
c/o Financial Balloting Group LLC
757 Third Avenue - Third Floor
New York, New York 10017
Attn:  Ballot Processing Center

D.      Holders of Claims Entitled To Vote.

The following Classes are Impaired and thus entitled to vote to accept or reject the Plan:

| Classes |
| --- |
| A-1 |
| C-1 |
| C-2 |
| C-3 |

Classes A-1, C-1, C-2, and C-3 are Impaired Classes under the Plan and Holders of Claims in such Classes are entitled to receive a distribution under the Plan; therefore, only Holders of a Claim in Classes A-1, C-1, C-2, and C-3 as of the Record Date, may vote to accept or reject the Plan.

E.      Conclusively Presumed Acceptance of the Plan.

The following Classes are Unimpaired and conclusively presumed to accept the Plan. Therefore, such Classes are not entitled to vote to accept or reject the Plan and the vote of the Holders of such Claims and Interests will not be solicited.

| Classes |
| --- |
| A-2 |
| A-3 |
| B |

F.      Conclusively Presumed Rejection of the Plan

The Following Classes are Impaired and conclusively presumed to reject the Plan. Therefore, such Classes are not entitled to vote to accept or reject the Plan and the vote of such Holders of Claims and Interests shall not be solicited.

| Classes |
| --- |
| D |
| E |

G.    Voting Procedures.

All known Holders of Claims entitled to vote on the Plan will be sent a Ballot and/or Master Ballot together with a pre-addressed, postage pre-paid return envelope in accordance with the Solicitation Procedures. Such Holders should read the Ballot carefully and follow the instructions contained therein. Please use only the Ballot that accompanies the Disclosure Statement. If a Holder holds a Claim in more than one Class, such Holder may receive more than one Ballot.

The Debtors have engaged the Voting and Solicitation Agent and the Securities Voting Agent to assist Holders of Claims and Interests in the voting process. The Voting and Solicitation Agent and the Securities Voting Agent, as applicable, will (1) oversee the voting tabulation, (2) answer questions regarding the procedures and requirements for voting on the Plan and for objecting to the Plan, and (3) provide additional copies of all material. The Voting and Solicitation Agent and the Securities Voting Agent, as applicable, will also process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan.

If you have any questions on voting procedures, please call the Voting and Solicitation Agent at the following toll free number: (877) 631-3923 or the Securities Voting Agent at (646) 282-1800.

Except as specifically agreed to in writing by the Debtors, to be counted as votes to accept or reject the Plan, all Ballots and Master Ballots must be properly executed, completed, and delivered by: (a) first class mail; (b) overnight courier; or (c) personal delivery, so that they are actually received before the Voting Deadline, by either the Voting and Solicitation Agent or the Securities Voting Agent, as applicable. The Ballots and Master Ballots will clearly indicate the appropriate return address (or, in the case of the Unsecured Senior Subordinated Notes Claims, contain instructions for the proper return of Ballots).

H.    Tabulation Procedures

In tabulating votes, the following hierarchy will be used to determine the claim amount associated with the vote of the holder of such claim:

(1)    the Claim amount settled or agreed upon by the Debtors prior to the Record Date, as reflected in a court pleading, stipulation, agreement, or other document filed with the Bankruptcy Court, in an order entered by the Bankruptcy Court, or in a document executed by the Debtors pursuant to authority granted by the Bankruptcy Court, regardless of whether a Proof of Claim has been filed;

(2)    the Claim amount Allowed (temporarily or otherwise) pursuant to the Solicitation Procedures;

(3)    the Claim amount contained in a Proof of Claim that has been timely filed by the applicable Bar Date (or deemed timely filed by the Bankruptcy Court) except for any amounts in such Proof of Claim asserted on account of any interest accrued after the Petition Date; provided however, that Ballots cast by Holders whose Claims are not listed on the Debtors' Schedules, but who timely file a

92

Proof of Claim in an unliquidated or unknown amounts that are not the subject of an objection filed before the Voting Deadline, will count for satisfying the numerosity requirement of section 1126(c) of the Bankruptcy Code, and will count as Ballots for Claims in the amount of $1.00 solely for purposes of satisfying the dollar amount provisions of section 1126(c) of the Bankruptcy Code; provided further that to the extent the amount of the Claim contained in the Proof of Claim is different from the amount of the Claim set forth in a document filed with the Bankruptcy Court as referenced in subparagraph (1) above, the amount of the Claim in the document filed with the Bankruptcy Court shall supersede the amount of the Claim set forth on the respective Proof of Claim;

(4)    the Claim amount listed in the Debtors' Schedules; provided that such Claim is not scheduled as contingent, disputed, or unliquidated and has not been paid; provided further that if the Holder of a contingent, disputed, or unliquidated Claim is allowed to vote its Claim because the applicable Bar Date has not passed, then the amount of the Claim listed in the Schedules; and

(5)    in the absence of any of the foregoing, zero.

The amount of the Claim established herein shall control for voting purposes only and shall not constitute the Allowed amount of any Claim. Moreover, any amounts filled in on Ballots by the Debtors through the Voting and Solicitation Agent or the Securities Voting Agent, as applicable, are not binding for any purposes, including for purposes of voting and distribution.

The following voting procedures and standard assumptions will be used in tabulating Ballots:

(1)    Except as otherwise provided in the Solicitation Procedures, unless the Ballot or Master Ballot being furnished is timely submitted on or prior to the Voting Deadline, the Debtors will reject such Ballot or Master Ballot as invalid and, therefore, decline to count it in connection with Confirmation of the Plan.

(2)    The Voting and Solicitation Agent or the Securities Voting Agent, as applicable, will date and time-stamp all Ballots and Master Ballots when received. The Voting and Solicitation Agent or the Securities Voting Agent, as applicable, will retain the original Ballots and Master Ballots and an electronic copy of the same for a period of one year after the Voting Deadline, unless otherwise ordered by the Bankruptcy Court.

(3)    An original executed Ballot or Master Ballot is required to be submitted by the party submitting such Ballot or Master Ballot. Delivery of a Ballot or Master Ballot to the Voting and Solicitation Agent or the Securities Voting Agent, as applicable, by facsimile, email, or any other electronic means will not be valid.

(4)    Pursuant to Local Rule 3018-1, the Debtors will tabulate all Ballots and Master Ballots and file a voting report (the "Voting Report") no later than five (5) calendar days prior to the Confirmation Hearing.

(5)     The Debtors will provide notice of the Voting Report to the U.S. Trustee, the Master Service List, the 2002 List, and all parties who have timely filed an objection to the Plan by the Plan Objection Deadline.  The Debtors will also deliver a copy of the Voting Report to the Honorable Susan Pierson Sonderby at the United States Courthouse, 219 South Dearborn Street, Chicago, Illinois, 60604.

(6)     The Voting Report will, among other things, (a) describe each Class and whether or not it is Impaired; (b) provide the number of votes received, the number of votes voting to accept the Plan and their aggregate dollar amount, and the number of votes voting to reject the Plan and their aggregate dollar amount; (c) indicate whether the Plan has received sufficient votes to be confirmed; (d) delineate every irregular Ballot and Master Ballot, including, without limitation, those Ballots and Master Ballots that are late or (in whole or in material part) illegible, unidentifiable, lack signatures or lack necessary information, received via facsimile or electronic mail, or damaged.  The Voting Report will indicate the Debtors' intentions with regard to irregular Ballots and Master Ballots.

(7)     The method of delivery of Ballots or Master Ballots to the Voting and Solicitation Agent or the Securities Voting Agent, as applicable, is at the election and risk of each Holder of a Claim.  Except as otherwise provided in the Solicitation Procedures Order, delivery will be deemed made only when the Voting and Solicitation Agent  or the  Securities Voting Agent, as applicable, actually receives the originally executed Ballot or Master Ballot.

(8)     No Ballot or Master Ballot should be sent to any of the Debtors, the Debtors' agents (other than the Voting and Solicitation Agent or the Securities Voting Agent, as applicable,), any indenture trustee (unless specifically instructed to do so), or the Debtors' financial or legal advisors, and if so sent will not be counted.

(9)     If multiple Ballots or Master Ballots are received from the same Holder of a Claim with respect to the same Claim prior to the Voting Deadline, the latest dated, validly executed Ballot or Master Ballot timely received will supersede and revoke any prior Ballot or Master Ballot.

(10)    Holders must vote all of their Claims within a particular Class either to accept or reject the Plan and may not split their votes.  Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted.  Further, if a Holder has multiple Claims within the same Class, the Debtors may, in their discretion, aggregate the Claims of any particular Holder within a Class for the purpose of counting votes.

(11)    A person signing a Ballot or a Master Ballot in its capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity must indicate such capacity when signing and, if required or requested by the applicable Nominee or its agent, the

Voting and Solicitation Agent, Securities Voting Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder or Beneficial Holder.

(12)   The Debtors, subject to contrary order of the Bankruptcy Court, may waive any defects or irregularities as to any particular Ballot or Master Ballot at any time, either before or after the close of voting, and any such waivers will be documented in the Voting Report.

(13)   Neither the Debtors, nor any other party, will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots and Master Ballots other than as provided in the Voting Report, nor will any of them incur any liability for failure to provide such notification.

(14)   Unless waived by the Debtors, subject to contrary order of the Bankruptcy Court, any defects or irregularities in connection with deliveries of Ballots and Master Ballots must be cured prior to the Voting Deadline or such Ballots and Master Ballots will not be counted.

(15)   In the event a designation for lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected by such Claim.

(16)   Subject to any contrary order of the Bankruptcy Court, the Debtors reserve the right to reject any and all Ballots and Master Ballots not in proper form, the acceptance of which, in the opinion of the Debtors, would not be in accordance with the provisions of the Bankruptcy Code or the Bankruptcy Rules; provided that any such rejections shall be documented in the Voting Report.

(17)   If a Claim has been estimated or otherwise Allowed for voting purposes by an order of the Bankruptcy Court pursuant to Bankruptcy Rule 3018(a), such Claim will be temporarily Allowed in the amount so estimated or Allowed by the Bankruptcy Court for voting purposes only and not for purposes of allowance or distribution.

(18)   If an objection to a Claim is filed, such Claim will be treated in accordance with the procedures set forth in the Solicitation Procedures Order.

(19)   The following Ballots and Master Ballots shall not be counted in determining the acceptance or rejection of the Plan: (a) any Ballot or Master Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (b) any Ballot or Master Ballot cast by a party that does not hold a Claim in a Class that is entitled to vote on the Plan; (c) any Ballot or Master Ballot cast for a Claim scheduled as contingent, disputed, or unliquidated or for which the applicable Bar Date has passed and no Proof of Claim was timely Filed; (d) any unsigned Ballot or Master Ballot; (e) any Ballot or Master Ballot

not marked to accept or reject the Plan or any Ballot marked both to accept and reject the Plan; (f) any Ballot or Master Ballot sent by facsimile or other electronic means; and (g) any Ballot or Master Ballot submitted by any party not entitled to vote pursuant to the Solicitation Procedures.

In addition, the following additional procedures will apply to Beneficial Holders:

(1)     The Securities Voting Agent will serve or will cause to be served the appropriate number of copies of Solicitation Packages to each record holder holding a Note Claim as of the Record Date, including Nominees identified by the Securities Voting Agent as entities through which Beneficial Holders hold their Claims relating to the Notes.

(2)     Any Beneficial Holder holding a Note as a record holder in its own name should vote on the Plan by completing and signing a Ballot and returning it directly to the Securities Voting Agent on or before the Voting Deadline.

(3)     Any Nominee that is a holder of record with respect to a Note must facilitate the vote on behalf of the Beneficial Holder of such Note by (a) immediately distributing the Solicitation Package, including any applicable Ballot(s) it receives from the Securities Voting Agent, to such Beneficial Holder, (b) promptly collecting any completed Ballot(s) from such Beneficial Holder, (c) compiling and validating the votes and other relevant information of all such Beneficial Holders on the applicable Master Ballot, and (d) transmitting such Master Ballot to the Securities Voting Agent by the Voting Deadline.

(4)     Any Beneficial Holder holding a Note in "street name" through a Nominee must vote on the Plan through such Nominee by completing and signing the Ballot and returning such Ballot to the appropriate Nominee as promptly as possible and in sufficient time to allow such Nominee to process the Ballot and return the Master Ballot to the Securities Voting Agent prior to the Voting Deadline. A Ballot submitted directly by a Beneficial Holder holding a Note in "street name" will not be counted;

(5)     Any Ballot returned to a Nominee by a Beneficial Holder will not be counted for purposes of accepting or rejecting the Plan until such Nominee properly completes and delivers to the Securities Voting Agent a Master Ballot that reflects the vote of such Beneficial Holder by the Voting Deadline or otherwise validates the Ballot in a manner acceptable to the Securities Voting Agent.

(6)     Nominees must retain all Ballots returned by Beneficial Holders for a period of one year after the Voting Deadline; provided that the Ballot of any Beneficial Holder making the Opt-out Election shall be retained by such Nominee indefinitely.

(7)     If a Beneficial Holder holds a Note through more than one Nominee or through multiple accounts, such Beneficial Holder may receive more than one Ballot and each such Beneficial Holder should execute a separate Ballot for each block of

Notes that it holds through any Nominee and must return each such Ballot to the appropriate Nominee.

(8)    If a Beneficial Holder holds a portion of its Notes through a Nominee or Nominees and another portion in its own name as the record holder, such Beneficial Holder should follow the procedures described in subparagraph (2) above, to vote the portion held in its own name and the procedures described in the rest of this subparagraph (4) above, to vote the portion held by the Nominee(s).

(9)    A trustee (unless otherwise empowered to do so) is not entitled to vote on behalf of the holder of a Beneficial Holder Claim; rather, each such holder of a Beneficial Holder Claim must submit its own Ballot.

In addition, the following additional procedures will apply to Master Ballots cast by Nominees and Ballots cast by Beneficial Holders:

(1)    Votes cast by Beneficial Holders through Nominees will be applied to the applicable positions held by such Nominees in Class C-3, as of the Record Date, as evidenced by the record and depository listings.  Votes submitted by a Nominee, whether pursuant to a Master Ballot or prevalidated Ballot, will not be counted in excess of the amount of such Securities held by such Nominee as of the Record Date.

(2)    If conflicting votes or "over-votes" are submitted by a Nominee, whether pursuant to a Master Ballot or prevalidated Ballot, the Debtors will use reasonable efforts to reconcile discrepancies with the Nominees.

(3)    If over-votes on a Master Ballot or prevalidated Ballot are not reconciled prior to the preparation of the vote certification, the Debtors will apply the votes to accept and to reject the Plan in the same proportion as the votes to accept and to reject the Plan submitted on the Master Ballot or prevalidated Ballot that contained the over-vote, but only to the extent of the Nominee's position in Class C-3.

(4)    For purposes of tabulating votes, each Nominee or Beneficial Holder will be deemed to have voted the principal amount of its Claims in Class C-3, although any principal amounts may be adjusted by the Securities Voting Agent to reflect the amount of the Claim actually voted, including prepetition interest.

(5)    A single Nominee may complete and deliver to the Securities Voting Agent multiple Master Ballots.  Votes reflected on multiple Master Ballots will be counted, except to the extent that they are duplicative of other Master Ballots.  If two or more Master Ballots are inconsistent, the latest dated Master Ballot received prior to the Voting Deadline will, to the extent of such inconsistency, supersede, and revoke any prior Master Ballot.

I.    Votes Required for Acceptance by a Class.

The Classes entitled to vote will have accepted the Plan if (1) Holders of at least two-thirds in dollar amount of the Allowed Claims actually voting in each such Class, as applicable, have voted to accept the Plan and (2) Holders of more than one-half in number of the Allowed Claims actually voting in each such Class, as applicable, have voted to accept the Plan.

THE DEBTORS WILL SEEK CONFIRMATION OF THE PLAN UNDER SECTION 1129(B) OF THE BANKRUPTCY CODE WITH RESPECT TO ANY IMPAIRED CLASSES PRESUMED TO REJECT THE PLAN, AND THE DEBTORS RESERVE THE RIGHT TO DO SO WITH RESPECT TO ANY OTHER REJECTING CLASS OR TO MODIFY THE PLAN.

## ARTICLE XI.
## RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to the alternatives described herein because it provides for a larger distribution to the Holders of Claims than would otherwise result in a liquidation under Chapter 7 of the Bankruptcy Code.  In addition, any alternative other than Confirmation could result in extensive delays and increased Administrative Claims resulting in smaller distributions to the Holders of Claims.  **Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan support Confirmation and vote to accept the Plan**.

Respectfully Submitted,

KIMBALL HILL, INC. AND ITS AFFILIATED
DEBTORS

/s/ C. Kenneth Love
Name: C. Kenneth Love
Title: Authorized Signatory