# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 )  ) Case No. 08-10095 |
| KIMBALL HILL, INC., *et al.*,[1] | ) (Jointly Administered) ) |
| Debtors. | ) Hon. Susan Pierson Sonderby ) ) |

## DECLARATION OF ANDREW D. J. HEDE IN SUPPORT OF THE JOINT PLAN OF KIMBALL HILL, INC. AND ITS DEBTOR SUBSIDIARIES PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE

I, Andrew D. J. Hede, hereby declare under penalty of perjury:

1.   I am a Managing Director of Alvarez & Marsal North America, LLC ("A&M") and, since February 2008, I have served as the Chief Restructuring Officer of the above-captioned debtors (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"). I have worked as a turnaround consultant and interim crisis manager for over 15 years, and I have substantial knowledge and experience serving as an advisor to and assisting troubled companies with stabilizing their financial condition, analyzing their operations and developing appropriate business plans to accomplish their chapter 11 initiatives. As Chief Restructuring Officer of the Debtors, I am directly responsible for the Debtors' chapter 11 efforts

---

[1]   The Debtors in these cases include: Kimball Hill, Inc.; 18th and Peoria, LLC; KH Financial Holding Company; KH Ingham Park South, LLC; KHH Texas Trading Company L.P.; Kimball Hill Far East Detroit, LLC; Kimball Hill Homes Austin, L.P.; Kimball Hill Homes California, Inc.; Kimball Hill Homes Dallas, L.P.; Kimball Hill Homes Florida, Inc.; Kimball Hill Homes Houston, L.P.; Kimball Hill Homes Illinois, LLC; Kimball Hill Homes Nevada, Inc.; Kimball Hill Homes Ohio, Inc.; Kimball Hill Homes Oregon, Inc.; Kimball Hill Homes Realty Florida, Inc.; Kimball Hill Homes San Antonio, L.P.; Kimball Hill Homes Texas Investments, L.L.C.; Kimball Hill Homes Texas Operations, L.L.C.; Kimball Hill Homes Texas, Inc.; Kimball Hill Homes Washington, Inc.; Kimball Hill Homes Wisconsin, Inc.; Kimball Hill Stateway, Inc.; Kimball Hill Texas Investment Company, L.L.C.; Kimball Hill Urban Centers Chicago One, L.L.C.; Kimball Hill Urban Centers Chicago Two, L.L.C.; Kimball Hill Urban Centers Special Purposes, LLC; Kimball Hill Urban Centers, L.L.C.; National Credit and Guaranty Corporation; and The Hamilton Place Partnership.

and initiatives. In this capacity, I am familiar with the Debtors' day-to-day operations, business and financial affairs and books and records.

2.  I am familiar with the terms of the Joint Plan of Kimball Hill, Inc. and Its Debtor Subsidiaries Pursuant to Chapter 11 of the United States Bankruptcy Code (the "Plan").[2] I am authorized to submit this declaration (the "Declaration") in support of the Debtors' Memorandum of Law (A) in Support of Confirmation of the Joint Plan of Kimball Hill, Inc. and Its Debtor Subsidiaries Pursuant to Chapter 11 of the United States Bankruptcy Code and (B) in Response to Objections Thereto (the "Memorandum").

3.  Except as otherwise indicated, all matters set forth in this declaration are based on: (a) my personal knowledge; (b) my review of relevant documents; (c) my view, based upon my experience and knowledge of the Debtors' business and financial condition; or (d) as to matters involving United States bankruptcy law or rules or other applicable laws, my reliance on the advice of counsel to the Debtors. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

**I.  Background.**

4.  The Debtors commenced these Chapter 11 Cases with the goal of formulating and negotiating a consensual chapter 11 plan that would maximize recoveries for all parties in interest. At the inception of these Chapter 11 Cases, the Debtors envisioned a 90-120 day plan sponsor process designed to generate a range of chapter 11 exit alternatives. Although the Debtors made progress with the plan sponsor process, financial markets suffered a significant collapse in mid-September 2008 and the high profile failures of several large financial institutions made securing financing for plan sponsors, either with a third party or consensually

---

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

with the Debtors' prepetition creditors, highly unlikely and dramatically limited the forms of consideration acceptable to the Debtors' creditors, particularly the Prepetition Lenders. Given those circumstances, the Debtors decided, in consultation with the Prepetition Agent and the Creditors' Committee, that commencing an orderly wind-down of their business in conjunction with their continuing sale efforts was necessary to maximize returns for all parties in interest. In connection with the wind-down, the Debtors worked hard to negotiate and formulate the Plan, which incorporates a global settlement (the "Settlement") between, and enjoys the full support of, the representatives of both of the Debtors' primary constituent groups, the Prepetition Lenders and the Holders of Unsecured Claims.

5. As set forth in more detail below, I believe the Plan satisfies the necessary factual predicates for Confirmation and should be confirmed.

## II. The Plan Has Been Proposed In Good Faith And Not By Any Means Forbidden By Law (Section 1129(a)(3)).

6. I believe that the Plan was proposed in good faith, with the legitimate and honest purposes of winding down the Debtors' business and maximizing the recoveries of creditors. Indeed, the Plan is the result of the collaborative efforts of the Debtors, the Prepetition Agent, and the Creditors' Committee, all of whom support the Plan. Specifically, the Plan is premised on the Settlement, which resolves substantial claims that the Creditors' Committee and the Prepetition Agent sought to pursue against the Prepetition Lenders and the Debtors' estates, respectively.

7. On August 28, 2008, the Creditors' Committee moved for standing to assert various claims and causes of action against the Prepetition Lenders on behalf of the Estates (the "Committee Standing Motion"), including claims to avoid certain alleged constructively fraudulent transfers and preferential transfers under chapter 5 of the Bankruptcy Code (the

3

"Chapter 5 Claims"). Generally speaking, the Creditors' Committee sought authority in the Committee Standing Motion to bring Claims to avoid the following transfers as constructively fraudulent under sections 544 and 548 of the Bankruptcy Code: (a) security interests granted to the Prepetition Lenders under the Senior Secured Credit Facility from and after August 10, 2007; and (b) the incurrence of guarantee obligations by the Debtor subsidiaries of Kimball Hill, Inc. in favor of the Prepetition Lenders. The Creditors' Committee also sought authority to bring Claims to avoid the following transfers as preferences under section 547 of the Bankruptcy Code: (i) the liens granted by the Debtors to secure obligations under the Senior Secured Credit Facility in the ninety (90) days prior to the Petition Date; and (ii) approximately $20 million in cash allegedly paid by the Debtors on the Senior Secured Credit Facility during the ninety (90) days prior to the Petition Date.

8. The Prepetition Lenders' claims stem from the priming of their liens and the use of their cash collateral in connection with the Debtors' DIP Facility. As adequate protection for the Prepetition Lenders' consensual priming of their liens and the consensual use of their cash collateral, the Prepetition Lenders received, among other things, a superpriority claim for the diminution in the value of their collateral pursuant to section 507(b) of the Bankruptcy Code, but not to the extent of the liens granted to the DIP Lender, which claim is secured by unencumbered assets of the Debtors (a "Diminution Claim"). In light of the continued decline of the housing market during the Chapter 11 Cases, the Prepetition Agent informed the Debtors and the Creditors' Committee that it intended to assert a substantial Diminution Claim — well in excess of the Diminution Claim payment under the Settlement — against the Debtors' unencumbered assets. The Prepetition Agent also informed the Debtors that the Prepetition Lenders expected

4

that under any restructuring or wind-down of operations, a portion of the Administrative Claims would be paid from the unencumbered assets available to satisfy Unsecured Claims.

9. The Settlement is in the best interest of the Debtors, their creditors, and other parties in interest. If the Court does not authorize the Debtors to enter into the Settlement, I believe the Prepetition Lenders will continue to assert a substantial Diminution Claim against the unencumbered assets of the Debtors' estates that likely would tie up the Estates in, among other things, a costly and complex valuation proceeding, delay the administration of the Chapter 11 Cases, and usurp in substantial part any potential recoveries to Holders of Unsecured Claims. Moreover, the Committee will seek to revive the Committee Standing Motion and any ensuing litigation of the Committee's Chapter 5 Claims likewise would be complex and costly and delay the expeditious administration of the wind-down and distributions under the Plan. Instead, the Settlement eliminates the substantial claims that have been or may be asserted against between the parties and resolve all differences between the Debtors' major constituent groups regarding the ongoing administration of the Chapter 11 Cases.

10. The terms of the Settlement were negotiated in good faith and at arm's length by the Debtors, the Prepetition Agent, and the Creditors' Committee. I believe the terms of the Settlement are fair and equitable and in the best interest of the Debtors, their creditors, and other parties in interest. Overall, the Settlement maximizes the value of the Debtors' assets and minimizes claims against their Estates. The Settlement not only is within the reasonable range of litigation possibilities, but also enables the smooth and efficient administration of the trusts and the Chapter 11 Cases going forward

11. The Debtors, the Prepetition Agent, and the Creditors' Committee conducted extensive arms' length negotiations and reached the Settlement in good faith to establish the key

terms of the Plan and resolve all of the Claims at issue between the Parties. Because the Plan is premised on a Settlement which was developed through extensive good faith negotiations, it is my opinion that the Plan has been proposed in good faith and will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.

**III.    The Plan Is In The Best Interest Of Creditors And Interest Holders (Section 1129(a)(7)).**

12.    I understand that to satisfy the best interests test under section 1129(a)(7) of the Bankruptcy Code a debtor must demonstrate that the stakeholders are receiving at least as much value under a proposed plan as they would receive in a hypothetical chapter 7 liquidation. The value of the distributions under the Plan depends upon the proceeds realized pursuant to the Sale and Wind-Down Process as set forth in the Disclosure Statement.

**B.    The Liquidation Analysis**

13.    Together with the Debtors' management, A&M prepared a liquidation analysis assuming a chapter 7 liquidation instead of the orderly wind-down contemplated under the Plan (the "Liquidation Analysis"). The Liquidation Analysis attached as <u>Exhibit C</u> to the Disclosure Statement (the "Consolidated Liquidation Analysis") details the recoveries to creditors on a consolidated basis and contains a summary of the estimates and assumptions underlying that analysis. In addition, the Liquidation Analysis attached as <u>Exhibit D</u> to the Disclosure Statement (the "Unconsolidated Liquidation Analysis") details the recoveries to creditors on an entity by entity basis. As the Settlement is predicated on consolidated distributions and arguably would not be preserved absent consolidation, the Liquidation Analysis attached as <u>Exhibit D</u> projects distributions on an entity by entity basis assuming the Settlement is not in place.

14. The Consolidated Liquidation Analysis presents both "High" and "Low" estimates of Liquidation Proceeds representing a range of management's assumptions relating to the costs incurred during a liquidation and the proceeds realized. It is assumed that a liquidation would be performed over a period of nine months commencing as of December 1, 2008, the projected date of conversion to a hypothetical chapter 7 liquidation. In each case, it is assumed that the chapter 7 trustee would enter into an agreement with the Prepetition Lenders to wind-down operations and sell the Debtors' encumbered assets on a piecemeal basis.

15. In a chapter 7 liquidation, certain distinctive factors would limit recovery from the sale of the Debtors' homebuilding operations and assets. In a liquidation, it is assumed that the Debtors would not have sufficient liquidity to fund the completion and delivery of homes currently under construction, and would be forced to cease construction immediately. Given the limited operating margins generated from such homes and the requirement that a bulk purchaser complete such homes based on the Debtors' specifications, it is unlikely that any such purchaser would be willing to purchase partially completed homes. Accordingly, in a liquidation, it is assumed that the sale of partially completed homes would yield recoveries from the underlying land asset only. In addition, the Debtors would be unlikely to be able to offer warranties, or related insurance, on completed homes, preventing them from being able to sell homes to homebuyers with VA loans and significantly reducing the attractiveness of the Debtors' homes as compared to other homebuilders. The unavailability of a home warranty would be anticipated to limit demand for the Debtors' homes, limit the universe of potential homebuyers, and/or significantly reduce home sale recoveries.

16. The Consolidated Liquidation Analysis assumes that, in a chapter 7 liquidation, all of the Debtors' assets would be sold on an expedited basis, with only a limited marketing

K&E 14298393.

period. In light of the current depressed state of the homebuilding and real estate markets, an expedited sale process could materially reduce recoveries from the Debtors' land assets. In addition, the Debtors are parties to certain joint venture arrangements for land development and other related activities. The Debtors' recovery on their investments in these joint ventures is dependent on the successful wind down of operations and/or the release of the Debtors from certain related obligations, which, if not facilitated, may materially reduce recoveries. The Consolidated Liquidation Analysis does not account for the Chapter 5 Claims of the Creditors' Committee, the Diminution Claim of the Prepetition Lenders, or the terms of the Settlement.

17. The Consolidated Liquidation Analysis projects that, in aggregate, between $129,236,000 and $147,337,000 would be available for distribution to Holders of Allowed Claims, Senior Secured Credit Agreement Claims (A-1) would receive a recovery of between 23% and 27%; Other Secured Claims (A-2), Senior Bank Claims (A-3), and Priority Non-Tax Claims (Class B) would receive 100% of their claims; Senior Unsecured Claims (C-1) would receive a recovery of between 22% and 26%; General Unsecured Claims (Class C-2) would receive a recovery of between 14% and 16%; and Unsecured Senior Subordinated Note Claims (Class C-3), Subordinated Debt Securities Claims (Class D), and Interests (Class E) would not receive a recovery in a consolidated chapter 7 liquidation.

18. The Unconsolidated Liquidation Analysis incorporates the same assumptions and analytical methods as the Consolidated Liquidation Analysis, but estimates recoveries on an entity by entity basis. The Unconsolidated Liquidation Analysis projects that, in aggregate, between $129,236,000 and $147,337,000 would be available for distribution to Holders of Allowed Claims, Senior Secured Credit Agreement Claims (A-1) would receive a recovery of

8

between 23% and 27%; Other Secured Claims (A-2) would receive a recovery of approximately 1%; Senior Bank Claims (A-3) and Priority Non-Tax Claims (Class B) would receive 100% of their claims; Senior Unsecured Claims (C-1) would receive a recovery of between 2% and 3%; General Unsecured Claims (Class C-2) would receive a recovery of between 7% and 8%; and Unsecured Senior Subordinated Note Claims (Class C-3), Subordinated Debt Securities Claims (Class D), and Interests (Class E) would not receive a recovery in an entity by entity chapter 7 liquidation.

### C.    The Plan Distribution Analysis

19.    In addition, A&M, together with the Debtors' management, estimated the amount available for distribution to holders of allowed Claims pursuant to the Plan assuming, among other things, that the liquidation contemplated pursuant to the Plan would involve:  (a) an orderly wind-down of the Debtors' non-salable business operations; (b) sales of all remaining assets; and (c) preservation of the Debtors' working capital assets and mitigation of Administrative Claims and other wind-down costs to the extent possible (the "Plan Distribution Analysis").

20.    The Plan Distribution Analysis is set forth in detail in Article VI.D.1 of the Disclosure Statement.  The Plan Distribution Analysis presents "High" and "Low" estimates of the proceeds that would be available for distribution to creditors if the Plan were confirmed and effectuated according to its terms.  These estimates represent a range of management's assumptions regarding the costs that would be incurred to implement the Plan and the funds that would be available for distribution to creditors.  The Plan Distribution Analysis has the same Effective Date as the Liquidation Analysis.  In addition, the Plan Distribution Analysis assumes that the Debtors would complete and deliver homes under construction in the ordinary course, with the Debtors being able to offer warranties, or related insurance, on completed homes, to all homebuyers. The Plan Distribution Analysis also assumes that the Debtors' remaining assets

would be sold over a 12-15 month period, allowing an extensive sale and marketing period to be completed. Furthermore, the Plan Distribution Analysis assumes that the Debtors would also wind down the operations of certain joint venture arrangements for land development and other related activities, maximize recoveries on these investments and/or negotiate a release of the Debtors' obligations in such joint ventures.

21. The Plan Distribution Analysis projects that, in aggregate, between $183,639,000 and $224,965,000 will be available for distribution to Holders of Allowed Claims. Notably, the Plan Distribution Analysis projects Senior Secured Credit Agreement Claims (A-1) would receive a recovery of between 37% and 48%; Other Secured Claims (A-2), Senior Bank Claims (A-3), and Priority Non-Tax Claims (Class B) would receive 100% of their claims; Senior Unsecured Claims (C-1) would receive a recovery of between 29% and 36%; General Unsecured Claims (Class C-2) would receive a recovery of between 17% and 20%; Unsecured Senior Subordinated Note Claims (Class C-3) would receive a recovery of 1%; and Subordinated Debt Securities Claims (Class D) and Interests (Class E) would receive nothing under the Plan.

22. Estimated recoveries under the Plan Distribution Analysis are compared against those under the Consolidated Liquidation Analysis below:

K&E 14298393.

| Class | Plan Distribution Analysis | | Consolidated Liquidation Analysis | |
|---|---|---|---|---|
| | High | Low | High | Low |
| A-1 | 48% | 37% | 27% | 23% |
| A-2 | 100% | 100% | 100% | 100% |
| A-3 | 100% | 100% | 100% | 100% |
| B | 100% | 100% | 100% | 100% |
| C-1 | 36% | 29% | 26% | 22% |
| C-2 | 20% | 17% | 16% | 14% |
| C-3 | 1% | 1% | 0% | 0% |
| D | 0% | 0% | 0% | 0% |
| E | 0% | 0% | 0% | 0% |

23. As demonstrated by the Liquidation Analysis, the proposed consolidation is fair and equitable and in the best interests of the Debtors' estates. Specifically, projected distributions on a consolidated basis yield recoveries to all Classes of Claims and Interests no lower and, in most instances, higher, than non-consolidated distributions.[3] Accordingly, the consolidated distribution scheme pursuant to the Settlement does not prejudice creditors.

| Class | Plan Distribution Analysis | | Unconsolidated Liquidation Analysis | |
|---|---|---|---|---|
| | High | Low | High | Low |
| A-1 | 48% | 37% | 34% | 28% |
| A-2 | 100% | 100% | 100% | 100% |
| A-3 | 100% | 100% | 100% | 100% |
| B | 100% | 100% | 100% | 100% |
| C-1 | 36% | 29% | 3% | 2% |
| C-2 | 20% | 17% | 8% | 7% |
| C-3 | 1% | 1% | 0% | 0% |
| D | 0% | 0% | 0% | 0% |
| E | 0% | 0% | 0% | 0% |

---

[3] Although the Holders of Class A-1 Claims are projected to receive a higher distribution in an unconsolidated *chapter 7 liquidation* than in a consolidated *chapter 7 liquidation*, projected distributions for such Holders on a consolidated basis under the Plan are higher than both consolidated and unconsolidated chapter 7 liquidation distributions. Moreover, to the extent any such Class A-1 Claim Holders could be prejudiced by consolidation as opposed to non-consolidation under the Plan, all such Holders voted to accept the Plan. In addition, Holders of Claims and Interests in Classes D and E will receive no distributions under any scenario and thus are not prejudiced by the proposed consolidation.

11

24. Based upon my comparison of the Plan Distribution Analysis and the Liquidation Analysis, holders of allowed Claims receive more under the Plan than in a chapter 7 liquidation. Accordingly, I believe the Debtors have satisfied the requirements of section 1129(a)(7) of the Bankruptcy Code.

**IV.  The Plan Is Feasible (Section 1129(a)(11)).**

25. I believe that the Plan is feasible. The Plan contemplates the sale and liquidation of all the Debtors' assets. With this goal in mind, I believe the Plan offers a reasonable probability of success and is workable. In particular, the Debtors have enough cash or will have enough cash after execution of the Plan to pay the distributions set forth in the Plan. Moreover, the Debtors have ensured the retention of key personnel, familiar with the Debtors' business, to implement the Sale and Wind-Down Process.

26. In particular, the Plan contemplates paying Administrative and Priority Claims in full. As of November 28, 2008, Kurtzman Carson Consultants LLC, the Debtors' claims, voting, and solicitation agent (the "Voting and Solicitation Agent"), had received approximately 2,990 Claims and the approximate numbers and total amounts of Administrative and Priority Claims filed against one or more of the Debtors were as follows: (1) 30 Administrative Claims in the total amount of $1,060,220.43; (2) 19 Priority Tax Claims in the total amount of $1,182,171.15; and (3) 575 Priority Non-Tax Claims in the total amount of $3,436,016.66 (plus unliquidated amounts).

27. The Debtors generally have been paying Administrative Claims in the ordinary course as they come due and estimate that, at the conclusion of the Claims objection, reconciliation, and resolution process, the aggregate amount of Administrative and Priority Claims will be as follows: (1) Allowed Administrative Claims in the approximate total amount

of $1,000,000; (2) Allowed Priority Tax Claims in the approximate total amount of $1,000,000; and (3) Allowed Priority Non-Tax Claims in the approximate total amount of $1,000,000.

28. Pursuant to the Plan, all Administrative Claims will be paid in Cash according to the terms of the Settlement, as incorporated into the Post-Consummation Trust Agreement and the Liquidation Trust Agreement, and all Priority Claims will be paid in Cash out of the collateral securing the Senior Credit Agreement Claims. I believe that these sources of payment are more than adequate to satisfy and pay all Administrative and Priority Claims in full.

29. The Plan contemplates that all assets of the Debtors ultimately will be disposed of and all proceeds of the assets will be distributed to the creditors pursuant to the terms of the Plan. Therefore, I believe there is a high probability that the Debtors will have sufficient funds available to meet their obligations under the Plan and that the Plan is feasible and satisfies the standards of section 1129(a)(11) of the Bankruptcy Code.

**V.    The Plan Satisfies the "Cram Down" Requirements (Section 1129(b)).**

30. I believe that the Plan satisfies the absolute priority rule with respect to Subordinated Debt Securities Claims (Class D) and Interests (Class E). With respect to Subordinated Debt Securities Claims (Class D), no Holders of Claims or Interests junior to the holders of Subordinated Debt Securities Claims (Class D) would receive or retain any property under the Plan on account of such Claims or Interests. No Class of Claims or Interests is of the same or equal priority as Class D. Additionally, as set forth in the Plan Distribution Analysis contained in the Disclosure Statement, it is my understanding that Holders of Claims in senior Classes will not receive more than 100% of their allowed Claims.

31. With respect to Interests (Class E), there is no junior class. Moreover, no Class of Claims or Interests is of the same or equal priority as Class E, and Holders of Claims in senior Classes will not receive more than 100% of their allowed Claims.

32.     I believe that the Plan's treatment of Subordinated Debt Claims is proper because no similar Class of Claims exists. Class D contains all Subordinated Debt Claims against the Debtors and all Holders of Subordinated Debt Claims will receive the same treatment—no recovery. Likewise, Class E contains all Interests and all such interests are treated similarly. Thus, I believe that the Plan does not unfairly discriminate with respect to Impaired Classes and the "cram down" test is satisfied.

**VI.     Discretionary Plan Provisions.**

33.     It is my understanding that the Plan employs various provisions in accordance with the discretionary authority of section 1123(b) of the Bankruptcy Code. For example, the Plan leaves certain Classes of Claims and Interests impaired, while leaving others unimpaired.

34.     The Plan also seeks to implement release, exculpation, and injunction provisions. I believe that such provisions are particularly appropriate in these Chapter 11 Cases because they represent the product of extensive negotiations among the Debtors and their creditor constituents to facilitate this consensual Plan.

35.     I believe that the exculpation provision in Article VIII.D of the Plan is appropriate and vital under the circumstances of these Chapter 11 Cases because it provides protection to those interested parties who were essential to the Debtors' Plan and who exercised good faith in negotiating and participating throughout these Chapter 11 Cases but is limited to exclude acts of gross negligence, willful misconduct, and fraud. Moreover, I believe that the exculpation provision is necessary to protect parties who have made substantial contributions to the Debtors' Plan from future collateral attacks related to actions taken in good faith in connection with the Debtors' Plan. Indeed, the parties involved in negotiating the Plan have specifically required that the Debtors include such a provision in the Plan. As noted above, the Settlement upon which the

Plan is based is essential and, as such, a consensual Plan would be impossible absent their involvement.

36. I also believe that the release provisions of the Plan are fair and necessary under the circumstances of these Chapter 11 Cases. I believe that the release provisions of the Plan are fair to all parties involved because, among other things, those affected by the third party release provisions in Article VIII.E of the Plan were given the ability to "opt-out" of the releases. Thus, the third party releases are completely consensual. In addition, I believe that the release provisions of the Plan also are a necessary, indispensable, component of the Plan. The release provisions in their current form are the product of exhaustive negotiations to reach a consensus on the Plan. Without the release provisions in their current form, I believe that the Debtors would not have received the necessary support from the Prepetition Lenders, the Creditors' Committee, and other key parties to implement the Plan which provides unsecured creditors with significant recoveries. Without the support of these creditor constituencies, I believe that the Debtors would have been forced to proceed with a chapter 7 liquidation.

*[Remainder of page intentionally left blank.]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 4, 2009

_____
Andrew D. J. Hede
Chief Restructuring Officer

K&E 14298393.