UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 08bk10095 |
|  | ) |  |
| In re Kimball Hill, Inc., *et al.*, | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Judge Timothy A. Barnes |
|  | ) |  |

TIMOTHY A. BARNES, Judge.

## MEMORANDUM DECISION

This matter comes on for consideration on the Purchaser's Motion for Entry of an Order (I) Enforcing Confirmation Order; (II) Directing Dismissal of State Court Claims; (III) Awarding Damages; and (IV) Granting Related Relief [Dkt. No. 3969] (the "Motion") brought by TRG Venture Two, LLC ("TRG"), the successor to a purchaser of assets from the above-captioned bankruptcy case. The Motion is opposed by Fidelity and Deposit Company of Maryland ("F&D"), a surety on projects relating to those assets and a creditor of the bankruptcy estate.

For the reasons more fully set forth below, upon review of the parties' respective filings and after conducting a hearing on the matter, the court finds that TRG has established that the claims brought against it by F&D in the state court actions are precluded by the confirmation order entered in this case. The motion will be, therefore, by separate order concurrent herewith, GRANTED in the manner described herein. A separate hearing on damages will follow.

## JURISDICTION

The federal district courts have "original and exclusive jurisdiction" of all cases under title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code"). 28 U.S.C. § 1334(a). The federal district courts also have "original but not exclusive jurisdiction" of all civil proceedings arising under the Bankruptcy Code, or arising in or related to cases under the Bankruptcy Code. 28 U.S.C. § 1334(b). District courts may, however, refer these cases to the bankruptcy judges for their districts. 28 U.S.C. § 157(a). In accordance with section 157(a), the District Court for the Northern District of Illinois has referred all of its bankruptcy cases to the Bankruptcy Court for the Northern District of Illinois. N.D. Ill. Internal Operating Procedure 15(a).

A bankruptcy judge to whom a case has been referred may enter final judgment on any core proceeding arising under the Bankruptcy Code or arising in a case under the Bankruptcy Code. 28 U.S.C. § 157(b)(1). Bankruptcy judges must therefore determine, on motion or *sua sponte*, whether a proceeding is a core proceeding or is otherwise related to a case under the Bankruptcy Code. 28 U.S.C. § 157(b)(3). As to the former, the court may hear and determine such matters. 28 U.S.C. § 157(b)(1). As to the latter, the bankruptcy court may hear the matters, but may not decide them without the consent of the parties. 28 U.S.C. §§ 157(b)(1) & (c); *In re Radco Merch. Servs., Inc.*, 111 B.R. 684, 686 (N.D. Ill. 1990). Instead, the bankruptcy court must "submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by

the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing *de novo* those matters to which any party has timely and specifically objected." 28 U.S.C. § 157(c)(1).

While the court presumes at this point both jurisdiction and constitutional authority to hear and determine this matter under the foregoing, this matter will be revisited below.

## PROCEDURAL HISTORY

In taking up the Motion, the court has considered the arguments of the parties at the October 19, 2016 and December 14, 2016 hearings on the Motion (the "Hearings"), and has reviewed and considered the following filed documents relating to the Motion:

(1)   Response of Fidelity and Deposit Company of Maryland in Opposition to TRG Joint Venture, LLC's Motion for Entry of Order (I) Enforcing Confirmation Order; (II) Directing Dismissal of State Court Claims; (III) Awarding Damages and (IV) Granting Related Relief [Dkt. No. 3994] (the "Response");

(2)   Amended Response of Fidelity and Deposit Company of Maryland in Opposition to TRG Joint Venture, LLC's Motion for Entry of Order (I) Enforcing Confirmation Order; (II) Directing Dismissal of State Court Claims; (III) Awarding Damages and (IV) Granting Related Relief [Dkt. No. 3998] (the "Amended Response"); and

(3)   Purchaser's Reply in Support of Motion for Entry of Order (I) Enforcing Confirmation Order; (II) Directing Dismissal of State Court Claims; (III) Awarding Damages and (IV) Granting Related Relief [Dkt. No. 4002] (the "Reply").

The court has also taken into consideration any and all exhibits submitted in conjunction with the Motion and the foregoing. Though these items do not constitute an exhaustive list of the filings in the above-captioned bankruptcy case, the court has taken judicial notice of the contents of the docket in this matter. *See Levine v. Egidi*, Case No. 93C188, 1993 WL 69146, at *2 (N.D. Ill. Mar. 8, 1993) (authorizing a bankruptcy court to take judicial notice of its own docket); *In re Brent*, 458 B.R. 444, 455 n.5 (Bankr. N.D. Ill. 2011) (Goldgar, J.) (recognizing same). The court has also considered the procedural history and previous court filings in this case, as is discussed below in detail.

## BACKGROUND

The history of this matter is largely undisputed. Prior to petitioning for bankruptcy relief, Kimball Hill, Inc. ("Kimball Hill" and together with its affiliates, "KHI"), was a residential construction business with operations across the United States. In that capacity, KHI was party to numerous subdivision construction projects in the State of Illinois and elsewhere. Included in the Illinois construction projects are those at issue here, located in Elgin, Montgomery, Sugar Grove, Yorkville and Shorewood, Illinois (the "Developments").[1]

---

[1]   The subdivisions for each respective Development are as follows: Elgin (Waterford Subdivision), Montgomery (Huntington Chase Subdivision), Sugar Grove (Settler's Ridge Subdivision), Yorkville (Whispering Meadows Subdivision) and Shorewood (Edgewater Subdivision).

As was not uncommon with such subdivision construction, KHI was subject to any number of restrictions relating to the Developments. Those at issue here arose out of annexation agreements between KHI and the municipality having jurisdiction over the subdivision (the "Annexation Agreements"). Each Annexation Agreement contained terms and conditions under which the subdivision development would proceed pursuant to the Illinois Municipal Code, 65 ILCS 5/11.15.1-1, *et seq.*, and each was recorded on or near its effective date.

As was also not uncommon for such developments, KHI obtained bonds (the "Performance Bonds") securing its performance with respect to the Developments, including with the restrictions placed on it by the Annexation Agreements. F&D acted as the surety for such Performance Bonds, which means that, in exchange for a fee, F&D was contractually obligated to make good financially for any failure of KHI within the scope of the Performance Bonds. In return, F&D had a right of indemnity from KHI that was memorialized in one or more indemnity agreements (the "Indemnity Agreements").

On April 23, 2008 (the "Petition Date"), Kimball Hill and 29 of the other KHI entities (collectively, the "Debtors") filed voluntary petitions for chapter 11 bankruptcy relief. Shortly after the Petition Date, the court entered an order providing for the joint administration of all of the Debtors' cases pursuant to Federal Rule of Bankruptcy Procedure 1015 (together, the "Cases"). In the Schedules and Statements of Financial Affairs filed by the Debtors, the Debtors listed and made reference to a significant number of indemnity obligations. *See, e.g.*, First Amended Schedules of Assets and Liabilities re: Kimball Hill, Inc., at Schedules F & G [Dkt. No. 477].

The general bar date for the filing of proofs of claims was set as August 1, 2008 (the "Bar Date"). Order (A) Setting Bar Date for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof [Dkt. No. 359]. On or before the Bar Date, F&D filed ten proofs of claim against an equal number of Debtor entities (collectively, the "F&D Claims"). Each of the F&D Claims not only expressly asserted claims under the Indemnity Agreements, but also asserted claims under "principals of common law" and "Suretyship." *See, e.g.*, Proof of Claim #1636 filed in Case 08-10095 on August 1, 2008 and attachments thereto (capitalization in original).

On February 6, 2009, the Debtors objected to eight of the F&D Claims on the grounds that they were duplicative. Debtors' Second Omnibus Objection to Certain (A) Duplicative Claims and (B) Overstated Claims for Voting Purposes Only [Dkt. No. 965] (the "First Claims Objection"). F&D responded but later withdrew its response. The court thereafter sustained the First Claims Objection, disallowing the subject F&D Claims for voting purposes only. Order Granting Objection to Certain (A) Duplicative Claims and (B) Overstated Claims for Voting Purposes Only [Dkt. No. 1163].

On March 12, 2009, the court entered an order (the "Confirmation Order")[2] confirming the Debtors' joint plan of liquidation (the "Plan").[3] The Plan and the Confirmation Order discharged

---

[2]    Findings of Fact, Conclusions of Law, and Order Confirming Joint Plan of Kimball Hill, Inc. and its Debtor Subsidiaries Pursuant to Chapter 11 of the United States Bankruptcy Code [Dkt. No. 1118].

[3]    Joint Plan of Reorganization of Kimball Hill, Inc. and Its Debtor Subsidiaries Pursuant to Chapter 11 of the Bankruptcy Code [Dkt. No. 814, as amended].

and released all claims of parties that voted in favor of the Plan against the Debtors, the KHI Trust (defined below) and other identified parties, specifically providing that:

> [O]n and after the Effective Date, Holders of Claims and Interests *voting to accept* the Plan . . . shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Debtors, the Post-Consummation Trust, the Liquidation Trust, and the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively) . . . .

Plan, at VIII.E (emphasis added); Confirmation Order, at ¶ 19(b) (emphasis added) (together, the "Release"). The Plan adopted section 101 of the Bankruptcy Code's definition as the definition of "Claims", as follows:

> Claim: (a) Any claim as defined in section 101(5) of the Bankruptcy Code against a Debtor; and (b) with respect to ARTICLES VIII.C, D, E, and F, any claim as defined in section 101(5) of the Bankruptcy Code against the applicable Entities references therein.

Plan, at I.A(24).[4]  Section 101 of the Bankruptcy Code defines a "claim" as a

> (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

> (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

11 U.S.C. § 101(5).  F&D voted the remainder of the F&D Claims in favor of the Plan, and thus by the express terms of the Release, accepted and is bound thereby.

In furtherance of the Release, both the Plan and the Confirmation Order contained an injunction stating that:

> [A]ll Entities who have held, hold, or may hold Claims or Interests that have been released . . . are permanently enjoined, from and after the Effective Date, from:
> (1) commencing or continuing in any manner any action or other proceeding of any

---

[4]    The term "Entity" is in this section is also used throughout the Plan; sometimes capitalized and sometimes not. The Plan provides that "[a]ny term used but not defined in the Plan, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules." Plan I.A. As such, the term "Entity" includes "person, estate, trust, governmental unit, and United States trustee." 11 U.S.C. § 101(15).

kind on account of or in connection with or with respect to any such Claims or
Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means
any judgment, award, decree, or order . . . with respect to any such Claims or Interest
. . . (5) commencing or continuing in any manner any action or other proceeding of
any kind on account of or in connection with or with respect to any such Claims or
Interests released or settled pursuant to the Plan . . . .

Plan, at VIII.F; Confirmation Order, at ¶ 19(d) (together, the "Plan Injunction").

The Confirmation Order contained language retaining for this court exclusive jurisdiction
"to hear and determine disputes relating arising in connection with the interpretation,
implementation, or enforcement of the Plan," Confirmation Order, at ¶ 58(j), and to "[r]esolve any
cases, controversies, suites, disputes, or Causes of Action with respect to the releases, injunctions,
and other provisions contained in Article VIII of the Plan ...." Confirmation Order, at ¶ 58(n).

The Plan created a trust for post confirmation administration of the bankruptcy estate (the
"KHI Trust"),[5] and into that KHI Trust all or substantially all of the Debtors' remaining assets not
otherwise transferred to the concurrent, liquidating trust were transferred, "free and clear of any and
all liens, claims, encumbrances and interests (legal, beneficial or otherwise) of all other entities to the
maximum extent contemplated by and permissible under section 1141(c) of the Bankruptcy Code."
KHI Trust Agreement, at ¶ 1.3(a); see also Confirmation Order, at ¶¶ 26, 59. Further, the KHI Trust,
as a successor to the Debtors, was entitled to the benefit of the Release and the Plan Injunction, as
follows:

> The rights, benefits, and obligations of any Entity named or referred to in the
> Plan shall be binding on, and shall inure to the benefit of any heir, executor,
> administrator, successor or assign, affiliate, officer, director, agent, representative,
> attorney, beneficiaries, or guardian, if any, of each Entity.

Plan, at XV.F.

The administrator under the Plan (the "Plan Administrator") was afforded the authority on
behalf of the KHI Trust to liquidate, including by sale, the remainder of the Debtors' assets so
vested in the KHI Trust. KHI Trust Agreement, at ¶ 1.4. It was also afforded the authority to
resolve claims, including through objection heard by this court. Confirmation Order, at ¶ 34.

While the Plan's treatment of the Indemnity Agreements is unclear, the parties here appear
to be in agreement that the Indemnity Agreements are no longer contractually binding. The parties
also appear to agree that the Annexation Agreements—as covenants that run with the land—remain
binding on all concerned.

---

[5]    As governed by the KHI Post-Consummation Trust Agreement [Dkt. No. 1024] (the "KHI Trust
Agreement"). The Plan actually created two trusts: The KHI Trust and the so-called "Liquidation Trust."
See Plan XI. The parties herein focus only on the terms and operation of the KHI Trust, as well as the rights
and obligations thereof.

On or about December 7, 2009, the KHI Trust agreed to sell all of its right, title and interest in the properties underlying the Developments (the "Properties") to JNI, LLC. JNI, LLC, subsequently sold the Properties to TRG, and is not a party to the disputes herein.

Also during the pendency of the bankruptcy cases, several of the municipalities sought relief from the Plan Injunction in order to permit them to continue enforcement of the regulations governing the Developments by suing F&D and other parties. The Debtors, F&D and the moving municipalities entered into several stipulations resolving these motions. *See* Stipulation and Agreed Order for Modification of Plan Injunction [Dkt. No. 1805] (the "Montgomery Stipulation"); Stipulation and Agreed Order for Modification of Plan Injunction [Dkt. No. 2365] (the "Sugar Grove Stipulation"); Stipulation and Agreed Order for Modification of Plan Injunction [Dkt. No. 2366] (the "Yorkville Stipulation" and together with the Montgomery Stipulation and the Sugar Grove Stipulation, the "Municipal Stipulations"). The Municipal Stipulations are substantially the same and, as approved by the court, modified the stay to allow the municipalities to proceed against the Performance Bonds and to "declare KHI in default and establish liability, if any, against KHI under the Annexation Agreement for the sole purpose of recovering against the proceeds of the Performance Bonds, if any." *See, e.g.,* Yorkville Stipulation, at ¶ 1. The Municipal Stipulations modified the Plan Injunction in a limited manner only. That modification clearly, in an intentional way, stopped short of permitting claims by F&D against the Debtors or their successors. *See, e.g., id.* at ¶ 1 (containing a stipulation from all of the parties, including F&D, that the F&D Claims are subject to the Plan Injunction).

On May 14, 2012, the above-captioned case was reassigned to the undersigned. Administrative Order No. 12-07 [Dkt. No. 3171]. On April 10, 2013, the Plan Administrator caused the KHI Trust to again object to the F&D Claims on the basis that they were duplicative under the terms of the Plan. Twenty-Second Omnibus Objection to Certain Duplicate Filed Claims [Dkt. No. 3394] (the "Second Claims Objection"). The matter was litigated by F&D, who then appealed when the undersigned sustained the Second Claims Objection. The District Court affirmed the court's ruling on appeal. *In re Kimball Hill, Inc.,* Case No. 13 C 07146, 2014 WL 5615650, at *5 (N.D. Ill. Nov. 4, 2014).

On July 8, 2013, the Plan Administrator again caused the KHI Trust to object, this time to the remaining F&D Claim. Objection to Claim No. 1636 Asserted by Fidelity & Deposit Co. of MD [Dkt. No. 3474] (the "Third Claims Objection"). In that Claim, F&D asserted a total amount owed of $43,505,473.47, with the largest component being the contingent indemnification obligations owed by the Debtors. Claim No. 1636. On November 15, 2013, the court sustained in part and overruled in part the Third Claims Objection. Order Allowing Claim No. 1636 Asserted by Fidelity & Deposit Co. of MD [Dkt. No. 3642] (the "F&D Order"). The F&D Order allowed the F&D Claims in the aggregate amount spent by F&D at that time and expressly reserved F&D's right under section 502(j) of the Bankruptcy Code to seek reconsideration should those amounts change. *Id.* at ¶ 3.

At or about the time that F&D was seeking recovery from this court on the F&D Claims, it also began to seek recovery against TRG on essentially the same basis in the Illinois state courts. As to each of the Developments, a lawsuit was commenced (collectively, the "State Court Lawsuits"),[6]

---

[6]    These cases are: (a) City of Elgin v. Fidelity & Dep. Co. of Maryland, pending in the Circuit Court of Kane County, Illinois, Case No. 12 MR 53 (the "Elgin Lawsuit"); (b) Village of Montgomery v. Fidelity &

generally by the affected municipality against F&D under the Performance Bond. Over the course of each individual suit, F&G interpleaded TRG as the successor to KHI, the obligee/indemnitor under the Performance Bonds. TRG subsequently moved for its dismissal from each of the State Court Lawsuits, and was successful in each of the State Court Lawsuits.

Though TRG was dismissed, that dismissal does not appear to have become final. With respect to the Elgin and Montgomery Lawsuits, appeals were taken. Those appeals resulted in the state trial courts' dismissal decisions being reversed in part.[7] In others, reconsideration was sought. At the December 14, 2016 Hearing, counsel for F&D represented that all dismissals either had been challenged in some manner or would be. He also represented that the Illinois Supreme Court had declined to hear appeals from the State Appellate Decisions. While there has been no stay of the State Court Lawsuits issued by this court independent of the Plan Injunction, counsel for both parties further indicated that they would await a ruling from this court before taking any further steps with regard thereto.

Also at the Hearing on December 14, 2016, the court, after hearing further argument, announced its ruling on the issues addressed herein. Though it is largely consistent with the remarks made at that time, this Memorandum Decision may differ in its treatment of some. This Memorandum Decision therefore supersedes the court's earlier remarks.

## DISCUSSION

The Motion asks the court to determine that the State Court Lawsuits, insofar as they seek to assess liability to TRG as the Debtors' successor, violate the terms of the Plan Injunction. More specifically, TRG asks that this court (i) enforce the Confirmation Order against F&D, (ii) direct F&D to dismiss its claims against TRG in the State Court Lawsuits, and (iii) award TRG damages. TRG alleges that in bringing the claims against TRG, F&D has violated the Plan Injunction and failed to respect the Release contained in the Plan.

In response, F&D seeks at first to have the court decline to hear the matter for reasons sounding in abstention, estoppel and laches. As to the substantive claims, F&D points to the State Appellate Decisions, arguing that the state court has found that the transfer of the Properties to TRG did not invalidate the Annexation Agreements and further found that TRG is independently liable to F&D as the surety on the Performance Bonds because the Performance Bonds were

---

Dep. Co. of Maryland, pending in the Circuit Court of Kane County, Illinois, Case No. 10 MR 598 (the "Montgomery Lawsuit"); (c) Village of Sugar Grove v. Fidelity & Dep. Co. of Maryland, pending in the Circuit Court of Kane County, Illinois, Case No. 10 MR 597 (the "Sugar Grove Lawsuit"); (d) United City of Yorkville v. Fidelity & Dep. Co. of Maryland, pending in the Circuit Court of Kendall County, Illinois, Case No. 2014 MR 90 (the "Yorkville Lawsuit") and (e) Village of Shorewood v. Fidelity & Dep. Co. of Maryland, pending in the Circuit Court of Will County, Illinois, Case No. 2014 L 471 (the "Shorewood Lawsuit").

[7]     *See Vill. of Montgomery v. Fid. & Deposit Co. of Maryland*, Case No. 2-15-0571, 2016 WL 1621971 (Ill. 2nd Dist. Ct. App. Apr. 21, 2016), *leave to appeal denied*, 65 N.E.3d 847 (Ill. 2016) (the "Montgomery Decision"); *City of Elgin v. Arch Ins. Co.*, 53 N.E.3d 31 (Ill. 2nd Dist. Ct. App. 2015), *leave to appeal denied*, 60 N.E.3d 871 (Ill. 2016) (the "Elgin Decision" and together with Montgomery Decision, the "State Appellate Decisions"). In the State Appellate Decisions, the Appellate Court of Illinois, Second District, reversed each of the underlying trial courts' dismissal, for failure to state a claim, of F&D's claims against TRG in the respective State Court Lawsuits.

unaffected by the Plan, because the Annexation Agreements bind successors in interest and because the Illinois state law of surety gives rise to a common law obligation between the parties, irrespective of the Plan's treatment of the F&D Claims.

The court will first address the applicable law, jurisdiction and burdens. Following that, the court will consider F&D's objections to this court hearing this dispute and the effect of the State Appellate Decisions, in turn. The court then turns to the heart of the issue—whether the actions taken by F&D violated the Plan Injunction. Finally, the court considers the remedies relating thereto.

A.    Applicable Law, Jurisdiction and Burdens

    1.    *Applicable Law*

A request to enforce a plan injunction contained both in a confirmed bankruptcy plan and a confirmation order poses a mixed question. Bankruptcy plans are contracts and state principles of contract law apply. *In re Harvey*, 213 F.3d 318, 320 (7th Cir. 2000) ("[B]ankruptcy plans are to be treated as contracts and interpreted under state law . . . ."). Here, the Plan makes clear that it is Illinois state law that will apply. Article XV of the Plan states:

> Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Illinois, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control).

Plan, at XV.J.

    2.    *Jurisdiction*

Here, it appears clear that this court's jurisdiction to hear the contract dispute is, at best, shared with the state court. Section 1334(b) confers on the courts "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). By statute, therefore, this court's jurisdiction is not exclusive.

While subject matter jurisdiction cannot be waived,[8] if the federal courts have subject matter jurisdiction, bankruptcy court adjudication can be consented to. *Cf. Wellness Int'l Network, Ltd. v. Sharif*, — U.S. —, 135 S.Ct. 1932, 1939 (2015); *Siragusa v. Collazo (In re Collazo)*, 817 F.3d 1047, 1053-54 (7th Cir. 2016). Further, such consent can be implied. *Richer v. Morehead*, 798 F.3d 487, 490 (7th

---

[8]    *But see Pancoe v. Southman (In re Park Beach Hotel Bldg. Corp.)*, 96 F.2d 886, 892 (7th Cir. 1938) ("A complete answer to the receiver's assertion of lack of jurisdiction is found in his own acquiescence therein. Recognizing paramount jurisdiction in the bankruptcy court, he surrendered the premises without controversy. He even invoked exercise of jurisdiction by asking in his petition for additional compensation and for approval of his acts as receiver. He could not play both hot and cold with this question. He could not in one breath invoke the beneficence of the jurisdiction and in the other deny in toto its experience.").

Cir. 2016) ("The parties' consent was implicit, but implied consent is good enough, [*Wellness*, 135 S.Ct.] at 1948 ('nothing in the Constitution requires that consent to adjudication by a bankruptcy court be express') ....").

Here, each party has voluntarily submitted itself to this court's jurisdiction—TRG, by bringing the Motion, and F&D, by filing a claim in the above-captioned case. *Matilla v. Radco Merch. Servs., Inc. (In re Radco Merch. Servs., Inc.)*, 111 B.R. 684, 686 (N.D. Ill. 1990). Neither party has challenged this court's jurisdiction. F&D, as the target of the Motion, admits jurisdiction but asks instead that the court abstain.

Nonetheless, because subject matter jurisdiction cannot be waived, it is incumbent upon the court to ensure to its own satisfaction that it has jurisdiction. That issue is somewhat complex.

Because questions regarding the interpretation of confirmed plans arise, by their very nature, post confirmation, the bankruptcy court's subject matter jurisdiction to hear such questions is presumed to be narrow. *Pettibone Corp. v. Easley*, 935 F.2d 120, 122 (7th Cir. 1991) ("Once the bankruptcy court confirms a plan of reorganization, the debtor may go about its business without further supervision or approval. The firm also is without the protection of the bankruptcy court. It may not come running to the bankruptcy judge every time something unpleasant happens."). In *Pettibone*, the Seventh Circuit did not directly address section 1334, the statute conferring jurisdiction in bankruptcy cases and proceedings. Nonetheless, in considering 28 U.S.C. § 157, the Circuit concluded that the bankruptcy court's postconfirmation jurisdiction is narrow. *Pettibone*, 935 F.2d at 122 ("Formerly a ward of the court, the debtor is emancipated by the plan of reorganization.").

The Seventh Circuit's reasoning in *Pettibone* is arguably limited to reorganization cases, the type of case presented therein. In liquidating chapter 11 cases, the debtor does not "go about its business without further supervision or approval," but remains subject to court supervision until the plan of liquidation is fully consummated. In such cases, the debtor has no business but liquidation, thus disputes under the plan are presumptively ones that affect the administration of the bankruptcy case. *Accord id.* at 122-23; *Elscint, Inc. v. First Wisconsin Fin. Corp. (In re Xonics, Inc.)*, 813 F.2d 127, 130-32 (7th Cir. 1987). Here, for example, the bankruptcy case is not and has not been closed. The business of the debtor is liquidating according to the Plan, and the interpretation of the Plan remains very much an issue of concern before this court. F&D has, as was noted above, repeatedly challenged the scope of the Plan in this court. These issues remain ripe.

Further, the Seventh Circuit has made clear that bankruptcy courts have the authority to enforce plan provisions, including injunctions. *Thomas v. United States (In re 4145 Broadway Hotel Co.)*, 131 F.2d 120, 122 (7th Cir. 1942) ("[T]he court has the authority to enjoin any act inconsistent with or which will interfere with the operation or execution of the plan as confirmed."). As a result, it is this court's conclusion that the federal courts have concurrent, ongoing jurisdiction over the plan dispute and that bankruptcy court adjudication has been consented to.

As to the other half of the mix, the injunction as set forth in the confirmation order, that involves enforcement of an order of this court. The Supreme Court has made clear that bankruptcy courts have, as do all courts, jurisdiction to hear matters relating to their own orders. *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (1934) ("[T]he Bankruptcy Court plainly had jurisdiction to interpret and enforce its own prior orders."); *In re Olsen*, 559 B.R. 879, 883-84 (Bankr. E.D. Wis. 2016) (same).

As with bankruptcy plan injunctions, *4145 Broadway Hotel*, 131 F.2d at 122, "[a] court retains jurisdiction to enforce its injunctions." *Cox v. Zale Delaware, Inc.*, 239 F.3d 910, 916 (7th Cir. 2001); *Napleton Enters., LLC v. Bahary*, Case No. 15 C 3146, 2016 WL 792322, at *6 (N.D. Ill. Mar. 1, 2016) ("[T]he bankruptcy court had jurisdiction to interpret and enforce the discharge injunction.").

As noted above, in this case, the court expressly retained jurisdiction to hear matters such as these. While a court cannot confer jurisdiction on itself, *Zerand–Bernal Grp., Inc. v. Cox*, 23 F.3d 159, 164 (7th Cir. 1994) ("A court cannot write its own jurisdictional ticket."); *Olsen*, 559 B.R. 883-84 ("A court cannot confer jurisdiction on itself by purporting to assume it."), if it has such jurisdiction, it appears that it may retain such. *See, e.g., Hawxhurst v. Pettibone Corp.*, 40 F.3d 175, 181 (7th Cir. 1994) (noting with approval the bankruptcy court's retention of jurisdiction in a confirmation order to hear issues regarding the debtor's chapter 11 injunction).

But the court cannot change the fact that such jurisdiction is concurrent, *Local Loan Co. v. Hunt*, 292 U.S. 234, 239-42 (1934); *Olsen*, 559 B.R. at 883-84., even if its assumed jurisdiction (as was the case here) purports to be exclusive. Similar to the limitations noted by the Seventh Circuit in *Pettibone*, the Supreme Court in *Local Loan* made clear that that jurisdiction is discretionary, and the court should exercise that discretion sparingly. *Local Loan*, 292 U.S. at 241-43.

The facts of *Local Loan* give further guidance that is helpful in this case. As is the case here, in *Local Loan*, had the bankruptcy court declined to exercise jurisdiction, the parties would be forced to continue to litigate in a multitude of state courts. *See id.* at 241; *Olsen*, 559 B.R. at 886-87 (citing to *Local Loan*'s deference to the efficiency and cost-effectiveness of a single point of resolution, as well as predominate bankruptcy issues, as grounds for exercising discretionary jurisdiction over the plan injunction dispute). Further, unlike in *Olsen* and as will be seen below, not only does this matter require interpretation of the Plan and the Confirmation Order, but bankruptcy concepts are at the center of that interpretation.

As a result, the court also has discretionary jurisdiction over this matter, and concludes that the exercise of that jurisdiction is appropriate.

3.    *Burdens*

The general standard in litigation is that the movant bears the burden of proof. *See Simmons v. Kmart Corp. (In re KMart Corp.)*, 381 F.3d 709, 714 (7th Cir. 2004); *In re Suburban W. Properties, LLC*, 504 B.R. 477, 483 (Bankr. N.D. Ill. 2013) (Barnes, J.) ("the Debtor—as the movant—bears the burden of proof").

This case is no exception. The same standard applies when a movant is trying to enforce a provision of a confirmed chapter 11 plan. *See In re Irwin*, 558 B.R. 743, 750 (Bankr. E.D. Pa. 2016) (burden of proof fell on the plan's liquidating agent, who had moved to compel debtor's payment pursuant to the confirmed plan).

As is customary in bankruptcy, this burden is satisfied by a preponderance of the evidence. *E.g., In re Woodbrook Assocs.*, 19 F.3d 312, 317 (7th Cir. 1994) (motion to dismiss case); *In re Chicago Const. Specialties, Inc.*, 510 B.R. 205, 211 (Bankr. N.D. Ill. 2014) (Barnes, J.) (motion to authorize the debtor to reject all collective bargaining agreements); *In re Chicago, Missouri & W. Ry. Co.*, 133 B.R. 438, 440 (Bankr. N.D. Ill. 1991) (Schwartz, C.J.) (motion for summary judgment).

Guidance on how a debtor should proceed in seeking to enforce a discharge injunction is helpful in this matter. In that regard,

> The Debtors bear the burden of proof on this Motion …. *In re Pincombe*, 256 B.R. 774 (Bankr. N.D. Ill. 2000). To sustain the burden in this case, the Debtors must first prove that the debt at issue was discharged. *In re Stoneking*, 222 B.R. 650 (Bankr. M.D. Fla. 1998) (primary issue in action to enforce the § 524(a) injunction is whether the debt is one which was discharged); *In re Toussaint*, 259 B.R. 96 (Bankr. E.D.N.C. 2000) (creditor's claim was not discharged, therefore no violation could occur). Once it has been determined that the debt was discharged, [the creditors] may be held in contempt if they willfully violated the injunction. *In re Andrus*, 184 B.R. 311 (Bankr. N.D. Ill. 1995). This burden is met by establishing that [the creditors] (1) had knowledge of the post-discharge injunction; and (2) intended the actions which violated the injunction. *Hardy v. United States (In re Hardy)*, 97 F.3d 1384 (11th Cir. 1996) (creditor was in contempt of discharge injunction by attempting to collect discharged tax debt).

*In re Weinhold*, 393 B.R. 623, 628-29 (Bankr. E.D. Wis. 2008).

Before taking up these issues, however, the court must turn to F&D's nonjurisdictional arguments that this court should defer from hearing the matter.

B.   Propriety of Relief from this Court

F&D, while admitting this court's jurisdiction, nonetheless argues that this court should not entertain the Motion. Its arguments sound in abstention, estoppel and laches.

1.   *Abstention*

F&D's primary argument is that this court should abstain from interceding in a matter that has been proceeding through the Illinois state courts. In support of that argument, F&D attempts to persuade this court that the matter in question satisfies many of the twelve factors for abstention adopted by the Seventh Circuit. *See In re Chicago, Milwaukee, St. Paul Pac. R.R.*, 6 F.3d 1184, 1189 (7th Cir. 1993) (adopting twelve factor analysis set forth by the *Ninth Circuit in Eastport Assoc. v. Los Angeles (In re Eastport Assoc.)*, 935 F.2d 1071, 1075 (9th Cir.1991)). In *Eastport*, the Ninth Circuit stated those factors as

> (1) the effect or lack thereof on the efficient administration of the estate if a Court recommends abstention, (2) the extent to which state law issues predominate over bankruptcy issues, (3) the difficulty or unsettled nature of the applicable law, (4) the presence of a related proceeding commenced in state court or other nonbankruptcy court, (5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334, (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case, (7) the substance rather than form of an asserted "core" proceeding, (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court, (9) the burden of [the bankruptcy court's] docket, (10) the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties,

(11) the existence of a right to a jury trial, and (12) the presence in the proceeding of nondebtor parties.

*Eastport Assoc.*, 935 F.2d at 1075-76.

It is true, that the existence of the State Court Lawsuits appears to satisfy the fourth factor. It is also true, that the State Court Lawsuits turn, in large part, on state law, the second factor in the *Eastport* list. But as to that, F&D is incorrect that this matter is predominately a state law question. As was discussed above, the gating question this court must answer is whether the debt in question was "discharged." *Weinhold*, 393 B.R. at 628-29. Recall that this is a liquidating corporate chapter 11 case, which lacks a discharge. Given the differences, the gating issue becomes instead whether F&D's claims were treated under the Plan and covered by the Release and Injunction. That question is *not* predominately a state law question, or at the least, is not predominately the state law question that has been addressed to date in the State Court Lawsuits. That is a question that this court takes up quite often.

Further, the existence of the State Court Lawsuits is belied by the fact that F&D has been litigating the bankruptcy effect of the Plan in this court for quite some time. There have been two tracks to this litigation, and the bankruptcy track predates the state court one. Requiring F&D to answer in this court the question of whether its actions violate this court's and the District Court's ruling is, therefore, an important consideration. Not allowing F&D to avoid the effect of its actions in the Cases is as well. These considerations tilt the second factor away from abstention.

As to the other factors, they are either neutral or favor exercise of jurisdiction by this court. For example, each of the parties appears to be invoking the forum most favorable to it, and each has cause to avoid the outcomes in the other's choice of forum.

For these reasons, the court cannot conclude that abstention is appropriate. The question of the effect of the Confirmation Order and Plan is better taken up here.

2.    *Waiver & Laches*

For similar reasons, F&D's waiver and laches arguments are equally unavailing. The fact that TRG allowed the State Court Lawsuits to progress is meaningful to the matters where the state courts and this court have concurrent jurisdiction. Nonetheless, the court finds nothing troubling about a party that has not previously needed to invoke a plan injunction having waited to do so until the need has arisen.

Both waiver and laches require more than simple delay in presenting an argument, and each requires more than pursuit of alternate remedies. Waiver requires

the voluntary and intentional relinquishment of a known and existing right and may be either express or implied. *See Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1275 (7th Cir.1996); *Havoco of America, Ltd. v. Sumitomo Corp. of America*, 971 F.2d 1332, 1337 (7th Cir.1992). Waiver requires three elements: (1) existence of a right, privilege, advantage or benefit which may be waived; (2) the actual or constructive knowledge thereof; and (3) an intention to relinquish such right, privilege, advantage or benefit. A prerequisite ingredient of the waiver of a

right or privilege consists of an intention to relinquish it. *TMF Tool Co. v. Siebengartner*, 899 F.2d 584, 590 (7th Cir.1990). "Before a party is deemed to have waived or relinquished a right or remedy available to it under the law, a clear and distinct manifestation of such an intent must be found." *American Nat. Bank & Trust Co. v. K-Mart Corp.*, 717 F.2d 394, 398 (7th Cir.1983) (citation omitted).

*Solow v. Am. Airlines, Inc. (In re Midway Airlines, Inc.)*, 221 B.R. 411, 460-61 (Bankr. N.D. Ill. 1998) (Squires, J.).

Here, there is no clear and distinct manifestation of TRG intending to voluntarily relinquish any right, privilege, advantage or benefit. TRG has not waived its rights.

F&D's laches argument fares no better. F&D is correct that laches "bars a party's rights when the party has unreasonably delayed their assertion so as to cause prejudice to the opposing party," *Hawxhurst*, 40 F.3d at 181, but nothing herein speaks to unreasonable delay. As was discussed above, until the State Appellate Decisions were rendered, TRG was successful in its attempts to have the State Court Lawsuits dismissed. That process was likely a simpler process than this has been. Here, TRG filed the Motion on July 5, 2016, and is receiving this written determination approximately eight months later. Following the quick route to dismissal should not be held against it.

Further, F&D's allegation of prejudice is unavailing. "Laches is an affirmative defense which is required to be proved by the party raising it." *Hawxhurst*, 40 F.3d at 181 n.5. Yet F&D simply argues in a conclusory manner that TRG failed to "exercise due diligence to protect its rights and that lack of diligence has caused substantial prejudice to F&D in the form of hundreds of thousands of dollars of attorneys' fees and costs by litigating numerous state law actions in Illinois state for almost six years." Amended Response, at p. 10.

That, alone, does not carry F&D's burden. It appears clear that the State Court Lawsuits are not, in and of themselves, about TRG. Nor is any party arguing that the State Court Lawsuits— except as they assert claims against TRG—are enjoined. F&D's costs in that regard are what they are. It is only F&D's efforts to interplead TRG that are at issue here, and in each of the State Court Lawsuits, it appears that those efforts were unsuccessful. Though the State Appellate Decisions reopen some of the issues in that regard, F&D's expenses relating to TRG are limited and of its own making.

Finally, as the Seventh Circuit has made clear, laches is an equitable defense, which the court has discretion in applying. *Baker Mfg. Co. v. Whitewater Mfg. Co.*, 430 F.2d 1008, 1009 (7th Cir. 1970) ("In approaching the issue of laches, we recognize, of course, the firmly established rule that a decision on such issue is addressed to the sound discretion of the trial judge ...."). Here, the court finds no reason to exercise that discretion in F&D's favor.

C.    Effect of the State Appellate Decisions

This is not to say, however, that TRG's decision to participate in the State Court Lawsuits as opposed to bringing the matter to this court immediately is without consequences. Because, as was discussed above, this court has concurrent jurisdiction with the state courts over the issues at bar, F&D contends that any decisions made by the state courts are binding upon this court.

F&D argues what is, in essence, claim preclusion (*res judicata*). It states that:

A bankruptcy court sharing concurrent jurisdiction with a state court must give the state court decision "the same preclusive effect as would be given [the decision] under the law of the State in which [it was] rendered." *Skyline Woods*, 636 F.3d at 470 (*citing Migra v. Warren City Sch. Dist. Bd. of Ed.*, 465 U.S. 75, 81 (1984)). In *Durfee v. Duke*, the Supreme Court stated that "a judgment is entitled to full faith and credit – even as to questions of jurisdiction – when the second court's inquiry discloses that those questions have been fully and fairly litigated and finally decided in the court which rendered the original judgment." 375 U.S. 106 (1963).

Amended Response, at p. 6; *see also Attorneys' Title Guaranty Fund, Inc. v. Wolf (In re Wolf)*, 519 B.R. 228, 251-53 (Bankr. N.D. Ill. 2014) (Barnes, J.) (discussing in detail this and other preclusion issues).

Issue preclusion also applies in bankruptcy proceedings. *Adams v. Adams*, 738 F.3d 861, 865 (7th Cir. 2013) ("Issue preclusion principles apply to prevent the relitigation of issues in bankruptcy proceedings, just as they do in other cases."); *Wolf*, 519 B.R. at 252 (same). As with *res judicata*, however, express conditions must be met for it to apply. *Wolf*, 519 B.R. at 252.

Preclusion is a waivable defense, *Simstad v. Scheub*, 816 F.3d 893, 898 (7th Cir. 2016), and the court's responsibility with respect to such is limited.

"It is not the Court's responsibility to find arguments, facts, and supporting case law for the parties." *Sanders v. JGWPT Holdings, Inc.*, Case No. 14 C 9188, 2016 WL 4009941, at *11 (N.D. Ill. July 26, 2016). Instead, it is the "advocate's job … to make it easy for the court to rule in his client's favor." *Dal Pozzo v. Basic Mach. Co.*, 463 F.3d 609, 613 (7th Cir. 2006). "Judges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). "Nor are they archaeologists searching for treasure." *Jeralds ex rel. Jeralds v. Astrue*, 754 F. Supp. 2d 984, 985 (N.D. Ill. 2010) (*citing DeSilva v. DiLeonardi*, 181 F.3d 865, 867 (7th Cir.1999)); *see also Bobak Sausage Co. v. A & J Seven Bridges, Inc.*, 805 F. Supp. 2d 503, 508 (N.D. Ill. 2011) (summarizing the foregoing).

*In re Ace Track Co., Ltd.*, 556 B.R. 887, 903 (Bankr. N.D. Ill. 2016) (Barnes, J.).

While F&D argues that preclusion applies, it makes little effort to plead the required elements of either claim or issue preclusion. Both claim and issue preclusion require a final judgment on the merits. *Wolf*, 519 B.R. at 251-52. In each of the State Appellate Decisions, however, the ruling was a reversal of the underlying trial court's dismissal for failure to state a claim. *See* Montgomery Decision, 2016 WL 1621971 at *7; Elgin Decision, 53 N.E.3d at 43. In so ruling, all the Illinois Appellate Court did was determine the sufficiency of the complaints, not the merits.

Under Illinois law, an involuntary dismissal is an adjudication on the merits, *see, e.g.*, Ill. S. Ct. R. 273 (eff. July 1, 1967); *Dinerstein v. Evanston Athletic Clubs, Inc.*, 64 N.E.3d 1132, 1140 (Ill. 1st Dist. Ct. App. 2016). The same cannot be said of the opposite. A motion to dismiss tests only the sufficiency of the complaint. *Bonhomme v. St. James*, 970 N.E.2d 1, 10 (Ill. 2012). In reinstating F&D's claims, the Illinois Appellate Court did not, therefore, make a final adjudication on the merits

of those claims. Further, the State Appellate Decisions are not uniformly binding, even with the State of Illinois. Appeals in the Shorewood Lawsuit, for example, would be taken before a different court of appeals which would not be bound to follow the State Appellate Decisions. *O'Casek v. Children's Home & Aid Soc. of Illinois*, 229 Ill.2d 421, 440 (Ill. 2008) ("[T]he opinion of one district, division, or panel of the appellate court is not binding on other districts, divisions, or panels."). For that reason, the trial court therein is similarly not bound. The state law on this matter is, quite simply, not uniformly or finally decided.

It may be that, nonetheless, given the nature of the State Appellate Decisions pronouncements on Illinois surety law, those pronouncements are preclusive. F&D, as the party claiming the waivable defense of preclusion and thus bearing the burden in this regard, has failed to demonstrate how that burden has been met.

Dwelling on these doctrines is therefore improvident. *Simstad*, 816 F.3d at 898 ("But the difference in these doctrines does not matter for present purposes, for a simple reason: the defendants never renewed their motion on any theory of preclusion. Had they done so, we might have been able to render our opinion here. But under the circumstances, they have waived their preclusion defense, *see Kratville v. Runyon*, 90 F.3d 195, 198 (7th Cir. 1996), and we must press on."). The court too will press on, but in a manner nonetheless deferential to the state courts' determination of Illinois state law issues.

Regardless of whether and what principle applies, having permitted the state courts to determine issues that touch on the question here, TRG would be hard pressed to argue to this court that what the State Appellate Decisions contain should be ignored. As is discussed below, nothing in this court's determination runs contrary to those determinations. This is more a question of bankruptcy law than it is of state law.

D.    Effect of the Release and Plan Injunction

Earlier the court noted the *Weinhold* case for a roadmap of what must be shown in a discharge injunction case. This is not, however, a discharge injunction case. This is a liquidating chapter 11 case. In such cases, corporate debtors are not entitled to a discharge. *See* 11 U.S.C. § 1141(d)(3). Nonetheless, *Weinhold* is instructive. It stated that, in order for the movant to establish its burden, it must "first prove that the debt at issue was discharged." *Weinhold*, 393 B.R. at 628. Once that has been determined, the movant must then show that the respondent had knowledge of the injunction and intended the actions which violated the injunction. *Id.* at 629.

Put in the terms of what is before the court here, TRG must demonstrate that the claim that is the subject of the State Court Lawsuits was released or enjoined, and if it was, that F&D had knowledge of the release/injunction and intended the act that violated the release/injunction.

F&D cannot contest that the latter part of this inquiry is satisfied. Certainly, it had knowledge of both the Release and the Plan Injunction. It voted in favor of the Plan that contained them, and later acknowledged their effect in the Municipal Stipulations. Nor does F&D challenge the nature, breadth and/or depth of that Plan Injunction or TRG's status as a successor.[9] In light of

---

[9]    Nor could it easily do so, at this late stage. As the District Court stated when it affirmed this court's ruling disallowing aspects of the F&D Claims:

that, F&D cannot contest that by deliberately interpleading TRG into the State Court Lawsuits it intended an act that may violate the Plan Injunction.  There is no question that the act of commencing or continuing the State Court Lawsuits falls within the proscribed actions in the Plan Injunction, provided the claims asserted in the State Court Lawsuits by F&D against TRG are within the scope of the same.  Plan, at VIII.F; Confirmation Order, at ¶ 19(d).

What remains for inquiry is the former part of the *Weinhold* standard—whether the claims asserted by F&D against TRG in the State Court Lawsuits were released or enjoined under the Plan and Confirmation Order.  This is an inquiry into the scope of the term "Claim" as defined in the Plan at I.A(24) and 11 U.S.C. § 101(5), as informed by the language of the F&D Claims themselves.

F&D does not dispute that TRG, as a successor to or assign of the Debtors and the Plan Trust, is entitled to the benefit of the Release and the Plan Injunction.  *See* Plan, at XV.F (set forth the Plan's application to successors and assigns).  Instead, F&D argues that the claims it asserts against TRG are independent from the claims subject to the Release and the Plan Injunction.  Now, after having received the benefit of the two State Appellate Decisions, it bases that assertion on the contents of those rulings.

To understand why the claims are not independent, the court must look to both the scope of the claims covered by the Plan and asserted by F&D in the Cases, and also must look to the contents of the State Appellate Decisions.

1.    *"Claims" Subject to the Release and the Plan Injunction*

As noted above, Section I.A(24) of the Plan defines "claim" by reference to section 101 of the Bankruptcy Code.  The Bankruptcy Code's definition, in turn, is quite broad.  "Congress intended by this language to adopt the broadest available definition of 'claim.'" *Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991); *In re LaMont*, 487 B.R. 488, 493 (N.D. Ill. 2012), *aff'd*, 740 F.3d 397 (7th Cir. 2014) (quoting same).  That definition is very broad, and encompasses future claims by including contingent, unliquidated and unmatured claims.  11 U.S.C. § 101(5).

That the breadth of the definition of claims in section 101(5) would include the future claims of sureties is not a new concept in the courts.  Neither is it new to consider the effect of bankruptcy injunctions on the claims of such sureties.  More than one hundred years ago, the Supreme Court considered these issues, and stated as follows:

> If the bond was executed before the commencement of proceedings in
> bankruptcy, the discharge of the bankrupt protects him from liability to the obligees,
> so that, in an action on the bond against him and his sureties, any judgment
> recovered by the plaintiffs must be accompanied with a perpetual stay of execution

---

These two creditors' efforts to preserve their various individual claims amount to an impermissible collateral attack on a settlement Plan that was confirmed over five years ago.  The bankruptcy court acted appropriately in not entertaining such an attack and the doubt and uncertainty it would throw on the ongoing liquidation of Kimball Hill's assets.  "After the orders of confirmation and consummation have been entered, finality becomes paramount."  *Matter of Chicago*, 891 F.2d at 161.

*Kimball Hill*, 2014 WL 5615650, at *5.

against him; but his discharge does not prevent that judgment from being rendered generally against them. *Wolf v. Stix*, above cited. If the sureties should ultimately pay the amount of any such judgment, and thereby acquire a claim to be reimbursed by their principal the amount so paid, which is a point not now in issue, it would be because his liability to them upon such a claim did not exist at the time of the commencement of the proceedings in bankruptcy, and therefore could not be proved in bankruptcy nor barred by the discharge, and consequently would not be affected by any provision of the bankrupt act.

*Hill v. Harding*, 130 U.S. 699, 704 (1889) (so holding with respect to Illinois surety law). In *Harding*, the Supreme Court hypothesized about the circumstances under which a surety might, despite the debtor's discharge, nonetheless be able to pursue the debtor, but did not resolve the issue. *Id.*

This open issue was addressed in more detail by the Third Circuit nearly one hundred years later. *See Avellino & Bienes v. M. Frenville Co., Inc. (In re M. Frenville Co., Inc.)*, 744 F.2d 332, 336-37 (3d Cir. 1984).

When parties agree in advance that one party will indemnify the other party in the event of a certain occurrence, there exists a right to payment, albeit contingent, upon the signing of the agreement. *See In re THC Financial Corp.*, 686 F.2d 799, 802-04 (9th Cir. 1982); *In re All Media Properties, Inc.*, 5 B.R. 126, 133 (Bankr. S.D. Tex. 1980), *aff'd*, 646 F.2d 193 (5th Cir. (Unit A) 1981) (*per curiam*). Such a surety relationship is the classic case of a contingent right to payment under the Code-the right to payment exists as of the signing of the agreement, but it is dependent on the occurrence of a future event. *See All Media*, 5 B.R. at 133.

*Id.*; *see also Graff v. Nieberg*, 233 F.2d 860, 863-64 (7th Cir. 1956) (*citing with approval Evans v. Illinois Sur. Co.*, 298 Ill. 101, 113 (Ill. 1921) ("The relation of debtor and creditor between principal and surety commences at the date of the obligation by which the surety company becomes bound, and not from the time he makes payment.")). While the precise ruling of *Frenville* was not directed at surety law and was later retracted by the Third Circuit *en banc*, *Jeld-Wen, Inc. v. Van Brundt (In re Grossman's Inc.)*, 607 F.3d 114, 121 (3d Cir. 2010), this part of the court's analysis remained undisturbed. Further, in retracting *Frenville*'s narrow accrual approach to what constitutes a claim, the Third Circuit strengthened the analysis with respect to suretyship law.

Even prior to *Jeld-Wen*, this court had rejected the narrow *Frenville* accrual test as applied to indemnity contracts. *In re Kewanee Boiler Corp.*, 297 B.R. 720, 734 (Bankr. N.D. Ill. 2003) (Schmetterer, J.) ("[T]he rule under Illinois law is that a right to sue and contingent right to payment exists once an indemnification contract is signed.") (*citing to Nieberg*, 233 F.2d at 863-64). Those rights include both the express contractual indemnification rights and the implied promises to reimburse under Illinois surety law. *Nieberg*, 233 F.2d at 864 (*citing to Ramsay's Estate v. Whitbeck*, 183 Ill. 550, 567 (Ill. 1900)).

Here, the Plan released all Claims against the Debtor, with such term adopting the definition of claims in the Bankruptcy Code. There is no question that the parties were aware of the possibility of future claims against F&D on the Performance Bonds based on performance of the Annexation

Agreement by successors to the Debtors. Those future claims are claims within the meaning of section 101(5) and thus are also within the meaning of Claims under the Plan.

Not only did the Plan expressly include successors to the Debtors as the beneficiaries of the Release and Plan Injunction, but the entire structure of the Plan as a plan of liquidation called for exactly what has happened here. When a debtor is in liquidation, it is a foregone conclusion that any future performance on the Debtors' obligation will not be by the Debtor, but by some other party.

Illinois law supports the conclusion that F&D's claims against the Debtors include those that might later be asserted against the Debtors' successors. *See Ramsay*, 183 Ill. at 567 ("[W]hen the sureties signed the bond of Ramsay the law implied a promise on his part to indemnify and save them harmless from *all loss which they might sustain by reason of such signing*, and when they made up the deficit this implied promise related back to the date of bond.") (emphasis added). The claims against F&D in the State Court Lawsuits exist solely because of the signing of the Performance Bonds by the Debtors.

Recall that F&D has repeatedly asserted such claims, in their entirety, in the Cases. F&D expressly asserted its claims under the Indemnity Agreements, "principals of common law" and "Suretyship." The amount of the F&D Claims asserted by F&D was far in excess of amounts actually paid by it to date, and clearly sought recovery on future payments under the Performance Bonds, including by necessity in a liquidating case those future payments resulting from the nonperformance of the Debtors' successors and assigns. F&D extensively litigated the F&D Claims in this court and the District Court and bargained for and received the right to augment its allowed claim with future amounts paid by it. F&D cannot now in good faith claim that it was not aware of the Plan's effect on the very claims it asserted.

Further, F&D voluntarily subjected itself to the Release and the Plan Injunction by voting in favor of the Plan. The Plan expressly protected not only the Debtors and the KHI Trust, but also the successors thereto and assigns thereof. Subsequent to the confirmation of the Plan, F&D entered into the Municipal Stipulations, stipulating to the Plan Injunction's effect on its claims.

On the other hand, TRG is a successor entitled to the protection of the Release and Plan Injunction. The claims asserted by F&D against it are, but for the discussion below, the same claims asserted against the Debtors. F&D was and is enjoined by the Plan Injunction from proceeding against TRG on these claims, and by interpleading TRG into the State Court Lawsuits for the purpose of recovering from TRG, violated the terms of that injunction.

Barring some other consideration, therefore, the Motion is well taken.

2.      *State Appellate Decisions Regarding F&D's Cause of Action Against TRG*

The only remaining consideration is whether the court should rule differently in light of the State Appellate Decisions. As noted above, F&D, as the party seeking to have this court bound by the State Appellate Decisions, has not carried its burden in this regard, whether that be under waiver, laches, claim preclusion or issue preclusion. Nothing argued by F&D changes the fact that the Motion is well taken.

Assuming arguendo that the State Appellate Decisions do apply, or, at the very least, looking to them deferentially as a state court determination of some of the state law concepts in play, does not change the result.

F&D puts much stock in the language of the State Appellate Decisions that it has a common law suretyship right of reimbursement from TRG, independent from the contractual right of indemnification it asserted against the Debtors. *See, e.g.,* Elgin Decision, 53 N.E.3d at 42 ("As noted by our supreme court over a century ago, '[w]hen a surety signs a bond, the law raises an implied promise by the principal to reimburse the surety for any loss which he may sustain.'") (citing to *Ramsay,* 183 Ill. at 567); *see also, e.g.,* Montgomery Decision, 2016 WL 1621971 at * 7 (following the Elgin Decision).

In so doing, however, it appears that the Illinois Appellate Court conflates without adequate explanation, TRG's obligations under the Annexation Agreement, the continued existence of the Performance Bonds and the Illinois common law of suretyship's right of indemnification to conclude that TRG must indemnify F&D. What is missing in the Illinois Appellate Court's analysis is the central point here, that F&D agreed to a release of all of its indemnification rights against the Debtors and is enjoined from asserting such rights against successors to the Debtors such as TRG. This court need not disturb the Illinois state courts' rulings in order to determine that the Release and Plan Injunction nonetheless bar F&D from seeking recovery on the foregoing rights.

Again, the pivotal point here is whether the claims asserted by F&D were released.

Under Illinois law, releases are treated as contracts and are construed and applied according to the rules of contract law. *Heard v. Tilden,* 809 F.3d 974, 979 (7th Cir. 2016) ("A release is a contract, and thus, even though the settlement occurred in litigation brought in federal court, Illinois law governs the effect of the release at issue here."). As the Seventh Circuit has stated:

> Illinois courts consider a release to be a contract in which "a party relinquishes a claim to a person against whom the claim exists." *Carona v. Illinois Central Gulf R.R. Co.,* 203 Ill. App. 3d 947, 148 Ill. Dec. 933, 561 N.E.2d 239, 242 (1990). Thus, it is subject to the rules of contract law. *See id.* While the "intention of the parties controls the scope and effect of the release," courts determine this intent "from the language used and the circumstances of the transaction." *Carlile v. Snap-on Tools,* 271 Ill. App. 3d 833, 207 Ill. Dec. 861, 648 N.E.2d 317, 321 (1995) (internal citation and quotation marks omitted). If no ambiguity exists, the question is a matter of law.

*Capocy v. Kirtadze,* 183 F.3d 629, 632 (7th Cir. 1999).

The language of the Release and the Plan Injunction, combined with the Plan's treatment of successors, is clear. F&D may not pursue TRG as a successor to the Debtors on the same theories asserted against the Debtors. This is not a question of whether TRG has an obligation under the Annexation Agreements as the successor to the Debtors. Nor is it a question of whether TRG, as a successor to the Debtors, owes a common law right of indemnification under the Performance Bonds. It is a question of whether F&D has bargained away its right of recovery against TRG. It has.

In argument at the Hearings, the court posed to F&D's counsel a hypothetical situation. Suppose that a suretyship relationship such as existed here between F&D and KHI existed. Suppose that, instead of a bankruptcy, F&D and KHI agreed to contractually release F&D's rights as against KHI and any and all successors and assigns prior to the expiration of the Performance Bonds, and that subsequently, also prior to the expiration of the Performance Bonds, KHI sold its rights in the Developments to TRG, and in so doing, TRG became obligated under the Performance Bonds. Would F&D then still have the right it claims here to pursue TRG, over and above the agreed contractual release?

F&D's counsel argued that it would. That, quite simply, cannot be the case.

Illinois law supports releases, and in the case of general releases, Illinois law includes in such releases all claims that the parties were aware of at the time of contract. *Gavery v. McMahon & Elliott*, 283 Ill. App. 3d 484, 487 (Ill. 1st Dist. Ct. App. 1996) ("Where both parties were aware of an additional claim at the time of signing the release, however, the general release language of the agreement will be given effect to release that claim as well.") (*citing to Farm Credit Bank of St. Louis v. Whitlock*, 144 Ill. 2d 440, 447 (Ill. 1991)). As discussed in the preceding section, future claims under the Performance Bonds are within the scope of claims as defined in section 101(5) of the Bankruptcy Code and thus within the meaning of Claims under the Plan. They would, therefore, have been known by the parties and subject to the general release under Illinois law. The same is true of the Release under the Plan.

Further, as *Capocy* makes clear, if the scope of a release is unclear, the "intention of the parties controls the scope and effect of the release," and the court may determine this intent "from the language used and the circumstances of the transaction." *Capocy v. Kirtadze*, 183 F.3d at 632 (*citing to Carlile*, 271 Ill. App.3d at 833 (internal citation and quotation marks omitted)). If the same intention existed in the hypothetical contract as was evidenced by the parties' actions here, there is little doubt that the scope of the release included future claims against successors. Not only did F&D seek recovery for its future liability – liability that would only arise in the context of successors to the liquidating Debtors – from the Debtors, F&D acted all points in the Cases after the Plan was confirmed in a manner that shows it intended for its recovery to be limited to that under the Plan. F&D negotiated for and received the right to augment the F&D Claims for amounts paid in the future. It stipulated to the effect of the Plan Injunction, which operates by way of the Release.

Put another way, the court can find nothing in the Plan or in the parties' actions in the Cases that supports the conclusion that the parties intended to preserve these rights for F&D. Reading the Release and Plan Injunction in the manner urged by F&D would render the protections to successors and assigns meaningless.

Returning to the hypothetical contractual release outside of bankruptcy, if that release were to have occurred, the court has little doubt that, were F&D to nonetheless seek recovery from KHI, the Illinois courts would grant a motion to dismiss brought by KHI. *See Dickman v. E.I. Du Pont de Nemours & Co.*, 278 Ill. App. 3d 776, 781 (Ill. 1st Dist. Ct. App. 1996) (affirming trial court's motion to dismiss irrespective of nominal consideration in relation to claims where plaintiff signed a release). As stated, under Illinois law releases are contracts, *Carona*, 203 Ill. App. 3d at 936. When such contracts include full releases of liability, that also include rights under statutory and common law. *Chicago Surface Lines v. Foster*, 241 Ill. App. 49, 55 (Ill. 1st Dist. App. Ct. 1926) ("To permit the

plaintiffs to recover after such a settlement . . . would compel defendant to pay twice for the same injury.").

The court is confident that TRG, as an intended but unnamed beneficiary of such a hypothetical release would be entitled to do the same. As the Supreme Court of Illinois has stated:

> A contract made for the direct benefit of a third person permits the third person to sue for a breach thereof, and that right rests on the liability of the promisor appearing from the language of the contract properly construed. While the language of the contract is controlling, it is not necessary that the contract for the benefit of a third-party beneficiary identify him by name; the contract may define the party benefited by description of a class.

*Garcia v. Lovellette*, 265 Ill. App. 3d 724, 732 (Ill. 2nd Dist. Ct. App. 1994) (internal citations omitted); *Am. Nat. Trust Co. of Chicago v. Kentucky Fried Chicken of S. California, Inc.*, 308 Ill. App. 3d 106, 120 (Ill. 1st Dist. Ct. App. 1999) (same) (*citing to Lovellette*). The court can find nothing in Illinois law that supports F&D's contention that such law would allow a party to consensually, contractually release all claims and later reassert such claims against a successor; F&D has offered no Illinois law to that effect.

Nothing herein stands for the general proposition that, in the absence of a release and injunction in favor of successors, such successors cannot be held liable for claims such as F&D's. The Illinois Appellate Court's reasoning is not unsound, it simply did not consider that F&D was bound by the Release and the Plan Injunction not to bring the claims it discussed in the State Appellate Decisions.

As a result, even considering the language of the State Appellate Decisions, the court's conclusion here is unchanged. F&D, by interpleading TRG into the State Court Lawsuits, has violated the terms of the Release and the Plan Injunction.

E.    Request for Order Compelling Dismissal/Damages

TRG asks that this court order F&D to dismiss its counterclaims against TRG in the State Court Lawsuits. Such a request runs perilously close to requesting this court violate the Anti-Injunction Act, which states that "[a] court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283.

Congress has, of course, authorized bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). There is no question that chapter 11 plans may issue injunctions, whether or not such plans include an actual discharge. 11 U.S.C. § 524(g)(1). TRG is not seeking a new injunction, only enforcement of the existing one. Even if it were seeking a new injunction, the court would not only be acting under an Act of Congress, but it would also be acting to effectuate its prior judgment, the Confirmation Order. Thus, the bankruptcy court may issue an order to carry out the terms of that injunction.

As such, while the court will not enjoin the State Court Lawsuits themselves (they are, after all, broader than the part in which F&D asserts claims against TRG), it will by order concurrent with this Memorandum Decision compel F&D to dismiss its claims against TRG therein. Failure to abide by such order will be punishable by civil contempt. *See* Fed. R. Bank. P. 9020.

Last, TRG asks for damages arising from F&D's violation of the Release and Plan Injunction. The Seventh Circuit has made clear that a bankruptcy court may sanction a party for violating the injunction under section 524(a)(2). *In re Taylor*, 793 F.3d 814, 819-20 (7th Cir. 2015) ("The bankruptcy court is permitted to 'sanction a party for violating the discharge injunction' …") (citation omitted); *Zale Delaware*, 239 F.3d at 916-17. It follows that the bankruptcy court has the same power to sanction a party for a violation of the injunction issued under the authority in section 524(g). *See, e.g.*, *Grossman v. The Belridge Grp. (In re Lothian Oil, Inc.)*, 531 F. App'x 428, 445 (5th Cir. 2013). That too, is punishable by civil contempt. Fed. R. Bank. P. 9020; *Zale Delaware*, 239 F.3d at 916.

TRG has not, however, been required to date to set forth its civil contempt damages stemming from the violation of the Plan Injunction. As a result, the court will set a further hearing to determine how to proceed on that request.

## CONCLUSION

Having considered the arguments of the parties, it is the conclusion of the court that the claims asserted by F&D in the State Court Lawsuits were released and enjoined under the Plan and Confirmation Order. As such, in bringing the claims against TRG in the State Court Lawsuits, F&D has violated the terms of the Plan Injunction, and in so doing, has subjected itself to further order of this court and civil contempt damages.

By separate order entered current herewith, the court therefore orders F&D to dismiss its claims against TRG in the State Court Lawsuits and sets a further status hearing on the question of the amount of civil contempt damages, if any, owed to TRG.

Dated: March 20, 2017

ENTERED:

_____
Timothy A. Barnes
United States Bankruptcy Judge