**Page 1**

```
 1            IN THE UNITED STATES DISTRICT COURT
 2               NORTHERN DISTRICT OF ILLINOIS
 3                      EASTERN DIVISION
 4    IN RE:                    )
 5    KIMBALL HILL, INC.,       )   No. 08-10095
 6    DEBTOR,                   )
 7
 8         REPORT OF PROCEEDINGS at the hearing of
 9    the above-entitled cause before the Honorable
10    TIMOTHY A. BARNES, Judge of said Court, on
11    August 27, 2018 at the hour of 1:22 p.m.
12
13
14
15
16
17
18
19
20
21
22
23    Reported by:  Dorelle Scheeringa, CSR, RPR
24    License No. 084-004844
                                                    1
```

**Page 2**

```
 1    APPEARANCES:
 2         PRETZEL & STOUFER, CHARTERED
 3         BY:  MR. EDWARD B. RUFF, III
 4              MR. MICHAEL P. TURIELLO
 5         One South Wacker Drive, Suite 2500
 6         Chicago, Illinois  60606
 7         (312) 346-1973
 8         eruff@pretzel-stoufer.com
 9         mturiello@pretzel-stoufer.com
10              Representing the Movant,
11              TRG Venture Two, LLC;
12
13         VEDDER PRICE, P.C.
14         BY:  MR. WILLIAM W. THORSNESS
15         222 North LaSalle Street, Suite 2600
16         Chicago, Illinois  60601
17         (312) 609-7500
18         wthorsness@vedderprice.com
19              Representing the Movant,
20              TRG Venture Two, LLC;
21
22
23
24
                                                    2
```

**Page 3**

```
 1    APPEARANCES CONTINUED:
 2         SCHUYLER, ROCHE & CRISHAM, P.C.
 3         BY:  MR. CORNELIUS F. RIORDAN
 4         180 North Stetson Avenue, Suite 3700
 5         Chicago, Illinois 60601
 6         (312) 565-2500
 7         criordan@rmp-llc.com
 8              Representing Fidelity & Deposit
 9              Company of Maryland,
10
11
12         ECKERT SEAMANS CHERIN & MELLOTT, LLC
13         BY:  MR. ALAN I. MOLDOFF
14         50 South 16th Street, Suite 2200
15         Philadelphia, Pennsylvania  19102
16         (215) 851-8450
17         amoldoff@eckertseamans.com
18              Representing Fidelity & Deposit
19              Company of Maryland.
20
21
22
23
24
                                                    3
```

**Page 4**

```
 1                    I N D E X
 2    WITNESS                        EXAMINATION
 3    GREGORY W. KILBURN
 4       By Mr. Ruff                      5
 5
 6
 7
 8
 9
10
11               E X H I B I T S
12    NUMBER                    MARKED FOR ID
13
14            (NO EXHIBITS MARKED)
15
16
17
18
19
20
21
22
23
24
                                                    4
```

1          (whereupon, the following
2              proceedings were held in
3              open court:)
4     THE COURT: Okay. Let's call the matter back
5  for the record please.
6     THE CLERK: Okay. Kimball Hill, Inc.
7     THE COURT: Okay. And will you remain,
8  Mr. Kilburn, on the stand? Reminder, you remain
9  under oath.
10    THE WITNESS: Yes, your Honor.
11    THE COURT: Okay. Counsel, your witness.
12    MR. RUFF: Thank you, your Honor.
13         GREGORY W. KILBURN,
14  called as an adverse witness pursuant to
15  Section 2-1102 of the Illinois Code of Civil
16  Procedure, having been previously sworn, was
17  examined and testified as follows:
18        EXAMINATION (CONTINUED)
19  BY MR. RUFF:
20    Q.   Mr. Kilburn, before the break, we were
21  discussing the Montgomery stipulation, the
22  original draft had been sent by Mr. Radtke, the
23  trustee. The attorney for municipality
24  responded. Do you recall that, sir?

5

1    A.   Yes, sir, I do.
2    Q.   Okay. And then if we could look at
3  Exhibit 85. Exhibit 85 is -- the top is an
4  e-mail from Mr. Riordan to Mr. Radtke and
5  Mr. Frieders responding to the two previous
6  e-mails we discussed, correct?
7    A.   Yes, it is.
8    Q.   And it's set on January 11th, 2010;
9  correct?
10    A.   Yes, sir, correct.
11    Q.   This is an e-mail produced by Fidelity
12  in response to TRG's discovery requests in this
13  matter, correct?
14    A.   Yes, sir, it is.
15    Q.   All right. And at the time of this
16  e-mail, we can agree that Mr. Riordan was
17  Fidelity's agent?
18    A.   Yes, sir, he was. That's correct.
19    Q.   And we've already established he's your
20  agent, correct?
21    A.   Yes, sir.
22    Q.   Okay. We can agree that the statement
23  made in the contents of the e-mail was made
24  during the course of Mr. Riordan's relationship

6

1  with Fidelity as its attorney, correct?
2    A.   Yes, sir, that's correct.
3    Q.   The subject matter relates to matters
4  within the scope of that agency, correct?
5    A.   Yes, sir, it does.
6    Q.   And this is a document that we
7  discussed at your deposition, correct, sir?
8    A.   Yes, sir.
9    Q.   In which you testified in a
10  representative capacity for Fidelity and in a
11  personal capacity because you were involved in a
12  lot of the tractions, correct?
13    A.   Yes, sir, that's correct.
14    Q.   All right. So if we look at this, we
15  can see that it's from -- Mr. Riordan states --
16    MR. RUFF: Highlight, Jim, attached are my
17  proposed revisions to the stip and order.
18  BY MR. RUFF:
19    Q.   Did I read that correctly, sir?
20    A.   Yes, sir, you did.
21    Q.   If you look at Page 7 of the document,
22  on the bottom, Paragraph 4. In adjacent
23  Paragraph 4, you see the comment that was
24  previously put --

7

1    MR. RUFF: Just a moment. We're just going
2  to back up. We are going to come to this, Jim,
3  but I want to go to the comment first. Thank
4  you.
5  BY MR. RUFF:
6    Q.   That comment over on the right-hand
7  side is the same comment that Mr. Frieders put
8  in, correct?
9    A.   Yes, sir, it is.
10    Q.   And can we agree that this -- this
11  revised stipulation includes Mr. Riordan's
12  comments, correct?
13    A.   Yes, sir, it does.
14    Q.   He doesn't strike the comment or even
15  comment on the comment made by Mr. Frieders on
16  the right-hand side. Can we -- can we agree on
17  that?
18    A.   Correct, sir, we can.
19    Q.   Okay. We can agree that Mr. Riordan
20  was making his revisions working off the draft
21  that the municipality had sent around just in
22  the previous e-mail that we showed, correct?
23    A.   Yes, sir, that's correct.
24    Q.   Okay. You understand that if there

8

**Page 9**

1  were response or a comment that Mr. Riordan felt
2  that he needed to make in response to that
3  concern raised by the village, he could have put
4  a comment in the margin.  Can we agree to that?
5      A.    Yes, sir.
6      Q.    Okay.  And you agree that no comment or
7  response in any fashion appears?
8      A.    Yes, sir.
9      MR. RUFF:  Now -- now we can go to that, Jim.
10  Thank you.
11  BY MR. RUFF:
12      Q.    If we look at Paragraph 4, in fact, on
13  Page 7, Trial Exhibit 7, we can see that
14  Mr. Riordan actually did make some changes on
15  Paragraph 4; correct?
16      A.    Yes, sir.
17      Q.    And going back to the -- we don't need
18  to go back to the first page, but these are the
19  additional changes Mr. Riordan was suggesting;
20  correct?
21      A.    Yes, sir.
22      Q.    And on Fidelity's behalf, Mr. Riordan
23  had the opportunity, reviewing this document, to
24  make whatever changes he felt were necessary or

**Page 10**

1  just reject the stipulation out of hand; fair?
2      A.    Yes, sir, fair.
3      Q.    Exhibit 86.  This is Exhibit 86.
4  Page 1 at the top is a response by Mr. Frieders
5  to Mr. Riordan's previous e-mail that we just
6  discussed with the Court, correct?
7      A.    Yes, sir.
8      Q.    Okay.  And this is later that day on
9  January 11th, 2010 indicating, I don't have an
10  objection to Con's changes.  I'm still working
11  on resolving the Arch issue for VSG.  Did I read
12  that correctly, sir?
13      A.    Yes, you did.
14      Q.    Exhibit 87.  Can we agree, in case we
15  need to establish foundation on every one of
16  these documents, that this is again an e-mail
17  produced by Fidelity in response to TRG's
18  discovery requests in this matter?
19      A.    Yes, sir, it is.
20      Q.    At the time of this e-mail, we
21  can agree that Mr. Riordan was Fidelity's agent?
22      A.    Yes, sir, correct.
23      Q.    We can agree that the statement made
24  and contents of the e-mail were made during the

**Page 11**

1  course of Mr. Riordan's relationship with
2  Fidelity as its attorney, correct?
3      A.    Yes, sir, correct.
4      Q.    The subject matter relates to matters
5  within the scope of that agency, correct?
6      A.    Yes, sir, it does.
7      Q.    This is a document that we reviewed and
8  discussed in your deposition as a personal and
9  corporate representative for Fidelity, correct?
10      A.    Yes, sir, it was.
11      Q.    Okay.  Mr. Radtke writes, Dean and Con,
12  I made a couple of changes in Paragraph 3 and 6
13  to the draft that Con circulated on Monday.
14  Assuming the attached draft is acceptable to
15  both of you, let's sign it.  I'll then present
16  it to the court at the February 9th omnibus
17  hearing.  Thanks.  Did I read that correctly?
18      A.    Yes, sir.
19      Q.    If we look at Paragraph 6 on Page 7 of
20  the exhibit and we compare it to --
21      MR. RUFF:  I don't mean to jump back on the
22  Court back and forth on this.
23  BY MR. RUFF:
24      Q.    But if we look at Mr. Riordan's

**Page 12**

1  suggested changes on Trial Exhibit 85, if you
2  put those next to each other, Mr. Riordan had
3  made changes to Paragraph 6 in his version,
4  which in Exhibit 87 Mr. Radtke lines out merely
5  all of the changes proposed by Mr. Riordan.  Can
6  we agree on that?
7      A.    Yes, sir.
8      Q.    Okay.  Exhibit 88.  Thank you, sir.
9      A.    Thank you.
10      Q.    Looking at Exhibit No. 8 (sic).
11      MR. RUFF:  Thank you, Jim.
12  BY MR. RUFF:
13      Q.    It is an e-mail exchange between
14  Mr. Radtke and Mr. Frieders, and Mr. Riordan is
15  cc'd on that; correct?
16      A.    Yes, sir, that's correct.
17      Q.    It's January 14th, 2010; correct?
18      A.    Yes, sir.
19      Q.    Okay.  If we look at Mr. Frieders'
20  e-mail on Page 2 of the exhibit --
21      MR. RUFF:  Thank you, Jim.
22  BY MR. RUFF:
23      Q.    It says here, he's responding to the
24  changes that Mr. Radtke made to the proposed

1  stipulation. Can we agree on that?
2      A.   Yes, sir.
3      Q.   And he asks, can you explain the
4  rationale for the changes in Paragraph 6? An
5  integral component of our approach to this issue
6  is preserving the village's rights under the
7  annexation agreement. Did I read that
8  correctly?
9      A.   Yes, sir.
10     Q.   Okay. And then if we go to Page 1 of
11  that exhibit, Mr. Radtke writes --
12     MR. RUFF: We'll get to the first page, Jim,
13  toward the top. First paragraph, if that can be
14  highlighted and brought up for the Court.
15  BY MR. RUFF:
16     Q.   Mr. Radtke writes, in response to that
17  e-mail by Mr. Frieders, I cannot agree to your
18  proposed language in Paragraph 6. It is legally
19  erroneous and goes well beyond any relief that
20  you would be entitled to receive in connection
21  with any motion to modify the plan injunction.
22  Did I read that correctly?
23     A.   Yes, sir, you did.
24     Q.   Okay. He goes on to state, I have

13

1  accordingly attempted to craft language that
2  addresses your comment to Paragraph 6 without
3  attempting to predetermine any issues that are
4  not appropriately addressed in the context of
5  the stipulation. Did I read that correctly?
6      A.   Yes, you did.
7      Q.   All right. In the third paragraph --
8      MR. RUFF: Can you highlight that please,
9  Jim? Thank you. If we go down about two-thirds
10  of the way down, the second sentence. Could you
11  highlight that to the end please, Jim?
12  BY MR. RUFF:
13     Q.   The second sentence is also legally
14  erroneous for numerous reasons including, but
15  not limited to, the plan and confirmation order
16  which provides, for example, that upon
17  confirmation, the debtor and all property dealt
18  with herein shall be free and clear of all such
19  claims and interests including, but not limited
20  to, liens, security interests, and any other
21  encumbrances. Did I read that correctly, sir?
22     A.   Yes, sir, you did.
23     Q.   And this is something that Mr. Riordan
24  received on January 14th, 2010; correct?

14

1      A.   Yes, sir, that's correct.
2      Q.   Mr. Riordan was advised at that time
3  that one of the reasons that the trustee's
4  attorney thought that the proposed language was
5  legally erroneous was that they were
6  inconsistent with the plan and confirmation
7  order which provided that upon confirmation, the
8  debtor and all property dealt with herein shall
9  be free and clear of all such claims and
10  interests including, but not limited to, liens,
11  security interests, and any and all other
12  encumbrances; correct?
13     A.   Yes, sir.
14     Q.   Next exhibit, 89. Thank you, sir.
15          This is an e-mail from Mr. Frieders.
16     MR. RUFF: And the second portion of that.
17  It's the one on the bottom, Jim. The halfway
18  mark a little bit below. Yeah, if you could
19  raise that. Thank you. That's exactly where I
20  want it to be. Thanks, Jim.
21  BY MR. RUFF:
22     Q.   Mr. Frieders is sending an e-mail on
23  January 18th, 2010 and proposes additional
24  language to correct or address their concerns

15

1  and the trust's concerns about Paragraph 6; is
2  that correct?
3      A.   Yes, sir, it is.
4      Q.   All right. And the proposal that
5  Mr. Frieders suggests is in bold letters,
6  correct?
7      A.   Yes, sir, it is.
8      Q.   It states as follows: The parties
9  acknowledge that the entry of the
10  stipulation -- this stipulation is not intended
11  to affect the rights and obligations, if any,
12  under the annexation agreement between the
13  village and any third party.
14          The village by its execution of this
15  stipulation does not waive any claims or concede
16  any issues relating to the enforceability of the
17  annexation agreement except as to the debtor.
18  Did I read that correctly, sir?
19     A.   Yes.
20     Q.   And in response to that, Mr. Radtke
21  writes at the top.
22     MR. RUFF: Can we get the top now, Jim?
23  Thank you.
24

16

BY MR. RUFF:

Q.    That same day he responds -- Mr. Radtke
responds, your proposed revision will be fine.
If the second -- if the second sentence
concludes by saying, except as to the debtors
and the KH1 (sic) trust.  Did I read that
correctly?

A.    Yes, sir.

Q.    Okay.  You agree that if Mr. Riordan or
Fidelity disagreed with this language, there was
still an opportunity to respond and make changes
before agreeing to the stipulation; is that
correct?

A.    Yes, sir.

Q.    If there was any clarity that needed to
be made about the scope of the stipulation or
what rights Fidelity had, there was still time
to seek clarification of those; correct?

A.    Yes, sir.

Q.    And if Fidelity did not believe that
this stipulation adequately preserved its
rights, it didn't have to agree to it; true?

A.    That's correct.

Q.    Exhibit 90.  I'm trying to make sure I

17

get you one.

A.    Thank you.

Q.    Now, on Exhibit 90, again, if I need to
go through the foundation on every one of these,
we can.  Can we agree that this is an e-mail
produced by Fidelity in response to TRG -- TRG's
discovery requests in this matter?

A.    Yes, it is.

Q.    And at that -- at the time of this
e-mail, we can agree that Mr. Riordan was
Fidelity's agent?

A.    Yes.

Q.    We can agree that the statement made
and the contents of the e-mail was made during
the course of Mr. Riordan's relationships with
Fidelity as its attorney?

A.    Yes.

Q.    The subject matter relates to matters
within the scope of that agency?

A.    Yes.

Q.    This is a document we reviewed and
discussed with you in your deposition in your
representative and personal capacity, correct?

A.    Yes.

18

Q.    Mr. -- and if we -- we see here on this
e-mail, the bottom portion of this.

MR. RUFF:  We just need to move it up just a
hair, Jim, please.  Yeah, get the bottom of it
too just so the Court knows that this is the
response.  Thank you.  Right there is perfect.

BY MR. RUFF:

Q.    We see that this is the same e-mail
chain wherein Mr. Radtke had proposed some
language.  And then Mr. Frieders responds again
on the same day, January 18th, fine with me.
Did I read that correctly?

A.    Yes.

Q.    And Mr. Radtke responds by attaching an
executed copy of the stipulation with those
changes, correct?

A.    Yes.

Q.    And he's asking Mr. Frieders on behalf
of the municipality and Mr. Riordan on behalf of
the Fidelity to execute and return the stip so
it could be entered, correct?

A.    Yes.

Q.    All right.  This is the type of
document that now indicates we have a final

19

agreement that would have been presented to you
and you would have signed off on behalf of
Fidelity, correct?

A.    Yes.

Q.    Before signing this document in
Exhibit 90, you would have consulted with
Mr. Riordan; and he would have sought your
approval concerning this, correct?

A.    Yes.

Q.    And we can agree before this
stipulation as far as Montgomery was concerned
that Fidelity approved them, correct?

A.    Yes.

Q.    And if Fidelity at that point in time
after being presented by their counsel had
questions about what certain provisions meant,
those could have been addressed at that point
still; correct?

A.    Yes.

Q.    And there's no evidence that after this
proposal that you were aware of was submitted
that Fidelity raised any questions or sought any
clarification at that time, correct?

A.    Correct.

20

1    Q.   If we look at the stipulation that's
2  attached, sir, if you don't mind doing so.  It
3  starts on Page 5 of the exhibit.  If we look at
4  that, all of the red lines and notes in the
5  margins have now been removed.  Can we agree on
6  that?
7    A.   Yes.
8    Q.   And if we look at Paragraph 6.  It's on
9  Page 10 of the exhibit.  If you don't mind doing
10 that for us.
11   MR. RUFF:  And, Jim, if you could put that
12 up.  It's on Paragraph 6.  There you go.  If you
13 could move that up for the Court, if it's
14 possible to highlight the entire Paragraph 6.
15 BY MR. RUFF:
16   Q.   It states, the parties acknowledge the
17 entry of the stipulation is not intended to
18 affect the rights and obligations, if any, under
19 the annexation agreement between the village and
20 any third parties.  Can we agree on that?  Have
21 I read that correctly?
22   A.   Yes, and yes, you have.
23   Q.   And it goes on to state, the village by
24 its execution of the stipulation does not waive

21

1  any claims or concede any issues relating to the
2  enforceability of the annexation agreement
3  except as to the debtor and the KH1 (sic) trust.
4  Did I read that correctly?
5    A.   Debtor was plural; but other than that,
6  yes, you did.
7    Q.   Debtors, excuse me.  You are absolutely
8  correct, and I apologize.  I didn't mean to
9  misstate.
10   A.   No problem.
11   Q.   Thank you for catching that.
12   A.   I'm trying to listen.
13   Q.   I'm trying to go through it.  It tells
14 me you're paying attention, though.
15   A.   Yes.
16   MR. RIORDAN:  Except it's KHI not KH1.
17 BY MR. RUFF:
18   Q.   If you look at Exhibit 91 please, sir.
19   A.   Thank you.
20   MR. RUFF:  Both Mr. Riordan and my
21 co-counsel, Mr. Turiello, have indicated that
22 I -- in addition to the clarification that was
23 made by Mr. Kilburn, I misspoke in saying KH1.
24

22

1  BY MR. RUFF:
2    Q.   It's the KHI trusts.  That's what it
3  says, correct, sir?
4    A.   Yes, sir, correct.
5    Q.   Okay.  Thank you.
6         If we look at Exhibit 91, it states --
7    MR. RUFF:  If we can get that one up there
8  please.  And looking at the bottom of
9  Page -- the first -- Page 1 of Exhibit 91, Jim.
10 Thank you.  Right there.
11 BY MR. RUFF:
12   Q.   And, again, if we need to establish
13 foundation on each and every one of the
14 Fidelity-produced documents, I will do so.  This
15 is an e-mail produced by Fidelity in response to
16 TRG's discovery requests in this matter,
17 correct?
18   A.   Yes.
19   Q.   At the time of this e-mail, we can
20 agree that Mr. Riordan was Fidelity's agent;
21 correct?
22   A.   Yes.
23   Q.   We can agree that the statement made
24 and the contents of the e-mail was made during

23

1  the course of Mr. Riordan's relationship with
2  Fidelity as its attorney, correct?
3    A.   Yes.
4    Q.   The subject matter relates to matters
5  within the scope of that agency, correct?
6    A.   Yes.
7    Q.   This is a document that was reviewed
8  and discussed with you in your deposition in a
9  personal and representative capacity, true?
10   A.   True, correct.
11   Q.   All right.  If we could go to the
12 bottom portion, the bottom e-mail here.  That's
13 from Gordon Goviea to Mr. Riordan on
14 February 5th, 2010; correct?  The first page of
15 that, sir?
16   A.   Yes, correct.  I'm sorry.
17   Q.   And it states, attached is a stip and
18 order regarding Montgomery -- excuse me.
19        Attached is the fully executed
20 stipulation and agreed order for modification of
21 plan injunction which I will deliver to the
22 court today and present at the omnibus hearing;
23 correct?  Page 1.
24   A.   Page 1, yes, correct.

24

1    Q.    Okay.  And if we can go to Page 2, this
2  is right at the top.  This is from Mr. Riordan
3  indicating, attached is the stip and order
4  regarding Montgomery stay relief which I have
5  signed for F&O; correct?
6    A.    Yes, sir, correct.
7    Q.    So the order was signed by Mr. Riordan,
8  and it was going to be presented at the hearing;
9  correct?
10    A.    Yes.  And I assume so, yes.
11    Q.    Okay.  You recall earlier when we
12  discussed drafts of the stipulation and notes in
13  the margin where the village raised a concern
14  that the surety might raise an argument that
15  discharge of Kimball Hill discharged the bonds.
16  Do you recall that discussion?
17    A.    Yes.
18    Q.    Okay.  And the surety was brought
19  into -- Mr. Riordan was brought into the -- into
20  the loop of those e-mails by the village in an
21  effort to prevent that argument from being
22  raised, true?
23    A.    Yes.
24    Q.    And after that concern was raised, that

25

1  wasn't pushed back on or no clarification was
2  sought by Mr. Riordan regarding that issue;
3  true?
4    A.    Correct.
5    Q.    And if he had -- he had the opportunity
6  if he wished at that point in time to say that
7  it was Fidelity's position that the discharge of
8  Kimball Hill discharged the bond.  That could
9  have been raised, correct?
10    A.    Correct.
11    Q.    And it wasn't raised, correct?
12    A.    Correct.
13    Q.    And you would agree that as of
14  February 5th, 2010, all the property at issue
15  was owned by the KHI trust?
16    A.    Correct.
17    Q.    Exhibit 92.
18    A.    Thank you.
19    Q.    We will get to Exhibit 92; but this is,
20  again, an e-mail produced by Fidelity in
21  response to TRG's discovery requests in this
22  matter; correct?
23    A.    Yes.
24    Q.    At the time of this e-mail, we can

26

1  agree that Mr. Riordan was Fidelity's agent;
2  correct?
3    A.    Yes.
4    Q.    We can agree that the statement made
5  and contents of the e-mail was made during the
6  course of Mr. Riordan's relationship with
7  Fidelity as its attorney, correct?
8    A.    Yes.
9    Q.    The subject matter relates to matters
10  within the scope of that agency, correct?
11    A.    Yes.
12    Q.    This is a document that was reviewed
13  and discussed by you in your deposition -- with
14  you in your deposition in your personal and
15  representative capacity, correct?
16    A.    Yes.
17    Q.    All right.  This is a February 25th,
18  2010 e-mail from Mr. Radtke with a stipulation.
19  For now, we're talking about the City of
20  Yorkville; correct?
21    A.    Yes, sir, that's correct.
22    Q.    There's five communities involved.
23  This is the second one we happen to be
24  discussing.  We already discussed Montgomery,

27

1  correct?
2    A.    Yes, sir, that's correct.
3    Q.    Okay.  And this would be similar with
4  what we went through with Montgomery, but now
5  with respect to the Yorkville bonds; right?
6    A.    Yes, that's correct.
7    Q.    Mr. Radtke writes, please review the
8  attached draft of a stipulation resolving the
9  United City of Yorkville's recent motion for
10  stay relief.  Did I read that correctly?
11    A.    Yes.
12    Q.    It is similar to the stipulation with
13  the Village of Montgomery that was entered by
14  the Court earlier this month but attempts to
15  acknowledge the key difference that Yorkville
16  did not file a claim for any damage relating to
17  the annexation agreement.  Did I read that
18  correctly?
19    A.    Yes.
20    Q.    If we look at Page 7 of the agreement,
21  Paragraph 6, this is the same stipulation we
22  talked about as the Montgomery; correct?
23    A.    Yes.
24    Q.    And this is Mr. Radtke submitting this

28

1   stipulation to among others Mr. Riordan for
2   comment and any potential revisions, correct?
3       A.   Yes.
4       Q.   Exhibit 93.  It's on both sides.  So
5   it's easier, one piece of paper, conserve a
6   little bit.
7           Exhibit 93 --
8       MR. RUFF:  Your Honor, do I -- should I go
9   through the foundation on every single one of
10  these now?
11      THE COURT:  No, I don't think we need to
12  unless we hear an objection from Mr. Riordan.
13      MR. RIORDAN:  Judge, I don't have any problem
14  with it.  I think if a particular document
15  requires an objection, I'll raise it at that
16  time; but we can proceed on that basis.
17      THE COURT:  Okay.  Thank you.
18      MR. RUFF:  I was just trying to avoid the
19  repetitive nature of that, your Honor.
20      THE COURT:  I appreciate that.
21      MR. RUFF:  Okay.
22  BY MR. RUFF:
23      Q.   All right.  Exhibit 93 is an e-mail
24  string that -- if we go to the bottom of the

                                                29

1   page on Page 1, we see that it starts on
2   February 25th, 2010.
3       MR. RUFF:  And then if you could scroll to
4   the top, Jim, just to show the Court the time
5   frame we're dealing with.
6   BY MR. RUFF:
7       Q.   Until February -- excuse me, until
8   April 8th, 2010; is that correct?
9       A.   Yes, sir, it is.
10      Q.   Okay.  Now on the bottom of this
11  e-mail, the string, we just went through this on
12  Exhibit 92, attaching the Yorkville stipulation
13  on the bottom of here.  And Yorkville has
14  returned the signed stip as we see in the middle
15  from Mr. Radtke to -- I need signatures to sign
16  stip from Mr. Lusignan, L-U-S-I-G-N-A-N.  The
17  signed stipulation is attached.  Do you need the
18  original?  Did I read that correctly?
19      A.   Yes, sir.
20      Q.   Okay.  Exhibit 94.  Thank you, sir.
21      A.   Thank you.  Thank you, sir.
22      Q.   Showing you Exhibit 94, this is an
23  e-mail exchange.  We'll go to the top,
24  Exhibit 94, Page 1.  April 16, 2010, this is now

                                                30

1   an exchange between Mr. Radtke, Mr. Riordan, and
2   Mr. Frieders about a Sugar Grove stipulation; is
3   that correct?
4       A.   Yes, sir, it is.
5       Q.   On all three of these stipulations,
6   Montgomery, Yorkville, Sugar Grove, Mr. Riordan
7   was involved in the discussions, negotiations,
8   and agreement on Fidelity's behalf; true?
9       A.   True, correct.
10      Q.   If we look at Page 8 of the Trial
11  Exhibit, Paragraph 6.
12      MR. RUFF:  I don't think you need to
13  highlight it, Jim.  Just get to that page so the
14  Court can see.
15  BY MR. RUFF:
16      Q.   Can we agree the language is identical
17  to the Montgomery and Yorkville stipulations?
18      A.   Yes.
19      Q.   Okay.  Exhibit 95.  On -- Exhibit 95.
20  Thank you, sir.
21      A.   Thank you.
22      Q.   This is the -- if we look at
23  Exhibit 95, Page 1, this is a -- an April 19th,
24  2010.  At the top -- can we see it?  Yes, we

                                                31

1   can.  Okay.  So the Court knows the date.
2           This is from Mr. Riordan.  Attached is
3   the Sugar Grove stip and order which I have
4   signed for F&D.  Did I read that correctly?
5       A.   Yes.
6       Q.   So if we look at Page 11 -- excuse me,
7   Page 12.
8       MR. RUFF:  Sorry, Jim.
9   BY MR. RUFF:
10      Q.   That's Mr. Riordan's signature.  Can we
11  agree?
12      A.   Yes.
13      Q.   All right.  Can we also agree that
14  Mr. Riordan's response returning the signed
15  Sugar Grove stipulation is made without any
16  revisions.  Please feel free to look through
17  here and see if you see any.
18          And I'll represent to you I didn't see
19  any, but feel free to correct me?
20      A.   You're correct.
21      Q.   Okay.  And Mr. Riordan on Fidelity's
22  behalf had the opportunity to now in its third
23  stipulation make any necessary changes,
24  revisions, clarifications that he felt were

                                                32

1 necessary.  Can we agree on that?
2     A.   Yes.
3     Q.   And he didn't make any on those two
4 prior -- on the two subsequent stipulations
5 after the first one, which Mr. Radtke responded
6 to and changed; correct?
7     A.   Correct.
8     Q.   At the time of all three of these
9 stipulations, all the property we're here today
10 about was still owned by the KHI trust.  Can we
11 agree?
12     A.   Yes, correct.
13     Q.   At no point during the negotiation of
14 the three stipulations did Mr. Riordan or
15 Fidelity raise with the municipalities or the
16 trustee that they intended to pursue subsequent
17 purchasers.  Can we agree with that?
18     A.   Correct.
19     Q.   Talk to you --
20     MR. RUFF:  Changing subjects for a moment
21 now, your Honor.
22 BY MR. RUFF:
23     Q.   Let me talk to you about the
24 Neumann Homes.  Prior to the Kimball Hill
                                              33

1 bankruptcy, Fidelity had been involved in the
2 Neumann Homes bankruptcy; correct?
3     A.   Yes.
4     MR. RIORDAN:  Judge, I'm going to raise a
5 relevancy objection to the -- raise a relevancy
6 objection to the Neumann Homes issues that he's
7 going to raise.  And I don't want to get up
8 after every question and raise a relevancy
9 objection.
10     So subject to the Court's ruling, of
11 course, I think this is completely irrelevant of
12 the matters before this Court.  What happened in
13 another case, what F&D did and did not do in
14 another case, what opportunities might have had
15 in another case have no bearing on the issues
16 that your Honor is to decide in this hearing.
17     THE COURT:  All right.  So I don't need a
18 response from the movant on this.
19     I'll preserve your objection for the
20 purposes of appeal.  The issues on relevancy, as
21 I said, in a bench trial will be determined by
22 the Court in its final determination.
23     So you don't need to respeak your
24 relevancy objection for --
                                              34

1     MR. RIORDAN:  And that was my point, Judge.
2 I didn't want to get up after every question.  I
3 just want to make sure that the Court agrees
4 that my objection is preserved for this whole
5 line the questioning.
6     THE COURT:  We'll just say it's an ongoing
7 objection with the line of questioning with
8 respect to --
9     MR. RIORDAN:  I may have different objections
10 to certain questions, but the relevancy
11 objection is kind of an overarching --
12     THE COURT:  Understood.
13     MR. RIORDAN:  Thank you, your Honor.
14     THE COURT:  You may proceed.
15     MR. RUFF:  Thank you, your Honor.
16 BY MR. RUFF:
17     Q.   In the Neumann Homes bankruptcy, there
18 was also a situation where there was a sale of
19 property from the debtor to a third party,
20 correct, a trust to a third party?
21     A.   Yes.
22     MR. RIORDAN:  Judge, I'm going to object to
23 the characterization that what he's talking
24 about was a sale.  It was a pushback order.
                                              35

1 Creditors took their collateral back, a sale in
2 that sense.
3     THE COURT:  Counsel, any response?
4     MR. RUFF:  I'm going to impeach
5 Mr. Riordan -- I mean, Mr. Kilburn on that very
6 explanation by Mr. Riordan.  He's certainly
7 allowed to do whatever he wants to do on
8 redirect, your Honor, or re-cross, however it's
9 termed; but in response to that very question,
10 Mr. Kilburn in his deposition said yes.
11     THE COURT:  All right.  Well, I'll allow you
12 to continue to use the term, sale, for the
13 purposes of your questioning without making any
14 conclusion as to the nature of the underlying
15 issue.
16     And of course, Mr. Riordan, when you
17 have your opportunity on cross, you'll go into
18 the issues.
19     MR. RIORDAN:  Thank you.
20 BY MR. RUFF:
21     Q.   You were the individual in charge of
22 overseeing Fidelity's responsibilities and
23 rights and obligations in the Neumann
24 bankruptcy, correct?
                                              36

1    A.   Yes.
2    Q.   You served in the same role in the
3 Neumann bankruptcy that you did in the
4 Kimball Hill bankruptcy?
5    A.   Yes.
6    Q.   And you would have been the Fidelity
7 representative responsible for signing off on
8 any agreed order or plan to the extent that it
9 was done, true?
10   A.   Yes.
11   Q.   And you would have been the
12 decisionmaker regarding -- regarding -- I'll
13 start the question over.  I apologize for the
14 stopping of my question, Mr. Kilburn.
15        And you would have been the decisionmaker
16 regarding any filing in the Neumann Homes
17 bankruptcy with the advice of counsel, correct?
18   A.   Yes.
19   Q.   Your knowledge of the Neumann
20 bankruptcy is focused on the same thing it was
21 in Kimball Hill, Fidelity's rights,
22 responsibilities, and obligations along with the
23 advice of counsel; agree?
24   A.   Yes.

37

1    Q.   And so this -- the process you used in
2 Kimball Hill is the same process that you --
3 that you used in the Neumann Homes bankruptcy.
4 You would have relied upon counsel to provide
5 you advice and offer opinions as to what should
6 be done or what responses should be made.  And
7 you would act on that advice, correct?
8    A.   Yes.
9    Q.   All right.  Exhibit 7 -- Exhibit 75
10 please.  It's on both sides just to conserve
11 paper.
12        All right.  If we can look at Exhibit 75,
13 Page 1.
14   MR. RUFF:  If we could just move it up just a
15 hair please.  Yeah.  I want to get that large
16 portion in there, Jim.  Right there.  Perfect.
17        Can you highlight the bolded
18 information up until we get to the paren
19 capital A?
20 BY MR. RUFF:
21   Q.   All right.  I'm going to show you that
22 this is a motion.  I'm going to read it.  Please
23 take notice that on March 31, 2008, Residential
24 Funding Company filed this motion to clarify the

38

1 order pursuant to 11 USC Section 105(a) 363,
2 365, and 506(a).  So far, have I read that
3 correctly?
4    A.   Yes, sir.
5    Q.   And Federal Rule Bankruptcy P2002,
6 6004 -- 6004, 6006, and 6007.  Did I read that
7 correctly?
8    A.   Yes.
9    Q.   Authorizing the applicable debtors to
10 sell to Residential Funding Company, LLC or its
11 designee.  Did I read that correctly, sir?
12   A.   Yes.
13   Q.   The word that RFC, the movant on this
14 motion, uses is sell; correct?
15   A.   Yes.
16   Q.   If we could look at Page 6 of the
17 motion.
18   MR. RUFF:  Paragraph 7 to start out with
19 please, Jim.
20 BY MR. RUFF:
21   Q.   Under relief requested, it states,
22 quote, by this motion, RFC seeks entry of an
23 amended version of the underdeveloped pushback
24 order substantially in the form attached as

39

1 Exhibit A, hereto which clarifies the term,
2 assumed liabilities under Paragraph 8 of the
3 undeveloped pushback order.
4        It does not include and neither RFC nor
5 its designee will affirmatively assume any
6 obligations or liabilities of any bonding
7 company or surety in respects of the assets,
8 paren, all such obligations, collectively the
9 bonding obligations, end paren.  Did I read that
10 correctly?
11   A.   Yes, sir.  I think the first
12 undeveloped you called it underdeveloped; but
13 other than that, yes.
14   Q.   Okay.  And then if we look at the first
15 introductory paragraph --
16   THE WITNESS:  Can we take a quick break?
17 BY MR. RUFF:
18   Q.   I don't mean to jump around on you,
19 but --
20   THE COURT:  Counsel, I'm sorry.  The witness
21 is asking for a break.  Is -- at this point --
22   MR. RUFF:  That's fine.
23   THE COURT:  We can take a short break?
24   MR. RUFF:  That's fine, your Honor.

40

1       THE COURT:  Okay.  So let's do this:  Let's
2  take a five -- five-plus minute break to allow
3  the parties to use the facilities.
4       And as a reminder, you remain under
5  oath during the break, Counsel --
6       THE WITNESS:  I understand.
7       THE COURT:  -- or Mr. Kilburn.
8            (Recess taken.)
9       THE COURT:  Okay.  Let's recall the matter
10  just for the record please.
11       THE CLERK:  Recall Kimball Hill, Inc.
12       THE COURT:  Okay.  And the witness is back on
13  the stand.  Reminder, you remain under oath.
14            Counsel, your witness.
15       MR. RUFF:  Thank you, your Honor.
16  BY MR. RUFF:
17       Q.   Just so we know where we left off, sir,
18  we were on Page 6 of Exhibit -- Trial Exhibit --
19  TRG Trial Exhibit 75.  We were discussing
20  Paragraph 7.  Do you recall that, sir?
21       A.   Yes.
22       Q.   All right.  So you agree that -- we'll
23  call them RFC is an entity that is a potential
24  purchaser of property from the bankruptcy estate

41

1  that's seeking to clarify whether an obligation
2  is owed to the surety company, correct?
3       A.   Yes.
4       Q.   You agree that based upon this, the
5  subsequent purchaser is seeking a clarification
6  as to what liability may exist to the surety,
7  correct?
8       A.   Yes.
9       Q.   And they are attempting to add --
10       MR. RUFF:  On Page 6, if we go to the bottom,
11  Jim, can you move that bolded paragraph?  And
12  where it's underlined, I'm going to ask to
13  please highlight for the Court.  Perfect.  Thank
14  you.
15  BY MR. RUFF:
16       Q.   The language that they are attempting
17  to add on Page 6 in the underlined sentence of
18  the blocked paragraph states -- they want to add
19  this in Paragraph 8:  For the avoidance of
20  doubt, the assumed liabilities do not include
21  any obligations or liabilities of bonding
22  companies or surety in respect of the assets
23  including, without limitation, any such
24  obligations or liabilities related to public

42

1  improvements thereon required to be made or paid
2  by any such bonding company or surety under
3  applicable law.  Did I read that correctly?
4       A.   Yes.  You just called company plural;
5  but yes, you did read correctly everything else.
6       Q.   Okay.  So the language they are seeking
7  to add is to clarify that assumed liabilities
8  does not include liabilities that a surety may
9  incur or may pay for public improvements, true?
10       A.   True.
11       Q.   So that entity had a question about
12  what an order meant and sought clarification
13  from the bankruptcy court, true?
14       A.   True.
15       Q.   Exhibit 77.  Thank you, sir.
16       A.   Thank you.
17       Q.   Exhibit 77 is from the Neumann
18  bankruptcy docket, bankruptcy file docket
19  No. 698.  Did you see that at the top, sir, 698?
20       A.   Yes.
21       Q.   Okay.  Dated April 7, 2008.  And it's
22  an objection of Fidelity --
23       MR. RUFF:  If we look down in the body here,
24  maybe we can highlight for the Court, Jim, just

43

1  again until we get to A, that -- that bolded
2  section until we get to A.  We don't need that
3  far.  Just up to the paren A, just like we did
4  before.  Perfect.  Thank you.
5  BY MR. RUFF:
6       Q.   This is an objection of Fidelity and
7  Deposit Company of Maryland to motion to clarify
8  order pursuant to 11 USC Sections 105(a),
9  et cetera; correct?
10       A.   Correct, sir.
11       Q.   So Fidelity in the Neumann Homes
12  bankruptcy that you were overseeing did file an
13  objection to that motion for clarification,
14  correct?
15       A.   Yes.
16       Q.   But if we look at -- I believe it's
17  Page 5 of the exhibit, we see the electronic
18  signature of Mr. Riordan; correct?
19       A.   Yes.
20       Q.   And your practice in overseeing the
21  Neumann litigation would have been to sign off
22  on this filing, correct?
23       A.   Yes.
24       Q.   So at this point in time, Fidelity and

44

1  you understood that you could file a written
2  objection if there were things that you
3  disagreed with in a court filing or in a motion
4  or in an order; correct?
5      A.  Yes.
6      Q.  If we look at Paragraph 1 on Page 2.
7  MR. RUFF:  Go to Page 2 please, Jim.
8  BY MR. RUFF:
9      Q.  It states on March 19th, 2008, this
10 Court entered the order authorizing the
11 applicable debtors to sell Residential Funding
12 Company, LLC or its designee, A, the remainder
13 of the debtor's real and personal property and
14 other assets subject to RFC's liens and
15 securities, interests related to -- and then it
16 lists a number of developments.  Did I read that
17 correctly?
18     A.  Yes.  You read it correctly.  You just
19 omitted the statutory reference.
20     Q.  For purposes of brevity.
21     A.  Yes, sir.
22     Q.  But you agree with that, correct, sir?
23     A.  Yes, you read it correctly.
24     Q.  The second paragraph, F&D states -- it

45

1  states, F&D provided subdivision improvement
2  bonds for the subdivisions commonly known as
3  new -- Neufairfield in Joliet, Illinois and
4  Chatham Grove in Aurora, Illinois.  Did I read
5  that correctly?
6      A.  Yes.
7      Q.  And then each of the bond names -- I'm
8  continuing reading, each bond names
9  Neumann Homes as principal and F&D as surety.
10 Did I read that correctly?
11     A.  No.  Neumann Homes, Incorporated.
12     Q.  Incorporated.  Did I read that
13 correctly now with that addition?
14     A.  Yes, sir.
15     Q.  And then each bond names Neumann
16 Homes, Inc. as principal and F&D as surety,
17 correct?
18     A.  Yes.
19     Q.  Paragraph 5 on that page, Page 3 on the
20 bottom is the argument portion of the objection
21 filed by Mr. Riordan.  Can we agree on that?
22     A.  Yes.
23     Q.  And Mr. Riordan on Fidelity's behalf
24 argues F&D -- for F&D -- or F&D agrees that the

46

1  term, assumed liabilities, in the above
2  provision does not include RFC's assumption on
3  F&D's bond, F&D's obligations under its
4  subdivision bonds.  Did I read that correctly?
5      A.  Yes.
6      Q.  It goes on, assumed liabilities does,
7  however, include RFC's assumption of the
8  obligations of NHI to pay all respective
9  construction and development-related
10 liabilities.  Did I read that correctly?
11     A.  Yes.
12     Q.  And then it states.
13 MR. RUFF:  And this goes on to the next page,
14 so.  Thanks, Jim.
15 BY MR. RUFF:
16     Q.  By assumption of such liabilities, RFC
17 has stepped into the shoes of NHI and must pay
18 for all of the construction and developmental
19 liabilities that NHI has undertaken in the
20 applicable annexation and development agreement
21 with Aurora, Illinois with respect to
22 Chatham Grove and with Joliet, Illinois with
23 respect to Newtenshire (phonetic).  Did I read
24 that correctly?

47

1      A.  Yes, sir, you did.
2      Q.  Okay.  Those assumed construction and
3  development liabilities include, but are not
4  limited to completion of streets, curbs, sewer,
5  and water lines in those subdivisions.  Did I
6  read that correctly?
7      A.  Yes.
8      Q.  And then Paragraph 7, the last
9  sentence, it says, RFC is -- I think there's a
10 misspelling in here.  It's supposed to be RFC is
11 required, and I think it's --
12     A.  It's twisted, yes, sir.  It's
13 perversed.
14     Q.  Yeah.  To pay for construction and
15 developmental liabilities of NHI in
16 Chatham Grove and New Stoneshire (phonetic).
17 Did I read that correctly?
18     A.  Yes.
19     Q.  Paragraph 8 in the middle states,
20 RFC -- are you with me, certainly knew that such
21 liabilities could include completion of public
22 improvements in the subdivisions for which it
23 had provided financing.  Did I read that
24 correctly?  I'm in Paragraph 8 right in the

48

1    middle.  RFC certainly knew, do you see that,
2    Page 4?
3        A.   Yes, you did.
4        Q.   Okay.  And then the objection to the
5    clarification is signed by Mr. Riordan on the
6    very next page.  Can we agree with that?
7        A.   Yes.
8        Q.   The argument of Fidelity at this point
9    is that in purchasing the property, the
10   purchaser from the bankruptcy estate assumed all
11   the obligations of your original principal for
12   completion of public improvements; correct?
13       A.   Yes.
14       Q.   And you oversaw and would have approved
15   of this objection at that time, correct?
16       A.   Yes.
17       Q.   And this is an objection that Fidelity
18   filed and a position that Fidelity advanced in
19   this bankruptcy estate one year before the
20   Kimball Hill bankruptcy, correct?
21       A.   Yes.
22       Q.   And the position advanced by Fidelity
23   at that point was that the purchaser from the
24   bankruptcy estate assumed the obligations of the

49

1    debtor and your principal as a result of that
2    purchase, correct?
3        A.   Correct.
4        Q.   Let's look at Exhibit 78.
5        A.   Thank you.
6        Q.   Exhibit 78.
7        MR. RUFF:  Jim, if we could do -- just
8    highlight the title portion up to A again like
9    you've done in the other two, amended order to
10   paren A.
11   BY MR. RUFF:
12       Q.   This is an amended order on RFC's
13   motion for clarification.  Can we agree on that?
14       A.   Yes.
15       Q.   If you look at the last page of this
16   order, it is actually Page 14.
17       MR. RUFF:  If you don't mind going to
18   Page 14, Jim.
19   BY MR. RUFF:
20       Q.   This is an order signed on April 15th,
21   2008 by the United States bankruptcy judge,
22   Judge Wedoff; correct?
23       A.   Yes.
24       MR. RUFF:  I hope I'm saying that correctly,

50

1    your Honor.
2        THE COURT:  You are.
3    BY MR. RUFF:
4        Q.   Now if you go back to Page 9,
5    two-thirds of the way down the page.
6        MR. RUFF:  And, Jim, I'm going to ask you to
7    highlight this and maybe bring it up for the
8    Court.  It starts with, for the avoidance.  Is
9    it possible to highlight that, for the
10   avoidance, that entire sentence?  It goes on for
11   four lines.
12   BY MR. RUFF:
13       Q.   For the avoidance of doubt, the assumed
14   liabilities do not include any obligations or
15   liabilities of any bonding company or surety in
16   respect of the assets including, without
17   limitation, any such obligations or liabilities
18   related to public improvements thereon required
19   to be made or paid for by any such bonding
20   company or surety under applicable law.  Did I
21   read that correctly?
22       A.   Yes.
23       Q.   We went through the proposed language
24   that was suggested by RFC, correct?

51

1        A.   Yes.
2        Q.   Okay.  And if we look at that language
3    and compare it to this language, that is the
4    exact language from the proposed addition by
5    RFC.  Can we agree on that?
6        A.   Yes.
7        Q.   The same language that Fidelity
8    objected to, correct?
9        A.   Yes.
10       Q.   And so Fidelity understood that upon
11   entry of this order, that the bankruptcy court
12   had overruled Fidelity's objection to that
13   language; correct?
14       A.   Yes.
15       Q.   This is just over two years before TRG
16   bought the property, correct?
17       A.   Yes, April 15, 2008.
18       Q.   It's a little over a year before
19   Fidelity started negotiating stipulations with
20   the municipalities, correct?
21       A.   Yes.
22       Q.   Fidelity never filed a lawsuit against
23   RFC, correct?
24       A.   Yes, correct.

52

1    Q.    Fidelity never sought to pursue any
2    subsequent purchaser of the property in the
3    Neumann bankruptcy, correct?
4    A.    Correct.
5    Q.    If we need to, I can pull it out; but
6    we already went through Exhibit 90.  If you need
7    to see it again, I can -- I can pull it out for
8    you, for the Court; but that was the final
9    version of the Montgomery stipulation that
10   formed the basis of the Yorkville and
11   Sugar Grove stipulations.  Do you recall me
12   going through that?
13   A.    Yes, sir, I do.
14   Q.    And this is almost -- so this order
15   that we're talking about by Judge Wedoff, the
16   stipulations that we went through in Exhibit 90
17   are almost two years and nine months after the
18   Neumann Homes motion for clarification and
19   objections and the order being entered; correct?
20   A.    Yes.
21   Q.    Fidelity was an active participant in
22   the negotiations of the stipulations in this
23   case, correct?
24   MR. RIORDAN:  Objection as to form, your

53

1    Honor.
2    THE COURT:  Counsel?
3    MR. RUFF:  I think it's --
4    MR. RIORDAN:  It's the term, active.  I think
5    that's a little argumentative, Judge.
6    MR. RUFF:  Okay.
7    THE COURT:  Can you rephrase please?
8    MR. RUFF:  I was trying to figure out what
9    was wrong.  So I can say it more mildly I guess,
10   your Honor.
11   BY MR. RUFF:
12   Q.    Fidelity was a participant in the
13   negotiations of the stipulations in this case,
14   correct?
15   A.    Yes, sir, correct.
16   Q.    And the language that was changed in
17   Paragraph 6 to clarify rights and obligations as
18   to third parties was made in this particular
19   case, correct?
20   A.    Yes.
21   Q.    And at the time the stipulations were
22   agreed to, you agree that the KH trust owned the
23   property?
24   A.    Yes.

54

1    Q.    Fidelity never sought clarification of
2    its rights with respect to property purchased by
3    third parties from the KH trust, correct?
4    A.    Correct.
5    Q.    Fidelity never sued the successor owner
6    in the Neumann bankruptcy, correct?
7    A.    Correct.
8    MR. RIORDAN:  Asked and answered, your Honor.
9    MR. RUFF:  Did I ask it?  I'm not sure if I
10   did.  I'm just trying to close the loop.
11   THE COURT:  Honestly, I can't recall whether
12   you asked it or not; but if counsel can give us
13   more --
14   MR. RIORDAN:  Judge, he asked it a couple of
15   times right after he finished his questioning
16   relating to the pushback order, the amended
17   pushback order.
18   MR. RUFF:  Or the sale order, depending upon
19   which side you're on.
20   THE COURT:  However you want to characterize
21   it.  It sounds as if Mr. Riordan may be correct
22   that you asked this question.  If you could move
23   on, Counsel.
24   MR. RUFF:  Okay.  So I'm assuming the answer

55

1    was yes.
2    BY MR. RUFF:
3    Q.    Fidelity has never sued any subsequent
4    purchaser of property other than related to the
5    Kimball Hill bankruptcy, isn't that true?
6    A.    True, correct, sir.
7    Q.    As a result of the Neumann bankruptcy,
8    Fidelity was required to pay 13 million dollars
9    to satisfy those bonds; correct?
10   A.    True, correct, sir.
11   Q.    After the stipulations were entered in
12   the Kimball Hill bankruptcy, there began a
13   period of time where municipalities would
14   default Kimball Him and then begin negotiations
15   with Fidelity regarding the bonds; correct?
16   A.    Yes, sir.
17   Q.    So you understood that when negotiating
18   the stipulations with the municipalities,
19   Fidelity understood that that was a step in the
20   process toward holding Kimball Hill in default
21   and seeking performance on the bonds; correct?
22   A.    Yes, sir.
23   Q.    Okay.  Exhibit 96.  Thank you.
24   A.    Thank you.

56

1    Q.   Thank you.  Showing you Exhibit 96, an
2 exchange of correspondence between counsel for
3 Elgin, Mr. Riordan, the City of Elgin, and the
4 trustee's attorney; correct?
5    A.   Yes.
6    Q.   All right.  If we look at the last page
7 of this exhibit, you see a letter notice, if we
8 could.
9    MR. RUFF:  And this is Page 3 of the exhibit,
10 your Honor.
11 BY MR. RUFF:
12    Q.   It's April 21, 2010.  It's a notice
13 from the City of Elgin to Mr. Riordan advising
14 Fidelity that Kimball Hill has failed to
15 complete certain improvements, correct?
16    A.   Yes.
17    Q.   And the letter makes a demand upon F&D
18 to perform all of its obligations under the
19 bond, correct?
20    A.   Yes.
21    Q.   At this point, the property at issue is
22 owned by the KH trust; correct?
23    A.   Yes.
24    Q.   And Mr. Moehlmann, M-O-E-H-L-M-A-N-N,

57

1 was also one of the -- one of the attorneys in
2 the Neumann bankruptcy; correct?
3    A.   Yes, sir, he was.
4    Q.   Here he's the attorney for Elgin,
5 correct?
6    A.   Yes, sir, correct.
7    Q.   If we look back on the first page, this
8 is an e-mail from Mr. Moehlmann at the top to
9 Mr. Radtke advising that his firm has been
10 retained by Elgin as special counsel to pursue
11 surety bond claims against Fidelity and Arch
12 Insurance; correct?
13    A.   Yes, sir, that's correct.
14    Q.   If we look toward the bottom of
15 page -- if we look at the second sentence.
16    MR. RUFF:  Jim, if you could highlight that,
17 starts with please forward.
18 BY MR. RUFF:
19    Q.   Mr. Moehlmann requested Mr. Radtke,
20 please forward to me the stipulations which you
21 had been negotiating with the sureties on
22 Kimball -- on the Kimball Hill projects in order
23 to lift the automatic stay to modify any
24 injunction or to gain whatever relief is

58

1 necessary to pursue these claims and complete
2 the public improvements.  Did I read that
3 correctly?
4    A.   Yes.
5    Q.   And on April 22nd, Mr. Moehlmann also
6 forwards -- it's at the top of the page, the
7 letter making the demands -- demand on the bonds
8 to counsel for the trustee and copies to
9 Mr. Riordan.  Did I read that correctly?
10    A.   Yes, sir, that's correct.
11    Q.   Okay.  And he attaches the letter that
12 I've already identified on Page 3, correct?
13    A.   Correct, sir.
14    Q.   He's declaring Kimball Hill in default
15 of its obligations in order to construct public
16 improvements and making a demand under the bonds
17 issued by Fidelity, is that true, sir?
18    A.   Correct, sir, that's true.
19    Q.   And then he says, we will now work on
20 an agreed order for the stay -- for stay relief
21 so that the work may proceed.  Did I read that
22 correctly?
23    A.   Yes.
24    Q.   So at this point, it was Fidelity's

59

1 understanding that Elgin was now going to work
2 on an agreed stipulation to allow it to pursue
3 Fidelity for the bonds; correct?
4    A.   Yes.
5    Q.   We're now 13 months past the entry of
6 the confirmation order, correct?
7    A.   Yes, sir.
8    Q.   All right.  Exhibit 97.  Thank you,
9 sir.
10    A.   Yes, sir.
11    Q.   All right.  This is another e-mail
12 exchange relating to Elgin's efforts to pursue
13 the bond, correct?
14    A.   Yes.
15    Q.   He sends an e-mail at the top on the
16 first page to Mr. Riordan, copies
17 to -- copies -- let's see here.  Yes, copied --
18 I don't know if it's on the top one or the
19 second one.  Do you see where you're copied on
20 that in the top third, sir?
21    MR. RUFF:  And just for the Court, if you
22 could blow this up even further; Jim.
23 BY MR. RUFF:
24    Q.   It says cc Gregory Kilburn.  You're

60

1  actually copied in this -- in this exchange, is
2  that correct?
3      A.  Yes, sir, I was.
4      Q.  Okay.
5      MR. RIORDAN:  I'd object, your Honor.  He's
6  copied on the second e-mail.
7      MR. RUFF:  I wasn't trying to say the first.
8  I was just -- I said part of the -- part of the
9  exchange.
10  BY MR. RUFF:
11     Q.  Mr. Moehlmann sends an e-mail to
12  Mr. Riordan and copies you regarding a meeting
13  with the City of Elgin, correct?
14     A.  Yes.
15     MR. RIORDAN:  Again, objection, your Honor.
16  There's no indication that I was -- that
17  Mr. Kilburn was copied on the e-mail from
18  Mr. Moehlmann to me.
19     THE COURT:  I couldn't tell if that's what
20  counsel was attempting to imply.  And if
21  the -- if the -- the section that's been blown
22  up, if we can get rid of that.
23     MR. RUFF:  Yes.  I'm sorry, your Honor.
24     THE COURT:  All right.  So I think this is
                                              61

1  clear on its face that the cc relates to an
2  underlying e-mail, not on the e-mail that is at
3  the top of this.
4      MR. RUFF:  Fine, your Honor.  And I'm not
5  trying to suggest something that isn't there.
6  BY MR. RUFF:
7      Q.  So if that's the case, the one before
8  it does indicate that there is going to be a
9  meeting.  And perhaps the one from Mr. Riordan
10  to Mr. Moehlmann, you were just forwarded the
11  one on the bottom it looks like?
12     A.  Yes, sir.
13     Q.  Okay.  It indicates here, however, that
14  we will meet under a full and complete
15  reservation of rights.  So Mr. Riordan is
16  indicating that he -- he is in agreement to go
17  to a meeting, correct?
18     A.  Yes, sir.
19     Q.  You understood at this point --
20     MR. RUFF:  And this is really the only
21  purpose of this, your Honor.
22  BY MR. RUFF:
23     Q.  Elgin was looking to Fidelity to
24  perform under the bonds with respect to the
                                              62

1  uncompleted work, correct?
2      A.  Yes, sir.
3      Q.  You agree on the top, it indicates, I
4  have received sample orders from Mr. Radtke.
5  Did I read that correctly?
6      A.  Yes, sir, you did.
7      Q.  Okay.  And it indicates right in the
8  sentence before that, we will work on an order
9  to modify the plan injunction; correct?
10     A.  Yes, sir.
11     Q.  Exhibit 98.
12     A.  Thank you.
13     Q.  Thank you.
14         This Exhibit 98 is dated April 28th,
15  2010.  It's a letter from Mr. Riordan.
16     MR. RUFF:  If we could show the whole thing
17  at first because Mr. -- I'm just going to show
18  the Court that Mr. Kilburn is actually cc'd on
19  this.  Can you highlight on the bottom
20  Mr. Kilburn please?
21  BY MR. RUFF:
22     Q.  That -- you are cc'd on this.  Can we
23  agree?
24     A.  Yes.
                                              63

1      MR. RUFF:  You can remove that, Jim.  Thank
2  you.
3  BY MR. RUFF:
4      Q.  And then Mr. Riordan is acknowledging
5  the claim and the demand letter that we spoke of
6  from Mr. Moehlmann.  Can we agree on that?
7      A.  From Mr. Evers, I believe.
8      Q.  Evers, the chief engineer, the city
9  engineer; correct?
10     A.  Yes, yes, sir.
11     Q.  But it's Elgin's claim, correct?
12     A.  Yes, sir.
13     Q.  Okay.  All right.  And if we go
14  to -- and I -- jumping back and forth, but if we
15  can go to 97 for one moment.
16         In Mr. Riordan's e-mail, he indicates,
17  so there is no misunderstanding, it is my
18  understanding from talking with counsel for the
19  liquidation trust, the claims of the bond
20  obligees are subject to the plan injunction.
21  Did I read that correctly?
22     A.  Yes.
23     Q.  Fidelity understood that this was the
24  case, true, that the claims of the bond obligees
                                              64

1  were subject to the plan injunction?
2      A.   Yes.
3      Q.   And Fidelity understood that any claim
4  that it performed under the bonds needed
5  permission of the bankruptcy court, correct?
6      A.   Yes.
7      Q.   Exhibit 99.
8      A.   Thank you.
9      Q.   Thank you.  It's a notice letter from
10 the village, Exhibit 99, from Anne Marie Gaura,
11 G-A-U-R-A; correct?
12     A.   Yes.
13     Q.   And attached to that is a notice from
14 the city pursuant to a stipulation.  It says on
15 Page 1, pursuant to the stipulation we discussed
16 earlier -- where is it?
17          Can we agree that Exhibit 99 is a
18 notice pursuant to the stipulation we've
19 discussed earlier for the village of Montgomery?
20     A.   Yes, sir, it is, along with a copy of
21 the resolution from the village trustees.
22     Q.   And it's -- the purpose is advising
23 Fidelity of the notice of default against
24 Kimball Hill in making a demand that Fidelity

65

1  perform on the bonds, correct?
2      A.   Correct, sir, yes.
3      Q.   You knew this was coming when
4  Kimball Hill went into bankruptcy, correct?
5      A.   Yes.
6      Q.   And during the time you were involved
7  in the negotiations, you knew that -- and
8  this -- per the stipulations, you knew that was
9  coming; correct?
10     A.   Yes.
11     Q.   And the acting village manager makes a
12 demand upon you, the surety, for the
13 above-referenced bonds to fulfill -- this is on
14 Page 2, from 1 to 2, demand is hereby made by
15 the village of Montgomery upon you, the surety,
16 for the above-referenced bonds to fulfill your
17 obligations under said bonds to complete the
18 reference public improvements contained within
19 said bonds and indemnify and save harmless the
20 village of Montgomery as obligee from all costs
21 and damage which it may suffer by reason of the
22 principal's failure to do so.  Have I read it
23 correctly up to that point?
24     A.   Up to that point, sir, yes.

66

1      Q.   Okay.  And to fully reimburse and pay
2  obligee for any outlay and expense which
3  shall -- it shall have incurred as a result of
4  the principal's default thereunder.  Did I read
5  that correctly?
6      A.   Yes.
7      Q.   The principal would have been
8  Kimball Hill, correct?
9      A.   Yes.
10     Q.   Exhibit 100.
11     A.   Thank you.
12     Q.   Thank you.  It's a letter from
13 Mr. Keith Mitchell, two pages, Trial
14 Exhibit 100, dated March 5th, 2010; correct?
15     A.   Yes.
16     Q.   And we can see that his title, as on
17 Page 2, is national director of community
18 development Kimball Hill Homes and authorized
19 signatory, KHI trust.  Did I read that
20 correctly?
21     A.   Yes.
22     Q.   And now this deals with Sugar Grove,
23 correct?
24     A.   Yes.

67

1      Q.   Okay.  And if we look at Page 2, we see
2  that Mr. Riordan is copied on this letter;
3  correct?
4      A.   Yes.
5      Q.   Therefore, Fidelity did receive through
6  its counsel a copy of this letter; correct?
7      A.   Yes.
8      Q.   And the letter advises of the sale of
9  the Sugar Grove property, is that correct?
10     A.   Yes.
11     Q.   And it states, Kimball Hill Homes and
12 the KHI trust have sold our remaining properties
13 in Settler Ridge -- Settlers Ridge to take TRG
14 Venture Two, LLC; correct?
15     A.   Yes.
16     Q.   So you understand that this was a sale
17 of property from the trust?
18     A.   Yes.
19     Q.   And you agree that the trust is subject
20 to the plan injunction regarding actions against
21 the trust?
22     A.   Yes.
23     Q.   The second paragraph states, pursuant
24 to Section J5 of the stipulation and agreed

68

1    order for modification of plan injunction
2    executed by the village, sureties in trust and
3    docketed on April 30th, 2010.  Did I read that
4    correctly?
5        A.   Yes.
6        Q.   And then it states that the village
7    shall -- and then it says, consult with the
8    trust administrator or their authorized
9    representatives before performing or requesting
10   the performance of any work that may be
11   reimbursable under the bonds or otherwise paid
12   by the sureties under the bonds and with respect
13   to going -- ongoing work related to the bonds
14   continue to involve all -- and provide all
15   reasonably requested information to this trust
16   administrators or authorized representatives.
17   Did I read that correctly?
18       A.   Yes.
19       Q.   And you don't know one way or another
20   whether the village called with the trust
21   administrators or their authorized
22   representatives before requesting TRG to perform
23   any work that was reimbursable under the bonds,
24   correct?

                                                69

1        A.   I have no idea.
2        Q.   You don't recall Fidelity ever
3    consulting with the trust administrators or
4    their authorized representatives before
5    requesting that TRG perform any work that was
6    reimbursable under the bonds, correct?
7        A.   Not that I can recall, that's correct.
8        Q.   And this letter dated May 5th, 2010
9    from Kimball Hill Homes, Keith Mitchell,
10   national director of community development,
11   Kimball Hill Homes authorized signatory, KHI
12   trust is to -- oh, excuse me.  I'm jumping
13   ahead.
14            Exhibit 101.  This is a similar demand
15   made to Yorkville, correct?
16       MR. RIORDAN:  I'm going to object to the form
17   and as to the word, demand.  I'm not really sure
18   this letter --
19       MR. RUFF:  Similar letter almost identical,
20   if not identical to what we just went through.
21   I was trying to save a little bit of time.
22       THE COURT:  So -- so you'll rephrase it,
23   Counsel?
24       MR. RUFF:  I'm sorry?

                                                70

1        THE COURT:  You're going to rephrase here?
2        MR. RUFF:  Sure, your Honor.
3        THE COURT:  Okay.
4    BY MR. RUFF:
5        Q.   This is a letter from Mr. Mitchell, who
6    we've already identified, to Mr. Bart Olsen to
7    the city administrator for the Village of
8    Yorkville; correct?
9        A.   Yes, sir.
10       Q.   Okay.  This advises Mr. Olsen of the
11   sale of the remaining properties in
12   whispering Meadows in Yorkville to TRG Ventures,
13   correct?
14       A.   Yes.
15       Q.   Okay.  And in the same language -- all
16   I was really trying to establish, the same
17   language about the village notifying the trust
18   administrator before requesting performance on
19   the bond is in the letter; correct?
20       A.   Yes.
21       Q.   Okay.  And the same with Sugar Grove.
22   Fidelity never consulted with the trust
23   administrators or their authorized
24   representatives before making a demand on TRG to

                                                71

1    perform work or to make a payment for work that
2    was being performed under the bonds, correct?
3        A.   Correct.
4        Q.   Same question regarding Yorkville.
5    Fidelity never consulted with the trust
6    administrators or their authorized
7    representatives before making a demand on TRG to
8    perform work or to make a payment for work that
9    was being performed under the bonds, correct?
10       A.   Correct, sir.
11       Q.   And we see on Page 2 that Mr. Riordan
12   is copied on that correspondence, correct?
13       A.   Correct, sir.
14       MR. RUFF:  Exhibit 102, your Honor.
15       THE WITNESS:  Thank you.
16   BY MR. RUFF:
17       Q.   Thank you.
18            Exhibit 102 is a letter dated May 11th,
19   2010 from Mr. Riordan to the acting village
20   manager at Montgomery; correct?
21       A.   Correct, sir, yes.
22       Q.   If we look on Page 2, Mr. Riordan signs
23   the letter; and you're cc'd, correct?
24       A.   Yes.

                                                72

1    Q.    And a few exhibits ago, Exhibit 99, we
2    saw Mr. -- excuse me, Ms. Gaura's demand for
3    performance on the bonds; correct?
4    A.    Yes.
5    Q.    This is Fidelity's response through its
6    counsel to that demand, correct?
7    A.    It's acknowledgement of receipt of the
8    demand, yes, sir.
9    Q.    Okay.  And in that response,
10   Mr. Riordan on behalf of Fidelity, advises that
11   he needs more information with respect to the
12   investigation; correct?
13   A.    Yes, sir.
14   Q.    Exhibit 103.  Thank you.
15   A.    Thank you.
16   MR. RUFF:  Exhibit 103, your Honor, is a
17   letter dated May 19th, 2010 from
18   Brent Eichelberger to a number of people.
19   BY MR. RUFF:
20   Q.    Correct?
21   A.    Yes.
22   Q.    On Page 3 of the document is a
23   resolution, Exhibit 103, Page 3 is a resolution
24   declaring a default against Sugar Grove property

73

1    by Kimball Hill related to the Sugar Grove
2    property; correct?
3    A.    Yes.
4    Q.    And the first two pages are the demand
5    by Sugar Grove to Fidelity that fulfill its
6    obligations under the bond, correct?
7    A.    Correct, sir, yes.
8    MR. RUFF:  If we look at the first page, if
9    we could, Jim.  Thank you.
10   There are a number of addressees on
11   there.
12   If we could just pull that up just a
13   little bit for his Honor.
14   BY MR. RUFF:
15   Q.    We see Mr. Riordan on the right-hand
16   side of that document.  He's one of the
17   addressees?
18   A.    Yes.
19   Q.    Okay.  Exhibit 104.  Thank you, sir.
20   A.    Thank you.
21   Q.    That's a letter from Mr. Riordan,
22   two-page document, May 24, 2010.  If you look on
23   the second page, it's Mr. Riordan; correct?
24   A.    Yes.

74

1    Q.    And you're cc'd on that, correct?
2    A.    Yes.
3    Q.    And this is a letter responding to the
4    demand by Sugar Grove, correct?
5    A.    Correct.  It is a -- an acknowledgment
6    of receipt of the demand by Sugar Grove.
7    Q.    And at this point in time, Fidelity was
8    aware that the property had been sold by the KHI
9    trust; correct?
10   A.    Correct, sir, yes.
11   Q.    Showing you Exhibit --
12   MR. RUFF:  I just want to back up one -- for
13   a second, Jim.  If we could go back, your Honor.
14   I don't mean to backtrack, but there's a point I
15   want to make on Exhibit 103 that I did not make.
16   Can we show the addressees again
17   please, Jim?  Pull those up for his Honor.
18   BY MR. RUFF:
19   Q.    On Exhibit 103, sir, none of the
20   addressees are TRG; isn't that correct?
21   A.    Correct, sir.
22   Q.    Or any TRG attorney, correct?
23   A.    Correct, sir.
24   Q.    Okay.  Exhibit 105.  Thank you, sir.

75

1    A.    Thank you.
2    Q.    Exhibit 105 is, again, Keith Mitchell
3    representative of KHI trust, a two-page letter,
4    May 5th, 2010.  Do you agree with me, sir?
5    A.    Yes.
6    Q.    All right.  This is the same
7    representative and the same type of form letter
8    we've seen before, correct?
9    A.    Yes.
10   Q.    All right.  Before it dealt with
11   Sugar Grove in Yorkville, but now we're dealing
12   with Montgomery; correct?
13   A.    Yes.
14   Q.    All right.  This advises Fidelity
15   through its counsel that the property to which
16   KHI trust owned in Montgomery had been sold to
17   TRG, correct?
18   A.    Yes.
19   Q.    And on Page 2, just so his Honor is
20   aware, again, Mr. Riordan is cc'd on that
21   letter; correct?
22   A.    Yes.
23   Q.    And, again, there's reference to the
24   stipulation language in this letter that

76

1    requires the village to consult with the trust
2    or trust administrators before performing or
3    requesting performance of work under the bond;
4    correct?
5        A.   Correct, sir.
6        Q.   And with respect to Montgomery,
7    Fidelity never consulted with the trust
8    administrator or authorized representative
9    before making a demand upon TRG to either
10   perform the work or reimburse Fidelity for any
11   work performed.  Can we agree on that?
12       A.   Correct, sir.
13       MR. RUFF:  Exhibit 106, your Honor.
14       THE WITNESS:  Thank you.
15   BY MR. RUFF:
16       Q.   Thank you.  Okay.  This is Exhibit 106.
17   It's dated February 10th, 2011 from Mr. Riordan
18   to Nancy Roman in Shorewood regarding Edgewater
19   subdivision; correct?
20       A.   Yes.
21       Q.   He acknowledges receipt of the
22   November 2nd, 2010 letter to F&D and a copy of
23   the village resolution where the village made a
24   demand upon F&D with respect to the subdivision

                                                    77

1    bonds; is that right?
2        A.   Correct.
3        Q.   And Mr. Riordan indicates that he
4    needed additional information in order to
5    complete Fidelity's investigation regarding that
6    request, true?
7        A.   True, sir.
8        Q.   And on Page 2, it references the
9    retention of an engineering consultant to assist
10   in the investigation; correct?
11       A.   Correct, sir.
12       Q.   And that is Mr. Carlino, correct?
13       A.   Correct, sir, C-A-R-L-I-N-O, Steven.
14       Q.   Correct.  Thank you.
15            Fidelity was investigating a bond request
16   and making an assessment as to what the work would
17   cost to complete and hired an outside consultant
18   to analyze the cost to complete bond impacts,
19   correct.
20       A.   Correct, sir.
21       Q.   This is now ten months after the
22   stipulations were entered that allowed
23   municipalities to begin the process of moving
24   against the bonds, correct?

                                                    78

1        A.   Yes, sir.
2        Q.   At this point in time, Fidelity was
3    trying to get a sense of how much it was, for
4    lack of a better term, on the hook for bonded
5    improvements that its principal, Kimball Hill,
6    had defaulted on; agree?
7        A.   We were trying to determine what our
8    exposure was, which we felt was the prudent
9    thing to do.
10       Q.   So you were looking at financial
11   exposure, correct?
12       A.   Yes.
13       Q.   Showing you Exhibit 107.  Thank you,
14   sir.
15       A.   Thank you, sir.
16       Q.   Exhibit 107, it's a letter dated -- to
17   you; correct?
18       A.   Yes.
19       Q.   February 23rd, 2011?
20       A.   Yes.
21       Q.   From the United City of Yorkville,
22   correct?
23       A.   Yes.
24       Q.   From a Joseph Wywrot, correct?

                                                    79

1        A.   Yes.
2        Q.   He advises that at their meetings on
3    February 22nd, the Yorkville city council voted
4    to call the referenced performance bonds for
5    whispering Meadows subdivision; correct?
6        A.   Units -- Whispering Meadows subdivision
7    Units 1 and 2.
8        Q.   I didn't put in 1 and 2.  So with that
9    caveat, would you agree with my sentence -- with
10   my question?
11       A.   Yes, I would, yes.
12       Q.   And he attaches a punch list.
13       MR. RUFF:  So if could show his Honor, Jim,
14   Pages 2, 3, and 4 attaches a punch list of items
15   of work that needs to be performing; correct?
16       MR. RIORDAN:  Judge, I am going to object.  I
17   don't know that there's any foundation to show
18   that this is a punch list.  I personally know
19   what it is from the state court cases, but --
20       THE COURT:  Counsel, response?
21       MR. RUFF:  when I asked this identical
22   question in his deposition as representative of
23   Fidelity, he said, yes, sir, he did.  I used the
24   exact terminology.

                                                    80

1    THE COURT:  Right.  I think the -- I think
2    the objection is different, though.  The
3    question was not -- he's not objecting to your
4    form of question.  He's objecting to the
5    foundation of the underlying documents that
6    you're inquiring as to.
7        MR. RIORDAN:  Your Honor --
8        THE COURT:  Do you raise foundational
9    objections at a deposition?
10       MR. RIORDAN:  Well, I don't remember, Judge
11   if I did.
12       MR. RUFF:  He did not.
13       THE COURT:  Okay.  But, again, I'm not sure
14   that -- like I said, I don't believe that
15   there's a duty to object to foundation of
16   exhibits to use at a deposition.  You can
17   use --
18       MR. RUFF:  No.  On the trial exhibit list.
19       THE COURT:  Oh, I see.  All right.  So
20   that -- that actually is a good response.  And
21   that is, per our pretrial order, the failure to
22   raise objections on those grounds constitutes a
23   waiver of those objections.  And so I will
24   overrule the objection and allow you to proceed.

81

1        MR. RIORDAN:  Thank you, your Honor.
2        MR. RUFF:  Can we go, Jim, please to Page 1
3    of the exhibit again please?  Would you please
4    highlight one word for me, Jim?  It's in the
5    second paragraph.  It says -- just one word I
6    want there, punch -- these punch lists.  Would
7    you highlight punch lists please?
8    BY MR. RUFF:
9        Q.   Sir, Mr. Wywrot attached a punch list
10   of work that needed to be performed; correct?
11       A.   Yes.  He attached an engineer's
12   estimate or opinion of probable construction
13   cost.
14       Q.   Okay.  Page 145, Lines 22 through 24
15   please.  Page 145, Jim, Lines 22 through 24
16   please.  I'm sorry if I rattled it off fast.
17       MR. RIORDAN:  What was that again?  I'm
18   sorry.
19       MR. RUFF:  145, Lines 22 through 24.
20       MR. RIORDAN:  Thank you.
21            (whereupon, the following was an
22            audio recording.)
23       Q.   And he attached a punch list of work
24   that needed to be performed, correct?

82

1        A.   Yes, sir, he did.
2            (whereupon, the audio recording
3             concluded.)
4    BY MR. RUFF:
5        Q.   Sir, were you asked that question, and
6    did you give that response?
7        A.   Yes.
8        Q.   Okay.
9        MR. RIORDAN:  Judge, I will note that in his
10   prior answer, he was reading the title of the
11   document that counsel pointed him to.  So I
12   don't believe that's proper impeachment.
13       THE COURT:  All right.  Well, once again,
14   I'll allow you to proceed on these lines; but
15   Counsel, you may certainly address this on
16   cross.
17   BY MR. RUFF:
18       Q.   The total amount of work that Yorkville
19   indicated needed to be performed pursuant to the
20   Fidelity bonds was set forth --
21       MR. RUFF:  If we could, Page -- you got the
22   right page there, Jim.  Hold on just one second.
23   If you could go to the last page please, Jim,
24   the total amount.  Thank you.  And if you could

83

1    highlight, which is hard to read -- I mean, bold
2    it -- I mean, blow it up.  There we go.
3    BY MR. RUFF:
4        Q.   The total amount of work that Yorkville
5    indicated needed to be performed pursuant to the
6    Fidelity bonds was $2,875,447.30; correct?
7        A.   Correct, sir.
8        Q.   And at this point in time, Fidelity had
9    retained Mr. Carlino to take a look and see if
10   these numbers added up and assess what
11   Fidelity's exposure was; agreed?
12       A.   Agreed, sir.
13       Q.   Exhibit 108 please.  Thank you.
14       A.   Thank you.
15       Q.   Exhibit 108 is a letter from
16   Mr. Riordan, a two-page letter, you're carbon
17   copied on the second page.  Can we agree you're
18   carbon copied?
19       A.   Yes, sir, I was.
20       MR. RUFF:  All right.  And then back to
21   Page 1 please, Jim.  Thank you for doing that.
22   BY MR. RUFF:
23       Q.   March 16th, 2011 is the date of the
24   letter; correct?

84

1    A.   Yes, sir, it was.
2    Q.   This is Mr. Riordan responding to
3  Yorkville's demand regarding the bonds on the
4  Whispering Meadows property, correct?
5    A.   Correct, sir.  He was acknowledging
6  receipt and also pointing out pertinent language
7  to the -- in the bonds.
8    Q.   At this point in time, Fidelity was
9  still attempting to assess its exposure related
10  to work that Kimball Hill had not performed on
11  those bonds; is that fair?
12    A.   Yes, sir, that's fair.
13    Q.   All right.  Exhibit 109 please.
14    MR. RUFF:  This is small, your Honor.  So a
15  lot of this will have to be blown up.  It's just
16  the way it was produced.  Exhibit 109.
17        Wait, Bonnie, I think we missed one.
18  Maybe it was me.  I think you handed -- I handed
19  the witness 110.  Do you have this one?
20        We handed the witness the wrong
21  exhibit, your Honor.  We handed him the next
22  exhibit.
23  BY MR. RUFF:
24    Q.   If I could, I'll just give you mine

85

1  with highlights if you don't mind that, sir.  Is
2  that okay?
3    A.   No, that's fine.
4    Q.   Okay.  Exhibit 109.
5    A.   Thank you.
6    Q.   That's -- Exhibit 109 is a letter dated
7  August 11th, 2011 from Mr. Riordan to
8  Nancy Roman for the Village of Shorewood;
9  correct?
10    A.   Correct, sir.
11    Q.   And then we see on Page 2 of that
12  document -- and this is, again, Mr. Riordan's
13  letter; and you're cc'd on that.  Can we agree?
14    A.   Yes.
15    Q.   Okay.  And the second page first
16  sentence states, pursuant to the terms and
17  conditions of the annexation agreement, the
18  owners and successor owners agree to construct
19  certain public improvements for Edgewater
20  subdivision.  Did I read that correctly?
21    A.   Yes.
22    Q.   And the language from the annexation
23  agreement is cited, and some of it is in black
24  quotes.  Do you see that?

86

1    A.   Yes.
2    Q.   Okay.  Fidelity is arguing in this
3  response that acquiring the property by TRG
4  released Fidelity's obligations under the bonds,
5  correct?
6    A.   Correct.
7    Q.   This concept of the release of bonds by
8  the acquisition -- by acquisition of the
9  property by a subsequent purchaser wasn't raised
10  in connection with any of the stipulations that
11  had been entered a year and a half before,
12  correct?
13    A.   Correct, sir.
14    Q.   On the third page of this document, the
15  first full paragraph says, the surety is only
16  liable to the extent its principal is liable.
17  Did I read that correctly?
18    A.   Yes.
19    Q.   Then it states, the next sentence, no
20  suit on a surety bond can be maintained against
21  the surety unless it could have been maintained
22  against the principal as well.  Did I read that
23  correctly?
24    A.   Correct.

87

1    Q.   Fidelity knew since the bankruptcy
2  action was filed almost three years before this
3  letter by Mr. Riordan that no suit could be
4  maintained against Kimball Hill regarding these
5  improvements, correct?
6    A.   Kimball Hill was out of business.  So
7  the answer is yes.
8    Q.   Okay.  And in negotiations of the
9  stipulations, one of the issues that was raised
10  was a concern that Fidelity might claim that the
11  discharge of Kimball Hill acted as a discharge
12  of Fidelity's obligations under the bonds.  Do
13  you recall that, sir?
14    A.   Yes, sir.
15    Q.   And the village wanted to make sure
16  this wasn't the case.  And Mr. Riordan didn't
17  ask for any clarification or additional language
18  in any of those stipulations, correct?
19    A.   Correct, sir.
20    Q.   You don't recall if Fidelity ever
21  reviewed any purchase agreement between the
22  trust and TRG to see if the bonds were
23  addressed, correct?
24    A.   I don't recall one way or the other.

88

1    Q.   Your counsel had an appearance on file
2  in the bankruptcy proceedings and full access to
3  the entire docket, correct?
4    A.   Yes.
5    Q.   You don't know whether your counsel or
6  Fidelity ever reviewed the purchase and sale
7  agreements related to the properties acquired by
8  TRG before making the assertion that TRG was
9  responsible for the bonded obligations, correct?
10    A.   Correct.
11    Q.   There are two bases in your letter for
12  Fidelity's denial; one, your position that TRG
13  assumed responsibility for the bond and
14  improvements based upon the language in the
15  annexation agreement, correct?
16    A.   Correct.  It was a covenant of record
17  which ran with the land.
18    MR. RUFF:  Move to strike everything after
19  yes, your Honor.
20    THE COURT:  It's stricken.  I think that that
21  was a yes or no question.
22    And I'll advise the witness to please
23  attempt to answer yes or no.  You've got
24  opportunity with your counsel to provide

                                          89

1  clarification.
2    THE WITNESS:  Yes, sir.
3  BY MR. RUFF:
4    Q.   And the other was that a release of the
5  principal, Kimball Hill, Fidelity is released
6  from any obligation under the bond; correct?
7    A.   Yes, sir.
8    Q.   And on Page 3 of Mr. Riordan's letter,
9  he cites the 1986 case, correct?
10    A.   Correct, sir.
11    Q.   And 1986 was before the Neumann
12  bankruptcy, correct?
13    A.   Yes, sir.
14    Q.   And Neumann Homes Fidelity paid,
15  correct?
16    A.   Yes, sir.
17    Q.   Fidelity didn't sue or test the theory
18  that the surety is released when the principal
19  is released in that Neumann bankruptcy action,
20  correct?
21    A.   Correct, sir.
22    Q.   And the time that the stipulations were
23  entered into with the municipalities in
24  Kimball Hill, allowing those municipalities to

                                          90

1  call the bonds and declare Kimball Hill in
2  default, the properties were owned by the trust;
3  correct, sir?
4    A.   Correct, sir.
5    Q.   Fidelity already had a contingent claim
6  for 38 million dollars plus in the bankruptcy
7  proceedings against the trust, correct?
8    A.   Correct, sir.
9    MR. RUFF:  Your Honor, I'm about to move to a
10  topic on -- I don't know what the timing is.
11  I'm just apprising the Court that pursuant to
12  your direction at the beginning, I'm moving to a
13  new area.  I'm moving on rather quickly now, but
14  this is a new topic area.
15    THE COURT:  It is a new topic area, and
16  you're right about the timing.  We've
17  been -- the witness has been on the stand
18  approximately an hour.  I think it might be a
19  good point to take a five-minute break and let
20  the parties use the facilities.
21    A reminder, you remain under oath.
22    THE WITNESS:  Yes, your Honor.
23    THE COURT:  All right.  Let's take a break.
24    (Recess taken.)

                                          91

1    THE COURT:  All right.  Let's call the matter
2  back for the record please.
3    THE CLERK:  Okay.  Kimball Hill, Inc.
4    THE COURT:  All right.  Counsel, before you
5  begin, just -- just checking in with you on
6  timing.  I know you had a timing that you had
7  assumed at the beginning of the matter.  Are we
8  on par with what you'd expected us to be at this
9  point, running behind, running ahead?
10    MR. RUFF:  Running behind, but I hope the
11  remainder is the homestretch.  I had a bunch of
12  documents that I had to go through.  So it was a
13  little bit of a -- slow at the start, but I had
14  to go through the documents.
15    THE COURT:  All right.  Would you think --
16  what --
17    MR. RUFF:  I'm hoping to finish him by today.
18  And then also if there's no redirect or
19  whatever, we do have time for -- I mean,
20  Mr. Teteak is available.
21    So I still think we could put our three
22  witnesses on tomorrow.  That's -- you know, we
23  don't intend to be long with Mr. Teteak, our
24  expert.  Mr. Kyte may take some time in the

                                          92

1  afternoon tomorrow, but I'm still hopeful to
2  give it another two days.
3      THE COURT:  All right.  So you -- but you do
4  think that you'll be -- at the very least,
5  you'll be able to finish with the witness and
6  have an opportunity for cross today?
7      MR. RIORDAN:  Well, we talked about the idea
8  of my reserving him until my case.  He's on our
9  witness list.
10     THE COURT:  Right.  You can certainly do
11 that, and I sometimes advise parties to do that.
12 In a bench trial, there isn't going to be a
13 motion for --
14     MR. RIORDAN:  Directed finding.
15     THE COURT:  -- directed finding because
16 there's -- is that it's a partial finding.  And
17 if you read the section, it says, I can wait
18 until the presentation of all the evidence,
19 which I always do.  So you're going to get
20 through your cases no matter what.
21     MR. RIORDAN:  And that might work better
22 because that will give me time to go back and
23 look at things and maybe synthesize things a
24 little better.

                                            93

1      THE COURT:  Okay.
2      MR. RIORDAN:  So it might be long at the end.
3      THE COURT:  Okay.  Well, if you do hold your
4  cross for part of your -- for essentially the
5  direct on your defense or on your response, then
6  that will mean, of course, that you'll be doing
7  both essentially a redirect and a cross when
8  you're up again.
9      MR. RUFF:  That -- I would -- there's not
10 going to be repetition from me.  There's -- so I
11 can tell the Court that right now.
12     THE COURT:  Well, that makes it -- I guess
13 where I was heading with this is that it makes
14 it unlikely that I would ask the plaintiff or
15 permit the plaintiff to present a rebuttal case
16 in and of itself since you'll have built that
17 into your -- some civil trials, as you know --
18     MR. RUFF:  No.  I get it.
19     THE COURT:  -- plaintiff goes, then the
20 defense goes, then the plaintiff comes back
21 again.  If you're going to get it all taken care
22 of --
23     MR. RUFF:  I think we're going to get it all
24 taken care of.

                                            94

1      THE COURT:  Okay.  All right.  That's all I
2  wanted to know.  Let's -- let's have on with it.
3      MR. RUFF:  Thank you, your Honor.
4  BY MR. RUFF:
5      Q.  Sir, Fidelity decided to initiate state
6  court actions against TRG after a claim
7  committee meeting in May of 2011; correct?
8      A.  May I have the question back again?
9      MR. RUFF:  I can repeat it.  You don't have
10 to read it back.  I can repeat it.
11 BY MR. RUFF:
12     Q.  Fidelity decided to initiate state
13 court actions against TRG after a claim
14 committee meeting by Fidelity in May of 2011,
15 correct?
16     A.  Yes, among other things.
17     Q.  And as of May of 2011 -- May of 2011,
18 just during the period of time where Fidelity
19 was evaluating its exposure or potential
20 exposure related to the bonds that have been
21 called by the various municipalities; correct?
22     A.  Correct, sir.
23     Q.  And at some point during the process,
24 Fidelity began contemplating the possibility of

                                            95

1  suing the successor owner, correct?
2      A.  Correct, sir.
3      Q.  We saw in the objection that
4  Mr. Riordan filed in the Neumann bankruptcy that
5  filing sued against the successor owner was one
6  of the arguments he made in that Neumann case,
7  correct?
8      MR. RIORDAN:  Objection to characterization
9  of the document, your Honor.
10     THE COURT:  Counsel, response?
11     MR. RUFF:  I don't think it is.  I think I've
12 got an answer very similar to this.  It's a play
13 into the rest of the questions.
14     THE COURT:  All right.  Well, subject to my
15 making that determination when I do look at the
16 evidence at the end of trial, I'll allow you to
17 proceed.
18     THE WITNESS:  May I have your question again
19 please?
20 BY MR. RUFF:
21     Q.  Yes, sir.  We saw in the objection that
22 Mr. Riordan filed in the Neumann bankruptcy that
23 filing suit against the successor owner was one
24 of the arguments he made.  We went through that

                                            96

1 earlier today, correct?
2    A.   Correct, sir. We did and the
3 clarification motion that RFC had requested.
4    Q.   Thank you. That's exactly right.
5    The purpose of the Fidelity claims
6 committee was to discuss counsel's reports and
7 recommendations, correct?
8    A.   Correct, sir, that's fair.
9    Q.   Based upon the claims committee meeting
10 in May of 2011, a decision was made to reject
11 the claims of the municipalities and pursue TRG;
12 correct?
13    A.   Correct, sir.
14    Q.   In that meeting, the issue of the
15 successor claim was discussed; and it was
16 decided that Fidelity would deny the claims
17 based upon the terms in the annexation
18 agreement, correct?
19    A.   Correct, sir, among other things
20 depending on each individual one.
21    Q.   Apart from the annexation agreement,
22 Fidelity relied upon case law from Mr. Riordan
23 outlined to support once the principal is
24 released, the surety's liability is coextensive
97

1 with that of the principal; correct?
2    A.   Case law that you've recited as well as
3 case law supporting the concept of the successor
4 in title claim that -- that we can --
5    Q.   Right, but I'm talking about -- we
6 talked about one portion about the annexation
7 agreement. Now I'm talking about the -- apart
8 from the annexation agreement, Fidelity relied
9 upon case law that Mr. Riordan outlined in
10 support -- to support once the principal is
11 released, the surety's liability is coextensive
12 with that of the principal. That's what we saw
13 in that letter, correct?
14    A.   Correct, sir, yes, sir.
15    Q.   Okay. And we saw one case cited. I
16 mentioned to the Court and you that it was a
17 1986 case. Do you remember that?
18    A.   Yes, sir, I do.
19    Q.   Okay. And you don't know one way or
20 the other whether -- if that case
21 analyzed -- that case law analyzed that issue in
22 light of bankruptcy proceedings, correct?
23    A.   Correct, sir, I do not.
24    Q.   That could have been a situation where
98

1 one solvent entity sold to another solvent
2 entity, true?
3    MR. RIORDAN: Calls for speculation on the
4 part of the witness, your Honor.
5    THE COURT: I'll sustain that.
6    Counsel, rephrase please.
7 BY MR. RUFF:
8    Q.   Okay. You don't know the holding of
9 that case. You don't know the exact status of
10 one entity selling to another entity selling in
11 that particular case, true?
12    MR. RIORDAN: Object to the form, your Honor.
13 I'm not sure what he's talking about in terms of
14 status.
15    MR. RUFF: Whether they're solvent or not.
16    MR. RIORDAN: It's also a compound question
17 as well.
18    THE COURT: It is a bit. Try to unpack it a
19 bit for me, Counsel.
20    MR. RUFF: Okay.
21 BY MR. RUFF:
22    Q.   We talked about the 1986 case, right?
23    A.   Yes, sir.
24    Q.   And we -- and you don't know if that
99

1 case was analyzed in light of a bankruptcy
2 proceeding, right?
3    A.   Correct, sir.
4    Q.   And if it wasn't in a bankruptcy
5 proceeding, it could be two solvent entities
6 selling property; correct?
7    A.   It could be.
8    MR. RIORDAN: Object to form again, your
9 Honor.
10    MR. RUFF: I think there was an answer there,
11 your Honor.
12    MR. RIORDAN: It was, it could be. I mean,
13 he's acting in the -- asking the subjunctive,
14 not what he knew, but what could be in the case.
15    THE COURT: Well, we are -- well, we do fall
16 under the realm of anything is possible, I
17 suppose; but I think we got an answer to that
18 one. I think the question is sufficiently clear
19 in the circumstances. I'll allow you to
20 proceed.
21    MR. RUFF: Okay. We did get an answer?
22    THE COURT: I heard an answer. I don't know
23 if the court reporter heard an answer.
24    THE WITNESS: Go ahead.
100

1    THE COURT: Did the court reporter hear an
2  answer to that question?
3          (Record read as requested.)
4    THE COURT: All right. That's the answer we
5  received. So equally equivocal. Okay.
6  BY MR. RUFF:
7    Q.  You would agree that through -- that in
8  this case, the property passed through a
9  bankruptcy court; correct?
10   A.  Yes, sir, from the trust.
11   Q.  Okay. In deciding whether to reject
12 the claims, Fidelity considered the terms of the
13 confirmation order and orders in the bankruptcy
14 proceedings; correct?
15   A.  I don't recall if we did or not.
16 That's something we would have received
17 information from counsel about.
18   Q.  In deciding whether to reject the
19 claims, Fidelity considered the terms of the
20 confirmation order or any order in the
21 bankruptcy proceeding through its counsel;
22 correct?
23   A.  Through its counsel, yes, sir.
24   Q.  I already handed you Exhibit 110.

101

1    A.  Yes, sir.
2    MR. RUFF: If you could bring that up please,
3  Jim.
4          And this is the one I was cautioning
5  your Honor that it's -- it's really small print.
6  That's the way it was produced. We're going to
7  have to blow this up; but essentially, this is
8  an e-mail --
9          If you can -- yeah, there. That's
10 better. Thank you, Jim.
11 BY MR. RUFF:
12   Q.  It's an e-mail from David Guest to
13 Robert Lawrence and you from or at -- near the
14 time of your claims committee meeting, correct?
15   A.  Yes, it is.
16   Q.  And we see June 27th, 2011; correct?
17   A.  Yes, sir, we do.
18   Q.  This discusses some of the conclusions
19 and analysis that you at Fidelity went through
20 in its deliberative process, correct?
21   A.  Correct, sir, it does.
22   Q.  It states in the second paragraph, KHI
23 sold its interest in the subdivisions to a third
24 party. Do you see that in the first sentence

102

1  there?
2    A.  Yes, sir, I do.
3    Q.  Okay. Kimball Hill, Inc. did not sell
4  property to TRG; correct?
5    A.  You are correct, sir.
6    Q.  The next sentence says, KHI was a party
7  to the annexation agreement with each obligee;
8  is that correct?
9    A.  Yes, sir, that's what it says.
10   Q.  Okay. It is not his belief that
11 Kimball Hill trust was a party to the annexation
12 agreement, is that correct?
13   A.  Say that again please, sir.
14   Q.  Let's see. It's not Fidelity's belief
15 that the Kimball Hill trust was a party to the
16 annexation agreement, correct?
17   A.  You are correct, sir. They were not.
18   Q.  And we could agree that Kimball Hill
19 trust was not a party to any annexation
20 agreement, correct?
21   A.  You are correct, sir. They were not.
22   Q.  And we can agree that Kimball
23 Hill, Inc. didn't sell anything to TRG; correct?
24   A.  You are correct, sir. We can agree to

103

1  that.
2    Q.  We can agree that Kimball Hill, Inc.'s
3  assets were transferred into the Kimball Hill
4  trust; correct?
5    A.  Correct, sir.
6    Q.  And that -- and that the Kimball Hill
7  trust is the entity that sold the property,
8  agreed?
9    A.  Agreed, sir, correct.
10   MR. RUFF: Okay. The next sentence, if you
11 can highlight that each. Thank you, Jim.
12 BY MR. RUFF:
13   Q.  Each agreement contained provisions
14 that in the event that title to the property was
15 conveyed from KHI to a third party, the third
16 party assumes all the obligations under KHI
17 under the agreement including the installation
18 of public improvements in the subdivision. Did
19 I read that correctly?
20   A.  Yes, sir, you did.
21   Q.  And that's a summary of your, meaning
22 you and Fidelity's, basis for Fidelity's belief
23 that TRG assumed responsibilities by virtue of
24 acquiring the property; correct?

104

1     A.   In addition to the information that we
2  received from counsel, correct, sir.
3     Q.   And it goes on further and states that
4  the new owner assumed the obligation to provide
5  a subdivision bond or other security, correct?
6     A.   Correct, sir.
7     Q.   You never considered the actual sale
8  agreement involving TRG property when deciding
9  whether or not TRG had an obligation as a
10  successor, correct?
11     A.   Correct, sir.
12     Q.   Fidelity -- Fidelity does not believe
13  that TRG is a successor to the debtor, correct?
14     A.   Correct, sir.
15     Q.   You reached that conclusion by
16  discussing it with counsel and also relied upon
17  your general understanding of the type of
18  business that Kimball Hill was engaged in,
19  residential home construction, and the type of
20  business TRG was engaged in, investment in real
21  estate; correct?
22     A.   Correct, sir.
23     Q.   Okay.  If TRG were a home builder and
24  purchased the same property, that is something

105

1  you would have discussed with counsel and may
2  have come to a different conclusion; correct?
3     MR. RIORDAN:  Objection, calls for
4  speculation on the part of the witness, your
5  Honor.
6     THE COURT:  Sustained.
7     MR. RUFF:  Your Honor, I'm presenting another
8  set of facts.  It's -- it's -- just because the
9  status of the party does not matter how you
10  treat the successor owner.
11     So Mr. Riordan agreed -- I mean,
12  Mr. Kilburn agreed in the deposition that it may
13  have come to a different conclusion.  Status
14  means nothing.  That's all the point of my --
15     THE COURT:  If you can find that -- if you
16  can get to that without asking him to speculate
17  as to what he may have done in a hypothetical
18  set of circumstances, then -- then fine; but I
19  think that we need to stick more closely to --
20     MR. RUFF:  Okay.
21  BY MR. RUFF:
22     Q.   If the status of TRG was a home builder
23  versus an investor, you may have come to a
24  different conclusion; correct?

106

1     MR. RIORDAN:  Same objection, your Honor.
2     THE COURT:  Still having a problem with that
3  one, Counsel.  Give me a moment just to see if I
4  can -- I can -- I really can't.  I think you can
5  ask him what factors might have caused him to
6  come to a different conclusion, and you can see
7  where that leads you; but I just --
8     MR. RUFF:  It will probably lead me where I
9  don't want to go.
10     THE COURT:  That might be why we're having
11  this issue to begin with.
12     MR. RUFF:  Well, he did admit to that in the
13  deposition, which is why I asked the question.
14  BY MR. RUFF:
15     Q.   You perceive TRG as an investor; and
16  therefore, that was one of the basis for
17  assuming that they're not entitled to
18  protections of the bankruptcy plan; correct?
19     A.   I perceived TRG that they were not a
20  successor, you are correct, sir.
21     Q.   Very simply, it's one of your basis,
22  correct, that you perceive TRG as an investor
23  and, therefore, you assume that they're not
24  entitled to protections of the bankruptcy claim;

107

1  correct?
2     A.   One of our bases, correct, sir.
3     Q.   Okay.  That's the point I was getting
4  to in the prior question.
5     You don't recall Fidelity considering
6  whether the bankruptcy plan and confirmation
7  order applied in its analysis as to whether it
8  had successor claim against TRG, correct?
9     A.   Yeah.  I don't recall one way or the
10  other.
11     Q.   Looking at Exhibit 110.
12     MR. RUFF:  Final sentence, highlighting, Jim,
13  in that same broken out portion.
14  BY MR. RUFF:
15     Q.   Some of these agreements contained
16  additional language upon conveyance to a third
17  party.  KHI was released from its obligations
18  under the annexation agreement including
19  installation of public improvements, correct?
20     A.   Correct, sir.  That's what it says.
21     Q.   And you did not consider the property
22  being conveyed into the KHI trust as a
23  conveyance to a third party, correct?
24     A.   I'm not sure I understand the question.

108

1    Q.    You did not consider the property being
2    conveyed from -- into the KHI trust as a
3    conveyance to a third party, correct?
4        A.    I can't recall if we did or not.
5        MR. RUFF:    Page 192, Lines 13 through 15.
6    The answer, Lines 20 through 22.
7        MR. RIORDAN:    Judge, I'm going to object.  I
8    think he's trying to impeach him.  Perhaps the
9    proper way is to show him the deposition to
10   refresh his memory before he tries the
11   impeachment.
12       MR. RUFF:    Never heard of that one.
13       MR. RIORDAN:    I object it's not proper
14   impeachment.  He said he couldn't recall.
15       MR. RUFF:    It's -- it's something different
16   than what he said in his deposition.  And all
17   I'm doing is pointing out he knew, and I don't
18   have to refresh his recollection.  He said
19   something different at another time.
20       THE COURT:    I agree.  You don't -- you don't
21   have to attempt to refresh recollection in order
22   to impeach.
23            Well, I'll allow you to proceed.  We'll
24   see if indeed it is proper impeachment.

109

1            (Whereupon, the following was an
2                audio recording.)
3        Q.    Do you consider the property being
4    conveyed into the KHI trust as conveyance to a
5    third party?
6        A.    I didn't really consider it a
7    convenance because the trust was there to
8    administer the estate.
9            (Whereupon, the audio recording
10               concluded.)
11   BY MR. RUFF:
12       Q.    Sir, were you asked that question, and
13   did you give that response?
14       A.    Yes, sir, I did.
15       Q.    Okay.  Fidelity never sought
16   determination from the bankruptcy court
17   regarding whether it was absolved from its
18   obligations under the surety bond to
19   Kimball Hill in the bankruptcy court, correct?
20       A.    Correct, sir.
21       Q.    Fidelity never sought a clarification
22   as to whether a discharge by Kimball Hill also
23   discharged Fidelity, correct?
24       A.    Correct, sir.

110

1        Q.    The decision to deny the bonds was made
2    during the claims committee meeting, correct?
3        A.    Correct, sir.
4        Q.    And the basis for denying the claims
5    was twofold; one, TRG became the current owner,
6    and Fidelity therefore felt it was responsible
7    for improvements under the annexation agreement;
8    and two, the general proposition that the
9    liability of surety is coextensive with the
10   principal, correct?
11       A.    Correct, as well as additional
12   information provided by counsel.
13       MR. RUFF:    Page 196.  That's good enough.
14   BY MR. RUFF:
15       Q.    Fidelity made the determination that
16   the terms of the annexation agreement released
17   Fidelity from any obligation under the bonds
18   upon someone other than Kimball Hill acquiring
19   the property during this claims committee
20   meeting, correct?
21       MR. RIORDAN:    I'm going to object.  It's a
22   mischaracterization of the e-mail which said
23   certain of the agreements.  And I think he's
24   referring generically to all of the agreements.

111

1        THE COURT:    Counsel?
2        MR. RUFF:    It sounds like a speaking
3    objection, your Honor, that he wants to insert
4    something that Mr. Kilburn should add into his
5    answer.  But the question is something that was
6    asked in the deposition without qualification.
7    And I think I'm entitled to get an answer.
8        THE COURT:    So this is the first time I think
9    I'll say, Counsel, that -- I'll caution you on
10   the speaking objections, which is -- up until
11   the point where you added that last bit, it
12   was -- it was a good objection; but when you
13   added the last bit, it sure looked like you were
14   providing guidance to --
15       MR. RIORDAN:    I'll try to -- I'll try to
16   limit myself, your Honor.
17       THE COURT:    All right.
18       MR. RIORDAN:    But I -- but he had the -- he
19   has it in front of him as well, so.
20       THE COURT:    The mischaracterization would be
21   the certain issue, but you don't need to
22   recharacterize it for the purposes of
23   these -- these proceedings.
24       MR. RIORDAN:    I'll make the objection.  I'll

112

1  let the Court ask me if you -- if you want
2  further explanation.
3      THE COURT:  All right.  Under these
4  circumstances, I'm going to allow you to
5  continue with the questioning; and the caution
6  will remain on the record.
7  BY MR. RUFF:
8      Q.  The thing I'm after is when.  So
9  Fidelity made the determination that the terms
10  of the annexation agreement released Fidelity
11  from any obligation under the bonds upon someone
12  other than Kimball Hill acquiring the property.
13  That determination was made during the claims
14  committee meeting, true?
15      A.  Yes, sir, that's correct.
16      Q.  Other than the discussion with
17  Mr. Guest, Mr. Lawrence, and Mr. Riordan, there
18  were no other discussions that went into
19  Fidelity's decision to deny the bond claims and
20  pursue a cause of action against TRG; correct?
21      A.  That is correct, sir.
22      Q.  Mr. Lawrence was the most senior person
23  in that meeting, and he made the ultimate
24  decision to reject the bonds and pursue TRG;

113

1  correct?
2      A.  That is correct, sir.  He was the vice
3  president of Fidelity and surety claims.
4      Q.  The reason this went to a claims
5  committee rather than you making the decision
6  yourself is that it was a significant case with
7  large exposure that was getting larger, and the
8  legal issues were novel; correct?
9      A.  Yes, sir to all three statements.
10      Q.  And one of the factors in determining
11  to call a claims committee was the fact that
12  this was a very large exposure with a large
13  financial exposure to Fidelity, correct?
14      A.  Yes, sir, that's one of the factors.
15      Q.  And another was the legal issues being
16  presented by counsel were novel, correct?
17      A.  That's another factor, sir, yes.
18      Q.  Because those issues -- of those
19  issues, it was kicked up to the higher level for
20  a more full discussion; correct?
21      A.  That's a fair characterization, yes,
22  sir.
23      Q.  And you don't recall any consideration
24  being given to returning to the bankruptcy court

114

1  prior to filing suit against TRG to determine
2  whether such action was in violation of the
3  confirmation order, correct?
4      A.  You're correct, sir.  I do not.
5      Q.  Exhibit 111 please.
6      A.  Thank you.
7      Q.  Thank you.  This is -- Exhibit 111 is a
8  letter from David Silverman.  It's a two-page
9  letter dated November 4th, 2011 to Bruce Cook
10  and Mr. Riordan; correct?
11      A.  That's correct, sir.
12      Q.  And attached to that on Pages 3
13  through 5 of that exhibit is a letter from
14  Mr. Riordan August 11, 2011 to Nancy Roman,
15  village of Shorewood; correct?
16      A.  That is correct, sir.
17      Q.  And Mr. Silverman is responding to
18  Mr. Riordan's denial of Shorewood's claim,
19  correct?
20      A.  Correct, sir.
21      Q.  And in the third paragraph,
22  Mr. Silverman points out that the position being
23  raised by Mr. Cook, who you understood was
24  associated with TRG; correct?

115

1      A.  Yes, sir.
2      Q.  Okay.  If you look at that third
3  paragraph --
4      MR. RUFF:  If we can bold -- highlight
5  that -- I mean, expand it, which you've done.  I
6  would like to start with -- highlight the last
7  sentence in that, Mr. Cook asserts please, Jim.
8  BY MR. RUFF:
9      Q.  Mr. Cook -- and Mr. Cook asserts that
10  TRG has no requirement by contract or law to
11  replace the bonds that Mr. Riordan contends are
12  no longer enforceable.  Did I read that
13  correctly?
14      A.  Yes, sir, you did.
15      Q.  Okay.  After Mr. Silverman pointed out
16  to Mr. Riordan that TRG was contending that it
17  had no obligation under the contract to replace
18  the bonds, you don't recall whether Fidelity
19  ever reviewed the contract, TRG's contract of
20  purchase; correct?
21      A.  I don't recall one way or the other.
22  That's correct.
23      Q.  You understood at this time it was the
24  village's position that the surety was not

116

1   released, correct?
2       A.   Correct, sir.
3       Q.   You understand that the contract that
4   we are discussing for the purchase of the
5   property is a contract that was entered into
6   with the bankruptcy estate, correct?
7       A.   Correct, sir.
8       Q.   And it necessarily involves the
9   bankruptcy court, correct?
10      A.   Correct, sir.
11      Q.   And you understand that there are
12  bankruptcy issues that potentially surround the
13  sale of the property, correct?
14      A.   Correct, sir.
15      Q.   And at this point in time, Fidelity did
16  nothing to go back and seek clarification or
17  determination of what TRG's responsibilities
18  were under the contract where the property was
19  purchased out of bankruptcy; correct?
20      A.   That is correct, sir.
21      Q.   In this case based upon the demand for
22  the surety bonds, a claim was opened; correct?
23      A.   A claim file was opened when we
24  initially became aware in late 2007 or early

117

1   2008 that Kimball Hill was experiencing
2   financial distress and that a bankruptcy filing
3   was a possibly.  So the claim file was opened
4   very early.
5       Q.   That would have been opened
6   in -- sometime in late 2007 or early 2008 with
7   the connection -- in connection with the filing
8   of the bankruptcy, correct?
9       A.   Yes, sir.
10      Q.   And in anticipation of the
11  municipalities making demands upon the bonds,
12  correct?
13      A.   Correct, sir.  As each claim came
14  in since -- as I point out in my deposition,
15  they each involved a separate bond number.  And
16  therefore, each had to have a separate claim
17  number assigned to it.
18      Q.   And that is a standard situation where
19  one of Fidelity's principals declares bankruptcy
20  that upon the filing of the bankruptcy
21  claim -- bankruptcy, a claim file is opened;
22  correct?
23      A.   Yes, sir.
24      Q.   And the only minutes of the claims

118

1   committee where we would see what was discussed
2   would be in this case status reports, correct?
3       A.   Yes, sir.
4       Q.   And the case status reports that you
5   prepared, correct?
6       A.   Correct, sir.
7       Q.   If we look at Exhibit 113 please.
8       A.   Thank you.
9       Q.   Thank you.  Exhibit 113 is your initial
10  case status report dated June 24th, 2011; is
11  that fair?
12      A.   It's a -- it's not the initial one, but
13  it's a -- it is a case summary report dated 24,
14  June 2011.  Yes, sir, that's correct.
15      Q.   And the facts section, that is your
16  summary of the facts up until now?
17      MR. RUFF:  And that's on Page 2, your Honor,
18  the recitation of the facts.
19      THE WITNESS:  Yes, sir.  That's correct.
20  BY MR. RUFF:
21      Q.   Okay.  Is this the first case status
22  report from three years after Fidelity opened a
23  claim?
24      A.   I don't recall for sure.  I thought we

119

1   had an earlier one that was on a form that when
2   we discussed it in my deposition was not the
3   original correct form.  And then it was
4   resubmitted on this one as well as the headings
5   were broken out to make things clear.
6       Q.   Well, I think they were both the same
7   date.  So I'll show you Exhibit 112.  I was just
8   trying to save some time.  It's the same date as
9   Exhibit 112; and the same information, I
10  believe, appears.
11      A.   Yes, sir, it does.
12      Q.   Okay.  So does that refresh your
13  recollection?
14      MR. RUFF:  I know how to do it, your Honor.
15  BY MR. RUFF:
16      Q.   That fact there was a -- that was the
17  first report, claims report in the case?
18      A.   Yes, sir, it was.
19      Q.   Okay.  So it was on June 24th, 2011;
20  correct?
21      A.   Yes, sir, it was.
22      Q.   So even though the case had been open
23  for three years, this is the first report; fair?
24      A.   Fair, sir, yes.

120

1    Q.   All right.  The confirmation order was
2  entered in March of 2009.  From June of 2009
3  through April of 2010, Fidelity was working on
4  stipulations; correct?
5    A.   That's correct, sir.
6    Q.   After that, there were defaults and
7  demands on the bonds.  Fidelity started working
8  with a consultant, correct?
9    A.   Yes, sir.
10   Q.   Mr. Carlino, correct?
11   A.   Yes, sir.
12   Q.   To advise the exposure for the work
13 that may be completed, correct?
14   A.   That's correct, sir.
15   Q.   So for the first year after the
16 stipulations were entered, Fidelity spends time
17 hiring Mr. Carlino, evaluating the work, and
18 evaluating its exposure; correct?
19   A.   Correct, sir.
20   Q.   And the discussion about potentially
21 suing TRG was in May of 2011, more than a year
22 after TRG had purchased the property; correct?
23   A.   That's correct, sir.
24   Q.   If you look at Exhibit 113, as they're
                                               121

1  identical just a different format, I'm looking
2  at Page 3 under the coverage section.
3    MR. RUFF:  If we could break that out.  There
4  you go.  Thank you, Jim.
5          The second sentence under coverage
6  states -- if we could highlight that.
7  BY MR. RUFF:
8    Q.   In each municipality, KHI sold its
9  interests -- interest -- it looks like a word is
10 missing, a subdivision to a third party.  Did I
11 read that correctly?
12   A.   You did, sir.
13   Q.   Next sentence, KHI was a party to an
14 annexation agreement with each obligee.  Did I
15 read that correctly?
16   A.   You did, sir.
17   Q.   You agree that KHI did not sell its
18 interests in the subdivisions to a third party,
19 and this is not an accurate statement?
20   A.   I agree that that one sentence is
21 incorrect, sir.  You're right.
22   Q.   TRG obtained the property from the
23 trust, correct?
24   A.   Yes, sir.  I agree with that.
                                               122

1    Q.   In the report, you talk about -- if we
2  go down to just below the first blocked section,
3  it says, the Yorkville bonds.  Do you see that?
4    MR. RUFF:  Highlight that whole sentence,
5  Jim.
6    THE WITNESS:  Yes, sir, I see it.
7  BY MR. RUFF:
8    Q.   Thank you.  You talked about the
9  statute of limitations, correct?
10   A.   Yes, sir, I did.  I did, sir.  I'm
11 sorry.  Yes.
12   Q.   Okay.  You indicate here that the suit
13 limitations was 12 months.  We believe Yorkville
14 was aware more than a year ago that KHI was in
15 bankruptcy and would not be able to perform.
16 Did I read that correctly?
17   A.   Yes, sir, you did.
18   Q.   There's no discussion or analysis in
19 your case status report about the impact of the
20 bankruptcy plan confirmation order on Fidelity's
21 ability to pursue claims against TRG, correct?
22   A.   Correct, sir.
23   Q.   If we go to the next page at the top,
24 the recommended course of action was no prepare
                                               123

1  denial letters.  Can we agree on that?
2    A.   Yes, sir.
3    Q.   At this point in time, there was still
4  a discussion of settlement of the bonds; but
5  there was no recommendation in this report
6  regarding suing TRG, correct?
7    A.   Correct, sir.
8    Q.   The next case report, Exhibit 114.
9    A.   Thank you.
10   Q.   Thank you.  The next case report is
11 June 26, 2011; correct?
12   A.   It is, sir, correct.
13   MR. RUFF:  And if we go to Page 2, Jim,
14 toward the top of the first paragraph, break
15 that up for the Judge.  There we go.  Perfect.
16 BY MR. RUFF:
17   Q.   Fidelity states here, third -- I think
18 it's the third sentence down, this is -- this is
19 based upon a 60/40 probability of success.  Did
20 I read that correctly?
21   A.   Yes, sir, you did.
22   Q.   Fidelity believed it had a 60/40 chance
23 of success, correct?
24   A.   Correct, sir.
                                               124

1    Q.    So at this point, Fidelity is making
2    the decision that it is not going to pay on the
3    bonds, go to litigation against the
4    municipalities, and then against TRG with a
5    probability of success at 60/40; correct?
6        A.    Correct, sir.
7        Q.    And that is based, in part, on the
8    theory that Fidelity intended to pursue which
9    you describe as a quote, novel theory, end
10   quote; correct?
11       A.    Correct.
12       Q.    And as a novel theory, you would agree
13   that you did not have any readily available
14   information presented to you to tell you the
15   likelihood of success or what the outcome would
16   be; correct?
17       A.    Correct, sir.
18       Q.    This was a business decision made by
19   Fidelity to pursue litigation and find out if
20   this novel approach was correct or not, correct?
21       A.    Correct, sir.
22       Q.    Exhibit 120.  Here you are, sir.
23       A.    Thank you.
24       Q.    Thank you.  Exhibit 120 is a case

125

1    summary report.
2        MR. RUFF:  If you can blow up the date just
3    for his Honor.  Thank you, Jim.
4    BY MR. RUFF:
5        Q.    The date is May 12th, 2015; correct?
6        A.    Correct, sir.
7        Q.    All right.  If we go to the second
8    page, I'm going to read the first sentence.
9        MR. RUFF:  Jim, if you could highlight this
10   for his Honor.
11   BY MR. RUFF:
12       Q.    It says on Page 2, subsequent to the
13   last update, our attorney along with our expert
14   and I met with a representative of Montgomery.
15   Did I read that correctly?
16       A.    Yes, sir, except representative was
17   plural.
18       Q.    Representatives, excuse me.  I was
19   actually reading two documents at once.  That
20   will teach me.
21           If we go to Page 6 of the document, the
22   first paragraph on the top, it says, Con Riordan
23   and I met with Montgomery -- Montgomery's
24   attorneys and their village administrator on

126

1    December 1, 2014.  Did I read that correctly?
2        A.    Yes, sir, you did.
3        Q.    It states, while the meeting was
4    cordial, they continue to refuse to accept our
5    bonds.  They believe we should have paid them
6    when the court dismissed our successor liability
7    defense.  Did I read that correctly?
8        A.    You did, sir.
9        Q.    After a thorough discussion, it became
10   apparent they know we did not single them out.
11   They understand that we are seeking clarity of
12   the law in Illinois so we will know how to cost
13   our future submissions for subdivision bonds.
14   Did I read that correctly?
15       A.    Yes, sir.
16       Q.    The decision to seek clarity of the law
17   in Illinois to know how it would cost future
18   submissions for subdivision bonds was one of the
19   purposes of proceeding with successor liability
20   from the outset, correct?
21       A.    Correct, sir.
22       Q.    And so part of the decision to pursue
23   TRG was to see what cost or premiums would be
24   appropriate to charge in the future based on an

127

1    area of law that you thought was not settled at
2    this point, correct?
3        A.    You are correct.  That was part of it.
4        Q.    So it's fair to say that this was
5    partially a test case to see what the law was so
6    you could make business decisions in the future,
7    true?
8        A.    I'm not sure I would agree with that
9    characterization.
10       MR. RUFF:  Page 240, Lines 8 through 11
11   please, Jim.
12               (whereupon, the following was an
13               audio recording.)
14       Q.    So this was a test case to see --
15       MR. RIORDAN:  I would object.  It's not --
16       THE COURT:  Sir, can you pause the audio
17   please?
18               (whereupon, the audio recording
19               was paused.)
20       THE COURT:  Go ahead.
21       MR. RIORDAN:  I would object.  It's not fair
22   impeachment based on the answer to this question
23   and the answer he gave in Court here.
24       THE COURT:  All right.  I'm going to allow

128

1  it, though.  I'll take into account the two
2  answers, and I'll make my decision.
3     MR. RIORDAN:  Thank you, your Honor.
4     MR. RUFF:  Your Honor, may we play?
5     THE COURT:  Could you restart it then please?
6          (whereupon, the following was an
7             audio recording.)
8     Q.  So this was a test case to see what the
9  law actually was so you could make business
10 decisions in the future, is that fair?
11    A.  That's partly fair, yes.
12         (whereupon, the audio recording
13            was concluded.)
14 BY MR. RUFF:
15    Q.  Were you asked that question?  Did you
16 give that response, sir?
17    A.  Yes, sir, I did.
18    Q.  The next case summary, Exhibit 121.
19 Thank you, sir.
20    A.  Thank you.
21    Q.  This is dated November 18th, 2015;
22 correct?
23    A.  Correct, sir.
24    Q.  The purpose of this report was in part

129

1  to apprise management that a judgment had been
2  rendered against Fidelity in Sugar Grove,
3  correct?
4     A.  Correct, sir.
5     Q.  And the argument that Fidelity was
6  released because Kimball Hill was released
7  didn't fly.  Fidelity lost, correct?
8     A.  You are correct.
9     Q.  There was no reevaluation of Fidelity's
10 position in that respect after the loss in
11 Sugar Grove, correct?
12    A.  You are correct.
13    Q.  Fidelity decided to continue to press
14 on and seek what clarification they could in
15 order to price the bonds in the future, correct?
16    A.  You are correct.  We decided to
17 continue.
18    Q.  And there was no decision to say, hey,
19 wait a second here; maybe we should go to the
20 bankruptcy court and tell them what we're doing?
21 There was no -- there was no decision made in
22 that regard either, correct?
23    A.  You are correct, sir.
24    Q.  After the bankruptcy courts entered an

130

1  order granting TRG's motion in this case on
2  March 20th, 2017, there was no further
3  reevaluation of the correctness of Fidelity's
4  position regarding successor liability; correct?
5     A.  I wouldn't agree with that.  As you --
6  as you know and I said in my deposition, counsel
7  had requested authorization to retain additional
8  legal assistance from Kit Turner's (phonetic)
9  law firm which specializes in bankruptcy.  I had
10 approved counsel's recommendation.
11         And as part of -- I had always directed
12 counsel and also directed the other law firm
13 that if they felt we did anything wrong, they
14 could not only tell me; and I would definitely
15 have to pass it up the line, which I would do.
16    MR. RUFF:  Page 247, Lines 1 through 5
17 please.
18         (whereupon, the following was an
19            audio recording.)
20    Q.  After the court entered its order
21 granting TRG's motion, was there any further
22 reevaluation of the correctness of Fidelity's
23 position regarding successor liability?
24    A.  No.  We still think we're correct.

131

1          (whereupon, the audio recording
2             was concluded.)
3  BY MR. RUFF:
4     Q.  Were you asked that question, and did
5  you give that response, sir?
6     A.  Yes, sir, I did.
7     Q.  You still think you're correct, don't
8  you?
9     A.  Yes, sir, I do.
10    Q.  And depending upon the outcome here,
11 Fidelity may still continue to pursue its
12 position through any and all available appeal
13 routes; correct, sir?
14    A.  That decision has not been made.
15    Q.  It's depending upon the outcome of the
16 hearing on the issue of damages, correct?
17    A.  That decision has not been made.  I've
18 been directed by management to --
19    Q.  So if it's not enough, sir; then maybe
20 Fidelity says, okay, we'll pay that if it's
21 small enough; but if it's large enough, then
22 they will appeal it, correct, sir?
23    MR. RIORDAN:  Objection, he's arguing with
24 the witness now, Judge.

132

1    THE COURT:  Counsel?
2    MR. RUFF:  It's called making a point.
3    THE COURT:  All right.  Well --
4    MR. RIORDAN:  Depends on what side of the
5 fence you're on.
6    THE COURT:  You're entitled to make a point
7 in opening and closing; but with a witness on
8 the stand, you're entitled to ask questions.
9    MR. RUFF:  Sometimes the witness agrees with
10 a point that I'm going to make on closing.
11    If your Honor says no, I'll stop.  If
12 your Honor says he wants to hear the answer, I'm
13 waiting to hear the answer as well.
14    THE COURT:  I think we're going to leave it
15 where it is.  I'll sustain the objection.  You
16 can make your points in closing.
17    MR. RUFF:  Okay.  Your Honor.
18 BY MR. RUFF:
19    Q.  Depending upon the outcome, it's still
20 going to be a business decision at that point;
21 correct?
22    A.  It will be a decision that will be made
23 by management, you're correct.  They will
24 decide.

133

1    Q.  It's going to be a business decision at
2 that point, correct?
3    A.  Yes, it will be a factor.
4    Q.  Okay.  Since March of last year when
5 this Court concluded that Fidelity violated the
6 confirmation order, Fidelity has incurred
7 significant fees and expenses for attorneys and
8 experts as this matter has progressed towards
9 today's hearing; correct?
10    A.  Yes, sir, that's right.
11    Q.  You would agree TRG has as well?
12    A.  Yes, sir.  As I said in my deposition,
13 that's correct.
14    Q.  Exhibit 126.  Thank you, sir.
15    This is an e-mail with the latest date
16 of -- at the top of Page 1, Exhibit 26 (sic),
17 July 23rd, 2012; correct?
18    A.  Yes, sir, that's correct.
19    Q.  It's relating to Montgomery,
20 Sugar Grove versus Fidelity; correct?
21    A.  That's correct.
22    Q.  Second page, if we could.  This is from
23 Montgomery, slash, Sugar Grove's attorney,
24 Gary Mickey, to Mr. Riordan; correct?

134

1    A.  Yes, sir, it is.
2    Q.  It states as follows:  Now that
3 Mueller -- that's Judge Mueller, correct?
4    A.  I believe so, sir, yes.
5    Q.  Has ruled on your third party
6 complaints to dismiss both with prejudice, it
7 seems to me that we should probably resume
8 talking settlement before we spend too much more
9 time and money on this matter.  Did I read that
10 correctly?
11    A.  Yes, sir, you did.  You said -- I'm
12 sorry.  You said this matter.  It says these
13 matters.
14    Q.  These matters, excuse me.  I wrote it
15 down wrong, incorrectly.  Thank you for
16 correcting me.  In these matters.  With that
17 correction, do you agree?
18    A.  Yes, sir, I do.
19    Q.  Okay.  And the third party complaints
20 with Fidelity's third party complaints versus
21 TRG, correct?
22    A.  That is correct, sir.
23    Q.  Mr. Riordan responds on Page 1, second
24 sentence.  It says --

135

1    MR. RUFF:  If we can -- yeah, highlight it.
2 You're doing good, Jim.
3 BY MR. RUFF:
4    Q.  Second sentence, from F&D's point of
5 view, settlement cannot occur without TRG and
6 LCP's participation.  Did I read that correctly?
7    A.  Yes, sir.
8    Q.  Continuing on, the next line
9 highlighted, we believe that the villages should
10 add them as a defendant to the case since they
11 each clearly had obligations to the villages
12 under the applicable annexation agreements.  Did
13 I read that correctly?
14    A.  Yes, sir, you did.
15    Q.  And the response from the attorney for
16 the municipality states at the top --
17    MR. RUFF:  If you would go to the top of the
18 e-mail, Jim.  Third sentence, needless to say,
19 if we can highlight that area.  Thank you.
20 Break it up.
21 BY MR. RUFF:
22    Q.  Needless to say, we don't agree with
23 F&D's rather interesting view of their bond
24 obligations.  Did I read that correctly?

136

1    A.    You did, sir.
2    Q.    They indicated they have
3  no -- next -- two lines down, as of now, we have
4  no intention of adding TRG or LCP as defendants.
5  Did I read that correctly?
6    A.    You did, sir.
7    Q.    Beginning in 2011, Fidelity was
8  encouraging the city's municipalities to seek
9  recovery against TRG as opposed to Fidelity;
10  correct?
11    A.    As to this e-mail here.  I'm not aware
12  of any others.
13    MR. RUFF:  Page 262, Lines 11 through 16
14  please, Jim.
15              (whereupon, the following was an
16              audio recording.)
17    Q.    Beginning in 2011, TRG or Fidelity was
18  encouraging the cities, the municipalities to
19  seek recovery against TRG as opposed to
20  Fidelity; agree?
21    A.    Yes, sir, because we thought they were
22  responsible.
23              (whereupon, the audio recording
24              was concluded.)

137

1  BY MR. RUFF:
2    Q.    Okay.  Sir, were you asked that
3  question; and did you give that response?
4    A.    Yes, sir, I did.
5    Q.    Mr. Mikey didn't agree with -- from
6  Montgomery did not agree with your position with
7  respect to its bond obligations and successor
8  liability, correct?
9    A.    That is correct.  He did not agree with
10  our position.
11    Q.    You understand that TRG responded that
12  they did not assume the bonded obligations under
13  the sale agreement or the -- or the requirement
14  to purchase substitute bonds, correct?
15    A.    That was their position.  I understand
16  that, yes.
17    Q.    All right.  Exhibit 127 please.  Thank
18  you.
19    A.    Thank you.
20    Q.    Both sides, sir.  Thank you.
21          If we see -- if we look at Exhibit 127,
22  it's two pages; and it's an e-mail exchange
23  between -- it begins with an e-mail exchange
24  between Mr. Riordan and Mr. Scott Leo; correct?

138

1    A.    Yes, sir, it does.
2    Q.    Carbon copying Michael Dudik on -- on
3  that.  It starts April 20th, 2013; correct?
4    A.    Correct, sir.
5    MR. RUFF:  Now if we look on Page 1 at the
6  bottom please, Jim.
7  BY MR. RUFF:
8    Q.    We see on the bottom of Page 1 an
9  e-mail exchange from Mr. Dudik to Mr. Riordan
10  and Scott Leo, correct?  On May 2nd, 2013,
11  11:17 a.m.  Do you see that, the front page,
12  bottom of the page?  Do you want me to help you?
13    A.    I'm sorry.  What, sir?
14    Q.    I'm looking at the bottom of the page.
15    A.    Yes.
16    Q.    Okay.  I didn't know that -- you didn't
17  respond.  So I was --
18    A.    Oh, I apologize.
19    Q.    Okay.  You see that, sir?
20    A.    Yes.
21    Q.    Okay.  The e-mail states, from
22  Mr. Dudik, I talked to Mark Radtke, attorney for
23  the debtors, earlier this week.  Do you see
24  that?

139

1    A.    Yes, sir.
2    Q.    The debtors are only seeking to expunge
3  duplicate claims and leave the surety as one
4  claim against the trust.  Did I read that
5  correctly?
6    A.    You did, sir.
7    Q.    Okay.  So through this, Fidelity was
8  maintaining that claim against the liquidating
9  trust for what it did or was required to expend
10  on the surety bonds; correct.
11    A.    That's correct.
12    Q.    Okay.  Now we see that -- we see that
13  on the top of this e-mail from Mr. Riordan to
14  Mr. Dudik, he's responding on May 7th -- May 2nd
15  about 15 minutes later at 11:32 a.m.  Do you see
16  that?
17    A.    Yes, sir, I do.
18    MR. RUFF:  We don't need that, Jim.  There's
19  one thing I want to highlight to his Honor.  If
20  you would go to the cc line, please pull that
21  entire -- on the top one, pull the entire cc out
22  and highlight that.
23  BY MR. RUFF:
24    Q.    You see an attorney on here, Joel Page;

140

1  correct?
2      A.   Yes, sir, we do.
3      MR. RIORDAN:  Your Honor, I think -- I'm not
4  sure what the relevance of this 22-claim
5  objection is to this case.  This e-mail deals
6  with a claim objection which your Honor ruled
7  on, and it has been resolved and settled or
8  disposed of at least.
9      THE COURT:  Counsel, can you help me?  Where
10  are we going with this?
11     MR. RUFF:  We're going to tie this up in
12  about two minutes.
13     THE COURT:  All right.
14     MR. RUFF:  This is my last point in this
15  case.  Your Honor will see exactly where I'm
16  going in about five minutes.
17     THE COURT:  I hope it's not your last point
18  in this case; otherwise, your other witnesses
19  will be pointless.
20     MR. RUFF:  The last point on this witness,
21  but I think what you're going to see is a tie-up
22  and notice to Fidelity.
23     THE COURT:  All right.  I'll let you proceed.
24     MR. RUFF:  Okay.

                                                    141

1  BY MR. RUFF:
2      Q.   Go to Exhibit 128 please.  Sir, this is
3  a two-page exhibit, Exhibit 128.  Can we agree
4  on that?
5      A.   Yes, sir, we do.
6      Q.   Okay.  It's an e-mail exchange
7  with -- between Mr. Scott Leo and
8  Brandon Hummel.  Do you see that?
9      A.   Yes, sir, I do.
10     Q.   Mr. Hummel is a former partner of
11  Mr. Riordan, correct?
12     A.   Yes, sir, that's correct.
13     Q.   He actually appeared and has argued in
14  this case in front of this -- this Court,
15  correct?
16     A.   Yes, sir.
17     Q.   And it references on the top here --
18     MR. RUFF:  And I'm going to ask that -- Jim,
19  if you could pull out the line starting with
20  that Travelers case at the very first line.
21  Pull that out so the Court can see that.  Put a
22  highlight there.
23  BY MR. RUFF:
24     Q.   That Travelers case from Michigan they

                                                    142

1  cite has been a problem.  Did I read that
2  correctly?
3      A.   Yes, sir, you did.
4      MR. RUFF:  The next line please highlight.
5  BY MR. RUFF:
6      Q.   But it seems that case the court
7  specifically found the obligations of the
8  improvement bonds did not run with the land.
9  Did I read that correctly?
10     A.   Yes, sir, you did.
11     Q.   And the date --
12     MR. RUFF:  And just so we get the -- if we
13  can take those highlights out of there for a
14  minute just so we see the date of the e-mail.
15  BY MR. RUFF:
16     Q.   It's July 19th, 2016.  Did I read that
17  correctly?
18     A.   Yes, sir, you did.
19     Q.   That happens to be after TRG filed its
20  motion in this case, correct?
21     A.   Yes, sir, it is.
22     Q.   Okay.  Exhibit 129.
23          Exhibit No. 129 is a document produced
24  by your attorney in discovery in this case,

                                                    143

1  correct?
2      A.   It is an article that has what appears
3  to be a TR designation on the bottom right
4  corner.  So I'm not sure it came from our
5  counsel or from you-all's files, your clients
6  files.  It's TR -- a Bates Stamp number of
7  TR0446.  So I'm not sure what the source of the
8  document was.
9      Q.   You see in this -- I'll represent to
10  you that it is a document produced by your
11  attorney in this case.  Okay?
12     A.   Yes, sir.
13     Q.   Okay.  If we look on the second page,
14  it says --
15     MR. RIORDAN:  Judge, I'm going to object to
16  this exhibit.  It's irrelevant.  There's no
17  foundation for it.  Counsel's representation is
18  not the witness's answer.  I'm not sure what
19  this has to do with this case.  I don't know
20  where -- and I don't believe there's proper
21  foundation for it.
22     THE COURT:  Counsel?
23     MR. RUFF:  Your Honor, this is Mr. Joel Page
24  who we've just seen represented Fidelity

                                                    144

1  in -- who we've just seen was representing
2  Fidelity in this case and has actually filed an
3  appearance in this case, which I'm about to go
4  through and demonstrate.
5         What this article demonstrates is what
6  Fidelity knew or should have known, notice to
7  Fidelity regarding what to do in a bankruptcy
8  setting.
9         And Mr. Page knew it. He was an
10  attorney who appeared for Fidelity in this case,
11  and he appeared way back in 2012. And here he
12  is in 2011, if I'm allowed to go through this,
13  saying what Fidelity did in this case is
14  absolutely wrong.
15    THE COURT: I'll return this back to you,
16  Mr. Riordan.
17    MR. RIORDAN: Judge, this is an article. I
18  don't even know if it's an article. And I --
19  just looking at it now, I don't even -- it's
20  dated January 6, 2011, I see; but I'd like to
21  have some foundation.
22         Was this actually written by
23  Mr. Page -- I mean, Mr. -- I think that they'd
24  have to bring Mr. Page in to lay the foundation

                                                      145

1  to show that he wrote this. He'd have to show
2  us further when did this article come to
3  Fidelity's attention, if at all. Was it after
4  the enforcement motion was filed? Was it
5  before, the fact that it was dated in
6  January 2011? They're trying to say that
7  Mr. Page somehow -- that constitutes notice to
8  F&D because he wrote an article in 2011?
9         I don't see it. I think it's totally
10  irrelevant. If they want to argue that there's
11  law out there that says this in their closing
12  arguments or closing papers, they're free to do
13  that; but showing this as somehow notice to F&D,
14  I don't see where they're going with this and
15  how they're going to get there.
16    MR. RUFF: The notice -- oh, go ahead, your
17  Honor.
18    THE COURT: You know, Counsel, I got to say,
19  I think we're on pretty shifty ground here. I
20  think Mr. Riordan has a point.
21         First of all, I see what this purports
22  to be. I can't really tell if it is what it
23  purports to be, however, based on looking at it.
24  So I think you have a foundation issue which may

                                                      146

1  have been waived pursuant to the pretrial order,
2  that much I understand.
3         But nonetheless, equating this article
4  somehow to knowledge of -- it's -- it's a pretty
5  far stretch.
6    MR. RUFF: If we go through the next few
7  questions, which Mr. Kilburn answered in his
8  deposition, he said that Mr. Page was my lawyer;
9  and he started working on the case in 2012.
10  Here he is just a year before saying, you don't
11  do this. And here's exactly what they did.
12         He's an attorney in this case. He's
13  one of their agents. He's one of their agents
14  saying, hey, listen, you shouldn't do this.
15  I've already had him admit that this is -- they
16  produced this document.
17    THE COURT: All right. So once again, I'm
18  having trouble making that connection. I
19  understand exactly what you're trying to say,
20  and I tend to agree with Mr. Riordan that you
21  can make that argument in closing.
22         I just don't know how this is a
23  productive line inquiry for the witness given
24  the uncertainty that, in fact, the -- what

                                                      147

1  advice Mr. Page may or may not have given.
2         I think you can -- the article is out
3  there. It's admitted into evidence. You can
4  draw the conclusions you will in your closing,
5  and I'll take that into account; but I just
6  don't know how this --
7    MR. RIORDAN: We did raise foundation and
8  relevancy objections in the pretrial statement,
9  Judge, just so you know.
10    THE COURT: Well -- and I said it may have.
11  I didn't say it was. I just --
12    MR. RIORDAN: Right. I'm just saying. I'm
13  just --
14    THE COURT: So I'm having -- I'm having
15  trouble with this -- this line of inquiry,
16  Counsel. I honestly don't believe that it's
17  going to help the Court. Your -- but move on
18  here please.
19    MR. RUFF: Is it -- is it possible to at
20  least because it's relevance -- and I don't want
21  to incur any wrath of the Court at all, but to
22  go through the line -- this is actually my last
23  point because I think it's kind of a significant
24  point, to demonstrate -- this is cross-exam. A

                                                      148

1  wide latitude is provided on cross-exam.
2  Articles are frequently shown on cross-exam.
3      This happens to be an article written
4  by an attorney who represented him, not only
5  represented him, but represented him in this
6  case in an article that demonstrates, which he's
7  gone through in his -- in his deposition, that
8  cautions -- cautions that what you should do is
9  take into account the Travelers case and not do
10 what they did in this case.
11     I think to -- that demonstrates -- your
12 Honor could take it -- your Honor makes -- can
13 allow it to come in and, you know, determine
14 whatever relevance it is because it is a bench.
15 I think if your Honor sees the
16 cross-examination -- I frequently bring in
17 articles to show witnesses.  They are not even
18 disclosed.
19     We disclosed this article, and he
20 answered questions concerning that; and he
21 admitted that Mr. Page was one of his attorneys.
22 I frequently bring in articles, cross-examine
23 witnesses on a proposition that is simply wrong.
24     And that's -- not only is this an

149

1  article that's relevant to demonstrate that you
2  shouldn't do this.
3      And Mr. Riordan, how long have you been
4  a member of the Chicago Surety Claims
5  Association?
6  MR. RIORDAN:  I'm not a witness here.
7  MR. RUFF:  How long have you been --
8  THE COURT:  I don't think he needs to answer
9  that.
10 MR. RUFF:  Okay.
11 THE COURT:  I understand there's a fine line
12 here and that you're certainly abdicating on
13 behalf of your client with respect to this.  I'm
14 not changing my ruling.  Move on.
15 MR. RUFF:  Okay.  Thank you.
16     May I inquire just as to the
17 propositions of what's stated in the article
18 without reference to the article?
19 THE COURT:  You may proceed cautiously.
20 We'll see how that works.
21 MR. RUFF:  Okay.
22 THE COURT:  And as it stands, I don't know,
23 do we need to have the article up on --
24 MR. RUFF:  Okay.  We can take it off.

150

1  THE COURT:  Okay.  Could you please?
2  MR. RUFF:  What I would normally do in a
3  cross-examine of a witness once I have talked
4  about an article is go through the propositions.
5      If you feel that that is going to
6  offend the Court by going through those
7  propositions, then I won't -- I won't do so
8  because I don't want to engender any of that
9  feeling; but I think the propositions set forth
10 here are what they should have considered and
11 didn't do.
12 THE COURT:  Counsel, you're not going to
13 offend me one way or another.  This is my --
14 this is my job.  You do your job.  I'll do mine.
15 If a question is objectionable and if a party
16 objects, I'll rule on that objection.  I'll let
17 you proceed.
18 BY MR. RUFF:
19 Q.   You agree with this proposition, sir,
20 yes or no, a subdivision bond surety like a
21 performance bond surety gets no benefit from its
22 principal's inability to pay and gets very
23 little benefit from its principal filing
24 bankruptcy protection?

151

1  MR. RIORDAN:  Object, asks for a conclusion
2  on the part of the witness, Judge, and it's
3  essentially a hypothetical.
4  THE COURT:  I think -- I think it is in part
5  a hypothetical, but I think it's exactly the
6  kind of conclusion that counsel is permitted to
7  inquire as to.  I'll let you proceed.
8  MR. RIORDAN:  Thank you, your Honor.
9  THE COURT:  Overruled.
10 BY MR. RUFF:
11 Q.   Do you agree with this statement or
12 not:  A subdivision bond surety like a
13 performance bond surety gets no benefit from it
14 principal -- principal's inability to pay and
15 gets very little benefit from its principal
16 filing a bankruptcy protection?  Do you agree
17 with that principal?
18 A.   In general terms, yes.
19 Q.   Okay.  With respect to the subdivision
20 bonds where the debtor owns the land, most
21 obligees seek relief from stay in a principal
22 bankruptcy to proceed against a surety.  Do you
23 agree with that proposition?
24 A.   Yes, sir.  In general terms, I do.

152

1    Q.   Such a motion is probably required.
2  Definitely it is best practice to avoid
3  offending the bankruptcy court and facing
4  contempt charges and is routinely granted.  Do
5  you think -- do you agree with that position?
6    MR. RIORDAN:  Same objection as before, your
7  Honor.
8    THE COURT:  All right.  So now we're straying
9  a little bit into the legal conclusion.
10  I'm -- I'm going to that question could be
11  problematic.
12    MR. RUFF:  Okay.  All right.
13    THE COURT:  I'll sustain the objection.
14  BY MR. RUFF:
15    Q.   Would you agree with this proposition,
16  sir -- are you familiar with the Travelers case?
17    A.   Somewhat, yes.
18    Q.   Okay.  So would you agree that the
19  Travelers case, the court dismissed the surety's
20  complaint against the successor developer on
21  grounds that the bankruptcy sale order
22  extinguished all liens and claims against the
23  property; and the surety subsequent suit was a
24  collateral attack on the bankruptcy court's sale

153

1  order.  Do you agree with that as the ruling of
2  the Travelers case?
3    MR. RIORDAN:  Objection, your Honor.  I think
4  a little bit more foundation as to the general
5  familiarity of it.  Now he's asking him to draw
6  a conclusion as to what the Court ruled in
7  whatever Travelers case he's referring to.
8    THE COURT:  Again, Counsel, I'm pointing that
9  objectionable on a number of grounds.  I'll
10  sustain the objection.  Let's see if you can
11  rephrase.
12  BY MR. RUFF:
13    Q.   You are familiar with the Travelers
14  case, correct?
15    A.   Somewhat.  I've heard of it.  I saw it
16  in articles.  I've heard of it.
17    Q.   Okay.  And you follow the articles?
18    A.   I've read them.  Now obviously prior to
19  my deposition, I think I said in my deposition I
20  had not seen this article.
21    Q.   Are you aware of the Court's dismissal
22  of the surety's complaint against the successor
23  developer in that case?
24    A.   Yes.

154

1    Q.   Okay.  On the grounds that the
2  bankruptcy sale order extinguished all liens and
3  claims against the property?
4    MR. RIORDAN:  Again, I'll object, your Honor.
5  He's taking the conclusion of the so-called
6  author of this document and stating it as if
7  it's actually true or a fact and then asking the
8  witness to say whether the conclusions drawn by
9  the author of the article are correct or not.
10    I think that's pure opinion and
11  speculation in asking him to draw conclusions
12  which he's not -- he's not here to do.
13    MR. RUFF:  Your Honor, that is what I would
14  call a speaking objection.  I don't even know if
15  I can find an objection in what was stated other
16  than potentially speculation.
17    This is cross-examination, and he's
18  already said that he's familiar with the
19  Travelers case.  He's familiar with the holding,
20  and he agrees that that was the holding.  And
21  now I'm just asking him further questions in
22  that inquiry.
23    THE COURT:  All right.  I'm going to permit
24  the questioning to continue.  We'll keep

155

1  listening for objections, but -- though I will
2  tell you that the very last question was not a
3  question.  It was a statement.  So phrase it in
4  the form of a question.  We'll see how that
5  works.
6    MR. RUFF:  Very good, your Honor.  May I just
7  have where I left off?
8    THE COURT:  You can have the court reporter
9  read that back.  Sure.
10    (Record read as requested.)
11  BY MR. RUFF:
12    Q.   We were -- what led to that question
13  was your agreement on point that -- where the
14  Court dismissed the surety's complaint against
15  the successor developer, and you said yes.  Do
16  you recall that?
17    A.   Yes, sir.  I did say that because
18  that's what the article says.
19    Q.   And it -- on the grounds that the
20  bankruptcy sale order extinguished all liens and
21  claims against the property, correct?
22    A.   That is correct.  That's what the
23  article says.
24    Q.   And the surety subsequent suit was a

156

1  collateral attack on the bankruptcy court's sale
2  order, correct?
3     A.  That's what the article says, yes, sir.
4     Q.  In any event, do you agree that the
5  Travelers case cautions in favor of
6  conditionally objecting to a sale or plan so as
7  to preserve the surety's rights?
8     MR. RIORDAN:  Objection, your Honor, now that
9  is a conclusion drawn from this article which
10 he's -- they're asking him to comment upon.
11    That's a -- that's a conclusion that
12 the Court can draw as part of its legal and
13 factual analysis in this case.  And it may be
14 proper argument to say that there's this case
15 out there that says this, and it's instructive;
16 but I don't know that getting it from this
17 witness is proper.
18    MR. RUFF:  Your Honor, again, that's --
19    THE COURT:  Counsel, I'm going to overrule
20 the objection.  So you might as well just let me
21 say my peace which is, I understand the basis of
22 the objection.  I think that the question is --
23 is asking whether he agrees with that
24 proposition.  The proposition is what it is.
                                              157

1  I'll let him make the question.  The question is
2  overruled.  If you need to have the question
3  read back --
4     MR. RUFF:  I do not, your Honor; and thank
5  you.
6     THE COURT:  -- for the witness.
7     MR. RUFF:  I was just picking up where I left
8  off.
9  BY MR. RUFF:
10    Q.  Would you agree that the Travelers case
11 cautions in favor of conditionally objecting to
12 a sale or plan so as to preserve the surety's
13 rights against the successor owners?
14    A.  I would say that the Travelers case
15 cautions that the surety should proceed only
16 with the advice and upon the recommendation of
17 counsel because the Travelers case, as I
18 understand it, was out of Michigan.
19    And I'm not familiar with each and
20 every little nuance of Michigan law.  I didn't
21 prepare for that here today; but I -- I'm sure
22 that in closing, it will be addressed.  So I
23 would say that this case is a note to make sure
24 that you proceed with the advice and
                                              158

1  recommendation of counsel and after it has been
2  thoroughly discussed internally.
3     Q.  Okay.  I don't think that answers the
4  question, but I'm going to try it one more way.
5     What the case cautions in favor of,
6  whether it's by your counsel or by Fidelity,
7  conditionally objecting to a sale or plan so as
8  to preserve the surety's rights against
9  successor owners as to improvements made by the
10 surety post sale or post confirmation.  Would
11 you agree with that statement, either Fidelity
12 should be aware of it or its counsel?
13    MR. RIORDAN:  Same objection, your Honor, as
14 before.
15    THE COURT:  I'm going to, again, overrule the
16 objection and allow the question.
17    THE WITNESS:  May I have the question again
18 please, sir?
19    MR. RUFF:  It was so good, I don't think I
20 can reproduce it.
21    THE COURT:  Ask the court reporter to read
22 the question back then.
23        (Record read as requested.)
24    THE WITNESS:  I believe that this case
                                              159

1  strongly cautions the surety to proceed only
2  with the advice and recommendation of counsel.
3     I am very well aware in this case we
4  didn't have notice and opportunity to object to
5  a sale.  This was a sale from the plan.  There
6  wasn't -- the first notice that we had of the
7  sale was when the exhibits that Mr. Love
8  (phonetic) has talked about before, the letters
9  were sent to our counsel.
10    And as to the plan back in March of '09
11 what my state of mind was, we had no claims on
12 our bonds.  We had no lawsuits.  We had retained
13 outside counsel that had represented our company
14 for decades and was very competent in this area.
15 And we were doing everything we could.
16    Number one, we hoped that our principal
17 might survive; and it's sad.  It really is.
18 That didn't happen here.  That was a good
19 company.  A lot of people lost a lot; but at the
20 time that the decision I made to support the
21 plan, not only with the recommendation of
22 counsel, I did not feel there was any
23 justifiable reason to oppose the plan.
24    And throughout this whole thing from
                                              160

1  the beginning up to the present day, it never
2  entered our mind that the protections of the
3  bankruptcy plan injunctions would extend to a
4  third-party, non debtor purchaser of discrete
5  assets.
6      THE COURT:  All right.  So I'll caution the
7  witness that when you're asked a question that
8  can be answered yes or no, do you agree or don't
9  you agree, your job is to try to do that.
10         And if you can't do that, say that you
11  can't do that.  Allow your counsel to give you
12  an opportunity to respond; but responding at
13  length as you just did is not appropriate.
14     THE WITNESS:  I apologize.
15     MR. RUFF:  This is literally my last
16  question.  I'm going to try it again.
17  BY MR. RUFF:
18     Q.   Sir --
19     MR. RUFF:  Can I have the answer stricken by
20  the way?
21     THE COURT:  Yeah, I will strike the answer as
22  nonresponsive.
23  BY MR. RUFF:
24     Q.   Would you agree, sir, that the
                                        161

1     THE COURT:  I think we can take a short
2  break, but I will -- I think at this point,
3  we're very close to concluding for the day.
4     MR. RUFF:  I agree.
5     THE COURT:  It may be, Mr. Riordan, that
6  you're going to begin -- I understand that this
7  has been referred to as cross on several
8  occasions.  It's direct of a hostile or adverse
9  witness, but -- so Mr. Riordan, you would be
10  crossing; but I think we'll begin with the cross
11  tomorrow at this rate.  Does that make sense to
12  you?
13     MR. RIORDAN:  Well, unless I reserve, Judge.
14     THE COURT:  Unless you reserve, which we've
15  said; but I don't think we're going to have time
16  for another witness today.
17     MR. RUFF:  I agree, your Honor.
18     THE COURT:  All right.  So let's take a short
19  break.  You decide whether you have further
20  questions for the witness.  We'll come back.
21         A reminder to Mr. Kilburn, you remain
22  under oath.
23     THE WITNESS:  Yes, your Honor.
24           (Recess taken.)
                                        163

1  Travelers case, whether it's knowledge by
2  Fidelity or knowledge by its counsel should be
3  aware that the Travelers case cautions in favor
4  of conditionally objecting to a sale or plan so
5  as to preserve the surety's rights against
6  successor owners as to improvements made by the
7  surety post sale or post confirmation?  Do you
8  agree with that, either Fidelity should know
9  that or its counsel?
10     A.   I agree that that's what the article
11  says.
12     Q.   And my question is, do you agree that
13  either Fidelity or its counsel should be aware
14  of this caution?
15     A.   Yes.
16     MR. RUFF:  That's all the questions I have.
17  Let me just check with my co-counsel before I
18  walk away from this podium.
19         Your Honor, under stage advice from my
20  partner and co-counsel, they've asked me to just
21  take a two-minute break to see if I have any
22  further.  I think I've finished the outline.  I
23  just kind of wrapped up the last 15 pages in the
24  last two questions there, so.
                                        162

1     THE COURT:  All right, Counsel.
2     MR. RUFF:  One question.
3     THE COURT:  Oh, I'm sorry.  For the record --
4     THE CLERK:  Kimball Hill, Inc.
5     THE COURT:  When we get near the end of the
6  day, everything sort of accelerates as we all
7  move to the doors.
8     MR. RIORDAN:  Or slows down.
9     THE COURT:  Right.  Go ahead, Counsel, your
10  witness.
11  BY MR. RUFF:
12     Q.   Mr. Kilburn, one final question.
13  You've been a gentleman to me.  Have I been a
14  gentleman to you, sir?
15     A.   Always, sir.  It's a pleasure.
16     MR. RUFF:  Thank you.  That's the only
17  question I had, your Honor.
18     THE COURT:  That was worth coming back for.
19  Okay.  So, again, we're going it recess until
20  tomorrow morning.
21         Mr. Kilburn, you remain under oath with
22  respect to your testimony; but you are, of
23  course, the client in this matter.  And you
24  are -- can consult with your attorneys during
                                        164

```
 1   the break.  And we'll pick it up tomorrow
 2   morning at 9:30 a.m.
 3       MR. RUFF:  Very good, your Honor.
 4       THE COURT:  All right.  Thank you all very
 5   much.
 6       MR. RUFF:  Thank you for your time.
 7                    (which were all the proceedings
 8                     had in the above cause this
 9                     date and time.)
10                    (Proceedings concluded at
11                     5:18 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
                                            165
```

```
 1   STATE OF ILLINOIS      )
 2                          )  SS:
 3   COUNTY OF C O O K      )
 4
 5       Dorelle Scheeringa, as an Officer of the
 6   Court, says that she is a shorthand reporter
 7   doing business in the State of Illinois; that
 8   she reported in shorthand the proceedings of
 9   said hearing, and that the foregoing is a true
10   and correct transcript of her shorthand notes so
11   taken as aforesaid, and contains the proceedings
12   given at said hearing.
13       IN TESTIMONY WHEREOF:  I have hereunto
14   set my verified digital signature on
15   August 28, 2018.   Dorelle Scheeringa
16
17       _____
18       Illinois Certified Shorthand Reporter
19
20
21
22
23
24
                                            166
```

| | | | | | |
|---|---|---|---|---|---|
| **$** | **129** | **2017** | 12,14 28:21 31:11 | **A** | **addresses** |
| | 143:22,23 | 131:2 | 39:16 41:18 42:10, | | 14:2 |
| $2,875,447.30 | **12th** | **20th** | 17 54:17 126:21 | **a.m.** | **adequately** |
| 84:6 | 126:5 | 131:2 139:3 | 145:20 | 139:11 140:15 165:2 | 17:21 |
| | **13** | **21** | **60/40** | **abdicating** | **adjacent** |
| **0** | 56:8 60:5 109:5 | 57:12 | 124:19,22 125:5 | 150:12 | 7:22 |
| | **14** | **22** | **6004** | **ability** | **administer** |
| **09** | 50:16,18 | 82:14,15,19 109:6 | 39:6 | 123:21 | 110:8 |
| 160:10 | **145** | **22-claim** | **6006** | **above-referenced** | **administrator** |
| | 82:14,15,19 | 141:4 | 39:6 | 66:13,16 | 69:8 71:7,18 77:8 |
| **1** | **14th** | **22nd** | **6007** | **absolutely** | 126:24 |
| | 12:17 14:24 | 59:5 80:3 | 39:6 | 22:7 145:14 | **administrators** |
| **1** | **15** | **23rd** | **698** | **absolved** | 69:16,21 70:3 71:23 |
| 10:4 13:10 23:9 | 52:17 109:5 140:15 | 79:19 134:17 | 43:19 | 110:17 | 72:6 77:2 |
| 24:23,24 30:1,24 | 162:23 | **24** | | **accelerates** | **admit** |
| 31:23 38:13 45:6 | **15th** | 74:22 82:14,15,19 | **7** | 164:6 | 107:12 147:15 |
| 65:15 66:14 80:7,8 | 50:20 | 119:13 | | **accept** | **admitted** |
| 82:2 84:21 127:1 | **16** | **240** | **7** | 127:4 | 148:3 149:21 |
| 131:16 134:16 | 30:24 137:13 | 128:10 | 7:21 9:13 11:19 | **acceptable** | **advanced** |
| 135:23 139:5,8 | **16th** | **247** | 28:20 38:9 39:18 | 11:14 | 49:18,22 |
| **10** | 84:23 | 131:16 | 41:20 43:21 44:8 | **access** | **adverse** |
| 21:9 | **18th** | **24th** | **75** | 89:2 | 5:14 163:8 |
| **100** | 15:23 19:11 129:21 | 119:10 120:19 | 38:9,12 41:19 | **account** | **advice** |
| 67:10,14 | **192** | **25th** | **77** | 129:1 148:5 149:9 | 37:17,23 38:5,7 |
| **101** | 109:5 | 27:17 30:2 | 43:15,17 | **accurate** | 148:1 158:16,24 |
| 70:14 | **196** | **26** | **78** | 122:19 | 160:2 162:19 |
| **102** | 111:13 | 124:11 134:16 | 50:4,6 | **acknowledge** | **advise** |
| 72:14,18 | **1986** | **262** | **7th** | 16:9 21:16 28:15 | 89:22 93:11 121:12 |
| **103** | 90:9,11 98:17 99:22 | 137:13 | 140:14 | **acknowledgement** | **advised** |
| 73:14,16,23 75:15, | **19th** | **27th** | | 73:7 | 15:2 |
| 19 | 31:23 45:9 73:17 | 102:16 | **8** | **acknowledges** | **advises** |
| **104** | 143:16 | **28th** | | 77:21 | 68:8 71:10 73:10 |
| 74:19 | | 63:14 | **8** | **acknowledging** | 76:14 80:2 |
| **105** | **2** | **2nd** | 12:10 31:10 40:2 | 64:4 85:5 | **advising** |
| 75:24 76:2 | | 77:22 139:10 140:14 | 42:19 48:19,24 | **acknowledgment** | 57:13 58:9 65:22 |
| **105(a)** | **2** | | 128:10 | 75:5 | **affect** |
| 39:1 44:8 | 12:20 25:1 45:6,7 | **3** | **85** | **acquired** | 16:11 21:18 |
| **106** | 66:14 67:17 68:1 | | 6:3 12:1 | 89:7 | **affirmatively** |
| 77:13,16 | 72:11,22 76:19 78:8 | **3** | **86** | **acquiring** | 40:5 |
| **107** | 80:7,8,14 86:11 | 11:12 46:19 57:9 | 10:3 | 87:3 104:24 111:18 | **afternoon** |
| 79:13,16 | 119:17 124:13 | 59:12 73:22,23 | **87** | 113:12 | 93:1 |
| **108** | 126:12 | 80:14 90:8 115:12 | 10:14 12:4 | **acquisition** | **agency** |
| 84:13,15 | **2-1102** | 122:2 | **88** | 87:8 | 7:4 11:5 18:19 24:5 |
| **109** | 5:15 | **30th** | 12:8 | **act** | 27:10 |
| 85:13,16 86:4,6 | **20** | 69:3 | **89** | 38:7 | **agent** |
| **10th** | 109:6 | **31** | 15:14 | **acted** | 6:17,20 10:21 18:11 |
| 77:17 | **2007** | 38:23 | **8th** | 88:11 | 23:20 27:1 |
| **11** | 117:24 118:6 | **363** | 30:8 | **acting** | **agents** |
| 32:6 39:1 44:8 | **2008** | 39:1 | | 66:11 72:19 100:13 | 147:13 |
| 115:14 128:10 | 38:23 43:21 45:9 | **365** | **9** | **action** | **agree** |
| 137:13 | 50:21 52:17 118:1,6 | 39:2 | | 88:2 90:19 113:20 | 6:16,22 8:10,16,19 |
| **110** | **2009** | **38** | **9** | 115:2 123:24 | 9:4,6 10:14,21,23 |
| 85:19 101:24 108:11 | 121:2 | 91:6 | 51:4 | **actions** | 12:6 13:1,17 17:9,22 |
| **111** | **2010** | | **90** | 68:20 95:6,13 | 18:5,10,13 20:10 |
| 115:5,7 | 6:8 10:9 12:17 14:24 | **4** | 17:24 18:3 20:6 | **active** | 21:5,20 23:20,23 |
| **112** | 15:23 24:14 26:14 | | 53:6,16 | 53:21 54:4 | 26:13 27:1,4 31:16 |
| 120:7,9 | 27:18 30:2,8,24 | **4** | **91** | **actual** | 32:11,13 33:1,11,17 |
| **113** | 31:24 57:12 63:15 | 7:22,23 9:12,15 49:2 | 22:18 23:6,9 | 105:7 | 37:23 41:22 42:4 |
| 119:7,9 121:24 | 67:14 69:3 70:8 | 80:14 | **92** | **add** | 45:22 46:21 49:6 |
| **114** | 72:19 73:17 74:22 | **4th** | 26:17,19 30:12 | 42:9,17,18 43:7 | 50:13 52:5 54:22 |
| 124:8 | 76:4 77:22 121:3 | 115:9 | **93** | 112:4 136:10 | 63:3,23 64:6 65:17 |
| **11:17** | **2011** | | 29:4,7,23 | **added** | 68:19 76:4 77:11 |
| 139:11 | 77:17 79:19 84:23 | **5** | **94** | 84:10 112:11,13 | 79:6 80:9 84:17 |
| **11:32** | 86:7 95:7,14,17 | | 30:20,22,24 | **adding** | 86:13,18 101:7 |
| 140:15 | 97:10 102:16 115:9, | **5** | **95** | 137:4 | 103:18,22,24 104:2 |
| **11th** | 14 119:10,14 120:19 | 21:3 44:17 46:19 | 31:19,23 | **addition** | 109:20 122:17,20,24 |
| 6:8 10:9 72:18 86:7 | 121:21 124:11 | 115:13 131:16 | **96** | 22:22 46:13 52:4 | 124:1 125:12 128:8 |
| **12** | 137:7,17 145:12,20 | **506(a)** | 56:23 57:1 | 105:1 | 131:5 134:11 135:17 |
| 32:7 123:13 | 146:6,8 | 39:2 | **97** | **additional** | 136:22 137:20 |
| **120** | **2012** | **5:18** | 60:8 64:15 | 9:19 15:23 78:4 | 138:5,6,9 142:3 |
| 125:22,24 | 134:17 145:11 147:9 | 165:11 | **98** | 88:17 108:16 111:11 | 147:20 151:19 |
| **121** | **2013** | **5th** | 81:13,14 | 131:7 | 152:11,16,23 153:5, |
| 129:18 | 139:3,10 | 24:14 26:14 67:14 | **99** | **address** | 15,18 154:1 157:4 |
| **126** | **2014** | 70:8 76:4 | 65:7,10,17 73:1 | 15:24 83:15 | 158:10 159:11 |
| 134:14 | 127:1 | | **9:30** | **addressed** | 161:8,9,24 162:8,10, |
| **127** | **2015** | **6** | 165:2 | 14:4 20:17 88:23 | 12 163:4,17 |
| 138:17,21 | 126:5 129:21 | | **9th** | 158:22 | **agreed** |
| **128** | **2016** | **6** | 11:16 | **addressees** | 24:20 37:8 54:22 |
| 142:2,3 | 143:16 | 11:12,19 12:3 13:4, | | 74:10,17 75:16,20 | 59:20 60:2 68:24 |
| | | 18 14:2 16:1 21:8, | | | 84:11,12 104:8,9 |
| | | | | | 106:11,12 |

agreeing
17:12
agreement
13:7 16:12,17 20:1
21:19 22:2 28:17,20
31:8 47:20 62:16
86:17,23 88:21
89:15 97:18,21 98:7,
8 103:7,12,16,20
104:13,17 105:8
108:18 111:7,16
113:10 122:14
138:13 156:13
agreements
89:7 108:15 111:23,
24 136:12
agrees
35:3 46:24 133:9
155:20 157:23
ahead
70:13 92:9 100:24
128:20 146:16 164:9
allowed
36:7 78:22 145:12
allowing
90:24
amended
39:23 50:9,12 55:16
amount
83:18,24 84:4
analysis
102:19 108:7 123:18
157:13
analyze
78:18
analyzed
98:21 100:1
Anne
65:10
annexation
13:7 16:12,17 21:19
22:2 28:17 47:20
86:17,22 89:15
97:17,21 98:6,8
103:7,11,16,19
108:18 111:7,16
113:10 122:14
136:12
answers
129:2 159:3
anticipation
118:10
apologize
22:8 37:13 139:18
161:14
apparent
127:10
appeal
34:20 132:12,22
appearance
89:1 145:3
appeared
142:13 145:10,11
appears
9:7 120:10 144:2
applicable
39:9 43:3 45:11
47:20 51:20 136:12
applied
108:7
apprise
130:1
apprising
91:11
approach
13:5 125:20
appropriately
14:4
approval
20:8

approved
20:12 49:14 131:10
approximately
91:18
April
30:8,24 31:23 43:21
50:20 52:17 57:12
59:5 63:14 69:3
121:3 139:3
Arch
10:11 58:11
area
91:13,14,15 128:1
136:19 160:14
argue
146:10
argued
142:13
argues
46:24
arguing
87:2 132:23
argument
25:14,21 46:20 49:8
130:5 147:21 157:14
argumentative
54:5
arguments
96:6,24 146:12
article
144:2 145:5,17,18
146:2,8 147:3 148:2
149:3,6,19 150:1,17,
18,23 151:4 154:20
155:9 156:18,23
157:3,9 162:10
Aurora
86:7 115:14
author
155:6,9
authorization
131:7
authorized
67:18 69:8,16,21
70:4,11 71:23 72:6
77:8
authorizing
39:9 45:10
automatic
58:23
avoid
29:18 153:2
avoidance
42:19 51:8,10,13
aware
20:21 75:8 76:20
117:24 123:14
137:11 154:21
159:12 160:3 162:3,
13

─────────────
B
─────────────
back
5:4 8:2 9:17,18
11:21,22 26:1 36:1
41:12 51:4 58:7
64:14 75:12,13
84:20 92:7 93:22
94:20 95:8,10
117:16 145:11,15
156:9 158:3 159:22
160:10 163:20
164:18
backtrack
75:14
bankruptcy
34:1,2 35:17 36:24
37:3,4,17,20 38:3
39:5 41:24 43:13,18
44:12 49:10,19,20
124 50:21 52:11 53:3

55:6 56:5,7,12 58:2
65:5 66:4 88:1 89:2
90:12,19 91:6 96:4,
22 98:22 100:1,4
101:9,13,21 107:18,
24 108:6 110:16,19
114:24 117:6,9,12,
19 118:2,8,19,20,21
123:15,20 130:20,24
131:9 145:7 151:24
152:16,22 153:3,21,
24 155:2 156:20
157:1 161:3
Bart
71:6
based
42:4 89:14 97:9,17
117:21 124:19 125:7
127:24 128:22
146:23
bases
89:11 108:2
basis
29:16 53:10 104:22
107:16,21 111:4
157:21
Bates
144:6
bearing
34:15
began
56:12 95:24
begin
56:14 78:23 92:5
107:11 163:6,10
beginning
91:12 92:7 137:7,17
161:1
begins
138:23
behalf
9:22 19:18,19 20:2
31:8 32:22 46:23
73:10 150:13
belief
103:10,14 104:22
believed
124:22
bench
34:21 93:12 149:14
benefit
151:21,23 152:13,15
bit
15:18 29:6 70:21
74:13 92:13 99:18,
19 112:11,13 153:9
154:4
black
86:23
blocked
42:18 123:2
blow
60:22 84:2 102:7
126:2
blown
61:21 85:15
body
43:23
bold
16:5 84:1 116:4
bolded
38:17 42:11 44:1
bond
26:8 46:7,8,15 47:3
57:19 58:11 60:13
64:19,24 71:19 74:6
77:3 78:15,18 87:20
89:13 90:6 105:5
110:18 113:19
118:15 136:23 138:7
151:20,21 152:12,13

bonded
79:4 89:9 138:12
bonding
40:6,9 42:21 43:2
51:15,19
bonds
25:15 28:5 46:2 47:4
56:9,15,21 59:7,16
60:3 62:24 65:4
66:1,13,16,17,19
69:11,12,13,23 70:6
72:2,9 73:3 78:1,24
80:4 83:20 84:6
85:3,7,11 87:4,7
88:12,22 91:1 95:20
111:1,17 113:11,24
116:11,18 117:22
118:11 121:7 123:3
124:4 125:3 127:5,
13,18 130:15 138:14
140:10 143:8 152:20
160:12
Bonnie
85:17
bottom
7:22 15:17 19:2,4
23:8 24:12 29:24
30:10,13 42:10
46:20 58:14 62:11
63:19 139:6,8,12,14
144:3
bought
52:16
Brandon
142:8
break
5:20 40:16,21,23
41:2,5 91:19,23
122:3 124:14 136:20
162:21 163:2,19
165:1
Brent
73:18
brevity
45:20
bring
51:7 102:2 145:24
149:16,22
broken
108:13 120:5
brought
13:14 25:18,19
Bruce
115:9
builder
105:23 106:22
built
94:16
bunch
92:11
business
88:6 105:18,20
125:18 128:6 129:9
133:20 134:1

─────────────
C
─────────────
C-A-R-L-I-N-O
78:13
call
5:4 41:23 80:4 91:1
92:1 114:11 155:14
called
5:14 40:12 43:4
69:20 95:21 133:2
calls
99:3 106:3
capacity
7:10,11 18:23 24:9
27:15

capital
38:19
carbon
84:16,18 139:2
care
94:21,24
Carlino
78:12 84:9 121:10,
17
case
10:14 34:13,14,15
53:23 54:13,19 62:7
64:24 88:16 90:9
93:8 94:15 96:6
97:22 98:2,3,9,15,
17,20,21 99:9,11,22
100:1,14 101:8
114:6 117:21 119:2,
4,10,13,21 120:17,
22 123:19 124:8,10
125:24 128:5,14
129:8,18 131:1
136:10 141:5,15,18
142:14,20,24 143:6,
20,24 144:11,19
145:2,3,10,13 147:9,
12 149:6,9,10
153:16,19 154:2,7,
14,23 155:19 157:5,
13,14 158:10,14,15,
22 159:5,24 160:3
162:1,3
cases
80:19 93:20
catching
22:11
caused
107:5
caution
12:19 113:5 161:6
162:14
cautioning
102:4
cautions
149:8 157:5 158:11,
15 159:5 160:1
162:3
cautiously
150:19
caveat
80:9
cc'd
12:15 63:18,22
72:23 75:1 76:20
86:13
cetera
44:9
chain
19:9
chance
124:22
changed
33:6 54:16
changing
33:20 150:14
characterization
35:23 96:8 114:21
128:9
characterize
55:20
charge
36:21 127:24
charges
153:4
Chatham
46:4 47:22 48:16
check
162:17
checking
92:5



**Chicago**
150:4
**chief**
64:8
**circulated**
11:13
**circumstances**
100:19 106:18 113:4
**cite**
143:1
**cited**
86:23 98:15
**cites**
90:9
**cities**
137:18
**city**
27:19 28:9 57:3,13
61:13 64:8 65:14
71:7 79:21 80:3
**city's**
137:8
**civil**
5:15 94:17
**claim**
28:16 64:5,11 65:3
88:10 91:5 95:6,13
97:15 98:4 107:24
108:8 115:18
117:22,23 118:3,13,
16,21 119:23 140:4,
8 141:6
**claims**
14:19 15:9 16:15
22:1 58:11 59:1
64:19,24 97:5,9,11,
16 101:12,19 102:14
111:2,4,19 113:13,
19 114:3,4,11
118:24 120:17
123:21 140:3 150:4
153:22 155:3 156:21
160:11
**clarification**
17:18 20:23 22:22
26:1 42:5 43:12
44:13 49:5 50:13
53:18 55:1 88:17
90:1 97:3 110:21
117:16 130:14
**clarifications**
32:24
**clarifies**
40:1
**clarify**
38:24 42:1 43:7 44:7
54:17
**clarity**
17:15 127:11,16
**clear**
14:18 15:9 62:1
100:18 120:5
**CLERK**
5:6 41:11 92:3 164:4
**client**
150:13 164:23
**clients**
144:5
**close**
55:10 163:3
**closely**
106:19
**closing**
133:7,10,16 146:11,
12 147:21 148:4
158:22
**co-counsel**
22:21 162:17,20
**Code**
5:15

**coextensive**
97:24 98:11 111:9
**collateral**
36:1 153:24 157:1
**collectively**
40:8
**comment**
7:23 8:3,6,7,14,15
9:1,4,6 14:2 29:2
157:10
**comments**
8:12
**committee**
95:7,14 97:6,9
102:14 111:2,19
113:14 114:5,11
119:1
**commonly**
46:2
**communities**
27:22
**community**
67:17 70:10
**companies**
42:22
**company**
38:24 39:10 40:7
42:2 43:2,4 44:7
45:12 51:15,20
160:13,19
**compare**
11:20 52:3
**competent**
160:14
**complaint**
153:20 154:22
156:14
**complaints**
135:6,19,20
**complete**
57:15 59:1 62:14
66:17 78:5,17,18
**completed**
121:13
**completely**
34:11
**completion**
48:4,21 49:12
**component**
13:5
**compound**
99:16
**Con**
11:11,13 126:22
**Con's**
10:10
**concede**
16:15 22:1
**concept**
87:7 98:3
**concern**
9:3 25:13,24 88:10
**concerned**
20:11
**concerns**
15:24 16:1
**concluded**
83:3 110:10 129:13
132:2 134:5 137:24
165:10
**concludes**
17:5
**concluding**
163:3
**conclusion**
36:14 105:15 106:2,
13,24 107:6 152:1,6
153:9 154:6 155:5
157:9,11

**conclusions**
102:18 148:4 155:8,
11
**conditionally**
157:6 158:11 159:7
162:4
**conditions**
86:17
**confirmation**
14:15,17 15:6,7 60:6
101:13,20 108:6
115:3 121:1 123:20
134:6 159:10 162:7
**connection**
13:20 87:10 118:7
147:18
**conserve**
29:5 38:10
**consideration**
114:23
**considered**
101:12,19 105:7
151:10
**constitutes**
81:22 146:7
**construct**
59:15 86:18
**construction**
47:9,18 48:2,14
82:12 105:19
**consult**
69:7 77:1 164:24
**consultant**
78:9,17 121:8
**consulted**
20:6 71:22 72:5 77:7
**consulting**
70:3
**contained**
66:18 104:13 108:15
**contemplating**
95:24
**contempt**
153:4
**contending**
116:16
**contends**
116:11
**contents**
6:23 10:24 18:14
23:24 27:5
**context**
14:4
**contingent**
91:5
**continue**
36:12 69:14 113:5
127:4 130:13,17
132:11 155:24
**CONTINUED**
5:18
**continuing**
46:8 136:8
**contract**
116:10,17,19 117:3,
5,18
**convenance**
110:7
**conveyance**
108:16,23 109:3
110:4
**conveyed**
104:15 108:22 109:2
110:4
**Cook**
115:9,23 116:7,9
**copied**
60:17,19 61:1,6,17
68:2 72:12 84:17,18

**copies**
59:8 60:16,17 61:12
**copy**
19:15 65:20 68:6
77:22
**copying**
139:2
**cordial**
127:4
**corner**
144:4
**corporate**
11:9
**correct**
6:6,9,10,13,18,20
7:1,2,4,7,12,13 8:8,
12,18,22,23 9:15,20
10:6,22 11:2,3,5,9
12:15,16,17 14:24
15:1,12,24 16:2,6
17:13,18,23 18:23
19:16,21 20:3,8,12,
18,23,24 22:8 23:3,
4,17,21 24:2,5,10,
14,16,23,24 25:6,9
26:4,9,10,11,12,16,
22 27:2,7,10,15,20,
21 28:1,2,6,22 29:2
30:8 31:3,9 32:19,20
33:6,7,12,18 34:2
35:20 36:24 37:17
38:7 39:14 42:2,7
44:9,10,14,18,22
45:4,22 46:17 49:12,
15,20 50:2,3,22
51:24 52:8,13,16,20
23,24 53:3,4 54:11,
6,7,21 56:6,9,10,15,
21 57:4,15,19,22
58:2,5,6,12,13
59:10,12,13,18 60:3,
6,13 61:2,13 62:17
63:1,9 64:9,11 65:5,
11 66:1,2,4,9 67:8,
14,23 68:3,6,9,14
69:24 70:6,7,15
71:8,13,19 72:2,3,9,
10,12,13,20,21,23
73:3,6,12,20 74:2,6,
7,23 75:1,4,5,9,10,
20,21,22,23 76:8,12,
17,21 77:4,5,12,19
78:2,10,11,12,13,14,
19,20,24 79:11,17,
22,24 80:5,15 82:10
24 84:6,7,24 85:4,5
86:9,10 87:7,14,20,
23 88:5,18,19,23
89:3,9,10,15,16
90:6,9,10,12,15,20,
21 91:3,4,7 95:7,
15,21,22 96:1,2
97:1,2,7,8,12,13,18,
19 98:1,13,14,22,22
102:14,16,20,21
103:4,5,8,12,16,17,
20,21,23,24 104:4,5,
9,24 105:2,5,6,18
106:7,16,21,22 107:7
111:4,6,7,9,16 162:2,
9,13 164:1,1,9

**121:**4,5,8,10,13,14,
18,19,22,23 122:23
123:9,21,22 124:6,7,
11,12,23,24 125:5,6,
10,11,16,17,20,21
126:5,6 127:20,21
128:2,3 129:22,23
130:3,4,7,8,11,12,
15,16,22,23 131:4,
24 132:7,13,16,22
133:21,23 134:2,9,
13,17,18,20,21,24
135:3,21,22 137:10
138:8,9,14,24 139:3,
4,10 140:10,11
141:1 142:11,12,15
143:20 144:1 154:14
155:9 156:21,22
157:2
**correcting**
135:16
**correction**
135:17
**correctly**
7:19 10:12 11:17
13:8,22 14:5,21
16:18 17:7 19:12
21:21 22:4 28:10,18
30:18 32:4 39:3,7,11
40:10 43:3,5 45:17,
18,23 46:5,10,13
47:4,10,24 48:6,17,
24 50:24 51:21 59:3,
9,22 63:5 64:21
66:23 67:5,20 69:4,
17 86:20 87:17,23
104:19 116:13
122:11,15 123:16
124:20 126:15
127:1,7,14 135:10
136:6,13,24 137:5
140:5 143:2,9,17
**correctness**
131:3,22
**correspondence**
57:2 72:12
**cost**
78:17,18 82:13
127:12,17,23
**costs**
66:20
**council**
80:3
**counsel**
5:11 20:15 36:3
37:17,23 38:4 40:20
41:5,14 54:2 55:12,
23 57:2 58:10 59:8
61:20 64:18 68:6
70:23 73:6 76:15
80:20 83:1,15 89:1,
5,24 92:4 96:10
99:6,19 101:17,21,
23 105:2,16 106:1
107:3 111:12 112:1,
9 114:16 131:6,12
133:1 141:9 144:5,
22 146:18 148:16
151:12 152:6 154:8
157:19 158:17
159:1,6,12 160:2,9,
13,22 161:11 162:2,
9,13 164:1,9

**31:**14 32:1 34:12,17,
22 35:3,6,12,14
36:3,11 40:20,23
41:1,7,9,12 42:13
43:13,24 45:3,10
51:2,8 52:11 53:8
54:2,7 55:11,20
60:21 61:19,24
63:18 65:5 70:22
71:1,3 80:19,20
81:1,8,13,19 83:13
89:20 91:11,15,23
92:1,4,15 93:3,10,15
94:1,3,11,12,19
95:1,6,13 96:10,14
96:18 99:5,18
100:15,22,23 101:1,
4,9 106:6,15 107:2,
10 109:20 110:16,19
112:1,8,17,20 113:1,
3 114:24 117:9
127:6 128:16,20,23,
24 129:5 130:20
131:20 133:1,3,6,14
134:5 141:9,13,17,
23 142:14,21 143:6
144:22 145:15
146:18 147:17
148:10,14,17,21
150:8,11,19,22
151:1,6,12 152:4,9
153:3,8,13,19 154:6,
8 155:23 156:8,14
157:12,19 158:6
159:15,21 161:6,21
163:1,5,14,18 164:1,
3,5,9,18 165:4
**court's**
34:10 153:24 154:21
157:1
**courts**
130:24
**covenant**
89:16
**coverage**
122:2,5
**craft**
14:1
**Creditors**
36:1
**cross**
36:17 83:16 93:6
94:4,7 163:7,10
**cross-exam**
148:24 149:1,2
**cross-examination**
149:16 155:17
**cross-examine**
149:22 151:3
**crossing**
163:10
**curbs**
48:4
**current**
111:5

---

D

**damage**
28:16 66:21
**damages**
132:16
**date**
32:1 84:23 120:7,8
126:2,5 134:15
143:11,14 165:9
**dated**
43:21 63:14 67:14
70:8 72:18 73:17
77:17 79:16 86:6
115:9 119:10,13
129:21 145:20 146:5



David
102:12 115:8
day
10:8 17:2 19:11
161:1 163:3 164:6
days
93:2
dealing
30:5 76:11
deals
67:22 141:5
dealt
14:17 15:8 76:10
Dean
1:11
debtor
14:17 15:8 16:17
22:3,5 35:19 50:1
105:13 152:20 161:4
debtor's
45:13
debtors
17:5 22:7 39:9 45:11
139:23 140:2
decades
160:14
December
127:1
decide
34:16 133:24 163:19
decided
95:5,12 97:16
130:13,16
deciding
101:11,18 105:8
decision
97:10 111:1 113:19,
24 114:5 125:2,18
127:16,22 129:2
130:18,21 132:14,17
133:20,22 134:1
160:20
decisionmaker
37:12,15
decisions
128:6 129:10
declare
91:1
declares
118:19
declaring
59:14 73:24
default
56:14,20 59:14
65:23 67:4 73:24
91:2
defaulted
79:6
defaults
121:6
defendant
136:10
defendants
137:4
defense
94:5,20 127:7
deliberative
102:20
deliver
24:21
demand
57:17 59:7,16 64:5
65:24 66:12,14
70:14,17 71:24 72:7
73:2,6,8 74:4 75:4,6
77:9,24 85:3 117:21
demands
59:7 118:11 121:7
demonstrate
145:4 148:24 150:1

demonstrates
145:5 149:6,11
denial
89:12 115:18 124:1
deny
97:16 111:1 113:19
denying
111:4
depending
55:18 97:20 132:10,
15 133:19
Depends
133:4
Deposit
44:7
deposition
7:7 11:8 18:22 24:8
27:13,14 36:10
80:22 81:9,16
106:12 107:13
109:9,16 112:6
118:14 120:2 131:6
134:12 147:8 149:7
154:19
describe
125:9
designation
144:3
designee
39:11 40:5 45:12
determination
34:22 96:15 110:16
111:15 113:9,13
117:17
determine
79:7 115:1 149:13
determined
34:21
determining
114:10
developer
153:20 154:23
156:15
development
47:20 48:3 67:18
70:10
development-
related
47:9
developmental
47:18 48:15
developments
45:16
difference
28:15
direct
94:5 163:8
directed
93:14,15 131:11,12
132:18
direction
91:12
director
67:17 70:10
disagreed
17:10 45:3
discharge
25:15 26:7 88:11
110:22
discharged
25:15 26:8 110:23
disclosed
149:18,19
discovery
6:12 10:18 18:7
23:16 26:21 143:24
discrete
161:4
discuss
97:6

discussed
6:6 7:7 10:6 11:8
18:22 24:8 25:12
27:13,24 65:15,19
97:15 106:1 119:1
120:2 159:2
discusses
102:18
discussing
5:21 27:24 41:19
105:16 117:4
discussion
25:16 113:16 114:20
121:20 123:18 124:4
127:9
discussions
31:7 113:18
dismiss
135:6
dismissal
154:21
dismissed
127:6 153:19 156:14
disposed
141:8
distress
118:2
docket
43:18 89:3
docketed
69:3
document
7:6,21 9:23 11:7
18:21 19:24 20:5
24:7 27:12 29:14
73:22 74:16,22
83:11 86:12 87:14
96:9 126:21 143:23
144:8,10 147:16
155:6
documents
10:16 23:14 81:5
92:12,14 126:19
dollars
56:8 116:6
doors
164:7
doubt
42:20 51:13
draft
5:22 8:20 11:13,14
28:8
drafts
25:12
draw
148:4 154:5 155:11
157:12
drawn
155:8 157:9
Dudik
139:2,9,22 140:14
duplicate
140:3
duty
81:15

E

e-mail
6:4,11,16,23 8:22
10:5,16,20,24 12:13,
20 13:17 15:15,22
18:5,10,14 19:2,8
23:15,19,24 24:12
26:20,24 27:5,18
29:23 30:11,23 58:8
60:11,15 61:6,11,17
62:2 64:16 102:8,12
111:22 134:15
136:18 137:11
138:22,23 139:9,21

140:13 141:5 142:6
143:14
e-mails
6:6 25:20
earlier
25:11 28:14 65:16,
19 97:1 120:1
139:23
early
117:24 118:4,6
easier
29:5
Edgewater
77:18 86:19
effort
25:21
efforts
60:12
Eichelberger
73:18
electronic
44:17
Elgin
57:3,13 58:4,10 60:1
61:13 62:23
Elgin's
60:12 64:11
encouraging
137:8,18
encumbrances
14:21 15:12
end
14:11 40:9 94:2
96:16 125:9 164:5
enforceability
16:16 22:2
enforceable
116:12
enforcement
146:4
engaged
105:18,20
engender
151:8
engineer
64:8,9
engineer's
82:11
engineering
78:9
entered
19:21 28:13 45:10
53:19 56:11 78:22
87:11 90:23 117:5
121:2,16 130:24
131:20 161:2
entire
21:14 51:10 89:3
140:21
entities
100:5
entitled
13:20 107:17,24
112:7 133:6,8
entity
41:23 43:11 99:1,2,
10 104:7
entry
16:9 21:17 39:22
52:11 60:5
equally
101:5
equating
147:3
equivocal
101:5
erroneous
13:19 14:14 15:5
essentially
94:4,7 102:7 152:3

establish
10:15 23:12 71:16
established
6:19
estate
41:24 49:10,19,24
105:21 110:8 117:6
estimate
82:12
evaluating
95:19 121:17,18
event
104:14 157:4
Evers
64:7,8
evidence
20:20 93:18 96:16
148:3
exact
52:4 80:24 99:9
EXAMINATION
5:18
examined
5:17
exchange
12:13 30:23 31:1
57:2 60:12 61:1,9
138:22,23 139:9
excuse
22:7 24:18 30:7 32:6
70:12 73:2 126:18
135:14
execute
19:20
executed
19:15 24:19 69:2
execution
16:14 21:24
exhibit
6:3 9:13 10:3,14
11:20 12:1,4,8,10,20
13:11 15:14 17:24
18:3 20:6 21:3,9
22:18 23:6,9 26:17,
19 29:4,7,23 30:12,
20,22,24 31:11,19,
23 38:9,12 40:1
41:18,19 43:15,17
44:17 50:4,6 53:6,16
56:23 57:1,7,9 60:8
63:11,14 65:7,10,17
67:10,14 70:14
72:14,18 73:1,14,16,
23 74:19 75:11,15,
19,24 76:2 77:13,16
79:13,16 81:18 82:3
84:13,15 85:13,16,
21,22 86:4,6 101:24
108:11 115:5,7,13
119:7,9 120:7,9
121:24 124:8
125:22,24 129:18
134:14,16 138:17,21
142:2,3 143:22,23
144:16
exhibits
73:1 81:16 160:7
exist
42:6
expand
116:5
expected
92:8
expend
140:9
expense
67:2
expenses
134:7

experiencing
118:1
expert
92:24 126:13
experts
134:8
explain
13:3
explanation
36:6 113:2
exposure
79:8,11 84:11 85:9
95:19,20 114:7,12,
13 121:12,18
expunge
140:2
extend
161:3
extent
37:8 87:16
extinguished
153:22 155:2 156:20

F

F&d
25:5 32:4 34:13
45:24 46:1,9,16,24
57:17 77:22,24
146:8,13
F&d's
47:3 136:4,23
face
62:1
facilities
41:3 91:20
facing
153:3
fact
9:12 114:11 120:16
146:5 147:24 155:7
factor
114:17 134:3
factors
107:5 114:10,14
facts
106:8 119:15,16,18
factual
157:13
failed
57:14
failure
66:22 81:21
fair
10:1,2 85:11,12 97:8
114:21 119:11
120:23,24 128:4,21
129:10,11
fall
100:15
familiar
153:16 154:13
155:18,19 158:19
familiarity
154:5
fashion
9:7
fast
82:16
favor
157:5 158:11 159:5
162:3
February
11:16 24:14 26:14
27:17 30:2,7 77:17
79:19 80:3
Federal
39:5
feel
32:16,19 151:5



160:22
**feeling**
151:9
**fees**
134:7
**felt**
9:1,24 32:24 79:8
111:6 131:13
**fence**
133:5
**Fidelity**
6:11 7:1,10 10:17
11:2,9 17:10,17,20
18:6,16 19:20 20:3,
12,14,22 23:15 24:2
26:20 27:7 33:15
34:1 37:6 43:22
44:6,11,24 49:8,17,
18,22 52:7,10,19,22
53:1,21 54:12 55:1,5
56:3,8,15,19 57:14
58:11 59:17 60:3
62:23 64:23 65:3,23,
24 68:5 70:2 71:22
72:5 73:10 74:5 75:7
76:14 77:7,10 78:15
79:2 80:23 83:20
84:6,8 85:8 87:2
88:1,10,20 89:6
90:5,14,17 91:5
95:5,12,14,18,24
97:5,16,22 98:8
101:12,19 102:19
105:12 108:5
110:15,21,23 111:6,
15,17 113:9,10
114:3,13 116:18
117:15 119:22
121:3,7,16 124:17,
22 125:1,8,19 130:2,
5,7,13 132:11,20
134:5,6,20 137:7,9,
17,20 140:7 141:22
144:24 145:2,6,7,10,
13 159:6,11 162:2,8,
13
**Fidelity's**
6:17 9:22 10:21
18:11 23:20 26:7
27:1 31:8 32:21
36:22 37:21 46:23
52:12 59:24 73:5
78:5 84:11 87:4
88:12 89:12 103:14
104:22 113:19
118:19 123:20 130:9
131:3,22 135:20
146:3
**Fidelity-produced**
23:14
**figure**
54:8
**file**
28:16 43:18 44:12
45:1 89:1 117:23
118:3,21
**filed**
38:24 46:21 49:18
52:22 88:2 96:4,22
143:19 145:2 146:4
**files**
144:5,6
**filing**
37:16 44:22 45:3
96:5,23 115:1 118:2,
7,20 151:23 152:16
**final**
19:24 34:22 53:8
108:12 164:12
**financial**
79:10 114:13 118:2

**financing**
48:23
**find**
106:15 125:19
155:15
**finding**
93:14,15,16
**fine**
17:3 19:11 40:22,24
62:4 86:3 106:18
150:11
**finish**
92:17 93:5
**finished**
55:15 162:22
**firm**
58:9 131:9,12
**five-minute**
91:19
**five-plus**
41:2
**fly**
130:7
**focused**
37:20
**follow**
154:17
**form**
39:24 53:24 70:16
77:8,14 89:12
100:8 120:1,3 156:4
**format**
122:1
**formed**
53:10
**forward**
58:17,20
**forwarded**
59:6
**forwards**
59:6
**found**
143:7
**foundation**
10:15 18:4 23:13
29:9 80:17 81:5,15
144:17,21 145:21,24
146:24 148:7 154:4
**foundational**
81:8
**frame**
30:5
**free**
14:18 15:9 32:16,19
146:12
**frequently**
149:2,16,22
**Frieders**
6:5 8:7,15 10:4
12:14 13:17 15:15,
22 16:5 19:10,18
31:2
**Frieders'**
12:19
**front**
112:19 139:11
142:14
**fulfill**
66:13,16 74:5
**full**
62:14 87:15 89:2
114:20
**fully**
24:19 67:1
**Funding**
38:24 39:10 45:11
**future**
127:13,17,24 128:6
129:10 130:15

**G**

**G-A-U-R-A**
65:11
**gain**
58:24
**Gary**
134:24
**Gaura**
65:10
**Gaura's**
73:2
**gave**
128:23
**general**
105:17 111:8
152:18,24 154:4
**generically**
111:24
**gentleman**
46:13,14
**give**
55:12 83:6 85:24
93:2,22 107:3
110:13 129:16 132:5
138:3 161:11
**good**
81:20 91:19 111:13
112:12 136:2 156:6
159:19 160:18 165:3
**Gordon**
24:13
**Goviea**
24:13
**granted**
153:4
**granting**
131:1,21
**Gregory**
5:13 60:24
**ground**
146:19
**grounds**
81:22 153:21 154:9
155:1 156:19
**Grove**
31:2,6 32:3,15 46:4
47:22 48:16 53:11
67:22 68:9 71:21
73:24 74:1,5 75:4,6
76:11 130:2,11
134:20
**Grove's**
134:23
**guess**
54:9 94:12
**Guest**
102:12 113:17
**guidance**
112:14

**H**

**hair**
19:4 38:15
**half**
87:11
**halfway**
15:17
**hand**
10:1
**handed**
85:18,20,21 101:24
**happen**
27:23 160:18
**happened**
34:12
**hard**
84:1

**harmless**
66:19
**heading**
94:13
**headings**
120:4
**hear**
29:12 101:1 133:12,
13
**heard**
100:22,23 109:12
154:15,16
**hearing**
11:17 24:22 25:8
34:16 132:16 134:9
**held**
5:2
**hereto**
40:1
**hey**
130:18 147:14
**higher**
114:19
**highlight**
7:16 14:8,11 21:14
31:13 38:17 42:13
43:24 50:8 51:7,9
58:16 63:19 82:4,7
84:1 104:11 116:4,6
122:6 123:4 126:9
136:1,19 140:19,22
142:22 143:4
**highlighted**
13:14 136:9
**highlighting**
108:12
**highlights**
86:1 143:13
**Hill**
5:6 25:15 26:8 33:24
37:4,21 38:2 41:11
49:20 56:5,12,20
57:14 58:22 59:14
65:24 66:4 67:8,18
68:11 70:9,1 74:1
79:5 85:10 88:4,6,11
90:5,24 91:1 92:3
103:3,11,15,18,23
104:2,3,6 105:18
110:19,22 111:18
113:12 118:1 130:6
164:4
**hired**
78:17
**hiring**
121:17
**hold**
83:22 94:3
**holding**
56:20 99:8 155:19,
20
**home**
105:19,23 106:22
**Homes**
33:24 34:2,6 35:17
37:16 38:3,4 44:11
46:9,11,16 53:18
67:18 68:11 70:9,11
90:14
**homestretch**
92:11
**honestly**
55:11 148:16
**Honor**
5:10,12 29:8,19
33:21 34:16 35:13,
15 36:8 40:24 41:15
51:1 54:1,10 55:8
57:10 61:5,15,23
62:4,21 71:2 72:14
73:16 74:13 75:13,

17 76:19 77:13
80:13 81:7 82:1
85:14,21 89:19 91:9,
22 95:3 96:9 99:4,12
100:9,11 102:5
106:5,7 107:1 112:3,
16 119:17 120:14
126:3,10 129:3,4
133:11,12,17 140:19
141:3,6,15 144:23
146:17 149:12,15
152:6 153:7 154:3
155:4,13 156:6
157:8,18 158:4
159:13 162:19
163:17,23 164:17
165:3
**hook**
79:4
**hope**
50:24 92:10 141:17
**hoped**
160:16
**hopeful**
93:1
**hoping**
92:17
**hostile**
163:8
**hour**
91:18
**Hummel**
142:8,10
**hypothetical**
106:17 152:3,5

**I**

**idea**
70:1 93:7
**identical**
31:16 70:19,20
80:21 122:1
**identified**
59:12 71:6
**Illinois**
5:15 46:3,4 47:21,22
127:12,17
**impact**
123:19
**impacts**
78:18
**impeach**
36:4 109:8,22
**impeachment**
83:12 109:11,14,24
128:22
**imply**
61:20
**improvement**
46:1 143:8
**improvements**
43:1,9 48:22 49:12
51:18 57:15 59:2,16
66:18 79:5 86:19
88:5 89:14 104:18
109:19 111:7 159:9
162:6
**inability**
151:22 152:14
**Inc.'s**
104:2
**include**
40:4 42:20 43:8
47:2,7 48:3,21 51:14
**includes**
8:11
**including**
14:14,19 15:10
42:23 51:16 104:17
108:18

**inconsistent**
15:6
**Incorporated**
46:11,12
**incorrect**
122:21
**incorrectly**
135:15
**incur**
43:9 148:21
**incurred**
67:3 134:6
**indemnify**
66:19
**indicating**
10:9 25:3 62:16
**indication**
61:16
**individual**
36:21 97:20
**information**
38:18 69:15 73:11
78:4 101:17 105:1
111:12 120:9 125:14
**initial**
119:9,12
**initially**
117:24
**initiate**
95:5,12
**injunction**
13:21 24:21 58:24
63:9 64:20 65:1
68:20 69:1
**injunctions**
161:3
**inquire**
150:16 152:7
**inquiring**
81:6
**inquiry**
147:23 148:15
155:22
**insert**
112:3
**installation**
104:17 108:19
**instructive**
157:15
**Insurance**
58:12
**integral**
13:5
**intend**
92:23
**intended**
16:10 21:17 33:16
125:8
**intention**
137:4
**interest**
102:23 122:9
**interesting**
136:23
**interests**
14:19,20 15:10,11
45:15 122:9,18
**internally**
159:2
**introductory**
40:15
**investigating**
78:15
**investigation**
73:12 78:5,10
**investment**
105:20
**investor**
106:23 107:15,22



involve
69:14
involved
7:11 27:22 31:7 34:1
66:6 118:15
involves
117:8
involving
105:8
irrelevant
34:11 144:16 146:10
issue
10:11 13:5 26:2,14
36:15 57:21 97:14
98:21 107:11 112:21
132:16 146:24
issued
59:17
issues
14:3 16:16 22:1
34:6,15,20 36:18
88:9 114:8,15,18,19
117:12
items
80:14

**J**

J5
68:24
January
6:8 10:9 12:17 14:24
15:23 19:11 145:20
146:6
Jim
7:16 8:2 9:9 12:11,
21 13:12 14:9,11
15:17,20 16:22 19:4
21:11 23:9 30:4
31:13 32:8 38:16
39:19 42:11 43:24
45:7 47:14 50:7,18
51:6 58:16 60:22
64:1 74:9 75:13,17
80:13 82:2,4,15
83:22,23 84:21
102:3,10 104:11
108:12 116:7 122:4
123:5 124:13 126:3,
9 128:11 136:2,18
137:14 139:6 140:18
142:18
job
151:14 161:9
Joel
140:24 144:23
Joliet
46:3 47:22
Joseph
79:24
judge
29:13 34:4 35:1,22
50:21,22 53:15 54:5
55:14 80:16 81:10
83:9 109:7 124:15
132:24 135:3 144:15
145:17 148:9 152:2
163:13
judgment
130:1
July
134:17 143:16
jump
11:21 40:18
jumping
64:14 70:12
June
102:16 119:10,14
120:19 121:2 124:11
justifiable
160:23

**K**

Keith
67:13 70:9 76:2
key
28:15
KH
54:22 55:3 57:22
KH1
17:6 22:3,16,23
KHI
22:16 23:2 26:15
33:10 67:19 68:12
70:11 75:8 79:16
102:22 103:6
104:15,16 108:17,22
109:2 110:4 122:8,
13,17 123:14
kicked
114:19
Kilburn
5:8,13,20 22:23
36:5,10 37:14 41:7
60:24 61:17 63:18,
20 106:12 112:4
147:7 163:21
164:12,21
Kimball
5:6 25:15 26:8 33:24
37:4,21 38:2 41:11
49:20 56:5,12,14,20
57:14 58:22 59:14
65:24 66:4 67:8,18
68:11 70:9,11 74:1
79:5 85:10 88:4,6,11
90:5,24 91:1 92:3
103:3,11,15,18,22
104:2,3,6 105:18
110:19,22 111:18
113:12 118:1 130:6
164:4
kind
35:11 148:23 152:6
162:23
Kit
131:8
knew
48:20 49:1 66:3,7,8
88:1 100:14 109:17
145:6,9
knowledge
37:19 147:4 162:1,2
Kyte
92:24

**L**

L-U-S-I-G-N-A-N
30:16
lack
79:4
land
89:17 143:8 152:20
language
13:18 14:1 15:4,24
17:10 19:10 31:16
42:16 43:6 51:23
52:2,3,4,7,13 54:16
71:15,17 76:24 85:6
86:22 88:17 89:14
108:16
large
38:15 114:7,12
132:21
larger
114:7
late
117:24 118:6
latest
134:15

latitude
149:1
law
43:3 51:20 97:22
98:2,3,9,21 116:10
127:12,16 128:1,5
129:9 131:9,12
146:11 158:20
Lawrence
102:13 113:17,22
lawsuit
52:22
lawsuits
160:12
lawyer
147:8
lay
145:24
LCP
137:4
LCP's
136:6
lead
107:8
leads
107:7
leave
133:14 140:3
led
156:12
left
41:17 156:7 158:7
legal
114:8,15 131:8
153:9 157:12
legally
13:18 14:13 15:5
length
161:13
Leo
138:24 139:10 142:7
letter
57:7,17 59:7,11
63:15 64:5 65:9
67:12 68:2,6,8 70:8,
18,19 71:5,19 72:18,
23 73:17 74:21 75:3
76:3,7,21,24 77:22
79:16 84:15,16,24
86:6,13 88:3 89:11
90:8 98:13 115:8,9,
13
letters
16:5 124:1 160:8
level
114:19
liabilities
40:2,6 42:20,21,24
43:7,8 47:1,6,16,16,
19 48:3,15,21 51:14,
15,17
liability
42:6 97:24 98:11
111:9 127:6,19
131:4,23 138:8
liable
87:16
liens
14:20 15:10 45:14
153:22 155:2 156:20
lift
58:23
light
98:22 100:1
likelihood
125:15
limit
112:16
limitation
42:23 51:17

limitations
123:9,13
limited
14:15,19 15:10 48:4
lines
12:4 21:4 48:5 51:11
82:14,15,19 83:14
109:5,6 128:10
131:16 137:3,13
liquidating
140:8
liquidation
64:19
list
80:12,14,18 81:18
82:9,23 93:9
listen
22:12 147:14
listening
156:1
lists
45:16 82:6,7
literally
161:15
litigation
44:21 125:3,19
LLC
39:10 45:12 68:14
long
92:23 94:2 150:3,7
longer
116:12
looked
112:13
loop
25:20 55:10
loss
130:10
lost
130:7 160:19
lot
7:12 85:15 160:19
Love
160:7
Lusignan
30:16

**M**

M-O-E-H-L-M-A-N-
N
57:24
made
6:23 8:15 10:23,24
11:12 12:3,24 17:16
18:13,14 22:23
23:23,24 27:4,5
32:15 38:6 43:1
51:19 54:18 66:14
70:15 77:23 96:6,24
97:10 111:1,15
113:9,13,23 125:18
130:21 132:14,17
133:22 159:9 160:20
162:6
maintained
87:20,21 88:4
maintaining
140:8
make
9:2,14,24 17:11,24
32:23 33:3 35:3
73:8 75:15 88:15
112:24 120:5 128:6
129:2,9 133:6,10,16
147:21 158:1,23
163:11
makes
57:17 66:11 94:12,
13 149:12

making
8:20 36:13 59:7,16
65:24 71:24 72:7
77:9 78:16 89:8
96:15 114:5 118:11
125:1 133:2 147:18
management
130:1 132:18 133:23
manager
66:11 72:20
March
38:23 45:9 67:14
38:23 121:2 131:2
134:4 160:10
margin
9:4 25:13
margins
21:5
Marie
65:10
mark
15:18 139:22
Maryland
44:7
matter
5:4 6:13 7:3 10:18
11:4 18:7,18 23:16
24:4 26:22 27:9 41:9
92:1,7 93:20 100:16
134:8 135:9,12
164:23
matters
7:3 11:4 18:18 24:4
27:9 34:12 135:13,
14,16
Meadows
71:12 80:5,6 85:4
meaning
104:21
means
106:14
meant
20:16 43:12
meet
62:14
meeting
61:12 62:9,17 95:7,
14 97:9,14 102:14
111:2,20 113:14,23
127:3
meetings
126:23
member
150:4
memory
109:10
mentioned
98:16
met
126:14,23
Michael
139:2
Michigan
142:24 158:18,20
Mickey
134:24
middle
30:14 48:19 49:1
Mikey
135:5
mildly
54:9
million
56:8 91:6
mind
21:2,9 50:17 86:1
160:11 161:2
mine
85:24 151:14

minute
41:2 143:14
minutes
118:24 140:15
141:12,16
mischaracterizatio
n
111:22 112:20
missed
85:17
missing
122:10
misspelling
48:10
misspoke
22:23
misstate
22:9
misunderstanding
64:17
Mitchell
67:13 70:9 71:5 76:2
modification
24:20 69:1
modify
13:21 58:23 63:9
Moehlmann
57:24 58:8,19 59:5
61:11,18 62:10 64:6
moment
8:1 33:20 64:15
107:3
Monday
11:13
money
135:9
Montgomery
5:21 20:11 24:18
25:4 27:24 28:4,13,
22 31:6,17 53:9
65:19 66:15,20
72:20 76:12,16 77:6
126:14,23 134:19,23
138:6
Montgomery's
126:23
month
28:14
months
53:17 60:5 78:21
123:13
morning
164:20 165:2
motion
13:21 28:9 38:22,24
39:14,17,22 44:7,13
45:3 50:13 53:18
93:13 97:3 131:1,21
143:20 146:4 153:1
movant
34:18 39:13
move
19:3 21:13 38:14
42:11 55:22 89:18
91:9 148:17 150:14
164:7
moving
78:23 91:12,13
Mueller
135:3
municipalities
33:15 52:20 56:13,
18 78:23 90:23,24
95:21 97:11 118:11
125:4 137:8,18
municipality
5:23 8:21 19:19
122:8 136:16



**N**

names
46:7,8,15
Nancy
77:18 86:8 115:14
national
67:17 70:10
nature
29:19 36:14
necessarily
117:8
needed
9:2 17:15 65:4 78:4
82:10,24 83:19 84:5
needless
136:18,22
negotiating
52:19 56:17 58:21
negotiation
33:13
negotiations
31:7 53:22 54:13
56:14 66:7 88:8
Neufairfield
46:3
Neumann
33:24 34:2,6 35:17
36:23 37:3,16,19
38:3 43:17 44:11,21
46:9,11,15 53:3,18
55:6 56:7 58:2
90:11,14,19 96:4,6,
22
Newtenshire
47:23
NHI
47:8,17,19 48:15
nonetheless
147:3
nonresponsive
161:22
note
83:9 158:23
notes
21:4 25:12
notice
38:23 57:7,12 65:9,
13,18,23 141:22
145:6 146:7,13,16
160:4,6
notifying
71:17
November
77:22 115:9 129:21
nuance
158:20
number
45:16 73:18 74:10
118:15,17 144:6
154:9 160:16
numbers
84:10
numerous
14:14

**O**

oath
5:9 41:5,13 91:21
163:22 164:21
object
35:22 61:5 70:16
80:16 81:15 99:12
100:8 109:7,13
111:21 128:15,21
144:15 152:1 155:4
160:4
objected
52:8
objecting
81:3,4 157:6 158:11
159:7 162:4
objection
10:10 29:12,15 34:5,
6,9,19,24 35:4,7,11
43:22 44:6,13 45:2
46:20 49:4,15,17
52:12 53:24 61:15
81:22,24 06:3,8,21
106:3 107:1 112:3,
12,24 132:23 133:15
141:5,6 151:16
153:6,13 154:3,10
155:14,15 157:8,20,
22 159:13,16
objectionable
151:15 154:9
objections
35:9 53:19 81:9,22,
23 112:10 148:8
156:1
objects
151:16
obligation
42:1 90:6 105:4,9
111:17 113:11
116:17
obligations
16:11 21:18 36:23
37:22 40:6,8,9
42:21,24 47:3,8
49:11,24 51:14,17
54:17 57:18 59:15
66:17 74:6 87:4
88:12 89:9 104:16
108:17 110:18
136:11,24 138:7,12
143:7
obligee
66:20 67:2 103:7
122:14
obligees
64:20,24 152:21
obtained
122:22
occasions
163:8
occur
136:5
offend
151:6,13
offending
153:3
offer
71:6,10
omitted
45:19
omnibus
11:16 24:22
ongoing
35:6 69:13
open
5:3 120:22
opened
117:22,23 118:3,5,
21 119:22
opening
133:7
opinion
82:12 155:10
opinions
38:5
opportunities
34:14
opportunity
9:23 17:11 26:5

32:22 36:17 89:24
93:6 160:4 161:12
oppose
160:23
opposed
137:9,19
order
7:17 14:15 15:7
24:18,20 25:3 32:3
35:24 37:8 39:1,24
40:3 43:12 44:8
45:4,10 50:9,12,16,
22 51:1 53:14,19
55:16,17,18 58:22
59:15,20 60:6 63:8
67:1 78:4 81:21
101:13,20 108:7
109:21 115:3 121:1
123:20 130:15
131:1,20 134:6
147:1 153:21 154:1
155:2 156:20 157:2
orders
63:4 101:13
original
5:22 30:18 49:11
120:3
outcome
125:15 132:10,15
133:19
outlay
67:2
outline
162:22
outlined
97:23 98:9
outset
127:20
overarching
35:11
overrule
81:24 157:19 159:15
overruled
52:12 152:9 158:2
oversaw
49:14
overseeing
36:22 44:12,20
owed
42:2
pause
126:15 33:10 54:22
57:22 76:16 91:2
owner
55:5 96:1,5,23 105:4
106:10 111:5
owners
86:18 158:13 159:9
162:6
owns
152:20

**P**

p.m.
165:11
P2002
39:5
pages
62:13 74:4 80:14
115:12 138:22
162:23
paid
43:1 51:19 69:11
90:14 127:5
paper
29:5 38:11
papers
146:12
par
92:8

paragraph
7:22,23 9:12,15
11:12,19 12:3 13:4,
13,18 14:2,7 16:1
21:8,12,14 28:21
31:11 39:18 40:2,15
41:20 42:11,18,19
45:6,24 46:19 48:8,
19,24 54:17 68:23
82:5 87:15 102:22
121:21 116:3 124:14
126:22
paren
38:18 40:8,9 44:3
50:10
part
61:8 94:4 99:4 106:4
125:7 127:22 128:3
129:24 131:11
152:2,4 157:12
partial
93:16
partially
128:5
participant
53:21 54:12
participation
136:6
parties
16:8 21:16,20 41:3
54:18 55:3 91:20
93:11
partly
129:11
partner
14:12 160:20
party
16:13 35:19,20
102:24 103:6,11,15,
19 104:15,16 106:9
108:17,23 109:3
110:5 122:10,13,18
135:5,19,20 151:15
pass
131:15
passed
101:8
past
60:5
pause
128:16
paused
128:19
pay
43:9 47:8,17 48:14
56:8 67:1 125:2
132:20 151:22
152:14
paying
22:14
payment
72:1,8
peace
157:21
people
73:18 160:19
perceive
107:15,22
perceived
107:19
perfect
19:6 38:16 42:13
44:4 124:15
perform
57:18 62:24 66:1
69:22 70:5 72:1,8
77:10 123:15
performance
56:21 69:10 71:18
73:3 77:3 80:4
151:21 152:13

performed
65:4 72:2,9 77:11
82:10,24 83:19 84:5
85:10
performing
69:9 77:2 80:15
period
56:13 95:18
permission
65:5
permit
94:15 155:23
permitted
152:6
person
113:22
personal
7:11 11:8 18:23 24:9
27:14 45:13
personally
80:18
pertinent
85:6
perversed
48:13
phonetic
47:23 48:16 131:8
160:8
phrase
156:3
pick
165:1
picking
158:7
piece
29:5
plaintiff
94:14,15,19,20
plan
13:21 14:15 15:6
24:21 37:8 63:9
64:20 65:1 68:20
69:1 107:18 108:6
123:20 157:6 158:12
159:7 160:5,10,21,
23 161:3 162:4
play
96:12 129:4
pleasure
164:15
plural
22:5 43:4 126:17
podium
162:18
point
20:14,17 26:6 33:13
35:1 40:21 44:24
49:8,23 57:21 59:24
62:19 66:23,24 75:7,
14 79:2 84:8 85:8
91:19 92:9 95:23
106:14 108:3 112:11
117:15 118:14 124:3
125:1 128:2 133:2,6,
10,20 134:2 136:4
141:14,17,20 146:20
148:23,24 156:13
163:2
pointed
83:11 116:15
pointing
85:6 109:17 154:8
pointless
141:19
points
115:22 133:16
portion
15:16 19:2 24:12
38:16 46:20 50:8
98:6 108:13

position
26:7 49:18,22 89:12
115:22 116:24
130:10 131:4,23
132:12 138:6,10,15
153:5
possibility
95:24
possibly
118:3
post
159:10 162:7
potential
29:2 41:23 95:19
potentially
117:12 121:20
155:16
practice
44:20 153:2
predetermine
14:3
prejudice
135:6
premiums
127:23
prepare
123:24 158:21
prepared
119:5
present
11:15 24:22 94:15
161:1
presentation
93:18
presented
20:1,15 25:8 114:16
125:14
presenting
106:7
preserve
34:19 157:7 158:12
159:8 162:5
preserved
17:21 35:4
preserving
13:6
president
114:3
press
130:13
pretrial
81:21 147:1 148:8
pretty
146:19 147:4
prevent
25:21
previous
6:5 8:22 10:5
previously
5:16 7:24
price
130:15
principal
46:9,16 49:11 50:1
67:7 79:5 87:16,22
90:5,18 97:23 98:1,
10,12 111:10 151:23
152:14,15,17,21
160:16
principal's
66:22 67:4 151:22
152:14
principals
118:19
print
102:5
prior
33:4,24 83:10 108:4
115:1 154:18



**probability**
124:19 125:5
**probable**
82:12
**problem**
22:10 29:13 107:2
143:1
**problematic**
153:11
**Procedure**
5:16
**proceed**
29:16 35:14 59:21
81:24 83:14 96:17
100:20 109:23
141:23 150:19
151:17 152:7,22
158:15,24 160:1
**proceeding**
100:2,5 101:21
127:19
**proceedings**
5:2 89:2 91:7 98:22
101:14 112:23
165:7,10
**process**
38:1,2 56:20 78:23
95:23 102:20
**produced**
6:11 10:17 18:6
23:15 26:20 85:16
102:6 143:23 144:10
147:16
**productive**
147:23
**progressed**
134:8
**projects**
58:22
**proper**
83:12 109:9,13,24
144:20 157:14,17
**properties**
68:12 71:11 89:7
91:2
**property**
14:17 15:8 26:14
33:9 35:19 41:24
45:13 49:9 52:16
53:2 54:23 55:2 56:4
57:21 68:9,17 73:24
74:2 75:8 76:15 85:4
87:3,9 100:6 101:8
103:4 104:7,14,24
105:8,24 108:21
109:1 110:3 111:19
113:12 117:5,13,18
121:22 122:22
153:23 155:3 156:21
**proposal**
16:4 20:21
**proposed**
7:17 12:5,24 13:18
15:4 17:3 19:9 51:23
52:4
**proposes**
15:23
**proposition**
111:8 149:23 151:19
152:23 153:15
157:24
**propositions**
150:17 151:4,7,9
**protection**
151:24 152:16
**protections**
107:18,24 161:2
**provide**
38:4 69:14 89:24
105:4

**provided**
15:7 46:1 48:23
111:12 149:1
**providing**
112:14
**provision**
47:2
**provisions**
20:16 104:13
**prudent**
79:8
**public**
42:24 43:9 48:21
49:12 51:18 59:2,15
66:18 86:19 104:18
108:19
**pull**
53:5,7 74:12 75:17
140:20,21 142:19,21
**punch**
80:12,14,18 82:6,7,
9,23
**purchase**
50:2 88:21 89:6
116:20 117:4 138:14
**purchased**
55:2 105:24 117:19
121:22
**purchaser**
41:24 42:5 49:10,23
53:2 56:4 87:9 161:4
**purchasers**
33:17
**purchasing**
49:9
**pure**
155:10
**purports**
146:21,23
**purpose**
62:21 65:22 97:5
129:24
**purposes**
34:20 36:13 45:20
112:22 127:19
**pursuant**
5:14 39:1 44:8
65:14,15,18 68:23
83:19 84:5 86:16
91:11 147:1
**pursue**
33:16 53:1 58:10
59:1 60:2,12 97:11
113:20,24 123:21
125:8,19 127:22
132:11
**pushback**
35:24 39:23 40:3
55:16,17
**pushed**
26:1
**put**
7:24 8:7 9:3 12:2
21:11 80:8 92:21
142:21

**Q**

**qualification**
112:6
**question**
34:8 35:2 36:9
37:13,14 43:11
55:22 72:4 80:10,22
81:3,4 83:5 89:21
95:8 96:18 99:16
100:18 101:2 107:13
108:4,24 110:12
112:5 128:22 129:15
132:4 138:3 151:15
153:10 156:2,3,4,12

157:22 158:1,2
159:4,16,17,22
161:7,16 162:12
164:2,12,17
**questioning**
35:5,7 36:13 55:15
113:5 155:24
**questions**
20:16,22 35:10
96:13 133:8 147:7
149:20 155:21
162:16,24 163:20
**quick**
40:16
**quickly**
91:13
**quote**
39:22 125:9,10
**quotes**
86:24

**R**

**Radtke**
5:22 6:4 11:11 12:4,
14,24 13:11,16
16:20 17:2 19:9,14
27:18 28:7,24 30:15
31:1 33:5 58:9,19
63:4 139:22
**raise**
15:19 25:14 29:15
33:15 34:4,5,7,8
81:8,22 148:7
**raised**
9:3 20:22 25:13,22,
24 26:9,11 87:9 88:9
115:23
**ran**
89:17
**rate**
163:11
**rationale**
13:4
**rattled**
82:16
**re-cross**
36:8
**reached**
105:15
**read**
7:19 10:11 11:17
13:7,22 14:5,21
16:18 17:6 19:12
21:21 22:4 28:10,17
30:18 32:4 38:22
39:2,6,11 40:9 43:3,
5 45:16,18,23 46:4,
10,12 47:4,10,23
48:6,17,23 51:21
59:2,9,21 63:5 64:21
66:22 67:4,19 69:3,
17 84:1 86:20 87:17,
22 93:17 95:10
101:3 104:19 116:12
122:11,15 123:16
127:1,7,14 135:9
136:6,13,24 137:5
140:4 143:1,9,16
145:19 156:9,10
158:3 159:21,23
**readily**
125:13
**reading**
46:8 83:10 126:19
**real**
43:13 105:20
**realm**
100:16

**reason**
66:21 114:4 160:23
**reasons**
14:14 15:3
**rebuttal**
94:15
**recall**
5:24 25:11,16 41:9,
11,20 53:11 55:11
70:2,7 88:13,20,24
101:15 108:5,9
109:4,14 114:23
116:18,21 119:24
156:16
**receipt**
73:7 75:6 77:21 85:6
**receive**
13:20 68:5
**received**
14:24 63:4 101:5,16
105:2
**recent**
28:9
**recess**
41:8 91:24 163:24
164:19
**recharacterize**
112:22
**recitation**
119:18
**recited**
98:2
**recollection**
109:18,21 120:13
**recommendation**
124:5 131:10 156:16
159:1 160:2,21
**recommendations**
97:7
**recommended**
123:24
**record**
5:5 41:10 89:16 92:2
101:3 113:6 156:10
159:23 164:3
**recording**
82:22 83:2 110:2,9
128:13,18 129:7,12
131:19 132:1
137:16,23
**recovery**
137:9,19
**red**
21:4
**redirect**
36:8 92:18 94:7
**reevaluation**
130:9 131:3,22
**reference**
45:19 66:18 76:23
150:18
**referenced**
80:4
**references**
78:8 142:17
**referred**
163:7
**referring**
111:24 154:7
**refresh**
109:10,18,21 120:12
**refuse**
127:4
**regard**
130:22
**reimbursable**
69:11,23 70:6
**reimburse**
67:1 77:10

**reject**
10:1 97:10 101:11,
18 113:24
**related**
42:24 45:15 51:18
56:4 69:13 74:1 85:9
89:7 95:20
**relates**
7:3 11:4 18:18 24:4
27:9 62:1
**relating**
16:16 22:1 28:16
55:16 60:12 134:19
**relationship**
6:24 11:1 24:1 27:6
**relationships**
18:15
**release**
87:7 90:4
**released**
87:4 90:5,18,19
97:24 98:11 108:17
111:16 113:10 117:1
130:6
**relevance**
141:4 148:20 149:14
**relevancy**
34:5,8,20,24 35:10
148:8
**relevant**
150:1
**relied**
38:4 97:22 98:8
105:16
**relief**
13:19 25:4 28:10
39:21 58:24 59:20
152:21
**remain**
5:7,8 41:4,13 91:21
113:6 163:21 164:21
**remainder**
45:12 92:11
**remaining**
68:12 71:11
**remember**
81:10 98:17
**reminder**
5:8 41:4,13 91:21
163:21
**remove**
64:1
**removed**
21:5
**rendered**
130:2
**repeat**
95:9,10
**repetition**
94:10
**repetitive**
29:19
**rephrase**
54:7 70:22 71:1 99:6
154:11
**replace**
116:11,17
**report**
119:10,13,22
120:17,23 123:1,19
124:5,8,10 126:1
129:24
**reporter**
100:23 101:1 156:8
159:21
**reports**
97:6 119:2,4
**represent**
32:18 144:9
**representation**
144:17

**representative**
7:10 11:9 18:23 24:9
27:15 37:7 76:3,7
77:8 80:22 126:14,
16
**representatives**
69:9,16,22 70:4
71:24 72:7 126:18
**represented**
144:24 149:4,5
160:13
**representing**
145:1
**reproduce**
159:20
**request**
78:6,15
**requested**
39:21 58:19 69:15
97:3 101:3 131:7
156:10 159:23
**requesting**
69:9,22 70:5 71:18
77:3
**requests**
6:12 10:18 18:7
23:16 26:21
**required**
43:1 48:11 51:18
56:8 140:9 153:1
**requirement**
116:10 138:13
**requires**
29:15 77:1
**reservation**
62:15
**reserve**
163:13,14
**reserving**
93:8
**residential**
38:23 39:10 45:11
105:19
**resolution**
65:21 73:23 77:23
**resolved**
141:7
**resolving**
10:11 28:8
**respeak**
34:23
**respect**
28:5 35:8 42:22
47:21,23 51:16 55:2
62:24 69:12 73:11
77:6,24 130:10
138:7 150:13 152:19
164:22
**respective**
47:8
**respects**
40:7
**respond**
17:11 139:17 161:12
**responded**
5:24 33:5 138:11
**responding**
6:5 12:23 75:3 85:2
115:17 140:14
161:12
**responds**
17:2,3 19:10,14
135:23
**response**
6:12 9:1,2,7 10:4,17
13:16 16:20 18:6
19:6 23:15 26:21
32:14 34:18 36:3,9
73:5,9 80:20 81:20
83:6 87:3 94:5 96:10
110:13 129:16 132:5



136:15 138:3
**responses**
38:6
**responsibilities**
36:22 37:22 104:23
117:17
**responsibility**
89:13
**responsible**
37:7 89:9 111:6
137:22
**rest**
96:13
**restart**
129:5
**resubmitted**
120:4
**result**
50:1 56:7 67:3
**resume**
135:7
**retain**
131:7
**retained**
58:10 84:9 160:12
**retention**
78:9
**return**
19:20 145:15
**returned**
30:14
**returning**
32:14 114:24
**review**
28:7
**reviewed**
11:7 18:21 24:7
27:12 88:21 89:6
116:19
**reviewing**
9:23
**revised**
8:11
**revision**
17:3
**revisions**
7:17 8:20 29:2
32:16,24
**RFC**
39:13,22 40:4 41:23
47:16 48:9,10,20
49:1 51:24 52:5,23
97:3
**RFC's**
45:14 47:2,7 50:12
**rid**
61:22
**Ridge**
68:13
**right-hand**
8:6,16 74:15
**rights**
13:6 16:11 17:17,22
21:18 36:23 37:21
54:17 55:2 62:15
157:7 158:13 159:8
162:5
**Riordan**
6:4,16 7:15 8:19 9:1,
14,19,22 10:21 12:2,
5,14 14:23 15:2 17:9
18:10 19:19 20:7
22:16,20 23:20
24:13 25:2,7,19 26:2
27:1 29:1,12,13
31:1,6 32:2,21 33:14
34:4 35:1,9,13,22
36:5,6,16,19 44:18
46:21,23 49:5 53:24
54:4 55:8,14,21
57:3,13 59:9 60:16

61:5,12,15 62:9,15
63:15 64:4 68:2
70:16 72:11,19,22
73:10 74:15,21,23
76:20 77:17 78:3
80:16 81:7,10 82:1,
17,20 83:9 84:16
85:2 86:7 88:3,16
93:7,14,21 94:2
96:4,8,22 97:22 98:9
99:3,12,16 100:8,12
106:3,11 107:1
109:7,13 111:21
112:15,18,24 113:17
115:10,14 116:11,16
126:22 128:15,21
129:3 132:23 133:4
134:24 135:23
138:24 139:9 140:13
141:3 142:11 144:15
145:16,17 146:20
147:20 148:7,12
150:3,6 152:1,8
153:6 154:3 155:4
157:8 159:13 163:5,
9,13 164:8
**Riordan's**
6:24 8:11 10:5 11:1,
24 18:15 24:1 27:6
32:10,14 64:16
86:12 90:8 115:18
**Robert**
102:13
**role**
37:2
**Roman**
77:18 86:8 115:14
**routes**
132:13
**routinely**
153:4
**RUFF**
5:12,19 7:16,18 8:1,
5 9:9,11 11:21,23
12:11,12,21,22
13:12,15 14:8,12
15:2,15 16:22 17:1
19:3,7 21:11,15
22:17,20 23:1,7,11
29:8,18,21,22 30:3,6
31:12,15 32:8,9
33:20,22 35:15,16
36:4,20 38:14,20
39:18,20 40:17,22,
24 41:15,16 42:10,
15 43:23 44:5 45:7,8
47:13,15 50:7,11,17,
19,24 51:3,6,12
54:3,6,8,11 55:9,18,
24 56:2 57:9,11
58:16,18 60:21,23
61:7,10,23 62:4,6,
20,22 63:16,21 64:1,
3 70:19,24 71:2,4
72:14,16 73:16,19
74:8,14 75:12,18
77:13,15 80:13,21
81:12,18 82:2,8,19
83:4,17,21 84:3,20,
22 85:14,23 89:18
90:3 91:9 92:10,17
94:9,18,23 95:3,4,9,
11 96:11,20 99:7,15,
20,21 100:10,21
101:6 102:2,11
104:10,12 106:7,20,
21 107:8,12,14
108:12,14 109:5,12,
15 110:11 111:13,14
112:2 113:7 116:4,8
119:17,20 120:14,15
122:3,7 123:4,7
124:13,16 126:2,4,9,

11 128:10 129:4,14
131:16 132:3 133:2,
9,17,18 136:1,3,17,
21 137:13 138:1
141:11,14,20,24
142:1,18,23 143:4,5,
12,15 144:23 146:16
147:6 148:19 150:7,
10,15,21,24 151:2,
18 152:10 153:2 154:12 155:13
156:6,11 157:18
158:4,7,9 159:19
161:15,17,19,23
162:16 163:4,17
164:2,11,16 165:3,6
**rule**
39:5 151:16
**ruled**
135:5 141:6 154:6
**ruling**
34:10 150:14 154:1
**run**
143:8
**running**
92:9,10

## S

**sad**
160:17
**sale**
35:18,24 36:1,12
55:18 68:8,16 71:11
89:6 105:7 117:13
138:13 153:21,24
155:2 156:20 157:1,
6 158:12 159:7,10
160:5,7 162:4,7
**sample**
63:4
**satisfy**
56:9
**save**
66:19 70:21 120:8
**scope**
7:4 11:5 17:16 18:19
24:5 27:10
**Scott**
138:24 139:10 142:7
**scroll**
30:3
**section**
5:15 39:1 44:2 61:21
68:24 93:17 119:15
122:2 123:2
**Sections**
44:8
**securities**
45:15
**security**
14:20 15:11 105:5
**seek**
17:18 117:16 127:16
130:14 137:8,19
152:21
**seeking**
42:1,5 43:6 56:21
127:11 140:2
**seeks**
39:22
**sees**
149:15
**sell**
39:10,14 45:11
103:3,23 122:17
**selling**
99:10 100:6
**sending**
15:22

**sends**
60:15 61:11
**senior**
113:22
**sense**
36:2 79:3 163:11
**sentence**
14:10,13 17:4 42:17
48:9 51:10 58:15
63:8 80:9 86:16
87:19 102:24 103:6
104:10 108:12 116:7
122:5,13,20 123:4
124:18 126:8 135:24
136:4,18
**separate**
118:15,16
**served**
37:2
**set**
6:8 83:20 106:8,18
151:9
**setting**
145:8
**settled**
128:1 141:7
**settlement**
124:4 135:8 136:5
**Settler**
68:13
**Settlers**
68:13
**sewer**
48:4
**shifty**
146:19
**shoes**
47:17
**Shorewood**
77:18 86:8 115:15
**Shorewood's**
115:18
**short**
40:23 163:1,18
**show**
30:4 38:21 63:16,17
75:16 80:13,17
109:9 120:7 146:1
149:17
**showed**
8:22
**showing**
30:22 57:1 75:11
79:13 146:13
**shown**
149:2
**sic**
12:10 17:6 22:3
134:16
**side**
8:7,16 55:19 74:16
133:4
**sides**
29:4 38:10 138:20
**sign**
11:15 30:15 44:21
**signatory**
67:19 70:11
**signature**
32:10 44:18
**signatures**
30:15
**signed**
20:2 25:5,7 30:14,17
32:4,14 49:5 50:20
**significant**
114:6 134:7 148:23
**signing**
20:5 37:7

**signs**
72:22
**Silverman**
115:8,17,22 116:15
**similar**
28:3,12 70:14,19
96:12
**simply**
107:21 149:23
**single**
29:9 127:10
**sir**
5:24 6:1,10,14,18,21
7:2,5,7,8,13,19,20
8:9,13,18,23 9:5,8,
16,21 10:2,7,12,19,
22 11:3,6,10,18
12:7,8,16,18 13:2,9,
23 14:21,22 15:1,13,
14 16:3,7,18 17:8,
14,19 21:22 22:16
23:3,4 24:15 25:6
27:21 28:2 30:9,19,
20,21 31:4,20 39:4,
11 40:11 41:17,20
43:15,19 44:10
45:21,22 46:14 48:1,
12 53:13 54:15 56:6,
10,16,22 58:3,6,13
59:10,13,17,18 60:7,
9,10,20 61:3 62:12,
18 63:2,6,10 64:10,
12 65:20 66:2,24
71:9 72:10,13,21
73:8,13 74:7,19
75:10,19,21,23,24
76:4 77:5,12 78:7,
11,13,20 79:1,14,15
80:23 82:8 83:1,5
84:7,12,19 85:1,5,12
86:1,10 87:13 88:13,
14,19 90:2,7,10,13,
16,21 91:3,4,8 95:5,
22 96:2,21 97:2,8,
13,19 98:14,18,23
99:23 100:3 101:10,
23 102:1,17,21
103:2,5,9,13,17,21,
24 104:5,9,20 105:2,
6,11,14,22 107:20
108:2,20 110:12,14,
20,24 111:3 113:15,
21 114:2,9,14,17,22
115:4,11,16,20
116:1,14 117:2,7,10,
14,20 118:9,13,23
119:3,6,14,19
120:11,18,21,24
121:9,5,11,14,19,23
122:12,16,21,24
123:6,10,17,22
124:2,7,12,21,24
125:6,17,21,22
126:6,16 127:2,8,15,
21 128:16 129:16
131:14,19,24 132:4
132:5,6,9,13,19,22
134:10,12,14,18
135:1,4,11,18,22
136:7,14 137:1,6,11
138:2,4,20 139:1,4,
11,14,19,24 140:12
141:2 142:2,5,9,12,
16 143:3,10,18,21
144:12 151:19
152:24 153:16
156:17 157:3 159:18
161:18,24 164:14,15
**situation**
35:18 98:24 118:18
**slash**
134:23

**slow**
92:13
**slows**
164:8
**small**
42:16 102:5 132:21
**so-called**
155:5
**sold**
68:12 75:8 76:16
99:1 102:23 104:7
122:8
**solvent**
99:1,15 100:5
**sort**
164:6
**sought**
20:7,22 26:2 43:12
53:1 55:1 110:15,21
**sounds**
55:21 112:2
**source**
144:7
**speaking**
112:2,10 155:14
**special**
58:10
**specializes**
131:9
**specifically**
143:7
**speculate**
106:16
**speculation**
99:3 106:4 155:11,
16
**spend**
135:8
**spends**
121:16
**spoke**
64:5
**stage**
162:19
**Stamp**
144:6
**stand**
5:8 41:13 91:17
133:8
**standard**
118:18
**stands**
150:22
**start**
37:13 39:18 92:13
116:6
**started**
52:19 121:7 147:9
**starting**
142:19
**starts**
21:3 30:1 51:8 58:17
123:9
**state**
13:24 21:23 80:19
95:5,12 160:11
**stated**
150:17 155:15
**statement**
6:22 10:23 18:13
23:23 27:4 122:19
148:8 152:11 156:3
159:11
**statements**
114:9
**states**
7:15 16:8 21:16 23:6
24:17 39:21 42:18
45:9,24 46:1 47:12
48:19 50:21 68:11,



23 69:6 86:16 87:19
102:22 105:3 122:6
124:17 127:3 135:2
136:16 139:21
**stating**
155:6
**status**
99:9,14 106:9,13,22
119:2,4,10,21
123:19
**statute**
123:9
**statutory**
45:19
**stay**
25:4 28:10 58:23
59:20 152:21
**step**
56:19
**stepped**
47:17
**Steven**
78:13
**stick**
106:19
**stip**
7:17 19:20 24:17
25:3 30:14,16 32:3
**stipulation**
5:21 8:11 10:1 13:1
14:5 16:10,15 17:12,
16,21 19:15 20:11
21:1,17,24 24:20
25:12 27:18 28:8,12,
21 29:1 30:12,17
31:2 32:15,23 53:9
60:2 65:14,15,18
68:24 76:24
**stipulations**
31:5,17 33:4,9,14
52:19 53:11,16,22
54:13,21 56:11,18
58:20 66:8 78:22
87:10 88:9,18 90:22
121:4,16
**Stoneshire**
48:16
**stop**
133:11
**stopping**
37:14
**straying**
153:8
**streets**
48:4
**stretch**
147:5
**stricken**
89:20 161:19
**strike**
8:14 89:18 161:21
**string**
29:24 30:11
**strongly**
160:1
**subdivision**
46:1 47:4 77:19,24
80:5,6 86:20 104:18
105:5 122:10
127:13,18 151:20
152:12,19
**subdivisions**
46:2 48:5,22 102:23
122:18
**subject**
7:3 11:4 18:18 24:4
27:9 34:10 45:14
64:20 65:1 68:19
96:14
**subjects**
33:20

**subjunctive**
100:13
**submissions**
127:13,18
**submitted**
20:21
**submitting**
28:24
**subsequent**
33:4,16 42:5 53:2
56:3 87:9 126:12
153:23 156:24
**substantially**
39:24
**substitute**
138:14
**success**
124:19,23 125:5,15
**successor**
55:5 86:18 96:1,5,23
97:15 98:3 105:10,
13 106:10 107:20
108:8 127:6,19
131:4,23 138:7
153:20 154:22
156:15 158:13 159:9
162:6
**sue**
90:17
**sued**
55:5 56:3 96:5
**suffer**
66:21
**sufficiently**
100:18
**Sugar**
21:2,6 32:3,15 53:11
67:22 68:9 71:21
73:24 74:1,5 75:4,6
76:11 130:2,11
134:20,23
**suggest**
62:5
**suggested**
12:1 51:24
**suggesting**
9:19
**suggests**
16:5
**suing**
96:1 121:21 124:6
**suit**
87:20 88:3 96:23
115:1 123:12 153:23
156:24
**summary**
104:21 119:13,16
126:1 129:18
**support**
97:23 98:10 160:20
**supporting**
98:3
**suppose**
100:17
**supposed**
48:10
**sureties**
58:21 69:2,12
**surety**
25:14,18 40:7 42:2,
6,22 43:2,8 46:9,16
51:15,20 58:11
66:12,15 87:15,20,
21 90:18 110:18
111:9 114:3 116:24
117:22 140:3,10
150:4 151:20,21
152:12,13,22 153:23
156:24 158:15
159:10 160:1 162:7

**surety's**
97:24 98:11 153:19
154:22 156:14 157:7
158:12 159:8 162:5
**surround**
117:12
**survive**
160:17
**sustain**
99:5 133:15 153:13
154:10
**Sustained**
106:6
**sworn**
5:16
**synthesize**
93:23

---
## T

**taking**
155:5
**talk**
33:19,23 123:1
**talked**
28:22 93:7 98:6
99:22 123:8 139:22
151:3 160:8
**talking**
27:19 35:23 53:15
64:18 98:5,7 99:13
135:8
**teach**
126:20
**tells**
22:13
**ten**
78:21
**tend**
147:20
**term**
36:12 40:1 47:1 54:4
79:4
**termed**
36:9
**terminology**
80:24
**terms**
86:16 97:17 99:13
101:12,19 111:16
113:9 152:18,24
**test**
90:17 128:5,14
129:8
**testified**
5:17 7:9
**testimony**
164:22
**Teteak**
92:20,23
**theory**
90:17 125:8,9,12
**thereon**
43:1 51:18
**thereunder**
67:4
**thing**
37:20 63:16 79:9
113:8 140:19 160:24
**things**
45:2 93:23 95:16
97:19 120:5
**third-party**
161:4
**thought**
15:4 119:24 128:1
137:21
**tie**
141:11

**tie-up**
141:21
**time**
6:15 10:20 15:2
17:22 18:20 20:14,23
23:19 26:6,24 29:16
30:4 33:8 44:24
49:15 54:21 56:13
66:6 70:21 75:7 79:2
84:8 85:8 90:22
92:19,24 93:22
95:18 102:14 109:19
112:8 116:23 117:15
120:8 121:16 124:3
135:9 160:20 163:15
165:6,9
**times**
55:15
**timing**
91:10,16 92:6
**title**
50:8 67:16 83:10
98:4 104:14
**today**
24:22 33:9 92:17
93:6 97:1 158:21
**today's**
134:9
**tomorrow**
92:22 93:1 163:11
164:20 165:1
**top**
6:3 10:4 13:13
16:21,22 25:2 30:4,
23 31:24 43:19 58:8
59:6 60:15,18,20
62:3 63:3 123:23
134:16 136:16,17
140:13,21 142:17
**topic**
91:10,14,15
**total**
83:18,24 84:4
**totally**
146:9
**TR**
144:3,6
**TR0446**
144:7
**tractions**
7:12
**transferred**
104:3
**Travelers**
142:20,24 149:9
153:16,19 154:2,7,
13 155:19 157:5
158:10,14,17 162:1,
3
**treat**
106:10
**TRG**
18:6 41:19 52:15
68:13 69:22 70:5
71:12,24 72:7 75:20,
22 76:17 77:9 87:3
88:22 89:8,12 95:6,
13 97:11 103:4,23
104:23 105:8,9,13,
20,23 106:22
107:15,19,22 108:8
111:5 113:20,24
115:1,24 116:10,16
121:21,22 122:22
123:21 124:6 125:4
127:23 134:11
135:21 136:5 137:4,
9,17,19 138:11
143:19

**TRG's**
6:12 10:17 18:6
23:16 26:21 116:19
117:17 131:1,21
**trial**
9:13 12:1 31:10
34:21 41:18,19
67:13 81:18 93:12
96:16
**trials**
94:17
**trouble**
147:18 148:15
**true**
17:22 24:9,10 25:22
26:3 31:8,9 37:9
43:9,10,13,14 56:5,
6,10 59:17,18 64:24
78:6,7 99:2,11
113:14 128:7 155:7
**trust**
17:6 22:3 26:15
33:10 35:20 54:22
55:3 57:22 64:19
67:19 68:12,17,19,
21 69:2,8,15,20
70:3,12 71:17,22
72:5 75:9 76:3,16
77:1,2,7 88:22 91:2,
7 101:10 103:1,11,15,
19 104:4,7 108:22
109:2 110:4,7
122:23 140:4,9
**trust's**
16:1
**trustee**
5:23 33:16 59:8
**trustee's**
15:3 57:4
**trustees**
65:21
**trusts**
23:2
**Turiello**
22:21
**Turner's**
131:8
**twisted**
48:12
**two-minute**
162:21
**two-page**
74:22 76:3 84:16
115:8 142:3
**two-thirds**
14:9 51:5
**twofold**
111:5
**type**
19:23 76:7 105:17,
19

---
## U

**ultimate**
113:23
**uncertainty**
147:24
**uncompleted**
63:1
**underdeveloped**
39:23 40:12
**underlined**
42:12,17
**underlying**
36:14 62:2 81:5
**understand**
8:24 41:6 68:16
108:24 117:3,11
127:11 138:11,15
147:2,19 150:11

157:21 158:18 163:6
**understanding**
60:1 64:18 105:17
**understood**
35:12 45:12 52:10
56:17,19 62:19
64:23 65:3 115:23
116:23
**undertaken**
47:19
**undeveloped**
40:3,12
**United**
28:9 50:21 79:21
**Units**
80:6,7
**unpack**
99:18
**update**
126:13
**USC**
39:1 44:8

---
## V

**Venture**
68:14
**Ventures**
71:12
**version**
12:3 39:23 53:9
**versus**
106:23 134:20
135:20
**vice**
114:2
**view**
136:5,23
**village**
9:3 16:13,14 21:19,
23 25:13,20 28:13
65:10,19,21 66:11,
15,20 69:2,6,20
71:7,17 72:19 77:1,
23 86:8 88:15
115:15 126:24
**village's**
13:6 116:24
**villages**
136:9,11
**violated**
134:5
**violation**
115:2
**virtue**
104:23
**voted**
80:3
**VSG**
10:11

---
## W

**wait**
85:17 93:17 130:19
**waiting**
133:13
**waive**
16:15 21:24
**waived**
147:1
**waiver**
81:23
**walk**
162:18
**wanted**
88:15 95:2
**water**
48:5

Wedoff
  50:22 53:15
week
  139:23
Whispering
  71:12 80:5,6 85:4
wide
  149:1
wished
  26:6
witness's
  144:18
witnesses
  92:22 141:18
  149:17,23
word
  39:13 70:17 82:4,5
  122:9
work
  59:19,21 60:1 63:1,8
  69:10,13,23 70:5
  72:1,8 77:3,10,11
  78:16 80:15 82:10,
  23 83:18 84:4 85:10
  93:21 121:12,17
working
  8:20 10:10 121:3,7
  147:9
works
  150:20 156:5
worth
  164:18
wrapped
  162:23
wrath
  148:21
writes
  11:11 13:11,16
  16:21 28:7
written
  45:1 145:22 149:3
wrong
  54:9 85:20 131:13
  135:15 145:14
  149:23
wrote
  135:14 146:1,8
Wywrot
  79:24 82:9

—————————
          Y
—————————
year
  49:19 52:18 87:11
  121:15,21 123:14
  134:4 147:10
years
  52:15 53:17 88:2
  119:22 120:23
Yorkville
  27:20 28:5,15 30:12,
  13 31:6,17 53:10
  70:15 71:8,12 72:4
  76:11 79:21 80:3
  83:18 84:4 123:3,13
Yorkville's
  28:9 85:3
you-all's
  144:5

