**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT NORTHERN
 2                  DISTRICT OF ILLINOIS
 3                    EASTERN DIVISION
 4
 5
 6   IN RE:                        )
 7   KIMBALL HILL, INC.,           )
 8         Debtor,                 ) No. 08 BK 10095
 9
10
11         REPORT OF PROCEEDINGS at the trial of the
12   above-entitled cause before the Honorable TIMOTHY
13   A. BARNES, Judge of said Court, on the 28th day of
14   August, 2018, at the hour of 9:35 a.m.
15
16
17
18
19
20
21
22
23   Reported By: Liza Marie Regan, CSR, RPR
24   License No.: 084-002477
```

**Page 2**

```
 1   APPEARANCES:
 2         PRETZEL & STOUFFER, CHTD.,
         BY:  MR. EDWARD B. RUFF, III and
 3              MR. MICHAEL P. TURIELLO,
         One South Wacker Drive, Suite 2500
 4         Chicago, Illinois 60606
         (312) 346-1973
 5         eruff@pretzel-stouffer.com
         mturiello@pretzel-stouffer.com,
 6              and
         VEDDER PRICE, P.C.,
 7         BY:  MR. WILLIAM W. THORSNESS,
         222 North LaSalle Street, Suite 2600
 8         Chicago, Illinois 60601
         (312) 609-7500
 9         wthorsness@vedderprice.com
              Representing TRG Venture Two, LLC,
10         SCHUYLER, ROCHE & CRISHAM, P.C.,
         BY:  MR. CORNELIUS F. RIORDAN,
11         180 North Stetson Avenue, Suite 3700
         Chicago, Illinois 60601
12         (312) 565-2500
         criordan@rmp-llc.com
13              and
         ECKERT SEAMANS CHELLIN & MELLOTT, LLC,
14         BY:  MR. ALAN I. MOLDOFF,
         50 South 16th Street, Suite 2200
15         Philadelphia, Pennsylvania 19102
         (215) 851-8450
16         amoldoff@eckertseamans.com
              Representing Fidelity & Deposit
17              Company of Maryland.
18
19
20
21
22
23
24
```

**Page 3**

```
 1                    I N D E X
 2   WITNESS                    DX   CX  RDX  RCX
 3   RANDY TETEAK
 4     By Mr. Turiello         15
 5
 6
 7
 8                  E X H I B I T S
 9   NUMBER                 MARKED FOR ID   RECEIVED
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 4**

```
 1              (whereupon, the following
 2              proceedings were held in open
 3              court.)
 4   THE COURT:  Good morning.  I see we have a new
 5   court reporter.  If you need a break, just tell me.
 6        So let's call today's matter and then
 7   let's get appearances of counsel, please.
 8   THE CLERK:  Kimball Hill, Inc.
 9   THE COURT:  If I could get counsel to all stand
10   in sort of Chicago style theater of the round and
11   I'll do appearances from my left to right.
12   MR. MOLDOFF:  Alan Moldoff on behalf of F&D.
13   MR. RIORDAN:  Cornelius Riordan on behalf of
14   F&D.  Good morning, your Honor.
15   MR. RUFF:  Good morning, your Honor.  Ed Ruff,
16   R-U-F-F, on behalf of TRG.
17   MR. TURIELLO:  Mike Turiello on behalf of TRG.
18   MR. THORSNESS:  Bill Thorsness for TRG as well.
19   THE COURT:  Again, since we have a different
20   court reporter today, it might not be a bad idea
21   give a business card to her so she can get the
22   spellings of the firm names, please.
23        Let's have all but the primary two counsel
24   have a seat.  Let's just take our pulse.
```

1    MR. RUFF:  Mr. Turiello will be taking the lead
2  here today, your Honor, for TRG.  I just had a
3  housecleaning matter from yesterday.
4    THE COURT:  That's exactly why we're doing
5  this.  So Mr. Turiello, you can have a seat and
6  then it will be his turn in a moment.
7        So the point of asking you to remain
8  standing is just to see where we are, where we're
9  going.  I know I think we went slower yesterday
10  than we intended to and what result that might have
11  and then we'll get to the housekeeping,
12  housecleaning matter.
13        As I understand it, the movant here had
14  finished with the direct examination of the party
15  opponent Mr. Kilburn and the cross was being
16  reserved as part of the direct on the respondent's
17  case.
18    MR. RIORDAN:  That's absolutely right, your
19  Honor.
20    THE COURT:  And so as I further understand, the
21  movant has three additional witnesses who it
22  intended to call.
23    MR. RUFF:  Yes, your Honor.  They're all here.
24    THE COURT:  So we thought we'd get to at least

5

1  one more witness yesterday.  Will you be able to
2  complete your three witnesses today?
3    MR. RUFF:  Hopeful.  We're going to try our
4  hardest to get done today.  If we have to lead a
5  little bit into tomorrow, we may have to.
6    THE COURT:  Well, the reason I wanted to point
7  that out, I said to you yesterday that I had some
8  overflow time on Thursday.  Then I realized that I
9  have to do a naturalization ceremony up in the
10  ceremonial courtroom in the afternoon on Thursday.
11  So I just -- I really don't have that ability.
12        So one thing I'd like each of the parties
13  to think about -- you got a long day today -- is if
14  we don't conclude within the three days that we
15  have allotted, what date would we come back and
16  finish up.  That's something that you can all agree
17  to.  You can agree to several dates and then ask me
18  what the availability is.  You can certainly look
19  at the Court's calendar to get an idea of when I'm
20  just here and when I'm not keeping in mind my
21  strong preference to afternoons on Tuesdays or
22  Wednesdays because that's when I normally conduct
23  the small trials, the 523 matters.
24    MR. RUFF:  Very good, your Honor.

6

1    THE COURT:  Anything else from you,
2  Mr. Riordan?  You're very silent this morning.
3    MR. RIORDAN:  Not at this time, Judge.
4    THE COURT:  Okay.
5    MR. RIORDAN:  I'm sure you'll hear from me
6  during the day.
7    THE COURT:  I'm sure you'll speak up later.
8  Okay.
9        We have a housecleaning matter.
10    MR. RUFF:  Your Honor, we used a number of
11  exhibits.  Our paralegal is very good about keeping
12  a running list of everything we used.  I noted one
13  objection that was sustained on Exhibit 129.  As
14  housekeeping, I don't know if your Honor's
15  preference is to admit those into evidence now.  We
16  established the foundation I believe on all.  The
17  only one, like I said, was Exhibit 129 where your
18  Honor had sustained an objection.
19    THE COURT:  And that was the article?
20    MR. RUFF:  Article.
21    THE COURT:  Right.
22    MR. RUFF:  The rest were primarily -- I think
23  all were Fidelity produced documents which I think
24  we laid the foundation on every one.  I can give

7

1  the Court the list, not to take time from today,
2  but whatever the Court's preference.
3    THE COURT:  So you raise a good point.  That
4  was something as we went into yesterday, I realized
5  I normally address at the beginning.  As I said, it
6  would be more helpful if I had a list because I
7  left one off the list.  What I left off the list
8  was moving exhibits into evidence and, that is,
9  because the vast majority of the trials we do here
10  at the bankruptcy court are simple -- they're small
11  727 or 523 actions, turnover actions and the
12  like -- our pretrial orders are designed to be
13  streamlined.  One of the things that the pretrial
14  orders have built into them is the presumption of
15  admission which is that absent objection, the
16  documents will be admitted.  So those exhibits that
17  the parties have presented that have garnered no
18  objections, let's start with that, no objections
19  from either side either in the pretrial statement
20  or during use in court, those exhibits will be
21  admitted.
22        Now, having said that, I'll give you a
23  cautionary item which is I'm not in the habit of
24  going and reading exhibits that parties have made

8

1  no use of.  If you give me a hundred exhibits and
2  use 20 of them, unless you give me some compelling
3  reason to go look at the other 80, even if they're
4  admitted pursuant to our order, I don't go look at
5  them because they're admitted but assigned a weight
6  of zero.  Because if it didn't seem important to
7  you to use them, so why would it be important to me
8  to use them?
9       Now, that's -- when I say that, parties
10 sometimes panic because they think, "Oh, wait, I
11 expected he was just sort of going to read all of
12 those things and independently decide their worth."
13 Well, if you use them and I mean, use them, even in
14 your closing, if you make a reference to them and
15 explain to me how they fit into the system, I will
16 go look at them at least to the point of your
17 reference.  It doesn't have to be in your main
18 case.  It can be in your closing arguments as well.
19      Do you understand?
20      MR. RUFF:  I do, your Honor.
21      THE COURT:  So then moving on to those matters
22 where there was an objection raised in the pretrial
23 statement, I handled some of those in sort of
24 general, overall where I said, "Such and such is

9

1  relevance, reserve your objections on relevance,
2  but I'm not going to exclude any item on a
3  relevance basis unless I think I just absolutely
4  can't figure out how it works in the system."  I
5  think I did that at least to a certain extent with
6  that article.  So the relevance objections were
7  handled prior to coming in here.  Then the same
8  thing goes to weight and prejudice.  Those all
9  deal -- are all dealt with by the Court in that
10 they come out in the wash, if you will.
11      That leaves objections, essentially, that
12 were raised in the pretrial.  The remaining
13 objections really need to be raised as the exhibits
14 were used.  So I don't look at the pretrial
15 statement anymore.  I just wait for the use and the
16 objection.  Make sense?
17      MR. RUFF:  Very good, your Honor.  That does
18 make sense.
19      THE COURT:  So now, as the objections have been
20 raised and as I've dealt with them -- and my
21 understanding is I sustained one objection as you
22 said and that was to the article -- the remainder
23 of those, if there was a pending objection at the
24 pretrial statement, if it wasn't asserted or it was

10

1  asserted and I overruled it, those will be
2  admitted.
3       MR. RUFF:  Very good, your Honor.
4       THE COURT:  Makes sense?
5       MR. RUFF:  We understand our burden.  We don't
6  want to burden the Court with irrelevant or
7  exhibits we have not actually gone to.  So it's our
8  intent every exhibit that has some relevance to the
9  case we intend to put up and show it or
10 specifically refer it and not waste the Court's
11 time.
12      THE COURT:  I appreciate that.
13      MR. RIORDAN:  And I think there were only maybe
14 a handful of exhibits that were really contested
15 yesterday.
16      THE COURT:  I think that's right.
17      It's just again, as a cautionary tale,
18 Judge Hollis once presumed our pretrial order
19 allowed the parties to deliver CDs with their
20 exhibits on it.  It wasn't until she completed the
21 trial and looked at the CD that she realized that
22 there was a total of 30,000 pages that had been
23 submitted to her and very little reference made to
24 any of it in the trial and then she was stuck.  She

11

1  wasn't sure what she was supposed to do because she
2  hadn't announced in court, essentially, what I do.
3  So she spent about three months reading every
4  exhibit before she had to issue her judgment.  I'm
5  not doing that.  Okay?
6       MR. RUFF:  We understand.  We agree.
7       THE COURT:  Okay.
8       Any other housekeeping, housecleaning
9  matters for this morning before we get started?
10      MR. RUFF:  No, your Honor.
11      THE COURT:  So it is now I suppose you're
12 turning it over to your co-counsel.
13      MR. RUFF:  Mr. Turiello.
14      THE COURT:  Mr. Turiello.  Just call the first
15 witness in.  Remind me who the first witness is,
16 please.
17      MR. TURIELLO:  Thank you, your Honor.  The
18 movant calls Randy Teteak.
19      THE COURT:  And he's present here?
20      MR. TURIELLO:  He is, your Honor.
21      THE COURT:  If you could come up to the stand
22 and remain standing please and my deputy will put
23 you under oath.
24      (Witness sworn.)

12

1    THE CLERK: Please state your name for the
2  record.
3    THE WITNESS: Randall Teteak.
4    THE COURT: Please have a seat, Mr. Teteak.
5    Were you here yesterday when I explained
6  how the witness stand works and the microphone and
7  the like? Okay. Have a seat. I'll tell you.
8    THE WITNESS: I was here yesterday afternoon,
9  your Honor, and not yesterday morning.
10    THE COURT: I'll do it again just to make sure
11  you understand.
12    First of all, there's a microphone there.
13  It's got a gooseneck. There's several microphones
14  around, but the one with the gooseneck is the one
15  you're speaking into. I assume it's there. You're
16  looking around like --
17    THE WITNESS: It is.
18    THE COURT: All right. There you go. That's
19  what you need to speak into. We have a court
20  reporter here but we also record everything. So
21  everything is audio recorded and so that microphone
22  catches it. I'm also -- and I didn't say this
23  yesterday -- a little hard of hearing and if you
24  don't speak into the microphone which then

13

1  broadcasts it back to me through the speakers, I
2  have a very hard time hearing the witness, so
3  please do.
4    If you -- if you speak too closely to the
5  microphone or get too animated, too loud, the
6  microphone will protect itself from you meaning it
7  will cut off and you'll hear it. There will be a
8  loud noise and that will be the microphone's way of
9  saying stop. Well, stop. Okay? Take a moment.
10  The microphone will recover. It will come back
11  into working in a few seconds and then you can go
12  again. But it's a great thing to keep my witnesses
13  in line as well because if they get really
14  animated, it calms them down, okay? So I'm never
15  going to fix that issue. I like it.
16    The -- it -- I -- I don't like to have
17  witnesses on the stand for more than an hour
18  without a break, but if you need a break for any
19  reason, you tell me, all right? That's -- I want
20  your honest and truthful testimony with -- I don't
21  want it to be pressured because you need to get to
22  the bathroom and you're just going to throw out an
23  answer, understand?
24    THE WITNESS: Yes, your Honor.

14

1    THE COURT: Okay.
2    Now, again, interactions between you and
3  counsel. Not here to get into an argument. If you
4  don't understand a question, if you feel that
5  somehow the question is inappropriate, look to me.
6  You don't look to directions from any other
7  parties, all right? It doesn't matter who's
8  questioning you, you take your cues from me if you
9  have a problem with the questions, understood?
10    THE WITNESS: Understood.
11    THE COURT: Okay. Here we go.
12    RANDY TETEAK,
13  called as a witness herein, having been first duly
14  sworn, was examined and testified as follows:
15    DIRECT EXAMINATION
16  BY MR. TURIELLO:
17    Q.  Good morning, sir.
18    A.  Good morning.
19    Q.  Can you tell the Court where do you live?
20    A.  Presently live in Corona Del Mar,
21  California.
22    Q.  We're going to go through your background,
23  but just to give this Court a sense of why you're
24  here, you were -- you worked at SunCal between 2006

15

1  and 2016?
2    A.  Correct.
3    Q.  And in your role at SunCal, did you have
4  involvement in the due diligence, purchase and then
5  post-purchase period related to the Kimball Hill
6  Chicago properties?
7    A.  Yes.
8    Q.  And you understand that that's what you're
9  here to talk about today?
10    A.  Yes.
11    Q.  If we can start with your background.
12    Can you tell the Court where did you grow
13  up?
14    A.  A suburb of Chicago named Riverside.
15    Q.  And where did you attend high school?
16    A.  Fenwick High School in Oak Park, Illinois.
17    Q.  When did you graduate from Fenwick?
18    A.  1984.
19    Q.  After graduation from Fenwick, did you
20  attend college?
21    A.  I did.
22    Q.  Where did you go?
23    A.  Boston College.
24    Q.  And when were you at Boston College?

16

1    A.    1984 through 1988.
2    Q.    What did you study at Boston College?
3    A.    Finance.
4    Q.    And did you obtain a degree?
5    A.    I did.
6    Q.    And what was that degree in?
7    A.    Bachelor of Science in Finance.
8    Q.    After graduating in 1988, did you begin
9  your employment career?
10    A.    Shortly after college, I went to officer
11  candidate school and became an officer of the
12  United States Marine Corps.
13    Q.    And what -- what did you do in the Marine
14  Corps?
15    A.    I was a Cobra attack helicopter pilot.
16    Q.    And how long were you a Cobra attack
17  helicopter pilot in the Marine Corps?
18    A.    Nine years active duty, two years
19  reserves.
20    Q.    If you could, just give the Court a sense
21  of what your assignments and -- those were?
22    A.    Initially, it was the time of the first
23  Gulf War.  I was part of a Marine expeditionary
24  unit assigned to a ship.  We were deployed to Iraq

                                                          17

1  twice.
2    Q.    You said you were nine years active and
3  two years reserve?
4    A.    Yes, sir.
5    Q.    And at what rank did you retire?
6    A.    Major.
7    Q.    After completing your service in the
8  Marine Corps, did you enter the civilian workforce?
9    A.    I did.
10    Q.    What was your first civilian job after you
11  left the Marine Corps?
12    A.    I went to work for Roger Staubach at The
13  Staubach Company.
14    Q.    And what is the Staubach Company?
15    A.    The Staubach Company represented Fortune
16  1000 companies and their real estate needs.
17    Q.    When did you go to work for Roger
18  Staubach?
19    A.    1998.
20    Q.    And I believe that's headquartered out of
21  Dallas, but you were in the southern California?
22    A.    I was in Orange County, California, yes.
23    Q.    And what type of real estate did you work
24  in?

                                                          18

1    A.    I was focused primarily on the real estate
2  needs of technology companies.
3    Q.    And tell us about that.
4    A.    At the time in the late '90s, early 2000s,
5  many technology companies were looking for data
6  center hotels.  The data center hotel required a
7  significant portion -- or a significant acreage and
8  my primary focus for those first couple of years
9  was looking for the land for those data center
10  hotels.
11    Q.    During your time at The Staubach Company,
12  did you have any involvement in residential real
13  estate?
14    A.    In early 2000 when the tech bubble was
15  forcing some of the technology companies to rethink
16  their real estate needs, one of my clients was long
17  about 40 acres of land in Irvine, California, and
18  the highest and best use for that land other than
19  the data center which we had contemplated was
20  residential.  At that time, I reached out to the
21  leading land brokerage firm in California named
22  O'Donnell/Atkins to look for a solution to unload
23  that property on behalf of my client.
24    Q.    Okay.

                                                          19

1          So there was a change in market conditions
2  and you took a look at it and adapted and came up
3  with a different plan?
4    A.    That's correct.
5    Q.    When you took a look at the property and
6  identified that it was -- there was potential for
7  use as residential property, you say you reached
8  out to O'Donnell/Atkins?
9    A.    Yes.
10    Q.    And were they a customer at the time?
11    A.    O'Donnell/Atkins was a brokerage firm, the
12  then leading land brokerage firm in California,
13  residential land brokerage firm.  And by
14  residential, I don't mean that their clients were
15  individual home buyers.  By residential, I mean
16  they were representing developers and builders.
17    Q.    So developments, subdivisions, things like
18  we're talking about here today?
19    A.    Yes.
20    Q.    When you reached out to O'Donnell/Atkins
21  about this potential new avenue for the property in
22  residential, can you tell me what was involved in
23  that?
24    A.    My expertise at the time was not knowing

                                                          20

1  who the potential purchasers of that property would
2  be. So I co-brokered that property with
3  O'Donnell/Atkins. O'Donnell/Atkins was successful
4  in finding Lennar, who is one of the largest public
5  builders in the country, to be the buyer for that
6  property.
7      Q.   Based upon that identification of the
8  property and interaction with O'Donnell/Atkins, did
9  that create an opportunity that caused you to then
10  leave The Staubach Company?
11     A.   It did. The two principals of
12  O'Donnell/Atkins, Mac O'Donnell and Craig Atkins,
13  shortly after that assignment asked me if I would
14  come and run their company.
15     Q.   And you joined O'Donnell/Atkins in 2002?
16     A.   I did.
17     Q.   And at what position were you brought on
18  as?
19     A.   President.
20     Q.   And just give us a sense of the scope of
21  the work and the company of O'Donnell/Atkins?
22     A.   During my tenure as president from 2002
23  through 2006, we were the largest land brokerage
24  company in California. To the best of my

21

1  knowledge, we were the largest land brokerage
2  company in the country. We were representing
3  developers and builders on land in excess of $1.5
4  to $2 billion a year depending what year we're
5  looking at with commission revenues in excess of
6  $20 million a year during that time frame.
7      Q.   And what were your responsibilities at
8  O'Donnell/Atkins?
9      A.   Primarily to grow the business during that
10  time. Two hats really. One to grow the business
11  and train the brokerage force, but at the same
12  time, to continue to lead by example and lead from
13  the front by doing deals.
14     Q.   When you say "doing deals," what do you
15  mean? What type of deals?
16     A.   Large land development deals.
17     Q.   And would you have even though you were
18  the president been involved in or aware of all
19  aspects of those deals?
20     A.   I was involved in every major deal that
21  the firm did.
22     Q.   And would that include the due diligence,
23  purchase price, things like that?
24     A.   Absolutely.

22

1      Q.   Did you have any involvement with public
2  builders during that time period?
3      A.   The public builders and some of the large
4  privates were probably 95 percent of our off taking
5  customers.
6      Q.   Off taking, is that the people you sell
7  to?
8      A.   Yes.
9      Q.   And just -- I think it's probably evident,
10  but can you tell us what a public builder is?
11     A.   Sure. A public builder is publicly
12  traded.
13     Q.   How long were you at O'Donnell/Atkins?
14     A.   2002 through 2006.
15     Q.   And where did you go in 2006?
16     A.   At the time, my largest client was the
17  SunCal Companies. They made me an offer in summer
18  of 2006 to come over and become an executive at
19  their firm.
20     Q.   Okay.
21          And can you tell me about the business of
22  the SunCal Companies at the time you joined them in
23  2006?
24     A.   Sure. At the time I joined in 2006, the

23

1  SunCal Companies was one of the largest land
2  developers in the country. When I got there, they
3  owned or controlled over 100,000 residential lots.
4  I think at the peak in 2008, they owned or
5  controlled approximately 150,000 residential lots.
6      Q.   So you were initially recruited away from
7  The Staubach Company and now you were being
8  recruited away from O'Donnell/Atkins?
9      A.   Yes.
10     Q.   And that was based upon their experience
11  working with you, they asked you to come on?
12     A.   Yes.
13     Q.   You mentioned the scope of the
14  developments that were involvement.
15          Can you tell us about the different stages
16  of development that you would be involved in in
17  that initial period of time at the SunCal Company?
18     A.   Sure. During 2006 and 2007, the market
19  was still quite robust and at that time, our
20  primary objective on the acquisition side was to
21  find raw land or untitled land and then perfect
22  those entitlements, bring in the horizontal
23  infrastructure and then sell that once completed to
24  the public building community.

24

1 Q. When you say protect the...

2 A. Perfect.

3 Q. Perfect the infrastructure, tell us what's

4 involved with that?

5 A. I think I said perfect the entitlement.

6 Q. And what does that mean?

7 A. A developer or builder doesn't have, by

8 right, the ability to put a residence or

9 subdivision on any piece of land.  You need to work

10 with the local jurisdictions, whether it's a city

11 or a county, and obtain that right.  We call that

12 an entitlement.

13 Q. And you said to "bring in the horizontal

14 infrastructure," what do you mean by that?

15 A. Horizontal infrastructure, a simple way of

16 defining that would be the streets and all the

17 utilities required.

18 Q. And did you have any experience in

19 underwriting these deals?

20 A. I had -- that's what I did every day.

21 Q. Tell me what's involved in that.

22 A. There are -- I'll break down underwriting

23 into two stages.  The initial stage of underwriting

24 would be the amount of diligence we would do prior

25

1 to making a bid.  And, oftentimes, you need to make

2 seven, eight, nine, ten bids to get awarded one

3 deal.  Once you're awarded a deal, then you go into

4 a deeper dive due diligence or underwriting.

5 The initial due diligence could be as long

6 as two or three months.  Then the follow on due

7 diligence, the deeper dive, is typically 60, 90,

8 120 days.

9 Q. As part of this work, did you come to be

10 exposed to surety bonds?

11 A. Yes.

12 Q. And during that initial couple of years at

13 SunCal, what was your involvement or experience

14 with surety bonds?

15 A. I wasn't personally responsible for

16 negotiating the surety bonds, but I was a member of

17 both the asset management committee at SunCal and

18 the investment committee.  We had meetings every

19 Monday on acquisitions and meetings every Friday on

20 dispositions.  As we went through each project, I

21 was certainly aware of which projects we needed to

22 post bonds on and which projects we didn't.

23 As a matter of practice, we broke down our

24 projects into A maps and B maps.  I'll tell you

26

1 what I mean by that.  We typically broke our

2 projects into an A map or a large lot tentative

3 tract map and we would post the surety bonds for

4 the major infrastructure work and we would leave

5 the tentative tract map or the smaller B map for

6 the builders to post bonds on those.

7 Q. During this initial couple of years at

8 SunCal, did you have experience dealing with public

9 builders?

10 A. They were 95 percent of our clients on the

11 disposition side.

12 Q. Did the business of SunCal change

13 beginning in 2008 or 2009?

14 A. It did.

15 Q. Why?

16 A. Between 2004, prior to my arrival at

17 SunCal, and 2008, SunCal became Lehman Brothers

18 largest land position.  Just to give you a sense of

19 scale, Lehman Brothers had over $2 billion of

20 equity with our firm and just under $2 billion of

21 debt with our firm.  So in September of 2008 when

22 Lehman Brothers went bankrupt, it became quite the

23 seminal moment for our company.

24 Q. And after Lehman Brothers went bankrupt in

27

1 the crash of 2008, did -- were you a part of a

2 group that reinvented or restructured what SunCal

3 was doing?

4 A. Yes, sir.

5 Q. Tell us about that.

6 A. So prior to Lehman's bankruptcy, our firm

7 grew in size to approximately 500 people.  After

8 the bankruptcy, we attempted to right size and in

9 late 2008, 2009, that right size was approximately

10 100, 120 folks.  The large percentage of those

11 folks were dealing with the 30 plus projects that

12 we had followed Lehman into bankruptcy with.

13 Then we took a group of us and decided

14 that there was a need for a path forward and that

15 path forward was in this distress, where is there

16 opportunity and how do we capitalize and what are

17 we going to look like going forward post Lehman

18 bankruptcy.

19 Q. Is it fair to say that you took -- as in

20 2000 when the tech bubble burst, you took a look

21 and found an alternate path for success.  And here,

22 when the housing bubble burst, you took a look and

23 tried to figure out a way to save the company

24 moving forward?

28

1    A.   Yes.  In late 2008, 2009, the current
2  atmosphere in the land development space was there
3  were tens of thousands of lots across the country
4  that were already developed.  And SunCal's core
5  business model prior to that was developing raw
6  land and we didn't feel that there was a need to --
7  and there certainly was not a need to take on any
8  new raw land projects.  There were plenty of lots
9  out there that were trading below replacement cost
10  because, again, the backdrop was the headlines
11  every day were still that there was still room to
12  drop even further after 2009.  There was much
13  uncertainty in the financial markets, let alone the
14  real estate markets.  And we saw that distressed
15  lots were trading well below replacement costs and
16  we developed an investment strategy around buying
17  lots below replacement costs.
18    Q.   Just can you tell us what replacement cost
19  means?
20    A.   Sure.  I'll just go through an example, if
21  I can.  If I bought an acre -- or we bought an acre
22  of land for $100,000 and I could divide that acre
23  of land into four lots, then I would assign $25,000
24  per lot for the land price.

29

1    Then once I went through the entitlement
2  stage, it typically takes -- with the engineering
3  and the amount of time, that's another five to
4  $10,000 per lot in engineering and documentation,
5  environmental reports to get to an entitled stage,
6  so now there's $35,000 invested in that lot.
7    Then once I bring in the infrastructure
8  needed to make that lot, it could be anywhere from
9  fifty to $80,000 more, so now that lot could --
10  depending on how much infrastructure is actually
11  needed both onsite and offsite, someone's basis in
12  that lot could be anywhere from seventy to
13  $100,000.
14    The replacement cost strips out the land
15  and strips out the soft costs such as anyone's
16  interest or consulting and things like that.  And
17  we were truly looking at how many dollars were in
18  the ground that could be reused and that's what we
19  defined as replacement cost.
20    So in the example I just gave, we'd strip
21  out the $25,000 of land.  We'd strip out any carry
22  that that previous developer or builder would have
23  had and generally in a market like the Chicago MSA,
24  you're looking at somewhere between fifty to

30

1  $80,000.
2    Q.   So you would go in and buy it for less
3  than the previous owner had invested in it?
4    A.   Absolutely, at the time because there was
5  a ton of supply and very few buyers.  There was --
6  the price of these lots in 2009, 2010 ranged from
7  anywhere from ten to 30¢ on the dollar.
8    Q.   What was the attractiveness or thought
9  process behind now targeting lots that had been
10  developed and purchasing them below replacement
11  cost versus raw land?
12    A.   Had -- well, a number of fronts.  One, had
13  we gone across the street to where these lots were
14  already built and tried to recreate them, we would
15  be spending 100 percent of replacement cost to
16  replicate them, No. 1.
17    No. 2, many of these lots were in
18  subdivisions that were half built or three-quarters
19  built meaning they weren't pioneering.  In the last
20  cycle, builders were successful in bringing home
21  buyers to those subdivisions.  They were proven.
22  It wasn't a stretch by any means to assume that in
23  any type of mild recovery, those would be the first
24  lots that the builders would want to continue

31

1  building on.
2    Q.   You said "pioneering."
3    What does that mean?
4    A.   I would define pioneering as if the -- the
5  A ring, B ring and C ring.  A ring would be your --
6  to use Chicago as an example, your nearer suburbs
7  would be your A ring.  Suburbs that are just a
8  little further out would be your B ring.  Then once
9  you're starting to get deeper into the cornfields
10  and start trying to entitle and develop cornfields,
11  I would call that a little bit more pioneering.
12    Q.   Was the thought that once the market
13  started to recover, the first place builders would
14  look was property that had already been
15  developed --
16    A.   Absolutely.
17    Q.   -- to a certain degree rather than raw
18  land?
19    A.   Yes.
20    Q.   And was your thought process you'll buy
21  below replacement cost and still be able to give
22  those builders value so they'll come to you?
23    A.   We were in a unique position to -- if
24  buying at twenty to 30¢ on the dollar, we were in a

32

1  unique position to still sell a lot fifty, sixty,
2  70¢ on the dollar to a builder and make a profit,
3  yes.
4      Q.   During the time when the market was still
5  going down, was the plan to sell immediately or to
6  hold them for a period of time?
7      A.   The idea was to hold for a period of time.
8      Q.   And based upon the business model that you
9  came up with, did you need to wait for a complete
10  recovery before you could get value out of these
11  lots and move them to a subsequent purchaser?
12     A.   If I can back up and answer that question.
13          We were successful in deploying this
14  strategy in several states and we were pleasantly
15  surprised in some MSAs or metropolitan statistical
16  areas that our -- the hold period we envisioned in
17  the business plan was quite truncated from what we
18  initially anticipated.  By way of example, in 2009
19  and 2010, we were anticipating three to four years
20  for things to settle down.  And in some markets, we
21  were able to take these lots that we bought for
22  ten, fifteen, 20¢ on the dollar and sell them
23  immediately back to the builders within six, nine,
24  12 months.

                                                    33

1      Q.   As part of the business plan, why was the
2  plan to hold it for a period of time?
3      A.   The -- at the time, especially in '09 and
4  '10, there wasn't lot of -- the sentiment and the
5  builder confidence wasn't such that the builders
6  wanted to put more land on their balance sheet in
7  many of these markets.  So, in effect, we were
8  becoming the land bank and holding those lots up
9  until the point where the builders felt more
10  comfortable putting those lots back onto their
11  balance sheet.
12     Q.   You said the genesis for this revised
13  business model came about in 2008 with the
14  bankruptcy.
15          When were you actually out there executing
16  on this plan?
17     A.   We started putting the investment thesis
18  together in late '08, early '09.  That thesis made
19  its way into the formal presentation probably late
20  first quarter, early second quarter of '09.  Then
21  we went on what I'll call a "road show" to as many
22  potential equity partners as would listen to us at
23  the time.  All of the traditional real estate
24  lenders, the big investment banks, the insurance

                                                    34

1  companies, pension funds were actually running from
2  the business so we had to look to the more
3  opportunistic or contrarian type folks.  Those
4  categories would be opportunity funds, hedge funds
5  and some family offices.
6          I'd say we probably pitched this or
7  presented this investment thesis to 30 groups and
8  we found six or seven that said, "we agree.  We
9  share this contrary viewpoint with you and we would
10  be happy to invest alongside you should you present
11  us with a deal that meets our satisfaction."
12     Q.   The -- so, basically, banks were staying
13  away from this so you needed to go to places like
14  opportunity funds, hedge funds, family operations?
15     A.   The banks were actually a place where we
16  were finding deals.
17     Q.   And that would be through foreclosure
18  sales and things like that?
19     A.   Yes, through their REO department which
20  stands for real estate owned.
21     Q.   Were you also finding deals in bankruptcy
22  courts?
23     A.   Yes.
24     Q.   This road show that yielded six investors,

                                                    35

1  can you tell us generally what those outfits were?
2      A.   Yes.  Primarily, they were opportunity
3  funds and hedge funds.  By way of example, King
4  Street which is a large hedge fund based in New
5  York; Colony Capital based out of L.A.; Dune Real
6  Estate Investors based out of New York; D.E. Shaw
7  based out of New York.  Then some family offices,
8  one of which was a group in L.A. and then some
9  other folks that were newer funds that were looking
10  to get into the space.  Specifically, one of the
11  newer funds looking to get into this space was TRG.
12     Q.   So TRG is one of the groups that you
13  pitched your plan to and they agreed to come on
14  board and provide capital?
15     A.   Yes.
16          And if I can add to that, Mr. Kyte at TRG
17  was actually instrumental in 2009 in helping us
18  formulate this investment thesis.
19     Q.   Tell me about Mr. Kyte's involvement in
20  that 2009 period in helping you formulate this
21  thesis.
22     A.   Sure.  The way we were structured at
23  SunCal is we had an executive team at corporate in
24  Irvine, California.  Then we had three or four

                                                    36

1  vice-presidents of acquisition. Their job was to
2  be the tip of the spear and identify deals for
3  possible acquisition. One of those gentleman was
4  named Casey Tischer. Casey Tischer and Mr. Kyte
5  had worked together at a home building company in
6  southern California prior to Mr. Tischer coming to
7  work at SunCal. It was through Mr. Tischer that we
8  were introduced -- or that I was introduced and
9  other executives at SunCal were introduced to
10  Mr. Kyte during this time frame. And we shared not
11  only -- we had a shared vision for where we were in
12  the market in 2009, 2010, but we had a shared
13  vision on how to deploy capital at that time.
14      Q.  So in looking for partners, you were not
15  only looking for people who were interested in you
16  but people who you were interested in, in working
17  with?
18      A.  That's correct.
19      Q.  And Mr. Kyte was one of those individuals?
20      A.  Yes.
21      Q.  What is a promoted developer?
22      A.  A developer who does not use all of their
23  own money in an investment. The best way to
24  describe it would be to give you an example, I

37

1  believe. SunCal and most other developers that I
2  am aware of work off of a similar business model.
3  If I -- if we, as a firm, identified an
4  opportunity -- and just for the sake of discussion,
5  say it was a $10 million investment -- we would
6  approach our equity partners, the aforementioned
7  hedge funds, opportunity funds and they would put
8  in anywhere from 100 percent to 90 percent of the
9  required capital. The most typical would probably
10  be a 95 percent/5 percent structure, but there were
11  times where we would trade sweat equity in exchange
12  for only -- for putting zero in.
13      Then what would happen is over the course
14  of the lifecycle of that project as the project
15  returned capital and then after returning capital,
16  there were profits returned, the equity investor
17  or, really, the owner of the project because,
18  obviously, if you have 90 to 100 percent equity,
19  you're the de facto owner of the project, would get
20  what's called a preferred return. In 2009 and
21  2010, that preferred return was anywhere from 12 to
22  15 percent. This is where that term promoted
23  developer comes from.
24      Once that investor received 12 to

38

1  15 percent return, anything over that, we would
2  promote their interest. That would mean the next
3  dollar after that 12 percent, instead of it being a
4  pari passu dollar meaning I had five and he had 95,
5  instead of splitting that dollar 95/5, I promote
6  that dollar and we'd split it 80/20 up to the first
7  hurdle rate. And typically, that would be if the
8  preferred return was 15, between a 15 and an 18, we
9  might split that next dollar 80/20; between an 18
10  and a 21, we would split that next dollar 70/30;
11  and then we would, ultimately, get to over a 30 or
12  35 percent, we would start to split dollars 50/50.
13      Once you start getting into that
14  promote -- well, once you start getting into those
15  non-pari passu returns, that's how you define a
16  promoted interest.
17      Q.  So the business model, to a large extent,
18  was SunCal brought expertise, people, resources and
19  knowledge that they would put into this deal and
20  that sweat equity would be a primary contribution?
21      A.  We made a conscious decision rather -- and
22  it was expensive at the time. SunCal made the
23  conscious decision not to completely downsize to a
24  handful of core folks but to keep the core

39

1  competency in every discipline involved in real
2  estate development on the bench so we were more
3  attractive to the equity investors on one hand and
4  on the other hand, we could quickly parachute into
5  where these opportunities were and with just
6  calling guys off our own bench, we could complete
7  the entire due diligence process from beginning to
8  end. Then once we closed on a particular project,
9  we could execute that project from beginning to
10  end. We thought we would be an attractive platform
11  for investment having made that investment
12  ourselves in those personnel.
13      Q.  And this investment thesis, this new
14  business plan that you and your team came up with,
15  it saved SunCal?
16      A.  We executed it and we took considerable
17  market risk in '09 and '10 because none of us had a
18  crystal ball knowing what was going to happen
19  between '09, '10, '11 and where we sit today, but,
20  as it turns out, between that downturn in the
21  market, we've enjoyed one the longest real estate
22  recovery in the history of this country.
23      Q.  So while many firms went under, you
24  adapted the business model, downsized but made it

40

1  through, fair?
2      A.   Yes.
3      Q.   As part of the group at SunCal that
4  execute the strategy, was there a team, a land
5  acquisition team that was in place?
6      A.   Yes.  I mentioned that we had the
7  vice-presidents of acquisition who were our tip of
8  the spear.  Their primary role was to initially
9  identify opportunities and bring those back to
10 corporate.  At corporate, we had an investment
11 committee put together.  We would weekly go through
12 the acquisition pipeline that these acquisition
13 specialists would present to the investment
14 committee and decide which of those projects in
15 that pipeline we wanted to, A, spend time on and,
16 B, spend money on and I guess, C, devote personnel
17 to do it.  From there, we would look to that bench
18 that I described and decide who we'd pull off the
19 bench to start that initial underwriting.
20     Q.   If you could give us just a little sense
21 of that process.
22          You said these vice-presidents are the tip
23 of the spear and identified opportunities,
24 properties of interest; is that right?

                                                    41

1      A.   That's correct.
2      Q.   Is that something that they just do from a
3  desk in their office or what's the process involved
4  in that tip of the spear research?
5      A.   During this particular time period, it
6  would have been both being on the phone with
7  brokerage companies in the target markets we were
8  in, talking to title companies in those target
9  markets, following bankruptcy proceedings in those
10 target markets, talking to title companies,
11 lawyers.  With the depth of our firm, we had a
12 pretty deep Rolodex.  And once it became known that
13 we were a buyer of distressed lots, not only were
14 we out seeking opportunities, opportunities were
15 coming to us.
16          But additionally, those -- we did not have
17 any acquisition specialist bring a project to the
18 investment committee that we would vote on until
19 that specialist put what we referred to as "shoe
20 leather on the ground" on those lots and took a
21 look at them because there's really no substitution
22 for being there.
23     Q.   Okay.
24          So before this was even brought to an

                                                    42

1  investment committee, the acquisition
2  vice-president would go through all these resources
3  that you had, actually go to the target market and
4  go to the lots?
5      A.   Yes.  So initially -- so if we want to
6  break it down into three stages.  We previously
7  discussed two but the initial stage would be the
8  acquisition vice-president identifying the
9  opportunity, doing what I'll refer to as a quick
10 desktop underwriting.  The second stage would be
11 once that passed his test or sniff test, so to
12 speak, he would bring it to investment committee.
13 Once the investment committee elected to move
14 forward, we'd start that second stage of initial
15 due diligence.  That second stage of initial due
16 diligence was primarily focused on generating a
17 purchase price or an offer price.
18     Q.   You mentioned target markets.
19          What were the target markets?
20     A.   Our target markets were major metropolitan
21 areas and I will refer to those as the top 15 MSAs
22 in the country.  The reason why we targeted the top
23 15 MSAs in the country is even in the worst of
24 times -- and if we define the worst of times as

                                                    43

1  '09, '10 -- there were still a couple thousand
2  single family home permits being pulled in these
3  markets whereas some markets completely shut down,
4  some of the tertiary markets completely shut done.
5  These large markets just by their sheer size, there
6  was -- none of them slowed to zero.  We also
7  anticipated that they would be the first to
8  recover.
9      Q.   Okay.
10          And Chicago -- the Chicago area,
11 obviously, falls within that top 15?
12     A.   Yes.  I don't remember at the time whether
13 Chicago was the third or fourth largest, but it's
14 somewhere in that.
15     Q.   And MSA, you said what that stood for, but
16 can you tell us what that means?
17     A.   Metropolitan statistical area.
18     Q.   So you told us about the initial desktop.
19          You mentioned an investment committee.
20          Can you tell me who was on that investment
21 committee?
22     A.   Yes.  We had two owners of our company, we
23 had our chief operating officer, we had our
24 director of development, we had our director of

                                                    44

1 underwriting, we had our general counsel and then
2 myself. And my title at the time -- I was wearing
3 two hats. I was book ending all of these projects.
4 By book ending meaning I was an acquisition
5 specialist but then also on the other side of these
6 deals, I was the disposition specialist.
7     Q. What was your actual title?
8     A. Executive vice-president.
9     Q. So the acquisition vice-president
10 identifies property and brings it to the investment
11 committee.
12         What's the process that the investment
13 committee would follow when determining whether the
14 matter should proceed for further inquiry?
15     A. First and foremost, we had to like the
16 real estate. Secondly, we needed to make sure that
17 we had a potential equity partner that would also
18 like the real estate. If we could check both of
19 those boxes, then we would kick off the initial due
20 diligence team and create an initial due diligence
21 budget.
22         Just for the sake of letting you know what
23 that entailed, it was probably four to six people
24 and we generally would allocate somewhere between

45

1 75 and $100,000 for our initial due diligence.
2     Q. And what would that 75 to $100,000 make
3 up? What would be done?
4     A. Our primary goal would be to get to a
5 final cash flow that we could vote on at investment
6 committee which would, ultimately, be presented to
7 our investor. And the money and the time was made
8 up of validating every line that went into that
9 cash flow.
10         And if I can break that cash flow down for
11 you so you get a sense of what that entailed.
12 First and foremost, we wanted to understand the
13 amount and timing of the potential revenue for the
14 lot sales which I'll call "above the line." Then
15 equally important, we needed to understand the
16 amount and the timing of the costs to get to those
17 lot sales. When you subtract the above the line
18 revenue -- or when you subtract the below the line
19 costs from the above the line revenue, you get
20 what's called a net cash flow. And if that net
21 cash flow yielded a hurdle return that our
22 investors required, then at that time, we would
23 bring the project to our investors for their
24 initial diligence.

46

1     Q. Could you just define for us what a hurdle
2 return is?
3     A. Sure. At the time -- well, generally, a
4 hurdle return is a rate where I would, anyone would
5 take a series of net cash flows and discount them
6 back to get a present value. More specifically in
7 the real estate business and more particularly in
8 our business, capital is a very scarce commodity,
9 extremely scarce going into land in this time
10 frame. And our potential investors in order to put
11 their money in the project required a certain
12 return and that become our hurdle rate.
13         So if I took that series of net cash flows
14 and applied that hurdle rate or discount rate to
15 that series of cash flows and it resulted in a
16 positive net present value, then that would tell me
17 that it was a deal -- or tell anyone that it was a
18 deal worth doing. If it resulted in a negative
19 present value, then it would be a deal that we
20 wouldn't do.
21         Additionally, I think it's important to
22 mention that we would use that discount rate or
23 hurdle rate oftentimes to take that series of
24 assumptions -- by series of assumptions, I'm

47

1 referring, again, to the timing and the cost -- or
2 the timing and the amount of revenue less the
3 timing and the amount of costs. We'd apply that
4 hurdle rate or that discount rate to solve for what
5 we could pay for the property.
6     Q. You would assess how long you expected to
7 hold the property, cash flow over that time period
8 and discount it back to present value?
9     A. Correct.
10     Q. And that would give you a value of what
11 the property was worth at the time, essentially?
12     A. Yes. If I had a series of cash flows --
13 and in this particular era, it was a series of cash
14 flows ranging from -- out to probably five years.
15 We would take that series of cash flows, discount
16 it back at that discount or hurdle rate. It would
17 tell us what -- the result value would be a number
18 and that number would kind of be our -- the most we
19 could pay for a property. That wouldn't
20 necessarily mean we offered that amount on a
21 property because there was enough distress in this
22 market where oftentimes, we could -- by way of
23 example, if I took that series of cash flows,
24 applied a 25 percent discount rate to that series

48

1  of cash flows and the resultant number was
2  $5 million, our initial offer didn't necessarily
3  have to be $5 million. We just knew we couldn't go
4  above $5 million.
5      Q.   So you would identify a value that above
6  which it wouldn't make sense to go forward?
7      A.   Correct.
8      Q.   And that's something that you would bring
9  to these potential investors, that analysis,
10 assessment of value, to see whether it's a
11 economically feasible investment?
12     A.   Yes.
13          So once we were comfortable with our set
14 of assumptions, then we would present the set of
15 assumptions to our investors and really start the
16 process over all again. What I mean by that is
17 every single one of those assumptions had to be
18 vetted by our investors the same way we vetted
19 them.
20     Q.   This discounted -- net cash flow or
21 discounted cash flow analysis, is that something
22 that's common in the industry?
23     A.   I am unaware of any real estate investment
24 firm that uses any other valuation analysis other

49

1  those assumptions are unrealistic which is why 100
2  percent of people I know in this business use
3  discounted cash flow to determine the worth or
4  value of any real estate investment.
5      Q.   That would be discounted cash flow and
6  comp capitalization, those are common methods?
7  Those are the methods that are used?
8      A.   The only ones I know.
9      Q.   And just -- you touched on it briefly, but
10 just give us the scope of the data that goes into
11 that analysis?
12     A.   Sure. So each of the line items requires
13 significant research and effort. If we start with
14 the above the line revenues, first and foremost, we
15 need to understand what we think lots are
16 going to be worth in the future when we sell them.
17 There's ways of doing that. No. 1, we look at --
18 because we have deep relationships with many of the
19 builders and we understand their business models,
20 we look at what the house -- the eventual house on
21 those lots could sell for. We work backwards to
22 determine based upon the ultimate sale price of
23 that house and the required return for that
24 builder, what a builder could pay for that

51

1  than a discounted cash flow.
2      Q.   Are you familiar with the term "income
3  capitalization approach"?
4      A.   I am.
5      Q.   Is this a subset of that?
6      A.   It is. And I think when most people hear
7  the term "income capitalization approach" and the
8  term "cap rate," which is cap being short for
9  capitalization, they're used to hearing that in
10 connection with commercial buildings or retail
11 buildings. And I'll tell you what I mean by that.
12 If you hear something traded at a five cap or a six
13 cap, it means someone took the first year's net
14 revenue of that particular asset, divided it by, in
15 the case of a five or six cap, by 5 or 6 percent to
16 come up with a value of that purchase. But all
17 that is is a shorthand for a discounted cash flow
18 analysis and, frankly, I know of no sophisticated
19 investors that actually buy property like that
20 because all it is is a metric on -- that people use
21 as a comp. Because inherent in that analysis is
22 that that revenue is going to be constant forever
23 and inherent in that analysis is the property's
24 never sold. Both of those examples -- both of

50

1  particular commodity being land at the time.
2          Additionally, we work with local brokers,
3  land brokers. We work with local market research
4  analysts. Each MSA tends to have two or three
5  firms that specialize in market research.
6          Additionally, we use companies like
7  Metrostudy which keep tremendous amounts of data on
8  each of the markets.
9          Once we understand -- and then to
10 reference other valuation approaches, this is where
11 we would use a comp analysis or comparable lot
12 analysis. We'd also look at replacement costs.
13 And while we wouldn't use those two data points to
14 come up with our ultimate value, they would aid us
15 in determining whether or not our assumptions going
16 forward were accurate.
17         Then on the cost side, which is,
18 obviously, equally as important as the revenue
19 side, we'd want to understand looking at each lot
20 the remaining cost to complete, to take it from its
21 current condition into what I'll call a finished
22 condition. And a finished condition is defined as
23 a lot that is ready to commence construction of a
24 house. We would pay particular attention to the

52

1  timing of those costs because the amount of these
2  costs is certainly relevant to discuss profits, but
3  to talk about costs in a vacuum would be
4  inappropriate because money has a time value.  And
5  if you also don't understand and quantify the
6  timing of the revenue and costs, you are unable to
7  come up with a hurdle rate or discount rate to
8  present to your investors.
9     Q.   In your assessment of the remaining
10  development costs, would you also look at the
11  status of bonded improvements?
12     A.   Yes.
13     Q.   Would you look at the status of any surety
14  bonds that are in place?
15     A.   Yes.
16     Q.   Why would you look at those?
17     A.   Bonded improvements, if there was a bond
18  in place -- and, certainly, in this transaction,
19  there were bonds in place.  There was a reputable
20  firm with a several hundred billion dollar balance
21  sheet behind them that had guaranteed those bonds.
22  We had -- we certainly asked the question on
23  whether there were bonds in place, we certainly
24  asked the question who was the guarantee -- or

                                                      53

1  guarantor of those bonds and we certainly wanted to
2  know whether or not we would have to replace those
3  bonds.
4     Q.   Is that something that you would inquire
5  about, look into in each due diligence that you
6  perform?
7     A.   Absolutely.
8     Q.   So you've gone through the revenue side,
9  the cost side.
10        What other areas were involved in this
11  deep dive due diligence process?  Legal?
12     A.   Legal, absolutely.
13        So if we just go through all of the folks
14  that were represented at investment committee, I
15  spoke about some of my duties on acquisitions and
16  coming up with revenue and the timing of that
17  revenue.  Our director of development would be
18  responsible for what I mentioned, the amount and
19  timing of the development costs.  The bonded
20  improvement issue would fall under two different
21  hats on that investment committee.  First and
22  foremost, it would fall under the director of
23  development to be aware of what costs were our
24  responsibility and what costs were not our

                                                      54

1  responsibility and then bond improvements would
2  also come under legal as our general counsel was on
3  our investment committee.
4        And I think it's probably worth pointing
5  out that while we were looking at these
6  opportunities, these distressed opportunities,
7  whether they were through bankruptcy sales or
8  whether they were through REO departments at banks,
9  the other two-thirds of our firm were dealing with
10  our own bonds on $2 billion worth of land that we
11  had in bankruptcy with Lehman Brothers.  So our
12  bench of both in-house attorneys and outside
13  attorneys with experience in surety bonds was quite
14  deep.
15     Q.   So you've gone through revenue, costs,
16  legal.
17        Once all of those areas were satisfied,
18  would you then determine or look for appropriate
19  financing?
20     A.   We would find our partner, as I discussed,
21  and together with our partner, we'd come up with a
22  price that we wanted to offer on the property.
23     Q.   And in bankruptcy, for example, what would
24  the bidding process be?

                                                      55

1     A.   Each of the trustees were running -- I'll
2  back up.  Not all of the processes were the same.
3  We competed in trustee sales that were live
4  auctions and we competed in trustee sales that were
5  run through brokerage firms which would be the more
6  traditional way of presented information and then
7  picking a date to call for offers.  Once the offers
8  were called for, there was likely a best and final
9  where the two or three highest offers were asked to
10  present their best offer or final offer.  And then
11  there was a due diligence period following the --
12  being awarded that particular deal.
13     MR. TURIELLO:  Okay.  Your Honor, we're about a
14  an hour.  This is probably a good place to take a
15  break, if that's acceptable.
16     THE COURT:  Yeah, I think it probably is.
17  Let's take a short break and let the witness and
18  other parties use the facility.  Come back, let's
19  say, in about eight minutes or so.
20     MR. TURIELLO:  Thank you.
21                    (A short break was taken.)
22                    (whereupon, the following
23                    proceedings were held in open
24                    court.)

                                                      56

1    THE COURT:  Okay.  Short breaks always end up
2  being a little bit longer once I get behind that
3  door because then everybody has their business I
4  need to attend to.  So that means we're a little
5  bit closer to lunch than we were before the break.
6  I would expect we're going to probably go through
7  to the lunch break now at this point.  No other
8  breaks.
9    MR. TURIELLO:  I would anticipate finishing him
10  before lunch, yes.
11    THE COURT:  Yes.  Then we'll decide what time
12  our lunch break makes sense based on the other
13  witnesses, okay?  So the witness is back on the
14  stand.  I remind you that you remain under oath.
15    Let's call it out just for the record so
16  we know which one we're doing.
17    THE CLERK:  Calling Kimball Hill, Inc.
18    THE COURT:  Okay.  And Counsel.
19    MR. TURIELLO:  May I continue, your Honor?
20    THE COURT:  Still your witness.
21    MR. TURIELLO:  Thank you, your Honor.
22  BY MR. TURIELLO:
23    Q.   Mr. Teteak, we left off discussing what
24  was involved in the due diligence process that

57

1  would lead up to making a bid and just generally
2  that bid process.
3    Do you recall that?
4    A.   Yes.
5    Q.   Okay.
6    Prior to the Kimball Hill Chicago
7  bankruptcy that we're here talking about, what was
8  SunCal's experience with this model, going out and
9  making these types of bids?
10    A.   I believe the Kimball Hill Chicago
11  portfolio was the fourth or fifth portfolio we
12  bought out of bankruptcy.
13    Q.   About how many -- I'm assuming that all
14  bids weren't successful that you made?
15    A.   No.  I think our track record in bidding
16  on these -- on one hand, there was not a lot of
17  folks that had this contrarian viewpoint that we're
18  showing up to bid.  On the other hand, the five or
19  six groups that were bidding seemed to show up at
20  many of them.  So our -- I believe our success rate
21  from bids to accepted bids was probably in the one
22  out of six, one out of seven.
23    Q.   Can you just give us a sense of how many
24  bids were made and how many were accepted?

58

1    A.   I don't have exact numbers, but I would
2  say during this time frame between bankruptcy, REO
3  departments, buying distress directly from other
4  institutional firms, we probably underwrote ten
5  deals a month over two years and we ended up buying
6  in '09, '10 and early '11 approximately 15,000
7  lots.
8    Q.   Were you and SunCal involved in the
9  purchase of the Kimball Hill properties in Las
10  Vegas?
11    A.   Yes.
12    Q.   And the due diligence process that we went
13  through and that you described in detail, did all
14  of that precede your offer, your purchase of those
15  lots?
16    A.   We would have gone through the same
17  process in buying the Kimball Hill portfolio out of
18  bankruptcy in Vegas that we did in Chicago, yes.
19    Q.   And that's the process that you just went
20  through in some detail?
21    A.   Correct.
22    Q.   The funding for that process, how did that
23  come about?
24    A.   The -- we initially bought a portfolio in

59

1  Las Vegas out of bankruptcy called Land Source.  I
2  can't recall the number of lots, somewhere north of
3  500.  We partnered on that deal with a hedge fund
4  out of New York called D.E. Shaw.  It is typical in
5  partnership agreements that once you effectuate a
6  deal with a partner in a certain geographical area
7  and then that partner -- well, the partner puts
8  rights -- first rights into that operating -- or
9  partnership agreement that says if there are any
10  follow on projects in that same geography, then
11  that particular partner has a first right of
12  refusal on those.
13    So after D.E. Shaw was our partner on Land
14  Source -- and we were quite pleased with that
15  purchase -- the Kimball Hill portfolio in Las Vegas
16  came to our attention.  It was right around this
17  time that we were actively pursuing deals with TRG
18  in a number of markets and TRG did a pretty deep
19  dive underwriting on that Las Vegas Kimball Hill
20  portfolio with us.  Unfortunately for TRG, D.E.
21  Shaw exercised their first right of refusal on that
22  particular project and ended up partnering with us
23  on that deal.
24    Q.   When you say "unfortunately for TRG," what

60

1  do you mean by that?

2      A.   The Kimball Hill portfolio in Las Vegas,

3  in layman's terms, we tripled our money within two

4  years, probably within 18 months.

5      Q.   In any of those instances -- well, strike

6  that.

7           In the Kimball Hill Vegas purchase and

8  ultimate sale within two years, were there any

9  issues with respect to sureties?

10      A.   We had no issues with respect to sureties

11  in any other of our deals that we bought in this

12  time frame.

13      Q.   So in Kimball Hill Vegas and in no other

14  deals did you have issues with sureties.  Is that

15  fair?

16      A.   Fair.

17      Q.   And Kimball Hill in Las Vegas, did the

18  surety file suit against you?

19      A.   No.

20      Q.   And just so we're clear, again, same due

21  diligence process for Kimball Hill Vegas, same due

22  diligence for Kimball Hill Chicago?

23      A.   Yes.

24      Q.   If we can turn to the matter that we're

61

1  here for today and you've touched on it a bit, the

2  Kimball Hill Chicago project.

3           So TRG was involved, made a bid on the

4  Vegas property and then Kimball Hill Chicago was

5  after that?

6      A.   Yes.

7      Q.   And how is it that TRG was identified as a

8  potential investor for the Kimball Hill Chicago

9  properties?

10      A.   I don't know if I recall the exact -- we

11  were in constant contact with all of our partners

12  at the time and I believe because TRG lost out on

13  the Vegas opportunity, we wanted to make sure we

14  put them -- or gave them the opportunity to invest

15  in our next deal and as it happens, Kimball Chicago

16  was our next deal.

17      Q.   It's been suggested that no due diligence

18  was done or due diligence was waived.

19           Is that accurate?

20      A.   Nonsense.

21      Q.   So -- and I don't want to go through the

22  lengthy discussion again, but all of those things

23  that you described, the revenue, costs and analysis

24  of the legal status including surety bonds, were

62

1  all -- was that deep dive done with respect to

2  Kimball Hill Chicago?

3      A.   Absolutely.

4      Q.   And were any issues identified, any red

5  flags identified during that due diligence process?

6      A.   No.

7      Q.   And when you dove into Kimball Hill

8  Chicago, what did you learn about the

9  attractiveness or the appropriateness of these lots

10  for purchase?

11      A.   They met -- or these lots checked all of

12  the boxes that were a requirement for us to match a

13  portfolio of lots to our investment thesis.

14  Namely, we were buying them at a significant

15  discount to replacement costs in a major

16  Metropolitan area in communities that were not on

17  the fringe, in communities that had existing

18  development.

19      Q.   As part of this analysis before deciding

20  to make the purchase, before deciding to partner

21  with TRG, did you analyze in this due diligence

22  whether there were surety bonds in place?

23      A.   I did not personally but our team

24  certainly did.

63

1      Q.   And that would have been information that

2  was brought to you as a member of the investment

3  committee who was part of the ultimate decision

4  making process?

5      A.   It was asked and answered multiple times

6  at our investment committee.

7      Q.   What was your understanding or what did

8  you discover about the status of surety bonds.

9      A.   We were satisfied that we did not have to

10  replace these bonds.

11      Q.   That was actually part of the agreement

12  for purchase is that there was no responsibility to

13  replace the surety bonds?

14      A.   Correct.  It was in the purchase and sale

15  agreement.

16      Q.   And if there were no surety bonds in place

17  or an obligation to replace surety bonds, how would

18  that affect your due diligence and decision making

19  process in deciding whether or not to bid on a

20  property?

21      A.   If there were no bonds in place and/or

22  there was a requirement for us to replace the

23  bonds, we would have to account for those costs and

24  the timing of those costs in that underwriting, in

64

1  that cash flow analysis that we discussed earlier.
2  And in this particular case, had that been the
3  case, then the $6.6 million offer that we made
4  probably would have gone to zero. I'm not sure
5  these lots would have sold if that was the case,
6  No. 1.
7       No. 2 -- well, I'll leave it at that.
8       Q.  Why is that, that if the -- if during your
9  due diligence you discovered that the surety bonds
10 weren't there or they needed to be replaced, why
11 would that drive the value of the property down to
12 zero in your analysis?
13      A.  Because then the costs of that bonded
14 infrastructure would have been in our cash flow
15 rather than someone else's cash flow.
16      Q.  That would have been...
17      A.  So I would have to account for those costs
18 in our cash flow. And my recollection was there
19 was nine or $10 million worth of bonds here.
20 Obviously, we would have done a much deeper
21 analysis on what bonded improvements were already
22 in the ground and what bonded improvements were
23 still not spent. So it was likely less than that
24 nine or $10 million.

65

1       But at the same time, we did not account
2  for any of those bonded improvements in our cash
3  flow when we came up with our $6.6 million offer
4  price.
5       Q.  During the due diligence process, did
6  you -- did anyone express to you or did you become
7  aware that the surety intended to sue or pursue the
8  successor owner for the bonded improvements?
9       A.  No.
10      Q.  How would that impact your analysis and
11 due diligence?
12      A.  That would have been the ultimate red flag
13 to stay away from this deal. There were plenty of
14 other deals at the time and we were not in the
15 business of buying into potential litigation.
16      Q.  Okay.
17      As part of the due diligence with respect
18 to Kimball Hill Chicago, was a market analysis
19 done?
20      A.  Yes.
21      Q.  Tell me about that.
22      A.  We used the -- we talked to local brokers.
23 We met with a firm -- and I may get the name
24 wrong -- R.W. Realty Advisors which were a team of

66

1  folks that had worked for a considerable amount of
2  time in the Chicago market on this very type of
3  real estate meaning subdivision lot sales to
4  builders. I remember meeting with them two or
5  three times, getting their sense on the current
6  market conditions as well as their opinion on the
7  forecast of recovery here in Chicago.
8       Additionally, I remember pouring through
9  pages and pages of data coming from the equivalent
10 of the Metrostudy of -- in Chicago. And the reason
11 why I say it that way is I'm not sure at the time
12 that Metrostudy was the firm, but it would have
13 been an equivalent firm to Metrostudy where we
14 would have gathered that data.
15      Q.  This pouring through information, this due
16 diligence, that's something that you do -- you're
17 doing -- or is that something that you're doing to
18 protect SunCal's interests and assess liability for
19 SunCal's perspective as well as your potential
20 partner, financial partner?
21      A.  Well, all of the above. First and
22 foremost, it's prudent, professional and, frankly,
23 our financial partners wouldn't have it any other
24 way.

67

1       Q.  You need to satisfy these concerns in
2  order not only for your people to sell it to the
3  investment committee but for you to sell it to
4  potential partners like TRG?
5       A.  Absolutely. Our reputation is what
6  allowed us and would continue to allow them --
7  since I'm no longer there -- to raise money in the
8  future.
9       Q.  Did you perform an economic analysis,
10 discounted cash flow, those types of assessments
11 with respect to Kimball Hill as well?
12      A.  Absolutely.
13      Q.  And tell us -- if you could -- you've gone
14 through what that process entails generally, but
15 just take us through specific to this what was
16 done.
17      A.  In this particular case, we made the
18 assumption that we would -- and this would have
19 been late '09 during our deep dive due diligence
20 going into early 2010. We made the assumption that
21 we would commence lot sales after a hold period of
22 three years, so 2013 would have been our first lot
23 sales with the final lot sales in 2014.
24      Q.  The -- based upon this due diligence

68

1  market analysis, economic analysis, legal analysis,
2  you came up with a price that made sense that you
3  couldn't go above.  Is that fair?
4      A.   It's typical that we run a base case pro
5  forma -- and by base case, I mean, the expected
6  case -- and then we typically also run what we call
7  a stressed case and then we also run, for lack of a
8  better term, a home run case.  Our offer price is
9  mostly supported by the expected or base case, but
10  it's often guided by the stressed case.  And,
11  again, when we are solving for our hurdle rate or
12  discount rate to determine what we can bid on a
13  property, that doesn't necessarily mean that's what
14  we would bid on a property.
15          In this particular case, I believe that
16  the stressed case was given a higher weighting in
17  our offer than the base case and that revolved
18  around the due diligence efforts in knowing that
19  the Chicago market was a bit slower at the time
20  than other markets in the country, but, certainly,
21  by no means did that deter us from offering.
22      Q.   At the conclusion of this due diligence
23  period, were you and SunCal satisfied that this was
24  an appropriate purchase?

69

1      A.   Yes.
2      Q.   And that's one that you recommended to
3  your partner TRG?
4      A.   Yes.
5      Q.   If there were these issues with the surety
6  that we talked about, that there wasn't one in
7  place or that there was an obligation to replace or
8  that you became aware that the surety intended to
9  file suit, would you have recommended this for
10  purchase?
11      A.   No.
12      Q.   Why not?  I think you've already gone
13  through that.
14          You wouldn't have wanted -- you wouldn't
15  have wanted to walk into that situation.  It would
16  have been -- it wouldn't have made sense, fair?
17      MR. RIORDAN:  I'm sorry, Counsel.  Could you
18  read the last couple -- there was a buzzer going
19  off back here.  I'm sorry.  Could you read the last
20  question and answer back?  I apologize.
21      MR. TURIELLO:  I can just reask.  It wasn't --
22  I don't think it was that vital.  I think it's been
23  answered, so.
24      MR. RIORDAN:  Something was going off back

70

1  here, Judge.  I don't know what it was.
2      THE COURT:  What's your preference, Counsel?
3      MR. RIORDAN:  Let counsel proceed.  Thank you,
4  Judge.
5      THE COURT:  Thank you, Counsel.
6  BY MR. TURIELLO:
7      Q.   Prior to the purchase being finalized --
8  and I believe the documents, the purchase
9  agreement, Exhibit 1 and I believe there's an
10  assignment that's also marked as an exhibit that's
11  not been objected to.  So I don't want to go
12  through documents unnecessarily, but there was a
13  purchase and sale agreement executed that was then
14  assigned to TRG and TRG closed on the purchase?
15      A.   Correct, which is typical.  We would have
16  bid on the project under one of our entity names
17  and then once during the due diligence process we
18  identified which of our financial partners was
19  actually going to be our partner, we would assign
20  it to that entity and that entity would close on
21  it.
22      Q.   And in this case -- you mentioned that
23  there are situations where your financial partner
24  might fund 90 percent.  In some instances, they

71

1  might fund 100 percent.
2          Which was the case here?
3      A.   TRG funded 100 percent.
4      Q.   So is that a situation where, "Well, we
5  got them to buy it, it's their responsibility now,"
6  and walk away or did you still have skin in the
7  game?
8      A.   We had considerable skin in the game
9  because SunCal agreed to work for a very reduced
10  management fee and the only way SunCal was going to
11  make money was if this project performed.
12      Q.   The willingness to do that, was that based
13  upon the confidence you had in your due diligence,
14  the strength of that assessment?
15      A.   It was wholly based on our belief in the
16  success of this project.
17      Q.   That belief is based upon that deep dive,
18  years of experience and all the information that
19  we've just discussed?
20      A.   Yes.
21      MR. TURIELLO:  Jim, if you could call up TRG
22  Exhibit 17.
23          Now, I'm going to approach the witness and
24  give him a hard copy in the event he needs to flip

72

1  to any particular page that's not on the screen,
2  Judge.
3      THE COURT:  Okay.
4      MR. TURIELLO:  I've returned to the podium.
5  BY MR. TURIELLO:
6      Q.   Showing you what's been marked TRG
7  Exhibit 16, can you tell me what this is?
8      A.   This represents the initial business plan
9  for the portfolio.
10     Q.   And this was prepared in April of 2010?
11     A.   Correct.
12     Q.   It says Argent Mangement.
13          Is that SunCal?
14     A.   Yes.  It's the management arm of SunCal.
15     Q.   Are you familiar with this document?
16     A.   I am.
17     Q.   And you're familiar with the contents of
18 this document?
19     A.   I am.
20     Q.   We've described the due diligence process.
21          Are key components of that process that
22 you went through reflected in this business plan?
23     A.   Yes.
24     Q.   And this business plan was prepared

                                                    73

1  April 2010 which would have been in the month this
2  deal closed?
3      A.   Correct.
4      Q.   So this reflects what you found, a
5  condensed version, obviously, of what you found,
6  fair?
7      A.   Fair.
8      Q.   And expectations moving forward?
9      A.   Yes.
10     Q.   If you look at it's the exhibit page 2,
11 page 1 of the document, the table of contents.  And
12 we see in this table of contents a number of
13 different items, summaries of information that make
14 up this business plan, fair?
15     A.   Yes.
16     Q.   And we've talked about the different
17 things that you and your team conducted in the due
18 diligence.  For example, we see here market
19 overview, project overview.  Those are things that
20 we talked about in your analysis.  Is that fair?
21     A.   Fair.
22     Q.   And so this provides TRG that information
23 in a business plan form so everyone can be on the
24 same page moving forward?

                                                    74

1      A.   Correct.
2      Q.   The -- if you look at the exhibit page 3,
3  exhibit page 3, it's page 2 of the plan itself.
4          Now, just for the record, the exhibit is
5  Bate's numbered at the top left TRG Trial
6  Exhibit 17, page 3.  I'm referencing that number
7  for ease of the technician who is calling up the
8  documents.
9          But we see that larger number at the
10 bottom, right?
11     A.   Yes.
12     Q.   Okay.
13          So the executive summary, can you tell us
14 what that is and what that's describing?
15     A.   First paragraph summarizes that TRG will
16 be the 100 percent owner of the property.  The
17 second paragraph summarizes what we are buying, 437
18 finished lots, 115 partially developed lots.  The
19 third paragraph summarizes our team's summary of
20 the purchase price to our estimation of how much
21 hard costs were in the ground without attributing
22 any value to land.
23          So in my previous explanation, when I went
24 through that, I said we were buying lots for 10,

                                                    75

1  15, 20, 30¢ on the dollar.  This particular
2  paragraph indicates that these lots were 70 percent
3  of the applicable hard costs which means we were
4  buying them for 30¢ on the dollar of hard costs.
5  If we attributed any value to the land, it probably
6  would have resulted in some 20¢ on the dollar type
7  of metric.
8      Q.   The third paragraph references -- if we
9  look midway -- third line down, midway through
10 where it states -- if you could highlight -- "The
11 terms of the purchase agreement provide a due
12 diligence period that began October 14, 2009, and
13 extended to January 8, 2010."
14     A.   Yes.
15     Q.   This is a property that you would have
16 been looking at this before, though, at the VP
17 level and then this describes the time frame in
18 which the deeper dive was occurring?
19     A.   Correct.  What would have happened is at
20 some time prior to that October 14th date, we would
21 have completed our initial due diligence.  That
22 initial due diligence, again, would have gotten us
23 to our offer price.  Then after being awarded the
24 deal on October 14th, we were given a period of

                                                    76

1  time to perform our deeper due diligence at which
2  time we would go nonrefundable. And then it
3  appears there was a period of time after we went
4  nonrefundable with the deposit to the actual close.
5      Q.   The fourth paragraph refers to the success
6  that we talked about earlier with your involvement
7  in the Kimball Hill Las Vegas properties?
8      A.   Correct.
9      Q.   And it expresses this was successful in
10 reselling the entire portfolio at a significant
11 premium?
12     A.   Yes.
13     Q.   The last sentence of the fourth paragraph,
14 "Current -- if you could highlight -- "Current
15 underwriting for the Chicago portfolio assumes a
16 hold period of three to four years."
17          And what was that hold period based on?
18     A.   It was based upon all of that market
19 research that we previously discussed.
20 Specifically, when we thought was an appropriate
21 time that the five or six largest builders in
22 Chicago would purchase these lots from us at a
23 price that would allow us to make these outsized
24 returns.

77

1      Q.   The plan wasn't to just try to flip them
2  immediately, fair?
3      A.   Fair.
4      Q.   And did you need at the end of that --
5  well, strike that.
6          The plan and assessment at that time was
7  that all of the lots would be sold by the end of
8  year four?
9      A.   Correct.
10     Q.   And at that point in time, it was
11 impossible to predict whether there would be a
12 return to baseline or a boom in the market by 2014.
13 Is that fair?
14     A.   In this time period, it was very uncertain
15 on what the future held.
16     Q.   Did you need that guarantee or did you
17 need that full recovery in order to make this an
18 economically viable option?
19     A.   No. When you're buying lots at 20, 30¢ on
20 the dollar, you can sell them to builders still
21 below replacement costs and make a healthy return.
22     Q.   Okay.
23          And is that what that four-year period
24 reflects, that it would have recovered, the

78

1  pendulum would have recovered enough or what was
2  your assessment at that point in time?
3      A.   By no means were we assuming that the home
4  prices were getting anywhere near back to where
5  they were in the previous peak or even in the
6  previous run-up. We were assuming a modest home
7  price recovery. But more importantly, we were
8  assuming a change in the sentiment of the builder
9  community from -- to a more positive tone.
10     Q.   If you could look at the exhibit number --
11 the exhibit page would be page 7. In the document
12 itself, it's page 6. Actually, I apologize. If we
13 can go back to page 5 of the exhibit, page 4 of the
14 document. This identifies just a summary of
15 project specifics.
16          What's this intended to convey?
17     A.   It's a summary that says there is no
18 entitlement risk. In other words, none of these
19 lots are subject to discretionary approval from any
20 city or other county jurisdiction. It highlights
21 that the master and in-tract improvements are
22 complete and that we have identified a budget for
23 the remaining 115 lots that are not complete. And
24 it also highlights our anticipated hold costs for

79

1  the three to four years and then shows the timing
2  of the sales commencing in '13 with the project
3  sell out being defined as selling your last lot in
4  '14.
5      Q.   If we can now go to exhibit page 7, the
6  business plan, page 6.
7          This page is labeled Investment
8  Highlights?
9      A.   Correct.
10     Q.   Is that some of just the key points that
11 made this an attractive investment?
12     A.   Yes.
13     Q.   The first paragraph, "Significant Discount
14 to Seller's Investment."
15          Can you just read that and tell us what
16 that is?
17     A.   That is the same concept that I've been
18 referring to as buying lots for some percentage or
19 cents on the dollar to the replacement cost.
20     Q.   And in this case, the estimation was that
21 Kimball Hill would put $22 million into the lots
22 that you purchased for 6.6?
23     A.   Correct.
24     Q.   And would that when the market started to

80

1  show a modest recovery give you room to work with,
2  room to sell still a discounted rate below the 22
3  million but at a cost that you could make money and
4  the builder could get a good deal?
5      A.   The 22 million just represents our
6  estimate based upon our experience of having
7  developed 100,000 lots prior to employing this
8  particular strategy of buying someone else's lots.
9  It would have been our estimate of what it would
10  have cost us to make these same lots.
11     Q.   Paragraph two is what we talked about, the
12  market that's involved, it's an attractive market.
13  Is that...
14     A.   Yes.
15     Q.   Paragraph three, "No replacement of
16  performance or surety bonds."
17          That's listed in investment highlights,
18  fair?
19     A.   Fair.
20     Q.   If you could highlight paragraph three.
21          It states "There is no requirement to
22  replace the approximately $9 million in performance
23  and surety bonds as a part of this transaction."
24          Did I read that correctly?

                                                    81

1      A.   Yes.
2      Q.   And that was something that you found
3  significant enough to list in the bullet point
4  short investment highlights.  That was a key
5  factor.  Is that fair?
6      A.   Very much so.
7      Q.   And you even investigated and identified
8  the approximate amount of the bonds that were
9  out -- that were out there that didn't need to be
10  replaced?
11     A.   Correct.
12     Q.   And, again, that would be important to
13  whether or not you would even buy the property?
14     A.   Correct.
15     Q.   And if there was an obligation to replace
16  $9 million worth the bonds or perform -- of bonds,
17  would you have bought the property?
18     A.   No.
19     Q.   If we could go back to -- I hate to jump
20  around on you, but the exhibit number page 5,
21  business plan page 4.  Under Entitlement Status,
22  you talk about pulling title but it also says "All
23  maps have been recorded."
24          What's the significance of that?

                                                    82

1      A.   In order to record a map in -- well, in
2  every jurisdiction I know, you need to put up the
3  performance or surety bond.
4      Q.   In this case, it was -- your investigation
5  revealed that a performance bond had been put up by
6  Kimball Hill?
7      A.   Correct.
8      Q.   And that was a performance bond by
9  Fidelity or Zurich, a very, very large company?
10     A.   Correct.
11     Q.   If we could go to page of the exhibit,
12  page 8.  It's page 7 of the business plan.  Just to
13  orient ourselves, if we could, just look at page 7
14  and then on page 8.  I believe it's a two page
15  category.  And then we'll go back to the beginning.
16  If you can see page 8.  Page 9 of the exhibit,
17  page 8 of the business plan.
18          So this is a brief economic overview; is
19  that right?
20     A.   Market overview, yes.
21     Q.   And what's the -- if we could go back to
22  the previous page.  I don't want to go through all
23  the things we talked about in detail, but does this
24  reflect the process you described of -- it actually

                                                    83

1  says R.W. Real Estate Advisors, which is the entity
2  that you described earlier consulting with, the
3  data that you looked at, Chicago MSA regarding new
4  residential units, is that information condensed
5  here?
6      A.   This would be a summary of that research.
7      Q.   And, again, this is the end result of a
8  deeper dive due diligence process that you
9  described at length?
10     A.   Yes.
11     Q.   What does this information that you
12  identified, that you -- that was memorialized in
13  April of 2010 in this document tell you about the
14  appropriateness or viability of this investment?
15     A.   Again, this would be a summary that all of
16  the boxes that we needed to check in order to pass
17  our investment parameters were checked and this
18  business plan summarizes all of that due diligence.
19     Q.   And, again, what improvement costs were
20  required, expected, that would have been something
21  that was assessed as part of your analysis as well?
22     A.   Yes.
23     Q.   And at that point in time, your
24  investigation revealed, again, that there were

                                                    84

1  surety bonds in place to do the bonded
2  improvements?
3      A.  Correct.
4      Q.  Okay.
5          We -- we talked about your involvement in
6  the -- well, actually, I don't want to go through
7  it in detail, but just so we can get a sense.  You
8  showed your work in this document as well, right,
9  if we look at page 19, page 18, page 20. There's
10 financial information, annual cash flow.  If you go
11 on to the next page, financial summaries; next
12 page, capitalization summaries.  All of that data
13 analysis, financial analysis is contained in this
14 April 2010 business plan that summarizes parts of
15 the larger due diligence that you did?
16     A.  Yes.  Those cash flows would be summary
17 cash flows taken from a very large and extensive
18 underwriting model that we would have in our
19 underwriting department.
20     Q.  And at this point in time, was there any
21 indication that the surety was planning on suing?
22     A.  Zero.
23     Q.  And at any point up through the time that
24 you could, would you have walked away if you would

85

1  have learned about that?
2      A.  Absolutely.
3      Q.  The -- you described a hold period of
4  three to four years.
5          So the plan was to hold it for a period of
6  time; is that right?
7      A.  Yes.
8      Q.  So after the business plan -- after the
9  due diligence period ended, the business plan was
10 implemented.  There was an agreement between TRG
11 and SunCal where SunCal would perform management
12 and other responsibilities?
13     A.  Yes.
14     Q.  And were you involved in that -- those
15 management responsibilities for the Kimball Hill
16 Chicago project after the project was closed on?
17     A.  Yes.  Personally, I would have switched
18 hats from acquisition to disposition for this
19 particular portfolio.  So I would be assisting in
20 the disposition efforts.
21     Q.  And let's take us -- take us through the
22 first months of your role in the disposition
23 effort.  What would you have been doing?
24     A.  Well, initially because we had a hold

86

1  period, the priority would not have been to start
2  reaching out to the builder community to buy these
3  lots.  The priority would have been to continue to
4  monitor these markets, monitor what the builders
5  were doing, monitor what the builders were buying
6  other lots for, monitor home prices, to introduce
7  ourself since we were new to the market to the
8  building community and to whatever brokerage
9  communities or brokers we hadn't met during the due
10 diligence, to kind of keep those lines of
11 communication open.
12     Q.  Is that something that you did, let's say,
13 in the first six months after the project was
14 closed on?
15     A.  It would have been in the first year.
16     Q.  Now, would you have maintained regular
17 contact with Mr. Kyte and TRG during that time
18 period?
19     A.  Yes.  It is very typical that once we
20 close on a project, through the operating and
21 management agreement, there are either biweekly or
22 monthly calls.  I don't recall in this particular
23 case whether we were having biweekly or monthly
24 calls, but often what happens with me in particular

87

1  since I'm on the disposition side is we accomplish
2  many of those conversations just with one off phone
3  calls whenever they're needed.
4      Q.  And so you said that that would have been
5  the process for the first year, reach out,
6  continuing the analysis, monitoring the market,
7  developing and maintaining relationships and
8  staying in touch with TRG.  That would have
9  continued for past the first year as well?
10     A.  Both.  We would routinely speak to TRG as
11 our partner and, really, the owner of the project.
12 We were the development and management partner.
13 And we would routinely keep in contact with the
14 builder community during these first couple of
15 years.
16     Q.  At some point, did you become aware of
17 issues related to the surety, Fidelity?
18     A.  Yes.
19     Q.  And when did you first become aware that
20 there were issues with respect to Fidelity pursuing
21 TRG?
22     A.  It would have been in a conversation I had
23 with Mr. Kyte and, frankly, I shouldn't say it was
24 my conversation.  It would have been a conversation

88

1    with Mr. Kyte and probably many of us on the SunCal
2    executive team during one of our routine calls.
3        Q.   Was this something that was surprising to
4    you, that Fidelity was now attempting to come after
5    TRG?
6        A.   Yes.
7        Q.   Why?
8        A.   It was in the purchase and sale agreement
9    that we weren't responsible for these bonds.
10       Q.   And based upon that information, what
11   impact did that have on your assessment of your
12   role on the distribution side being able to market,
13   being able to try to sell these things?
14       A.   It was cause for grave concern.
15       Q.   Why is that?
16       A.   Because I know of -- in my experience in
17   selling tens of thousands of lots to public
18   builders and large private builders, I know of no
19   builders that could get a purchase of lots with
20   pending litigation of this type and magnitude
21   through their investment committee.
22       Q.   Is -- in finalizing a sale and negotiating
23   a deal, is some give and take within a municipality
24   about improvements something that's discussed or

                                                    89

1    done from time to time or regularly?
2        A.   It's standard operating procedure.
3        Q.   Was there anything unique about this
4    situation where a surety for an entity that had
5    gone bankrupt was now attempting to come after a
6    subsequent purchaser? Was there something unique
7    about that?
8        A.   It was the first time it ever happened to
9    us.
10       Q.   Is there anything about the surety coming
11   after the subsequent purchaser that made it more
12   difficult to sell or difficult to define what it
13   was you were selling or attempting to sell?
14       A.   We didn't have the ability to define the
15   risk to the builder community and if you cannot
16   define the risk or the exposure to the building
17   community, you effectively put yourself in a zero
18   bid situation.
19       Q.   And was the unique nature of the surety
20   attempting to sue a subsequent purchaser who
21   brought a property in bankruptcy something that
22   made it difficult to define that risk?
23       A.   Absolutely.  It would have been something
24   that the building community would have ran in the

                                                    90

1    opposite direction from.
2        Q.   After you became aware of the surety
3    pursuing TRG, did you continue to perform your role
4    of monitoring the property, assessing the market,
5    talking to builders?
6        A.   Yes, but it became less and less frequent
7    because of all the litigation.  At some point,
8    because there are only five or six major builders
9    in the Chicagoland market, these lots and this
10   issue became known.  These lots became tainted.  To
11   this day, they are still tainted.  You can't have a
12   conversation with the builder about these lots
13   without the first question from that builder being,
14   "Have you solved all of your problems with
15   Fidelity?"
16       Q.   And this feedback that you're getting from
17   builders about problems with Fidelity, is that
18   something that you heard each time you talked to
19   builders or how frequently?
20       A.   Every time.
21       Q.   And how did this surety lawsuit impact
22   TRG's ability to sell the property?
23       MR. RIORDAN:  Objection, foundation, your
24   Honor.  He's talking about how it affects TRG's

                                                    91

1    ability to sell the property.  He doesn't work for
2    TRG.
3        MR. TURIELLO:  May I respond?
4        THE COURT:  You may.
5        MR. TURIELLO:  This is the disposition
6    individual who is TRG's partner who is responsible
7    for attempting to sell the property.  It's based
8    upon his personal knowledge and experience.  He's
9    attempting to sell it for TRG.
10       MR. RIORDAN:  I'm not sure that that's been
11   established, Judge.  That's the nature of the
12   objection.
13       THE COURT:  I think that the question is
14   allowable in the broader sense of how it would
15   affect the disposition of the property, even if you
16   didn't say TRG.
17       MR. TURIELLO:  Okay.  Then I can rephrase, your
18   Honor.
19       THE COURT:  So if you rephrase, I'll overrule
20   the objection.
21   BY MR. TURIELLO:
22       Q.   How during your time after learning about
23   the surety lawsuit did this affect the ability to
24   dispose the property?

                                                    92

1    A.   It made it virtually impossible to dispose
2 of any of these lots.
3    Q.   How -- how based upon your assessment
4 would -- did this impact the value of the lots?
5    A.   Well, as we touched upon earlier, there
6 are some concepts that are very important here and
7 one of them is the time value of money.  The other
8 of them is opportunity cost.
9         There was a significant change in the
10 Chicagoland market in 2012.  The builders started
11 seeing month over month, quarter over quarter
12 positive home price appreciation in many of their
13 communities and that would have been when it would
14 have been appropriate to start metering out these
15 lots, either in chunks or in takes, to the builder
16 community.  In doing so, there would have been a
17 return of capital to TRG and that return of capital
18 would have then gone into the actual cash flow that
19 we would keep to determine the returns.  Because we
20 were unable to sell any of these lots due to the
21 pending litigation, TRG was unable to return
22 capital to their ultimate investor and because TRG
23 was unable to return capital, TRG was unable to
24 redeploy that capital into one of the -- again, as

93

1 previously stated, one of the longest and best real
2 estate run-ups we've had in the history of this
3 country.
4         And then there is also an opportunity cost
5 that goes along with all of this which is not only
6 are you not returning capital, not only are you not
7 stopping the recurring monthly costs of holding
8 these lots, but you're also reaching into your
9 pocket and pulling out millions of dollars to
10 defend this litigation.  Those millions of dollars
11 could have gone into other real estate deals,
12 again, in one of the best real estate markets this
13 country's ever seen.
14         Then there's also the opportunity cost of
15 time.  And having worked and been aware of this
16 project since its inception, I know that Mr. Kyte
17 will never get the time back and the resources back
18 that he's put in in fighting this.
19    Q.   Based upon your experience, your attempts
20 to dispose these properties during that time frame,
21 is it fair to say that TRG based upon the Fidelity
22 litigation missed this entire run-up, this
23 entire...
24    A.   Yes.

94

1    MR. RIORDAN:  Objection, calls for an opinion
2 on the part of the witness, your Honor.  He's here
3 as a fact witness, not an opinion witness.
4    THE COURT:  Counsel?
5    MR. TURIELLO:  I think it's based upon his
6 experience, his observation.  He described the
7 recovery and described TRG's ability to -- the
8 ability to dispose of the property during this time
9 frame.  I believe he's also qualified to respond to
10 the question.
11    THE COURT:  Well, I think, though, that
12 counsel's got a good point which is ordinarily,
13 witnesses are not to testify as to their opinions
14 unless they're qualified as experts.  So I don't
15 think we've gone through the process to qualify him
16 as an expert to offer his expertise to the Court.
17 Certainly, the Court can draw conclusions and can
18 make its own opinions with respect to the facts
19 that he's put before us.  But his opinion in this
20 regard I think is inappropriate in this manner so
21 sustain the objection.
22    MR. TURIELLO:  Sure.  I think I can rephrase.
23    THE COURT:  You can certainly try.
24

95

1 BY MR. TURIELLO:
2    Q.   Based upon your observation, experience
3 and involvement with attempting to dispose of the
4 property during this run-up that you described, did
5 the surety lawsuit have an impact on your ability
6 to do that?
7    MR. RIORDAN:  Objection, your Honor, I think
8 that's been asked and answered several times.
9    THE COURT:  I'll allow it.
10    THE WITNESS:  It had a direct impact.
11 BY MR. TURIELLO:
12    Q.   How so?
13    A.   The lots were tainted.  They were clouded.
14 No one wanted to entertain a conversation.  Did we
15 have inquiries?  Yes.  Did people write offers?
16 Sure.  Could we get to a point in -- because we
17 tried.  We tried at SunCal or Argent and I know
18 Mr. Kyte moved here to pay closer attention to all
19 of these matters and I know Mr. Kyte started
20 developing his own relationships with builders.
21 And between our collective efforts, we tried
22 repeatedly to try to bracket the exposure.  We
23 tried repeatedly to explain the situation.  We did
24 generate some offers.  However, it is standard

96

1  procedure for a seller of lots to have to provide
2  certain representations and warranties in that
3  sale. One of those we could not answer to anyone's
4  satisfaction and that was: Is there or do you know
5  of any pending litigation surrounding these lots?
6  Q.  Now, the surety lawsuit, again, you
7  described as something you've not seen before?
8  A.  Correct.
9  Q.  The -- during the time -- you left SunCal
10  in 2016?
11  A.  I did.
12  Q.  And then went where?
13  A.  In the summer of 2016, I began negotiating
14  with CalAtlantic Homes. CalAtlantic Homes was the
15  then fourth largest public home builder in the
16  country. They hired me in the fourth quarter of
17  2016 to manage and/or create and then, ultimately,
18  manage and run an on balance sheet land fund, a
19  nationwide land fund.
20  Q.  Through the time that you were at SunCal
21  attempting to dispose of these properties, were all
22  of the issues that you described that were related
23  to the surety litigation present, inability to
24  sell, skepticism on the part of builders?

97

1  A.  When I left SunCal, this was very much
2  ongoing.
3  Q.  You worked at CalAtlantic for a time and I
4  believe you now opened your own consulting
5  operation?
6  A.  Correct. What happened was I started the
7  land fund at CalAtlantic, bought approximately -- I
8  bought two home builders in 2017 and I bought
9  approximately $125 million worth of land on their
10  behalf. In the fourth quarter of 2017, Lennar
11  Homes, the then second largest public home builder
12  in the company (sic) made an unsolicited offer to
13  acquire us and they were successful in acquiring
14  CalAtlantic Homes in February of this year.
15  In February of this year after I received
16  my stock and my payout, I intended to play some
17  golf. However, many of the -- my previous
18  relationships with opportunity funds and hedge
19  funds, they found out I was a free agent. They
20  reached out to me to see if I would help them with
21  some of their projects. Shortly after Lennar
22  closed the sale --
23  MR. RIORDAN: I think we're getting pretty far
24  afield here.

98

1  THE COURT: We may be. I'm not certain where
2  we're going with it, Counsel.
3  THE WITNESS: And --
4  THE COURT: Just pause for a moment and ask
5  counsel --
6  MR. TURIELLO: Sure.
7  BY MR. TURIELLO:
8  Q.  After you left CalAtlantic, you opened a
9  consulting firm.
10  Did there come a time when you came back
11  in contact with TRG related to the Kimball Hill
12  Chicago project?
13  A.  Yes. That's where I was going. Some of
14  the hedge funds and opportunity funds asked me to
15  baby-sit some of their projects. And by baby-sit,
16  my specialty is putting buyers and sellers of large
17  master plans together with public builders. So I'm
18  currently -- I started a consulting firm to do just
19  that in March of this year. Mr. Kyte along that
20  time frame reached out to me and I am now
21  performing that service for TRG again.
22  Q.  After you opened your own consulting firm
23  and came back and again became involved in this
24  project, did you become aware of a March 2017 order

99

1  of this court holding Fidelity in contempt?
2  A.  I actually became aware of that while I
3  was still at CalAtlantic. Mr. Kyte had reached out
4  to me while I was employed at CalAtlantic because
5  after that March '17 order by this court, he was
6  able to put some of the lots under a letter of
7  intent with CalAtlantic and he had reached out to
8  me for some information.
9  Q.  What about that order -- so after that
10  order was entered and you were involved again, were
11  lots able to be sold?
12  MR. RIORDAN: Objection, your Honor, calls for
13  speculation on the part of the witness.
14  THE COURT: Counsel?
15  MR. TURIELLO: After -- I can -- well, okay.
16  BY MR. TURIELLO:
17  Q.  After you became --
18  THE COURT: Are you rephrasing?
19  MR. TURIELLO: I'll rephrase. Judge, I
20  apologize. I didn't mean to be dismissive. I'm
21  just trying to -- I'm just trying to wrap it up.
22  BY MR. TURIELLO:
23  Q.  Did you become aware of TRG's efforts
24  after the order or -- the oral order in December

100



1  of 2016 to try to move these lots?
2      A.   Yes.
3      Q.   And how did you become aware of it?  You
4  described Mr. Kyte reaching out to you at
5  CalAtlantic; is that correct?
6      A.   Yes.
7      Q.   So as of -- at CalAtlantic, you were able
8  to -- you were involved in that or aware of that as
9  well?
10     A.   Yes.
11     Q.   Okay.
12          Did you become aware of any additional
13  efforts after that time that TRG was able to or
14  attempted to move lots after that order?
15     A.   As we -- as -- for the last several
16  months, I've been working as a consultant for TRG
17  in trying to get the rest of these lots sold now
18  that the March of '17 order from this court.
19     Q.   What is it about the order, just from your
20  experience, that allows you more success in being
21  able to sell these lots?
22     MR. RIORDAN:  Objection, lack of foundation,
23  your Honor.
24     THE COURT:  Counsel, you don't have to agree
                                                    101

1  with the objection.  At this point, I would like
2  your response.
3      MR. TURIELLO:  I don't agree with the
4  objection, Judge.  He's -- he became aware of an
5  order.  He became -- he described the impact of the
6  litigation on his ability to sell the properties.
7  It's just continuing in that vein.  It's within his
8  personal experience.  I'm not asking him to
9  interpret the order.  I'm just asking him to --
10 based upon that, what impact did it have on the
11 ability to dispose of the property.
12     THE COURT:  I'll allow it.
13     MR. RIORDAN:  Well, Judge, I would -- just my
14 only response is that he's testified this is the
15 only time this has ever happened so I don't know
16 what experience he could ever have about it.
17     THE COURT:  And Counsel, I'll allow it, but of
18 course, I'll weigh it accordingly.
19     MR. RIORDAN:  Thank you, your Honor.
20     THE COURT:  Go ahead.
21     THE WITNESS:  I'm going to ask you to repeat
22 the question.
23     MR. TURIELLO:  Sure.
                                                    102

1  BY MR. TURIELLO:
2      Q.   What was -- based upon your experience and
3  involvement, what was it about an order saying that
4  the surety couldn't sue that allowed for the
5  disposition of the property where it couldn't be
6  before?
7      A.   I think it was a combination of two very
8  important things that now allows TRG to sell these
9  lots.  First, it was this court's order in 2017
10 which defined who can sue and the exposure around
11 that.  Secondly, and concurrently while this was
12 all happening, Fidelity was settling their bonded
13 requirements with the cities or municipalities.
14          And those two things combined have allowed
15 TRG to come up with a very atypical hybrid way to
16 sell these lots and that is they are having to post
17 a considerable amount of money in escrow in order
18 to get these lots sold and they're having to
19 indemnify the builders in order to get these lots
20 sold which is extremely unique and atypical.  And
21 the reason why they're able to do that is because
22 of those two facts.
23     Q.   And the indemnification provision that you
24 described, do those relate to Fidelity's continued
                                                    103

1  after the order pursuit of their -- assertion that
2  their -- they have the right to pursue these
3  claims?
4      A.   Correct.  The fear is the money that TRG
5  is -- has posting in escrow to backstop the
6  exposure could be stuck in escrow until all of the
7  appeals from this matter are exhausted.
8      Q.   Okay.
9          And that's -- just if I can clarify.  So
10 the escrow amounts are to satisfy the buyers that
11 if Fidelity for some reason regains -- wins on
12 appeal and attempts to sue the subsequent builders
13 that there's money there for that?
14     A.   It protects the builders.  TRG's
15 indemnifying the builders who are the buyers of
16 these lots that should Fidelity win on appeal,
17 Fidelity cannot go after those builders.
18     Q.   Based upon your experience and what you've
19 described, is this ongoing litigation still
20 impacting what TRG can sell for and how they can
21 sell?
22     A.   It goes, again, to the time value of money
23 and opportunity cost.  That money that's sitting in
24 escrow is not being put to work by TRG's fund in
                                                    104

1  other investments. It is not making a return.
2  There's considerable loss of return based upon the
3  fact that that money has not been returned to TRG's
4  investors and there's considerable lost opportunity
5  cost in that that money is not able to be deployed
6  into other investments.
7      Q.  And based upon your experience selling
8  these types of properties and marketplaces, is the
9  ongoing process that we're in now up through
10 whenever the appeals process ends impacting TRG's
11 ability to sell these at market rate, fair rate?
12     MR. RIORDAN:  Again, objection, your Honor. I
13 think it's calling for an opinion on the part of
14 the witness as to what is a market rate.
15     THE COURT:  Counsel?
16     MR. TURIELLO:  Well, I think he's described
17 his -- the process of valuing property and things
18 of that nature.
19     THE COURT:  I think it's a necessary element of
20 his ability to testify here that he can conclude
21 what in his opinion a market rate is.  That
22 doesn't -- he isn't opining to the Court what a
23 market rate is so I'll allow the question.
24         What's your answer?

105

1      A.  Extremely atypical.
2      Q.  And the situation you described, are they
3  normal or ideal situations in which a builder -- or
4  an owner of a property would attempt to sell?
5      A.  Absolutely not.
6      Q.  The fact that there is a light at the end
7  of the tunnel by that March order, does that at
8  least give some ability to define the risk so that
9  they can attempt to salvage something out of this?
10     A.  Yes.
11     MR. TURIELLO:  Thank you, sir.  That's all I
12 have.  Thank you, your Honor.
13     THE COURT:  So we're at the witching hour, I
14 suppose.
15         Mr. Riordan, do you have an estimate of
16 how long on cross you might take with this witness?
17     MR. RIORDAN:  No, Judge.  I'm going to have to
18 look over my notes, but I'm going to say half hour,
19 45 minutes at most.
20     THE COURT:  So I think maybe it's time to take
21 the break now and resume after lunch with the
22 witness on the stand for cross and redirect.  And
23 that will give you the opportunity to look over
24 your notes and maybe we'll be a little more

107

1  THE WITNESS:  Can you repeat the question,
2  please?
3      MR. TURIELLO:  If you don't understand the
4  question, I can rephrase it as well.
5  BY MR. TURIELLO:
6      Q.  Is the ongoing process with the surety
7  impacting the value of what TRG can get for these
8  properties?
9      MR. RIORDAN:  Again, same objection because I
10 don't think the question was posed as your Honor
11 had said, restricted to his personal.
12     THE COURT:  I'll accept the answer in -- with
13 that restraint.  I don't think you need to phrase
14 the question that way.  That's how I will determine
15 it.  So go ahead.  If you need to ask it again, go
16 ahead.
17     MR. TURIELLO:  I think we're good.
18     THE WITNESS:  Yes, I think it would be
19 impossible to separate the fact that there is still
20 a cloud on these lots from the market price of
21 these lots.
22 BY MR. TURIELLO:
23     Q.  These indemnity agreements that we're
24 talking about, are those common?

106

1  streamlined with that, okay?
2      MR. RIORDAN:  Thank you, Judge.
3      THE COURT:  So we're going to break for lunch.
4  I remind the witness you remain under oath and a
5  witness before the Court and not to consult with
6  counsel regarding your testimony.
7      THE WITNESS:  Yes.
8      THE COURT:  Thank you.
9              (whereupon, further proceedings
10              in said cause were adjourned.
11              To 8-28-18 at the hour of 1:15.)
12
13
14
15
16
17
18
19
20
21
22
23
24

108

```
1    STATE OF ILLINOIS  )
2                       )  SS:
3    COUNTY OF C O O K  )
4
5         Liza Marie Regan, being first duly sworn,
6    on oath says that she is a court reporter doing
7    business in the City of Chicago; and that she
8    reported in shorthand the proceedings of said
9    trial, and that the foregoing is a true and correct
10   transcript of her shorthand notes so taken as
11   aforesaid, and contains the proceedings given at
12   said trial.
13
14             _____
15             Certified Shorthand Reporter
16
17
18
19
20
21
22
23
24
                                        109
```

**$**

**$1.5**
22:3
**$10**
38:5 65:19,24
**$10,000**
30:4
**$100,000**
29:22 30:13 46:1,2
**$125**
98:9
**$2**
22:4 27:19,20 55:10
**$20**
22:6
**$22**
80:21
**$25,000**
29:23 30:21
**$35,000**
30:6
**$5**
49:2,3,4
**$6.6**
65:3 66:3
**$80,000**
30:9 31:1
**$9**
81:22 82:16

**0**

**08**
34:18
**09**
34:3,18,20 40:17,19
44:1 59:6 68:19

**1**

**1**
31:16 51:17 65:6
71:9 74:11
**10**
34:4 40:17,19 44:1
59:6 75:24
**100**
28:10 31:15 38:8,18
51:1 72:1,3 75:16
**100,000**
24:3 81:7
**1000**
18:16
**11**
40:19 59:6
**115**
75:18 79:23
**12**
33:24 38:21,24 39:3
**120**
26:8 28:10
**129**
7:13,17
**13**
80:2
**14**
76:12 80:4
**14th**
76:20,24
**15**
38:22 39:1,8 43:21,
23 44:11 76:1
**15,000**
59:6
**150,000**
24:5
**16**
73:7

**17**
72:22 75:6 100:5
101:18
**18**
38:8,9 61:4 85:9
**19**
85:9
**1984**
16:18 17:1
**1988**
17:1,8
**1998**
18:19
**1:15**
108:11

**2**

**2**
31:17 65:7 74:10
75:3
**20**
9:2 76:1 78:19 85:9
**2000**
19:14 28:20
**2000s**
19:4
**2002**
21:15,22 23:14
**2004**
27:16
**2006**
15:24 21:23 23:14,
15,18,23,24 24:18
**2007**
24:18
**2008**
24:4 27:13,17,21
28:1,9 29:1 34:13
**2009**
27:13 28:9 29:1,12
31:6 33:18 36:17,20
37:12 38:20 76:12
**2010**
31:6 33:19 37:12
38:21 68:20 73:10
74:1 76:13 84:13
85:14
**2012**
93:10
**2013**
68:22
**2014**
68:23 78:12
**2016**
16:1 97:10,13,17
101:1
**2017**
98:8,10 99:24 103:9
**20¢**
33:22 76:6
**21**
39:10
**22**
81:2,5
**25**
48:24

**3**

**3**
75:2,3,6
**30**
28:11 35:7 39:11
**30,000**
11:22
**30¢**
31:7 32:24 76:1,4
78:19

**35**
39:12

**4**

**4**
79:13 82:21
**40**
19:17
**437**
75:17
**45**
107:19

**5**

**5**
50:15 79:13 82:20
**50/50**
39:12
**500**
28:7 60:3
**523**
6:23 8:11

**6**

**6**
50:15 79:12 80:6
**6.6**
80:22
**60**
26:7

**7**

**7**
79:11 80:5 83:12,13
**70**
76:2
**70/30**
39:10
**70¢**
33:2
**727**
8:11
**75**
46:1,2

**8**

**8**
76:13 83:12,14,16,
17
**8-28-18**
108:11
**80**
9:3
**80/20**
39:6,9

**9**

**9**
83:16
**90**
26:7 38:8,18 71:24
**90s**
19:4
**95**
23:4 27:10 38:10
39:4
**95/5**
39:5

**A**

**ability**
6:11 25:8 90:14

**absent**
8:15
**absolutely**
5:18 10:3 22:24 31:4
32:16 54:7,12 63:3
68:5,12 86:2 90:23
107:5
**accept**
106:12
**acceptable**
56:15
**accepted**
58:21,24
**accomplish**
88:1
**account**
64:23 65:17 66:1
**accurate**
52:16 62:19
**acquire**
98:13
**acquiring**
98:13
**acquisition**
24:20 37:1,3 41:5,7,
12 42:17 43:1,8
45:4,9 86:18
**acquisitions**
26:19 54:15
**acre**
29:21,22
**acreage**
19:7
**acres**
19:7
**actions**
8:11
**active**
17:18 18:2
**actively**
60:17
**actual**
45:7 77:4 93:18
**adapted**
20:2 40:24
**add**
36:16
**additional**
5:21 101:12
**additionally**
42:16 47:21 52:2,6
67:8
**address**
8:5
**adjourned**
108:10
**admission**
8:15
**admit**
7:15
**admitted**
8:16,21 9:4,5 11:2
**Advisors**
66:24 84:1
**affect**
64:18 92:15,23
**affects**
91:24
**afield**
98:24
**aforementioned**
38:6
**afternoon**
6:10 13:8
**afternoons**
6:21

**agent**
98:19
**agree**
6:16,17 12:6 35:8
101:24 102:3
**agreed**
36:13 72:9
**agreement**
60:9 64:11,15 71:9,
13 76:11 86:10
87:21 89:8
**agreements**
60:5 106:23
**ahead**
102:20 106:15,16
**aid**
52:14
**Alan**
4:12
**allocate**
45:24
**allotted**
6:15
**allowable**
92:14
**allowed**
11:19 68:6 103:4,14
**alongside**
35:10
**alternate**
28:21
**amount**
25:24 30:3 46:13,16
48:2,3,20 53:1 54:18
67:1 82:8 103:17
**amounts**
52:7 104:10
**analysis**
49:9,21,24 50:18,21,
23 51:11 52:11,12
62:23 63:19 65:1,12,
21 66:10,18 68:9
69:1 74:20 84:21
85:13 88:6
**analysts**
52:4
**analyze**
63:21
**and/or**
64:21 97:17
**animated**
14:5,14
**announced**
12:2
**annual**
85:10
**anticipate**
57:9
**anticipated**
33:18 44:7 79:24
**anticipating**
33:19
**anymore**
10:15
**anyone's**
30:15 97:3
**apologize**
70:20 79:12 100:20
**appeal**
104:12,16
**appeals**
104:7 105:10
**appearances**
4:7,11
**appears**
77:3
**applicable**
76:3
**applied**
47:14 48:24

**apply**
48:3
**appreciation**
93:12
**approach**
38:6 50:3,7 72:23
**approaches**
52:10
**appropriateness**
63:9 84:14
**approval**
79:19
**approximate**
82:8
**approximately**
24:5 28:7,9 59:6
81:22 98:7,9
**April**
73:10 74:1 84:13
85:14
**area**
44:10,17 60:6 63:16
55:17
**areas**
33:16 43:21 54:10
55:17
**Argent**
73:12 96:17
**argument**
15:3
**arguments**
9:18
**arm**
73:14
**arrival**
27:16
**article**
7:19,20 10:6,22
**aspects**
22:19
**asserted**
10:24 11:1
**assertion**
104:1
**assess**
48:6 67:18
**assessed**
84:21
**assessing**
91:4
**assessment**
49:10 53:9 72:14
78:6 79:2 89:11 93:3
**assessments**
68:10
**asset**
26:17 50:14
**assign**
29:23 71:19
**assigned**
9:5 17:24 71:14
**assignment**
21:13 71:10
**assignments**
17:21
**assisting**
86:19
**assume**
13:15 31:22
**assumes**
77:15
**assuming**
58:13 79:3,6,8
**assumption**
68:18,20
**assumptions**
47:24 49:14,15,17
51:1 52:15
**Atkins**
21:12



atmosphere
29:2
attack
17:15,16
attempt
107:4,9
attempted
28:8 101:14
attempting
89:4 90:5,13,20
92:7,9 96:3 97:21
attempts
94:19 104:12
attend
16:15,20 57:4
attention
52:24 60:16 96:18
attorneys
55:12,13
attractive
40:3,10 80:11 81:12
attractiveness
31:8 63:9
attributed
76:5
attributing
75:21
atypical
103:15,20 107:1
auctions
56:4
audio
13:21
availability
6:18
avenue
20:21
awarded
26:2,3 56:12 76:23
aware
22:18 26:21 38:2
54:23 66:7 70:8
88:16,19 91:2 94:15
99:24 100:2,23
101:3,8,12 102:4

**B**

baby-sit
99:15
Bachelor
17:7
back
6:15 14:1,10 33:12,
23 34:10 41:9 47:6
48:8,16 56:2,18
57:13 70:19,20,24
79:4,13 82:19 83:15,
21 94:17 99:10,23
backdrop
29:10
background
15:22 16:11
backstop
104:5
backwards
51:21
bad
4:20
balance
34:6,11 53:20 97:18
ball
40:18
bank
34:8
bankrupt
27:22,24 90:5
bankruptcy
8:10 28:6,8,12,18
34:14 35:21 42:9

55:7,11,23 58:7,12
59:2,18 60:1 90:21
banks
34:24 35:12,15 55:8
base
69:4,5,9,17
based
21:7 24:10 33:8
36:4,5,6,7 51:22
57:12 68:24 72:12,
15,17 77:17,18 81:6
89:10 92:7 93:3
94:19,21 95:5 96:2
102:10 103:2 104:18
105:2,7
baseline
78:12
basically
35:12
basis
10:3 30:11
Bate's
75:5
bathroom
14:22
began
76:12 97:13
begin
17:8
beginning
8:5 27:13 40:7,9
83:15
behalf
4:12,13,16,17 19:23
98:10
belief
72:15,17
bench
40:2,6 41:17,19
55:12
bid
26:1 58:1,2,18 62:3
64:19 69:12,14
71:16 90:18
bidding
55:24 58:15,19
bids
26:2 58:9,14,21,24
big
34:24
Bill
4:18
billion
22:4 27:19,20 53:20
55:10
bit
6:5 32:11 57:2,5
62:1 69:19
biweekly
87:21,23
board
36:14
bond
53:17 55:1 83:3,5,8
bonded
53:11,17 54:19
65:13,21,22 66:2,8
85:1 103:12
bonds
26:10,14,16,22 27:3,
6 53:14,19,21,23
54:1,3 55:10,13
62:24 63:22 64:8,10,
13,16,17,21,23 65:9,
19 81:16,23 82:8,16
85:1 89:9
book
45:3,4
boom
78:12

Boston
16:23,24 17:2
bottom
75:10
bought
29:21 33:21 58:12
59:24 61:11 82:17
98:7,8
boxes
45:19 63:12 84:16
bracket
96:22
break
4:5 14:18 25:22 43:6
46:10 56:15,17,21
57:5,7,12 107:21
108:3
breaks
57:1,8
briefly
51:9
bring
24:22 25:13 30:7
41:9 42:17 43:12
46:23 49:8
bringing
31:20
brings
45:10
broadcasts
14:1
broader
92:14
broke
26:23 27:1
brokerage
19:21 20:11,12,13
21:23 22:1,11 42:7
56:5 87:8
brokers
52:2,3 66:22 87:9
Brothers
27:17,19,22,24
brought
21:17 39:18 42:24
64:2 90:21
bubble
19:14 28:20,22
budget
45:21 79:22
builder
23:10,11 25:7 30:22
33:2 34:5 51:24 79:8
81:4 87:2 88:14
90:15 91:12,13
93:15 97:15 98:11
107:3
builders
20:16 21:5 22:3
23:2,3 27:6,9 31:20,
24 32:13,22 33:23
34:5,9 51:19 67:4
77:21 78:20 87:4,5
88:18 91:5,8,17,
19 93:10 96:20
97:24 98:8 99:17
103:19 104:12,14,
15,17
building
24:24 32:1 37:5 87:8
90:16,24
buildings
50:10,11
built
8:14 31:14,18,19
bullet
82:3
burden
11:5,6

burst
28:20,22
business
4:21 22:9,10 23:21
27:12 29:5 33:8,17
34:1,13 35:2 38:2
39:17 40:14,24 47:7,
8 51:2,19 57:3 66:15
73:8,22,24 74:14,23
80:6 82:21 83:12,17
84:18 85:14 86:8,9
buy
31:2 32:20 50:19
72:5 82:13 87:2
buyer
21:5 42:13
buyers
20:15 31:5,21 99:16
104:10,15
buying
29:16 32:24 59:3,5,
17 63:14 66:15
75:17,24 76:4 78:19
80:18 81:8 87:5
buzzer
70:18

**C**

Calatlantic
97:14 98:3,7,14 99:8
100:3,4,7 101:5,7
calendar
6:19
California
15:21 18:21,22
19:17,21 20:12
21:24 36:24 37:6
call
4:6 5:22 12:14 25:11
32:11 34:21 46:14
52:21 56:7 57:15
69:6 72:21
called
15:13 38:20 46:20
56:8 60:1,4
calling
40:6 57:17 75:7
105:13
calls
12:18 87:22,24 88:3
89:2 95:1 100:12
calms
14:14
candidate
17:11
cap
50:8,12,13,15
capital
36:5,14 37:13 38:9,
15 47:8 93:17,22,23,
24 94:6
capitalization
50:3,7,9 51:6 85:12
capitalize
28:16
card
4:21
career
17:9
carry
30:21
case
5:17 9:18 11:9 50:15
65:2,3,5 68:17 69:4,
5,6,7,8,9,10,15,16,
17 71:22 72:2 80:20
83:4 87:23
Casey
37:4

cash
46:5,9,10,20,21
47:5,13,15 48:7,12,
13,15,23 49:1,20,21
50:1,17 51:3,5 65:1,
14,15,18 66:2 68:10
85:10,16,17 93:18
catches
13:22
categories
35:4
category
83:15
cause
89:14 108:10
caused
21:9
cautionary
8:23 11:17
CD
11:21
CDS
11:19
center
19:6,9,19
cents
80:19
ceremonial
6:10
ceremony
6:9
change
20:1 27:12 79:8 93:9
check
45:18 84:16
checked
63:11 84:17
Chicago
4:10 16:6,14 30:23
32:6 44:10,13 58:6,
10 59:18 61:22 62:2,
4,8,15 63:2,8 66:18
67:2,7,10 69:19
77:15,22 84:3 86:16
99:12
Chicagoland
91:9 93:10
chief
44:23
chunks
93:15
cities
103:13
city
25:10 79:20
civilian
18:8,10
claims
104:3
clarify
104:9
clear
61:20
CLERK
4:8 13:1 57:17
client
19:23 23:16
clients
19:16 20:14 27:10
close
71:20 77:4 87:20
closed
40:8 71:14 74:2
86:16 87:14 98:22
closely
14:4
closer
57:5 96:18
closing
9:14,18

cloud
106:20
clouded
96:13
co-brokered
21:2
co-counsel
12:12
Cobra
17:15,16
collective
96:21
college
16:20,23,24 17:2,10
Colony
36:5
combination
103:7
combined
103:14
comfortable
34:10 49:13
commence
52:23 68:21
commencing
80:2
commercial
50:10
commission
22:5
committee
26:17,18 41:11,14
42:18 43:1,12,13
44:19,21 45:11,13
46:6 54:14,21 55:3
64:3,6 68:3 89:21
commodity
47:8 52:1
common
49:22 51:6 106:24
communication
87:11
communities
63:16,17 87:9 93:13
community
24:24 79:9 87:2,8
88:14 90:15,17,24
93:16
comp
50:21 51:6 52:11
companies
18:16 19:2,5,15
23:17,22 24:1 35:1
42:7,8,10 52:6
company
18:13,14,15 19:11
21:10,14,21,24 22:2
24:7,17 27:23 28:23
37:5 44:22 83:9
98:12
comparable
52:11
compelling
9:2
competed
56:3,4
competency
40:1
complete
6:2 33:9 40:6 52:20
79:22,23
completed
11:20 24:23 76:21
completely
39:23 44:3,4
completing
18:7
components
73:21



concept
80:17
concepts
93:6
concern
89:14
concerns
68:1
conclude
6:14 105:20
conclusion
69:22
conclusions
95:17
concurrently
103:11
condensed
74:5 84:4
condition
52:21,22
conditions
20:1 67:6
conduct
6:22
conducted
74:17
confidence
34:5 72:13
connection
50:10
conscious
39:21,23
considerable
40:16 67:1 72:8
103:17 105:2,4
constant
50:22 62:11
construction
52:23
consult
108:5
consultant
101:16
consulting
30:16 84:2 98:4
99:9,18,22
contact
62:11 87:17 88:13
99:11
contained
85:13
contemplated
19:19
contempt
100:1
contents
73:17 74:11,12
contested
11:14
continue
22:12 31:24 57:19
68:6 87:3 91:3
continued
88:9 103:24
continuing
88:6 102:7
contrarian
35:3 58:17
contrary
35:9
contribution
39:20
controlled
24:3,5
conversation
88:22,24 91:12
96:14
conversations
88:2

convey
79:16
copy
72:24
core
29:4 39:24
Cornelius
4:13
cornfields
32:9,10
Corona
15:20
corporate
33:23 41:10
Corps
17:12,14,17 18:8,11
correct
16:2 20:4 37:18 42:1
48:9 49:7 59:21
64:14 71:15 73:11
75:1 76:19 77:8
78:9 80:9,23 82:11,
14 83:7,10 85:3 97:8
98:6 101:5 104:4
correctly
81:24
cost
29:9,18 30:14,19
31:11,15 32:21 48:1
52:17,20 54:9 80:19
81:3,10 93:8 94:4,14
104:23 105:5
costs
29:15,17 30:15
46:16,19 48:3 52:12
53:1,2,3,6,10 54:19,
23,24 55:15 62:23
63:15 64:23,24
65:13,17 75:21 76:3,
4 78:21 79:24 84:19
94:7
counsel
4:7,9,23 15:3 45:1
55:2 57:18 70:17
71:2,3,5 95:4 99:2,5
100:14 101:24
102:17 105:15 108:6
counsel's
95:12
country
21:5 22:2 24:2 29:3
40:22 43:22,23
69:20 94:3 97:16
country's
94:13
county
18:22 25:11 79:20
couple
19:8 26:12 27:7 44:1
70:18 88:14
court
4:3,4,5,9,19,20 5:4,
20,24 6:6 7:1,4,7,19,
21 8:1,3,10,20 9:21
10:9,19 11:4,6,12,16
12:2,7,11,14,19,21
13:4,10,18,19 15:1,
11,19,23 16:12
17:20 56:16,24 57:1,
11,18,20 71:2,5 73:3
92:4,13,19 95:4,11,
16,17,23 98:9 99:1,4
100:1,5,14,18
101:18,24 102:12,
17,20 105:15,19,22
106:12 107:13,20
108:3,5,8
court's
6:19 8:2 11:10 103:9
courtroom
6:10

courts
35:22
Craig
21:12
crash
28:1
create
21:9 45:20 97:17
cross
5:15 107:16,22
crystal
40:18
cues
15:8
current
29:1 52:21 67:5
77:14
customer
20:10
customers
23:5
cut
14:7
cycle
31:20

D

D.E.
36:6 60:4,13,20
Dallas
18:21
data
19:5,6,9,19 51:10
52:7,13 67:9,14 84:3
85:12
date
6:15 56:7 76:20
dates
6:17
day
6:13 7:6 25:20 29:11
91:11
days
6:14 26:8
de
38:19
deal
10:9 22:20 26:3
35:11 39:19 47:11,
19,19 56:12 60:3,6,
23 62:15,16 66:13
74:2 76:24 81:4
89:23
dealing
27:8 28:11 55:9
deals
22:13,14,15,16,19
25:19 35:16,21 37:2
45:6 59:5 60:17
61:11,14 66:14
94:11
dealt
10:9,20
debt
27:21
December
100:24
decide
9:12 41:14,18 57:11
decided
28:13
deciding
63:19,20 64:19
decision
39:21,23 64:3,18
deep
42:12 51:18 54:11
55:14 60:18 63:1
68:19 72:17

deeper
26:4,7 32:9 65:20
76:18 77:1 84:8
defend
94:10
define
32:4 39:15 43:24
47:1 90:12,14,16,22
107:8
defined
30:19 52:22 80:3
103:10
defining
25:16
degree
17:4,6 32:17
Del
15:20
deliver
11:19
department
35:19 85:19
departments
55:8 59:3
depending
22:4 30:10
deploy
37:13
deployed
17:24 105:5
deploying
33:13
deposit
77:4
depth
42:11
deputy
12:22
describe
37:24
describes
76:17
describing
75:14
designed
8:12
desk
42:3
desktop
43:10 44:18
detail
59:13,20 83:23 85:7
deter
69:21
determine
51:3,22 55:18 69:12
93:19 106:14
determining
45:13 52:15
develop
32:10
developed
29:4,16 31:10 32:15
75:18 81:7
developer
25:7 30:22 37:21,22
38:23
developers
20:16 22:3 24:2 38:1
developing
29:5 88:7 96:20
development
22:16 24:16 29:2
40:2 44:24 53:10
54:17,19,23 63:18
88:12
developments
20:17 24:14
devote
41:16

difficult
90:12,22
diligence
6:14 22:22 25:24
26:4,5,7 40:7 43:15,
16 45:20 46:1,24
54:5,11 56:11 57:24
59:12 61:21,22
62:17,18 63:5,21
64:18 65:9 66:5,11,
17 67:16 68:19,24
69:18,22 71:17
72:13 73:20 74:18
76:12,21,22 77:1
84:8,18 85:15 86:9
87:10
direct
5:14,16 15:15 96:10
direction
91:1
directions
15:6
directly
59:3
director
44:24 54:17,22
discipline
40:1
discount
47:5,14,22 48:4,8,
15,16,24 53:7 63:15
69:12 80:13
discounted
49:20,21 50:1,17
51:3,5 68:10 81:2
discover
64:8
discovered
65:9
discretionary
79:19
discuss
53:2
discussed
43:7 55:20 65:1
72:19 77:19 89:24
discussing
57:23
discussion
38:4 62:22
dismissive
100:20
dispose
92:24 93:1 94:20
95:8 96:3 97:21
102:11
disposition
27:11 45:6 86:18,20,
22 88:1 92:5,15
103:5
dispositions
26:20
distress
28:15 48:21 59:3
distressed
29:14 42:13 55:6
distribution
89:12
dive
26:4,7 54:11 60:19
63:1 68:19 72:17
76:18 84:8
divide
29:22
divided
50:14
document
73:15,18 74:11
79:11,14 84:13 85:8
documentation
30:4

documents
7:23 8:16 71:8,12
75:8
dollar
31:7 32:24 33:2,22
39:3,4,5,6,9,10
53:20 76:1,4,6 78:20
80:19
dollars
30:17 39:12 94:9,10
door
57:3
dove
63:7
downsize
39:23
downsized
40:24
downturn
40:20
draw
95:17
drive
65:11
drop
29:12
due
16:4 22:22 26:4,5,6
40:7 43:15 45:19,20
46:1 54:5,11 56:11
57:24 59:12 61:20,
21 62:17,18 63:5,21
64:18 65:9 66:5,11,
17 67:15 68:19,24
69:18,22 71:17
72:13 73:20 74:17
76:11,21,22 77:1
84:8,18 85:15 86:9
87:9 93:20
duly
15:13
Dune
36:5
duties
54:15
duty
17:18

E

earlier
65:1 77:6 84:2 93:5
early
19:4,14 34:18,20
59:6 68:20
ease
75:7
economic
68:9 69:1 83:18
economically
49:11 78:18
Ed
4:15
effect
34:7
effectively
90:17
effectuate
60:5
effort
51:13 86:23
efforts
69:18 86:20 96:21
100:23 101:13
elected
43:13
element
105:19
else's
65:15 81:8



| | | | | | |
|---|---|---|---|---|---|
| employed<br>100:4<br>employing<br>81:7<br>employment<br>17:9<br>end<br>40:8,10 57:1 78:4,7<br>84:7 107:6<br>ended<br>59:5 60:22 86:9<br>ending<br>45:3,4<br>ends<br>105:10<br>engineering<br>30:2,4<br>enjoyed<br>40:21<br>entailed<br>45:23 46:11<br>entails<br>68:14<br>enter<br>18:8<br>entered<br>100:10<br>entertain<br>96:14<br>entire<br>40:7 77:10 94:22,23<br>entitle<br>32:10<br>entitled<br>30:5<br>entitlement<br>25:5,12 30:1 79:18<br>82:21<br>entitlements<br>24:22<br>entity<br>71:16,20 84:1 90:4<br>environmental<br>30:5<br>envisioned<br>33:16<br>equally<br>46:15 52:18<br>equity<br>27:20 34:22 38:6,11,<br>16,18 39:20 40:3<br>45:17<br>equivalent<br>67:9,13<br>era<br>48:13<br>escrow<br>103:17 104:5,6,10,<br>24<br>essentially<br>10:11 12:2 48:11<br>established<br>7:16 92:11<br>estate<br>18:16,23 19:1,13,16<br>29:14 34:23 35:20<br>36:6 40:2,21 45:16,<br>18 47:7 49:23 51:4<br>67:3 84:1 94:2,11,12<br>estimate<br>81:6,9 107:15<br>estimation<br>75:20 80:20<br>event<br>72:24<br>eventual<br>51:20<br>evidence<br>7:15 8:8 | evident<br>23:9<br>exact<br>59:1 62:10<br>examination<br>5:14 15:15<br>examined<br>15:14<br>examples<br>50:24<br>excess<br>22:3,5<br>exchange<br>38:11<br>exclude<br>10:2<br>execute<br>40:9 41:4<br>executed<br>40:16 71:13<br>executing<br>34:15<br>executive<br>23:18 36:23 45:8<br>75:13 89:2<br>executives<br>37:9<br>exercised<br>60:21<br>exhausted<br>104:7<br>exhibit<br>7:13,17 11:8 12:4<br>71:9,10 72:22 73:7<br>74:10 75:2,3,4,6<br>79:10,11,13 80:5<br>82:20 83:11,16<br>exhibits<br>7:11 8:8,16,20,24<br>9:1 10:13 11:7,14,20<br>existing<br>63:17<br>expect<br>57:6<br>expectations<br>74:8<br>expected<br>9:11 48:6 69:5,9<br>84:20<br>expeditionary<br>17:23<br>expensive<br>39:22<br>experience<br>24:10 25:18 26:13<br>27:8 55:13 58:8<br>72:18 81:6 89:16<br>92:8 94:19 95:6 96:2<br>101:20 102:8,16<br>103:2 104:18 105:7<br>expert<br>95:16<br>expertise<br>20:24 39:18 95:16<br>experts<br>95:14<br>explain<br>9:15 96:23<br>explained<br>13:5<br>explanation<br>75:23<br>exposed<br>26:10<br>exposure<br>90:16 96:2 103:10<br>104:6<br>express<br>66:6 | expresses<br>77:9<br>extended<br>76:13<br>extensive<br>85:17<br>extent<br>10:5 39:17<br>extremely<br>47:9 103:20 107:1<br><br>**F**<br><br>F&d<br>4:12,14<br>facility<br>56:18<br>fact<br>95:3 105:3 106:19<br>107:6<br>facto<br>38:19<br>factor<br>82:5<br>facts<br>95:18 103:22<br>fair<br>28:19 41:1 61:15,16<br>69:3 70:16 74:6,7,<br>14,20,21 78:2,3,13<br>81:18,19 82:5 94:21<br>105:11<br>fall<br>54:20,22<br>falls<br>44:11<br>familiar<br>73:15,17<br>family<br>35:5,14 36:7 44:2<br>fear<br>104:4<br>feasible<br>49:11<br>February<br>98:14,15<br>fee<br>72:10<br>feedback<br>91:16<br>feel<br>15:4 29:6<br>felt<br>34:9<br>Fenwick<br>16:16,17,19<br>Fidelity<br>7:23 83:9 88:17,20<br>89:4 91:15,17 94:21<br>100:1 103:12<br>104:11,16,17<br>Fidelity's<br>103:24<br>fifteen<br>33:22<br>fifty<br>30:9,24 33:1<br>fighting<br>94:18<br>figure<br>10:4 28:23<br>file<br>61:18 70:9<br>final<br>46:5 56:8,10 68:23<br>finalized<br>71:7<br>finalizing<br>89:22 | Finance<br>17:3,7<br>financial<br>29:13 67:20,23<br>71:18,23 85:10,11,<br>13<br>financing<br>55:19<br>find<br>24:21 55:20<br>finding<br>21:4 35:16,21<br>finish<br>6:16<br>finished<br>5:14 52:21,22 75:18<br>finishing<br>57:9<br>firm<br>4:22 19:21 20:11,12,<br>13 22:21 23:19<br>27:20,21 28:6 38:3<br>42:11 49:24 53:20<br>55:9 66:23 67:12,13<br>99:9,18,22<br>firms<br>40:23 52:5 56:5 59:4<br>fit<br>9:15<br>fix<br>14:15<br>flag<br>66:12<br>flags<br>63:5<br>flip<br>72:24 78:1<br>flow<br>46:5,9,10,20,21 48:7<br>49:20,21 50:1,17<br>51:3,5 65:1,14,15,18<br>66:3 68:10 85:10<br>93:18<br>flows<br>47:5,13,15 48:12,14,<br>15,23 49:1 85:16,17<br>focus<br>19:8<br>focused<br>19:1 43:16<br>folks<br>28:10,11 35:3 36:9<br>39:24 54:13 58:17<br>67:1<br>follow<br>26:6 45:13 60:10<br>force<br>22:11<br>forcing<br>19:15<br>forecast<br>67:7<br>foreclosure<br>35:17<br>foremost<br>45:15 46:12 51:14<br>54:22 67:22<br>forever<br>50:22<br>form<br>74:23<br>forma<br>69:5<br>formal<br>34:19<br>formulate<br>36:18,20<br>Fortune<br>18:15 | forward<br>28:14,15,17,24<br>43:14 49:6 52:16<br>74:8,24<br>found<br>28:21 35:8 74:4,5<br>82:2 98:19<br>foundation<br>7:16,24 91:23<br>101:22<br>four-year<br>78:23<br>fourth<br>44:13 58:11 77:5,13<br>97:15,16 98:10<br>frame<br>22:6 37:10 47:10<br>59:2 61:12 76:17<br>94:20 95:9 99:20<br>frankly<br>50:18 67:22 88:23<br>free<br>98:19<br>frequent<br>91:6<br>frequently<br>91:19<br>Friday<br>26:19<br>fringe<br>63:17<br>front<br>22:13<br>fronts<br>31:12<br>full<br>78:17<br>fund<br>36:4 60:3 71:24 72:1<br>97:18,19 98:7<br>104:24<br>funded<br>72:3<br>funding<br>59:22<br>funds<br>35:1,4,14 36:3,9,11<br>38:7 98:18,19 99:14<br>future<br>51:16 68:8 78:15<br><br>**G**<br><br>game<br>72:7,8<br>garnered<br>8:17<br>gathered<br>67:14<br>gave<br>30:20 62:14<br>general<br>9:24 45:1 55:2<br>generally<br>30:23 36:1 45:24<br>47:3 58:1 68:14<br>generate<br>96:24<br>generating<br>43:16<br>genesis<br>34:12<br>gentleman<br>37:3<br>geographical<br>60:6<br>geography<br>60:10<br>give<br>4:21 7:24 8:22 9:1,2 | 15:23 17:20 21:20<br>27:18 32:21 37:24<br>41:20 48:10 51:10<br>58:23 72:24 81:1<br>89:23 107:8,23<br>goal<br>46:4<br>golf<br>98:17<br>good<br>4:4,14,15 6:24 7:11<br>8:3 10:17 11:3<br>15:17,18 56:14 81:4<br>95:12 106:17<br>gooseneck<br>13:13,14<br>graduate<br>16:17<br>graduating<br>17:8<br>graduation<br>16:19<br>grave<br>89:14<br>great<br>14:12<br>grew<br>28:7<br>ground<br>30:18 42:20 65:22<br>75:21<br>group<br>28:2,13 36:8 41:3<br>groups<br>35:7 36:12 58:19<br>grow<br>16:12 22:9,10<br>guarantee<br>53:24 78:16<br>guaranteed<br>53:21<br>guarantor<br>54:1<br>guess<br>41:16<br>guided<br>69:10<br>Gulf<br>17:23<br>guys<br>40:6<br><br>**H**<br><br>habit<br>8:23<br>half<br>31:18 107:18<br>hand<br>40:3,4 58:16,18<br>handful<br>11:14 39:24<br>handled<br>9:23 10:7<br>happen<br>38:13 40:18<br>happened<br>76:19 90:8 98:6<br>102:15<br>happening<br>103:12<br>happy<br>35:10<br>hard<br>13:23 14:2 72:24<br>75:21 76:3,4<br>hardest<br>6:4<br>hate<br>82:19 |

hats
22:10 45:3 54:21
86:18
headlines
29:10
headquartered
18:20
healthy
78:21
hear
7:5 14:7 50:6,12
heard
91:18
hearing
13:23 14:2 50:9
hedge
35:4,14 36:3,4 38:7
60:3 98:18 99:14
held
4:2 56:23 78:15
helicopter
17:15,17
helpful
8:6
helping
36:17,20
high
16:15,16
higher
69:16
highest
19:18 56:9
highlight
76:10 77:14 81:20
highlights
79:20,24 80:8 81:17
82:4
Hill
4:8 16:5 57:17 58:6,
10 59:9,17 60:15,19
61:2,7,13,17,21,22
62:2,4,8 63:2,7
66:18 68:11 77:7
80:21 83:6 86:15
99:11
hired
97:16
history
40:22 94:2
hold
33:6,7,16 34:2 48:7
68:21 77:16,17
79:24 86:3,5,24
holding
34:8 94:7 100:1
Hollis
11:18
home
20:15 31:20 37:5
44:2 69:8 79:3,6
87:6 93:12 97:15
98:8,11
Homes
97:14 98:11,14
honest
14:20
Honor
4:14,15 5:2,19,23
6:24 7:10,18 9:20
10:17 11:3 12:10,17,
20 13:9 14:24 56:13
57:19,21 91:24
92:18 95:2 96:7
100:12 101:23
102:19 105:12
106:10 107:12
Honor's
7:14
Hopeful
6:3

horizontal
24:22 25:13,15
hotel
19:6
hotels
19:6,10
hour
14:17 56:14 107:13,
18 108:11
house
51:20,23 52:24
housecleaning
5:3,12 7:9 12:8
housekeeping
5:11 7:14 12:8
housing
28:22
hundred
9:1 53:20
hurdle
39:7 46:21 47:1,4,
12,14,23 48:4,16
53:7 69:11
hybrid
103:15

I

idea
4:20 6:19 33:7
ideal
107:3
identification
21:7
identified
20:6 38:3 41:23 62:7
63:4,5 71:18 79:22
82:7 84:12
identifies
45:10 79:14
identify
37:2 41:9 49:5
identifying
43:8
Illinois
16:16
immediately
33:5,23 78:2
impact
66:10 89:11 91:21
93:4 96:5,10 102:5,
10
impacting
104:20 105:10 106:7
implemented
86:10
important
9:6,7 46:15 47:21
52:18 82:12 93:6
103:8
importantly
79:7
impossible
78:11 93:1 106:19
improvement
54:20 84:19
improvements
53:11,17 55:1 65:21,
22 66:2,8 79:21 85:2
89:24
in-house
55:12
in-tract
79:21
inability
97:23
inappropriate
15:5 53:4 95:20
inception
94:16

include
22:22
including
62:24
income
50:2,7
indemnification
103:23
indemnify
103:19
indemnifying
104:15
indemnity
106:23
independently
9:12
indication
85:21
individual
20:15 92:6
individuals
37:19
industry
49:22
information
56:6 64:1 67:15
72:18 74:13,22 84:4,
11 85:10 89:10
100:8
infrastructure
24:23 25:3,14,15
27:4 30:7,10 65:14
inherent
50:21,23
initial
24:17 25:23 26:5,12
27:7 41:19 43:7,14,
15 44:18 45:9 46:20
46:1,24 49:2 73:8
76:21,22
initially
17:22 24:6 33:18
41:8 43:5 59:24
86:24
inquire
54:4
inquiries
96:15
inquiry
45:14
instances
61:5 71:24
institutional
59:4
instrumental
36:17
insurance
34:24
intend
11:9
intended
5:10,22 66:7 70:8
78:10 98:16
intent
11:8 100:7
interaction
21:8
interactions
15:2
interest
30:16 39:2,16 41:24
interested
37:15,16
interests
67:18
interpret
102:9
introduce
87:6

introduced
37:8,9
invest
35:10 62:14
invested
30:6 31:3
investigated
82:7
investigation
83:4 84:24
investment
26:18 29:16 34:17,
24 35:7 36:18 37:23
38:5 40:11,13 41:10,
13 42:18 43:1,12,13
44:19,20 45:10,12
46:5 49:11,23 51:4
54:14,21 55:3 63:13
64:2,6 68:3 80:7,11,
14 81:17 82:4 84:14,
17 89:21
investments
105:1,6
investor
38:16,24 46:7 62:8
93:22
investors
35:24 36:6 40:3
46:22,23 47:10 49:9,
15,18 50:19 53:8
105:4
involved
20:22 22:18,20
24:16 25:4,21 40:1
42:3 54:10 57:24
59:8 62:3 81:12
86:14 99:23 100:10
101:8
involvement
16:4 19:12 23:1
24:14 26:13 36:19
77:6 85:5 96:3 103:3
Iraq
17:24
irrelevant
11:6
Irvine
19:17 36:24
issue
12:4 14:15 54:20
91:10
issues
61:9,10,14 63:4 70:5
88:17,20 97:22
item
8:23 10:2
items
51:12 74:13

J

January
76:13
Jim
72:21
job
18:10 37:1
joined
21:15 23:22,24
Judge
7:3 11:18 71:1,4
73:2 92:11 100:19
102:4,13 107:17
108:2
judgment
12:4
jump
82:19
jurisdiction
79:20 83:2

jurisdictions
25:10

K

keeping
6:20 7:11
key
73:21 80:10 82:4
kick
45:19
Kilburn
5:15
Kimball
4:8 16:5 57:17 58:6,
10 59:9,17 60:15,19
61:2,7,13,17,21,22
62:2,4,8,15 63:2,7
66:18 68:11 77:7
80:21 83:6 86:15
99:11
kind
48:18 87:10
King
36:3
knew
49:3
knowing
20:24 40:18 69:18
knowledge
22:1 39:19 92:8
Kyte
36:16 37:4,10,19
87:17 88:23 89:1
94:16 96:18,19
99:19 100:3 101:4
Kyte's
36:19

L

L.A.
36:5,8
labeled
80:7
lack
69:7 101:22
laid
7:24
land
19:9,17,18,21 20:12,
13 21:23 22:1,3,16
24:1,21 25:9 27:18
29:2,6,8,22,23,24
30:14,21 31:11
32:18 34:6,8 41:4
47:9 52:1,3 55:10
60:1,13 75:22 76:5
97:18,19 98:7,9
large
22:16 23:3 27:2
28:10 36:4 39:17
44:5 83:9 85:17
89:18 99:16
larger
75:9 85:15
largest
21:4,23 22:1 23:16
24:1 27:18 44:13
77:21 97:15 98:11
Las
59:9 60:1,15,19
61:2,17 77:7
late
19:4 28:9 29:1
34:18,19 68:19
lawsuit
91:21 92:23 96:5
97:6
lawyers
42:11

layman's
61:3
lead
5:1 6:4 22:12 58:1
leading
19:21 20:12
learn
63:8
learned
86:1
learning
92:22
leather
42:20
leave
21:10 27:4 65:7
leaves
10:11
left
4:11 8:7 18:11 57:23
75:5 97:9 98:1 99:8
legal
54:11,12 55:2,16
62:24 69:1
Lehman
27:17,19,22,24
28:12,17 55:11
Lehman's
28:6
lenders
34:24
length
84:9
lengthy
62:22
Lennar
21:4 98:10,21
let alone
29:13
letter
100:6
letting
45:22
level
76:17
liability
67:18
lifecycle
38:14
light
107:6
lines
87:10
list
7:12 8:1,6,7 82:3
listed
81:17
listen
34:22
litigation
66:15 89:20 91:7
93:21 94:10,22 97:5,
23 102:6 104:19
live
15:19,20 56:3
local
25:10 52:2,3 66:22
long
6:13 17:16 19:16
23:13 26:5 48:6
107:16
longer
57:2 68:7
longest
40:21 94:1
looked
11:21 84:3
loss
105:2



lost
62:12 105:4
lot
27:2 29:24 30:4,6,8,
9,12 33:1 34:4
46:14,17 52:11,19,
23 58:16 67:3 68:21,
22,23 80:3
lots
24:3,5 29:3,8,15,17,
23 31:6,9,13,17,24
33:11,21 34:8,10
42:13,20 43:4 51:15,
21 59:7,15 60:2
63:9,11,13 65:5
75:18,24 76:2 77:22
78:7,19 79:19,23
80:18,21 81:7,8,10
87:3,6 89:17,19
91:9,10,12 93:2,4,
15,20 94:8 96:13
97:1,5 100:6,11
101:1,14,17,21
103:9,16,18,19
104:16 106:20,21
loud
14:5,8
lunch
57:5,7,10,12 107:21
108:3

**M**

Mac
21:12
made
8:24 11:23 23:17
34:18 39:21,22
40:11,24 46:7 58:14,
24 62:3 65:3 68:17,
20 69:2 70:16 80:11
90:11,22 93:1 98:12
magnitude
89:20
main
9:17
maintained
87:16
maintaining
88:7
major
18:6 22:20 27:4
43:20 63:15 91:8
majority
8:9
make
9:14 10:16,18 13:10
26:1 30:8 33:2 45:16
46:2 49:6 62:13
63:20 72:11 74:13
77:23 78:17,21 81:3,
10 95:18
makes
11:4 57:12
making
26:1 58:1,9 64:4,18
105:1
manage
97:17,18
management
26:17 72:10 73:14
86:11,15 87:21
88:12
Mangement
73:12
manner
95:20
map
27:2,3,5 83:1
maps
26:24 82:23

Mar
15:20
March
99:19,24 100:5
101:18 107:7
Marine
17:12,13,17,23 18:8,
11
marked
71:10 73:6
market
20:1 24:18 30:23
32:12 33:4 37:12
40:17,21 43:3 48:22
52:3,5 66:18 67:2,6
69:1,19 74:18 77:18
78:12 80:24 81:12
83:20 87:7 88:6
89:12 91:4,9 93:10
105:11,14,21,23
106:20
marketplaces
105:8
markets
29:13,14 33:20 34:7
42:7,9,10 43:18,19,
20 44:3,4,5 52:8
60:18 69:20 87:4
94:12
master
79:21 99:17
match
63:12
matter
4:6 5:3,12 7:9 15:7
26:23 45:14 61:24
104:7
matters
6:23 9:21 12:9 96:19
meaning
14:6 31:19 39:4 45:4
67:3
means
29:19 31:22 44:16
50:13 57:4 69:21
76:3 79:3
meeting
67:4
meetings
26:18,19
meets
35:11
member
26:16 64:2
memorialized
84:12
mention
47:22
mentioned
24:13 41:6 43:18
44:19 54:18 71:22
met
63:11 66:23 87:9
metering
93:14
methods
51:6,7
metric
50:20 76:7
metropolitan
33:15 43:20 44:17
63:16
Metrostudy
52:7 67:10,12,13
microphone
13:6,12,21,24 14:5,
6,10
microphone's
14:8
microphones
13:13

midway
76:9
Mike
4:17
mild
31:23
million
22:6 38:5 49:2,3,4
65:3,19,24 66:3
80:21 81:3,5,22
82:16 98:9
millions
94:9,10
mind
6:20
minutes
56:19 107:19
missed
94:22
model
25:5 33:8 34:13 38:2
39:17 40:24 58:8
85:18
models
51:19
modest
79:6 81:1
Moldoff
4:12
moment
5:6 14:9 27:23 99:4
Monday
26:19
money
37:23 41:16 46:7
47:11 53:4 61:3 68:7
72:11 81:3 93:7
103:17 104:4,13,22,
23 105:3,5
monitor
87:4,5,6
monitoring
88:6 91:4
month
59:5 74:1 93:11
monthly
87:22,23 94:7
months
12:3 26:6 33:24 61:4
86:22 87:13 101:16
morning
4:4,14,15 7:2 12:9
13:9 15:17,18
movant
5:13,21 12:18
move
33:11 43:13 101:1,
14
moved
96:18
moving
8:8 9:21 28:24 74:8,
24
MSA
30:23 44:15 52:4
84:3
MSAS
33:15 43:21,23
multiple
64:5
municipalities
103:13
municipality
89:23

**N**

named
16:14 19:21 37:4

names
4:22 71:16
nationwide
97:19
naturalization
6:9
nature
90:19 92:11 105:18
nearer
32:6
necessarily
48:20 49:2 69:13
needed
26:21 30:8,11 35:13
45:16 46:15 65:10
84:16 88:3
negative
47:18
negotiating
26:16 89:22 97:13
net
46:20 47:5,13,16
49:20 50:13
newer
36:9,11
noise
14:8
non-pari
39:15
nonrefundable
77:2,4
Nonsense
62:20
normal
107:3
north
60:2
noted
7:12
notes
107:18,24
number
7:10 31:12 48:17,18
49:1 60:2,18 74:12
75:6,9 79:10 82:20
numbered
75:5
numbers
59:1

**O**

O'DONNELL
21:12
O'DONNELL/
ATKINS
19:22 20:8,11,20
21:3,8,12,15,21 22:8
23:13 24:8
Oak
16:16
oath
12:23 57:14 108:4
objected
71:11
objection
7:13,18 8:15 9:22
10:16,21,23 91:23
92:12,20 95:1,21
96:7 100:12 101:22
102:1,4 105:12
106:9
objections
8:18 10:1,6,11,13,19
objective
24:20
obligation
64:17 70:7 82:15
observation
95:6 96:2

obtain
17:4 25:11
occurring
76:18
October
76:12,20,24
offer
23:17 43:17 49:2
55:22 56:10 59:14
65:3 66:3 69:8,17
76:23 95:16 98:12
offered
48:20
offering
69:21
offers
56:7,9 96:15,24
office
42:3
officer
17:10,11 44:23
offices
35:5 36:7
offsite
30:11
oftentimes
26:1 47:23 48:22
ongoing
98:2 104:19 105:9
106:6
onsite
30:11
open
4:2 56:23 87:11
opened
98:4 99:8,22
operating
44:23 60:8 87:20
90:2
operation
98:5
operations
35:14
opining
105:22
opinion
67:6 95:1,3,19
105:13,21
opinions
95:13,18
opponent
5:15
opportunistic
35:3
opportunities
40:5 41:9,23 42:14
55:6
opportunity
21:9 28:16 35:4,14
36:2 38:4,7 43:9
62:13,14 93:8 94:4
14 98:18 99:14
104:23 105:4 107:23
opposite
91:1
option
78:18
oral
100:24
Orange
18:22
order
9:4 11:18 47:10 68:2
78:17 83:1 84:16
99:24 100:5,9,10,24
101:14,18,19 102:5,
9 103:3,9,17,19
104:1 107:7
orders
8:12,14

ordinarily
95:12
orient
83:13
ourself
87:7
outfits
36:1
outsized
77:23
overflow
6:8
overrule
92:19
overruled
11:1
overview
74:19 83:18,20
owned
24:3,4 35:20
owner
31:3 38:17,19 66:8
75:16 88:11 107:4
owners
44:22

**P**

pages
11:22 67:9
panic
9:10
parachute
40:4
paragraph
75:15,17,19 76:2,8
77:5,13 80:13 81:11,
15,20
paralegal
7:11
parameters
84:17
pari
39:4
Park
16:16
part
5:16 17:23 26:9 28:1
34:1 41:3 63:19
64:3,11 66:17 81:23
84:21 95:2 97:24
100:13 105:13
partially
75:18
parties
6:12 8:17,24 9:9
11:19 15:7 56:18
partner
45:17 55:20,21 60:6,
7,11,13 63:20 67:20
70:3 71:19,23 88:11,
12 92:6
partnered
60:3
partnering
60:22
partners
34:22 37:14 38:6
62:11 67:23 68:4
71:18
partnership
60:5,9
parts
85:14
party
5:14
pass
84:16
passed
43:11



**passu**
39:4,15
**past**
88:9
**path**
28:14,15,21
**pause**
99:4
**pay**
48:5,19 51:24 52:24
96:18
**payout**
98:16
**peak**
24:4 79:5
**pending**
10:23 89:20 93:21
97:5
**pendulum**
79:1
**pension**
35:1
**people**
23:6 28:7 37:15,16
39:18 45:23 50:6,20
51:2 68:2 96:15
**percent**
23:4 27:10 31:15
38:8,10,18,22 39:1,
3,12 48:24 50:15
51:2 71:24 72:1,3
75:16 76:2
**percent/5**
38:10
**percentage**
28:10 80:18
**perfect**
24:21 25:2,3,5
**perform**
54:6 68:9 77:1 82:16
86:11 91:3
**performance**
81:16,22 83:3,5,8
**performed**
72:11
**performing**
99:21
**period**
16:5 23:2 24:17
33:6,7,16 34:2 36:20
42:5 48:7 56:11
68:21 69:23 76:12,
24 77:3,16,17 78:14,
23 86:3,5,9 87:1,18
**permits**
44:2
**personal**
92:8 102:8 106:11
**personally**
26:15 63:23 86:17
**personnel**
40:12 41:16
**perspective**
67:19
**phone**
42:6 88:2
**phrase**
106:13
**picking**
56:7
**piece**
25:9
**pilot**
17:15,17
**pioneering**
31:19 32:2,4,11
**pipeline**
41:12,15
**pitched**
35:6 36:13

**place**
32:13 35:15 41:5
53:14,18,19,23
56:14 63:22 64:16,
21 70:7 85:1
**places**
35:13
**plan**
20:3 33:5,17 34:1,2,
16 36:13 40:14 73:8,
22,24 74:14,23 75:3
78:1,6 80:6 82:21
83:12,17 84:18
85:14 86:5,8,9
**planning**
85:21
**plans**
99:17
**platform**
40:10
**play**
98:16
**pleasantly**
33:14
**pleased**
60:14
**plenty**
29:8 66:13
**pocket**
94:9
**podium**
73:4
**point**
5:7 6:6 8:3 9:16 34:9
57:7 78:10 79:2 82:3
84:23 85:20,23
88:16 91:7 95:12
96:16 102:1
**pointing**
55:4
**points**
52:13 80:10
**portfolio**
58:11 59:17,24
60:15,20 61:2 63:13
73:9 77:10,15 86:19
**portion**
19:7
**posed**
106:10
**position**
21:17 27:18 32:23
33:1
**positive**
47:16 79:9 93:12
**post**
26:22 27:3,6 28:17
103:16
**post-purchase**
16:5
**posting**
104:5
**potential**
20:6,21 21:1 34:22
45:17 46:13 47:10
49:9 62:8 66:15
67:19 68:4
**pouring**
67:8,15
**practice**
26:23
**precede**
59:14
**predict**
78:11
**preference**
6:21 7:15 8:2 71:2
**preferred**
38:20,21 39:8
**prejudice**
10:8

**premium**
77:11
**prepared**
73:10,24
**present**
12:19 35:10 41:13
47:6,16,19 48:8
49:14 53:8 56:10
97:23
**presentation**
34:19
**presented**
8:17 35:7 46:6 56:6
**Presently**
15:20
**president**
21:19,22 22:18
**pressured**
14:21
**presumed**
11:18
**presumption**
8:14
**pretrial**
8:12,13,19 9:22
10:12,14,24 11:18
**pretty**
42:12 60:18 98:23
**previous**
30:22 31:3 75:23
79:5,6 83:22 98:17
**previously**
43:6 77:19 94:1
**price**
22:23 29:24 31:6
43:17 51:22 55:22
66:4 69:2,8 75:20
76:23 77:23 79:7
93:12 106:20
**prices**
79:4 87:6
**primarily**
7:22 19:1 22:9 36:2
43:16
**primary**
4:23 19:8 24:20
39:20 41:8 46:4
**principals**
21:11
**prior**
10:7 25:24 27:16
28:6 29:5 37:6 58:6
71:7 76:20 81:7
**private**
89:18
**privates**
23:4
**pro**
69:4
**problem**
15:9
**problems**
91:14,17
**procedure**
90:2 97:1
**proceed**
45:14 71:3
**proceedings**
4:2 42:9 56:23 108:9
**process**
31:9 32:20 40:7
41:21 42:3 45:12
49:16 54:11 55:24
57:24 58:2 59:12,17,
19,22 61:21 63:5
64:4,19 66:5 68:14
71:17 73:20,21
83:24 84:8 88:5
95:15 105:9,10,17

**106:6
**processes**
56:2
**produced**
7:23
**professional**
67:22
**profit**
33:2
**profits**
38:16 53:2
**project**
26:20 38:14,17,19
40:8,9 42:17 46:23
47:11 60:22 62:2
71:16 72:11,16
74:19 79:15 80:2
86:16 87:13,20
88:11 94:16 99:12,
24
**projects**
26:21,22,24 27:2
28:11 29:8 41:14
45:3 60:10 98:21
99:15
**promote**
39:2,5,14
**promoted**
37:21 38:22 39:16
**properties**
16:6 41:24 59:9 62:9
77:7 94:20 97:21
102:6 105:8 106:8
**property**
19:23 20:5,7,21
21:1,2,6,8 32:14
45:10 48:5,7,11,19,
21 50:19 55:22 62:4
64:20 65:11 69:13,
14 75:16 76:15
82:13,17 90:21 91:4,
22 92:1,7,15,24 95:8
96:4 102:11 103:5
105:17 107:4
**property's**
50:23
**protect**
14:6 25:1 67:18
**protects**
104:14
**proven**
31:21
**provide**
36:14 76:11 97:1
**provision**
103:23
**prudent**
67:22
**public**
21:4 23:1,3,10,11
24:24 27:8 89:17
97:15 98:11 99:17
**publicly**
23:11
**pull**
41:18
**pulled**
44:2
**pulling**
82:22 94:9
**pulse**
4:24
**purchase**
16:4 22:23 43:17
50:16 59:3,14 60:15
61:7 63:10,20 64:12,
14 69:24 70:10 71:7,
8,13,14 75:20 76:11
77:22 89:8,19
**purchased**
80:22

**purchaser**
33:11 90:6,11,20
**purchasers**
21:1
**purchasing**
31:10
**pursuant**
9:4
**pursue**
66:7 104:2
**pursuing**
60:17 88:20 91:3
**pursuit**
104:1
**put**
11:9 12:22 25:8 34:6
38:7 39:19 41:11
42:19 47:10 62:14
80:21 83:2,5 90:17
94:18 95:19 100:6
104:24
**puts**
60:7
**putting**
34:10,17 38:12
99:16

**Q**

**qualified**
95:9,14
**qualify**
95:15
**quantify**
53:5
**quarter**
34:20 93:11 97:16
98:10
**question**
15:4,5 33:12 53:22,
24 70:20 91:13
92:13 95:10 102:20
105:23 106:1,4,10,
14
**questioning**
15:8
**questions**
15:9
**quick**
43:9
**quickly**
40:4

**R**

**R-U-F-F**
4:16
**R.W.**
66:24 84:1
**raise**
8:3 68:7
**raised**
9:22 10:12,13,20
**ran**
90:24
**Randall**
13:3
**Randy**
12:18 15:12
**ranged**
31:6
**ranging**
48:14
**rank**
18:5
**rate**
39:7 47:4,12,14,22,
23 48:4,16,24 50:8
53:7 58:20 69:11,12
81:2 105:11,14,21,

**23
**raw**
24:21 29:5,8 31:11
32:17
**reach**
88:5
**reached**
19:20 20:7,20 98:20
99:20 100:3,7
**reaching**
87:2 94:8 101:4
**read**
9:11 70:18,19 80:15
81:24
**reading**
8:24 12:3
**ready**
52:23
**real**
18:16,23 19:1,12,16
29:14 34:23 35:20
36:5 40:1,21 45:16,
18 47:7 49:23 51:4
67:3 84:1 94:1,11,12
**realized**
6:8 8:4 11:21
**Realty**
66:24
**reask**
70:21
**reason**
6:6 9:3 14:19 43:22
67:10 103:21 104:11
**recall**
58:3 60:2 62:10
87:22
**received**
38:24 98:15
**recollection**
65:18
**recommended**
70:2,9
**record**
13:2,20 57:15 58:15
75:4 83:1
**recorded**
13:21 82:23
**recover**
14:10 32:13 44:8
**recovered**
78:24 79:1
**recovery**
31:23 33:10 40:22
67:7 78:17 79:7 81:1
95:7
**recreate**
31:14
**recruited**
24:6,8
**recurring**
94:7
**red**
63:4 66:12
**redeploy**
93:24
**redirect**
107:22
**reduced**
72:9
**refer**
11:10 43:9,21
**reference**
9:14,17 11:23 52:10
**references**
76:8
**referencing**
75:6
**referred**
42:19



referring
48:1 80:18
refers
77:5
reflect
83:24
reflected
73:22
reflects
74:4 78:24
refusal
60:12,21
regains
104:11
regard
95:20
regular
87:16
regularly
90:1
reinvented
28:2
relate
103:24
related
16:5 88:17 97:22
99:11
relationships
51:18 88:7 96:20
98:18
relevance
10:1,3,6 11:8
relevant
53:2
remain
5:7 12:22 57:14
108:4
remainder
10:22
remaining
10:12 52:20 53:9
79:23
remember
44:12 67:4,8
remind
12:15 57:14 108:4
REO
35:19 55:8 59:2
repeat
102:21 106:1
repeatedly
96:22,23
rephrase
92:17,19 95:22
100:19 106:4
rephrasing
100:18
replace
54:2 64:10,13,17,22
70:7 81:22 82:15
replaced
65:10 82:10
replacement
29:9,15,17,18 30:14,
19 31:10,15 32:21
52:12 63:15 78:21
80:19 81:15
replicate
31:16
reporter
4:5,20 13:20
reports
30:5
representations
97:2
represented
18:15 54:14
representing
20:16 22:2

represents
73:8 81:5
reputable
53:19
reputation
68:5
required
19:6 25:17 38:9
46:22 47:11 51:23
84:20
requirement
63:12 64:22 81:21
requirements
103:13
requires
51:12
research
42:4 51:13 52:3,5
77:19 84:6
reselling
77:10
reserve
10:1 18:3
reserved
5:16
reserves
17:19
residence
25:8
residential
19:12,20 20:7,13,14,
15,22 24:3,5 84:4
resources
39:18 43:2 94:17
respect
61:9,10 63:1 66:17
68:11 88:20 95:18
respond
92:3 95:9
respondent's
5:16
response
102:2,14
responsibilities
22:7 86:12,15
responsibility
54:24 55:1 64:12
72:5
responsible
26:15 54:18 89:9
92:6
rest
7:22 101:17
restraint
106:13
restricted
106:11
restructured
28:2
result
5:10 48:17 84:7
resultant
49:1
resulted
47:15,18 76:6
resume
107:21
retail
50:10
rethink
19:15
retire
18:5
return
38:20,21 39:1,8
46:21 47:2,4,12
51:23 78:12,21
93:17,21,23 105:1,2
returned
38:15,16 73:4 105:3

returning
38:15 94:6
returns
39:15 77:24 93:19
reused
30:18
revealed
83:5 84:24
revenue
46:13,18,19 48:2
50:14,22 52:18 53:6
54:8,16,17 55:15
62:23
revenues
22:5 51:14
revised
34:12
revolved
69:17
rights
60:8
ring
32:5,7,8
Riordan
4:13 5:18 7:2,3,5
11:13 70:17,24 71:3
91:23 92:10 95:1
96:7 98:23 100:12
101:22 102:13,19
105:12 106:9
107:15,17 108:2
risk
40:17 79:18 90:15,
16,22 107:8
Riverside
16:14
road
34:21 35:24
robust
24:19
Roger
18:12,17
role
16:3 41:8 86:22
89:12 91:3
Rolodex
42:12
room
29:11 81:1,2
round
4:10
routine
89:2
routinely
88:10,13
Ruff
4:15 5:1,23 6:3,24
7:10,20,22 9:20
10:17 11:3,5 12:6,
10,13
run
21:14 56:5 69:4,6,7,
8 97:18
run-up
79:6 94:22 96:4
run-ups
94:2
running
7:12 35:1 56:1

S

sake
38:4 45:22
sale
51:22 61:8 64:14
71:13 89:8,22 97:3
98:22
sales
35:18 46:14,17 55:7

56:3,4 67:3 68:21,23
80:2
salvage
107:9
satisfaction
35:11 97:4
satisfied
55:17 64:9 69:23
satisfy
68:1 104:10
save
28:23
saved
40:15
scale
27:19
scarce
47:8,9
school
16:15,16 17:11
Science
17:7
scope
21:20 24:13 51:10
screen
73:1
seat
4:24 5:5 13:4,7
seconds
14:11
seeking
42:14
sell
23:6 24:23 33:1,5,22
51:16,21 68:2,3
78:20 80:3 81:2
89:13 90:12,13
91:22 92:1,7,9 93:20
97:24 101:21 102:6
103:8,16 104:20,21
105:11 107:4
seller
97:1
Seller's
80:14
sellers
99:16
selling
80:3 89:17 90:13
105:7
seminal
27:23
sense
10:16,18 14:15 23
17:20 21:20 27:18
41:20 46:11 49:6
57:12 58:23 67:5
69:2 70:16 85:7
92:14
sentence
77:13
sentiment
34:4 79:8
separate
106:19
September
27:21
series
47:5,13,15,23,24
48:12,13,15,23,24
service
18:7 99:21
set
49:13,14
settle
33:20
settling
103:12
seventy
30:12

share
35:9
shared
37:10,11,12
Shaw
36:6 60:4,13,21
sheer
44:5
sheet
34:6,11 53:21 97:18
ship
17:24
shoe
42:19
short
50:8 56:17,21 57:1
82:4
shorthand
50:17
shortly
17:10 21:13 98:21
show
11:9 34:21 35:24
58:19 81:1
showed
85:8
showing
58:18 73:6
shows
80:1
shut
43:3,4
sic
98:12
side
8:19 24:20 27:11
45:5 52:17,19 54:8,9
88:1 89:12
significance
82:24
significant
19:7 51:13 63:14
77:10 80:13 82:3
93:9
silent
7:2
similar
38:2
simple
8:10 25:15
single
44:2 49:17
sir
15:17 18:4 28:4
107:11
sit
40:19
sitting
104:23
situation
70:15 72:4 90:4,18
96:23 107:2
situations
71:23 107:3
sixty
33:1
size
28:7,8,9 44:5
skepticism
97:24
skin
72:6,8
slowed
44:6
slower
5:9 69:19
small
6:23 8:10
smaller
27:5

sniff
43:11
soft
30:15
sold
50:24 65:5 78:7
100:11 101:17
103:18,20
solution
19:22
solve
48:4
solved
91:14
solving
69:11
someone's
30:11
sophisticated
50:18
sort
4:10 9:11,23
Source
60:1,14
southern
18:21 37:6
space
29:2 36:10,11
speak
7:7 13:19,24 14:4
43:12 88:10
speakers
14:1
speaking
13:15
spear
37:2 41:8,23 42:4
specialist
42:17,19 45:5,6
specialists
41:13
specialize
52:5
specialty
99:16
specific
68:15
specifically
11:10 36:10 47:6
77:20
specifics
79:15
speculation
100:13
spellings
4:22
spend
41:15,16
spending
31:15
spent
12:3 65:23
split
39:6,9,10,12
splitting
39:5
spoke
54:15
stage
25:23 30:2,5 43:7,
10,14,15
stages
24:15 25:23 43:6
stand
4:9 12:21 13:6 14:17
57:14 107:22
standard
90:2 96:24
standing
5:8 12:22



stands
35:20
start
8:18 16:11 32:10
39:12,13,14 41:19
43:14 49:15 51:13
87:1 93:14
started
12:9 32:13 34:17
80:24 93:10 96:19
98:6 99:18
starting
32:9
state
13:1
stated
94:1
statement
8:19 9:23 10:15,24
states
17:12 33:14 76:10
81:21
statistical
33:15 44:17
status
53:11,13 62:24 64:8
82:21
Staubach
18:12,13,14,15,18
19:11 21:10 24:7
stay
66:13
staying
35:12 88:8
stock
98:16
stood
44:15
stop
14:9
stopping
94:7
strategy
29:16 33:14 41:4
81:8
streamlined
8:13 108:1
street
31:13 36:4
streets
25:16
strength
72:14
stressed
69:7,10,16
stretch
31:22
strike
61:5 78:5
strip
30:20,21
strips
30:14,15
strong
6:21
structure
38:10
structured
36:22
stuck
11:24 104:6
study
17:2
style
4:10
subdivision
25:9 67:3
subdivisions
20:17 31:18,21

subject
79:19
submitted
11:23
subsequent
33:11 90:6,11,20
104:12
subset
50:5
substitution
42:21
subtract
46:17,18
suburb
16:14
suburbs
32:6,7
success
28:21 58:20 72:16
77:5 101:20
successful
21:3 31:20 33:13
58:14 77:9 98:13
successor
66:8
sue
66:7 90:20 103:4,10
104:12
suggested
62:17
suing
85:21
suit
61:18 70:9
summaries
74:13 85:11,12
summarizes
75:15,17,19 84:18
85:14
summary
75:13,19 79:14,17
84:6,15 85:16
summer
23:17 97:13
Suncal
15:24 16:3 23:17,22
24:1,17 26:13,17
27:8,12,17 28:2
36:23 37:7,9 38:1
39:18,22 40:15 41:3
59:8 69:23 72:9,10
73:13,14 86:11 89:1
96:17 97:9,20 98:1
Suncal's
29:4 58:8 67:18,19
supply
31:5
supported
69:9
suppose
12:11 107:14
supposed
12:1
sureties
61:9,10,14
surety
26:10,14,16 27:3
53:13 55:13 61:18
62:24 63:22 64:8,13,
16,17 65:9 66:7
70:5,8 81:16,23 83:3
85:1,21 88:17 90:4.
10,19 91:2,21 92:23
96:5 97:6,23 103:4
106:6
surprised
33:15
surprising
89:3
surrounding
97:5

sustain
95:21
sustained
7:13,18 10:21
sweat
38:11 39:20
switched
86:17
sworn
12:24 15:14
system
9:15 10:4

---

**T**

table
74:11,12
tainted
91:10,11 96:13
takes
30:2 93:15
taking
5:1 23:4,6
tale
11:17
talk
16:9 53:3 82:22
talked
66:22 70:6 74:16,20
77:6 81:11 83:23
85:5 91:18
talking
20:18 42:8,10 58:7
91:5,24 106:24
target
42:7,8,10 43:3,18,
19,20
targeted
43:22
targeting
31:9
team
36:23 40:14 41:4,5
45:20 63:23 66:24
72:5
team's
75:19
tech
19:14 28:20
technician
75:7
technology
19:2,5,15
ten
26:2 31:7 33:22 59:4
tens
29:3 89:17
tentative
27:2,5
tenure
21:22
term
38:22 50:2,7,8 69:8
terms
61:3 76:11
tertiary
44:4
test
43:11
testified
15:14 102:14
testify
95:13 105:20
testimony
14:20 108:6
Teteak
12:18 13:3,4 15:12
57:23
theater
4:10

thesis
34:17,18 35:7 36:18,
21 40:13 63:13
thing
6:12 10:8 14:12
things
8:13 9:12 20:17
22:23 30:16 33:20
35:18 62:22 74:17,
19 83:23 89:13
103:8,14 105:17
Thorsness
4:18
thought
5:24 31:8 32:12,20
40:10 77:20
thousand
44:1
thousands
29:3 89:17
three-quarters
31:18
throw
14:22
Thursday
6:8,10
time
6:8 7:3 8:1 11:11
14:2 17:22 19:4,11,
20 20:10,24 22:6,10,
12 23:2,16,22,24
24:17,19 30:3 31:4
33:4,6,7 34:2,3,23
37:10,13 39:20
41:15 42:5 44:12
45:2 46:7,22 47:3,9
48:7,11 52:1 53:4
57:11 59:2 60:17
61:12 62:12 66:11,14
67:2,11 69:19 76:17,
20 77:1,2,3,21 78:6,
10,14 79:2 84:23
85:20,23 86:6 87:17
90:1,8 91:18,20
92:22 93:7 94:15,17,
20 95:8 97:9,20 98:3
99:10,20 101:13
102:15 104:22
107:20
times
38:11 43:24 64:5
67:5 96:8
timing
46:13,16 48:1,2,3
53:1,6 54:16,19
64:24 80:1
tip
37:2 41:7,22 42:4
Tischer
37:4,6,7
title
42:8,10 45:2,7 82:22
today
4:20 5:2 6:2,4,13 8:1
16:9 20:18 40:19
62:1
today's
4:6
told
44:18
tomorrow
6:5
ton
31:5
tone
79:9
top
43:21,22 44:11 75:5
total
11:22

touch
88:8
touched
51:9 62:1 93:5
track
58:15
tract
27:3,5
trade
38:11
traded
23:12 50:12
trading
29:9,15
traditional
34:23 56:6
train
22:11
transaction
53:18 81:23
tremendous
52:7
throw
14:22
TRG
4:16,17,18 5:2
36:11,12,16 60:17,
18,20,24 62:3,7,12
63:21 68:4 70:3
71:14 72:3,21 73:6
74:22 75:5,15 86:10
87:17 88:8,10,21
89:5 91:3 92:2,9,16
93:17,21,22,23
94:21 99:11,21
103:13,16 103:8,15
104:4,20 106:7
TRG's
91:22,24 92:6 95:7
100:23 104:14,24
105:3,10
trial
11:21,24 75:5
trials
6:23 8:9
tripled
61:3
truncated
33:17
trustee
56:3,4
trustees
56:1
truthful
14:20
Tuesdays
6:21
tunnel
107:7
Turiello
4:17 5:1,5 12:13,14,
17,20 15:16 56:13,
20 57:9,19,21,22
70:21 71:6 72:21
73:4,5 92:3,5,17,21
95:5,22 96:11,11
99:6,7 100:15,16,19,
22 102:3,23 103:1
105:16 106:3,5,17,
22 107:11
turn
5:6 61:24
turning
12:12
turnover
8:11
turns
40:20
twenty
32:24
two-thirds
55:9

type
18:23 22:15 31:23
35:3 67:2 76:6 89:20
types
58:5 68:10 105:8
typical
38:9 60:4 69:4 71:15
87:19
typically
26:7 27:1 30:2 39:7
69:6

---

**U**

ultimate
51:22 52:14 61:8
64:3 66:12 93:22
ultimately
39:11 46:6 97:17
unable
53:6 93:20,21,23
unaware
49:23
uncertain
78:14
uncertainty
29:13
understand
5:13,20 9:19 11:5
12:6 13:11 14:23
15:4 16:8 46:12,15
51:15,19 52:9,19
53:5 106:3
understanding
10:21 64:7
understood
15:9,10
underwriting
25:19,22,23 26:4
41:19 43:10 45:1
60:19 64:24 77:15
85:18,19
underwrote
59:4
unique
32:23 33:1 90:3,6,19
103:20
unit
17:24
United
17:12
units
84:4
unload
19:22
unnecessarily
71:12
unrealistic
51:1
unsolicited
98:12
untitled
24:21
utilities
25:17

---

**V**

vacuum
53:3
validating
46:8
valuation
49:24 52:10
valuing
105:17
vast
8:9
Vegas
59:10,18 60:1,15,19

61:2,7,13,17,21
62:4,13 77:7
**vein**
102:7
**version**
74:5
**versus**
31:11
**vetted**
49:18
**viability**
84:14
**viable**
78:18
**vice-president**
43:2,8 45:8,9
**vice-presidents**
37:1 41:7,22
**viewpoint**
35:9 58:17
**virtually**
93:1
**vision**
37:11,13
**vital**
70:22
**vote**
42:18 46:5
**VP**
76:16

---

**W**

**wait**
9:10 10:15 33:9
**waived**
62:18
**walk**
70:15 72:6
**walked**
85:24
**wanted**
6:6 34:6 41:15 46:12
54:1 55:22 62:13
70:14,15 96:14
**War**
17:23
**warranties**
97:2
**wash**
10:10
**waste**
11:10
**ways**
51:17
**wearing**
45:2
**Wednesdays**
6:22
**weekly**
41:11
**weigh**
102:18
**weight**
9:5 10:8
**weighting**
69:16
**wholly**
72:15
**willingness**
72:12
**win**
104:16
**wins**
104:11
**witching**
107:13
**witnesses**
5:21 6:2 14:12,17
57:13 95:13

**words**
79:18
**work**
18:12,17,23 21:21
25:9 26:9 27:4 37:7
38:2 51:21 52:2,3
72:9 81:1 85:8 92:1
104:24
**worked**
15:24 37:5 67:1
94:15 98:3
**workforce**
18:8
**working**
14:11 24:11 37:16
101:16
**works**
10:4 13:6
**worst**
43:23,24
**worth**
9:12 47:18 48:11
51:3,16 55:4,10
65:19 82:16 98:9
**wrap**
100:21
**write**
96:15
**wrong**
66:24

---

**Y**

**year**
22:4,6 78:8 87:15
88:5,9 98:14,15
99:19
**year's**
50:13
**years**
17:18 18:2,3 19:8
26:12 27:7 33:19
48:14 59:5 61:4,8
68:22 72:18 77:16
80:1 86:4 88:15
**yesterday**
5:3,9 6:1,7 8:4 11:15
13:5,8,9,23
**yielded**
35:24 46:21
**York**
36:5,6,7 60:4

---

**Z**

**Zurich**
83:9

