```
 1          IN THE UNITED STATES DISTRICT COURT
 2          NORTHERN DISTRICT OF ILLINOIS
 3               EASTERN DIVISION
 4                          )
 5   IN RE:                 )
 6   KIMBALL HILL, INC.,    ) No. 08-10095
 7   DEBTOR                 )
 8                          )
 9
10        REPORT OF PROCEEDINGS at the hearing of
11   the above-entitled cause before the Honorable
12   TIMOTHY A. BARNES, Judge of said Court, on the
13   28th day of August, 2018, at the hour of 1:15 p.m.
14
15
16
17
18
19
20
21
22
23   Reported by:  Frances S. Lucente, CSR
24   License No.:  084-004005
```
1

```
 1                    I N D E X
 2
 3   WITNESS              DX   CX   RDX   RCX
 4   RANDY TETEAK
 5     By Mr. Riordan          4
 6     By Mr. Turiello              53
 7
 8   JOHN VANSANTEN
 9     By Mr. Turiello         98
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```
3

```
 1   APPEARANCES:
 2
 3        PRETZEL & STOUFFER, CHTD.
 4        BY:  MR. EDWARD B. RUFF, III and
 4             MR. MICHAEL P. TURIELLO
          One South Wacker Drive, Suite 2500
 5        Chicago, Illinois  60606
          (312) 346-1973
 6        eruff@pretzel-stouffer.com
          mturiello@pretzel-stouffer.com
 7
               and
 8
 9        VEDDER PRICE, P.C.
          BY:  MR. WILLIAM W. THORSNESS
10        222 North LaSalle Street, Suite 2600
          Chicago, Illinois 60601
11        (312) 609-7500
12        wthorsness@vedderprice.com
               Representing TRG Venture Two, LLC;
13
14        SCHUYLER, ROCHE & CRISHAM, P.C.
          BY:  MR. CORNELIUS F. RIORDAN
15        180 North Stetson Avenue, Suite 3700
          Chicago, Illinois 60601
16        (312) 565-2500
          criordan@srcattorneys.com
17             and
18        ECKERT SEAMANS CHERIN & MELLOTT, LLC
          BY:  MR. ALAN I. MOLDOFF
19        50 South 16th Street, Suite 2200
          Philadelphia, Pennsylvania 19102
20        (215) 851-8450
          amoldoff@eckertseamans.com
21
               Representing Fidelity & Deposit
22             Company of Maryland.
23
24
```
2

```
 1   THE COURT:  We left off with it appears that the
 2   movant was done on direct with the witness.
 3   It was time for Mr. Riordan's cross-examination.
 4      MR. RIORDAN:  Yes, your Honor.
 5      THE COURT:  I will remind the witness that you
 6   remain under oath.
 7      THE WITNESS:  Yes, your Honor.
 8              CROSS-EXAMINATION
 9   BY MR. RIORDAN:
10      Q.   Good afternoon, Mr. Teteak.  As a father
11   of an Iraq War Veteran, I thank you for your
12   service.
13      A.   My pleasure, sir.
14      Q.   I want to go over a little bit your
15   employment history.  I think at the end of your
16   testimony here this morning, you said you had some
17   professional association with TRG at the present
18   time?
19      A.   Yes, sir.
20      Q.   What is that association?
21      A.   Initially, in March, Mr. Kyte reached
22   out to me because I had very recent and relevant
23   experience working at the highest levels of one of
24   the largest public home builders in the country.
```
4

1   I took a look at a lot of his underwriting, not
2   only on the TRG lots but on some other projects
3   that he has an investment in. Additionally,
4   Mr. Kyte asked me to reengage with some of the
5   public homebuilders in Chicago in an attempt to see
6   if there was a possibility of continuing to move
7   some of these lots.
8       Q.   Are you an employee of TRG or an
9   independent contractor, or do you know?
10      A.   I am not an employee, sir.
11      Q.   How are you compensated?
12      A.   I am not compensated presently.
13      Q.   So you're not compensated at all by TRG,
14  and you've been working with them since March of
15  this year?
16      A.   Correct.
17      Q.   Do you have any type of contract with
18  them?
19      A.   I do not.
20      Q.   I'm sorry?
21      A.   Not written.
22      Q.   Not written. That began in March of this
23  year between 2016 when you left SunCal. I believe
24  that's where it was, correct?

5

1       A.   Yes, fourth quarter of '16 I left SunCal.
2       Q.   Right. And between then and March
3   of 2018, were you employed by or under contract
4   with TRG for any reason?
5       A.   No.
6       Q.   I think you said in 2008 -- that time
7   period -- SunCal's focus changed because of the
8   economic conditions at that time, is that correct?
9       A.   Yes, sir. I believe I said our condition
10  changed when Lehman declared bankruptcy in
11  September of that year.
12      Q.   What was SunCal's relationship to Lehman
13  Brothers at the time that Lehman Brothers filed its
14  bankruptcy?
15      A.   SunCal was through 30 separate limited
16  liability companies a partner with Lehman Brothers
17  on 30 distinct projects.
18      Q.   Were any of those limited liability
19  companies debtors in the Lehman bankruptcy?
20      A.   I'm sure many were.
21      Q.   Was SunCal a member of those 30 limited
22  liability companies along with Lehman Brothers?
23      A.   As I sit here today, it's probably best
24  that I don't comment on facts that are best left to

6

1   at the time our counsel on what claims we had in
2   that bankruptcy.
3       Q.   I'm not asking what claims you had. I'm
4   asking whether SunCal was a member of those 30
5   limited liability companies?
6       A.   Our standard agreement at the time with
7   Lehman Brothers was a 95-5 relationship.
8       Q.   The five being SunCal?
9       A.   Correct.
10      Q.   Were you involved on SunCal's behalf in
11  any respect in that bankruptcy proceeding?
12      A.   In what capacity, sir?
13      Q.   In your capacity at Lehman Brothers.
14  I'm sorry, not Lehman Brothers, but at SunCal?
15      A.   I was a member of SunCal's Asset
16  Management Committee. I was a member of SunCal's
17  Investment Committee. I was a member of SunCal's
18  Executive Committee. I would have been present in
19  the weekly meetings for a period of years while a
20  main topic was the projects that were in SunCal's
21  bankruptcy. However, I did not appear in any
22  bankruptcy court on behalf of SunCal.
23      Q.   You left that up to your attorneys,
24  correct?

7

1       A.   Correct.
2       Q.   In these various investment committee
3   meetings, did you confer with your attorneys
4   regarding the progress and status of the bankruptcy
5   case?
6       A.   I would have been at the meetings where it
7   was discussed, but I would not have been the one
8   asking the questions.
9       Q.   But you were there and you were
10  participating in those meetings, correct?
11      A.   I was in the room.
12      Q.   What does that mean you were in the room?
13  You just sat silent through every meeting?
14      A.   We routinely met on Mondays and Fridays,
15  as I said in prior testimony. As a member of the
16  Executive Committee, I would sit through and listen
17  to the updates on our bankruptcy cases; however, my
18  focus at the time was -- and I believe I used the
19  term two-thirds of our company were focused on the
20  bankruptcies and one-third of our company was
21  focused on future business. I was on the future
22  business side, so during the discussions of the
23  bankruptcies I had my ears open but my mouth
24  closed.

8

1    Q.    And the limited partnerships that you're
2  referring to owned various properties that were
3  under development at that time of the bankruptcy
4  filing?
5    A.    Yes, sir.
6    Q.    I think you mentioned rings.  You said
7  A-Ring, B-Ring, and C-Ring.  Do you remember that
8  testimony?
9    A.    I do.
10   Q.    Those rings referred to geographical
11 areas, did they not?
12   A.    In some cases they refer to geographic
13 areas.  In some cases, within a geographic area
14 there could be A, B and C parts.
15   Q.    But let's take Chicago, for instance,
16 where is the A-Ring located?
17   A.    I would have to go suburb by suburb.
18   Q.    Generally?
19   A.    I think if you're asking me if it's a
20 radius around the downtown core that you could
21 measure, I would say no.  Because depending on what
22 direction you go, you might find land that public
23 builders would be more inclined to want to build on
24 than if they had gone in a different direction.

9

1    Q.    So the more desirable properties would be
2  in the A-Ring?
3    A.    Correct.
4    Q.    And the less desirable properties would be
5  in the C-Rings?
6    A.    Correct.
7    Q.    Did you classify where the Shorewood
8  property was?  Was it in the A-Ring, B-Ring or in
9  the C-Ring.
10   A.    I would classify an A-Ring as almost
11 impossible to find new development.  In A-Ring by
12 way of example would be if a school in the town of
13 Hinsdale decided to add surplus land, and a public
14 builder could go into Hinsdale and put up new
15 homes, I would add that as an A-Ring.
16         A B-Ring, I would describe it as a
17 suburban area of Chicago where the public
18 homeowners have an appetite to put up new houses
19 and where the builders are enjoying a comfortable
20 level of absorption in those houses.
21         I would describe the C-Ring as a ring that
22 is not presently being built on, but in the last
23 cycle developers probably in the euphoria that was
24 the last cycle, developers probably went out a

10

1  little too far and started entitling property and
2  putting infrastructure on property that was a
3  little bit ahead of its time.
4    Q.    So at the time of the purchase of the
5  Shorewood property, did you classify it as being in
6  one of these rings?
7    A.    I would classify all of the Kimball Hill
8  lots as squarely in the B-Ring.  I would further
9  classify all of those lots as in the upper echelon
10 of the B-Ring because they have previous successful
11 home sales in those communities.  It's again
12 virtually impossible to find properties in the
13 A-Ring.
14   Q.    Now I take it in response to questions by
15 Mr. Turiello, you talked about discounted cash
16 flows.  Do you recall that testimony?
17   A.    I do.
18   Q.    In that testimony, he referred to TRG
19 Trial Exhibit No. 17.  I don't know if that's still
20 in front of you or not.
21   A.    If you're referring to the Business Plan,
22 yes, sir, I have it in front of me.
23   Q.    Okay.  You testified that the Business
24 Plan contained examples of discounted cash flow

11

1  analysis beginning on Page 16, 17, 18 and 19, is
2  that accurate?
3    A.    Let's refer to those each individually if
4  we can.
5    Q.    Sure.
6    A.    Page 16 is not a discounted cash flow
7  analysis.  It is an example of a builder residual
8  analysis.  There is no time value of money in that.
9  The result of that builder residual analysis would
10 be a component of a discounted cash flow analysis,
11 but it is not in and of itself a discounted cash
12 flow analysis.
13   Q.    But it gets you to a finished lab value,
14 does it not?  The result of this lot residual
15 analysis shows a finished lot value?
16   A.    Correct.
17   Q.    How is that arrived at?
18   A.    Sir, the math is on that page.  Would you
19 like to go through the math?
20   Q.    No, I'm talking about the value.  Is there
21 some mathematical procedure you go through to get
22 to the value?
23   A.    Yes, sir.  It's all right here.  I'm happy
24 to go through it with you if you're asking how it

12

1  works.

2  Q.   Sure, if maybe you want to just take the

3  top line -- Waterford?

4  A.   Sure.  The assumption there is there were

5  61 lots at Waterford.  We determined through market

6  analysis that the average house size would be

7  2,886 square feet.  The average base home price at

8  the time of sale would be $358,730.  If you divide

9  the $358,730 by the 2,886, you could see that

10  they're selling those houses for $124 a square

11  foot.  That net house price -- because this is a

12  summary page and it's taken from a very detailed

13  discounted cash flow analysis and underwriting

14  model -- would show that between the base price and

15  the net price a Delta.  The details of that Delta

16  would be in the embedded model, but it's easy to

17  assume here that the difference between the 358,000

18  and the 373,000 would come from two categories.

19  It's easy for me to assume because I'm familiar

20  with this matrix.  Those two categories would be

21  lot premiums -- such as if a lot was on a corner or

22  on a cul-de-sac or backed to open space, and/or it

23  would constitute additional options that a buyer

24  may purchase above and beyond what the builder

13

1  would put in his base spec level of the house.  The

2  net per square foot price would be $373,079 divided

3  by the average house size.  Actually, I misspoke.

4  The premium and option percentages are right there

5  to get to $373,000, I'm sorry.

6  Q.   I see that.

7  A.   The direction construction cost, it would

8  be our assumption for what it would cost that

9  builder for the sticks and bricks component of that

10  2,886 square feet, and then we assign a soft cost

11  allowance for everything else other than the hard

12  cost or the bricks and sticks, and then we assign a

13  typical builder margin to arrive at what's called a

14  finished lot value.  However, that finished lot

15  value is not what a developer can expect to receive

16  from a builder because there are significant

17  deducts to that finished lot value that still need

18  to be taken into consideration before we arrive at

19  what we call a residual or contract lot price.

20  Q.   To perform this analysis, you're relying

21  on historical data?

22  A.   Historical data would be one component of

23  this analysis.

24  Q.   So you could not look into the future

14

1  because you don't have data from the future at that

2  point in time, correct?

3  A.   While it is a truism that we don't have

4  data from the future, we certainly look into the

5  future and make projections.

6  Q.   Now in terms of the Kimball Hill

7  properties, it appeared to me that you placed great

8  significance on the existence of surety bonds being

9  in place as part of your analysis of whether or not

10  to buy the property; is that correct?

11  A.   It was a component of our analysis, yes.

12  Q.   Was it an important component?

13  A.   Yes.

14  Q.   Absent the bonds, would you have gone

15  through with the deal?

16  A.   That question I think needs more

17  specificity, sir.

18  Q.   In what respect?

19  A.   Because we did at the time buy projects

20  where we were required to assume bonds.  When

21  presented with those types of projects, we priced

22  assuming those bonds into our discounted cash flow

23  in order to make the offer.

24  Q.   In this case, you did some due diligence

15

1  as you testified, correct?

2  A.   Yes, sir.

3  Q.   And as part of that due diligence, did

4  you examine the bonds in place on all of the

5  developments in the subdivisions you were looking

6  to purchase in the Kimball Hill portfolio in

7  Chicago?

8  A.   Sir, I don't know what you mean by

9  examine.

10  Q.   Did you physically look at the bonds to

11  see what the terms and conditions of each bond was?

12  A.   Personally, I did not, but we had a legal

13  team that was tasked with doing so.

14  Q.   Do you know if that was done?

15  A.   I'm quite confident it was done.  It was

16  routinely done in all of our deals.

17  Q.   Did your legal team report back to you as

18  to what they found in the bonds?

19  A.   They reported back to our investment

20  committee what they found.

21  Q.   But if I showed you the bonds today, you

22  wouldn't recognize them because you've never seen

23  them; correct?

24  A.   The actual physical paper?

16



1    Q.   Correct.
2    A.   I have not examined them personally, no.
3    Q.   Did you understand that these communities
4  were governed by Annexation Agreements?
5    A.   I understood some of them to be, yes.
6    Q.   Did you know that all of them were when
7  you were doing your due diligence?
8    A.   Upon recollection, it could be all of
9  them. It could be some of them. I'm not sure what
10 the relevance is.
11   Q.   I think the Court will make that decision,
12 Mr. Teteak. Did you examine any of the Annexation
13 Agreements?
14   A.   Our Director of Development and his team
15 would have examined the Annexation Agreements, and
16 our legal team would have examined the Annexation
17 Agreements as a matter of routine, yes.
18   Q.   Did you physically examine them?
19   A.   I did not physically examine them. That
20 was not my role. As part of the team, that was not
21 my personal role.
22   Q.   Did you understand that the Annexation
23 Agreements had provisions in them that imposed
24 liability on subsequent purchasers?

                                                    17

1    A.   On the legal side, no.
2    Q.   Were you familiar with the document
3  itself?
4    A.   I was familiar with the process. I did
5  not negotiate the document.
6    Q.   I've put a book in front of you called
7  Fidelity & Deposit Exhibit Books 1 and 2. I'm
8  going to refer to F & D Trial Exhibit No. 13.
9    THE COURT: Tell me again the number, please.
10   MR. RIORDAN: 13, Judge.
11 BY MR. RIORDAN:
12   Q.   Have you had a chance to examine it -- or
13 review it, I'm sorry?
14   A.   I have had a chance to turn to the
15 exhibit, and I could see that it is the Purchase
16 and Sale Agreement.
17   Q.   You recognize it as that document,
18 correct?
19   A.   I do not recognize it, but I trust that it
20 is that document.
21   Q.   If you look at the second page, 15, which
22 has TRG 53.
23   MR. RIORDAN: My page is obscured there, Judge.
24 That's why I'm using the TRG designation.

                                                    19

1    MR. TURIELLO: Object to foundation.
2    MR. RIORDAN: It's cross-examination. I'm
3  asking if he understood that. He told me that his
4  legal team reported to him. He told me that people
5  reported to him on what they were finding in the
6  due diligence period.
7    THE COURT: Fair enough.
8    THE WITNESS: For clarification, I hope I
9  didn't say that the legal team was reporting to me.
10   MR. RIORDAN: I believe you said reported to
11 the Investment Committee of which you were on.
12   THE WITNESS: Correct, as well as our general
13 counsel. I could answer your question this way,
14 sir. Those questions were asked and answered.
15 There were 200 years of experience on that
16 Investment Committee. We got very comfortable with
17 the answer.
18 BY MR. RIORDAN:
19   Q.   After receiving that answer, you elected
20 to continue to proceed with the deal; correct?
21   A.   Yes.
22   Q.   Were you involved with the negotiation of
23 the Purchase and Sale Agreement for the
24 communities?

                                                    18

1    THE WITNESS: Yes.
2  BY MR. RIORDAN:
3    Q.   Do you recognize the signature there for
4  JNI, Inc.?
5    A.   I do.
6    Q.   Who is that?
7    A.   That is a gentleman by the name of
8  Mr. Bruce Cook, who was our general counsel, who
9  was the gentleman I was referring to as a member of
10 our Investment Committee.
11   Q.   JNI, Inc. is an affiliate of SunCal?
12   A.   It is one of the many LLCs that the
13 principals of SunCal would be principals in.
14   Q.   It's fair to say that JNI is a SunCal
15 company?
16   A.   There are members of JNI that I would also
17 classify as owners of SunCal.
18   Q.   Mr. Bruce Cook was general counsel for
19 both JNI and SunCal?
20   A.   Yes.
21   Q.   Did you have any position with JNI at the
22 time this document was signed?
23   A.   To clarify, SunCal in and of itself
24 doesn't own anything. Each of these deals -- as

                                                    20

1    I'm sure you're aware -- are put into separate
2    limited liability companies.  Each of those limited
3    liability companies would have its own members.
4         To answer your question, SunCal is a group
5    of 40 or 50 separate LLCs, each that have their own
6    members.  To the best of my knowledge, Bruce Cook
7    is the general counsel for all of them.
8         Q.   If we go back to Page 3 of the document,
9    you'll see a listing of communities there.
10        A.   Yes.
11        Q.   Are those the nine communities which were
12   part of the original Purchase and Sale Agreement?
13        A.   I would assume so, sir.
14        Q.   Okay.  And eventually Cherry Ridge and
15   Mayfair were eliminated from the deal.  Is that
16   your understanding?
17        A.   I know that they weren't part of the deal
18   post-closing.  How they were eliminated, I do not
19   recall.
20        Q.   I think you indicated that one of the
21   reasons that SunCal pursued this deal was because
22   it would not be required to obtain replacement
23   bonds, is that right?
24        A.   I don't think I said it exactly like that.

                                              21

1    I said -- if I didn't say it this way let me
2    clarify -- that we had had success in buying the
3    Kimball project in Las Vegas.  When we learned of
4    the Kimball project in Chicago, we were eager to
5    underwrite it.  For the sake of clarification, if
6    we were told that we would have to replace the
7    bonds, we would have underwritten the replacement
8    of those bonds.  Once we ascertained that we did
9    not have to replace the bonds, we did not
10   underwrite.  So whether or not the bonds were on
11   the property is a different question than whether
12   or not we underwrote whether or not we were going
13   to have to assume them.
14        Q.   How did you ascertain that you did not
15   have to replace the bonds?
16        A.   Again, I believe I answered that.  We had
17   a legal team do that due diligence.  It was a legal
18   team that was very knowledgeable on bonds.  We were
19   going through hundreds of millions of dollars of
20   bond negotiations for our own bonds, so I'm quite
21   confident that that legal team knew what questions
22   to ask in order to satisfy themselves with the
23   appropriate answers to bring back to the Investment
24   Committee.

                                              22

1         Q.   Do you know if any member of the legal
2    team talked with anyone at Fidelity & Deposit
3    Company of Maryland?
4         A.   As I sit here today, I would not be able
5    to answer who our legal team spoke to at any time.
6         Q.   So the answer is, no, you don't know?
7         A.   Correct.
8         Q.   Do you know if your legal team talked to
9    anyone at Arch Insurance Company?
10        A.   Sir, my answer is going to be the same for
11   all of these questions.  I do not know who our
12   legal team spoke to.
13        Q.   Is that something you would expect your
14   legal team to do -- consult with the surety
15   companies?
16        A.   I would expect my legal team to dot the
17   I's and cross their T's on whatever diligence they
18   deemed necessary in order to report back to the
19   Investment Committee to answer the question we
20   would pose.
21        Q.   Are you aware that in the Purchase and
22   Sale Agreement the seller was telling the buyer
23   that it was making no representations as to the
24   bonds?

                                              23

1         MR. TURIELLO:  Object on form, foundation,
2    misstates the evidence.
3         THE COURT:  Response?
4         MR. RIORDAN:  Judge, it's a generic question.
5    I'm asking if he was aware that there was such a
6    provision in the Agreement.  I'm just asking what
7    he was aware of.
8         THE COURT:  It presumes that the version as you
9    described it is in fact in the Agreement.  That is
10   the basis of the objection.  If you can make it
11   clear what you're presuming, what you're
12   representing to him as fact, I'll let you ask the
13   question.  Rephrase that.
14   BY MR. RIORDAN:
15        Q.   I'll direct your attention to Page 11 of
16   the Agreement.  There's a Section G at the bottom.
17        A.   I'm on Page 11.
18        Q.   Have you found Section G?
19        A.   Yes.
20        Q.   Have you seen that before today?
21        A.   I do not recall.
22        Q.   And about five lines from the bottom,
23   the wording starts as follows:  Purchaser hereby
24   acknowledges that seller makes no representation or

                                              24

1 warranty whatsoever, express or implied, with
2 respect to the bonds including but not limited to
3 whether or not the bonds will remain in place after
4 the closing, be improved and secured thereby, the
5 enforceability of the bonds by the issuers thereof,
6 the defenses, if any, or lack thereof, available to
7 the issuers of the bonds for the performance
8 thereof by such issuers, the financial status of
9 such issuers -- and going on to the next page -- of
10 the bonds or the adequacy of the bonds to secure
11 the improvements and maintenance of the
12 improvements covered thereby.
13      Did I read that correctly?
14   A.   I didn't follow you word for word, but
15 I'll assume you did.
16   Q.   Thank you. Were you aware that the
17 Purchase and Sale Agreements were modified on two
18 separate occasions -- this Purchase and Sale
19 Agreement was modified on two separate occasions?
20   A.   I do not recall.
21   Q.   Can you turn to Exhibit 14. Do you have
22 that in front of you, sir?
23   A.   I do.
24   Q.   I'm going to ask you to look at the third

25

1 page of the exhibit again. I ask you if you can
2 identify the signature for JNI, LLC?
3   A.   It is again Mr. Bruce Cook, our general
4 counsel.
5   Q.   Did you understand that this Agreement was
6 signed in order to extend the due diligence period?
7   A.   This is the first time I'm seeing this
8 Agreement. However, I'm aware that the due
9 diligence expired in early 2010, and we didn't
10 close until April of 2010, so I imagine there would
11 be a corresponding document to extend that due
12 diligence period once money was released.
13   Q.   If you turn to Exhibit 15, have you seen
14 this document before today?
15   A.   No.
16   Q.   If you look on Page 6 of the exhibit,
17 which is TRG 109, I believe, do you see Bruce
18 Cook's signature there again?
19   A.   I do.
20   Q.   If you turn to Paragraph 8, do you see the
21 heading there says waiver of due diligence
22 contingency?
23   A.   Are you on the same --
24   Q.   No, Page 3. I'm sorry, Paragraph 8, which

26

1 is TRG 106.
2   A.   I'm there.
3   Q.   There's a paragraph that refers to waiver
4 of due diligence contingency?
5   A.   Yes.
6   Q.   I believe you said that when you bought
7 the property --
8   A.   Are we done with that?
9   Q.   Yeah, we're done with that. I'm sorry,
10 sir. Thank you. I believe your testimony was when
11 you bought the property you did not anticipate any
12 litigation by any of the sureties against the
13 purchaser, is that correct?
14   A.   Correct.
15   Q.   Did you anticipate any litigation by the
16 municipalities against the sureties?
17   A.   Did I anticipate litigation, no. Did we
18 anticipate discussions, that's the normal course of
19 business in working on any project to have ongoing
20 discussions with those municipalities.
21   Q.   But you didn't anticipate that the
22 municipalities would be in litigation with the
23 surety companies?
24   A.   We had no reason to believe that Fidelity

27

1 was not going to honor their bonds, sir.
2   Q.   You mean, honor the bonds in the terms and
3 conditions of each separate bond; don't you?
4   A.   I suppose I would have to mean that.
5   Q.   You don't mean write a check regardless of
6 whether they have defenses or not, do you?
7   A.   You'd have to rephrase that question.
8   Q.   You didn't look at these bonds as letters
9 of credit, did you?
10   A.   Sir, I am not an attorney. I did not know
11 what defenses you had or didn't have on these
12 bonds. We had a very competent legal team examine
13 these bonds, and we got comfortable that due to the
14 language in the Purchase and Sale Agreement and due
15 to our diligence, that it was not a cost that we
16 needed to underwrite on whether or not Fidelity was
17 going to honor their bonds.
18   Q.   And eventually I think you said the surety
19 settled with the towns, correct?
20   A.   That's my understanding.
21   Q.   Did you understand as a result of those
22 settlements, the towns released the bonds?
23   A.   Can you ask the question again, sir?
24   Q.   Did you understand that as a result of

28

1    those settlements, the towns released the bonds?
2       A.   I would imagine.  I'm aware in certain
3    instances that bonds have been released.  As I sit
4    here today, I cannot tell you that I know all the
5    specifics of the release, but I would imagine that
6    once the City is satisfied that they have the
7    amount of money needed to fulfill the bonded
8    improvements or the work that needs to be done,
9    that that could happen.
10      Q.   You don't quarrel with the surety
11   companies submitting their dispute to a Court of
12   Law to determine exactly what their bonded
13   obligations were, do you?
14      A.   I think that question is best asked and
15   answered to an attorney.
16      Q.   Why is that?
17      A.   Because if any of my investors asked me
18   that question, the first person I would call is an
19   attorney.
20      Q.   You would have to call an attorney to
21   determine whether a surety company or any other
22   person is entitled to submit their disputes to a
23   Court of Law?
24      A.   Sir, I'm sure anyone could sue anyone for
                                                        29

1    anything, but whether it's appropriate is a matter
2    for counsel.
3       Q.   That's a matter really ultimately for the
4    Court to decide, isn't it?
5       A.   If it got to that, yes.
6       Q.   Did you anticipate that Yorkville would
7    wait until 2014 before suing F & D in Yorkville
8    when you underwrote the deal?
9       A.   I certainly didn't anticipate any of this,
10   or we didn't anticipate any of this.  I would
11   imagine all of this is a result of the city's not
12   getting the money from Fidelity for the bonded
13   improvements.
14      Q.   You're aware, are you not, that the City
15   of Elgin sued TRG?
16      A.   I have heard that, yes.
17      Q.   Did that litigation taint these properties
18   in Elgin?
19      A.   Sir, any litigation will taint a property.
20      Q.   Did you know that Yorkville sued Yorkville
21   sued TRG?
22      A.   I'm vaguely aware of that, yes.
23      Q.   Are you aware that that case is still
24   ongoing?
                                                        30

1       A.   I do not know the specifics of that case.
2       Q.   Are you aware that in that case F & D does
3    not have a claim against TRG?
4       MR. TURIELLO:  Misstates the record,
5    foundation.
6       THE COURT:  Counsel?
7       MR. RIORDAN:  I'm just asking if he's aware
8    whether or not F & D has a claim against TRG in the
9    Yorkville case.
10      THE COURT:  That seems okay to me.  Go ahead.
11      THE WITNESS:  I'm not aware of the specifics on
12   which municipalities still have outstanding
13   litigation with Fidelity, no.
14   BY MR. RIORDAN:
15      Q.   Or with TRG?
16      A.   My belief is that TRG would have no
17   litigation with any City but for Fidelity not
18   honoring their bonds.
19      Q.   You're aware that F & D has honored its
20   bonds in Yorkville by settling it, is that correct?
21      MR. TURIELLO:  Objection, form -- honoring
22   bonds.
23      MR. RIORDAN:  That's the words he used, Judge.
24   They used the words honoring bonds.
                                                        31

1       MR. TURIELLO:  Misstates the nature of the
2    settlement.
3       THE COURT:  I'd have to have it read back in
4    order to see if those were his exact words.  If
5    I'm hearing the objection correctly, it's not the
6    objection to the honoring of the bonds.  It's the
7    honoring of the bonds by settlement, it's the
8    connection of the two that he's finding
9    objectionable.  Is there a way for you to
10   rephrase around this?
11      MR. RIORDAN:  Let me try, Judge.
12   BY MR. RIORDAN:
13      Q.   F & D settled with Yorkville, correct?
14      A.   I'll take your word on that, sir.
15      Q.   And you're aware that F & D paid money to
16   Yorkville because of that settlement?
17      A.   I would imagine so, yes.
18      Q.   And following that settlement, Yorkville
19   continued to sue TRG, isn't that correct?
20      A.   If that's a fact, then I'll accept it as
21   so.
22      Q.   And you're aware that the bonds at
23   Yorkville contained limitation provisions in them
24   within which Yorkville had to sue within a certain
                                                        32

1  period of time or lose its bond rates, are you not?
2      MR. TURIELLO:  Objection, foundation.
3      THE COURT:  I'm going to have you go forward.
4      MR. RIORDAN:  Thank you, Judge.
5      THE WITNESS:  I'm not aware of the specific
6  language in the Yorkville bonds.  The specifics of
7  the Yorkville bonds would have been left to our
8  legal team.
9  BY MR. RIORDAN:
10     Q.  But you surely know that the settlement of
11 a claim is the resolution of a dispute, correct?
12     A.  That makes sense.
13     Q.  It's a compromise?
14     A.  Is that a question?
15     Q.  Yes.
16     A.  I would imagine that after a long and
17 tiring process in trying to get money out of
18 Fidelity, that the City eventually compromised and
19 they probably compromised an amount less than they
20 were asking for.
21     Q.  That long and tiring process is continuing
22 against TRG, isn't it?
23     A.  I imagine if it is continuing against TRG,
24 it is probably a direct result of Fidelity's

33

1  actions.
2      Q.  You don't know that.  You're just
3  imagining it, isn't that right?
4      A.  I'm connecting the dots as best that I can
5  here.  I see no reason why a city would need to sue
6  a developer under bonds unless the guarantor of
7  those bonds did not pay on those bonds.
8      Q.  What do you mean by City suing under a
9  bond?
10     A.  I'll try to be more specific.  There were
11 improvements that were bonded for.  Kimball Hill
12 was the creditor.  Fidelity guaranteed Kimball's
13 performance for those bonded improvements.  I would
14 imagine that if the City -- any city in this
15 case -- received the entire bonded amount, that
16 they would have absolutely no reason to sue a
17 developer or any follow on purchaser of those lots,
18 because they would have been satisfied with an
19 appropriate amount of money to complete the bonded
20 improvements.
21     Q.  That assumes -- doesn't it, sir -- that
22 the amount of the bond is adequate to pay for all
23 the improvements?
24     A.  I imagine that when the bond amounts were

34

1  put in place, that they were put in place with the
2  assistance of professional engineers who estimated
3  the cost of those bonded improvements and that was
4  how they calculated the resulting bond amount.
5      MR. RIORDAN:  Move to strike, Judge,
6  nonresponsive.  Calls for a yes or no answer.
7      THE COURT:  Strike the answer.  You can ask it
8  again.
9      MR. RIORDAN:  Would you read the question back.
10            (Record read as requested.)
11     MR. RIORDAN:  It calls for a yes or no answer,
12 sir.
13     THE WITNESS:  Yes.
14 BY MR. RIORDAN:
15     Q.  If the amount of the bond had been reduced
16 over time and was inadequate and if the surety paid
17 that amount, there would be some improvements that
18 would still need to be completed; correct?
19     A.  I could follow that logic.
20     Q.  Who would pay for that?
21     A.  Circumstance to circumstance I'm sure
22 would be different.
23     Q.  And if there was an Annexation Agreement
24 with the property imposing liability on a

35

1  subsequent purchaser, that would be a factor;
2  wouldn't it?
3      A.  Sir, you're asking me hypothetical
4  questions.
5      THE COURT:  I failed to instruct you as to
6  this.  When a counsel objects, you should stop.
7      MR. TURIELLO:  I object on foundation,
8  incomplete hypothetical.
9      MR. RIORDAN:  I think it's a specific
10 hypothetical given the questions I've asked.
11     MR. TURIELLO:  Foundation as to lack of
12 adequate bonds.  Despite that the bonds weren't
13 adequate, it's just that Fidelity didn't pay on it.
14     MR. RIORDAN:  That's not true.
15     THE COURT:  Stop, because I'm about to rule in
16 the favor.  Once you made the sale, you should stop
17 selling.  The fact is when we were having issues
18 like this on a previous witness with hypotheticals,
19 I allowed some leeway to pose hypotheticals and get
20 responses even though they were beyond fact witness
21 hypotheticals.  I'm going to let you do it as well
22 because as it was pointed out by your counter-party
23 it was in the nature of cross to allow.
24     THE WITNESS:  I'm sure that our legal team

36

1   would first need to address whether that liability
2   was indeed appropriate.  Secondly, none of this
3   with the City is ever done in a vacuum.  It is not
4   a stretch to assume that if Fidelity did settle
5   with a municipality for a certain bond amount that
6   there would be certain small items remaining that
7   would otherwise have constituted bonded
8   improvements.  We would be able to take those
9   additional costs, sit down with the City, and
10   negotiate with the City how those additional costs
11   could get paid.  The City would have some
12   negotiating tools in that regard in the sense that
13   each time a building permit is pulled the City
14   collects impact fees.  So if there was a gap so to
15   speak in the amount that Fidelity settled for in
16   the ultimate cost to complete the bond and
17   improvements say, for example, a street tree, we
18   could agree with the City to account for the cost
19   of that street tree.  In exchange, the City may
20   agree to lower their impact fees by the cost of
21   that street tree thereby making it a zero sum game.
22       MR. RIORDAN:  I'll move to strike, Judge,
23   non-responsive.
24       THE COURT:  To the extent you can answer a

37

1   question that is asked in an objective manner, yes
2   or no, do you agree or don't you agree, you're
3   required to do so.  If you can't, then state that
4   you can't and that way we'll start from that
5   understanding and we'll see where we can go from
6   there.  Simply going on with an exposition with
7   response to an objective question --
8       THE WITNESS:  Your Honor, it's hard for me to
9   answer a hypothetical question without a
10   hypothetical answer.
11       THE COURT:  Right.  Again, if you feel that you
12   can't answer the question as posed, you ask for
13   clarification or you ask the Court to assist you.
14   What you're doing is essentially not responding to
15   the objective question.  Respond on an objective
16   level first, then I may permit you to go on.
17       THE WITNESS:  Yes.
18       THE COURT:  The answer is stricken.
19       MR. RIORDAN:  Could you read the question back.
20           (Record read as requested.)
21       THE WITNESS:  It would be something we would
22   have to deal with, yes.
23   BY MR. RIORDAN:
24       Q.  Would it surprise you to learn that the

38

1   City of Yorkville estimates the cost to complete
2   the improvements in Whispering Meadows to be around
3   $2.7 million?
4       A.  I would have to consult the development
5   budgets.
6       Q.  Do you understand that F & D paid $800,000
7   to the City?
8       A.  I do not.
9       THE REPORTER:  I'm sorry, your Honor.  Did he
10   answer I do not or I do now?
11       THE WITNESS:  I answered I do not, but I do
12   now.
13   BY MR. RUFF:
14       Q.  Okay.  Touché.  If that gap existed, those
15   wouldn't be small items, would they -- the gap
16   between $800,000 and $2.7 million?
17       A.  I would think that's one-point-nine-nine,
18   sir.
19       Q.  Those wouldn't consist of small items in
20   your experience?
21       A.  Sir, $1.9 million is not an insignificant
22   amount of money, but you would have to give me the
23   context in order for me to answer that question
24   more specifically.

39

1       Q.  You understood that the litigation
2   instituted by F & D against TRG was for money
3   damages?
4       A.  I'm not a party to that litigation, and
5   I'm not here to testify on the specifics of that
6   litigation.
7       Q.  You just know it exists?
8       A.  I know it exists.
9       Q.  You don't know the specifics of it?
10       A.  Correct.
11       Q.  You don't know whether F & D is seeking
12   only money or whether there's a mechanics' lien
13   filed against the property.  You have no knowledge
14   of that?
15       A.  I have a general knowledge but not a
16   specific knowledge.
17       Q.  What is that general knowledge?
18       A.  That TRG is and has been fighting in both
19   State Court and in this Court to clear these lots
20   and the cloud that is on these lots to allow these
21   lots to be marketable lots to the public building
22   community.
23       Q.  The clearing you're talking about is
24   ending the litigation, correct?

40

1    A.    Yes.
2    Q.    You're not talking about who's right or
3    who's wrong in the litigation, are you?
4    A.    I'm not sure I understand that question.
5    Q.    You're not saying that it's only the
6    ending of the litigation, not what the claims of
7    defenses are in the litigation; correct?
8    A.    Are you asking me does it matter who
9    prevails in the litigation?
10    Q.    No, I'm asking you if it's just the ending
11    of the litigation itself, not what the specific
12    claims and defenses are in the litigation that you
13    saw causes the cloud or the tainting of the
14    properties?
15    THE WITNESS:    Is this a yes or no question,
16    your Honor?
17    THE COURT:    I'm having a little trouble with
18    the question myself, Counsel.
19    MR. RIORDAN:    All right.
20    BY MR. RIORDAN:
21    Q.    Is it the existence of the litigation
22    that causes the tainting of the property that you
23    testified to earlier?
24    A.    It is going on seven years of litigation

41

1    that has tainted this property, yes, or these
2    properties.
3    Q.    So it's the existence of the case that
4    taints the property?
5    A.    Is that a different question?  I'm not
6    sure I'm following, sir.
7    Q.    Why aren't you following?
8    A.    Because you just asked me if I thought the
9    litigation was a problem, and I said yes.
10    Q.    That's fine.
11    A.    In my experience, seven years of
12    litigation is the problem.
13    Q.    You had a prefatory statement before you
14    got to the answer.  I just wanted to make sure of
15    your answer.  Thank you.
16          You indicated that escrows and indemnity
17    obligations were set up in these transactions
18    involving CalAtlantic and TRG?
19    A.    Yes.
20    Q.    The purpose of that was to protect the
21    subsequent purchaser in the event that F & D is
22    right in its claim against TRG, correct?
23    THE WITNESS:    This is not a yes or no answer,
24    your Honor.  Is that okay?

42

1    THE COURT:    I think you can give us a little
2    bit of detail here.
3    THE WITNESS:    I think that a large component
4    is protecting the subsequent purchaser from an
5    extended long drawnout legal battle with F & D at a
6    minimum.  At a maximum, it would be to protect that
7    builder from both the long and drawnout legal
8    battle with Fidelity and the exposure under the
9    settled bond.
10    BY MR. RIORDAN:
11    Q.    So if F & D wins the litigation against
12    TRG, the amount deposited in the escrow would be
13    there as security to pay F & D?
14    A.    I do not believe F & D is the beneficiary
15    of that escrow, no.
16    Q.    Who is?
17    A.    It's an amount of money put in escrow to
18    satisfy the potential purchaser that they will not
19    incur that liability.
20    MR. RIORDAN:    Since we've probably gone a
21    little over an hour --
22    THE COURT:    We have.  I was about to ask you
23    that.
24    MR. RIORDAN:    I'd like to look at my notes over

43

1    a small break.
2    THE COURT:    We'll take a short break.  The
3    witness remains under oath.  He will remain on the
4    stand.  You can't consult regarding your testimony
5    while on the break.
6          (A short break was taken.)
7    THE COURT:    All right, let's call the matter
8    back on the record.
9    THE DEPUTY:    Calling Kimball Hill, Inc.
10    THE COURT:    I'll remind the witness you remain
11    under oath.  Mr. Riordan?
12    MR. RIORDAN:    Thank you, Judge.
13          CONTINUED CROSS-EXAMINATION
14    BY MR. RIORDAN:
15    Q.    Mr. Teteak, are you aware that there's
16    six different lawsuits filed by the municipalities
17    against F & D and other sureties in Illinois
18    relating to the Kimball Hill property?
19    A.    In the State Court?
20    Q.    Yes.
21    A.    I'm aware that there are some State Court
22    actions.  I'm not an expert on the status of each
23    of those.
24    Q.    Were you aware that in the suit filed by

44

1  Montgomery that F & D's claim against TRG was
2  dismissed in June of 2012?
3      A.   Could you repeat the question.
4      MR. RIORDAN:  Would you read it back, please.
5              (Record read as requested.)
6      THE WITNESS:  I don't recall.
7  BY MR. RIORDAN:
8      Q.   Were you aware that F & D's claim against
9  TRG in the Sugar Grove litigation was dismissed on
10 June 12, 2012?
11     A.   I don't recall.
12     Q.   Were you aware that F & D's claim against
13 TRG was dismissed in the Elgin case on May 29,
14 2014?
15     A.   I don't recall.
16     Q.   Were you aware that F & D's claim against
17 TRG was dismissed in the Yorkville litigation on
18 Units 1 and 2 on June 27, 2013?
19     A.   I don't recall.
20     Q.   Were you aware that in the Yorkville
21 litigation relating to Unit 4, that F & D's claim
22 against TRG was dismissed on April 28, 2015?
23     A.   I don't recall.
24     Q.   Were you aware that the Village of

45

1  Shorewood made a claim against TRG because it was
2  a subsequent purchaser and was responsible for the
3  public improvements?
4      THE WITNESS:  Your Honor, can I answer this
5  without a yes or no?
6      THE COURT:  That's fine.  You've been doing
7  very good, but if you can answer yes or no.  Give
8  it a go.
9      THE WITNESS:  You're asking me specifics on
10 dates and times and cities and municipalities.
11 I would have to tell you that I'm unaware of the
12 specific dates and the specific timing of the
13 municipalities and the litigation.  So when you ask
14 me if I'm aware and you put a date to it, I'm going
15 to answer each of them with I don't recall the
16 specifics of the dates of each.
17 BY MR. RIORDAN:
18     Q.   That wasn't my question.  My question was
19 whether you were aware that Shorewood had made a
20 claim against TRG as subsequent purchaser that it
21 was responsible for the public improvements?
22     A.   I'm aware that there is a claim.
23     Q.   Did that claim taint the property in
24 Shorewood?

46

1      A.   As a seller of lots -- this is not a yes
2  or no answer -- but as a seller of lots, it is much
3  easier for us to deal with municipalities because
4  that is standard operating procedure for us to get
5  a deal done than it is to try to put a box around
6  exposure from pending litigation outside a
7  municipality.
8      MR. RIORDAN:  I'm going to strike that as being
9  nonresponsive, your Honor.
10     THE COURT:  I think you could have answered
11 that one yes or no or at least objectively.  Can
12 we get the question read back so that I can hear it
13 again, please.
14              (Record read as requested.)
15     THE COURT:  Sir, I think that you raised the
16 concept of tainting the property.  You should be
17 able to answer this one yes or no.
18     THE WITNESS:  Yes.
19 BY MR. RIORDAN:
20     Q.   Are you aware that TRG has not settled
21 Elgin's claim as of today's date?
22     A.   I'm aware that TRG is in constant dialogue
23 with Elgin, and I believe that dialogue is very
24 positive.

47

1      MR. RIORDAN:  I move to strike, your Honor.
2      THE COURT:  I'll strike the answer.  You can
3  answer yes or no.  Just a reminder to the witness,
4  there will be an opportunity for redirect where
5  counsel for TRG will ask you questions and you'll
6  be able to expand further.
7      THE WITNESS:  I don't know what stage those
8  conversations are.
9      MR. MOLDOFF:  Your Honor, if I may object.
10 It misstates the record and stipulated facts.
11 Claims by Elgin were dismissed and not appealed.
12 The case by Fidelity remains pending against TRG.
13 Misstates the record.  Assumes facts not in
14 evidence.
15     MR. RIORDAN:  The claim was dismissed without
16 prejudice, not with prejudice.  That's why the
17 claim remains alive.
18     THE COURT:  Counsel you seem to have a
19 difference of opinion.
20     MR. TURIELLO:  It misstates the status of
21 that litigation.  The claims by Elgin were
22 dismissed.  They had an opportunity to appeal.
23 They did not appeal.  F & D did appeal.  The
24 matter was remanded.  It's now been stayed by your

48

```
1   Honor.  Counsel has been ordered to stay that.
2   There is no claim pending by Elgin.  There is a
3   claim pending by Fidelity that they have yet to
4   dismiss in the Elgin matter.  It just misstates
5   stipulated facts on the record.
6       THE COURT:  I understand.  Counsel, it seems
7   that you're treading a line that's going to be very
8   hard for me to police.  If you could try to
9   rephrase this in a way that doesn't tread the
10  line so narrowly, I'd appreciate it.
11  BY MR. RIORDAN:
12      Q.  Do you know if a Settlement Agreement
13  exists between the City of Elgin and TRG regarding
14  Elgin's claim in the lawsuit by Elgin against TRG?
15      A.  I do not.
16      Q.  With respect to your agreement with
17  TRG, you said it was a verbal agreement; correct?
18      A.  I'm helping Mr. Kyte with builder
19  discussions and some underwriting with no agreement
20  in place.
21      Q.  So just voluntary?  You have no promise of
22  any kind to receive any compensation for your work
23  either now or in the future?
24      A.  I have no verbal or written agreement with
                                                    49
```

```
1   Mr. Kyte to receive compensation for this work.
2       Q.  Do you have an expectation of receiving
3   compensation for your work?
4       A.  My expectation would be dictated and
5   predicated upon whether or not Mr. Kyte ultimately
6   ended up making any money with this transaction.
7       Q.  So your compensation would be contingent
8   upon your ability to have TRG make money on the
9   Kimball Hill properties?
10      A.  I'm helping Mr. Kyte voluntarily -- if
11  that answers your question -- because I was a part
12  of putting TRG into this investment.  I am not one
13  to sit on the sidelines and watch unfairness or an
14  injustice happen.  I will happily help TRG as much
15  as I can time-permitting to dispose of the
16  remaining lots and put this project behind TRG.
17      Q.  Part of that voluntary effort is your
18  presence here in court today, is that correct?
19      A.  Yes.
20      Q.  I understand you were involved with the
21  CalAtlantic transactions between TRG and
22  CalAtlantic in the Village of Shorewood and the
23  Village of Montgomery?
24      A.  I was not involved.
                                                    50
```

```
1       Q.  Are you aware of those transactions?
2       A.  I'm aware now of those transactions.
3       Q.  And you're aware that TRG entered into a
4   contract with CalAtlantic to sell 51 lots in
5   Shorewood and two takedowns?
6       A.  Yes.
7       Q.  The first takedown was at $50,000 per lot,
8   and the second one at $52,000 per lot?
9       A.  Yes.
10      Q.  You're aware that TRG entered into an
11  agreement with CalAtlantic for one takedown of
12  47 lots in the Village of Montgomery?
13      A.  Yes.
14      Q.  And the per lot purchase price is $49,500?
15      A.  I believe it's lower than that, sir.
16      Q.  You would agree that the price that's
17  reflected in the contract would be the price,
18  correct?
19      A.  I don't believe that those lots are at
20  $49,000, no, sir.
21      Q.  But the best place to find that out would
22  be in the contract itself, isn't that right?
23      A.  The best place would be to -- initially,
24  yes, unless there was any amendments to that
                                                    51
```

```
1   contract.
2       Q.  That would be all part of the contract --
3   the amendments?
4       A.  Sure.
5       Q.  Are you assisting TRG with selling its
6   lots in Settlers Ridge?
7       A.  I am part of that team, yes.
8       Q.  Are you assisting TRG in selling its lots
9   in Waterford?
10      A.  Yes.
11      Q.  Are you assisting TRG in selling its lots
12  in Legend Lakes?
13      A.  Yes.
14      Q.  Are you assisting TRG in selling its lots
15  in Ingham Park?
16      A.  No.
17      Q.  Does TRG still own lots in Ingham Park?
18      A.  I don't believe so.
19      Q.  Do you know when those lots were sold?
20      A.  My recollection is there was only six of
21  those, is that correct?
22      Q.  Now you got me there.  I don't know.  It
23  doesn't matter the number.
24      A.  I believe those six lots were sold early
                                                    52
```

1   on.

2        Q.   Are you aware of any litigation over the

3   Legend Lakes property?

4        A.   I'm not.

5        Q.   Legend Lakes would not be tainted by

6   litigation like the other ones you say are?

7        A.   That's correct.

8        Q.   As we saw, Legend Lakes was part of the

9   original Kimball Hill purchase by TRG back in 2010;

10  right?

11       A.   Yes, sir.

12       MR. RIORDAN:  That's all I have.  Thank you,

13  your Honor.

14       THE COURT:  Thank you.  Counsel?

15       MR. TURIELLO:  Thank you, your Honor.

16                REDIRECT EXAMINATION

17  BY MR. TURIELLO:

18       Q.   Good afternoon, again.

19       A.   Good afternoon.

20       Q.   Let's start with the litigation that

21  counsel asked you about.  Counsel asked you if you

22  were aware that, for example, the Montgomery

23  suits -- let me just get the dates -- whether you

24  were aware that Montgomery had been dismissed in

                                              53

1   2012.  Do you recall that question?

2        A.   I do.

3        Q.   And when this came about, was it your

4   understanding TRG defended and was obtaining

5   dismissals in those actions?

6        A.   Yes.

7        Q.   It was your understanding that those

8   actions continued to be pending until an appeal

9   period started?

10       A.   Yes.

11       MR. RIORDAN:  Objection, leading questions.

12       THE COURT:  I'm sorry, I couldn't hear you.

13       MR. RIORDAN:  Objection, leading.

14       MR. TURIELLO:  I said was it your

15  understanding.

16       THE COURT:  It is on the borderline.  The

17  problem is you take a leading question and you put

18  a qualifier on it that arguably makes it less

19  leading.  You're still feeding the answer to the

20  party.  Please rephrase.

21  BY MR. TURIELLO:

22       Q.   Do you know whether the dismissal of the

23  City's claim disposed of all matters against TRG

24  finally?

                                              54

1        A.   During this period of time, I would have

2   known the status of all this litigation, not by

3   specifics, by what TRG was explaining to me as

4   someone who was talking to builders.

5        Q.   Was it your understanding that the

6   litigation remained pending during the time that

7   you were at SunCal in 2016?

8        A.   Yes.

9        Q.   Do you know whether Fidelity's claims

10  against TRG are still on the docket in Kane County

11  in the Montgomery case?

12       A.   I do not know specifics of that.

13       Q.   If the Fidelity claims against TRG,

14  despite this Court's order a year-and-a-half ago

15  were still on the dockets at Kane County, what

16  effect would that have on the desirability of this

17  property?

18       A.   It would have great effect.

19       Q.   Counsel asked you about the Elgin lawsuit

20  that was dismissed years ago.  Do you recall that?

21       A.   Yes.

22       Q.   Do you know whether Fidelity's claim

23  against TRG -- despite this Court's Order from a

24  year-and-a-half ago -- remains on the docket in

                                              55

1   Kane County in the Elgin case?

2        A.   I do not know the specifics.

3        Q.   If Fidelity's action against TRG remains

4   on the docket in Kane County, what impact would

5   that have on the desirability of those lots?

6        A.   It would certainly chill the bids for the

7   lots, and it would certainly decrease the subset of

8   potential buyers for those lots.

9        Q.   Counsel asked you about the dismissal of

10  Yorkville -- both Yorkville actions -- and you

11  understand that happened years ago, is that right?

12       A.   Yes.

13       Q.   With Yorkville, do you know when those

14  suits were filed by the City as opposed to by

15  Fidelity?

16       A.   I don't recall the timing.

17       Q.   You would have known at the time?

18       A.   Back then, I would have recalled better.

19       Q.   If the record shows that it was several

20  years later before Yorkville sued TRG directly

21  after it had been in litigation with Fidelity,

22  does that comport with your recollection?

23       A.   What that tells me is that the City was

24  looking for anyone because Fidelity was not

                                              56

1  honoring their bonds.
2      Q.   Counsel suggested to you that Fidelity's
3  claim against TRG is done.  Do you recall that line
4  of questioning?
5      A.   Yes.
6      Q.   Do you know when Fidelity's claim against
7  TRG finally went away?
8      A.   I believe it's still ongoing.
9      Q.   If the record shows that their time to
10 file an appeal from the dismissal ended just in
11 March of this year, what impact would that have on
12 TRG to sell the property up to March of 2018?
13     A.   Any pending litigation would have the same
14 effect that I just described -- No. 1, chilling the
15 bids, and No. 2, making the subset of potential
16 purchasers much smaller.
17     Q.   Any pending litigation, but interacting
18 with the municipality about work that needs to be
19 performed or finalizing the sale, is that something
20 that's done regularly?
21     A.   Yes.  Negotiations with the City are
22 standard operating procedure, and the City has
23 impact fees.  The City wants to see development on
24 these lots.  The City has homeowners in these

                                                  57

1      A.   I'm sure in a conversation with TRG I
2  would have known.
3      Q.   If the docket shows that Shorewood didn't
4  sue TRG, does that comport with your recollection?
5      A.   This was years ago.  I don't recall by
6  name each city.  I would have in each instance
7  conferred with Mr. Kyte for the status of any
8  ongoing litigation at the time, but I don't recall
9  specifics from those time periods.
10     Q.   Would you have conferred with Mr. Kyte
11 about any discussions about Sherwood's position
12 that Fidelity's defenses were in bad faith?
13     A.   I didn't consult with Mr. Kyte on legal
14 matters that didn't pertain to the sale of the
15 lots.
16     Q.   During the time that you were involved in
17 TRG and that the initial lawsuits started coming in
18 from the surety, were you receiving any feedback
19 that Fidelity was trying to push cities and
20 municipalities towards coming after TRG?
21     A.   Yes, I remember those conversations.
22     Q.   Tell me about those.
23     MR. RIORDAN:  I'm going to object, your Honor.
24 He's calling for hearsay.

                                                  59

1  communities that want to see these lots completed.
2  Because of that, we're able to negotiate with the
3  City most of the time to a zero sum game for what
4  the remaining costs to complete are that would
5  otherwise not be covered in a normal Purchase and
6  Sale Agreement by offsetting it with fees.
7      Q.   Does the added component of the surety who
8  provided the bonds to an entity that went bankrupt
9  trying to sue someone that bought the property out
10 of bankruptcy complicate those dealings?
11     A.   That condition is the condition that makes
12 the lots most unsalable.
13     Q.   The other issues with municipalities,
14 that's part of the deal.  That's what you work out?
15     A.   Those can be worked out.
16     Q.   Counsel asked you a series of questions
17 about lawsuits.  Then he asked about a claim filed
18 by Shorewood.  Do you recall that line of
19 questioning?
20     A.   Yes.
21     Q.   Do you know whether Shorewood ever sued
22 TRG?
23     A.   I don't recall.
24     Q.   At the time, would you have known?

                                                  58

1      MR. TURIELLO:  His understanding of the state
2  of mind, not for the truth of the matter.
3      THE COURT:  I'll allow it.
4      THE WITNESS:  In conversation with TRG, it was
5  our collective opinion -- and by our, I mean TRG,
6  SunCal, Argent Management and our counsel -- that
7  issues were arising with these municipalities as a
8  direct result of Fidelity's actions with these
9  municipalities.
10 BY MR. TURIELLO:
11     Q.   Counsel went through some questioning
12 about A, B, and C Rings, do you recall that?
13     A.   Yes.
14     Q.   Whether A was more desirable than B and B
15 was more desirable than C, do you recall that?
16     A.   Yes.
17     Q.   Put a property on any ring, and if a
18 surety is suing a company that bought a property
19 out of bankruptcy, what does that do to its
20 desirability?
21     A.   Again, it makes it virtually impossible to
22 sell.  No builder that I know of wants to buy
23 property that comes with pending litigation.  I do
24 not think those properties would get through an

                                                  60

1  Investment Committee. I think it's fair at this
2  point that I clarify an answer that I gave to
3  Mr. Riordan. When Mr. Riordan asked me about these
4  properties and what ring I thought they were in, I
5  answered the question that I thought all these
6  properties were clearly in the B-Ring. I was
7  referring to only the properties that are subject
8  to this Court that had Fidelity bonds on them. One
9  of those properties was not in the B-Ring that was
10 in McHenry County -- Legend Lakes that Mr. Riordan
11 subsequently asked me about. I want to clarify
12 that the B-Ring properties are properties that are
13 subject to this matter and not all of the
14 properties that we bought in the Kimball Hill
15 bankruptcy.
16     Q.   This litigation that you're referring to
17 that would make this property undesirable until it
18 was resolved, is that the surety litigation?
19     A.   Yes.
20     Q.   Counsel went through the Purchase and Sale
21 Agreement and the subsequent amendments. Do you
22 recall that?
23     A.   Yes.
24     Q.   If you could call up F & D Trial Exhibit

61

1  indicates in the second sentence, purchaser further
2  hereby agrees and acknowledges that sellers
3  previously provided it with the right to conduct
4  its due diligence and determine the feasibility of
5  purchasing the property. Did I read that
6  correctly?
7      A.   Yes.
8      Q.   The paragraph here indicates that there's
9  a waiver of this due diligence period, is that
10 correct?
11     A.   That's a standard paragraph when you're
12 releasing money.
13     Q.   This paragraph, if it were represented to
14 this Court as being a waiver of due diligence and
15 an indication that SunCal and TRG conducted no
16 due diligence, would that be fair?
17     A.   Absolutely not.
18     Q.   Would that be misrepresenting what
19 happened in this case?
20     A.   A hundred percent.
21     Q.   If we go back to F & D Exhibit 13, if we
22 go to Page 15 of this exhibit --
23     Q.   -- do you see the date of Mr. Cook's

63

1  No. 15.
2      A.   15?
3      Q.   Yes, 15.
4      MR. RUFF:   It's 13.
5      MR. TURIELLO:   If you could blow up Paragraph 8
6  on Page 3.
7  BY MR. TURIELLO:
8      Q.   Counsel -- as you recall -- asked you
9  about this paragraph. Do you recall that?
10     A.   I recall he had me look at this paragraph.
11 I don't recall the question regarding this
12 paragraph.
13     Q.   The title of this paragraph is Waiver of
14 Due Diligence Contingency, do you see that?
15     A.   Yes.
16     Q.   The paragraph indicates that the seller is
17 provided -- I'm summarizing -- the buyer the
18 opportunity to conduct due diligence and that the
19 buyer has waived that. Is that your understanding
20 of the questioning that was put to you regarding
21 this paragraph?
22     A.   I'm sorry, I just don't recall his
23 question on this paragraph.
24     Q.   Just take a look at this paragraph. It

62

1  signature of September 7, 2009?
2      A.   Yes.
3      Q.   This is the initial Purchase and Sale
4  Agreement that you were shown two amendments to?
5      A.   Yes.
6      Q.   I hate to skip around. If we could go to
7  TRG Exhibit 17 for a moment. If you could go to
8  the third page of the exhibit?
9      A.   Okay.
10     Q.   The third paragraph, if you could
11 highlight the terms of the Purchase Agreement
12 provided a due diligence period that began
13 October 14, 2009 and extended to January 8th, 2010.
14 Did I read that correctly?
15     A.   Yes.
16     Q.   That's a reflection of the lengthy
17 involved due diligence process that you described
18 earlier?
19     A.   Yes.
20     Q.   If we look at or if we recall Exhibit 13
21 the Purchase and Sale Agreement, that was dated
22 December 8th -- December 7th of 2009 -- right
23 toward the end of that period; is that right?
24     A.   Correct.

64

1    Q.    About a month before the expiration was
2  identified in Exhibit 17?
3    A.    Yes.
4    Q.    That indicates that this term of diligence
5  was extended?
6    A.    Yes.
7    Q.    Calling up, F & D Exhibit 14.
8    A.    Yes.
9    Q.    There was an amendment to the Purchase and
10  Sale Agreement extending the contingency period and
11  that Mr. Cook -- if you look at Page 3 -- signed on
12  January 22, 2010?
13    A.    Yes.
14    Q.    So there was a due diligence period?
15  Not only was there one, it was extended?
16    A.    That's correct.
17    Q.    To say anything based on Exhibit 15 that a
18  diligence period was waived, that's just wrong;
19  fair?
20    A.    They many two completely different things.
21    Q.    Just again, the diligence period that you
22  described that we won't go through again, that was
23  done with this property?
24    A.    Extensively.

65

1    Q.    If we can go back to Exhibit 13 now.  Go
2  to Page 11.
3    A.    Yes.
4    Q.    Counsel was asking you about whether you
5  read the bonds yourself or whether you studied them
6  or examined them.  Do you recall that?
7    A.    I do.
8    Q.    As part of the due diligence period, your
9  team performed an assessment as to whether there
10  were bonds in place and whether there was an
11  obligation to replace them?
12    A.    Yes.
13    Q.    What was the determination based upon that
14  due diligence?
15    A.    That, yes, there were bonds in place, and,
16  no, we did not have to replace them.
17    Q.    If we could blow up Paragraph G on Page 11
18  of F & D Exhibit 13.  This is a paragraph that you
19  were shown -- part of which you were shown -- by
20  Mr. Riordan.  Do you recall the bottom half of that
21  paragraph?
22    A.    I do.
23    Q.    If you could look at the top half of that
24  paragraph, if you go down to the third line where

66

1  it says notwithstanding.
2    A.    Yes.
3    Q.    If you could highlight notwithstanding the
4  forgoing, purchaser hereby acknowledges that it has
5  been advised by seller that seller's predecessor
6  entitled to the property posted completion and/or
7  maintenance bonds, individually a bond and
8  collectively the bonds, with municipalities to
9  secure completion of certain improvements to the
10  property.
11    Did I read that correctly?
12    A.    Yes.
13    Q.    Your due diligence and reflected in the
14  Purchase Agreement is the representation by the
15  seller that there were bonds in place?
16    A.    Yes.
17    Q.    If you go to the next sentence, if we
18  can highlight purchaser and seller acknowledge and
19  agree that purchaser shall have no obligation to
20  seller to replace the bonds.
21    Did I read that correctly?
22    A.    Yes.
23    Q.    That, again, was part of your due
24  diligence, and it's reflected in the Purchase

67

1  and Sale Agreement?
2    A.    Yes.
3    Q.    That's information that you relied upon in
4  doing the cash flow analysis in determining value
5  in the deciding to buy the property?
6    A.    Yes.
7    Q.    Counsel asked you about the latter portion
8  of this paragraph that referenced defenses by the
9  surety or defenses by the bond company, do you
10  recall that?
11    A.    Yes.
12    Q.    If you go to the fifth line up from the
13  bottom, purchaser hereby acknowledges that seller
14  makes no representation or warranty, express or
15  implied, with respect to the bonds, including
16  whether or not the bonds will remain in place
17  after the closing.  Counsel raised that with you?
18    A.    Yes.
19    Q.    Based upon your involvement in the
20  analysis, did those bonds remain in place after
21  the closing?
22    A.    Yes.
23    Q.    Next, the improvements secured thereby --
24  the improvements that Fidelity was coming after TRG

68

1  for, were those the ones that were secured by those
2  bonds?
3      A.   The bond and improvements, yes.
4      Q.   The enforceability of the bonds by the
5  beneficiaries thereof?  You were aware that
6  Fidelity raised a defense in Sugar Grove that they
7  weren't responsible anymore and the Court found
8  otherwise?
9      A.   Yes.
10      Q.   It's your understanding based upon your
11  assessment even through today that the bounds were
12  enforceable?
13      MR. RIORDAN:  Objection, calls for a legal
14  opinion on the part of the witness, your Honor.
15      THE COURT:  I tend to think it does, Counsel.
16  Rephrase.  I'll sustain the objection.
17  BY MR. TURIELLO:
18      Q.   Did you become aware of any concerns from
19  your perspective that the bonds were enforceable?
20      A.   No.
21      Q.   Or were unenforceable?
22      A.   No.
23      Q.   The defenses, if any, or lack thereof
24  available to the issuers of the bonds to the

69

1  want.
2      MR. RIORDAN:  We're not going to stipulate.
3  It's public record.
4      MR. TURIELLO:  I will wait for a ruling.
5      THE COURT:  Given the exchange, I will allow
6  it.
7  BY MR. TURIELLO:
8      Q.   Is that correct?
9      A.   Yes, we are well aware of Fidelity, and we
10  are well aware of Fidelity's parent company being
11  Zurich, and we are well aware that Zurich is a
12  multinational insurance company with hundreds of
13  millions of dollars in assets.
14      Q.   And counsel asked you about the
15  accuracy of the bonds to secure the completion,
16  maintenance and crew part covered thereby.  As part
17  of the assessment, did you assess the bonds in
18  place, the improvements that they secured, and
19  whether the municipality deemed those appropriate
20  and whether they appeared appropriate at the time?
21      A.   Our team would have absolutely examined
22  the bonds, determined their accuracy, determined
23  exactly what the bonded improvements were, and then
24  we would have completed our analysis of the

71

1  performance thereof by the insurers, the defense
2  that its TRG's fault, you're aware that this Court
3  ruled that Fidelity could not pursue that in March
4  of 2017?
5      A.   I am.
6      Q.   If we could, the next sentence continues
7  on to the next page, the financial status of the
8  issuers of the bonds.  You're still in business,
9  right, in real estate?
10      A.   Yes.
11      Q.   Is Fidelity still in business?
12      A.   Yes.
13      Q.   What's your understanding based upon your
14  involvement of the industry of the financial status
15  of Fidelity?
16      MR. RIORDAN:  Objection, your Honor,
17  foundation.
18      THE COURT:  Counsel?
19      MR. TURIELLO:  It's a matter of public record
20  that Zurich is a publicly trade multi-million-
21  dollar corporation.
22      MR. RIORDAN:  If that's true, why are you
23  asking him the question?
24      MR. TURIELLO:  We can stipulate to that if you

70

1  remaining costs to complete starting at that point.
2      Q.   As far as what amounts were settled for
3  and why the municipality decided to take less, you
4  have no information about that; right?
5      A.   I was not part of those discussions.
6      Q.   If a bonding company didn't honor its
7  bonds or perform the work for a period of eight
8  years, what effect could that have on
9  infrastructure over time?
10      A.   It would deteriorate.
11      Q.   Would that increase the costs?
12      A.   Absolutely.
13      Q.   Counsel asked you about the portfolio.
14  This is a portfolio of property, is that right?
15      A.   Yes.
16      Q.   And this was the allocation, the
17  assessment, as of April of 2010?
18      A.   Yes.
19      Q.   Exhibit 17.  Is that something that can
20  change and is updated over time?
21      A.   Yes.
22      Q.   Would you perform any periodic assessments
23  over time to, I guess, update the business plan?
24      A.   Yes.

72

1    Q.    Was that done in this case?
2    A.    There would have been a time period.
3  I don't know if in this particular case it was
4  annually, semiannually, but there would have been a
5  time period where we would update the business plan
6  for all of our assets.
7    Q.    In one of the subdivisions -- I think it
8  was Ingham Park, you stated you believed there were
9  six lots, and counsel said number of lots don't
10 matter. Is that a fair statement?
11   A.    Absolutely not.
12   Q.    Why not?
13   A.    Because --
14   MR. RIORDAN:  I'm going to object, your Honor.
15 That's a mischaracterization of the comment.  It
16 didn't matter insofar as that question was
17 concerned.  That was the comment that I made.
18   THE COURT:  With that clarification, Counsel,
19 you need to follow up. He's qualified away what
20 you were concerned about.
21   MR. TURIELLO:  I still think the point needs
22 clarification as to whether or not the number of
23 lots in that subdivision matters.
24   THE COURT:  You can ask that without trying to

73

1  clarify what counsel asked. My recollection of
2  what counsel asked is different as well.
3    MR. TURIELLO:  I had a different understanding,
4  but with that clarification I will reask.
5  BY MR. TURIELLO:
6    Q.    Does the number of lots involved in a
7  division or subdivision matter as far as their
8  marketability or salability, anything like that?
9    A.    Yes, on a number of fronts.  First and
10 foremost, six lots is a difficult number to market
11 to the public building community.  So at that
12 amount of lots, it would be safe to assume that you
13 want to just put a purchase price number on them to
14 make them go away as soon as possible.  So you no
15 longer have a concern yourself of such a small
16 number.
17   Q.    That six-lot property, that's not one
18 of the ones involved in this litigation?
19   A.    No.
20   Q.    This property was bought out of a
21 bankruptcy estate, correct?
22   A.    Yes.
23   Q.    What was the importance or significance of
24 that to you in moving forward?

74

1    A.    In laymen's terms, our experience in
2  buying distressed properties during this time
3  period, the lots that came out of a Bankruptcy 363
4  Sale were clean.  We never had any issues but for
5  this case.
6    Q.    How did the other properties you bought
7  out of bankruptcy perform?
8    A.    All those were sold within two to three
9  years.
10   Q.    There was questioning about the indemnity
11 provisions in some of these sales that are moving
12 now post-March 17 Order.  What impact is the
13 requirement that has to be done have on TRG?
14   A.    Impact on a number of fronts.  I think we
15 touched on some.  I'll go over the list. First and
16 foremost, it has the impact of chilling the bids.
17 Not every builder will bid on these lots.  No. 2,
18 the subset -- this is kind of a subset or
19 subcategory of my first point -- because not every
20 builder will bid on these lots, we are probably not
21 getting the highest price for these lots, or TRG is
22 not getting the highest price for these lots.  Two,
23 the very atypical purchase and sale agreements
24 whereby TRG is forced to put considerable sums of

75

1  money into escrow has a tremendous opportunity cost
2  to TRG in that they are unable to recycle that
3  money either, A, to their investor or, B, into
4  another real estate project.
5    Q.    Was the plan to just have a one-off deal
6  with TRG, sell these things, be done, or was there
7  another plan?
8    A.    Our plan back in 2009 and 2010 was to help
9  TRG grow their new fund into a multi-hundred-
10 million-dollar land fund to compete with some of
11 the other bigger land funds on Wall Street.
12   Q.    The plan that was implemented with your
13 other investors who weren't sued by the surety, how
14 did that pan out?
15   MR. RIORDAN:  Objection, relevance, your Honor,
16 beyond the scope of direct examination -- way
17 beyond the scope of direct examination.
18   THE COURT:  Relevance, I would deal with as we
19 said before, allow it to continue; but if it is
20 beyond the scope of cross, however, Counsel --
21   MR. TURIELLO:  I don't know that it's beyond
22 the scope of cross. He did broadly question him
23 about his involvement with TRG and about the impact
24 of not being able to sell. He raised the issue of

76

1  damages, and this goes to that.
2     MR. RIORDAN: I don't think this is part of
3  their damages request before the Court. The fact
4  that they might not have grown into some
5  hypothetical company, that's not part of the
6  claim here.
7     THE COURT: I'll sustain the objection. I
8  think we're a little too far afield.
9  BY MR. TURIELLO:
10    Q.  Counsel asked you about lawsuits, and he
11  said a claim in Shorewood, would that have put a
12  cloud on the property. Do you recall that?
13    A.  Yes.
14    Q.  If Shorewood didn't sue TRG, did that put
15  a cloud on the property?
16    A.  If Shorewood did not sue TRG?
17    Q.  Right.
18    A.  But there was still pending litigation
19  with Fidelity?
20    Q.  Let's go with that.
21    A.  There would absolutely be a cloud on the
22  property.
23    Q.  That wouldn't be a cloud by the fact of
24  anything that Shorewood did. That would be based

                                              77

1  on Fidelity?
2     A.  Correct.
3     Q.  Counsel mentioned the sale price of some
4  of these lots at Shorewood as $50,000 for the first
5  take and then $52,000. Do you recall that?
6     A.  Yes.
7     Q.  I think there were some other
8  properties -- Montgomery -- which were less.
9  So based upon that, TRG is fine. Based upon the
10  fact that some of these properties are being sold
11  for $40,000 to $50,000, does that indicate that TRG
12  is back on square footage?
13    MR. RIORDAN: Objection, your Honor, calls for
14  an opinion on the part of the witness. I don't
15  think he's their damages expert.
16    THE COURT: I'll sustain it. Again, you're too
17  far afield, Counsel.
18    MR. TURIELLO: Let me try a different way. The
19  issue was raised by counsel, and there were
20  inferences from that so I just want to clarify that
21  if I could try?
22    THE COURT: You may try.
23    MR. TURIELLO: Thank you, Judge.
24

                                              78

1  BY MR. TURIELLO:
2     Q.  You were involved in these sales?
3     A.  The initial two sales I was not directly
4  involved in.
5     Q.  But you would have been involved in the
6  sales since?
7     A.  I am involved in negotiating sales. None
8  of them have yet consummated into a sale.
9     Q.  Have you conducted an analysis since
10  you've been involved of whether TRG will make a
11  profit off of these sales?
12    MR. RIORDAN: I object, your honor. He's
13  asking about conducting an analysis. Again, it's
14  more of expert witness than opinion testimony.
15    THE COURT: Counsel, I'm having a hard time
16  seeing what you're getting at here. The problem is
17  you're falling into that realm, and yet you could
18  ask the questions without doing so. I think you're
19  trying to. Tell me where you're going, maybe I can
20  allow you some leeway.
21    MR. TURIELLO: Well, I mean, this is his role
22  as a fact witness. He was involved in assessing
23  the sales, the impact of the pricing, so he does
24  have personal knowledge of what these sales are,

                                              79

1  how the amounts were arrived at, and whether those
2  amounts result in profit or cause other issues.
3  That's something he has personal involvement in.
4  Its not an independent opinion.
5     MR. RIORDAN: Judge, he said he was not
6  involved in the sales that counsel is asking him
7  about -- that is the sales in Shorewood and he said
8  I'm involved in other potential sales.
9     THE COURT: I suppose we're back to a point
10  that Mr. Riordan raised earlier in this matter,
11  which is I'm not sure that we're here to project
12  facts on something that has actually occurred.
13  You're asking him to opine about property loss on a
14  transaction that has occurred. That's not a matter
15  of opinion. It's a matter of fact. You should be
16  able to show me the facts. I don't think it's a
17  proper line of questioning.
18    MR. TURIELLO: I don't want to belabor it,
19  Judge, but counsel asked about lots or specific
20  subdivisions, specific prices, lot sales, with the
21  suggestion that TRG is now making X on the lots.
22  I just would ask the witness to the extent he was
23  involved in those, and we could limit it to those
24  to expand on that and those sales. He was asked

                                              80

1  about that.
2      THE COURT:  You can certainly ask him to expand
3  on the line of inquiry, but Mr. Riordan correctly
4  states that you're running into him opining about
5  issues that it doesn't appear that he actually
6  touched on or that they confirmed it.  I'll sustain
7  the objection.
8      MR. RIORDAN:  I would also note that I didn't
9  make any suggestion to him that somehow those
10  prices -- how they've benefitted.  I never asked
11  him how they benefit TRG.  I just said this is the
12  deal, this is the price.  That's all I asked.
13     MR. TURIELLO:  I think if counsel were to give
14  me the ultimate use for what he extracted on
15  cross-examination, he would be doing his client
16  a disservice.  I think that an inference that
17  could be drawn from that, that I anticipate, is
18  one that I would like to --
19     THE COURT:  And I'm going to allow you some
20  leeway.  I'm going to let you ask the question.  I
21  think the door has been opened as to this line of
22  inquiry.  It's just that it hasn't -- as the Judge
23  I clerked for used to say, I try to keep an open
24  mind, not so open that my brain falls out.  So the
                                                      81

1  door is open, but it's only open so far.
2      MR. TURIELLO:  Okay, and I'll try not to
3  attempt to push too far.
4  BY MR. TURIELLO:
5      Q.   Counsel asked you about certain properties
6  that sold after the Order of this Court.  Do you
7  recall that?
8      A.   Yes.
9      Q.   Which ones have been directly involved in?
10     A.   I'm directly involved in the remaining
11  portfolio.  I am fully aware of having reviewed the
12  contracts of the sales that Mr. Riordan asked me
13  about.
14     Q.   Are some of those sales that you reviewed
15  the contracts still pending?
16     A.   Yes.
17     Q.   Which ones are those?
18     A.   CalAtlantic -- which we've learned today
19  if you didn't already know became Lennar in
20  February -- purchased one of the projects in bulk,
21  and they purchased one of the projects in two
22  takes.  That first take was the beginning of this
23  year, and the second take -- my recollection is --
24  is in January of '19.  It's important to note that
                                                      82

1  while we are in discussions with builders since the
2  March 17 Order from this Court, we have yet to sell
3  any other lots.  The lots that we have sold
4  represent a fraction of the portfolio.  The lots
5  that have sold, in my opinion could have been sold
6  years prior to them selling at probably the same
7  price.  So there is a considerable loss in value
8  due to the time value of money, and there is really
9  no assurance that we are going to close any of
10  these additional lots under the pending terms that
11  we're negotiating right now, because we are at the
12  initial stages of the negotiations and we have not
13  yet gotten to the faithful paragraph that says is
14  there any pending litigation that we need to know
15  about.
16         Now the builders are aware of the Court's
17  word because we're doing our best to comfort these
18  builders and lead them down the path that they
19  should buy these lots, and that there is a method
20  in place where we can get you comfortable, but it
21  is certainly still a very tall Order and a very
22  challenging Order.
23     Q.   And Fidelity's persistence in this claim
24  has complicated it?
                                                      83

1      A.   Absolutely.
2      Q.   The sales that you've looked at, are those
3  profitable?
4      A.   There will need to be many millions and
5  millions and millions of dollars of lot sales
6  before any of this investment is even returned to
7  the investor before we start talking about profits.
8      MR. TURIELLO:  Thank you, sir.  That's all I
9  have.  Thank you, your Honor.
10     THE COURT:  Unless counsel believes that he has
11  a case for recross, which I almost never allow.
12     MR. RIORDAN:  I don't.
13     THE COURT:  Was this witness also reserved by
14  F & D on F & D's witness list?
15     MR. RIORDAN:  This witness?
16     THE COURT:  Yes.
17     MR. RIORDAN:  No, your Honor.
18     THE COURT:  Is it safe to conclude that we are
19  through with this witness for this matter?
20     MR. RUFF:  Yes, your Honor.
21     THE COURT:  The witness is excused.  You are
22  no longer under oath.  You may consult with the
23  attorneys.  Thank you so much.
24     THE WITNESS:  Thank you, your Honor.
                                                      84

1    THE COURT: And we're at a good breakpoint,
2  it seems again. Are we going to get done with our
3  witnesses today, Counsel?
4    MR. RUFF: Well, we heard that it was 30- to
5  45-minute cross, and I have it down at two hours
6  and 25 minutes. You're Honor, we're going to work
7  hard to try to get as much as we can done. We have
8  an expert witness. We think it will be succinct.
9  We can potentially finish that expert witness
10  today. I have some ideas to shorten things up.
11  Maybe we will discuss that at the end of the day.
12    THE COURT: Let me throw a few things out
13  there. As I said before, we have some leeway but
14  it won't be long. Keep in mind, that I have court
15  employees and a court reporter than have families
16  and places to be. If we go long, we're talking
17  about 30 minutes or so. We're not talking about
18  hours. It also means that we could start
19  30 minutes or so earlier tomorrow if necessary.
20  Rather than start at 9:30, we can start at 9:00 in
21  order to move things along. I mentioned earlier if
22  the parties think we need an overflow date, what
23  that date would be. You should be using your time
24  accordingly in that regard.

85

1    Last, one other thing that I've done on
2  unfortunately an all too frequent basis is allow
3  closing statements to be made in writing so that
4  they're not part of the timing of the reserved
5  trial, but a lot of the parties do them at a later
6  point. I'd like you to think about that as well.
7  I'm not asking you to respond to any of those
8  things at the moment. We'll take a break. You
9  can talk amongst yourselves and see where we are.
10    (A short break was taken.)
11    THE CLERK: Calling Kimball Hill, Inc.
12    THE COURT: Okay. So before we launch into the
13  next witness, I'd like to hear from counsel if they
14  thought about what we're going to do when we run
15  out of time, as I strongly suspect we will.
16    MR. RUFF: Your Honor, what counsel had
17  indicated, we're going to try to be as succinct as
18  possible with the expert, that he may not call his
19  expert. We have a Motion to Exclude that expert
20  because in various portions we were going to file
21  it tonight. I've already reviewed it, and it's
22  ready to go. I was encouraging counsel perhaps not
23  calling him because of the fact that in numerous
24  spots he admits that if he testifies before this

86

1  Court it could be an Illinois Department of Finance
2  and Professional Regulation, IDFPR, violation, and
3  he's not an expert, et cetera. We might not get to
4  him, so the thought was -- and then I asked even at
5  the outside how much time do you have with this
6  expert. He said a half an hour. I don't think he
7  should testify. The only other two witnesses that
8  they have are Mr. Kilburn, who we've already heard
9  from, and my recross will not be very long at all,
10  but I don't know how long counsel will be with
11  Mr. Kilburn. Mr. Olson -- we had 10 or 15 minutes
12  of questions for him in his deposition -- told me
13  previously that there would be limited time for
14  that. If those three witnesses go on, those three
15  witnesses are short. The only other witness for
16  tomorrow would be Mr. Peter Kyte, which I think we
17  can finish. So I'm still holding out hope against
18  hope that we can finish tomorrow. We also agreed
19  we could submit written closings.
20    THE COURT: Mr. Riordan?
21    MR. RIORDAN: Judge, the way things have
22  gone, I suspect what's going to happen is we'll
23  get through Mr. Kyte tomorrow at best and we're
24  probably looking at an additional day. Having said

87

1  that, I think the Court might give us some days
2  that it's available so I could check with my
3  witnesses and their schedule.
4    THE COURT: It's a fair request. I hear the
5  optimism from counsel for TRG. I gave up being
6  an optimist a while ago. Let's just have a look
7  here. As I stated here in the past, I've got
8  afternoons. Half days essentially are generally
9  better for me. I've got additional half days on
10  the 4th and 5th of September, which is next week
11  Tuesday and Wednesday, also on the 18th and 19th of
12  September so two weeks after that. And then in
13  October, as it stands right now I believe any of
14  the Tuesdays or Wednesdays in October are
15  available.
16    I understand by the way that the 18th and
17  19th could run into religious holidays. So I know
18  parties have to think about what works for them.
19    MR. RIORDAN: Alan said it's all right for him.
20    MR. MOLDOFF: I will not be available.
21    MR. RIORDAN: You will not be available?
22    MR. MOLDOFF: I will not be.
23    THE COURT: Okay. All right. You might be
24  flying solo if it's any one of those dates.

88

1    MR. RIORDAN: I could be. I know the 4th and
2  5th, Judge, will be impossible for me given my
3  family situation. I'd like to try to shoot for the
4  18th and 19th, if we can. I'll check. I mean, I
5  think we can probably do it in one day.
6    THE COURT: Again, it's a half day.
7    MR. RIORDAN: I understand. I think you're
8  probably talking like 1:00 to 5:00 or 5:30.
9    THE COURT: That's correct.
10   MR. RIORDAN: If we finish their case tomorrow,
11 that would be a natural break and then we can
12 finish my case in an afternoon. If they're going
13 to be filing their Motion to Exclude, I would like
14 a day or two to digest it and file a response.
15   THE COURT: I prefer it to come in the context
16 of an objection to your Motion to Amend because
17 that's already in the docket. I'll handle it one
18 way or the other. If it is a motion, I'll just
19 deal with the two motions together.
20       How does the afternoon of the 18th and
21 19th work for you just in case we don't make it
22 tomorrow?
23   MR. RUFF: I can make it on the 4th and 5th.
24 Your Honor, I just would like to make a statement

89

1  before we start. What we're hearing is again
2  Fidelity -- delay, delay, delay. I bet if we put
3  them to task tomorrow and we see what they actually
4  do have, it's not going to be that much. Because
5  if we do finish in the morning with Mr. Kyte, and
6  now he only needs an afternoon, guess what, that's
7  tomorrow afternoon.
8       What I'd like to do in the context of how
9  their expert could testify, because we still
10 haven't heard how long he's going to be with
11 Mr. Kilburn. Even if Mr. Kilburn takes some time,
12 we can at least get Mr. Kilburn done, so we are
13 assured that all we have is something that's a
14 little bit of time. I'll do the 18th or the 19th
15 if I have to. I'll do the 4th and 5th if I have
16 to. I still come back to Page 267, 268, their
17 expert said in response to this question --
18   THE COURT: We're not going to -- please,
19 please. I'm not ruling on any motion until I see
20 the motion. You're free to advocate with one
21 another on your own time as much as you want.
22   MR. RUFF: I'm sorry, your Honor.
23   THE COURT: The 4th and 5th, I heard from
24 Mr Riordan is not an option. So that does take us

90

1  to the 18th or 19th. To be clear, some of this
2  delay is driven by the Court's schedule. I just
3  can't do it in the week in between because I'm
4  participating in a Federal Judicial Center event
5  that I have to be at in California. That is what
6  it is.
7       What I'm going to do right now is I'm
8  going to block the Court schedule for both the
9  afternoon of the 18th and 19th, but I will be
10 sorely unhappy if we use both afternoons. We can
11 plan on the 18th as being the overflow day. There
12 has been some back and forth about whether this
13 motion gets filed on the expert. You do what you
14 do. I'm not going to say you must or must not. We
15 will work to try to get done as much as we can
16 between now and the end of the day tomorrow.
17 If the motion is in fact filed, I can't guarantee
18 you I'll be able to rule on it in 12 hours.
19 Mr. Riordan has got a point, that he has to look at
20 it and respond as well. We will deal with that
21 As I often say, we'll burn that bridge when we get
22 to it.
23       Okay. So now we have an overflow day.
24 written closings I think we'll also include that in

91

1  our presumption going forward. As I said, we can
2  start tomorrow at 9:00 if that's helpful.
3    MR. RIORDAN: That's fine, Judge. I'll be
4  glad if we can get through everything and have
5  Mr. Kilburn get on the stand and finish that
6  tomorrow -- great.
7    MR. RUFF: Just so the other people are here.
8  They are -- what I'm hearing -- short witnesses.
9  I have had my witnesses here every day. At least
10 Mr. Riordan can have his witnesses here tomorrow.
11 I don't want the Motion and an argument of the
12 Motion to delay things either, because I know your
13 Honor had cautioned at the time we were arguing
14 that one of the first things you did is on
15 cross-examination heard from a witness. It was
16 a slip opinion. I heard it very well.
17       This is a situation, which I think is
18 quite similar. You have to hear that point. I
19 don't want a Motion to delay that either. I think
20 once your Honor hears the cross-examination, he's
21 not going to last that long.
22   THE COURT: Well, you're entitled to each of
23 your beliefs in that regard, but here's a belief we
24 all share. We are going to move as rapidly as

92

1  possible without impinging on anybody's rights.
2  We're going to move forward to try to get this
3  done.
4      MR. RUFF:  Thank you, your Honor.
5      THE COURT:  So that means we are now back to
6  TRG on its case in chief, and you are about to call
7  your third witness, I believe.
8      MR. RUFF:  Yes, your Honor.
9      MR. RIORDAN:  Judge, may I be heard on this
10  just for a moment?
11      THE COURT:  You may.
12      MR. RIORDAN:  I think they're going to be
13  calling Mr. VanSanten, correct?
14      THE COURT:  Correct.
15      MR. RIORDAN:  I was handed this actual damages
16  sheet yesterday, and it looks like Mr. VanSanten's
17  opinions have changed in the sense that there's
18  more dollars here.  Now the report that's part of
19  the trial exhibits has a lower figure, and there's
20  been no amended disclosure of any kind other than
21  this document as to what his amended report might
22  contain.  My only point is I think that his
23  testimony should be limited to the documents that
24  have been disclosed so far.  I took his deposition

93

1  and examined him on the report that's in evidence,
2  and I think in all fairness they should be limited
3  to that report because there has been no additional
4  disclosure other than this document.
5      THE COURT:  I don't know what this document is.
6      MR. RIORDAN:  It's actual damages -- the
7  demonstrative exhibit.
8      THE COURT:  Oh, that was the one that was shown
9  during opening statements.
10      MR. RIORDAN:  Right.  So I would object at this
11  point to any deviation from the report that was put
12  into evidence that I deposed Mr. VanSanten on.  I
13  think they should have disclosed that this was
14  coming.  They've been saying it for a long time
15  we're going to do this, we're going to do this.
16  I haven't seen anything other than a demonstrative
17  exhibit that indicates that is actually happening.
18  Therefore, I think that the testimony of
19  Mr. VanSanten should be limited to what report is
20  in the exhibit books that has been put before the
21  Court.
22      THE COURT:  Counsel?
23      MR. RUFF:  Yes, your Honor.  What we did as
24  courtesy to counsel was to update the damages.  We

94

1  filed our damages submission a year ago.  We stated
2  in our damages submission these would be updated
3  seasonally as it occurs.  We updated our legal
4  fees, for instance, consultant fees.  The only
5  update is, I believe, $170,000 in additional
6  damages that have occurred regarding the mere
7  passage of time related to the property.
8  Mr. VanSanten said that in his deposition that
9  these are ongoing -- it states in the report these
10  are ongoing.  This was filed on August 2nd, 2017,
11  so it's quite disingenuous to suggest they had no
12  notice of the fact that the damages were ongoing.
13  In fact, the damages are projected through a
14  proposed appeal process as well.
15      So if Fidelity continues in its contempt
16  and continues in its actions and again it's upheld
17  on appeal in the first round and the second round,
18  the damages are going up.  Today, his damages are
19  going up because we have to defend against
20  Fidelity's contempt.  He knows that.  This is not a
21  very well-thought-out argument, and I think it's
22  another attempt to delay.
23      THE COURT:  Here's the way this goes.  As far
24  as calculation of damages goes, this is not the

95

1  sort of thing where I simply pick one person's
2  numbers over the other's.  What I'm trying to do is
3  establish who has applied the correct methodology,
4  what factors should be considered and what factors
5  should be excluded.  The Seventh Circuit has made
6  it very clear to me in matters of attempting to
7  value things where I've got a high and a low but I
8  can't flip a coin or I can't split the baby, but I
9  have to come to a reasonable conclusion in the
10  middle.  That reasonable conclusion will be based
11  on methodology, not necessarily based on the
12  numbers that are updated.
13      The methodology that has been before the
14  parties is before the parties.  You will address
15  the methodology.  The numbers will be what they are
16  in light of what the Court rules on the
17  methodology.  I'm not saying these numbers are in
18  or saying these numbers are out.  You will respond
19  to the methodology, and I will rule for you.  All
20  right?  He may testify, and we'll see where that
21  falls out.
22      MR. RIORDAN:  Thank you, Judge.
23      THE COURT:  Counsel, call your witness.
24      MR. TURIELLO:  Thank you, your Honor.  We call

96

1  John VanSanten.
2      THE COURT: Sir, if you'll remain standing
3  please, my deputy will put you under oath.
4              (witness sworn.)
5      THE DEPUTY: Please state your name for the
6  record.
7      THE WITNESS: John VanSanten, spelled
8  V-a-n-S-a-n-t-e-n.
9      THE COURT: You may have a seat. You've been
10 in the courtroom. You've heard me tell witnesses
11 how the microphone works and the like?
12     THE WITNESS: Yes.
13     THE COURT: So I won't go through that again.
14 You are, however, the first witness to actually
15 carry a document with you as you approach the
16 bench.
17         Counsel, if he has a document with him, I
18 would like to you explain what it is so we're clear
19 whether he's testifying from his own knowledge or
20 he's testifying -- I'd like to you to explain what
21 that is.
22     MR. TURIELLO: Understood, your Honor. I can
23 clear that up and identify the document. I believe
24 it's a copy of his report that's marked as

97

1  Exhibit 15. Rather than handing him a copy that we
2  have here, he has his copy to refer to when we get
3  to that point.
4      THE COURT: Has that report been annotated in
5  any way, or does it have his own personal notes?
6      THE WITNESS: No, it's just a clean copy.
7      MR. TURIELLO: This is a clean copy rather than
8  a loose paper one. It's got tabs for ease of
9  reference.
10     THE COURT: I'm just trying to be sensitive to
11 the fact that I want the witness to testify as to
12 what his own knowledge is as opposed to side notes.
13 So long as he's got a document and that I've made
14 that clear on the record we can go forward.
15     MR. TURIELLO: I understand. Thank you, Judge.
16         JOHN VANSANTEN,
17 called as a witness herein, having been first duly
18 sworn, was examined and testified as follows:
19         DIRECT EXAMINATION
20 BY MR. TURIELLO:
21     Q. Mr. VanSanten, what is your current
22 occupation?
23     A. I'm a real estate appraiser.
24     Q. And where do you work?

98

1      A. I work for a company called Stout here in
2  Chicago.
3      Q. If I could, I'd like to go through your
4  background a little bit if you can call up
5  Exhibit 15. Go to the Trial Exhibit Page 123.
6          Mr. VanSanten, first can you tell me what
7  Exhibit 15 is that is on the screen and that you
8  have in front of you in hard copy.
9      A. Exhibit 15 is a copy of my appraisal
10 report that I prepared for this case.
11     Q. Page 113 of your report that is Trial
12 Exhibit Page 123, is that a statement of your
13 qualifications and experience?
14     A. Yes, it is.
15     Q. I'd like to go through that if I could.
16 First, can you tell the Court where did you attend
17 college?
18     A. I got a Bachelor's Degree of Economics and
19 Business from Augustana College, and then I also
20 got an MBA in Real Estate and Finance from DePaul
21 University.
22     Q. That's reflected under education off on
23 the right. When did you obtain your degree from
24 Augustana?

99

1      A. That was 1986.
2      Q. Then after graduating from Augustana, did
3  you obtain any further education?
4      A. I did. I went on and get my MBA at DePaul
5  University in Real Estate and Finance.
6      Q. What do you mean by the MBA in Real Estate
7  and Finance, that's a particular focus that you
8  were able to do?
9      A. Yes, at the time, DePaul's MBA program had
10 a particular concentration in real estate and
11 finance.
12     Q. How long was that program?
13     A. Two years of night school.
14     Q. When did you obtain your MBA in finance
15 and real estate?
16     A. That was in 1989.
17     Q. How long have you been working as a real
18 estate appraiser?
19     A. About 26 years.
20     Q. After graduating from DePaul, tell me
21 about your initial employment.
22     A. I was working at the time for a bank
23 called First Chicago for about another year after I
24 got my MBA and then moved into the real estate

100

1  appraisal profession.
2      Q.  When did you move into real estate
3  appraisal?
4      A.  1992.
5      Q.  Do you hold any licenses?
6      A.  I do.  I'm a Certified General Real Estate
7  Appraiser in the State of Illinois as well as
8  several other states.
9      Q.  What does it mean to be a Licensed
10  Certified General Real Estate Appraiser?
11      A.  Every state has licensing requirements for
12  real estate appraisers.  The highest level of
13  licensing is what they call the Certified General,
14  which indicates that you're legally qualified to
15  appraise any type of property -- commercial or
16  residential.
17      Q.  What goes into obtaining a license as a
18  Certified General Real Estate Appraiser?
19      A.  There's a series of courses that you must
20  take.  There's an exam that you have to pass.  Then
21  there's also what they call an experience review
22  where you accumulate a certain number of hours,
23  several thousand hours of experience.  You submit
24  the log to the states, and then they review a few

                                                101

1  samples of those reports to make sure that they
2  meet standards.
3      Q.  Did you perform that work and take that
4  examination?
5      A.  I did, yes.
6      Q.  Were you able to pass on the first
7  attempt?
8      A.  I did, yes.
9      Q.  When did you obtain that license?
10      A.  That goes back probably 1993, '94,
11  something like that.
12      Q.  You also hold a certified general real
13  estate appraiser license in other states?
14      A.  I do, yes.
15      Q.  In what other states?
16      A.  I'm also certified in Wisconsin, Michigan,
17  Indiana, Arizona, Florida, Ohio, Pennsylvania,
18  California, Texas.  I think that's it.
19      Q.  Those are all licenses that were granted
20  to you by those states?
21      A.  Yes.
22      Q.  You had to demonstrate similar
23  proficiencies in each of those states?
24      A.  I did, yes.

                                                102

1      Q.  Do you hold any other professional
2  designation?
3      A.  I do.  I hold the MAI designation.
4      Q.  What is the MAI designation?
5      A.  Well, the MAI designation is a whole other
6  level over and above your basic licensing that's
7  required at the state level.  The MAI is issued by
8  a professional association called The Appraisal
9  Institute.  The Appraisal Institute is really the
10  preeminence professional association of real estate
11  appraisers.  There's a series of requirements that
12  you have to go through in order to achieve that
13  designation.
14      Q.  Are there different levels of affiliation
15  with The Appraisal Institute?
16      A.  There are, yes.  You can be a member
17  of The Appraisal Institute but not have your MAI
18  designation.  You can be what they call a
19  candidate, that you're working toward your MAI
20  designation, and then once you get that designation
21  you're officially designated as an MAI.
22      Q.  If you could, take us through the steps
23  that you have to go through in order to obtain the
24  MAI designation.

                                                103

1      A.  For the MAI designation, the fundamental
2  basic level of requirements are that you have to
3  have your certified job within the particular
4  state, but then they have another three other
5  courses that you must take, more advanced
6  courses -- Evaluation, Methodology and Analysis.
7  You have to take and pass both classes.  There is
8  a two-day certified or a two-day comprehensive
9  exam, which is somewhat similar to a CPA exam or a
10  Bar exam that you have to pass.  There's what they
11  call a Demonstration Appraisal Report that you have
12  to prepare, where you work through all the
13  different applications and methodologies and
14  demonstrate that you understand the techniques that
15  are used in appraisals.  That report has to be
16  reviewed by a committee of peers to make sure that
17  it meets all the standards.
18      Lastly, there is a formal peer review
19  process where you submit samples of your work.
20  Again, peers review that to make sure that they
21  meet the standards of The Appraisal Institute.
22      Q.  The two-day examination, did you pass that
23  on the first attempt?
24      A.  I did, yes.

                                                104

1    Q.   And you completed all the requirements and
2    then eventually you were granted the designation of
3    MAI?
4    A.   I was, yes.
5    Q.   When was that?
6    A.   That was in 1989 -- or, no, I'm sorry
7    1999.
8    Q.   What other roles or responsibilities have
9    you had with your ongoing relationship with
10   The Appraisal Institute?
11   A.   I was involved with the institute in a
12   number of different ways serving on the Board of
13   Directors for a local chapter, a number of
14   different committees, and I've also gotten another
15   designation in addition to the MAI.
16   Q.   What's that additional designation?
17   A.   It's what they call the AI-GRS,
18   which is specific for completing review appraisals.
19   Q.   What's involved in obtaining that
20   additional designation of AI-GRS?
21   A.   Well, if you already have the MAI and
22   you've already fulfilled those requirements, then
23   getting the AI-GRS involves taking an additional
24   class, taking another exam, and then submitting

105

1    appraisal must follow.  It dictates the type of
2    analysis that you must follow, the type of
3    documentation that you can issue, and the
4    elements that are required to be a part of that
5    documentation.  It's sort of equivalent I guess to
6    the financial accounting standards that accountants
7    must follow.  This is for appraisers.
8    Q.   Are there consequences or repercussions
9    for not following those required standards?
10   A.   Absolutely.  There's a enforce of
11   mechanism in every state, where if you don't follow
12   USPAP and you're found to be in violation, you
13   could suffer anything from a small fine to all the
14   way up to having your license revoked.
15   Q.   Would that USPAP govern the work that
16   you've done in this case?
17   A.   Absolutely, yes.
18   Q.   We'll go into that a little bit more, but
19   are there any other standards that apply through
20   your relationship with The Appraisal Institute to
21   appraising work?
22   A.   There are.  The Appraisal Institute also
23   follows USPAP, but in addition to that they have
24   their own set of Codes of Ethics that we must

107

1    samples of actual review reports that you prepared,
2    again for peer review to make sure that they meet
3    standards.
4    Q.   You mentioned standards.  Are there
5    standards that -- let's start with the initial
6    level -- the Certified General Real Estate
7    Appraisers have to follow?
8    A.   There are.  There's what's known as the
9    Uniform Standards of Professional Appraisal
10   Practice.  The acronym is USPAP.  As a licensed
11   appraiser, you are required to follow all the USPAP
12   standards.
13   Q.   The requirement to follow USPAP, is that
14   something that's optional or is it in the statutes?
15   A.   It's in the statutes.  It is not optional.
16   It's a fundamental requirement that you must follow
17   in USPAP.
18   Q.   And your license in your profession,
19   that's regulated within the State of Illinois and
20   then the other states that you also hold licenses?
21   A.   That is, yes.
22   Q.   What is USPAP?
23   A.   A USPAP is a set of standards, some
24   guidelines that we as appraisers in performing an

106

1    follow that go over and above the standards of
2    USPAP.
3    Q.   As a member or someone affiliated with
4    The Appraisal Institute, is that something that
5    you're required to follow as well?
6    A.   Absolutely, yes.
7    Q.   What's the purpose of having these uniform
8    standards in place for appraisal work like you've
9    done in this case?
10   A.   Well, I think it's to make sure that
11   consumers of appraisals or people that are hiring
12   an appraiser, that they can have confidence that
13   the work that's being done is not misleading, that
14   it's well-supported, that the conclusions and the
15   opinions are appropriate.  I think it's important
16   to have those standards to make sure that all the
17   consumers of appraisal services have that
18   confidence.
19   Q.   And your final designation that's listed
20   in your report is a Counselor of Real Estate.  Tell
21   me what that is.
22   A.   Well, the Counselors of Real Estate is
23   another organization made up of more than just
24   appraisers.  It's professionals in all areas of

108

1  real estate.  It could be brokers, developers,
2  attorneys, accountants, appraisers.  It's folks
3  that are regularly providing consulting services
4  in the real estate industry.
5       Q.   You mentioned it I think at the outset,
6  but who is your current employer?
7       A.   I work for a company called Stout that's
8  headquartered here in Chicago.
9       Q.   What's the business of Stout?
10      A.   Stout is a financial consulting firm.
11 It's made up of three primary service lines, one
12 being what they call Valuation and Financial
13 Opinions, that would include real estate valuation,
14 business valuation, as well as equipment valuation.
15 We also have an Investment Banking Group, and then
16 they have what they call a Dispute Advisory and
17 Consulting Group, which is essentially litigation
18 support.
19      Q.   What group are you in, and what's your
20 position?
21      A.   I'm in the Valuation and Financial
22 Opinions group.  I am a managing director and I
23 co-lead the real estate valuation practice.
24      Q.   I'd like to take you through your

                                                    109

1  employment history, specifically doing appraisal
2  work which I believe you started in 1992?
3       A.   That's correct yes.
4       Q.   If you could, take us through your work
5  history and just give a sense of what work you were
6  doing beginning in 1992 as an appraiser?
7       A.   Sure.  I first started my career
8  appraising residential properties -- single-family
9  homes, two- to four-unit apartment buildings.  I
10 spent probably the first two years of my career
11 doing that, and then after that I moved into
12 commercial properties.  So then I was appraising
13 industrial properties, office buildings, hotels,
14 shopping centers, subdivisions, health care
15 properties, anything beyond just the residential
16 appraisals.
17      Q.   Where were you working during that time
18 period?
19      A.   So when I started doing commercial work,
20 I was working for a company called Real Estate
21 Counselors International here in Chicago.
22      Q.   How long were you there?
23      A.   I was there for about three years.
24      Q.   In about 1995, what was your next

                                                    110

1  employment?
2       A.   I went to work for a company called
3  Valuation Counselors, another commercial valuation
4  firm.
5       Q.   How long were you there?
6       A.   It was there for about four years, I
7  believe.
8       Q.   If you could, take us through the next
9  employment up to the point where we get to Stout?
10      A.   Sure.  The next company I worked for was a
11 company here in Chicago again called Real Estate
12 Analysis Corporation.  That's really where I
13 started working in litigation cases and started
14 doing expert witness testimony.  I worked for that
15 firm for another approximately four years, and then
16 I went to work for a company called Wellspring
17 Valuation, which later was bought by Huron
18 Consulting Group, and collectively that was about
19 another six years, and then from there I moved to
20 Stout, where I've been now for a little over seven
21 years.
22      Q.   In the time before you got to Stout, can
23 you give me a breakdown of the type of work that
24 you were doing, the type of appraisal work?

                                                    111

1       A.   It would be a variety of different
2  commercial properties, including subdivisions like
3  this, apartment buildings, office buildings,
4  hotels, a lot of healthcare properties, for a
5  variety of purposes.  A lot of it was in a
6  litigation context.  Some of it was in a trust
7  and estate context.  Some of it would be for bank
8  financing -- a variety of different reasons.
9       Q.   Over the course of your career, how many
10 times have you been called upon to perform an
11 appraisal of a subdivision?
12      A.   I'd say in the course of my career
13 somewhere around 20 subdivisions that I've
14 appraised.
15      Q.   In each, have you employed the methodology
16 that you talked about that's required in USPAP?
17      A.   Yes.
18      Q.   Have those all been in litigation, or have
19 they been in other contexts?
20      A.   Actually, a lot of those have been in
21 other contexts.
22      Q.   What type of contexts?
23      A.   There's quite a few that we did for banks
24 that had taken subdivisions back, so they were what

                                                    112

1  they call REO types of situations.  The bank wanted
2  to have the collateral valued for their own
3  internal purposes.  I've done trust and estate
4  planning for privately held companies that own land
5  and want to do some trust and estate planning.
6        There have been some IRS tax disputes that
7  I've been involved in that involve subdivisions.
8  There's a variety of different reasons.
9        Q.   You came onto Stout seven years ago?
10       A.   Yes.
11       Q.   And what position did you hold when you
12  came on board?
13       A.   I was hired in as the managing director
14  and coleader of the real estate valuation practice.
15       Q.   And that's still the position you hold
16  today?
17       A.   It is, yes.
18       Q.   As the managing director and coleader of
19  the real estate valuation practice, can you tell me
20  what your responsibilities are and what type of
21  work do you do?
22       A.   Yes.  So we had a group of about 30
23  professionals in the real estate valuation
24  practice.  They're actually located not just here

113

1  in Chicago but also some of our other offices,
2  including Detroit, New York, Houston, and Irvine,
3  California.  So I oversee or co-lead that practice,
4  and that would include things like recruiting,
5  training, business development, bringing in new
6  business, but then certainly executing on work,
7  serving in an expert witness capacity in litigation
8  matters.  Those are kind of the general
9  responsibilities.
10       Q.   When you say executing on work, would
11  part of that execution on work that you've done at
12  Stout have been executing appraisals involving
13  subdivisions or developments?
14       A.   Yes.
15       Q.   That's something that you've become
16  familiar with and have dealt with you said 20 times
17  or so over your career?
18       A.   Yes.
19       Q.   Is part of the work that you do in
20  litigation context testifying like you're doing
21  here today?
22       A.   It is, yes.
23       Q.   If you could go back to Exhibit 15,
24  Page 124 of the exhibit.  In your report, if you go

114

1  to Page 124.  Let's start on 124.  You list in your
2  report the testifying experience that you had over
3  the last four years?
4        A.   This actually extends beyond four years,
5  but there's the full list of all my testimony
6  experience.
7        Q.   If we could just flip through here and see
8  the number of pages.  Go to Page 115.  So there's a
9  page-and-a-half of cases that you've testified in
10  in the past, is that fair?
11       A.   I think it's actually two-and-a-half
12  pages.
13       Q.   In those cases, you've been offered as an
14  expert in real estate appraisal?
15       A.   I have, yes.
16       Q.   And that's been in various State and
17  Federal Courts throughout the country?
18       A.   That's correct, yes.
19       Q.   In your experience, how many times have
20  you been tendered as an expert in Federal Court?
21       A.   Well, so in Federal Court I've actually
22  been deposed many times, not actually testified at
23  trial in Federal Court.
24       Q.   In all of the matters that you've

115

1  testified in, has your testimony ever been
2  excluded?
3        A.   No, it has not.
4        Q.   Have you testified regarding appraisals
5  involving subdivisions or developments?
6        A.   I believe there's one IRS tax dispute that
7  involved a subdivision where I testified in Tax
8  Court.
9        Q.   Have you also published articles?
10       A.   I have.
11       Q.   If you could go to Page 126 of Exhibit 15.
12  Page 116 -- Page 126 of the Exhibit, begins a list
13  of publications, speeches and seminars that you've
14  been involved in; is that fair?
15       A.   Yes.
16       Q.   If we go to the next page, we see the
17  speeches and publications continues?
18       A.   That's correct, yes.
19       Q.   Have you published and spoken on real
20  estate appraising?
21       A.   I have.  Almost every presentation and
22  publication I have authored has been on the topic
23  of real estate appraisal.
24       Q.   Have you been invited to speak and offer

116

1   your thoughts and opinions on the topic of real
2   estate appraisal?
3       A.   I have, yes.
4       Q.   In what sorts of places have you been
5   invited to speak?
6       A.   The Chicago Bar Association was one,
7   The American Bar Association.  There's
8   organizations like the International Association of
9   Assessing Officers, The Institute for Professionals
10   in Taxation.  There's several different
11   professional associations.
12       MR. TURIELLO:  Your Honor, at this point I'd
13   like to tender Mr. VanSanten as an expert real
14   estate appraiser.
15       THE COURT:  Any objection, Counsel?
16       MR. RIORDAN:  No objection, your Honor.
17       THE COURT:  All right.  Mr. VanSanten will be
18   accepted as an expert in real estate appraisal.
19       MR. TURIELLO:  Thank you, Judge.
20   BY MR. TURIELLO:
21       Q.   If we can turn to the first page of
22   Exhibit 15 -- the second page.  This is a copy of
23   the report that you prepared in this case?
24       A.   It is, yes.

117

1       Q.   What was her rate?
2       A.   I don't recall off the top of my head.
3       Q.   How much has Stout billed to date to
4   prepare the damages assessment that's been marked
5   as Exhibit 15?
6       A.   Altogether, I checked yesterday, which
7   would include not only preparation of the report
8   but also time for my deposition preparation and
9   preparation for this trial, we're at about
10   $135,000.
11       Q.   You also reviewed Mr. Barry's report or
12   letter and attended his deposition?
13       A.   I did, yes.
14       Q.   So when you talked about USPAP before and
15   that there are certain requirements, I'd like to
16   just start, if we could, going through what USPAP
17   requires to be in a report.  If you could just
18   maybe give us a bullet point of what information or
19   categories of information are required under USPAP
20   to be in a real estate appraisal?
21       A.   USPAP -- in terms of what's required in a
22   report -- is found under what they call as
23   Standard 2.  There's a hole series of elements that
24   have to be or are required to be in a report.  They

119

1       Q.   It is all of the analysis, methodology,
2   documentation that will support your analysis
3   that's been collected in this report?
4       A.   Yes.
5       Q.   You didn't include every document that you
6   relied upon, but this is a summary and the data
7   that supports the opinions that you've rendered in
8   this case?
9       A.   That's correct, yes.
10       Q.   Was Stout paid a fee including for your
11   time to prepare this report?
12       A.   Yes.
13       Q.   And what is your hourly rate?
14       A.   My hourly rate is $410 an hour.
15       Q.   And did you have any assistance in
16   preparing this report?
17       A.   I did.  I had some of my colleagues
18   assisting me in preparing this.
19       Q.   Just in case their names come up, can
20   you tell us the colleagues' names.
21       A.   Kari Kreiter is the main person that
22   assisted me on this.
23       Q.   Did she charge for her time?
24       A.   She did.

118

1   would include things like the intended use and the
2   intended user.  You have to specifically identify
3   what the intended use of the appraisal was and who
4   the intended users are.  You must clearly identify
5   what your scope of work is, which is considered
6   also the scope of the work that you're going to
7   pursue in your appraisal.  You must indicate what
8   the property history is of the subject property.
9   That is, have there been any sales or listings or
10   releases that have occurred within the last three
11   years.  Probably the biggest or most important
12   element is the signed certification.  You must have
13   a signed certification in every report.
14       Q.   What's the importance of having clearly
15   identified and disclosed the intended use or user
16   of the appraisal?
17       A.   It's a fundamental element of the
18   appraisal because it dictates really the
19   appropriate methodology and approach that you're
20   going to take, understanding what that intended use
21   and the intended users are.  The framers of USPAP
22   want to make sure that a report is not misleading
23   in any way.  It's very clear to the reader exactly
24   what was set out to be done and what the intended

120

1  use of the report is, whether it's for a case like
2  this or for bad financing or for estate planning,
3  divorce case, whatever the intended use is, you
4  have to specifically identify that.
5     Q.  You said that's the most important element
6  is the certification.  Can you tell me why that is?
7     A.  A signed certification is a fundamental
8  requirement of every appraisal and every review
9  appraisal.  That indicates that I, as the expert,
10  am taking full responsibility for this opinion,
11  and this report has been put together.  Without
12  that signed certification, there is no ownership of
13  the opinion.
14     Q.  If a report is signed when it shouldn't
15  be, doesn't apply with USPAP, that's something that
16  could subject the individual to discipline?
17     A.  Absolutely, if they are violating USPAP
18  that can result in discipline.
19     Q.  You mentioned the scope of the work.  Why
20  is that something that's important?
21     A.  It's important for the reader of the
22  report to understand the work, the analysis, the
23  research that went into actually preparing the
24  opinion and producing the opinion.

121

1     Q.  Just so we're clear, again, on the record,
2  we mentioned this at the outset, what you have in
3  front of you is a hard copy of Exhibit 15; is that
4  correct?
5     A.  I do, yes.
6     Q.  Is that a bound and tabbed copy that was
7  prepared by your office?
8     A.  It is, yes.
9     Q.  Has that been altered in any way, or is
10  that just a clean and tabbed copy of the report
11  that's been marked as Exhibit 15?
12     A.  Yeah, it's just a clean and tabbed copy of
13  my report.
14     Q.  When were you first contacted in this
15  case?
16     A.  I don't remember the specific date, but I
17  think it was spring of 2017.
18     Q.  And who were you contacted by?
19     A.  I believe I was initially contacted by the
20  attorneys at Pretzel & Stouffer.
21     Q.  If we could, go to Trial Exhibit 15,
22  Page 16, which is Page 6 of the Stout report.
23  Can you tell me what's reflected on this page?
24     A.  So these are some of the elements that I

122

1  was just discussing.  You can see at the top of the
2  page, there's a heading there for intended use and
3  users of the appraisal, which I indicated this was
4  a requirement that you include this in your report.
5  There's a scope of work.  You can see a series of
6  bullet points that outline the scope of work that's
7  going to be detailed in the following report.
8  Again, that's a requirement of USPAP that that be
9  clearly displayed within your report.
10     Q.  If we can go back with Trial Exhibit 15,
11  which is Page 5 of the report.  Before we start,
12  specifically referring to this, I just would ask
13  you what was your understanding of what you were
14  being asked to do when you were contacted in this
15  case?
16     A.  Well, I was asked to prepare an
17  estimation of the diminution of value between the
18  two different scenarios -- a value of the property
19  as of January 1, 2012.
20     Q.  What two scenarios were you asked to
21  assess?
22     A.  So now I'll refer to them as Scenario A
23  and Scenario B, which is how I refer to them in my
24  report.  In Scenario A, I was asked to value the

123

1  properties as of January 1, 2012, assuming that the
2  lots can start to be marketed and sold immediately.
3  Scenario B, I was asked to estimate the market
4  value of the property again as of January 1, 2012,
5  but in this scenario to assume that there's a
6  six-year delay in your ability to sell the lots.
7     Q.  If we look at Exhibit 15 under subject
8  overview, does this identify the property that you
9  were being asked to assess?
10     A.  At the very top there, it does identify
11  the specific properties that I'm appraising.
12     Q.  That would be the Edgewater Subdivision
13  in Shorewood, Settlers Ridge in Sugar Grove,
14  Whispering Meadows in Yorkville, Huntington Chase
15  in Montgomery, and Waterford in Elgin?
16     A.  That's correct, yes.
17     Q.  After you were contacted and informed of
18  what the assignment was, what was your next step?
19     A.  So after we were actually officially
20  engaged, the next step then was to prepare what
21  they call an information request, which was
22  submitted to our clients asking for certain
23  documents to help us in our preparation of the
24  appraisal.

124

1    Q.   Before you asked for the information and
2  as part of the initial decision as to whether or
3  not to accept it, is that when the intended user is
4  defined?
5    A.   Yes.  I mean, that's one of the first
6  questions we ask before being hired is what's the
7  intended use of the appraisal and who's going to be
8  using it.
9    Q.   Can we look just on this first page
10  under relevant dates, does that identify the two
11  different scenarios that you're being asked to
12  assess?
13    A.   Yes, it does.
14    Q.   If we go down to purpose of the appraisal,
15  you identify that it's to provide a fair market
16  value under two different scenarios?
17    A.   That's correct, yes.
18    Q.   If you go to the next page, at the top,
19  intended use and users of the appraisal.  Who were
20  the intended use and user of the appraisal that you
21  were preparing as requested by TRG?
22    A.   As I indicated, I think the intended use
23  of the appraisal is to assist in determining the
24  damages associated with the bankruptcy case
                                                    125

1    Q.   In this case, what information would you
2  have required to start your analysis?
3    A.   Well, we want to get a good handle on
4  the physical description of the property, so we
5  would ask for things like plats of surveys,
6  site plans, so we get a good sense of the actual
7  inventory of the lots as well as a configuration of
8  each of the subdivisions.  Those would be some of
9  the documents we would ask for.
10    Q.   The information that you requested, did
11  you obtain that from TRG?
12    A.   I did, yes.
13    Q.   If we look at Page 119 of Exhibit 15,
14  it's Page 109 of the Stout report.  You identify
15  a list of documents that you relied upon?
16    A.   I do, yes.
17    Q.   If we look, you didn't just rely upon
18  11 documents; is that fair?
19    A.   That's true, correct.
20    Q.   Would these be categories of information
21  that you reviewed and relied upon in preparing your
22  report?
23    A.   Yes.  Some of these categories have
24  multiple documents in them.
                                                    127

1  involving the five subdivision developments
2  contained in the report.  And then the intended
3  users are my clients, legal counsel representing
4  the clients, and the bankruptcy court.
5    Q.   If we go down in this assignment overview,
6  there's an area scope of work.  Is this something
7  that -- if you could highlight that or blow that
8  up -- is that something that would also be
9  identified at the outset of the assignment what
10  it is that you were doing and what the scope would
11  be?
12    A.   Yes.
13    Q.   You mentioned I think they're already in
14  the first bullet point contacting the client to
15  obtain physical and financial data?
16    A.   Yes, that's correct.
17    Q.   So what other steps would go into the
18  process before that request goes out, or are we
19  there now?
20    A.   I think we're at that point, yes.
21    Q.   So the initial step after defining the
22  scope of the assignment, the intended users, is you
23  ask the client for information?
24    A.   Yes.
                                                    126

1    Q.   So if we look at categories five through 6
2  or 5 through 8 indicate that they were provided by
3  the client?
4    A.   That's correct, yes.
5    Q.   Then will that include things for like
6  costs for carrying, costs to complete, real estate
7  tax information, and information on the number of
8  the remaining lots?
9    A.   Yes.
10    Q.   Was that information that was provided to
11  you by TRG adequate for you to continue your
12  analysis?
13    A.   Yes, it was.
14    Q.   In addition to obtaining information from
15  the client, did you go obtain your own documents
16  independently and obtain information independently?
17    A.   We did.  We completed significant
18  independent market research of our own, you know,
19  searching different databases, public records.
20  There's a whole host of documentation and research
21  that we gathered on our own separate than what was
22  provided to us by TRG.
23    Q.   Those studies that you referenced --
24  which we'll go into more detail when you describe
                                                    128

1  your analysis - natural study, Multiple Listing
2  Service, would that be the data that you researched
3  and obtained along with PWC, the Real Estate
4  Investor Survey, to assist you in your analysis?
5     A.  Yes, it is.
6     Q.  Again, you indicate the USPAP 2016-2017
7  edition.  What does that indicate, that you
8  consulted with that in preparing your report?
9     A.  Yes, because USPAP -- they update USPAP
10 every two years.  It's on a two-year cycle.  At the
11 time this report was issued, it was subject to the
12 standards in place as of 2016 and 2017.
13    Q.  Was that to make sure that you were in
14 full compliance, and that your report was totally
15 above board?
16    A.  Completely compliant with USPAP, yes.
17    Q.  In the report that you've prepared, have
18 you reviewed it in its entirety to ascertain
19 whether it's compliant with USPAP?
20    A.  I have, and it is.
21    Q.  What other documents or categories of
22 documents did you rely upon in preparing your
23 report?
24    A.  Well, as you can see here, we obtained

                                                    129

1  what they call the Metro Study Reports, which is
2  really the gold standard for subdivision
3  developments here in the Chicago area.  It's a
4  service that gathers all sorts of market
5  information regarding competing lot inventories,
6  competing subdivisions, trends in home prices and
7  selection rates.  It's a very important source of
8  information specific to residential subdivisions,
9  and we obtained those for all five subdivisions
10 both as of 2011 and then also for 2016.
11        Multiple Listing Service is another very
12 critical resource for us, because we're talking
13 about single-family homes, and Multiple Listing
14 Service is a great source of information about
15 trends and home prices, buying the lot at sales and
16 home sales.  Again, that's another resource I
17 relied upon.  These other investor surveys relate
18 to appropriate discount rates that investors
19 require for investments like the subject
20 properties.  Those are the sources that we relied
21 upon to help us determine what the appropriate
22 discount rates would be.
23    Q.  If we could go back to Page 15 of the
24 exhibit, Page 5 of the report.  Under relevant

                                                    130

1  dates, did you actually visit the properties that
2  we're here to talk about?
3     A.  I did, yes.
4     Q.  Did your associate partner Kari Kreiter
5  visit the properties as well?
6     A.  She did too, yes.
7     Q.  Are the dates of those visits indicated in
8  this report?
9     A.  Yes.  You can see here, Keri, my
10 colleague, inspected all the properties on
11 April 14, 2017, and then I inspected them
12 separately on June 16, 2017.
13    Q.  What was the purpose of actually
14 conducting a physical inspection of the properties
15 that are at issue?
16    A.  Well, it's a fundamental aspect of any
17 appraisal that you prepare.  You want to actually
18 go out there and see the property, touch it, feel
19 it, get a good sense of the physical
20 characteristics, the locational characteristics,
21 what the neighborhood surrounding it is like.  It's
22 just a fundamental step in preparing an appraisal.
23    Q.  So you actually were able to observe the
24 physical conditions of these properties?

                                                    131

1     A.  I was, yes.
2     Q.  Would that include things like streets,
3  curbs, parkways, sidewalks?
4     A.  Yes.
5     Q.  Did you include in your analysis of the
6  damages the legal costs incurred by TRG?
7     A.  I did not.
8     Q.  Why not?
9     A.  I was not asked to include that.  I was
10 specifically asked just to focus on the diminution
11 of value related to the delay of six years.
12    Q.  If we could go to exhibit Page 4.  Try the
13 next page, Page 5.  Thank you.  If we could take a
14 look at the chart in the middle of the page.  Your
15 task was to appraise the value of the property on
16 January 1st, 2012, assuming a three-year selloff
17 and then a Scenario B, assuming a forced delay of
18 six years caused by litigation followed by a
19 selloff period; is that fair?
20    A.  Well, actually Scenario A was assuming
21 that the owner could start marketing and selling
22 the lots immediately in 2012.  Depending on the
23 subdivisions, that sellout period could be a
24 couple of years or it could be three years.  It

                                                    132

1 depends on how many lots are being sold. We can
2 talk about that further as we get into my analysis.
3 Scenario B, on the other hand, I was asked to
4 assume that you could not sell any lots or start
5 marketing them until six years later.
6  Q. And based upon those assumptions, you
7 arrived at an appraised value for Scenario A, where
8 you can begin selling lots right away, and
9 Scenario B, when you couldn't start selling lots
10 for six years?
11  A. That's correct, yes.
12  Q. What was your conclusion with respect to
13 Scenario A?
14  A. For Scenario A, my opinion of the market
15 value of the properties is $9,435,000.
16  Q. And under Scenario B, where there was a
17 forced delay in the ability to sell for six years,
18 what was your appraisal of the value under that
19 scenario?
20  A. An estimate of my opinion of value is
21 $1,715,000.
22  Q. Okay. And then you identified actual
23 damages, and what is that?
24  A. That's just a difference between the two

133

1 value indications from the two scenarios come to
2 $7,720,000.
3  Q. That's based upon your assessment that the
4 property is worth $7.72 million less because you
5 can't sell it for six years. Is that a simple way
6 of saying it?
7  A. That's correct.
8  Q. Go back into your analysis. Now step back
9 on where we left off. You asked for information
10 from the client, and then conducted your own
11 research and did a site visit; is that correct?
12  A. Yes.
13  Q. Or multiple site visits. What's the next
14 step in your process that you follow under USPAP to
15 perform an appraisal like you did in this case?
16  A. After gathering information from the
17 clients, doing our own market research, visiting
18 the property, now we start doing an analysis of all
19 that information to help prepare our opinion of
20 value.
21  Q. As part of your analysis, did you assess
22 exposure time?
23  A. I did, yes.
24  Q. What is exposure time?

134

1  A. Exposure time is a defined term within the
2 USPAP. It is really a retrospective look, and so
3 it's saying if the value of the property is X on a
4 certain date, how many months would it have had to
5 have been exposed on the market in order to sell at
6 that price. Contrast that with marketing time --
7 which is really looking forward that says that your
8 value is X as of a certain date -- how long would
9 you have to market it going forward in order to
10 sell at that price.
11  Q. If you look at Trial Exhibit Page 17 --
12 and it's Page 7 of the Stout report -- at the top
13 of the page you indicate here the exposure time
14 that you arrived at in this case?
15  A. Yes.
16  Q. How was that arrived at?
17  A. Based on my research analysis, I estimate
18 that the exposure time and marketing time under
19 Scenario A, assuming you can start selling the lots
20 immediately, would be within the range of 6 to
21 12 months. That is, you can sell these
22 subdivisions within 6 to 12 months to an investor.
23 Under Scenario B, I indicate here it's unknown what
24 the time would be in order for it to be on the

135

1 market, because it's going to be hard to find a
2 buyer in the first place who would actually buy it
3 knowing that they have to wait six years to receive
4 any proceeds from the sale.
5  Q. How did you calculate the exposure time?
6  A. Well, again, it's based on my own
7 research. There's investor surveys which indicate
8 what typical exposure time is for subdivisions and
9 also just our own research within the local
10 markets.
11  Q. Look at Trial Exhibit Page 60. It's
12 Page 50 of the Stout report. Section 7 of the
13 report is Income Capitalization Approach, correct?
14  A. That's correct.
15  Q. What is an income capitalization approach?
16  A. Well, within the appraisal profession
17 there's three approaches that you can take to
18 estimate market value. One is income
19 capitalization approach. The income capitalization
20 approach is based on the idea that you can measure
21 the value of the property by looking at the
22 anticipated cash flows. You can look at for a
23 given set of cash flows what would an investor be
24 willing to pay in order to receive those cash flows

136



1  going out into the future.
2      Q.  In this section of your report, does that
3  lay out the methodology you followed in coming to
4  your conclusion?
5      A.  It does, yes.
6      Q.  The income capitalization approach,
7  why would that be an appropriate analysis or
8  methodology to use when valuing subdivisions like
9  you do in this case?
10     A.  Well, as appraisers, it's very important
11  for us to put ourselves in the shoes of a typical
12  investor.  We consider what's important to them.
13  When it comes to subdivisions, what's important to
14  them is the cash flow.  That's the only reason why
15  they invest in these things is they want the
16  anticipated cash flow.  Typical investors would go
17  through the same sort of discounted cash flow
18  analysis to help inform them on what they're
19  willing to pay.
20         As appraisers, it's important for us to
21  follow the same methodology as the typical buyer
22  would.  That's why here I conclude that the income
23  approach is the approach to use.
24     Q.  Will you look at the next page.  You see

137

1  at the tope it's Methodology Subdivision
2  Development Analysis?
3      A.  Yes.
4      Q.  There are four bullet points, the first
5  four.  Can you tell us what those reflect?
6      A.  So, yeah, the four bullet points that are
7  highlighted, these are some of the inputs that are
8  required in order to perform a discounted cash flow
9  analysis for subdivisions like the subject
10  properties.  You can see there in the first bullet
11  points, one of the first things you have to
12  consider is what's the probable sale price of the
13  lots.  That is, what you could potentially sell
14  each of those lots for.  That's going to help you
15  determine what the potential value is for each of
16  those subdivisions.
17         The next important part of that is what's
18  the rate at which you actually will be able to sell
19  those lots.  We often refer to that as the
20  absorption rate or the sellout period.  That goes
21  to, let's just say, for example, you have 50 lots
22  in your subdivision, how long is it going to take
23  to be able to sell those lots.  Are you going to be
24  able to sell one a month, four a month, you know,

138

1  10 a year?  What's the range, the sellout, that
2  you're going to be able to sell those lots out at.
3         So those two things together -- the actual
4  sale price of the lots and then how quickly are you
5  going to be able to sell them -- is going to drive
6  the actual revenue that you're going to be
7  receiving from your investment.
8      Q.  So the first two would be the revenue,
9  and then what's the third bullet point that we're
10  looking at here on Page 51?
11     A.  Along with the actual revenue side of the
12  equation, you also have to consider the expense
13  side of the equation.  Particularly, when you're
14  talking about sellout period that can extend for
15  years sometimes, there's going to be significant
16  expenses that the developer is going to be
17  incurring.  It could be things like the cost to
18  complete.  In this case, there were still some
19  street improvements that still need to be made in
20  some of the subdivisions.  Those kinds of costs to
21  complete have to be considered in the analysis.
22  There's carrying costs, which would be things like
23  real estate taxes, insurance, you know, different
24  costs that you're incurring over that period of

139

1  time as you're selling the lots out.  All those
2  expenses have to be considered as well.
3      Q.  Then the fourth bullet point -- would the
4  first three be inputs that go into your analysis?
5      A.  Yes.
6      Q.  What does the fourth bullet point reflect?
7      A.  Once you have determined now what the
8  revenue side of the equation is and what the
9  expense side of the equation is, you get what you
10  call your net proceeds -- that's the net cash flows
11  that will be coming to the developer.  And so the
12  next part of the analysis to determine the value is
13  to apply the appropriate discount rate to your
14  analysis.
15     Q.  We heard Mr. Teteak describe it before.
16  Can you just tell us what is a discount rate?
17     A.  The discount rate really is the
18  developer's rate of return.  It's the rate of
19  return that a developer will require in order to
20  compensate them for the risk of taking that
21  investment on.
22     Q.  If we could, the next two sentences down
23  below that with the bullet point still on.  This is
24  fine.  Below that, you indicate that projected net

140

1  cash flows are discounted to a value by applying
2  the discount rate, resulting value is
3  a fair market value of the subject to a single
4  purchaser as of the valuation date; is that right?
5     A.   That's correct, yes.
6     Q.   So you come up with these three inputs,
7  and you apply the discount rate and then that's how
8  you arrive at your analysis?
9     A.   Right.  By preparing a discounted cash
10 flow analysis, looking at the revenue side, the
11 expense side, the net proceeds, and then applying a
12 discount rate, you come up with a net present value
13 of that investment, which is really what a
14 potential buyer would be willing to pay as of
15 that date.
16    Q.   Look at the next page of that report,
17 Page 62 of the trial exhibit, Page 52 of the
18 report.  Just for clarity, again, you understand
19 that on the screen the trial exhibit number is
20 the Bates number along the bottom, and the 52 is
21 the original number from your report?
22    A.   Yes.
23    Q.   If we could look at the table that we have
24 here.  Tell me what this is.

141

1     A.   This is really a summary of the inventory
2  of lots.  You can see a group done by the different
3  subdivisions.  There at the top, you can see the
4  first one displayed is the Edgewater subdivision,
5  which is in Shorewood, and there's a total of 51
6  lots.  It gives you some of the physical
7  characteristics, like the lot width and the total
8  lot size for each of those.  I've gone and
9  displayed the inventory for each of the different
10 subdivisions.  You could see there's a total of
11 396 lots between all five subdivisions.
12    Q.   This is the inventory, the scope of the
13 property that you are looking at.  You've laid that
14 out in this report?
15    A.   Yes.
16    Q.   If we take a look at the next page, the
17 first table on the top.  On the revenue side, you
18 looked at the finished lot value?
19    A.   I did, yes.  That's the first input that
20 we talked about with those bullet points before.
21    Q.   On Page 53 of your report, Page 63 of the
22 exhibit, does this table reflect the result of your
23 analysis for the finished lot values?
24    A.   It does, yes.  As you can see here, I've

142

1  presented the finished lot values for both
2  Scenarios A and B for each of the different
3  subdivisions.
4     Q.   Is the methodology that you used to arrive
5  at those opinions laid out in your report?
6     A.   It is.  It's contained within Section 3 of
7  my report, which is the market overview.
8     Q.   If we can turn to Trial Exhibit Page 19,
9  Page 9 of the Stout report.  Let me know if you're
10 oriented?
11    A.   I've got it, yes.
12    Q.   This is the section where you detail your
13 work that went into the market overview for the
14 different subdivisions?
15    A.   Right.  This details all the research that
16 I conducted into the market for each of the
17 specific subdivisions in helping me determine the
18 lot value as well as the absorption rates for each
19 of these subdivisions.
20    Q.   Did you perform the independent analysis
21 using the same methodology for each of the five
22 subdivisions?
23    A.   I did, yes.
24    Q.   And would it be helpful to your analysis

143

1  start with the first subdivision, Edgewater, and
2  describe that analysis?
3     A.   Yes, it would.
4     Q.   If we could, there are a number of
5  different areas that are defined.  The first area
6  you defined is the market area.  What's the
7  significance of that?
8     A.   So there you can see on Page 9, this is
9  specific to the Edgewater subdivision in Shorewood,
10 Illinois.  You can see the first setting there is
11 primary market area.  This is important because you
12 want to understand the primary area from which
13 demand will come from for your subject property,
14 and also from which there's other competing
15 subdivisions.  In this case, for Edgewater, I've
16 determined that the primary market area is within
17 a five-mile radius from the subject property.
18    Q.   Why did you select a five-mile radius?
19    A.   You know, based on the locational
20 characteristics of being around Shorewood and its
21 surrounding area and also just talking to
22 developers in the area, what's the typical primary
23 market areas that they would consider, and a
24 five-mile radius seemed appropriate.

144

1    Q.   The next area of analysis under
2  Paragraph 2 is PMA demographics and housing
3  statistics.  If we could highlight the caption in
4  that cable of the demographics, please.
5          The next step that's identified in the
6  market overview is an analysis of demographics.
7  Could you tell us what went into this analysis?
8    A.   Yes.  It's summarized here in this chart.
9  What I'm looking at here is I'm looking at the
10  population within a five-mile radius and the growth
11  trends in population within that same radius.  You
12  can see in the first column that the population is
13  growing from 2010 to 2016, and then again into 2021
14  is projected to continue growing.
15          The next column there is the number of
16  households.  Here we're talking about residential
17  subdivisions.  We want to understand how many
18  households there are, and what the growth of
19  households is going to be.
20          The last column there is the median
21  household income which relates to affordability of
22  people within that five-mile radius, how much they
23  can actually afford to pay for housing.
24    Q.   Why are these demographics important to
                                              145

1  you as a piece of your analysis to determine the
2  appraised value?
3    A.   Well, we're trying to get a sense for
4  what's the level of demand for lots that we have
5  here in Shorewood in the subdivision called
6  Edgewater.  We're trying to get a sense for what
7  people within that area can actually afford in
8  terms of home prices.  These are very important
9  statistics to look at.  Certainly, the trends as
10  well are very important too.  If you were to see a
11  trend that's going in reverse, where households are
12  declining, that might be a red flag that you have a
13  problem in that particular market.
14    Q.   I notice that you projected out the 2021.
15  Why is that?
16    A.   Because here we're trying to get a sense
17  under Scenario A -- well, we're first looking at
18  starting in 2012 going forward what the trends
19  would be, what the level of demand might be.
20  And then under Scenario B, we're not able to start
21  selling lots until 2018, so we want to get some
22  sort of projecting going forward in 2018 as well.
23    Q.   Go to the next table on the next page, if
24  we can blow that up.  You analyze the housing in a
                                              146

1  five-mile radius of detached home sales.  Where did
2  you obtain this information, and what is the
3  significance?
4    A.   This data was obtained through the
5  Multiple Listing Service.  Again, this is specific
6  to that area within a five-mile radius of our
7  subject property.  Here, what I wanted to look at
8  was the volume of sales by year.  You can see the
9  first column I've got years beginning in 2010 all
10  the way up to 2017.  The next column shows the
11  actual number of home sales that occurred in those
12  years.  The next column shows the volume in terms
13  of the total dollar value of all those home sales,
14  and then lastly in the column in the far right that
15  shows the average home price of each of those sales
16  for each of the given years.
17    Q.   Why is this information significant to you
18  in your analysis or appraisal of these properties?
19    A.   Again, this is another very important data
20  point to look at when you want to see if the volume
21  of sales goes to the level of demand for homes, and
22  if certainly the average price goes to what would
23  be a typical home pricing within that particular
24  five-mile radius.
                                              147

1    Q.   Still under the category of demographics,
2  if you could move to the next page, and if you
3  could, Jim, blow up the building permits table.
4          You did an assessment of building permits
5  in Kendall and Will Counties?
6    A.   I did, yes.
7    Q.   And what was the purpose of doing that?
8    A.   Well, building permits is another
9  indication of level of demand.  Building permits
10  are issued for new construction, and so getting a
11  sense of how many building permits are being issued
12  in a given year is another indication of
13  construction activity and demand for housing.
14    Q.   Did your analysis as far as demand and
15  demographics -- did that rely solely on building
16  permits, or was that just a piece?
17    A.   That was just one piece.  As I indicated
18  before, I also looked at the multiple listing
19  service.  I looked at trends and demographics.
20  Then as you'll see, we'll move onto the metro
21  studies and other information sources.  All of
22  those things collectively, I looked at, researched,
23  and relied upon.
24    Q.   If we can move onto Section 3, the demand
                                              148

1 factors. You can just highlight the whole section.
2        You analyzed demand. Did you calculate
3 annual demand?
4    A.   I did, yes.
5    Q.   How did you do that?
6    A.   Well, looking at the demographics that I
7 previously presented, actually if you move onto the
8 next page you'll see the chart how it's actually
9 calculated.
10    Q.   So at the top of Trial Exhibit Page 21,
11 Stout Report Page 11?
12    A.   Yes.
13    Q.   You've identified a demand analysis in
14 this chart. Could you tell us how did you arrive
15 at this demand analysis?
16    A.   You can see here in Line 1, I'm looking at
17 the total number of households in 2010 and then the
18 total number of households in 2016, then the
19 difference obviously is the growth of the number of
20 households. In this case, there's 971 new
21 households that were created during that period of
22 time. The next thing we want to look at, of those
23 households, because that term household includes
24 not only owner-occupied but also rental households.

149

1 We want to get a sense how many of those are
2 actually owner occupied. That's going to give you
3 a better indication of level of demand for single
4 family homes as opposed to people who are looking
5 for renting apartments.
6        Here you can see the percentage in 2010
7 was about 81 percent and about 78 percent in 2016.
8 So now we can translate by applying those
9 percentages what the forecast of the owner-occupied
10 demand is in that period of time.
11        Then the next thing is to look at of that
12 total forecasted demand, what percentage of the
13 population can actually afford housing at the
14 subject's price point. So if we go through a
15 calculation that's not completely detailed here,
16 but we look at typical ratios that a lender would
17 look at in approving a borrower for financing on a
18 mortgage for a single-family home, and that is that
19 typically they don't want them to be spending more
20 than 30 percent of their income on mortgage,
21 insurance and taxes.
22        We have statistics within that five-mile
23 radius of what the income is for these households,
24 and then we can decide based on the price point

150

1 that we've determined for a subject property
2 how many people could actually afford a home at
3 that price.
4    Q.   So you don't just look at what's
5 available. You go deeper into the analysis to see
6 whether you could actually buy it?
7    A.   Right.
8    Q.   This is the analysis that you performed in
9 2016?
10    A.   It is, right.
11    Q.   Go down to the next chart. If you could
12 highlight -- actually to Paragraph 5 -- just for
13 clarity in the chart -- this is the similar
14 analysis you did but for 2021, is that right?
15    A.   Right. So this really relates -- so
16 the first one we just looked at relates more to
17 Scenario A, where we can start selling the lots
18 immediately in 2012, and then this relates more to
19 Scenario B, where you're not able to start selling
20 the lots until six years out. We went through the
21 same process here, just using data from that next
22 time period that was available to us between 2016
23 and 2021.
24    Q.   If we open up the whole page, we see the

151

1 forecasted demand for 2016 to be 106 per year in
2 Edgewater and 100 per year under the 2021 scenario?
3    A.   That's correct, yes.
4    Q.   After identifying the market, the
5 demographics, and the demand, what's the next
6 step that you follow in your process?
7    A.   Well, the next step is to look at the
8 supply of competitive subdivisions, the supply of
9 other lots that are out there.
10    Q.   If you go to the next page, Trial Exhibit
11 Page 21, Page 12 of the Stout Report. You identify
12 this area's supply and absorption analysis. Tell
13 us what that is.
14    A.   This first chart here is data that we
15 obtained from that Metra study that I referenced
16 before. That Metra study really is the gold
17 standard for subdivisions. Investors typically
18 will pull a Metra study report like this to get a
19 sense for the total lot inventory within a primary
20 market, the number of subdivisions competing with
21 your subject property, and then what kind of sale
22 prices -- actually, the volume of sales and the
23 sale prices that they're able to sell those homes
24 at. These are all summarized here in this chart.

152

1   As you can see, for the Edgewater subdivision there
2   are 17 competing subdivisions within a five-mile
3   radius of our subject property.
4       Q.   We see under the sales prices that there's
5   quite a range from 137 at the bottom to 344 at the
6   top. What's the significance of the fact that
7   there's a range of costs and prices?
8       A.   Well, there's always a range of home
9   prices within a particular market. Some of these
10  subdivisions are a more higher income or a little
11  bit lower end. This is a cross-section of all the
12  subdivisions that are within a primary market.
13      Q.   Is that an appropriate data point to look
14  at?
15      A.   Absolutely. This is a very important data
16  point to look at.
17      Q.   You also looked at -- this is for a period
18  of 2011 -- you also on the next page looked at
19  closings in a five-mile radius for 2016 to 2017?
20      A.   That's correct. So that chart there at
21  the top, that's basically the same thing, but now
22  we're looking at that time period, the first
23  quarter of 2016 to the first quarter of 2017.
24      Q.   Were the two different time periods -- the
                                                    153

1   first one so you could do your work with respect to
2   Scenario A, and this is Scenario B?
3       A.   That's correct, yes.
4       Q.   How did you calculate or arrive at an
5   absorption rate?
6       A.   Well, so one of the things we looked at,
7   you can see on this chart it shows what the monthly
8   absorption has been for each of those competing
9   subdivisions. That's one data point that we looked
10  at. We also looked, again, going back to that
11  chart from the MLS. We looked at actual closed
12  home sales by year, pulled from the Multiple
13  Listing Service. Then we also considered building
14  permits. We really considered all of those
15  different things in arriving at what an appropriate
16  absorption rate would be for both Scenarios A and
17  Scenario B.
18      Q.   If we look at the bottom of this page, you
19  see absorption conclusion starts. Is this the area
20  of your report where you've now synthesized the
21  data that we've gone through and arrived at your
22  conclusions regarding absorption?
23      A.   Yes.
24      Q.   If we look at the next page, the top
                                                    154

1   chart, tell us what this is.
2       A.   So this is a summary of my absorption
3   forecast for Edgewater under both scenarios. You
4   can see under Scenario A, I forecast if you were
5   able to start selling lots immediately that you
6   would sell 15 lots in 2012, 20 lots in 2013, and
7   then the remaining inventory of 16 lots in 2014.
8           Under Scenario B, you can figure that you
9   don't sell any lots for the first six years, and
10  then the first year that you can start selling you
11  sell 46 lots. That's a good reflection of the fact
12  that by 2018 the market had improved significantly,
13  and the demand per lot was higher than it was back
14  in 2012 for forecasting the ability to sell lots
15  out at a rapid pace once you are able to sell those
16  lots six years into the future.
17      Q.   What if your absorption rate under
18  Scenario B is a bit optimistic and it would
19  actually take longer to sell off those properties,
20  what would the impact be on the damages?
21      A.   Scenario B, if we were to forecast that
22  the absorption would actually take longer, that
23  would actually lower the value under Scenario B,
24  and that would actually increase the amount of
                                                    155

1   damages.
2       Q.   The next area of analysis now that
3   you have your absorption rate, if we can look at
4   Paragraph 8, Lot Pricing Analysis?
5       A.   Yes.
6       Q.   What does a lot allocation percentage
7   mean?
8       A.   Well, what we've analyzed up until
9   this point is we're looking at sales of actual
10  homes. That's how people buy these things.
11  They're buying a fully-built home. They're not
12  buying individual vacant lots. We're trying to get
13  a sense, first of all, what the likely home price
14  would be. In order to determine the value of the
15  land, we have to figure out of that home price how
16  much of that is attributed to the land value. So
17  this is where we went through and did our analysis
18  to determine that approximately 20 percent of the
19  total home price was reflective of the underlying
20  lot value. That's driven by our pretty extensive
21  market research looking at actual closed home sales
22  and looking at the ratio of how the assessor has
23  broken out the land value for those sales compared
24  to the overall value, and what we find is that on
                                                    156

1  average it's roughly 20 percent. We also confirmed
2  that by talking to some of the developers and
3  investors in these areas to find out what they
4  typically consider to be a normal allocation of
5  land value, and again that confirmed 20 percent
6  is an appropriate amount.
7      Q.  I noticed that the two entry -- estimated
8  entry median price homes are different. Why is
9  that?
10     A.  Well, this goes again to what I'd
11 indicated before, that by 2018 the market had
12 improved significantly from what it was in 2012.
13 So the actual home price value, we estimate to be
14 significantly higher at $280,000 in 2018 compared
15 to 2015 and 2012 -- $215,000 in 2012. What that
16 reflects is the home prices have appreciated over
17 that period of time, and we want to make sure that
18 we capture that.
19     Q.  You did this same analysis for each of the
20 subdivisions?
21     A.  I did, yes.
22     Q.  This is the last page dealing with
23 Edgewater, right?
24     A.  I believe so, yes. Yes, it is.

157

1  Page 53 at the top, a chart with finished lot
2  values. Is that the result of the work that we
3  just went through and you described under Section 3
4  of your report?
5      A.  Yeah, this is really a summary or
6  recapitulation of everything we just talked about
7  from my market overview analysis.
8      Q.  With respect to each of the lot values,
9  did you arrive at a value under each scenario?
10     A.  I did, yes.
11     Q.  If we can highlight under -- Line 5 be a
12 place to start?
13     A.  Yes.
14     Q.  If you can highlight across to Line 5.
15 Now there are numbers -- there's a column for each
16 of the subdivisions. Do you see that at the top?
17     A.  I do, yes.
18     Q.  There's a Concluded Lot Value Scenario A.
19 Can you tell us what that is?
20     A.  Yes, this is my concluded lot value under
21 Scenario A for each of the different subdivisions
22 that are highlighted there.
23     Q.  For Edgewater, it's $38,414; Settlers
24 Ridge, $48,211; Whispering Meadows, $43,167;

159

1      Q.  If we could, just so the Court is aware,
2  if we look at the beginning of Page 15, which is
3  Page 25 of the trial exhibit, through Page 39,
4  which is Page 49 of the trial exhibit, is that the
5  analysis that we went through in detail for each of
6  the other subdivisions?
7      A.  It is, yes.
8      Q.  Did you apply the same methodology to each
9  of these different subdivisions?
10     A.  I did, yes.
11     Q.  If we went through each of the these
12 subdivisions individually, would your response as
13 far as what you were considering what type of
14 analysis it was be the same?
15     A.  Yes, it would.
16     Q.  Did you reach based upon the data
17 that you analyzed for each of these different
18 subdivisions -- absorption rate, lot pricing, the
19 things that we just went through with Edgewater?
20     A.  I did, yes.
21     Q.  Go to Trial Exhibit Page 63, Page 53 of
22 your report. Now that you've gone through this
23 process or you've gone through the processing of
24 identifying lot values -- first of all, we see on

158

1  Huntington Chase, $37,635; and Waterford, $29,605;
2  is that right?
3      A.  That's correct, yeah.
4      Q.  So that's the revenue side of the lot
5  value under Scenario A?
6      A.  That is one input to the revenue side.
7      Q.  If we look at Line 10, if we could
8  highlight that, would this be the lot value similar
9  to what we just talked about on Line 5 under
10 Scenario B?
11     A.  Yes, it is.
12     Q.  Edgewater, $50,956; Settlers Ridge,
13 $57,832; Whispering Meadows, $44,884; Huntington
14 Chase, $46,299; and Waterford, $35,766; is that
15 correct?
16     A.  That's correct, yes.
17     Q.  Now that you've arrived at these inputs,
18 what is the next step in the methodology that you
19 applied?
20     A.  Well, the next step would be to
21 determine -- you can actually see as part of this
22 there's a Line 4 and Line 9 is the cost to
23 complete, which I previously referenced those are
24 the costs to complete each of those subdivisions,

160

1  which you wanted to take into account, and that's
2  presented beginning on Page 53 of my report.
3     Q.  If we look at Line 3 and Line 8, there's a
4  lot value, and then Line 5 and Line 10 show lot
5  value less cost to complete?
6     A.  Correct.
7     Q.  If we look again using Edgewater as our
8  example down at the bottom of this page, you begin
9  your analysis of cost to complete; is that right?
10     A.  That's correct, yes.
11     Q.  What goes into your analysis and
12  conclusions regarding costs to complete?
13     A.  In this case, I relied upon my client to
14  provide us what the actual cost to complete would
15  be for each of the subdivisions in each of the
16  different scenarios. In my experience, the
17  developer is the best source of that kind of
18  information, so I relied upon that in this case.
19     Q.  Would you -- again looking at Edgewater --
20  calculate the cost to complete under the Scenario A
21  and Scenario B?
22     A.  I did, yes.
23     Q.  For Edgewater, the cost to complete under
24  Scenario A is what?

161

1     A.  Per lot it's $4,586.
2     Q.  Under Scenario B?
3     A.  It's $5,044 per lot.
4     Q.  If we expand the page again, those are the
5  costs to complete that we saw on Lines 4 and 9 of
6  the table regarding finished lot values?
7     A.  That's correct, yes.
8     Q.  If we look going forward the next two
9  pages, or we'll go to the next page and pause. We
10  see Settlers Ridge, Whispering Meadows, Huntington
11  Chase, and the next page Waterford, so we see the
12  analysis that you did for each of those
13  subdivisions regarding cost to complete?
14     A.  Yes.
15     Q.  After you've identified the cost to
16  complete, what's the next step in the methodology?
17     A.  So the next input from the revenue side is
18  to look at the absorption rate, which is the rate
19  at which we should actually sell the lots.
20     Q.  Why is that important?
21     A.  Well, it's a very important part of the
22  analysis to know how quickly you're going to be
23  able to sell those lots. For instance, by example,
24  if you look at that chart there where I have the

162

1  absorption schedule for Edgewater -- and I
2  referenced this before -- I estimate that you would
3  sell 15 of the lots in the first year, 20 lots in
4  the second year, then the remaining 16 lots in the
5  third year. So that is going to help drive the
6  revenue side of the equation. Obviously, if you
7  can sell them faster you get the revenue sooner.
8  If it takes longer to sell them, it takes longer to
9  get that revenue.
10     Q.  What's the significance of the amount of
11  time it takes to get revenue?
12     A.  The time value of money is very
13  significant. If you're not going to receive the
14  revenue until much further out in the future, it's
15  worth less to you today than if you received it
16  sooner. It's a very important factor to consider.
17     Q.  I noticed under Waterford the absorption
18  rate is actually longer than the others. Why is
19  that?
20     A.  Waterford has a much higher lot inventory.
21  You can see that the other four subdivisions,
22  there's 51 lots in Edgewater, 51 in Settlers Ridge,
23  71 in Whispering Meadows, and 47 in Huntington
24  Chase, whereas Waterford has 176. Just by virtue

163

1  of the fact that you have a lot more lots in your
2  inventory at Waterford, it's going to take longer
3  to sell those out.
4     Q.  Now that you have the lot values, the
5  absorption rate and the other data that we've just
6  gone through, what's the next step in arriving at
7  an appraisal?
8     A.  The next step now that we've determined
9  what the revenue side of the equation is, now we
10  have to look at the operating expenses.
11     Q.  Let's go to the next page, Trial Exhibit
12  Page 66, Page 56 of the Stout Report. Did the
13  operating expenses that you analyzed, do the
14  summaries of those expenses begin on Page 56?
15     A.  They do, yes.
16     Q.  Tell me what it is you're looking for and
17  what it is you analyze when assessing the operating
18  expenses.
19     A.  Well, the operating expenses are a normal
20  part of any kind of investment like this. You're
21  going to incur real estate costs, real estate
22  taxes, sales commissions. You're going to have
23  carrying costs. All those things are an important
24  part of the cash flow analysis that we're looking

164

1  at, so you have to look at each of those and
2  incorporate those into your analysis.
3       Q.   The real estate taxes, is that something
4  that was provided by the client?
5       A.   They did provide information on real
6  estate taxes, but we actually researched that by
7  going through public records ourselves.
8       Q.   We see onto the next page that there are
9  categories of information and data that you
10  analyzed under operating expenses, is that fair?
11       A.   Yes.
12       Q.   If we could blow up the chart under
13  marketing, general and administration.  Tell us
14  what that is.
15       A.   So this is another expense category very
16  typical of what you incur in subdivisions like
17  this.  It goes to things like office salaries, and
18  supplies and accounting, marketing expense.  These
19  are just typical of what you would find in a
20  subdivision.
21       Q.   All these things that we've talked about,
22  these data points, absorption, operating expenses,
23  cost to complete, is that part of a generally
24  accepted methodology for appraising a subdivision?
165

1       A.   Yes, absolutely.
2       Q.   Once you analyze the operating expenses,
3  now what is your next -- I'm assuming you
4  identified additional input?
5       A.   Yes.
6       Q.   You talk about the revenue side.  We're
7  now on the cost side?
8       A.   Right.
9       Q.   Now we have information on both sides of
10  the line there.  What's the next step?
11       A.   So now since we have both the revenue
12  and expenses figured out, we know what the net
13  sale proceeds would be, which is really just the
14  expenses being subtracted from the actual revenue.
15  The next step then is to apply the appropriate
16  discount rate, which is what an investor will
17  require for a rate of return to make that
18  investment.
19       Q.   The net sale proceeds, is that identified
20  in a chart?
21       A.   Well, there's a heading on Page 57, but
22  then when we get to our discount cash flow
23  analysis, you'll see where the net sale proceeds
24  are for each of the subdivisions.
166

1       Q.   The next step is identifying the
2  appropriate discount rate?
3       A.   Yes.
4       Q.   How do you go about in an appraisal such
5  as this identifying an appropriate discount rate?
6       A.   The best resource for that is to look at
7  published investor surveys.  There's a number of
8  surveys that are published where they actually go
9  out and seek responses from investors and
10  subdivisions like the subject and ask them what
11  kind of rate of return they're looking for as of a
12  point in time.  You can see on Page 58 of my
13  report, that chart in the middle, there's a summary
14  of discount rates from three different investor
15  surveys that I relied upon.
16       Q.   Are these the types of surveys that you
17  would rely upon in conducting a discount rate
18  analysis both in cases involving litigation and
19  cases that are outside of litigation?
20       A.   Yeah.  I mean, regardless of what the
21  purpose of this valuation is, these are the
22  resources we would rely upon to determine the
23  appropriate discount rate.
24       Q.   What did your review of this data -- how
167

1  did that form your conclusions?
2       A.   In looking at this, the range of discount
3  rates that are displayed here as well as the
4  average and then comparing that to specific
5  circumstances around our subject properties, I
6  came to the opinion as to what the appropriate
7  discount would be under both Scenario A and
8  Scenario B.
9       Q.   What discount rate did you apply to
10  Scenario A?
11       A.   Scenario A, in my opinion the appropriate
12  discount rate is 15 percent.  You can see that
13  that's below the average, and it's toward the low
14  end of the range.  The rationale for selecting a
15  rate that's more the lower end of the range would
16  be the fact that these are established
17  subdivisions.  They already have a track record
18  of being able to have demand for the lots that are
19  there.  The infrastructure is essentially in place.
20  You've already got the entitlements.  The plats
21  have been recorded.  When you think about the
22  higher end of the spectrum, those typically would
23  be for more raw land, where you have to go through
24  the whole entitlement process, you have to get all
168

1  the plats done, you have to get all the approvals
2  done and then start generating demand for it.
3  There's a lot more risk associated with that. In
4  this case, we're already past that phase, and so
5  in my view it's less risky and that's why a
6  15 percent discount rate would be appropriate.
7      Q.   The greater the risk, the greater the
8  discount rate?
9      A.   Yes.
10     Q.   Did you select a discount rate with
11 respect to Scenario B?
12     A.   I did. In my opinion in Scenario B
13 there's significantly more risk associated with
14 having to wait six years until they can start
15 receiving sale proceeds. Anything could happen in
16 that six-year period of time. The economy could
17 tank and all of a sudden there's no demand for
18 lots. You've also got significant carrying costs,
19 so there's a lot more risk associated with that.
20 In my opinion, there should be a 10 percent premium
21 added to that rate, and a rate of 25 percent is
22 appropriate for Scenario B.
23     Q.   The 10 percent premium accounts for the
24 fact that Scenario B, where you're going to sit for

169

1  six years before being able to sell anything is a
2  much riskier investment?
3      A.   Exactly, yes.
4      Q.   If you were to increase that discount
5  rate, what would that do to the value of the
6  property on January 1st, 2012?
7      A.   Well, the higher the discount rate, the
8  lower the present value. So if you increase the
9  discount rate, it's going to lower the value.
10     Q.   The longer that you're required to hold
11 it, the less the value?
12     A.   Yes.
13     Q.   If you look at the next page, once you
14 arrive at the discount rate -- if we could it blow
15 up including the heading -- there's a chart that
16 reflects discounted cash flow analysis under
17 Scenario A?
18     A.   Yes.
19     Q.   Take us through all the inputs that
20 we have gone through, the data that we've gone
21 through, and put that into this analysis and what
22 you arrived at?
23     A.   Okay. So this is Scenario A for the
24 Edgewater subdivision. This really summarizes all

170

1  of the inputs that we just talked about. You can
2  see there on Line 1, this is the total number of
3  lots that are available to you as of January 2012.
4  You can see in that first column there's 51 lots.
5  That's the total inventory of the lots at
6  Edgewater. As I previously indicated, I estimate
7  the absorption of 15 lots -- that is, you'll be
8  able to sell 15 lots the first year. That will
9  leave you with 36 lots remaining.
10          Then moving on to 2013, you can see you
11 have 36 lots at that point, and I estimate you'll
12 be able to sell 20 lots that year. So now you have
13 16 lots of the total remaining.
14          Then, finally, in the third year, I
15 estimate that you will be able to sell those
16 remaining 16 lots. Then moving down, then the way
17 the calculation works is you can see in Line 4
18 I've concluded what I estimate to be the average
19 standard vacant lot price. We do the math. We
20 sell 15 lots in year one, multiply it by the
21 average lot price of $38,414, and it gives you
22 gross sale proceeds of $576,217. That's Line 7 in
23 that chart. Then just continuing on down that same
24 column, now you have to account for the expenses.

171

1  You'll have some sales commissions associated with
2  those sales. You would have property taxes. You
3  have marketing, general administration. So now you
4  have net sale proceeds of $535,882, so that's what
5  you expect to receive net in that first year. Now
6  this is where the discount rate is applied to come
7  up with the present value of that cash flow that
8  you're going to receive the first year. Once you
9  apply that, then you get the present value, which
10 is displayed in Line 14.
11          I do that same calculation for the second
12 year and for the third year, and you can see the
13 present value of that net proceeds on Line 14 for
14 each of those three years. You add those together,
15 and that's the present value or the current market
16 value to a single buyer as of January 1, 2012 for
17 Edgewater.
18     Q.   So, again, this is for Edgewater. You
19 have a concluded market value that you rounded down
20 to $1,395,000?
21     A.   That's correct.
22     Q.   Then once you arrive at that number,
23 are you able to calculate the value per lot?
24     A.   The value per finished lot, yes.

172

1    Q.   For Edgewater, that's identified on
2    Line 17 as $27,353?
3    A.   Yes.
4    Q.   If we could just go to the next page,
5    Page 60.  Is that the same analysis for Settlers
6    Ridge and Whispering Meadows?
7    A.   Yes.
8    Q.   If we were to walk through it, it would
9    be the same analysis that you just described with
10   Edgewater?
11   A.   Yes, it is.
12   Q.   The next page, we see Scenario A for
13   Huntington Chase and Waterford?
14   A.   That's correct, yes.
15   Q.   Again, if we were to walk through each
16   chart, it would be the same analysis, same
17   approach?
18   A.   That's correct, yes.
19   Q.   If you could take us to Trial Exhibit
20   Page 72, Page 62 of the Stout Report, highlighting
21   just the top chart.  Is this the Scenario B
22   discounted cash analysis for Edgewater?
23   A.   Yes, it is.
24   Q.   Take us through the analysis that you

173

1    performed to arrive at the market value here.
2    A.   Yes.  So the approach is the same as what
3    I just went through for Scenario A; however, you
4    can see here if you look at Line No. 2, for each of
5    those first six years you're selling no lots.  So
6    you have zero lots being sold in those first six
7    years.  Then finally, in January of 2018, when
8    you're able to start selling them, then I estimate
9    you would be able to sell 36 lots in the first year
10   and then the remaining 15 in that second year.
11       So you can see then by moving down the
12   chart, you can see how this translates into cash
13   flows.  You would have no revenue because you're
14   not selling anything for that first six years.
15   Yet, at the same time, you're still incurring
16   carrying costs, you're still incurring property
17   taxes, and so you actually have negative net sale
18   proceeds for the first six years of that
19   investment.  That's all displayed on Line 13.  You
20   don't have positive cash flow until 2018 over six
21   years out.  So you're taking the present value of
22   all those negative cash flows and then those future
23   cash flows six years out, and adding those
24   altogether it comes up with an indicated present

174

1    value or market value of $325,000, which is shown
2    on Line 17.
3    Q.   So the longer that property is held
4    without the ability to sell, the less it's worth?
5    A.   Yes.
6    Q.   If we can expand the page just to close
7    the loop on the others, the next chart is the same
8    analysis that you described with respect to
9    Settlers Ridge?
10   A.   Yes.
11   Q.   The next page, if we were to go through
12   it, it's the same analysis that you went through
13   with Edgewater for Whispering Meadows and
14   Huntington chase?
15   A.   That's correct, yes.
16   Q.   The next page, Page 64, would be the
17   Scenario B that you just described with respect to
18   Edgewater, but using the data that you identified
19   for Waterford?
20   A.   Yes, correct.
21   Q.   If you could move to Trial Exhibit
22   Page 75, Page 65 of the Stout Report, this is an
23   income capitalization conclusion and there's a
24   chart that identifies numbers for Scenario A and

175

1    Scenario B for all five subdivisions.  Can you tell
2    me what this is?
3    A.   This is a summary of my conclusions from
4    all the previous pages, so this is a discounted
5    cash flow analysis conclusions for each of the
6    subdivisions under each scenario.
7    Q.   If we look in each of these scenarios, the
8    value under Scenario B with the forced hold period
9    is less?
10   A.   Yes, it is.
11   Q.   Edgewater is more than a million dollars
12   less in value under Scenario B?
13   A.   That's correct, yes.
14   Q.   Line 6, what does that tell us with
15   respect to Scenario A and Scenario B?
16   A.   Line 6 is a total.  It's adding up all the
17   market value indications for the five subdivisions
18   under each scenario.  For Scenario A, the total
19   conclusion market value is $9,435,000.  Under
20   Scenario B it's $1,715,000.
21   Q.   The numbers that we're talking about here,
22   are those based upon the methodology and the
23   analysis that you performed?  Is that the appraised
24   value under each of the scenarios?

176

1    A.   It is, yes.
2    Q.   After you arrived at the appraised value
3  under the two different scenarios, did you perform
4  any additional steps in your analysis?
5    A.   The final step is really just a
6  reconciliation.
7    Q.   If you could turn to Trial Exhibit
8  Page 77, Page 67 of the Stout Report.  Break out
9  under reconciliation through the chart.  So once
10  you identified the value under the two different
11  scenarios, you performed a reconciliation.  Can you
12  tell us what that is?
13    A.   Yes.  This chart here is just a summary of
14  what I presented before with the value indications
15  for each subdivision.  Then the chart just below
16  that summarizes my final conclusion of value under
17  each scenario.  This is similar to the chart that
18  we originally looked at back at the very front of
19  my report, which indicates the fair market value
20  under Scenario A is $9,435,000.  Under Scenario B
21  it's $1,715,000.  That difference, which is the
22  damages due to the diminution of value is
23  $7,720,000.
24    Q.   We mentioned this before, and I think it

177

1  may be clear, but is your opinion in this case to a
2  reasonable degree of appraising certainty that the
3  actual damages caused by the forced delay are
4  $7,720,000?
5    A.   Yes.
6    Q.   And is it your opinion to a reasonable
7  degree of appraising certainty that the fair market
8  value of the property as of January 1st, 2012 under
9  Scenario A is $9,435,000?
10    A.   Yes, it is.
11    Q.   And is it your opinion to a reasonable
12  degree of appraising certainty that the fair market
13  value of the property under Scenario B with a
14  forced hold is $1,715,000?
15    A.   That's correct, yes.
16    Q.   What's the date of your report?
17    A.   My report was actually issued on August 2,
18  2017.
19    Q.   So you're assuming a date of January 1st,
20  2012.  Is that common to assume a date for
21  valuation?
22    A.   Yeah, for any valuation assignment that we
23  have, we're asked typically to provide our opinion
24  of value as of a specific date.  It just depends on

178

1  what the purpose of the appraisal is.  For example,
2  if it's an appraisal being done for Estate Tax
3  Purposes, we might be asked to assume a date of
4  value consistent with a date of death.  It depends
5  on the purpose.  It's very common for a client to
6  ask us for an opinion as of a specific date.
7    Q.   So you were valuing this property as of
8  January 1st, 2012, but in 2017 should you have gone
9  back and reviewed January 1st, 2012 in a vacuum or
10  not considered any actual information after that
11  date?
12    A.   Absolutely not.  The purpose here, as
13  we're trying to determine what the damages are,
14  we want to take into consideration changes that
15  occurred in the market between that period of time.
16  In fact, in this case the market has improved.  As
17  I indicated before, home prices have improved.  The
18  level of demand and absorption have improved.  We
19  want to make sure we capture what's actually
20  happened in the market, so we get a more accurate
21  estimate of what the damages are.
22    Q.   Did you prepare any additional scenarios?
23    A.   I did.  I was also asked to prepare what I
24  call a Scenario C and a Scenario D.  Those are

179

1  presented on Page 101 of my report.
2    Q.   Page 111 of the trial exhibit Page 101 of
3  the Stout report.  This was prepared last year on
4  August 2, 2017.  What was the purpose?
5    A.   So the purpose under Scenario C, I was
6  asked in this case then to assume that there's a
7  further delay and that you're not able to start
8  selling lots until October 1st, 2018.  Then for
9  Scenario D, I was asked to assume that the lot
10  sales extended even further up to September 1st,
11  2019.
12    Q.   Did you compare Scenario A to Scenario C
13  assuming a sale date beginning in October of 2018?
14    A.   I did, yes.
15    Q.   And did you calculate the damages based on
16  that assumption?
17    A.   Yes, based on that scenario C, the damages
18  would be $8,110,000, as shown in that chart.
19    Q.   Did you calculate the damages based on
20  Scenario D that assumed lot sales beginning in
21  2019?
22    A.   Yes.  In that case, I estimate that number
23  to be $8,620,000.
24    Q.   That was based upon the uncertainty of

180

1 when these proceedings would finish, is that fair?
2     A.   I believe that was the reason I was asked
3 to do that, yes.
4     Q.   Did you actually perform an updated
5 assessment this year, in July?
6     A.   I did not, no.
7     Q.   After you prepared this report, did you
8 become aware of any closings or sales?
9     A.   Yes, I understand there have been two
10 closed sales of some of the subject lots since this
11 report was issued.
12     Q.   Do you know the percentage of lots that
13 have sold since the Court Order and since your
14 report was issued?
15     A.   It's my understanding that there were
16 72 lots that have actually closed, which represent
17 about 18 percent of the total inventory of the
18 lots.  I believe there were 25 lots in Edgewater
19 and then 47 lots in Huntington Chase that were
20 sold.
21     Q.   Do you recall the amounts of the lot
22 prices?
23     A.   I do.  The lot prices for Edgewater --
24 there's 25 lots that sold in January of 2018 for

181

1 $50,000 per lot, and then the Huntington Chase sold
2 in April of 2018 for $45,500 per lot.
3     Q.   Do those lot prices change your opinion in
4 any way?
5     A.   They do not.  They actually confirm it,
6 because those average lot prices -- there's less
7 than a two percent difference between those actual
8 lot prices and what I had projected for lot values
9 as of 2018 for those subdivisions.
10     Q.   Has the market improved since 2012?
11     A.   Yes, it has.
12     Q.   Did your analysis account for these market
13 improvements?
14     A.   It did.
15     Q.   How so?
16     A.   Well, as I previously indicated, the home
17 values have appreciated significantly.  If you look
18 at my Scenario A versus Scenario B, you could see
19 I've estimated the average home price has increased
20 between 2012 and 2018.  The other thing is I've
21 looked at the rate of absorption, and the level of
22 demand has increased between that period of time,
23 so I guess the lots will sell faster starting in
24 2018 than they did back in 2012.  So I've captured

182

1 that improvement in the market.
2     Q.   If the lot prices have improved since 2012
3 to 2018, wouldn't TRG have made a profit from that
4 forced delay?
5     A.   Well, no, because here they had to wait
6 six years before they could even start receiving
7 those proceeds.  There's a number of things that go
8 into that.  There's a time value of money.  They're
9 also incurring significant carrying costs during
10 that period of time for which you're receiving no
11 sale proceeds.
12     Q.   Would it be fair to -- if you're trying to
13 find out the level of damages -- to just compare a
14 purchase price to the sale price?
15     A.   I'm not sure I understand your question.
16     Q.   I will withdraw the question.
17         If you'll look at Page 78 of the trial
18 exhibit, Page 68 of your report.  This is the
19 section for Certification?
20     A.   Yes.
21     Q.   This is what you've described as the most
22 important aspect of a USPAP compliant report?
23     A.   Yes.
24     Q.   This is where as an appraiser you're

183

1 putting your license out there and your reputation
2 and experience out there and certifying that this
3 work is done appropriately and fully compliant?
4     A.   That's correct.  If you move onto the next
5 page, you can see some of the details of part of
6 that certification.
7     Q.   There's a number of details listed on this
8 page.  If you look at the top, it says I certify as
9 otherwise noted in this appraisal report that to
10 the best of my knowledge at belief -- and then it
11 lists a number of different bullet points.  Do you
12 see that?
13     A.   Yeah, these bullet points and specific
14 wording are dictated very specifically within
15 USPAP.  You have to use this exact language in
16 your reports as far as your certification.
17     Q.   If we look at the next page, we see on
18 the left, is that your signature?
19     A.   Yes, it is.
20     Q.   And your license number?
21     A.   Yes.
22     Q.   And we see Ms. Krieger's signature and
23 license number on the right-hand side?
24     A.   That's correct, yes.

184

1   Q.   In your opinion, to a reasonable degree of
2   appraisal certainty, that the analysis that you
3   performed, the methodology that you employed, and
4   the conclusions that you reached are all in
5   compliance with USPAP?
6   A.   Yes.
7   Q.   And you hold the opinions that you
8   discussed here today to a reasonable degree of
9   appraisal certainty?
10   A.   I do, yes.
11   MR. TURIELLO:  May I have a two-minute break,
12   Judge?  It's probably going to be the last
13   question.
14   THE COURT:  It's going to need to be pretty
15   close to that anyway.  I think we've run out of
16   time for cross today.  You can confer.  We're not
17   taking a recess.  Just confer on the side.
18   MR. TURIELLO:  I appreciate what you're saying.
19          (Discussion off the record.)
20   MR. TURIELLO:  Thank you, your Honor.  Subject
21   to reserving our right to offer Mr. VanSanten in
22   rebuttal of Mr. Barry, should he testify, we would
23   thank him for his time, and subject to admission of
24   Exhibit 15, which we would move at this time.  I

185

1   or someone from her office will be available?
2   THE REPORTER:  Yes.
3   THE COURT:  So we will stand in recess until
4   tomorrow morning at 9:00 a.m.
5   MR. RIORDAN:  I have one comment.  The way
6   things are going, we haven't even gotten to
7   Mr. Kyte.  Mr. Kilburn will be here.  I just
8   request the Court's permission not to have my other
9   two witnesses here tomorrow because I don't think
10   we're going to get to them.  We've already talked
11   about a future date that I can have them available.
12   One of them is a village administrator in
13   Yorkville.  He's got a lot of duties to attend to.
14   The other is my expert.  He could be here, but I
15   just don't think we're going to get to him.
16   They're going to be filing a motion.  We talked
17   about that already.
18   MR. RUFF:  Your Honor, I'd like to hear how
19   long counsel is going to be with each of the
20   witnesses, because then that will determine whether
21   or not they should be here because what we've heard
22   is these are going to be very short witnesses.  So
23   how long with Mr. Kilburn, just a general outline.
24   THE COURT:  Or maybe more precisely, if you

187

1   think that's all we have.
2   THE COURT:  So you're moving for the admission
3   of Exhibit 15.  I don't want you to run off.  I
4   want to hear from opposing counsel.
5   MR. RIORDAN:  Your Honor, I think I'd like to
6   reserve my objection until after Cross.
7   MR. TURIELLO:  I think that's fair.  That's
8   fine, so as not to take the time now on objections.
9   THE COURT:  Okay.  So we're reserving on that
10   issue and also reserving the witness for possible
11   rebuttal.  Then that means, Mr. Riordan, it would
12   ordinarily be your attempt to cross at this point,
13   but I'd be cutting you short after about five
14   minutes, which I suspect you don't want.
15   MR. RIORDAN:  No.
16   THE COURT:  Okay.  So what I think we're going
17   to have to do is reconvene tomorrow morning, and
18   that means that the witness would have to be here
19   tomorrow morning.  I think we've discussed starting
20   at 9:00 a.m. tomorrow to try to get some more time
21   in.  Everyone understand that start time?
22   MR. RUFF:  Yes, your Honor.
23   MR. RIORDAN:  Yes, your Honor.
24   THE COURT:  Will you make sure a court reporter

186

1   don't bring your two witnesses, would you be able
2   to conclude with those two witnesses in a five-hour
3   period which is another afternoon?
4   MR. RIORDAN:  Yes, I would be.
5   THE COURT:  How much do you think each witness
6   would take for your direct?
7   MR. RIORDAN:  I would say no more than an hour
8   with Mr. Olson and a half hour, maybe 45 minutes
9   tops, with Mr. Barry.  But I know when we took
10   Mr. Olson's deposition, he was examined for almost
11   four hours by TRG's counsel.  They have added many
12   exhibits since that date to the trial book, which I
13   didn't have any objection to except I reserved my
14   objections to the exhibits themselves, so I mean
15   you could use that as a guide.
16   THE COURT:  I don't think any one of us,
17   including the Court, on recesses has stuck to a
18   timeframe that they've promised.  So I think that
19   absent an objection from opposing counsel, I'm
20   going to say that's fine, but I think the quid pro
21   quo for that is if we do overflow to an afternoon,
22   I'm going to require you to finish in that
23   afternoon.
24   MR. RIORDAN:  I agree with that, Judge.  I

188

```
 1   don't have a problem with that.  You said we would
 2   have from 1:00 to 5:30, so that's four-and-a-half
 3   hours.  I can't guarantee what the cross is going
 4   to be, but I know my direct will be able to finish
 5   in that period of time.
 6       THE COURT:  I understand.  Is there an
 7   objection to preceding in that matter?
 8       MR. RUFF:  You Honor, I just feel -- how long
 9   is Mr. Kilburn going to be?
10       MR. RIORDAN:  He could be a half hour,
11   40 minutes.  I don't know.
12       MR. RUFF:  I mean, I've already done my cross.
13   That's what I'm saying.  I think there might be
14   room if we're talking bring the one witness --
15       MR. RIORDAN:  We're going another day.
16       THE COURT:  Gentlemen -- and I use that term
17   because I think you can both be gentlemen -- let's
18   be reasonable here.  If we're overflowing for one
19   witness, we might as well overflow for two, so
20   there's no danger of going beyond that overflow
21   day.  That will mean we'll close early tomorrow.
22   Frankly, I would welcome that, and perhaps you
23   shall as well.
24       MR. RUFF:  Very well.
                                              189
```

```
 1       THE COURT:  Okay?
 2       MR. RUFF:  Okay, your Honor.
 3       THE COURT:  We'll see you back here at 9:30 --
 4   no, 9:00 a.m.
 5                   (whereupon, further proceedings
 6                    in said cause were adjourned to
 7                    8-29-18 at 9:00 a.m.)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
                                              190
```

```
 1   STATE OF ILLINOIS  )
 2                      )  SS:
 3   COUNTY OF C O O K  )
 4
 5       Frances S. Lucente, as an Officer of the
 6   Court, says that she is a shorthand reporter doing
 7   business in the State of Illinois; that she
 8   reported in shorthand the proceedings of said
 9   trial, and that the foregoing is a true and correct
10   transcript of her shorthand notes so taken as
11   aforesaid, and contains the proceedings given at
12   said trial.
13       IN TESTIMONY WHEREOF:  I have hereunto set
14   my verified digital signature this 28th day of
15   September, 2018.
16
17
18       Illinois Certified Shorthand Reporter
19
20
21
22
23
24
                                              191
```

**$**

$1,395,000
172:20
$1,715,000
133:21 176:20
177:21 178:14
$1.9
39:21
$124
13:10
$135,000
119:10
$170,000
95:5
$2.7
39:3,16
$215,000
157:15
$27,353
173:2
$280,000
157:14
$29,605
160:1
$325,000
175:1
$35,766
160:14
$358,730
13:8,9
$37,635
160:1
$373,000
14:5
$373,079
14:2
$38,414
159:23 171:21
$4,586
162:1
$40,000
78:11
$410
118:14
$43,167
159:24
$44,884
160:13
$45,500
182:2
$46,299
160:14
$48,211
159:24
$49,000
51:20
$49,500
51:14
$5,044
162:3
$50,000
51:7 78:4,11 182:1
$50,956
160:12
$52,000
51:8 78:5
$535,882
172:4
$57,832
160:13
$576,217
171:22
$7,720,000
134:21 177:23 178:4
$7.72
134:4
$8,110,000
180:18

$8,620,000
180:23
$800,000
39:6,16
$9,435,000
133:15 176:19
177:20 178:9

**1**

1
19:7 45:18 57:14
123:19 124:1,4
149:16 171:2 172:16
10
87:11 139:1 160:7
161:4 169:20,23
100
152:2
101
180:1,2
106
27:1 152:1
109
26:17 127:14
11
24:15,17 66:2,17
127:18 149:11
111
180:2
113
99:11
115
115:8
116
116:12
119
127:13
12
45:10 91:18 135:21,
22 152:11
123
99:5,12
124
114:24 115:1
126
116:11,12
13
19:8,10 62:4 63:21
64:20 66:1,18
174:19
137
153:5
14
25:21 64:13 65:7
131:11 172:10,13
15
19:21 26:13 62:1,2,3
63:22 65:17 87:11
98:1 99:5,7,9 114:23
116:11 117:22 119:5
122:3,11,21 123:10
124:7 127:13 130:23
155:6 158:2 163:3
168:12 169:6 171:7,
8,20 174:10 185:24
186:3
16
6:1 12:1,6 122:22
131:12 155:7 163:4
171:13,16
17
11:19 12:1 64:7 65:2
72:19 75:12 83:2
135:11 153:2 173:2
175:2
176
163:24
18
12:1 181:17

18th
88:11,16 89:4,20
90:14 91:1,9,11
19
12:1 82:24 143:8
1986
100:1
1989
100:16 105:6
1992
101:4 110:2,6
1993
102:10
1995
110:24
1999
105:7
19th
88:11,17 89:4,21
90:14 91:1,9
1:00
89:8 189:2
1st
132:16 170:6 178:8,
19 179:8,9 180:8,10

**2**

2
19:7 45:18 57:15
75:17 119:23 145:2
74:4 178:17 180:4
2,886
13:7,9 14:10
20
112:13 114:16 155:6
156:18 157:1,5
163:3 171:12
200
18:15
2008
6:6
2009
64:1,13,22 76:8
2010
26:9,10 53:9 64:13
65:12 72:17 76:8
145:13 147:9 149:17
150:6
2011
130:10 153:18
2012
45:2,10 54:1 123:19
124:1,4 132:16,22
146:18 151:18
155:6,14 157:12,15
170:6 171:3 172:16
178:8,20 179:8,9
182:10,20,24 183:2
2013
45:18 155:6 171:10
2014
30:7 45:14 155:7
2015
45:22 157:15
2016
5:23 55:7 129:12
130:10 145:13
149:18 150:7 151:9,
22 152:11 153:19,23
2016-2017
129:6
2017
70:4 95:10 122:17
129:12 131:11,12
147:10 153:19,23
178:18 179:8 180:8
2018
6:3 57:12 146:21,22
155:12 157:11,14
174:7,20 180:8,13

181:24 182:2,9,20,
24 183:3
2019
180:11,21
2021
145:13 146:14
151:14,23 152:2
21
149:10 152:11
22
65:12
25
85:6 158:3 169:21
181:18,24
26
100:19
267
90:16
268
90:16
27
45:18
28
45:22
29
45:13
2nd
95:10

**3**

3
21:8 26:24 62:6
65:11 143:6 148:24
159:3 161:3
30
6:15,17,21 7:4
85:17,19 113:22
150:20
30-
85:4
344
153:5
358,000
13:17
36
171:9,11 174:9
363
75:3
373,000
13:18
39
158:3
396
142:11

**4**

4
45:21 132:12 160:22
162:5 171:17
40
21:5 189:11
45
188:8
45-minute
85:5
46
155:11
47
51:12 163:23 181:19
49
158:4
4th
88:10 89:1,23 90:15,
23

**5**

5
123:11 128:2 130:24
132:13 151:12
159:11,14 160:9
161:4
50
21:5 136:12 138:21
51
51:4 139:10 142:5
163:22 171:4
52
141:17,20
53
19:22 142:21 158:21
159:1 161:2
56
164:12,14
57
166:21
58
167:12
5:00
89:8
5:30
89:8 189:2
5th
88:10 89:2,23 90:15,
23

**6**

6
26:16 122:22 128:1
135:20,22 176:14,16
60
136:11 173:5
61
13:5
62
141:17 173:20
63
142:21 158:21
64
175:16
65
175:22
66
164:12
67
177:8
68
183:18

**7**

7
64:1 135:12 136:12
171:22
71
163:23
72
173:20 181:16
75
175:22
77
177:8
78
150:7 183:17
7th
64:22

**8**

8
26:20,24 62:5 128:2
156:4 161:3

8-29-18
190:7
81
150:7
8th
64:13,22

**9**

9
143:9 144:8 160:22
162:5
94
102:10
95-5
7:7
971
149:20
9:00
85:20 92:2 186:20
187:4 190:4,7
9:30
85:20 190:3

**A**

A-RING
9:7,16 10:2,8,10,11,
15 11:13
a.m.
186:20 187:4 190:4,
7
ability
50:8 124:6 133:17
155:14 175:4
absent
15:14 188:19
absolutely
34:16 63:17 71:21
72:12 73:11 77:21
84:1 107:10,17
108:6 121:17 153:15
166:1 179:12
absorption
10:20 138:20 143:18
152:12 154:5,8,16,
19,22 155:2,17,22
156:3 158:18 162:18
163:1,17 164:5
165:22 171:7 179:18
182:21
accept
32:20 125:3
accepted
117:18 165:24
account
37:18 161:1 171:24
182:12
accountants
107:6 109:2
accounting
107:6 165:18
accounts
169:23
accumulate
101:22
accuracy
71:15,22
accurate
12:2 179:20
achieve
103:12
acknowledge
67:18
acknowledges
24:24 63:2 67:4
68:13
acronym
106:10



action
56:3
actions
34:1 44:22 54:5,8
56:10 60:8 95:16
activity
148:13
actual
16:24 93:15 94:6
106:1 127:6 133:22
139:3,6,11 147:11
154:11 156:9,21
157:13 161:14
166:14 178:3 179:10
182:7
add
10:13,15 172:14
added
58:7 169:21 188:11
adding
174:23 176:16
addition
105:15 107:23
128:14
additional
13:23 37:9,10 83:10
87:24 88:9 94:3 95:5
105:16,20,23 166:4
177:4 179:22
Additionally
5:3
address
37:1 96:14
adequacy
25:10
adequate
34:22 36:12,13
128:11
adjourned
190:6
administration
165:13 172:3
administrator
187:12
admission
185:23 186:2
admits
86:24
advanced
104:5
advised
67:5
Advisory
109:16
advocate
90:20
affiliate
20:11
affiliated
108:3
affiliation
103:14
afford
145:23 146:7 150:13
151:2
affordability
145:21
afield
77:8 78:17
afternoon
4:10 53:18,19 89:12,
20 90:6,7 91:9
188:3,21,23
afternoons
88:8 91:10
agree
37:18,20 38:2 51:16
67:19 188:24
agreed
87:18

agreement
7:6 18:23 19:16
21:12 23:22 24:6,9,
16 25:19 26:5,8
28:14 35:23 49:12,
16,17,19,24 51:11
58:6 61:21 64:4,11,
21 65:10 67:14 68:1
agreements
17:4,13,15,17,23
25:17 75:23
agrees
63:2
ahead
11:3 31:10
AI-GRS
105:17,20,23
Alan
88:19
alive
48:17
allocation
72:16 156:6 157:4
allowance
14:11
allowed
36:19
altered
122:9
altogether
119:6 174:24
Amend
89:16
amended
93:20,21
amendment
65:9
amendments
51:24 52:3 61:21
64:4
American
117:7
amount
29:7 33:19 34:15,19,
22 35:4,15,17 37:5,
15 39:22 43:12,17
74:12 155:24 157:6
163:10
amounts
34:24 72:2 80:1,2
181:21
analysis
12:1,7,8,9,10,12,15
13:6,13 14:20,23
15:9,11 68:4,20
71:24 79:9,13 104:6
107:2 111:12 118:1,
2 121:22 127:2
128:12 129:1,4
132:5 133:2 134:8,
18,21 135:17 137:7,
18 138:2,9 139:21
140:4,12,14 141:8,
10 142:23 143:20,24
144:2 145:1,6,7
146:1 147:18 148:14
149:13,15 151:5,8,
14 152:12 156:2,4,
17 157:19 158:5,14
159:7 161:9,11
162:12,22 164:24
165:2 166:23 167:18
170:16,21 173:5,9,
16,22,24 175:8,12
176:5,23 177:4
182:12 185:2
analyze
146:24 164:17 166:2
analyzed
149:2 156:8 158:17
164:13 165:10

and/or
13:22 67:6
Annexation
164:12,15,16,22
35:23
annotated
98:4
annual
149:3
annually
73:4
answers
22:23 50:11
anticipate
27:11,15,17,18,21
30:6,9,10 81:17
anticipated
136:22 137:16
anybody's
93:1
anymore
69:7
apartment
110:9 112:3
apartments
150:5
appeal
48:22,23 54:8 57:10
95:14,17
appealed
48:11
appeared
15:7 71:20
appears
4:1
appetite
10:18
applications
104:13
applied
96:3 160:19 172:6
apply
107:19 121:15
140:13 141:7 158:8
166:15 168:9 172:9
applying
141:1,11 150:8
appraisal
99:9 101:1,3 103:8,
9,15,17 104:11,21
105:10 106:9 107:1,
20,22 108:4,8,17
110:1 111:24 112:11
115:14 116:23
117:2,18 119:20
120:3,7,16,18 121:8,
9 123:3 124:24
125:7,14,19,20,23
131:17,22 133:18
134:15 136:16
147:18 164:7 167:4
179:1,2 184:9 185:2,
9
appraisals
104:15 105:18
108:1 110:16
114:12 116:4
appraise
101:15 132:15
appraised
112:14 133:7 146:2
176:23 177:2
appraiser
98:23 100:18 101:7,
10,18 102:13 106:11
108:12 110:6 117:14
183:24
appraisers
101:12 103:11
106:7,24 107:7
124:20 109:2

137:10,20
appraising
107:21 110:8,12
116:20 124:11
165:24 178:2,7,12
appreciated
157:16 182:17
approach
97:15 120:19
136:13,15,19,20
137:6,23 173:17
174:2
approaches
136:17
appropriately
184:3
approvals
169:1
approving
150:17
approximately
111:15 156:18
April
26:10 45:22 72:17
131:11 182:2
Arch
23:9
area
9:13 10:17 126:6
130:3 144:5,6,11,12,
16,21,22 145:1
146:7 147:6 154:19
156:2
area's
152:12
areas
9:11,13 108:24
144:5,23 157:3
Argent
60:6
arguably
54:18
arguing
92:13
argument
92:11 95:21
arising
60:7
Arizona
102:17
arrive
14:13,18 141:8
143:4 149:14 154:4
159:9 170:14 172:22
174:1
arrived
12:17 80:1 133:7
135:14,16 154:21
160:17 170:22 177:2
arriving
154:15 164:6
articles
116:9
ascertain
22:14 129:18
ascertained
22:8
aspect
131:16 183:22
assess
71:17 123:21 124:9
125:12 134:21
assessing
79:22 117:9 164:17
assessment
66:9 69:11 71:17
72:17 119:4 134:3
148:4 181:5
assessments
72:22

assessor
156:22
Asset
7:15
assets
71:13 73:6
assign
14:10,12
assignment
124:18 126:5,9,22
178:22
assist
38:13 125:23 129:4
assistance
35:2 118:15
assisted
118:22
assisting
52:5,8,11,14 118:18
associate
131:4
association
4:17,20 103:8,10
117:6,7,8
associations
117:11
assume
13:17,19 15:20
21:3 22:13 25:15
37:4 74:12 124:5
133:4 178:20 179:3
180:6,9
assumed
180:20
assumes
34:21 48:13
assuming
15:22 124:1 132:16,
17,20 135:19 166:3
178:19 180:13
assumption
13:4 14:8 180:16
assumptions
133:6
assurance
83:9
assured
90:13
attempt
5:5 82:3 95:22 102:7
104:23 186:12
attempting
96:6
attend
99:16 187:13
attended
119:12
attention
24:15
attorney
28:10 29:15,19,20
attorneys
7:23 8:3 84:23 109:2
122:20
attributed
156:16
atypical
75:23
August
95:10 178:17 180:4
Augustana
99:19,24 100:2
authored
116:22
average
13:6,7 14:3 147:15,
22 157:1 168:4,13
171:18,21 182:6,19
aware
21:1 23:21 24:5,7

25:16 26:8 29:2
30:14,22,23 31:2,7,
11,19 32:5,15,22 33:5
44:15,21,24 45:8,12,
16,20,24 46:14,19,
22 47:20,22 51:1,2,
3,10 53:2,22,24
69:5,18 70:2 71:9,
10,11 82:11 83:16
158:1 181:8

---

B

B-RING
9:7 10:8,16 11:8,10
61:6,9,12
baby
96:8
Bachelor's
99:18
back
16:17,19 21:8 22:23
23:18 32:3 35:9
38:19 44:8 45:4
47:12 53:9 56:18
63:21 66:1 76:8
78:12 80:9 90:16
91:12 93:5 102:10
112:24 114:23
123:10 130:23 134:8
154:10 155:13
177:18 179:9 182:24
190:3
backed
13:22
background
99:4
bad
59:12 121:2
bank
100:22 112:7 113:1
Banking
109:15
bankrupt
58:8
bankruptcies
8:20,23
bankruptcy
6:10,14,19 7:2,11,
21,22 8:4,17 9:3
58:10 60:19 61:15
74:21 75:3,7 125:24
126:4
banks
112:23
Bar
104:10 117:6,7
Barry
185:22 188:9
Barry's
119:11
base
13:7,14 14:1
based
65:17 66:13 68:19
69:10 70:13 77:24
78:9 96:10,11 133:6
134:3 135:17 136:6,
20 144:19 150:24
158:16 176:22
180:15,17,19,24
basic
103:6 104:2
basically
153:21
basis
24:10 86:2
Bates
141:20
battle
43:5,8



began
 5:22 64:12
begin
 133:8 161:8 164:14
beginning
 12:1 82:22 110:6
 147:9 158:2 161:2
 180:13,20
begins
 116:12
behalf
 7:10,22
belabor
 80:18
belief
 31:16 92:23 184:10
beliefs
 92:23
believed
 73:8
believes
 84:10
bench
 97:16
beneficiaries
 69:5
beneficiary
 43:14
benefit
 81:11
benefitted
 81:10
bet
 90:2
bid
 75:17,20
bids
 56:6 57:15 75:16
bigger
 76:11
biggest
 120:11
billed
 119:3
bit
 4:14 11:3 43:2 90:14
 99:4 107:18 153:11
 155:18
block
 91:8
blow
 62:5 66:17 126:7
 146:24 148:3 165:12
 170:14
board
 105:12 113:12
 129:15
bond
 16:11 22:20 28:3
 33:1 34:9,22,24
 35:4,15 37:5,16 43:9
 67:7 68:9 69:3
bonded
 29:7,12 30:12 34:11,
 13,15,19 35:3 37:7
 71:23
bonding
 72:6
bonds
 15:8,14,20,22 16:4,
 10,18,21 21:23 22:7,
 8,9,10,15,18,20
 23:24 25:2,3,5,7,10
 28:1,2,8,12,13,17,22
 29:1,3 31:18,20,22,
 24 32:6,7,22 33:6,7
 34:6,7 36:12 57:1
 58:8 61:8 66:5,10,15
 67:7,8,15,20 68:15,
 16,20 69:2,4,19,24
 70:8 71:15,17,22

72:7
book
 19:6 188:12
books
 19:7 94:20
borderline
 150:17
borrower
 150:17
bottom
 24:16,22 66:20
 68:13 141:20 153:5
 154:18 161:8
bought
 27:6,11 58:9 60:18
 61:14 74:20 75:6
 111:17
bound
 122:6
bounds
 69:11
box
 47:5
brain
 81:24
break
 44:1,2,5,6 86:8,10
 89:11 177:8 185:11
breakdown
 111:23
breakpoint
 85:1
bricks
 14:9,12
bridge
 91:21
bring
 22:23 188:1 189:14
bringing
 114:5
broadly
 76:22
broken
 156:23
brokers
 109:1
Brothers
 6:13,16,22 7:7,13,14
Bruce
 20:8,18 21:6 26:3,17
budgets
 39:5
build
 9:23
builder
 10:14 12:7,9 13:24
 14:9,13,16 43:7
 49:18 60:22 75:17,
 20
builders
 4:24 9:23 10:19 55:4
 83:1,16,18
building
 37:13 40:21 74:11
 148:3,4,8,9,11,15
 154:13
buildings
 110:9,13 112:3
built
 10:22
bulk
 82:20
bullet
 119:18 123:6 126:14
 138:4,6,10 139:9
 140:3,6,23 142:20
 184:11,13
burn
 91:21

business
 8:21,22 11:21,23
 27:19 70:8,11 72:23
 73:5 99:19 109:9,14
 114:5,6
buy
 15:10,19,20 60:22 68:5
 83:19 136:2 151:6
 156:10
buyer
 13:23 23:22 62:17,
 19 136:2 137:21
 141:14 172:16
buyers
 56:8
buying
 22:2 75:2 130:15
 156:11,12

## C

C-RING
 9:7 10:9,21
C-RINGS
 10:5
cable
 145:4
Calatlantic
 42:18 50:21,22 51:4,
 11 82:18
calculate
 136:5 149:2 154:4
 161:20 172:23
 180:15,19
calculated
 35:4 149:9
calculation
 95:24 150:15 171:17
 172:11
California
 91:5 102:18 114:3
call
 14:19 29:18,20 44:7
 61:24 86:18 93:6
 96:23,24 99:4
 101:13,21 103:18
 104:11 105:17
 109:12,16 113:1
 119:22 124:21 130:1
 140:10 179:24
called
 14:13 19:6 98:17
 99:1 100:23 103:8
 109:7 110:20 111:2,
 11,16 112:10 146:5
calling
 44:9 59:24 65:7
 86:11,23 93:13
calls
 35:6,11 69:13 78:13
candidate
 103:19
capacity
 7:12,13 114:7
capitalization
 136:13,15,19 137:6
 175:23
caption
 145:3
capture
 157:18 179:19
captured
 182:24
care
 110:14
career
 110:7,10 112:9,12
 184:11,13
carry
 97:15

carrying
 128:6 139:22 164:23
 169:18 174:16 183:9
case
 8:5 15:24 30:23
 31:1,2,9,24 41:5 42:3
 45:13 48:12 55:11
 56:1 63:19 73:1,3
 75:5 84:11 89:10,12,
 21 93:6 99:10
 107:16 108:9 117:23
 118:8,19 121:1,3
 122:15 123:15
 125:24 127:1 134:15
 135:14 137:9 139:18
 144:15 149:20
 161:13,18 169:4
 178:1 179:16 180:6,
 22
cases
 8:17 9:12,13 111:13
 115:9,13 167:18,19
cash
 11:15,24 12:6,10,11
 13:13 15:22 68:4
 136:22,23,24
 137:14,16,17 138:8
 140:10 141:1,9
 164:24 166:22
 170:16 172:7 173:22
 174:12,20,22,23
 176:5
categories
 13:18,20 119:19
 127:20,23 128:1
 129:21 165:9
category
 148:1 165:15
cause
 80:2 190:6
caused
 132:18 178:3
cautioned
 92:13
Center
 91:4
centers
 110:14
certainty
 178:2,7,12 185:2,9
certification
 120:12,13 121:6,7,
 12 183:19 184:6,16
certified
 101:6,10,13,18
 102:12,16 104:3,8
 106:6
certify
 184:8
certifying
 184:2
cetera
 87:3
challenging
 83:22
chance
 19:12,14
change
 72:20 182:3
changed
 6:7,10 93:17
chapter
 105:13
characteristics
 131:20 142:7 144:20
charge
 118:23
chart
 132:14 145:8 149:8,
 14 151:11,13
 152:14,24 153:20

154:7,11 155:1
 159:1 162:24 165:12
 166:20 167:13
 170:15 171:23
 173:16,21 174:12
 175:7,24 177:9,13,
 15,17 180:18
chase
 124:14 160:1,14
 162:11 163:24
 173:13 175:14
 181:19 182:1
check
 28:5 88:2 89:4
checked
 119:6
Cherry
 21:14
Chicago
 5:5 9:15 10:17 16:7
 22:4 99:2 100:23
 109:8 110:21 111:11
 114:1 117:6 130:3
chief
 93:6
chill
 56:6
chilling
 57:14 75:16
Circuit
 96:5
circumstance
 35:21
circumstances
 168:5
cities
 46:10 59:19
city
 29:6 30:14 31:17
 33:18 34:5,8,14
 37:3,9,10,11,13,18,
 19 39:1,7 49:13
 56:14,23 57:21,22,
 23,24 58:3 59:6
city's
 30:11 54:23
claim
 31:3,8 33:11 42:22
 45:1,8,12,16,21
 48:15,17 49:2,3,14
 54:23 55:22 57:3,6
 58:17 77:6,11 83:23
claims
 7:1,3 41:6,12 48:11,
 21 55:9,13
clarification
 18:8 22:5 38:13
 73:18,22 74:4
clarify
 20:23 22:2 61:2,11
 74:1 78:20
clarity
 141:18 151:13
class
 105:24
classes
 104:7
classify
 10:7,10 11:5,7,9
 20:17
clean
 75:4 98:6,7 122:10,
 12
clear
 24:11 40:19 91:1
 96:6 97:18,23 98:14
 120:23 122:1 178:1
clearing
 40:23

CLERK
 86:11
clerked
 81:23
client
 81:15 126:14,23
 128:3,15 134:10
 161:13 165:4 179:5
clients
 124:22 126:3,4
 134:17
close
 26:10 83:9 175:6
 185:15 189:21
closed
 8:24 154:11 156:21
 181:10,16
closing
 25:4 68:17,21 86:3
closings
 87:19 91:24 153:19
 181:8
cloud
 40:20 41:13 77:12,
 15,21,23
co-lead
 109:23 114:3
Codes
 107:24
coin
 96:8
coleader
 113:14,18
collateral
 113:2
colleague
 131:10
colleagues
 118:17
colleagues'
 118:20
collected
 118:3
collective
 60:5
collectively
 67:8 111:18 148:22
collects
 37:14
college
 99:17,19
column
 145:12,15,20 147:9,
 10,12,14 159:15
 171:4,24
comfort
 83:17
comfortable
 10:19 18:16 28:13
 83:20
comment
 6:24 73:15,17 187:5
commercial
 101:15 110:12,19
 111:3 112:2
commissions
 164:22 172:1
committee
 7:16,17,18 8:2,16
 16:20 18:11,16
 20:10 22:24 23:19
 61:1 104:16
committees
 105:14
common
 178:20 179:5
communities
 11:11 17:3 18:24
 21:9,11 58:1



**community**
40:22 74:11
**companies**
6:16,19,22 7:5 21:2,
3 23:15 27:23 29:11
113:4
**company**
8:19,20 20:15 23:3,9
29:21 60:18 68:9
71:10,12 72:6 77:5
99:1 109:7 110:20
111:2,10,11,16
**compare**
180:12 183:13
**compared**
156:23 157:14
**comparing**
168:4
**compensate**
140:20
**compensated**
5:11,12,13
**compensation**
49:22 50:1,3,7
**compete**
76:10
**competent**
28:12
**competing**
130:5,6 144:14
152:20 153:2 154:8
**competitive**
152:8
**complete**
34:19 37:16 39:1
58:4 72:1 128:6
139:18,21 160:23,24
161:5,9,12,14,20,23
162:5,13,16 165:23
**completed**
35:18 58:1 71:24
105:1 128:17
**completely**
65:20 129:16 150:15
**completing**
105:18
**completion**
67:6,9 71:15
**compliance**
129:14 185:5
**compliant**
129:16,19 183:22
184:3
**complicate**
58:10
**complicated**
83:24
**component**
12:10 14:9,22 15:11,
12 43:3 58:7
**comport**
56:22 59:4
**comprehensive**
104:8
**compromise**
33:13
**compromised**
33:18,19
**concentration**
100:10
**concept**
47:16
**concern**
74:15
**concerned**
73:17,20
**concerns**
69:18
**conclude**
84:18 137:22 188:2

**concluded**
159:18,20 171:18
172:19
**conclusion**
96:9,10 133:12
137:4 154:19 175:23
176:19 177:16
**conclusions**
108:14 154:22
161:12 168:1 176:3,
5 185:4
**condition**
6:9 58:11
**conditions**
6:8 16:11 28:3
131:24
**conduct**
62:18 63:3
**conducted**
63:15 79:9 134:10
143:16
**conducting**
79:13 131:14 167:17
**confer**
8:3 185:16,17
**conferred**
59:7,10
**confidence**
108:12,18
**confident**
16:15 22:21
**configuration**
127:7
**confirm**
182:5
**confirmed**
81:6 157:1,5
**connecting**
34:4
**connection**
32:8
**consequences**
107:8
**considerable**
75:24 83:7
**consideration**
14:18 179:14
**considered**
96:4 120:5 139:21
140:2 154:13,14
179:10
**consist**
39:19
**consistent**
179:4
**constant**
47:22
**constitute**
13:23
**constituted**
37:7
**construction**
14:7 148:10,13
**consult**
23:14 39:4 44:4
59:13 84:22
**consultant**
95:4
**consulted**
129:8
**consulting**
109:3,10,17 111:18
**consumers**
108:11,17
**consummated**
79:8
**contacted**
122:14,18,19 123:14
124:17

**contacting**
126:14
**contained**
21:14 32:23 126:2
143:6
**contempt**
95:15,20
**context**
39:23 89:15 90:8
112:6,7 114:20
**contexts**
112:19,21,22
**contingency**
26:22 27:4 62:14
65:10
**contingent**
50:7
**continue**
18:20 76:19 128:11
145:14
**continued**
32:19 44:13 54:8
**continues**
70:6 95:15,16
116:17
**continuing**
5:6 33:21,23 171:23
**contract**
5:17 6:3 14:19 51:4,
17 22 52:1,2
**contractor**
5:9
**contracts**
82:12,15
**Contrast**
135:6
**conversation**
59:1 60:4
**conversations**
48:8 59:21
**Cook**
20:8,18 21:6 26:3
65:11
**Cook's**
26:18 63:24
**copy**
97:24 98:1,2,6,7
99:8,9 117:22 122:3,
6,10,12
**core**
9:20
**corner**
13:21
**corporation**
70:21 111:12
**correct**
5:16,24 6:8 7:9,24
8:1,10 10:3,6 12:16
15:2,10 16:1,4 17:18
18:12,20 19:18 23:7
27:13,14 28:19
31:20 32:13,19
33:11 35:18 40:10,
24 41:7 42:22 49:17
50:18 51:18 52:21
53:7 63:10 64:24
65:16 71:8 74:21
78:2 89:9 93:13,14
96:3 110:3 115:18
116:18 118:9 122:4
133:11 134:7,11
136:13,14 141:5
152:3 153:20 154:3
160:3,15,16 161:6,
10 162:7 172:21
173:14,18 175:15,20
176:13 178:15
184:4,24

**correctly**
25:13 32:5 63:6
64:14 67:11,21 81:3
**cost**
14:7,8,10,12 28:15
35:3 37:16,18,20
39:1 76:1 139:17
160:22 161:5,9,14,
20,23 162:13,15
165:23 166:7
**costs**
37:9,10 58:4 72:1,11
128:6 132:6 139:20,
22,24 153:7 160:24
161:12 162:5
164:21,23 169:18
174:16 183:9
**counsel**
7:1 18:13 20:8,18
21:7 26:4 30:2 31:6
36:6 41:18 48:5,18
49:1,6 53:14,21
55:19 56:9 57:2
58:16 60:6,1 61:20
62:8 66:4 68:21 67
69:15 70:18 71:14
72:13 73:9,18 74:1,2
76:20 77:10 78:3,17,
19 79:15 80:6,19
81:13 82:5 84:10
85:3 86:13,16,22
87:10 88:5 94:22,24
96:23 97:17 117:15
126:3 186:4 187:19
188:11,19
**Counselor**
108:20
**Counselors**
108:22 110:21 111:3
**counter-party**
36:22
**Counties**
148:5
**country**
4:24 115:17
**County**
55:10,15 56:1,4
61:10
**couple**
132:24
**courses**
101:19 104:5,6
**court**
4:1,5 7:22 17:11
18:7 19:9 24:3,8
29:11,23 30:4 31:6,
10 32:3 33:3 35:7
36:5,15 37:24 38:11,
13,18 40:19 41:17
43:1,22 44:2,7,10,
19,21 46:6 47:10,15
48:12 49:6 50:18
53:14 54:12,16 60:3
61:8 63:14 69:7,15
70:2,18 71:5 73:18,
24 76:18 77:3,7
78:16,22 79:15 80:9
84:10,13,16,18,21
85:1,12,14,15 86:12
87:1,20 88:1,4,23
89:6,9,15 90:18,23
91:8 92:22 93:5,11,
14 94:5,8,21,22
95:23 96:16,23 97:2,
9,13 98:4,10 99:16
115:20,21,23 116:8
117:15,17 126:4
158:1 181:13 185:14
186:2,9,16,24 187:3,
24 188:5,16,17
189:6,16 190:1,3

**Court's**
55:14,23 83:16 91:2
187:8
**courtesy**
94:24
**courtroom**
97:10
**Courts**
115:17
**covered**
25:12 58:5 71:16
**CPA**
104:9
**created**
149:21
**credit**
28:9
**creditor**
34:12
**crew**
71:16
**critical**
130:12
**cross**
23:17 36:23 76:20,
22 85:5 185:16
186:6,12 189:3,12
**cross-examination**
4:3,8 18:2 44:13
81:15 92:15,20
**cross-section**
153:11
**cul-de-sac**
13:22
**curbs**
132:3
**current**
98:21 109:6 172:15
**cutting**
186:13
**cycle**
10:23,24 129:10

**D**

**D's**
45:1,8,12,16,21
84:14
**damages**
40:3 77:1,3 78:15
93:15 94:6,24 95:1,
2,6,12,13,18,24
119:4 125:24 132:6
133:23 155:20 156:1
177:22 178:3
179:13,21 180:15,
17,19 183:13
**danger**
189:20
**data**
14:21,22 15:1,4
118:6 126:15 129:2
147:4,19 151:21
152:14 153:13,15
154:9,21 158:16
164:5 165:9,22
167:24 170:20
175:18
**databases**
128:19
**date**
46:14 47:21 63:24
85:22,23 119:3
122:16 135:4,8
141:4,15 178:16,19,
20,24 179:3,4,6,11
180:13 187:11
188:12
**dated**
64:21

**dates**
46:10,12,16 53:23
88:24 125:10 131:1,
7
**day**
85:11 87:24 89:5,6,
14 91:11,16,23 92:9
189:15,21
**days**
88:1,8,9
**deal**
15:15 18:20 21:15,
17,21 30:8 38:22
47:3,5 58:14 76:5,18
81:12 89:19 91:20
**dealing**
157:22
**dealings**
58:10
**deals**
16:16 20:24
**dealt**
114:16
**death**
179:4
**debtors**
6:19
**December**
64:22
**decide**
30:4 150:24
**decided**
10:13 72:3
**deciding**
68:5
**decision**
17:11 125:2
**declared**
6:10
**declining**
146:12
**decrease**
56:7
**deducts**
14:17
**deemed**
23:18 71:19
**deeper**
151:5
**defend**
95:19
**defended**
54:4
**defense**
69:6 70:1
**defenses**
25:6 28:6,11 41:7,12
59:12 68:8,9 69:23
**defined**
125:4 135:1 144:5,6
**defining**
126:21
**degree**
99:18,23 178:2,7,12
185:1,8
**delay**
90:2 91:2 92:12,19
95:22 124:6 132:11,
17 133:17 178:3
180:7 183:4
**Delta**
13:15
**demand**
144:13 146:4,19
147:21 148:9,13,14,
24 149:2,3,13,15
150:3,10,12 152:1,5
155:13 168:18
169:2,17 179:18
182:22



**demographics**
145:2,4,6,24 148:1,
15,19 149:6 152:5
**demonstrate**
102:22 104:14
**Demonstration**
104:11
**demonstrative**
94:7,16
**Department**
87:1
**Depaul**
99:20 100:4,20
**Depaul's**
100:9
**depending**
9:21 132:22
**depends**
133:1 178:24 179:4
**deposed**
94:12 115:22
**Deposit**
19:7 23:2
**deposited**
43:12
**deposition**
87:12 93:24 95:8
119:8,12 188:10
**deputy**
44:9 97:3,5
**describe**
10:16,21 128:24
140:15 144:2
**description**
127:4
**designated**
103:21
**designation**
19:24 103:2,3,4,5,
13,18,20,24 104:1
105:2,15,16,20
108:19
**desirability**
55:16 56:5 60:20
**desirable**
10:1,4 60:14,15
**detached**
147:1
**detail**
43:2 128:24 143:12
158:5
**detailed**
13:12 123:7 150:15
**details**
13:15 143:15 184:5,
7
**deteriorate**
72:10
**determination**
66:13
**determine**
29:12,21 63:4
130:21 138:15
140:12 143:17 146:1
156:14,18 160:21
167:22 179:13
187:20
**determined**
13:5 71:22 140:7
144:16 151:1 164:8
**determining**
68:4 125:23
**Detroit**
114:2
**developer**
14:15 34:6,17
139:16 140:11,19
161:17
**developer's**
140:18

**developers**
10:23,24 109:1
144:22 157:2
**development**
9:3 10:11 17:14 39:4
57:23 114:5 138:2
**developments**
16:5 114:13 116:5
126:1 130:3
**deviation**
94:11
**dialogue**
47:22,23
**dictated**
50:4 184:14
**dictates**
107:1 120:18
**difference**
13:17 48:19 133:24
149:19 177:21 182:7
**difficult**
74:10
**digest**
49:4
**diligence**
15:24 16:3 17:7 18:6
22:17 23:17 26:6,9,
12,21 27:4 28:15
62:14,18 63:4,9,14,
18,21 66:8,14 67:13,
24
**diminution**
123:17 132:10
177:22
**direct**
24:24:15 33:24 60:8
76:16,17 98:19
188:6 189:4
**direction**
9:22,24 14:7
**directly**
56:20 79:3 82:9,10
**director**
17:14 109:22
113:13,18
**Directors**
105:13
**discipline**
121:16,18
**disclosed**
93:24 94:13 120:15
**disclosure**
93:20 94:4
**discount**
130:18,22 140:13,
16,17 141:2,7,12
166:16,22 167:2,5,
14,17,23 168:2,7,9,
22 169:6,8,10 170:4,
7,9,14 172:6
**discounted**
11:15,24 12:6,10,11
13:13 15:22 137:17
138:8 141:1,9
170:16 173:22 176:4
**discuss**
85:11
**discussed**
8:7 185:8 186:19
**discussing**
123:1
**discussion**
185:19
**discussions**
8:2 27:18,20 49:19
59:11 72:5 83:1
**disingenuous**
95:11
**dismiss**
49:4

**dismissal**
54:22 56:9 57:10
**dismissals**
54:5
**dismissed**
45:2,9,13,17,22
48:11,15,22 53:24
55:20
**displayed**
123:9 142:4,9 168:3
172:10 174:19
**dispose**
50:15
**disposed**
54:23
**dispute**
29:11 33:11 109:16
116:6
**disputes**
29:22 113:6
**disservice**
81:16
**distinct**
6:17
**distressed**
75:2
**divide**
13:8
**divided**
14:2
**division**
74:7
**divorce**
121:3
**docket**
55:10,24 56:4 59:3
89:17
**dockets**
55:15
**document**
19:2,5,17,20 20:22
21:8 26:11,14 93:21
94:4,5 97:15,17,23
98:13 118:5
**documentation**
107:3,5 118:2
128:20
**documents**
93:23 124:23 127:9,
15,18,24 128:15
129:21,22
**dollar**
70:21 147:13
**dollars**
22:19 71:13 84:5
93:18 176:11
**door**
81:21 82:1
**dot**
23:16
**dots**
34:4
**downtown**
9:20
**drawn**
81:17
**drawnout**
43:5,7
**drive**
139:5 163:5
**driven**
91:2 156:20
**due**
15:24 16:3 17:7 18:6
22:17 26:6,8,11,21
27:4 28:13,14 62:14,
18 63:4,9,14,16
64:12,17 65:14 66:8,
14 67:13,23 83:8
177:22

**duly**
98:17
**duties**
187:13

**E**

**eager**
22:4
**earlier**
41:23 64:18 80:10
85:19,21
**early**
26:9 52:24 189:21
**ears**
8:23
**ease**
98:8
**easier**
47:3
**easy**
13:16,19
**echelon**
11:9
**economic**
6:8
**Economics**
99:18
**economy**
169:16
**Edgewater**
124:12 142:4 144:1,
9,15 146:6 152:2
153:1 155:3 157:23
158:19 159:23
160:12 161:7,19,23
163:1,22 170:24
171:6 172:17,18
173:1,10,22 175:13,
18 176:11 181:18,23
**edition**
129:7
**education**
99:22 100:3
**effect**
55:16,18 57:14 72:8
**effort**
50:17
**elected**
18:19
**element**
120:12,17 121:5
**elements**
107:4 119:23 122:24
**Elgin**
30:15,18 45:13
47:23 48:11,21 49:2,
4,13,14 55:19 56:1
124:15
**Elgin's**
47:21 49:14
**eliminated**
21:15,18
**embedded**
13:16
**employed**
6:3 112:15 185:3
**employee**
5:8,10
**employees**
85:15
**employer**
109:6
**employment**
4:15 100:21 110:1
111:1,9
**encouraging**
86:22
**end**
4:15 64:23 85:11

**duly** (continued in next column is error)
91:16 153:11
168:14,15,22
**ended**
50:6 57:10
**ending**
40:24 41:6,10
**enforce**
107:10
**enforceability**
25:5 69:4
**enforceable**
69:12,19
**engaged**
124:20
**engineers**
35:2
**enjoying**
10:19
**entered**
51:3,10
**entire**
34:15
**entirety**
129:18
**entitled**
29:22 67:6 92:22
**entitlement**
168:24
**entitlements**
168:20
**entitling**
11:1
**entity**
58:8
**entry**
157:7,8
**equation**
139:12,13 140:8,9
163:6 164:9
**equipment**
109:14
**equivalent**
107:5
**escrow**
43:12,15,17 76:1
**escrows**
42:16
**essentially**
38:14 88:8 109:17
168:19
**establish**
96:3
**established**
168:16
**estate**
70:9 74:21 76:4
98:23 99:20 100:5,6,
10,15,18,24 101:2,6,
10,12,18 102:13
103:10 106:6
108:20,22 109:1,4,
11,12 112:7 113:3,5,14,19,
23 115:14 116:20,23
117:2,14,18 119:20
121:2 128:6 129:3
139:23 164:21
165:6,6 179:2
**estimate**
124:3 133:20 135:17
136:18 157:13 163:2
171:6,11,15,18
174:8 179:21 180:22
**estimated**
35:2 157:7 182:19
**estimates**
39:1
**estimation**
123:17

**Ethics**
107:24
**euphoria**
10:23
**Evaluation**
104:6
**event**
42:21 91:4
**eventually**
21:14 28:18 33:18
105:2
**evidence**
24:2 48:14 94:1,12
**exact**
32:4 184:15
**exam**
101:20 104:9,10
105:24
**examination**
53:16 76:16,17
98:19 102:4 104:22
**examine**
16:4,9 17:12,18,19
19:12 28:12
**examined**
17:2,15,16 66:6
71:21 94:1 98:18
188:10
**examples**
11:24
**exchange**
37:19 71:5
**Exclude**
86:19 89:13
**excluded**
96:5 116:2
**excused**
84:21
**executing**
114:6,10,12
**execution**
114:11
**Executive**
7:18 8:16
**exhibit**
11:19 19:7,8,15
25:21 26:1,13,16
61:24 63:21,22 64:7,
8,20 65:2,7,17 66:1,
18 72:19 94:7,17,20
98:1 99:5,7,9,12
114:23,24 116:11,12
117:22 119:5 122:3,
11,21 123:10 124:7
127:13 130:24
132:12 135:11
136:11 141:17,19
142:22 143:8 149:10
152:10 158:3,4,21
164:11 173:19
175:21 177:7 180:2
183:18 185:24 186:3
**exhibits**
93:19 188:12,14
**existed**
39:14
**existence**
15:8 41:21 42:3
**exists**
40:7,8 49:13
**expand**
48:6 80:24 81:2
162:4 175:6
**expect**
14:15 23:13,16
172:5
**expectation**
50:2,4
**expense**
139:12 140:9 141:11
165:15,18



**expenses**
139:16 140:2
164:10,13,14,18,19
165:10,22 166:2,12,
14 171:24
**experience**
4:23 18:15 39:20
42:11 75:1 99:13
101:21,23 115:2,6,
19 161:16 184:2
**expert**
44:22 78:15 79:14
85:8,9 86:18,19
87:3,6 90:9,17 91:13
111:14 114:7
115:14,20 117:13,18
121:9 187:14
**expiration**
65:1
**expired**
26:9
**explain**
97:18,20
**explaining**
55:3
**exposed**
135:5
**exposition**
38:6
**exposure**
43:8 47:6 134:22,24
135:1,13,18 136:5,8
**express**
25:1 68:14
**extend**
26:6,11 139:14
**extended**
43:5 64:13 65:5,15
180:10
**extending**
65:10
**extends**
115:4
**extensive**
156:20
**Extensively**
65:24
**extent**
37:24 80:22
**extracted**
81:14

**F**

**fact**
24:9,12 32:20 36:17,
20 77:3,23 78:10
79:22 80:15 86:23
91:17 95:12,13
98:11 153:6 155:11
164:1 168:16 169:24
179:16
**factor**
36:1 163:16
**factors**
96:4 149:1
**facts**
6:24 48:10,13 49:5
80:12,16
**failed**
36:5
**fair**
18:7 20:14 61:1
63:16 65:19 73:10
88:4 115:10 116:14
125:15 127:18
132:19 141:3 165:10
177:19 178:7,12
181:1 183:12 186:7
**fairness**
94:2

**faith**
59:12
**faithful**
83:13
**falling**
76:2
**falls**
81:24 96:21
**familiar**
13:19 19:2,4 114:16
**families**
85:15
**family**
89:3 150:4
**faster**
163:7 182:23
**father**
4:10
**fault**
70:2
**favor**
36:16
**feasibility**
63:4
**February**
82:20
**Federal**
91:4 115:17,20,21,
23
**fee**
118:10
**feedback**
59:18
**feeding**
54:19
**feel**
38:11 131:18 189:8
**fees**
37:14,20 57:23 58:6
95:4
**feet**
13:7 14:10
**Fidelity**
19:7 23:2 27:24
28:16 30:12 31:13,
17 33:18 34:12
36:13 37:4,15 43:8
48:12 49:3 55:13
56:15,21,24 59:19
61:8 68:24 69:6
70:3,11,15 71:9
77:19 78:1 90:2
95:15
**Fidelity's**
33:24 55:9,22 56:3
57:2,6 59:12 60:8
71:10 83:23 95:20
**fighting**
40:18
**figure**
93:19 155:8 156:15
**figured**
166:12
**file**
57:10 86:20 89:14
**filed**
6:13 40:13 44:16,24
56:14 58:17 91:13,
17 95:1,10
**filing**
9:4 89:13 187:16
**final**
108:19 177:5,16
**finalizing**
57:19
**finally**
54:24 57:7 171:14
174:7
**finance**
87:1 99:20 100:5,7,
11,14

**financial**
25:8 70:7,14 107:6
109:10,12,21 126:15
**financing**
112:8 121:2 150:17
**find**
9:22 10:11 11:12
51:21 136:1 156:24
157:3 165:19 183:13
**finding**
18:5 32:8
**fine**
42:10 46:6 78:9 92:3
107:13 140:24 186:8
188:20
**finish**
85:9 87:17,18 89:10,
12 90:5 92:5 181:1
188:22 189:4
**finished**
12:13,15 14:14,17
142:18,23 143:1
159:1 162:6 172:24
**firm**
109:10 111:4,15
**five-hour**
188:2
**five-mile**
144:17,18,24
145:10,22 147:1,6,
24 150:22 153:2,19
**flag**
146:12
**flip**
96:8 115:7
**flow**
11:24 12:6,10,12
13:13 15:22 68:4
137:14,16,17 138:8
141:10 164:24
166:22 170:16 172:7
174:20 176:5
**flows**
11:16 136:22,23,24
140:10 141:1
174:13,22,23
**flying**
88:24
**focus**
6:7 8:18 100:7
132:10
**focused**
8:19,21
**folks**
109:2
**follow**
25:14 34:17 35:19
73:19 106:7,11,13,
16 107:1,2,7,11
108:1,5 134:14
137:21 152:6
**foot**
13:11 14:2
**footage**
18:12
**forced**
75:24 132:17 133:17
176:8 178:3,14
183:4
**forecast**
150:9 155:3,4,21
**forecasted**
150:12 152:1
**forecasting**
155:14
**foremost**
74:10 75:16
**forgoing**
67:4

**form**
24:1 31:21 168:1
**formal**
104:18
**forward**
33:3 74:24 92:1 93:2
98:14 135:7,9
146:18,22 162:8
**found**
16:18,20 24:18 69:7
107:12 119:22
**foundation**
18:1 24:1 31:5 33:2
36:7,11 70:17
**four-and-a-half**
189:2
**four-unit**
110:9
**fourth**
6:1 140:3,6
**fraction**
83:4
**framers**
120:21
**Frankly**
189:22
**free**
90:20
**frequent**
86:2
**Fridays**
8:14
**front**
11:20,22 19:6 25:22
99:8 122:3 177:18
**fronts**
74:9 75:14
**fulfill**
29:7
**fulfilled**
105:22
**full**
115:5 121:10 129:14
**fully**
82:11 184:3
**fully-built**
156:11
**fund**
76:9,10
**fundamental**
104:1 106:16 120:17
121:7 131:16,22
**funds**
76:11
**future**
8:21 14:24 15:1,4,5
49:23 137:1 155:16
163:14 174:22
187:11

**G**

**game**
37:21 58:3
**gap**
37:14 39:14,15
**gathered**
128:21
**gathering**
134:16
**gathers**
150:9 155:3,4,21
**gave**
61:2 88:5
**general**
18:12 20:8,18 21:7
26:3 40:15,17 101:6,
10,13,18 102:12
106:6 114:8 165:13
172:3 187:23

**generally**
9:18 88:8 165:23
**generating**
169:2
**generic**
24:4
**gentleman**
20:7,9
**gentlemen**
189:16,17
**geographic**
9:12,13
**geographical**
9:12,13
**get all**
168:24 169:1
**give**
39:22 43:1 46:7
81:13 88:1 110:5
111:23 119:18 150:2
**glad**
92:4
**gold**
130:2 152:16
**good**
4:10 46:7 53:18,19
85:1 127:3,6 131:19
155:11
**govern**
107:15
**governed**
17:4
**graduating**
100:2,20
**granted**
102:19 105:2
**great**
15:7 55:18 92:6
130:14
**greater**
169:7
**gross**
171:22
**group**
21:4 109:15,17,19,
22 111:18 113:22
142:2
**Grove**
45:9 69:6 124:13
**grow**
76:9
**growing**
145:13,14
**grown**
76:9
**growth**
145:10,18 149:19
**guarantee**
91:17 189:3
**guaranteed**
34:12
**guarantor**
34:6
**guess**
72:23 90:6 107:5
182:23
**guide**
188:15
**guidelines**
106:24

**H**

**half**
66:20,23 87:6 88:8,9
89:6 188:8 189:10
**hand**
133:3
**handed**
93:15

**handing**
98:1
**handle**
89:17 127:3
**happen**
29:9 50:14 87:22
169:15
**happened**
56:11 63:19 179:20
**happening**
94:17
**happily**
50:14
**happy**
12:23
**hard**
14:11 38:8 49:8
79:15 85:7 99:8
122:3 136:1
**hate**
64:6
**head**
119:2
**heading**
26:21 123:2 166:21
170:15
**headquartered**
109:8
**health**
110:14
**healthcare**
112:4
**hear**
47:12 54:12 86:13
88:4 92:18 186:4
187:18
**heard**
30:16 85:4 87:8
90:10,23 92:15,16
93:9 97:10 140:15
187:21
**hearing**
32:5 90:1 92:8
**hears**
92:20
**hearsay**
59:24
**held**
113:4 175:3
**helpful**
92:2 143:24
**helping**
49:18 50:10 143:17
**high**
96:7
**higher**
153:10 155:13
157:14 163:20
168:22 170:7
**highest**
4:23 75:21,22
101:12
**highlight**
64:11 67:3,18 126:7
145:3 149:1 151:12
159:11,14 160:8
**highlighted**
138:7 159:22
**highlighting**
173:20
**Hill**
11:7 15:6 16:6 34:11
44:9,18 50:9 53:9
61:14 86:11
**Hinsdale**
10:13,14
**hired**
113:13 125:6
**hiring**
108:11



historical
 14:21,22
history
 4:15 110:1,5 120:8
hold
 101:5 102:12 103:1,
 3 106:20 113:11,15
 170:10 176:8 178:14
 185:7
holding
 87:17
hole
 119:23
holidays
 88:17
home
 4:24 11:11 13:7
 130:6,15,16 146:8
 147:1,11,13,15,23
 150:18 151:2 153:8
 154:12 156:11,13,
 15,19,21 157:13,16
 179:17 182:16,19
homebuilders
 5:5
homeowners
 10:18 57:24
homes
 10:15 110:9 130:13
 147:21 150:4 152:23
 156:10 157:8
honor
 4:4,7 28:1,2,17 38:8
 39:9 41:16 42:24
 46:4 47:9 48:1,9
 49:1 53:13,15 59:23
 69:14 70:16 72:6
 73:14 76:15 78:13
 79:12 84:9,17,20,24
 85:6 86:16 89:24
 90:22 92:13,20 93:4,
 8 94:23 96:24 97:22
 117:12,16 185:20
 186:5,22,23 187:18
 189:8 190:2
honored
 31:19
honoring
 31:18,21,24 32:6,7
 57:1
hope
 18:8 87:17,18
host
 128:20
hotels
 110:13 112:4
hour
 43:21 87:6 118:14
 188:7,8 189:10
hourly
 118:13,14
hours
 85:5,18 91:18
 101:22,23 188:11
 189:3
house
 13:6,11 14:1,3
household
 145:21 149:23
households
 145:16,18,19 146:11
 149:17,18,20,21,23,
 24 150:23
houses
 10:18,20 13:10
housing
 145:2,23 146:24
 148:13 150:13
Houston
 114:2

hundred
 63:20
hundreds
 22:19 71:12
Huntington
 124:14 160:1,13
 162:10 163:23
 173:13 175:14
 181:19 182:1
Huron
 111:17
hypothetical
 36:3,8,10 38:9,10
 77:5
hypotheticals
 36:18,19,21

I

I's
 23:17
idea
 136:20
ideas
 85:10
identified
 65:2 120:15 126:9
 133:22 145:5 149:13
 162:15 166:4,19
 173:1 175:18 177:10
identifies
 175:24
identify
 26:2 97:23 120:2,4
 121:4 124:8,10
 125:10,15 127:14
 152:11
identifying
 152:4 158:24 167:1,
 5
IDFPR
 87:2
Illinois
 44:17 87:1 101:7
 106:19 144:10
imagine
 26:10 29:2,5 30:11
 32:17 33:16,23
 34:14,24
imagining
 34:3
immediately
 13:22 122:12 135:20
 151:18 155:5
impact
 37:14,20 56:4 57:11,
 23 75:12,14,16
 76:23 79:23 155:20
impinging
 93:1
implemented
 76:12
implied
 25:1 68:15
importance
 74:23 120:14
important
 15:12 82:24 108:15
 120:11 121:5,20,21
 130:7 137:10,12,13,
 20 138:17 144:11
 145:24 146:8,10
 147:19 153:15
 162:20,21 163:16
 164:23 183:22
imposed
 17:23
imposing
 35:24
impossible
 10:11 11:12 60:21

89:2
improved
 25:4 155:12 157:12
 179:16,17,18 182:10
 183:2
improvement
 183:1
improvements
 25:11,12 29:8 30:13
 34:11,13,20,23 35:3,
 17 37:8,17 39:2
 46:3,27 67:9 68:23,
 24 69:3 71:18,23
 139:19 182:13
inadequate
 35:16
inclined
 9:23
include
 91:24 109:13 114:4
 118:5 119:7 120:1
 123:4 128:5 132:2,5,
 9
includes
 149:23
including
 25:8 68:15 112:2
 114:2 118:10 170:15
 188:17
income
 136:13,15,18,19
 137:6,22 145:21
 150:20,23 153:10
 175:23
incomplete
 36:8
incorporate
 165:2
increase
 72:11 155:24 170:4,
 8
increased
 162:19,22
incur
 43:19 164:21 165:16
incurred
 132:6
incurring
 139:17,24 174:15,16
 183:3
indemnity
 42:16 75:10
independent
 5:9 80:4 128:18
 143:20
independently
 128:16
Indiana
 102:17
indication
 63:15 148:9,12
 150:3
indications
 134:1 176:17 177:14
individual
 121:16 156:12
individually
 12:3 67:7 158:12
industrial
 110:13
industry
 70:14 109:4
inference
 81:16
inferences
 78:20
inform
 137:18
information
 68:3 72:4 119:18,19
 124:21 125:1 126:23

127:1,10,20 128:7,
 10,14,16 130:5,8,14
 134:9,16,19 147:2,
 17 148:21 161:18
 165:5,9 166:9
 179:10
informed
 124:17
infrastructure
 11:2 72:9 168:19
Ingham
 52:15,17 73:8
initial
 59:17 64:3 79:3
 83:12 100:21 106:5
 125:2 126:21
initially
 4:21 51:23 122:19
injustice
 50:14
input
 142:19 160:6 162:17
 166:4
inputs
 138:7 140:4 141:6
 160:17 170:19 171:1
inquiry
 81:3,22
insignificant
 39:21
inspected
 131:10,11
inspection
 131:14
instance
 9:15 59:6 95:4
 162:23
instances
 29:3
institute
 103:9,15,17 104:21
 105:10,11 107:20,22
 108:4 117:9
instituted
 40:2
instruct
 36:5
insurance
 23:9 71:12 139:23
 150:21
insurers
 70:1
intended
 120:1,2,3,4,15,20,
 21,24 121:3 123:2
 125:3,7,19,20,22
 126:2,22
interacting
 57:17
internal
 113:3
International
 110:21 117:8
inventories
 130:5
inventory
 127:7 142:1,9,12
 152:19 155:7 163:20
 164:2 171:5 181:17
invest
 137:15
investment
 5:3 7:17 8:2 16:19
 18:11,16 20:10
 22:23 23:19 50:12
 61:1 84:6 109:15
 139:7 140:21 141:13
 164:20 166:18 170:2
 174:19
investments
 130:19

investor
 76:3 84:7 129:4
 130:17 135:22
 136:7,23 137:22
 166:16 167:7,14
investors
 29:17 76:13 130:18
 137:16 152:17 157:3
 167:9
invited
 116:24 117:5
involve
 113:7
involved
 7:10 18:22 50:20,24
 59:16 64:17 74:6,18
 79:2,4,5,7,10,22
 80:6,8,23 82:9,10
 105:11,19 113:7
 116:7,14
involvement
 68:19 70:14 76:23
 80:3
involves
 105:23
involving
 42:18 114:12 116:5
 126:1 167:18
Iraq
 4:11
IRS
 113:6 116:6
Irvine
 114:2
issue
 76:24 78:19 107:3
 131:15 186:10
issued
 103:7 129:11
 148:10,11 178:17
 181:11,14
issuers
 25:5,7,8,9 69:24
 70:8
issues
 36:17 58:13 60:7
 75:4 80:2 81:5
items
 37:6 39:15,19

J

January
 64:13 65:12 82:24
 123:19 124:1,4
 132:16 170:6 171:3
 172:16 174:7 178:8,
 19 179:8,9 181:24
Jim
 148:3
JNI
 20:4,11,14,16,19,21
 26:2
job
 104:3
John
 97:1,7 98:16
Judge
 19:10,23 24:4 31:23
 32:11 33:4 35:5
 37:22 44:12 78:23
 80:5,19 81:22 87:21
 89:2 92:3 93:9 96:22
 98:15 117:19 185:12
 188:24
Judicial
 91:4
July
 181:5
June
 45:2,10,18 131:12

K

Kane
 55:10,15 56:1,4
Kari
 128:21 131:4
Kendall
 148:5
Keri
 131:9
Kilburn
 87:8,11 90:11,12
 92:5 187:7,23 189:9
Kimball
 11:7 15:6 16:6 22:3,
 4 34:11 44:9,18 50:9
 53:9 61:14 86:11
Kimball's
 34:12
kind
 49:22 75:18 93:20
 114:8 152:21 161:17
 164:20 167:11
kinds
 139:20
knew
 22:21
knowing
 136:3
knowledge
 21:6 40:13,15,16,17
 79:24 97:19 98:12
 184:10
knowledgeable
 22:18
Kreiter
 118:21 131:4
Krieger's
 184:22
Kyte
 4:21 5:4 49:18 50:1,
 5,10 59:7,10,13
 87:16,23 90:5 187:7

L

lab
 12:13
lack
 25:6 36:11 69:23
laid
 142:13 143:5
Lakes
 52:12 53:3,5,8 61:10
land
 9:22 10:13 76:10,11
 113:4 156:15,16,23
 157:5 168:23
language
 28:14 33:6 184:15
large
 43:3
largest
 4:24
Las
 22:3
lastly
 104:18 147:14
launch
 86:12
Law
 29:12,23
lawsuit
 49:14 55:19
lawsuits
 44:16 58:17 59:17
 77:10
lay
 137:3



laymen's
75:1
lead
83:18
leading
54:11,13,17,19
learn
38:24
learned
22:3 82:18
leave
171:9
leeway
36:19 79:20 81:20
85:13
left
4:1 5:23 6:1,24 7:23
33:7 134:9 184:18
legal
16:12,17 17:16 18:4,
9 19:1 22:17,21
23:1,5,8,12,14,16
28:12 33:8 36:24
43:5,7 59:13 69:13
95:3 126:3 132:6
legally
101:14
Legend
52:12 53:3,5,8 61:10
Lehman
6:10,12,13,16,19,22
7:7,13,14
lender
150:16
lengthy
64:16
Lennar
82:19
letter
119:12
letters
28:8
level
10:20 14:1 38:16
101:12 103:6,7
104:2 106:6 146:4,
19 147:21 148:9
150:3 179:18 182:21
183:13
levels
4:23 103:14
liability
6:16,18,22 7:5 17:24
21:2,3 35:24 37:1
43:19
license
101:17 102:9,13
106:18 107:14
184:1,20,23
licensed
101:9 106:10
licenses
101:5 102:19 106:20
licensing
101:11,13 103:6
lien
40:12
light
96:16
limit
80:23
limitation
32:23
limited
6:15,18,21 7:5 9:11
21:2 25:2 87:13
93:23 94:2,19
lines
24:22 109:11 162:5
list
75:15 84:14 115:1,5

116:12 127:15
listed
108:19 184:7
listen
8:16
listing
21:9 129:1 130:11,
13 147:5 148:18
154:13
listings
120:9
lists
184:11
litigation
27:12,15,17,22
30:17,19 31:13,17
40:1,4,6,24 41:3,6,7,
9,11,12,21,24 42:9,
12 43:11 45:9,17,21
46:13 47:6 48:21
53:2,6,20 55:2,6
56:21 57:13,17 59:8
60:23 61:16,18
74:18 77:18 83:14
109:17 111:13
112:6,18 114:7,20
132:18 167:18,19
LLC
26:2
LLCS
20:12 21:5
local
105:13 136:9
located
9:16 113:24
locational
131:20 144:19
log
101:24
logic
35:19
long
33:16,21 43:5,7
85:14,16 87:9,10
90:10 92:21 94:14
98:13 100:12,17
110:22 111:5 135:8
138:22 187:19,23
189:8
longer
74:15 84:22 155:19,
22 163:8,18 164:2
170:10 175:3
looked
84:2 142:18 148:18,
19,22 151:16
153:17,18 154:6,9,
10,11 177:18 182:21
loop
175:7
loose
98:8
lose
33:1
loss
80:13 83:7
lot
5:1 12:14,15 13:21
14:14,17,19 51:7,8,
14 80:20 84:5 86:5
112:4,5,20 130:5,15
142:7,8,18,23 143:1,
18 152:19 155:13
156:4,6,20 158:18,
24 159:1,8,18,20
160:4,8 161:4 162:1,
3,6 163:20 164:1,4
169:3,19 171:19,21
172:23,24 180:9,20
181:21,23 182:1,2,3,
6,8 183:2 187:13

lots
5:2,7 11:8,9 13:5
34:17 40:19,20,21
47:1,2 50:16 51:4,
12,19 52:6,8,11,14,
17,19,24 56:5,7,8
57:24 58:1,12 59:15
73:9,23 74:6,10,12
75:3,17,20,21,22
78:4 80:19,21 83:3,
4,10,19 124:2,6
127:7 128:8 132:22
133:1,4,8,9 135:19
138:13,14,19,21,23
139:2,4 140:1 142:2,
6,11 146:4,21
147:1,21,20 152:9
155:6,6,7,9,11,14,16
156:12 162:19,23
163:3,4,22 164:1
168:18 169:18
171:3,4,5,7,8,9,11,
12,13,16,20 174:5,6,
9 180:8 181:10,12,
16,18,19,24 182:23
low
96:7 168:13
lower
37:20 51:15 93:19
153:11 155:23
168:15 170:8,9

### M

made
36:16 46:1,19 73:17
86:3 96:5 98:13
108:23 109:11
139:19 183:3
MAI
103:3,4,5,7,17,19,
21,24 104:1 105:3,
15,21
main
7:20 118:21
maintenance
25:11 67:7 71:16
make
15:5,23 17:11 24:10
42:14 50:8 61:17
74:14 79:10 81:9
89:21,23,24 102:1
104:16,20 106:2
108:10,16 120:22
129:13 157:17
166:17 179:19
186:24
makes
24:24 33:12 54:18
58:11 60:21 68:14
making
23:23 37:21 50:6
57:15 80:21
Management
7:16 60:6
managing
109:22 113:13,18
manner
38:1
March
4:21 5:14,22 6:2
57:11,12 70:3 83:2
margin
14:13
marked
97:24 119:4 122:11
market
13:5 74:10 124:3
125:15 128:18 130:4
133:14 134:17
135:5,9 136:1,6,18
141:3 143:7,13,16

144:6,11,16,23
145:6 146:13 152:4,
20 153:9,12 155:12
156:21 157:11 159:7
172:15,19 174:1
175:1 176:17,19
177:19 178:7,12
179:15,16,20
182:10,12 183:1
marketability
74:8
marketable
40:21
marketed
124:2
marketing
132:21 133:5 135:6,
18 165:13,18 172:3
markets
136:10
Maryland
23:3
math
12:18,19 171:19
mathematical
12:21
matrix
13:20
matter
17:17 30:1,3 41:8
44:7 48:24 49:4
52:23 60:2 61:13
70:19 73:10,16 74:7
80:10,14,15 84:19
189:7
matters
54:23 59:14 73:23
96:6 114:8 115:24
maximum
43:6
Mayfair
21:15
MBA
99:20 100:4,6,9,14,
24
Mchenry
61:10
Meadows
39:2 124:14 159:24
160:13 162:10
163:23 173:6 175:13
means
85:18 93:5 186:11,
18
measure
9:21 136:20
mechanics'
40:12
mechanism
107:11
median
145:20 157:8
meet
102:2 104:21 106:2
meeting
8:13
meetings
7:19 8:3,6,10
meets
104:17
member
6:21 7:4,15,16,17
8:15 20:9 23:1
103:16 108:3
members
20:16 21:3,6
mentioned
9:6 78:3 85:21 106:4
109:5 121:19 122:2
126:13 177:24

mere
95:6
met
8:14
method
83:19
methodologies
104:13
methodology
96:3,11,13,15,17,19
104:6 112:15 118:1
120:19 137:3,8,21
138:1 143:4,21
158:8 160:18 162:16
165:24 176:22 185:3
Metra
152:15,16,18
metro
130:1 148:20
Michigan
102:16
microphone
97:11
middle
96:10 132:14 167:13
million
39:3,16,21 134:4
176:11
million-dollar
76:10
millions
22:19 71:13 84:4,5
mind
60:2 81:24 85:14
minimum
43:6
minutes
85:6,17,19 87:11
186:14 188:8 189:11
mischaracterizatio
n
73:15
misleading
108:13 120:22
misrepresenting
14:3
misspoke
14:3
misstates
24:2 31:4 32:1
48:10,13,20 49:4
MLS
154:11
model
13:14,16
modified
25:17,19
MOLDOFF
48:9 88:20,22
moment
64:7 86:8 93:10
Mondays
8:14
money
12:8 26:12 29:7
30:12 32:15 33:17
34:19 39:22 40:2,12
43:17 50:6,8 63:12
76:1,3 83:8 163:12
183:8
Montgomery
45:1 50:23 51:12
53:22,24 55:11 78:8
124:15
month
65:1 138:24
monthly
154:7
months
135:4,21,22

morning
4:16 90:5 186:17,19
187:4
mortgage
150:18,20
motion
86:19 89:13,16,18
90:19,20 91:13,17
92:11,12,19 187:16
motions
89:19
mouth
8:23
movant
4:2
move
5:6 35:5 37:22 48:1
85:21 92:24 93:2
101:2 148:2,20,24
149:7 175:21 184:4
185:24
moved
100:24 110:11
111:19
moving
74:24 75:11 171:10,
16 174:11 186:2
multi-hundred-
76:9
multi-million-
70:20
multinational
71:12
multiple
127:24 129:1
130:11,13 134:13
147:5 148:18 154:12
multiply
171:20
municipalities
27:16,20,22 31:12
44:16 46:10,13 47:3
58:13 59:20 60:7,9
67:8
municipality
37:5 47:7 57:18
71:19 72:3

### N

names
118:19,20
narrowly
49:10
natural
89:11 129:1
nature
32:1 36:23
necessarily
96:11
needed
28:16 29:7
negative
174:17,22
negotiate
19:5 37:10 58:2
negotiating
37:12 79:7 83:11
negotiation
18:22
negotiations
22:20 57:21 83:12
neighborhood
131:21
net
13:11,15 14:2
140:10,24 141:11,12
166:12,19,23 172:4,
5,13 174:17



**night**
100:13
**non-responsive**
37:23
**nonresponsive**
35:6 47:9
**normal**
27:18 58:5 157:4
164:19
**note**
81:8 82:24
**noted**
184:9
**notes**
43:24 98:5,12
**notice**
95:12 146:14
**noticed**
157:7 163:17
**notwithstanding**
67:1,3
**number**
19:9 52:23 73:9,22
74:6,9,10,13,16
75:14 101:22
105:12,13 115:8
128:7 141:19,20,21
144:4 145:15 147:11
149:17,18,19 152:20
167:7 171:2 172:22
180:22 183:7 184:7,
11,20,23
**numbers**
96:2,12,15,17,18
159:15 175:24
176:21
**numerous**
86:23

**O**

**oath**
4:6 44:3,11 84:22
97:3
**object**
18:1 24:1 36:7 48:9
59:23 73:14 79:12
94:10
**objection**
24:10 31:21 32:5,6
33:2 54:11,13 69:13,
16 70:16 76:15 77:7
78:13 81:7 89:16
117:15,16 186:6
188:13,19 189:7
**objectionable**
32:9
**objections**
186:8 188:14
**objective**
38:1,7,15
**objectively**
47:11
**objects**
36:6
**obligation**
66:11 67:19
**obligations**
29:13 42:17
**obscured**
19:23
**observe**
131:23
**obtain**
21:22 99:23 100:3,
14 102:9 103:23
126:15 127:11
128:15,16 147:2
**obtained**
129:3,24 130:9
147:4 152:15

**obtaining**
54:4 101:17 105:19
128:14
**occasions**
25:18,19
**occupation**
98:22
**occupied**
150:2
**occurred**
80:12,14 95:6
120:10 147:11
179:15
**occurs**
95:3
**October**
64:13 88:13,14
180:8,13
**offer**
15:23 116:24 185:21
**offered**
115:13
**office**
110:13 112:3 122:7
165:17 187:1
**Officers**
117:9
**offices**
114:1
**officially**
103:21 124:19
**offsetting**
58:6
**Ohio**
102:17
**Olson**
87:11 188:8
**Olson's**
188:10
**one-off**
76:5
**one-point-nine-
nine**
39:17
**one-third**
8:20
**ongoing**
27:19 30:24 57:8
59:8 95:9,10,12
105:9
**open**
8:23 13:22 81:23,24
82:1 151:24
**opened**
81:21
**opening**
94:9
**operating**
47:4 57:22 164:10,
13,17,19 165:10,22
166:2
**opine**
80:13
**opining**
81:4
**opinion**
48:19 60:5 69:14
78:14 79:14 80:4,15
83:5 92:16 121:10,
13,24 133:14,20
134:19 168:6,11
169:12,20 178:1:6,
11,23 179:6 182:3
185:1
**opinions**
93:17 108:15
109:13,22 117:1
118:7 143:5 185:7
**opportunity**
48:4,22 62:18 76:1

**opposed**
56:14 98:12 150:4
**opposing**
186:4 188:19
**optimism**
88:5
**optimist**
88:6
**optimistic**
155:18
**option**
14:4 90:24
**optional**
106:14,15
**options**
13:23
**order**
15:23 22:22 23:18
26:6 32:4 39:23
55:14,23 75:12 82:6
83:2,21,22 85:21
103:12,23 135:5,9,
24 136:24 138:8
140:19 156:14
181:13
**ordered**
49:1
**ordinarily**
186:12
**organization**
108:23
**organizations**
117:8
**oriented**
143:10
**original**
21:12 53:9 141:21
**originally**
177:18
**other's**
96:2
**outline**
123:6 187:23
**outset**
109:5 122:2 126:9
**outstanding**
31:12
**overflow**
85:22 91:11,23
188:21 189:19,20
**overflowing**
189:18
**oversee**
114:3
**overview**
124:8 126:5 143:7,
13 145:6 159:7
**owned**
9:2
**owner**
22:21 150:2
**owner-occupied**
149:24 150:9
**owners**
20:17
**ownership**
121:12

**P**

**pace**
155:15
**page-and-a-half**
115:9
**pages**
115:8,12 162:9
176:4
**paid**
32:15 35:16 37:11
30:6 118:10

**pan**
76:14
**paper**
26:24 98:8
**paragraph**
26:20,24 27:3 62:5,
9,10,12,13,16,21,23,
24 63:8,11,13 64:10
66:17,18,21,24 68:8
83:13 145:2 151:12
156:4
**parent**
71:10
**Park**
52:15,17 73:8
**parkways**
132:3
**part**
15:9 16:3 17:20
21:12,17 50:11,17
52:2,7 53:8 58:1,4
66:8,19 67:23 69:14
71:16 72:5 77:2,5
78:14 86:4 93:18
107:4 114:11,19
125:2 134:21 138:17
140:12 160:21
162:21 164:20,24
165:23 184:5
**participating**
8:10 91:4
**parties**
85:22 86:5 88:18
96:14
**partner**
6:16 131:4
**partnerships**
9:1
**parts**
9:14
**party**
40:4 54:20
**pass**
101:20 102:6 104:7,
10,22
**passage**
95:7
**past**
88:7 115:10 169:4
**path**
83:18
**pause**
162:9
**pay**
34:7,22 35:20 36:13
43:13 136:24 137:19
141:14 145:23
**peer**
104:18 106:2
**peers**
104:16,20
**pending**
47:6 48:12 49:2,3
54:8 55:6 57:13,17
60:23 77:18 82:15
83:10,14
**Pennsylvania**
102:17
**people**
18:4 92:7 108:11
145:22 146:7 150:4
151:2 156:10
**percent**
63:20 150:7,20
156:18 157:1,5
168:12 169:6,20,21,
23 181:17 182:7
**percentage**
150:6,12 156:6
181:12

**percentages**
14:4 150:9
**perform**
14:20 72:7,22 75:7
102:3 112:10 134:15
138:8 143:20 177:3
181:4
**performance**
25:7 34:13 70:1
**performed**
57:19 66:9 151:8
174:1 176:23 177:11
185:3
**performing**
106:24
**period**
6:7 7:19 18:6 26:6,
12 33:1 54:9 55:1
63:9 64:12,23 65:10,
14,18,21 66:8 72:7
73:2,5 75:3 110:18
132:19,23 138:20
139:14,24 149:21
150:10 151:22
153:17,22 157:17
169:16 176:8 179:15
182:22 183:10 188:3
189:5
**periodic**
72:22
**periods**
59:9 153:24
**permission**
187:8
**permit**
37:13 38:16
**permits**
148:3,4,8,9,11,16
154:14
**persistence**
83:23
**person**
29:18,22 118:21
**person's**
96:1
**personal**
17:21 79:24 80:3
98:5
**personally**
16:12 17:2
**perspective**
69:19
**pertain**
59:14
**Peter**
87:16
**phase**
169:4
**physical**
16:24 126:15 127:4
131:14,19,24 142:6
**physically**
16:10 17:18,19
**pick**
96:1
**piece**
146:1 148:16,17
**place**
15:9 16:4 25:3 35:1
49:20 51:21,23
66:10,15 67:15
68:16,20 71:18
83:20 108:8 129:12
136:2 159:12 168:19
**places**
85:16 117:4
**plan**
11:21,24 72:23 73:5
76:5,7,8,12 91:11
**planning**
113:4,5 121:2

**plans**
127:6
**plats**
127:5 168:20 169:1
**pleasure**
4:13
**PMA**
145:2
**point**
15:2 61:2 72:1 73:21
75:19 80:9 86:6
91:19 92:18 93:22
94:11 98:3 111:9
117:12 119:18
126:14,20 139:9
140:3,6,23 147:20
150:14,24 153:13,16
154:9 156:9 167:12
171:11 186:12
**pointed**
36:22
**points**
123:6 138:4,6,11
142:20 165:22
184:11,13
**police**
49:8
**portfolio**
16:6 72:13,14 82:11
83:4
**portion**
68:7
**portions**
86:20
**pose**
23:20 36:19
**posed**
38:12
**position**
20:21 59:11 109:20
113:11,15
**positive**
47:24 174:20
**possibility**
5:6
**post-closing**
21:18
**post-march**
75:12
**posted**
67:6
**potential**
43:18 56:8 57:15
80:8 138:15 141:14
**potentially**
85:9 138:13
**practice**
106:10 109:23
113:14,19,24 114:3
**preceding**
189:7
**precisely**
187:24
**predecessor**
67:5
**predicated**
50:5
**preeminence**
103:10
**prefatory**
42:13
**prefer**
89:15
**prejudice**
48:16
**premium**
14:4 169:20,23



premiums
13:21
preparation
119:7,8,9 124:23
prepare
104:12 118:11 119:4
123:16 124:20
131:17 134:19
179:22,23
prepared
99:10 106:1 117:23
122:7 129:17 180:3
181:7
preparing
118:16,18 121:23
125:21 127:21
129:8,22 131:22
141:9
presence
50:18
present
4:17 7:18 141:12
170:8 172:7,9,13,15
174:21,24
presentation
116:21
presented
15:21 143:1 149:7
161:2 177:14 180:1
presently
5:12 10:22
presumes
24:8
presuming
24:11
presumption
92:1
pretty
156:20 185:14
Pretzel
122:20
prevails
41:9
previous
11:10 36:18 176:4
previously
63:3 87:13 149:7
160:23 171:6 182:16
price
13:7,11,14,15 14:2,
19 51:14,16,17
74:13 75:21,22 78:3
81:12 83:7 135:6,10
138:12 139:4
147:15,22 150:14,24
151:3 156:13,15,19
157:8,13 171:19,21
182:19 183:14
priced
15:21
prices
80:20 81:10 130:6,
15 146:8 152:22,23
153:4,7,9 157:16
179:17 181:22,23
182:3,6,8 183:2
pricing
79:23 147:23 156:4
158:18
primary
109:11 144:11,12,
16,22 152:19 153:12
principals
20:13
prior
8:15 83:6
privately
113:4
pro
188:20

probable
138:12
problem
42:9,12 54:17 79:16
146:13 189:1
procedure
12:21 47:4 57:22
proceed
18:20
proceeding
7:11
proceedings
181:1 190:5
proceeds
136:4 140:10 141:11
166:13,19,23 169:15
171:22 172:4,13
174:18 183:7,11
process
19:4 33:17,21 64:17
95:14 104:19 126:18
134:14 151:21 152:6
158:23 168:24
processing
158:23
producing
121:24
production
101:1 106:18 136:16
professional
4:17 35:2 87:2
103:1,8,10 106:9
117:11
professionals
108:24 113:23 117:9
proficiencies
102:23
profit
79:11 80:2 183:3
profitable
84:3
profits
84:7
program
100:9,12
progress
8:4
project
22:3,4 27:19 50:16
76:4 80:11
projected
95:13 140:24 145:14
146:14 182:8
projecting
146:22
projections
15:5
projects
5:2 6:17 7:20 15:19,
21 82:20,21
promise
49:21
promised
188:18
proper
80:17
properties
9:2 10:1,4 11:12
12:9 27:4 31:17 41:14
42:2 50:9 60:24
61:4,6,7,9,12,14
75:2,6 78:8,10 82:5
110:8,12,13,15
112:2,4 124:1,11
130:20 131:1,5,10,
14,24 133:15 138:10
147:18 155:19 168:5
property
10:8 11:1,2,5 15:10
22:11 27:7,11 30:19
35:24 40:13 41:22

42:1,4 44:18 46:23
47:16 53:3 55:17
57:12 58:9 60:17,18,
23 61:17 63:5 65:23
67:6,10 68:5 72:9,14
74:17,20 77:12,15,
22 80:13 95:7
101:15 120:8 123:18
124:4,8 127:4
131:18 132:15
134:4,18 135:3
136:21 142:13
144:13,17 147:7
151:1 152:21 153:3
170:6 172:2 174:16
175:3 178:8,13
179:7 178:6,13
proposed
95:14
protect
42:20 43:6
protecting
43:4
provide
125:15 161:14 165:5
178:23
provided
58:8 62:17 63:3
64:12 128:2,10,22
165:4
providing
109:3
provision
24:6
provisions
17:23 32:23 75:11
public
4:24 5:5 9:22 10:13,
17 40:21 46:3,21
70:19 71:3 74:11
72:18 165:7
publication
116:22
publications
116:13,17
publicly
70:20
published
116:9,19 167:7,8
pull
152:18
pulled
37:13 154:12
purchase
11:4 13:24 16:6
18:23 19:15 21:12
23:21 25:17,18
28:14 51:14 53:9
58:5 61:20 64:3,11,
21 65:9 67:14,24
74:13 75:23 183:14
purchased
82:20,21
purchaser
24:23 27:1,3 34:17
36:1 42:21 43:4,18
46:2,20 63:1 67:4,
18,19 68:13 141:4
purchasers
17:24 57:16
purchasing
63:5
purpose
42:20 108:7 125:14
131:13 148:7 167:21
179:1,5,12 180:4,5
purposes
112:5 113:3 179:3
pursue
70:3 120:7

pursued
21:21
push
59:19 82:3
put
10:14,18 14:1 19:6
21:1 35:1 43:17
46:14 47:5 50:16
54:17 60:17 62:20
74:13 75:24 77:11,
14 90:2 94:11,20
97:3 121:11 137:11
170:21
putting
11:2 50:12 184:1
PWC
129:3

---

**Q**

qualifications
99:13
qualified
73:19 101:14
qualifier
54:18
quarrel
29:10
quarter
6:1 153:23
question
15:16 18:13 21:4
22:11 23:19 24:4,13
28:7,23 29:14,18
33:14 35:9 38:1,7,9,
12,15,19 39:23 41:4,
15,18 42:5 45:3
46:18 47:12 50:11
54:1,17 61:5 62:11,
23 70:23 73:16
76:22 81:20 90:17
183:15,16 185:13
questioning
57:4 58:19 60:11
62:20 75:10 80:17
questions
8:8 11:14 18:14
22:21 23:11 36:4,10
48:5 54:11 58:16
79:18 87:12 125:6
quickly
139:4 162:22
quid
188:20
quo
188:21

---

**R**

radius
9:20 144:17,18,24
145:10,11,22 147:1,
6,24 150:23 153:3,
19
raised
14:15 68:17 69:6
76:24 78:19 80:10
range
135:20 139:1 153:5,
7,8 168:2,14,15
rapid
155:15
rapidly
92:24
rate
1:18 13,14 119:1
138:18,20 140:13,
16,17,18 141:2,7,12
154:5,16 155:17
156:3 158:18 162:18
163:18 164:5

166:16,17 167:2,5,
11,17,23 168:9,12,
15 169:6,8,10,21
170:5,7,9,14 172:6
182:21
rates
33:1 130:7,18,22
143:18 167:14 168:3
ratio
156:22
rationale
168:14
ratios
150:16
raw
168:23
reach
158:16
reached
4:21 185:4
read
25:13 32:3 35:9,10
38:19,20 45:4,5
47:12,14 63:5 64:14
66:5 67:11,21
reader
120:23 121:21
ready
86:22
real
70:9 76:4 98:23
99:20 100:5,6,10,15,
17,24 101:2,6,10,12,
18 102:12 103:10
106:6 108:20,22
109:1,4,13,23
110:20 111:11
113:14,19,23 115:14
116:19,23 117:1,13,
18 119:20 128:6
129:3 139:23 164:21
165:3,5
realm
79:17
reask
74:4
reason
6:4 27:24 34:5,16
137:14 181:2
reasonable
96:9,10 178:2,6,11
185:1,8 189:18
reasons
21:21 112:8 113:8
rebuttal
185:22 186:11
recall
11:6 21:19 24:21
25:20 45:6,11,15,19,
23 46:15 54:1 55:20
56:16 57:3 58:18,23
59:5,8 60:12,15
61:22 62:8,9,10,11,
22 64:20 66:6,20
68:10 77:12 78:5
82:7 119:2 181:21
recalled
56:18
recapitulation
159:6
receive
14:15 49:22 50:1
136:3,24 163:13
172:5,8
received
34:15 163:15
receiving
18:19 50:2 59:18
139:7 169:15 183:6,
10

recent
4:22
recess
185:17 187:3
recesses
188:17
recognize
16:22 19:17,19 20:3
recollection
17:8 52:20 56:22
59:4 74:1 82:23
reconciliation
177:6,9,11
reconvene
186:17
record
31:4 35:10 38:20
44:8 45:5 47:14
48:10,13 49:5 56:19
57:9 70:19 71:3 97:6
98:14 122:1 168:17
185:19
recorded
168:21
records
128:19 165:7
recross
84:11 87:9
recruiting
114:4
recycle
76:2
red
146:12
redirect
48:4 53:16
reduced
35:15
reengage
74:18
refer
9:12 12:3 19:8 98:2
123:22,23 138:19
reference
98:9
referenced
68:8 128:23 152:15
160:23 163:2
referred
9:10 11:18
referring
9:2 11:21 20:9 61:7,
16 123:12
refers
27:3
reflect
138:5 140:6 142:22
reflected
51:17 67:13,24
99:22 122:23
reflection
64:16 155:11
reflective
156:19
reflects
157:16 170:16
regard
37:12 85:24 92:23
regularly
57:20 109:3
regulated
106:19
Regulation
87:2
relate
130:17
related
95:7 132:11
relates
145:21 151:15,16,18

relating
44:18 45:21
relationship
6:12 7:7 105:9
107:20
release
29:5
released
26:12 28:22 29:1,3
releases
120:10
releasing
63:12
relevance
17:10 76:15,18
relevant
4:22 125:10 130:24
relied
68:3 118:6 127:15,
21 130:17,20 148:23
161:13,18 167:15
religious
88:17
rely
127:17 129:22
148:15 167:17,22
relying
14:20
remain
4:6 25:3 44:3,10
68:16,20 97:2
remained
55:6
remaining
37:6 50:16 58:4 72:1
82:10 128:8 155:7
163:4 171:9,13,16
174:10
remains
44:3 48:12,17 55:24
56:3
remanded
48:24
remember
9:7 59:21 122:16
remind
4:5 44:10
reminder
48:3
rendered
118:7
rental
149:24
renting
150:5
REO
113:1
repeat
45:3
repercussions
107:8
rephrase
24:13 28:7 32:10
49:9 54:20 69:16
replace
22:6,9,15 66:11,16
67:20
replacement
21:22 22:7
report
16:17 23:18 93:18,
21 94:1,3,11,19 95:9
97:24 98:4 99:10,11
104:11,15 108:20
114:24 115:2 117:23
118:3,11,16 119:7,
11,17,22,24 120:13,
22 121:1,11,14,22
122:10,13,22 123:4,
7,9,11,24 126:2
127:14,22 129:8,11,

14,17,23 130:24
131:8 135:12
136:12,13 137:2
141:16,18,21
142:14,21 143:5,7,9
149:11 152:11,18
154:20 158:22 159:4
161:2 164:12 167:13
173:20 175:22
177:8,19 178:16,17
180:1,3 181:7,11,14
183:18,22 184:9
reported
16:19 18:4,5,10
reporter
39:9 85:15 186:24
187:2
reporting
18:9
reports
102:1 106:1 130:1
184:16
represent
83:4 181:16
representation
24:24 67:14 68:14
representations
23:23
represented
63:13
representing
24:12 126:3
reputation
184:1
request
77:3 88:4 124:21
126:18 187:8
requested
35:10 38:20 45:5
47:14 125:21 127:10
require
130:19 140:19
166:17 188:22
required
15:20 21:22 38:3
103:7 106:11 107:4,
9 108:5 112:16
119:19,21,24 127:2
138:8 170:10
requirement
75:13 106:13,16
121:8 123:4,8
requirements
101:11 103:11 104:2
105:1,22 119:15
requires
119:17
research
121:23 128:18,20
134:1,11,17 135:17
136:7,9 143:15
156:21
researched
129:2 148:22 165:6
reserve
186:6
reserving
184:13 86:4 188:13
185:21 186:9,10
residential
101:16 110:8,15
130:8 145:16
residual
12:7,9,14 14:19
resolution
33:11
resolved
61:18
resource
130:12,16 167:6

resources
167:22
respect
7:11 15:18 25:2
49:16 68:15 133:12
154:1 159:8 169:11
175:8,17 176:15
respond
38:15 86:7 91:20
96:18
responding
38:14
response
11:14 24:3 38:7
89:14 90:17 158:12
responses
36:20 167:9
responsibilities
105:8 113:20 114:9
responsibility
121:10
responsible
46:2,21 69:7
result
12:9,14 28:21,24
30:11 33:24 60:8
80:2 121:18 142:22
159:2
resulting
35:4 141:7
retrospective
135:2
return
140:18,19 166:17
167:11
returned
46:4
revenue
139:6,8,11 140:8
141:10 142:17
160:4,6 162:17
163:6,7,9,11,14
164:9 166:6,11,14
174:13
reverse
146:11
review
19:13 101:21,24
104:18,20 105:18
106:1,2 121:8
167:24
reviewed
82:11,14 86:21
104:16 119:11
127:21 129:18 179:9
revoked
107:14
Ridge
21:14 52:6 124:13
159:24 160:12
162:10 163:22 173:6
175:9
right-hand
184:23
rights
93:1
ring
10:21 60:17 61:4
rings
9,6,10 11:6 60:12
Riordan
4:4,9 18:2,10,18
19:10,11,23 20:2
24:4,14 31:7,14,23
32:11,12 33:4,9
35:5,9,11,14 36:9,14
37:22 38:19,23
41:19,20 43:10,20,
24 44:11,12,14 45:4
7 46:17 47:8,19
48:1,15 49:11 53:12

54:11,13 59:23 61:3,
10 66:20 69:13
70:16,22 71:2 73:14
76:15 77:2 78:13
79:12 80:5,10 81:4,8
82:12 84:12,15,17
87:20,21 88:19,21
89:1,7,10 90:24
91:19 92:3,10 93:9,
12,15 94:6,10 96:22
117:16 186:5,11,15,
23 187:5 188:4,7,24
189:10,15
Riordan's
4:3
risk
140:20 169:3,7,13,
19
riskier
170:2
risky
169:5
role
17:20,21 79:21
roles
105:8
room
8:11,12 189:14
roughly
157:1
round
95:17
rounded
172:19
routine
17:17
routinely
8:14 16:16
RUFF
39:13 62:4 84:20
85:4 86:16 89:23
90:22 92:7 93:4,8
94:23 186:22 187:18
189:8,12,24 190:2
rule
36:15 91:18 96:19
ruled
70:3
rules
96:16
ruling
71:4 90:19
run
86:14 88:17 185:15
186:3
running
81:4


S

safe
74:12 84:18
sake
22:5
salability
74:8
salaries
165:17
sale
13:8 18:23 19:16
21:12 23:22 25:17,
18 28:14 36:16
57:19 58:6 59:14
61:20 64:3,21 65:10
68:1 75:4,23 78:3
79:8 136:4 138:12
139:4 152:21,23
166:13,19,23 169:15
171:22 172:4 174:17
180:13 183:11,14

sales
11:11 75:11 79:2,3,
6,7,11,23,24 80:6,7,
8,20,24 82:12,14
84:2,5 120:9 130:15,
16 147:1,8,11,13,15,
21 152:22 153:4
154:12 156:9,21,23
164:22 172:1,2
180:10,20 181:8,10
samples
102:1 104:19 106:1
sat
8:13
satisfied
29:6 34:18
satisfy
22:22 43:18
scenario
123:22,23,24 124:3,
5 132:17,20 133:3,7,
9,13,14,16,19
135:19,23 146:17,20
151:17,19 152:2
154:2,17 155:4,8,18,
21,23 159:9,18,21
160:5,10 161:20,21,
24 162:2 168:7,8,10,
11 169:11,12,22,24
170:17,23 173:12,21
174:3 175:17,24
176:1,6,8,12,15,18,
20 177:17,20 178:9,
13 179:24 180:5,9,
12,17,20 182:18
scenarios
123:18,20 125:11,16
134:1 143:2 154:16
155:3 161:16 176:7,
24 177:3,11 179:22
schedule
88:3 91:2,8 163:1
school
10:12 100:13
scope
76:16,17,20,22
120:5,6 121:19
123:5,6 126:6,10,22
142:12
screen
99:7 141:19
searching
128:19
seasonably
95:3
seat
97:9
section
24:16,18 136:12
137:2 143:6,12
148:24 149:1 159:3
183:19
secure
25:10 67:9 71:15
secured
25:4 68:23 69:1
71:18
security
43:13
seek
167:9
seeking
40:11
select
144:18 169:10
selecting
168:14
selection
130:7
sell
51:4 57:12 60:22

76:6,24 83:2 124:6
133:4,17 134:5
135:5,10,21 138:13,
18,23,24 139:2,5
152:23 155:6,9,11,
14,15,19 162:19,23
163:3,7,8 164:3
170:3 177:8,12,15,
20 174:9 175:4
182:23
seller
23:22 24:24 47:1,2
62:16 67:5,15,18,20
68:13
seller's
67:5
sellers
63:2
selling
13:10 36:17 52:5,8,
11,14 83:6 132:21
133:8,9 135:19
140:1 146:21
151:17,19 155:5,10
174:5,8,14 180:8
selloff
132:16,19
sellout
132:23 138:20
139:1,14
semiannually
73:4
seminars
116:13
sense
33:12 37:12 93:17
110:5 127:6 131:19
146:3,6,16 148:11
150:1 152:19 156:13
sensitive
98:10
sentence
63:1 67:17 70:6
sentences
140:22
separate
6:15 21:1,5 25:18,19
28:3 128:21
separately
131:12
September
6:11 64:1 88:10,12
180:10
series
58:16 101:19 103:11
119:23 123:5
service
4:12 109:11 129:2
130:4,11,14 147:5
148:19 154:13
services
108:17 109:3
serving
105:12 114:7
set
42:17 106:23 107:24
120:24 136:23
setting
144:10
settle
37:4
settled
28:19 32:13 37:15
43:9 47:20 72:2
settlement
32:2,7,16,18 33:10
49:12
settlements
28:22 29:1
Settlers
52:6 124:13 159:23



160:12 162:10
163:22 173:5 175:9
**settling**
31:20
**Seventh**
96:5
**share**
92:24
**sheet**
93:16
**Sherwood's**
59:11
**shoes**
137:11
**shoot**
89:3
**shopping**
110:14
**Shorewood**
10:7 11:5 46:1,19,24
50:22 51:5 58:18,21
59:3 77:11,14,16,24
78:4 80:7 124:13
142:5 144:9,20
146:5
**short**
44:2,6 86:10 87:15
92:8 186:13 187:22
**shorten**
85:10
**show**
13:14 80:16 161:4
**showed**
16:21
**shown**
64:4 66:19 94:8
175:1 180:18
**shows**
12:15 56:19 57:9
59:3 147:10,12,15
154:7
**side**
8:22 19:1 98:12
139:11,13 140:8,9
141:10,11 142:17
160:4,6 162:17
163:6 164:9 166:6,7
184:23 185:17
**sidelines**
50:13
**sides**
166:9
**sidewalks**
132:3
**signature**
20:3 26:2,18 64:1
184:18,22
**signed**
20:22 26:6 65:11
120:12,13 121:7,12,
14
**significance**
15:8 74:23 144:7
147:3 153:6 163:10
**significant**
14:16 128:17 139:15
147:17 163:13
169:18 183:9
**significantly**
155:12 157:12,14
169:13 182:17
**silent**
8:13
**similar**
92:18 102:22 104:9
151:13 160:8 177:17
**simple**
134:5
**simply**
38:6 96:1

**single**
141:3 150:3 172:16
**single-family**
110:8 130:13 150:18
**sir**
4:13,19 5:10 6:9
7:12 9:5 11:22
12:18,23 15:17 16:2,
8 18:14 21:13 23:10
25:22 27:10 28:1,10,
23 29:24 30:19
32:14 34:21 35:12
36:3 39:18,21 42:6
47:15 51:15,20
53:11 84:8 97:2
**sit**
6:23 8:16 23:4 29:3
37:9 50:13 169:24
**site**
127:6 134:11,13
**situation**
89:3 92:17
**situations**
113:1
**six-lot**
74:17
**six-year**
124:6 169:16
**size**
13:6 14:3 142:8
**skip**
64:6
**slip**
92:16
**small**
37:6 39:15,19 44:1
74:15 107:13
**smaller**
57:16
**soft**
14:10
**sold**
52:19,24 75:8 78:10
82:6 83:3,5 124:2
133:1 174:6 181:13,
20,24 182:1
**solely**
148:15
**solo**
88:24
**sooner**
163:7,16
**sorely**
91:10
**sort**
96:1 107:5 137:17
146:22
**sorts**
117:4 130:4
**source**
130:7,14 161:17
**sources**
130:20 148:21
**space**
13:22
**speak**
37:15 116:24 117:5
**spec**
14:1
**specific**
33:5 34:10 36:9
40:16 41:11 46:12
80:19,20 105:18
122:16 124:11 130:8
143:17 144:9 147:5
168:4 178:24 179:6
184:13
**specifically**
39:24 110:1 120:2
121:4 123:12 132:10
184:14

**specificity**
15:17
**specifics**
29:5 31:1,11 33:6
40:5,9 46:9,16 55:3,
12 56:2 59:9
**spectrum**
168:22
**speeches**
116:13,17
**spelled**
97:7
**spending**
150:19
**spent**
110:10
**split**
96:8
**spoke**
23:5,12
**spoken**
116:19
**spots**
86:24
**spring**
122:17
**square**
13:7,10 14:2,10
78:12
**squarely**
11:8
**stage**
48:7
**stages**
83:12
**stand**
44:4 92:5 187:3
**standard**
7:6 47:4 57:22 63:11
119:23 130:2 152:17
171:19
**standards**
102:2 104:17,21
106:3,4,5,9,12,23
107:6,9,19 108:1,8,
16 129:12
**standing**
97:2
**stands**
88:13
**start**
38:4 53:20 84:7
85:18,20 90:1 92:2
106:5 115:1 119:16
123:11 124:2 127:2
132:21 133:4,9
134:18 135:19 144:1
146:20 151:17,19
155:5,10 159:12
169:2,14 174:8
180:7 183:6 186:21
**started**
11:1 54:9 59:17
110:2,7,19 111:13
**starting**
72:1 146:18 182:23
186:19
**starts**
24:23 154:19
**state**
38:3 40:19 44:19,21
60:1 97:5 101:7,11
103:7 104:4 106:19
107:11 115:16
**stated**
73:8 88:7 95:1
**statement**
42:13 73:10 89:24
99:12
**statements**
86:3 94:9

**states**
81:4 95:9 101:8,24
102:13,15,20,23
106:20
**statistics**
145:3 146:9 150:22
**status**
8:4 25:8 44:22 48:20
55:2 59:7 70:7,14
**statutes**
106:14,15
**stay**
49:1
**stayed**
48:24
**step**
124:18,20 126:21
131:22 134:8,14
145:5 152:6,7
160:18,20 162:16
164:6,8 166:10,15
167:1 177:5
**steps**
103:22 126:17 177:4
**sticks**
14:9,12
**stipulate**
70:24 71:2
**stipulated**
48:10 49:5
**stop**
36:6,15,16
**Stouffer**
122:20
**Stout**
99:1 109:7,9,10
111:9,20,22 113:9
114:12 118:10 119:3
122:22 127:14
135:12 136:12 143:9
149:11 152:11
164:12 173:20
175:22 177:8 180:3
**street**
37:17,19,21 76:11
139:19
**streets**
132:2
**stretch**
37:4
**stricken**
38:18
**strike**
35:5,7 37:22 47:8
48:1,2
**strongly**
86:15
**stuck**
188:17
**studied**
66:5
**studies**
128:23 148:21
**study**
129:1 130:1 152:15,
16,18
**subcategory**
75:19
**subdivision**
73:23 74:7 112:11
116:7 124:12 126:1
130:2 138:1,22
142:4 144:1,9 146:5
153:1 165:20,24
170:24 177:15
**subdivisions**
16:5 73:7 80:20
110:14 112:2,13,24
113:7 114:13 116:5
127:8 130:6,8,9
132:23 135:22 136:8

137:8,13 138:9,16
139:20 142:3,10,11
143:3,14,17,19,22
144:15 145:17
152:8,17,20 153:2,
10,12 154:9 157:20
158:6,9,12,18
159:16,21 160:24
161:15 162:13
163:21 165:16
166:24 167:10
168:17 176:1,6,17
182:9
**subject**
61:7,13 120:8
121:16 124:7 129:11
130:19 138:9 141:3
144:13,17 147:7
151:1 152:21 153:3
167:10 168:5 181:10
185:20,23
**subject's**
150:14
**submission**
95:1,2
**submit**
29:22 87:19 101:23
104:19
**submitted**
124:22
**submitting**
29:11 105:24
**subsequently**
61:11
**subset**
56:7 57:15 75:18
**subtracted**
166:14
**suburb**
9:17
**suburban**
10:17
**success**
22:2
**successful**
11:10
**succinct**
85:8 86:17
**sudden**
169:17
**sue**
29:24 32:19,24 34:5,
16 58:9 59:4 77:14,
16
**sued**
30:15,20,21 56:20
58:21 76:13
**suffer**
107:13
**Sugar**
45:9 69:6 124:13
**suggest**
95:11
**suggested**
57:2
**suggestion**
80:21 81:9
**suing**
30:7 34:8 60:18
**suit**
44:24
**suits**
53:23 56:14
**sum**
37:21 58:3
**summaries**
164:14

**summarized**
145:8 152:24
**summarizes**
170:24 177:16
**summarizing**
62:17
**summary**
13:12 118:6 142:1
155:2 159:5 167:13
176:3 177:13
**sums**
75:24
**Suncal**
5:23 6:1,15,21 7:4,8,
14,22 20:11,13,14,
17,19,23 21:4,21
55:7 60:6 63:15
**Suncal's**
6:7,12 7:10,15,16,
17,20
**supplies**
165:18
**supply**
152:8,12
**support**
109:18 118:2
**supports**
118:7
**suppose**
28:4 80:9
**surely**
33:10
**sureties**
27:12,16 44:17
**surety**
15:8 23:14 27:23
28:18 29:10,21
35:16 58:7 59:18
60:18 61:18 68:9
76:13
**surplus**
10:13
**surprise**
38:24
**surrounding**
131:21 144:21
**Survey**
129:4
**surveys**
127:5 130:17 136:7
167:7,8,15,16
**suspect**
86:15 87:22 186:14
**sustain**
69:16 77:7 78:16
81:6
**sworn**
97:4 98:18
**synthesized**
154:20

---

**T**

**tabbed**
122:6,10,12
**table**
141:23 142:17,22
146:23 148:3 162:6
**tabs**
98:8
**taint**
30:17,19 46:23
**tainted**
42:1 53:5
**tainting**
41:13,22 47:16
**taints**
42:4
**takedown**
51:7,11



**takedowns**
51:5
**takes**
82:22 90:11 163:8,
11
**taking**
105:23,24 121:10
140:20 174:21
185:17
**talk**
86:9 131:2 133:2
166:6
**talked**
11:15 23:2,8 112:16
119:14 142:20 159:6
160:9 165:21 171:1
187:10,16
**talking**
12:20 40:23 41:2
55:4 84:7 85:16,17
89:8 130:12 139:14
144:21 145:16 157:2
176:21 189:14
**tall**
83:21
**tank**
169:17
**task**
90:3 132:15
**tasked**
16:13
**tax**
113:6 116:6,7 128:7
179:2
**Taxation**
117:10
**taxes**
139:23 150:21
164:22 165:3,6
172:2 174:17
**team**
16:13,17 17:14,16,
20 18:4,9 22:17,18,
21 23:2,5,8,12,14,16
28:12 33:8 36:24
52:7 66:9 71:21
**techniques**
104:14
**telling**
23:22
**tells**
56:23
**tend**
69:15
**tender**
117:13
**tendered**
115:20
**term**
8:19 65:4 135:1
149:23 189:16
**terms**
15:6 16:11 28:2
64:11 75:1 83:10
119:21 146:8 147:12
**testified**
11:23 16:1 41:23
98:18 115:9,22
116:1,4,7
**testifies**
86:24
**testify**
40:5 87:7 90:9 96:20
98:11 185:22
**testifying**
97:19,20 114:20
115:2
**testimony**
4:16 8:15 9:8 11:16,
18 27:10 44:4 79:14
93:23 94:18 111:14

115:5 116:1
**Teteak**
4:10 17:12 44:15
140:15
**Texas**
102:18
**thereof**
25:5,6,8 69:5,23
70:1
**thing**
86:1 96:1 149:22
150:11 153:21
182:20
**things**
65:20 76:6 85:10,12,
21 86:8 87:21 92:12,
14 96:7 114:4 120:1
127:5 128:5 132:2
137:15 138:11
139:3,17,22 148:22
154:6,15 156:10
158:19 164:23
165:17,21 183:7
187:6
**thought**
42:8 61:4,5 86:14
87:4
**thoughts**
117:1
**thousand**
101:23
**three-year**
132:16
**throw**
85:12
**time**
4:3,18 6:6,8,13 7:1,6
8:18 9:3 11:3,4 12:8
13:8 15:2,19 20:22
23:5 26:7 33:1 35:16
37:13 55:1,6 56:17
57:9 58:3,24 59:8,9,
16 71:20 72:9,20,23
73:2,5 75:2 79:15
83:8 85:23 86:15
87:5,13 90:11,14,21
92:13 94:14 95:7
100:9,22 110:17
111:22 118:11,23
119:8 129:11
134:22,24 135:1,6,
13,18,24 136:5,8
140:1 149:22 150:10
151:22 153:22,24
157:17 163:11,12
167:12 169:16
174:15 179:15
182:22 183:8,10
185:16,23,24 186:8,
20,21 189:5
**time-permitting**
50:15
**timeframe**
188:18
**times**
46:10 112:10 114:16
115:19,22
**timing**
46:12 56:16 86:4
**tiring**
33:17,21
**title**
62:13
**today**
6:23 16:21 23:4
24:20 26:14 29:4
50:18 69:11 82:18
85:3,10 95:18
113:16 114:21
163:15 185:8,16

**today's**
47:21
**told**
18:3,4 22:6 87:12
**tomorrow**
85:19 87:16,18,23
89:10,22 90:3,7
91:16 92:2,6,10
176:17,19,20 187:4,
9 189:21
**tonight**
86:21
**tools**
37:12
**top**
13:3 66:23 119:2
123:1 124:10 125:18
135:12 142:3,17
149:10 153:6,21
139:17,22 148:22
173:21 184:8
**tope**
138:1
**topic**
7:20 116:22 117:1
**tops**
188:9
**total**
142:5,7,10 147:13
149:17,18 150:12
152:19 156:19
171:2,5,13 176:16,
18 181:17
**totally**
129:14
**touch**
131:18
**touched**
75:15 81:6
**Touché**
39:14
**town**
10:12
**towns**
28:19,22 29:1
**track**
168:17
**trade**
70:20
**training**
114:5
**transaction**
50:6 80:14
**transactions**
42:17 50:21 51:1,2
**translate**
150:8
**translates**
174:12
**tread**
49:9
**treading**
49:7
**tree**
37:17,19,21
**tremendous**
76:1
**trend**
146:11
**trends**
130:6,15 145:11
146:9,18 148:19
**TRG**
4:17 5:2,8,13 6:4
11:18 19:22,24
26:17 27:1 30:15,21
31:3,8,15,16 32:19
33:22,23 40:2,18
42:18,22 43:12 45:1,
9,13,17,22 46:1,20
47:20,22 48:5,12

49:13,14,17 50:8,12,
14,16,21 51:3,10
52:5,8,11,14,17 53:9
54:4,23 55:3,10,13,
23 56:3,20 57:3,7,12
58:22 59:1,4,17,20
60:4,5 63:15 64:7
68:24 75:13,21,24
76:2,6,9,23 77:14,16
78:9,11 79:10 80:21
81:11 88:5 93:6
125:21 127:11
128:11,22 132:6
183:3
**TRG's**
70:2 188:11
**trial**
11:19 19:8 61:24
86:5 93:19 99:5,11
115:23 119:9 122:21
123:10 135:11
136:11 141:17,19
143:8 149:10 152:10
158:3,4,21 164:11
173:19 175:21 177:7
180:2 183:17 188:12
**trouble**
41:17
**true**
36:14 70:22 127:19
**truism**
15:3
**trust**
19:19 112:6 113:3,5
**truth**
60:2
**Tuesday**
88:11
**Tuesdays**
88:14
**Turiello**
11:15 18:1 24:1
31:4,21 32:1 33:2
36:7,11 48:20 53:15,
17 54:14,21 60:1,10
62:5,7 69:17 70:19,
24 71:4,7 73:21
74:3,5 76:21 77:9
78:18,23 79:1,21
80:18 81:13 82:2,4
84:8 96:24 97:22
98:7,15,20 117:12,
19,20 185:11,18,20
186:7
**turn**
19:14 25:21 26:13,
20 117:21 143:8
177:7
**two-**
110:9
**two-and-a-half**
115:11
**two-day**
104:8,22
**two-minute**
185:11
**two-thirds**
8:19
**two-year**
129:10
**type**
5:17 101:15 107:1,2
111:23,24 112:22
113:20 158:13
**types**
15:21 113:1 167:16
**typical**
14:13 136:8 137:11,
16,21 144:22 147:23
150:16 165:16,19

**typically**
150:19 152:17 157:4
168:22 178:23

**U**

**ultimate**
37:16 81:14
**ultimately**
30:3 50:5
**unable**
76:2
**unaware**
46:11
**uncertainty**
180:24
**underlying**
156:19
**understand**
17:3,22 26:5 28:21,
24 39:6 41:4 49:6
50:20 56:11 88:16
89:7 98:15 104:14
121:22 141:18
144:12 145:17 181:9
183:15 186:21 189:6
**understanding**
21:16 28:20 38:5
54:4,7,15 55:5 60:1
62:19 69:10 70:13
74:3 120:20 123:13
181:15
**understood**
17:5 18:3 40:1 97:22
**underwrite**
22:5,10 28:16
**underwritten**
5:1 13:13 49:19
22:7
**underwrote**
22:12 30:8
**undesirable**
61:17
**unenforceable**
69:21
**unfairness**
50:13
**unhappy**
91:10
**uniform**
106:9 108:7
**Unit**
45:21
**Units**
45:18
**University**
99:21 100:5
**unknown**
135:23
**unsalable**
58:12
**update**
72:23 73:5 94:24
95:5 129:9
**updated**
72:20 95:2,3 96:12
181:4
**updates**
8:17
**upheld**
95:16
**upper**
11:9
**user**
120:2,15 125:3,20
**users**
120:4,21 123:3
125:19 126:3,22

**USPAP**
106:10,11,13,17,22,
23 107:12,15,23
108:2 112:16
119:14,16,19,21
120:21 121:15,17
123:8 129:6,9,16,19
134:14 135:2 183:22
184:15 185:5

**V**

**V-A-N-S-A-N-T-E-N**
97:8
**vacant**
156:12 171:19
**vacuum**
37:3 179:9
**vaguely**
30:22
**valuation**
109:12,13,14,21,23
111:3,17 113:14,19,
23 141:4 167:21
178:21,22
**valued**
113:2
**values**
142:23 143:1 158:24
159:2,8 162:6 164:4
182:8,17
**valuing**
137:8 179:7
**Vansanten**
93:13 94:12,19 95:8
97:1,7 98:16,21 99:6
117:5,17 185:21
**Vansanten's**
93:16
**variety**
112:1,5,8 113:8
**Vegas**
22:3
**verbal**
49:17,24
**version**
24:8
**versus**
182:18
**Veteran**
4:11
**view**
169:5
**village**
45:24 50:22,23
51:12 187:12
**violating**
121:17
**violation**
87:12 107:12
**virtually**
11:12 60:21
**virtue**
163:24
**visit**
131:1,5 134:11
**visiting**
134:17
**visits**
131:7 134:13
**volume**
147:8,12,20 152:22
**voluntarily**
50:10
**voluntary**
49:21 50:17

**W**

wait
30:7 71:4 136:3
169:14 183:5
waived
62:19 65:18
waiver
26:21 27:3 62:13
63:9,14
walk
173:8,15
Wall
76:11
wanted
42:14 113:1 147:7
161:1
War
4:11
warranty
25:1 68:14
watch
50:13
Waterford
13:3,5 52:9 124:15
160:1,14 162:11
163:17,20,24 164:2
173:13 175:19
ways
105:12
Wednesday
88:11
Wednesdays
88:14
week
88:10 91:3
weekly
7:19
weeks
88:12
well-supported
108:14
well-thought-out
95:21
Wellspring
111:16
whatsoever
25:1
Whispering
39:2 124:14 159:24
160:13 162:10
163:23 173:6 175:13
width
142:7
wins
43:11
Wisconsin
102:16
withdraw
183:16
witnesses
85:3 87:7,14,15 88:3
92:8,9,10 97:10
187:9,20,22 188:1,2
word
25:14 32:14 83:17
wording
24:23 184:14
words
31:23,24 32:4
work
29:8 49:22 50:1,3
57:18 58:14 72:7
85:6 89:21 91:15
98:24 99:1 102:3
104:12,19 107:15,21
108:8,13 109:7
110:2,4,5,19 111:2,
16,23,24 113:21

114:6,10,11,19
120:5,6 121:19,22
123:5,6 126:6
143:13 154:1 159:2
184:3
worked
58:15 111:10,14
working
4:23 5:14 27:19
100:17,22 103:19
110:17,20 111:13
works
13:1 88:18 97:11
171:17
worth
134:4 163:15 175:4
write
28:5
writing
86:3
written
5:21,22 49:24 87:19
91:24
wrong
41:3 65:18

**Y**

year
5:15,23 6:11 57:11
82:23 95:1 100:23
139:1 147:8 148:12
152:1,2 154:12
155:10 163:3,4,5
171:8,12,14,20
172:5,6,12 174:9,10
180:3 181:5
year-and-a-half
55:14,24
years
7:19 18:15 41:24
42:11 55:20 56:11,
20 59:5 72:8 75:9
83:6 100:13,19
110:10,23 111:6,15,
19,21 113:9 115:3,4
120:11 129:10
132:11,18,24 133:5,
10,17 134:5 136:3
139:15 147:9,12,16
151:20 155:9,16
169:14 170:1 172:14
174:5,7,14,18,21,23
183:6
yesterday
93:16 119:6
York
114:2
Yorkville
30:6,7,20 31:9,20
32:13,16,18,23,24
33:6,7 39:1 45:17,20
56:10,13,20 124:14
187:13

**Z**

Zurich
70:20 71:11