**Page 1**

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 NORTHERN DISTRICT OF ILLINOIS
 3                        EASTERN DIVISION
 4
 5   IN RE:                        )
                                   )
 6   KIMBALL HILL, INC.,           )
           Debtor,                 ) No. 08-10095
 7
 8
 9                  REPORT OF PROCEEDINGS at the trial of
10   the above-entitled cause before the Honorable
11   TIMOTHY A. BARNES, Judge of said Court, at the
12   Richard J. Daley Center, Room 744, on the 29th day
13   of August, 2018, at the hour of 1:30 p.m.
14
15
16
17
18   Reported By:  Melissa C. Guandique, CSR
19   License No.  084-004335
20
21
22
23
24
                                                          1
```

**Page 2**

```
 1   APPEARANCES:
 2        PRETZEL & STOUFFER, CHTD.
 3        BY:  MR. EDWARD B. RUFF, III
 4             MR. MICHAEL P. TURIELLO
 5        One South Wacker Drive, Suite 2500
 6        Chicago, Illinois 60606
 7        (312) 346-1973
 8        Eruff@pretzel-stouffer.com
 9        Mturiello@pretzel-stouffer.com
10
11             - and -
12
13        VEDDER PRICE, P.C.
14        BY:  MR. WILLIAM W. THORSNESS
15        222 North LaSalle Street, Suite 2600
16        Chicago, Illinois 60601
17        (312) 609-7500
18        wthorsness@vedderprice.com
19             Representing TRG Venture
20             Two, LLC;
21
22
23
24
                                                          2
```

**Page 3**

```
 1   APPEARANCES (CONTINUED:)
 2        SCHUYLER ROCHE & CRISHAM
 3        BY:  MR. CORNELIUS F. RIORDAN
 4        180 North Stetson Avenue, Suite 3700
 5        Chicago, Illinois 60601
 6        (312) 565-2500
 7        Criordan@rmp-llc.com
 8
 9             - and -
10
11        ECKERT SEAMANS CHERIN & MELLOTT, LLC
12        BY:  MR. ALAN I. MOLDOFF
13        50 South 16th Street, Suite 2200
14        Philadelphia, Pennsylvania 19102
15        (215) 851-8450
16        Amoldoff@eckertseamans.com
17             Representing Fidelity & Deposit
18             Company of Maryland.
19
20
21
22
23
24
                                                          3
```

**Page 4**

```
 1                      I N D E X
 2   WITNESS                    DX   CX   RDX   RCX
 3
 4   PETER KYTE
 5        By Mr. Turiello        05
 6        By Mr. Riordan              80
 7        By Mr. Turiello                  131
 8
 9   GREGORY KILBURN
10        By Mr. Riordan        152
11
12
13                  E X H I B I T S
14
15   NUMBER            MARKED FOR ID    RECEIVED
16
17        (NO EXHIBITS WERE MARKED)
18
19
20
21
22
23
24
                                                          4
```

1                  (whereupon, the following
2                  proceedings were held in
3                  open court:)
4      THE COURT:  Sorry about that.  We had an
5  emergency motion, which we sometimes get.
6         Let's call the matter for the record,
7  please.
8      THE CLERK:  Kimball Hill.
9      THE COURT:  Mr. Kyte, you're still on the stand
10 and still under oath, just to remind you, and we
11 are still on direct examination, I believe of
12 Mr. Kyte.
13     MR. TURIELLO:  May I continue?
14     THE COURT:  You may.
15         DIRECT EXAMINATION - (CONTINUED)
16 BY MR. TURIELLO:
17     Q.  Good afternoon.  We left off talking about
18 the diligent period of events leading up to the
19 purchase, do you recall that?
20     A.  Yes.
21     Q.  As part of the process was an assessment
22 made of what would be worthwhile to bid or what TRG
23 would be willing to pay for these properties?
24     A.  Yes.

5

1      Q.  And was that process described by
2  Mr. Teteak?
3      A.  I believe Mr. Teteak was more focused on
4  SunCal's approach and SunCal's opinion of price of
5  what they would be willing to pay.
6      Q.  Did you do your own assessment of what you
7  would be willing to pay or TRG would be willing to
8  pay for the properties?
9      A.  We did with the assistance of SunCal.
10     Q.  The Court has seen and is aware of the
11 different properties.  But just generally, where
12 are they located and what properties was TRG
13 wanting to buy?
14     A.  They acquired seven -- we acquired lots,
15 remaining lots within seven different Kimball Hill
16 communities.  So those would be one, Waterford,
17 which is in Elgin.  Two, Edgewater, which is in
18 Shorewood.  Three, Huntington Chase, which is in
19 Montgomery.  Four, Ingham Park, which is Aurora, I
20 believe.  Five, Settlers Ridge, which is in Sugar
21 Grove.  Six, Legend Lakes, which is in McHenry.
22 And seven, there is -- I'm missing one, I'm trying
23 to -- Yorkville.
24     Q.  What did TRG pay for those properties?

6

1      A.  $6.6 million.
2      Q.  And how did you come to that number?
3      A.  Well, I mentioned that I was more
4  concerned or focused on down side, so when they do
5  their base case analysis, as Mr. Teteak discussed
6  yesterday, they did that based off the business
7  plan.
8         If you looked at the business plan, the
9  returns projected were, I want to say, north of
10 40 percent of annualized internal rate of return.
11 That would mean that you would have been able to
12 pay more for that piece of property, kind of a
13 normal -- the 25 percent discount rate return that
14 we were looking for.
15         So we internally were -- SunCal looked at
16 down side scenario and worked into that
17 $6.6 million number and kind of instructed SunCal
18 that if we were going to move forward with the
19 project that was our price.
20     Q.  And you were able to acquire the property
21 for that price?
22     A.  We were.
23     Q.  As part of that assessment you
24 looked -- did you look at costs?

7

1      A.  Absolutely.
2      Q.  And did you look at the status of maturity
3  bonds and municipal improvements?
4      A.  That was a different team, or two teams
5  focused on the surety bonds, but I was certainly
6  aware that there were surety bonds.  It would have
7  been discussed during the weekly meetings, pretty
8  much project by project discussing the outstanding
9  improvements that were covered by those surety
10 bonds.
11     Q.  What was in this process that led you
12 to authorize an offer of $6.6 million?  What was
13 your understanding of the status of surety bonds?
14     A.  That they were in place, they were
15 irrevocable, and the original kind of bond
16 agreement, so to speak, between Kimball Hill,
17 Fidelity, and the municipality, in some cases there
18 were other sureties, but that Kimball Hill,
19 obviously, through bankruptcy was already in
20 default of their bonds or just nonexistent.
21         So that the primary was Fidelity, and that
22 the municipalities and various bonding companies
23 were in the process of working through settlement
24 agreements to complete those improvements.

8

1    Q.   As part of your due diligence in coming up
2  with your purchase price, did you inquire or find
3  out whether there would be any requirements to
4  replace the bonds?
5    A.   That was part of the diligence effort
6  led by SunCal's team, but it's my recollection
7  based off of those meetings that none of the
8  municipalities ever indicated that they were
9  looking to us to replace the surety bonds.
10   Q.   Would -- if there were either no bonds
11 or a requirement to replace the bonds, how would
12 that factor into what TRG was willing to do or
13 whether they were willing to make a bid on this
14 property?
15   A.   Well, presumably if there were no bonds,
16 that would either mean that the project -- the
17 improvement was complete and/or it was a raw piece
18 of property.  I suppose if there were no bonds we
19 would have factored that into the purchase price
20 and to see if the deal made sense.
21       If it was raw, or there were no bond and
22 no improvements that needed to be completed, we
23 would have looked at that, or if the villages said
24 that we had to replace the bonds, we would have
                                                    9

1  looked at that.
2        But ultimately just where the numbers
3  were, we wouldn't have even considered acquiring
4  the property under any of those scenarios because
5  the math just wouldn't have worked out.
6    Q.   And you wouldn't have considered acquiring
7  this property if there were either no bonds or
8  requirements in place?
9    A.   Correct.
10   Q.   If we could call up Exhibit 21, please.
11 After the sale -- in conjunction with closing on
12 this property did you -- did TRG enter into a
13 development management and participation agreement?
14   A.   We did.
15   Q.   And can you tell me what trial Exhibit 21
16 is?
17   A.   It's the development management and
18 participation agreement between TRG Venture Two, I
19 believe, and SunCal or some of SunCal's entities,
20 JNI.
21   Q.   If you could go to Page 15 of Exhibit 21,
22 there is a signature on the project owner, can you
23 tell me whose signature that is?
24   A.   That is my signature, Peter Kyte, under
                                                    10

1  TRG Venture Two, and Bruce Kut's (phonetic)
2  signature under JNI general counsel.
3    Q.   Going back to the first page, just so we
4  could have the heading in mind, could you tell us
5  generally what is this development management and
6  participation agreement?
7    A.   So this is somewhat of a standard
8  development management and participation agreement
9  with respect to the rules and responsibilities of
10 the development manager, in this case, SunCal, and
11 that would outline their roles and
12 responsibilities.
13       And I say that this is somewhat of a stock
14 agreement because it has a lot of development roles
15 and functions covering projects that have a lot
16 more work to do, a lot of development activities.
17 In this case although the rules are that -- all the
18 rules were included, these properties just by
19 nature of their state really didn't require
20 remotely close to the -- these rules and
21 responsibilities listed in the agreement.
22       It was effectively asset management was
23 the main part and that would have taken place after
24 the guys on the team on the ground had gotten
                                                    11

1  maintenance agreements in place, set up the process
2  for where the property tax bills would go and where
3  the HOA bills would go.  So they would take that
4  and set a budget, and then it would turn into an
5  assess management exercise.
6        So we would get a monthly update, and that
7  update would be a draw request, that draw request
8  would title a budget.  If the project was under
9  budget, we would approve the draws, fund that
10 capital call, and then they would provide us with
11 those financials a couple weeks later.
12   Q.   So the maintenance of the process you're
13 describing that was JNI or SunCal would manage the
14 project on behalf of TRG and make these reports and
15 keep you informed?
16   A.   Correct.
17   Q.   And they would be responsible for when it
18 came time to marketing, attempting to sell, things
19 like that?
20   A.   Correct.  By this time because of the
21 whole period this was more of a babysitting
22 exercise and that was the intent for a couple
23 years.
24   Q.   You mentioned your concern was the stress
                                                    12

1 case and not looking for perhaps the homerun.
2       With this hold period was the intent to
3 hold it until the market fully recovered?
4    A.  No.
5    Q.  Why not?
6    A.  So for us, as I said, we were trying to
7 establish a track record, so the benefit of having
8 a portfolio is that, you know, some naturally, of
9 the seven projects some are going to go as planned,
10 some are going to not go as well as planned, some
11 might go better than planned.
12       So I personally assumed that there would
13 be an opportunity to sell lots earlier, which would
14 help us establish a track record based off an
15 internal rate of return.  And what I mean by that
16 is, if our cost basis is $12,000 a lot, and we got
17 an offer for $18,000 a lot for 50 lots, although
18 nominally that wouldn't be a large amount of money
19 in terms of profit, the internal rate of return
20 would be very high, which indicates success.
21       And that's the kind of track record we
22 were looking for within the portfolio.  So we were
23 looking to get one to two sales done earlier in the
24 2013-2014 period to be able to take that out to the
                                                    13

1 market and show, hey, we got this asset, we've
2 already sold a couple lots within the portfolio,
3 you can now buy into this portfolio as a part of
4 this, and take the benefit of something we bought
5 back in 2010 and participate in the profit going
6 forward.
7    Q.  You mentioned the concept of a family
8 office, and that's the venture that was set up.
9       Could you tell us how this project and
10 this purchase -- project and purchase was funded?
11    A.  Sure.  It was TRG Venture Two, the entity
12 that owns the seven different subdivisions, was
13 designed to look at what funds looked like at the
14 time that this was created.  So that would have
15 required us as a fund manager to put a
16 co-investment in and then also to get an equity
17 investor in on the other side.
18       Yesterday it was mentioned that 95/5 was a
19 typical kind of operator-capital relationship in
20 the fund world or somewhat similar, 95/5, 90/10, so
21 we needed to -- wanted to show that we had ten
22 percent skin in the game with TRG, so we had a ten
23 percent contribution, and the 90 percent from
24 the -- the 90 percent remaining was from AD-BAC for
                                                    14

1 their equity contribution.
2    Q.  And AD-BAC was your family's -- the entity
3 that your family created for equity funding?
4    A.  For these types of investments.
5    Q.  If we could take a look at Exhibit 142.
6       Could you tell us what this is?
7    A.  Without reading the entire document, based
8 off of the $1,875,000 number at the top I'm
9 assuming that is the loan agreement for the ten
10 percent loan from AD-BAC to TRG for ten percent
11 contribution to these deals.
12    Q.  I'm going to approach and give him a hard
13 copy of TRG Exhibit 142.
14       If you could take a look at that, tell me
15 what this document is?
16    A.  Looks like our loan document with AD-BAC
17 for our ten percent commitment to the credit.
18    Q.  Then if we could -- if I could -- if we
19 could show Exhibit 143, I'll approach Mr. Kyte and
20 hand him a hard copy for his benefit.
21       Could you tell me what Exhibit 143 is?
22    A.  Revolving loan agreement between TRG
23 Venture Two and AD-BAC.
24    Q.  Could you take a look on the last page of
                                                    15

1 Exhibit 142.
2    A.  The first one or second one?
3    Q.  At the bottom of the page are the Bates
4 numbers.
5    A.  142, Page 7.  Yes.
6    Q.  This indicates that the Roanoke Group is a
7 borrower, is that your --
8    A.  That is my signature.
9    Q.  Signature of lender, is that of your
10 father?
11    A.  Yes, sir, and mine.
12    Q.  And what was the -- then also at the same
13 time Exhibit 143 there was another document
14 executed at the same time called revolving loan
15 agreement?
16    A.  Correct.
17    Q.  And these documents were executed
18 together; is that correct?
19    A.  I believe so.
20    Q.  What was the purpose with respect to the
21 funding of this and how did the funding work with
22 respect to these two documents?
23    A.  You know, these were done a long time ago.
24 So we went to SNR Dentons was our law firm at the
                                                    16

1  time, they had a lot of experience creating fund
2  docs, so we instructed SNR Dentons to create
3  documents representative of what they would have
4  done for a normal fund.
5       So this wasn't like a handshake family
6  loan agreement.  This was intended to look and
7  supposed to look, feel, and act as it should, as an
8  actual loan with a default date and interest rate,
9  loan terms.
10      Q.   So AD-BAC put up 90 percent of its capital
11 and TRG -- or TRG borrowed the remaining ten
12 percent so they could put up that stake as well?
13      A.   Correct.
14      Q.   There are terms identified in the loan
15 agreement?
16      A.   I don't know -- well, the terms of the
17 loan would have been identified here.  I believe
18 there would have been a separate agreement talking
19 about how AD-BAC's equity would have been treated
20 as a 90 percent investor and how our ten percent
21 would have been treated.
22      Q.   So this was a real financial commitment
23 with real lenders that had to be paid back?
24      A.   Correct.

17

1      Q.   And both you, TRG, and the family office
2  AD-BAC had a stake in the game?
3      A.   Yes, sir.
4      Q.   At any point during this process has
5  TR -- up through purchase was TRG asked to replace
6  bonds?
7      A.   No.
8      Q.   At any point up to the purchase was TRG
9  made aware of the fact that if Fidelity or a surety
10 intended to pursue it if it purchased the property
11 for the bond of improvements?
12      A.   No, quite the opposite.
13      Q.   If TRG had become aware prior to the
14 purchase that Fidelity or any surety intended to
15 sue it for the bond of improvements, what would you
16 have done with respect to this purchase?
17      A.   With respect to this purchase we would not
18 have closed.
19      Q.   You would have moved on to the next
20 opportunity?
21      A.   Correct.
22      Q.   If you could call up exhibit -- trial
23 Exhibit 17.  I'll hand Mr. Kyte a copy for his
24 review.

18

1           Do you recognize this document?
2      A.   I do.
3      Q.   What is this?
4      A.   This is the business plan created and
5  distributed in 2010.
6      Q.   Does this -- is this a document that we
7  went through in some detail with Mr. Teteak?
8      A.   It is.
9      Q.   And as part of their development
10 management agreement is this something that was put
11 together for TRG's benefit?
12      A.   This is really high level.  This is more
13 intended for -- well, at this point investors, but
14 at this point AD-BAC just to give a big picture
15 understanding of what the business plan looked
16 like, highlights, that sort of thing.
17           There are hundreds of pages and backup
18 information and pretty detailed financial models
19 that would support all of this.
20      Q.   So the highlights of what was important
21 about this project, what was attractive about this
22 project are set out in here?
23      A.   Yes.
24      Q.   So if you look at exhibit Page 7, Page 6

19

1  of the portfolio, we went through this with
2  Mr. Teteak, but the third paragraph, no replacement
3  or performance of surety bonds, was that something
4  that was important or a key factor?
5      A.   Yes.
6      Q.   And that's something that was being passed
7  on to you, but also to the 90 percent investor,
8  AD-BAC, that was --
9      A.   The information?
10      Q.   The information.
11      A.   Yes.
12      Q.   The loan that went through a moment ago
13 was a four-year term?
14      A.   Correct.
15      Q.   And we talked about a three-to-four-year
16 hold period?
17      A.   Yes.
18      Q.   What was the thought process behind a
19 four-year term and planned three-to-four-year hold
20 period?
21      A.   It was additional incentive for us to
22 pursue outside capital with a hard date with -- but
23 yet still built in a little bit of room, not a
24 little bit, but room for error, perhaps expected to

20

1  start returning capital in advance of that outside
2  14 date. At the time the structure was different
3  in terms of -- I'd have to look at the exact
4  documents, but I believe that the distributions of
5  revenue were going to be coming back
6  90/10 pari-passu to a 15 percent preferred return,
7  and then after that we would have a promote.
8       But as money would come back, our ten
9  percent would immediately go back to payback that
10 loan until that loan was extinguished.
11      Q.  What's a pari-passu?
12      A.  Basically pro rata. So if we put $100
13 into a project AD-BAC was putting in $90, we were
14 putting in $10, and as that $100 came back, $90
15 would go to AD-BAC, $10 would go to TRG. And then
16 that $10 from TRG would then go back to payback
17 that loan. And that would keep occurring until
18 that preferred return was hit, that 90/10
19 distribution process.
20      And then once the preferred return was
21 hit, I believe we went into a pretty significant
22 promote. I want to say at least -- I think we
23 jumped to 50 percent of those dollars above -- I
24 can't remember exactly, but that was the general

21

1  structure up front.
2       Q.  After the property was purchased what was
3  the -- your ongoing involvement or what was the
4  progress through that initial let's say first year
5  of the hold period?
6       A.  So once the project was closed because of
7  all the work that was done and the business plan
8  was in place, the agreements were in place, the
9  asset managements were in place, it was really on
10 cruise control as a management or investor
11 reporting perspective.
12      I believe we mentioned earlier, it really
13 was a monthly update, which there wasn't a lot to
14 update on until August of 2011, but kind of an
15 update of where the budget was, where the
16 financials were. But it was really early on in the
17 project, so you're not really changing anything
18 dramatically unless something major comes up. So
19 that was taking almost zero of my time, because I
20 was so involved in the diligence, but my role at
21 that point, besides doing the monthly draw
22 approvals and providing those financial summaries
23 back to AD-BAC or Roda Capital Management.
24      I was at that point looking for one more

22

1  deal to kind of close out our seed deals for the
2  future fund. I was working on -- or starting to
3  work on, you know, collateral material, marketing
4  material, websites, starting discussions with other
5  attorneys on those fund docks, just getting ready
6  for the next phase of our company.
7       Q.  At this point where were you living?
8       A.  At this point I was living in Manhattan
9  Beach and we had an office in El Segundo, which was
10 nice, it was a five-minute commute.
11      Q.  So while this was during that initial
12 period you were out trying to find other
13 opportunities and keep trying to grow the business?
14      A.  I was. But at the same time, I think
15 Mr. Teteak mentioned it with the -- with respect to
16 Las Vegas because we closed on a deal with -- in
17 Chicago, we had a lot of opportunities coming to
18 us. So sort of traveling to Chicago to look at
19 these opportunities. There was a project in
20 Western Springs called Timber Trails. There was a
21 project in Lake Bluff called Stone Bridge. There
22 were a couple other projects that we were trying to
23 tie up. But we did tie up two of those projects,
24 Timber Trails and Stone Bridge, and we were

23

1  starting that diligence process.
2       Q.  And that first year did you have any
3  indication that Fidelity intended to sue TRG for
4  its bond --
5       A.  No, quite the opposite. We were -- the
6  project manager that was signed to an asset
7  management team was in touch with attorneys for
8  some of the municipalities, was in touch with the
9  municipalities, and the feedback that we were
10 getting in those brief management updates were that
11 a couple bonds actually settled on their
12 obligations. And, again, the message was the
13 municipalities felt that they were closing in on
14 settlement agreements with the municipalities.
15      Q.  When did TRG first receive an indication
16 that Fidelity was going to attempt to pursue it as
17 a successor?
18      A.  My first recollection of this message
19 was -- I believe it was August of 2011, which is
20 three or four months after we closed on our third
21 deal.
22      Q.  And so did this come as a surprise to you?
23      A.  To say the least.
24      Q.  So we're now a year and a half after the

24

1  purchase of the property, and this is the first
2  time that you're getting an indication from
3  Fidelity that they want you to pay for what their
4  bond secured?
5     A.   Correct.
6     Q.   And what did you do or what did TRG do
7  after receiving a notice from Fidelity that
8  Fidelity was now going to try to look to TRG?
9     A.   Immediately forwarded that letter to
10  SunCal's legal team, and frankly, the letter might
11  have gone to them first.  I don't know.  But
12  anyway -- I don't remember.  But immediately
13  forwarded that to SunCal's legal team.  They stated
14  that their high-level position said they were going
15  to, you know, respond with our approval.  We gave
16  them the approval to send a response letter to
17  Fidelity, and at the same time started immediately
18  discussing the situation with real estate attorneys
19  that we were working with in Chicago.
20     Q.   Did the first lawsuit from Fidelity come
21  that same month?
22     A.   It might have come before our letter even
23  was received.
24     Q.   The dates -- it's not a memory test on the

25

1  dates.  I think the dates have been stipulated to.
2  I'm not looking for exact dates.
3        But the first lawsuit came about the same
4  time as the first notice from Fidelity in August
5  of 2011?
6     A.   I believe so.
7     Q.   In the year and a half since TRG bought
8  the property up through that letter and then
9  lawsuit from Fidelity had any municipality filed
10  suit against TRG?
11     A.   No.
12     Q.   After the first lawsuit was filed against
13  TRG, did Fidelity file additional lawsuits?
14     A.   Yes.
15     Q.   And which municipalities would that have
16  been in?
17     A.   Well, I believe Sugar Grove, Settlers
18  Ridge, and Montgomery Huntington Chase were
19  represented by the same law firm, so I believe
20  those came at the exact same time.  I want to say
21  that the next lawsuit was Yorkville, I'm not
22  positive on that.  And I believe the third was, I
23  think, Yorkville was the second one, and there was
24  another lawsuit in Elgin, but I don't think that

26

1  was until 2012, 2013.
2     Q.   Okay.  That's a pretty good memory.
3        Did you come to understand that Yorkville
4  and Montgomery and Sugar Grove had already sued
5  Fidelity prior to that, prior to Fidelity bringing
6  you in?
7     A.   Yes.
8     Q.   And they filed those actions just against
9  the surety to collect on the bonds, not against
10  TRG?
11     A.   Correct.
12     Q.   And in August 2011 Fidelity began bringing
13  TRG into these lawsuits?
14     A.   Correct.
15     Q.   Did the municipalities immediately jump on
16  that bandwagon?
17     A.   They did not.
18     Q.   Again, the dates are stipulated to, but
19  for example, Yorkville didn't file an action for a
20  couple years after Fidelity dragged TRG into the
21  lawsuit, correct?
22     A.   A couple years in I believe it was two
23  separate motion to dismiss processes between
24  Fidelity -- Fidelity against TRG.

27

1     Q.   So it was only after Fidelity began
2  asserting this successor liability claim that the
3  municipalities began to -- some of the
4  municipalities began to attempt to sue TRG?
5     A.   Correct.
6     Q.   what -- was TRG sued in every action by
7  municipalities?
8     A.   No.
9     Q.   which ones weren't they?
10     A.   Montgomery, Sugar Grove, and --
11     Q.   Shorewood?
12     A.   Shorewood.  Thank you.
13     Q.   After receiving notice of this lawsuit
14  what did TRG do to respond?
15     A.   We immediately discussed the situation
16  with our real estate attorneys locally while SunCal
17  was looking into it.  They had never heard of
18  anything like this.  And my real estate attorneys,
19  I need transactional, I need land use, I need
20  municipal attorneys.  SunCal's team was doing their
21  own research.
22        And, ultimately, we ended up hiring an
23  attorney from Duane Morris.  The collective belief,
24  and I'm not an attorney, obviously, someone

28

1    qualified with this was that there was one part of
2    our motion to dismiss filings that was consistent
3    with all of the state court litigation that
4    Fidelity or our belief was that Fidelity would not
5    be able to, I guess, overcome, and I don't know if
6    that's the right legal term. What I mean by that
7    is that they had not actually written checks to the
8    municipalities, so as a result, again, not as an
9    attorney, my understanding was that until they
10   wrote a check, they wouldn't be able to pursue us
11   because there wasn't an actual number.
12         So the point is that the thought process
13   was that was the fastest possible way to get out of
14   these cases was to file that motion to dismiss
15   knowing that they wouldn't be able to overcome that
16   until they started writing checks. So --
17   Q.   So, again, you're not an attorney, the
18   legal thought process analysis, that's what you
19   hire people like us for?
20   A.   Correct.
21   Q.   But the decision was made to seek -- after
22   Fidelity chose to file state court actions, the
23   decision was to seek dismissal of those actions in
24   state court?

                                              29

1    A.   I mean, the direction given was what is
2    the fastest possible way we can get out of these
3    lawsuits and that was the legal advice was to file
4    the motion to dismiss.
5    Q.   Were those motions successful to your
6    understanding?
7    A.   Very early on, my understanding. I mean,
8    my -- again, not as an attorney, but I believe that
9    the initial motion to dismiss that we filed, first
10   ones being Huntington Chase and Sugar Grove, those
11   motions to dismiss we filed. I think the response
12   a couple months later by Fidelity was to amend
13   those motions to dismiss. And as it was explained
14   to me as a non-attorney that meant that they didn't
15   have a response or they weren't able to defend
16   their response, if that makes sense. I don't know.
17   I'm not an attorney. But that meant early on the
18   strategy was working, at least as it was presented
19   to me.
20   Q.   Okay. So motions to dismiss were filed,
21   and in some instances Fidelity tried again a couple
22   of times to amend, but ultimately they were all
23   dismissed?
24   A.   Correct.

                                              30

1    Q.   So that strategy of seeking to obtain a
2    dismissal obtained dismissals?
3    A.   The strategy appeared to be working.
4    Q.   In December of 2015 did you become aware
5    of an Appellate Court decision reversing one of
6    those dismissals?
7    A.   Yes.
8    Q.   And that was an appeal by only Fidelity,
9    not the village of Elgin, city of Elgin?
10   A.   Correct.
11   Q.   After that reversal came down what did you
12   do?
13   A.   We immediately instructed our -- well, our
14   attorney advised that we appeal that decision at
15   the next level up. And then at the same time we
16   also started reaching out to our real estate
17   attorney team, other attorneys, just to start
18   discussing other strategies to see if there were
19   other strategies.
20   Q.   And, ultimately, the motion that we're
21   here for was filed, the motion to have Fidelity
22   held in contempt, essentially for violating the
23   confirmation order?
24   A.   Correct.

                                              31

1    Q.   And that was in July of 2006?
2    A.   I believe so.
3    Q.   So immediately after the appellate
4    decision came down, this process was put in the
5    works and the motion was filed?
6    A.   The process was in the works and -- but I
7    believe we were -- I'm not positive, I believe we
8    were waiting to see what our appeal resulted in.
9    And then when it wasn't heard or, I don't know the
10   legal terminology, but we immediately went for --
11   with an attorney Freeborn that we were working with
12   recommended talking to a bankruptcy attorney. We
13   got a quick memo, took that memo to your firm,
14   Pretzel. Pretzel recommended Vedder Price as a
15   bankruptcy attorney that we should use, and they
16   were instructed to move forward as quickly as
17   possible.
18   Q.   Do you believe that TRG responded in a
19   timely fashion to the actions that Fidelity chose
20   to file in state court?
21   A.   I believe we did and instructed our
22   attorneys at every level to take the fastest
23   possible path, and while taking the fastest
24   possible path to also continually reach out to

                                              32

1    Fidelity, and our attorneys were seeing a lot of
2    Mr. Riordan to ask if there was any opportunity to
3    discuss settlement.
4        Q.   Okay.  So the decision was made to obtain,
5    those dismissals were obtained, and then once the
6    Appellate Court decision was entered, this action
7    was initiated?
8        A.   Yes.
9        Q.   You mentioned -- well, in your experience
10   working in real estate had you ever seen a surety
11   sue a successor/owner where the property came out
12   of a bankruptcy?
13       A.   No.
14       Q.   There were more sureties than just
15   Fidelity?
16       A.   Correct.
17       Q.   How many sureties tried to -- came after
18   TRG in state court?
19       A.   Just one.  And that was also a surprise to
20   us because after the purchase of the property, Arch
21   was one of the sureties that pursued us, but they
22   had actually settled on a couple bonds within the
23   Waterford subdivision after we bought the property.
24   So it was somewhat surprising that they changed
                                                      33

1    course and also chose to try to bring us into the
2    Elgin litigation.
3        Q.   Were you successful in having that
4    dismissed?
5        A.   We were.
6        Q.   And did Arch appeal?
7        A.   They did not.
8        Q.   Arch hasn't -- once you obtained that
9    dismissal Arch didn't persist?
10       A.   I believe in the Waterford settlement
11   discussions during and after trial the municipal
12   attorneys for Elgin requested that the bonding
13   companies basically agree to not pursue us or
14   future developers or owners.
15            And I believe that Arch agreed to that.
16       MR. RIORDAN:  Object as hearsay, Judge.
17       MR. TURIELLO:  Just his understanding not being
18   offered for truth of the matter.
19       MR. RIORDAN:  And lack of foundation.
20       THE COURT:  On the basis that it's his
21   understanding I will allow you to go forward.
22       MR. TURIELLO:  Go ahead and finish your answer.
23       THE WITNESS:  I thought I did.
24
                                                      34

1    BY MR. TURIELLO:
2        Q.   I believe you were -- it was your
3    understanding that Arch -- that Elgin asked
4    sureties not to pursue subsequent owners,
5    essentially?
6        A.   Yes, and that could be confirmed in the
7    settlement agreement.
8        Q.   And Arch didn't?
9        A.   Correct.
10       Q.   Fidelity did?
11       A.   Correct.
12       Q.   And the other sureties that were involved
13   in these properties did they just honor their
14   obligations?
15       A.   They did.  I believe in Waterford
16   Continental was a bonding company.  There may have
17   been a few others, but they had been working
18   through settlements with the municipalities,
19   McHenry, Legend Lakes, either before or right after
20   we acquired that property I believe they settled
21   with the bonding company and completed
22   improvements.
23            Ingham Park either right before we closed
24   or after had completed their settlement agreement
                                                      35

1    with the bonding company, and the feedback that we
2    were getting early on was that the municipalities
3    believed that they were closing in on settlement
4    agreements with the bonding companies, and that was
5    based on the bonding company's sending out their
6    own cost estimate team.
7            It was just the feedback we were getting
8    from the municipalities, they felt they were
9    closing in on settlement for at least the -- I want
10   to say the first, you know, four, six months.
11       Q.   So there were instances where Elgin and
12   Yorkville filed suit against TRG, and attorneys'
13   fees were incurred dealing specifically with their
14   issues.  Are you seeking those here today?
15       A.   No.
16       Q.   And those were carved out, we'll get to
17   that later when we talk about damages, is that your
18   understanding?
19       A.   Yes.  I would like to clarify my bond
20   knowledge, just as a result of these lawsuits, may
21   be -- there was a bunch of reading all this stuff
22   during the --
23       MR. RIORDAN:  There is no question pending.
24       THE COURT:  You should ask a question and have
                                                      36

1   an answer.  Strike the last statement and you can
2   proceed by way of questioning.
3   BY MR. TURIELLO:
4      Q.   Your knowledge of bonds early on as a
5   developer was the function and whether they were in
6   place and the importance of that?
7      A.   Yes.
8      Q.   Since Fidelity has been pursuing TRG for
9   the last seven years, I would assume you learned
10  more about surety bonds?
11     A.   Yes.  The additional information we would
12  have been getting would have been from the actual
13  SunCal project management team in our monthly
14  calls.
15     Q.   Is that typical in development and real
16  estate that you don't get into the minutia of the
17  bonds, but know that they're in place and know what
18  that means and know how that might affect purchase
19  price, things like that?
20     A.   Repeat.
21     Q.   Strike that.  I can rephrase that
22  question, if you'd like?
23     A.   Sure.
24     Q.   I believe you talked about your knowledge

37

1   of bonds, whether they were in place, that you
2   would have factored them into pricing if you had to
3   replace them.  Is that the knowledge you have for
4   bonds regarding the early phases?
5      A.   My knowledge of bonds would have come from
6   my previous work experience, but that's not
7   related, obviously, to the Kimball Hill bonds.
8           The information I was getting for Kimball
9   Hill bonds during diligence would have been covered
10  by SunCal's legal team and also their kind of
11  development team on the ground.
12     Q.   So I'd like to talk a little bit about
13  what else was done by TRG to try to mitigate things
14  after Fidelity pursued this lawsuit.  We talked
15  about obtaining dismissals, and if we could focus
16  on the two time frames.  Before the Court's March
17  2017 order and after.
18          Before the Court's -- after the lawsuits
19  were filed and before this court's March 2017
20  order, what steps was TRG taking in an effort to
21  mitigate the damages it was suffering as a result
22  of Fidelity's actions?
23     A.   We were working with our attorneys because
24  there were so many different lawsuits to negotiate

38

1   lower legal fees.  We were working with our
2   contractors and homeowners' associations to get
3   costs and HOA dues down, and we were working with
4   our tax assessors because we had effectively vacant
5   and unsellable lots now with this litigation to try
6   to get property tax reductions, so getting our
7   carry costs down as low as we possibly could.
8      Q.   So if you could just take us through the
9   cost cutting measures.  I think it's probably self
10  evident.  What was the purpose of attempting to cut
11  costs during the time Fidelity was pursuing TRG in
12  state court?
13     A.   So just because Fidelity wasn't honoring
14  their bond obligations doesn't mean we had the
15  ability to stop paying property taxes or stop
16  paying lot maintenance costs.
17          One of the benefits of having seven
18  different subdivisions is having scale.  So
19  that -- so we were responsible for mowing and
20  maintaining our own lots or we're going incur fees
21  or fines from municipalities, so we had crews
22  already going out there.  Then working with the
23  homeowners' associations, they also had landscape
24  responsibilities.  So we worked with them and we

39

1   worked with our base to get the homeowners'
2   associations to also use the same lot maintenance
3   companies so that it's one trip to do both pieces
4   of work and give them more business and cut costs,
5   not just for us but also all the homeowners out
6   there.
7      Q.   Were you required to hire any consultants
8   in an effort to try to identify costs that could be
9   cut?
10     A.   We hired -- so, one, as I mentioned
11  earlier, and I think Mr. Teteak also mentioned
12  this, there was a sweat equity component of the
13  development management agreement, so SunCal being
14  paid I think $5,000 a month, they would have looked
15  at that as losing $30,000 to $40,000 a month
16  because it was so far under their normal management
17  fees.  We were paid $5,000 a month to kind of do
18  some management and reporting as well.  So
19  initially instead of increasing those fees, I
20  basically started coming here and doing a lot of
21  the work that wasn't anticipated as a part of the
22  original agreement.  Ultimately, we did --
23     Q.   So you said that as part of the agreement
24  SunCal was going to take certain steps do certain

40

1  things and that you started coming here.
2       You mean you actually personally took over
3  doing these things in order to cut costs?
4       A.  Yes, so --
5       Q.  Yes?
6       A.  Yes.  So from SunCal's office in
7  California they call a lot maintenance company and
8  they could call in the homeowner's association
9  meetings, but when this turned ugly, it required
10  someone to actually be here, especially with these
11  homeowners that were living in these communities
12  with streets falling apart.  They didn't understand
13  what was going on.  They needed someone to talk to.
14  There was a lot of work that we took on personally,
15  it wasn't anticipated, so, yes, I moved here to
16  take on a lot of these responsibilities.
17       Q.  Before moving here you said you would come
18  here.  Was there a period of time where you would
19  commute from California in order to try to take
20  care of these issues that were raised by Fidelity's
21  persistence?
22       A.  For the most part every Sunday at night I
23  would fly in and every Thursday night I would fly
24  back for three to four weeks, a month, probably.
                                                    41

1       Q.  How did you do by taking this burden on
2  yourself as opposed to leaving it under the
3  management agreement to save costs?
4       A.  I meaning, just with my development
5  experience, my previous company didn't require us
6  to hire people locally to manage it.  We did, from
7  time to time, hire consultants, versus full-time
8  employees because it was the cheapest way to do it.
9       But consultants as not full-time employees
10  also have a lot of other projects that they're
11  working on, so sometimes they miss things, which is
12  why it's important for me or someone to be here
13  locally, that's why I came in.
14       Q.  How long did you do the commute?
15       A.  A couple years.
16       Q.  After a couple years of flying here
17  personally to manage the property while this
18  litigation was going on, did you make a decision to
19  move to Chicago?
20       A.  Yes.
21       Q.  Why?
22       A.  We were in the process of trying to have a
23  kid and didn't want to be commuting during that
24  period, so it was important to live here together.
                                                    42

1  And I mentioned we closed on another project in
2  April of '11 that also started to get impacted by
3  all the time and money that was going into this
4  project, so just made sense for me to move.
5       Q.  So it was disrupting the commute, it was
6  disrupting both personal and professional
7  obligations?
8       A.  I don't think it was disrupting
9  professional obligations because I was here doing
10  the work, but personal, sure.
11       Q.  You said you also would attempt to
12  negotiate taxes and other fees?
13       A.  Correct.
14       Q.  And were you able to do that?
15       A.  Yes.
16       Q.  How did that reduce costs?
17       A.  I just reduced carry costs.  One of the
18  few things that Illinois takes a break on is
19  property taxes for vacant lots without homes on
20  them, so I got those down as low as we could.
21       Q.  Did you actually go out and try to
22  negotiate lower rates for snow removal?
23       A.  Absolutely.  That was all part of the
24  maintenance.
                                                    43

1       Q.  That was all part of the things you were
2  coming here to do Sunday through Thursday and after
3  you moved here?
4       A.  That and also getting -- a lot of the time
5  was also really getting involved with the builder
6  community.  That was important to establish those
7  relationships, identify the right builders by
8  project, that also takes a tremendous amount of
9  time.  And that is constantly evolving as you work
10  through a project.  The builder might have interest
11  in an area in 2011, but if they bought another
12  project around that area in 2011, they would be
13  kind of off that list immediately.  But another
14  builder may not be in the area and you'd want to
15  know where they were to bring them in.  So it was
16  just getting other builder community -- it's
17  obviously small.
18       I think the top five builders here
19  probably do 70 percent of the margin, so it was
20  just getting to know the division presidents,
21  acquisition guys at all these shops.  Everyone was
22  short staffed, so it was important that they were
23  updated.  They knew about the lots and litigation,
24  it's a small community.  But we wanted to make sure
                                                    44

1  they knew where we were on this and that we would
2  be the first people to call them depending on
3  project and builder when this was behind them.
4      So we didn't want to waste their time,
5  which would ultimately down the road it would have
6  hurt our ability to sell the lots.
7      Q.  Okay.  So part of the moving here was to
8  maintain and build those relationships so when and
9  if this cloud was lifted, you could work towards --
10     A.  Sales as quickly as possible.
11     Q.  In addition to relationships with builders
12 and potential purchasers, was there anything about
13 being here that was important as far as
14 relationships with homeowners' associations or
15 municipalities?
16     A.  Both.
17     Q.  How so?
18     A.  We instructed our attorneys to be in
19 communication with all municipal attorneys.
20 Sometimes they weren't interested in talking to us,
21 but the municipalities that were just letting them
22 know what was going on.  Through the motion to
23 dismiss process, they were very interested in that.
24 And then also we were instructing our attorneys to
                                                    45

1  offer any, you know, advice or assistance or view
2  if they needed anything or had any questions about
3  other cases.
4      Through those kind of meetings with
5  municipalities, you know, early on, we were also
6  letting them know that we were happy to be a part
7  of the settlement discussions that was made more
8  challenging because Fidelity through its
9  third-party lawsuit effectively also put us in
10 appearance as if we were also against the village
11 or maybe part of the problem, but it didn't stop us
12 from meeting and trying to let everyone know that
13 we were there if they needed us.
14     Q.  Tell us about those interactions with the
15 homeowners in the different municipalities?
16     A.  It's pretty tough.
17     MR. RIORDAN:  Your Honor, calls for a narrative
18 on the part of the witness.
19     THE COURT:  It does indeed, counsel.  Can you
20 have more direct questions.
21     MR. TURIELLO:  Sure.
22 BY MR. TURIELLO:
23     Q.  As part of your efforts moving here and
24 interacting with individuals to mitigate damages,
                                                    46

1  did you have any interactions with homeowners?
2      A.  We attended -- I personally attended
3  home -- all the homeowners' association meetings I
4  could, there were five different projects under
5  litigation, and I was on the board of a lot of
6  those homeowners associations, so --
7      Q.  What if any, concerns or issues were you
8  being informed of directly from the homeowners?
9      A.  The home values they were concerned being
10 impacted by the streets that were falling apart.
11 There was a lot of questions about when the
12 improvements would be fixed.  There was a lot of
13 concerns about the kids and potholes and safety,
14 just trying to help them try to understand what was
15 going on.  And then, ultimately, our goal was to
16 get the communities finished, tell the builders as
17 quickly as possible and keep them informed also
18 what was going on with the litigation.
19     Q.  And there was issues -- the roads falling
20 apart and potholes causing health and safety, those
21 were things that were bonded improvements that
22 Fidelity had issued a surety bond for?
23     A.  Correct, those were improvements that the
24 homeowners who bought those homes expected to be
                                                    47

1  finished in the community that they bought homes
2  in.
3      Q.  Counsel in his questioning, I believe,
4  Mr. Teteak mentioned efforts to sell or solicit
5  bids from builders in 2014, do you recall that?
6      A.  Yes.
7      Q.  Was a bid packet put together or if that's
8  not the correct term, feel free to correct me, to
9  go out to builders in early March -- early of 2014?
10     A.  It was.
11     Q.  What was the purpose of that?
12     A.  Well, a few purposes.  One, our loan,
13 initial loan term was coming up, I believe, on
14 default.  So it was an effort to see if we could
15 get any builders interested in buying some of these
16 lots.  And the reason why we made an attempt at
17 that period of time is because, I believe, there
18 was no -- I think -- whatever Fidelity had filed
19 against us at that time, all the dismissals --
20 there were no motions to dismiss, I guess, that
21 were active, so we were, my understanding at that
22 point, out of all the litigation.
23     Q.  So the litigation had been -- the
24 dismissals that you had been seeking had been
                                                    48

1  obtained by that point?
2      A.   Yes.
3      Q.   Then did Fidelity appeal?
4      A.   No -- well, I think the first thing that
5  happened was we got an offer -- letter of intent
6  on lots in Shorewood, and we got a purchase and
7  sale agreement, I think, either a week before or a
8  week after Fidelity third partied us into a lawsuit
9  in Shorewood. And the effect on that is that there
10 is -- well, not really a standard provision, in our
11 purchase and sale agreements because the builders
12 were aware of the surety litigation, I believe the
13 rep was specific to there is no pending or -- I
14 can't remember the word, imminent or possible, the
15 attorneys -- the person failed doing this, but, you
16 know, pending litigation but then there was no
17 litigation anticipated in my nonlegal words.
18      So we weren't able to sign those purchase
19 and sale agreements without -- because we couldn't
20 make that rep.
21     Q.   How long -- in 2014 that was the end of
22 how long you anticipated holding the property?
23     A.   It's fair to say, yeah.
24     Q.   If we could see Exhibit 152. Mr. Kyte,
                                                    49

1  hard copy of Exhibit 152.
2      THE COURT:  How much further do you have for
3  direct?
4      MR. TURIELLO:  This is a decent time for a
5  break.  I probably have another at least half an
6  hour.
7      THE COURT:  So we're well over the estimated
8  time.
9          So if you have approximately a half an
10 hour for your direct and if we could go immediately
11 into cross at that point without another break,
12 then I'll take a break now. But if at that -- I'll
13 let Mr. Riordan see, if not, we'll go for the next
14 half hour and take a break between direct and
15 cross.
16         Mr. Riordan, will you be able to begin
17 your cross immediately?
18     MR. RIORDAN:  I think so, Judge.
19     THE COURT:  All right. All right. Let's take
20 a break now. Short break. Same precautions to the
21 witness, you remain under oath. Do not consult
22 with regard to your testimony during the break. Be
23 back in ten minutes.
24         (Recess taken.)
                                                    50

1      THE COURT:  Let's call it up for the record.
2      THE CLERK:  Kimball Hill, Inc.
3      THE COURT:  Counsel -- first of all, the
4  witness you remain under oath. Counsel, you remain
5  on direct.
6      MR. TURIELLO:  Thank you. May I continue?
7      THE COURT:  You may.
8  BY MR. TURIELLO:
9      Q.   We left off with Exhibit 152. You
10 mentioned originally there was a loan and other
11 financing lines of credit that were taken out that
12 were due in 2014?
13     A.   Yes.
14     Q.   As a result of this delay did those need
15 to be refinanced?
16     A.   Yes.
17     Q.   Exhibit 152, is that an extension of that
18 loan agreement?
19     A.   Yes.
20     Q.   And what did that extend the term to?
21     A.   The end of 2019.
22     Q.   So all of the money that was -- well, the
23 money that was borrowed on this note is now due by
24 that date?
                                                    51

1      A.   Yes.
2      Q.   If you could turn to the last page.
3      A.   Yes.
4      Q.   Is that your signature?
5      A.   Yes.
6      Q.   Showing you 153. Could you tell me what
7  this document is?
8      A.   A member set-up interest pledge agreement.
9      Q.   That also related to the need to extend
10 the financing due to the actions of Fidelity?
11     A.   Yes.
12     Q.   What is the purpose of this?
13     A.   Just another document as a function of the
14 new loan terms.
15     Q.   Did you sign this document?
16     A.   I did.
17     Q.   And what is the term of this?
18     A.   I believe 2019, end of 2019.
19     Q.   Showing you what's been marked as
20 Exhibit 154. Could you tell me what this is?
21     A.   Asset management agreement.
22     Q.   What is the purpose of that?
23     A.   Succinctly when we were first going into
24 default we notified our lender. They, obviously,
                                                    52

1  as any lender had concerns something may have been
2  done wrong and they wanted us to provide them with
3  what we thought their options were.  We felt the
4  options at that time were, one, to try and sell all
5  of the assets, and based off of litigation our
6  belief was that they would be lucky to get any
7  recovery at all, and that would lead to potentially
8  just not paying anything on the entity, letting it
9  go to kind of a courthouse sale.
10      The other option was based off of -- the
11  second option was you could find another group to
12  manage this property, and we gave them the analysis
13  what we thought the fees would be for them to go
14  with that.
15      And the third option was we could continue
16  to manage this.  This is the time we feel we'll
17  need to get through this litigation.  This is the
18  money we think we'll need to get through holding
19  these kind of projects until we get through
20  litigation.  They hired a third-party group called
21  RCLCO, a national real estate advisory firm.
22      They reviewed our recommendations.  They
23  agreed with those recommendations with AD-BAC.
24  AD-BAC elected to go with the third option,

53

1  continue to have us manage that.
2      As a result they said that one person and
3  one assistant do not have the ability to do all of
4  this work because it turned into potential
5  development management and incomplete improvements,
6  much more insensitive asset management for
7  reporting if you're able to refinance, and also I
8  was forced to sell my percentage ownership in
9  Roanoke Capital Management, and as a result there
10  was an overhead component that was included in the
11  new loan terms to cover part of my overhead -- some
12  of my overhead and the office overhead.  This is
13  one of those documents.
14      Q.  So even though this is a family office,
15  when the loan came due and business hadn't made
16  progress, an outside auditor was --
17      A.  Yes, sir.
18      Q.  And an independent evaluation was done and
19  based upon that the lender agreed to extend the
20  terms?
21      A.  Yes.
22      Q.  And you made concessions as part of it?
23      A.  Yes.
24      Q.  And those monies are due at the end of

54

1  2019?
2      A.  Yes.
3      Q.  During the time of Fidelity's attempt up
4  to the order of March 2019 [sic], were any efforts
5  made to try and settle the cases?
6      A.  Yes.
7      Q.  If you didn't believe that you were
8  responsible for the amount that Fidelity owed under
9  the bonds, why would you try to settle?
10      A.  To do anything we could to try and get the
11  litigation behind us so that we could sell lots.
12      Q.  Were there settlement discussions?
13      A.  There were.  The first one would have
14  been, I believe, in the Elgin case.  We took a stay
15  from the State court litigation for a non-binding
16  mediation meeting between ourselves, Arch,
17  Fidelity, and the municipality, Elgin.
18      Q.  Was -- during that time were you able to
19  make any progress with Fidelity?
20      A.  Fidelity settlement offer on their
21  outstanding bonds I believe north of a million
22  dollars, was $50,000, and I think the message from
23  the judge was it does not appear that there is
24  going to be any settlement opportunity here based

55

1  off of their approach.
2      So that was a waste of four to six-month
3  period of time.  And after that the subsequent, I
4  believe, settlement discussions were basically, if
5  you're willing to pay all of our outstanding bond
6  amounts, we'll talk settlement.  So it became kind
7  of evident that settlement was not an option.  And
8  there was also a message from our attorney after a
9  meeting with Mr. Riordan that settlement was not
10  something that was necessarily in their interest
11  because they were testing our theory.
12      Q.  Before the March 2017 order did TRG
13  receive any commercially reasonable offers for
14  these properties?
15      A.  We did.
16      Q.  Were you able to execute on those?
17      A.  No.
18      Q.  Why not?
19      A.  Because of the Fidelity litigation or the
20  threat of appeal through Fidelity, depending on the
21  different state of the lawsuit.
22      Q.  After the March 2017 order, did you take
23  any -- after this court's order of March 2017 did
24  you take any steps in an effort to try to market

56

1 these properties again?
2     A.   We didn't even wait until the March order.
3 The moment I believe it was in December where we
4 got an oral ruling from Judge Barnes, we
5 immediately called the builder communities and said
6 we expect a written ruling at some point in the
7 near future.  We updated our pipeline list of
8 builders per project for builders to be interested in
9 those projects, started putting together our
10 diligence packages for these builders so that as
11 soon as we got the written order, we could begin
12 marketing the projects.  That also involved meeting
13 with municipalities and starting discussions about
14 amending various agreements because there were
15 incomplete improvements as a result of Fidelity
16 settling for less than the bonded amount
17 obligations.  So in order for us to sell we had to
18 discuss with the municipalities how those
19 improvements were going to be complete, which is --
20     Q.   Did you notice any change in the
21 receptiveness of builders to these properties after
22 they were given an indication that Fidelity's right
23 to pursue TRG may be not long for this --
24     A.   Still extremely challenging.  So the

57

1 builder at the time was close to the biggest
2 builder, the one that we had been in communication
3 with the most, because the principal of that
4 builder, Matt at CalAtlantic, had gone through a
5 bankruptcy with his own building company before, he
6 was very familiar with the process, and he felt
7 that he would have the ability to get this through
8 corporate.  And, fortunately, that builder was
9 interested in a lot of our lot holdings.  But,
10 unfortunately, he left their -- after the merger
11 and we were dealing with a new division president
12 by the name of Kevin Jonathan (phonetic).  Kevin's
13 immediate response after we got the written ruling
14 was I do not believe that we can get this through
15 counsel.
16         And at our insistence we were able to get
17 a call set up with corporate counsel, I believe
18 representatives from Pretzel were on that call,
19 potentially representatives from Vedder Price, and
20 also our real estate transaction attorneys, they
21 walked through the court's order and they were able
22 to, after a series of calls and drafts of
23 indemnification agreements, get corporate counsel
24 comfortable enough to start a formal letter of

58

1 intent.
2         That letter of intent led to a diligence
3 period -- led to a purchase and sale agreement
4 period that lasted four to six months, which is
5 abnormally long, but because of all the
6 complications around it that's what happened.
7         And then they were supposed to close on
8 those lots in December, the Shorewood deal, but
9 they came to us with what they call a retrade at
10 the last minute talking about soils issues and
11 asked for a lower lot price.
12         But we had no choice.  In a normal
13 situation we would have pushed back or gone to
14 another builder, but that would start that year
15 process over again.  So in order to mitigate our
16 damages we accepted that retrade.  And those
17 lots -- the first of the lots closed in January
18 of 2019 [sic].
19     Q.   You mentioned the indemnity agreement, is
20 that something that you would ordinarily have to
21 agree to in a sale such as this?
22     A.   Never, and there was two components to the
23 indemnity agreement.
24     Q.   And what were those?

59

1     A.   The first was the amount in that deal that
2 had been written by Fidelity, and then the second
3 indemnity bucket was a $50,000 amount that was to
4 be refilled in the event that Fidelity ever
5 contacted those builders that they would have funds
6 to pay for any and all legal bills associated with
7 any conversations with Fidelity around these
8 bonding permits.
9     Q.   Is that in the event this court's order is
10 overturned and Fidelity resumes its efforts to
11 pursue subsequent purchasers?
12     A.   Yes, that is their net money sitting in an
13 escrow account earning less than one percent
14 interest that we cannot touch until the appeal
15 period is exhausted to protect the builder.
16     Q.   And is it your understanding, and I
17 believe Mr. Kilburn stated in his deposition,
18 Fidelity maintains -- it has the right to sue
19 anybody this property is sold to?
20     A.   Fidelity's opinion is that any subsequent
21 owner could be sued.
22     Q.   The concession that you made at the end
23 when Shorewood came back to you, is that a
24 concession that would you ordinarily grant?

60

1    A.   The concession is that CalAtlantic, the
2    builder, that was buying the lots or under contract
3    for the lots, you know, those types of things
4    happen as part of normal transactions, and there is
5    generally a negotiation, but we were not in a
6    position to negotiate and jeopardize sales if we
7    are ever going to return money to our investors.
8    Q.   Is the fact that while you have the order
9    allows you to have these discussions and sell that
10   the ongoing pursuit of Fidelity of this action and
11   threatened appeals continues to impact your ability
12   to sell these lots for a commercially reasonable
13   amount?
14   A.   We cannot sell any of our lots at a
15   commercially reasonable amount.
16   Q.   Why not just hold on to them?
17   A.   We have to do whatever we can to return
18   cash to our investors to have any chance for the
19   survival of TRG, my company, and it's also the
20   appropriate thing to do for the investor that has
21   been enormously damaged by having at this point now
22   over $14 million that has been sitting out over a
23   period of time from 2010 to today not earning any
24   money.

61

1    Q.   What would happen to TRG if it waited
2    until after this appeals process ended before it
3    attempted to sell those lots for a reasonable
4    amount?
5    MR. RIORDAN:  Objection, your Honor.  Calls for
6    speculation on the part of the witness.
7    MR. TURIELLO:  I can lay a --
8    THE COURT:  I'll instruct you to do that.
9    BY MR. TURIELLO:
10   Q.   Have you analyzed -- first of all, I don't
11   think I asked this, what is your role at TRG?
12   A.   Right now I'm still the principal of TRG,
13   but we now have three other full-time employees.
14   We have an employee that focuses on asset
15   management.  We have an employee that focuses on
16   land development, and we have an employee that does
17   a lot of everything, accounting, project
18   management, just general office management duties.
19   Q.   As part of your responsibilities, do you
20   perform assessments of cash flow projections of
21   future income, future expenses?
22   A.   We update our numbers every day.  We have
23   a limited amount of cash left to call on our
24   numbers and it is extremely important for us to be

62

1    on top of our cash flows, and I can say that there
2    isn't a speculation on my statements with respect
3    to the numbers in this deal.  We will not have the
4    ability to cover payroll towards the end of
5    probably the summer of next year if this drags on
6    and we don't get any damage recovery, which means
7    that in two to three months I will have to have a
8    conversation with the three people that work with
9    me and try and help them start to get new jobs.
10   Q.   Did any of those people move here to work
11   for you?
12   A.   All of them.
13   Q.   And if this appeals process goes past that
14   two or three month period what impact will it have
15   if you just held on to the properties and didn't
16   sell them?
17   A.   Some properties we probably still will not
18   be able to sell due to the complications around
19   Fidelity's ability to appeal and that its
20   exhausted.  But it will effectively turn into what
21   my role was at Pacific Century.  This time out of
22   just duty to my family, I will continue to do
23   whatever I have to do to sell these lots whenever
24   the opportunity arises.

63

1    Q.   Okay.  If this cloud isn't lifted and this
2    final order regarding Fidelity's inability to
3    pursue TRG isn't arrived at before those loans come
4    due, what will happen to TRG?
5    A.   We will be in default.
6    Q.   As a result of Fidelity's damages, did you
7    direct your counsel to perform an assessment of
8    their attorneys' fees, and also did you perform an
9    assessment of damages that were related to these
10   actions?
11   A.   Yes.
12   Q.   At your direction did your attorneys
13   review their invoices and remove any fee or charge
14   that might be related to litigation with the
15   village as opposed to Fidelity?
16   A.   Would you repeat the question?
17   Q.   Sure.  Did your attorneys review the
18   invoices and submit fees in this case?
19   A.   Yes.
20   Q.   And did you review those invoices?
21   A.   I reviewed all the invoices since we
22   started getting legal bills, but I've reviewed the
23   affidavits, and the result of those affidavits.  I
24   guess the direction was out of respect to the

64

1   Court's time, knowing that this is a large amount
2   of money as a result of the large delay that we've
3   had, wanted to make sure that the direction was
4   given to be as overly conservative in terms of what
5   we were asking for, meaning, any dollar that was
6   spent on legal that wasn't directly related to the
7   Fidelity, the instructions given to the attorneys
8   was to not put that into the affidavits for
9   damages.
10      Q.   You mentioned a number of attorneys that
11  you obtained in this case.  One was
12  Gerald Callaghan who was at Freeborn & Peters?
13      A.   Yes.
14      Q.   If you could show what's been marked as
15  Exhibit Number 9, go to the second page.
16           This was attached to your affidavit, it is
17  an affidavit of Gerald Callaghan?
18      A.   Correct.
19      MR. TURIELLO:  If I could approach and show the
20  witness the hard copy of the affidavit to review.
21  BY MR. TURIELLO:
22      Q.   Is this an affidavit that was prepared at
23  your direction by your counsel Mr. Callaghan to
24  identify his fees that were directly related to

65

1   grand total of fees and expenses.
2       A.   Uh-huh, yes.
3       Q.   And is that amount $111,737.65?
4       A.   Yes.
5       Q.   Showing you Exhibit 11.  I'm approaching
6   the witness and handing him a hard copy.
7            Exhibit 11 is an affidavit that was
8   attached -- your affidavit from a Michael Van Dyke?
9       A.   Yes.
10      Q.   And Michael Van Dyke was, I believe, first
11  at Dentons and then at Polsinelli?
12      A.   Correct.
13      Q.   Did Mr. Dyke perform work related to
14  Fidelity's actions that we're here to talk about?
15      A.   Mr. Van Dyke did the original loan
16  documents, but I don't believe those were included
17  in this.  He did the revised loan documents in
18  2013, 2014 that you showed me earlier.
19      Q.   And Mr. Van Dyke was instructed, likewise,
20  to remove anything unrelated -- directly related to
21  Fidelity's actions?
22      A.   Yes, in addition -- yes.
23      Q.   Could you look at Page 11 of the exhibit.
24           Do you see in the middle of the page the

67

1   Fidelity?
2       A.   Yes, sir.
3       Q.   And did he do that?
4       A.   I believe so.
5       Q.   If you could look at Trial Exhibit Page 5,
6   do you see a chart?
7       A.   Yes.
8       Q.   What are the total fees related to
9   Mr. Callaghan's work?
10      A.   $132,577.50.
11      Q.   If I could approach the witness and show
12  Trial Exhibit Number 10.  I'll hand him that
13  document.
14           Exhibit Number 10 is an attachment to your
15  affidavit and it's an affidavit of Mr. Ruff?
16      A.   Yes.
17      Q.   And Mr. Ruff was one of the attorneys that
18  represented you in this matter?
19      A.   Yes.
20      Q.   And you reviewed that and you instructed
21  him to remove anything not directly related to
22  Fidelity's actions?
23      A.   Yes.
24      Q.   If you could go to Page 8.  There is a

66

1   grand total for his fees and firm's fees are
2   $283,222.50; is that right?
3       A.   Correct.
4       Q.   I will approach the witness and show him a
5   hard copy of Exhibit Number 12.
6            Just to be clear for the record, I'm
7   handing the affidavit -- there were invoices that
8   were attached to each of the affidavits, you
9   reviewed all of those?
10      A.   Yes.  Just to point out, obviously, we've
11  been in litigation for quite sometime and I did
12  review these and did review the bills, but with
13  hundreds and hundreds of pages it is possible I
14  could have missed one or two, but --
15      Q.   Your attorneys reviewed and submitted
16  those to you?
17      A.   Yes.
18      Q.   To be clear, these are bills as of the end
19  of June of 2017?
20      A.   I believe so.
21      Q.   Exhibit Number 12 is an affidavit of
22  William Thorsness that was attached to your
23  affidavit?
24      A.   Yes.

68

1    Q.   And Mr. Thorsness was retained to respond
2  to Fidelity's actions in violating the confirmation
3  order?
4    A.   Yes.
5    Q.   He was directed to remove anything that
6  might be unrelated to that?
7    A.   Yes.
8    Q.   If you look at Page 8 of the exhibit and
9  the total amount -- Mr. Lipke is Mr. Thorsness's
10  partner --
11    A.   Correct.
12    Q.   -- who also did work in this case?  If you
13  look at Page 8, the grand total for work related to
14  this action as of June 30, 2017, is $190,801.81; is
15  that correct?
16    A.   Yes.
17    MR. TURIELLO:  Approaching the witness and
18  handing him a hard copy of Exhibit 13.
19  BY MR. TURIELLO:
20    Q.   This is an affidavit of Paul Chronis?
21    A.   Correct.
22    Q.   And Mr. Chronis is an attorney at
23  Duane Morris?
24    A.   Yes.

69

1    Q.   And Mr. Chronis was an attorney that was
2  retained to defend against the actions brought by
3  Fidelity?
4    A.   Yes.
5    Q.   And he also defended against -- actions by
6  municipalities?
7    A.   Yes.
8    Q.   And he was, likewise, instructed to review
9  his invoices and remove anything that might be
10  unrelated to Fidelity?
11    A.   Yes.
12    Q.   And then if you look at Page 8, he
13  identifies total fees and expenses related to
14  Fidelity's actions through February of 2017 as
15  $544,747.08?
16    A.   Yes.  And this would have been the biggest
17  cut due to his time in state court.
18    Q.   If we add these up, and we will, that's
19  the total amount of fees as of last year?
20    A.   Yes.
21    Q.   And you've still incurred fees since last
22  year?
23    A.   I'm sure we have.
24    Q.   And still as of today those bills have

70

1  been sent to you?
2    A.   Yes.
3    Q.   Showing you -- in addition to the legal
4  fees, have you incurred any additional consulting
5  fees?
6    A.   Yes.
7    Q.   If I could show you Exhibit 14 --
8  actually, let's go to Exhibit 7.  If I could show
9  you Exhibit 7, Page 26 -- this is your affidavit,
10  first of all, correct?
11    A.   Correct.
12    Q.   Page 26 of Exhibit 7 the top chart under
13  Paragraph 68 under avoidable legal fees we see the
14  total amount of the attorneys' fees that we just
15  went through added up and that's $1,263,008?
16    A.   Yes.
17    Q.   You also list avoidable consulting fees?
18    A.   Yes.
19    Q.   And I believe if we look at -- well, total
20  amount is $194,300; is that correct?
21    A.   Yes.
22    Q.   And were those fees directly related to
23  Fidelity's action?
24    A.   Yes.

71

1    Q.   What types of activities were those?
2    A.   The majority of this category would be
3  Stout, I'd have to see the breakout.
4    Q.   If you could look at Trial Exhibit 14,
5  second page.  If you could zoom in on the top
6  chart, zoom in on Page 2.  We see under additional
7  costs consultant bond litigation.  If you look at
8  actual year 2016 and actual year 2017, those
9  numbers total $194,000 figure that we went through,
10  correct?
11    A.   Yes, but -- yes.
12    Q.   Go back to exhibit -- Exhibit 7, Page 26.
13  Additional category of damages related to
14  Fidelity's action identified as avoidable project
15  construction management fees, do you see that?
16    A.   Yes.
17    Q.   What's the total amount there?
18    A.   $362,382.
19    Q.   And the property damage, that references
20  the number that Stout arrived at for the actual
21  damages?
22    A.   Yes.
23    Q.   And total amount of damages for these
24  avoidable fees and property damage comes to what

72

1  amount?
2      A.   $9,539,690.
3      Q.   So let's assume that the court -- that
4  this is what's awarded, have you done any analysis
5  as to what kind of -- what that reflects as far as
6  a return on investment?
7      A.   Yes.
8      Q.   What is that?
9      A.   That would be approximately an eight
10  percent return to the entity, but I do not believe
11  that TRG would be able to -- I'd have to check my
12  numbers, but I do not believe that TRG would be
13  able to pay its full loan back.
14      Q.   So this would still place TRG in a
15  position of default if this action continues
16  through appeals?
17      A.   I'm just going to, just to be
18  conservative, I'm going to change -- I'd like to
19  restate that.
20          It may -- we may be able to payback our
21  loan with that damage number, TRG's loan.  But the
22  overall project return would be approximately eight
23  percent and that I am confident.
24      Q.   And then would that be considered a

                                                    73

1  successful venture?
2      A.   No.
3      Q.   Why not?
4      A.   Well, I think Stout talked about discount
5  rates or how investors would look at returns.  They
6  used a 15 percent number for a short hold period of
7  time, and they used a 25 percent investor
8  expectation number for holding a project until
9  2018.  And that is also from a 2012 date, not from
10  when we originally acquired the property back in
11  2010.  So it doesn't even come close to market.
12  We've run numbers on this, in order to get a
13  15 percent return, the damages would have to be
14  north of -- the damage award would have to be north
15  of $20 million.  In order to get -- to hit a
16  25 percent IRR, the damages would have to be north
17  of $50 million.  And in order to get a return along
18  the lines of the Cambridge Report, which discussed
19  discount rates in excess of 30 percent, the number
20  would have to be north of $90 million.
21          And the point is that I don't think this
22  damage number obviously reflects the actual
23  damages, and I just want to emphasize that if we
24  were awarded that $9.539 million, that does not

                                                    74

1  turn this into even remotely close to the deal of
2  the century.
3      Q.   Has the ongoing litigation by Fidelity
4  caused you to have to forego other ventures?
5      A.   Absolutely.
6      Q.   How so?
7      A.   I mentioned that we closed on a deal in
8  April of 2010, we would never have closed on that
9  deal if we knew this was going to happen because it
10  also has capital requirements, and that was also
11  intended to be part of the fund, kind of seed deals
12  because we have had to put so much time and
13  resources and capital into this venture.
14          We have not been able to put time, as much
15  time or capital into our other projects, which is
16  has limited our ability to get entitlement
17  approval, etcetera, but it is not responsible for
18  us to spend money on other projects when we have
19  this unknown liability outstanding.
20          Secondly, the moment we got sued, is the
21  moment that there was no longer even an opportunity
22  to discuss a fund or bring in cash from outside
23  investors.  I mentioned track record.  Track record
24  is based off of returns, which we obviously have

                                                    75

1  not shown at this point.
2          But in addition, no investor that is
3  reputable is going to be interested in investing in
4  companies that have litigation around them.  They
5  wouldn't even take the time to look deeper in to
6  seeing why this litigation exists or who started
7  it.  It doesn't matter.
8          The fact that there is litigation is just
9  an immediate check the box no on diligence, and the
10  investor would move on to look at another
11  opportunity.
12      Q.   Has there been any damage to your
13  reputation or the reputation of TRG as a result of
14  being -- gone through this over the last eight
15  years?
16      A.   Damage to --
17      MR. RIORDAN:  Objection.  Relevance.  These
18  items that are not even being claimed.  I will
19  allow him to go on for a while, but he's way beyond
20  what the damage claim is here.
21      MR. TURIELLO:  The damage claim includes a
22  claim for punitive damages.  And in addition to the
23  hard numbers that are being submitted, I think it's
24  important for the Court to consider the actual

                                                    76

1 impact of what this has done and what the -- what
2 Fidelity's willful contempt has done to this entity
3 and those associated with it.
4      I'm close to wrapping up, but I think it's
5 important for the Court to hear not just here is a
6 timeline, but here is the impact. I don't intend
7 to belabor too long, but I think it goes to the
8 issue of punitive damages.
9      THE COURT: I tend to agree with Mr. Riordan
10 that we're getting a little far afield here. But I
11 will weigh whatever it is with the context, but we
12 do need to wrap it up here. We're well beyond the
13 time that we were projecting.
14      MR. RIORDAN: May I have a continuing relevance
15 objection to all this?
16      THE COURT: Most certainly, yes.
17      MR. TURIELLO: Could you read the question.
18           (Record read as requested.)
19      THE WITNESS: Yes, I don't believe it's
20 speculative. Every time you Google the name of our
21 company, litigation comes up. We have been forced
22 into the business of land development, as we have
23 had to take over those roles when we originally
24 were designed to be a private equity fund, as a

77

1 example, in Elgin as an example, every one of these
2 homeowners they don't understand how surety bonds
3 work, how Kimball Hill works. They just look at us
4 and say Kimball Hill, and they assume that we're
5 the bad guy in all this.
6      So there are enormous reputational
7 damages. There will be stigma associated with
8 every person that works for me when they're trying
9 to get other jobs because of their work experience.
10 And there is going to be a stigma associated with
11 me when I try and go get another job ultimately
12 because of all this.
13 BY MR. TURIELLO:
14      Q.   The damages that we've talked about, and
15 the fees that you're incurring, will those continue
16 until this matter related to the order of 2017
17 reaches a final resolution?
18      A.   I think without appeal, which obviously
19 we've given Fidelity a lot of leverage to keep
20 appealing knowing our financial position, but
21 without appeal, we expect to spend another million
22 and a half dollars of carry costs on this project
23 just to be able to get to lot sales based off
24 existing LOIs or ongoing negotiations with

79

1 result the business model has had to change, that
2 requires looking for new properties, trying to
3 development new properties. It's equivalent to
4 what Mr. Teteak was speaking about with SunCal and
5 what happened when they started losing properties
6 as a result of their lender relationships and
7 having to find another way to build the company.
8      So that involves buying projects in
9 municipalities and working with municipalities.
10 When municipalities see lawsuits that come up
11 specifically around improvements that are
12 incomplete or communities that are not finished,
13 that has an enormous impact on their desire to work
14 with you as a developer.
15      Investment-wise, pretty safe to say that
16 anything with litigation will prevent normal
17 investors from looking to invest capital with you.
18 You know, if we were able to grow with litigation
19 around us, yes, we do have four employees, but the
20 ability to hire other employees is an issue.
21 Reputation within homeowners' association, there
22 has been articles published with homeowners that
23 have been given the belief that TRG is responsible
24 for what has been going on in Yorkville as an

78

1 builders. That's the state that we're in.
2      MR. TURIELLO: Your Honor, subject to updating
3 expenses and related items that have been incurred
4 since the last submission, we would conclude.
5      THE COURT: All right. Thank you.
6 Mr. Riordan?
7      MR. RIORDAN: Thank you, Judge.
8           CROSS EXAMINATION
9 BY MR. RIORDAN:
10      Q.   Good afternoon, Mr. Kyte.
11      A.   Good afternoon.
12      Q.   As I understand your work history you
13 became associated with SunCal in the 2008, 2009
14 time period?
15      A.   Associated with them along the lines of
16 knowing people that actually worked there, but I've
17 known of SunCal since I got into the business back
18 in 2005.
19      Q.   When did you first get started doing
20 business with SunCal?
21      A.   How do you define business?
22      Q.   When did you first develop a business
23 relationship with SunCal?
24      A.   Well, we developed a relationship with

80



1  SunCal, personally, starting when my former
2  co-worker went over to work with SunCal, but we did
3  not close our first deal with SunCal, which I would
4  term as our official beginning of a true business
5  relationship until April of 2010.
6      Q.   And is that the Kimball Hill Chicago
7  property?
8      A.   There were two projects, Kimball Hill
9  Chicago, which was a portfolio and there was a
10  project in Stockton, California, called
11  Cornerstone, which was one project, which was also
12  a Kimball Hill project.
13      Q.   And that was TRG Venture One?
14      A.   Correct.
15      Q.   And TRG Venture was formed in April
16  of 2010, correct?
17      A.   Yes, sir.
18      Q.   Just a few days before the closing of the
19  Kimball Hill Chicago portfolio?
20      A.   Yes.
21      Q.   Okay.  And as I understand it, from your
22  testimony at least, you had approached SunCal or
23  SunCal had approached you, I couldn't tell which,
24  about partnering up to buy the property here in
                                                    81

1  Chicago, the Chicagoland area?
2      A.   We had discussed a business relationship
3  with SunCal about looking at multiple properties.
4      Q.   When did you agree -- there was probably a
5  verbal agreement before you went to actual
6  documents, when did you have a handshake deal with
7  SunCal for the Chicago properties?
8      A.   It was right up until closing, actually.
9  I mean, they're still in the business of getting
10  the best deal possible for their company and we're
11  in the business of getting the best deal for our
12  company.  So I don't know exactly when the verbal
13  agreement was reached, but I would imagine that it
14  was pretty close to the closing date of the
15  project.
16      Q.   And TRG was formed by two members,
17  correct?
18      A.   Correct.
19      Q.   One was Roanoke Group?
20      A.   TRG the entity or the --
21      Q.   TRG -- let me -- you're right.
22           TRG Venture Two had two members, correct?
23      A.   Correct.
24      Q.   And it was formed in April of 2010 that we
                                                    82

1  just talked about?
2      A.   Correct.
3      Q.   And Roanoke Group was one of those
4  members?
5      A.   Correct.
6      Q.   And you were the principal of Roanoke
7  Group?
8      A.   Correct.
9      Q.   And the other member was AD-BAC Holdings?
10      A.   Correct.
11      Q.   And the principals of AD-BAC Holdings are
12  your parents?
13      A.   Yes, but it's managed by a company called
14  Roanoke Capital Management, which is run by a
15  gentleman named Neil Keegan.
16      Q.   Neil Keegan is the gentleman you mentioned
17  earlier that had worked at another company that you
18  brought in to assist you with TRG?
19      A.   Correct.
20      Q.   And what company did he work at?
21      A.   He was in the navy, after the naval
22  academy and then he was at Goldman Sachs in private
23  wealth management, and then he came on board to
24  work with me on the real estate side helping to
                                                    83

1  develop the fund, and then also separately to help
2  set up a family office and ultimately run that
3  family office.
4      Q.   When you say family office, you mean a
5  family business?
6      A.   No.
7      Q.   What is the difference?
8      A.   It's not a business as a manufacturing
9  company would be a business.  As an example, it's
10  intended to be an investment vehicle, think of it
11  as a small kind of hedge fund private equity group.
12      Q.   But it's a venture or business that's
13  family owned, isn't that what you're saying?
14      A.   There is other owners, more minority
15  owners.  It's -- I mean, it's just an LLC that has
16  different investment objectives are all under this
17  Roanoke Capital Management umbrella.
18      Q.   When was the first -- when was the --
19  strike that.
20           As I understand it, AD-BAC Holdings
21  contributed 90 percent of the equity and Roanoke
22  contributed the other ten percent to TRG?
23      A.   That is correct, but our ten percent was
24  in -- was loaned to us by AD-BAC.
                                                    84

1    Q.   That was going to be my next question.
2    The ten percent that you contributed, you borrowed
3    from AD-BAC, correct?
4        A.   I believe that was covered in the
5    questions --
6        Q.   I understand, but I'm entitled to ask.
7        A.   Sure.
8        Q.   I have a short memory so...
9        A.   I don't believe you.
10       MR. RIORDAN:  Move to strike, Judge.
11   BY MR. RIORDAN:
12       Q.   When you agreed to partner up with SunCal
13   on the Chicago portfolio, had the purchase and sale
14   agreement already been executed by JNI and the
15   trustee bankruptcy?
16       A.   I believe so.
17       Q.   You're familiar with that agreement?
18       A.   Yes, I'm familiar with the agreement.
19       Q.   Okay.  And did you review those agreements
20   before you decided to enter into this venture with
21   SunCal?
22       A.   We did.  But -- actually -- yes.
23       Q.   Book one of two.  Could you turn to
24   Exhibit 13.  Do you recognize 13?

85

1    to the agreement, do you see that?  That was also
2    part of the purchase and sale agreement?
3        A.   Okay.
4        Q.   And then if you turn to Exhibit 16, can
5    you identify that?
6        A.   Assignment of the purchase and sale
7    agreement.
8        Q.   And your signature appears on this
9    document on TRG 147?
10       A.   Yes.
11       Q.   Did you understand when you signed this
12   agreement that you took an assignment of the
13   purchase agreement, all of its benefits, and
14   assumed all of its obligations?
15       A.   Yes.
16       Q.   And when you did that, did you review at
17   that time these documents, the purchase agreement,
18   the first restatement and second restatement?
19       A.   Both in my previous job at Pacific Century
20   and also with SunCal I would have reviewed purchase
21   and sale agreement.  I could have even made
22   comments to purchase and sale agreements, but
23   ultimately those always go to the attorneys.  In
24   this case it would have gone to counsel for SunCal

87

1        A.   I do.
2        Q.   This is the purchase and sale agreement
3    between JNI and the trustee?
4        A.   It appears to be, sir.
5        Q.   And I believe -- do you recognize
6    Mr. Cook's signature?
7        A.   What page?
8        Q.   On page TRG 53.
9        A.   I'm not seeing --
10       MR. RIORDAN:  May I approach to try and help
11   him find the page?
12       THE COURT:  Sure.
13       THE WITNESS:  Yes, this is Mr. Cook's
14   signature.
15   BY MR. RIORDAN:
16       Q.   And there was an amendment to that
17   agreement, which is Exhibit 14?
18       A.   I would assume that's correct.
19       Q.   If you turn to the next exhibit, you have
20   14.
21       A.   Yes.
22       Q.   Do you recognize Mr. Cooks' signature --
23       A.   I do.
24       Q.   On TRG 145.  There was a second amendment

86

1    to make any kind of final comments, amendments,
2    revisions.
3            In this case, since we had an attorney on
4    our side, he would have also reviewed the purchase
5    and sale agreement and this assignment agreement.
6        Q.   And you were aware that in the purchase
7    and sale agreement the trustee was making no
8    representations about the status of the surety
9    bonds?
10       MR. TURIELLO:  I just want to object to the
11   extent -- (inaudible) document.
12       THE COURT:  Counsel, response.
13       MR. RIORDAN:  Judge, I'm just asking, he
14   basically said that I sent this on to my attorneys.
15   I'm just asking if he was aware of the specific
16   provision.
17       THE COURT:  I'll allow it.
18       THE WITNESS:  Would you show me the provision
19   you're referring to.
20   BY MR. RIORDAN:
21       Q.   Yes.  If you look at 15G on TRG -- I'm
22   sorry, let me back up.  Exhibit 13, it's Page 11 of
23   the agreement itself, and Bates is TRG 48.
24       A.   Yes.

88

1    Q.   Do you remember me reading the provision
2  in court yesterday to Mr. Teteak?
3    A.   I do.
4    Q.   At the time you signed the assignment
5  agreement with SunCal were you aware of the
6  provisions in Paragraph 15G?
7    A.   I was and I would have been aware of that
8  before during the executive meetings that I
9  attended with respect to diligence to this.
10    Q.   I think in your earlier testimony you said
11  that it's important to make sure that you
12  understand all of the risks when you're going into
13  a transaction.  Do you recall that testimony?
14    A.   Yes, I do.
15    Q.   And in this case you said that due
16  diligence was not performed by TRG, but by JNI or
17  SunCal; is that correct?
18    A.   Well, no.  I believe it was -- I believe,
19  if I didn't say it, I will clarify, that the
20  diligence efforts were led by SunCal and SunCal's
21  investment team, but that I was a part of the
22  majority of those meetings discussing the diligence
23  process throughout the diligence process.
24    Q.   And one of the things I think was pointed

89

1  out on direct examination, and the business plan
2  was shown to you, was the importance of the surety
3  bonds being in place for this transaction to be
4  able to proceed, correct?
5    A.   Correct.
6    Q.   In connection with your due diligence, did
7  you review any of the surety bonds that were
8  furnished by any of the sureties --
9    A.   I --
10    Q.   Let me finish, then you can go.
11       -- in any of the communities?
12    A.   I would not have been responsible for
13  reading the bonds.  This would have been discussed
14  by counsel and also by the development team that
15  specializes in this area and discussing those
16  diligence meetings and all of the concerns, if any,
17  would have been addressed during those diligence
18  meetings, during those executive meetings that
19  Mr. Teteak referenced yesterday.
20    MR. RIORDAN:  Judge, move to strike as being
21  nonresponsive.
22    THE COURT:  I do think that was not responsive.
23    MR. RIORDAN:  I asked him if he reviewed them.
24    THE COURT:  Right.  The answer is stricken.  Do

90

1  you need the question read back to you?
2    THE WITNESS:  No.  I do not recall reading the
3  bonds bond by bond.
4  BY MR. RIORDAN:
5    Q.   If you look at Exhibit Number 2.  I will
6  represent to you Exhibit Number 2 are the bonds
7  posted by F&D in the Waterford project.  Do you
8  recall reviewing any of these bonds?
9    A.   At what point in time?
10    Q.   In -- as part of your diligence effort
11  with respect to the transaction?
12    A.   I don't recall one way or another
13  reviewing the Waterford bond specifically.
14    Q.   All right.  I'll direct your attention to
15  Exhibit 3, which I will represent to you these are
16  some of the surety bonds, Sugar Grove.
17       Do you recall reviewing any of these bonds
18  as part of your diligence effort in connection with
19  this transaction?
20    A.   Personally I do not recall.
21    Q.   And I direct your attention to Exhibit 4.
22       Do you recall reviewing this bond, which
23  is for Huntington Chase?
24    A.   Not at that time.

91

1    Q.   And directing your attention to Exhibit 5,
2  which I will represent to you are the bonds posted
3  in the Yorkville communities?
4    A.   Okay.
5    Q.   Did you review these as part of your
6  diligence efforts?
7    A.   Not personally.
8    Q.   And Exhibit 6, these are the bonds posted
9  for unit four in Whispering Meadows.  Do you recall
10  reviewing these bonds?
11    A.   I'm happy to state for all the bonds, if
12  you wish, that I did not personally -- I do not
13  personally remember reviewing these bonds as a part
14  of the diligence.
15    Q.   I understand that, but when you
16  tell -- because you told me you didn't recall, I'm
17  showing you the bonds because it could refresh your
18  recollection.
19       So go to Exhibit 7, which are the bonds
20  furnished for Edgewater, do you recall reviewing
21  these bonds?
22    A.   I do not recall reviewing these specific
23  bonds.
24    Q.   As part of your due diligence did you

92

1  consider any defenses that the sureties might have
2  with respect to any of the bonds?
3      A.   That would not have been my role.
4      Q.   So it's a no answer, you personally did
5  not consider?
6      A.   I personally did not consider the need to
7  explore any defenses.
8      Q.   Did you personally consider whether the
9  amounts of the bonds were adequate to secure
10 whatever bond and improvements were left to be
11 completed?
12     THE WITNESS:  Your Honor, so personally -- I
13 mean, I know these were discussed as part of the
14 team, I remember those discussions.  Is that too
15 long of an answer.  Sorry, I'm struggling --
16     THE COURT:  I think it's fair to ask what you
17 mean by personally, counsel.  If you can give a
18 little bit more focus on that, maybe we'll get a
19 more focused answer.
20 BY MR. RIORDAN:
21     Q.   Did you personally consider whether the
22 bonds were adequate to secure the bond improvements
23 that were left to be completed, not in conjunction
24 with any members of the committee?
                                                    93

1      A.   I would say I personally do recall
2  conversations with the committee that the bonds in
3  place were adequate to cover the remaining
4  improvement costs.
5      Q.   But did you do anything on your own to
6  investigate whether that was in fact true?
7      A.   I visited the projects and saw the state
8  of the improvements, in the executive committee
9  meetings the development managers would have gone
10 through, and I recall them going through the cost
11 estimates that they performed internally for all of
12 the bonded improvements, and how that compared to
13 the outstanding bond.  And then it was our regular
14 part of our process after litigation to continue to
15 update those costs to complete based off current
16 costs, and to check those against the outstanding
17 bonds for these projects.
18     Q.   Did you review the annexation agreements
19 before you -- as part of your diligence effort,
20 personally?
21     A.   It's -- the annexation agreements were a
22 part of the due diligence review, but I personally
23 do not recall reading every annexation agreement.
24 But I do recall the annexation agreements being
                                                    94

1  discussed in conjunction with municipal code, in
2  conjunction with the bond and cost to complete
3  estimates, in conjunction with the feedback we were
4  getting from municipalities and their read on whose
5  responsibility this was.
6          So I felt like with the SunCal team in
7  place and the reports we were getting that although
8  I did not read, I don't recall reading these word
9  by word, this was a large part of the discussion
10 and I do recall those discussions.
11     Q.   And did you understand that the annexation
12 agreements were held in its running with the land?
13     MR. TURIELLO:  Objection.  Foundation.  Calls
14 for a legal conclusion.
15     THE COURT:  Counsel?
16     MR. RIORDAN:  Judge, he said that he had been
17 discussing these in the committee meetings and they
18 were brought up and he was aware of them.  And I'm
19 asking him if he has an understanding if they were
20 covenants running with the land.
21     THE COURT:  I don't know that that calls for a
22 legal conclusion.  It calls for a statement of
23 awareness of a legal term, no question about that.
24 But as to what that means or not, that remains to
                                                    95

1  be seen.  You can ask the question.  We'll see what
2  the answer is.
3      MR. RIORDAN:  Do you want the question read
4  back?
5      THE WITNESS:  No.  I don't think you can answer
6  that in a yes or no fashion.
7      THE COURT:  Just so you understand, you do your
8  best.  Keep in mind that there will be one more
9  opportunity for counsel for TRG to you questions.
10 So if the answer is no, but, you have to still
11 answer with a no, do you understand?
12     THE WITNESS:  Understood.  Keep the but out.
13     THE COURT:  Yes, keep the but out.
14     THE WITNESS:  Would you repeat the question,
15 please.
16 BY MR. RIORDAN:
17     Q.   Did you understand the covenant -- the
18 annexation agreements were covenants running with
19 the land?
20     A.   Yes, one covenant that runs with the land.
21     Q.   And is that true for each of the
22 annexation agreements?
23     MR. TURIELLO:  Object on the same grounds.
24 Object, foundation.  And calls for legal
                                                    96

1  conclusion.
2      THE COURT:  Again, he's asking about his
3  understanding.  His understanding as a lay person
4  knowing that he's not an attorney.  Do your best to
5  answer the question.
6      THE WITNESS:  I'm having a hard time because I
7  don't agree with -- I don't believe you can look at
8  an annexation agreement on its own as if it's just
9  this document out of nowhere.  It's tied to so many
10  other documents that it's hard for me to comment
11  without looking at the municipal code for all of
12  these subdivisions.
13          Their regulations as it relates to
14  annexation agreements, the specific annexation
15  agreements, each one of these deals, these are very
16  broad statements for documents that are very
17  nuanced, so that's why I'm struggling with a yes or
18  no.
19      THE COURT:  This is a struggle that you will
20  have to do your best with.
21      THE WITNESS:  Okay.  Understood.
22      THE COURT:  Try to answer the question as best
23  you can.
24      THE WITNESS:  Okay.  And I'm sorry, I'm not

                                                97

1  trying to fight you on this.  One last time.
2  BY MR. RIORDAN:
3      Q.  Did you understand each of the annexation
4  agreements was recorded with the county recorder's
5  office?
6      A.  I would assume, yes, I understood that.
7      Q.  And at the time you acquired the property
8  did you believe that TRG would become responsible
9  for the obligations under each of those annexation
10  agreements?
11      A.  No.
12      Q.  And why not?
13      A.  Specifically because of the nature of the
14  improvements.
15      Q.  So are you telling us that you didn't feel
16  that you were responsible to put the improvements
17  in because the question was did you believe you
18  became responsible for the obligations under the
19  annexation agreements?
20      A.  I don't believe obligations and bonds tie
21  to the annexation agreement.  I believe that the
22  annexation agreement is a road map for development
23  approval, not as an attorney, and I believe that
24  one of the conditions of an annexation agreement is

                                                98

1  to follow municipal code when developing a
2  property, and the municipal code, or the annexation
3  agreement, could require one to post bonds in order
4  to record that map.
5          And then that locks in an irrevocable bond
6  between the municipality and the bonding company
7  and the builder and that in substantially complete
8  communities when that builder goes default, it is
9  the responsibility of the builder and the bonding
10  company to complete all of those public
11  improvements, specifically those that deal with
12  health, safety, and welfare on streets that are
13  occupied by homeowners, and that is the entire
14  point of a bond.  And that is not covered in the
15  annexation agreement, that is covered more in the
16  municipal code.
17      MR. RIORDAN:  Move to strike, your Honor, as
18  being nonresponsive.
19      MR. TURIELLO:  He didn't ask him why, he asked
20  him to explain.
21      THE COURT:  Again, I'm trying to remember the
22  question back in my mind.  I'm going to have to ask
23  the court reporter to read it back.
24          (Record read as requested.)

                                                99

1      THE COURT:  I'm not hearing the why either.
2      MR. RIORDAN:  But then I asked him the follow
3  up question, that was the question that was
4  pending.  He gave an answer to some --
5      THE COURT:  I understand it.  The open ended
6  question was the previous question.  The close
7  ended question was the one that you were answering.
8  So I will strike the answer.  You may ask it again.
9      MR. TURIELLO:  Your Honor, was there a response
10  to the why not or did it go on --
11      THE COURT:  Counsel, you will have plenty of
12  opportunity on redirect.
13      MR. TURIELLO:  Understood.
14      MR. RIORDAN:  Could you answer the question?
15      THE COURT:  How much more do you think you
16  have?
17      MR. RIORDAN:  A little bit.
18      THE COURT:  Could you be a little bit more
19  specific?
20      MR. RIORDAN:  I'm going to say half hour,
21  40 minutes.
22      THE COURT:  And probably the same amount of
23  time on redirect?
24      MR. TURIELLO:  If this is a half hour, maybe

                                               100

1  10, 15 minutes.
2      THE COURT:  So we're talking an hour total
3  then, half an hour to 40 minutes, plus 15 minutes
4  still with this witness and then we have your first
5  witness to call, which is about 5:00 p.m.
6      MR. RIORDAN:  That's fine with us.
7      THE COURT:  Do you think you will be able to
8  conclude with your witness and counsel also have an
9  opportunity for cross?
10     MR. RIORDAN:  I know I will be able to finish.
11     MR. RUFF:  We don't anticipate much cross.
12     MR. RIORDAN:  He had eight hours the other day.
13     MR. RUFF:  I don't think it was eight hours.
14     THE WITNESS:  Your Honor, I think with all the
15  instruction I think I actually could do this a
16  little bit better now.
17     THE COURT:  Why don't we take this a little
18  further along and we'll take a break.  Mr. Riordan,
19  pick it up again.
20  BY MR. RIORDAN:
21     Q.   Now, as I understand when you purchased
22  the property you had -- you were reliant on the
23  plan and confirmation order and the trust
24  agreement, that is the KHI trust agreement; is that
                                                    101

1  correct?
2      A.   We were -- that was one of many things --
3  we were relying on the SunCal's counsel's review of
4  the trust agreement and KHI trust, so through that
5  report I had relied on, yes, SunCal's counsel.
6      Q.   And you knew these properties were coming
7  out of bankruptcy?
8      A.   Yes.
9      Q.   And one of the reasons you selected the
10  properties was because it was in a bankruptcy,
11  correct?
12     A.   Because we were buying it out of a
13  bankruptcy, correct.
14     Q.   And you believe that you would get certain
15  protections as a result of that, correct?
16     A.   Correct.
17     Q.   One of those protections was the fact that
18  claims that F&D brought against your company were
19  released, isn't that right?
20     A.   We never believed that claims would be
21  brought against out company.
22     MR. RIORDAN:  Move to strike, Judge.
23     THE WITNESS:  Yes, I believe they were being
24  released, but we didn't anticipate claims.
                                                    102

1      THE COURT:  So the part of the answer after yes
2  is stricken.
3  BY MR. RIORDAN:
4      Q.   Now, I think in response to questions by
5  Mr. Turiello you said that TRG received a demand
6  from F&D in August 2011?
7      A.   That's my recollection.
8      Q.   And you then turned that demand letter
9  over to SunCal, did you not?
10     A.   Correct.
11     Q.   And SunCal's attorneys responded to that
12  demand, correct?
13     A.   Correct.
14     Q.   And did you understand that the response
15  was that TRG is not liable because the annexation
16  agreements were rejected contracts in the
17  bankruptcy?
18     A.   I recall that SunCal's attorney's advice
19  was to issue a response to Fidelity, and that's the
20  position that they decided to take in that letter.
21     Q.   And you relied on your attorneys to take
22  the legally correct position in responding to F&D's
23  bonds, correct?
24     A.   Always.
                                                    103

1      Q.   That wasn't the first time that an entity
2  had come to you with respect to the Chicago
3  portfolios claiming that TRG was liable for public
4  improvements because it had assumed the obligations
5  under the annexation agreement, correct?
6      A.   I disagree with the phrasing of that
7  statement, but I think I can answer that we did
8  have meetings with the municipality, if that's what
9  you're referring to about the obligations about the
10  improvements.
11     MR. RIORDAN:  I move to strike.
12     THE COURT:  I appreciate your attempt.  I can
13  tell you that you're trying to answer, but nonetheless,
14  you're still falling a bit short here.
15     THE WITNESS:  The answer is yes.
16     THE COURT:  You've got an opportunity to
17  clarify when your counsel is asking you questions.
18     THE WITNESS:  I apologize.  Yes, that's
19  correct.
20  BY MR. RIORDAN:
21     Q.   Could you turn to F&D Exhibit Number 20,
22  which is the last one in the book in front of you
23  there.
24     A.   Yes.
                                                    104

```
 1      Q.   And could you identify this document for
 2   us?
 3      A.   This is a letter from the city of
 4   Yorkville to SunCal, our representatives, about the
 5   subdivision.
 6      Q.   At the time this letter was written SunCal
 7   was your agent and manager of the Chicago
 8   portfolio, isn't that right?
 9      A.   I don't believe we had closed on this
10   project at this time.
11      Q.   The summer of 2010?
12      A.   I believe we closed in April -- I'm sorry,
13   yes.  Yes, SunCal, yes.
14      Q.   I thought that was the one factor we all
15   agreed on.
16           This was sent to Mr. Waleen (phonetic) and
17   Mr. Hicks?
18      A.   Yes.
19      Q.   Both of them are associated with SunCal?
20      A.   They were at the time.
21      Q.   And did Mr. Waleen or Mr. Hicks send this
22   letter to you at the time?
23      A.   I'm sure I saw this letter at some point
24   in time.
                                                    105
```

```
 1   diligence period that you talked about that you
 2   attended once or twice a week?
 3      A.   During the diligence period.
 4      Q.   During the diligence period.
 5      A.   Yorkville made this a similar statement,
 6   it was discussed with counsel.  Counsel was very
 7   comfortable with our position, and we were not
 8   concerned, we went ahead and closed.  This was a
 9   follow-up meeting, and they made the same
10   statement, as I'm sure was discussed with counsel.
11   I believe the response in that meeting was the same
12   position that they took in diligence, and that was
13   the extent of -- to my understanding was the extent
14   of those communications with Yorkville.
15      Q.   Do you know who Bart Olson is?
16      A.   I do.
17      Q.   And you indicated that Yorkville had
18   communicated during the diligence period
19   communicated either to TRG or SunCal its position
20   regarding subsequent ownership, was that done in
21   person or by communication?
22      A.   I don't recall if it was by call, e-mail,
23   or a meeting.
24      Q.   Was that some -- was that communication
                                                    107
```

```
 1      Q.   Did this come as a surprise to you?
 2      A.   That Yorkville sent this letter to us?
 3      Q.   And made the demand that it made in this
 4   letter?
 5      A.   Well, this particular letter, no, was not
 6   a surprise.
 7      Q.   Why is that?
 8      A.   There was a meeting -- Yorkville was one
 9   municipality during the diligence period, the only
10   municipality, and one of the meetings -- one of the
11   diligence meetings, I actually believe it was
12   attended by Mr. Waleen, in which they discussed
13   their belief that the subsequent owner was
14   responsible for the improvements, but I'm not sure
15   if the reason was the annexation agreement.
16      Q.   But you're sure that they made the
17   assertion that the subsequent owner was responsible
18   for the public improvements?
19      A.   Yes.
20      Q.   You just can't recall what the reason for
21   that was?
22      A.   Yes, and this -- I recall this being
23   covered also in the executive --
24      Q.   One of those committee meetings during the
                                                    106
```

```
 1   made with you or someone else?
 2      A.   It would have been a SunCal
 3   representative.
 4      Q.   Did -- in your committee meeting did the
 5   name of the individual from Yorkville, was that
 6   name mentioned?
 7      A.   I don't recall.
 8      Q.   At the time that Yorkville's assertion was
 9   discussed in the committee meetings during the
10   diligence period was a decision made to respond in
11   writing at that time?
12      A.   I don't recall.
13      Q.   Did you ever see any response to
14   Yorkville's assertion prior to the time of the
15   closing?
16      A.   I don't recall.
17      Q.   I'm going to show you -- I'll ask you to
18   take a look at Exhibit 21.
19      A.   Yes.
20      Q.   If you could bring that up.
21      A.   I got it.
22      Q.   Have you seen this letter before today?
23      A.   I would imagine.
24      Q.   And can you tell us what it is?
                                                    108
```

1    A.    It appears to be a letter from one of
2  SunCal's attorney, Andy Cook, to Bart Olson.
3    Q.    This was written in January of 2011?
4    A.    Yes, sir.
5    Q.    And on the first page there is a reference
6  to Section 22, the annexation agreement?
7    A.    Okay.
8    Q.    And after that it says, we disagree with
9  your analysis, did I read that right?
10   A.    Yes.
11   Q.    And it says, in fact, TRG acquired the,
12 quote, empty lots, unquote, for, quote, residential
13 occupation, unquote.  Did I read that right?
14   A.    Yes.
15   Q.    And on the second page on the second full
16 paragraph Mr. Cook says, in addition to the
17 foregoing even if your interpretation of the
18 annexation agreement were correct, TRG is not a
19 successor and interested developer of Kimball Hill
20 Homes because the annexation agreement was not
21 listed as a, quote, assumed contract, unquote, in
22 the Kimball Hill bankruptcy, and therefore, the
23 annexation agreement is automatically deemed to be
24 a, quote, rejected contract, unquote, under the
                                                    109

1  plan.  Did I read that right?
2    A.    I believe that's what it says.
3    Q.    And was this TRG's position as of
4  January 18, 2011, regarding Yorkville's assertion
5  that it was liable under the annexation agreement
6  for the public improvements?
7    A.    TRG's position or SunCal's position?
8    Q.    TRG's position.
9    A.    This was not TRG's position.
10   Q.    This is on TRG letterhead, correct?
11   A.    That's not TRG letterhead.  This was
12 written by SunCal and Dan -- and Mike Waleen was on
13 this.  I'm sure I was aware of their response.  If
14 this is the interpretation and this is what their
15 attorney recommended the response being, I would
16 imagine I would have seen it.  But I have a
17 different -- I'm sure I would have approved or
18 referred to this letter or response going out at
19 the time.  Maybe --
20   Q.    And but you would refer -- as you said
21 before, SunCal was acting as your manager on this
22 property, correct?
23   A.    Correct.
24   Q.    Okay.  And you had referred this matter to
                                                    110

1  SunCal's attorneys, correct?
2    A.    I don't know if I referred this letter
3  or -- I would assume if that's --
4    Q.    You referred the issue of the assertion of
5  TRG's liability under the annexation agreement to
6  SunCal's attorneys to handle on your behalf,
7  correct?
8    A.    SunCal's attorneys were handling this,
9  correct.
10   Q.    On behalf of TRG?
11   A.    Correct.
12   Q.    Now, you continued to have discussions
13 with Yorkville, did you not, about its handling of
14 the bond claims?
15   A.    Yes.
16   Q.    And you understand that Yorkville filed a
17 lawsuit in 2011 on Units 1 and 2?
18   A.    I do.
19   Q.    And that lawsuit was filed in May of 2011?
20   A.    That sounds correct.
21   Q.    Sounds about right.  Okay.  And that was
22 about three years after the bankruptcy petition was
23 filed in April of 2008?
24   A.    Sounds right.
                                                    111

1    Q.    You had meetings in 2013 and the latter
2  part of 2013 with Yorkville concerning Whispering
3  Meadows subdivision?
4    A.    I believe we had a few meetings with
5  Yorkville.
6    Q.    Do you remember how many?
7    A.    Between two and five would be my guess.
8    Q.    Was the time frame I mentioned correct,
9  the end of 2013?
10   A.    I don't know when our first meeting was,
11 but I know we did have a meeting around this time.
12   Q.    And are you -- which exhibit are you
13 looking at?  I saw you point down.
14   A.    The exhibit you pointed me to, Exhibit 22,
15 is that where I'm supposed to be?
16   Q.    I don't think I had gotten there yet.  So
17 you're looking at Exhibit 22?
18   A.    Yes.
19   Q.    That is a letter from the Roanoke Group?
20   A.    Yes.
21   Q.    To Bart Olson?
22   A.    Yes.
23   Q.    And Bart Olson is the city administrator
24 -- was the city administrator for Yorkville as of
                                                    112

1    the date of this letter?
2        A.   Yes.
3        Q.   And you had been discussing with Yorkville
4    its conduct of the bond litigation?
5        A.   Amongst other things, yes.
6        Q.   And also discussing the condition of the
7    subdivision known as Whispering Meadows, correct?
8        A.   Yes.
9        Q.   And you were also discussing the fact that
10   Yorkville had decided to sue TRG?
11       A.   Yes.
12       Q.   And, in fact, by the date of this letter,
13   which is December 9, 2013, Yorkville had already
14   sued TRG, correct?
15       A.   I don't have a timeline in front of me, so
16   I'm going to assume that your dates are correct and
17   agree that yes.
18       Q.   I think it's been stipulated to that the
19   lawsuit was filed June 27th, 2013.
20       A.   Okay.  Then, yes.
21       Q.   And as of December 2013 F&D was dismissed
22   from Yorkville, the 2011 Yorkville case?
23       A.   I don't recall.
24       Q.   And, again, I think it's stipulated that
                                                    113

1    coincidentally on that same date, June 27, 2013,
2    F&D's claim was dismissed against TRG.  Does that
3    refresh your memory?
4        A.   I would have to see a timeline.  If you're
5    saying it, I'm assuming it's correct.  There were
6    so many motions to dismiss in Yorkville, that's why
7    I get confused.  But I'll assume you're right.
8        MR. TURIELLO:  Just to clearly state the
9    timeline, we did amend that, it was two years after
10   that and remained available for appeal until March
11   of this year, so he's misstating the stipulated
12   facts.
13       MR. RIORDAN:  I'm not sure that's true.  But
14   there was June 27, 2013 -- I don't want to get
15   into an argument about that.  If we argue about
16   stipulated facts, it's not a good thing.
17   BY MR. RIORDAN:
18       Q.   And in this letter, Mr. Kyte, didn't you
19   express your concern to Yorkville that due to its
20   delay in filing the 2011 case it had created
21   defenses for the surety based on the terms and
22   provisions in the bonds?
23       A.   At this time, yes, that was the statement
24   made.
                                                    114

1        Q.   And when you bought the property your
2    expectation was that the municipalities would
3    immediately start pursuing the sureties to have the
4    improvements installed, correct?
5        A.   Our -- would you restate, please.
6        MR. RIORDAN:  Would you read it back?
7                (Record read as requested.)
8        THE WITNESS:  No, that was not my
9    understanding.
10   BY MR. RIORDAN:
11       Q.   I'm asking your expectation, your
12   expectation with respect to the municipalities
13   seeking to enforce the rights under the bonds.
14       A.   My expectation was that the municipalities
15   were pursuing their rights against the bonds.
16       Q.   And Yorkville did not sue F&D until over a
17   year after you bought the property, correct?
18       A.   I believe so.
19       Q.   And did that come as a surprise to you
20   that it took them a year to file a suit?
21       A.   Yes.
22       Q.   And as of the date of this letter they had
23   not yet filed a suit for Unit 4, correct?
24       A.   Correct.
                                                    115

1        Q.   So no claims as of December 9, 2013, were
2    pending against TRG regarding Unit 4 of Whispering
3    Meadows, correct?
4        A.   I don't believe so.
5        Q.   And Yorkville didn't file suit on Unit 4
6    until May of 2014, correct?
7        A.   Correct.
8        Q.   One of the concerns you raised was that
9    the delay in Yorkville filing suit resulted in the
10   streets and the other improvements in the
11   subdivision were in a deteriorating condition and
12   detrimental to the residents, correct?
13       A.   I think you're bleeding a lot of stuff
14   together in this letter, but it's one of the things
15   that we were concerned about was the deteriorating
16   streets.
17       Q.   And that impacted on the value of your
18   investment, didn't it?
19       A.   It -- the impact was on the cost to repair
20   the streets.
21       Q.   Didn't you say in this letter that the
22   value of the homes in the subdivision were
23   plummeting because of the deteriorating conditions?
24       A.   Yes, we did an analysis on the homes in
                                                    116

1  this community and the homes in communities next
2  door where the bonding companies had completed the
3  streets.
4      THE COURT: Mr. Riordan, before you start
5  another topic, I wonder if it's a good time for a
6  break.
7      MR. RIORDAN: I have one more letter.
8      THE COURT: I'll ask the witness. Do you need
9  a break?
10     THE WITNESS: We can keep going until he's
11 done.
12     THE COURT: Let's keep going.
13 BY MR. RIORDAN:
14     Q.  Mr. Kyte, I'm going to direct you to
15 Exhibit 24.
16     A.  Okay.
17     Q.  This was Mr. Olson's response to your
18 earlier letter of December 9th, correct?
19     A.  Exhibit 24?
20     Q.  Yes. 23, I'm sorry.  23.  I apologize.
21     A.  Okay.
22     Q.  This was Yorkville's response where it
23 again restates its assertion that TRG is
24 responsible for the public improvements under the

117

1  annexation agreement?
2      A.  That was their assertion.
3      Q.  Now, I'll get to Exhibit 24.
4          Have you seen this letter before today?
5      A.  I would imagine.
6      Q.  And it's addressed to Mr. Bruce Cook at
7  Argent Management?
8      A.  Correct.
9      Q.  Is that the same Bruce Cook that wrote the
10 letter on what appeared to be TRG letterhead, which
11 is Exhibit 21?
12         No, that was Andy Cook.  Are they related
13 Andrew Cook and Bruce Cook?
14     A.  I believe they're brothers.  I apologize,
15 I believe they're father/son.
16     Q.  But they're related in some fashion?
17     A.  Yes.
18     Q.  And they're both attorneys for Argent
19 Management?
20     A.  Yes, sir.
21     Q.  And at the time -- as of November 4, 2011,
22 Argent Management was still under its management
23 agreement with TRG?
24     A.  And still are today.

118

1      Q.  Okay.  I will direct your attention to the
2  second page of the exhibit, would you bring that
3  up, please.
4          The second paragraph on the second page it
5  says, TRG's position is it has not incurred
6  liabilities by coming into title to the property
7  because it, quote, rejected, quote, the agreement.
8  The village takes exception, period.  The
9  annexation agreement by its terms and by operation
10 of laws is binding upon successor owners.  Do you
11 see that?
12     A.  I do.
13     Q.  Was this letter forwarded to you by
14 Mr. Cook in November 4, 2011?
15     A.  I don't recall, but it's possible that
16 I've seen this.
17     Q.  In November of 2011 the village of
18 Shorewood was asserting that TRG was liable under
19 the annexation agreement just as Yorkville had?
20     A.  I don't think the position was exactly the
21 same, but it appears, yes.
22     Q.  Similar?
23     A.  Similar.
24     Q.  Maybe not the exact words, but it's a

119

1  similar assertion?
2      A.  Sure.
3      Q.  Did TRG respond to this letter in writing,
4  if you know?
5      A.  If there is an exhibit that you have.  I
6  don't recall.  I do know that we met multiple times
7  with counsel for Shorewood.
8      Q.  Was that in November of 2011 or was that
9  some other time frame?
10     A.  I believe we probably met with
11 Mr. Silverman at least five times, and we may have
12 had more than ten phone calls with him.
13     Q.  You ultimately entered into a development
14 agreement with the village of Shorewood, did you
15 not?
16     A.  I'd have to look at it.  I don't know if
17 it was a development agreement, settlement
18 agreement, or an amendment to the annexation
19 agreement.
20     Q.  Could you look at Exhibit 25, please.
21         Is this an agreement that TRG entered into
22 with the village of Shorewood on or about
23 May 9, 2017?
24     A.  This is.

120

1    Q.   And would you turn to the last page of the
2  exhibit.
3    A.   Sure.
4    Q.   Does your signature appear on that
5  document?
6    A.   It is.
7    Q.   And as represent representative of TRG?
8    A.   Yes.
9    Q.   Could you bring up the first page of
10 Exhibit 25, Paragraph 6, please, and highlight it.
11         Paragraph 6 reads, in April 2010 in
12 reliance on the plan and the release of claims
13 resulting from the plan, TRG purchased 51 lots in
14 the subdivision, which I think has been defined as
15 Edgewater, it's defined as TRG lots, from the trust
16 created by the bankruptcy case to liquidate KHI
17 assets.  Did I read that correctly?
18   A.   Yes.
19   Q.   That was a true statement on the date you
20 signed this letter or this agreement, excuse me?
21   A.   This was written by our attorneys, I
22 obviously approved it and signed it.  My signature
23 is on this document.
24   Q.   I'm sorry, what was the answer?
                                              121

1    A.   My signature is on this document.
2    Q.   Yes, it is.
3    MR. RIORDAN:  Now might be a good time for a
4  short break, Judge.
5    THE COURT:  Okay.  How much longer do you have?
6    MR. RIORDAN:  20 minutes.
7    THE COURT:  Okay.  So with the hope that we
8  will conclude with cross and redirect by 5:00 p.m.
9  so we could continue on, we'll take a short break.
10         (Recess taken.)
11   THE COURT:  Call case.
12   THE CLERK:  Kimball Hill.
13   THE COURT:  Mr. Kyte, you're still under cross
14 examination.  You may continue.
15 BY MR. RIORDAN:
16   Q.   Mr. Kyte, in addition to F&D's claims
17 Elgin sued TRG, did it not?
18   A.   Yes.
19   Q.   And has Elgin released TRG as of today's
20 date from its claim?
21   A.   I don't know.
22   Q.   Are you having settlement discussions with
23 Elgin on an ongoing basis as of today?
24   A.   We are working very closely with Elgin
                                              122

1  right now.
2    Q.   And Yorkville also sued you, as we talked
3  about earlier, correct?
4    A.   Yes.
5    Q.   And that suit is still ongoing?
6    A.   I'm not aware of the current condition,
7  but if you say it's ongoing, sure, yes.
8    Q.   If it is still ongoing, you still would
9  not be able to make the representations regarding
10 existing litigation in any sale agreement related
11 to Whispering Meadows, correct?
12   A.   If the suit is ongoing?
13   Q.   Yes.
14   A.   That is correct.
15   Q.   In the development agreement that was
16 entered into between TRG and Shorewood, Shorewood
17 agreed not to sue any future builders, correct?
18   A.   Correct.
19   Q.   But there was no agreement that -- in the
20 document that Shorewood would not sue TRG for the
21 difference between what it received from F&D in the
22 settlement and the amount it spent to install the
23 improvements, correct?
24   A.   Shorewood -- we gave Shorewood the right,
                                              123

1  if they chose, to pursue TRG for the difference
2  between the, I believe it was $500,000 that they
3  put in to finish their streets, and whatever their
4  recovery was from Fidelity in order to allow TRG to
5  then go forward and sell lots to builders.
6    Q.   Now, in all the years that the state
7  litigation was pending, TRG never raised the
8  release in the bankruptcy plan as a defense in any
9  of the state court cases, correct?
10   A.   Correct.  Did you say the release of the
11 bankruptcy plan?  I'm sorry, would you --
12   Q.   That were contained in the bankruptcy
13 plan?
14   A.   Would you repeat it.
15   Q.   Yes.  I think I better restate that
16 question.
17         In any of the pleadings that TRG filed in
18 the state court cases, TRG never raised as a
19 defense the release contained in the bankruptcy
20 plan; is that correct?
21   A.   I don't -- I don't recall.
22   Q.   But that -- but if we looked at the
23 documents that TRG filed, if -- it would be there,
24 correct, if that defense was asserted?
                                              124

1    A.   I would assume so.
2    Q.   In fact, that defense was never asserted
3  outside of the state court cases other than perhaps
4  in the motion to enforce in this case?
5    A.   My understanding is that we did not deal
6  with bankruptcy issues in the state court because
7  it would have been inappropriate to do so.  But I
8  do believe that we referenced the purchase and sale
9  agreement from the trust, if that counts.  I just
10 don't understand, not being an attorney, I don't
11 know if I'm -- I'm not trying to avoid your
12 question.
13   Q.   Thank you, sir.  Did you view the surety
14 bonds as insurance policies that the sureties would
15 simply come in, and install the* improvements,
16 write a check for the improvements to be put in?
17   A.   It was our experience that municipalities
18 and sureties would always work out deals to
19 complete improvements, especially improvements that
20 were held safety issues, and the majority of those
21 improvements would be streets, punch list items
22 around under ground utilities, anything within
23 public right of ways.
24        In most cases -- in most cases when in

125

1  situations where we would not have been sued by a
2  surety, we would welcome the opportunity to be part
3  of those discussions.  Obviously, one, to avoid
4  litigation, but two, to assist in completion of the
5  public improvements to help the process go faster.
6        The general way we would do so would be
7  starting with bonded improvements that are on lots
8  that would generally be installed after a home is
9  constructed because it wouldn't necessarily make
10 sense to complete sidewalks and trees in front of
11 an empty lot that the builder would then run over
12 and potentially damage in building the home, and
13 then have to come back and repair that.
14        And those are significant dollars that
15 were successfully used in negotiation of a lot of
16 SunCal deals that Mr. Teteak referenced.  $5,000 a
17 lot, or $4,000 a lot, as an example, times 500 lots
18 is a lot of money, so that was kind of the starting
19 point.  Although we didn't feel like we were
20 responsible for those improvements.  Always willing
21 to try and help resolve these situations.
22   Q.   You had significant dollars allocated for
23 over and above $4,000 or $5,000 a lot for repair
24 costs, did you not, for construction costs?

126

1    A.   We did.
2    Q.   That was because many of the streets
3  hadn't been installed yet in units 1, 4, some of
4  the sewer lines and water lines hadn't been
5  installed in those units as well?
6    A.   That's an incorrect statement.  There was
7  a lot of dollars involved in the Waterford
8  development because there was one neighborhood, a
9  neighborhood four, which did have Fidelity grading
10 bond on it, I believe, and potentially a bond
11 around box culvert, which was a structure that
12 ultimately would have a bridge on it, but the rest
13 of that neighborhood was not bonded.  And I believe
14 we talked -- Mr. Teteak mentioned how much it cost
15 to build a lot, rule of thumb.  So there is 36 lots
16 in that neighborhood, I'm not going to breakout a
17 calculator, but 36 lots times $50,000 to $60,000 is
18 a lot of money.
19        So that would have been the cost that we
20 would have assumed as a builder responsibility as
21 part of the transaction.  That was the majority of
22 that cost to complete of that particular
23 subdivision during the underwriting.
24   Q.   And you understood that in the state court

127

1  litigation F&D was raising defenses to the various
2  lawsuits that were filed against it by the
3  municipalities?
4    A.   At what time?
5    Q.   At any time after the suits were filed.
6    A.   So the question is did I understand
7  that --
8    Q.   F&D was raising defenses?
9    A.   Sure.
10   Q.   And you understood that one of the
11 defenses raised in each suit was the value of the
12 work to be installed, correct?
13   A.   That would be probably a fair statement,
14 general understanding.
15   Q.   If fact, you sat through one of those
16 trials, didn't you?
17   A.   I did.
18   Q.   That was out in Elgin?
19   A.   Yes.
20   Q.   You had Mr. Chronis sit there every day
21 with you or his associate?
22   A.   We did.
23   Q.   And at that time TRG was not in that
24 lawsuit, correct?

128

1    A.   Correct.
2    Q.   And Montgomery you sat through that trial
3 as well, did you not?
4    A.   I don't remember how involved I was in the
5 Montgomery trial.  It's very possible Mr. Chronis
6 would have been there or one of his associates.
7    Q.   Did you direct Mr. Chronis to sit through
8 those two trials?
9    A.   From time to time, especially when the
10 trials were coming to an end, we wanted him there
11 because Fidelity had demonstrated that that was the
12 time that they would look to settle with a couple
13 days left of trial, and if we would have been able
14 to have been of assistance in that settlement, we
15 would have tried to do so.
16   Q.   And that is because F&D settled with Elgin
17 near the end of the first trial, correct?
18   A.   With Elgin?
19   Q.   Yes.
20   A.   I thought there was only one trial.
21   Q.   Excuse me?
22   A.   Wasn't there only one trial in Elgin?
23   Q.   Yes.  You said the reason you thought the
24 reason being there near the end of the Sugar Grove

                                                    129

1 trial, you said because F&D had demonstrated that
2 it would settle near the end of trial.
3    A.   I think we went from Montgomery to Sugar
4 Grove to Elgin.
5    Q.   If I said Montgomery, I apologize.  I
6 meant Sugar Grove.  There was no trial in
7 Montgomery.
8    A.   I don't --
9    Q.   You're confused now.
10   A.   Yes.
11   Q.   Let's go back to the Elgin trial.  You sat
12 through the Elgin trial?
13   A.   I believe so.
14   Q.   And there was a second trial or there was
15 another trial, but that one involved Sugar Grove?
16   A.   I believe that trial happened after Elgin.
17   Q.   And did you sit through that trial as
18 well?
19   A.   I'm not -- I don't recall.  But it's very
20 possible that I had been there.  It's possible that
21 Paul Chronis or one of his associates had been
22 there.
23   Q.   That would be reflected in his time
24 sheets, would it not, if he was there?

                                                    130

1    A.   You know, maybe out of the kindness of his
2 heart maybe he didn't bill for that time.
3    MR. RIORDAN:  Give me a couple minutes, your
4 Honor.
5         Judge, that's all I have.  Thank you.
6    THE COURT:  Thank you.  Redirect?
7    MR. TURIELLO:  Thank you.
8         REDIRECT EXAMINATION
9 BY MR. TURIELLO:
10   Q.   Good afternoon again, Mr. Kyte.
11   A.   Good afternoon.
12   Q.   Counsel asked you about the status of the
13 company as being family owned?
14   A.   Yes.
15   Q.   Does that mean its okay to lose the money?
16   A.   No.
17   Q.   And what -- the fact that it is family
18 owned, what's the significance of that as far as
19 your investment -- let me reask the question.
20        Having a personal stake, does that
21 heighten your concern about doing the right thing,
22 making sure you do the right diligence, things of
23 that nature?
24   A.   I'd like to believe I'd do the right thing

                                                    131

1 for any investor.  But certainly the fact that my
2 family was involved, yes, it's a big deal.
3    Q.   And the people that moved here those are
4 real lives that are being affected, fair?
5    A.   Yes.  I worked with the Pacific Century
6 Group 15 years they know our family well,
7 John Sutherland I've known for 20 years.
8 Mike Waleen, I've known him for 15 years, family
9 and kids, it's a big deal.
10   Q.   If this isn't resolved, they'll have to
11 look for other work, fair?
12   A.   Yes.
13   Q.   If we could go to F&D Exhibit 13, we went
14 through this with Mr. Teteak, and I think counsel
15 asked you about it.
16        If you could look at the Bates number on
17 the bottom of the page is 48, it's actually Page 11
18 of the document.
19   A.   Yes.
20   Q.   Counsel asked you about if you could pull
21 up paragraph -- Section 15, Paragraph G, the larger
22 paragraph at the bottom.
23        Counsel asked you about -- at the
24 bottom -- counsel asked you generally whether the

                                                    132

1  seller made any representations regarding the
2  bonds, do you recall that?  Do you recall being
3  asked that?
4      A.  Vaguely.
5      Q.  If we could, third sentence down, the
6  sentence that begins not withstanding, not
7  withstanding the foregoing purchaser hereby
8  acknowledges that it has been advised by seller
9  that seller's predecessor in title to the property
10 posted completion and/or maintenance bonds,
11 individually a bond and collectively the bonds with
12 various municipalities to secure completion of
13 certain improvements to the property, did I read
14 that correctly?
15     A.  I'm sorry, there was a cell phone buzzing.
16 Yes.
17     Q.  So it was represented to you and you
18 understood at that time that Kimball Hill had
19 posted a completion and/or maintenance bond?
20     A.  Yes.
21     Q.  And that's something you considered when
22 deciding whether to purchase the property and when
23 you did an assessment as to the value and what
24 would be a fair price?

133

1      A.  Absolutely.
2      Q.  The next sentence continues, purchaser and
3  seller acknowledge and agree that purchaser shall
4  have no obligation to seller to replace the bonds.
5  Did I read that correctly?
6      A.  Yes.
7      Q.  Was that represented to you and was that
8  your understanding based upon the due diligence and
9  the terms of the contract?
10     A.  An important one, yes.
11     Q.  Towards the bottom, I don't want to go
12 through it in that much detail because we went
13 through it with Mr. Teteak, but the sentence that
14 starts purchaser hereby acknowledges that seller
15 makes no representation or warranty, do you see
16 that?
17     A.  Yes.
18     Q.  To your understanding has there ever been
19 a dispute that the bonds at issue were to secure
20 the improvements that the cities were seeking?
21     A.  Sorry, could you --
22     Q.  Sure.  The municipalities were looking for
23 completion of improvements regarding certain
24 subdivisions and certain items that needed to be

134

1  completed?
2      A.  Yes.
3      Q.  And the bonds that Fidelity posted applied
4  to those improvements, is that your understanding?
5      A.  That's the purpose of the bonds.
6      Q.  So this first -- so they did cover the
7  property and they did remain in place based --
8      A.  Yes, and that was part diligence and part
9  of the diligence discussion, no municipality ever
10 represented that they were going to require us to
11 replace bonds.
12     Q.  They remained in place throughout and
13 throughout the time Fidelity was suing you and then
14 Fidelity ultimately settled and paid on those
15 bonds?
16     A.  Correct.
17     Q.  Fidelity never won a lawsuit, did they?
18     A.  I don't believe so.
19     Q.  The successor liability claim that they
20 came up with, they lost on that Sugar Grove, is
21 that your understanding?
22     A.  That's my understanding.
23     Q.  At the time you purchased this property in
24 2010, and its referencing defenses, were you aware

135

1  that 13 months later in a claims committee Fidelity
2  would decide to pursue a novel theory and come
3  after the successor of the bankruptcy estate?
4      A.  No.
5      Q.  And Fidelity and Zurich are still an
6  ongoing entity at this point?
7      A.  They are.
8      Q.  And part of the team, but not you
9  personally, would have looked at the bonds and
10 determined that they did apply to the different
11 subdivisions?
12     A.  Yes.
13     Q.  Look at Exhibit 20.
14     MR. RIORDAN:  Is that your Exhibit 20?
15     MR. TURIELLO:  Fidelity's Exhibit 20.
16     THE WITNESS:  Yes.
17 BY MR. TURIELLO:
18     Q.  Just in case I forget to state it for
19 purposes of redirect I'm only going to be referring
20 to Fidelity's exhibits, but I will try and be
21 clear.
22     Counsel showed you this letter from
23 Mr. Olson from the city of Yorkville dated
24 December 21, 2010?

136

1      A.   Yes.
2      Q.   And that is an assertion by the city that
3   TRG is actually a subsequent developer and
4   responsible for these improvements, is that your
5   understanding?
6      A.   This is -- unfortunately for Yorkville
7   this is a very large misunderstanding of the
8   specific annexation agreement.
9      Q.   I'm not saying they're asserting in this
10  letter that you're responsible, fair?
11     A.   That's fair.
12     Q.   Are they actually -- they lost on that,
13  that action against F&D -- against TRG was
14  dismissed and the court found that you weren't, you
15  were a purchaser of lots?
16     A.   Yes.
17     Q.   And that -- the claim by Fidelity was,
18  likewise, dismissed, correct?
19     A.   I believe so, yes.
20     Q.   And that actually, although it was
21  dismissed, Fidelity maintained its rights to appeal
22  until after the settlement with Yorkville in
23  February of this year and then when the time to
24  appeal ran sometime in March, if the docket shows
                                                    137

1   that, does that sound about right?
2      A.   That sounds right.
3      Q.   So until six months ago Fidelity's action
4   was still hanging over the Yorkville properties, is
5   that fair?
6      A.   Fair.
7      Q.   Since that dismissal have you been taking
8   further attempts to sell those Yorkville
9   properties?
10     A.   We had a meeting with Yorkville last week
11  to discuss that very point.
12     Q.   And any progress?
13     A.   Absolutely.
14     Q.   So you're continuing your efforts as new
15  issues break free, such as Fidelity can no longer
16  appeal, attempting to use that to try to continue
17  to move the properties?
18     A.   Yeah, we have an offer on these lots and
19  we are using the offer to work on an agreement with
20  Yorkville that will hopefully complete all of the
21  remaining bonded improvements that were left
22  incomplete and bonded improvements in people's
23  backyards, people living in these homes.
24     Q.   Are you still under the same constraints
                                                    138

1   that we talked about with respect to Shorewood
2   where you need to agree to work that you wouldn't
3   otherwise do just to move the lots?
4      A.   We already agreed to the terms with
5   Shorewood to be able to sell those lots, and
6   Shorewood through follow-up discussions indicated
7   they have zero desire to pursue us for anything and
8   they have not pursued us for anything.
9      Q.   With respect to the ongoing efforts with
10  respect to Yorkville, due to the fact that this
11  remains pending, are you in a situation where you
12  would need to offer similar concessions or
13  concessions that you wouldn't otherwise, if this
14  pressure wasn't on you with the Fidelity action?
15     A.   Yorkville is a little bit different
16  because there is so much incomplete bonded
17  improvements, and we have -- we'll be able to work
18  out a deal with Yorkville, it will be challenging,
19  but we'll be able to get one done.
20     Q.   Exhibit 21, Fidelity Exhibit 21 was a
21  response to Yorkville's assertion that TRG was
22  somehow responsible for bonded improvements, do you
23  recall that?
24     A.   Is 21 the letter on the screen?
                                                    139

1      Q.   Yes, the January 2011?
2      A.   Yes.
3      Q.   The response was we're not responsible for
4   these improvements in short, right?
5      A.   Yes.
6      Q.   And then at least these have been
7   stipulated to, but Yorkville sued Fidelity in May
8   of 2011?
9      A.   Yes.
10     Q.   And after sending a letter to TRG saying
11  you were responsible for these improvements and TRG
12  responding that you were not, did Yorkville sue
13  when it sued Fidelity?
14     A.   No.
15     Q.   Did it sue at all in 2011?
16     A.   No.
17     Q.   Did it sue TRG in 2012?
18     A.   No.
19     Q.   Did it sue TRG in June 27, 2013, two and a
20  half years later?
21     A.   It did and it was confusing because the
22  meeting we had where we actually went to the author
23  of the annexation agreement on behalf of Yorkville,
24  Yorkville's author of the annexation agreement, and
                                                    140

1  Yorkville's own author wrote an affidavit stating
2  that we as the owner of lots with the intended use
3  of residential -- for residential use had no right
4  to pursue any subsequent owner, and we presented
5  that affidavit to Yorkville at that time, which is
6  why we were so surprised that they even attempted
7  to sue us three years later.
8     Q.  Just so we're clear on the timeline,
9  January 2011, you respond saying TRG is not
10  responsible and they sue Fidelity in May?
11     A.  Yes.
12     Q.  And in October of 2011, October 26,
13  Fidelity brings TRG into that action?
14     A.  Yes.
15     Q.  So two months after they first made you
16  aware that they intended to pursue TRG for
17  successor liability?
18     A.  Yes.
19     Q.  A year and a half after you purchased the
20  property?
21     A.  Yes.
22     Q.  And despite the fact that Fidelity is now
23  asserting in court that it's TRG's responsibility,
24  Yorkville didn't sue TRG for two years after this

141

1  thing dragged out?
2     A.  Correct.
3     Q.  Counsel asked you some questions earlier
4  about whether you knew the claims were released or
5  obligations were released because of this going to
6  bankruptcy, do you recall that line of questioning?
7     A.  Yes.
8     Q.  Is that just a general understanding of it
9  being a bankruptcy sale that things come up?
10     A.  My understanding was that that was the
11  purpose of the whole process of the trust, the
12  confirmation order, was the ability for the trust
13  to sell lots to investors, builders, developers so
14  that they could then, yeah, build, sell lots,
15  complete communities.
16     Q.  And after Fidelity chose to sue you in
17  state court, you consulted with attorneys and a
18  decision was to defend those cases and that was
19  thought to be the most expeditious way to go
20  forward and get rid of the case?
21     A.  Yes.
22     Q.  And you were seeing success?
23     A.  Yes.
24     Q.  It's fair to say you didn't know in 2011

142

1  that specific -- that you could come to bankruptcy
2  court, file an enforcement motion, you were given
3  the best option and it seemed to be working, is
4  that fair?
5     A.  All the attorneys that we consulted with,
6  the consensus was the fastest way to get out of
7  this case was to respond in state court with a
8  motion to dismiss to be able to get out
9  specifically because of the first kind of component
10  that Fidelity had written a check, so that would
11  get us out of this fast and force Fidelity to
12  settle with municipalities, and that was the
13  quickest path to get through this at the advice of
14  counsel.
15     Q.  You heard testimony from Mr. Kilburn that
16  between him and Mr. Riordan they have 60-plus years
17  of experience in surety and bankruptcy litigation?
18     A.  Yes.
19     Q.  And you heard testimony that the year
20  before they tried to have a court say that they
21  could pursue a successor out of a bankruptcy state
22  and the court said no?
23     MR. RIORDAN:  Objection to the form.
24     THE COURT:  Could you rephrase that?

143

1     MR. TURIELLO:  Sure.
2  BY MR. TURIELLO:
3     Q.  Based upon being here for Mr. Kilburn's
4  testimony do you have any understanding of whether
5  Fidelity, specifically Mr. Kilburn, Mr. Riordan had
6  experience about coming to bankruptcy court to ask
7  for permission?
8     A.  Yes.
9     Q.  And is it your understanding they did?
10     A.  My understanding is that they did go to
11  the bankruptcy court on other matters, but not this
12  matter.
13     Q.  And you at the time in 2011 was it your
14  understanding that the course of action that was
15  appropriate and that you ultimately took to
16  actually some level of success was to file this
17  motion to dismiss in the venues they selected?
18     A.  Yes.
19     Q.  Counsel referenced the Shorewood agreement
20  for -- let me put it up.  It's Exhibit 24.
21  Apologies -- yeah, it's Exhibit 24.  Fidelity
22  Exhibit 24.
23     This is a letter from 2011 where Shorewood
24  is acknowledging that TRG does not believe it's

144

```
 1  liable?
 2      A.   Yes.
 3      Q.   Shorewood never sued, did they?
 4      A.   They did not.  They also agreed to a
 5  settlement agreement with us before their
 6  litigation was done with Fidelity, I believe.
 7      Q.   If you go to Fidelity Exhibit 24 -- 25, I
 8  apologize.  Counsel showed you Paragraph 6?
 9      A.   Yes.
10      Q.   It does -- this paragraph doesn't say that
11  back in April of 2010 TRG relied upon the release
12  of particular claims, does it?
13      A.   It does not.
14      Q.   It doesn't say that TRG knew back in 2010
15  the plan released claims of sureties?
16      A.   Resulting from -- sorry?
17      Q.   In this paragraph it doesn't say that TRG
18  knew back in 2010 the plan released claims of
19  sureties?
20      A.   I'm sorry.
21      Q.   It doesn't say in this paragraph that's on
22  the screen that TRG knew back in 2010 the plan
23  released claims of sureties?
24      A.   I don't believe so.
                                                      145
```

```
 1      Q.   It doesn't say TRG knew back in April
 2  of 2010 that TRG knew it could file an enforcement
 3  motion?
 4      A.   No.
 5      Q.   And if we look -- if we could look at the
 6  whole page, first this is a recital drafted by
 7  counsel in this agreement, is that fair?
 8      A.   This was -- yes.
 9      Q.   If we look at the top paragraph.
10      A.   Yes.
11      Q.   If we look at the date, it's the 9th of
12  May, 2017?
13      A.   Yes.
14      Q.   So this was signed after this court
15  had already determined that Fidelity violated
16  the confirmation plan by pursuing TRG in state
17  court?
18      A.   Yes.
19      Q.   And this is in the period where I believe
20  you said as soon as you got the oral ruling you
21  were negotiating even in unfavorable terms to
22  try to move some of these properties; is that
23  right?
24      A.   This would be an example of that, yes.
                                                      146
```

```
 1      Q.   And you were agreeing to terms on the
 2  property and selling them at amounts and conditions
 3  that you wouldn't otherwise in an effort to save --
 4      A.   Yes.
 5      Q.   In this -- if we could go back and open it
 6  up, it doesn't say in here that TRG knew back in
 7  April of 2010 the plan released novel unique claims
 8  never before pursued by a surety?
 9      A.   No.
10      Q.   Counsel asked you about the lawsuit with
11  Elgin, do you recall that?
12      A.   I do.
13      Q.   And that Elgin sued TRG?
14      A.   Yes.
15      Q.   Once TRG obtained a dismissal of Elgin,
16  Elgin didn't appeal, did it?
17      A.   It did not.
18      Q.   Those cases though, Montgomery, Elgin,
19  and Sugar Grove, I believe we have a status in a
20  few weeks, those still remained pending in
21  Kane County?
22      A.   I believe so.
23      Q.   Litigation by Fidelity in those actions is
24  still on the docket?
                                                      147
```

```
 1      A.   Yes.
 2      Q.   With respect to Yorkville, if I could see
 3  exhibit --
 4           You said -- counsel referred to several of
 5  the trials out in Kane County that you or counsel
 6  may have sat through?
 7      A.   Yes.
 8      Q.   At that point in time while the claims of
 9  Fidelity had been dismissed, there was still a
10  chance that once that was over they could continue
11  and they could appeal?
12      A.   Yes.
13      Q.   And I think you said that the reason you
14  were there was if an opportunity for settlement
15  arose, you wanted to be there to try to make it
16  happen?
17      A.   There were two reasons, that was one of
18  them.  The second was we had seen Fidelity require
19  as part of their settlements very strange language,
20  from a non-legal person, where they were demanding
21  or requiring the municipalities to assign municipal
22  rights, whatever those municipal rights may be to
23  Fidelity as part of the settlement.
24      Q.   So Fidelity even when settling with
                                                      148
```

1   municipalities was still reserving the right to
2   come after TRG?
3       A.   Correct, and it was our understanding
4   through conversations with those attorneys that had
5   Fidelity -- had the municipalities not agreed to
6   release those rights that Fidelity had threatened
7   appeal and prolong this even more.
8       Q.   So even once they settled with the
9   municipalities, they still wanted to pursue this
10  novel theory against TRG?
11      A.   Yes.
12      Q.   In fact, in Yorkville the settlement that
13  was reached earlier this year is it your
14  understanding that they also reserved their
15  rights even after this court's order to come after
16  TRG?
17      A.   Yes.
18      MR. TURIELLO:  Thank you, Mr. Kyte.  Thank you,
19  your Honor.
20      THE COURT:  At this point is anyone reserving a
21  right to recall Mr. Kyte?
22      MR. TURIELLO:  I don't think we need that.
23  Subject to the admission of exhibits, we're not
24  reserving.

                                              149

1       MR. RIORDAN:  I think he's said everything he
2   needs to say.
3       THE COURT:  So I can excuse Mr. Kyte?
4       MR. RIORDAN:  You can.
5       THE COURT:  All right.  Mr. Kyte, you're done.
6   You are excused.  You can discuss with your counsel
7   whatever you please.
8       THE WITNESS:  Thank you for your patience.
9
10      (Witness excused.)
11      THE COURT:  Before I ask this question of TRG,
12  I will ask you the obvious question, which is if
13  will you be able to in this amount of time that we
14  have today --
15      MR. RIORDAN:  Judge I know this is going to be
16  less than 15 minutes.
17      THE COURT:  Keeping in mind that none of us,
18  including the court, has kept to any time line.
19      MR. RIORDAN:  The Court will be surprised.
20      THE COURT:  Okay.  So now then the obvious
21  question goes to the movant, with a potential for
22  rebuttal is the movant resting at this stage?
23      MR. RUFF:  Yes, your Honor.
24      THE COURT:  That means, Mr. Riordan, as the

                                              150

1   respondent, you may call your first witness.
2       MR. RUFF:  Subject to admission of exhibits.
3       THE COURT:  We haven't handled that, though I
4   think I tried to handle that in a general sense.
5   But --
6       MR. RUFF:  I didn't expect it to be done.
7       MR. RIORDAN:  Maybe we can meet and go through
8   the exhibits.
9       MR. RUFF:  I generally have no objection to any
10  of the exhibits.
11      THE COURT:  I think that's a wonderful idea.
12  work with each other.  Mr. Riordan.
13      MR. RIORDAN:  Mr. Gregory Kilburn.
14      THE COURT:  You were previously put under oath,
15  but it has been a length of time here so I'm
16  going to ask the deputy to place you back under
17  oath.
18              (Witness sworn.)
19      THE CLERK:  Please state your name for the
20  record.
21      THE WITNESS:  Gregory, G-r-e-g-o-r-y, Wilton,
22  W-i-l-t-o-n, Kilburn, K-i-l-b-u-r-n.
23      THE COURT:  Mr. Riordan, your witness.
24

                                              151

1              GREGORY KILBURN,
2   called as a witness herein, having been first duly
3   sworn, was examined and testified as follows:
4              DIRECT EXAMINATION
5   BY MR. RIORDAN:
6       Q.   Mr. Kilburn, you're the same
7   Gregory Kilburn who testified during plaintiff's
8   case?
9       A.   Yes.
10      Q.   And you are an employee of Fidelity &
11  Deposition Company of Maryland?
12      A.   Yes.
13      Q.   And your position is claim counsel?
14      A.   Yes.
15      Q.   And we went through your duties and
16  responsibilities as claim counsel when you were
17  questioned by Mr. Ruff, correct?
18      A.   Yes.
19      Q.   Was your description of your duties and
20  responsibilities accurate at that time?
21      A.   Yes.
22      Q.   I'd like to direct your attention to the
23  time period of May through July of 2011.
24      A.   Yes.

                                              152

1    Q.   That's the time period when you were
2   preparing your first case status report on Kimball
3   Hill?
4    A.   Yes.
5    Q.   And that first case status report resulted
6   in a claim committee meeting, correct?
7    A.   Yes.
8    Q.   And the claim committee meeting
9   discussed -- strike that.
10       What did the claim committee -- what was
11  discussed at the claim committee meeting?  What was
12  the subject matter?
13   A.   Counsels' recommendations as to our future
14  course of action with the Kimball Hill matters.
15   Q.   And I believe you testified that one of
16  the -- the decision was made to defend the bond
17  claims on various grounds, one of which was the
18  so-called successor liability defense?
19   A.   Yes.
20   Q.   And at that time, around that time did F&D
21  give consideration to the bankruptcy plan and
22  injunction in its deliberations?
23   A.   No, we didn't think it was necessary.
24   Q.   Can you explain to Judge Barnes why you

153

1   did not think it was necessary?
2    A.   TRG was not a debtor.  And we had received
3   confirmation that we had covenants that were
4   recorded and ran with the land that imposed the
5   liability for the improvements on successors in
6   title.
7        And we also were apprised of the pertinent
8   Illinois statute and we did not believe at that
9   time that those could be avoided by a bankruptcy
10  filing.
11       MR. RIORDAN:  Thank you, Mr. Kilburn.  That's
12  all I have, your Honor.
13       THE WITNESS:  Thank you, sir.
14       THE COURT:  Mr. Ruff?
15       MR. RUFF:  I had one killer question.  I'll
16  reserve that killer question.  No follow up.
17       THE COURT:  All right.
18       So is anyone reserving the right to call
19  Mr. Kilburn again?
20       MR. RUFF:  No.
21       THE COURT:  Thank you for your testimony once
22  again.  You are excused.
23            (whereupon, the witness was
24             excused.)

154

1       MR. RIORDAN:  I feel ashamed that I actually
2   kept my word on that one.
3       THE COURT:  There you go.  Maybe I should go
4   back and strike that comment that we had earlier.
5       All right.  So, gentlemen, I believe we
6   have reached a breaking point for the day because I
7   believe the remaining two or three potential
8   witnesses are all scheduled for the 18th.
9       MR. RIORDAN:  18th.
10      THE COURT:  Now, you'll recall at the
11  beginning of today there was the issue regarding
12  the potential motion to exclude the witness, the
13  expert witness, and I suggested that if Mr. Riordan
14  had not communicated by the end of the day today
15  that he did not intend to call that expert, then
16  the motion should get filed by the end of the day
17  Friday.  Has that communication occurred?
18      MR. RIORDAN:  We haven't had time, but I was
19  going to tell counsel that I do intend to call
20  Mr. Barry.
21      THE COURT:  All right.  So let's look at the
22  calendar again and make sure we're all in
23  agreement.
24      At this point my brain is swimming a

155

1   little bit, too.  The motion was to be filed by the
2   31st, that is Friday.  I believe the response was
3   to be filed by the 10th, that is a Monday.
4       Does that sound correct?
5       MR. RIORDAN:  Correct.
6       THE COURT:  You said there was no need to file
7   a reply.
8       MR. RUFF:  Correct.
9       THE COURT:  And I said by the 14th, the Friday
10  before we reconvene, I would let the parties
11  know what my decision was, though it might be a
12  cursory one subject to later explanation on the
13  record.
14      MR. RIORDAN:  That's fine, Judge.
15      MR. RUFF:  That's fine.
16      THE COURT:  My staff, who is at all counts more
17  diligent and smarter than I am has pointed out that
18  we have a hearing scheduled next week on your
19  motion to amend.
20      And due to -- I'm striking that hearing
21  and I'm tying the two together and I will resolve
22  the motion to amend the witness list alongside this
23  issue.
24      MR. RIORDAN:  So no need to appear next week?

156

```
1      THE COURT:  No need to appear next week.
2      MR. RUFF:  Okay.
3      THE COURT:  We are going to stand in recess
4  until the 18th at 1:00 p.m.
5                         (which were all the proceedings
6                         had in the above cause this date
7                         and time.)
8                         (whereupon the proceedings in
9                         the above-entitled cause were
10                        continued to September 18, 2018
11                        at 1:00 p.m.)
12                        (Proceedings concluded at
13                        5:20 p.m.)
14
15
16
17
18
19
20
21
22
23
24
                                                    157
```

```
1  STATE OF ILLINOIS  )
2                     )  SS:
3  COUNTY OF C O O K  )
4
5      MELISSA C. GUANDIQUE, as an officer of the
6  Court, says that she is a shorthand reporter doing
7  business in the State of Illinois; and that she
8  reported in shorthand the proceedings of said
9  trial, and that the foregoing is a true and correct
10 transcript of her shorthand notes so taken as
11 aforesaid, and contains the proceedings given at
12 said trial.
13      IN TESTIMONY WHEREOF:  I have hereunto set
14 my verified digital signature this 14th day of
15 September, 2018.
16
17
18      _____
19
20         Illinois Certified Shorthand Reporter
21
22
23
24
                                                    158
```

**$**

$1,263,008
71:15
$1,875,000
15:8
$10
21:14,15,16
$100
21:12,14
$111,737.65
67:3
$12,000
13:16
$132,577.50
66:10
$14
61:22
$18,000
13:17
$190,801.81
69:14
$194,000
72:9
$194,300
71:20
$20
74:15
$283,222.50
68:2
$30,000
40:15
$362,382
72:18
$4,000
126:17,23
$40,000
40:15
$5,000
40:14,17 126:16,23
$50
74:17
$50,000
55:22 60:3 127:17
$500,000
124:2
$544,747.08
70:15
$6.6
7:1,17 8:12
$60,000
127:17
$9,539,690
73:2
$9.539
74:24
$90
21:13,14 74:20

**1**

1
111:17 127:3
10
66:12,14 101:1
10th
156:3
11
43:2 67:5,7,23 88:22
132:17
12
68:5,21
13
69:18 85:24 88:22
132:13 136:1
14
21:2 71:7 72:4
86:17,20

142
15:5,13 16:1,5
143
15:19,21 16:13
145
86:24
147
87:9
14th
156:9
15
10:21 21:6 74:6,13
101:1,3 132:6,8,21
150:16
152
49:24 50:1 51:9,17
153
52:6
154
52:20
15G
88:21 89:6
16
87:4
17
18:23
18
110:4 157:10
18th
155:8,9 157:4
1:00
157:4,11

**2**

2
72:6 91:5,6 111:17
20
104:21 122:6 132:7
136:13,14,15
2005
80:18
2006
32:1
2008
80:13 111:23
2009
80:13
2010
14:5 19:5 61:23
74:11 75:8 81:5,16
82:24 105:11 121:11
135:24 136:24
145:11,14,18,22
146:2 147:7
2011
22:14 24:19 26:5
27:12 44:11,12
103:6 109:3 110:4
111:17,19 113:22
114:20 118:21
119:14,17 120:8
140:1,8,15 141:9,12
142:24 144:13,23
152:23
2012
27:1 74:9 140:17
2013
27:1 67:18 112:1,2,9
113:13,19,21 114:1,
14 116:1 140:19
2013-2014
13:24
2014
48:5,9 49:21 51:12
67:18 116:6
2015
31:4
2016
72:8

2017
38:17,19 56:12,22,
23 68:19 69:14
70:14 72:8 79:16
120:23 146:12
2018
74:9 157:10
2019
51:21 52:18 55:1,4
59:18
21
10:10,15,21 108:18
118:11 136:24
139:20,24
22
109:6 112:14,17
23
117:20
24
117:15,19 118:3
144:20,21,22 145:7
25
7:13 74:7,16 120:20
121:10 145:7
26
71:9,12 72:12
141:12
27
114:1,14 140:19
27th
113:19

**3**

3
91:15
30
69:14 74:19
31st
156:2
36
127:15,17

**4**

4
91:21 115:23 116:2,
5 118:21 119:14
127:3
40
7:10 100:21 101:3
48
88:23 132:17

**5**

5
66:5 92:1
50
13:17 21:23
500
126:17
51
121:13
53
86:8
5:00
101:5 122:8
5:20
157:13

**6**

6
19:24 92:8 121:10,
11 145:8
60-plus
143:16
68
71:13

**7**

7
16:5 19:24 71:8,9,12
72:12 92:19
70
44:19

**8**

8
66:24 69:8,13 70:12

**9**

9
65:15 113:13 116:1
120:23
90
14:23,24 17:10,20
20:7 84:21
90/10
14:20 21:6,18
95/5
14:18,20
9th
117:18 146:11

**A**

ability
39:15 45:6 54:3 58:7
61:11 63:4,19 75:16
78:20 142:12
abnormally
59:5
above-entitled
157:9
Absolutely
8:1 43:23 75:5 134:1
138:13
academy
83:22
accepted
59:16
account
60:13
accounting
62:17
accurate
152:20
acknowledge
134:3
acknowledges
133:8 134:14
acknowledging
144:24
acquire
7:20
acquired
6:14 35:20 74:10
98:7 109:11
acquiring
10:3,6
acquisition
44:21
act
17:7
acting
110:21
action
27:19 28:6 33:6
61:10 69:14 71:23
72:14 73:15 137:13
138:3 139:14 141:13
144:14 153:14
actions
27:8 29:22,23 32:19
38:22 52:10 64:10

66:22 67:14,21 69:2
70:2,5,14 147:23
active
48:21
activities
11:16 72:1
actual
17:8 29:11 37:12
72:8,20 74:22 76:24
82:5
AD-BAC
14:24 15:2,10,16,23
17:10 18:2 19:14
20:8 21:13,15 22:23
53:23,24 83:9,11
84:20,24 85:3
AD-BAC's
17:19
add
70:18
added
71:15
addition
45:11 67:22 71:3
76:2,22 109:16
122:16
additional
20:21 26:13 37:11
71:4 72:6,15
addressed
90:17 118:6
adequate
93:9,22 94:3
administrator
112:23,24
admission
149:23 151:2
advance
21:1
advice
30:3 46:1 103:18
143:13
advised
31:14 133:8
advisory
53:21
affect
37:18
affected
132:4
affidavit
65:16,17,20,22
66:15 67:7,8 68:7,
21,23 69:20 71:9
141:1,5
affidavits
64:23 65:8 68:8
afield
77:10
afternoon
5:17 80:10,11
131:10,11
agent
105:7
agree
34:13 59:21 77:9
82:4 97:7 113:17
134:3 139:2
agreed
34:15 53:23 54:19
85:12 105:15 123:17
139:4 145:4 149:5
agreeing
147:1
agreement
8:16 10:13,18 11:6,
8,14,21 15:9,22
16:15 17:6,15,18
19:10 35:7,24 40:13,
22,23 42:3 49:7
51:18 52:8,21 59:3,

19,23 82:5,13 85:14,
17,18 86:2,17 87:1,
2,7,12,13,17,21
88:5,7,23 89:5 94:23
97:8 98:21,22,24
99:3,15 101:24
102:4 104:5 106:15
109:6,18,20,23
110:5 111:5 118:1,
23 119:7,9,19
120:14,17,18,19,21
121:20 123:10,15,19
125:9 137:8 138:19
140:23,24 144:19
145:5 146:7 155:23
agreements
8:24 12:1 22:8 24:14
36:4 49:11,19 57:14
58:23 85:19 87:22
94:18,21,24 95:12
96:18,22 97:14,15
98:4,10,19 103:16
ahead
34:22 107:8
allocated
126:22
alongside
156:22
amend
30:12,22 114:9
156:19,22
amending
57:14
amendment
86:16,24 120:18
amendments
88:1
amount
13:18 44:8 55:8
57:16 60:1,3 61:13,
15 62:4,23 65:1 67:3
69:9 70:19 71:14,20
72:17,23 73:1
100:22 123:22
150:13
amounts
56:6 93:9 147:2
analysis
7:5 29:18 53:12 73:4
109:9 116:24
analyzed
62:10
and/or
9:17 133:10,19
Andrew
118:13
Andy
109:2 118:12
annexation
94:18,21,23,24
95:11 96:18,22 97:8,
14 98:3,9,11,21,22,
24 99:2,15 103:15
104:5 106:15 109:6,
18,20,23 110:5
111:5 118:1 119:9,
19 120:18 137:8
140:23,24
annualized
7:10
answering
100:7
anticipate
101:11 102:24
anticipated
40:21 41:15 49:17,
22
Apologies
144:21
apologize
104:18 117:20

118:14 130:5 145:8

**appeal**
31:8,14 32:8 34:6
49:3 56:20 60:14
63:19 79:18,21
114:10 137:21,24
138:16 147:16
148:11 149:7
**appealing**
79:20
**appeals**
61:11 62:2 63:13
73:16
**appearance**
46:10
**appeared**
31:3 118:10
**appears**
86:4 87:8 109:1
119:21
**appellate**
31:5 32:3 33:6
**applied**
135:3
**apply**
136:10
**apprised**
154:7
**approach**
6:4 15:12,19 56:1
65:19 66:11 68:4
86:10
**approached**
81:22,23
**approaching**
67:5 69:17
**approval**
25:15,16 75:17
98:23
**approvals**
22:22
**approve**
12:9
**approved**
110:17 121:22
**approximately**
50:9 73:9,22
**April**
43:2 75:8 81:5,15
82:24 105:12 111:23
121:11 145:11 146:1
147:7
**Arch**
33:20 34:6,8,9,15
35:3,8 55:16
**area**
44:11,12,14 82:1
90:15
**Argent**
118:7,18,22
**argue**
114:15
**argument**
114:15
**arises**
63:24
**arose**
148:15
**arrived**
64:3 72:20
**articles**
78:22
**ashamed**
155:1
**asserted**
124:24 125:2
**asserting**
28:2 119:18 137:9
141:23

**assertion**
106:17 108:8,14
110:4 111:4 117:23
118:2 120:1 137:2
139:21
**assess**
12:5
**assessment**
5:21 6:6 7:23 64:7,9
133:23
**assessments**
62:20
**assessors**
39:4
**asset**
11:22 14:1 22:9 24:6
52:21 54:6 62:14
**assets**
53:5 121:17
**assign**
148:21
**assignment**
87:6,12 88:5 89:4
**assist**
83:18 126:4
**assistance**
6:9 46:1 129:14
**assistant**
54:3
**associate**
128:21
**associates**
129:6 130:21
**association**
41:8 47:3 78:21
**associations**
39:2,23 40:2 45:14
47:6
**assume**
37:9 73:3 79:4 86:18
96:8 111:3 113:16
114:7 125:1
**assumed**
13:12 87:14 104:4
109:21 127:20
**assuming**
15:9 114:5
**attached**
65:16 67:8 68:8,22
**attachment**
66:14
**attempt**
24:16 28:4 43:11
48:16 55:3 104:12
**attempted**
62:3 141:6
**attempting**
12:18 39:10 138:16
**attempts**
138:8
**attended**
47:2 89:9 106:12
107:2
**attention**
91:14,21 92:1 119:1
152:22
**attorney**
28:23,24 29:9,17
30:8,17 31:14,17
32:11,12,15 56:8
69:22 70:1 88:3 97:4
98:23 109:2 110:15
125:10
**attorney's**
103:18
**attorneys**
23:5 24:7 25:18
28:16,18,20 31:17
32:22 33:1 34:12
38:23 45:18,19,24
49:15 58:20 64:12,

17 65:7,10 66:17
68:15 87:23 88:14
103:11,21 111:1,6,8
118:18 121:21
142:17 143:5 149:4
**attorneys'**
36:12 64:8 71:14
**attractive**
19:21
**auditor**
54:16
**August**
22:14 24:19 26:4
27:12 103:6
**Aurora**
6:19
**author**
140:22,24 141:1
**authorize**
8:12
**automatically**
109:23
**avoid**
125:11 126:3
**avoidable**
71:13,17 72:14,24
**avoided**
154:9
**award**
74:14
**awarded**
73:4 74:24
**aware**
6:10 8:6 18:9,13
31:4 49:12 88:6,15
89:5,7 95:18 110:13
123:6 135:24 141:16
**awareness**
95:23

**B**

**babysitting**
12:21
**back**
11:3 14:5 17:23
21:5,8,9,14,16 22:23
41:24 50:23 59:13
60:23 72:12 73:13
74:10 80:17 88:22
91:1 96:4 99:22,23
115:6 126:13 130:11
145:11,14,18,22
146:1 147:5,6
151:16 155:4
**backup**
19:17
**backyards**
138:23
**bad**
79:5
**bandwagon**
27:16
**bankruptcy**
8:19 32:12,15 33:12
58:5 85:15 102:7,10,
13 103:17 109:22
111:22 121:16
124:8,11,12,19
125:6 136:3 142:6,9
143:1,17,21 144:6,
11 153:21 154:9
**Barnes**
57:4 153:24
**Barry**
155:20
**Bart**
107:15 109:2
112:21,23
**base**
7:5 40:1

**based**
7:6 9:7 13:14 15:7
36:5 53:5,10 54:19
55:24 75:24 79:23
94:15 114:21 134:8
135:7 144:3
**basically**
21:12 34:13 40:20
56:4 88:14
**basis**
13:16 34:20 122:23
**Bates**
16:3 88:23 132:16
**Beach**
23:9
**began**
27:12 28:1,3,4
**begin**
50:16 57:11
**beginning**
81:4 155:11
**begins**
133:6
**behalf**
12:14 111:6,10
140:23
**belabor**
77:7
**belief**
28:23 29:4 53:6
78:23 106:13
**believed**
36:3 102:20
**benefit**
13:7 14:4 15:20
19:11
**benefits**
39:17 87:13
**bid**
5:22 9:13 48:7
**bids**
48:5
**big**
19:14 132:2,9
**biggest**
58:1 70:16
**bill**
131:2
**bills**
12:2,3 60:6 64:22
68:12,18 70:24
**binding**
119:10
**bit**
20:23,24 38:12
93:18 100:17,18
101:16 104:14
139:15 156:1
**bleeding**
116:13
**Bluff**
23:21
**board**
47:5 83:23
**bond**
8:15 9:21 18:11,15
24:4 25:4 36:19
39:14 47:22 56:5
72:7 91:3,13,22
93:10,22 94:13 95:7
95:14 111:14
113:4 127:10
133:11,19 153:16
**bonded**
47:21 57:16 94:12
126:7 127:13
138:21,22 139:16,22
**bondling**
8:22 34:12 35:16,21
36:1,4,5 60:8 99:6,9
117:2

**bonds**
8:3,5,6,10,13,20 9:4,
9,10,11,15,18,24
10:7 18:6 20:3 24:11
27:9 33:22 37:4,10,
17 38:1,4,5,7,9 55:9,
21 79:2 88:9 90:3,7,
13 91:3,6,8,16,17
92:2,8,10,11,13,17,
19,21,23 93:2,9,22
94:2,17 98:20 99:3
103:23 114:22
115:13,15 125:14
133:2,10,11 134:3,
19 135:3,5,11,15
136:9
**book**
85:23 104:22
**borrowed**
17:11 51:23 85:2
**borrower**
16:7
**bottom**
16:3 132:17,22,24
134:11
**bought**
14:4 26:7 33:23
44:11 47:24 48:1
115:1,17
**box**
76:9 127:11
**brain**
155:24
**break**
43:18 50:5,11,12,14,
20,22 101:18 117:6,
9 122:4,9 138:15
**breaking**
155:6
**breakout**
72:3 127:16
**bridge**
23:21,24 127:12
**bring**
34:1 44:15 75:22
108:20 119:2 121:9
**bringing**
27:5,12
**brings**
141:13
**broad**
97:16
**brothers**
18:14
**brought**
70:2 83:18 95:18
102:18,21
**Bruce**
11:1 118:6,9,13
**bucket**
60:3
**budget**
12:4,8,9 22:15
**build**
45:8 78:7 127:15
142:14
**builder**
44:5,10,14,16 45:3
57:5 58:1,2,4,8
59:14 60:15 61:2
99:7,8,9 126:11
127:20
**builders**
44:7,18 45:11 47:16
48:5,9,15 49:11
57:8,10,21 60:5 80:1
123:17 124:5 142:13
**building**
58:5 126:12
**built**
20:23

**bunch**
36:21
**burden**
42:1
**business**
7:6,8 19:4,15 22:7
23:13 40:4 54:15
77:22 78:1 80:17,20,
21,22 81:4 82:2,5,13
84:5,8,9,12 90:1
**buy**
6:13 14:3 81:24
**buying**
48:15 61:2 78:8
102:12
**buzzing**
133:15

**C**

**Calatlantic**
58:4 61:1
**calculator**
127:17
**calendar**
155:22
**California**
41:7,19 81:10
**call**
5:6 10:10 12:10
18:22 41:7,8 45:2
51:1 58:17,18 59:9
62:23 101:5 107:22
122:11 151:1 154:18
155:15,19
**Callaghan**
65:12,17,23
**Callaghan's**
66:9
**called**
16:14 23:20,21
53:20 57:5 81:10
83:13 152:2
**calls**
37:14 46:17 58:22
62:5 95:13,21,22
96:24 120:12
**Cambridge**
74:18
**capital**
12:10 17:10 20:22
21:1 22:23 54:9
75:10,13,15 78:17
83:14 84:17
**care**
41:20
**carry**
39:7 43:17 79:22
**carved**
36:16
**case**
7:5 11:10,17 13:1
55:14 64:18 65:11
69:12 87:24 88:3
89:15 113:22 114:20
121:16 122:11 125:4
136:18 142:20 143:7
152:8 153:2,5
**cases**
8:17 29:14 46:3 55:5
124:9,18 125:3,24
142:18 147:18
**cash**
61:18 62:20,23 63:1
75:22
**category**
72:2,13
**caused**
75:4
**causing**
47:20



cell
133:15
century
63:21 75:2 87:19
132:5
challenging
46:8 57:24 139:18
chance
61:18 148:10
change
57:20 73:18 78:1
changed
33:24
changing
22:17
charge
64:13
chart
66:6 71:12 72:6
Chase
6:18 26:18 30:10
91:23
cheapest
42:8
check
29:10 73:11 76:9
94:16 125:16 143:10
checks
29:7,16
Chicago
23:17,18 25:19
42:19 81:6,9,19
82:1,7 85:13 104:2
105:7
Chicagoland
82:1
choice
59:12
chose
29:22 32:19 34:1
124:1 142:16
Chronis
69:20,22 70:1
128:20 129:5,7
130:21
cities
134:20
city
31:9 105:3 112:23,
24 136:23 137:2
claim
28:2 76:20,21,22
114:2 122:20 135:19
137:17 152:13,16
153:6,8,10,11
claimed
76:18
claiming
104:3
claims
102:18,20,24 111:14
116:1 121:12 122:16
136:1 142:4 145:12,
15,18,23 147:7
148:8 153:17
clarify
36:19 89:19 104:17
clear
68:6,18 136:21
141:8
CLERK
5:8 51:2 122:12
151:19
close
11:20 23:1 58:1 59:7
74:11 75:1 77:4 81:3
82:14 100:6
closed
18:18 22:6 23:16
24:20 35:23 43:1
59:17 75:7,8 105:9,

12 107:8
closely
122:24
closing
10:11 24:13 36:3,9
81:18 82:8,14
108:15
cloud
45:9 64:1
co-investment
14:16
co-worker
81:2
code
95:1 97:11 99:1,2,16
coincidentally
114:1
collateral
23:3
collect
27:9
collective
28:23
collectively
133:11
comfortable
58:24 107:7
comment
97:10 155:4
comments
87:22 88:1
commercially
56:13 61:12,15
commitment
15:17 17:22
committee
93:24 94:2,8 95:17
106:24 108:4,9
136:1 153:6,8,10,11
communicated
107:18,19 155:14
communication
45:19 58:2 107:21,
24 155:17
communications
107:14
communities
6:16 41:11 47:16
57:5 78:12 90:11
92:3 99:8 117:1
142:15
community
44:6,16,24 48:1
117:1
commute
23:10 41:19 42:14
43:5
commuting
42:23
companies
8:22 34:13 36:4 40:3
76:4 117:2
company
23:6 35:16,21 36:1
41:7 42:5 58:5 61:19
77:21 78:7 82:10,12
83:13,17,20 84:9
99:6,10 102:18,21
131:13 152:11
company's
36:5
compared
94:12
complete
8:24 9:17 57:19
94:15 95:2 99:7,10
125:19 126:10
127:22 138:20
142:15
completed
9:22 35:21,24 93:11,

23 117:2 135:1
completion
126:4 133:10,12,19
134:23
complications
59:6 63:18
component
40:12 54:10 143:9
components
59:22
concept
14:7
concern
12:24 114:19 131:21
concerned
7:4 47:9 107:8
concerns
47:7,13 53:1 90:16
116:8
concession
60:22,24 61:1
concessions
54:22 139:12,13
conclude
80:4 101:8 122:8
concluded
157:12
conclusion
95:14,22 97:1
condition
113:6 116:11 123:6
conditions
98:24 116:23 147:2
conduct
113:4
confident
73:23
confirmation
31:23 69:2 101:23
142:12 146:16 154:3
confirmed
35:6
confused
114:7 130:9
confusing
140:21
conjunction
10:11 93:23 95:1,2,3
connection
90:6 91:18
consensus
143:6
conservative
65:4 73:18
consideration
153:21
considered
10:3,6 73:24 133:21
consistent
29:2
constantly
44:9
constraints
138:24
constructed
126:9
construction
72:15 126:24
consult
50:21
consultant
72:7
consultants
40:7 42:7,9
consulted
142:17 143:5
consulting
71:4,17

contacted
60:5
contained
124:12,19
contempt
31:22 77:2
context
77:11
Continental
35:16
continually
32:24
continue
5:13 51:6 53:15 54:1
63:22 79:15 94:14
122:9,14 138:16
148:10
continued
5:15 111:12 157:10
continues
61:11 73:15 134:2
continuing
77:14 138:14
contract
61:2 109:21,24
134:9
contractors
39:2
contracts
103:16
contributed
84:21,22 85:2
contribution
14:23 15:1,11
control
22:10
conversation
63:8
conversations
60:7 94:2 149:4
Cook
109:2,16 118:6,9,12,
13 119:14
Cook's
86:6,13
Cooks'
86:22
copy
15:13,20 18:23 50:1
65:20 67:6 68:5
69:18
Cornerstone
81:11
corporate
58:8,17,23
correct
10:9 12:16,20 16:16,
18 17:13,24 18:21
20:14 25:5 27:11,14,
21 28:5 29:20 30:24
31:10,24 33:16 35:9,
11 43:13 47:23 48:8
65:18 67:12 68:3
69:11,15,21 71:10,
11,20 72:10 81:14,
16 82:17,18,22,23
83:2,5,8,10,19 84:23
85:3 86:18 89:17
90:4,5 102:1,11,13,
15,16 103:10,12,13,
22,23 104:15 109
109:18 110:10,22,23
111:1,7,9,11,20
112:8 113:7,14,16
114:5 115:4,17,23,
24 116:3,6,7,12
117:18 118:8 123:3,
11,14,17,18,23
124:9,10,20,24
128:12,24 129:1,17
135:16 137:18 142:2

149:3 152:17 153:6
156:4,5,8
correctly
121:17 133:14 134:5
cost
13:16 36:6 39:9
94:10 95:2 116:19
127:14,19,22
costs
7:24 39:3,7,11,16
40:4,8 41:3 42:3
43:16,17 72:7 79:22
94:4,15,16 126:24
counsel
11:2 46:19 48:3
51:3,4 58:15,17,23
64:7 65:23 87:24
88:12 90:14 93:17
95:15 96:9 100:11
101:8 102:5 104:17
107:6,10 120:7
131:12 132:14,20,
23,24 136:22 142:3
143:14 144:19 145:8
146:7 147:10 148:4,
5 150:6 152:13,16
155:19
counsel's
102:3
Counsels'
153:13
counts
125:9 156:16
county
98:4 147:21 148:5
couple
12:11,22 14:2 23:22
24:11 27:20,22
30:12,21 33:22
42:15,16 129:12
131:3
court
5:3,4,9,14 6:10 29:3,
22,24 31:5 32:20
33:6,18 34:20 36:24
39:12 46:19 50:2,7,
19 51:1,3,7 55:15
62:8 70:17 73:3
76:24 77:5,9,16 80:5
86:12 88:12,17 89:2
90:22,24 93:16
95:15,21 96:17,13
97:2,19,22 99:21,23
100:1,5,11,15,18,22
101:2,7,17 103:1
104:12,16 117:4,8,
12 122:5,7,11,13
123:24 148:9 125:3,6
154:14,17,21 155:3,
10,21 156:6,9,16
157:1,3
court's
38:16,18,19 56:23
58:21 60:9 65:1
149:15
courthouse
53:9
covenant
96:17,20
covenants
95:20 96:18 154:3
cover
54:11 63:4 94:3
135:6

covered
8:9 38:9 85:4 99:14,
15 106:23
covering
11:15
create
17:2
created
14:14 15:3 19:4
114:20 121:16
creating
17:1
credit
15:17 51:11
crews
39:21
cross
50:11,15,17 80:8
101:9,11 122:8,13
cruise
22:10
culvert
127:11
current
94:15 123:6
cursory
156:12
cut
39:10 40:4,9 41:3
70:17
cutting
39:9

D

damage
63:6 72:19,24 73:21
74:14,22 76:12,16,
20,21 126:12
damaged
61:21
damages
36:17 38:21 46:24
59:16 64:6,9 65:9
72:13,21,23 74:13,
16,23 76:22 77:8
79:7,14
Dan
110:12
date
17:8 20:22 21:2
51:24 74:9 82:14
113:1,12 114:1
115:22 121:19
122:20 146:11 157:6
dated
136:23
dates
25:24 26:1,2 27:18
113:16
day
62:22 101:12 128:20
155:6,14,16
days
81:18 129:13
deal
9:20 23:1,16 24:21
59:8 60:1 63:3 75:1,
7,9 81:3 82:6,10,11
99:11 125:5 132:2,9
139:18
dealing
36:13 58:11
deals
15:11 23:1 75:11
97:15 125:18 126:16
debtor
154:2
December
31:4 57:3 59:8
113:13,21 116:1



117:18 136:24
decent
  50:4
decide
  136:2
decided
  85:20 103:20 113:10
deciding
  133:22
decision
  29:21,23 31:5,14
  32:4 33:4,6 42:18
  108:10 142:18
  153:16 156:11
deemed
  109:23
deeper
  76:5
default
  8:20 17:8 48:14
  52:24 64:5 73:15
  99:8
defend
  30:15 70:2 142:18
  153:16
defended
  70:5
defense
  124:8,19,24 125:2
  153:18
defenses
  93:1,7 114:21 128:1,
  8,11 135:24
define
  80:21
defined
  121:14,15
delay
  51:14 65:2 114:20
  116:9
deliberations
  153:22
demand
  103:5,8,12 106:3
demanding
  148:20
demonstrated
  129:11 130:1
Dentons
  16:24 17:2 67:11
depending
  45:2 56:20
deposition
  60:17 152:11
deputy
  151:16
describing
  12:13
description
  152:19
designed
  14:13 77:24
desire
  78:13 139:7
detail
  19:7 134:12
detailed
  19:18
deteriorating
  116:11,15,23
determined
  136:10 146:15
detrimental
  116:12
develop
  80:22 84:1
developed
  80:24
developer
  37:5 78:14 109:19

137:3
developers
  34:14 142:13
developing
  99:1
development
  10:13,17 11:5,8,10,
  14,16 19:9 37:15
  38:11 40:13 42:4
  54:5 62:16 77:22
  78:3 90:14 94:9
  98:22 120:13,17
  123:15 127:8
difference
  84:7 123:21 124:1
diligence
  9:1,5 22:20 24:1
  38:9 57:10 59:2 76:9
  89:9,16,20,22,23
  90:6,16,17 91:10,18
  92:6,14,24 94:19,22
  106:9,11 107:1,3,4,
  12,18 108:10 131:22
  134:8 135:8,9
diligent
  5:18 156:17
direct
  5:11,15 46:20 50:3,
  10,14 51:5 64:7 90:1
  91:14,21 117:14
  119:1 129:7 152:4,
  22
directed
  69:5
directing
  92:1
direction
  30:1 64:12,24 65:3,
  23
directly
  47:8 65:6,24 66:21
  67:20 71:22
disagree
  104:6 109:8
discount
  7:13 74:4,19
discuss
  33:3 57:18 75:22
  138:11 150:6
discussed
  7:5 8:7 28:15 74:18
  82:2 90:13 93:13
  95:1 106:12 107:6,
  10 108:9 153:9,11
discussing
  8:8 25:18 31:18
  89:22 90:15 95:17
  113:3,6,9
discussion
  95:9 135:9
discussions
  23:4 34:11 46:7
  55:12 56:4 57:13
  61:9 93:14 95:10
  111:12 122:22 126:3
  139:6
dismiss
  27:23 29:2,14 30:4,
  9,11,13,20 45:23
  48:20 114:6 143:8
  144:17
dismissal
  29:23 31:2 34:9
  138:7 147:15
dismissals
  31:2,6 33:5 38:15
  48:19,24
dismissed
  30:23 34:4 113:21
  114:2 137:14,18,21
  148:9

dispute
  134:19
disrupting
  43:5,6,8
distributed
  19:5
distribution
  21:19
distributions
  21:4
division
  44:20 58:11
docket
  137:24 147:24
docks
  23:5
docs
  17:2
document
  15:7,15,16 16:13
  19:1,6 52:7,13,15
  66:13 87:9 88:11
  97:9 105:1 121:5,23
  122:1 123:20 132:18
documents
  16:17,22 17:3 21:4
  54:13 67:16,17 82:6
  87:17 97:10,16
  124:23
dollar
  65:5
dollars
  21:23 55:22 79:22
  126:14,22 127:7
door
  117:2
drafted
  146:6
drafts
  58:22
dragged
  27:20 142:1
drags
  63:5
dramatically
  22:18
draw
  12:7 22:21
draws
  12:9
Duane
  28:23 69:23
due
  9:1 51:12,23 52:10
  54:15,24 63:18 64:4
  70:17 89:15 90:6
  92:24 94:22 114:19
  134:8 139:10 156:20
dues
  39:3
duly
  152:2
duties
  62:18 152:15,19
duty
  63:22
Dyke
  67:8,10,13,15,19

E

e-mail
  107:22
earlier
  13:13,23 22:12
  40:11 67:18 83:17
  89:10 117:18 123:3
  142:3 149:13 155:4
early
  22:16 30:7,17 36:2

37:4 38:4 46:5 48:9
earning
  60:13 61:23
Edgewater
  6:17 92:20 121:15
effect
  49:9
effectively
  11:22 39:4 46:9
  63:20
effort
  9:5 38:20 40:8 48:14
  56:24 91:10,18
  94:19 147:3
efforts
  46:23 48:4 55:4
  60:10 89:20 92:6
  138:14 139:9
EI
  23:9
elected
  53:24
Elgin
  6:17 26:24 31:9
  34:2,12 35:3 36:11
  55:14,17 79:1
  122:17,19,23,24
  128:18 129:16,18,22
  130:4,11,12,16
  147:11,13,15,16,18
emergency
  5:5
emphasize
  74:23
employee
  62:14,15,16 152:10
employees
  42:8,9 62:13 78:19,
  20
empty
  109:12 126:11
end
  49:21 51:21 52:18
  54:24 60:22 63:4
  68:18 112:9 129:10,
  17,24 130:2 155:14,
  16
ended
  28:22 62:2 100:5,7
enforce
  115:13 125:4
enforcement
  143:2 146:2
enormous
  78:13 79:6
enormously
  61:21
enter
  10:12 85:20
entered
  33:6 120:13,21
  123:16
entire
  15:7 99:13
entities
  10:19
entitled
  85:6
entitlement
  75:16
entity
  14:11 15:2 53:8
  73:10 77:2 82:20
  104:1 136:6
equity
  14:16 15:1,3 17:19
  40:12 77:24 84:11,
  21
equivalent
  78:3

error
  20:24
escrow
  60:13
essentially
  31:22 35:5
establish
  13:7,14 44:6
estate
  25:18 28:16,18
  31:16 33:10 37:16
  53:21 58:20 83:24
  136:3
estimate
  36:6
estimated
  50:7
estimates
  94:11 95:3
etcetera
  75:17
evaluation
  54:18
event
  60:4,9
events
  5:18
evident
  39:10 56:7
evolving
  44:9
exact
  21:3 26:2,20 119:24
examination
  5:11,15 80:8 90:1
  122:14 131:8 152:4
examined
  152:3
exception
  119:8
excess
  74:19
exclude
  155:12
excuse
  121:20 129:21 150:3
excused
  150:6,10 154:22,24
execute
  56:16
executed
  16:14,17 85:14
executive
  89:8 90:18 94:8
  106:23
exercise
  12:5,22
exhausted
  60:15 63:20
exhibit
  10:10,15,21 15:5,13,
  19,21 16:1,13 18:22,
  23 19:24 49:24 50:1
  51:9,17 52:20 65:15
  66:5,12,14 67:5,7,23
  68:5,21 69:8,18
  71:7,8,9,12 72:4,12
  85:24 86:17,19 87:4
  88:22 91:5,6,15,21
  92:1,8,19 104:21
  108:18 112:12,14,17
  117:15,19 131:7 132:1
  139:10 141:22
  149:12
exhibits
  136:20 149:23
  151:2,8,10

existing
  79:24 123:10
exists
  76:6
expect
  57:6 79:21 151:6
expectation
  74:8 115:2,11,12,14
expected
  20:24 47:24
expeditious
  142:19
expenses
  62:21 67:1 70:13
  80:3
experience
  17:1 33:9 38:6 42:5
  79:9 125:17 143:17
  144:6
expert
  155:13,15
explain
  99:20 153:24
explained
  30:13
explanation
  156:12
explore
  93:7
express
  114:19
extend
  51:20 52:9 54:19
extension
  51:17
extent
  88:11 107:13
extinguished
  21:10
extremely
  57:24 62:24

F

F&d
  91:7 102:18 103:6
  104:21 113:21
  115:16 123:21
  128:1,8 129:16
  130:1 132:13 137:13
  153:20
F&d's
  103:22 114:2 122:16
fact
  18:9 61:8 76:8 94:6
  102:17 109:11
  113:9,12 125:2
  128:15 131:17 132:1
  139:10 141:22
  149:12
factor
  9:12 20:4 105:14
factored
  9:19 38:2
facts
  114:12,16
failed
  49:15
fair
  49:23 93:16 128:13
  132:4,11 133:24
  137:10,11 138:5,6
  142:24 143:4 146:7
failing
  41:12 47:10,19
  104:14
familiar
  58:6 85:17,18
family
  14:7 15:3 17:5 18:1



54:14 63:22 84:2,3,
4,5,13 131:13,17
132:2,6,8
**family's**
15:2
**fashion**
32:19 96:6 118:16
**fast**
143:11
**faster**
126:5
**fastest**
29:13 30:2 32:22,23
143:6
**father**
16:10
**father/son**
118:15
**February**
70:14 137:23
**fee**
64:13
**feedback**
24:9 36:1,7 95:3
**feel**
17:7 48:8 53:16
98:15 126:19 155:1
**fees**
36:13 39:1,20 40:17,
19 43:12 53:13 64:8,
18 65:24 66:8 67:1
68:1 70:13,19,21
71:4,5,13,14,17,22
72:15,24 79:15
**felt**
24:13 36:8 53:3 58:6
95:6
**Fidelity**
8:17,21 18:9,14
24:3,16 25:3,7,8,17,
20 26:4,9,13 27:5,
12,20,24 28:1 29:4,
22 30:12,21 31:8,21
32:19 33:1,15 35:10
37:8 38:14 39:11,13
46:8 47:22 48:18
49:3,8 52:10 55:8,
17,19,20 56:19,20
57:15 60:2,4,7,10,18
61:10 64:15 65:7
66:1 70:3,10 75:3
79:19 103:19 124:4
127:9 129:11 135:3,
13,14,17 136:1,5
137:17,21 138:15
139:14,20 140:7,13
141:10,13,22 142:16
143:10,11 144:5,21
145:6,7 146:15
147:23 148:9,18,23,
24 149:5,6 152:10
**Fidelity's**
38:22 41:20 55:3
57:22 60:20 63:19
64:2,6 66:22 67:14,
21 69:2 70:14 71:23
72:14 77:2 136:15,
20 138:3
**fight**
98:1
**figure**
72:9
**file**
26:13 27:19 29:14,
22 30:3 32:20
115:20 116:5 143:2
144:16 146:2 156:6
**filed**
26:9,12 27:8 30:9,
11,20 31:21 32:5
36:12 38:19 48:18
111:16,19,23 113:19

115:23 124:17,23
128:2,5 155:16
156:1,3
**filing**
114:20 116:9 154:10
**filings**
29:2
**final**
64:2 79:17 88:1
**financial**
17:22 19:18 22:22
79:20
**financials**
12:11 22:16
**financing**
51:11 52:10
**find**
9:2 23:12 53:11 78:7
86:11
**fine**
101:6 156:14,15
**fines**
39:21
**finish**
34:22 90:10 101:10
124:3
**finished**
47:16 48:1 78:12
**firm**
16:24 26:19 32:13
53:21
**firm's**
68:1
**five-minute**
23:10
**fixed**
47:12
**flow**
62:20
**flows**
63:1
**fly**
41:23
**flying**
42:16
**focus**
38:15 93:18
**focused**
6:3 7:4 8:5 93:19
**focuses**
62:14,15
**follow**
99:1 100:2 154:16
**follow-up**
107:9 139:6
**force**
143:11
**forced**
54:8 77:21
**forego**
75:4
**foregoing**
109:17 133:7
**forget**
136:18
**form**
143:23
**formal**
58:24
**formed**
81:15 82:16,24
**fortunately**
58:8
**forward**
7:18 14:6 32:16
34:21 124:5 142:20
**forwarded**
25:9,13 119:13
**found**
137:14

**foundation**
34:19 95:13 96:24
**four-year**
20:13,19
**frame**
112:8 120:9
**frames**
38:16
**frankly**
25:10
**free**
48:8 138:15
**Freeborn**
32:11 65:12
**Friday**
155:17 156:2,9
**front**
22:1 104:22 113:15
126:10
**full**
73:13 109:15
**full-time**
42:7,9 62:13
**fully**
13:3
**function**
37:5 52:13
**functions**
11:15
**fund**
12:9 14:15,20 17:1,4
23:2,5 75:11,22
77:24 84:1,11
**funded**
14:10
**funding**
15:3 16:21
**funds**
14:13 60:5
**furnished**
90:8 92:20
**future**
23:2 34:14 57:7
62:21 123:17 153:13

---

## G

**G-R-E-G-O-R-Y**
151:21
**game**
14:22 18:2
**gave**
25:15 53:12 100:4
123:24
**general**
11:2 21:24 62:18
126:6 128:14 142:8
151:4
**generally**
6:11 11:5 61:5 126:8
132:24 151:9
**gentleman**
83:15,16
**gentlemen**
155:5
**Gerald**
65:12,17
**give**
15:12 19:14 40:4
93:17 131:3 153:21
**goal**
47:15
**Goldman**
83:22
**good**
5:17 27:2 80:10,11
114:16 117:5 122:3
131:10,11
**Google**
77:20

**grading**
127:9
**grand**
67:1 68:1 69:13
**grant**
60:24
**Gregory**
151:13,21 152:1,7
**ground**
11:24 38:11 125:22
**grounds**
96:23 153:17
**group**
16:6 53:11,20 82:19
83:3,7 84:11 112:19
132:6
**Grove**
6:21 26:17 27:4
28:10 30:10 91:16
129:24 130:4,6,15
135:20 147:19
**grow**
23:13 78:18
**guess**
29:5 48:20 64:24
112:7
**guy**
79:5
**guys**
11:24 44:21

---

## H

**half**
24:24 26:7 50:5,9,14
79:22 100:20,24
101:3 140:20 141:19
**hand**
15:20 18:23 66:12
**handing**
67:6 68:7 69:18
**handle**
111:6 151:4
**handled**
151:3
**handling**
111:8,13
**handshake**
17:5 82:6
**hanging**
138:4
**happen**
61:4 62:1 64:4 75:9
148:16
**happened**
49:5 59:6 78:5
130:16
**happy**
46:6 92:11
**hard**
15:12,20 20:22 50:1
65:20 67:6 68:5
69:18 76:23 97:6,10
**heading**
11:4
**health**
47:20 99:12
**hear**
77:5
**heard**
28:17 32:9 143:15,
19
**hearing**
100:1 156:18,20
**hearsay**
34:16
**heart**
131:2
**hedge**
84:11

**heighten**
131:21
**held**
5:2 31:22 63:15
95:12 125:20
**helping**
83:24
**hey**
14:1
**Hicks**
105:17,21
**high**
13:20 19:12
**high-level**
25:14
**highlight**
121:10
**highlights**
19:16,20
**Hill**
5:8 6:15 8:16,18
38:7,9 51:2 79:3,4
81:6,8,12,19 109:19,
22 122:12 133:18
133:13,14
**hire**
29:19 40:7 42:6,7
78:20
**hired**
40:10 53:20
**hiring**
28:22
**history**
80:12
**hit**
21:18,21 74:15
**HOA**
12:3 39:3
**hold**
13:2,3 20:16,19 22:5
61:16 74:6
**holding**
49:22 53:18 74:8
**holdings**
58:9 83:9,11 84:20
**home**
47:3,9 126:8,12
**homeowner's**
41:8
**homeowners**
40:5 41:11 46:15
47:1,6,8,24 78:22
79:2 99:13
**homeowners'**
39:2,23 40:1 45:14
47:3 78:21
**homerun**
13:1
**homes**
43:19 47:24 48:1
109:20 116:22,24
117:1 138:23
**honor**
35:13 46:17 62:5
80:23 93:12 99:17
100:9 101:14 131:4
149:19 150:23
154:12
**honoring**
39:13
**hope**
122:7
**hour**
50:6,10,14 100:20,
24 101:2,3
**hours**
101:12,13
**hundreds**
19:17 68:13

**Huntington**
6:18 26:18 30:10
91:23
**hurt**
45:6

---

### I

**idea**
151:11
**identified**
17:14,17 72:14
**identifies**
70:13
**identify**
40:8 44:7 65:24 87:5
105:1
**Illinois**
43:18 154:8
**imagine**
82:13 108:23 110:16
118:5
**immediately**
21:9 25:9,12,17
27:15 28:15 31:13
32:3,10 44:13 50:10,
17 57:5 115:3
**imminent**
49:14
**impact**
61:11 63:14 77:1,6
78:13 116:19
**impacted**
43:2 47:10 116:17
**importance**
37:6 90:2
**important**
19:20 20:4 42:12,24
44:6,22 45:13 62:24
76:24 77:5 89:11
134:10
**imposed**
154:4
**improvement**
9:17 94:4
**improvements**
8:3,9,24 9:22 18:11,
15 35:22 47:12,21,
23 54:5 57:15,19
78:11 93:10,22 94:8,
12 98:14,16 99:11
104:4,10 106:14,18
110:6 115:4 116:10
117:24 123:23
125:15,16,19,21
126:5,7,20 133:13
134:20,23 135:4
137:4 138:21,22
139:17,22 140:4,11
154:5
**inability**
64:2
**inappropriate**
125:7
**inaudible**
88:11
**incentive**
20:21
**included**
11:18 54:10 67:16
**includes**
76:21
**including**
150:18
**income**
62:21
**incomplete**
54:5 57:15 78:12
138:22 139:16
**incorrect**
127:6



increasing
40:19
incur
39:20
incurred
36:13 70:21 71:4
80:3 119:5
incurring
79:15
indemnification
58:23
indemnity
59:19,23 60:3
independent
54:18
indication
24:3,15 25:2 57:22
individual
108:5
individually
133:11
individuals
46:24
information
19:18 20:9,10 37:11
38:8
informed
12:15 47:8,17
Ingham
6:19 35:23
initial
22:4 23:11 30:9
48:13
initially
40:19
initiated
33:7
injunction
153:22
inquire
9:2
insensitive
54:6
insistence
58:16
install
123:22 125:15
installed
115:4 126:8 127:3,5
128:12
instances
30:21 36:11
instruct
62:8
instructed
7:17 17:2 31:13
32:16,21 45:18
66:20 67:19 70:8
instructing
45:24
instruction
101:15
instructions
65:7
insurance
125:14
intend
77:6 155:15,19
intended
17:6 18:10,14 19:13
24:3 75:11 84:10
141:2,16
intent
12:22 13:2 49:5
59:1,2
interacting
46:24
interactions
46:14 47:1

interest
17:8 44:10 52:8
56:10 60:14
interested
45:20,23 48:15 57:8
58:9 76:3 109:19
internal
7:10 13:15,19
internally
7:15 94:11
interpretation
109:17 110:14
invest
78:17
investigate
94:6
investing
76:3
investment
73:6 84:10,16 89:21
116:18 131:19
Investment-wise
78:15
investments
15:4
investor
14:17 17:20 20:7
22:10 61:20 74:7
76:2,10 132:1
investors
19:13 61:7,18 74:5
75:23 78:17 142:13
invoices
64:13,18,20,21 68:7
70:9
involved
22:20 35:12 44:5
57:12 127:7 129:4
130:15 132:2
involvement
22:3
involves
78:8
IRR
74:16
irrevocable
8:15 99:5
issue
77:8 78:20 103:19
111:4 134:19 155:11
156:23
issued
47:22
issues
36:14 41:20 47:7,19
59:10 125:6,20
138:15
items
76:18 80:3 125:21
134:24

J

January
59:17 109:3 110:4
140:1 141:9
jeopardize
61:6
JNI
10:20 11:2 12:13
85:14 86:3 89:16
job
79:11 87:19
jobs
63:9 79:9
John
132:7
Jonathan
58:12

judge
34:16 50:18 55:23
57:4 80:7 85:10
88:13 90:20 95:16
102:22 122:4 131:5
150:15 153:24
156:14
July
32:1 152:23
jump
27:15
jumped
21:23
June
68:19 69:14 113:19
114:1,14 140:19

K

K-I-L-B-U-R-N
151:22
Kane
147:21 148:5
Keegan
83:15,16
Keeping
150:17
Kevin
58:12
Kevin's
58:12
key
20:4
KHI
101:24 102:4 121:16
kid
42:23
kids
47:13 132:9
Kilburn
60:17 143:15 144:5
151:13,22 152:1,6,7
154:11,19
Kilburn's
144:3
killer
154:15,16
Kimball
5:8 6:15 8:16,18
38:7,8 51:2 79:3,4
81:6,8,12,19 109:19,
22 122:12 133:18
153:2,14
kind
7:12,17 8:15 13:21
14:19 22:14 23:1
38:10 40:17 44:13
46:4 53:9,19 56:6
73:5 75:11 84:11
88:1 126:18 143:9
kindness
131:1
knew
44:23 45:1 75:9
102:6 142:4 145:14,
18,22 146:1,2 147:6
knowing
29:15 65:1 79:20
80:16 97:4
knowledge
36:20 37:4,24 38:3,5
Kut's
11:1
Kyte
5:9,12 10:24 15:19
18:23 49:24 80:10
114:18 117:14
122:13,16 131:10
149:18,21 150:3,5

L

lack
34:19
Lake
23:21
Lakes
6:21 35:19
land
28:19 62:16 77:22
95:12,20 96:19,20
154:4
landscape
39:23
language
148:19
large
13:18 65:1,2 95:9
137:7
larger
132:21
Las
23:16
lasted
59:4
law
16:24 26:19
laws
119:10
lawsuit
25:20 26:3,9,12,21,
24 27:21 28:13
38:14 46:9 49:8
56:21 111:17,19
113:19 128:24
135:17 147:10
lawsuits
26:13 27:13 30:3
36:20 38:18,24
78:10 128:2
lay
62:7 97:3
lead
53:7
leading
5:18
learned
37:9
leaving
42:2
led
8:11 9:6 59:2,3
89:20
left
5:17 51:9 58:10
62:23 93:10,23
129:13 138:21
legal
25:10,13 29:6,18
30:3 32:10 38:10
39:1 60:6 64:22 65:6
71:3,13 95:14,22,23
96:24
legally
103:22
Legend
6:21 35:19
lender
16:9 52:24 53:1
54:19 78:6
lenders
17:23
length
151:15
letter
25:9,10,16,22 26:8
49:5 58:24 59:2
103:8,20 105:3,6,22,
23 106:2,4,5 108:22
109:1 110:18 111:2

112:19 113:1,12
114:18 115:22
116:14,21 117:7,18
118:4,10 119:13
120:3 121:20 136:22
137:10 139:24
140:10 144:23
letterhead
110:10,11 118:10
letting
45:21 46:6 53:8
level
19:12 31:15 32:22
144:16
leverage
79:19
liabilities
119:6
liability
28:2 75:19 111:5
135:19 141:17
153:18 154:5
liable
103:15 104:3 110:5
119:18 145:1
lifted
45:9 64:1
likewise
67:19 70:8 137:18
limited
62:23 75:16
lines
51:11 74:18 80:15
127:4
Lipke
69:9
liquidate
121:16
list
44:13 57:7 71:17
125:21 156:22
listed
11:21 109:21
litigation
29:3 34:2 39:5 42:18
44:23 47:5,18 48:22,
23 49:12,16,17 53:5,
17,20 55:11,15
56:19 64:14 68:11
72:7 75:3 76:4,6,8
77:21 78:16,18
94:14 113:4 123:10
124:7 126:4 128:1
143:17 145:6 147:23
live
42:24
lives
132:4
living
23:7,8 41:11 138:23
LLC
84:15
loan
15:9,10,16,22 16:14
17:6,8,9,14,17 20:12
21:10,17 48:12,13
51:10,18 52:14
54:11,15 67:15,17
73:13,21
loaned
84:24
loans
64:3
locally
28:16 42:6,13
located
6:12
locks
99:5
LOIS
79:24

long
16:23 42:14 49:21,
22 57:23 59:5 77:7
93:15
longer
75:21 122:5 138:15
looked
7:8,15,24 9:23 10:1
14:13 19:15 40:14
124:22 136:9
lose
131:15
losing
40:15 78:5
lost
135:20 137:12
lot
11:14,15,16 13:16,
17 17:1 22:13 23:17
33:1 39:16 40:2,20
41:7,14,16 42:10
44:4 47:5,11,12 58:9
59:11 62:17 79:19,
23 116:13 126:11,
15,17,18,23 127:7,
15,18
lots
6:14,15 13:13,17
14:23 39:5,20 43:19
44:23 45:6 48:16
49:6 55:11 59:8,17
61:2,3,12,14 62:3
63:23 109:12
121:13,15 124:5
126:7,17 127:15,17
137:15 138:18
139:3,5 141:2
142:13,14
low
39:7 43:20
lower
39:1 43:22 59:11
lucky
53:6

M

made
5:22 9:20 18:9 29:21
33:4 43:4 46:7 48:16
54:15,22 55:5 60:22
87:21 106:3,16
107:5,9 108:1,10
114:24 133:1 141:15
153:16
main
11:23
maintain
45:8
maintained
137:21
maintaining
39:20
maintains
60:18
maintenance
12:1,12 39:16 40:2
41:7 43:24 133:10,
12
major
22:18
majority
72:2 89:22 125:20
127:21
make
9:13 12:14 42:18
44:24 49:20 55:19
65:3 88:1 89:11
123:9 126:9 148:15
155:22



makes
30:16 134:15
making
88:7 131:22
manage
12:13 42:6,17 53:12,
16 54:1
managed
83:13
management
10:13,17 11:5,8,22
12:5 19:10 22:10,23
24:7,10 37:13 40:13,
16,18 42:3 52:21
54:5,6,9 62:15,18
72:15 83:14,23
84:17 118:7,19,22
managements
22:9
manager
11:10 14:15 24:6
105:7 110:21
managers
94:9
Manhattan
23:8
manufacturing
84:8
map
98:22 99:4
March
38:16,19 48:9 55:4
56:12,22,23 57:2
114:10 137:24
margin
44:19
marked
52:19 65:14
market
13:3 14:1 56:24
74:11
marketing
12:18 23:3 57:12
Maryland
152:11
material
23:3,4
math
10:5
Matt
58:4
matter
5:6 34:18 66:18 76:7
79:16 110:24 144:12
153:12
matters
144:11 153:14
maturity
8:2
Mchenry
6:21 35:19
Meadows
92:9 112:3 113:7
116:3 123:11
meaning
42:4 65:5
means
37:18 63:6 95:24
150:24
meant
30:14,17 130:6
measures
39:9
mediation
55:16
meet
151:7
meeting
46:12 55:16 56:9
57:12 106:8 107:9,
11,23 108:4 112:10,

11 138:10 140:22
153:6,8,11
meetings
8:7 9:7 41:9 46:4
47:3 89:8,22 90:16,
18 94:9 95:17 104:8
106:10,11,24 108:9
112:1,4
member
52:8 83:9
members
82:16,22 83:4 93:24
memo
32:13
memory
25:24 27:2 85:8
114:3
mentioned
7:3 12:24 14:7,18
22:12 23:15 33:9
40:10,11 43:1 48:4
51:10 59:19 65:10
75:7,23 83:16 108:6
112:8 127:14
merger
58:10
message
24:12,18 55:22 56:8
met
120:6,10
Michael
67:8,10
middle
67:24
Mike
110:12 132:8
million
7:1,17 8:12 55:21
61:22 74:15,17,20,
24 79:21
mind
11:4 96:8 99:22
150:17
mine
16:11
minority
84:14
minute
59:10
minutes
50:23 100:21 101:1,
3 122:6 131:3
150:16
minutia
37:16
missed
68:14
missing
6:22
misstating
114:11
misunderstanding
137:7
mitigate
38:13,21 46:24
59:15
model
78:1
models
19:18
moment
20:12 57:3 75:20,21
Monday
156:3
money
13:18 21:8 43:3
51:22,23 53:18
60:12 61:7,24 65:2
75:18 126:18 127:18
131:15

monies
54:24
Montgomery
6:19 26:18 27:4
28:10 129:2,5 130:3,
5,7 147:18
month
25:21 40:14,15,17
41:24 63:14
monthly
12:6 22:13,21 37:13
months
24:20 30:12 36:10
59:4 63:7 136:1
138:3 141:15
Morris
28:23 69:23
motion
5:5 27:23 29:2,14
30:4,9 31:20,21 32:5
45:22 125:4 143:2,8
144:17 146:3
155:12,16 156:1,19,
22
motions
30:5,11,13,20 48:20
114:6
movant
150:21,22
move
7:18 32:16 42:19
43:4 63:10 76:10
85:10 90:20 99:17
102:22 104:11
138:17 139:3 146:22
moved
18:19 41:15 44:3
132:3
moving
41:17 45:7 46:23
mowing
39:19
multiple
82:3 120:6
municipal
8:23 28:20 34:11
45:19 95:1 97:11
99:1,2,16 148:21,22
municipalities
8:22 9:8 24:8,9,13,
14 26:15 27:15 28:3,
4,7 29:8 35:18 36:2,
8 39:21 45:15,21
46:5,15 57:13,18
70:6 78:9,10 95:4
115:2,12,14 125:17
128:3 133:12 134:22
143:12 148:21
149:1,5,9
municipality
8:17 26:9 55:17 99:6
104:8 106:9,10
135:9

N

named
83:15
narrative
46:17
national
53:21
naturally
13:8
nature
11:19 98:13 131:23
naval
83:21
navy
83:21

necessarily
56:10 126:9
needed
9:22 14:21 41:13
46:2,13 134:24
negotiate
38:24 43:12,22 61:6
negotiating
146:21
negotiation
61:5 126:15
negotiations
79:24
neighborhood
127:8,9,13,16
Neil
83:15,16
net
60:12
nice
23:10
night
41:22,23
nominally
13:18
non-attorney
30:14
non-binding
55:15
non-legal
148:20
nonetheless
104:13
nonexistent
8:20
nonlegal
49:17
nonresponsive
90:21 99:18
normal
7:13 17:4 40:16
59:12 61:4 78:16
north
7:9 55:21 74:14,16,
20
note
51:23
notice
25:7 26:4 28:13
57:20
notified
52:24
November
118:21 119:14,17
120:8
nuanced
97:17
number
7:2,17 15:8 29:11
65:10,15 66:12,14
68:5,21 72:20 73:21
74:6,8,19,22 91:5,6
104:21 132:16
numbers
10:2 16:4 62:22,24
63:3 72:9 73:12
74:12 76:23

O

oath
5:10 50:21 51:4
151:14,17
object
34:16 88:10 96:23,
24
objection
62:5 76:17 77:15
95:13 143:23 151:9

objectives
84:16
obligation
134:4
obligations
24:12 35:14 39:14
43:7,9 57:17 87:14
98:9,18,20 104:4,9
142:5
obtain
31:1 33:4
obtained
31:2 33:5 34:8 49:1
65:11 147:15
obtaining
38:15
obvious
150:12,20
occupation
109:13
occupied
99:13
occurred
155:17
occurring
21:17
October
141:12
offer
8:12 13:17 46:1 49:5
55:20 138:18,19
139:12
offered
34:18
offers
56:13
office
14:8 18:1 23:9 41:6
54:12,14 62:18 84:2,
3,4 98:5
official
81:4
Olson
107:15 109:2
112:21,23 136:23
Olson's
117:17
ongoing
22:3 61:10 75:3
79:24 122:23 123:5,
7,8,12 136:6 139:9
open
5:3 100:5 147:5
operation
119:9
operator-capital
14:19
opinion
6:4 60:20
opportunities
23:13,17,19
opportunity
13:13 18:20 33:2
74:6 75:21 76:11
96:9 100:12
101:9 104:16 126:2
148:14
opposed
42:2 64:15
opposite
18:12 24:5
option
53:10,11,15,24 56:7
143:3
options
53:3,4
oral
57:4 146:20
order
31:23 38:17,20 41:3,
19 55:4 56:12,22,23

57:2,11,17 58:21
59:15 60:9 61:8 64:2
69:3 74:12,15,17
79:16 99:3 101:23
124:4 142:12 149:15
ordinarily
59:20 60:24
original
8:15 40:22 67:15
originally
51:10 74:10 77:23
outline
11:11
outstanding
8:8 55:21 56:5 75:19
94:13,16
overcome
29:5,15
overhead
54:10,11,12
overly
65:4
overturned
60:10
owed
55:8
owned
84:13 131:13,18
owner
10:22 60:21 106:13,
17 141:2,4
owners
34:14 35:4 84:14,15
119:10
ownership
54:8 107:20
owns
14:12

P

p.m.
101:5 122:8 157:4,
11,13
Pacific
63:21 87:19 132:5
packages
57:10
packet
48:7
pages
19:17 68:13
paid
17:23 40:14,17
135:14
paragraph
20:2 71:13 89:6
109:16 119:4
121:10,11 132:21,22
145:8,10,17,21
146:9
parents
83:12
pari-passu
21:6,11
Park
6:19 35:23
part
5:21 7:23 9:1,5
11:23 14:3 19:9 29:1
40:21,23 41:22
43:23 44:1 45:7
46:6,11,18,23 54:11,
22 61:4 62:6,19
75:11 87:2 89:21
91:10,18 92:5,13,24
93:13 94:14,19,22
95:9 103:1 112:2
126:2 127:21 135:8
136:8 148:19,23



participate
14:5
participation
10:13,18 11:6,8
partied
49:8
parties
156:10
partner
69:10 85:12
partnering
81:24
passed
20:6
past
63:13
path
32:23,24 143:13
patience
150:8
Paul
69:20 130:21
pay
5:23 6:5,7,8,24 7:12
25:3 56:5 60:6 73:13
payback
21:9,16 73:20
paying
39:15,16 53:8
payroll
63:4
pending
36:23 49:13,16
100:4 116:2 124:7
139:11 147:20
people
29:19 42:6 45:2
63:8,10 80:16 132:3
138:23
people's
138:22
percent
7:10,13 14:22,23,24
15:10,17 17:10,12,
20 20:7 21:6,9,23
44:19 60:13 73:10,
23 74:6,7,13,16,19
84:21,22,23 85:2
percentage
54:8
perform
62:20 64:7,8 67:13
performance
20:3
performed
89:16 94:11
period
5:18 12:21 13:2,24
20:16,20 22:5 23:12
41:18 42:24 48:17
56:3 59:3,4 60:15
61:23 63:14 74:6
80:14 106:9 107:1,3,
4,18 108:10 119:8
146:19 152:23 153:1
permission
144:7
permits
60:8
persist
34:9
persistence
41:21
person
49:15 54:2 79:8 97:3
107:21 148:20
personal
43:6,10 131:20
personally
13:12 41:2,14 42:17
47:2 81:1 91:20

92:7,12,13 93:4,6,8,
12,17,21 94:1,20,22
136:9
perspective
22:11
pertinent
154:7
Peter
10:24
Peters
65:12
petition
111:22
phase
23:6
phases
38:4
phone
120:12 133:15
phonetic
11:1 58:12 105:16
phrasing
104:6
pick
101:19
picture
19:14
piece
7:12 9:17
pieces
40:3
pipeline
57:7
place
8:14 10:8 11:23 12:1
22:8,9 37:6,17 38:1
73:14 90:3 94:3 95:7
135:7,12 151:16
plaintiff's
152:7
plan
7:7,8 19:4,15 22:7
90:1 101:23 110:1
121:12,13 124:8,11,
13,20 145:15,18,22
146:16 147:7 153:21
planned
13:9,10,11 20:19
pleadings
124:17
pledge
52:8
plenty
100:11
plummeting
116:23
point
18:4,8 19:13,14
22:21,24 23:7,8
29:12 48:22 49:1
50:11 57:6 61:21
68:10 74:21 76:1
91:9 99:14 105:23
112:13 126:19 136:6
138:11 148:8 149:20
155:6,24
pointed
89:24 112:14 156:17
policies
125:14
Polsinelli
67:11
portfolio
13:8,22 14:2,3 20:1
81:9,19 85:13 105:8
portfolios
104:3
position
25:14 61:6 73:15
79:20 103:20,22
107:7,12,19 110:3,7,

8,9 119:5,20 152:13
positive
26:22 32:7
possibly
39:7
post
99:3
posted
91:7 92:2,8 133:10,
19 135:3
potential
45:12 54:4 150:21
155:7,12
potentially
53:7 58:19 126:12
127:10
potholes
47:13,20
precautions
50:20
predecessor
133:9
preferred
21:6,18,20
prepared
65:22
preparing
153:2
presented
30:18 141:4
president
58:11
presidents
44:20
pressure
139:14
pretty
8:7 19:18 21:21 27:2
46:16 78:15 82:14
Pretzel
34:18 58:18
prevent
78:16
previous
38:6 42:5 87:19
100:6
previously
151:14
price
6:4 7:19,21 9:2,19
32:14 37:19 58:19
59:11 133:24
pricing
38:2
primary
8:21
principal
58:3 62:12 83:6
principals
83:11
prior
18:13 27:5 108:14
private
77:24 83:22 84:11
pro
21:12
problem
46:11
proceed
37:2 90:4
proceedings
5:2 157:5,8,12
process
5:21 6:1 8:11,23
12:1,12 18:4 20:18
21:19 24:1 29:12,18
32:4,6 42:22 45:23
58:6 59:15 62:2
63:13 89:23 94:14
126:5 142:11

processes
27:23
professional
43:6,9
profit
13:19 14:5
progress
22:4 54:16 55:19
138:12
project
7:19 8:8 9:16 10:22
12:8,14 14:9,10
19:21,22 21:13 22:6,
17 23:19,21 24:6
37:13 43:1,4 44:8,
10,12 45:3 57:8
62:17 72:14 73:22
74:8 79:22 81:10,11,
12 82:15 91:7
projected
7:9
projecting
77:13
projections
62:20
projects
11:15 13:9 23:22,23
42:10 47:4 53:19
57:9,12 75:15,18
78:8 81:8 94:7,17
prolong
149:7
promote
21:7,22
properties
5:23 6:8,11,12,24
11:18 35:13 56:14
57:1,21 63:15,17
78:2,3,5 82:3,7
102:6,10 138:4,9,17
146:22
property
7:12,20 9:14,18
10:4,7,12 12:2 18:10
22:2 25:1 26:8
33:11,20,23 35:20
39:6,15 42:17 43:19
49:22 53:12 60:19
72:19,24 74:10 81:7,
24 98:7 99:2 101:22
110:22 115:1,17
119:6 133:9,13,22
135:7,23 141:20
147:2
protect
60:15
protections
102:15,17
provide
12:10 53:2
providing
22:22
provision
49:10 88:16,18 89:1
provisions
89:6 114:22
public
99:10 104:3 106:18
110:6 117:24 125:23
126:5
published
78:22
pull
132:20
punch
125:21
punitive
76:22 77:8
purchase
5:19 9:2,19 14:10

18:5,8,14,16,17 25:1
33:20 37:18 49:6,11,
18 59:3 85:13 86:2
87:2,6,13,17,20,22
88:4,6 125:8 133:22
purchased
18:10 22:2 101:21
121:13 135:23
141:19
purchaser
133:7 134:2,3,14
137:15
purchasers
45:12 60:11
purpose
16:20 39:10 48:11
52:12,22 135:5
142:11
purposes
48:12 136:19
pursue
18:10 20:22 24:16
29:10 34:13 35:4
57:23 60:11 64:3
124:1 136:2 139:7
141:4,16 143:21
149:9
pursued
33:21 38:14 139:8
147:8
pursuing
37:8 39:11 115:3,15
146:16
pursuit
61:10
pushed
59:13
put
14:15 17:10,12
19:10 21:12 32:4
46:9 48:7 65:8
75:12,14 98:16
124:3 125:16 144:20
151:14
putting
21:13,14 57:9

Q

qualified
29:1
question
36:23,24 37:22
64:16 77:17 85:1
91:1 95:23 96:1,3,14
97:5,22 98:17 99:22
100:3,6,7,14 124:16
125:12 128:6 131:19
150:11,12,21
150:15,16
questioned
152:17
questioning
37:2 48:3 142:6
questions
46:2,20 47:11 85:5
96:9 103:4 104:17
142:3
quick
32:13
quickest
143:13
quickly
32:16 45:10 47:17
quote
109:12,21,24 119:7

R

raised
41:20 116:8 124:7,

18 128:11
raising
128:1,8
ran
137:24 154:4
rata
21:12
rate
7:10,13 13:15,19
17:8
rates
43:22 74:5,19
raw
9:17,21
RCLCO
53:21
reach
32:24
reached
82:13 149:13 155:6
reaches
79:17
reaching
31:16
read
77:17,18 91:1 95:4,8
96:3 99:23,24 109:9,
13 110:1 115:6,7
121:17 133:13 134:5
reading
15:7 36:21 89:1
90:13 91:2 94:23
95:8
reads
121:11
ready
23:5
real
17:22,23 25:18
28:16,18 31:16
33:10 37:15 53:21
58:20 83:24 132:4
reask
131:19
reason
48:16 106:15,20
129:23,24 148:13
reasonable
56:13 61:12,15 62:3
reasons
102:9 148:17
rebuttal
150:22
recall
5:19 48:5 89:13
91:2,8,12,17,20,22
92:9,16,20,22 94:1,
10,23,24 95:8,10
103:18 106:20,22
107:22 108:7,12,16
113:23 119:15 120:6
122:4,21 130:19 133:2
139:23 142:6 147:11
149:21 155:10
receive
24:15 56:13
received
25:23 103:5 123:21
154:2
receiving
25:7 28:13
receptiveness
57:21
recess
50:24 122:10 157:3
recital
146:6
recognize
11:85:24 86:5,22
recollection
9:6 24:18 92:18



103:7
recommendations
53:22,23 153:13
recommended
32:12,14 110:15
reconvene
156:10
record
5:6 13:7,14,21 51:1
68:6 75:23 77:18
99:4,24 115:7
151:20 156:13
recorded
98:4 154:4
recorder's
98:4
recovered
13:3
recovery
53:7 63:6 124:4
redirect
100:12,23 122:8
131:6,8 136:19
reduce
43:16
reduced
43:17
reductions
39:6
refer
110:20
reference
109:5
referenced
90:19 125:8 126:16
144:19
references
72:19
referencing
135:24
referred
110:18,24 111:2,4
148:4
referring
88:19 104:9 136:19
refilled
60:4
refinance
54:7
refinanced
51:15
reflected
130:23
reflects
73:5 74:22
refresh
92:17 114:3
regard
50:22
regular
94:13
regulations
97:13
rejected
103:16 109:24 119:7
related
38:7 52:9 64:9,14
65:6,24 66:8,21
67:13,20 69:13
70:13 71:22 72:13
79:16 80:3 118:12,
16 123:10
relates
97:13
relationship
14:19 80:23,24 81:5
82:2
relationships
44:7 45:8,11,14 78:6

release
121:12 124:8,10,19
145:11 149:6
released
102:19,24 122:19
142:4,5 145:15,18,
23 147:7
relevance
76:17 77:14
reliance
121:12
reliant
101:22
relied
102:5 103:21 145:11
relying
102:3
remain
50:21 51:4 135:7
remained
114:10 135:12
147:20
remaining
6:15 14:24 17:11
94:3 138:21 155:7
remains
95:24 139:11
remember
21:24 25:12 49:14
89:1 92:13 93:14
99:21 112:6 129:4
remind
5:10
remotely
11:20 75:1
removal
43:22
remove
64:13 66:21 67:20
69:5 70:9
rep
49:13,20
repair
116:19 126:13,23
repeat
37:20 64:16 96:14
124:14
rephrase
37:21 143:24
replace
9:4,9,11,24 18:5
38:3 134:4 135:11
replacement
20:2
reply
156:7
report
74:18 102:5 153:2,5
reporter
99:23
reporting
22:11 40:18 54:7
reports
12:14 95:7
represent
91:6,15 92:2 121:7
representation
134:15
representations
88:8 123:9 133:1
representative
17:3 108:3 121:7
representatives
58:18,19 105:4
represented
26:19 66:18 133:17
134:7 135:10
reputable
76:3

reputation
76:13 78:21
reputational
79:6
request
12:7
requested
34:12 77:18 99:24
115:7
require
11:19 42:5 99:3
135:10 148:18
required
14:15 40:7 41:9
requirement
9:11
requirements
9:3 10:8 75:10
requires
78:2
requiring
148:21
research
28:21
reserve
14:16
reserved
149:14
reserving
149:1,20,24 154:18
residential
109:12 141:3
residents
116:12
resolution
79:17
resolve
126:21 156:21
resolved
132:10
resources
75:13
respect
11:9 16:20,22 18:16,
17 23:15 63:2 64:24
89:9 91:11 93:2
104:2 115:12 139:1,
9,10 148:2
respond
25:15 28:14 69:1
108:10 120:3 141:9
143:7
responded
32:18 103:11
respondent
151:1
responding
103:22 140:12
response
25:16 30:11,15,16
58:13 88:12 100:9
103:4,14,19 107:11
108:13 110:13,15,18
117:17,22 139:21
140:3 156:2
responsibilities
11:9,12,21 39:24
41:16 62:19 152:16,
20
responsibility
95:5 99:9 127:20
141:23
responsible
12:17 39:19 55:8
75:17 78:23 90:12
98:8,16,18 106:14,
17 117:24 126:20
137:4,10 139:22
140:3,11 141:10
responsive
90:22

rest
127:12
restate
73:19 115:5 124:15
restatement
87:18
restates
117:23
resting
150:22
result
29:8 36:20 38:21
51:14 54:2,9 57:15
64:6,23 65:2 76:13
78:1,6 102:15
resulted
32:8 116:9 153:5
resulting
121:13 145:16
resumes
60:10
retained
69:1 70:2
retrade
59:9,16
return
7:10,13 13:15,19
21:6,18,20 61:7,17
73:6,10,22 74:13,17
returning
21:1
returns
7:9 74:5 75:24
revenue
21:5
reversal
31:11
reversing
31:5
review
18:24 64:13,17,20
65:20 68:12 70:8
85:19 87:16 90:7
92:5 94:18,22 102:3
reviewed
53:22 64:21,22
66:20 68:9,15 87:20
88:4 90:23
reviewing
91:8,13,17,22 92:10,
13,20,22
revised
67:17
revisions
88:2
revolving
15:22 16:14
rid
142:20
Ridge
6:20 26:18
rights
115:13,15 137:21
148:22 149:6,15
Riordan
33:2 34:16,19 36:23
46:17 50:13,16,18
56:9 62:5 76:17
77:9,14 80:6,7,9
85:10,11 86:10,15
88:13,20 90:20,23
91:4 93:20 95:16
96:3,16 98:2 99:17
100:2,14,17,20
101:6,10,12,18,20
102:22 103:3
104:11,20 114:7,9
115:6,10 117:4,7,13
122:3,6,15 131:3
136:14 143:16,23
144:5 150:1,4,15,19,

24 151:7,12,13,23
152:5 154:11 155:1,
9,13,18 156:5,14,24
risks
89:12
road
45:5 98:22
roads
4:7,19
Roanoke
16:6 54:9 82:19
83:3,6,14 84:17,21
112:19
Roda
22:23
role
22:20 62:11 63:21
93:3
roles
11:11,14 77:23
room
20:23,24
Ruff
66:15,17 101:11,13
150:23 151:2,6,9
152:17 154:14,15,20
156:8,15 157:2
rule
127:15
rules
11:9,17,18,20
ruling
57:4,6 58:13 146:20
run
74:12 83:14 84:2
126:11
running
95:12,20 96:18
runs
96:20

S

Sachs
83:22
safe
78:15
safety
47:13,20 99:12
125:20
sale
10:11 49:7,11,19
53:9 59:3,21 85:13
86:2 87:2,6,21,22
88:5,7 123:10 125:8
142:9
sales
13:23 45:10 61:6
79:23
sat
128:15 129:2 130:11
148:6
save
42:3 147:3
scale
39:18
scenario
7:16
scenarios
10:4
scheduled
155:8 156:18
screen
139:24 145:22
Section
109:6 132:21
secure
93:9,22 133:12
134:19

secured
25:4
seed
23:1 75:11
seek
29:21,23
seeking
31:1 36:14 48:24
115:13 134:20
Segundo
23:9
selected
102:9 144:17
sell
12:18 13:13 45:6
48:4 53:4 54:8 55:11
57:17 61:9,12,14
62:3 63:16,18,23
124:5 138:8 139:5
142:13,14
seller
133:1,8 134:3,4,14
seller's
133:9
selling
147:2
send
25:16 105:21
sending
36:5 140:10
sense
9:20 30:16 43:4
126:10 151:4
sentence
133:5,6 134:2,13
separate
17:18 27:23
separately
84:1
September
157:10
series
58:22
set
12:1,4 14:8 19:22
58:17 84:2
set-up
52:8
settle
55:5,9 129:12 130:2
143:12
settled
24:11 33:22 35:20
129:16 135:14 149:8
settlement
8:23 24:14 33:3
34:10 35:7,24 36:3,9
46:7 55:12,20,24
56:4,6,7,9 120:17
122:22 123:22
129:14 137:22 145:5
148:14,23 149:12
settlements
35:18 148:19
Settlers
6:20 26:17
settling
57:16 148:24
sewer
127:4
sheets
130:24
shops
44:21
Shorewood
6:18 28:11,12 49:6,9
59:8 60:23 119:18
120:7,14,22 123:16,
20,24 139:1,5,6
144:19,23 145:3



short
44:22 50:20 74:6
85:8 104:14 122:4,9
140:4
show
14:1,21 15:19 65:14,
19 66:11 68:4 71:7,8
88:18 108:17
showed
67:18 136:22 145:8
showing
52:6,19 67:5 71:3
92:17
shown
76:1 90:2
shows
137:24
sic
55:4 59:18
side
7:4,16 14:17 83:24
88:4
sidewalks
126:10
sign
49:18 52:15
signature
10:22,23,24 11:2
16:8,9 52:4 86:6,14,
22 87:8 121:4,22
122:1
signed
24:6 87:11 89:4
121:20,22 146:14
significance
131:18
significant
21:21 126:14,22
Silverman
120:11
similar
14:20 107:5 119:22,
23 120:1 139:12
simply
125:15
sir
16:11 18:3 54:17
66:2 81:17 86:4
109:4 118:20 125:13
154:13
sit
128:20 129:7 130:17
sitting
60:12 61:22
situation
25:18 28:15 59:13
139:11
situations
126:1,21
six-month
56:2
skin
14:22
small
44:17,24 84:11
smarter
156:17
snow
43:22
SNR
16:24 17:2
so-called
153:18
soils
59:10
sold
14:2 60:19
solicit
48:4

sort
19:16 23:18
sound
138:1 156:4
sounds
111:20,21,24 138:2
speak
8:16
speaking
78:4
specializes
90:15
specific
49:13 88:15 92:22
97:14 100:19 137:8
143:1
specifically
36:13 78:11 91:13
98:13 99:11 143:9
144:5
speculation
62:6 63:2
speculative
77:20
spend
75:18 79:21
spent
65:6 123:22
Springs
23:20
staff
156:16
staffed
44:22
stage
150:22
stake
17:12 18:2 131:20
stand
5:9 157:3
standard
11:7 49:10
start
21:1 31:17 58:24
59:14 63:9 115:3
117:4
started
25:17 29:16 31:16
40:20 41:1 43:2 57:9
64:22 76:6 78:5
80:19
starting
23:2,4 24:1 57:13
81:1 126:7,18
starts
134:14
state
11:19 29:3,22,24
32:20 33:18 39:12
55:15 56:21 70:17
80:1 92:11 94:7
114:8 124:6,9,18
125:3,6 127:24
136:18 142:17
143:7,21 146:16
151:19
stated
25:13 60:17
statement
37:1 95:22 104:7
107:5,10 114:23
121:19 127:6 128:13
statements
63:2 97:16
stating
141:1
status
8:2,13 88:8 131:12
147:19 153:2,5
statute
154:8

stay
55:14
steps
38:20 40:24 56:24
stigma
79:7,10
stipulated
1:21 127:18 113:18,
24 14:11,16 140:7
stock
11:13
Stockton
81:10
Stone
23:21,24
stop
39:15 46:11
Stout
72:3,20 74:4
strange
148:19
strategies
31:18,19
strategy
30:18 31:1,3
streets
41:12 47:10 99:12
116:10,16,20 117:3
124:3 125:21 127:2
stress
12:24
stricken
90:24 103:2
strike
37:1,21 84:19 85:10
90:20 99:17 100:8
102:22 104:11 153:9
155:4
striking
156:20
structure
21:2 22:1 127:11
struggle
97:19
struggling
93:15 97:17
stuff
36:21 116:13
subdivision
33:23 105:5 112:3
113:7 116:11,22
121:14 127:23
subdivisions
14:12 39:18 97:12
134:24 136:11
subject
80:2 149:23 151:2
153:12 156:12
submission
80:4
submit
64:18
submitted
68:15 76:23
subsequent
35:4 56:3 60:11,20
106:13,17 107:20
137:3 141:4
substantially
99:7
success
13:20 142:22 144:16
successful
30:5 34:3 74:1
successfully
126:15
successor
24:17 28:2 109:19
119:10 135:19 136:3
141:17 143:21

153:18
successor/owner
33:11
successors
154:5
Succinctly
52:23
sue
18:15 24:3 28:4
33:11 60:18 113:10
115:16 123:17,20
140:12,15,17,19
141:7,10,24 142:16
sued
27:4 28:6 60:21
75:20 113:14 122:17
123:2 126:1 140:7,
13 145:3 147:13
suffering
38:21
Sugar
6:20 26:17 27:4
28:10 30:10 91:16
129:24 130:3,6,15
135:20 147:19
suggested
155:13
suing
135:13
suit
26:10 36:12 115:20,
23 116:5,9 123:5,12
128:11
suits
128:5
summaries
22:22
summer
63:5 105:11
Suncal
6:9 7:15,17 10:19
11:10 12:13 28:16
37:13 40:13,24 78:4
80:13,17,20,23 81:1,
2,3,22,23 82:3,7
85:12,21 87:20,24
89:5,17,20 95:6
103:9 105:4,6,13,19
107:19 108:2
110:12,21 126:16
Suncal's
6:4 9:6 10:19 25:10,
13 28:20 38:10 41:6
89:20 102:3,5
103:11,18 109:2
110:7 111:1,6,8
Sunday
41:22 44:2
support
19:19
suppose
9:18
supposed
17:7 59:7 112:15
sureties
8:18 33:14,17,21
35:4,12 90:8 93:1
115:3 125:14,18
145:15,19,23
surety
8:5,6,9,13 98:9,13,
14 20:3 27:9 33:10
37:10 47:22 49:12
79:2 88:8 90:2,7
91:16 114:21 125:13
126:2 143:17 147:8
surprise
24:22 33:19 106:1,6
115:19
surprised
141:6 150:19

surprising
33:24
survival
61:19
Sutherland
132:7
sweat
40:12
swimming
155:24
sworn
151:18 152:3

───────────

T

takes
14:18 44:8 119:8
taking
22:19 32:23 38:20
42:1 138:7
talk
36:17 38:12 41:13
56:6 67:14
talked
20:15 37:24 38:14
74:4 79:14 83:1
107:1 123:2 127:14
139:1
talking
5:17 17:18 32:12
45:20 59:10 101:2
tax
12:2 39:4,6
taxes
39:15 43:12,19
team
8:4 9:6 11:24 24:7
25:10,13 28:20
31:17 36:6 37:13
38:10,11 89:21
90:14 93:14 95:6
136:8
teams
8:4
telling
98:15
ten
14:21,22 15:9,10,17
17:11,20 21:8 50:23
84:22,23 85:2
120:12
tend
77:9
term
20:13,19 29:6 48:8,
13 51:20 52:17 81:4
95:23
terminology
32:10
terms
13:19 17:9,14,16
21:3 52:14 54:11,20
65:4 114:21 119:9
134:9 139:4 146:21
147:1
test
25:24
testified
152:3,7 153:15
testimony
50:22 81:22 89:10,
13 51:20 52:17 81:4
13 143:15,19 144:4
154:21
testing
56:11
Teteak
6:2,3 7:5 19:7 20:2
23:15 40:11 48:4
78:4 89:2 90:19
126:16 127:14
132:14 134:13

theory
56:11 136:2 149:10
thing
19:16 49:4 61:20
114:16 131:21,24
142:1
things
12:18 37:19 38:13
41:1,3 42:11 43:18
44:1 47:21 61:3
89:24 102:2 113:5
116:14 131:22 142:9
third-party
46:9 53:20
Thorsness
68:22 69:1
Thorsness's
69:9
thought
20:18 29:12,18
34:23 53:3,13
105:14 129:20,23
142:19
threat
56:20
threatened
61:11 149:6
three-to-four-year
20:15,19
thumb
127:15
Thursday
41:23 44:2
tie
23:23 98:20
tied
97:9
Timber
23:20,24
time
12:18,20 14:14
16:13,14,23 17:1
21:2 22:19 23:14
25:2,17 26:4,20
31:15 38:16 39:11
41:18 42:7 43:3
44:4,9 45:4 48:17,19
50:4,8 53:4,16 55:3,8
18 56:3 58:1 61:23
63:21 65:1 70:17
74:7 75:12,14,15
76:5 77:13,20 80:14
87:17 89:4 91:9,24
97:6 98:1,7 100:23
104:1 105:16,20,20,
22,24 108:8,11,14
120:9 122:3 128:4,5,
23 129:9,12 130:23
131:2 133:18
135:13,23 137:23
141:5 144:13 148:8
150:13,18 151:5
152:20,23 153:1,20
154:9 155:18 157:7
timeline
77:6 113:15 114:4,9
141:8
timely
32:19
times
30:22 120:6,11
126:17 127:17
title
12:8 119:6 133:9
154:6
today
36:14 61:23 70:24
108:22 118:4,24
122:23 150:14



155:11,14
**today's**
122:19
**told**
92:16
**top**
15:8 44:18 63:1
71:12 72:5 146:9
**topic**
117:5
**total**
66:8 67:1 68:1 69:9,
13 70:13,19 71:14,
19 72:9,17,23 101:2
**touch**
24:7,8 60:14
**tough**
46:16
**TR**
18:5
**track**
13:7,14,21 75:23
**Trails**
23:20,24
**transaction**
58:20 89:13 90:3
91:11,19 127:21
**transactional**
28:19
**transactions**
61:4
**traveling**
23:18
**treated**
17:19,21
**trees**
126:10
**tremendous**
44:8
**TRG**
5:22 6:7,12,24 9:12
10:12,18 11:1 12:14
14:11,22 15:10,13,
22 17:11 18:1,5,8,13
21:15,16 24:3,15
25:6,8 26:7,10,13
27:10,13,20,24 28:4,
6,14 32:18 33:18
36:12 37:8 38:13,20
39:11 56:12 57:23
61:19 62:1,11,12
64:3,4 73:11,12,14
76:13 78:23 81:13,
15 82:16,20,21,22
83:18 84:22 86:8,24
87:9 88:21,23 89:16
96:9 98:8 103:5,15
104:3 107:19
109:11,18 110:10,11
111:10 113:10,14
114:2 116:2 117:23
118:10,23 119:18
120:3,21 121:7,13,
15 122:17,19
123:16,20 124:1,4,7,
17,18,23 128:23
137:3,13 139:21
140:10,11,17,19
141:9,13,16,24
144:24 145:11,14,
17,22 146:1,2,16
147:6,13,15 149:2,
10,16 150:11 154:2
**TRG's**
19:11 73:21 110:3,7,
8,9 111:5 119:5
141:23
**trial**
10:15 18:22 34:11
66:5,12 72:4 129:2,
5,13,17,20,22 130:1,

2,6,11,12,14,15,16,
17
**trials**
128:16 129:8,10
148:5
**trip**
40:3
**true**
81:4 94:6 96:21
114:13 121:19
**trust**
101:23,24 102:4
121:15 125:9
142:11,12
**trustee**
85:15 86:3 88:7
**truth**
34:18
**Turiello**
5:13,16 34:17,22
35:1 37:3 46:21,22
50:4 51:6,8 62:7,9
65:19,21 69:17,19
76:21 77:17 79:13
80:2 88:10 95:13
96:23 99:19 100:9,
13,24 103:5 114:8
131:7,9 136:15,17
144:1,2 149:18,22
**turn**
12:4 52:2 63:20 75:1
85:23 86:19 87:4
104:21 121:1
**turned**
41:9 54:4 103:8
**tying**
156:21
**types**
15:4 61:3 72:1
**typical**
14:19 37:15

**U**

**ugly**
41:9
**Uh-huh**
67:2
**ultimately**
10:2 28:22 30:22
31:20 40:22 45:5
47:15 79:11 84:2
87:23 120:13 127:12
135:14 144:15
**umbrella**
84:17
**understand**
27:3 41:12 47:14
79:2 80:12 81:21
84:20 85:6 87:11
89:12 92:15 95:11
96:7,11,17 98:3
100:5 101:21 103:14
111:16 125:10 128:6
**understanding**
8:13 19:15 29:9
30:6,7 34:17,21 35:3
36:18 48:21 60:16
95:19 97:3 107:13
115:9 125:5 128:14
134:8,18 135:4,21,
22 137:5 142:8,10
144:4,9,10,14 149:3,
14
**understood**
96:12 97:21 98:6
100:13 127:24
128:10 133:18
**underwriting**
127:23

**unfavorable**
146:21
**unique**
147:7
**unit**
92:9 115:23 116:2,5
**units**
111:17 127:3,5
**unknown**
75:19
**unquote**
109:12,13,21,24
**unrelated**
67:20 69:6 70:10
**unsellable**
39:5
**update**
12:6,7 22:13,14,15
62:22 94:15
**updated**
44:23 57:7
**updates**
24:10
**updating**
80:2
**utilities**
125:22

**V**

**vacant**
39:4 43:19
**Vaguely**
133:4
**values**
47:9
**Van**
67:8,10,15,19
**Vedder**
32:14 58:19
**Vegas**
23:16
**vehicle**
84:10
**venture**
10:18 11:1 14:8,11
15:23 74:1 75:13
81:13,15 82:22
84:12 85:20
**ventures**
75:4
**venues**
144:17
**verbal**
82:5,12
**versus**
42:7
**view**
46:1 125:13
**village**
31:9 46:10 64:15
119:8,17 120:14,22
**villages**
9:23
**violated**
146:15
**violating**
31:22 69:2
**visited**
94:7

**W**

**W-I-L-T-O-N**
151:22
**wait**
57:2
**waited**
62:1

**waiting**
32:8
**Waleen**
105:16,21 106:12
110:12 132:8
**walked**
58:21
**wanted**
14:21 44:24 53:2
65:3 129:10 148:15
149:9
**wanting**
6:13
**warranty**
134:15
**waste**
45:4 56:2
**water**
127:4
**Waterford**
6:16 33:23 34:10
35:15 91:7,13 127:7
**ways**
125:23
**wealth**
83:23
**websites**
23:4
**week**
49:7,8 107:2 138:10
156:18,24 157:1
**weekly**
8:7
**weeks**
12:11 41:24 147:20
**weigh**
77:11
**welfare**
99:12
**Western**
23:20
**Whispering**
92:9 112:2 113:7
116:2 123:11
**willful**
77:2
**William**
68:22
**Wilton**
151:21
**withstanding**
133:6,7
**witnesses**
155:8
**won**
135:17
**wonderful**
151:11
**word**
49:14 95:8,9 155:2
**words**
49:17 119:24
**work**
11:16 16:21 22:7
23:3 38:6 40:4,21
41:14 43:10 44:9
45:9 54:4 63:8,10
66:9 67:13 69:12,13
78:13 79:3,9 80:12
81:2 83:20,24
125:18 128:12
132:11 138:19
139:2,17 151:12
**worked**
7:16 10:5 39:24 40:1
80:16 83:17 132:5
**working**
8:23 23:2 25:19
30:18 31:3 32:11
33:10 35:17 38:23
39:1,3,22 42:11 78:9

122:24 143:3
**works**
32:5,6 79:3,8
**world**
14:20
**worthwhile**
5:22
**wrap**
77:12
**wrapping**
77:4
**write**
125:16
**writing**
29:16 108:11 120:3
**written**
29:7 57:6,11 58:13
60:2 105:6 109:3
110:12 121:21
143:10
**wrong**
53:2
**wrote**
29:10 118:9 141:1

**Y**

**year**
22:4 24:2,24 26:7
59:14 63:5 70:19,22
72:8 114:11 115:17,
20 137:23 141:19
143:19 149:13
**years**
12:23 27:20,22 37:9
42:15,16 76:15
111:22 114:9 124:6
132:6,7,8 140:20
141:7,24 143:16
**yesterday**
7:6 14:18 89:2 90:19
**Yorkville**
6:23 26:21,23 27:3,
19 36:12 78:24 92:3
105:4 106:2,8 107:5,
14,17 108:5 111:13,
16 112:2,5,24 113:3,
10,13,22 114:6,19
115:16 116:5,9
119:19 123:2 136:23
137:6,22 138:4,8,10,
20 139:10,15,18
140:7,12,23 141:5,
24 148:2 149:12
**Yorkville's**
108:8,14 110:4
117:22 139:21
140:24 141:1

**Z**

**zoom**
72:5,6
**Zurich**
136:5

