1     UNITED STATES BANKRUPTCY COURT

2     NORTHERN DISTRICT OF ILLINOIS

3     EASTERN DIVISION

4  IN RE:                    )

5  KIMBALL HILL, INC.,       )

6  DEBTOR,                   )No. 0810095

7                            )

8                            )

9

10

11     REPORT OF PROCEEDINGS at the hearing of

12  the above-entitled cause before the

13  Honorable TIMOTHY A. BARNES, Judge of said Court,

14  on September 18, 2018, at the hour of 1:00 p.m.

15

16

17

18

19

20

21

22

23  Reported by:  Athanasia Mourgelas

24  License No. 084-004329

1

---

1  APPEARANCES:
2
3     PRETZEL & STOUFFER, CHTD., by
      MR. EDWARD B. RUFF, III,
4     MR. MICHAEL P. TURIELLO,
      One South Wacker Drive, Suite 2500,
5     Chicago, Illinois  60606,
      (312) 346-1973,
6     eruff@pretzel-stouffer.com
         Representing the Movant, TRG Venture
7         Two, LLC;
8            -and-
9     VEDDER PRICE, PC, by
      MR. WILLIAM W. THORSNESS,
10    222 North LaSalle Street, Suite 2600
      Chicago, Illinois  60601
11    (312) 609-7500
      wthorsness@vedderprice.com
12       Representing TRG Venture Two, LLC;
13
      SCHUYLER, ROCHE & CRISHAM, PC, by
14    MR. CORNELIUS RIORDAN,
      180 North Stetson Avenue, Suite 3700,
15    Chicago, Illinois  60601,
      (312) 565-2500,
16    criordan@scrattorneys.com
         Representing Fidelity & Deposit
17       Company of Maryland;
18
      GARDINER, KOCK, WEISBERG & WRONA, by
19    MR. THOMAS GARDINER,
      53 West Jackson Boulevard, Suite 950
20    Chicago, Illinois  60604
      (312) 362-0000
21    tgardiner@gkwlaw.com
         Representing the Deponent, Mr. Olson.
22
23
24

2

---

1              I N D E X

2  WITNESS                        EXAMINATION

3  BART OLSON

4     By Mr. Riordan (direct)        12

5     By Mr. Turiello (cross)        39

6     By Mr. Riordan (re-direct)     68

7

8  BRIAN BARRY

9     By Mr. Riordan (direct)        75

10    By Mr. Ruff (cross)           117

11    By Mr. Riordan (re-direct)    173

12

13

14

15

16

17

18

19

20

21

22

23

24

3

---

1            (whereupon, the following
2            proceedings were held in open
3            court.)
4     THE COURT:  All right.  Let's call the 1:30
5  matter, please.
6     THE CLERK:  1:30 matter, Kimball Hill, Inc.
7     THE COURT:  And could I have counsel please
8  approach the lectern and make their appearances.
9     MR. RIORDAN:  Good afternoon, your Honor,
10 Cornelius Riordan for Fidelity & Deposit.
11    MR. RUFF:  Good afternoon, your Honor, Ed Ruff,
12 R-U-F-F, on behalf of TRG.
13    MR. TURIELLO:  Good afternoon, your Honor, Mike
14 Turiello, on behalf of TRG.
15    MR. THORSNESS:  Good afternoon, your Honor,
16 Bill Thorsness for TRG.
17    MR. GARDINER:  Judge, I'm Tom Gardiner, I
18 represent Bart Olson who is going to be a witness
19 today.
20    THE COURT:  Okay.  Great.  Thank you all very
21 much.  Now, we're back here on the continued trial.
22 I cannot recall if this is the same court reporter
23 we had.  We've had so many different court
24 reporters.

4

1          We have a housekeeping matter, which I
2   handled in part by order prior to beginning today,
3   but I did say in the order that I would state in
4   more detail on the record today my ruling, and I'd
5   like to handle that first. And this isn't open to
6   what the parties have read -- have submitted and
7   I've reached my own conclusion. And the conclusion
8   is I failed to see a prejudice on behalf of the TRG
9   for this witness testifying.
10          The witness is -- the contents of the
11  testimony are subject to cross-examination but
12  they're subject to your interpretation of that in
13  your closing statements to me. You can do your
14  best to convince me why I should not consider that
15  testimony in whole or in part. But as it stands
16  right now, it does appear to me to be probative.
17  It does appear to me to be relevant.
18          I will make a determination as to the
19  weight as we go. And so for the same -- very same
20  reasons that I ruled I think on some of the motions
21  in limine, I'm going to permit it, and we'll allow
22  that to go forward. Okay.
23          MR. RUFF: Very good, your Honor.
24          THE COURT: Now, before we proceed then, what

5

1   other housekeeping matters do we have to handle for
2   today?
3          MR. RIORDAN: Judge, I'd like to introduce
4   Mr. James Hamel from Fidelity & Deposit. I think I
5   said last time Mr. Kilburn had a family medical
6   issue come up for today so Mr. Hamel is here to
7   observe for the Fidelity & Deposit.
8          THE COURT: All right. The more the merrier.
9   All right. And then remind me to make sure I'm not
10  confused here is where we left things at the
11  conclusion of the previous days of trial was that
12  it was Fidelity & Deposit was at the helm
13  presenting its case in defense to the motion.
14          There were some witnesses that were still
15  to be called. Now we have the expert witness as
16  well. And then there was a discussion that we
17  would, time permitting today, also allow for brief
18  oral closings, though, it is still my desire that
19  you submit your closing remarks in writing
20  thereafter. Is that where we were?
21          MR. RIORDAN: I think, Judge, you said maybe
22  ten minutes or so for each side at the end if
23  possible, and I have two witnesses today.
24          THE COURT: Two witnesses today including the

6

1   expert?
2          MR. RIORDAN: Yes.
3          MR. RUFF: That is exactly what you said and
4   exactly what we'll do. I'll ask for 17 minutes.
5          THE COURT: 17?
6          MR. RUFF: I timed it.
7          THE COURT: Did you bring a timer?
8          MR. RUFF: I timed it before I got here, your
9   Honor.
10          THE COURT: I coach a new court team and I have
11  timers and red lights and everything but--
12          MR. RUFF: Allow me 18 minutes then.
13          THE COURT: All right. Well, you'll each be
14  afforded then I suppose 18 minutes to the extent
15  you need it, but please don't feel obligated to
16  take all the time that you're allowed.
17          MR. RIORDAN: Judge, we have written
18  submissions, I will not feel that I need it, Judge.
19          THE COURT: Okay. Now I have a question. Yes,
20  sir.
21          MR. GARDNER: Judge, on behalf of Mr. Olson,
22  we've reached an agreement as to some
23  attorney/client and deliberative process privilege
24  issues. If there were to be an objection based on

7

1   a privilege, should I raise an objection as seated
2   in the front row or so or --
3          THE COURT: well, no. You probably should come
4   up and find a seat near one of the microphones.
5   There should be --
6          MR. GARDNER: Okay.
7          MR. TURIELLO: Judge, it's not going to be an
8   issue. There was one document during the
9   deposition that they -- that was produced pursuant
10  to FOIA but they claimed was inadvertently
11  produced, and we've advised them we're not going to
12  use it and we're not going to mention it or
13  reference it in these proceedings. So that was the
14  only issue and so I don't think it's a concern.
15          MR. GARDNER: That's the only issue I had and I
16  know that's been resolved. I just -- there were
17  other questions that were asked during the course
18  of the deposition which privilege was involved.
19          THE COURT: I'm going to allow him to monitor
20  the proceedings and I think -- again, I hope we put
21  the microphones on each of the counsel's tables. I
22  really can't see. But, yeah, just to be clear, we
23  have a court reporter, that is, the parties have
24  arranged a court reporter but we here in the court

8

1 record our proceedings and so you have to be near a
2 microphone --
3     MR. GARDNER:  Very good.
4     THE COURT:  -- for what you say to be picked
5 up.  And so I'm sure someone will make a seat for
6 you.
7     MR. GARDNER:  Very good.
8     MR. RIORDAN:  We have plenty of room here,
9 Judge.
10     THE COURT:  Anything else before we all sit
11 down and we pick it up and go.
12     MR. RUFF:  Thank you for your time.
13     THE COURT:  Thank you.
14         And, Counsel, you're on top.
15     MR. RIORDAN:  I call Bart Olson to the stand,
16 please.
17     THE COURT:  All right.  Please remain standing.
18     THE CLERK:  Please raise your right hand.
19             (Witness sworn.)
20     THE CLERK:  Please state your name for the
21 record.
22     THE WITNESS:  Bart Olson.
23     THE COURT:  You may have a seat.  Mr. Olson,
24 have you been present during any of the previous

                                            9

1 days of trial?
2     THE WITNESS:  I have not.
3     THE COURT:  So I'll walk you very quickly
4 through some of the things that apply here.  And
5 that is, number one, you'll see a large goose neck
6 microphone in front of you.  That is the microphone
7 that will be recording your testimony for Court's
8 perspective.  It will also be rebroadcasting it
9 through the speakers.  And I'm a little hard of
10 hearing so I need that in order for me to be able to
11 hear you.  So speak into the microphone.
12         If you get too close to the microphone or
13 if you get animated, meaning loud, the microphone
14 will stop working in order to protect itself.  You
15 back off, pause, it will come back online and then
16 you can try again.  You'll usually hear a loud
17 noise when it's complaining of your antics, not
18 that I expect that.
19         The -- if you are on stand for a drastic
20 period of time, I will try to give you a break.
21 But if you need a break for any reason, let me
22 know.
23         This is -- no matter who is asking you
24 questions whether it be an attorney at the lectern

                                            10

1 or the Court, your job is to try to answer those
2 questions as best you can.  You are under oath.
3         If you are confused by the question, you
4 can ask for a clarification.  If you feel for any
5 reason there's something inappropriate, you can
6 talk to me.  Don't get into an argument with the
7 attorneys.  Understood?
8     THE WITNESS:  Yes.
9     THE COURT:  Okay.  There should also be water
10 there if you need water, I hope.  Okay.  And then
11 the very last thing is there are probably documents
12 sitting around you.  Unless you are asked to look
13 at a document for the purposes of answering the
14 question, you should not be looking at the
15 documents around you.  You should be answering the
16 questions from your own knowledge.
17         Understood?
18     THE WITNESS:  Understood.
19     THE COURT:  Any questions of me before we get
20 started?
21     THE WITNESS:  No, sir.
22     THE COURT:  Counsel, your witness.
23     MR. RIORDAN:  Thank you, your Honor.
24

                                            11

1                 BART OLSON,
2 having been first duly sworn, was examined and
3 testified as follows:
4                 DIRECT EXAMINATION
5 BY MR. RIORDAN:
6     Q.  Good afternoon, Mr. Olson.  Thank you for
7 coming today.  Where do you live, sir?
8     A.  I live in Downers Grove, Illinois.
9     Q.  And by whom are you employed?
10     A.  The United City of Yorkville.
11     Q.  And what is your position with the United
12 City of Yorkville --
13     A.  I am the city administrator.
14     Q.  One thing, let me finish my question
15 before you jump into the answer.  You might be
16 anticipating but I think the record is better if we
17 both talk separately.
18         And how long have you held that position?
19     A.  I've held that position for eight, almost
20 nine years.
21     Q.  And what are your duties and
22 responsibilities as a city administrator?
23     A.  I manage the day-to-day operations of the
24 city for all the departments except police.

                                            12

1    Q.    And how many departments do you review?
2    A.    There's six or seven.
3    Q.    Okay.  And what are those departments?
4    A.    Administration, finance, community
5    development, building safety, parks and recreation,
6    public works and engineering to name a few.
7    Q.    And how many employees do you supervise?
8    A.    Between 35 and 40.
9    Q.    How many of those employees are direct
10   reports?
11   A.    I believe six.
12   Q.    And what percentage of your time would be
13   devoted to development of annexation agreements and
14   subdivisions?
15   A.    Currently it is maybe five percent of my
16   time.  In the past, it's been much more or less.
17   Q.    And why has it been much more in the past?
18   A.    As development goes, my time is spent on
19   annexation agreements go.
20   Q.    And which city department handles
21   subdivision development and review?
22   A.    Currently it's the community development
23   department.
24   Q.    And who is the current head of the

13

1    community development department?
2    A.    Krysti Barksdale-Noble.
3    Q.    And how long has she been in the position?
4    A.    She's been with the city for six to seven
5    years.
6    Q.    And does she report directly to you?
7    A.    She does.
8    Q.    Is your position as city administrator
9    appointed or elected?
10   A.    I am an appointed official.
11   Q.    And who appoints you?
12   A.    The mayor appoints me.
13   Q.    And does the city council have any say in
14   the appointment process?
15   A.    Yes, they have advice and consent.
16   Q.    Does your appointment have a term?
17   A.    It does.
18   Q.    And what is that term?
19   A.    The term runs concurrently with the term
20   of the mayor, so through currently April of 2019 --
21   Q.    That would be the next mayoral election?
22   A.    -- yes.
23   Q.    Somewhere in that time period?
24         Have you gone through any re-appointment

14

1    processes?
2    A.    Yes.
3    Q.    And how many?
4    A.    I believe two.
5    Q.    By the same mayor or different mayors?
6    A.    By the same mayor.
7    Q.    And what is involved in coordinating the
8    day-to-day operations in the city, in your capacity
9    as city administrator?
10   A.    Well, it's helping the city council
11   achieve their posted goals, managing the day-to-day
12   operations of multiple departments underneath me to
13   make sure that they're, you know, running
14   efficiently, solving problems when they come up.
15   So it's a very managerial role for me.
16   Q.    And when did you begin working for the
17   city of Yorkville?
18   A.    It was August of 2003 I believe.
19   Q.    And what position were you hired -- were
20   you hired for a position at that time?
21   A.    Yes, my first position was as an
22   undergraduate intern, which was temporary and then
23   I was hired as a graduate level intern the
24   following year.

15

1    Q.    Were those both salaried positions?
2    A.    The undergraduate internship was not.  The
3    graduate level internship was.
4    Q.    And what were your duties and
5    responsibilities as an undergraduate intern?
6    A.    Special projects as assigned.
7    Q.    And how about a graduate intern?
8    A.    Similar.  I would say maybe a little bit
9    more high level.  But as projects come up, I'd be
10   assigned to them.
11   Q.    And following your tenure as an
12   undergraduate assistant, did you continue to work
13   for the city after that?
14   A.    I did.
15   Q.    And where did you attend high school?
16   A.    Yorkville High School.
17   Q.    And where did you attend college?
18   A.    Northern Illinois University.
19   Q.    Did you receive an undergraduate degree
20   from Northern Illinois University?
21   A.    Yes.
22   Q.    In what?
23   A.    A bachelor of science with an emphasis in
24   political science.

16

1    Q.    And what year was that?
2    A.    2004.
3    Q.    Did you achieve any graduate degrees?
4    A.    I did.
5    Q.    And where did you obtain your graduate
6  degree?
7    A.    Northern Illinois University.
8    Q.    And what was that in?
9    A.    It was MPA, which is a master of public
10 administration.
11    Q.    And what does that involve for the Court's
12 education?
13    A.    It's similar to a business administration
14 degree except it gets involved in government
15 nonprofit work.
16    Q.    And what types of courses do you take in
17 an NPA versus an MBA?
18    A.    You would take classes related to
19 political theory, a high level, you know, federal
20 and state level issues but then you also get into
21 local management in Illinois specific issues.
22    Q.    What was your first full-time position
23 following graduation from Northern with the City of
24 Yorkville?

17

1    A.    My first full-time position would have
2  been as an assistant city administrator, and they
3  actually hired me I think a month before I
4  graduated.
5    Q.    What were your duties as an assistant city
6  administrator?
7    A.    To help the city administrator in whatever
8  projects or tasks that they needed to.
9  Additionally, at the time -- or at various times I
10 was responsible for some functions of IT, human
11 resources and other divisions within the admin
12 department.
13    Q.    Was that a position created for you or was
14 that a position that existed that you hired into?
15    A.    It was a position that was created at the
16 time that I was hired.
17    Q.    And in 2000 -- prior to 2011, who was the
18 city engineer?
19    A.    It was Joe Wywrot.
20    Q.    Did Mr. Wywrot eventually leave the city?
21    A.    He did.
22    Q.    And what role generally do you have with
23 reviewing subdivision development as your -- in
24 your position as city administrator?

18

1    A.    As high level issues, especially as it
2  relates to the negotiation of annexation agreement,
3  impact fees, you know, overarching city council
4  goals, I would get involved.  And the supervisory
5  part of my job as an assistant city administrator
6  or a city administrator would be assisting the
7  department heads, the city engineer, community
8  development director in issues as they came up.
9    Q.    And what do you mean by high level issues
10 related to subdivision development?
11    A.    It would be -- for instance, if there was
12 a piece of property that had drainage issues and
13 somebody that you maybe recommend a denser part of
14 the subdivision, then normally it would be allowed
15 under city code in exchange for a large green space
16 or a large detention area or it would be the impact
17 fees should be adjusted or negotiated to a
18 different level reduced or frozen, those types of
19 things.
20    Q.    And what is an impact fee?
21    A.    An impact fee is a fee paid usually at the
22 time of the building permit by a developer or a
23 home builder to the city to offset our increased
24 cost of serving, you know, the new residents that

19

1  come in from the new home.
2    Q.    And what role does Ms. Barksdale-Noble
3  play in subdivision development?
4    A.    She would be the main director in the city
5  responsible for all facets of subdivision
6  development.
7    Q.    And what role did Mr. Wywrot play?
8    A.    He was the city engineer, so he would have
9  reported to Ms. Barksdale-Noble at the time.
10    Q.    And when did Mr. Wywrot leave the city?
11    A.    I believe it was the summer of 2011 if I
12 remember correctly.
13    Q.    And was he employed as a city engineer
14 during the development phase of the Whispering
15 Meadows subdivision?
16    A.    He was, yes.
17    Q.    Are you familiar with the subdivision in
18 Yorkville called Whispering Meadows?
19    A.    I am, yes.
20    Q.    And are you familiar with the annexation
21 agreement governing Whispering Meadows?
22    A.    Yes.
23    Q.    You have two books in front of you and I'd
24 like you to look at book number one?  I'll ask you

20

1   to look at Exhibit No. 11.  Do you have that in
2   front of you?
3       A.   I do.
4       Q.   Have you had a chance to look at it?
5       A.   Just this cover page, yes.
6       Q.   Okay.  Do you recognize this document?
7       A.   I do.
8       Q.   And what is it?
9       A.   It's the -- I believe the original
10  annexation agreement for the Whispering Meadows
11  subdivision.
12      Q.   And what is the date of the agreement?
13      A.   It was recorded on October 1st, 2003, with
14  the county.  The actual city approval date is at
15  the end of the document.  Oh, it's at the start of
16  the document.  August 12th of 2003.
17      Q.   And did you participate in the drafting of
18  this agreement?
19      A.   No.
20      Q.   And were you working for the City at the
21  time of the -- as of the date of the agreement?
22      A.   I might have started that week as an
23  undergraduate intern.  I don't remember the exact
24  day in August that I started.
                                                   21

1       Q.   Does the agreement provide for the
2   furnishing of security for the installation of
3   public improvements?
4       A.   I don't recall off the top of my head.  It
5   would be usual for an agreement to do so, though.
6       Q.   Okay.  Do you know who provided the
7   security for Whispering Meadows?
8       A.   Fidelity & Deposit Company of Maryland is
9   the company that I'm familiar with that had
10  provided security at some point.
11      Q.   And if you look at Trial Group Exhibit 5.
12      A.   In book one?
13      Q.   In book one, thank you.  And do you
14  recognize the documents in Trial Exhibit 5?
15      A.   I do, yes.
16      Q.   And what are they?
17      A.   It's a bond for the Whispering Meadows
18  subdivision.
19      Q.   Okay.  Are there more -- is there more
20  than one bond as part of this exhibit?
21      A.   Yes.
22      Q.   And can you tell the Court what unit or
23  units of the subdivision in Whispering Meadows do
24  these bonds apply to?
                                                   22

1       A.   The first one is unit one.  The second one
2   is unit one.  The third bond is unit two.  The
3   fourth bond is unit two.
4       Q.   And if you look at Exhibit 5 or Group
5   Exhibit 5 after these Group Exhibit 5, which is the
6   next one.
7       A.   Okay.
8       Q.   Do you recognize the documents in Group
9   Exhibit 5?
10      A.   Exhibit 5 in book one?
11      Q.   Yes.
12      A.   I believe we were on Exhibit 5.
13      Q.   Oh, I'm sorry, Exhibit 6.  I apologize.
14      A.   I had it open, yes.
15      Q.   Do you recognize the documents in Group
16  Exhibit 6?
17      A.   Yes.
18      Q.   And could you just tell the Court what
19  they are?
20      A.   It is a bond for unit four.
21      Q.   Is there a second bond there if you refer
22  to Page 10 in the exhibit?
23      A.   There is, yes.  It is a bond for unit
24  four.
                                                   23

1       Q.   Are you aware of any instances where the
2   City of Yorkville sought performance from the
3   subsequent owner under an annexation agreement?
4       A.   On any instances?
5       Q.   Yes.
6       A.   Yes.
7       Q.   Can you tell the Court what those
8   instances were?
9       A.   Specifically every subsequent owner in
10  every subdivision in Yorkville has been sought by
11  the city to perform as a developer for obligations
12  in an annexation agreement.  There are several
13  dozen active developments in the city's history.
14           And so during the recession as
15  subdivisions would fail or become distressed, we
16  would work with existing landowners, bank holding
17  companies and subsequent owners to finish the
18  subdivision.
19      Q.   And what is Yorkville's position regarding
20  performance of an annexation agreement by a
21  subsequent owner?
22      A.   That the obligations of development run
23  with the land.  They're typically recorded against
24  the property.  And whoever buys the property that
                                                   24

1  has an annexation agreement recorded against it, to
2  the extent that they are not a person living in a
3  house, they are subject to the terms of the
4  annexation agreement.
5      Q.   I'm going to go ask you to look at F&D
6  Exhibit No. 20, which is the last tab in book one.
7      A.   Okay.
8      Q.   Do you recognize this exhibit?
9      A.   I do.
10     Q.   Now, you indicated earlier that you have
11 had discussions with every subsequent owner
12 regarding performance of the annexation agreement.
13 Does that include TRG Venture Two?
14     A.   It does, yes.
15     Q.   And can you tell the Court what Exhibit 20
16 is?
17     A.   This is a letter from me to
18 representatives of SunCal Companies in December of
19 2010 regarding the city's position that subsequent
20 owners of a property were bound by the terms in the
21 annexation agreement and will be looked at by the
22 city as being the successor owners.
23     Q.   And who is SunCal?
24     A.   SunCal at the time had represented to us
                                                    25

1  we were most concerned about getting the grass
2  mowed.  My recollection is at the time that they
3  had represented that they would probably cut the
4  grass but they didn't know that they were going to
5  for sure.
6      Q.   Okay.  And in the letter you quote from a
7  paragraph in the annexation agreement --
8      A.   Yes.
9      Q.   -- correct?
10          And in that paragraph appears in the
11 annexation agreement that you reviewed earlier,
12 which is F&D Trial Exhibit No. 11?
13     A.   Yes.
14     Q.   And if you flip back to No. 11 and go to
15 Page 20 of the exhibit and if you could highlight
16 sub-paragraph B.  Do you have that in front of you,
17 sir?
18     A.   I do, yes.
19     Q.   And the paragraph 22-B that you are quoted
20 in your letter of December 10th, 2010, is that now
21 highlighted on the screen before you?
22     A.   It is.
23     Q.   What prompted you to write the letter?
24     A.   I believe at the time it was SunCal's
                                                    27

1  that they were a representative of, you know, the
2  landowner there.  So whether they were a management
3  company or had an interest, I don't know.
4      Q.   Had you had discussions -- strike that.
5          The letter is addressed to Derrick Hicks
6  and Mike Walline of SunCal?
7      A.   Yes.
8      Q.   At the time you wrote this letter, had you
9  ever met either of those gentlemen?
10     A.   I believe that I did.  My recollection was
11 that it was a brief meeting and that it wasn't one
12 that I participated in.
13     Q.   Okay.  Were you at the meeting and did you
14 observe what was happening or was it the events
15 being reported to you?
16     A.   I believe it was the latter, that the
17 events had been reported to me.
18     Q.   And based -- and what was your
19 understanding of the position of SunCal regarding
20 performance of the annexation agreement following
21 your report you received?
22     A.   The report was that they were not going to
23 be seen as a developer, a successor owner.
24 Specifically to our concerns at the time, I think
                                                    26

1  position that the owner of the property was not
2  going to be acting as a future -- as a developer in
3  the property.  At the time we would have been
4  talking to multiple entities in various stages of
5  ownership in distress of subdivisions.
6          And the common question that we would pose
7  is, you know, do you want this property
8  re-developed, you know, do you have an interest in
9  adding more density, you know, what can we do to
10 make the property start again.  And they didn't
11 seem interested in doing that at the time.
12     Q.   Did you write any similar letters to any
13 other subsequent owners during your tenure as city
14 administrator?
15     A.   I wrote a lot of letters to owners
16 regarding the annexation agreement obligations,
17 demands, et cetera.  None that had the tone or
18 position of clarifying whether a landowner was a
19 successor developer or not.
20     Q.   And you received a response to this
21 letter, did you not?
22     A.   I believe so.  Yes.
23     Q.   And if you turn to book two, Exhibit 21,
24 which is the first exhibit.  Do you have that in
                                                    28

1  front of you?
2      A.  I do, yes.
3      Q.  Can you tell us whether this letter was
4  the response that you received on December 10th,
5  2010, the letter to SunCal?
6      A.  I believe that it was.
7      Q.  Okay.  This letter has a TRG Venture Two,
8  LLC, letterhead.  What was your understanding of
9  TRG Venture Two's involvement in the property?
10     A.  At the time, that they were the owner of
11 the lots.
12     Q.  And this letter set forth TRG Venture
13 Two's position regarding the position you took in
14 your December 10th, 2010 letter?
15     A.  Yes.
16     Q.  Now, prior to the time that you wrote the
17 December 10th, 2010 letter to SunCal, had you ever
18 had any conversations with any representative of
19 Fidelity & Deposit Company of Maryland?
20     A.  I don't believe so.
21     Q.  Had you had any communication from
22 Fidelity & Deposit Company of Maryland prior to
23 December 10th, 2010?
24     A.  Not that I recall.

29

1      Q.  Between December 10th, 2010 and the date
2  of January 18th, 2011, which is the date of F&D
3  Trial Exhibit No. 21, had you had any conversations
4  with Mr. Walline?
5      A.  There might have been a phone call.  There
6  might not have been.  I don't really remember.
7      Q.  Your recollection isn't clear on that;
8  correct?
9      A.  Correct.
10     Q.  How about Mr. Hicks?
11     A.  I'm not clear on that.
12     Q.  Do you recall having any conversations or
13 communications with anyone either representing
14 SunCal or TRG Venture Two between December 10th,
15 2010 and January 18th, 2011?
16     A.  I don't recall.
17     Q.  After you received the letter on January
18 18th, 2011, did you have any further communications
19 with representatives of either TRG Venture Two or
20 SunCal regarding the contents of the letter?
21     A.  After?
22     Q.  Yes, after.
23     A.  There were a number of conversations that
24 I had with TRG regarding issues related to this

30

1  letter over the next couple of years.  I don't
2  recall exactly when they were or with whom.
3      Q.  Now, I want to direct your attention to
4  December of 2013, if I might.  At about that time,
5  did you have any meetings with Mr. Peter Kyte of
6  TRG Venture Two?
7      A.  There were a number of meetings with
8  Mr. Kyte I believe so in that time frame.
9      Q.  Do you recall specifically if we direct
10 your attention to December of 2013 what the subject
11 matter of those discussions were?
12     A.  Yeah, it would have been a standard, you
13 know, re-start the development type meeting to see
14 if there's anything that could be done to, you
15 know, move the property along to start building
16 houses again.
17     Q.  And at some point in time in December of
18 2013 you received a letter from Mr. Kyte?
19     A.  I believe so, yes.
20     Q.  And if you could look at F&D Trial Exhibit
21 No. 22, is this the letter you received?
22     A.  Yes.
23     Q.  Before we get into the letter, I'm
24 directing your attention to the meetings with

31

1  Mr. Kyte.  Did Mr. Kyte have an attorney with him
2  at that time?
3      A.  At some of the meetings I believe he did.
4  Some of them I believe he did not.
5      Q.  Okay.  Do you know who the person -- who
6  that attorney was?  Do you know his name?
7      A.  The only attorney that I remember being
8  involved in the meeting was Paul Chronis.  It's
9  possible there might have been others but I don't
10 remember.
11     Q.  Do you recall who Mr. Chronis represented?
12     A.  He represented I believe TRG, and then
13 there was one meeting where he was claiming to
14 represent an individual homeowner who happened to
15 be the president of the HOA Board at the time.
16     Q.  And when you had these meetings with
17 Mr. Kyte and his lawyer, did the subject of the
18 special service area come up?
19     A.  It did, yes.
20     Q.  And what is a special service area?
21     A.  It's a financial mechanism allowed to
22 municipalities and private entities to a degree to
23 install infrastructure and provide some sort of
24 special service and then have the property owners

32

1   within that special service are be taxed at an
2   additional rate on property taxes usually to pay
3   for that service.
4        Q.   Do you recall the context in which the
5   subject matter of the special service area came up
6   at the meetings with Mr. Kyte and his attorney?
7        A.   I do.
8        Q.   Can you tell the Court what that was?
9        A.   Yes.  There was a proposal floated by
10  Mr. Kyte to use an SSI by the municipality to
11  complete the infrastructure and the subdivision
12  essentially making the existing residents and
13  property owners of the subdivision pay to complete
14  the infrastructure.
15       Q.   And how are they paid for that?
16       A.   Through an additional property tax is the
17  normal way.
18       Q.   And did you understand that SSI financing
19  can take place of surety bonds or letter of credit
20  and security for public improvements?
21       A.   Yes.
22       Q.   And turning your attention now to the
23  letter of December 9th, 2013, which is F&D Trial
24  Exhibit No. 22.

                                              33

1   refers to the TSC study, do you see that?
2        A.   Yes.
3        Q.   Do you recall what that was?
4        A.   It was a pavement study and cost estimate
5   for completing some of the roadways within the
6   subdivision.
7        Q.   Is that a study that was commissioned by
8   the city?
9        A.   I don't believe so.
10       Q.   Well, do you know who commissioned that
11  study?
12       A.   I think it was a TRG funded study.
13       Q.   And do you know why TRG funded that study?
14       A.   I believe it was represented to us as, you
15  know, we've put forth the effort to, you know, do
16  some due diligence on the cost of the roadways,
17  here is how bad they are, here is how much it's
18  going to cost, why don't you do something about
19  them.
20       Q.   And in that same third paragraph on Page 1
21  of the exhibit, Mr. Kyte states if the concrete
22  surface course is not completed shortly -- is not
23  completed shortly, the streets will continue to
24  come unglued and the cost to repair these streets

                                              35

1        A.   Okay.
2        Q.   Is this the letter that Mr. Kyte wrote to
3   you?
4        A.   It is, yes.
5        Q.   And did you understand that this letter
6   stated Mr. Kyte's position or TRG's position
7   regarding the state of the development at or about
8   the time of the date of the letter?
9        A.   Yes.
10       Q.   And in the letter he describes the
11  physical condition of the streets and other public
12  improvements in the subdivision, does he not?
13       A.   He does.
14       Q.   And in paragraph two on the first page, if
15  we could highlight it, please.  He states that
16  their home values and their overall enjoyment of
17  the homes are substantially diminished given the
18  unfinished improvements and their home values are,
19  quote, under water, unquote.  They still continue
20  to pay substantial taxes despite living in
21  unfinished and a deteriorated community.
22            Did I read that correctly?
23       A.   You did.
24       Q.   In the second -- in the next paragraph he

                                              34

1   will increase exponentially.  If that happens, the
2   value of the existing homes in this community will
3   plummet.
4            Did I read that correctly?
5        A.   You did.
6        Q.   And then going on to the third -- the
7   following sentence.  The significant cost to remedy
8   this worsening situation will likely exceed the
9   face amount of the bonds if the streets are not
10  complete in the 2014.
11            Did I read that correctly?
12       A.   Yes.
13       Q.   And then in the next full paragraph he
14  states, as we discussed, I'm concerned and
15  frustrated about Yorkville's overall handling of
16  the whispering Meadows project.  Indeed, it appears
17  that Yorkville may have dropped the ball in many
18  important ways, and we're all now suffering the
19  consequences of these missteps.
20            Did I read that correctly?
21       A.   I think it says those missteps but --
22       Q.   Those missteps, thank you.
23       A.   -- otherwise, yes.
24       Q.   And did you understand what missteps seems

                                              36

1  to be referring to in that sentence?
2      A.   Yes.
3      Q.   And what was your understanding?
4      A.   Just in general that the subdivision, you
5  know, wasn't moving.  That it wasn't being built
6  upon.  It wasn't being completed.
7      Q.   Did Mr. Kyte criticize the city's handling
8  of its pursuit of the bonds on the subdivision?
9      A.   I believe that he did, yes.
10     Q.   And then did you write your response to
11 the December 9th, 2010 letter?
12     A.   I don't recall.
13     Q.   If you could look at the next number
14 Exhibit 23, can you tell me if that refreshes your
15 recollection?
16     A.   It does, yes.
17     Q.   And can you tell the Court what Exhibit 23
18 is?
19     A.   It is a letter from me to Peter Kyte in
20 care of Paul Chronis regarding the previous letter
21 and kind of the city's position as it related to
22 the subdivision and litigation.
23     Q.   And I would like to direct your attention
24 to Page 2 of the exhibit at the bottom where it

                                                    37

1  begins TRG asserts, do you see that?
2      A.   Yes.
3      Q.   It says TRG asserts that Fidelity is the
4  only party responsibility -- the only party who
5  should bear responsibility.  Yorkville understand
6  that TRG's position because any other position
7  requires TRG to expend additional costs that TRG
8  may not have anticipated or anticipated but hope to
9  avoid which likely will make its investments in the
10 Whispering Meadows subdivision less profitable.
11          Did I read that correctly?
12     A.   Yes.
13     Q.   And this letter states the city's position
14 regarding the contentions made by TRG regarding its
15 handling of the bond litigation?
16     A.   Yes.
17     Q.   Now, following the -- following your
18 letter of December 10th, 2013, which is almost
19 three years today or exactly three years today from
20 your first letter to them, have you had further
21 discussions with TRG about Whispering Meadows?
22     A.   I believe so.
23     Q.   And is the city still in litigation with
24 TRG as of today?

                                                    38

1      A.   I know that they -- I don't believe some
2  but there are some appeals that are pending.
3      Q.   And you're not aware of any settlement
4  agreements between TRG and the City of Yorkville as
5  of today, are you?
6      A.   I am not.
7      MR. RIORDAN:  No further questions, your Honor.
8      THE COURT:  Counsel?
9               CROSS-EXAMINATION
10 BY MR. TURIELLO:
11     Q.   Good afternoon, sir.
12     A.   Hello.
13     Q.   Good to see you again.
14     A.   You, too.
15     Q.   Now, you don't have any training with
16 respect to performance bond sureties, fair?
17     A.   That's fair.
18     Q.   And you work with them in your position as
19 city administrator, though, fair?
20     A.   That's fair.
21     Q.   In a municipality such as Yorkville has a
22 surety bond in place to complete performance of a
23 subdivision in the event the developer doesn't meet
24 your standards; true?

                                                    39

1      A.   True.
2      Q.   Your understanding of a subdivision bond
3  is to secure completion of the improvements at some
4  point in the future should a subdivision become
5  dormant for one reason or another?
6      A.   Yes.
7      Q.   One situation where a developer may not be
8  able to complete improvements would be if a
9  developer goes bankrupt?
10     A.   Correct.
11     Q.   And performance bonds are in place to
12 protect the municipality in the event an issue
13 arises where the developer that was in place is no
14 longer in a position to complete the improvements?
15     A.   Yes.
16     Q.   And Yorkville has had situations where a
17 developer or owner of a subdivision has gone
18 bankrupt and Yorkville has been required to call
19 the bonds?
20     A.   Yes.
21     Q.   And that happened in this case with
22 Fidelity?
23     A.   Yes.
24     Q.   Is Whispering Meadows the only property

                                                    40

1    Yorkville has dealt with that has actually come out
2    of bankruptcy?
3        A.   I believe so.
4        Q.   Yorkville, though, did have other numerous
5    issues where it had to call a bond if a developer
6    walked away or was no longer present and available;
7    is that fair?
8        A.   Yes.
9        Q.   And you don't recall any prior instances
10   where surety has refused to perform work on a bond;
11   true?
12       A.   True.
13       Q.   You weren't aware of any surety company
14   other than Fidelity whose principal was defaulted
15   and refused to perform the work or on the bonds;
16   true?
17       A.   I believe so, yes.
18       Q.   You don't recall any prior situation in
19   Yorkville where other than Fidelity a surety
20   company argued that since their principal was in
21   bankruptcy, that they were free and clear of all
22   liability; true?
23       A.   True.
24       Q.   And you're not aware of any other surety

41

1    companies ever arguing that they actually get the
2    same protections or that their liability is
3    extinguished when their principal goes into
4    bankruptcy, agreed?
5        A.   Yes.
6        Q.   Prior to Fidelity, Yorkville never had to
7    sue a surety because they performed on a bond;
8    true?
9        A.   True.
10       Q.   In every other instance that you've been
11   involved in where a principal has been defaulted
12   and a surety has been called upon to perform under
13   the bonds, the surety has performed; correct?
14       A.   To my knowledge, yes.
15       Q.   And you're not aware of any other surety
16   company other than Fidelity when called upon to
17   perform, attempt to either sue or pass on its
18   liability to a subsequent owner; true?
19       A.   The -- yes. That's true.
20       Q.   If we can go to Fidelity -- or TRG
21   Exhibit 23. It's also -- you have it in front of
22   you as Fidelity Exhibit 20 if you want to refer to
23   a hard copy.
24       A.   Yes.

42

1        Q.   Okay. This is the letter that you just
2    talked about with Mr. Riordan that you drafted to
3    SunCal?
4        A.   Yes.
5        Q.   And the block quote you cite Section 22,
6    General Provision, Paragraph B from the annexation
7    agreement?
8        A.   Yes.
9        Q.   And then you make a statement in the
10   second to last paragraph, inasmuch as you do not
11   fall within the exception noted for purchasers to
12   acquire property for residential occupation, you
13   are subject to all outstanding covenants,
14   restrictions and obligation of the prior owners and
15   developer of Whispering Meadows subdivision;
16   correct?
17       A.   Yes.
18       Q.   And this is a statement that you made
19   based solely on review of the annexation agreement?
20       A.   Yes, and my -- so, no, not solely based on
21   the annexation agreement and my knowledge of a
22   general subdivision, you know, the general
23   annexation agreements.
24       Q.   You didn't review any of the bankruptcy

43

1    documents in making that statement; true?
2        A.   True.
3        Q.   And you didn't review the stipulation that
4    allowed Yorkville to proceed against the bond in
5    making that statement; agreed?
6        A.   Yeah, I don't recall doing so.
7        Q.   Counsel asked you about whether there was
8    any contact with Fidelity before the letters went
9    to TRG, do you recall that?
10       A.   I do.
11       Q.   If you could call up TRG Trial Exhibit 92.
12   This is an e-mail with an attached proposed
13   stipulation with the City of Yorkville dated
14   February 25th, 2010?
15       A.   Yes.
16       Q.   Actually, I'll approach the witness if I
17   may and give you a hard copy.
18       MR. RIORDAN:  What Trial Exhibit is that?
19       MR. TURIELLO:  Trial Exhibit 92.
20   BY MR. TURIELLO:
21       Q.   This is an exchange with Yorkville's
22   attorney and Mr. Riordan; is that right?
23       A.   Yes.
24       Q.   And that would have been ten months before

44

1   the letter that Mr. Riordan showed you to TRG?

2      A.   Yes.

3      Q.   And this actually would have been a couple

4   of months -- if TRG purchased the property in April

5   of 2010, this would have been before TRG purchased

6   the property from the bankruptcy state; agreed?

7      A.   Sure.

8      Q.   Just a calender?

9      A.   Yup.

10     Q.   So from this we do know that Yorkville was

11  in touch with Fidelity regarding the attached

12  stipulation to allow Yorkville to pursue the bonds

13  ten months before you wrote that letter to TRG;

14  agreed?

15     A.   It appears that our attorneys were, yes.

16     Q.   And that would be your understanding of

17  the standard practice if the principal is in

18  bankruptcy, you get permission and then you pursue

19  the surety; agreed?

20     A.   I don't know that I would agree with you,

21  but I'm not aware of how that would normally work.

22     Q.   But that's what you have the lawyers for;

23  right?

24     A.   Yes.

                                              45

1      Q.   You never reviewed the purchase and

2   agreement between the trust and TRG in making the

3   statement going back to Exhibit 23 about

4   Yorkville's position about TRG's responsibility as

5   a subsequent owner?

6      A.   I don't recall doing so, no.

7      Q.   And you did no review or analysis of the

8   impact -- if we can go back to Exhibit 23.  You did

9   no review or analysis of the impact of bankruptcy

10  on the property before making the statement to

11  SunCal, agreed?

12     A.   I believe that's correct.

13     Q.   And you're not aware of whether any

14  consideration was given to the bankruptcy in making

15  the statement to SunCal, agreed?

16     A.   I don't know.

17     Q.   If you could look at -- if we can go to

18  TRG Trial Exhibit 24.  I believe you have it in

19  front of you as Fidelity Exhibit 21 if that's

20  easier for you to refer to a hard copy.

21          And you went through this with Mr. Riordan

22  a few moments ago, do you recall that?

23     A.   Yes.

24     Q.   And this is TRG's response advising you

                                              46

1   that their position is that they're not a successor

2   in interest to the developer, agreed?

3      A.   Yes.

4      Q.   So in January of 2011, TRG responded to

5   you and advised that it purchased the property from

6   bankruptcy and they were not a successor in

7   interest to Kimball Hill; is that right?

8      A.   Yes.

9      Q.   If you could take a look at TRG Exhibit

10  No. 107.  I'll approach the witness and hand him a

11  copy.  And you're copied on this correspondence?

12     A.   Yes.

13     Q.   And this is a letter to Mr. Kilburn who

14  you understand is a representative of Fidelity?

15     A.   Yes.

16     Q.   And this notes that on February 22nd,

17  2011, the Yorkville city council voted to call the

18  performance bonds for Whispering Meadows one and

19  two to demand that Fidelity complete the land

20  improvement; correct?

21     A.   Yes.

22     Q.   And by doing so, it was Yorkville's intent

23  to seek performance on the bonds from Fidelity?

24     A.   Yes.

                                              47

1      Q.   And Yorkville was calling the bonds in

2   order to get the infrastructure completed?

3      A.   Yes.

4      Q.   And Yorkville's expectation was that

5   Fidelity had -- would either turn over the funds or

6   complete the infrastructure in the subdivision?

7      A.   Yes.

8      Q.   If you could look at TRG Exhibit No. 172.

9   I'm going to approach the witness and hand him a

10  copy.

11          This is an e-mail from you to the mayor on

12  March 15th, 2011; is that correct?

13     A.   Yes.

14     Q.   And you were writing to her at that point

15  in time to advise her on the bond issues?

16     A.   About the Whispering Meadows subdivision

17  in general, yes.

18     Q.   And you start at the top Whispering

19  Meadows conversation one and two bonds have been

20  called, only areas south of Faxson Road; is that

21  right?

22     A.   Yes.

23     Q.   And the next paragraph, if we can pull up

24  and highlight the second paragraph it starts with

                                              48

1  the word company.  It says, the company has called
2  us back to say they are evaluating it and will get
3  back to us.  If they agree the bond call was legal,
4  they will either complete the work themselves,
5  because it is a performance bond or they might
6  issue cash to the city and ask us to complete it.
7       Did I read that correctly?
8     A.  Yes.
9     Q.  And then it says -- I think the word if is
10  missing from the beginning of that paragraph; is
11  that correct?
12    A.  Yes.
13    Q.  If they do not agree that the bond call
14  was legal, then we'll have to negotiate or sue
15  them.  All indications make us think that the call
16  was legal and for the correct purposes.  Did I read
17  that correctly?
18    A.  Yes.
19    Q.  As of March 15th, 2011, Yorkville believed
20  that it had issued a legal and correct bond call;
21  correct?
22    A.  Yes.
23    Q.  And as of March 15th, 2011, it was
24  Yorkville's expectation at this point in time based

49

1  upon the fact that it had issued a legal bond call,
2  that Fidelity would either complete the work or
3  write a check?
4     A.  Yes.
5     Q.  And it was Yorkville's plan at that point
6  in time that if Fidelity took a different position,
7  that Yorkville would negotiate a resolution or sue
8  Fidelity; true?
9     A.  Yes.
10    Q.  And based upon the steps that Yorkville
11  had gone through, calling the bonds, getting the
12  appropriate stipulation to call the bonds, it was
13  your expectation that there wasn't an issue and
14  that Fidelity should --
15    A.  That's correct.
16    Q.  But you were aware at that point I think
17  there were other towns that were having issues with
18  Fidelity related to Kimball Hill Properties?
19    A.  Yes.
20    Q.  And based upon the climate, the housing
21  climate at the time, it was your belief that
22  bonding companies were going to look for ways to
23  not pay on the bond or to get out from under their
24  obligation if they could, especially when it came

50

1  to larger subdivisions like Whispering Meadows?
2     A.  Yes.
3     Q.  And Fidelity responded five days after
4  your e-mail to the mayor to your earlier letter
5  advising them that you called the bonds.  If we
6  could look at TRG Exhibit 108.  If I can approach
7  the witness and hand him a copy of the document.
8       On March 16th, 2011, Fidelity responded to
9  the bond call that Yorkville had issued on
10  February 23rd, 2011 --
11    A.  Yes.
12    Q.  -- is that right?
13       In its response, Fidelity requested
14  additional information to conduct its
15  investigation; correct?
16    A.  Yes.
17    Q.  So as of March 16th, 2011, about a year
18  after TRG bought the property, about a year after
19  the stipulations were being negotiated, Fidelity
20  had not asserted its coverage defense to its bonds
21  that it was not required to pay because the
22  principal was in bankruptcy, they were asking for
23  more information, agreed?
24    A.  I -- I don't know.

51

1     Q.  Okay.  In this correspondence, they're
2  not -- they didn't raise this defense that it's not
3  their obligation because the principal is in
4  bankruptcy; correct?
5     A.  I believe that's correct, yes.
6     Q.  They're asking for more information so
7  they can evaluate the work that's left to be done
8  so they can in your mind decide whether to cut a
9  check or finish the work themselves; correct?
10    A.  Yes.
11    Q.  Yorkville ultimately did have to sue
12  Fidelity thereafter, agreed?
13    A.  Yes.
14    Q.  And if the record shows that the lawsuit
15  was filed on May 5th, 2011, does that sound about
16  right?
17    A.  Yes.
18    Q.  And initially the lawsuit was only against
19  Fidelity, agreed?
20    A.  I believe so, yes.
21    Q.  And that was -- in the underlying
22  litigation, it was and still is the City of
23  Yorkville's position that the Fidelity bonds were
24  in place to secure performance of the work on that

52

1  subdivision, agreed?
2      A.  Yes.
3      Q.  And that was Yorkville's position from the
4  beginning is that the bonds were called and
5  Fidelity had an obligation to perform on those
6  bonds?
7      A.  Yes.
8      Q.  And if Fidelity had either written a check
9  for the work or performed the work itself, then the
10  bonded obligations would have been satisfied,
11  agreed?
12      A.  Yes.
13      Q.  And that's what you were expecting the
14  company to do for Fidelity is to perform in full
15  and complete the subdivision?
16      A.  Yes.
17      Q.  And if Fidelity had performed under its
18  obligations to complete the subdivision, the work
19  would have been done?
20      A.  Yes.
21      Q.  And so Fidelity, if when it was called
22  upon to do so, if it had performed under its surety
23  bonds, there would have been no need to sue a
24  subsequent owner if the work was done?

53

1      A.  Potentially.
2      Q.  If the work was done --
3      A.  Correct.
4      Q.  -- there's no need to sue; correct?
5      A.  Yes.
6      Q.  In that first lawsuit that Yorkville
7  filed, Fidelity filed a third-party complaint
8  bringing in TRG, is that your recollection?
9      A.  I'm sorry.  Can you repeat the question?
10      Q.  Sure.  So we've just established that
11  Yorkville sued Fidelity on May 5th, 2011; correct?
12      A.  Yes.
13      Q.  And Fidelity filed a third-party complaint
14  and brought TRG into that litigation in 2011 as
15  well; correct?
16      A.  I believe that's correct.
17      Q.  At that point in time when TRG -- or when
18  Fidelity first brought in TRG, Yorkville didn't
19  jump on board at that time and file suit against
20  Fidelity, agreed?
21      A.  To the best of my knowledge, yes.
22      Q.  So after two or three years of Fidelity
23  not performing on the bonds and the work not
24  getting done, you'd agree that some of the

54

1  homeowners were becoming agitated?
2      A.  Sure.
3      Q.  If I could show you exhibit -- TRG Trial
4  Exhibit No. 174.  If I could approach the witness
5  and hand him a copy of the exhibit.  Exhibit 174 is
6  an e-mail string.  If you look at the Trial Exhibit
7  Page 3, we see that the first e-mail is on
8  January 22nd, 2013, agreed?
9      A.  Yes.
10      Q.  If we go back to the first page, we see
11  that the e-mail string goes through March 18th,
12  2013?
13      A.  Yes.
14      Q.  And the last e-mail in the chain is
15  actually from you?
16      A.  Yes.
17      Q.  If we could turn back to the third page,
18  the initial e-mail.  Let me know when you have that
19  in front of you.
20      A.  I do.
21      Q.  This is an e-mail from an individual named
22  Brandy Rawlish?
23      A.  Yes.
24      Q.  And she was a resident of Whispering

55

1  Meadows?
2      A.  Yes.
3      Q.  And her e-mail is to Alderman Chris
4  Funkhouser?
5      A.  Yes.
6      Q.  And she writes, hi, Chris, can you provide
7  us with an update on the city bond's lawsuit with
8  Fidelity concerning our streets and Whispering
9  Meadows.  It's close to two years that this has
10  been in court and we're hoping for a resolution
11  soon.  In the meantime, our streets are breaking up
12  and it will most likely cost more to fix.
13          Did I read that correctly?
14      A.  Yes.
15      Q.  At this point in time we're now almost two
16  years after -- the bonds were called almost two
17  years after the lawsuit was filed against Fidelity
18  and Yorkville still had not sued TRG, agreed?
19      A.  I believe that's correct.
20      Q.  So at this point in time, if -- at this
21  point in time, Yorkville is receiving inquiries
22  from and complaints from residents by the length of
23  time it's taking for the work to be done and for
24  the lawsuit with Fidelity to proceed, agreed?

56

1      A.   Yes.
2      Q.   The alderman -- the streets that she
3  described that were deteriorating, those were
4  streets in front of lots owned by homeowners in the
5  subdivision; correct?
6      A.   I don't know that for a fact.
7      Q.   But she appeared to be complaining of
8  lots -- streets crumbling in front of her home;
9  correct?
10     A.   No, I don't think that's correct.  I think
11 further up in the e-mail she says her road Catalpa
12 is completely finished.  So I don't know for sure
13 that the street in front of her home specifically
14 was deteriorated at that time.
15     Q.   You don't know what street she's referring
16 to at that point?
17     A.   Sure, that's fair.
18     Q.   At that point in time, 75 percent of the
19 lots in the subdivision were owned by homeowners?
20     A.   That sounds correct.  I don't know for
21 sure, though.
22     Q.   And not owned by TRG?
23     A.   Sure.  Yes.
24     Q.   We see that -- if we go to the second page
                                                    57

1  of the e-mail.  Alderman Funkhouser on March 16,
2  2015, forwarded the e-mail to you and asks -- if we
3  can call that up toward the bottom of the page.
4  Bart, can you provide an update on the Whispering
5  Meadows bond calls.
6           Did I read that correctly?
7      A.   Yes.
8      Q.   And if we can go up to the -- your
9  March 18th, 2013 response, you responded the March
10 18th, 2013, 9:57 a.m. e-mail, you respond we're
11 still in the discovery slash interrogatory phase.
12 We've been preparing documents and responding to
13 questions for the past few months.  This is not
14 likely to make it through the court system soon.
15          Did I read that correctly?
16     A.   Yes.
17     Q.   At this point in time now almost two
18 months after --
19     THE COURT:  I'm sorry, Counsel, could you wait
20 for a response to your question?
21     MR. TURIELLO:  He said yes.
22     THE COURT:  I didn't hear one.
23     THE REPORTER:  He said yes, your Honor.
24     THE COURT:  Okay.  Into the microphone, please.
                                                    58

1      MR. TURIELLO:  I apologize, your Honor.
2  BY MR. TURIELLO:
3      Q.   This is almost two months after Ms.
4  Rawlish's initial e-mail?
5      A.   Yes.
6      Q.   At this point in time TRG had not been
7  sued by Yorkville?
8      A.   I believe so.
9      Q.   And if we look at March 18th -- oh, we
10 just looked at that.  Ms. Rawlish responded on
11 March 18th at 4:16 on Page 1, do you see that?
12     A.   Yes.
13     Q.   And she responds, seems we've been in this
14 discovery slash interrogatory phase for two years
15 now.  What's the real hold up.  Sugar Grove is
16 going through the same legal battle with Settler
17 Ridge, Kimball Hill Property and the same bond
18 company, Fidelity.  They are meeting with residents
19 tomorrow at 6:00 p.m. to address the issue.
20          Did I read that correctly?
21     A.   Yes.
22     Q.   And then you responded to her again the
23 same day at the top of the page?
24     A.   Yes.
                                                    59

1      Q.   And you state -- well, actually if we go
2  to the middle, you responded twice on March 18th at
3  4:28 p.m. on Page 1?
4      A.   Okay.
5      Q.   You respond to Aldermen Munns and
6  Funkhouser and I believe Ms. Rawlish is dropped
7  from the e-mail at this point?
8      A.   Yes.
9      Q.   And you write, I'm not sure who she's --
10 she's referencing when she says they were told
11 things were expected to go smoothly, nor am I aware
12 the context under which she was told that
13 information.
14          Did I read that correctly?
15     A.   Yes.
16     Q.   It is possible she is remembering a
17 conversation we had at city council prior to us
18 litigating or it could have been an e-mail.
19 Nonetheless, the expectation of smoothness would
20 have been reasonable prior to litigation and not so
21 afterwards.  Litigating bond calls is very
22 expensive and long.
23          Did I read that correctly?
24     A.   Yes.
                                                    60

1     Q.   And it's fair to say that at the time you
2   issued the bond call that you did not expect that
3   the -- this interaction with Fidelity would go as
4   roughly as it did; fair?
5     A.   That's fair.
6     Q.   After Ms. Rawlish mentioned Sugar Grove,
7   you note in the e-mail at the top of the page about
8   a conversation that you just had with a village
9   administrator?
10    A.   Yes.
11    Q.   And if we can go to the top e-mail.  It
12  says I just spoke with their village administrator
13  and the their is Sugar Grove, would you agree?
14    A.   Yes.
15    Q.   And you were aware at this time that
16  Fidelity was also doing this what they were doing
17  to you with other municipalities, agreed?
18    A.   Yes.
19    Q.   And you were concerned at this time that
20  this was a function of the economy, that bonding
21  companies were attempting to minimize or get around
22  their responsibilities, agreed?
23    A.   Yes.
24    Q.   Your e-mail goes on to state, they are in

61

1   almost the same situation as us.  A rejected bond
2   call with Fidelity has turned into litigation.
3   They don't really have much to update the residents
4   other than laying out the entire history of the
5   events and reiterating that they expect to be
6   successful in litigation at some point as we do.
7         Did I read that correctly?
8     A.   It says as do we but the rest of it was
9   correct.
10    Q.   Thank you.  And it goes onto state -- I
11  probably should read from the e-mail and not my
12  re-typed version of it.  It goes onto state,
13  however, they are in the middle of a hotly
14  contested election season and a few of the current
15  office holders and candidates wanted to make sure
16  everyone was aware of the current status of the
17  litigation even though there is not much that can
18  be done other than to continue through the court
19  system.
20         Did I read that correctly?
21    A.   Yes.
22    Q.   This is on March 18th, 2013; right?
23    A.   Yes.
24    Q.   And Yorkville didn't file its lawsuit

62

1   against TRG until June 27th, 2013; correct?
2     A.   I believe so.
3     Q.   That's two and a half years after the
4   letter that you initially sent to SunCal?
5     A.   Yes.
6     Q.   After having discussions with residents
7   and with Sugar Grove about resident concerns and
8   upset residents during an election season; is that
9   correct?
10    A.   Sure.
11    Q.   And having upset residents during an
12  election season is not something that elected
13  officials generally want to have, agreed?
14    A.   Sure.
15    Q.   And what Ms. Rawlish is complaining about
16  is the streets which is a bonded improvement,
17  agreed?
18    A.   Yes.
19    Q.   So after two and a half years, Yorkville
20  files an amended complaint adding TRG as a
21  defendant raising what you said here that it's your
22  position that subsequent owners have the
23  responsibilities as the developer under a
24  subdivision -- or under the annexation agreement,

63

1   agreed?
2     A.   Yes.
3     Q.   That position was rejected by the -- by
4   the court in Kendall County, City of Yorkville,
5   agreed?
6     A.   Yes.
7     Q.   The case was dismissed in January of 2014
8   about six months after it had been filed?
9     A.   I believe so.  I don't recall the exact
10  date.
11    Q.   And you are aware that Yorkville filed
12  multiple motions to re-consider asking that the
13  case be re-instated and those were all rejected?
14    A.   I remember that there was a motion to
15  re-consider.  I don't necessarily remember that
16  there were multiple.  I don't have reason to doubt
17  it but --
18    Q.   Well, if the record shows that there were
19  two, do you have any reason to doubt that?
20    A.   No.
21    Q.   You do agree that the Court continued to
22  reject Yorkville's position?
23    A.   Yes.
24    Q.   And there was a 2014 lawsuit filed as well

64

1  against Fidelity under bond number four?
2      A.   Yes.
3      Q.   And that was filed -- if the record shows
4  May 2nd, 2014, does that sound accurate?
5      A.   It sounds accurate, yeah.
6      Q.   And Yorkville didn't have TRG in that
7  lawsuit until January of 2015, is that --
8      A.   It sounds accurate.
9      Q.   And that was dismissed within three
10 months, agreed?
11     A.   Yeah, I don't have a reason to doubt that.
12     Q.   The same thing as the 2011 lawsuit,
13 Yorkville filed a motion to re-consider asking the
14 Court to accept your interpretation of the
15 annexation agreement and the Court rejected your
16 position, agreed?
17     A.   I believe that's correct.
18     Q.   And Yorkville continued the litigation
19 between Fidelity -- with Fidelity up through
20 February of this year?
21     A.   I believe so, yes.
22     Q.   And during that time the -- well, during
23 that time it was your understanding that Fidelity
24 still had the ability to appeal the dismissal of

65

1  its complaint against TRG?
2      A.   I believe so.
3      THE COURT:  Before you start your next
4  question, we've been with this witness on the stand
5  for an hour now.
6      MR. TURIELLO:  If I have, I'm just checking
7  notes from counsel.  I maybe have one question,
8  maybe two, but I think I can wrap up with him in
9  the next minute or two.
10     THE COURT:  Then I'm sure there will be some
11 re-direct but, okay, you can conclude.
12 BY MR. TURIELLO:
13     Q.   The Court in Kendall County rejected
14 Yorkville's position on the very annexation
15 agreement that Mr. Riordan showed you in this court
16 earlier, agreed?
17     A.   I believe so, yes.
18     Q.   And were you aware that this position that
19 Yorkville was asserting that it was absolved of
20 liability because its principal went bankrupt or it
21 could sue the subsequent owner that that was
22 rejected -- let me withdraw that question.
23          Were you aware that Yorkville's position
24 that it had no liability because its principal went

66

1  bankrupt was ultimately rejected by the Court in
2  Sugar Grove?
3      MR. RIORDAN:  I'm going to object, your Honor.
4  I don't believe -- I object to the form of the
5  question.
6      MR. TURIELLO:  I'm just asking if he was aware.
7      THE COURT:  Well, if he answered the question
8  in the form, it's misleading so --
9      MR. RIORDAN:  The form is misleading because
10 he's saying their position was because the
11 principal is in bankruptcy, the position was
12 because he became a new owner, which is a very
13 substantially different position.  It's stated in
14 the letter.
15     THE COURT:  Counsel --
16     MR. TURIELLO:  I can.
17     THE COURT:  -- can you rephrase?
18     MR. TURIELLO:  I can.
19 BY MR. TURIELLO:
20     Q.   We talked earlier about your interactions
21 with the administrator for Sugar Grove where they
22 told you about the problems they were having with
23 Fidelity seeking to avoid the bonds, agreed?
24     A.   Yes.

67

1      Q.   And were you aware that in Sugar Grove
2  Fidelity lost?
3      A.   No, I wasn't aware of that.
4      MR. TURIELLO:  Thank you, Mr. Olson.  Thank
5  you, your Honor, that's all I have.
6      THE COURT:  All right.  And then counsel for
7  Fidelity, I'm assuming you want some re-direct as
8  well.  How much time do you think you'll have on
9  re-direct?
10     MR. RIORDAN:  Five, ten minutes the most.
11     THE COURT:  Okay.  So I'll leave it to the
12 witness.  Do you need a break now or can you go for
13 another five, ten minutes?
14     THE WITNESS:  I can go.
15     THE COURT:  All right.
16          RE-DIRECT EXAMINATION
17 BY MR. RIORDAN:
18     Q.   Mr. Olson, I believe in answering one of
19 Mr. Turiello's questions you said that the suits
20 against F&D were the only times that Yorkville sued
21 a surety to recover on their bonds and you said no,
22 do you recall that?
23     A.   I do.
24     Q.   Do you recall a company by the name of

68

1   Ocean Atlantic?
2       A.   I do.
3       Q.   Do you recall that the City of Yorkville
4   sued Ocean Atlantic to recover under its bonds?
5       A.   I do.
6       Q.   And do you recall that Ocean Atlantic won
7   that case on the statute of limitations defense?
8       A.   That I don't recall specifically.
9       Q.   And when was the Ocean Atlantic case?
10  That predated the Fidelity case.
11      A.   I believe it predated it.
12      Q.   Mr. Turiello showed you an e-mail, which
13  is marked as TRG Exhibit 92 which I think -- I
14  thought he gave you a hard copy of that.
15      A.   TRG Trial Exhibit 92 --
16      Q.   Right.
17      A.   -- Exhibit 68?
18      Q.   Yes.
19      A.   Yes.
20      Q.   And he characterized this as a
21  communication between myself and Mr. Nate Lusignan
22  who is a -- was a member at that time of a law firm
23  retained by the City?
24      A.   I believe I characterized it as an e-mail
                                                    69

1   between the city's attorneys and then the attorneys
2   for Fidelity.
3       Q.   And do you know who the attorney for
4   Fidelity was at that time?
5       A.   No, I don't.
6       Q.   Would you -- would it surprise you to
7   learn that it was me?
8       A.   No.  No, it wouldn't.
9       Q.   And the e-mail is from Mr. Mark Radtke, do
10  you know who he is?
11      A.   I do not.
12      Q.   Okay.  Do you know who he represents?
13      A.   From this e-mail it appears that he's
14  representing Fidelity.
15      Q.   Okay.  Would it surprise you to learn that
16  he does not represent Fidelity?
17      A.   It would.
18      Q.   Do you know that he represents the
19  liquidation trust in this bankruptcy case?
20      A.   Yes.  I see that further down the document
21  now, yes.
22      Q.   This e-mail is a communication between
23  Mr. Radtke and other counsel; correct?
24      A.   Yes, you are correct.
                                                    70

1       Q.   And I think Mr. Turiello also showed you
2   TRG Exhibit 108.
3       A.   Marked as 88, TRG Exhibit 108.
4       Q.   Yes.  Correct.  Now, this letter was
5   addressed to Mr. Wywort?
6       A.   It is.
7       Q.   And as I think you testified earlier he
8   was the city engineer from the United City of
9   Yorkville in March of 2011?
10      A.   Yes.
11      Q.   And it was his responsibility -- or he had
12  responsibilities associated with subdivision
13  developments?
14      A.   Yes.
15      Q.   And did Mr. Wywrot prepare punch lists?
16      A.   I'm sorry.  Can you repeat?
17      Q.   Did he prepare punch lists?
18      A.   Yes.
19      Q.   And that would -- that was one of his
20  duties with respect to subdivision development work
21  to prepare punch lists?
22      A.   Yes, him or his subordinates.
23      Q.   Now -- and in the letter which I wrote on
24  behalf of the F&D, I ask for additional
                                                    71

1   documentation; correct?
2       A.   I believe so, yes.
3       Q.   And in the second page of the letter in
4   the first full paragraph it states, I direct your
5   attention to the conditions perceived and contained
6   in the bonds concerning written notice in the
7   filing of suit.
8            Did I read that correctly?
9       A.   Yes.
10      Q.   In that regard, the bonds provided to the
11  city shall provide written notice to F&D upon the
12  city's discovery of any act or omission that shall
13  or might involve a loss under the bonds and the
14  city must file suit on or about no later than 12
15  months following discovery of the act or omission
16  of KHI, which is Kimball Hill, on account in which
17  the claim is made.
18           Did I read that correctly?
19      A.   Yes.
20      Q.   Were these defenses raised in the bond
21  litigation?
22      A.   That I'm not aware of.
23      Q.   Do you recall that F&D filed a motion for
24  summary judgment based on these conditions in the
                                                    72

---

1  bond litigation?
2      A.   I recall something of that nature, sure.
3      Q.   And you were -- a mediation was held
4  between F&D and the City of Yorkville?
5      A.   Yes.
6      Q.   Was the subject of the limitations brought
7  up during the mediation?
8      A.   That I don't recall.
9      Q.   And as a result of the mediation, F&D paid
10  the city; correct?
11      A.   Yes, there was a settlement.
12      Q.   Were the bonds released?
13      A.   I believe that they were.
14      MR. RIORDAN:  That's all I have, Judge.  Thank
15  you.
16      THE COURT:  Thank you.
17          Is either party going to call this witness
18  for any purpose?
19      MR. TURIELLO:  No, your Honor.
20      MR. RIORDAN:  No, your Honor.
21      THE COURT:  Thank you very much.  You are
22  excused.
23              (witness excused.)
24              (Short recess taken.)

73

---

1      THE CLERK:  Re-calling Kimball Hill, Inc.
2      THE COURT:  So we're back on the record with
3  the Kimball Hill trial.  We remain in Fidelity's
4  case in defense.  We have one further witness is
5  what I've been told.
6      MR. RIORDAN:  That's what you've been told,
7  your Honor.
8      THE COURT:  Have I been told wrong?
9      MR. RIORDAN:  No, you haven't, Judge.
10      THE COURT:  And how much do you anticipate
11  having with this witness?
12      MR. RIORDAN:  No more than an hour.
13      THE COURT:  Okay.  Call your witness.
14      MR. RIORDAN:  I call Mr. Brian Barry to the
15  stand, your Honor.
16      THE COURT:  Please remain standing.
17              (witness sworn.)
18      THE CLERK:  Please state your name for the
19  record.
20      THE WITNESS:  Brian Barry.
21      THE COURT:  You may have a seat, sir.  And I
22  think you were here this morning when I was telling
23  the previous witness about how the microphone works
24  and alike.

74

---

1      THE WITNESS:  Yes, I was.
2      THE COURT:  Okay.  Well, I'll just remind you
3  also no matter who is asking the questions, your
4  job is to answer it.  If you can't answer it, talk
5  to me.  We'll see what we can do.
6      THE WITNESS:  Okay.
7      THE COURT:  And if you need a break, let me
8  know.
9      THE WITNESS:  Okay.  I shall.
10      THE COURT:  Counsel, your witness.
11      MR. RIORDAN:  Thank you, your Honor.
12              BRIAN BARRY,
13  having been first duly sworn, was examined and
14  testified as follows:
15          DIRECT EXAMINATION
16  BY MR. RIORDAN:
17      Q.   Mr. Barry, where do you reside?
18      A.   I now reside in an area outside of
19  Philadelphia, Kennett Square, Pennsylvania.  My
20  permanent address, though, is in Wausau, Wisconsin.
21      Q.   Can I ask you to speak up a little bit --
22      A.   Sure.
23      Q.   -- because you have a soft voice and
24  everybody hears you?

75

---

1      A.   Okay.  Wausau, Wisconsin is my permanent
2  residence.
3      Q.   And what is your business or occupation?
4      A.   I'm a real estate appraiser.
5      Q.   And by whom are you employed?
6      A.   Cambridge Partners in Palatine, Illinois.
7      Q.   And what is Cambridge Partners?
8      A.   Cambridge Partners is a valuation firm
9  that performs valuations for business purposes,
10  financial planning purposes and for bank lending.
11  We have three disciplines, business valuations,
12  machinery and equipment and real estate, and I'm in
13  the real estate division.
14      Q.   And what position do you currently hold at
15  Cambridge?
16      A.   I'm a senior manager.
17      Q.   And are the duties and responsibilities of
18  a senior manager at Cambridge?
19      A.   To oversee the real estate valuation
20  department.
21      Q.   How many employees report to you at this
22  time?
23      A.   At this time, just myself.
24      Q.   And who do you report to at Cambridge?

76

1        A.   A man named Jim Lemperis and another named
2   Nick Lemperis.  Nick is the owner.
3        Q.   And how long have you been the manager of
4   the real estate division?
5        A.   About 15 years.
6        Q.   I'd like to -- and during that time, what
7   have your duties and responsibilities been during
8   that 15-year period as manager, have they changed
9   in any respect?
10       A.   Not really changed.  Just grown to be more
11  of a base of what we participate in as far as
12  valuations.  When I first came on, we did a lot of
13  food processing and a lot of special use type
14  properties and loan commodity, tax credit,
15  apartments, market studies of such and we've grown
16  to do much more than that.  Now we do other
17  properties as well.
18       Q.   And during the last 15 years, can you
19  estimate for me how many appraisals you have done?
20       A.   I would estimate somewhere between 1500
21  and 2,000 appraisals.
22       Q.   Have any of those appraisals involve the
23  appraisals of subdivision property?
24       A.   Yes.

                                                    77

1        Q.   And can you tell the Court how many
2   subdivisions you have appraised?
3        A.   Approximately seven.
4        Q.   Do you recall them?
5        A.   I do.  There's -- there were two in
6   Michigan.  One in Frankfurt.  And one in Yorkville.
7   And there are three instances in Hampshire, which
8   involved the same property but under three
9   different scenarios under three different time
10  periods.
11       Q.   And directing your attention to the
12  Michigan properties, who was your client?
13       A.   It was a law firm.  I can't remember who
14  exactly it was, though.  It was for trust purposes.
15       Q.   What type of properties -- or were these
16  two separate appraisals or one appraisal?  You said
17  two instances in Michigan.
18       A.   They were separate appraisals.
19       Q.   So let's talk about the first time in
20  Michigan, when was that?
21       A.   Approximately 2005.
22       Q.   And what type of property were you asked
23  to appraise?
24       A.   A residential subdivision.

                                                    78

1        Q.   And you were employed by a law firm you
2   said?
3        A.   Yes.
4        Q.   Do you recall the name of the law firm?
5        A.   I do not.
6        Q.   And what was the purpose of appraising the
7   subdivision?
8        A.   It was for estate settlement person.  The
9   person who owned the property had passed away and
10  we were evaluating the property for his estate.
11       Q.   And what methodology did you use in
12  appraising the property?
13       A.   Discounted cash flow.  We figured out the
14  sell out period for the lots, the lot pricing and
15  the holding cost during the period.
16       Q.   Was that a retrospective appraisal?
17       A.   It was.
18       Q.   Did you use any data past the valuation
19  date in arriving your opinions in that matter?
20       A.   No.
21       Q.   And why not?
22       A.   Because we had set a time frame which was
23  established by the attorney -- well, the date of --
24  the date of passing was the date of value.  So once

                                                    79

1   we establish that time frame, that became -- or
2   aligned with the standards of the cost.  For
3   analysis purposes, you're only supposed to really
4   consider data that's relevant to that time period.
5        Q.   And is that a standard in the appraisal
6   industry?
7        A.   Yes, and especially in the estate planning
8   because of the definition of fair value that's used
9   by the IRS.  The IRS uses a value that is called
10  fair value, which establishes that the relevant
11  facts have to be as of that time period.  It cannot
12  go beyond the date of value, effective date of
13  value.
14       Q.   And the second Michigan engagement which
15  involved the subdivision, who was your client at
16  that time?
17       A.   It was again a law firm.
18       Q.   And what was the purpose of the appraisal?
19       A.   Oh, it was much like the other appraisal
20  as well.  A person had owned some land, and we were
21  valuating a plan for the estate purposes.
22       Q.   And was this -- did this involve estate
23  tax valuations as the prior one did?
24       A.   We were doing it for estate planning so

                                                    80

1  perhaps it would have had some type of tax
2  implications to the estate.
3      Q.   And was that a retrospective appraisal as
4  well?
5      A.   It was.
6      Q.   What is a retrospective appraisal?
7      A.   An appraisal that takes point in a time
8  period that was somewhere before the current time
9  period.
10      Q.   So you're assuming this is -- you're
11  talking about a valuation date that pre-dates
12  today?
13      A.   Correct.
14      Q.   You're talking about -- you're going back
15  in time?
16      A.   That's correct.  Generally like in estate
17  planning we may be as of today but the person may
18  have passed away back in February so we consider
19  the date which perhaps would have been
20  February 17th, that would become our date of the
21  value.
22      Q.   Did you use any information after the date
23  of value to arrive at your appraisal opinions in
24  that matter?

81

1      A.   No.
2      Q.   And I'll draw your attention to -- you
3  said there were -- there was an appraisal in
4  Yorkville?
5      A.   That's correct.
6      Q.   And what were the other Illinois towns?
7      A.   Frankfort and Hampshire.
8      Q.   And which was -- of those three, what was
9  the earliest one?
10      A.   I believe Yorkville would have been the
11  first one.
12      Q.   Let's talk about Yorkville.  What -- who
13  is your client?
14      A.   It was a bank out of Frankfort.
15      Q.   And what was the purpose of the appraisal?
16      A.   The bank had lent to one of their prime
17  clients in order for them to develop a subdivision
18  and they had done so somewhere around 2005, 2006,
19  and because of the housing crisis that occurred in
20  '07 and '08, the bank was left holding the property
21  when the subdivision went bankrupt.
22      Q.   And in that instance, did you have an
23  occasion to interact with any officials from the
24  United City of Yorkville?

82

1      A.   No, I did not.
2      Q.   Do you recall the name of the subdivision?
3      A.   I don't.  I'm sorry.
4      Q.   And was that a retrospective appraisal?
5      A.   It was.
6      Q.   And did you use any data subsequent to the
7  valuation date in arriving to your opinions in that
8  matter?
9      A.   No, it would not have gone beyond the date
10  of value.
11      Q.   And calling your attention to the
12  Frankfort engagement, who was your client there?
13      A.   Again, the bank in Frankfort.
14      Q.   So it's the same client as you had in
15  Yorkville?
16      A.   It was.
17      Q.   Was the purpose of the appraisal as it had
18  been in Yorkville?
19      A.   It was, yes.
20      Q.   And was that a retrospective appraisal as
21  well?
22      A.   Yes, it was.
23      Q.   And did you use any data subsequent to the
24  date of value in arriving at your opinions in that

83

1  case?
2      A.   No.
3      Q.   Now, you had mentioned one other
4  subdivision which involved three parts I think you
5  said or three scenarios?
6      A.   Under three scenarios, yes.
7      Q.   And what subdivision was that?
8      A.   It's a subdivision called Serosun Farms.
9      Q.   And where is that located?
10      A.   In Hampshire, Illinois.
11      Q.   Okay.  And can you tell us who your client
12  was for that engagement?
13      A.   It was one of the landowners.  The land
14  had been inherited by siblings and they wanted to
15  go ahead and do something with the land but keep
16  some in care of the rules of Hampshire.
17          So they were trying to put in some type of
18  subdivision and also had horseback riding and a
19  country atmosphere to it but the plans had changed
20  through the years so we were hired to value -- or
21  to -- yeah, to value the subdivision upon different
22  scenarios as their plans shifted.
23      Q.   Was that a prospective appraisal or --
24      A.   That was a current value.

84

1    Q.   That was a current value?
2    A.   It was.
3    Q.   And what is a current value appraisal?
4    A.   A current value would be general as
5 of generally the date of inspection or the time it
6 would have been with the developer and received the
7 information we needed in order to proceed with the
8 valuation.
9    Q.   I'm sorry, go ahead and finish your
10 answer.
11    A.   Oh, no, just it can be either the date of
12 inspection. Generally, it's a time period from
13 when you were first engaged, the time that we
14 inspected the property or received the bulk of the
15 data that you need in order to formulate your
16 opinions.
17    Q.   And did you issue your reports subsequent
18 to your date of value --
19    A.   Yes.
20    Q.   -- in that case?
21    And did you use any information subsequent
22 to the date of value and prior to the date of your
23 report in arriving to your opinions to the Serosun
24 Farms engagement.

85

1    A.   No, it was all prior to the date of value.
2    Q.   Mr. Barry, I'd like to review your
3 educational background, if I might. Where did you
4 attend high school?
5    A.   Barrington High School.
6    Q.   And where did you attend college?
7    A.   Northern Illinois University.
8    Q.   And what degree did you obtain from
9 Northern Illinois University?
10    A.   Russian studies.
11    Q.   And when was that?
12    A.   1989.
13    Q.   And following your graduation from
14 Northern Illinois University, did you enter the
15 workforce?
16    A.   I did. Not immediately. I was slated to
17 go in the Navy in June of 1989, and my position was
18 pushed back to October. I was supposed to go to
19 flight school and the position was flipped back to
20 October and then October became the following June
21 so I decided not to pursue that career and went
22 onto other things.
23    Q.   So not to pursue the career in the Navy?
24    A.   That's correct. Because of flight school

86

1 because of budget restraints and aircraft
2 reconfiguration that was not --
3    Q.   What was your first job after graduating
4 from college, first full-time position?
5    A.   It would have been February 1990.
6    Q.   And what who was your employer?
7    A.   American Airlines.
8    Q.   And what did you do for American Airlines?
9    A.   I was a flight attendant.
10    Q.   And how long were you with American
11 Airlines?
12    A.   About three and a half years.
13    Q.   And why did you go to work for American
14 Airlines?
15    A.   They had just purchased the routes to --
16 or the right -- or the routes to fly from Chicago
17 to Moscow and I was hoping to service those routes
18 and meet people going back and forth, business
19 people and see if I can make some connections to
20 start some business over in Russia or some type of
21 activity with my Russian degree.
22    Q.   And when did you leave American Airlines?
23    A.   1993 I believe.
24    Q.   And why did you leave?

87

1    A.   Because I had gotten married and wanted to
2 try something else instead. My wife stayed on as a
3 flight attendant for a while but I decided to go
4 and try to go into the security world. I was
5 always interested in stocks and bonds. I traded
6 through college and put myself through college
7 trading, and I wanted to become a stock broker.
8    Q.   And so who did you work for after leaving
9 American Airlines?
10    A.   I went to a small firm called Chatfield
11 Dean initially for my Series 7 licensing, but
12 shortly thereafter after I received my license I
13 went onto Merrill Lynch.
14    Q.   What is a Series 7 license?
15    A.   It's a security broker's license.
16    Q.   And when did you begin working for Merrill
17 Lynch?
18    A.   It was in 1994.
19    Q.   And where was that?
20    A.   In Barrington.
21    Q.   And how long did you work in Merrill
22 Lynch?
23    A.   About a year. I believe it was 1993.
24 1993 is when I worked there.

88

1    Q.    And what did you do for them?
2    A.    I was a stockbroker dialing calls and
3  trying to drum up business.
4    Q.    And when did you leave Merrill Lynch?
5    A.    July 4th the following year, yes.
6    Q.    And why did you leave?
7    A.    July 3rd. I'm sorry, I left before July
8  4th. July 3rd. We just came to an understanding
9  that this wasn't the career for me.
10   Q.    And did you -- where did you work after
11 leaving Merrill Lynch?
12   A.    I went to the Chicago Board of Trade a
13 week later.
14   Q.    And what were you doing -- what did you do
15 at the Chicago Board of Trade?
16   A.    I worked at the bond trader futures pit.
17   Q.    And how long did you work in the bond
18 trader futures pit?
19   A.    About five and a half years.
20   Q.    And when did you leave the Board of Trade?
21   A.    1999.
22   Q.    And where did you go to work after that?
23   A.    Well, while I was at the Board of Trade I
24 had gone along and picked up my residential

                                                    89

1  appraiser's license. Because we got out at 2:00
2  o'clock in the afternoon and there was time left in
3  the day so I thought that I would try to pick up a
4  second job.
5         So I started doing residential appraisals
6  after work and on the weekends. So I was actually
7  working part-time as a residential appraiser from
8  1988 through 1999.
9    Q.    You mentioned a residential appraiser's
10 license. Who issues that license?
11   A.    The State of Illinois.
12   Q.    And did you have to take any coursework in
13 order to obtain the license?
14   A.    Yes, there are three or four courses,
15 basic appraisal courses that need to be taken and
16 passed and then you sit for the State exam after
17 that.
18   Q.    And is the exam administered by the State
19 of Illinois?
20   A.    It is.
21   Q.    And when did you receive your residential
22 appraisers license?
23   A.    1998.
24   Q.    And when you left of the Board of Trade,

                                                    90

1  did you become a full-time residential real estate
2  appraiser?
3    A.    Yes.
4    Q.    And did you work by yourself or did you
5  work for a company as a residential real estate
6  appraiser?
7    A.    I worked for a company.
8    Q.    And what company was that?
9    A.    Steven & Associates was the last I worked
10 for. George Cortic was the person I worked with
11 prior to that.
12   Q.    When did you leave your employer as a
13 residential real estate appraiser?
14   A.    About the time I went with Cambridge
15 Partners in 2000, the year 2000 so probably early
16 2000. Probably January of 2000.
17   Q.    Now, directing your attention to the year
18 2000, you just testified that you joined Cambridge
19 Partners. What position were you hired as?
20   A.    As an appraiser.
21   Q.    And did you hold any licenses at that time
22 other than your residential real estate license?
23   A.    No, at that time that's all I held.
24   Q.    Did you work for -- did you report to

                                                    91

1  anyone in particular at Cambridge when you were
2  hired by Cambridge?
3    A.    Yes, I reported to two people. The main
4  person was Tom Rogers and the second person was a
5  man named David Binner.
6    Q.    And were they doing real estate
7  appraisals?
8    A.    Yes, they were.
9    Q.    Did they hold any licenses to your
10 knowledge?
11   A.    Yes, they both held certified general real
12 estate appraisal licenses through -- issued through
13 the State of Illinois.
14   Q.    And what is the general real estate
15 appraiser license?
16   A.    A certified general appraisers license is
17 a license that's beyond residential. Residential
18 has four basic courses. And then for a certified
19 general we have to go onto study more and pass
20 exams on income approach, highest and best use and
21 other standards that apply to commercial properties
22 those that are income producing.
23   Q.    And how long did you report to Mr. Binner?
24   A.    About three years.

                                                    92

1    Q.   And did he leave Cambridge at that time
2  after the three-year period?
3    A.   He did.
4    Q.   And after he left, did you report to
5  anyone?
6    A.   To Tom Rogers I believe.  That's -- I
7  believe that's how the sequence went but, yes.
8    Q.   Did Mr. Rogers hold any licenses?
9    A.   Yes, he was a certified general real
10  estate appraiser as well.
11    Q.   Did they hold any other designations as
12  appraisers?
13    A.   Yes, both were members of the Appraiser
14  Institute MAI.  Mr. Binner was also a certified
15  public accountant and a charter financial analyst.
16    Q.   Did there come a point in time where
17  Mr. Rogers left Cambridge?
18    A.   Yes.
19    Q.   And when was that?
20    A.   I believe that was 2003 or early 2004.
21    Q.   And by the time Mr. Rogers left, had you
22  received any other licenses?
23    A.   Yes.  I came out of Cambridge in the year
24  2000, and by 2001 I was a certified general real

93

1  estate appraiser so I had gone through the
2  additional coursework and passed the licensing
3  through the State of Illinois.
4    Q.   I'm going to -- you prepared a letter for
5  me I believe dated July 19th, 2018, which is F&D
6  Trial Exhibit 48.  There's a book in front of you
7  called Trial Exhibits Two of Two.
8    A.   Yes, I see it.  Yes.
9    Q.   And if you refer to Exhibit 48.  And if I
10  can direct your attention to Page 8 -- starting at
11  Page 8 of the exhibit.
12    A.   Okay.
13    Q.   Through Page 12 of the exhibit.  Do these
14  pages contain a summary of your qualifications as
15  an appraiser?
16    A.   They do.
17    Q.   And it shows professional development
18  courses on Page 8 of the exhibit?
19    A.   Yes.
20    Q.   And then it shows Appraisal Institute?
21    A.   Yes.  That's correct.
22    Q.   And what is the Appraisal Institute?
23    A.   It's an institute that's been established
24  that is set up to have appraisers be held to a

94

1  higher level of reporting and data collection and
2  analysis.
3    Q.   Are you associated with the Appraisal
4  Institute at this time?
5    A.   I am.  I'm an associate member of the
6  Appraisal Institute.
7    Q.   What is an associate member of the
8  Appraisal Institute?
9    A.   An associate member is a dues paid member
10  who has also opened themselves up to review by the
11  Appraisal Institute.  They can look at my reports
12  and see if there's anything that I need to address.
13  I also -- and under a timeline to complete my
14  education and my testing for -- to become a full
15  member of the Appraisal Institute.
16    Q.   And what testing is required -- strike
17  that.
18         What coursework is required to become a
19  full member of the Appraisal Institute?
20    A.   There's several courses.  They touch on
21  highest and best use analysis, income purchase is a
22  great one as well for direct capitalization and
23  discounted cash flow analysis, quantitative
24  analysis and report writing.

95

1    Q.   Have you taken all of those courses?
2    A.   I have.
3    Q.   And have you passed those courses?
4    A.   I have.
5    Q.   What else is required to become a member
6  of the Appraisal Institute?
7    A.   There's a demonstration report that needs
8  to be produced.  I have to do it on my own.  And
9  it's a rather lengthy report because it has to
10  demonstrate not only the findings that I have come
11  across but truly my development of how I get to my
12  assumptions in my report.  So that's one of them.
13  We also have to turn in our number of hours that we
14  completed within the last year and also sit for an
15  exam.
16    Q.   Now, have you -- have you completed your
17  report?
18    A.   No, I'm working on that presently.
19    Q.   Have you sat for the -- how many exams do
20  you need to sit for?
21    A.   There are four exams.
22    Q.   And what do those exams cover?
23    A.   They cover basic terminology and ethics,
24  capitary capitalization, income, sales comparison

96

1 approach and the cost approach.
2    Q.   Have you sat for any of those exams?
3    A.   I have.
4    Q.   which ones?
5    A.   All of them.
6    Q.   Have you passed any of them?
7    A.   I've passed half of them.
8    Q.   Which ones have you passed?
9    A.   I passed basic terminology and ethics and
10 cost approach.
11    Q.   Do you plan to sit for the other two in
12 the future?
13    A.   Yes, in November of this year.
14    MR. RIORDAN:  Your Honor, I would submit
15 Mr. Barry as an expert on appraisals.
16    THE COURT:  Counsel?
17    MR. RUFF:  Your Honor, I don't think I would
18 agree that -- as far as qualifications, that's not
19 my issue. My issue is Stauberg (phonetic), which
20 I'll save for my cross-examination.
21    THE COURT:  All right.  Well, for whatever it's
22 worth with that reservation, I will accept the
23 witness as an expert and permit him to testify as
24 such.

97

BY MR. RIORDAN:
2    Q.   Mr. Barry, who retained you in this
3 matter?
4    A.   You did.
5    Q.   And what was your initial assignment?
6    A.   Our initial assignment was to review the
7 cost -- or the damages report that had been
8 prepared by Stout.
9    Q.   And have you -- you've reviewed the
10 damages report prepared by Stout?
11    A.   We have not done a full review of it. The
12 scope of the assignment has changed to where we
13 were asked to really just go to a high level and
14 say what the criticisms were, if there's anything
15 that we -- that if we were hired to do a review,
16 what are some of the things that we would look at.
17    Q.   And what you mean by that is an appraisal
18 review; correct?
19    A.   Correct.
20    Q.   But it was your understanding that you're
21 dealing with the damages analysis prepared by
22 Stout; correct?
23    A.   That's correct.
24    Q.   I think I put in front of you TRG

98

1 Exhibit 15.  There's a clip on it.
2    A.   Is this Exhibit H?
3    Q.   If you look down at the bottom of the
4 document.
5    A.   Oh, yes, it's Exhibit 15, Page 1.
6    Q.   And it says -- it has Exhibit H to the
7 affidavit of Peter Kyte?  It's the first page.
8    A.   That's correct.  Yes, it does.
9    Q.   And then if you go beyond that page, the
10 second page of the exhibit, it says TRG Venture
11 Two, LLC, Kyte Damages Analysis Related to
12 Subdivision Developments?
13    A.   Yes, it does.
14    Q.   And is this the damages analysis that you
15 looked at in connection with your assignment in
16 this matter?
17    A.   Yes, it is.
18    Q.   And after having reviewed it, did you gain
19 an understanding of the approach taken by Stout in
20 its report?
21    A.   Yes.
22    Q.   And what was your understanding?
23    A.   That there are two separate hypothetical
24 scenarios that have been established.  Whereas, the

99

1 subdivision as of January 1st, 2012, was clear and
2 free and able to develop.  The appraiser then
3 estimated block pricing and sell out period and
4 reported cost of -- holding cost during this time
5 period and discounted the cash flows over a certain
6 extent -- or a certain period down to present
7 value.
8       And then in the second scenario they
9 assumed that the subdivision could not be
10 immediately constructed, use the date of value, the
11 same data of January 1st, 2012, but said the
12 subdivision could not be constructed for the next
13 six years.  Did the same type of approach where
14 they established a lot of pricing in the future and
15 then what the cash flows would be after holding
16 carry costs and discounted that value to the
17 present value in January -- as after January 1st,
18 2012.
19    Q.   How many subdivisions were involved in the
20 Stout report?
21    A.   Five.
22    Q.   And did you understand that Stout had
23 presented a fair market value conclusion as to each
24 scenario?

100

1    A.   Yes, they noted fair value as their
2  definition of value.
3    Q.   And did you understand from reading this
4  report the definition of fair market value that
5  Stout was using to arrive at its opinion -- or its
6  fair market level conclusions?
7    A.   Yes, I saw the value they listed in their
8  source of definition of value.
9    Q.   And if you look at -- could you turn to
10 Page 85 of the exhibit, Page 75 of the report?
11   A.   Yes, I see that.
12   Q.   And if you could highlight the fair market
13 value bullet point in the middle of the page.  If
14 you could you also go to the preceding sentence
15 before the bullet point.  Now, it says that
16 there's -- it says fair market value underlined?
17   A.   That's correct.
18   Q.   And did you understand this fair market
19 value definition was taken from the treasury
20 regulations?
21   A.   Yes.
22   Q.   And that is because that's what it says?
23   A.   Right.  Yes, they note that as their
24 source of their definition.
                                                101

1    Q.   Had you used this fair market value
2  definition in any of your assignments?
3    A.   I have and I do.
4    Q.   Okay.  Have you ever been retained by the
5  Internal Revenue Service?
6    A.   Yes.
7    Q.   And in connection with your assignment or
8  assignments by the Internal Revenue Service, is
9  this the definition that you use?
10   A.   Yes.
11   Q.   Can you tell the Court in laymen's terms
12 what the definition says?
13   A.   The definition at least speaks to that you
14 have a willing buyer and a willing seller who is
15 informed of knowledge and facts as of the date that
16 the transaction or hypothetical transaction is
17 taking place.
18        Fair value can also be used -- unlike a
19 market value, an appraisal for your home say where
20 you have actually a transaction between a buyer and
21 seller, fair value could be under a hypothetical
22 situation.
23   Q.   And what does the definition contemplate
24 with respect to the use of future data after the
                                                102

1  valuation date?
2    A.   Well, the definition states here, their
3  reasonable knowledge of the relevant facts.
4  Relevant facts are relevant as of the date -- or
5  the effective date of value.
6    Q.   And in the Stout report, what was the date
7  of value?
8    A.   January 1st, 2012.
9    Q.   And in scenario A, did Stout use -- what
10 data -- what time frame did Stout take its data
11 from for scenario A?
12   A.   The immediate time frame in the time frame
13 leading up to -- well, really one year leading up
14 to 2012.
15   Q.   And what date did Stout use in scenario B?
16   A.   They used data going all the way as far as
17 the year 2017.  So as of -- from 2012 through 2017.
18   Q.   In your opinion, does that comport with
19 the definition of fair market value used by Stout
20 in its report?
21   MR. RUFF:  Objection, your Honor, 702.
22   THE COURT:  Articulate it, please.
23   MR. RUFF:  He states in numerous times in his
24 deposition that he is not offering any expert
                                                103

1  opinion as an appraiser in this case and cannot
2  come before this Court and do so or is in violation
3  of his code of ethics.
4    MR. RIORDAN:  Judge, I think that's a matter
5  for cross-examination.  I think he's been
6  established as a qualified expert witness, and I'm
7  asking him if he has an opinion as to whether
8  Stout's use of the data that's used comports with
9  the Stout's selected definition of market value.
10        He's testified that he's been able -- he's
11 used that definition.  He understands what it says.
12 And I think that qualifies him to render this
13 opinion.  If they want to cross-examine him on that
14 matter, they certainly can.
15   THE COURT:  They can also do so.
16   MR. RUFF:  I'm sorry, it's also an undisclosed
17 opinion because he's never stated that opinion.
18   THE COURT:  Well, that -- so as to the first
19 point, I think that goes with my ruling of allowing
20 him to testify at all.  I will let you bring that
21 up that issue and impeach him on cross-examination
22 with respect to it, and it would go to the weight
23 of the testimony.
24        As to the second point, however, that's
                                                104

1   frankly -- that is potentially disqualifying him so
2   you have tell me, Counsel --
3       MR. RIORDAN: Well, maybe I can clean up if I
4   ask him a few more questions, Judge.
5       THE COURT: Okay. Again, I think what he's
6   saying is that he's offering an opinion now he's
7   never offered before. And, therefore, it's a
8   question whether I should permit him to do so.
9       MR. RIORDAN: I understand that, Judge.
10  BY MR. RIORDAN:
11      Q.   Could you refer to your report to Page 5,
12  please?
13      A.   Sure.
14      MR. RUFF: I'm sorry, your Honor, I didn't hear
15  the page.
16      MR. RIORDAN: Page 5 of the report and Page 5
17  of the exhibit.
18      MR. RUFF: Thank you very much.
19      THE WITNESS: Okay.
20  BY MR. RIORDAN:
21      Q.   And do you have that in front of you?
22      A.   I do.
23      Q.   And there's a bold heading there, do you
24  see that?

105

1   can't even produce this letter to you because it's
2   a violation of ethics.
3       So I'm prepared to wait and cross-examine
4   him. I'm not objecting kind of to interrupt. I'm
5   merely preserving my record. I know it's before
6   the Court, and the Court can take both sides. I
7   just caution that out a point or two on this issue.
8       THE COURT: All right. Well, Counsel, I'll let
9   you preserve the record on this but I will also
10  note the fact that I'm permitting this -- the
11  witness to testify at this point. I'm not in any
12  way saying that I am going to accept the testimony
13  in light of the objection that you are making.
14  That remains to be seen.
15  BY MR. RIORDAN:
16      Q.   Do you remember the question? Your Honor,
17  can I read --
18      A.   I believe you were speaking about the
19  effective date of value being 2012 and how -- well,
20  I was discussing how it ties back to the definition
21  of fair value and the relevant facts and how the
22  relevant facts are applicable to the effective date
23  of value and that being January 1st of 2012.
24      Q.   And what do you mean by relevant facts?

107

1       A.   I do.
2       Q.   And in this section you comment upon
3   Stout's use of post-valuation date information
4   used?
5       A.   That's correct, I do. Yes.
6       Q.   Does the information in this section of
7   the report refer to Stout's use of post-valuation
8   date information in scenario B of the damages
9   analysis?
10      A.   Well, it ties back to their definition of
11  fair value but it speaks of relevant facts.
12      Q.   And what do you mean by relevant facts?
13      A.   Relevant facts would be facts that would
14  be known in the marketplace at the effective date
15  of value.
16      Q.   And, again, the effective date of value is
17  January 1st, 2012?
18      A.   That's correct.
19      Q.   And what criticism do you offer in this
20  section as to Stout's use of post-valuation date
21  information?
22      MR. RUFF: Your Honor, again, I know I have my
23  right to cross-examine him and I will point out
24  that he gave all of this up on cross-exam. He

106

1       A.   Relevant facts are the facts that are
2   known to the market area whether they're -- what
3   the unemployment rate is or what the median
4   household income rate is and any rate of what the
5   building permit activity would have been up to that
6   time point or around that time point, but it goes
7   up to but not beyond that point.
8       The only time that I've ever seen anybody
9   go beyond the date of value was to buttress some
10  type of a function that they made using relevant
11  facts up to the date of value.
12      But the substantiation of say the price of
13  something that was built upon the facts leading up
14  to the date of value, any type of substantiation or
15  buttressing would have occurred from the date of
16  short-term afterwards, say a month afterwards to
17  say, okay, here is the -- for example, if you're
18  valuing a home and your date of value is today but
19  then you find out that there's a home that's
20  pending for sale that's very much like the home
21  that you're appraising and you see that the market
22  value of that home is under contract similar to
23  what you're coming up with your appraised value,
24  you may include that as a statement to say, by the

108

1  way, there's a home down the street that's under
2  contract at this price. However, we have not
3  included that in our analysis because it's now a
4  sale that actually occurred.
5      Q.   And in scenario B, does -- we established
6  that Stout uses post-information date of value to
7  establish its fair market conclusion as of
8  January 1st, 2012; is that correct?
9      A.   That's correct. In scenario B, yes.
10      Q.   And do you consider that appropriate?
11      A.   No, I don't.
12      Q.   And why not?
13      A.   Because it's -- the data is years beyond
14  2012. It's data that's from 2016, 2017. There's
15  no way that a person standing on their ground
16  saying one of those subdivisions as of January 1st,
17  2012, go with six years in the future and know what
18  the building permits would have been, what leading
19  household incomes would have been, what the average
20  house price would have been.
21      when you set your effective date of value,
22  that's what your effective time is. So it goes six
23  years beyond that, you would have to have a crystal
24  ball.
            109

1      Q.   And based on that, do you have an opinion
2  based on a reasonable degree of certainty whether
3  scenario B contains a fair market value in
4  conclusion?
5      MR. RUFF: Again, that's -- your Honor, I would
6  object to 702 an undisclosed opinion.
7      MR. RIORDAN: Your Honor, I believe that's
8  consistent with the opinions that he has in the
9  post-valuation date section of his report.
10      THE COURT: I'll note the continuing objection
11  for the record. And this will be sorted out when I
12  do, in fact, deal with the issues.
13      MR. RUFF: Understood, your Honor. I just
14  didn't see anything related to scenario B anywhere
15  on the Page 5 that counsel is referring to. I just
16  see there's general commentary.
17      THE COURT: Okay. Counsel, you don't need to
18  argue your objections. If you're just making them
19  for the record, just make them for the record and
20  then make your argument --
21      MR. RUFF: Understood.
22      THE COURT: Thank you.
23      THE WITNESS: Sorry, could you repeat the
24  question?
            110

1      MR. RIORDAN: Yes. Could you read it back,
2  please?
3             (Record read.)
4      THE WITNESS: In my opinion it would be that it
5  does not.
6  BY MR. RIORDAN:
7      Q.   And can you tell us why you hold that
8  opinion?
9      A.   Because the -- whether state relevant
10  facts in my mind are not relevant facts because
11  something that occurred in 2016 is not relevant in
12  the time period of 2012.
13      Q.   In your report, do you make the suggestion
14  that the valuation date should be forward in time
15  for scenario B?
16      A.   I don't know that I actually state that
17  here. It could be one of the ways to remedy the
18  report to -- would be to change the effective date
19  of value. If you want to use data that is say up
20  to the end of 2016, perhaps you would set your date
21  of value as December 31st, 2016.
22      Q.   Are you familiar with the Appraisal
23  Institute's Advisory Opinion No. 34?
24      A.   I am.
            111

1      Q.   And what is that?
2      A.   It speaks to time periods, valuations,
3  whether they're prospective or retrospective.
4      Q.   And, generally, what does that opinion --
5      MR. RUFF: Your Honor, I object. This is
6  nowhere disclosed in the report, nowhere disclosed
7  in any deposition testimony. Nowhere disclosed.
8      THE COURT: When you say this is --
9      MR. RUFF: Appraisal Opinion No. 34. I ask at
10  least some reference.
11      MR. RIORDAN: Judge, I agree that that is not
12  mentioned by name. But, again, it's consistent
13  with the information that he's providing in this
14  section of the report. And I'm just asking if he's
15  familiar with it and what does it provide.
16      THE COURT: I'll allow you.
17      MR. RIORDAN: I'm not asking if he has any
18  opinions with respect to it.
19      THE COURT: Once you've won, you won. I'll
20  allow it.
21      MR. RIORDAN: Thank you, Judge.
22  BY MR. RIORDAN:
23      Q.   Do you remember the question?
24      A.   Yes, am familiar with AO 34.
            112

1     Q.    And generally what does it provide?
2     A.    Well, an Advisory Opinion is issued by the
3  Appraisal Standards Board.  There's also the Board
4  that produced USPAP, which is the governing
5  document that appraisers need to follow.
6          An Advisory Opinion is something that's
7  found at the back of the USPAP that just like it's
8  named suggests that it advises.  There are certain
9  areas that USPAP or the Appraisal Standard awards
10  fees but there's a crossover of people having
11  confusing whether it's causing some type of issue
12  in the marketplace.
13          And they'll issue an Advisory Opinion that
14  gives advice to appraisers on how to proceed with
15  something.  In this case, they're talking about
16  re-doing a retrospective or prospective value,
17  which is if I were to be asked to do an appraisal
18  say over ten years ago or one from ten years from
19  now, I would look to AO 34 for advice on how to
20  proceed.
21     Q.    And does it contain advice about the use
22  of post-valuation date information?
23     A.    It does.
24     Q.    And what does it generally provide

113

1  regarding the use of post-valuation date
2  information in a retrospective appraisal?
3     A.    A retrospective appraisal it's a -- you
4  need to realize that when you're doing an appraisal
5  like that, that you're taking yourself back in time
6  and that you need to adhere to those same type of
7  standards that you would as if you were doing the
8  appraisal today.
9          Now, if I were back in say 2012, in this
10  case, 2012 will be the period that I'm standing
11  around, looking around, reading the papers and
12  taking in any information on what's going on in the
13  marketplace.
14          The AO does say that you can use
15  information as long as it's not too far along and
16  it's in support of what the premises or the
17  assumption that you've already concluded by using
18  relevant market data as of that date of value.
19     Q.    Now, in your report you refer to the
20  Illinois Realtor Charter Home Prices for 2008 and
21  2011, do you see that --
22     A.    Yes.
23     Q.    -- on Page 5 and onto Page 6?
24     A.    Yes.

114

1     Q.    And there are some graphs or bar charts
2  above the heading Stout Publication, it's a world
3  services group?
4     A.    Annual median sale prices?
5     Q.    Yes.  What do those bar charts represent?
6     A.    These bar charts that annual median sale
7  prices for the years 2008 through 2011.  And this
8  is issued by the Illinois Realtors Board.  This
9  is -- bar charts like this are set up to give a
10  visual of what's going on in the marketplace.
11     Q.    And why did you choose these bar charts to
12  put in your letter?
13     A.    Well, I was trying to convey here that
14  this is what an example of what relevant data would
15  be as of 2012.  That had I been asked to do an
16  valuation in 2012, these are some of the things
17  that we might have looked at.  It's stated it leads
18  up to the effective date of value.
19     Q.    On Page 5 of your report, in the bullet
20  point -- in the arrow bullet point which is the
21  intended paragraph, you refer to the fact that
22  Stout does not include income data for 2010.
23          What significance is that?
24     A.    Well, the chart itself is intended to show

115

1  how incomes have changed over several reporting
2  periods.  The base year they use is 2010.  I think
3  the next year was 2015 and then maybe 2020.
4          But what I found there as I was reading
5  through was that both 2015 and 2020 I believe it
6  was had reported what the incomes were at that time
7  and they showed an increase in incomes, but the
8  self retained data for 2010 was left blank so it
9  reads the reading unknown whether incomes arose or
10  fell from the point of 2010 through 2015.
11     Q.    After then the last bullet point states,
12  Cambridge Partners will recommend using only the
13  information available as of the valuation date such
14  as the data published by the Illinois Realtors in
15  their 2012 annual report on the Illinois housing
16  market.
17          The published data would make it difficult
18  for Stout to predict if and when a housing recovery
19  would occur as to be seen from the Illinois Realtor
20  Charter, Illinois home prices fell drastically from
21  2008 and 2011.
22          Did I read that correctly?
23     A.    That's correct.  Yes.
24     MR. RIORDAN:  Your Honor, that's all I have.

116

1  Thank you.
2      THE COURT:  Thank you.  Let's look at the clock
3  for a moment.  I think we're well under an hour so
4  perhaps we can start on cross-examination, unless
5  you tell me you need a break.
6      THE WITNESS:  Oh, no, I'm fine.  Thank you,
7  your Honor.
8              CROSS-EXAMINATION
9  BY MR. RUFF:
10     Q.  Mr. Barry?
11     A.  Yes.
12     Q.  Whenever you're ready.
13     A.  I'm all set.
14     Q.  All right.  Good afternoon, sir.
15     A.  Good afternoon.
16     Q.  My name is Ed Ruff.  Pleasure to meet you.
17     A.  Same.
18     Q.  In May of this year when you received the
19  assignment, you had an in-person meeting with
20  Mr. Riordan at Cambridge; correct?
21     A.  Yes.
22     Q.  That meeting was the first time you ever
23  saw the Stout report?  It's TRG's 50.  That's the
24  first time you saw the Stout report?

                                              117

1      A.  That's correct, yes.
2      Q.  Oh, 15 excuse me.  I apologize, your
3  Honor.
4      A.  That is correct.
5      Q.  As part of your assignment in this matter,
6  you did not have to provide a detailed -- or you
7  have not I should say provide a detailed rebuttal
8  report, agreed?
9      A.  That's correct.
10     Q.  Other than reviewing the assumptions and
11  conclusions in the Stout report, you had no other
12  tasks given to you by Fidelity; correct?
13     A.  That's correct.
14     Q.  You were only called upon to review
15  Stout's appraisal but not to come up with your own
16  value or anything of that nature; correct?
17     A.  That's correct.
18     Q.  You were only asked to look for signs that
19  something might point to problems with the Stout
20  report but you were never asked to offer an expert
21  opinion about the accuracy or the quality of the
22  Stout report; isn't that true?
23     A.  Well, I don't know about the phrase expert
24  opinion.  I think when somebody approaches me since

                                              118

1  I am a professional, I look at myself to be
2  somebody who is at least a professional.  I don't
3  know if your term expert would crossover to
4  professional but I think that I'm approached for
5  reasons like this.
6      Q.  Well, let me -- let's rephrase the
7  question.  You agree that as you sit here now, you
8  have no opinions that you hold to a reasonable
9  degree of appraising certainty as to the accuracy
10 or the quality of the Stout report; correct?
11     A.  No, I would disagree with that statement.
12     Q.  Okay.  May we have Page 267, 268.  Sir,
13 on -- we're going to read that exact question,
14 Page 267, Lines 24 through -- excuse me, Page 265,
15 Line 24.  Page 266, Line 1 through 9.  And before
16 that I'll set the foundation.
17         On August 2nd, 2018, you gave a deposition
18 in this case; correct?
19     A.  Yes.  That's correct.
20     Q.  And you gave the deposition at my office,
21 correct, at One South Walker?
22     A.  That's correct.  Yes.
23     Q.  And you were sworn under oath at that
24 time?

                                              119

1      A.  Yes.
2      Q.  Mr. Riordan was present?
3      A.  Yes, he was.
4      Q.  And my partner Mr. Turiello and
5  Mr. Thorsness were also present; is that correct?
6      A.  Yes.  That's correct.
7      Q.  Page 265, Line 24 through Page 266,
8  Line 9.  May we please play that now for the Court?
9      THE COURT:  For the record, what exhibit are
10 these pages from?
11     MR. RUFF:  This is his deposition transcript.
12     THE COURT:  Which is exhibit?  I'm sorry, could
13 you please stop the video, please.
14     MR. RUFF:  I don't think either of us offered
15 any of the deposition transcripts as exhibits.  We
16 can amend the record to include all the part but we
17 didn't do that in the prior --
18     THE COURT:  I just want to look at the printed
19 deposition while you're looking -- while you're
20 playing the audio.
21     MR. RUFF:  Perhaps even before we do that if
22 your Honor wants to take a look at that.  We have
23 all of the deposition transcripts here.
24     THE COURT:  Do you need to look at it first or

                                              120

1  do you trust --
2      MR. RIORDAN:  I'm going to take Mr. Ruff's word
3  that they're not full of -- you know, Fidelity is
4  full of it --
5      THE COURT:  All right.  So give me the page
6  numbers again, please.
7      MR. RUFF:  Yes, your Honor.  For Mr. Barry's
8  deposition, Page 265, Line 24 through Page 266,
9  Line 9.  In other words, 1 through 9.
10      THE COURT:  All right.  And just so you
11  understand it's because as I said before I don't
12  hear very well and so I wanted to see the text as
13  this was happening.  If you can afford them, you're
14  welcome to do so.
15      MR. RUFF:  May we play it now, your Honor?
16      THE COURT:  You may.
17      MR. RUFF:  I'm sorry, my hearing is just not as
18  good either.
19                  (whereupon, the videotaped
20                   discovery deposition was
21                   played.)
22  BY MR. TURIELLO:
23      Q.  "And is it agreed -- is it -- do you agree
24  that as you sit here, you have no opinions that you
                                                    121

1  hold to a reasonable degree of appraising certainty
2  as to the accuracy or quality of the Stout report?
3      A.  Right.  I have not done any type of
4  appraisal review that would refute the value
5  conclusions because we haven't gone through the
6  appraisal process."
7  BY MR. RUFF:
8      Q.  Sir, were you asked that question and did
9  you give that response?
10      A.  Yes, apparently I did.
11      Q.  And the reason you can't give any opinions
12  to a reasonable degree of appraising certainty as
13  to the accuracy or quality of the Stout report is
14  you haven't done any type of appraisal review that
15  would refute the value conclusions in the Stout
16  report?
17      A.  I think that the question that was
18  asked --
19      Q.  Sir, it's a yes or no.
20      A.  Would you repeat your question then?
21      Q.  Yes.  The reason you have no opinions that
22  you hold to a reasonable degree of appraising
23  certainty as to the accuracy or quality of the
24  Stout report is that you have not done any type of
                                                    122

1  appraisal review that would refute the value
2  conclusions in the Stout report; correct?
3      A.  Yes.
4      Q.  Because you haven't gone through the
5  appraisal process; correct?
6      A.  That's correct.
7      Q.  And you haven't gone through an appraisal
8  review process; correct?
9      A.  That is correct.
10      Q.  You were only asked to look for signs that
11  might point to problems with the quality as opposed
12  to offering an opinion about the quality; correct?
13      A.  Yes.
14      Q.  Because if you had an opinion about the
15  quality, you would have to substantiate that;
16  correct?
17      A.  That's correct.
18      Q.  And you haven't done anything to
19  substantiate any opinions refuting the Stout
20  report; true?
21      A.  The values.
22      Q.  I'm sorry?
23      A.  The values in the Stout report.
24      Q.  So the answer is correct?
                                                    123

1      A.  I believe that you're -- it's rather
2  broad, and I think that what you're saying is that
3  I have not done the groundwork to refute the value
4  or the appraisal that was produced.  But I have
5  looked at things and say that on a very broad level
6  that data was used beyond the effective date of
7  value.
8      Q.  Let's try this again.  As we sit here now,
9  you can't substantiate anything that you've
10  identified as a potential problem as being
11  incorrect, fair?
12      A.  No.
13      MR. RUFF:  Your Honor, Page 265, Lines 12
14  through 17.
15                  (whereupon, the videotaped
16                   discovery deposition was
17                   played.)
18  BY MR. TURIELLO:
19      Q.  "And as we sit here, you can't
20  substantiate anything that you've identified as a
21  potential problem as being incorrect; fair?
22      A.  Right, because I have not done anything
23  more than look at the appraisal and conveyed to Con
24  to say you may want to look at these points."
                                                    124

BY MR. RUFF:

Q.   Were you asked that question, sir, and did you give that response?

A.   Yes, I did.

Q.   Okay.  Because you haven't done -- and the reasons you can't substantiate anything is because you haven't done anything to look at the appraisal. All you did is convey -- you called Mr. Riordan and Con.  You conveyed to Con, here is some things you may want to look at; correct?

A.   That's correct.

Q.   But you, yourself haven't substantiated that; correct?

A.   Correct -- well, no, I don't agree with that because there's certain knowledge that I have of the appraisal -- of USPAP and appraisal standards that I wouldn't have to do any type of research for because these are standards that are set forth by USPAP.

Q.   All right.  Let me try the question one more time.  You were asked to look for signs that might point to problems with the quality as opposed to offering opinions about the quality; correct?

A.   Correct.

125

Q.   Because if you did offer an opinion about the quality, you would have to substantiate that; correct?

A.   That's correct.

Q.   And you haven't done anything to substantiate that; correct?

A.   I think anything is a very broad term.

Q.   You would need to substantiate that and you have not done that; correct?

A.   Substantiate what?

Q.   Problems with quality as opposed to offering an opinion about quality of the report?

A.   Again, I would have to go back to my knowledge of USPAP and as a licensed and certified appraiser, but USPAP is a governing document.  I wouldn't have to do any additional research or work to substantiate my knowledge of USPAP.

MR. RUFF:  I would move, your Honor, to strike the question as not being responsive and I can ask the question one more time.

THE COURT:  All right.  I would strike the answer as nonresponsive.

Sir, if you could, please, will you listen to the question.  Yes or no question.  If you can't

126

answer it yes or no, then say I can't answer that yes or no.

THE WITNESS:  Okay.

THE COURT:  But if you start to going into explanations, then we're getting beyond the scope of the question.

THE WITNESS:  Okay.  Got it.  Thank you, your Honor.

BY MR. RUFF:

Q.   All you were asked to do was to look for signs that might point to problems with quality as opposed to offering any opinion about the quality; correct?

A.   Correct.

Q.   Because if you offered opinions about the quality you would have to substantiate that and you have not substantiated that; correct?

A.   That's correct.

Q.   You would agree, sir, that the scope of your work did not include producing a document that could be used in this court proceedings; correct?

A.   Correct.

Q.   Because in order to use it in this court before his Honor, it must be USPAP compliant; true?

127

A.   Are you asking me?

Q.   Yes.

A.   I'm sorry, I cannot answer that.

Q.   You cannot answer that?

A.   No.

Q.   Page 273, Lines 13 through 19.

THE COURT:  273, Counsel?

MR. RUFF:  Yes, your Honor.  Lines 13 through 19, your Honor.

(Whereupon, the videotaped discovery deposition was played.)

BY MR. TURIELLO:

Q.   "And, therefore, you would agree that scope of work did not include producing a document that could be used in court proceedings?

A.   Right, because it was not USPAP compliant, we did not do a full appraisal review."

BY MR. RUFF:

Q.   Were you asked that question, sir, and did you give that response?

A.   I did.

Q.   You did not do a full appraisal review; correct?

128

1    A.    That's correct.
2    Q.    And if you're going to come into court and
3  produce a document, it must be USAP compliant if
4  you want that document to be looked at and
5  entertained by the Court; true?
6    A.    I can't answer that.
7    Q.    You don't know?
8    A.    I don't know.
9    Q.    You know the USAPP requirements, do you
10 know if that's one of USAPP requirements?
11    A.    Whether if they used USPAP compliance, if
12 the document is the only type of document that can
13 be introduced in a court hearing?
14    Q.    Right.  And if you're going to give an
15 opinion that you have -- that you're going to put
16 it in a document, one of the requirements of USPAP
17 is that you must put that into -- it must comply
18 with USPAP?
19    A.    Yes, if USPAP says in order to go to court
20 and we must do that, then, yes, that would be
21 something that would have to be done.
22    Q.    And you have not produced a USAPP
23 compliant document to this Court; true?
24    A.    Correct.

129

1    Q.    You have not done a full appraisal review;
2  correct?
3    A.    Correct.
4    MR. RIORDAN:  Objection, your Honor, asked and
5  answered at least five times.
6  BY MR. RUFF:
7    Q.    Very simply, sir --
8    THE COURT:  I'm sorry, just to be clear, I'll
9  sustain that objection.  You have asked that
10 question and answered multiple times.
11    MR. RUFF:  I understand, your Honor.  When you
12 get a good point sometimes, you use it again, I'm
13 sorry.
14  BY MR. RUFF:
15    Q.    You are not offering yourself to this
16 Court, to his Honor, as an expert in appraising,
17 can we agree on that?
18    A.    No.
19    Q.    Can we play Page 267, Lines 24
20 through 268, Lines 1 and 2?
21              (whereupon, the videotaped
22              discovery deposition was
23              played.)
24

130

1  BY MR. TURIELLO:
2    Q.    "And you are not offering yourself to this
3  Court as an expert in appraising; agreed?
4    A.    Correct."
5  BY MR. RUFF:
6    Q.    Were you asked that question and did you
7  give that response?
8    A.    Apparently it was.  I'm curious to see
9  what the question was before it, though.
10    MR. RUFF:  Your Honor, I move to strike
11 everything after yes.
12    THE COURT:  So stricken.
13  BY MR. RUFF:
14    Q.    Sir, did you ever get a copy of your
15 deposition transcript before you took the stand
16 here today?
17    A.    I did.
18    Q.    Did you read it?
19    A.    No.
20    Q.    Do you think now that that would have been
21 a good idea?
22    A.    No, because I would answer the same way I
23 answered prior.
24    Q.    Prior to the question before or prior when

131

1  you were giving your deposition, which one would be
2  answering to?
3    A.    Whatever they asked me when asked --
4    Q.    Which version --
5    MR. RUFF:  I'll strike that, your Honor.  I'm
6  engaging in a little bit of an argument and I
7  apologize.
8  BY MR. RUFF:
9    Q.    Now, if we can --
10    MR. RUFF:  For the record, your Honor, I'm
11 going to refer to F&D Trial Exhibit 48.  Your
12 Honor, we are looking at F&D Trial Exhibit 48.  Can
13 we please bring up, Jim, Page 8?  In the middle of
14 the page, Jim, can we highlight for his Honor
15 professional designation that section alone,
16 designation, not development, professional
17 designation.  It's where the license number
18 appears.  Thank you.
19  BY MR. RUFF:
20    Q.    That is your professional designation,
21 that's your certified general appraiser number with
22 the State of Illinois; correct?
23    A.    It is, yeah.
24    Q.    That represents that this is a license you

132

1  hold under the State of Illinois; correct?
2     A.   That's correct.
3     Q.   The practice of appraising is regulated by
4  the State of Illinois; correct?
5     A.   It is, yes.
6     Q.   You are familiar with the acronym IDFPR;
7  correct?
8     A.   Yes, I am.
9     MR. RUFF: And for the record, your Honor, that
10  is the Illinois Department of Finance and
11  Professional Regulation.
12  BY MR. RUFF:
13     Q.   That's what you understand it to be;
14  correct?
15     A.   That's correct. Yes.
16     Q.   That's the disciplinary body that covers
17  professionals like appraisers; true?
18     A.   True.
19     Q.   You are aware that there's a statute that
20  authorizes the practice of appraising in Illinois
21  and allows licensing; correct?
22     A.   Yes.
23     Q.   You are aware that there are professional
24  standards that are set up in the statute in

133

1  Illinois that a professional like an appraiser like
2  you needs to follow; correct?
3     A.   Correct.
4     Q.   And it is your understanding that if a
5  licensed appraiser does not comply with the
6  standards that are set forth, that that could
7  subject them to discipline; true?
8     A.   True.
9     MR. RUFF: Trial Exhibit, your Honor, 67, TRG.
10  If we can look at the top, Jim, the very -- the
11  first bolded section. There you go.
12  BY MR. RUFF:
13     Q.   You see Chapter 225 Professions and
14  Occupations and we see under that real estate
15  appraiser licensing. Can we agree on that?
16     A.   Yes.
17     Q.   And then Article 10 is business practice
18  provisions, can we agree on that?
19     A.   Yes.
20     Q.   The next section if you don't mind
21  highlighting, Jim, please. 225 down through --
22  until we get to history.
23     We see in the second sentence here the
24  Department and if we could highlight that for his

134

1  Honor. The Department must adopt as part of its
2  rules the uniform standards of professional
3  appraisal practice, paren, USPAP all caps, end
4  paren, as published from time to time by the
5  Appraisal Standards Board of the Appraisal
6  Foundation.
7     F did I read that correctly, sir?
8     A.   You did.
9     Q.   You agree that USPAP is the standard the
10  Illinois appraisers are required to follow;
11  correct?
12     A.   Correct.
13     Q.   And we see here we're dealing with the
14  section, if we look in the upper left-hand corner
15  of what is highlighted here, 225 ILSC, 458/10-10;
16  correct?
17     A.   Correct.
18     Q.   If we can call this 10-10 from now on.
19     A.   Sure.
20     Q.   Thank you. If you look at Exhibit 68,
21  Trial Exhibit 68 by TRG, your Honor. And if we
22  could -- again, we can agree, sir, that this is
23  generally the real estate licensing act; correct?
24     A.   Yes.

135

1     Q.   Jim, if you can please highlight the
2  bolded section starting with 225. Thank you. It
3  says, underneath 1510, grounds for disciplinary
4  actions, did I read that correctly?
5     A.   You did.
6     Q.   And we see here under A it says, the first
7  line -- if you can highlight that up until the
8  first comma or actually the whole line, the first
9  two lines. The Department may suspend or revoke,
10  refuse to issue, renew or restore a license and may
11  reprimand, place on probation or administrative
12  supervision or take any disciplinary or
13  nondisciplinary action and then it goes on to list;
14  correct?
15     A.   Correct.
16     Q.   And if we look at 6, highlight that,
17  please. Violating a provision or standard for the
18  development or communication of real estate
19  appraisals as provided in Section 1010 of this act
20  or as the defined by rule. I skipped over the
21  citation of the statute.
22     Do you agree with what I just read?
23     A.   Yes.
24     Q.   Okay. If you want, I'll put 1010 back up

136

1   until we agree that if we look at 1010, which is
2   the standards of practice, that would mean not
3   following USPAP is something that could subject
4   someone like you to discipline; correct?
5       A.   Correct.
6       Q.   You would agree that an Illinois appraiser
7   is required to follow USPAP in preparing an
8   appraisal report or appraiser review.  And if not,
9   they could be subject to discipline?
10      A.   Correct.
11      Q.   And that is to ensure the accuracy and
12  completeness of reports and reviews that appraisers
13  are putting out there; correct?
14      A.   Yes.
15      Q.   If you create a written document that
16  serves as a real estate appraisal review, there are
17  a number of requirements under USPAP that you have
18  to follow, agreed?
19      A.   Agreed.
20      Q.   There are requirements as to what needs to
21  be in there, what disclosures need to be made, the
22  type of signature and certification that you need
23  to have; correct?
24      A.   Yeah.  That's correct.
                                                    137

1       Q.   One of the reasons that an appraisal is
2   required to comply with USPAP is to prevent things
3   like a client using it for fraudulent purposes or
4   providing inaccurate information; correct?
5       A.   Yes.
6       Q.   And you would agree that an appraisal that
7   does not comply with USPAP should not be submitted
8   for purposes of obtaining a loan or really for any
9   purpose; correct?
10      A.   Correct.  Yes.
11      Q.   An appraiser would have an obligation to
12  ensure that his report complied with USPAP before
13  allowing it to be submitted to a lending
14  institution or to his Honor; correct?
15      A.   Yes.
16      Q.   Before an appraisal can be submitted to a
17  Court, it has to be USPAP compliant; true?
18      A.   True.
19      Q.   You agreed that an Illinois appraiser is
20  required to follow USPAP in preparing an appraisal
21  report or an appraisal review.  And if not, they
22  could be subject to discipline; correct?
23      A.   Correct.
24      Q.   If an appraiser determines after a report
                                                    138

1   has been submitted that there are issues that would
2   render it not compliant with USPAP, then that
3   appraiser should withdraw the report?
4       A.   Correct.
5       Q.   And the reason for that is to ensure the
6   accuracy and completeness of reports and reviews
7   that appraisers are providing?
8       A.   Yes.
9       Q.   And that's because you have a leave of
10  expertise that an attorney or a judge or a banker
11  does not have; correct?
12      A.   Correct.
13      Q.   And those standards set by USPAP exist to
14  ensure that the public can rely on the accuracy of
15  a report by an appraiser; correct?
16      A.   Yes.
17      Q.   You would agree that an appraisal review
18  that is submitted to a Court should comply with the
19  requirements of USPAP; correct?
20      A.   Correct.
21      Q.   And you would agree that in order to be
22  submitted to the Court, any critique of another
23  appraiser must be -- or appraisal, must comply with
24  USPAP?
                                                    139

1       A.   For an appraisal review, that's correct.
2       Q.   You are familiar with Standards 3 and 4 of
3   USPAP; correct?
4       A.   I am, yes.
5       MR. RUFF:  Your Honor, I'm moving into a
6   discussion of Standards 3 and 4.  If your Honor
7   wanted to take our hourly break, this is a good
8   point.
9       THE COURT:  I think it's a good point to take a
10  break.  I suspect there's probably -- how much more
11  time?
12      MR. RUFF:  45 minutes.
13      THE COURT:  Let's take a break.  Reminder you
14  remain under oath.  You can't discuss your
15  testimony.
16      THE WITNESS:  Okay.
17              (Short recess was taken.)
18  BY MR. RUFF:
19      Q.   Can we pull up, Jim, please Exhibit 69.
20  This is Standard Appraisal Review and Development
21  Standard 3; correct?
22      A.   Yes.  That's correct.
23      Q.   And you were asked about this in your
24  deposition; correct?
                                                    140

1    A.   That's correct.

2    Q.   Will you agree that you were obligated to
3  follow Standards 3 and 4 when preparing an
4  appraisal review; correct?

5    A.   Yes.

6    Q.   And that would include any appraisal
7  review prepared in this case; correct?

8    A.   Yes.

9    Q.   The standards are numbered.  If we can
10  look at 3-1(b).  It says above -- let's see.  In
11  developing an appraisal review, the reviewer must
12  and then we go through A, B, C, you see that?

13    A.   Yes.

14    Q.   I'm skipping over that in the interest of
15  time.  If you would go right to B, not commit
16  substantial error of omission or commission that
17  significantly affects an appraisal review.

18         Did I read that correctly?

19    A.   You did, yes.

20    Q.   Standard 3-1(c), must not render an
21  appraisal review services in a careless and
22  negligent manner such as making a series of errors
23  that although individually might not significantly
24  affect the results of an appraisal review in the

141

1  aggregate affect the credibility of those results.

2         Did I read those correctly?

3    A.   You did.

4    Q.   You would agree that these two Sections B
5  and C apply to your appraisal review in this case;
6  correct?

7    A.   No.

8    Q.   Page 151, Lines 17 through -- would you
9  please play that?  That's the exact question, Jim.
10  17 through 20 on Page 151.

11              (Whereupon, the videotaped
12              discovery deposition was
13              played.)

14  BY MR. TURIELLO:

15    Q.   "And you would agree that Standard 3-1C
16  would apply to your appraisal review in this case?

17    A.   Yes."

18  BY MR. RUFF:

19    Q.   Were you asked that question and did you
20  give that response?

21    A.   I did.

22    Q.   And the purpose of these standards is to
23  require that an appraiser use due diligence and due
24  care in preparing a real estate appraisal; correct?

142

1    A.   Yes.

2    Q.   And that's, in fact, under the comments --
3  if we can go to comment under C, the last line.
4  The standard -- the standards rule requires a
5  reviewer to use due diligence and due care.

6         Did I read that correctly?

7    A.   That's correct.  And it's an appraisal
8  review, yes.

9    Q.   There are sections in here but in the
10  interest of time I wonder if you'll trust me on
11  this without taking the time and pull up each one
12  of the highlight.  It's in there in small print but
13  I'm going to ask you to follow it.

14         Standards Rule 3.2, in developing an
15  appraisal review, the reviewer must, A, identify
16  the client and other intended users.

17         Do you agree with that statement?

18    A.   Yes.

19    Q.   B, identify the intended use of the
20  reviewer's opinions and conclusions.

21         Did I read that correctly?

22    A.   Yes.

23    Q.   If there are any limitations on what the
24  appraisal review could be used for, that's

143

1  something that the appraiser should put forth in
2  the report; correct?

3    A.   Correct.

4    Q.   The client will describe to you what their
5  intention is and then it would be your obligation
6  as an appraiser to determine the scope of work
7  necessary to complete the assignment; correct?

8    A.   Correct.

9    Q.   Next page, Jim, 3-3 rule.  I'm just going
10  to read it in the interest of time.  In developing
11  an appraisal review, a reviewer must apply the
12  appraisal review methods and techniques that are
13  necessary or credible assignment results.  That's
14  the heading.

15         And then underneath that, A, when
16  necessary for credible assignment results in the
17  review analyses, opinions and conclusion, the
18  reviewer must, three, develop the reasons for any
19  disagreement.

20         Do you agree with that, sir?

21    A.   Yes, that's how it reads.

22    Q.   4, Standard 4.  Jim, it's trial
23  Exhibit 70, please.  Can we agree in the interest
24  of time that Standard 4 also applies or do we need

144

1 to go through each item?
2     A.   Applies to what?
3     Q.   Appraisal review and reporting.
4     A.   Yes, it applies to it.  Yes, Standard 4
5 applies to appraisal review and reporting.
6     Q.   And would you agree that it would apply to
7 the appraisal review you prepared in this case;
8 correct?
9     A.   No.
10     Q.   Page 157, Lines 8 through 10, the exact
11 question was asked.
12              (whereupon, the videotaped
13              discovery deposition was
14              played.)
15 BY MR. TURIELLO:
16     Q.   "And, again, this would apply to the
17 appraisal review that you prepared in this case?
18     A.   Yes."
19 BY MR. RUFF:
20     Q.   Were you asked that question, sir, and did
21 you give that response?
22     A.   Apparently I did.
23     Q.   And if you could put Standard 4 back up
24 when you get a chance, Jim?  Looking at Standard

145

1 Rule 4-1(a), each written or oral appraiser review
2 report must be separate from the work under review
3 and must, A, clearly and accurately set forth the
4 appraisal review in a manner that will not be
5 misleading.
6          Did I read that correctly?
7     A.   You did, yup.
8     Q.   4(b), contains sufficient information to
9 enable the intended users of the appraisal review
10 to understand the report properly.  Did I read that
11 correctly?
12     A.   You did.
13     Q.   And that is another requirement that an
14 appraisal review must follow?
15     A.   Correct.
16     Q.   And that would be an obligation that you
17 would have to follow in preparing an appraisal
18 review in this case; correct?
19     A.   Had I -- yes, had I prepared an appraisal
20 review, I would be under these standards.
21     Q.   So is that a long way of saying yes?
22     A.   No, because you're referencing --
23     Q.   Page 158, Lines --
24     A.   And I also noted in my deposition --

146

1          THE COURT:  I'm sorry, Counsel, just as a
2 matter of decorum, you should allow him to answer.
3 And if you want the answer stricken --
4          MR. RUFF:  I'm sorry, I'm trying to hustle.
5          THE COURT:  I understand.  Sir, you could
6 finish your answer.
7          THE WITNESS:  Also, in my deposition I noted
8 that we were not hired and we did not prepare an
9 appraisal review.
10          MR. RUFF:  Move to strike the answer.  It's
11 nonresponsive.
12          THE COURT:  So stricken.
13 BY MR. RUFF:
14     Q.   And that would be an obligation that you
15 would have to follow preparing an appraisal review
16 in this case; correct?
17     A.   Had I prepared an appraisal review, yes,
18 that is correct.
19     Q.   Page 158, Lines 18 through 21.
20          THE COURT:  Counsel, I think he agreed to your
21 question.  Why are we playing the deposition?  Can
22 you pause it, please?
23          MR. RUFF:  Because he put the add-on in there
24 had I done an appraisal review.  He did not make

147

1 that clarification once in his deposition.
2          THE WITNESS:  Yes, I did.
3          THE COURT:  I'm sorry, the question is, would
4 that be an obligation that you would have to follow
5 in preparing an appraisal review?  The answer that
6 would be --
7          MR. RUFF:  In this case.
8          THE COURT:  I don't think this is a proper
9 impeachment.  Move on.
10          MR. RUFF:  Will do.
11 BY MR. RUFF:
12     Q.   Under Standard Rule 4-2, the content of an
13 appraisal review report must be consistent with the
14 intended use of the appraisal review and at an
15 minimum that a number of things are listed;
16 correct?
17     A.   Correct.
18     Q.   And if we look at page -- the next page,
19 Jim, J, on the bottom, the very bottom, small J, if
20 we can blow that up.
21          MR. RIORDAN:  Can I ask what exhibit page we're
22 on?
23          MR. RUFF:  It's the same exhibit, your Honor,
24 that we're on.

148

1    MR. RIORDAN:  No, the page of the exhibit, your
2  Honor.
3    MR. RUFF:  It's Page 2 of the exhibit.
4    MR. RIORDAN:  Thank you.  That's all I want.
5    MR. RUFF:  Trial Exhibit 70 right at the
6  bottom.  That's I.
7  BY MR. RUFF:
8    Q.   Include a signed certification in
9  accordance with the Standards Rule 4-3.  Did I read
10  that correctly?
11    A.   You did.
12    Q.   The next Page 3.  Standard Rule 4-3 says,
13  each written appraisal review report must contain a
14  signed certification that is similar in content to
15  the following form.  I certify that to the best of
16  my knowledge and belief, and then there's 11 bullet
17  pointed items listed; correct?
18    A.   That's correct.
19    Q.   If we go to the comment at the bottom of
20  A, which starts with a signed certification.  Just
21  the comment alone.  There we go.  Thank you, Jim.
22         A signed certification is an integral part
23  of the appraisal review report.  A reviewer who
24  signs any part of the appraisal review report
                                                    149

1  including a letter of transmittal must also sign
2  the certification.
3         Did I read that correctly?
4    A.   You did.
5    Q.   The next line if you'll highlight after
6  that, Jim.  Any reviewer who signs a certification
7  accepts responsibility for all elements of the
8  certification for the assignment results and for
9  the contents of the appraisal report -- review
10  report.
11         Did I read that correctly?
12    A.   You did.
13    Q.   And you are the individual responsible for
14  the information, the analysis, the conclusions and
15  the results contained in an appraisal review
16  report; correct?
17    A.   I would be had I prepared an appraisal
18  review.
19    Q.   Was that a yes?
20    A.   I think the question would lead one to
21  assume that I prepared an appraisal review when I
22  did not.  Had I prepared an appraisal review, these
23  standards and my certification and my signature
24  would have been just as you said.
                                                    150

1    Q.   I'm going to ask the question one more
2  time.  And so you are the individual responsible
3  for the information, the analysis, the conclusions
4  and the results contained in an appraisal review
5  report; correct?
6    A.   In an appraisal review report.
7    Q.   Is that a yes?
8    A.   In an appraisal review.
9    THE COURT:  I'm going to take a moment to
10  remind the witness your job is not to argue with
11  counsel.  He asked you a question.
12    THE WITNESS:  Yeah.
13    THE COURT:  And I'll just warn you, if you get
14  argumentative with counsel, that makes your
15  testimony carry less weight.
16    THE WITNESS:  Okay.
17    THE COURT:  You have an opportunity through
18  opposing counsel to make clarifications.
19    THE WITNESS:  Okay.  Wonderful.
20    THE COURT:  Answer the questions now.  If
21  they're posed yes or no, answer them.  If you can't
22  answer them, don't argue.
23    THE WITNESS:  Okay.  Thank you, your Honor.
24
                                                    151

1  BY MR. RUFF:
2    Q.   Do you need the question back again?
3    A.   Yes, please.
4    Q.   And you are the individual responsible for
5  the information, the analysis, the conclusions and
6  the results contained in an appraisal review
7  report; correct?
8    A.   Correct.  Yes, that's correct.
9    Q.   If there are any errors in there, it would
10  be attributable to you; correct?
11    A.   Correct.
12    Q.   And if there are errors in an appraisal
13  review report, you agree you are under the -- under
14  the standards, you would have an obligation to
15  correct them?
16    A.   Correct.
17    Q.   Sir, if we look at Exhibit No. 15, Page 69
18  of the report.  It's actually Page 79 of the Trial
19  Exhibit, your Honor.  Certification?
20    A.   Yes, I see this.
21    Q.   That's 69 of the report.  I'm asking you
22  for 79 of the Trial Exhibit, 69 of the report.
23  While that's being pulled up, there's a
24  certification in there where there are a number of
                                                    152

1   bullet pointed items, can we agree upon that?
2       A.   Yes.
3       Q.   And this is Mr. VanSanten's certification;
4   correct?
5       A.   Correct.
6       Q.   And it's also a certification of
7   Ms. Kreiter; correct?
8       A.   That's correct.  Yes.
9       Q.   If we look at the next page, Page 80, we
10  see Mr. VanSanten's signature, we see that;
11  correct?
12      A.   Yes, we do.
13      Q.   And we see Ms. Kreiter's signature;
14  correct?
15      A.   We do, yes.
16      Q.   And we see both of their licenses;
17  correct?
18      A.   Correct.
19      Q.   And if we look at your exhibit, F&D Trial
20  Exhibit 48, there is no such certification
21  whatsoever; correct?
22      A.   Correct.
23      Q.   And there's no such signature on the
24  report; correct?

153

1       A.   Correct.
2       Q.   And there's no such licensure put under
3   that; correct?
4       A.   Correct.
5       Q.   Can we agree, sir, that Appraisal
6   Institute is a governing body to appraisers who are
7   associate members or a member; correct?
8       A.   Correct.
9       Q.   You began coursework toward the
10  designation as a member of the Appraisal Institute;
11  correct?
12      A.   Correct.
13      Q.   It's also known as MAI; correct?
14      A.   Correct.
15      Q.   And you did that about three years ago;
16  correct?
17      A.   Correct.
18      Q.   And the significance of having an MAI
19  designation is that it demonstrates that you have
20  gone through additional courses that should help
21  you in developing an analysis and being able to
22  convey your analysis more concisely; correct?
23      A.   Correct.
24      Q.   And it's fair to say that having an MAI

154

1   designation shows that your credentials and your
2   work product has been reviewed by your piers and
3   found to be worthy of that designation; correct?
4       A.   Correct.
5       Q.   In order to become an MAI, there is an
6   exam that is required; correct?
7       A.   Correct.
8       Q.   The exam has four pods; correct?
9       A.   Correct.
10      Q.   You have taken all four pods; correct?
11      A.   I have.
12      Q.   But you failed the last two; correct?
13      A.   Correct.
14      Q.   And those two pods you failed were income
15  and sales comparison; correct?
16      A.   Yes, I believe so.
17      Q.   And, therefore, you are not MAI; correct?
18      A.   Correct.
19      Q.   And if we look again on the certification
20  by Mr. VanSanten and Ms. Kreiter, they are both --
21  no, Mr. VanSanten is MAI and Ms. Kreiter is not;
22  correct?
23      A.   I thought she was for some reason.  Maybe
24  she's not.  If she doesn't have an MAI, then

155

1   apparently she's not.
2       Q.   But Mr. VanSanten is; correct?
3       A.   He is, correct.
4       Q.   In your disclosure -- if we can go to F&D
5   Trial Exhibit 48, Page 9 of 48.  This is expert
6   witness and deposition provided by Mr. Barry;
7   correct?
8       A.   Correct.
9       Q.   If we can look at the first paragraph, it
10  says, the suit concerned an appraisal report that
11  had been prepared to convey the results of an
12  appraisal of vacant land.
13          Did I read that correctly?
14      A.   You did, yes.
15      Q.   The next line says, the lawsuit alleged
16  that the appraiser had not complied with USPAP;
17  correct?
18      A.   Correct.
19      Q.   And what you did is testify about the
20  appraiser -- criticizing the appraiser about not
21  using USPAP; correct?
22      A.   Correct.
23      Q.   The same thing you did in the second case
24  you testified in criticized the appraiser for not

156

1  following USPAP; correct?
2      A.   Correct.
3      Q.   Exhibit 71, please, Jim.  Oh, just by the
4  way, in your opinions in both -- in two of the
5  three cases you've testified in, it was your
6  opinion that the appraiser had not complied with
7  USPAP, if I didn't say that already, I'm clarifying
8  it?
9      A.   That's correct.  Yes.
10     Q.   Exhibit 71 is the Standards Evaluation
11 Practice; correct?
12     A.   That's correct.
13     Q.   You agree that this is the standard
14 practice that was in effect at the time of your
15 report and is in effect now; correct?
16     A.   Yes.
17     Q.   On Page 4 of the Trial Exhibit, it states
18 that a review is the act or process of developing
19 and communicating an opinion to a client about the
20 quality of another's appraisal or review report.
21          Did I read that correctly?
22     A.   You did, yes.
23     Q.   And then if we look on page -- before I do
24 that, it's your understanding of the definition of
                                          157

1  appraisal review, you agree with this definition;
2  correct?
3      A.   Yes.
4      Q.   Page 3 defines report.  The final
5  communication is written or oral of an appraisal
6  review -- of an appraisal or review transmitted to
7  the client.  Finality is evidenced by the presence
8  of the value or the signature in a written report
9  or a statement of finality in an oral report.  All
10 communications to the client prior to the final
11 communication must be conspicuously designated as
12 such.
13          Did I read that correctly?
14     A.   Yes.
15     Q.   Under Standard A, Page 5.  In developing
16 an appraiser, a valuer must, A, be aware of and
17 understand methods and techniques that are
18 necessary to produce credible assignment results.
19          Did I read that correctly?
20     A.   Yes.
21     Q.   And, sir, we've already established you
22 did nothing to establish -- you did no
23 substantiation in response to the Stout report;
24 correct?
                                          158

1      A.   Correct.
2      MR. RIORDAN:  Object as to form, your Honor.
3      THE COURT:  I'm sorry I heard an objection.
4  BY MR. RUFF:
5      Q.   So you have not --
6      THE COURT:  I'm sorry, pause.  I heard an
7  objection.
8      MR. RIORDAN:  Object as to form.  I believe
9  that's a mischaracterization of his prior
10 testimony.
11     THE COURT:  I'll have to hear the question
12 again.  Could you read the question back?
13          (Record read.)
14     THE COURT:  So the objection was to the form.
15          Your response?
16     MR. RUFF:  He didn't.  There's -- it's just --
17 he did nothing to substantiate.  He agrees in
18 response to the Stout report.
19     THE COURT:  Counsel?
20     MR. RIORDAN:  Judge, he said that he relied on
21 his knowledge of USPAP and --
22     MR. RUFF:  Your Honor, this is a speaking
23 objection.  I'm asking him --
24     MR. RIORDAN:  I'm trying to respond to what you
                                          159

1  asked me.
2      THE COURT:  Yes.
3      MR. RIORDAN:  He testified that he relied on
4  his knowledge of USPAP and appraising standards and
5  providing his opinion as to the use of future data.
6      THE COURT:  I think that's something that you
7  can use on re-direct.  The fact is that question or
8  a form of that question has been asked multiple
9  times.
10     MR. RIORDAN:  Yes.
11     THE COURT:  And I think the meaning behind that
12 question is clear to me.  But you can -- and I also
13 -- the clarification you're trying to make is clear
14 to me but let's move forward.  I'll allow you to
15 ask the question, Counsel.
16     MR. RIORDAN:  Thank you.
17     MR. RUFF:  Thank you, your Honor.  And in the
18 interest of time, his answer is correct.  Can we
19 just move on?
20     THE COURT:  He has answered the question so you
21 can just move.
22 BY MR. RUFF:
23     Q.   So it's fair to say that in any
24 transmittal that you send to a client, if you're
                                          160

1  just giving him your thoughts as you progress and
2  it's not your final report, you need to indicate
3  that this is a preliminary or a partial analysis,
4  something to that effect; correct?
5      A.   Correct.
6      Q.   And that's nowhere indicated in your
7  letter; correct?
8      A.   I believe it is.  I believe we state that,
9  you know, had we gone further or if we looked
10 further into -- let me see.  We say something about
11 these are the initial findings or something of that
12 nature.
13     Q.   And when you come to your ultimate
14 appraisal report, that needs to be clearly
15 designated as such and complied with the standards
16 of the Appraisal Institute and USPAP; correct?
17     A.   Correct.
18     Q.   And, sir, since you've done no
19 methodology, you have no sufficient facts -- are
20 you aware of Federal Rule of Evidence 702, sir?
21     A.   No.
22     Q.   You have done no methodology or
23 established any substantiation in response to the
24 Stout report like the Stout report has done;

161

1  correct?
2      A.   Correct.
3      Q.   You haven't produced to this Court that
4  your testimony is the product of reliable
5  principals and methods; correct?
6      A.   I don't know how to answer that.
7      Q.   That's a sufficient answer.  Thank you.
8  If we look at Standard A under B and C at the top
9  we were going on A, can we agree that this is
10 similar language that was already covered in USPAP,
11 must not commit substantial error of omission or
12 comission that's --
13     A.   Yes.  Yes.
14     Q.   And can we agree on Page 10,
15 certification, a report must contain the following
16 statements signed by the valuers or value, or I
17 certify it to the best of my knowledge and belief,
18 my analysis, opinions and conclusions were
19 developed and this report complies with the
20 standards evaluation practice?
21     A.   Correct.
22     Q.   Can we bring up Exhibit 72, please?  Would
23 you agree, sir, the Code of Professional Ethics in
24 explanatory comments applies to -- is something

162

1  that you must comply with?
2      A.   Yes.
3      Q.   In all respects; correct?
4      A.   Yes.  That's correct.
5      Q.   I want to go to your report, Exhibit 48.
6  Looking at the first bullet point in your letter
7  under discount rate, you indicate on the first line
8  of the bullet point at the bottom, the discount
9  rate is low at 15 percent.
10         Did I read that correctly?
11     MR. RIORDAN:  Your Honor, beyond the scope of
12 direct examination.  I only examined him on the
13 section of the report dealing with post-valuation
14 date information.
15     THE COURT:  Counsel?
16     MR. RUFF:  Your Honor, he produced this report,
17 and I said the entire report should be stricken.
18 What we are about to find is that there are
19 numerous errors in this report.  This cannot be
20 submitted to this Court.  It simply cannot.
21         And to suggest that I could sterilize his
22 report and only suggest a part that's helpful to me
23 or somehow is sanitized from the problems, I think
24 is not being fair with the Court.

163

1      THE COURT:  Well, the question is is this right
2  method of doing that, which is by witness.  He has
3  been asked limited questions on direct.  The -- it
4  sounds to me -- I'm going to allow -- I'm going to
5  let a limited amount of this questioning go forward
6  because I think it goes to the credibility of this
7  witness, and I think that's certainly is an issue.
8      MR. RUFF:  Your Honor, is counsel stating that
9  he's withdrawing everything before this because
10 that can certainly -- and is he saying that this is
11 not USPAP compliant and it's -- then I will
12 certainly streamline my examination and go to post
13 because if we're considering this out and he's not
14 going to ask you to even refer to it, then I'll
15 save my time.
16     MR. RIORDAN:  Judge, I'm not sure what Mr. Ruff
17 has said but it's our intent to offer that aspect
18 to the report into post-valuation date information
19 only.
20     THE COURT:  All right.  Well, I'm not sure that
21 solves the problem.  But if it does for you,
22 Counsel, we can move on.
23     MR. RUFF:  I don't know what that answer is
24 other than --

164

1    THE COURT:  So just to be clear where we stand,
2  I've ruled that I will allow additional questioning
3  along these lines because it goes to the
4  credibility of the witness.  You, Counsel, said I
5  can offer to compromise, which would be if Fidelity
6  would not use the exhibit beyond the scope of what
7  was asked for on --
8    MR. RIORDAN:  Right.
9    THE COURT:  -- direct.  Then you could solve
10  that question.  And I believe I heard in response
11  that is, in fact, what they were going to be using
12  the exhibit.
13    MR. RUFF:  So they're withdrawing the pages
14  before that?
15    THE COURT:  I don't know if they're withdrawing
16  it.  Remember again, I'm the party that makes the
17  determination of how exhibits would weigh.  And
18  I've said before, if you don't reference exhibits,
19  I will not assign it a weight other than zero.  So
20  what I'm hearing is those parts of it will be
21  referenced to the weight of zero.  I simply will
22  not --
23    MR. RUFF:  Very good, your Honor.  And thank
24  you for that clarification, sir.

                                            165

1    MR. RIORDAN:  Thank you, Judge.
2    THE COURT:  Okay.
3  BY MR. RUFF:
4    Q.    Your testimony is that Exhibit 48, you
5  were not asked to perform an appraisal review in
6  this case; correct?
7    A.    That's correct.
8    Q.    Because all you were asked to do was look
9  at an appraisal to see if there were any issues
10  that Fidelity would want to take a closer look at;
11  right?
12    A.    That's correct.
13    Q.    Or have somebody else look at it but not
14  you, though; correct?
15    A.    Correct.
16    Q.    You would agree that Exhibit 48, the
17  report, is not an appraisal review that complies
18  with USPAP; correct?
19    A.    That's correct.
20    Q.    This is only a preliminary analysis about
21  some potential concerns you saw in the Stout
22  report; correct?
23    A.    That's correct.
24    Q.    You have never gone to the extent in

                                            166

1  forming a conclusion as to whether there are any
2  problems with the Stout report, or if there were
3  problems, what impact they would have on Stout's
4  conclusions; correct?
5    A.    Correct.
6    Q.    You identified certain information that
7  Fidelity might want to look into further; correct?
8    A.    That's correct.
9    Q.    And only then to see if there was a
10  problem; correct?
11    A.    Correct.
12    Q.    You haven't even picked up a calculator
13  for this assignment; correct?
14    A.    Correct.
15    Q.    And as far as whether certain information
16  you identify would impact Stout's conclusions one
17  way or another, you have no opinion on that; is
18  that fair?
19    A.    That's correct.  Yes.
20    Q.    You would agree that an appraisal review
21  that is to be submitted to a Court should comply
22  with the requirements of USPAP; correct?
23    A.    Yes.
24    Q.    You would agree that in order to be

                                            167

1  submitted to the Court, any critique of another
2  appraisal must comply with the USPAP; correct?
3    A.    Correct.
4    Q.    And your testimony is that you were not
5  asked to perform an appraisal review in this case;
6  correct?
7    A.    That's correct.
8    Q.    All you were asked to do was to look at an
9  appraisal and to see if there were any issues that
10  Fidelity would want to take a closer look at;
11  correct?
12    MR. RIORDAN:  Judge, I think this may be the
13  fifth time.
14    THE COURT:  Asked and answered many of these
15  questions, Counsel.  So if you could move to
16  something new or sum up, please.
17    MR. RUFF:  I'll sum up.
18  BY MR. RUFF:
19    Q.    Since your report is not an appraisal
20  review and does not comply with the USPAP, you have
21  no opinions that you form in connection with this
22  report that you will be willing to offer to a Court
23  with any reasonable degree of appraisal certainty;
24  correct?

                                            168

1    A.   Correct.
2    Q.   How is that?  You have not come to any
3  opinion or conclusion as to whether anything that
4  you identified in your letter impacts the
5  conclusions of the value provided by Stout; isn't
6  that true?
7    A.   That is true.
8    Q.   You haven't done any analysis to determine
9  whether they actually impact the outcome?
10    A.   That's correct.
11    Q.   In this letter you wrote, that's something
12  that could have been written by someone who is not
13  an appraiser; correct?
14    A.   That's correct.
15    Q.   And that's one of the reasons why you
16  don't include your appraisal license on that;
17  correct?
18    A.   Yes.  That's correct.
19    Q.   You've never formed an opinion as to
20  whether any of the -- you called them red flags in
21  your deposition, or actually problems where they
22  actually challenge Stout's conclusions; correct?
23    A.   Correct.
24    Q.   You've agreed that since you have not done
                                                      169

1  the analysis, some of the red flags you identify,
2  if we ran the analysis, it could actually increase
3  TRG's damages; correct?
4    A.   It could.
5    Q.   You would agree then that this document is
6  not the report of a general certified appraiser?
7    A.   Correct.
8    Q.   So, therefore, you're not testifying under
9  oath that this is an appraisal review report in
10  your capacity as a general appraiser; correct?
11    A.   Correct.
12    Q.   You would agree -- also agree that this
13  letter could not be used in this court or any other
14  proceedings as a counter to the Stout appraisal and
15  couldn't be used as an appraisal review report to
16  counter a Stout appraisal; correct?
17    A.   Correct.
18    Q.   In order -- and you would agree that in
19  order to conduct an appraisal review report,
20  additional work would be required that's more
21  comprehensive than what she's done?
22    A.   Correct.
23    Q.   You would also agree that as a licensed
24  appraiser, you would need to caution Mr. Riordan
                                                      170

1  that this document should not be submitted in
2  opposition from an appraisal with the suggestion
3  that it is an appraisal review; correct?
4    A.   I don't -- well -- correct.  Yes.
5    Q.   Is it correct?
6    A.   Correct.
7    MR. RUFF:  I think I'm finished.  May I have
8  one moment to talk to my co-counsel?
9    THE COURT:  Let's make it clear, I'm not
10  cutting short your re-direct, Counsel.
11    MR. RIORDAN:  Thank you.
12    THE COURT:  And that result, of course, is that
13  we may, in fact, at this point cutting short
14  closing arguments but it is what it is.
15  BY MR. RUFF:
16    Q.   The one point that your report is being
17  used for is that post-valuation data, do you recall
18  that?
19    A.   Yes.
20    Q.   And as far as Stout performing an
21  assessment of the actual damages in this case, you
22  would agree that at this point we know what's
23  happened between 2012 and 2017 when this report
24  came out; correct?
                                                      171

1    A.   We do know, yes.  That's correct.
2    Q.   And as far determining what damages TRG
3  actually suffered, you would agree that taking into
4  account what actually happened will give you a more
5  accurate number; correct?
6    A.   I don't know how to answer that.
7    Q.   Page 240 -- Page 240, Lines 21 through 24.
8  242, Line 1.
9                    (whereupon, the videotaped
10                    discovery deposition was
11                    played.)
12  BY MR. TURIELLO:
13    Q.   "But you agree, though, that as far as
14  what damages TRG actually suffered taking into
15  account what actually happened will give you a more
16  accurate number?
17    A.   Yes."
18  BY MR. RUFF:
19    Q.   Were you asked that question and did you
20  give that response?
21    A.   Apparently, yes.
22    Q.   And, again, you have not forecasted out
23  from January 1, 2012; correct?
24    A.   No, I've done no forecasting of
                                                      172

1  calculations.

2      MR. RUFF:  Your Honor, thank you for allowing

3  me that time.

4      THE COURT:  Does the witness need a break?

5      THE WITNESS:  No, that's fine, your Honor.

6              RE-DIRECT EXAMINATION

7  BY MR. RIORDAN:

8      Q.  Thank you, your Honor.  Just a couple of

9  questions, Mr. Barry.  I think we've established

10 that you have not prepared an appraisal review,

11 would you agree with that?

12     A.  Yes, I agree with that.

13     Q.  And with respect to the use of

14 post-valuation date information, your opinion --

15 you offer an opinion that it was improper for Stout

16 to use that information to arrive at a fair market

17 value conclusion?

18     A.  Correct.

19     Q.  And that was based on what?

20     A.  Definitions of values and standards, the

21 fair market value definition and standards that

22 apply that say that you should be using data that's

23 relevant to the effective date of value.

24     Q.  And this definition that you referred to

                                                  173

1  just now is the definition from the treasury

2  regulations found in the Stout report?

3      A.  That's correct.

4      Q.  And the standards you refer to is Advisory

5  Committee Report?

6      A.  That's correct.

7      Q.  And you understood the Stout report to be

8  a damages analysis; correct?

9      A.  That's correct.

10     Q.  And that's what you were asked to look at?

11     A.  Yes.

12     MR. RIORDAN:  That's all I have, Judge.  Thank

13 you.

14     THE COURT:  Okay.  Does either party reserve

15 the right to call this witness again?

16     MR. RIORDAN:  No, your Honor.

17     MR. RUFF:  No, your Honor.

18     THE COURT:  You are excused.  Thank you very

19 much for your testimony.

20              (Witness excused.)

21     THE COURT:  Just to be clear, counsel for

22 Fidelity, are you at this point resting in response

23 to your case?

24     MR. RIORDAN:  We are, your Honor.

                                                  174

1      THE COURT:  And we have no rebuttal case?

2      MR. RUFF:  No, everything was handled in

3  Mr. Riordan's case.

4      THE COURT:  So we will take a break and we will

5  start again at 5:24.  Just so you each have your

6  18 minutes.

7              (Short recess was taken.)

8      THE COURT:  We are now at this point where each

9  party has rested their respective primary cases.

10         As was requested, I afforded some time for

11 oral closings, though, I will set a deadline for

12 written closings to follow, simultaneous written

13 closings to be clear.  And I've been told in

14 advance that the transcripts generally are made

15 available pretty rapidly in this.

16         What I would like is a deadline some time

17 perhaps in mid October, which is going to give you

18 about 30 days or so to work on this.

19         Any objection from either of the parties

20 on that?

21     MR. RUFF:  No, your Honor.

22     MR. RIORDAN:  No, your Honor.

23     THE COURT:  So if we were to, for example,

24 chose Friday, October 19th, as the deadline, which

                                                  175

1  is as I said almost exactly 30 days, anyone have an

2  issue with that deadline?

3      MR. RUFF:  No objection.

4      MR. RIORDAN:  No objection, your Honor.

5      THE COURT:  Okay.  So those are to be filed

6  with the Court on the docket in this matter

7  simultaneous meaning you each have the same

8  deadline.  If you choose to file earlier and your

9  opposing party an opportunity to respond but that's

10 up to you.  They get to read yours from whenever

11 you put it on the record.

12         Now, Counsel, you are the movant.  It

13 means your opportunity to sum up first.

14     MR. RUFF:  Your Honor, may I request that you

15 give me a five minute warning?

16     THE COURT:  I have a timing obligation that has

17 been sent to me for exactly that purpose.  So you

18 are asking for 18 minutes?

19     MR. RUFF:  Correct, your Honor.

20     THE COURT:  So at 13 minutes you would like a

21 warning or after 13 minutes.

22     MR. RUFF:  At 13 minutes can you just let me

23 know.

24     THE COURT:  You have 13 minutes to begin with.

                                                  176

1  And then I'll let you know when it runs, you'll
2  have 5 more minutes.
3      MR. RUFF:  Thank you, your Honor.
4      Your Honor, it's been a pleasure
5  presenting before you and I thank you and your
6  staff for all your time and working us in and work
7  after hours, and I state that on behalf on both
8  sides.
9      You met Peter Kyte.  He is impressive and
10  a smart young man.  He is an entrepreneur seeking
11  to be like his father and starting his own
12  business.  He did -- in doing so, he partnered with
13  SunCal.  Mr. Teteak told you SunCal had years of
14  experience doing deals like this.
15      Mr. Riordan stood up in his opening and
16  told you that TRG did not do due diligence prior to
17  purchasing the properties.  He may have said that,
18  but there was not an ounce of support for that
19  statement.  The evidence shows that he was wrong.
20  He actually couldn't have been further from the
21  truth.
22      Mr. Teteak testified extensively as to the
23  due diligence that was performed by SunCal.
24  Mr. Kyte, Peter Kyte testified to the same thing.
177

1  This case is not about a lack of due diligence.
2  Why?  Because due diligence won't find what
3  Fidelity had in store.
4      Fidelity itself knew no one would buy
5  these properties if they have denied the surety
6  claims, so instead they played nice.  They met with
7  the municipalities and the trustee and acted as
8  though everything would go here as it had in
9  countless other bankruptcy situations.
10      Never once did Fidelity even hint that it
11  intended to deny the claims or not cooperate with
12  the municipalities and a subsequent purchaser.
13  Fidelity sent out its people to prepare estimates
14  and look like they were doing what they were
15  supposed to be doing and gave every impression that
16  they were going to act like every other surety.
17  And that's what they did.  They tried to make it
18  look like that was what they were doing but they
19  did not.
20      After TRG purchased the properties,
21  Fidelity for the first time asserted its coverage
22  position that it was excused from paying the bond
23  claims because there was a subsequent purchaser of
24  the properties.
178

1      Mr. Kilburn himself deemed this position
2  to be novel.  His own words.  It's in the e-mails
3  that we found in discovery.  Unique, one of a kind.
4  He has worked for Fidelity in the insurance
5  industry for 30 years combined with Mr. Riordan's
6  experience 70 years.  Neither one of them has ever
7  asserted this position or seen it asserted before.
8      There's no legal support for this claim,
9  and they admit that.  But after paying a large
10  number of claims during the economic downturn, 13
11  million in the Neumann Homes case.  Fidelity in its
12  claims committee, a meeting of four people with
13  Mr. Riordan included decided they would test it out
14  and save $38 million in this case because that was
15  the potential claims.
16      Mr. Riordan also told you in his opening
17  that if TRG investigated the bonds, they would have
18  known that Fidelity was -- what Fidelity was going
19  to assert.  This is another incorrect statement.
20  It was not proven.  It's not even possible.
21      Surely TRG was not supposed to be able to
22  read Mr. Riordan's mind and know that it would come
23  up with this novel defense with Fidelity.
24      Fidelity throughout the course of this
179

1  trial has pointed to no provision in a bond that it
2  is relying upon to deny the claims.  Rather in an
3  admitted effort to try to determine pricing for
4  future bonds decided to pursue this novel theory,
5  reminiscent of David versus Goliath.  Fidelity
6  found what it believed to be the perfect victim in
7  TRG.
8      They were a small player, new in the field
9  and Fidelity assumed that they didn't have the
10  resources to fight them in six different
11  jurisdictions.  They were an investor, whatever
12  that was supposed to mean, but they weren't
13  entitled according to Mr. Kilburn to the same
14  respect that any other purchaser out of bankruptcy
15  was supposed to have.
16      Like that status mattered.  They didn't
17  pick on somebody like resources out of the first
18  Neumann case.  Somebody that was potentially a
19  large public builder that was a client perhaps.
20  They didn't pick on somebody like that.  They chose
21  TRG.
22      If Fidelity intended from the start to
23  deny the surety claims, why not make a coverage
24  defense known prior to the sale.  Because as
180

1   Mr. Teteak said, he sat up here and told you no one
2   would have purchased these properties from the
3   trust if Fidelity asserted its novel theory prior
4   to the sale. The properties would have been
5   worthless. Nobody would have touched them.
6       To understand how calculating Fidelity
7   was, it is very important for this Court to realize
8   that Fidelity had tried this once before in the
9   Neumann Homes case. Well, that's why we went
10  through that with Mr. Kilburn. And I know it was
11  painstaking for your Honor but we went through
12  those documents to demonstrate that -- and your
13  Honor could take judicial notice of those
14  pleadings, that Fidelity's attempts were quickly
15  rejected by Judge Wedoff. They failed.
16      In the stipulations in this case, they
17  tried to bring it in again and the trustee caught
18  it and said it's not coming in here. So what did
19  they do? They knew they couldn't go to bankruptcy
20  court. They knew they should not -- they couldn't
21  come before this Court because they would have been
22  shutdown.
23      They purposely avoided the bankruptcy
24  court and went to state court, and they just didn't
181

1   no care into the effects of the decision. They
2   didn't care about the people living in these
3   subdivisions. We heard about it briefly in one
4   document, but your Honor has more documents that
5   refer to the complaints by the homeowners. It's
6   not just the homeowners but also Mr. Peter Kyte as
7   well complaining about the streets. The health and
8   safety issues for failure to complete this work and
9   Fidelity didn't care. They didn't care about the
10  streets. They didn't care about the health and
11  safety, and they didn't care about TRG or Peter
12  Kyte.
13      While Fidelity attempts to complicate the
14  issue here is simple. It's not about an annexation
15  agreements or inadequate bond amounts. It all
16  comes down to Fidelity did not want to pay its
17  obligation on surety bonds where it had collected a
18  handsome premium.
19      This attempt to get out of paying has led
20  to years and years of litigation, which put a black
21  mark on each properties and rendered them
22  unsellable. Mr. Teteak told you no buyer would
23  touch these lots while there was litigation
24  pending.
183

1   file a one-third party complaint. They went on an
2   out assault and filed six state court actions.
3   Mr. Riordan -- Fidelity made a mockery of the
4   sanctity of the bankruptcy court in a confirmation
5   order. Not only did it ignore the state and file
6   action after action against TRG in state court but
7   it also created a bigger issue for the debtors
8   seeking bankruptcy relief.
9       If an entity cannot feel comfortable that
10  something that they purchased, a property that they
11  purchased out of bankruptcy, a debtor will never be
12  able to sell their property. If purchasing assets
13  from a trust, subjection to years of litigation,
14  who would buy it. Or if they do buy it, they'll
15  pay little to nothing for them, which means
16  creditors will not be paid.
17      Fidelity not only made Kimball Hill's
18  properties worthless to TRG but they single
19  handedly make any asset purchased out of bankruptcy
20  a liability. Fidelity's whole defense to paying
21  its bonds was to test the theory. They admit that
22  this is a business decision. They're going to sell
23  their products in the future.
24      In doing so, they were ruthless and took
182

1       Fidelity's own witness Bart Olson told you
2   that Yorkville has never had to sue a surety before
3   and would not have to do so but for Fidelity's
4   refusal to pay. So it is not the normal practice
5   for a surety to shook its obligations as it did in
6   this case.
7       The causation for TRG's damages rests
8   solely on Fidelity. Fidelity attempts to point
9   fingers at anyone else but blame that that should
10  be rejected. Had Fidelity done one thing that it
11  was required to do, we wouldn't be here, period.
12      Ultimately, Fidelity's role decision to
13  test to novel theory and to try to determine
14  pricing for future bonds has not only ruined TRG
15  but Peter Kyte as well.
16      There are many types of damages that TRG
17  could very well seek here but didn't in a
18  conservative effort such as reputation damage, lost
19  opportunity cost. 14 million was the testimony of
20  Mr. Kyte that has been expended when there was a
21  plan to sell -- even put in an additional million
22  dollars from the 5.6 to 6.6 that they had paid. 14
23  million has been expended. Those are actual
24  damages which we have not sought in this case. But
184

1    I suggest, your Honor, our right for punitive
2    damages.
3         Your Honor, we saw a witness produced
4    before you that basically -- not basically, said
5    he's not referring, and counsel said he's not
6    referring to the bulk of his report but referring
7    to one section of his report, which he then admits
8    at post-valuation -- post-date valuation can be
9    accurate.
10        He has -- and we'd go take those
11   depositions. I studied all weekend, not that I'm
12   complaining about that, preparing for his
13   cross-examination on the report that I think he
14   should never even bring before your Honor. And
15   then he says, oh, I'm not really going to use it.
16        We took depositions. We've had time. I
17   think the attorney -- the report from Stout stands
18   before you as unrebutted. There is no refutation
19   of what they've put forth. Nobody has come in here
20   and said anything. Not one dollar concerning that.
21   And I put up the exhibit in the beginning, that
22   $8 million which goes up as we sit here is
23   unrebutted. The attorney's fees, unrebutted. The
24   consultation fees, unrebutted. The management
                                                    185

1    fees, unrebutted.
2         And those fees, us standing before you
3    today is all because of Fidelity's contempt. And
4    our damages are seek -- as of today is
5    approximately $10.5 million in unrebutted,
6    unrefuted the damages. But also, your Honor, this
7    Court should award punitive damages against
8    Fidelity.
9         Ultimately, this Court needs to send a
10   sign and signal to Fidelity. Let's be clear,
11   that Zurich was an international billion dollar
12   company and will take a lot for them to -- a signal
13   to be sent to them.
14        So my final comments in regarding punitive
15   damages, your Honor, what Fidelity has done here,
16   it has done on purpose. There was no mistake.
17   There was no error. They knowingly, willingly
18   intentionally and repeatedly violated the
19   confirmation plan and disregarded this Court's
20   authority in order to test the theory. One they
21   admit was novel. They pursue this theory, this
22   novel theory in direct contempt of this Court and
23   at the expense of TRG all to avoid their
24   responsibilities under various bonds and to assist
                                                    186

1    in pricing.
2         They made a business decision to disregard
3    this Court and drive a small company into the
4    ground when they knew their actions were wrong all
5    to get some clarity about what they could charge
6    for the bonds. To this day, Fidelity is
7    unrepentant and persists in its contempt.
8         Once this Court issues a ruling, they will
9    make another business decision. You just heard
10   from Mr. Kimball whether they pay the award is a
11   cost of doing business or whether to appeal and see
12   if they can save a little bit more money all while
13   pursuing -- pushing TRG closer and closer to
14   bankruptcy.
15        All the while operating as if this Court's
16   authority does not extend to it. This Court needs
17   send a message that that behavior is unacceptable,
18   otherwise there's a chilling effect on what they're
19   doing for property sold out of bankruptcy on future
20   purchases from bankruptcy's estate. Undermining a
21   core purpose of this Court. The sanctity of the
22   bankruptcy Court.
23        If word gets out that Fidelity can get
24   away with a slap on the wrist, and believe me
                                                    187

1    $10 million, for how long -- I will finish within
2    that 5 minutes. Thank you for giving me signal.
3    $10 million to a company that size, this would --
4    then would ever trust this Court if they're allowed
5    to get away with that.
6         Fidelity's contemptuous actions which
7    continue to this day are a direct assault on this
8    Court's authority and affect every property coming
9    out of bankruptcy court in the future.
10        TRG has presented unrebutted testimony to
11   establish the reasonableness of its actions
12   throughout this ordeal, the fees, the costs related
13   directly to Fidelity's actions and expert testimony
14   regarding the impact of Fidelity's contempt and the
15   value of the property.
16        Fidelity presented essentially nothing.
17   Five minutes of testimony from Mr. Kilburn. That
18   was it. And a purported expert who gave up every
19   page of his report except for three paragraphs at
20   the end. And even then said, well, you know,
21   post-valuation could be a good thing because you
22   get an accurate read.
23        So I consider that, your Honor, no -- he
24   said he's not refuting the report on value at all.
                                                    188

1  That is why, your Honor, in addition to the 10
2  million, an unrebutted 10.5 million approximately
3  to this day, an unrebutted actual damage, this
4  Court should impose significant sanctions and
5  severe punitive damages.
6      Is it worth it to pay 10 million to test
7  theory? 15 million. 20 million, maybe. They were
8  looking at 38 million in bonded improvements for
9  which they submitted a claim. This Court needs to
10  enter an award over a multiple attempt. Single
11  digits is what the U.S. Supreme Court says is
12  appropriate and within that realm.
13      And I leave it to the Court as to that
14  particular number but I go to the testimony which
15  we will cite of Mr. Kyte. He stated it on his
16  testimony here. He said, an internal rate of
17  return, which was verified by Mr. Teteak, if we
18  said 20 percent, which they did more than that on
19  identical types of purchases right from this
20  type -- from Kimball Hill estate, trust, it would
21  be worth $30 to $35 million. Using their number --
22  we used a conservative number on the discount rate
23  is 20, 20 percent. If we use their number on 35
24  percent, it would be 90 million.

189

1      That's what Mr. Kyte missed out on. One
2  of the largest runs up in the history of the United
3  States in the real estate market because he was
4  tied up with what they did.
5      Your Honor, I leave it to you as to what
6  the appropriate number is. I'm suggesting a
7  multiple, multiple of 10. Whether it be 10 million
8  or 20 million, I think that's conservative under
9  the circumstances in addition to the 10.5 million
10  in the compensatory damages. So that others are
11  discouraged from flaunting this Court's authority
12  to test any theories that they may have.
13      Most importantly, Fidelity needs to be
14  punished so that other debtors and purchasers from
15  bankruptcy estates will know that this Court will
16  protect it.
17      One final point I'll make, your Honor, and
18  this is unrelated to everything I've stated thus
19  far. If they get up here and say that we should
20  have come to the Court first -- saying that we
21  should have come to the Court first or earlier
22  because we did come to the Court first. They sued
23  us in six different lawsuits. They sued us.
24      They chose the forum. They chose the

190

1  forum knowing that they should come here. They
2  chose the forum and TRG beat them up. And it
3  wasn't until 2015 which your Honor has already
4  stated in writing that they were reasonably getting
5  dismissals that eventually came to the -- to this
6  Court.
7      So I suggest that they should have come
8  earlier if that's even a consideration, but we came
9  as soon as, as soon as those decisions in the
10  appellate court were rendered.
11      I thank you for your time and attention.
12  I thank your staff who have been very accommodating
13  to us and I thank you.
14  THE COURT: Thank you.
15  MR. RIORDAN: Because we are going to be
16  providing submissions, Judge, so I don't intend to
17  address everything here today.
18      But I would like to thank your Court,
19  staff, yourself and counsel, too. It has been --
20  they've been courteous, civil people to work with.
21  And it's been -- from a lawyer to lawyer
22  standpoint, it's been a pleasure for me to work
23  with them.
24      Judge, when this enforcement motion was

191

1  initially filed, one of the first words out of
2  TRG's mouth was, when I bought this property in
3  2010, I relied on the protections of this Court to
4  protect me from lawsuits against property because I
5  believed that this -- that I was taking this
6  property free and clear of all liens and
7  encumbrances. When, in fact, that was a mistake.
8      The bankruptcy court cannot rid a property
9  of encumbrances like covenants from the land. That
10  is established law. There is no question about
11  that. TRG made a critical error when they decided
12  it could buy the property and not have to worry
13  about performing under these annexation agreements
14  when, in fact, the law was different. A mistake of
15  law is no defense, but it not only said it in its
16  open motion.
17      Mr. Kyte filed an affidavit where he made
18  a similar statements, I relied on the benefits and
19  the protections of the bankruptcy court. And if I
20  did not have those protections, I would not have
21  bought this property.
22      But he went one step further. After all
23  this litigation, after the enforcement motion was
24  filed, after he filed his affidavit in this court,

192

he signed an agreement with the Village of
Shorewood.  And in the agreement, he went one step
farther.  He said, I not only relied on the
benefits and the protections.  I relied on the plan
release.  He said the release specifically.

So from 2010 when he bought the property,
he was aware of the release, he believed it would
protect him and he went forward with the deal on
that basis.

Now, one thing that Mr. Ruff talked about
was due diligence.  And this case is not all about
due diligence but in a large measure it is.  As
your Honor said, TRG is staying in state court is
not without consequences.  And when I gave my
opening statement, I said TRG performed no due
diligence.  And I was absolutely correct about
that.

Because Mr. Kyte testified that he did not
do any due diligence.  He relied on SunCal, a
company that a college buddy worked for and that
got mixed up with the Lehman Brothers bankruptcy.
These are the kind of people that he was relying
on.

To perform his due diligence, he had no

193

idea what they were doing.  But he did know that
his purchase agreement said, well, he didn't have
to replay -- he was promising the trust that he
didn't have to replace the bonds but it didn't say
anything about he didn't have to install the
improvements.  And he relied on this company to
invest $6.6 million of his family's money into a
venture that he had never even been a part of that.

He said SunCal had been around a long time
and they knew what they were doing so I relied on
them.  But I found it very interesting when
Mr. Teteak said, a normal deal is, we're in for
10 percent.  We got some skin in the game but not
in this deal.  They had zero in the game.  Nothing.

TRG took 100 percent of their risk yet it
relied on Mr. Teteak and his group at SunCal to
perform all this due diligence.  And even though
these purchase agreements said that we're not
making any representations to you about these
bonds, the quality of the bonds and the defenses
that might exist, whether they're sufficient.
That's up to.

And Mr. Kyte said, I'm sure that SunCal
did that.  But when Mr. Teteak was on the stand and

194

asked about the annexation agreement, he said,
maybe that's something we should have looked at a
little closer and I indeed think it should be.

TRG says that F&D proceeded on testing a
theory.  Well, there's nothing legally wrong with
testing a legal theory.  If that were the case,
Brown versus the Board of Education would not be
the law today.  And I could cite numerous examples
where lawyers doing what they do extend the law or
existing legal principles into new factual
situations.

In fact, what F&D did in state court --
and I understand your Honor found that its actions
were in violation of the order.  But what we did in
state court was rightfully pursue our state court
remedies.

And while we lost in the trial courts, we
were vindicated by two appellate court decisions in
the State of Illinois, which your Honor is familiar
with, where each court said that F&D stated a cause
of action against TRG as successor or as subsequent
owner.

They bought the property like a taxpayer,
like a property owner, you've got to pay your

195

property taxes, but you don't have that obligation
until you take title.  The same thing is true here.
They had obligations.  And they knew they had these
obligations.

Because if you look at the Stout report,
all of those -- remember all the construction costs
that we talked about.  Well, they included these
construction costs in there because they knew that
those obligations were theirs.  They wouldn't have
included those if they were not.

The Neumann case and the RFC motion, there
was a pushback order that Judge Wedoff entered in
that case relating to secured lenders taking back
the property.  Residential Funding Corporation is
one such lender.

Residential Funding Corporation set a road
map that TRG failed to follow.  And what RFC did
there was they went in before Judge Wedoff and
said, we don't think we should be responsible for
improvements that are covered by the bonds.

Our response to Judge Wedoff, if you look
at our response in the City of Joliet is, you
cannot rid the buyers of the covenants that run
with the land.  And we pointed out to Judge Wedoff

196



1   that the same thing we did in these cases is that
2   there are successor liability provisions.
3       Judge Wedoff disagreed and entered the
4   order. But he said, RFC doesn't have to become the
5   surety but they do -- but he did not say that the
6   covenants is running with the land are somehow
7   voided. They survived that pushback order.
8       And that's what TRG should have done in
9   this case. It's buying property, even though it
10  wasn't in the context of a sale order. In fact, we
11  didn't know about the sale of the property until
12  after it happened.
13      And you remember letters that were shown I
14  think to Mr. Kilburn where the trust administrator,
15  one of the representatives of the trust
16  administrator, I think it was Bill Pursell from
17  Kimball Hill wrote -- said the property has been
18  sold to TRG and he copied me on those letters. So
19  it was in May of 2010 when we first learned of that
20  sale.
21      But they knew about the sale long before
22  that. It had been under negotiation for over a
23  year or maybe about ten months. And then the deal
24  closed in April of 2010, and it wasn't until after
                                                    197

1   that that we learned. So what could we do about it
2   before the sale.
3       TRG could have come into the Court and
4   said, we want to buy this property but we don't
5   want to have to pay what the surety is going to
6   have to pay, but they didn't do that.
7       The municipal stipulations. In the -- you
8   know, in the municipal stipulations the key phrase
9   there, Judge, is that the diligence rights against
10  third-parties are not affected by the stipulations.
11  That was a key phrase that nobody ever talked
12  about. In fact, TRG wanted to stay as far away
13  from that phrase as possible.
14      They related to suits and claims against
15  the debtor. And as Mr. Kilburn testified that TRG
16  -- F&D in good faith believed that it was not in
17  violation of this Court's plan and junction because
18  it didn't involve the debtor. And while the Court
19  found that a successor to the debtor -- TRG was a
20  successor to the debtor, TRG claimed for six years
21  in state court that they weren't a successor to the
22  debtor. They said, no, we're not a successor.
23      Now, if they had said we were a successor
24  to the debtor, maybe things would have been
                                                    198

1   different. But they didn't. They have kept saying
2   -- they kept raising defenses -- they even raised
3   bankruptcy defenses that many cases say, hey,
4   that's not -- that's wrong, you know, this assumed
5   contract defense. Courts have shot that down.
6       They raised the defenses in the state
7   court that had nothing to do with, you know, the
8   status of the property they said, you know, we were
9   not a -- we were subrogated to their claims. You
10  know, this is not a valid indemnity claim. They
11  went to state court for -- and if you read the City
12  of Elgin case, the appellate court systemically
13  shoots them down.
14      The damages in this case clearly is an
15  overreach. And as we pointed out, the big flaw in
16  the Stout report is scenario B. And what they're
17  trying to tell the Court is that I am a homebuilder
18  on January 1st, 2012, and I can look into the
19  future. And, you know, I feel Marty McFly here,
20  but I can look into the future and I can, you know,
21  see what's going to happen. And I'm going to set a
22  valuation date on January 1st, 2012 based upon
23  events that never had not yet occurred.
24      And it was based on valuations or data on
                                                    199

1   subdivisions which didn't even exist on
2   January 1st, 2012. And they say, well, we're going
3   to use this data because we need to know what
4   actually happened. This is -- but commonsense --
5   Mr. Barry testified that, you know, this is
6   appraisal 101 stuff, you know, not using
7   post-valuation date to establish a value date.
8       Well, if we all had the ability to see
9   into the future, maybe this financial crisis never
10  would have occurred. But we only have the ability
11  to look to the past. And that's what appraisals
12  are to be based on if you're going to be relying
13  upon them.
14      And I asked Mr. VanSanten about Advisory
15  Opinion No. 34, and he agreed that you have to be
16  extreme careful about using this post-valuation
17  date information. And he agreed that Advisory
18  Opinion 34 applies to his report.
19      But, nevertheless, he's going to use
20  post-valuation date to gin up a $10 million damage
21  claim. When in reality he said, I did an appraisal
22  as of January 1st, 2018, and he pointed to the lot
23  valuations that he had come up with, which were
24  close to $50,000 a lot.
                                                    200

1    And if you take that valuation and
2  multiply it by the roughly 400 lots, you're talking
3  about a gross income of $20 million against a 5.4
4  million purchase price. And even if you take all
5  of the carrying costs that are identified in the
6  report, they still end up with a profit. And the
7  reason Stout did not do -- do you remember --
8  strike that.
9    I asked Mr. VanSanten, you had all the
10  data here to do an appraisal with a valuation date
11  of January 1st, 2018, except for the discount rate.
12  And I asked him, do you know what that. He said,
13  no, no, I have to do a whole bunch of research in
14  order to come up with that.
15    But if they had done that valuation and
16  had come up with the appropriate discount rate,
17  which I suggest would have been close to the
18  15 percent he used for scenario A, that the profit
19  that TRG would have realized and is now realizing
20  from the sales would be shown.
21    On causation, there's one kind of small
22  fact that nobody wants to pay attention to is they
23  bought more subdivisions than we bonded. Do you
24  remember Legend Lakes and the subdivision Ingham

201

1  Park. Neither of which were bonded by F&D. And
2  there was a neighborhood six in Waterford not
3  bonded by F&D.
4    Legend Lakes hasn't sold yet. Why is
5  that? And Ingham Park was recently sold. Why is
6  that? Neighborhood six not sold. Why is that? We
7  can only say because Mr. Kyte would not have been
8  able to sell any of these properties. And they
9  don't want to talk about the claims by the
10  municipalities. Mr. Teteak said, any claim would
11  taint these properties.
12    Elgin and Shorewood and Yorkville all made
13  claims against the TRG. Shorewood settled their
14  claim. And Mr. Kyte kind of dismissed that by
15  saying, oh, we can just go ahead and sell with
16  those guys any time we want.
17    Well, Mr. Bart Olson also came in and
18  said, you know, here we are eight years after I
19  wrote my letter, haven't settled yet. No
20  settlement with Elgin. And only recently a settled
21  case with Shorewood. And it's interesting to note
22  that the sale in Shorewood occurred that settlement
23  occurred, even while -- even while F&D's claims
24  were still pending.

202

1    Thank you, Judge.
2    THE COURT: And you also were within your
3  18 minutes.
4    MR. RIORDAN: But I get to make it up on the
5  written. And I haven't talked to counsel yet but I
6  assume we're going to need 15 pages each.
7    THE COURT: Why don't you talk to me, which
8  is --
9    MR. RIORDAN: The only thing I was going to
10  suggest, Judge, was perhaps we could come in on a
11  motion or present some kind of an agreed order with
12  a page length agreement if that's all right with
13  your Honor.
14    THE COURT: Well, could you do that but your
15  presumption is that I want to read all the
16  documents.
17    MR. RIORDAN: That's true.
18    THE COURT: The normal limitation you're right
19  is 15 pages. What I would normally do on these
20  sorts of things is set a page limit today exclusive
21  of any attachments that you make. If you feel like
22  you have to attach something to make your point,
23  that doesn't count within your page limit.
24    MR. RIORDAN: Right.

203

1    THE COURT: On something of this magnitude, I
2  would be inclined to allow you to exceed the 15
3  page limit but I'm not inclined to give you
4  50 pages.
5    MR. RIORDAN: No, I wasn't thinking anything
6  like that.
7    THE COURT: Give me a reasonable estimate and I
8  will consider it, but I don't want to see another
9  motion. I think you could handle this today.
10    MR. RUFF: 25.
11    MR. RIORDAN: I was going to say the same
12  thing, 25.
13    THE COURT: All right. Sold. 25 pages
14  exclusive of attachments --
15    MR. RIORDAN: Correct.
16    THE COURT: -- of argument.
17    MR. RIORDAN: Right.
18    THE COURT: And don't monkey with the fonts,
19  don't monkey with the margins and alike. I'm very
20  attune to that because this happens all the time in
21  my motion practice.
22    MR. RIORDAN: I've kind of transferred over to
23  using what the Seventh Circuit like and it's
24  century font at 12 point because they say they can

204

1  read it so -- and I'm not saying he should use
2  that.
3      THE COURT:  I use Garamond because there was a
4  study years ago that said that the U.S. Government
5  switched from Thompson to Garamond.  They saved
6  hundreds of millions of dollars in printing costs
7  just in ink alone because of just the slight --
8      MR. RIORDAN:  We can do that.
9      THE COURT:  -- make up and that's stuck with me
10  and that's what I use in my opinions.  You'll have
11  to deal with if that's hard to read.  I'm not
12  encouraging you to do that.
13      MR. RIORDAN:  Okay.  I'm a little -- at the end
14  of these things you get a little levity.
15      THE COURT:  Sure, I understand.
16      MR. RIORDAN:  -- to get through it.
17      THE COURT:  There's also this -- as you recall,
18  this is -- I have a motion practice in the morning
19  and so you're encouraged to take out of here
20  everything you can take out of here.
21      MR. RUFF:  We've got somebody here right now.
22      THE COURT:  Okay.  If you can't --
23      MR. RIORDAN:  We'll send somebody in the
24  morning.  I'll put my stuff on the back bench,

205

1  Judge.
2      THE COURT:  Well, luckily tomorrow the motion
3  practice doesn't start until 10:00 a.m.
4      MR. RIORDAN:  I'll get someone here before.
5      THE COURT:  If you can get them here beforehand
6  but we may no -- no warranties.  There are no
7  bonds, a surety underlying our computer and
8  documents.  Okay.
9                      (which were all the
10                      proceedings had in the above
11                      cause this date and time.)
12
13
14
15
16
17
18
19
20
21
22
23
24

206

1   STATE OF ILLINOIS  )
2                      )  SS:
3   COUNTY OF C O O K  )
4
5      ATHANASIA MOURGELAS, being first duly sworn,
6   on oath says that she is a court reporter doing
7   business in the City of Chicago; and that she
8   reported in shorthand the proceedings of said
9   hearing, and that the foregoing is a true and
10  correct transcript of her shorthand notes so taken
11  as aforesaid, and contains the proceedings given at
12  said hearing.
13  _____
14
15  ATHANASIA MOURGELAS, CSR
16  LIC. NO. 084-004329
17
18
19
20
21
22
23
24

207

**$**

**$10**
188:1,3 200:20
**$10.5**
186:5
**$20**
201:3
**$30**
189:21
**$35**
189:21
**$38**
179:14
**$50,000**
200:24
**$6.6**
194:7
**$8**
185:22

**0**

**07**
82:20
**08**
82:20
**084-004329**
207:16

**1**

**1**
35:20 59:11 60:3
99:5 119:15 121:9
130:20 172:8,23
**10**
23:22 134:17 145:10
162:14 189:1,6
190:7 194:13
**10-10**
135:18
**10.5**
189:2 190:9
**100**
194:15
**101**
200:6
**1010**
136:19,24 137:1
**107**
47:10
**108**
51:6 71:2,3
**10:00**
206:3
**10th**
27:20 29:4,14,17,23
30:1,14 38:18
**11**
21:1 27:12,14
149:16
**12**
72:14 94:13 124:13
204:24
**12th**
21:16
**13**
128:6,8 176:20,21,
22,24 179:10
**14**
184:19,22
**15**
77:5,18 99:1,5 189:2
152:17 163:9 189:7
201:18 203:6,19
204:2
**15-year**
77:8

**1500**
77:20
**151**
142:8,10
**1510**
136:3
**157**
145:10
**158**
146:23 147:19
**15th**
48:12 49:19,23
**16**
58:1
**16th**
51:8,17
**17**
7:4,5 124:14 142:8,
10
**172**
48:8
**174**
55:4,5
**17th**
81:20
**18**
7:12,14 147:19
175:6 176:18 203:3
**18th**
30:2,15,18 55:11
58:9,10 59:9,11 60:2
62:22
**19**
128:6,9
**1988**
90:8
**1989**
86:12,17
**1990**
87:5
**1993**
87:23 88:23,24
**1994**
88:18
**1998**
90:23
**1999**
89:21 90:8
**19th**
94:5 175:24
**1:30**
4:4,6
**1st**
21:13 100:1,11,17
103:8 106:17 107:23
109:8,16 199:18,22
200:2,22 201:11

**2**

**2**
37:24 130:20 149:3
**2,000**
77:21
**20**
25:6,15 27:15 42:22
142:10 189:7,18,23
190:8
**2000**
18:17 91:15,16,18
93:24
**2001**
93:24
**2003**
15:18 21:13,16
93:20
**2004**
17:2 93:20
**2005**
78:21 82:18

**2006**
82:18
**2008**
114:20 115:7 116:21
**2010**
25:19 27:20 29:5,14,
17,23 30:1,15 37:11
44:14 45:5 115:22
116:2,8,10 192:3
193:6 197:19,24
**2011**
18:17 20:11 30:2,15,
18 47:4,17 48:12
49:19,23 51:8,10,17
52:15 54:11,14
65:12 71:9 114:21
115:7 116:21
**2012**
100:1,11,18 103:8,
14,17 106:17
107:19,23 109:8,14,
17 111:12 114:9,10
115:15,16 116:15
171:23 172:23
199:18,22 200:2
**2013**
31:4,10,18 33:23
36:10 55:8,12 58:9,
10 62:22 63:1
**2014**
36:10 64:7,24 65:4
**2015**
58:2 65:7 116:3,5,10
191:3
**2016**
109:14 111:11,20,21
**2017**
103:17 109:14
171:23
**2018**
94:5 119:17 200:22
201:11
**2019**
14:20
**2020**
116:3,5
**21**
28:23 30:3 46:19
147:19 172:7
**22**
31:21 33:24 43:5
**22-B**
27:19
**225**
134:13,21 135:15
136:2
**22nd**
47:16 55:8
**23**
37:14,17 42:21 46:3,
8
**23rd**
51:10
**24**
46:18 119:14,15
120:7 121:8 130:19
172:7
**240**
172:7
**242**
172:8
**25**
204:10,12,13
**25th**
44:14
**265**
119:14 120:7 121:8
124:13
**266**
119:15 120:7 121:8

**267**
119:12,14 130:19
**268**
119:12 130:20
**273**
128:6,7
**27th**
63:1
**2:00**
90:1
**2nd**
65:4 119:17

**3**

**3**
55:7 140:2,6,21
141:3 149:12 158:4
**3-1(b)**
141:10
**3-1(c)**
141:10
**3-1C**
142:15
**3-3**
144:9
**3.2**
143:14
**30**
175:18 176:1 179:5
**31st**
111:21
**34**
111:23 112:9,24
113:19 200:15,18
**35**
13:8 189:23
**38**
189:8
**3rd**
89:7,8

**4**

**4**
140:2,6 141:3
144:22,24 145:4,23
157:17
**4(b)**
146:8
**4-1(a)**
146:1
**4-2**
148:12
**4-3**
149:9,12
**40**
13:8
**400**
201:2
**45**
140:12
**458/10-10**
135:15
**48**
94:6,9 132:11,12
153:20 156:5 163:5
166:4,16
**4:16**
59:11
**4:28**
60:3
**4th**
89:5,8

**5**

**5**
22:11,14 23:4,5,9,
10,12 105:11,16

**110:15 114:23**
115:19 158:15 177:2
188:2
**5.4**
201:3
**5.6**
184:22
**50**
117:23 204:4
**5:24**
175:5
**5th**
52:15 54:11

**6**

**6**
23:13,16 114:23
136:16
**6.6**
184:22
**67**
134:9
**68**
69:17 135:20,21
**69**
140:19 152:17,21,22
**6:00**
59:19

**7**

**7**
88:11,14
**70**
144:23 149:5 179:6
**702**
103:21 110:6 161:20
**71**
157:3,10
**72**
162:22
**75**
57:18 101:10
**79**
152:18,22

**8**

**8**
94:10,11,18 132:13
145:10
**80**
153:9
**85**
101:10
**88**
71:3

**9**

**9**
119:15 120:8 121:9
156:5
**90**
189:24
**92**
44:11,19 69:13,15
**9:57**
58:10
**9th**
33:23 37:11

**A**

**a.m.**
58:10 206:3
**ability**
65:24 200:8,10

**absolutely**
193:16
**absolved**
66:19
**accept**
65:14 97:22 107:12
**accepts**
150:7
**accommodating**
191:12
**accordance**
149:9
**account**
72:16 172:4,15
**accountant**
93:15
**accuracy**
118:21 119:9 122:2,
13,23 137:11 139:6,
14
**accurate**
65:4,5,8 172:5,16
185:9 188:22
**accurately**
146:3
**achieve**
15:11 17:3
**acquire**
43:12
**acronym**
133:6
**act**
72:12,15 135:23
136:19 157:18
178:16
**acted**
178:7
**acting**
28:2
**action**
136:1 182:6 195:21
**actions**
136:4 182:2 187:4
188:6,11,13 195:13
**active**
24:13
**activity**
87:21 108:5
**actual**
21:14 171:21 184:23
189:3
**add-on**
147:23
**adding**
28:9 63:20
**addition**
189:1 190:9
**additional**
33:2,16 38:7 51:14
71:24 94:2 126:16
154:20 165:2 170:20
184:21
**Additionally**
18:9
**address**
59:19 75:20 95:12
191:17
**addressed**
26:5 71:5
**adhere**
114:6
**adjusted**
19:17
**admin**
18:11
**administered**
90:18
**administration**
13:4 17:10,13



administrative
136:11
administrator
12:13,22 14:8 15:9
18:2,6,7,24 19:5,6
28:14 39:19 61:9,12
67:21 197:14,16
admit
179:9 182:21 186:21
admits
185:7
admitted
180:3
adopt
135:1
advance
175:14
advice
14:15 113:14,19,21
advise
48:15
advised
8:11 47:5
advises
113:8
advising
46:24 51:5
Advisory
111:23 113:2,6,13
174:4 200:14,17
affect
141:24 142:1 188:8
affected
198:10
affects
141:17
affidavit
99:7 192:17,24
afford
121:13
afforded
7:14 175:10
aforesaid
207:11
afternoon
4:9,11,13,15 12:6
39:11 90:2 117:14,
15
aggregate
142:1
agitated
55:1
agree
45:20 49:3,13 54:24
61:13 64:21 97:18
112:11 119:7 121:23
125:14 127:19
128:14 130:17
134:15,18 135:9,22
136:22 137:1,6
138:6 139:17,21
141:2 142:4,15
143:17 144:20,23
145:6 152:13 153:1
154:5 157:13 158:1
162:9,14,23 166:16
167:20,24 170:5,12,
18,23 171:22 172:3,
13 173:11,12
agreed
42:4 44:5 45:6,14,19
46:11,15 47:2 51:23
52:12,19 53:1,11
54:20 55:8 56:18,24
61:17,22 63:13,17
64:1,5 65:10,16
66:16 67:23 118:8
121:23 131:3
137:18,19 138:19
147:20 169:24
200:15,17 203:11

agreement
7:22 19:2 20:21
21:10,12,18,21 22:1,
5 24:3,12,20 25:1,4,
12,21 26:20 27:7,11
28:16 43:7,19,21
46:2 63:24 65:15
66:15 193:1,2 194:2
195:1 203:12
agreements
13:13,19 39:4 43:23
183:15 192:13
194:18
agrees
159:17
ahead
84:15 85:9 202:15
aircraft
87:1
Airlines
87:7,8,11,14,22 88:9
alderman
56:3 57:2 58:1
Aldermen
60:5
aligned
80:2
alike
74:24 204:19
alleged
156:15
allowed
7:16 19:14 32:21
44:4 188:4
allowing
104:19 138:13 173:2
amend
120:16
amended
63:20
American
87:7,8,10,13,22 88:9
amount
36:9 164:5
amounts
183:15
analyses
144:17
analysis
46:7,9 80:3 95:2,21,
23,24 98:21 99:11,
14 106:9 109:3
150:14 151:3 152:5
154:21,22 161:3
162:18 166:20 169:8
170:1,2 174:8
analyst
93:15
animated
10:13
annexation
13:13,19 19:2 20:20
21:10 24:3,12,20
25:1,4,12,21 26:20
27:7,11 28:16 43:6,
19,21,23 63:24
65:15 66:14 183:14
192:13 195:1
annual
115:4,6 116:15
another's
157:20
answering
11:13,15 68:18
132:2
anticipate
74:10
anticipated
38:8
anticipating
12:16

antics
10:17
AO
112:24 113:19
114:14
apartments
77:15
apologize
23:13 59:1 118:2
132:7
apparently
122:10 131:8 145:22
156:1 172:21
appeal
65:24 187:11
appeals
39:2
appearances
4:8
appeared
57:7
appears
27:10 36:16 45:15
70:13 132:18
appellate
191:10 195:18
199:12
applicable
107:22
applies
144:24 145:2,4,5
162:24 200:18
apply
10:4 22:24 92:21
142:5,16 144:11
145:6,16 173:22
appointed
14:9,10
appointment
14:14,16
appoints
14:11,12
appraisal
78:16 79:16 80:5,18,
19 81:3,6,7,23 82:3,
15 83:4,17,20 84:23
85:3 90:15 92:12
94:20,22 95:3,6,8,
11,15,19 96:6 98:17
102:19 111:22 112:9
113:3,9,17 114:2,3,
4,8 118:15 122:4,6,
14 123:1,5,7 124:4,
23 125:7,16 128:18,
23 130:1 135:3,5
137:8,16 138:1,6,16,
20,21 139:17,23
140:1,20 141:4,6,11,
17,21,24 142:5,16,
24 143:7,15,24
144:11,12 145:3,5,7,
17 146:4,9,14,17,19
147:9,15,17,24
148:5,13,14 149:1,3,
23,24 150:9,15,17,
21,22 151:4,6,8
152:6,12 154:5,10
156:10,12 157:20
158:1,5,6 161:14,16
166:5,9,17 167:20
168:2,5,9,19,23
169:16 170:9,14,15,
16,19 171:2,3
173:10 200:6,21
210:10
appraisals
77:19,21,22,23
78:16,18 90:5 92:7
97:15 136:19 200:11
appraise
78:23

appraised
78:2 108:23
appraiser
76:4 90:7 91:2,6,13,
20 92:15 93:10,13
94:1,15 100:2 104:1
126:15 132:21
134:1,5,15 137:6,8
138:11,19,24 139:3,
15,23 142:23 144:1,
6 146:1 156:16,20,
24 157:6 158:16
169:13 170:6,10,24
appraiser's
90:1,9
appraisers
90:22 92:16 93:12
94:24 113:5,14
133:17 135:10
137:12 139:7 154:6
appraising
79:6,12 108:21
119:9 122:1,12,22
130:16 131:3 133:3,
20 160:4
approach
4:8 44:16 47:10 48:9
51:6 55:4 92:20
97:1,10 99:19
100:13
approached
119:4
approaches
118:24
approval
21:14
approximately
78:3,21 186:5 189:2
April
14:20 45:4 197:24
area
19:16 32:18,20 33:5
75:18 108:2
areas
48:20 113:9
argue
110:18 151:10,22
argued
41:20
arguing
42:1
argument
11:6 110:20 132:6
204:16
argumentative
151:14
arguments
171:14
arises
40:13
arose
116:9
arranged
8:24
arrive
81:23 101:5 173:16
arriving
79:19 83:7,24 85:23
arrow
115:20
Article
134:17
Articulate
103:22
asks
58:2
aspect
164:17
assault
182:2 188:7

assert
179:19
asserted
51:20 178:21 179:7
181:3
asserting
66:19
asserts
38:1,3
assessment
171:21
asset
182:19
assets
182:12
assign
165:19
assigned
16:6,10
assignment
98:5,6,12 99:15
102:7 117:19 118:5
144:7,13,16 150:8
158:18 167:13
assignments
102:2,8
assist
186:24
assistant
16:12 18:2,5 19:5
assisting
19:6
associate
95:5,7,9 154:7
Associates
91:9
assume
150:21 203:6
assumed
100:9 180:9 199:4
assuming
68:7 81:10
assumption
114:17
assumptions
96:12 118:10
ATHANASIA
207:5,15
Atlantic
69:1,4,6,9
atmosphere
84:19
attach
203:22
attached
44:12 45:11
attachments
203:21 204:14
attempt
42:17 183:19 189:10
attempting
61:21
attempts
181:14 183:13 184:8
attend
16:15,17 86:4,6
attendant
87:9 88:3
attention
31:3,10,24 33:2
37:23 72:5 78:11
82:2 83:11 91:17
94:10 191:11 201:22
attorney
10:24 32:1,6,7 33:6
44:22 70:3 79:23
139:10 185:17
attorney's
185:23

attorney/client
7:23
attorneys
11:7 45:15 70:1
attributable
152:10
attune
204:20
audio
120:20
August
15:18 21:16,24
119:17
authority
186:20 187:16 188:8
190:11
authorizes
133:20
average
109:19
avoid
38:9 67:23 186:23
avoided
181:23
award
186:7 187:10 189:10
awards
113:9
aware
24:1 39:3 41:13,24
42:15 45:21 46:13
50:16 60:1 61:15
62:16 64:11 66:18,
23 67:6 68:1,3 72:22
133:19,23 158:16
161:20 193:7

B

bachelor
16:23
back
4:21 10:15 27:14
46:3,8 49:2,3 55:10,
17 74:2 81:14,18
86:18,19 87:18
106:10 107:20 111:1
113:7 114:5,9
126:13 136:24
145:23 152:2 159:12
196:13 205:24
background
86:3
bad
35:17
ball
31:17 109:24
bank
24:16 76:10 82:14,
16,20 83:13
banker
139:10
bankrupt
40:9,18 66:20 67:1
82:21
bankruptcy
41:2,21 42:4 43:24
45:6,18 46:9,14 47:6
51:22 52:4 67:11
70:19 178:9 180:14
181:19,23 182:4,8,
11,19 187:14,19,22
188:9 190:15 192:8,
19 193:21 199:3
bankruptcy's
187:20
bar
115:1,5,6,9,11
Barksdale-noble
14:2 20:2,9



**Barrington**
86:5 88:20
**Barry**
74:14,20 75:12,17
86:2 97:15 98:2
117:10 156:6 173:9
200:5
**Barry's**
121:7
**Bart**
4:18 9:15,22 12:1
58:4 184:1 202:17
**base**
77:11 116:2
**based**
7:24 26:18 43:19,20
49:24 50:10,20
72:24 110:1,2
173:19 199:22,24
200:12
**basic**
90:15 92:18 96:23
97:9
**basically**
185:4
**basis**
193:9
**battle**
59:16
**bear**
38:5
**beat**
191:2
**began**
154:9
**begin**
15:16 88:16 176:24
**beginning**
5:2 49:10 53:4
185:21
**begins**
38:1
**behalf**
4:12,14 5:8 7:21
71:24 177:7
**behavior**
187:17
**belief**
50:21 149:16 162:17
**believed**
49:19 180:6 192:5
193:7 198:16
**bench**
205:24
**benefits**
192:18 193:4
**big**
199:15
**bigger**
182:7
**Bill**
4:16 197:16
**billion**
186:11
**Binner**
92:5,23 93:14
**bit**
16:8 75:21 132:6
187:12
**black**
183:20
**blame**
184:9
**blank**
116:8
**block**
43:5 100:3
**blow**
148:20

**board**
32:15 54:19 89:12,
15,20,23 90:24
113:3 115:8 135:5
195:7
**body**
133:16 154:6
**bold**
105:23
**bolded**
134:11 136:2
**bond**
22:17,20 23:2,3,20,
21,23 38:15 39:16,
22 40:2 41:5,10 42:7
44:4 48:15 49:3,5,
13,20 50:1,23 51:9
58:5 59:17 60:21
61:2 62:1 65:1 72:20
73:1 89:16,17
178:22 180:1 183:15
**bond's**
56:7
**bonded**
53:10 63:16 189:8
201:23 202:1,3
**bonding**
50:22 61:20
**bonds**
22:24 33:19 36:9
37:8 40:11,19 41:15
42:13 45:12 47:18,
23 48:1,19 50:11,12
51:5,20 52:23 53:4,
6,23 54:23 56:16
67:23 68:21 69:4
72:6,10,13 73:12
88:5 179:17 180:4
182:21 183:17
184:14 186:24 187:6
194:4,20 196:20
206:7
**book**
20:24 22:12,13
23:10 25:6 28:23
94:6
**books**
20:23
**bottom**
37:24 58:3 99:3
148:19 149:6,19
163:8
**bought**
51:18 192:2,21
193:6 195:23 201:23
**bound**
25:20
**Brandy**
55:22
**break**
10:20,21 68:12 75:7
117:5 140:7,10,13
173:4 175:4
**breaking**
56:11
**Brian**
74:14,20 75:12
**briefly**
183:3
**bring**
7:7 104:20 132:13
162:22 181:17
185:14
**bringing**
54:8
**broad**
124:2,5 126:7
**broker**
88:7
**broker's**
88:15

**Brothers**
193:21
**brought**
54:14,18 73:6
**Brown**
195:7
**buddy**
193:20
**budget**
87:1
**builder**
19:23 180:19
**building**
13:5 19:22 31:15
108:5 109:18
**built**
37:5 108:13
**bulk**
85:14 185:6
**bullet**
101:13,15 115:19,20
116:11 149:16 153:1
163:6,8
**bunch**
201:13
**business**
17:13 76:3,9,11
87:18,20 89:3
134:17 177:12
182:22 187:2,9,11
207:7
**but--**
7:11
**buttress**
108:9
**buttressing**
108:15
**buy**
178:4 182:14 192:12
**buyer**
102:14,20 183:22
**buyers**
196:23
**buying**
197:9
**buys**
24:24

**C**

**calculating**
181:6
**calculations**
173:1
**calculator**
167:12
**calender**
45:8
**call**
4:4 9:15 30:5 40:18
41:5 44:11 47:17
49:3,13,15,20 50:1,
12 51:9 58:3 61:2
62:2 73:17 74:13,14
135:18 174:15
**called**
6:15 20:18 42:12,16
48:20 49:1 51:5
53:4,21 56:16 80:9
84:8 88:10 94:7
118:14 125:8 169:20
**calling**
48:1 50:11 83:11
**calls**
58:5 60:21 89:2
**Cambridge**
76:6,7,8,15,18,24
91:14,18 92:1,2
93:1,17,23 116:12
117:20

**candidates**
62:15
**capacity**
15:8 170:10
**capitalization**
95:22 96:24
**capitary**
96:24
**caps**
135:3
**care**
37:20 84:16 142:24
143:5 183:1,2,9,10,
11
**career**
86:21,23 89:9
**careful**
200:16
**careless**
141:21
**carry**
100:16 151:15
**carrying**
201:5
**case**
6:13 40:21 64:7,13
69:7,9,10 70:19 74:4
84:1 85:20 104:1
113:15 114:10
119:18 141:7 142:5,
16 145:7,17 146:18
147:16 148:7 156:23
166:6 168:5 171:21
174:23 175:1,3
178:1 179:11,14
180:18 181:9,16
184:6,24 193:11
195:6 196:11,13
197:9 199:12,14
202:21
**cases**
157:5 175:9 197:1
199:3
**cash**
49:6 79:13 95:23
100:5,15
**Catalpa**
57:11
**caught**
181:17
**causation**
184:7 201:21
**cause**
195:20 206:11
**causing**
113:11
**caution**
107:7 170:24
**century**
204:24
**certainty**
110:2 119:9 122:1,
12,23 168:23
**certification**
137:22 149:8,14,20,
22 150:2,6,8,23
152:19,24 153:3,6,
20 155:19 162:15
**certified**
92:11,16,18 93:9,14,
24 126:14 132:21
170:6
**certify**
149:15 162:17
**cetera**
28:17
**chain**
55:14
**challenge**
169:22

**chance**
21:4 145:24
**change**
111:18
**changed**
77:8,10 84:19 98:12
116:1
**Chapter**
134:13
**characterized**
69:20,24
**charge**
187:5
**chart**
115:24
**charter**
93:15 114:20 116:20
**charts**
115:1,5,6,9,11
**Chatfield**
88:10
**check**
50:3 52:9 53:8
**checking**
66:6
**Chicago**
87:16 89:12,15
207:7
**chilling**
187:18
**choose**
115:11 176:8
**chose**
175:24 180:20
190:24 191:2
**Chris**
56:3,6
**Chronis**
32:8,11 37:20
**Circuit**
204:23
**circumstances**
190:9
**citation**
136:21
**cite**
43:5 189:15 195:8
**city**
12:10,12,13,22,24
13:20 14:4,8,13
15:8,9,10,17 16:13
17:23 18:2,5,7,18,
20,24 19:3,5,6,7,15,
23 20:4,8,10,13
21:14,20 24:2,11
25:22 28:13 35:8
38:23 39:4,19 44:13
47:17 49:6 52:22
56:7 60:17 64:4
69:3,23 71:8 72:11,
14 73:4,10 82:24
196:22 199:11 207:7
**city's**
24:13 25:19 37:7,21
38:13 70:1 72:12
**civil**
191:20
**claim**
72:17 179:8 189:9
199:10 200:21
202:10,14
**claimed**
8:10 198:20
**claiming**
32:13
**claims**
178:6,11,23 179:10,
12,15 180:2,23
198:14 199:9 202:9,
13,23

**clarification**
11:4 148:1 160:13
165:24
**clarifications**
151:18
**clarifying**
28:18 157:7
**clarity**
187:5
**classes**
17:18
**clean**
105:3
**clear**
82:3 30:7,11 41:21
100:1 130:8 160:12,
13 165:1 171:9
174:21 175:13
186:10 192:6
**CLERK**
4:6 9:18,20 74:1,18
**client**
78:12 80:15 82:13
83:12,14 84:11
138:3 143:16 144:4
157:19 158:7,10
160:24 180:19
**clients**
82:17
**climate**
50:20,21
**clip**
99:1
**clock**
117:2
**close**
10:12 56:9 200:24
201:17
**closed**
197:24
**closer**
166:10 168:10
113:13 195:3
**closing**
5:13 6:19 171:14
**closings**
6:18 175:11,12,13
**co-counsel**
171:8
**coach**
7:10
**code**
19:15 104:3 162:23
**collected**
183:17
**collection**
95:1
**college**
16:17 86:6 87:4 88:6
193:20
**combined**
179:5
**comfortable**
182:9
**comission**
162:12
**comma**
136:8
**comment**
106:2 143:3 149:19,
21
**commentary**
110:16
**comments**
143:2 162:24 186:14
**commercial**
92:21
**commission**
141:16



commissioned
35:7,10
commit
141:15 162:11
committee
174:5 179:12
commodity
77:14
common
28:6
commonsense
200:4
communicating
157:19
communication
29:21 69:21 70:22
136:18 158:5,11
communications
30:13,18 158:10
community
13:4,22 14:1 19:7
34:21 36:2
companies
24:17 25:18 42:1
50:22 61:21
company
22:8,9 26:3 29:19,22
41:13,20 42:16 49:1
53:14 59:18 68:24
91:5,7,8 186:12
187:3 188:3 193:20
194:6
comparison
96:24 155:15
compensatory
190:10
complaining
10:17 57:7 63:15
183:7 185:12
complaint
54:7,13 63:20 66:1
182:1
complaints
56:22 183:5
complete
33:11,13 36:10
39:22 40:8,14 47:19
48:6 49:4,6 50:2
53:15,18 95:13
144:7 183:8
completed
35:22,23 37:6 48:2
96:14,16
completely
57:12
completeness
137:12 139:6
completing
35:5
completion
40:3
compliance
129:11
compliant
127:24 128:17
129:3,23 138:17
139:2 164:11
complicate
183:13
complied
138:12 156:16 157:6
161:15
complies
162:19 166:17
comply
129:17 134:5 138:2,
7 139:18,23 163:1
167:21 168:2,20
comport
103:18

comports
104:8
comprehensive
170:21
compromise
165:5
computer
206:7
Con
124:23 125:9
concern
8:14
concerned
27:1 36:14 61:19
156:10
concerns
26:24 63:7 166:21
concisely
154:22
conclude
66:11
concluded
114:17
conclusion
5:7 6:11 100:23
109:7 110:4 144:17
167:1 169:3 173:17
conclusions
101:6 118:11 122:5,
15 123:2 143:20
150:14 151:3 152:5
162:18 167:4,16
169:5,22
concrete
35:21
concurrently
14:19
condition
34:11
conditions
72:5,24
conduct
51:14 170:19
confirmation
182:4 186:19
confused
6:10 11:3
confusing
113:11
connection
99:15 102:7 168:21
connections
87:19
consent
14:15
consequences
36:19 193:14
conservative
184:18 189:22 190:8
consideration
46:14 191:8
consistent
110:8 112:12 148:13
conspicuously
158:11
constructed
100:10,12
construction
196:6,8
consultation
185:24
contact
44:8
contained
72:5 150:15 151:4
152:6
contemplate
102:23
contempt
186:3,22 187:7

188:14
contemptuous
188:6
content
148:12 149:14
contentions
38:14
contents
5:10 30:20 150:9
contested
62:14
context
33:4 60:12 197:10
continue
16:12 34:19 35:23
62:18 188:7
continued
4:21 64:21 65:18
continuing
110:10
contract
108:22 109:2 199:5
conversation
48:19 60:17 61:8
conversations
29:18 30:3,12,23
convey
115:13 125:8 154:22
156:11
conveyed
124:23 125:9
convince
5:14
cooperate
178:11
coordinating
15:7
copied
47:11 197:18
copy
42:23 44:17 46:20
47:11 48:10 51:7
55:5 69:14 131:14
core
187:21
Cornelius
4:10
corner
135:14
Corporation
196:14,16
correct
27:9 30:8,9 40:10
42:13 43:16 46:12
47:20 48:12 49:11,
16,20,21 50:15
51:15 52:4,5,9 54:3,
4,11,15,16 56:19
57:5,9,10,20 62:9
63:1,9 65:17 70:23,
24 71:4 72:1 73:10
81:13,16 82:5 86:24
94:21 98:18,19,22,
23 99:8 101:21
106:5,18 109:8,9
116:23 117:20
118:1,4,9,12,13,16,
17 119:10,18,19,21,
22 120:5,6 123:2,5,
6,8,9,12,16,17,24
24 126:3,4,6,9
127:13,14,17,18,21,
22 128:24 129:1,24
130:2,3 131:4
132:22 133:1,2,4,7,
14,15,21 134:2,3
135:11,12,16,17,23
136:14,15 137:4,5,
10,13,23,24 138:4,9,
10,14,22,23 139:4,

11,12,15,19,20
140:1,3,21,22,24
141:1,4,7 142:6,24
143:7 144:2,3,7,8
145:8 146:15,18
147:16,18 148:16,17
149:17,18 150:16
151:5 152:7,8,10,11,
15,16 153:4,5,7,8,
11,14,17,18,21,22,
24 154:1,3,4,7,8,11,
12,13,14,16,17,22,
23 155:3,4,6,7,8,9,
10,12,13,15,17,18,
22 156:2,3,7,8,17,
18,21,22 157:1,2,9,
11,12,15 158:2,24
159:1 160:18 161:4,
5,7,16,17 162:1,2,5,
21 163:3,4 166:4,7,
12,14,15,18,19,22,
23 167:4,5,7,8,10,
11,13,14,19,22
168:2,3,6,7,11,24
169:1,10,13,14,17,
18,22,23 170:3,7,10,
11,16,17,22 171:3,4,
5,6,24 172:1,5,8,23
173:18 174:3,6,8,9
176:19 193:16
204:15 207:10
correctly
20:12 34:22 36:4,11,
20 38:11 49:7,17
56:13 58:6,15 59:20
60:14,23 62:7,20
72:8,18 116:22
135:7 136:4 141:18
142:2 143:6,21
146:6,11 149:10
150:3,11 156:13
157:21 158:13,19
163:10
correspondence
47:11 52:1
Cortic
91:10
cost
19:24 35:4,16,18,24
36:7 56:12 79:15
80:2 97:1,10 98:7
100:4 184:19 187:11
costs
38:7 100:16 188:12
196:6,8 201:5 205:6
council
14:13 15:10 19:3
47:17 60:17
counsel
4:7 9:14 11:22 39:8
44:7 58:19 66:7
67:15 68:6 70:23
75:10 97:16 105:2
107:8 110:15,17
128:7 147:1,20
151:11,14,18 159:19
160:15 163:15
164:8,22 165:4
168:15 171:10
174:21 176:12 185:5
191:19 203:5
counsel's
8:21
count
203:23
counter
170:14,16
countless
178:9
country
84:19

county
21:14 64:4 66:13
207:3
couple
31:1 45:3 173:8
courses
17:16 90:14,15
92:18 94:18 95:20
96:1,3 154:20
coursework
90:12 94:2 95:18
154:9
court
4:3,4,7,20,22,23
5:24 6:8,24 7:5,7,10,
13,19 8:3,19,23,24
9:4,10,13,17,23 10:3
11:1,9,19,22 22:22
23:18 24:7 25:15
33:8 37:17 39:8
58:10 58:14,19,22,
24 62:18 64:4,21
65:14,15 66:3,10,13,
15 67:1,7,15,17
68:6,11,15 73:16,21
74:2,8,10,13,16,21
75:2,7,10 78:1
97:16,21 102:11
103:22 104:2,15,18
105:5 107:6,8
110:10,17,22 112:8,
16,19 117:2 120:8,9,
12,18,24 121:5,10,
16 126:21 127:4,21,
23 128:7,16 129:2,5,
13,19,23 130:8,16
131:3,12 138:17
139:18,22 140:9,13
147:1,5,12,20 148:3,
8 151:9,13,17,20
159:3,6,11,14,19
160:2,6,11,20 162:3
163:15,20,24 164:1,
20 165:1,9,15 166:2
167:21 168:1,14,22
170:13 171:9,12
173:4 174:14,18,21
175:1,4,8,23 176:5,
6,16,20,24 181:7,20,
21,24 182:2,4,6
186:7,9,22 187:3,8,
16,21,22 188:4,9
189:4,9,11,13
190:15,20,21,22
191:6,10,14,18
192:3,8,19,24
193:13 195:12,15,
18,20 198:3,18,21
199:7,11,12,17
203:2,7,14,18 204:1,
7,13,16,18 205:3,9,
15,17,22 206:2,5
207:6
Court's
10:7 17:11 186:19
187:15 188:8 190:11
198:17
courteous
191:20
courts
195:17 199:5
covenants
43:13 192:9 196:23
197:6
cover
21:5 96:22,23
coverage
51:20 178:21 180:23
covered
162:10 196:20
covers
133:16

create
137:15
created
18:13,15 182:7
credentials
155:1
credibility
142:1 164:6 165:4
credible
144:13,16 158:18
credit
33:19 77:14
creditors
182:16
crisis
82:19 200:9
critical
192:11
criticism
106:19
criticisms
98:14
criticize
37:7
criticized
156:24
criticizing
156:20
critique
139:22 168:1
cross-exam
106:24
cross-examination
5:11 39:9 97:20
104:5,21 117:4,8
185:13
cross-examine
104:13 106:23 107:3
crossover
113:10 119:3
crumbling
57:8
crystal
109:23
CSR
207:15
curious
131:8
current
13:24 62:14,16 81:8
84:24 85:1,3,4
cut
27:3 52:8
cutting
171:10,13

D

damage
184:18 189:3 200:20
damages
98:7,10,21 99:11,14
106:8 170:3 171:21
172:2,14 174:8
184:7,16,24 185:2
186:4,6,7,15 189:5
190:10 199:14
data
79:18 80:4 83:6,23
85:15 95:1 100:11
102:24 103:10,16
104:8 109:13,14
111:19 114:18
115:14,22 116:8,14,
17 124:6 160:5
171:17 173:22
199:24 200:3 201:10
date
21:12,14,21 30:1,2
34:8 64:1 66:10 79:19,23,

24 80:12 81:11,19,
20,22 83:7,9,24
85:5,11,18,22 86:1
100:10 102:15
103:1,4,5,6,15
106:3,8,14,16,20
107:19,22 108:9,11,
14,15,18 109:6,21
110:9 111:14,18,20
113:22 114:1,18
115:18 116:13 124:6
163:14 164:18
173:14,23 199:22
200:7,17,20 201:10
206:11

**dated**
44:13 94:5

**David**
92:5 180:5

**day**
21:24 59:23 90:3
187:6 188:7 189:3

**day-to-day**
12:23 15:8,11

**days**
6:11 10:1 51:3
175:18 176:1

**deadline**
175:11,16,24 176:2,
8

**deal**
110:12 193:8
194:12,14 197:23
205:11

**dealing**
98:21 135:13 163:13

**deals**
177:14

**dealt**
41:1

**Dean**
88:11

**debtor**
182:11 198:15,18,
19,20,22,24

**debtors**
182:7 190:14

**December**
25:18 27:20 29:4,14,
17,23 30:1,14 31:4,
10,17 33:23 37:11
38:18 111:21

**decide**
52:8

**decided**
86:21 88:3 179:13
180:4 192:11

**decision**
182:22 183:1 184:12
187:2,9

**decisions**
191:9 195:18

**decorum**
147:2

**deemed**
179:1

**defaulted**
41:14 42:11

**defendant**
63:21

**defense**
6:13 51:20 52:2 69:7
74:4 179:23 180:24
182:20 192:15 199:5

**defenses**
72:20 194:20 199:2,
3,6

**defined**
136:20

**defines**
158:4

**definition**
80:8 101:2,4,8,19,24
102:2,9,12,13,23
103:2,19 104:9,11
106:10 107:20
157:24 158:1
173:21,24 174:1

**Definitions**
173:20

**degree**
16:19 17:6,14 32:22
86:8 87:21 110:2
112:17,22 122:1,12,22
168:23

**degrees**
17:3

**deliberative**
7:23

**demand**
47:19

**demands**
28:17

**demonstrate**
96:10 181:12

**demonstrates**
154:19

**demonstration**
96:7

**denied**
178:5

**denser**
19:13

**density**
28:9

**deny**
178:11 180:2,23

**department**
13:20,23 14:1 18:12
19:7 76:20 133:10
134:24 135:1 136:9

**departments**
12:24 13:1,3 15:12

**Deposit**
4:10 6:4,7,12 22:8
29:19,22

**deposition**
8:9,18 103:24 112:7
119:17,20 120:11,
15,19,23 121:8,20
124:16 128:11
130:22 131:15 132:1
140:24 142:12
145:13 146:24
147:7,21 148:1
156:6 169:21 172:10

**depositions**
185:11,16

**Derrick**
26:5

**describe**
144:4

**describes**
34:10

**designated**
158:11 161:15

**designation**
132:15,16,17,20
154:10,19 155:1,3

**designations**
93:11

**desire**
6:18

**detail**
5:4

**detailed**
118:6,7

**detention**
19:16

**deteriorated**
34:21 57:14

**deteriorating**
57:3

**determination**
5:18 165:17

**determine**
144:6 169:8 180:3
184:13

**determines**
138:24

**determining**
172:2

**develop**
82:17 100:2 144:18

**developed**
162:19

**developer**
19:22 24:11 26:23
28:2,19 39:23 40:7,
9,13,17 41:5 43:15
47:2 63:23 85:6

**developing**
141:11 143:14
144:10 154:21
157:18 158:15

**development**
13:5,13,18,21,22
14:1 18:23 19:8,10
20:3,6,14 24:22
31:13 34:7 71:20
94:17 96:11 132:16
136:18 140:20

**developments**
24:13 71:13 99:12

**devoted**
13:13

**dialing**
89:2

**difficult**
116:17

**digits**
189:11

**diligence**
35:16 142:23 143:5
177:16,23 178:1,2
193:11,12,16,19,24
194:17 198:9

**diminished**
34:17

**direct**
12:4 13:9 31:3,9
37:23 72:4 75:15
94:10 95:22 163:12
164:3 165:9 186:22
188:7

**directing**
31:24 78:11 91:17

**directly**
14:6 188:13

**director**
19:8 20:4

**disagree**
119:11

**disagreed**
197:3

**disagreement**
144:19

**disciplinary**
133:16 136:3,12

**discipline**
134:7 137:4,9
138:22

**disciplines**
76:11

**disclosed**
112:6,7

**disclosure**
156:4

**disclosures**
137:21

**discount**
163:7,8 189:22

**discounted**
79:13 95:23 100:5,
16

**discouraged**
190:11

**discovery**
58:11 59:14 72:12,
15 121:20 124:16
128:11 130:22
142:12 145:13
172:10 179:3

**discuss**
140:14

**discussed**
36:14

**discussing**
107:20

**discussion**
6:16 140:6

**discussions**
25:11 26:4 31:11
38:21 63:6

**dismissal**
65:24

**dismissals**
191:5

**dismissed**
64:7 65:9 202:14

**disqualifying**
105:1

**disregard**
187:2

**disregarded**
186:19

**distress**
28:5

**distressed**
24:15

**division**
76:13 77:4

**divisions**
18:11

**docket**
176:6

**document**
8:8 11:13 21:6,15,16
51:7 70:20 99:4
113:5 126:15 127:20
128:15 129:3,4,12,
16,23 137:15 170:5
171:1 183:4

**documentation**
72:1

**documents**
11:11,15 22:14 23:8,
15 44:1 58:12
181:12 183:4 203:16
206:8

**dollar**
185:20 186:11

**dollars**
184:22 205:6

**dormant**
40:5

**doubt**
64:16,19 65:11

**Downers**
12:8

**downturn**
179:10

**dozen**
24:13

**drafted**
43:2

**drafting**
21:17

**drainage**
19:12

**drastic**
10:19

**drastically**
116:20

**draw**
82:2

**drive**
187:3

**dropped**
36:17 60:6

**drum**
89:3

**due**
36:16 142:23 143:5
177:16,23 178:1,2
193:11,12,15,19,24
194:17

**dues**
95:9

**duly**
12:2 75:13 207:5

**duties**
12:21 16:4 18:5
71:20 76:17 77:7

---

**E**

**e-mail**
44:12 48:11 51:4
55:6,7,11,14,18,24
56:3 57:11 58:1,2,10
59:4 60:7,18 61:7,
11,24 62:11 69:12,
24 70:9,13,22

**e-mails**
179:2

**earlier**
25:10 27:11 51:4
66:16 67:20 71:7
176:8 190:21 191:8

**earliest**
82:9

**early**
91:15 93:20

**easier**
46:20

**economic**
179:10

**economy**
61:20

**Ed**
4:11 117:16

**education**
17:12 95:14 195:7

**educational**
86:3

**effect**
157:14,15 161:4
187:18

**effective**
80:12 103:5 106:14,
16 107:19,22
109:21,22 111:18
115:18 124:6 173:23

**effects**
183:1

**efficiently**
15:14

**effort**
35:15 180:3 184:18

**elected**
14:9 63:12

**election**
14:21 62:14 63:8,12

**elements**
150:7

**Elgin**
199:12 202:12,20

**emphasis**
16:23

**employed**
12:9 20:13 76:5 79:1

**employees**
13:7,9 76:21

**employer**
87:6 91:12

**enable**
146:9

**encouraged**
205:19

**encouraging**
205:12

**encumbrances**
192:7,9

**end**
6:22 21:15 111:20
135:3 188:20 201:6
205:13

**enforcement**
191:24 192:23

**engaged**
85:13

**engagement**
80:14 83:12 84:12
85:24

**engaging**
132:6

**engineer**
18:18 19:7 20:8,13
71:8

**engineering**
13:6

**enjoyment**
34:16

**ensure**
137:11 138:12
139:5,14

**enter**
86:14 189:10

**entered**
196:12 197:3

**entertained**
129:5

**entire**
62:4 163:17

**entities**
28:4 32:22

**entitled**
180:13

**entity**
182:9

**entrepreneur**
177:10

**equipment**
76:12

**error**
141:16 162:11
186:17 192:11

**errors**
141:22 152:9,12
163:19

**essentially**
33:12 188:16

**establish**
80:1 109:7 158:22
188:11 200:7

**established**
54:10 79:23 94:23
99:24 100:14 104:6
109:5 158:21 161:23
173:9 192:10

**establishes**
80:10

**estate**
76:4,12,13,19 77:4
79:8,10 80:7,21,22,
24 81:2,16 91:1,5,
13,22 92:6,12,14
93:10 94:1 134:14
135:23 136:18
137:16 142:24



187:20 189:20 190:3
estates
190:15
estimate
35:4 77:19,20 204:7
estimated
100:3
estimates
178:13
ethics
96:23 97:9 104:3
107:2 162:23
evaluate
52:7
evaluating
49:2 79:10
evaluation
157:10 162:20
event
39:23 40:12
events
26:14,17 62:5
199:23
eventually
18:20 191:5
evidence
161:20 177:19
evidenced
158:7
exact
21:23 64:9 119:13
142:9 145:10
exam
90:16,18 96:15
155:6,8
examination
12:4 68:16 75:15
163:12 164:12 173:6
examined
12:2 75:13 163:12
examples
195:8
exams
92:20 96:19,21,22
97:2
exceed
36:8 204:2
exception
43:11
exchange
19:15 44:21
exclusive
203:20 204:14
excuse
118:2 119:14
excused
73:22,23 174:18,20
178:22
exhibit
21:1 22:11,14,20
23:4,5,9,10,12,13,
16,22 25:6,8,15
27:12,15 28:23,24
30:3 31:20 33:24
35:21 37:14,17,24
42:21,22 44:11,18,
19 46:3,8,18,19 47:9
48:8 51:6 55:3,4,5,6
69:13,15,17 71:2,3
94:6,9,11,13,18
99:1,2,5,6,10 101:10
105:17 120:9,12
132:11,12 134:9
135:20,21 140:19
144:23 148:21,23
149:1,3,5 152:17,19,
22 153:19,20 156:5
157:3,10,17 162:22
163:5 165:6,12
166:4,16 185:21

exhibits
94:7 120:15 165:17,
18
exist
139:13 194:21 200:1
existed
18:14
existing
14:16 33:12 36:2
195:10
expect
10:18 61:2 62:5
expectation
48:4 49:24 50:13
60:19
expected
60:11
expecting
53:13
expend
38:7
expended
184:20,23
expense
186:23
expensive
60:22
experience
177:14 179:6
expert
6:15 7:1 97:15,23
103:24 104:6
118:20,23 119:3
130:16 131:3 156:5
188:13,18
expertise
139:10
explanations
127:5
explanatory
162:24
exponentially
36:1
extend
187:16 195:9
extensively
177:22
extent
7:14 25:2 100:6
166:24
extinguished
42:3
extreme
200:16

F

F&d
25:5 27:12 30:2
31:20 33:23 68:20
71:24 72:11,23 73:4,
9 94:5 132:11,12
153:19 156:4 195:4,
12,20 198:16 202:1,
3
F&d's
202:23
face
36:9
facets
20:5
fact
50:1 57:6 107:10
102:12 115:21 143:2
160:7 165:11 171:13
192:7,14 195:12
197:10 198:12
201:22
facts
80:11 102:15 103:3,
4 106:11,12,13

107:21,22,24 108:1,
11,13 111:10 161:19
factual
195:10
fail
24:15
failed
5:8 155:12,14
181:15 196:17
failure
183:8
fair
39:16,17,19,20 41:7
57:17 61:1,4,5 80:8,
10 100:23 101:1,4,6,
12,16,18 102:1,18,
21 103:19 106:11
107:21 109:7 110:3
124:11,21 154:24
160:23 163:24
167:18 173:16,21
faith
198:16
fall
43:11
familiar
20:17,20 22:9
111:22 112:15,24
133:6 140:2 195:19
family
6:5
family's
19:4,7
Farms
84:8 85:24
farther
193:3
father
177:11
Faxson
48:20
February
44:14 47:16 51:10
65:20 81:18,20 87:5
federal
17:19 161:20
fee
19:20,21
feel
7:15,18 11:4 182:9
199:19 203:21
fees
19:3,17 113:10
185:23,24 186:1,2
188:12
fell
116:10,20
Fidelity
4:10 6:4,7,12 22:8
29:19,22 38:3 40:22
41:14,19 42:6,16,20,
22 44:8 45:11 46:19
47:14,19,23 48:5
50:2,6,8,14,18 51:3,
8,13,19 52:12,19,23
53:5,8,14,17,21
54:7,11,13,18,20,22
56:8,17,24 59:18
61:3,16 62:2 65:1,
19,23 67:23 68:2,7
69:10 70:2,4,14,16
118:12 121:3 165:5
166:10 167:7 168:10
174:22 178:3,4,10,
13,21 179:4,11,18,
23,24 180:5,9,22
181:3,6,8 182:3,17
183:9,13,16 184:8,
10 186:8,10,15
187:6,23 188:16
190:13

Fidelity's
74:3 181:14 182:20
184:1,3,12 186:3
188:6,13,14
field
180:8
fight
180:10
figured
79:13
file
54:19 62:24 72:14
176:8 182:1,5,9
filed
52:15 54:7,13 56:17
64:8,11,24 65:3,13
72:23 176:5 182:2
192:1,17,24
files
63:20
filing
72:7
final
158:4,10 161:2
186:14 190:17
finality
158:7,9
finance
13:4 133:10
financial
32:21 76:10 93:15
200:9
financing
33:18
find
8:4 108:19 163:18
178:2
findings
96:10 161:11
fine
117:6 173:5
fingers
184:9
finish
12:14 24:17 52:9
85:9 147:6 188:1
firm
69:22 76:8 77:5
79:1,4 80:17 88:10
fix
56:12
flags
169:20 170:1
flaunting
190:11
flaw
199:15
flight
86:19,24 87:9 88:3
flip
27:14
flipped
86:19
floated
33:9
flow
79:13 95:23
flows
100:5,15
fly
87:16
FOIA
8:10
follow
113:5 134:2 135:10
137:7,18 138:20
141:3 143:13
146:14,17 147:15

148:4 175:12 196:17
font
204:24
fonts
204:18
food
77:13
forecasted
172:22
forecasting
172:24
foregoing
207:9
form
67:4,8,9 149:15
159:2,8,14 160:8
168:21
formed
169:19
forming
167:1
formulate
85:15
forum
204:20 191:1,2
forward
5:22 111:14 160:14
164:5 193:8
forwarded
58:2
found
113:7 116:4 155:3
174:2 179:3 180:6
194:11 195:13
198:19
foundation
119:16 135:6
fourth
23:3
frame
31:8 79:22 80:1
103:10,12
Frankfort
82:7,14 83:12
Frankfurt
78:6 83:13
frankly
105:1
fraudulent
138:3
free
41:21 100:2 192:6
Friday
175:24
front
8:2 10:6 20:23 21:2
27:16 29:1 42:21
46:19 55:19 57:4,8,
13 94:6 98:24
105:21
frozen
19:18
frustrated
18:18
full
36:13 53:14 72:4
95:14,19 98:11
121:3,4 128:18,23
130:1
full-time
17:22 18:1 87:4 91:1
function
61:20 108:10
functions
18:10
funded
35:12,13
Funding
196:14,16

funds
48:5
Funkhouser
56:4 58:1 60:6
furnishing
22:2
future
28:2 40:4 97:12
100:14 102:24
109:17 160:5 180:4
182:23 184:14
187:19 188:9
199:19,20 200:9
futures
89:16,18

G

gain
99:18
game
194:13,14
Garamond
205:3,5
Gardiner
4:17
GARDNER
7:21 8:6,15 9:3,7
gave
69:14 106:24
119:17,20 178:15
188:18 193:14
general
37:4 43:6,22 48:17
85:4 92:11,14,16,19
93:9,24 110:16
132:21 170:6,10
generally
18:22 63:13 81:16
85:5,12 112:4 113:1,
24 135:23 175:14
gentlemen
26:9
George
91:10
gin
200:20
give
10:20 44:17 115:9
121:5 122:9,11
125:3 128:21 129:14
131:7 142:20 145:21
172:4,15,20 175:17
176:15 204:3,7
giving
132:1 161:1 188:2
goals
15:11 19:4
Goliath
180:5
good
4:9,11,13,15 5:23
9:3,7 12:6 39:11,13
117:14,15 121:18
130:12 131:21
140:7,9 165:23
188:21 198:16
goose
10:5
governing
20:21 113:4 126:15
154:6
government
17:14 205:4
graduate
15:23 16:3,7 17:3,5
graduated
18:4
graduating
87:3



graduation
17:23 86:13
graphs
115:1
grass
27:1,4
great
4:20 95:22
green
19:15
gross
201:3
ground
109:15 187:4
grounds
136:3
groundwork
124:3
group
22:11 23:4,5,8,15
115:3 194:16
Grove
12:8 59:15 61:6,13
63:7 67:2,21 68:1
grown
77:10,15
guys
202:16

**H**

half
8:3,19 87:12 89:19
97:7
Hamel
6:4,6
Hampshire
78:7 82:7 84:10,16
hand
9:18 47:10 48:9 51:7
55:5
handedly
182:19
handle
5:5 6:1 204:9
handled
5:2 175:2
handles
13:20
handling
36:15 37:7 38:15
handsome
183:18
happen
199:21
happened
32:14 40:21 171:23
172:4,15 197:12
200:4
happening
26:14 121:13
hard
10:9 42:23 44:17
46:20 69:14 205:11
head
13:24 22:4
heading
105:23 115:2 144:14
heads
19:7
health
183:7,10
hear
10:11,16 58:22
105:14 121:12
159:11
heard
159:3,6 165:10
183:3 187:9

hearing
10:10 121:17 129:13
165:20 207:9,12
hears
75:24
held
4:2 12:18,19 73:3
91:23 92:11 94:24
helm
6:12
helpful
163:22
helping
15:10
hey
199:3
Hicks
26:5 30:10
high
16:9,15,16 17:19
19:1,9 86:4,5 98:13
higher
95:1
highest
92:20 95:21
highlight
27:15 34:15 48:24
101:12 132:14
134:24 136:1,7,16
143:12 150:5
highlighted
27:21 135:15
highlighting
134:21
Hill
4:6 47:7 50:18 59:17
72:16 74:1,3 189:20
197:17
Hill's
182:17
hint
178:10
hired
15:19,20,23 18:3,14,
16 84:20 91:19 92:2
98:15 147:8
history
24:13 62:4 134:22
190:2
HOA
32:15
hold
59:15 76:14 91:21
92:9 93:8,11 111:7
97:18 122:1,22
133:1
holders
62:15
holding
24:16 79:15 82:20
100:4,15
home
19:23 20:1 34:16,18
57:8,13 102:19
108:18,19,20,22
109:1 114:20 116:20
homebuilder
199:17
homeowner
32:14
homeowners
55:1 57:4,19 183:5,6
homes
34:17 36:2 179:11
181:9
Honor
4:9,11,13,15 5:23
7:9 11:23 39:7 58:23
59:1 67:3 68:5
73:19,20 74:7,15
75:11 97:14,17

103:21 105:14
106:22 107:16
110:5,7,13 112:5
116:24 117:7 118:3
120:22 121:7,15
124:13 126:18
127:8,24 128:8,9
130:4,11,16 131:10
132:5,10,12,14
133:9 134:9 135:1,
21 138:14 140:5,6
148:23 149:2 151:23
152:19 159:2,22
160:17 163:11,16
164:8 165:23 173:2,
5,8 174:16,17,24
175:21,22 176:4,14,
19 177:3,4 181:11,
13 183:4 185:1,3,14
186:6,15 188:23
189:1 190:5,17
191:3 193:13
195:13,19 203:13
hope
8:20 11:10 38:8
hoping
56:10 87:17
horseback
84:18
hotly
62:13
hour
66:5 74:12 117:3
hourly
140:7
hours
96:13 177:7
house
25:3 109:20
household
108:4 109:19
housekeeping
5:1 6:1
houses
31:16
housing
50:20 82:19 116:15,
18
human
18:10
hundreds
205:6
hustle
147:4
hypothetical
99:23 102:16,21

**I**

idea
131:21 194:1
identical
189:19
identified
124:10,20 167:6
169:4 201:5
identify
143:15,19 167:16
170:1
IDFPR
133:6
ignore
185:2
Illinois
12:8 16:18,20 17:7,
21 76:6 82:6 84:10
86:7,9,14 90:11,19
92:13 94:3 114:20
115:8 116:14,15,19,
20 132:22 133:1,4,
10,20 134:1 135:10

137:6 138:19 195:19
ILSC
135:15
immediately
86:16 100:10
impact
19:3,16,20,21 46:8,9
167:3,16 169:9
188:14
impacts
169:4
impeach
104:21
impeachment
148:9
implications
81:2
important
36:18 181:7
importantly
190:13
impose
189:4
impression
178:15
impressive
177:9
improper
173:15
improvement
47:20 63:16
improvements
22:3 33:20 34:1,12
40:3,8,14 189:8
194:6 196:20
in-person
117:19
inaccurate
138:4
inadequate
183:15
inadvertently
8:10
inappropriate
11:5
inclined
204:2,3
include
25:13 108:24 115:22
120:16 127:20
128:15 141:6 149:8
169:16
included
109:3 179:13 196:7,
10
including
6:24 150:1
income
92:20,22 95:21
96:24 108:4 115:22
155:14 201:3
incomes
109:19 116:1,6,7,9
incorrect
124:11,21 179:19
increase
36:1 116:7 170:2
increased
19:23
indemnity
199:10
indications
49:15
individual
32:14 55:21 150:13
151:2 152:4
individually
141:23

industry
80:6 179:5
information
51:14,23 52:6 60:13
81:22 85:7,21 106:3,
6,8,21 112:13
113:22 114:2,12,15
116:13 138:4 146:8
150:14 151:3 152:5
163:14 164:18
167:6,15 173:14,16
200:17
informed
102:15
infrastructure
32:23 33:11,14 48:2,
6
Ingham
201:24 202:5
inherited
84:14
initial
55:18 59:4 98:5,6
161:11
initially
52:18 63:4 88:11
192:1
ink
205:7
inquiries
56:21
inspected
85:14
inspection
85:5,12
install
32:23 194:5
installation
22:2
instance
19:11 42:10 82:22
instances
24:1,4,8 41:9 78:7,
17
institute
93:14 94:20,22,23
95:4,6,8,11,15,19
96:6 154:6,10
161:16
Institute's
111:23
institution
138:14
insurance
179:4
integral
149:22
intend
191:16
intended
115:21,24 143:16,19
146:9 148:14 178:11
180:22
intent
47:22 164:17
intention
144:5
intentionally
186:18
interact
82:23
interaction
61:3
interactions
67:20
interest
26:3 28:8 47:2,7
141:14 143:10
144:10,23 160:18
interested
28:11 88:5

interesting
194:11 202:21
intern
15:22,23 16:5,7
21:23
internal
102:6,8 189:16
international
186:11
internship
16:2,3
interpretation
5:12 65:14
interrogatory
58:11 59:14
interrupt
107:4
introduce
6:3
introduced
129:13
invest
194:7
investigated
179:17
investigation
51:15
investments
38:9
investor
180:11
involve
17:11 72:13 77:22
80:22 198:18
involved
8:18 15:7 17:14 19:4
32:8 42:11 78:8
80:15 84:4 100:19
involvement
29:9
IRS
80:9
issue
6:6 8:8,14,15 40:12
49:6 50:13 59:19
85:17 97:19 104:21
107:7 113:11,13
136:10 164:7 176:2
182:7 183:14
issued
49:20 50:1 51:9 61:2
92:12 113:2 115:8
issues
7:24 17:20,21 19:1,
8,9,12 30:24 41:5
48:15 50:17 90:10
110:12 139:1 166:9
168:9 183:8 187:8
item
145:1
items
149:17 153:1

**J**

James
6:4
January
30:2,15,17 47:4 55:8
64:7 65:7 91:16
100:1,11,17 103:8
106:17 107:23
109:8,16 172:23
199:18,22 200:2,22
201:11
Jim
77:1 132:13,14
134:10,21 136:1
140:19 142:9 144:9,
22 145:24 148:19
149:21 150:6 157:3



**job**
11:1 19:5 75:4 87:3
90:4 151:10
**Joe**
18:19
**joined**
91:18
**Joliet**
196:22
**judge**
4:17 6:3,21 7:17,18,
21 8:7 9:9 73:14
74:9 104:4 105:4,9
112:11,21 139:10
159:20 164:16 166:1
168:12 174:12
181:15 191:16,24
196:12,18,21,24
197:3 198:9 203:1,
10 206:1
**judgment**
72:24
**judicial**
181:13
**July**
89:5,7,8 94:5
**jump**
12:15 54:19
**junction**
198:17
**June**
63:1 86:17,20
**jurisdictions**
180:11

**K**

**Kendall**
64:4 66:13
**Kennett**
75:19
**key**
198:8,11
**KHI**
72:16
**Kilburn**
6:5 47:13 179:1
180:13 181:10
188:17 197:14
198:15
**Kimball**
4:6 47:7 50:18 59:17
72:16 74:1,3 182:17
187:10 189:20
197:17
**kind**
37:21 107:4 179:3
193:22 201:21
202:14 203:11
204:22
**knew**
178:4 181:19,20
187:4 194:10 196:3,
8 197:21
**knowing**
191:1
**knowingly**
186:17
**knowledge**
11:16 42:14 43:21
54:21 92:10 102:15
103:3 125:15
126:14,17 149:16
159:21 160:4 162:17
**Kreiter**
153:7 155:20,21
**Kreiter's**
153:13
**Krysti**
14:2

**Kyte**
31:5,8,18 32:1,17
33:6,10 34:2 35:21
37:7,19 99:7,11
177:9,24 183:6,12
184:15,20 189:15
190:1 192:17 193:18
194:23 202:7,14
**Kyte's**
34:6

**L**

**lack**
178:1
**Lakes**
201:24 202:4
**land**
24:23 47:19 80:20
84:13,15 156:12
192:9 196:24 197:6
**landowner**
26:2 28:18
**landowners**
24:16 84:13
**language**
162:10
**large**
10:5 19:15,16 179:9
180:19 193:12
**larger**
51:1
**largest**
190:2
**law**
69:22 78:13 79:1,4
80:17 192:10,14,15
195:8,9
**lawsuit**
52:14,18 54:6 56:7,
17,24 62:24 64:24
65:7,12 156:15
**lawsuits**
190:23 192:4
**lawyer**
32:17 191:21
**lawyers**
45:22 195:9
**laying**
62:4
**laymen's**
102:11
**lead**
150:20
**leading**
103:13 108:13
109:18
**leads**
115:17
**learn**
70:7,15
**learned**
197:19 198:1
**leave**
18:20 20:10 68:11
87:22,24 89:4,6,20
91:12 93:1 139:9
189:13 190:5
**leaving**
88:8 89:11
**lectern**
4:8 10:24
**led**
183:19
**left**
6:10 52:7 82:20 89:7
90:2,24 93:4,17,21
116:8
**left-hand**
135:14

**legal**
49:3,14,16,20 50:1
59:16 179:8 195:6,
10
**legally**
195:5
**Legend**
201:24 202:4
**Lehman**
193:21
**Lemperis**
77:1,2
**lender**
196:15
**lenders**
196:13
**lending**
76:10 138:13
**length**
56:22 203:12
**lengthy**
96:9
**lent**
82:16
**letter**
25:17 26:5,8 27:6,
20,23 28:21 29:3,5,
7,12,14,17 30:17,20
31:1,18,21,23 33:19,
23 34:2,5,8,10
37:11,19,20 38:13,
18,20 43:1 45:1,13
47:13 51:4 63:4
67:14 71:4,23 72:3
94:4 107:1 115:12
150:1 161:7 163:6
169:4,11 170:13
**letterhead**
29:8
**letters**
28:12,15 44:8
197:13,18
**level**
15:23 16:3,9 17:19,
20 19:1,9,18 95:1
98:13 101:6 124:5
**levity**
205:14
**liability**
41:22 42:2,18 66:20,
24 182:20 197:2
**LIC**
207:16
**license**
88:12,14,15 90:1,10,
13,22 91:22 92:15,
16,17 132:17,24
136:10 169:16
**licensed**
126:14 134:5 170:23
**licenses**
91:21 92:9,12 93:8,
22 153:16
**licensing**
88:11 94:2 133:21
134:15 135:23
**licensure**
154:2
**liens**
192:6
**light**
107:13
**lights**
7:11
**limine**
5:21
**limit**
203:20,23 204:3
**limitation**
203:18

**limitations**
69:7 73:6 143:23
**limited**
164:3,5
**lines**
119:14 124:13
128:6,8 130:19,20
136:9 142:8 145:10
146:23 147:19 165:3
172:7
**liquidation**
70:19
**list**
136:13
**listed**
101:7 148:15 149:17
**listen**
126:23
**lists**
71:15,17,21
**litigating**
60:18,21
**litigation**
37:22 38:15,23
52:22 54:14 60:20
62:2,6,17 65:18
72:21 73:1 182:13
183:20,23 192:23
**live**
12:7,8
**living**
25:2 34:20 183:2
**LLC**
29:8 99:11
**loan**
77:14 138:8
**local**
17:21
**located**
84:9
**long**
12:18 14:3 60:22
77:3 87:10 88:21
89:17 92:23 114:15
146:21 188:1 194:9
197:21
**longer**
40:14 41:6
**looked**
25:21 59:10 99:15
115:17 124:5 129:4
161:9 195:2
**loss**
72:13
**lost**
68:2 184:18 195:17
**lot**
28:15 77:12,13
79:14 100:14 186:12
200:22,24
**lots**
29:11 57:4,8,19
79:14 183:23 201:2
**loud**
10:13,16
**low**
163:9
**luckily**
206:2
**Lusignan**
69:21
**Lynch**
88:13,17,22 89:4,11

**M**

**machinery**
76:12
**made**
38:14 43:18 72:17

**limitations**

**108:10 137:21**
175:14 182:3,17
187:2 192:11,17
202:12
**magnitude**
204:1
**MAI**
93:14 154:13,18,24
155:5,17,21,24
**main**
20:4 92:3
**make**
4:8 5:18 6:9 9:5
15:13 28:10 38:9
43:9 49:15 58:14
62:15 87:19 110:19,
20 111:13 116:17
147:24 151:18
160:13 171:9 178:17
180:23 182:19 187:9
190:17 203:4,21,22
205:9
**makes**
151:14 165:16
**making**
33:12 44:1,5 46:2,
10,14 107:13 110:18
141:22 194:19
**man**
77:1 92:5 177:10
**manage**
12:23
**management**
17:21 26:2 185:24
**manager**
76:16,18 77:3,8
**managerial**
15:15
**managing**
15:11
**manner**
141:22 146:4
**map**
196:17
**March**
48:12 49:19,23 51:8,
17 55:11 58:1,9
59:9,11 60:2 62:22
71:9
**margins**
204:19
**mark**
70:9 183:21
**marked**
69:13 71:3
**market**
77:15 100:23 101:4,
6,12,16,18 102:1,19
103:19 104:9 108:2,
21 109:7 110:3
112:18 116:16
173:16,21 190:3
**marketplace**
106:14 113:12
114:13 115:10
**married**
88:1
**Marty**
199:19
**Maryland**
22:8 29:19,22
**master**
17:9
**matter**
4:5,6 5:1 10:23
31:11 33:5 75:3
79:19 81:24 83:8
98:3 99:16 104:4,14
118:5 147:2 176:6
**mattered**
180:16

**matters**
6:1
**mayor**
14:12,20 15:5,6
48:11 51:4
**mayoral**
14:21
**mayors**
15:5
**MBA**
17:17
**Mcfly**
199:19
**Meadows**
20:15,18,21 21:10
22:7,17,23 36:16
38:10,21 40:24
43:15 47:18 48:16,
19 51:1 56:1,9 58:5
**meaning**
10:13 160:11 176:7
**means**
176:13 182:15
**meantime**
56:11
**measure**
193:12
**mechanism**
32:21
**median**
108:3 115:4,6
**mediation**
73:3,7,9
**medical**
6:5
**meet**
39:23 87:18 117:16
**meeting**
26:11,13 31:13 32:8,
13 59:18 117:19,22
179:12
**meetings**
31:5,7,24 32:3,16
33:6
**member**
69:22 95:5,7,9,15,19
96:5 154:7,10
**members**
93:13 154:7
**mention**
8:12
**mentioned**
61:6 84:3 90:9
112:12
**merrier**
6:8
**Merrill**
88:13,16,21 89:4,11
**message**
187:17
**met**
26:9 177:9 178:6
**method**
164:2
**methodology**
79:11 161:19,22
**methods**
144:12 158:17 162:5
**Michigan**
78:6,12,17,20 80:14
**microphone**
9:2 10:6,11,12,13
58:24 74:23
**microphones**
8:4,21
**mid**
175:17
**middle**
60:2 62:13 101:13
132:13



**Mike**
4:13 26:6
**million**
179:11,14 184:19,
21,23 185:22 186:5
188:1,3 189:2,6,7,8,
21,24 190:7,8,9
194:7 200:20 201:3,
4
**millions**
205:6
**mind**
52:8 111:10 134:20
179:22
**minimize**
61:21
**minimum**
148:15
**minute**
66:9 176:15
**minutes**
6:22 7:4,12,14
68:10,13 140:12
175:6 176:18,20,21,
22,24 177:2 188:2,
17 203:3
**mischaracterizatio
n**
159:9
**misleading**
67:8,9 146:5
**missed**
190:1
**missing**
49:10
**missteps**
36:19,21,22,24
**mistake**
186:16 192:7,14
**mixed**
193:21
**mockery**
182:3
**moment**
117:3 151:9 171:8
**moments**
46:22
**money**
187:12 194:7
**monitor**
8:19
**monkey**
204:18,19
**month**
18:3 108:16
**months**
44:24 45:4,13 58:13,
18 59:3 64:8 65:10
72:15 197:23
**morning**
74:22 205:18,24
**Moscow**
87:17
**motion**
6:13 64:14 65:13
72:23 191:24
192:16,23 196:11
203:11 204:9,21
205:18 206:2
**motions**
5:20 64:12
**MOURGELAS**
207:5,15
**mouth**
192:2
**movant**
176:12
**move**
31:15 126:18 131:10
147:10 148:9

160:14,19,21 164:22
168:15
**moving**
37:5 140:5
**mowed**
27:2
**MPA**
17:9
**multiple**
15:12 28:4 64:12,16
130:10 160:8 189:10
190:7
**multiply**
201:2
**municipal**
198:7,8
**municipalities**
32:22 61:17 178:7,
12 202:10
**municipality**
33:10 39:21 40:12
**Munns**
60:5

---

## N

**named**
55:21 77:1 92:5
113:8
**Nate**
69:21
**nature**
73:2 118:16 161:12
**Navy**
86:17,23
**necessarily**
64:15
**neck**
10:5
**needed**
18:8 85:7
**negligent**
49:14 50:7
**negotiate**
49:16 50:7
**negotiated**
19:17 51:19
**negotiation**
19:2 197:22
**neighborhood**
202:2,6
**Neumann**
179:11 180:18 181:9
196:11
**nice**
178:6
**Nick**
77:2
**noise**
10:17
**nondisciplinary**
136:13
**Nonetheless**
60:19
**nonprofit**
17:15
**nonresponsive**
122:22 147:11
**normal**
33:17 184:4 194:12
203:18
**Northern**
16:18,20 17:7,23
86:7,9,14
**note**
61:7 101:23 107:10
110:10 202:21
**noted**
43:11 101:1 146:24
147:7

**notes**
47:16 66:7 207:10
**notice**
72:6,11 181:13
**November**
97:13
**NPA**
17:17
**number**
10:5 20:24 30:23
31:7 37:13 65:1
96:13 132:17,21
137:17 148:15
152:24 172:5,16
179:10 189:14,21,
22,23 190:6
**numbered**
141:9
**numbers**
121:6
**numerous**
41:4 103:23 163:19
195:8

---

## O

**oath**
11:2 119:23 140:14
170:9 207:6
**object**
67:3,4 110:6 112:5
159:2,8
**objecting**
107:4
**objection**
7:24 8:1 103:21
107:13 110:10
130:4,9 159:3,7,14,
23 175:19 176:3,4
**objections**
110:18
**obligated**
7:15 141:2
**obligation**
43:14 50:24 52:3
53:5 138:11 144:5
146:16 147:14 148:4
152:14 176:16
183:17 196:1
**obligations**
24:11,22 28:16
25:10,18 184:5
196:3,4,9
**observe**
6:7 26:14
**obtain**
17:5 86:8 90:13
**obtaining**
138:8
**occasion**
82:23
**occupation**
43:12 76:3
**Occupations**
134:14
**occur**
116:19
**occurred**
82:19 108:15 109:4
111:11 199:23
200:10 202:22,23
**Ocean**
69:1,4,6,9
**October**
21:13 86:18,20
175:17,24
**offer**
106:19 118:20 126:1
164:17 165:5 168:22
173:15

**offered**
105:7 120:14 127:15
**offering**
103:24 105:6 123:12
125:23 126:12
127:12 130:15 131:2
**office**
62:15 119:20
**official**
14:10
**officials**
63:13 82:23
**offset**
19:23
**Olson**
4:18 7:21 9:15,22,23
12:1,6 68:4,18 184:1
202:17
**omission**
72:12,15 141:16
162:11
**one-third**
182:1
**online**
10:15
**open**
4:2 5:5 23:14 192:16
**opened**
95:10
**opening**
177:15 179:16
193:15
**operating**
187:15
**operations**
12:23 15:8,12
**opinion**
101:5 103:18 104:1,
7,13,17 105:6 110:1,
6 111:4,8,23 112:4,9
113:2,6,13 118:21,
24 123:12,14 126:1,
12 127:12 129:15
157:6,19 160:5
167:17 169:3,19
173:14,15 200:15,18
**opinions**
79:19 81:23 83:7,24
85:16,23 110:8
112:18 119:8 121:24
122:11,21 123:19
125:23 127:15
143:20 144:17 157:4
162:18 168:21
205:10
**opportunity**
151:17 176:9,13
184:19
**opposed**
123:11 125:22
126:11 127:12
**opposing**
151:18 176:9
**opposition**
171:2
**oral**
6:18 146:1 158:5,9
175:11
**ordeal**
188:12
**order**
5:2,3 10:10,14 48:2
82:17 85:7,15 90:13
127:23 129:19
139:21 155:5 167:24
170:18,19 182:5
186:20 195:14
196:12 197:4,7,10
201:14 203:11
**original**
21:9

**ounce**
177:18
**outcome**
169:9
**outstanding**
43:13
**overarching**
19:3
**overreach**
199:15
**oversee**
76:19
**owned**
57:4,19,22 79:9
80:20
**owner**
24:3,9,21 25:11
26:23 28:1 29:10
40:17 42:18 46:5
53:24 66:21 67:12
77:2 195:22,24
**owners**
21:17 25:20,22
28:13,15 32:24
33:13 43:14 63:22
**ownership**
28:5

---

## P

**p.m.**
59:1 60:3
**pages**
94:14 120:10 165:13
203:6,19 204:4,13
**paid**
19:21 33:15 73:9
95:9 182:16 184:22
**painstaking**
181:11
**Palatine**
76:6
**papers**
114:11
**paragraph**
27:7,10,19 34:14,24
35:20 36:13 43:6,10
48:23,24 49:10 72:4
115:21 156:9
**paragraphs**
188:19
**paren**
135:3,4
**Park**
202:1,5
**parks**
13:5
**part**
5:2,15 19:5,13 22:20
118:5 120:16 135:1
149:22,24 163:22
194:8
**part-time**
90:7
**partial**
161:3
**participate**
21:17 77:11
**participated**
26:12
**parties**
5:6 8:23 175:19
**partner**
120:4
**partnered**
177:12
**Partners**
76:6,7,8 91:15,19
116:12

**parts**
84:4 165:20
**party**
38:4 73:17 165:16
174:14 175:9 176:9
182:1
**pass**
42:17 92:19
**passed**
79:9 81:18 90:16
94:2 96:3 97:6,7,8,9
**passing**
79:24
**past**
13:16,17 58:13
79:18 200:11
**Paul**
32:8 37:20
**pause**
10:15 147:22 159:6
**pavement**
35:4
**pay**
33:2,13 34:20 50:23
51:21 182:15 183:16
184:4 187:10 189:6
195:24 198:5,6
201:22
**paying**
178:22 179:9 182:20
183:19
**pending**
39:2 108:20 183:24
202:24
**Pennsylvania**
75:19
**people**
87:18,19 92:3
113:10 178:13
179:12 183:2 191:20
193:22
**perceived**
72:5
**percent**
13:15 57:18 163:9
189:18,23,24
194:13,15 201:18
**percentage**
13:12
**perfect**
180:6
**perform**
24:11 41:10,15
42:12,17 53:5,14
166:5 168:5 193:24
194:17
**performance**
24:2,20 25:12 26:20
39:16,22 40:11
47:18,23 49:5 52:24
**performed**
42:7,13 93:9,17,22
177:23 193:15
**performing**
54:23 171:20 192:13
**performs**
76:9
**period**
10:20 14:23 77:8
79:14,15 80:4,11
81:8,9 85:12 93:2
100:3,5,6 111:12
114:10 184:11
**periods**
78:10 112:2 116:2
**permanent**
75:20 76:1
**permission**
45:18
**permit**
5:21 19:22 97:23



105:8 108:5
**permits**
109:18
**permitting**
6:17 107:10
**persists**
187:7
**person**
25:2 32:5 79:8,9
80:20 81:17 91:10
92:4 109:15
**perspective**
10:8
Peter
31:5 37:19 99:7
177:9,24 183:6,11
184:15
**phase**
20:14 58:11 59:14
Philadelphia
75:19
**phone**
30:5
**phonetic**
97:19
**phrase**
118:23 198:8,11,13
**physical**
34:11
**pick**
9:11 90:3 180:17,20
**picked**
9:4 89:24 167:12
**piece**
19:12
**piers**
155:2
**pit**
89:16,18
**place**
33:19 39:22 40:11,
13 52:24 102:17
136:11
**plan**
50:5 80:21 97:11
184:21 186:19 193:4
198:17
**planning**
76:10 80:7,24 81:17
**plans**
84:19,22
**play**
20:3,7 120:8 121:15
130:19 142:9
**played**
121:21 124:17
128:12 130:23
142:13 145:14
172:11 178:6
**player**
180:8
**playing**
120:20 147:21
**pleadings**
181:14
**pleasure**
117:16 177:4 191:22
**plenty**
9:8
**plummet**
36:3
**pods**
155:8,10,14
**point**
22:10 31:17 40:4
48:14 49:24 50:5,16
54:17 56:15,20,21
57:16,18 58:17 59:6
60:7 62:6 81:7 93:16
101:13,15 104:19,24
106:23 107:7,11

108:6,7 115:20
116:10,11 118:19
123:11 125:22
127:11 130:12
140:8,9 163:6,8
171:13,16,22 174:22
175:8 184:8 190:17
203:22 204:24
**pointed**
149:17 153:1 180:1
196:24 199:15
200:22
**points**
124:24
**police**
12:24
**political**
16:24 17:19
**pose**
28:6
**posed**
151:21
**position**
12:11,18,19 14:3,8
15:19,20,21 17:22
18:1,13,14,15,24
24:19 25:19 26:19
28:1,18 29:13 34:6
37:21 38:6,13 39:18
40:14 46:4 47:1 50:6
52:23 53:3 63:22
64:3,22 65:16 66:14,
18,23 67:10,11,13
76:14 86:17,19 87:4
91:19 178:22 179:1,
7
**positions**
16:1
**post**
164:12
**post-date**
185:8
**post-information**
109:6
**post-valuation**
106:3,7,20 110:9
113:22 114:1 163:13
164:18 171:17
173:14 185:8 188:21
200:7,16,20
**posted**
15:11
**potential**
124:10,21 166:21
179:15
**potentially**
54:1 105:1 180:18
**practice**
45:17 133:3,20
134:17 135:3 137:2
157:11,14 162:20
184:4 204:21 205:18
206:3
**pre-dates**
81:11
**preceding**
101:14
**predated**
69:10,11
**predict**
116:18
**prejudice**
5:8
**preliminary**
161:3 166:20
**premises**
14:16
**premium**
183:18
**prepare**
71:15,17,21 147:8

178:13
**prepared**
94:4 98:8,10,21
107:3 141:7 145:7,
17 146:19 147:17
150:17,21,22 156:11
173:10
**preparing**
58:12 137:7 138:20
141:3 142:24 146:17
147:15 148:5 185:12
**presence**
158:7
**present**
9:24 41:6 100:6,17
120:2,5 203:11
**presented**
100:23 188:10,16
**presenting**
6:13 177:5
**presently**
96:18
**preserve**
107:9
**preserving**
107:5
**president**
32:15
**presumption**
203:15
**pretty**
175:15
**prevent**
138:2
**previous**
6:11 9:24 37:20
74:23
**price**
108:12 109:2,20
201:4
**prices**
114:20 115:4,7
116:20
**pricing**
79:14 100:3,14
180:3 184:14 187:1
**primary**
175:9
**prime**
82:16
**principal**
41:14,20 42:3,11
45:17 51:22 52:3
66:20,24 67:11
**principals**
162:5
**principles**
195:10
**print**
143:12
**printed**
120:18
**printing**
205:6
**prior**
5:2 18:17 29:16,22
41:9,18 42:6 43:14
60:17,20 80:23
85:22 86:1 91:11
120:17 131:23,24
158:10 159:9 177:16
180:24 181:3
**private**
32:22
**privilege**
7:23 8:1,18
**probation**
136:11
**probative**
5:16

**problem**
124:10,21 164:21
167:10
**problems**
15:14 67:22 118:19
123:11 125:22
126:11 127:11
163:23 167:2,3
169:21
**proceed**
5:24 44:4 56:24 85:7
113:14,20
**proceeded**
195:4
**proceedings**
4:2 8:13,20 9:1
127:21 128:16
170:14 206:10
207:8,11
**process**
7:23 14:14 122:6
123:5,8 157:18
**processes**
15:1
**processing**
77:13
**produce**
107:1 129:3 158:18
**produced**
8:9,11 96:8 113:4
124:4 129:22 162:3
163:16 185:3
**producing**
92:22 127:20 128:15
**product**
155:2 162:4
**products**
182:23
**professional**
94:17 119:1,2,4
132:15,16,20
133:11,23 134:1
135:2 162:23
**professionals**
133:17
**Professions**
134:13
**profit**
201:6,18
**profitable**
38:10
**progress**
161:1
**project**
36:16
**projects**
16:6,9 18:8
**promising**
194:3
**prompted**
27:23
**proper**
148:8
**properly**
146:10
**properties**
50:18 77:14,17
78:12,15 92:21
177:17 178:5,20,24
181:2,4 182:18
183:21 202:8,11
**property**
19:12 24:24 25:20
28:1,3,7,10 29:9
31:15 32:24 33:2,13,
16 40:24 43:12 45:4,
6 46:10 47:5 51:18
59:17 77:23 78:8,22
79:9,10,12 82:20
85:14 182:10,12
187:19 188:8,15

192:2,4,6,8,12,21
193:6 195:23,24
196:1,14 197:9,11,
17 198:4 199:8
**proposal**
33:9
**proposed**
44:12
**prospective**
84:23 112:3 113:16
**protect**
10:14 40:12 190:16
192:4 193:8
**protections**
42:2 192:3,19,20
193:4
**proven**
179:20
**provide**
22:1 32:23 56:6 58:4
72:11 112:15 113:1,
24 118:6,7
**provided**
22:6,10 72:10
136:19 156:6 169:5
**providing**
112:13 138:4 139:7
160:5 191:16
**provision**
43:6 136:17 180:1
**provisions**
134:18 197:2
**public**
13:6 17:9 22:5 33:20
34:11 93:15 139:14
180:19
Publication
115:2
**published**
116:14,17 135:4
**pull**
48:23 140:19 143:11
**pulled**
152:23
**punch**
71:15,17,21
**punished**
190:14
**punitive**
185:1 186:7,14
189:5
**purchase**
46:1 95:21 194:2,18
201:4
**purchased**
45:4,5 47:5 87:15
178:20 181:2
182:10,11,19
**purchaser**
178:12,23 180:14
**purchasers**
43:11 190:14
**purchases**
187:20 189:19
**purchasing**
177:17 182:12
**purported**
188:18
**purpose**
73:18 79:6 80:18
82:15 83:17 138:9
142:22 176:17
186:16 187:21
**purposely**
181:23
**purposes**
11:13 49:16 76:9,10
78:14 80:3,21 138:3,
8
Pursell
197:16

**pursuant**
8:9
**pursue**
45:12,18 86:21,23
180:4 186:21 195:15
**pursuing**
187:13
**pursuit**
37:8
**pushback**
196:12 197:7
**pushed**
86:18
**pushing**
187:13
**put**
8:20 35:15 84:17
88:6 98:24 115:12
129:15,17 136:24
144:1 145:23 147:23
154:2 176:11 183:20
184:21 185:19,21
205:24
**putting**
137:13

---

**Q**

**qualifications**
94:14 97:18
**qualified**
104:6
**qualifies**
104:12
**quality**
118:21 119:10
122:2,13,23 123:11,
12,15 125:22,23
126:2,11,12 127:11,
12,16 157:20 194:20
**quantitative**
95:23
**question**
7:19 11:3,14 12:14
28:6 54:9 58:20
66:4,7,22 67:5,7
105:8 107:16 110:24
112:23 119:7,13
122:8,17,20 125:2,
20 126:19,20,24
127:6 128:20 130:10
131:6,9,24 142:9,19
145:11,20 147:21
148:3 150:20 151:1,
11 152:2 159:11,12
160:7,8,12,15,20
164:1 165:10 172:19
192:10
**questioning**
164:5 165:2
**questions**
8:17 10:24 11:2,16,
19 39:7 58:13 68:19
75:3 105:4 151:20
164:3 168:15 173:9
**quickly**
10:3 181:14
**quote**
27:6 34:19 43:5
**quoted**
27:19

---

**R**

R-U-F-F
4:12
Radtke
70:9,23
**raise**
8:1 9:18 52:2



raised
72:20 199:2,6
raising
63:21 199:2
ran
170:2
rapidly
175:15
rate
33:2 108:3,4 163:7,9
189:16,22 201:11,16
Rawlish
55:22 59:10 60:6
61:6 63:15
Rawlish's
59:4
re-appointment
14:24
Re-calling
74:1
re-consider
64:12,15 65:13
re-developed
28:8
re-direct
66:11 68:7,9,16
160:7 171:10 173:6
re-doing
113:16
re-instated
64:13
re-start
31:13
re-typed
62:12
reached
5:7 7:22
read
5:6 34:22 36:4,11,20
38:11 49:7,16 56:13
58:6,15 59:20 60:14,
23 62:7,11,20 72:8,
18 107:17 111:1,3
116:22 119:13
131:18 135:7 136:4,
22 141:18 142:2
143:6,21 144:10
146:6,10 149:9
150:3,11 156:13
157:21 158:13,19
159:12,13 163:10
176:10 179:22
188:22 199:11
203:15 205:1,11
reading
101:3 114:11 116:4,
9
reads
116:9 144:21
ready
117:12
real
59:15 76:4,12,13,19
77:4 91:1,5,13,22
92:6,11,14 93:9,24
134:14 135:23
136:18 137:16
142:24 190:3
reality
200:21
realize
114:4 181:7
realized
201:19
realizing
201:19
realm
189:12
Realtor
114:20 116:19

Realtors
115:8 116:14
reason
10:21 11:5 40:5
64:16,19 65:11
122:11,21 139:5
155:23 201:7
reasonable
60:20 103:3 110:2
119:8 122:1,12,22
168:23 204:7
reasonableness
188:11
reasons
5:20 119:5 125:6
138:1 144:18 169:15
rebroadcasting
10:8
rebuttal
118:7 175:1
recall
4:22 22:4 29:24
30:12,16 31:2,9
32:11 33:4 35:3
37:12 41:9,18 44:6,9
46:6,22 64:9 68:22,
24 69:3,6,8 72:23
73:2,8 78:4 79:4
83:2 171:17 205:17
receive
16:19 90:21
received
26:21 28:20 29:4
30:17 31:18,21 85:6,
14 88:12 93:22
117:18
receiving
56:21
recently
202:5,20
recess
73:24 140:17 175:7
recession
24:14
recognize
21:6 22:14 23:8,15
25:8
recollection
26:10 27:2 30:7
37:15 54:8
recommend
19:13 116:12
reconfiguration
87:2
record
5:4 9:1,21 12:16
52:14 64:18 65:3
74:2,19 107:5,9
110:11,19 111:3
120:9,16 132:10
133:9 159:13 176:11
recorded
21:13 24:23 25:1
recording
10:7
recover
68:21 69:4
recovery
116:18
recreation
13:5
red
7:11 169:20 170:1
reduced
19:18
refer
23:21 42:22 46:20
94:9 105:11 106:7
114:19 115:21
132:11 164:14 174:4
183:5

reference
8:13 112:10 165:18
referenced
165:21
referencing
60:10 146:22
referred
173:24
referring
37:1 57:15 110:15
185:5,6
refers
35:1
refreshes
37:14
refusal
184:4
refuse
136:10
refused
41:10,15
refutation
185:18
refute
122:4,15 123:1
124:3
refuting
123:19 188:24
regard
72:10
regulated
133:3
Regulation
133:11
regulations
101:20 174:2
reiterating
62:5
reject
64:22
rejected
62:1 64:3,13 65:15
66:13,22 67:1
181:15 184:10
related
17:18 19:10 30:24
37:21 50:18 99:11
110:14 188:12
198:14
relates
19:2
relating
196:13
release
193:5,7
released
73:12
relevant
5:17 80:4,10 103:3,4
106:11,12,13
107:21,22,24 108:1,
10 111:9,10,11
114:18 115:14
173:23
reliable
162:4
relied
159:20 160:3 192:3,
18 193:3,4,19 194:6,
10,16
relief
182:8
rely
139:14
relying
180:2 193:22 200:12
remain
9:17 74:3,16 140:14
remains
107:14

remarks
6:19
remedies
195:16
remedy
36:7 111:17
remember
20:12 21:23 30:6
32:7,10 64:14,15
78:13 107:16 112:23
165:16 196:6 197:13
201:7,24
remembering
60:16
remind
6:9 75:2 151:10
Reminder
140:13
reminiscent
180:5
render
104:12 139:2 141:20
rendered
183:21 191:10
renew
136:10
repair
35:24
repeat
54:9 71:16 110:23
122:20
repeatedly
186:18
rephrase
67:17 119:6
replace
194:4
replay
194:3
report
14:6 26:21,22 76:21,
24 85:23 91:24
92:23 93:4 95:24
96:7,9,12,17 98:7,10
99:20 100:20 101:4,
10 103:6,20 105:11,
16 106:7 110:9
111:13,18 112:6,14
114:19 115:19
116:15 117:23,24
118:8,11,20,22
119:10 122:2,13,16,
24 123:2,20,23
126:12 137:8
138:12,21,24 139:3,
15 144:2 146:2,10
148:13 149:13,23,24
150:9,10,16 151:5,6
152:7,13,18,21,22
153:24 156:10
157:15,20 158:4,8,9,
23 159:18 161:2,14,
24 162:15,19 163:5,
13,16,17,19,22
164:18 166:17,22
167:2 168:19,22
170:6,9,15,19
171:16,23 174:2,5,7
185:6,7,13,17
188:19,24 196:5
196:19 200:18 201:6
reported
20:9 26,15,17 92:3
100:4 116:6 207:8
reporter
4:22 8:23,24 58:23
207:6
reporters
4:24
reporting
95:1 116:1 145:3,5

reports
13:10 85:17 95:11
137:12 139:6
represent
4:18 32:14 70:16
115:5
representations
194:19
representative
26:1 29:18 47:14
representatives
25:18 30:19 197:15
represented
25:24 27:3 32:11,12
35:14
representing
30:13 70:14
represents
70:12,18 132:24
reprimand
136:11
reputation
184:18
request
176:14
requested
51:13 175:10
require
142:23
required
40:18 51:21 95:16,
18 96:5 135:10
137:7 138:2,20
155:6 170:20 184:11
requirement
146:13
requirements
129:9,10,16 137:17,
20 139:19 167:22
requires
38:7 143:4
research
125:18 126:16
201:13
reservation
97:22
reserve
174:14
reside
75:17,18
residence
76:2
resident
55:24 63:7
residential
43:12 78:24 89:24
90:5,7,9,21 91:1,5,
13,22 92:17 196:14,
16
residents
19:24 33:12 56:22
59:18 62:3 63:6,8,11
resolution
50:7 56:10
resolved
8:16
resources
18:11 180:10,17
respect
39:16 71:20 77:9
202:14 104:22
112:18 173:13
180:14
respective
175:9
respects
163:3
respond
58:10 60:5 159:24
176:9

responded
47:4 51:3,8 58:9
59:10,22 60:2
responding
58:12
responds
59:13
response
28:20 29:4 37:10
46:24 51:13 58:9,20
122:9 125:3 128:21
131:7 142:20 145:21
158:23 159:15,18
161:23 165:10
172:20 174:22
196:21,22
responsibilities
12:22 16:5 61:22
63:23 71:12 76:17
77:7 186:24
responsibility
38:4,5 46:4 71:11
150:7
responsible
18:10 20:5 150:13
151:2 152:4 196:19
responsive
126:19
rest
62:8
rested
175:9
resting
174:22
restore
136:10
restraints
87:1
restrictions
43:14
rests
184:7
result
73:9 171:12
results
141:24 142:1
144:13,16 150:8,15
151:4 152:6 156:11
158:18
retained
69:23 98:2 102:4
116:8
retrospective
79:16 81:3,6 83:4,20
112:3 113:16 114:2,
3
return
189:17
Revenue
102:5,8
review
13:1,21 43:19,24
44:3 46:7,9 86:2
95:10 98:6,11,15,18
118:14 122:4,14
123:1,8 128:18,23
130:1 137:8,16
138:21 139:17
140:1,20 141:4,7,11,
17,21,24 142:5,16
143:8,15,24 144:11,
12,17 145:3,5,7,17
146:1,2,4,9,14,18,20
147:9,15,17,24
148:5,13,14 149:13,
23,24 150:9,15,18,
21,22 151:4,6,8
152:6,13 157:18,20
158:1,6 166:5,17
167:20 168:5,20
170:9,15,19 171:3

173:10
reviewed
27:11 46:1 98:9
99:18 155:2
reviewer
141:11 143:5,15
144:11,18 149:23
150:6
reviewer's
143:20
reviewing
18:23 118:10
reviews
137:12 139:6
revoke
136:9
RFC
196:11,17 197:4
rid
192:8 196:23
Ridge
59:17
riding
84:18
rightfully
195:15
rights
198:9
Riordan
4:9,10 6:3,21 7:2,17
9:8,15 11:23 12:5
39:7 43:2 44:18,22
45:1 46:21 66:15
67:3,9 68:10,17
73:14,20 74:6,9,12,
14 75:11,16 97:14
98:1 104:4 105:3,9,
10,16,20 107:15
110:7 111:1,6
112:11,17,21,22
116:24 117:20 120:2
121:2 125:8 130:4
148:21 149:1,4
159:2,8,20,24 160:3,
10,16 163:11 164:16
165:8 166:1 168:12
170:24 171:11 173:7
174:12,16,24 175:22
176:4 177:15
179:13,16 182:3
191:15 203:4,9,17,
24 204:5,11,15,17,
22 205:8,13,16,23
206:4
Riordan's
175:3 179:5,22
risk
194:15
road
48:20 57:11 196:16
roadways
35:5,16
Rogers
92:4 93:6,8,17,21
role
15:15 18:22 20:2,7
184:12
room
9:8
roughly
61:4 201:2
routes
87:15,16,17
row
8:2
Ruff
4:11 5:23 7:3,6,8,12
9:12 97:17 103:21,
23 104:16 105:14,18
106:22 110:5,13,21
112:5,9 117:9,16

120:11,14,21 121:7,
15,17 122:7 124:13
125:1 126:18 127:9
128:8,19 130:6,11,
14 131:5,10,13
132:5,8,10,19 133:9,
12 134:9,12 140:5,
12,18 142:18 145:19
147:4,10,13,23
148:7,10,11,23
149:3,5,7 152:1
159:4,16,22 160:17,
22 163:16 164:8,16,
23 165:13,23 166:3
168:17,18 171:7,15
172:18 173:2 174:17
175:2,21 176:3,14,
19,22 177:3 193:10
204:10 205:21
Ruff's
121:2
ruined
184:14
rule
136:20 143:4,14
144:9 146:1 148:12
149:9,12 161:20
ruled
5:20 165:2
rules
84:16 135:2
ruling
5:4 104:19 187:8
run
24:22 196:23
running
15:13 197:6
runs
14:19 177:1 190:2
Russia
87:20
Russian
86:10 87:21
ruthless
182:24

S

safety
13:5 183:8,11
salaried
16:1
sale
108:20 109:4 115:4,
6 180:24 181:4
197:10,11,20,21
198:2 202:22
sales
96:24 155:15 201:20
sanctions
189:4
sanctity
182:4 187:21
sanitized
163:23
sat
96:19 97:2 181:1
satisfied
53:10
save
97:20 164:15 179:14
187:12
saved
205:5
scenario
100:8,24 103:9,11,
15 106:8 109:5,9
110:3,14 111:15
199:16 201:18
scenarios
78:9 84:5,6,22 99:24

school
16:15,16 86:4,5,19,
24
science
16:23,24
scope
98:12 127:5,19
128:15 144:6 163:11
165:6
screen
27:21
season
62:14 63:8,12
seat
8:4 9:5,23 74:21
seated
8:1
section
43:5 106:2,6,20
110:9 112:14 132:15
134:11,20 135:14
136:2,19 163:13
185:7
sections
142:4 143:9
secure
40:3 52:24
secured
196:13
security
22:2,7,10 33:20
88:4,15
seek
47:23 184:17 186:4
seeking
67:23 177:10 182:8
selected
104:9
sell
79:14 100:3 182:12,
22 184:21 202:8,15
seller
102:14,21
send
160:24 186:9 187:17
205:23
senior
76:16,18
sentence
36:7 37:1 101:14
134:23
separate
78:16,18 99:23
146:2
separately
12:17
sequence
93:7
series
88:11,14 141:22
Serosun
84:8 85:23
serves
137:16
service
32:18,20,24 33:1,3,5
87:17 102:5,8
services
115:3 141:21
serving
19:24
set
29:12 79:22 94:24
109:21 111:20 115:9
117:13 119:16
125:19 133:24 134:6
139:13 146:3 175:11
196:16 199:21
203:20
settled
202:13,19,20

settlement
39:3 73:11 79:8
202:20,22
Settler
59:16
Seventh
204:23
severe
189:5
shifted
84:22
shook
184:5
shoots
199:13
Shorewood
193:2 202:12,13,21,
22
short
73:24 140:17
171:10,13 175:7
short-term
108:16
shorthand
207:8,10
shortly
35:22,23 88:12
shot
199:5
show
55:3 115:24
showed
45:1 66:15 69:12
71:1 116:7
shown
197:13 201:20
shows
52:14 64:18 65:3
94:17,20 155:1
177:19
shutdown
181:22
siblings
84:14
side
6:22
sides
107:6 177:8
sign
150:1 186:10
signal
186:10,12 188:2
signature
137:22 150:23
153:10,13,23 158:8
signed
149:8,14,20,22
162:16 193:1
significance
115:23 154:18
significant
36:7 189:4
significantly
141:17,23
signs
1:18:18 123:10
125:21 127:11
149:24 150:6
similar
16:8 17:13 28:12
108:22 149:14
162:10 192:18
simple
183:14
simply
130:7 163:20 165:21
simultaneous
175:12 176:7
single
182:18 189:10

sir
7:20 11:21 12:7
27:17 39:11 74:21
117:14 119:12
122:8,19 125:2
126:23 127:19
128:20 130:7 131:14
135:7,22 144:20
145:20 147:5 152:17
154:5 158:21
161:18,20 162:23
165:24
sit
9:10 90:16 96:14,20
97:11 119:7 121:24
124:8,19 185:22
sitting
11:12
situation
36:8 40:7 41:18 62:1
102:22
situations
40:16 178:9 195:11
size
188:3
skin
194:13
skipped
136:20
skipping
141:14
slap
187:24
slash
58:11 59:14
slated
86:16
slight
205:7
small
88:10 143:12 148:19
180:8 187:3 201:21
smart
177:10
smoothly
60:11
smoothness
60:19
soft
75:23
sold
187:19 197:18
202:4,5,6 204:13
solely
43:19,20 184:8
solve
165:9
solves
164:21
solving
15:14
sort
32:23
sorted
110:11
sorts
203:20
sought
24:2,10 184:24
sound
52:15 65:4
sounds
57:20 65:5,8 164:4
source
101:8,24
south
48:20 119:21
space
19:15

speak
10:11 75:21
speakers
10:9
speaking
107:18 159:22
speaks
102:13 106:11 112:2
special
16:6 32:18,20,24
33:1,5 77:13
specific
17:21
specifically
24:9 26:24 31:9
57:13 69:8 193:5
spent
13:18
spoke
61:12
Square
75:19
SS
207:2
SSI
33:10,18
staff
177:6 191:12,19
stages
28:4
stand
9:15 10:19 66:4
74:15 131:15 165:1
194:24
standard
31:12 45:17 80:5
113:9 135:9 136:17
140:20,21 141:20
142:15 143:4
144:22,24 145:4,23,
24 148:12 149:12
157:13 158:15 162:8
standards
39:24 80:2 92:21
113:3 114:7 125:17,
18 133:24 134:6
135:2,5 137:2
139:13 140:2,6
141:3,9 142:22
143:4,14 146:20
149:9 150:23 152:14
157:10 160:4 161:15
162:20 173:20,21
174:4
standing
9:17 74:16 109:15
114:10 186:2
standpoint
191:22
stands
5:15 185:17
start
21:15 28:10 31:15
48:18 66:3 87:20
117:4 127:4 175:5
180:22 206:3
started
11:20 21:22,24 90:5
starting
94:10 136:2 177:11
starts
48:24 149:20
state
5:3 9:20 17:20 34:7
45:6 60:1 61:24
62:10,12 74:18
90:11,16,18 92:13
94:3 111:9,16
132:22 133:1,4
161:8 177:7 181:24
182:2,5,6 193:13

195:12,15,19 198:21
199:6,11 207:1
**stated**
34:6 67:13 104:17
115:17 189:15
190:18 191:4 195:20
**statement**
43:9,18 44:1,5 46:3,
10,15 108:24 119:11
143:17 158:9 177:19
179:19 193:15
**statements**
5:13 162:16 192:18
**states**
34:15 35:21 36:14
38:13 72:4 103:2,23
116:11 157:17 190:3
**stating**
164:8
**status**
62:16 180:16 199:8
**statute**
69:7 133:19,24
136:21
**Stauberg**
97:19
**stay**
198:12
**stayed**
88:2
**staying**
193:13
**step**
192:22 193:2
**steps**
50:10
**sterilize**
163:21
**Steven**
91:9
**stipulation**
44:3,13 45:12 50:12
**stipulations**
51:19 181:16 198:7,
8,10
**stock**
88:7
**stockbroker**
89:2
**stocks**
88:5
**stood**
177:15
**stop**
10:14 120:13
**store**
178:3
**Stout**
98:8,10,22 99:19
100:20,22 101:5
103:6,9,10,15,19
109:6 115:2,22
116:18 117:23,24
118:11,19,22 119:10
122:2,13,15,24
123:2 199:23 158:23
159:18 161:24
166:21 167:2 169:5
170:14,16 171:20
173:15 174:2,7
185:17 196:5 199:16
201:7
**Stout's**
104:8,9 106:3,7,20
118:15 167:3,16
169:22
**streamline**
164:12
**street**
57:13,15 109:1

**streets**
34:11 35:23,24 36:9
56:8,11 57:2,4,8
63:16 183:7,10
**stricken**
131:12 147:3,12
163:17
**strike**
26:4 95:16 126:18,
21 133:10 132:5
147:10 201:8
**string**
55:6,11
**stuck**
205:9
**studied**
185:11
**studies**
77:15 86:10
**study**
35:1,4,7,11,12,13
92:19 205:4
**stuff**
200:6 205:24
**sub-paragraph**
27:16
**subdivision**
13:21 18:23 19:10,
14 20:3,5,15,17
21:11 22:18,23
24:10,18 33:11,13
34:12 35:6 37:4,8,22
38:10 39:23 40:2,4,
17 43:15,22 48:6,16
53:1,15,18 57:5,19
63:24 71:12,20
77:23 78:24 79:7
80:15 82:17,21 83:2
84:4,7,8,18,21 99:12
100:1,9,12 201:24
**subdivisions**
13:14 24:15 28:5
51:1 78:2 100:19
109:16 183:3 200:1
201:23
**subject**
5:11,12 25:3 31:10
32:17 33:5 43:13
73:6 134:7 137:3,9
138:22
**subjection**
182:13
**submissions**
7:18 191:16
**submit**
6:19 97:14
**submitted**
5:6 138:7,13,16
139:1,18,22 163:20
167:21 168:1 171:1
189:9
**subordinates**
71:22
**subrogated**
199:9
**subsequent**
24:3,9,17,21 25:11,
19 28:13 42:18 46:5
53:24 63:22 66:21
83:6,23 85:17,21
178:12,23 195:21
**substantial**
34:20 141:16 162:11
**substantially**
34:17 67:13
**substantiate**
125:15,19 124:9,20
125:6 126:2,6,8,10,
17 127:16 159:17
**substantiated**
125:12 127:17

**substantiation**
108:12,14 158:23
161:23
**successful**
62:6
**successor**
25:22 26:23 28:19
47:1,6 195:21 197:2
198:19,20,21,22,23
**sue**
42:7,17 49:14 50:7
52:11 53:23 54:4
66:21 184:2
**sued**
54:11 56:18 59:7
68:20 69:4 190:22,
23
**suffered**
172:3,14
**suffering**
36:18
**sufficient**
146:8 161:19 162:7
194:21
**Sugar**
59:15 61:6,13 63:7
67:2,21 68:1
**suggest**
163:21,22 185:1
191:7 201:17 203:10
**suggesting**
190:6
**suggestion**
111:13 171:2
**suggests**
113:8
**suit**
54:19 72:7,14
156:10
**suits**
68:19 198:14
**sum**
168:16,17 176:13
**summary**
72:24 94:14
**summer**
20:11
**Suncal**
25:18,23,24 26:6,19
29:5,17 30:14,20
43:3 46:11,15 63:4
177:13,23 193:19
194:9,16,23
**Suncal's**
27:24
**supervise**
13:7
**supervision**
136:12
**supervisory**
19:4
**support**
114:16 177:18 179:8
**suppose**
7:14
**supposed**
80:3 86:18 178:15
179:21 180:12,15
**Supreme**
189:11
**Surely**
179:21
**sureties**
39:16
**surety**
33:19 39:22 41:10,
13,19,24 42:7,12,13,
15 45:19 53:22
68:21 178:5,16
180:23 183:17
184:2,5 197:5 198:5

**surface**
35:22
**surprise**
70:6,15
**survived**
197:7
**suspect**
140:10
**suspend**
136:9
**sustain**
130:9
**switched**
205:5
**sworn**
9:19 12:2 74:17
75:13 119:23 207:5
**system**
58:14 62:19
**systemically**
199:12

---

**T**

**tab**
25:6
**tables**
8:21
**taint**
202:11
**takes**
81:7
**taking**
56:23 102:17 114:5,
12 143:11 172:3,14
192:5 196:13
**talk**
11:6 12:17 75:4
78:19 82:12 171:8
202:9 203:7
**talked**
43:2 67:20 193:10
196:7 198:11 203:5
**talking**
28:4 81:11,14
113:15 201:2
**tasks**
18:8 118:12
**tax**
33:16 77:14 80:23
81:1
**taxed**
33:1
**taxes**
33:2 34:20 196:1
**taxpayer**
195:23
**team**
7:10
**techniques**
144:12 158:17
**telling**
74:22
**temporary**
15:22
**ten**
6:22 44:24 45:13
68:10,13 113:18
197:23
**tenure**
16:11 28:13
**term**
14:16,18,19 119:3
126:7
**terminology**
96:23 97:9
**terms**
25:3,20 102:11

**test**
179:13 182:21
184:13 186:20 189:6
190:12
**testified**
12:3 71:7 75:14
91:18 104:10 156:24
157:15 160:3 177:22,
24 193:18 198:15
200:5
**testify**
97:23 104:20 107:11
156:19
**testifying**
5:9 170:8
**testimony**
5:11,15 10:7 104:23
107:12 112:7 140:15
151:15 159:10 162:4
166:4 168:4 174:19
184:19 188:10,13,17
184,16
**testing**
95:14,16 195:4,6
**Teteak**
177:13,22 181:1
183:22 189:17
194:12,16,24 202:10
**text**
121:12
**theories**
190:12
**theory**
17:19 180:4 181:3
182:21 184:13
186:20,21,22 189:7
195:5,6
**thing**
11:11 12:14 65:12
156:23 177:24
184:10 188:21
193:10 196:2 197:1
203:9 204:12
**things**
6:10 10:4 19:19
60:11 86:22 98:16
115:16 124:5 125:9
138:2 148:15 198:24
203:20 205:14
**thinking**
204:5
**third-parties**
198:10
**third-party**
54:7,13
**Thompson**
205:5
**Thorsness**
4:15,16 120:5
**thought**
69:14 90:3 155:23
**thoughts**
16:1
**three-year**
93:2
**tied**
190:4
**ties**
106:10 107:20
**time**
6:5,17 7:16 9:12
10:20 13:12,16,18
14:23 15:20 18:9,16
19:22 20:9 21:21
25:24 26:8,24 27:2,
24 28:3,11 29:10,16
31:4,8,17 32:2,15
34:8 48:15 49:24
50:6,21 54:17,19
56:15,20,21,23
57:14,18 58:17 59:6

**test**
61:1,15,19 65:22,23
68:8 69:22 70:4
76:22,23 77:6 78:9,
19 79:22 80:1,4,11,
16 81:7,8,15 85:5,
12,13 90:2 91:14,21,
23 93:1,16,21 95:4
100:4 103:10,12
108:6,8 109:22
111:12,14 112:2
114:5 116:6 117:22,
24 119:24 125:21
126:20 135:4 140:11
141:15 143:10,11
144:10,24 151:2
157:14 160:18
164:15 168:13 173:3
175:10,16 177:6
178:21 185:16
191:11 194:9 202:16
204:20 206:11
**timed**
7:6,8
**timeline**
95:13
**timer**
7:7
**timers**
7:11
**times**
18:9 68:20 103:23
130:5,10 160:9
**timing**
176:16
**title**
196:2
**today**
4:19 5:2,4 6:2,6,17,
23,24 12:7 38:19,24
39:5 81:12,17
108:18 114:8 131:16
186:3,4 191:17
195:8 203:20 204:9
**told**
60:10,12 67:22 74:5,
6,8 175:13 177:13,
16 179:16 181:1
183:22 184:1
**Tom**
4:17 92:4 93:6
**tomorrow**
59:19 206:2
**tone**
28:17
**top**
9:14 22:4 48:18
59:23 61:7,11
134:10 162:8
**touch**
45:11 95:20 183:23
**touched**
181:5
**towns**
50:17 82:6
**Trade**
89:12,15,20,23
90:24
**traded**
88:5
**trader**
89:16,18
**trading**
88:7
**training**
39:15
**transaction**
102:16,20
**transcript**
120:11 131:15
207:10



transcripts
120:15,23 175:14
transferred
204:22
transmittal
150:1 160:24
transmitted
158:6
treasury
101:19 174:1
TRG
4:12,14,16 5:8 25:13
29:7,9,12 30:14,19,
24 31:6 32:12 35:12,
13 38:1,3,7,14,21,24
39:4 42:20 44:9,11
45:1,4,5,13 46:2,18
47:4,9 48:8 51:6,18
54:8,14,17,18 55:3
56:18 57:22 59:6
63:1,20 65:6 66:1
69:13,15 71:2,3
98:24 99:10 134:9
135:21 172:2,14
177:16 178:20
179:17,21 180:7,21
182:6,18 183:11
184:14,16 186:23
187:13 188:10 191:2
192:11 193:13,15
194:15 195:4,21
196:17 197:8,18
198:3,12,15,19,20
201:19 202:13
TRG's
34:6 38:6 46:4,24
117:23 170:3 184:7
192:2
trial
4:21 6:11 10:1
22:11,14 27:12 30:3
31:20 33:23 44:11,
18,19 46:18 55:3,6
69:15 74:3 94:6,7
132:11,12 134:9
135:21 144:22 149:5
152:18,22 153:19
156:5 157:17 180:1
195:17
true
39:24 40:1 41:11,12,
16,22,23 42:8,9,18,
19 44:1,2 50:8
118:22 123:20
127:24 129:5,23
133:17,18 134:7,8
138:17,18 169:6,7
196:2 203:17 207:9
trust
46:2 70:19 78:14
121:1 143:10 181:3
182:13 188:4 189:20
194:3 197:14,15
trustee
178:7 181:17
truth
177:21
TSC
35:1
Turiello
4:13,14 8:7 39:10
44:19,20 58:21 59:1,
2 66:6,12 67:6,16,
18,19 68:4 69:12
71:1 73:19 120:4
121:22 124:18
128:13 131:1 142:14
145:15 172:12
Turiello's
68:19
turn
28:23 48:5 55:17

96:13 101:9
turned
62:2
turning
33:22
Two's
29:9,13
type
31:13 77:13 78:15,
22 81:1 84:17 87:20
100:13 108:10,14
113:11 114:6 122:3,
14,24 125:17 129:12
137:22 189:20
types
17:16 19:18 184:16
189:19
typically
24:23

U

U.S.
189:11 205:4
ultimate
161:13
ultimately
52:11 67:1 184:12
186:9
unacceptable
187:17
undergraduate
15:22 16:2,5,12,19
21:23
underlined
101:16
underlying
52:21 206:7
Undermining
187:20
underneath
15:12 136:3 144:15
understand
33:18 34:5 36:24
38:5 47:14 100:22
101:3,18 105:9
121:11 130:11
133:13 146:10 147:5
158:17 181:6 195:13
205:15
understanding
26:19 29:8 37:3 40:2
45:16 65:23 89:8
98:20 99:19,22
134:4 157:24
understands
104:11
understood
11:7,17,18 110:13,
21 174:7
undisclosed
104:16 110:6
unemployment
108:3
unfinished
34:18,21
unglued
35:24
uniform
135:2
Unique
179:3
unit
22:22 23:1,2,3,20,23
United
12:10,11 71:8 82:24
190:2
units
22:23

University
16:18,20 17:7 86:7,
9,14
unknown
116:9
unlike
102:18
unquote
34:19
unrebutted
185:18,23,24 186:1,
5 188:10 189:2,3
unrefuted
186:6
unrelated
190:18
unrepentant
187:17
unsellable
183:22
update
56:7 58:4 62:3
upper
135:14
upset
63:8,11
users
143:16 146:9
USPAP
113:4,7,9 125:16,19
126:14,15,17 127:24
128:17 129:3,9,10,
11,16,18,19,22
135:3,9 137:3,7,17
138:2,7,12,17,20
139:2,13,19,24
140:3 156:16,21
157:1,7 159:21
160:4 161:16 162:10
164:11 166:18
167:22 168:2,20
usual
22:5

V

vacant
156:12
valid
199:10
valuating
80:21
valuation
76:8,19 79:18 81:11
83:7 85:8 103:1
111:14 115:16
116:13 185:8 199:22
201:1,10,15
valuations
76:9,11 77:12 80:23
112:2 199:24 200:23
valuer
158:16
valuers
162:16
values
34:16,18 123:21,23
173:20
valuing
108:18
Vansanten
155:20,21 156:2
200:14 201:9
Vansanten's
153:3,10
venture
25:13 29:7,9,12
30:14,19 31:6 99:10
194:8
verified
189:17

version
62:12 132:4
versus
17:17 180:5 195:7
victim
180:6
video
120:13
village
61:8,12 193:1
vindicated
195:18
violated
186:18
Violating
136:17
violation
104:2 107:2 195:14
198:17
visual
115:10
voice
75:23
voided
197:7
voted
47:17

W

wait
58:19 107:3
walk
10:3
walked
41:6
Walker
119:21
Walline
26:6 30:4
wanted
62:15 84:14 88:1,7
121:12 140:7 198:12
warn
151:13
warning
176:15,21
warranties
206:6
water
11:9,10 34:19
Waterford
202:2
Wausau
75:20 76:1
ways
36:18 50:22 111:17
Wedoff
181:15 196:12,18,
21,24 197:3
week
21:22 89:13
weekend
185:11
weekends
90:6
weigh
165:17
weight
5:19 104:22 151:15
165:19,21
whatsoever
153:21
Whispering
20:14,18,21 21:10
22:7,17,23 36:16
38:10,21 40:24
43:15 47:18 48:16,
18 51:1 55:24 56:8
58:4

wife
88:2
willingly
186:17
Wisconsin
75:20 76:1
withdraw
66:22 139:3
withdrawing
164:9 165:13,15
witnesses
6:14,23,24
won
69:6 112:19
Wonderful
151:19
word
49:1,9 121:2 187:23
words
121:9 179:2 192:1
work
16:12 17:15 24:16
39:18 41:10,15
45:21 49:4 50:2
52:7,9,24 53:9,18,24
54:2,23 56:23 71:20
87:13 88:8,21 89:10,
17,22 90:6 91:4,5,24
126:16 127:20
128:15 144:6 146:2
155:2 170:20 175:18
177:6 183:8 191:20,
22
worked
88:24 89:16 91:7,9,
10 179:4 193:20
workforce
86:15
working
10:14 15:16 21:20
88:16 90:7 96:18
177:6
works
13:6 74:23
world
88:4 115:2
worry
192:12
worsening
36:8
worth
97:22 189:6,21
worthless
181:5 182:18
worthy
155:3
wrap
66:8
wrist
187:24
write
27:23 28:12 37:10
50:3 60:9
writes
56:6
writing
6:19 48:14 95:24
191:4
written
7:17 53:8 72:6,11
137:15 146:1 149:13
158:5,8 169:12
175:12 203:5
wrong
74:8 177:19 187:4
195:5 199:4
wrote
26:8 28:15 29:16
34:2 45:13 71:23
169:11 197:17
202:19

Wywort
71:5
Wywrot
18:19,20 20:7,10
71:15

Y

year
15:24 17:1 51:17,18
65:20 88:23 89:5
91:15,17 93:23
96:14 97:13 103:13,
17 116:2,3 117:18
197:23
years
12:20 14:5 31:1
38:19 54:22 56:9,16,
17 59:14 63:3,19
77:5,18 84:20 87:12
89:19 92:24 100:13
109:13,17,23 113:18
115:7 154:15 177:13
179:5,6 182:13
183:20 198:20
202:18 205:4
Yorkville
12:10,12 15:17
16:16 17:24 20:18
24:2,10 36:17 38:5
39:4,21 40:16,18
41:1,4,19 42:6 44:4,
13 45:10,12 47:17
48:1 49:19 50:7,10
51:9 52:11 54:6,11,
18 56:18,21 59:7
62:24 63:19 64:4,11
65:6,13,18 66:19
68:20 69:3 71:9 73:4
78:6 82:4,10,12,24
83:15,18 184:2
202:12
Yorkville's
24:19 36:15 44:21
46:4 47:22 48:4
49:24 50:5 52:23
53:3 64:22 66:14,23
young
177:10
yup
45:9 146:7

Z

Zurich
186:11

