UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) ) | Case No. 08bk10095 |
| In re Kimball Hill, Inc., *et al.*, | ) ) | Chapter 11 |
| Debtors. | ) ) | Judge Timothy A. Barnes |

TIMOTHY A. BARNES, Judge.

## MEMORANDUM DECISION

This matter comes on for continued consideration on the Purchaser's Motion for Entry of an Order (I) Enforcing Confirmation Order; (II) Directing Dismissal of State Court Claims; (III) Awarding Damages; and (IV) Granting Related Relief [Dkt. No. 3969] (the "Motion") brought by TRG Venture Two, LLC ("TRG"), the successor owner of assets from the above-captioned bankruptcy cases. The Motion is opposed by Fidelity and Deposit Company of Maryland ("F&D"), a surety on projects relating to those assets and a creditor of the bankruptcy estate.

The court has previously found that F&D's pursuit of TRG violated the confirmation order in this case. *See In re Kimball Hill, Inc.*, 565 B.R. 878 (Bankr. N.D. Ill. 2017) (Barnes, J.) (the "Violation Decision"). In the Violation Decision, the court deferred ruling on whether and to what extent damages may be appropriate in light of F&D's violation. The court thereafter conducted a trial on damages and this memorandum decision constitutes the court's determination of the issues at trial, and thereby is the final determination of issues reserved in the Violation Decision.

For the reasons set forth below, the court finds that TRG has suffered damages as a result of F&D's pursuit of litigation that violated orders entered by this court. The court awards TRG damages based on legal costs, consulting costs and project management costs, as well as reduced property value, which are to be paid by F&D. The court declines to award punitive damages as TRG has not demonstrated that the court has the authority to do so. By the award of the amounts set forth herein, the Motion is fully resolved and the previous interim stay of all directives that F&D must dismiss claims against TRG is removed.

## JURISDICTION

The federal district courts have "original and exclusive jurisdiction" of all cases under title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"). 28 U.S.C. § 1334(a). The federal district courts also have "original but not exclusive jurisdiction" of all civil proceedings arising under the Bankruptcy Code, or arising in or related to cases under the Bankruptcy Code. 28 U.S.C. § 1334(b). District courts may, however, refer these cases to the bankruptcy judges for their districts. 28 U.S.C. § 157(a). In accordance with section 157(a), the District Court for the Northern District of Illinois has referred all of its bankruptcy cases to the Bankruptcy Court for the Northern District of Illinois. N.D. Ill. Internal Operating Procedure 15(a).

A bankruptcy judge to whom a case has been referred may enter final judgment on any proceeding arising under the Bankruptcy Code or arising in a case under the Bankruptcy Code. 28 U.S.C. § 157(b)(1). Bankruptcy judges must therefore determine, on motion or *sua sponte*, whether a proceeding is a core proceeding or is otherwise related to a case under the Bankruptcy Code. 28 U.S.C. § 157(b)(3). As to the former, the court may hear and determine such matters. 28 U.S.C. § 157(b)(1). As to the latter, the bankruptcy court may hear the matters, but may not decide them without the consent of the parties. 28 U.S.C. §§ 157(b)(1), (c). Instead, the bankruptcy court must "submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing *de novo* those matters to which any party has timely and specifically objected." 28 U.S.C. § 157(c)(1).

In addition to the foregoing considerations, a bankruptcy judge must also have constitutional authority to hear and determine a matter. *Stern v. Marshall*, 564 U.S. 464 (2011). Constitutional authority exists when a matter originates under the Bankruptcy Code or, in noncore matters, where the matter is either one that falls within the public rights exception, *id.*, or where the parties have consented, either expressly or impliedly, to the bankruptcy court hearing and determining the matter. *See, e.g., Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1939 (2015) (parties may consent to a bankruptcy court's jurisdiction); *Richer v. Morehead*, 798 F.3d 487, 490 (7th Cir. 2015) (noting that "implied consent is good enough").

Each of the foregoing has been previously addressed by the court in the Violation Decision. 565 B.R. at 888-91. In sum, the court has jurisdiction and statutory authority to hear and determine the Motion as it is a request to enforce an injunction extant in an order confirming a liquidating chapter 11 plan. That jurisdiction is not, however, exclusive. *Id.* at 891. The court also has constitutional authority to enter a final order with respect to the Motion because both parties have consented to this court's hearing and determining the issues therein—TRG by filing the Motion and F&D by filing its claim and by its participation in this case. More importantly, no party has contested the jurisdiction or authority of this court in this matter.

Accordingly, the court has the jurisdiction, statutory authority and constitutional authority to hear and determine the Motion.

## BACKGROUND

Before the court determines the final stage of the Motion, it is helpful to consider the history of the proceedings before the court, as well as the scope of the Violation Decision.

A.    Violation Decision

The Motion was filed on July 18, 2016. In addressing the Motion, the parties agreed to first take up whether a violation of the court's confirmation order in this case had occurred. The parties thus briefed the Motion, limited to this issue, in September and October 2016. The court delivered its ruling on those issues, the Violation Decision, orally to the parties on December 14, 2016 and memorialized it in writing on March 20, 2017. In the Violation Decision, the court determined that "the claims asserted by F&D in the State Court Lawsuits were released and enjoined under the Plan and Confirmation Order. As such, in bringing the claims against TRG in the State Court Lawsuits, F&D has violated the terms of the Plan Injunction, and in so doing, has subjected itself to further

order of this court and civil contempt damages." Violation Decision, 565 B.R. at 902. The Violation Decision directed F&D to dismiss its claims against TRG in the state court and scheduled a status hearing to address damages. *Id.*

B.    Motion to Alter

At that status hearing the parties informed the court that they had agreed that a damages determination prior to an appeal, if any, was the appropriate next step. The court therefore set a deadline for TRG to file a statement of damages and continued the status hearing to shortly after that deadline. On April 3, 2017, before the deadline for TRG to file its statement of damages, however, F&D filed the Motion of Fidelity and Deposit Company of Maryland to Alter and/or Amend the March 20, 2017 Memorandum Decision and Order [Dkt. No. 4068] (the "Motion to Alter").

F&D argued in the Motion to Alter that the court should reconsider its ultimate conclusion in the Violation Decision, asserting many of the same arguments it had raised in its previous briefing on the Motion. F&D also asked that the court clarify whether F&D could pursue TRG based on assignments F&D had received from municipalities and that the court authorize it to stay its state court efforts against TRG rather than dismiss the suits, pending the ultimate resolution of the Motion. The parties briefed the Motion to Alter and the court ruled on the issues therein, denying the Motion to Alter in all respects but one. On that one remaining issue, that the court's directive that F&D dismiss its state court efforts against TRG should be stayed pending full resolution of the Motion, the Motion to Alter was granted. *See* Order Denying, In Part, and Granting, in Part, Motion of Fidelity and Deposit Company of Maryland to Alter and/or Amend the March 20, 2017 Memorandum Decision and Order [Dkt. No. 4187].

C.    Equitable Defenses

The court then set a further briefing schedule on damages. TRG filed a statement of damages to which F&D responded and TRG replied in support thereof. In the briefing, F&D argued that it needed more time to conduct discovery and that certain additional legal issues would be more efficiently addressed before a determination of damages. TRG did not agree. Ultimately, the court allowed briefing on F&D's assertion of equitable "defenses" that it alleged would prevent any damages award and thus would moot the need for discovery and evidence of damages.

The parties briefed these alleged equitable defenses and, on November 1, 2017, presented oral argument before the court. The court orally ruled on January 24, 2018 that F&D's laches defense was not well taken as it was already resolved against F&D in the Violation Decision, *see* Tr. at p. 32, Jan. 24, 2018 [Dkt. No. 4228], but that mitigation was a defense that could be addressed only after receiving evidence on the damages themselves. *Id.* at pp. 36-37.

The court then continued the Motion for parties to discuss whether discovery was needed and possible trial dates. On February 6, 2018, F&D again requested that the court revisit the legal issues, this time by entertaining partial summary judgment. The court declined to entertain another round of briefing and scheduled the matter for trial.

## PROCEDURAL HISTORY

In taking up the Motion, the court has considered its prior rulings in this matter as well as the arguments of the parties at the trial that took place on August 27, 28 and 29, 2018 and September 18, 2018 (the "Trial"), and has reviewed and considered the following filed documents relating to the Motion:

(1)   TRG's Supplemental Statement Regarding Damages [Dkt. No. 4188] (the "Damages Statement");

(2)   F&D's Response to TRG's Supplemental Statement Regarding Damages [Dkt. No. 4190];

(3)   Amended Final Pretrial Order Governing Purchaser's Motion for Entry of Order (I) Enforcing Confirmation Order; (II) Directing Dismissal of State Court Claims; (III) Awarding Damages and (IV) Granting Related Relief [Dkt. No. 4247] (the "Pretrial Order");

(4)   Pre-Trial Statement [Dkt. No. 4259] (the "Pretrial Statement");

(5)   F&D's Post-Trial Closing Statement [Dkt. No. 4281] ("F&D's Closing"); and

(6)   TRG's Closing Statement [Dkt. No. 4282].

The court has also taken into consideration any and all exhibits submitted in conjunction with the Motion, the Trial and the foregoing filings. Though these items do not constitute an exhaustive list of the filings in the above-captioned bankruptcy case, the court has taken judicial notice of the contents of the docket in this matter. *See Levine v. Egidi*, Case No. 93C188, 1993 WL 69146, at *2 (N.D. Ill. Mar. 8, 1993) (authorizing a bankruptcy court to take judicial notice of its own docket); *In re Brent*, 458 B.R. 444, 455 n.5 (Bankr. N.D. Ill. 2011) (Goldgar, J.) (recognizing same). In doing so, the court has also considered the procedural history and previous court filings in this case, as is discussed in detail herein.

## EVIDENTIARY RULINGS

The court entered the Pretrial Order on March 26, 2018, which provides that

No motion *in limine* is necessary for any objection raised in the Pretrial Statement. Any other motions *in limine* will be due with the Pretrial Statement unless the court orders otherwise. Any exhibit to which an objection is not raised in the Pretrial Statement will be received in evidence without the need to establish foundation. Any objection to an exhibit (other than weight/relevance) which is **not** raised in the Pretrial Statement will be waived. Whether evidence is considered by the court and what weight the court gives the evidence depends upon the party relying on such evidence to demonstrate at the trial the relevance and reliability of that evidence in relation to the party's case. If an exhibit is not mentioned by the parties at the trial, it will not be considered to be relevant by the court.

Pretrial Order, at p. 1.  On August 10, 2018, the parties submitted their joint Pretrial Statement.
Attached to the Pretrial Statement, and in accordance with the Pretrial Order, was the list of each
party's exhibits and the opposing party's objections, if any.  Pretrial Stmt., Exhs. D-1, D-2.

The parties asserted numerous objections on the basis of relevance.  While it is true that
Federal Rule of Evidence 403 affords the court the authority to "exclude relevant evidence if its
probative value is substantially outweighed by a danger of one or more of the following: unfair
prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly
presenting cumulative evidence," Fed. R. Evid. 403, the purpose of the Pretrial Order's statement
regarding weight and relevance is for parties not to file such objections.  As this court has previously
stated:

> 'In the bankruptcy court, the bankruptcy judge is the fact-finder.'  *In re Kenneth
> Leventhal & Co.*, 19 F.3d 1174, 1178 (7th Cir. 1994).  In that role, the court is more than
> capable of determining the weight of any judicially noticed fact, *In re Hood*, 449 Fed. Appx.
> 507, 510 (7th Cir. 2011) ('the bankruptcy court was entitled as the trier of fact to decide how
> to weigh the evidence before it'), and in that role Judge Posner has instructed that the court in
> a bench trial may 'admit evidence of borderline admissibility and give it the (slight) weight to
> which it is entitled.' *SmithKline Beecham Corp. v. Apotex Corp.*, 247 F. Supp. 2d 1011, 1042
> (N.D. Ill. 2003), *aff'd*, 365 F.3d 1306 (Fed. Cir. 2004), *opinion vacated on reh'g en banc and aff'd on
> other grounds*, 403 F.3d 1331 (Fed. Cir. 2005).

*In re Tabor*, 583 B.R. 155, 166 (Bankr. N.D. Ill. 2018) (Barnes, J.).  Relevance and weight objections
are not, therefore, well-taken exclusionary objections in bankruptcy bench trials.  For the same
reasons, objections that evidence is prejudicial, cumulative or may cause confusion are not effective
exclusionary objections in a bench trial.  *Schaumberg Bank & Trust Co. v. Hartford (In re Hartford)*, 525
B.R. 895, 900 n.1 (Bankr. N.D. Ill. 2015) (Barnes, J.).  Such matters are always under consideration by
the bankruptcy judge.

As a result, the court overruled all objections raised by the parties that were based on
relevance, weight, prejudice or confusion, or that evidence would be cumulative, preserving such
matters for its ultimate weighing of evidence as finder of fact.

In addition, the parties raised a number of objections regarding hearsay.  Unless an exception
applies, hearsay as defined in Federal Rule of Evidence 801 is inadmissible.  *See* Fed. R. Evid. 802.
The rule against hearsay, however, makes clear that hearsay is defined by its use.  Fed. R. Evid.
801(c)(2) (hearsay is a statement that "a party offers in evidence to prove the truth of the matter
asserted in the statement").  Given that the manner of use is difficult to determine until a party
actually offers a statement in trial, all hearsay objections were preserved for the Trial.  Tr. at p. 59,
Aug. 27, 2018 PM.  Ultimately all such objections were overruled at the Trial for the reasons then
stated.  Tr. at p. 34, Aug. 29, 2019 PM.

A.    TRG's Evidence

As for TRG's proposed exhibits, F&D also objected on the grounds of foundation and
privilege.  Pretrial Stmt., Exh. D-1.  At the beginning of the Trial, the court cautioned the parties to
raise such objections when an exhibit was to be used in the Trial and thus reserved ruling until that

point. Tr. at p. 10, Aug. 28, 2018 AM. No objections on these bases were sustained during the Trial.

F&D also filed a separate motion *in limine* and scheduled the motion for hearing before the Trial. Motion *in limine* of Fidelity and Deposit Company of Maryland to Exclude SRR Expert Report and Testimony Related to SRR Expert Report [Dkt. No. 4260] (the "Motion *in Limine*"). In the Motion *in Limine*, F&D asserted in a more fulsome manner its objection noted in the Pretrial Statement to TRG's Exhibit No. 15, TRG Venture Two, LLC – Damages Analysis Related to Subdivision Developments (the "SRR Report"). F&D argued that the SRR Report and any testimony relating thereto should be barred because the report methodology was flawed in that it used information after the target valuation date in forming the valuation. At the August 22, 2018 hearing on the Motion *in Limine*, TRG argued that this was an eleventh-hour attempt to discredit a report that had been on file since August 2017. TRG further argued that F&D only produced a rebuttal report a month prior to the Trial and, when questioned by TRG, the author of the rebuttal report withdrew his critique of the SRR Report. F&D, therefore, had no rebuttal evidence.

When pressed by the court to define the statutory basis for the Motion *in Limine*, F&D asserted its objection was under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). F&D argued that the SRR Report did not assist the trier of fact. The court did not agree. The court ruled that *Daubert* allowed hypotheticals by experts in appropriate circumstances. "Where an expert's hypothetical explanation of the possible or probable causes of an event would aid the jury in its deliberations, that testimony satisfies *Daubert*'s relevancy requirement." *Smith v. Ford Motor Co.*, 215 F.3d 713,718-19 (7th Cir. 2000) (*citing to Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 589-90 (7th Cir. 2000)). The court further found that in this case the hypotheticals were supported by the actual facts of later sales, *Daubert*, 509 U.S. at 590 ("Proposed testimony must be supported by appropriate validation—*i.e.*, 'good grounds,' based on what is known."), and thus the court could assess the SRR Report's methodology when used at the Trial.

One TRG exhibit was excluded from the record based on an in-court objection. The court sustained F&D's objection to TRG's use of its Exhibit No. 129, Outline of Possible Defenses for a Subdivision Bond Surety. Tr. at pp. 143-150, Aug. 27, 2018 PM. The remainder of the TRG exhibits were admitted.

B.    F&D's Evidence

TRG voiced numerous relevance and foundation objections to F&D's evidence in the Pretrial Statement, each of which were resolved by the court at the outset of the Trial in the same manner as the rulings detailed above. TRG also objected to F&D's Exhibit Nos. 48-53 under Federal Rules of Evidence 702 and 703. Pretrial Stmt., Exh. D-2. F&D's Exhibit No. 48 was the only of these exhibits actually used by F&D in the Trial and was used by F&D solely to provide credentials for Brian Barry ("Barry"). For that purpose, it is therefore admitted and deemed relevant. Otherwise, F&D's Exhibit Nos. 48-53 are not relevant because they were not used in the Trial and are not, therefore, considered herein.

With respect to witnesses, at the hearing on the Motion *in Limine* the parties noted that Barry, F&D's rebuttal expert, was not included on F&D's witness list. Pretrial Stmt., Exh. C-2. F&D suggested amending that list by oral motion, but the court advised the parties that it would not determine the propriety of an amendment to F&D's witness list raised orally. F&D therefore

thereafter filed its Motion of Fidelity and Deposit Company of Maryland to Amend Schedule C-2 to Pre-Trial Statement to Add Brian Barry as a Witness [Dkt. No. 4265] (the "Motion to Amend"), but inexplicably scheduled the hearing on the Motion to Amend for a date after the scheduled close of the Trial.

The issue of Barry's testimony, therefore, remained unresolved at the beginning of the Trial. Over the course of the first few days of the Trial, however, it became evident that a further day of Trial was necessary, and the court thus scheduled the Motion to Amend to be briefed before the additional day of testimony.

F&D argued in the Motion to Amend that the omission of Barry from F&D's witness list was an oversight. TRG argued, in turn, that under Federal Rule of Evidence 702 and *Daubert*, Barry should not be allowed to testify. The court also found little or no prejudice to TRG, as this is the ultimate issue for the Trial and TRG should have known and prepared for the fact that this was an oversight. The court may weigh relevance of any alleged expert testimony under *Daubert* much the same way as it does relevance generally and thus the court granted the Motion to Amend, allowing Barry to testify at the last day of Trial. Order Allowing Amendment of Pretrial Statement [Dkt. No. 4275].

## FINDINGS OF FACT[1]

Most of the relevant history has been set forth in detail in the Violation Decision, 565 B.R. at 883-88, which is incorporated by reference into this Memorandum Decision. From the consideration of the Motion, the documents listed in the procedural history, and the evidence presented at the Trial, the court further finds that:

(1)  Kimball Hill, Inc. ("Kimball Hill" and together with its affiliates, "KHI") purchased land in the Elgin, Montgomery, Sugar Grove, Yorkville and Shorewood, Illinois (the "Municipalities") to develop for residential use. Pretrial Stmt., Exh. A [Dkt. No. 4259-1] (the "Undisputed Facts"), at ¶ 3.

(2)  To secure KHI's performance on obligations due to the Municipalities under annexation agreements (the "Annexation Agreements"), KHI obtained bonds (the "Performance Bonds") issued by F&D. *Id.*

(3)  Mr. Cornelius F. Riordan ("Riordan") represents F&D with respect to all matters related to sureties issued by F&D in the Chicago region, including the Performance Bonds. Undisputed Facts, at ¶ 1.

---

[1]  To the extent that any of the findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any of the conclusions of law constitute findings of fact, they are adopted as such. Adjudicative facts may also be found and determined later in this Memorandum Decision.

A.    Neumann Homes, Inc.

(4)    Riordan represented F&D with respect to bonds issued to the debtor in the *Neumann Homes* case, previously pending in this court. *In re Neumann Homes, Inc.*, Dkt. No. 57, Case No. 07bk20412 (Bankr. N.D. Ill. filed Nov. 1, 2007) (Wedoff, J.).

(5)    In *Neumann Homes*, the court approved the sale of real property under section 363(f) of the Bankruptcy Code, free and clear of liens. *Neumann Homes*, Dkt. No. 678. The purchaser of that property sought the inclusion of the following language: "For the avoidance of doubt, the Assumed Liabilities do not include any obligations or liabilities of any bonding company or surety in respect of the Assets, including, without limitation, any such obligations or liabilities related to public improvements thereon required to be made or paid for by any such bonding company or surety under applicable law." *Id.* at Dkt. No. 687. F&D, through Riordan, objected to the language, arguing that the purchaser was liable for the improvement requirements that F&D had provided bonds for. *Id.* at Dkt. No. 698. The court overruled F&D's objection and included the purchaser's requested language in the sale order. *Id.* at Dkt. No. 722.

(6)    F&D never pursued the purchaser of real property in the *Neumann Homes* case. Tr. at p. 52, Aug. 27, 2018 PM.

B.    F&D's Claims

(7)    On April 23, 2008, eight days after Judge Wedoff overruled F&D's objection in *Neumann Homes*, KHI filed for bankruptcy relief. Voluntary Petition [Dkt. No. 1].

(8)    F&D, through Riordan, participated in the KHI bankruptcy case from the beginning, Appearance [Dkt. No. 118], including filing claims against several KHI debtors. Violation Decision, 565 B.R. at 884-87.

(9)    After multiple rounds of claim objections[2], the court determined the amount of F&D's claims and granted it one general unsecured claim against KHI in the amount of $422,229.56 on November 15, 2013. Order Allowing Claim No. 1636 Asserted by Fidelity & Deposit Co. of Maryland [Dkt. No. 3642]. The court's order clarifies that such determination was without prejudice to F&D's ability to seek relief under section 502(j) of the Bankruptcy Code, which entitles sureties to apply for increased costs. *Id.*

(10)   F&D has not applied to this court to increase its claim for any costs after November 15, 2013.

---

[2]    The details of the rounds of objections, all of which F&D responded to and even appealed, unsuccessfully, are set forth in the Violation Decision. 565 B.R. at 886-87.

C.    Sale to TRG

(11)    On March 12, 2009, the court entered an order confirming KHI's plan of
reorganization (the "Plan"). Findings of Fact, Conclusions of Law, and Order
Confirming Joint Plan of Kimball Hill, Inc. and its Debtor Subsidiaries Pursuant to
Chapter 11 of the United States Bankruptcy Code [Dkt. No. 1118] (the
"Confirmation Order"). F&D voted in favor if the Plan and made no attempt to
clarify any language as it had requested in the *Neumann Homes* case.

(12)    The Plan provided for KHI to transfer all right, title and interest in property to the
KHI Liquidation Trust "free and clear of any and all liens, claims, encumbrances and
interests (legal, beneficial or otherwise) of all other entities to the maximum extent
contemplated by and permissible under section 1141(c) of the Bankruptcy Code."
Conf. Order, at ¶¶ 11, 26, 59. The Plan and the Confirmation Order also discharged
and released all claims of parties that voted in favor of the Plan as against the
Debtors and specific parties, and instituted an injunction against the prosecution of
such claims or interests that were addressed in the Plan. Plan, at VIII.E, VIII.F;
Confirmation Order, at ¶ 19(b), (d); Violation Decision, 565 B.R. at 884-85.

(13)    On December 7, 2009, the KHI Liquidation Trust sold real property to JNI, LLC.
The real property consisted of (i) Neighborhoods 1 through 5 in the Waterford
Subdivision located in Elgin, Illinois (the "Elgin Property"), (ii) the Whispering
Meadows Subdivision located in Yorkville, Illinois (the "Yorkville Property"), (iii) the
Huntington Chase Subdivision located in Montgomery, Illinois (the "Montgomery
Property"), (iv) the Edgewater Subdivision located in Shorewood, Illinois (the
"Shorewood Property"), and (v) the Settlers Ridge Subdivision located in Sugar
Grove, Illinois (the "Sugar Grove Property" and, collectively with the Elgin
Property, the Yorkville Property, the Montgomery Property and the Shorewood
Property, the "Property"). Undisputed Facts, at ¶¶ 3, 20.

(14)    On April 27, 2010, JNI assigned all of its right, title and interest in the Property to
TRG. *Id.* at ¶ 21. This assignment was pursuant to a purchase agreement wherein
TRG paid $5,500,000.00 for the Property. *Id.* at ¶ 76.

(15)    As successor owner to estate property, TRG thus received the protections set forth
in the Confirmation Order. Violation Decision, 565 B.R. at 898.

D.    State Court Lawsuits

(16)    Starting in April 2009, certain Municipalities began to seek relief from the automatic
stay protecting KHI to pursue surety liability for KHI's obligations under the
Annexation Agreements. *Id.* at ¶ 27.

(17)    Following negotiations between the KHI Liquidating Trust, F&D and the
Municipalities, in April 2010, stipulations were approved by the court with respect to
the Montgomery Property, the Sugar Grove Property and the Yorkville Property (the
"Stipulations"). The Stipulations were each in substantially the same form and each

modified the stay in a limited respect by allowing the Municipalities to "declare KHI in default and establish liability, if any, against KHI under the Annexation Agreement for the sole purpose of recovering against the proceeds of the Performance Bonds, if any." *Id.* at ¶ 29.

(18)   The Stipulations provided that if a surety satisfied any portion of a Municipality's claim, the Municipality was to assign its claim in this case to the surety "in an amount equal to the payment(s) made by such Surety in discharge of its obligations under the Bonds" and that a surety also waived "any and all of its remaining claims [filed in this case] to the extent not assigned to the Surety.  For the avoidance of doubt, a Surety may succeed to the [Municipality's] rights in [its claim] solely to the extent the Surety satisfies any portion of the [Municipality claim] pursuant to the Bond; *provided, however, under no circumstances may a Surety obtain a double recovery on account of*" its own claims against the Debtor and the claim of the Municipality that was assigned to the surety.  *See* Stipulation and Agreed Order for Modification of Plan Injunction [Dkt. No. 2365] (for the Sugar Grove Property) (emphasis added).

(19)   Riordan signed the Stipulations on behalf of F&D.  Undisputed Facts, at ¶ 30.

(20)   As permitted under the Stipulations, the Municipalities commenced lawsuits against F&D.  These actions are:
   a.  *City of Elgin v. Fidelity & Dep. Co. of Maryland*, Case No. 12-MR-53, pending in the Circuit Court of Kane County, Illinois (the "Elgin Litigation");
   b.  *Village of Montgomery v. Fidelity & Dep. Co. of Maryland*, pending in the Circuit Court of Kane County, Illinois, 10-MR-598 (the "Montgomery Litigation");
   c.  *Village of Sugar Grove v. Fidelity & Dep. Co. of Maryland*, pending in the Circuit Court of Kane County, Illinois, Case No. 10-MR-597 (the "Sugar Grove Litigation");
   d.  *United City of Yorkville v. Fidelity & Dep. Co. of Maryland*, Case Nos. 2014-MR-90 and 2011-L-30, each pending in the Circuit Court of Kendall County, Illinois, (collectively, the "Yorkville Litigation"); and
   e.  *Village of Shorewood v. Fidelity & Dep. Co. of Maryland*, Case No. 2014 L 471, pending in the Circuit Court of Will County, Illinois, (the "Shorewood Litigation" and, collectively with the Elgin Litigation, the Montgomery Litigation, the Sugar Grove Litigation and the Yorkville Litigation, the "State Court Lawsuits").
Undisputed Facts, at ¶ 38.

(21)   Riordan worked with F&D's in-house counsel, Greg Kilburn and other F&D representatives on the KHI case (the "F&D Litigation Committee").  Undisputed Facts, at ¶ 40.  At a meeting in July 2011, the F&D Litigation Committee agreed to pursue the same goal as it had in *Neumann Homes* by attempting to recover from purchasers of property from bankruptcy estates.  Tr. at pp. 77-78, Aug. 27, 2018 AM; *Id.* at ¶ 41.

(22)   The F&D Litigation Committee agreed that pursuing purchasers was a "unique" and "one of a kind" suit.  Undisputed Facts, at ¶ 46.

(23)     This litigation strategy was pursued by the F&D Litigation Committee to gather information to clarify costing surety obligations for F&D in Illinois. Tr. at pp. 126-28, Aug. 27, 2018 PM.

(24)     On August 9, 2011, F&D sent TRG a demand letter, demanding that TRG post replacement bonds for the Performance Bonds and that the same was due under the Annexation Agreements. Damages Stmt., Exh. No. 1-A (the "Demand Letter"). It does not appear that TRG obtained bonds to replace the Performance Bonds.

(25)     Between August 2011 and December 2014, F&D filed counterclaims or third-party complaints against TRG in each of the State Court Lawsuits, asserting that TRG was liable to F&D under theories of indemnity, exoneration, *quia timet* and unjust enrichment, citing the Bonds and the Annexation Agreements as the legal basis for F&D's arguments. *Id.* at ¶ 49.

(26)     Arch Insurance Company ("Arch") also filed a third-party complaint against KHI in the Elgin Litigation. *Id.* at ¶ 53.

(27)     TRG successfully obtained dismissals of the counterclaims in all of the State Court Lawsuits. *Id.* at ¶¶ 54, 58, 61, 66, 72.

(28)     Arch did not appeal the dismissal of TRG. *Id.* at ¶ 53.

(29)     F&D appealed the dismissals of TRG and was largely unsuccessful until February 2016, when the Illinois Appellate court reversed in part and affirmed in part the dismissal in the Elgin Litigation. *City of Elgin v. Arch Ins. Co.*, 53 N.E.3d 31 (Ill. App. Ct. 2015), *appeal denied*, 60 N.E.3d 871 (Ill. 2016) (the "Elgin Decision"). Based on the Elgin Decision, a different division of the Illinois Appellate court ruled in the same way in F&D's appeal in the Montgomery Litigation. *Vill. of Montgomery v. Fid. & Deposit Co. of Maryland*, 2016 IL App (2d) 150571-U (Ill. App. Ct. 2016), *appeal denied*, 65 N.E.3d 847 (Ill. 2016).

(30)     The Elgin Decision affirms dismissal of F&D's claims against TRG for exoneration based on the Performance Bonds and for *quia timet*. As for F&D's claims for indemnity and unjust enrichment, the state appellate court found that these claims "were sufficiently pled." Elgin Decision, 53 N.E. at 43. The *Elgin* court, however, found that the ultimate issue of TRG's liability, as current owner of record, was not before it and therefore made "no final determination of that liability." *Id.* at 40.

(31)     F&D had never before sued a purchaser of property from a bankruptcy estate. Tr. at p. 27, Aug. 27, 2018 AM.

(32)     No other surety other than F&D and Arch pursued TRG with respect to the Property. Undisputed Facts, at ¶ 75.

E.    The Motion

    (33)    Based on the Elgin Decision, TRG filed the Motion in June 2016. Tr. at p. 31, Aug. 29, 2018 PM.

    (34)    F&D has repeatedly expressed that it believes the Elgin Decision vindicates its efforts and that it will appeal the court's prior Violation Decision and all rulings on the Motion. Tr. at p. 132, Aug. 27, 2018 PM.

F.    The Property

    (35)    TRG sold one model home in the Sugar Grove Property in April 2011. Damages Stmt., Exh. 1 [Dkt. No. 4188-1] (the "Kyte Affidavit"), at ¶ 31.

    (36)    No other commercially reasonable offers to purchase the Property had been tendered to TRG until the court delivered its December 2016 oral ruling, later memorialized in the Violation Decision. Kyte Affid., at ¶ 33.

    (37)    In May 2017, TRG entered into a development agreement with respect to the Shorewood Property that enabled TRG to offer the Shorewood Property. Undisputed Facts, at ¶ 93.

    (38)    On October 19, 2017, TRG entered into an Agreement of Purchase and Sale for the purchase of 51 lots in the Shorewood Property. The total sale will be for $2,602,000.00. *Id.* at ¶ 95.

    (39)    On January 24, 2018, TRG entered into another Agreement of Purchase and Sale for the purchase of 47 lots in the Montgomery Property. The total sale will be for $2,326,500.00. *Id.* at ¶ 96.

## DISCUSSION

    The primary method of enforcing an injunction, such as that contained in the Confirmation Order, is contempt, and contempt in instances such as those at bar leads to damages. "Damages are a recognized sanction for contempt." *Costa v. Welch (In re Costa)*, 172 B.R. 954, 963 (Bankr. E.D. Cal. 1994). Having previously determined that F&D's actions in the matter at bar violated the express provisions of the Plan (to which F&D had acceded) and thereby the court's Confirmation Order effectuating the Plan, Violation Decision, 565 B.R. at 902, F&D has been found to be in contempt of the Confirmation Order and the question before the court is narrowed to whether and if so to what extent damages are appropriate.

    In the Motion TRG asserts that it has suffered over $30 million in actual damages, yet does not seek the full measure of such alleged damages here. Instead TRG seeks $9,539,690.00 for damages from August 9, 2011, the date of the Demand Letter, to August 2, 2017. This amount is comprised of $1,263,008.00 in legal fees (the "Legal Fees"), $194,300.00 in consultant fees (the "Consultant Fees"), $362,382.00 in project/construction management fees (the "Project Management Fees") and $7,720,000.00 in lost property value (the "Property Value"). TRG further seeks $31,500,00.00 in punitive damages (the "Punitive Damages").

Considering these requests in light of what was shown at the Trial, the court first examines how damages for violations of court ordered injunctions are awardable. Second, the court considers whether F&D's actions form the basis for damages. Third, the court considers whether TRG had a duty to mitigate any such damages. The court then seeks to define the time period for which damages under the Motion might apply. The court will finally examine each of the categories of damages requested by TRG.

## A. Damages Stemming from Court Order

The Motion seeks contempt damages under section 105 of the Bankruptcy Code. The contempt giving rise to the damages sought stems from the violation of this court's Confirmation Order and the injunction contained therein. Violation Decision, 565 B.R. at 885. The majority of cases cited by the parties, however, address the court's ability to award or limitations in awarding sanctions based on violations of the automatic stay or the injunction contained in a bankruptcy discharge order, neither of which is directly applicable here.

The bankruptcy court does have civil contempt power, not only statutorily in section 105 of the Bankruptcy Code, but inherently. "A court's civil contempt power rests in its inherent limited authority to enforce compliance with court orders and ensure judicial proceedings are conducted in an orderly manner." *Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 737 (7th Cir. 1999); *see also In re Castle Home Builders, Inc.*, 520 B.R. 98, 106 (Bankr. N.D. Ill. 2014) (Cox, J.) ("The [Bankruptcy Court] Court is empowered by 11 U.S.C. § 105 to ensure compliance with the terms of its orders."). This power is not without limits.

"Civil contempt proceedings are coercive and remedial, but not punitive, in nature and sanctions for civil contempt are designed to compel the contemnor into compliance with an existing court order or to compensate the complainant for losses sustained as a result of the contumacy." *Jones*, 188 F.3d at 738 (*citing Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 826-28 (1994)). Damages awarded from civil contempt are therefore either coercive in an attempt to push a violating party into compliance with a court order, or remedial in an attempt to restore losses from a violation of a court order. *Jones*, 188 F.3d at 738. Regardless of the nature of the award, the sanction must relate to or have been caused by a violation of a court order. *Id.*

Without ruling on the ability of the bankruptcy court to issue punitive sanctions under section 105 of the Bankruptcy Code, the Seventh Circuit has cautioned bankruptcy courts against issuing punitive sanctions except where specifically authorized by statute.[3] "Since punitive damages are—punitive, and it is punitive purpose that distinguishes criminal from civil contempt, section 362(h) implies that bankruptcy judges do have some criminal contempt power; but there is no corresponding grant of power in section 524 and the omission may have been deliberate. We can save the issue of the bankruptcy judges' criminal-contempt powers for another day, however." *Cox v. Zale Delaware, Inc.*, 239 F.3d 910, 917 (7th Cir. 2001).

The Seventh Circuit has provided some guidance on when criminal contempt may be available where not otherwise expressly authorized. In the context of a violation of the discharge

---

[3]     *See, e.g.*, 11 U.S.C. § 362(k)(1) ("[A]n individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.").

injunction, it stated that "[t]he victim … might even be able to obtain punitive damages, though presumably only if he could prove criminal contempt, since punishment is the purpose of criminal but not of civil contempt." *Id.* at 916 (internal citations omitted). The Motion, however, does not seek redress of a violation of an injunction created by statute, and TRG has made no attempt to satisfy the predicates for criminal contempt.

Absent that, the bankruptcy court is not empowered to issue the punitive damages TRG seeks. No such express language was included by Congress in section 105 of the Bankruptcy Code and section 362 is not applicable here. *See Capriati Constr. Corp. v. SPER, Inc. (In re Capriati Constr. Corp.)*, Case No. BAP NV-17-1200-BHTA, 2018 WL 1404439, at *7-8 (B.A.P. 9th Cir. Mar. 20, 2018) (distinguishing between the applicability of sections 362(k) and 105 with respect to pre and postconfirmation actions against assets of corporate debtor).

TRG may not, therefore, be awarded the punitive damages it seeks. Though this may be a case that would warrant an award of punitive damages if the criminal contempt standards were met, the court need not consider the propriety of punitive damages as an award of such damages has not been shown. Further, there has been no showing of a need to coerce compliance with this court's orders. TRG's request for the Punitive Damages is therefore denied.

TRG may, however, be awarded reasonable, actual damages if it demonstrates that such damages were caused by F&D's violation of the Confirmation Order.

B.   Causation

In its Closing, F&D argues that no damages should be awarded because TRG has not demonstrated that its damages were caused by F&D's pursuit of TRG in the State Court Lawsuits. F&D's Closing, at p. 12. There is, however, sufficient evidence in this case of the State Court Lawsuits' effect on the ability of TRG to sell the Property.

TRG has detailed its efforts to sell the Property while F&D pursued TRG in the State Court Lawsuits. Peter Kyte, the manager of TRG ("Kyte"), set forth TRG's efforts to sell the Property in his affidavit in support of TRG's damages request and in his testimony at the Trial. Kyte Affid., at ¶¶ 30-37; Tr. at pp. 44-62, Aug. 29, 2018 PM. Kyte had numerous meeting with possible purchasers of the Property from 2011 to the time of the Trial. Tr. at p. 44, Aug. 29, 2018 PM. The only time that TRG received commercially reasonable offers was in 2014 after TRG had succeeded in obtaining dismissals in the State Court Lawsuits. *Id.* at pp. 48-49. Those offers fell through when F&D appealed the dismissals. TRG was unable to consummate the sale agreements as it could not represent that there was no pending surety litigation with respect to the Property. *Id.* at p. 49. In contrast, following the Violation Decision, TRG entered into two sale agreements with respect to part of the Property. These agreements, however, contain provisions requiring the establishment of escrows to account for F&D's possible pursuit of the buyer. *Id.* at pp. 58-61.

Litigation regarding real property unquestionably clouds title and affects the ability of an owner to sell such real property. When litigation asserts claims such as those asserted here, substantial claims that F&D argues run with the real property, the connection between the litigation and the marketability of the real property is not difficult to demonstrate. For example, title insurers customarily search for pending litigation. If litigation is pending, title insurers may not issue

insurance as they will be bound to cover the claims therein. *See Radovanov v. Land Title Co. of Am.*, 545 N.E.2d 351, 355 (Ill. App. Ct. 1989).

Even if title insurance can be obtained, or in the odd event it is not necessary, a purchaser is unlikely to close on a purchase when such closings routinely require a showing that liability arising from judgments pertaining to the property has been discharged. *See Reinbold v. Thorpe (In re Thorpe)*, 546 B.R. 172, 186 (Bankr. C.D. Ill. 2016), *aff'd*, 569 B.R. 310 (C.D. Ill. 2017), *aff'd*, 881 F.3d 536 (7th Cir. 2018), *reh'g denied* (7th Cir. Feb. 21, 2018). "When facts or circumstances are present that create doubt, raise suspicions, or engender uncertainty about the true state of title to the real estate, the transferee is not permitted to turn a blind eye but is, instead, required to investigate further. If he fails to make further inquiry, he will nevertheless be charged with notice of additional facts that may have been discovered by diligent inquiry. ... Such a purchaser is placed on inquiry notice when facts revealed in the title search process would cause a reasonable person to think twice about completing the transaction." *Id.* at 185.

The evidence and case law establish that during the pendency of F&D's claims against TRG and the Property, TRG's sale efforts have been frustrated. As a result, TRG has been required to maintain the unsold Property, which takes coordination and results in costs. The State Court Lawsuits have affected TRG's ability to sell the Property and thereby the value of the Property. It is also clear that the State Court Lawsuits caused TRG to incur legal fees.

TRG thus has sufficiently shown the causal link between F&D's actions and damages— which damages are considered individually below. F&D's objection that its actions have caused no damages is, therefore, not well taken.

F&D has asserted other arguments that are also not well taken.

First, F&D argues that damages are not appropriate because F&D did not have the requisite intent in violating the Confirmation Order. F&D's Closing, at pp. 4-9. The court has already ruled on this argument. "F&D cannot contest that by deliberately interpleading TRG into the State Court Lawsuits it intended an act that may violate the Plan Injunction. There is no question that the act of commencing or continuing the State Court Lawsuits falls within the proscribed actions in the Plan Injunction, provided the claims asserted in the State Court Lawsuits by F&D against TRG are within the scope of the same. Plan, at VIII.F; Confirmation Order, at ¶ 19(d)." Violation Decision, 565 B.R. at 896. This argument remains unconvincing here.

Second, F&D argues that damages are not appropriate because TRG and its partner SunCal Companies were testing their business model. TRG's business model is not relevant as to whether F&D's actions in the State Court Lawsuits caused damages. The evidence, in fact, demonstrates clearly that if any party was testing the waters, it was F&D. F&D has had numerous dismissals of its theories by this and other courts, yet it has continued its efforts against purchasers of KHI property. Despite F&D's assertions that it has been vindicated by the appellate court rulings, neither the Elgin Decision nor the case which relies on its logic rules on the propriety of F&D's theory, rather they merely provide that half of F&D's claims are "sufficiently pled." Nothing in either decision reaches the issues addressed by this court in the Violation Decision and here today. F&D cannot for these reasons escape liability for damages stemming from its pursuit of TRG.

Third, F&D asserts that the fact that Yorkville sued TRG proves that F&D's litigation strategy is well taken. F&D's Closing, at p. 16. This argument, of course, belies the fact that Bart Olsen, the city administrator for Yorkville, testified that Yorkville's arguments against TRG were not well taken in the state court. Tr. at pp. 63-68, Sept. 18, 2018 PM. Even if Yorkville had somehow been successful, just as F&D looked to place blame on other parties in the above argument, it is unclear how Yorkville's decision-making has any bearing on the propriety of F&D's litigation strategy.

Fourth, F&D argues that TRG has not yet sold other property it has purchased on which F&D does not have bonds. While this fact could have some limited implications here, by the very nature of real property each parcel is unique. F&D has not shown how this fact is meaningful to the sale of the Property at issue here.

Last, F&D argues that TRG has suffered no damages. F&D's Closing, at pp. 19-20. Using valuations of the Property provided by TRG's SRR Report (which F&D concedes are in line with the values of recent sales), F&D estimates that TRG will realize $17,205,821.00 from the sale of the Property. *Id.*, Exh. B. After deducting the $5,560,000.00 that TRG paid in 2010 for the Property, F&D concludes that TRG will profit from the sale and therefore TRG has suffered no damages.

The problem with this theory is that it does not account for many other factors—including the costs expended by TRG from 2010 to the present and how and if a reduced profit might nonetheless be quantifiable as damages. Kyte Affid., Exh G [Dkt. No. 4188-28] (the "TRG Costs Summary"). TRG has expended a total of $12,013,438.00 as of July 2017. There could be even more expenses beyond this sum as the Property remains unsold at the present, another 18 months beyond July 2017.

F&D's arguments that there are no damages are not well supported and do not serve to overcome TRG's showing of damages.

C.    Mitigation and Scope of Damages

F&D further argues that damages should not begin to accrue until TRG sought relief from this court as TRG chose to pursue dismissal of the State Court Lawsuits when it could have sought relief from this court earlier. F&D argues that it should not be responsible for TRG's litigation choices, choices which TRG should have known it had as TRG claims to have relied on the Confirmation Order when determining whether to purchase the Property. In other words, F&D argues that TRG has failed to mitigate its damages.

Illinois law applies here as TRG's claims are based on the terms of the Plan and chapter 11 plans are contracts between the debtor and its creditor, subject to the law of the state in which the plan was confirmed. *Miller v. United States (In re Miller)*, 253 B.R. 455, 458 (Bankr. N.D. Cal. 2000), *aff'd*, 284 B.R. 121 (N.D. Cal. 2002). Further, the Plan provides for such. *See* Plan, at XV.J; Violation Decision, 565 B.R. at 888.[4] "[U]nder Illinois law, 'the duty to mitigate damages does not arise until the party upon whom the duty is impressed is aware of facts which make the duty to mitigate necessary.'" *Straits Fin. LLC v. Ten Sleep Cattle Co.*, 900 F.3d 359, 375 (7th Cir. 2018), *reh'g*

---

[4]    *See also In re Heartland Steel, Inc.*, 389 F.3d 741, 745 (7th Cir. 2004) (finding a chapter 11 plan to be a contract and applying state law when the confirmed plan contained language similar to the Plan here).

*and suggestion for reh'g en banc denied* (Sept. 12, 2018) (*citing Cont'l Concrete Pipe Corp. v. Century Rd. Builders, Inc.*, 552 N.E.2d 1032, 1042 (Ill. App. Ct. 1990)). True, parties seeking damages are expected to have taken reasonable action when learning that relief in their favor is available, but the parties will not lose the benefit of those later remedies "simply because better precautions on their part might have avoided the fraud or ended it sooner, which is often the case, especially with a court's benefit of hindsight." *Straits Fin. LLC*, 900 F.3d at 375.

TRG's duty to mitigate thus arose when it became aware of the facts which made such duty necessary—when it became aware that it had remedies in the bankruptcy court superior to those which it had been successfully invoking in the state court. Kyte testified under penalty of perjury that he did not know of the bankruptcy court as an available source of relief until he consulted additional counsel following the Elgin Decision. Tr. at p. 31, Aug. 29, 2018 PM. Kyte's testimony was not controverted by other evidence. The court found Kyte to be credible and accepts this testimony as truthful. TRG therefore did not know of its bankruptcy remedies until it was advised of the same—sometime between February 2016 when the Elgin Decision was issued and June 2016 when the Motion was filed. No duty to mitigate arose prior to that point.

Further, TRG had no need for those remedies prior to the issuance of the Elgin Decision. All parties agree that TRG was repeatedly successful in obtaining dismissals from the State Court Lawsuits. There is little reason for a party to change a tactic when that tactic proves to be successful. Once it proved not to be, TRG promptly changed course. The court finds that TRG's dismissal efforts in the State Court Lawsuits were reasonable and sees no reduction based on F&D's mitigation theory as appropriate here.

In the Damages Statement TRG seeks damages from the date of the Demand Letter to August 2, 2017. As the court has already concluded that the State Court Lawsuits are the proximate cause of TRG's damages, it follows that the earliest in which TRG may seeks damages is the commencement of the State Court Lawsuits. Here that began with the Demand Letter. Absent a reason to the contrary, TRG's request for damages starting on the date TRG received the Demand Letter is well taken.

At the Trial, TRG increased its request, asking for additional legal fees, consultant fees and project management fees from August 2, 2017 to July 30, 2018. No increase was sought for additional lost property value. No evidence was submitted to support the additional damages; therefore, the court will not rule on the increase in damages requested by TRG.

As a result, the court finds that the scope of the Motion allows TRG to recover damages from date of the Demand Letter, August 9, 2011, to August 2, 2017.

D.    <u>Damages</u>

What remains is to quantify TRG's damages. As stated above, the court may award compensatory damages under its civil contempt powers. *Jones*, 188 F.3d at 738. As one court has stated, "various forms of compensatory damages may be awarded; attorneys' fees; litigation costs; travel expenses; other actual losses, such as wages or business income … ." *In re Haemmerle*, 529 B.R. 17, 26 (Bankr. E.D.N.Y. 2015) (collecting cases to support each category of damages).

The categories of nonpunitive damages asserted by TRG are Legal Fees, Consultant Fees, Project Management Fees and Property Value. These categories are somewhat helpful in allowing the court to understand the subject of the expenses incurred by TRG according to business categories, but the court also finds it necessary to distinguish between expenses incurred by TRG related to F&D's actions in the State Court Lawsuits and expenses incurred related to the Motion and TRG's efforts in this court.

The court makes this distinction because the type of damages and thus the standard for review is different. The expenses TRG has incurred in the former category—expenses related to the State Court Lawsuits—are actual damages that TRG has already paid for based on F&D's actions outside of this court. The expenses in the latter category—expenses related to the Motion—are attorney's fees of a party successful in and relating to a matter before the court, and thus would generally be subject to the American Rule.[5] One exception to the general rule is in "civil contempt action occasioned by willful disobedience of a court order." *Walker v. Columbia Broadcasting System, Inc.*, 443 F.2d 33, 35 (7th Cir. 1971). Because, as discussed below, such fees are damages but are nonetheless fees of a successful party, Legal Fees are addressed in two separate sections.

1.    *Actual Damages Incurred in, Related to or as a Direct Result of the State Court Lawsuits*

Sanctions imposed for civil contempt violations are to compensate TRG for actual losses sustained. "Where compensation is intended, a fine is imposed, payable to the complainant. Such fine must of course be based upon evidence of complainant's actual loss." *United Mine Workers of Am.*, 330 U.S. at 304. Evidence must support the court's finding that the loss compensated was definite in amount and that such amount was reasonable. *Allied Materials Corp. v. Superior Prod. Co.*, 620 F.2d 224, 227 (10th Cir. 1980).

> 'A party seeking damages must prove them using methodologies that need not be intellectually sophisticated.' *In re Vazquez*, 221 B.R. 222, 228 (Bankr. N.D. Ill. 1998) (*citing Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 415 (7th Cir. 1992)). However, the amount requested must be based on evidence rather than mere speculation or guesswork. *Vazquez*, at 228 (internal citation omitted).

*Castle Home Builders, Inc.*, 520 B.R. at 106.

TRG alleges that it has incurred actual losses related to the State Court Lawsuits in the form of Legal Fees and damages to or arising out of the Property itself. The court reviews these categories of actual damages to determine if such loss was definite and reasonable.

a.    <u>Legal Fees Related to State Court Lawsuits</u>

TRG's evidentiary support for compensation for legal fees consists of over 1,000 pages of invoices and affidavits attached to the Damages Statement. The law firms assisting TRG have

---

[5]    The "American Rule" with regard to attorneys' fees holds that "[e]ach litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise." *Baker Botts L.L.P. v. ASARCO LLC*, 135 S. Ct. 2158, 2164 (2015).

mostly focused their efforts on either legal issues stemming from F&D's actions in the state court or those involved in prosecuting the Motion, but some law firms worked on both.

F&D has presented no evidence to counter TRG's showing. Instead, it raises the objections previously considered herein and challenges the reasonableness of damages. In its Closing, F&D notes briefly that multiple law firms are included in TRG's request though only one worked directly on the State Court Lawsuits and that "allowance for such [fees], if any, as damages, must be only [for] those determined as 'reasonable and necessary' upon the court's review." F&D's Closing, at p. 24. As a result, the court will consider legal fees incurred by TRG in connection with the State Court Lawsuits in accordance with the definite and reasonable standard articulated above.

TRG seeks damages of $528,329.47 in compensation and $16,417.61 in expenses for costs incurred by the law firm of Duane Morris LLP ("Duane") working on the State Court Lawsuits. Damages Stmt., Exh. F, at ¶ 13. Duane's time entries span from November 2011 to February 2017 and are broken down into color categories based on relation to F&D's violations. Kyte testified in his Affidavit and at the Trial that Duane successfully obtained numerous dismissals of F&D's third-party complaints against TRG. Kyte Affid., at ¶¶ 38-40; Tr. at pp. 28-31, Aug. 29, 2018 PM. Duane did so by filing motions to dismiss in each of the State Court Lawsuits. Tr. at pp. 28-29, Aug. 29, 2018 PM. The court has already found this litigation strategy was successful and reasonable. The amounts of Duane's efforts for which TRG seeks reimbursement are also definite and supported by over 800 pages of invoices. Damages Stmt., Exh. F. The court has reviewed those invoices and has found no instance where TRG seeks reimbursement for work unreasonably performed. TRG is thus entitled to be compensated for the amounts paid to Duane in defending TRG in the State Court Lawsuits as actual damages.

TRG has also paid the law firm of Freeborn & Peters LLP ("Freeborn"). Damages Stmt., Exh. B, at ¶ 15. The court has reviewed the Freeborn invoices and, while some of the work performed related appears to relate to researching bankruptcy court remedies and is dealt with below under standards thus applicable, the more recent legal fees relate to Freeborn's counseling TRG with respect to the unique contractual provisions in the sale agreements due to the State Court Lawsuits. The invoices of Freeborn paid by TRG are detailed and definite and the work done to sell the Property in light of the still remaining State Court Lawsuits appears reasonable and necessary as a result of and in response to F&D's continued pursuit of TRG. The court sees no reason to reduce the amount of compensation TRG requests as paid to Freeborn in connection with the State Court Lawsuits. The court will determine the total award to TRG for Freeborn's work only after considering its work under the standards applicable for work performed in connection with the Motion, as set forth below.

In connection with the State Court Lawsuits, TRG also hired Michael J. Van Dyke ("Van Dyke"). VanDyke was employed at Dentons US LLP ("Dentons") from July 1999 to May 27, 2017, and subsequently at Polsinelli PC ("Polsinelli"). Damages Stmt., Exh. D. The requested compensation for VanDyke's efforts has been voluntarily adjusted to account for the August 2011 to August 2017 scope of the Motion. As it has done with other counsel, TRG has requested reimbursement for VanDyke's compensation in reduced amounts where the time entries appeared to be not entirely related to F&D's actions against TRG. TRG's requested damages for VanDyke's efforts are reasonable and appear related in time to the efforts of F&D in the State Court Lawsuits. TRG's request for compensation paid to VanDyke is well taken for work done in connection with the State Court Lawsuits. However, similar to Freeborn, VanDyke also worked on matters relating

to TRG's prosecution of the Motion. The court will make a final determination of TRG's damages incurred for VanDyke's work under the applicable standards below.

TRG alleges it has incurred over $200,000.00 in legal expenses paid to many other firms for which it does not seek compensation. Kyte Affid., at ¶ 41. Further, Duane, Freeborn and VanDyke also charged TRG additional amounts for matters related to the State Court Lawsuits to which TRG does not seek compensation. Those amounts are not before the court. Only those amounts actually sought are determined here.

The amount of Legal Fees for which TRG does seek to be compensated for as relating to the State Court Lawsuits and thus as actual damages satisfies the applicable standards and the court will award the requested Legal Fees.

### b.    Property Damages

The largest category of actual damages sought by TRG is damages relating to the Property. This is where much of the Trial and F&D's objection efforts were focused. As the court previously found, the State Court Lawsuits caused TRG to incur damages related to the Property. These damages consist of costs incurred in maintaining the Property and the lost value due to TRG's delayed ability to sell the Property.

#### i.    *Project Management Fees*

TRG alleges it has suffered actual damages in the amount of $362,382.00 for fees for the cost of managing the Property. Damages Stmt., at pp. 18-20. F&D voiced no objection or argument concerning TRG's assertion of damages in this category. The Project Management Fees are sought for 2016 and 2017, times in which the court has determined that the State Court Lawsuits prevented sales of the Property.[6] TRG has supported the request with details regarding the company hired to manage the Property, including the name of such company, the duties it performed and a monthly breakdown on TRG's Summary of Costs. Damages Stmt., Exh. G. Kyte also testified about the total paid for continued management of the Property and that the management expenses related to F&D's actions. Tr. at pp. 71-72, Aug. 29, 2018 PM. F&D did not attempt to impeach Kyte with respect to these expenses. As the court has determined that but for F&D's actions, TRG likely would have been able to sell the Property prior to TRG incurring these expenses, and thus these expenses are compensable as consequential damages. The court finds that the amounts TRG has paid for continued management of the Property in 2016 and 2017 are definite and reasonable and thus TRG will be compensated for such.

#### ii.    *Property Value*

TRG seeks damages in the amount of $7,720,000.00 for lost value of the Property resulting from the encumbrance of the Property by the State Court Lawsuits from the date of the Demand Letter. TRG relies on the SRR Report, which values the Property as of January 1, 2012 under two scenarios. Under Scenario A, all of the lots in the Property are ready for sale, have been marketed and sales commence by January 1, 2012. Under Scenario B, all of the lots in the Property are ready

---

[6]    No explanation was provided as to why TRG did not seek such expenses for the entire damages period. That omission does not, however, negate the fact that these limited expenses are compensable.

for sale by January 1, 2012, but cannot be sold until January 1, 2018. This second scenario represents the inability to sell the Property as was the case here, due to the State Court Lawsuits. The SRR Report concludes that the value of the Property under Scenario A is $9,435,000.00 and that the value of the Property under Scenario B is $1,715,000.00. The difference between these two values, the Property Value, reflects the lost value to TRG as a result of F&D's pursuit of TRG in the State Court Lawsuits.

The SRR Report was prepared by John W. VanSanten ("VanSanten") and Kari Kreiter ("Kreiter"). SRR Report, at pp. 113, 118. VanSanten is a certified general real estate appraiser (CRE) in the state of Illinois and other states and earned a designation known as "MAI" from the Appraisal Institute, which is the highest designation available to an appraiser. SRR Report, at p. 113; Tr. at pp. 101-05, Aug. 28, 2018 PM. As a CRE professional and thus in order to comply with his state license requirements, VanSanten prepared the SRR Report in accordance with the Uniform Standards of Professional Appraisal Practice (USPAP). SRR Report, at p. II. VanSanten testified at the Trial in support of the SRR Report and was accepted without objection as an expert real estate appraiser. Tr. at p. 117, Aug. 28, 2018 PM.

The SRR Report details the data and methodology used by VanSanten and Kreiter in creating it. VanSanten investigated numerous data points to determine the absorption rate for each neighborhood (the number of lots likely to sell per month), other development in the area based on new permits, availability and sales of similar, nearby developments, the absorption rate of the other developments and the disposable income of the neighborhood. Tr. at pp. 138-54, Aug. 28, 2018 PM. VanSanten then appraised the value of each lot depending on whether it was sold in January 2012 in Scenario A or if the sale and development of the lot was delayed until January 2018 in Scenario B. *Id.* at pp. 154-60. In doing so, VanSanten used the income capitalization approach— the valuation approach used by most developers in valuing real property. *Id.* at pp. 136-37.

The income capitalization approach is a method used in commercial property valuations to value a series of net cash flows, discounted to obtain the net present value. Tr. at pp. 46-51, Aug. 28, 2018 AM (testimony of Randy Teteak, a former executive of SunCal involved in the TRG purchase). It uses a discount rate in order to account for the time value of money. The SRR Report relies on actual sales data from the period of January 2011 to the date of the SRR Report to determine the sales for each scenario. Scenario A has a higher value because in Scenario A, TRG is able to sell the lots 6 years earlier than in Scenario B. This difference results in a higher net present value in Scenario A because liquidation of the investment and realization of profits occurs sooner.

VanSanten's methodology in the SRR Report is organized, clear and convincing.

At the Trial, F&D attempted to impeach VanSanten and thus discredit the SRR Report and VanSanten's conclusions therein. Despite the fact that SRR Report complied with applicable USPAP standards, F&D argued that the use of real sales numbers after January 2012, though performing a hypothetical sale on January 2012, was an error. F&D offered no alternative evidence to rebut the SRR Report.

F&D instead tendered for the first time at the Trial an advisory opinion from the Appraisal Institute. Tr. at pp. 111-13, Sept. 18, 2018 PM (establishing that the opinion was not provided to the court or the parties by F&D prior to the Trial). VanSanten was nonetheless familiar with the advisory opinion and informed the court that it dealt with prospective and retrospective appraisals.

Tr. at pp. 45-55, Aug. 29, 2018 AM. VanSanten explained his use of subsequent information on real estate taxes and sales in valuing the properties by assessing costs and how such use was appropriate in certain situations. *Id.* at pp. 45-47. This testimony was convincing.

F&D also offered the testimony of Barry to attack the conclusions in the SRR Report. Barry has a residential appraiser's license and is the sole member of the real estate valuation department for Cambridge Partners in Palatine, Illinois. Tr. at p. 90, Sept. 18, 2018 PM. Barry's testimony focused on the advisory opinion. *Id.* at pp. 111-13. He discussed the use of actual data in the SRR Report, but he did not directly offer any contradictory or rebutting testimony. Barry specifically clarified that he had no rebuttal report. *Id.* at p. 118. TRG crossed Barry with respect to his knowledge of the contents of reports as required by USPAP. *Id.* at p. 145. In so doing, TRG successfully demonstrated Barry's lack of in-depth knowledge of the same. When that occurred, Barry became argumentative with TRG's counsel and reluctant to answer questions clearly. *Id.* at pp. 149-51. Overall, Barry's testimony lacked credibility, was unconvincing and provided little assistance to the court.

In its Closing, F&D again attempts to attack the SRR Report, asserting that "[t]he use of the post valuation date information makes the fair market value as of the valuation date improper." F&D's Closing, at p. 22. The cases cited by F&D in this regard are not helpful. The first case, *Miller v. Am. Capital, Ltd. (In re New Starcom Holdings, Inc.)*, 514 B.R. 394 (Bankr. D. Del. 2014), deals with the valuation of a business in hindsight. A close examination of the case makes clear that the *Miller* court held that the use of post valuation date information was appropriate in some circumstances. *See id.* at 402-04. That runs contrary to F&D's theory that the use of such information cannot be appropriate. As the opinion dealt with business stock valuation, not standards applicable to real property, the case was otherwise unhelpful.

The second case, *First Nat'l Bank of Kenosha v. United States*, 763 F.2d 891 (7th Cir. 1985), is a tax valuation case. It goes further than *Miller* by clarifying why and how such information may be of use. As the Seventh Circuit stated therein,

> courts have not been reluctant to admit evidence of actual sales prices received for property after the date of death, so long as the sale occurred within a reasonable time after death and no intervening events drastically changed the value of the property. [collecting cases allowing for introduction of actual sales]. Moreover, evidence of actual price received for property in the estate after the date of death is generally admitted without any discussion of the rule against admission of post-valuation date events.
>
> This seeming inconsistency is explained by looking to the purposes of the rule. The rule against admission of subsequent events is, simply stated, *a rule of relevance*. In a valuation case, the question to be asked of any proffered evidence is whether the admission of the evidence would make more or less probable the proposition that the property had a certain fair market value on a given date (here, the date of death).

*Id.* at 894 (emphasis added).

The use of the additional sales data here is both relevant and helpful. The SRR Report is thus based on sound methodology, performed by a credible expert and has assisted the court in determining whether F&D's actions have affected the Property held by TRG. The court finds that the Property Value is definite, reasonable and the imposition of such damages against F&D is necessary to remedy the loss incurred by TRG.

2.    *Compensatory Damages Related to the Motion*

The court may also compensate TRG for the damages that it has incurred in successfully prosecuting the Motion. These damages consist of expenses incurred by legal professionals and expenses for expert testimony to support the Motion, such as the SRR Report.

a.    Legal Fees Related to the Motion

Generally, the 'American Rule' governs the awarding of attorney's fees in federal courts. The 'American Rule' provides that each party should bear the cost of its litigation. Thus, in the United States, the prevailing litigant is ordinarily not entitled to collect the reasonable attorney's fees from the loser.

An exception to the general rule applies when a statute specifically provides for the award of attorney's fees. … However, judicially created exceptions to the 'American Rule' apply (1) *when a defendant willfully disobeys a court order* and (2) when a losing party acts in bad faith, vexatiously, wantonly, or for oppressive reasons.

*Watkins v. Guardian Loan Co. of Massapequa (In re Watkins)*, 240 B.R. 668, 678 (Bankr. E.D.N.Y. 1999) (internal citations omitted) (emphasis added); *see also ASARCO*, 135 S. Ct. at 2164; *Walker*, 443 F.2d at 35. TRG was successful in prosecuting the Motion and proving that F&D willfully disobeyed this court's Confirmation Order and, therefore, TRG may recover its attorneys' fees.

The Motion seeks sanctions under section 105 of the Bankruptcy Code, which provides no guidance on how the court should determine awards thereunder. Absent statutory guidance on determining compensatory damages, courts have determined that awards for attorneys' fees "must be 'reasonable and necessary,' and that courts should 'closely scrutinize the fees requested by attorneys for unnecessary and excessive charges.'" *Sucre v. MIC Leasing Corp. (In re Sucre)*, 226 B.R. 340, 351 (Bankr. S.D.N.Y. 1998) (*quoting Price v. Pediatric Academic Assn.*, 175 B.R. 219, 221 (S.D. Ohio 1994)). In order to establish reasonableness of attorneys' fees for matters litigated before the court, courts have often looked to other statutory provisions that deal with determination of reasonable compensation, specifically section 330 of the Bankruptcy Code. *In re Price*, 143 B.R. 190, 192 (Bankr. N.D. Ill. 1992) (Squires, J.), *aff'd sub nom. United States v. Price*, 176 B.R. 807 (N.D. Ill. 1993), *aff'd and remanded sub nom. In re Price*, 42 F.3d 1068 (7th Cir. 1994); *see also Adler v. Roman (In re Roman)*, 283 B.R. 1, 11 (B.A.P. 9th Cir. 2002); *Sucre*, 226 B.R. at 351.

When considering fees under section 330 of the Bankruptcy Code, the court uses the lodestar method to determine reasonableness of compensation. The method calls for the court to

make an initial objective determination as to the number of hours reasonably expended and the reasonable hourly rate. After multiplying the two, the Court may

adjust the product by consideration of several subjective factors. Courts consider the following factors when using the 'lodestar' method:

(1) time and labor required;

(2) novelty and difficulty of the questions raised;

(3) the skill required to properly perform the legal services rendered;

(4) the preclusion of other employment by the attorney due to the acceptance of the case;

(5) the customary fee charges for like work;

(6) whether the fee sought is fixed or contingent;

(7) the time limitations imposed by the client or the circumstances;

(8) the amount in controversy and the results obtained;

(9) the experience, reputation, and ability of the attorney;

(10) the 'undesirability' of the case;

(11) the nature and length of the professional relationship between the attorney and the client; and

(12) attorney fee awards in similar cases.

*Sucre*, 226 B.R. at 351-52 (*citing Lindy Bros. Builders, Inc. of Phila. v. Am. Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 167 (3d Cir. 1973), *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974); *Price*, 143 B.R. at 192-93).

    F&D's objection to TRG's legal fees was broad, based on what was reasonable. No challenge was made under any lodestar factor. Nonetheless, the court will examine all of the damages requested by TRG under the lodestar analysis. In the Seventh Circuit, "[t]he attorney's actual billing rate for comparable work is 'presumptively appropriate' to use as the market rate." *People Who Care v. Rockford Bd. of Educ.*, 90 F.3d 1307, 1310 (7th Cir. 1996). Further, as TRG was successful in asserting the Motion, *Sughayyer v. City of Chicago*, Case No. 09 C 4350, 2012 WL 2359065, at *12 (N.D. Ill. June 20, 2012), the court finds no reason to perform a blanket reduction to fees requested.

    Four law firms worked on the Motion for TRG through the various rounds of litigation.

    As noted above, the court has reviewed the invoices for legal fees that TRG has paid Freeborn and found the work to be relevant and reasonable. Certain work also related to researching municipal law for the Motion, thus requiring a further lodestar consideration. Damages Stmt., Exh. B. The invoices of Freeborn are supported by the affidavit of Gerald P. Callaghan that states that rates billed by Freeborn are $300.00 to $500.00 per hour and that such rates are consistent

with customary charges for similar representation. *Id.* at ¶¶ 9, 17. Under *People Who Care*, those rates are presumably reasonable absent an objection. 90 F.3d at 1310. No challenge has been made to Freeborn's time entries or rates charged and all appear reasonable and necessary to TRG's Motion. Freeborn appeared to bring needed legal expertise to a novel and difficult state law question. TRG is therefore awarded the total $132,577.50 it has paid to Freeborn as damages.

TRG also paid the law firm of Pretzel & Stouffer, Chartered ("Pretzel"). Damages Stmt., Exh. C, at ¶ 17. Pretzel's services appear to be entirely related to the Motion. Pretzel began working for TRG in July 2016 and worked with other counsel to file the Motion. Pretzel also presented all arguments at the Trial. The invoices provided include time entries for which TRG does not seek full compensation because such work performed was not 100% relevant to F&D litigation.[7] An affidavit signed by Edward B. Ruff, III supports TRG's request for compensation for fees paid to Pretzel. *Id.* at pp. 2-9. In the affidavit, Ruff states that the rates of counsel working for TRG range from $275.00 to $350.00 per hour and that such rates are commensurate with litigation assistance in the community. *Id.* at ¶¶ 9, 18. Again, no specific challenge was made to the time entries or rate paid by TRG to Pretzel. The court has reviewed all compensation paid to Pretzel, other than the work already excluded by TRG, and it is reasonable and necessary to TRG's efforts in pursuing the Motion. Pretzel's litigation expertise and experience was beneficial to the efficient resolution of the matter before the court. TRG's payments to Pretzel for $111,339.24 in compensation and $398.41 in expenses are therefore compensable.

VanDyke, mentioned above, worked with Pretzel on the continued litigation of the Motion. TRG has requested compensation based on time billed by VanDyke which is supported by an affidavit of VanDyke. Damages Stmt., Exh. D. VanDyke discounted his rate from $680.00 to $500.00 per hour for TRG and states that such rates are comparable for the assistance given to TRG in the community. *Id.* at ¶¶ 9, 20. These rates are not challenged by F&D, nor are any of VanDyke's time entries challenged specifically by F&D. The time billed by VanDyke for work related to the Motion was helpful in successfully litigating the Motion and is reasonable and necessary. VanDyke's history in this matter allowed for continuity of representation. The court finds no need to reduce TRG's request and thus TRG is awarded the total $283,222.50[8] it seeks as reimbursement for amounts paid to VanDyke's firms. *See id.* at ¶ 19.

Last, TRG paid the law firm of Vedder Price P.C. ("Vedder") for work done from June 2016 to July 2017. Damages Stmt., Exh. E, at ¶ 18. Vedder worked with Pretzel to present TRG's case at the Trial and has filed the Motion and almost all of TRG's subsequent briefings. Vedder supplied the bankruptcy expertise required by this matter. In the invoices submitted by TRG, Vedder did not seek compensation for certain identified time entries because those entries did not relate to F&D's efforts against TRG. The remaining entries coincide with Vedder's efforts in this court. And both the time entries and expenses appear reasonable and necessary. The amounts for which TRG does seek to be compensated for is supported by the affidavit of William W. Thorsness, who states that

---

[7]     Due to the method of indicating entries that were partially reduced, the invoices submitted by Pretzel in conjunction with the Damages Statement were illegible for such entries. Dkt. No. 4188-8. However, the copies of the same invoices submitted by TRG in conjunction with the Trial, TRG Exh. No. 10, are complete and legible.

[8]     $269,972.50 for VanDyke's work while he was with Dentons and $13,250.00 for his work with Polsinelli.

the rates charged by Vedder vary from $120.00 to $761.15 per hour and are similar to customary rates in the community. *Id.* at ¶¶ 10, 19. TRG is awarded the $187,738.50 in compensation and $3,063.31 in expenses f it has paid to Vedder, as voluntarily reduced, as damages in pursuing the Motion.

    b.  <u>Consultant/Expert Witness Fees</u>

    Last, TRG seeks damages in the amount of $194,300.00 for Consultant Fees. Damages Stmt., at pp. 17-18. Again, F&D objects solely on the basis of reasonableness and necessity, and presents no contrary evidence. F&D's Closing, at p. 24. As such, the court need only consider the Consultant Fees under the standard already discussed as applicable.

    In the Damages Statement, the Consultant Fees are supported with a listing of consultants that TRG has employed, Damages Stmt., at p. 17, and a monthly breakdown of costs incurred. *See* TRG Costs Summary. At the Trial, Kyte testified that the Consultant Fees included the preparation of the SRR Report and that all of the expenses alleged as Consultant Fees related to F&D's actions. Tr. at pp. 71-72, Aug. 29, 2018 PM. Kyte's testimony regarding the consultants that TRG has had to employ and thus actually pay, based on the unique litigation in which F&D joined TRG, was credible. When given a chance to cross Kyte with respect to these expenses, F&D did not. The court has reviewed the evidence and finds no instance of unrelated or unreasonable charges. The court therefore concludes that the Consultant Fees were paid and are reasonable. TRG may recover the $194,300.00 in has paid consultants based on the prosecution of the Motion.

CONCLUSION

    TRG has, therefore, demonstrated to the court that it incurred a total of $1,263,086.54 in reasonable legal fees and expenses that were necessary and related to F&D's efforts against TRG.[9] These fees are the product of TRG's legal efforts in defending the State Court Lawsuits and TRG's pursuit of the Motion, from the date of the Demand Letter to August 2, 2017, and TRG is entitled to an award of the same for actual and compensatory damages. TRG further incurred actual damages in the amount of $194,300.00 paid for Consultant Fees, $362,382.00 paid for Project Management Fees and $7,720,000.00 in lost Property Value. The total amount TRG is entitled to recover, and for which F&D is liable, as damages under the Motion is $9,539,768.54.

---

[9]    The amount summarized in the Kyte Affidavit is less than the sum of the requests for each law firm. Having reviewed the request of TRG for the efforts of each law firm and finding them to meet the applicable standards, and without an explanation of which firm would bear the reduction sought by TRG, the court awards the total of these individual requests rather than the lower amount requested by TRG.

Having considered the arguments of the parties at the Trial and in accordance with the court's factual findings, it is the conclusion of the court that TRG is entitled to an award of damages via the imposition of sanctions on F&D in the manner described herein. A separate order to that effect, and lifting the interim stay of this court's previous order requiring dismissal of the State Court Lawsuits, will be entered concurrently herewith.

Dated: January 3, 2019

ENTERED:

Timothy A. Barnes
United States Bankruptcy Judge